# Status Report
# by the
# *Nunez* Independent Monitor

**January 13, 2026**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Elly Davis
*Junior Analyst*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Sarah Geisler
*Junior Analyst*

Dennis O. Gonzalez
*Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Associate*

Emmitt Sparkman
*Subject Matter Expert*

**Table of Contents**

**Introduction** .................................................................................................**1**

- Background ................................................................................. 1
- Update on the Appointment of a Remediation Manager.................. 3
- DOC's Dysfunctional Culture and Management Structure................. 4
- Current State of Affairs ................................................................ 7
- System and Operational Improvements ....................................... 10
- Reemergence of Past Practices ................................................... 12
- Monitor Recommendations for Priority Areas of Focus to Advance the Reform Effort  15
- Organization of the Report......................................................... 16

**Maximizing Staff Deployment** ................................................................**18**

- Background on DOC's Staffing Practices..................................... 18
- DOC's Current Staffing Numbers & Staff Absenteeism................. 19
- Unmanned Posts & Staff Off Post ............................................... 22
- Excessive Use of Overtime ......................................................... 25
- Conclusion ............................................................................... 26

**Assessment of the Department's Use of Force and Security Practices** .............**28**

- Department's Findings Regarding Problematic Security Practices & Use of Force ...... 29
- Trends in UOF and Violence Metrics, 2016-2025 ......................... 37
- Monitoring Team's Assessment of Security and Use of Force ......... 43
- The Monitoring Team's Ongoing Concerns about DOC's Use of Force and Security Practices ................................................................. 45
- Conclusion ............................................................................... 51

**Managing Behavior of People In Custody** ..............................................**54**

- Incentivizing Positive Behavior Among People in Custody ............ 54
- Managing People with Known Propensity for Violence.................. 56
- Local Regulations Regarding Housing for Individuals Involved in Serious Acts of Violence ................................................................... 71
- Conclusion ............................................................................... 75

**Death of People In Custody**....................................................................**76**

- Assessments of Deaths............................................................... 76
- DOC's Mortality Rate and Objective Evidence of Deaths ............. 79

- Summaries of Deaths in 2025 ................................................................. 80
- Incidents of Self-Harm ......................................................................... 87
- DOC's Efforts to Address Acts of Self-Harm ........................................ 88
- Conclusion .............................................................................................. 91

## Advancing the Nunez Reforms & Assessing Compliance .................................92

- Role and Responsibilities of Defendants and the Monitor ..................... 92
- Monitoring Team's Assessment of Compliance ...................................... 95
- Re-Organization and Prioritization of the *Nunez* Court Orders .................114
- Conclusion ............................................................................................116

## Update on the 2023 *Nunez* Court Orders ........................................................118

- June 13, 2023 Order (dkt. 550) ............................................................118
- August 10, 2023 Order (dkt. 564) ........................................................ 121
- October 10, 2023 Order (dkt. 582) ....................................................... 123
- December 14, 2023 Order (dkt. 656) ................................................... 123
- December 20, 2023 Order (dkt. 665) ................................................... 124

## Compliance Assessments .................................................................................125

- Facility Leadership Responsibilities (First Remedial Order § A., ¶ 2) ......................... 125
- New Use of Force Directive (Consent Judgment § IV., ¶ 1) ................... 134
- Independent Staff Reports (Consent Judgment § V., ¶ 2) ...................... 145
- Providing Medical Attention Following A Use of Force Incident (Consent Judgment § V., ¶ 22) ........................................................................................ 159
- Interim Security Plan (Second Remedial Order ¶ 1(i)(a) and Action Plan § D., ¶ 2(a))162
- Searches and Identify/Recover Contraband (Action Plan, § D., ¶ 2(d) and (e)and August 10, 2023 Order, § I., ¶ 2) ...................................................................... 174
- Escort Procedures (Action Plan § D., ¶ 2(f) and August 10, 2023 Order, § I., ¶ 3)...... 189
- Facility Emergency Response Teams (First Remedial Order § A., ¶ 6) ..................... 195
- Revised De-escalation Protocol (First Remedial Order § A., ¶ 3) ................................ 206
- Young Adults - Prevent Fight/Assault (Consent Judgment § XV., ¶ 1) ........................ 213
- Young Adults - Direct Supervision (Consent Judgment § XV., ¶ 12 & First Remedial Order § D., ¶ 3) ........................................................................... 219
- Young Adults - Consistent Assignment of Staff (Consent Judgment § XV., ¶ 17 & First Remedial Order § D., ¶ 1) ........................................................................... 226
- Screening & Promotions (Consent Judgment § XII., ¶¶ 1-3) .................. 235
- Supervision of Captains (First Remedial Order § A., ¶ 4 and Action Plan § C., ¶ 3 (II-III)) ...................................................................................................... 245
- Improved Routine Tours (Action Plan, § A., ¶1(d)) .................................... 254

- Facility Use of Force Reviews (First Remedial Order § A., ¶ 1)................................... 261
- Investigations Of Use Of Force Incidents (Consent Judgment § VII., ¶ 1, § VII., ¶ 9 (a) & § VII., ¶ 11) ................................................................................................................. 269
- Early Warning System (Consent Judgment § X., ¶ 1)................................................... 292
- Timely, Appropriate and Meaningful Accountability (Consent Judgment § VIII., ¶ 1 & § VIII., ¶ 3 (c)) .................................................................................................................. 302
- Immediate Corrective Action & Monitor Recommendations (First Remedial Order § C., ¶ 1 & C., ¶ 2)................................................................................................................. 323
- OATH Proceedings (First Remedial Order § C. 4/Third Remedial Order, ¶ 2, First Remedial Order § C., ¶ 5 & Third Remedial Order, ¶ 3)............................................. 331
- Trials Division Staffing (Consent Judgment § VIII., ¶ 4)............................................. 343
- Maximizing Deployment of Staff - Reduction of Uniformed Staff in Civilian Posts (Action Plan § C., ¶ 3(vii))........................................................................................... 347
- Maximizing Deployment of Staff - Awarded Posts (Action Plan § C., ¶ 3(v))............. 359
- Maximizing Deployment of Staff - Maximize Work Schedules (Action Plan § C., ¶ 3(vi)) ........................................................................................................................... 371

**Conclusion**............................................................................................................................**374**

**Appendix A: Comprehensive List of Provisions** .............................................................**376**

- Comprehensive List of "Select Group of Provisions" & Provisions Subject to the Court's 2024 Contempt Order ................................................................................................... 377

**Appendix B: Use of Force and Violence Indicators** .......................................................**383**

- Table 1: Number and Rate of UOF .............................................................................. 384
- Table 2: Number and Proportion of A, B, and C Uses of Force. .................................. 385
- Table 3: Number and Rate of Stabbings and Slashings ................................................ 386
- Table 4: Serious Injuries to Inmates............................................................................. 387
- Table 5: Number and Rate of Fights ............................................................................ 389
- Table 6: Number and Rate of Assaults on Staff with UOF ........................................... 390
- Table 7: Number and Rate of Assaults on Staff without UOF....................................... 391
- Table 8: Uses of Force Involving Incidents When a Staff Member is Not on Post ......... 392
- Table 9: Number and Rate of Fires .............................................................................. 393

**Appendix C: In-Custody Deaths** .....................................................................................**394**

- Table 1: Causes of Death ............................................................................................. 395
- Table 2: Mortality Rate ................................................................................................ 396

- Table 3: Corrective Action Taken by DOC Related to In-Custody Deaths - 2022-2025 .. 397

## Appendix D: Use of Force Reviews & Investigations .......................................399

- Table 1: Outcomes of Rapid Reviews Conducted by the Facilities .................................. 400
- Table 2: Corrective Actions Recommended via Rapid Reviews Conducted by the Facilities .................................................................................................................................... 401
- Table 3(a): ID Supervisors Assigned to UOF Cases ....................................................... 402
- Table 3(b): ID Investigators Assigned to UOF Cases ...................................................... 402
- Table 4: Summary of ID Hires and Departures ............................................................... 403
- Table 5: Status of Investigations of UOF Incidents ........................................................ 404
- Table 6: Status of Full ID Investigations ........................................................................ 405
- Table 7: Law Enforcement Referrals .............................................................................. 406
- Table 8(a): Results of Intake Investigation Audits by Date of Initial Intake Investigation .................................................................................................................................... 407
- Table 8(b): Number of Intake Investigation QA Audits Completed ................................. 408
- Table 9(a): Results of Full ID Investigation Audits by Date of Initial Full ID Investigation .................................................................................................................................... 409
- Table 9(b): Number of Full ID Investigation QA Audits Completed ............................. 410
- Table 10: Outcome of Intake Investigations .................................................................... 411
- Table 11: Investigation Findings .................................................................................... 412
- Table 12: Use of Force Incidents with Charges ............................................................. 414

## Appendix E: Data Related to Responses to Staff Misconduct ........................415

- Table 1: Accountability for Staff's Use of Force Related Misconduct ............................ 416
- Table 2: Immediate Corrective Action ........................................................................... 417
- Table 3: Suspension ....................................................................................................... 418
- Table 4: Accountability for High Level Supervisors ....................................................... 419
- Table 5(a): Command Disciplines Recommended by Rapid Reviews ............................ 420
- Table 5(b): Reasons that Command Disciplines Recommended by Rapid Reviews Were dismissed, Closed Administratively, or Not Entered into CMS ....................................... 421
- Table 6(a): Command Discipline Recommended by Other Sources ................................ 422
- Table 6(b): Reasons that Command Disciplines Recommended by Other Sources Were dismissed ....................................................................................................................... 423
- Table 7: Formal Discipline ............................................................................................. 424

- Table 8: Number of Cases Pending with the Trials Division ............................................ 425
- Table 9: Timeliness of Formal Discipline, by Incident Date ............................................ 426
- Table 10: Time that Cases Were Pending with the Trials Division Prior to Case Closure 427
- Table 11: Time that Current Cases Have Been Pending with the Trials Division ............ 428
- Table 12: Disposition of Formal Discipline Cases ........................................................ 429
- Table 13: Penalties Imposed via NPA for Use of Force Related Misconduct.................. 430
- Table 14: Cases Resolved via NPA with Provisions for CD or Expungement ................. 431
- Table 15: Outcome of Closed Action Plan § F, ¶ 2 Cases.................................................. 432
- Table 16: OATH Pre-Trial Conferences................................................................................ 433

## Appendix F: Staffing ..............................................................................................435

- Table 1: Number of ADWs ....................................................................................................... 436
- Table 2: Number of Captains ................................................................................................... 437
- Table 3: Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA ............. 438
- Table 4: Location of Awarded Posts ...................................................................................... 439
- Table 5: PIC-Facing Awarded Posts in Facility ................................................................. 440
- Table 6: Housing Unit Awarded Posts .................................................................................. 441
- Table 7: Triple Tours .................................................................................................................. 442
- Table 8: Overtime Spending ..................................................................................................... 443
- Table 9: Department's Average Daily Population and Staffing Levels ........................... 444
- Table 10: Training Academy Graduates................................................................................. 445
- Table 11: Attrition ....................................................................................................................... 446

## Appendix G: Leadership Appointments ..........................................................447

- Leadership Appointments – January 2022 to January 5, 2026 ......................................... 448

## Appendix H: Update on Processing of New Admissions ...................................454

- Length of Stay in Intake for Male New Admissions ......................................................... 455
- Length of Stay in Intake for Female New Admissions...................................................... 457
- Temporarily Suspending New Admission Processing, a.k.a. Clock-Stoppage................. 458
- NCU's Audits to Verify Data Entry ...................................................................................... 459
- Recent Updates at EMTC .......................................................................................................... 461

- Conclusion ............................................................................................... 461

## Appendix I: Updates on Technology Initiatives ...............................462

- Security & Operations Initiatives ....................................................... 463
- HR, Administration & Training Initiatives ........................................ 465
- Health Management Division (HMD) ................................................ 466
- Investigations & Legal ........................................................................ 467
- Finance & Procurement ....................................................................... 467
- Upcoming Projects................................................................................ 467

## Appendix J: Overview for January 2025 OATH Pre-Trial Conference of 2023 UOF Incident .................................................................................469

- Overview for January 2025 OATH Pre-Trial Conference of 2023 UOF Incident............ 470

## Appendix K: Staffing Summary ...............................................................477

## Appendix L: Illustrative Case Examples ...............................................495

- Illustrative Example 1: UOF Incident on Dorm Unit in March 2025.............................. 496
- Illustrative Example 2: UOF Incident on Dorm Unit in February 2025....................... 499
- Illustrative Example 3: UOF Incident on Dorm Unit in February 2025........................ 502
- Illustrative Example 4: UOF Head Strike Incident in April 2025 ................................... 506
- Illustrative Example 5: UOF Head Strike Incident in May 2025 ................................... 509
- Illustrative Example 6: UOF Head Strike Incident in June 2025 ................................... 512
- Illustrative Example 7: UOF Narcan Incident in January 2025....................................... 515
- Illustrative Example 8: UOF Prohibited Hold Incident in March 2025 ......................... 519
- Illustrative Example 9: UOF Prohibited Hold Incident in June 2025............................. 523
- Illustrative Example 10: UOF & Self-Harm Incident in March 2025 ............................. 527
- Illustrative Example 11: UOF & Self-Harm Incident in May 2025 ................................ 531
- Illustrative Example 12: UOF & Self-Harm Incident in November 2024....................... 535
- Illustrative Example 13: Serious Injury to Individuals in October 2025 ........................ 539
- Illustrative Example 14: UOF Serious Injury to Staff in February 2025........................ 546
- Illustrative Example 15: UOF Incident in December 2025 .............................................. 550
- Illustrative Example 16: UOF Incident in December 2025 .............................................. 555

- Illustrative Example 17: UOF Incident in February 2025 ................................................ 558
- Illustrative Example 18: UOF Avoidable OC Usage Incident in October 2025 .............. 562
- Illustrative Example 19: UOF Improper Takedown Incident in April 2025 .................... 566

## INTRODUCTION

This is the Monitor's 20th compliance assessment for the period January to June 2025 (either "20th Monitoring Period" or "Monitoring Period"), covering the Department's efforts to advance its progress toward compliance with the *Nunez* Court Orders.[1]

This report is being filed during a critical and uncertain time for the Department. The Court recently issued an Order to appoint a Remediation Manager (dkt. 938) and the Mayor has not yet announced who he will appoint as the Department's Commissioner. The next few months will be instrumental for the City's new leadership in determining how best to support the Department's efforts as it works with the Remediation Manager, the Monitoring Team, and various stakeholders to develop a roadmap that moves the Department toward compliance with the Contempt Provisions. The Monitoring Team looks forward to collaborating with the Remediation Manager and the new Administration and continuing to provide ongoing support to help the Department achieve the intended reforms.

### BACKGROUND

This report is filed just over 10 years after the Consent Judgment was entered in fall 2015. Much has occurred during this period: five Commissioners have led the agency, countless other leadership changes have occurred, at least 10 Remedial Orders have been issued, numerous efforts to address the requirements of the *Nunez* Court Orders have been initiated, and over 50 Monitor's Reports have been issued.

In 2020, the COVID-19 pandemic contributed to extraordinary levels of fear, stress, illness, and a resulting staff absenteeism crisis, further compounding the problems facing the

---

[1] *See*, Court's July 10, 2025 Order (dkt. 879).

Department and degrading the jails' already poor conditions. The jails became particularly volatile beginning in summer 2021, when the rates of use of force, injuries, and interpersonal violence skyrocketed, and the leadership of the agency was both unstable and chaotic.

In August 2021, for the first time outside of its routine reporting, the Monitoring Team issued a Special Report to the Court regarding its grave concerns about the conditions in the jails. Between August 2021 and December 2023, the Monitoring Team went on to issue approximately 20 Special Reports[2] about the conditions in the jails and the deterioration of the Department's efforts to work collaboratively with the Monitoring Team and to maintain transparency regarding the agency's actions.[3]

The first status conference with the Court on the conditions in the jails occurred in September 2021, with eight additional status conferences convened through the end of 2023, regarding the conditions in the jails and the agency's degrading transparency with the Monitoring Team.[4] On December 20, 2023, the Court issued an Order finding the Department in contempt for failing to collaborate with the Monitoring Team (dkt. 665).[5] The period between 2021 and

---

[2] *See*, Monitor's August 24, 2021 Report (dkt. 378); Monitor's September 2, 2021 Report (dkt. 380); Monitor's September 23, 2021 Report (dkt. 387); Monitor's October 14, 2021 Report (dkt. 403); Monitor's November 17, 2021 Report (dkt. 420); Monitor's December 1, 2021 Report (dkt. 429); Monitor's March 16, 2022 Report (dkt. 438); Monitor's April 20, 2022 Report (dkt. 445); Monitor's May 26, 2023 Report (dkt. 533); Monitor's May 31, 2023 Report (dkt. 537); Monitor's June 8, 2023 Report (dkt. 541); Monitor's June 12, 2023 Report (dkt. 544); Monitor's June 12, 2023 Report (dkt. 546); Monitor's July 10, 2023 Report (dkt. 557); Monitor's August 7, 2023 Report (dkt. 561); Monitor's October 5, 2023 Report (dkt. 581); Monitor's November 8, 2023 Report (dkt. 595); Monitor's November 15, 2023 Report (dkt. 599); Monitor's November 30, 2023 Report (dkt. 616); and Monitor's December 8, 2023 Report (dkt. 639).

[3] The Monitoring has not filed any Special Reports regarding the conditions in the jails since January 2024. The Monitor has filed various reports to the Court regarding the status of its work with the Parties regarding the pending motion practice and its assessment of Local Law 42.

[4] These status conferences took place on: September 16, 2021; December 2, 2021; April 26, 2022; May 24, 2022; November 17, 2022; April 27, 2023; June 13, 2023; August 10, 2023; December 14, 2023. Two status conferences in 2024 addressed the pending motion for contempt and appointment of a Receiver.

[5] Through the leadership of Commissioner Maginley-Liddie, the Department was able to purge the contempt finding. *See* Court's February 27, 2024 Order (dkt. 680).

2023 was marked by extraordinary instability and danger in the jails, efforts to stifle accountability and transparency, and myriad problems that stymied effective reform—a true crisis at all levels. The current Commissioner was appointed in December 2023.

UPDATE ON THE APPOINTMENT OF A REMEDIATION MANAGER

Litigation regarding the motion for contempt and appointment of a Receiver was initiated on August 10, 2023, when the Court granted Plaintiffs' application to move for contempt regarding certain provisions of the *Nunez* Court Orders ("the Contempt Provisions").[6] The Court issued an Order of Contempt on November 27, 2024. The Parties and the Monitoring Team were then directed to meet and confer regarding potential remedial relief.[7] The Court rendered a determination regarding remedial relief on May 13, 2025, and issued an order explaining that the Court would empower a skilled outside professional, named the "*Nunez* Remediation Manager," to assume primary responsibility and authority for achieving compliance with 18 Contempt Provisions. *See* May 13, 2025 Order (dkt. 846) at pg. 35. The Court then directed the Parties and the Monitoring Team to meet and confer about the proposed order and to provide objections and feedback. On September 11, 2025, the Monitoring Team provided a report containing proposals for the Court's Remediation Manager Order, Memoranda of Law from Defendants and the Plaintiff Class, along with an updated Summary of Receiverships. *See* Monitor's September 11, 2025 Report (dkt. 906). On December 18, 2025, the Court announced that it was actively

---

[6] Plaintiffs and S.D.N.Y. filed their initial brief on November 17, 2023 (dkts. 601 to 610). The motions were fully briefed on May 30, 2024. Following several meet and confers convened by the Monitoring Team, the Parties each filed a revised Statement of Facts and Plaintiffs filed a Supplemental Statement of Facts on July 30, 2025 (dkts. 762 to 764). On September 25, 2024, the Court held oral arguments.

[7] The Monitoring Team convened a series of meet and confers with the Parties to discuss potential remedial relief in December 2024 and January 2025. The Parties filed competing proposals on January 24, 2025, along with subsequent filings by the Parties and various *amici* in February, March, April, and early May 2025.

reviewing applicants for the Remediation Manager position and issued a revised Order regarding the responsibility and authority of the Remediation Manager.

**DOC'S DYSFUNCTIONAL CULTURE AND MANAGEMENT STRUCTURE**

Throughout the tenure of this case, the Monitoring Team has consistently reported on the Department's poorly functioning systems and ineffective practices and procedures which combine to form a deeply entrenched culture of dysfunction that has persisted across decades and many administrations. These deficiencies have been normalized and embedded across many facets of the Department's operations, persistently impeding reform efforts. Two recent examples of uses of force that occurred in December 2025 illustrate the toxicity that lies at the center of the culture that must be reformed. In these incidents, body-worn camera footage captured staff engaging in deceptive and unethical conduct, underscoring the dysfunctional practices that must be eliminated:

> **Attempt to Conceal Apparent Use of Excessive Force**: *Staff attempted to escort a restrained individual back to the holding area after court. The individual resisted by twisting and pulling away, eventually breaking free, but was then taken down to the ground by staff.* **Body-worn camera footage captured one officer (whose camera was improperly attached to his uniform and partially obstructed) yelling, "Don't leave marks," followed by visual footage of another officer apparently kicking the individual while he was restrained and on the ground.** *Once staff appeared to recognize the presence of the camera, they then began referencing a "face injury" and a "finger injury," that the staff allegedly sustained during the takedown. This is case example 16 in Appendix L.*

> **Deceptive Use of OC Spray**: *Staff were escorting a fully restrained individual back to his housing area when he dropped to the floor in the housing vestibule, refused orders to stand, and began convulsing multiple times. Staff appeared to dismiss this behavior as malingering. In full view of six other officers, a correction officer sought entry into a sanitation closet although the door had already been secured, and a key was used by another officer to open the door. Although in a blind spot for stationary cameras, the officer who sought entry into the closet was captured on body-worn camera with his left leg bent and he appeared to be spraying chemical agents onto the sole of his shoe in the sanitation closet. The officer immediately thereafter exited the closet and stood*

*immediately adjacent to the individual who was still fully restrained on the floor and placed the contaminated left boot next to the individual's face. Although the chemical agents did not appear, at that time, to affect the individual, surrounding staff began coughing while collectively pretending that no OC spray had been deployed. A few moments later the individual began convulsing and staff turned him on his side and moved him closer to the sanitation closet and nearer to what appeared to be orange boot prints on the floor in front of the closet. The individual can be heard on video claiming that there is OC on the floor. The same officer was then captured on body-worn camera applying a painful wrist-bend technique to the individual who screamed in pain. The officer calmly instructed the individual, "Don't resist, sir." This is case example 15 in Appendix L.*

There were no *physical* injuries in either incident and both were classified as Class C incidents. It is important to emphasize that just because there were no physical injuries, it does not mean that these incidents do not pose harm. The coordinated misconduct carried out openly in the presence of other staff, normalization of deception to conceal unnecessary and excessive uses of force, and a collective willingness to misrepresent events despite extensive surveillance, including body-worn cameras and stationary cameras, is demonstrative of a toxic culture. This culture perpetuates practices that are fundamentally incompatible with staff's constitutional and ethical obligations.

To be certain, the issues stymying reform are complex, with many "problem centers" that are inextricably intertwined and layered. Finding effective and sustainable solutions to such complex interwoven problems necessitates peeling back the layers of dysfunction to uncover the core problems and then developing sound and appropriate methods to correct them. The Department, thus far, has been unable to do so, and absent these foundational reforms, has been unable to materially improve the problem areas targeted by the Consent Judgment. The dysfunction that has characterized the Department's capacity to manage the reform effort remains steadfastly in place. The Monitoring Team has previously reported on these dynamics in detail, and, unfortunately, they remain unchanged. The analysis provided in prior Monitor

Reports[8] reflects the current state of affairs and the details are not repeated herein. Generally, the Department continues to:

- normalize poor practices and conditions,

- normalize high rates of violence and uses of force,

- be unable to construct a clear and candid assessment of the current state of affairs,

- be unable to identify and address problems proactively,

- lack elementary skills at all levels of the operation,

- struggle with ongoing staff skepticism and lack of buy-in to the reform effort,

- struggle with entrenched poor practice and/or inconsistent practice,

- struggle with effective deployment and assignment of staff,

- be unable to hold uniform leadership accountable or improve uniform leadership management,

- operate without an overall operational plan or set of priorities that is consistent and well thought-out,

- perpetuate a revolving door of Department and facility leadership,

- be in a perpetual state of crisis, and

- be mired in significant bureaucracy.

---

[8] *See,* for example, the Monitor's Reports filed on June 8, 2023 (dkt. 541) at pgs. 15 to 38, July 10, 2023 (dkt. 557) at pgs. 142 to 165, and November 30, 2023 (dkt. 616) at pgs. 12 to 23.

The many facets that permeate the Department's culture and operations that must be reformed underscore the complexity of the challenge to both protect the safety of the people in custody and to properly equip the staff with the skills and mindset needed for safe and humane operation of the jails.

## CURRENT STATE OF AFFAIRS

The reform effort continues to progress at a glacial pace. Internal and external obstacles, pervasive poor practices, and an entrenched culture that opposes and/or resists reform continue to hobble the Department's ability to materially improve the jails' conditions with the necessary level of urgency. Although key metrics continue to reflect high rates of violence and other serious incidents, it must be acknowledged that progress has been made in certain areas since the height of the 2021 crisis. These improvements are summarized in the section below, and many are described in detail in other sections of this report.

The risk of harm to people in custody and staff continues to be unreasonably high and is reflected in a variety of security metrics, internal audits and investigative findings, and the Monitoring Team's independent analysis of a panoply of data, incidents, and information. Below, the Monitoring Team provides summaries of several recent incidents that illustrate the risk and actual harm faced by both staff and incarcerated individuals. These examples were selected from hundreds of similar incidents reviewed by the Monitoring Team and are reflective of pervasive issues, not isolated events.

- **Assault on Staff Member in February 2025**: *In February 2025, in the OBCC mess hall during dinner service, an individual in custody suddenly ran up from behind and struck an officer in the head with his fists without provocation and while dozens of other individuals were present. The officer immediately collapsed face-down to the floor and appeared to be unconscious. Multiple officers responded at once, deployed chemical agents on the assailant, and took him to the ground to apply restraints, while other staff*

*moved to assist the injured officer. As the assailant was being restrained, several nearby individuals attempted to advance toward and assault him, requiring officers to physically intervene and use chemical agents on additional individuals to secure the area and push the crowd back. More officers arrived and carried the injured officer out of the mess hall, while other staff separately escorted the restrained assailant from the area. Residual chemical agents caused coughing and irritation among individuals remaining in the mess hall. Medical evaluation confirmed the officer sustained severe head and facial injuries, including significant swelling and trauma requiring hospital transport and subsequent admission to intensive care. This is case example 14 in Appendix L.*

- **Fight & UOF on an Unmanned Post in February 2025**: *In February 2025 at EMTC, a fight broke out between individuals in the bathroom area of a dorm housing unit when no officer was supervising the housing area (i.e., the B post was temporarily unmanned). The A station officer entered the housing area. When the officer stepped out of the A station, she failed to secure the door behind her. Once in the housing area, the A-station officer escorted a victim out of the area. The victim had a severe injury to the face with active bleeding, which can be seen on video. Additional staff arrived and escorted the victim out of the area. During this response, another individual in custody left the housing area without authorization, stood in the vestibule, and told a responding supervisor that he wanted to be rehoused. An officer then arrived, applied restraints, and escorted that individual through multiple corridors and stairwells toward another housing area, at times maintaining only a one-hand escort hold. Staff paused outside of a different housing area to wait for the housing area door to be opened. As the door was unlocked, the individual immediately pulled away from the staff. The officer pulled him toward a wall and secured him against it while the individual twisted and turned in resistance. While being held by the wall, the individual began banging his head against the surface, causing staff to briefly pull him away from the wall. The self-injurious behavior was not reported, and despite such behavior, the individual was not kept under continuous observation. The individual was later taken to a holding pen and produced for delayed medical evaluation more than eight hours after the incident, where he refused medical care. This is case example 2 in Appendix L.*

- **Serious Injury to Incarcerated Person with Major Security Lapses in October 2025**: *In October 2025, a serious injury to an incarcerated person occurred in a housing area at GRVC after an officer opened a cell door on the upper tier and allowed multiple individuals in custody to freely exit/enter cells and move about the tier. The video shows two individuals entering the cell and remaining inside unsupervised. About one minute and 15 seconds after the individuals entered the cell together, an officer opened the cell and addressed the individuals, but no one exited the cell. The officer then sat at the B-post desk. The video at this time captured other individuals in the same cell, indicating*

*that the officer failed to address this issue on multiple occasions. Approximately two minutes after sitting at the B-Post desk, an individual in custody appeared to alert the Officer to check on the same cell. When the officer returned to the cell and opened the door, the perpetrator exited the cell with blood on his clothing. The officer then entered the cell, and body-worn camera video captured the victim of the assault, seated and the victim exited the cell with blood on his clothing and severe facial injuries. Medical staff documented extensive injuries, including a forehead hematoma, a periorbital hematoma with the eye swollen shut, facial lacerations, and a fractured nasal bone, requiring hospital treatment. This is case example 13 in Appendix L.*

Furthermore, the jails continue to be operated without the consistent application of basic and sound correctional practices by staff and supervisors. DOC's Consultants', James Austin Ph.D.[9] and Gary Raney,[10] recently reported observations, consistent with the Department's *Nunez* Compliance Unit ("NCU") audits and the Monitoring Team's observations that the Department's staff and supervisors fail "to follow basic jail management policies." They further

---

[9] James Austin, Ph.D., is a nationally recognized expert on population management, classification and restrictive housing. He was retained by DOC in 2021 pursuant to the Second Remedial Order (dkt. 415). He has provided the Court with two declarations outlining his work with DOC. *See*, Declarations of James Austin dated August 8, 2023 (dkt. 109-1) and March 13, 2024 (dkt. 689-9). The declarations highlight his recommendations to DOC regarding a violence reduction strategy. While certain initiatives recommended by Dr. Austin have been implemented and continue to be in place (*e.g.*, the RESH housing unit), others have never been adopted by the City or DOC (*e.g.*, recommendation to reduce the population and implementing a behavioral health unit), and still others were initially reported to be implemented but the underlying problems appear to have returned (*e.g.*, Dr. Austin declared on March 19, 2024 that DOC blends housing units so that no one gang dominates a housing unit, but DOC has since reported that housing by gang affiliation continues to occur and it once again wants to eradicate that practice by reinstituting a blending strategy).

[10] Gary Raney is the former Sheriff for Ada County, Idaho and has served as a monitor in two cases pertaining to correctional facilities and the receiver in a case pertaining to the conditions of confinement in the Miami-Dade County, Florida jail system. He initially filed a declaration in support of Plaintiffs' motion for appointment of a receiver, stating that his role as "[t]he Independent Compliance Director [in Miami-Dade County] was necessary to achieve important reforms in the MCRD in short order. These changes could not be accomplished with the Monitors alone, and certainly not on the rapid timeline that we pursued." *See*, Declaration of Gary Raney dated May 26, 2024 (dkt. 718-22), ¶ 9. Mr. Raney was subsequently retained by DOC as a Consultant to the Commissioner "to assess [the Department's] operations to identify system deficiencies or opportunities for improving correctional practices and policies, in furtherance of improving the safety and security of persons in custody (PIC) and staff" and to develop plans "in order to persuade the Court to delay implementation of receivership, or alternatively accelerate the termination of the receivership if the Court ends up installing the remediation manager." *See*, Declaration of Gary Raney dated April 25, 2025 (dkt. 841-1), ¶ 3 and the City Online Record *available at* https://a856-cityrecord.nyc.gov/RequestDetail?RequestId=20251117032. Mr. Raney subsequently filed a declaration in support of the Defendants' application for the appointment of an Independent Compliance Director. *See*, Declaration of Gary Raney dated April 25, 2025 (dkt. 841-1). Mr. Raney has worked with DOC to develop certain plans and initiatives that are discussed in this report.

affirmed the Monitoring Team's longstanding findings that the agency struggles with "challenges of [ensuring appropriate] expectations [for staff], favoritism, apathy, and other beliefs that allow staff to avoid working where they are needed and doing what they should be doing."

The NCU security audits demonstrate little to no change in problematic staff practices since the audits were initiated in 2022. The Investigation Division's ("ID") investigations of UOF incidents and the facilities' Rapid Reviews of use of force incidents repeatedly identify lapses in security practices and violations of Department policy. The circumstances surrounding most of the 15 in-custody deaths in 2025 reflect the worst possible outcomes of the dereliction of duty, including staff being off post, failure to supervise, failure to enforce basic lock-in procedures, presence and use of dangerous contraband, a lack of staff urgency in response to emergencies, and potential failures to provide basic medical care by DOC and CHS staff, among others. Both these tragic deaths and the persistent, daily risk of harm faced by those in custody fuel the Monitoring Team's continued recommendation that the Department prioritize certain issues for immediate remediation. The areas in greatest need of attention are discussed at the end of this section of the report.

The effort and commitment of many DOC leaders and staff is clear and there have been pockets of progress (discussed below and throughout this report.). However, to date there has not been sufficient forward momentum to counteract the gravitational pull of the Department's many dysfunctional practices and entrenched cultural opposition to reform.

SYSTEM AND OPERATIONAL IMPROVEMENTS

An accurate assessment of the current state of affairs must also include a recognition of progress along with an accounting of ongoing concerns. Accordingly, from 2024 through the current Monitoring Period, the Department has taken many concrete steps to improve the jails'

management and support the necessary reform with new policies, training, staffing initiatives, and technology. These include:

- **Population Management**: The Department took several steps to manage its population by increasing capacity to accommodate individuals who languished awaiting transfer to the state prison system;[11] improving the quality of certain housing areas at NIC to increase meaningful interaction and enable congregate programming; expanding elements of the RNDC Action Plan to other young adult units; stabilizing the Special Management unit; and opening an Honors Dorm to pilot a program to better incentivize positive conduct.

- **Improvements in Key Metrics**: Various violence indicators, including the system-wide use of force rate, the rate of slashings and stabbings, and other key metrics, continue to be lower than the apex of the 2021 staffing crisis. This is particularly true at EMTC and RMSC.

- **Policy Development and Quality Assurance**: The Department increased staffing in its Policy and Procedure Unit to expand capacity for policy development and revision. Important work is underway to modernize the Department's incident reporting process, which has involved collaboration amongst many stakeholders across various Divisions. The *Nunez* Compliance Unit has also expanded the scope of its audits. These structural changes offer essential support to facility operations.

- **Security**: Staff use of Body-Worn Cameras was significantly expanded, supported by updated technology and expanded practice audits. Mail operations were centralized in an attempt to reduce the introduction of dangerous contraband. Visiting Operations were overhauled and a new online visit scheduling system was introduced. Facilities are utilizing their own staff and supervisors to respond to crises and are relying less on Emergency Response Teams.

- **Reporting, Investigating and Addressing Staff Misconduct**: ID has maintained its highly qualified leadership and important steps have been taken to elevate the quality of the work of the division and to address poor practice from the past to ensure that misconduct is properly identified. Nearly 1,000 Intake Investigations from ID's backlog were closed and investigators received additional training and supervision. The Trials Division's use of force-related disciplinary backlog is at an all-time low and the time to close cases continues to be reduced.

---

[11] In 2025, staffing issues in the New York State prison system significantly impacted the Department's population as discussed in more detail in the "External Factors that Impact Department Operations" of the "Advancing the Nunez Reforms & Assessing Compliance" of this report.

- **Staffing**: Various efforts to improve staff wellness and retention were implemented including wellness centers, employee recognition, a staff band, and work to develop childcare-related supports. DWs and ADWs were promoted and received improved and Monitor-approved promotional training programs, and 270 new correction officers graduated from the Academy. The Staff Efficiency Committee continued to untangle issues related to civilianization, and TDY staff were frequently redeployed to facilities to address shortages in uniform staff coverage. Staff's use of sick leave and indefinite sick leave have been significantly reduced over the past few years.

- **Training**: Training videos were created and made available to support staff skill-development and promote message consistency. The Training Division developed dozens of lesson plans and curricula to support operations and to prepare staff promoted to various supervisory roles.

- **Technology**: The Department's IT Division has demonstrated important leadership in overhauling the Department's infrastructure. The IT Division continues to modernize its technology infrastructure and reduce reliance on paper documents through dashboards, digitized systems and a new agency intranet. New enterprise data systems are being developed or advanced to improve reporting and tracking in various aspects of operation and staff management, including unit logbooks, infractions, clinic production and FMLA leave.

- **Programming**: Record numbers of people in custody obtained their high school equivalency degrees, tablet access was expanded, and multiple cohorts of people in custody have graduated from the PAWS program in which they reside and work with rescue dogs. The Department expanded its partnerships with the City's various children's museums to facilitate off-island visits between people in custody and their children, and to improve spaces for children visiting their family members on the island.

**REEMERGENCE OF PAST PRACTICES**

In this case, a disturbing pattern under various DOC administrations continues to repeat itself such that, as conditions worsen and efforts to advance reform begin to stall, DOC leadership attempts to limit transparency and candor. This began in 2021[12]. The situation became progressively worse in 2022 and 2023 as the Department then started to minimize the concerning

---

[12] *See*, Monitor's December 6, 2021 Report at pgs. 121 to 122. Finding, among other things, in Fall and Winter 2021, communication and coordination between the Department and Monitoring Team were strained and these lapses negatively impacted the work of the Monitoring Team.

issues occurring in the jails, diverted responsibility by attempting to shift blame for the Department's failures to external actors, including the Monitoring Team, and attempted to limit the independence of the Monitor. The Department began to provide false and/or misleading information and, in some cases, mischaracterized the record.[13] These actions, along with others by the Department, led the Court to find DOC in contempt in December 2023. *See*, December 20, 2023 Order (dkt. 665) and the transcript of the December 14, 2023 Status Conference at pgs. 52 to 60. More recently, the Department's current administration has made some progress in managing the *Nunez* Court Orders, but as its ability to advance reforms and change practice slowed, previous patterns of attempting to limit transparency, minimize issues, divert responsibility, and use false/misleading information and mischaracterizations of the record appear, in some instances, to have reemerged.

The Department has repeatedly pledged that it is committed to advancing the reform effort, that success in advancing the reform requires transparency and collaboration with the Monitoring Team, and that practices repudiated by the Court are in the past.[14] Yet, even with these pledges, and the purported safeguards put in place to ensure that such practices would not reemerge, they, in fact, have in some cases.

The Safety Plan produced by the Department in August 2025 raises concerns about the Department's commitment to advancing reform. The Safety Plan included some valid observations and initiatives, but overall, it appears to attempt to normalize the current poor conditions and to repeat arguments that have been repudiated by the Court *multiple times*,

---

[13] *See*, for example, Monitor's November 30, 2023 Report (dkt. 616).

[14] *See*, for example, Transcript of December 14, 2023 Court Conference at pg. 32: 15-20; and 45:11-20, the Commissioner's Message to Staff included in the Monitor's February 26, 2024 Report (dkt. 679) at Appendix A, and Declaration of Commissioner Lynelle Maginley-Lidde, dated March 19, 2024 (dkt. 689-1) at ¶ 9.

including minimizing the inherent danger in the jails' conditions and shifting the blame for the lack of progress to external actors and factors. For example, arguments were put forward to minimize in-custody deaths and to excuse poor security practices and problematic use of force practices and rates. The Department's security and use of force practices are discussed in more detail in the "Assessments of the Department's Use of Force and Security Practices" and "Death of People In Custody" sections of this report and the compliance assessments of the "New Use of Force Directive" and "Security Plan".

The Department subsequently worked with its Consultants, Mr. Raney and Dr. Austin, (collectively referred to as DOC's Consultants) on a series of recommendations to purportedly achieve compliance with the *Nunez* Court Orders in response to a draft review of this report. The recommendations essentially sought to reaffirm the arguments from the Department's Safety Plan (*e.g.* minimizing the scope of the issues facing DOC and shifting blame for the lack of progress), repeat various legal arguments from the Defendant's opposition to the motion for contempt/appointment of a receiver (*e.g.* that the Court should not appoint a Remediation Manager or should delay the appointment of a Remediation Manager), and advocate for the return to past practices previously repudiated by the Court (*e.g.* curtail transparency, lower standards to assess compliance, and limit the Monitor's independence and give DOC at least some authority over the Monitor).

DOC's Safety Plan and its work with its Consultants is premised, at least in part, on false and misleading information, mischaracterizations of the record, inaccurate claims about the Orders in this case, and legal arguments and judicial findings not rooted in the law. The presence of these recurring issues in DOC's work is particularly concerning, given DOC affirmed that its staff checked and verified the accuracy of the work **<u>and</u>** the Commissioner's repeated pledges to

the Court and the Monitoring Team that these practices were in the past. DOC's ongoing attempts to perpetuate failed past practices, legal arguments and to normalize and minimize current conditions (discussed throughout this report) in combination with attempts to limit staff's candor and engagement with the Monitoring Team (discussed in other sections of this report) is deeply disturbing.

These efforts by the Department are a squandered opportunity, counter-productive, and demonstrate an apparent unwillingness to repudiate the deeply embedded culture and advance the reform effort. It is antithetical to both the Monitor's role and responsibilities for the Monitor to engage the DOC, City, or their retained consultants in any way on such matters or to otherwise promote or endorse initiatives that seek to reintroduce and/or reinforce failed past practices that were previously repudiated by the Court, and that ultimately serve to undermine the *Nunez* Court Orders and stifle or impede the reform effort.

### MONITOR RECOMMENDATIONS FOR PRIORITY AREAS OF FOCUS TO ADVANCE THE REFORM EFFORT

To advance the reform effort, the Monitoring Team reiterates its long-standing recommendations to prioritize certain areas for immediate remediation as summarized below:

- **Strategic Plan:** An overarching plan that clearly defines the reform priorities for the Department and outlines how leadership, staffing, and resources will be allocated to address those priorities in a deliberate and systematic way.

- **Practices that Elevate Safety:** Officers and Captains must properly manage and supervise housing units to reduce interpersonal violence among incarcerated people and assaults on staff and ensure the housing units are safely managed. Supervisors must adopt a skill-development focus when supervising their subordinates. Consideration should be given to development of a larger organization management strategy by the Department and Remediation Manager, in consultation with the Monitor.

- **Basic Security Practices:** Basic and sound security practices must become embedded in staff's routine duties on the housing units.

- **Number of Available Staff:** Staff absenteeism must continue to be curtailed, and the number of staff deployed to housing unit posts and others that engage with the incarcerated population must be maximized.

- **Staff Assignment and Service Provision**: Tour Commanders and Control Room Captains must ensure that sufficient numbers of staff are assigned to housing unit posts and to ancillary posts that provide access to off-unit services. Service provision must become consistent and reliable.

- **Use of Force**: Unnecessary and excessive use of force must be reduced, focusing on reducing the use of high impact force, including head strikes, and the Department must consistently implement the requirements of the UOF Directive. Staff must develop a greater understanding of proportionality and must use the least amount of force necessary to address an extant threat.

- **Ownership of the Reform Effort**: Facility Leadership must be more directly involved in managing their staff to identify and remediate poor practice. Elevating and changing staff practice will require an infusion of correctional expertise in a form that reaches more broadly, deeply, and consistently into staff practice than Facility Leadership has been able to accomplish to date.

- **Investigation Triage**: The Department must continue to reduce investigative caseloads by effectively allocating resources to investigations according to incident severity. A pilot that implements this concept is underway and should be expanded as appropriate.

- **Timely Accountability**: Accountability for staff misconduct must be imposed closer in time to the incident(s) in which misconduct occurred.

- **Collaboration:** The Department must engage both the Remediation Manager and the Monitoring Team in a transparent and collaborative manner that maximizes their respective abilities to support the Department's work. Absent such a commitment, the synergy required to advance the reform will remain elusive.

ORGANIZATION OF THE REPORT

Detailed discussions about the current state of the jails and key aspects of the Department's functioning are discussed in the next section of this report, followed by a discussion about the Monitoring Team's approach to assessing compliance and where relevant the recommendations offered by DOC's Consultants. That section is followed by updates on various practice areas and detailed compliance assessments for provisions of the *Nunez* Court Orders. This report includes the following specific sections:

- Maximizing Staff Deployment
- Assessment of Department's Use of Force & Security Practices
- Managing Behavior of People in Custody
- Death of People in Custody
- Advancing the *Nunez* Reforms & Assessing Compliance
- Update on the 2023 *Nunez* Court Orders
- Compliance Assessment with Select Provisions of the *Nunez* Court Orders
- Conclusion

This report includes the following appendices:

- Appendix A: Comprehensive List of Provisions
- Appendix B: Use of Force and Violence Indicators
- Appendix C: In-Custody Deaths
- Appendix D: Use of Force Investigations
- Appendix E: Data Related to Responses to Staff Misconduct
- Appendix F: Staffing
- Appendix G: Leadership Appointments
- Appendix H: Update on Processing of New Admissions
- Appendix I: Updates on Technology Initiatives
- Appendix J: Overview for January 2025 OATH Pre-Trial Conference of 2023 UOF Incident
- Appendix K: Staffing Summary
- Appendix L: Illustrative Examples of Various Incidents

# MAXIMIZING STAFF DEPLOYMENT

Progress toward the goals and requirements of the *Nunez* Court Orders can be advanced only when an adequate number of staff are supervising those in custody and carrying out the jails' day-to-day operations. The Monitoring Team has long reported that the Department struggles to manage its large number of staff productively, to deploy them effectively, to supervise them responsibly, and to elevate the base skill level of its staff.[15] All of these have a direct, detrimental impact on the Department's ability to reduce the level of violence and ensure the safety and well-being of staff and incarcerated individuals.

## BACKGROUND ON DOC'S STAFFING PRACTICES

In 2022, a staffing expert retained by the Monitoring Team conducted an initial staffing analysis of DOC's practices. The staffing report was the first initiative that attempted to concretely untangle and identify the underpinnings of the Department's mismanagement of staff deployment. The report identified that DOC has a series of unique practices that must each be closely examined and addressed. The report specifically looked at and addressed these unique facets of DOC's staffing practices.[16] The staffing report determined that DOC does not have a reasonable accounting of the security posts that are actually necessary to manage the jails, nor an accurate or reliable operative relief factor (a calculation determining how many full-time correctional officers are needed to provide continuous 24/7 coverage for a single security post)

---

[15] *See*, for example, the Monitor's May 11, 2021 Report (dkt. 368) at pgs. 10 to 14.

[16] DOC's Consultants claim the staffing report was of "little value" because it did not consider the unique facets of DOC's staffing practices. This is baseless. In order for the staffing expert to render his findings, he reported reviewing myriad materials and extensively meeting with Department staff in order to reach his conclusions. The review of materials included review of the relevant labor contracts, local laws regarding staffing, local regulations regarding staffing from oversight boards, DOC policies, tables of organizations, DOC's budget proposals and annual reports, among other materials.

because of the various intricacies of DOC's staffing practices and mismanagement of staff absenteeism. The report also found that efficient deployment of staff was inhibited by the Department's practices, including among other things, those related to Awarded Posts, staff's work schedules, and the use of uniform staff in positions that could be reasonably filled by civilians. Finally, the report identified the need for the Department to conduct a post analysis in order to provide critical information on the number and duties of each post in the facility as well as the number of uniform staff needed to ensure adequate coverage. Many of the staffing requirements in the Action Plan were developed to ensure the Department addressed the findings of the 2022 staffing report.

The Monitoring Team has been working to understand all these factors because they are both complicated and interconnected. To support the overall goal of improving staff efficiency, the Monitoring Team has produced a summary of the following practices:

- Post Assignments,
- Scheduling,
- Overtime,
- Time Keeping, and
- Obtaining Resources.

The goal of this summary is to support the necessary capacity to address these staffing issues given DOC's unique and complicated practices. This summary is attached as Appendix K.

**DOC'S CURRENT STAFFING NUMBERS & STAFF ABSENTEEISM**

During this Monitoring Period, the Department had an average of 5,935 uniform staff on the payroll, which is a 42% decrease since the 8th Monitoring Period (January to June 2019) when the Department had an average of 10,268 staff. The uniform headcount declined for many

reasons including retirements, voluntary departures, medical separations, terminations and rectifying clerical errors in staff's employment status. Coupled with new staff hiring that has not kept pace for a variety of reasons, these dynamics have resulted in a significantly smaller uniform workforce. Appendix F includes Tables 10 and 11 that reflect the number of new uniform graduates from 2013 to June 2025 as well as the attrition of uniform staff by rank from 2020 to the present. Correctional systems around the country have reported similar declines in the number of uniform staff on their payrolls. Although the number of people in custody has also declined, the larger decrease in the size of the workforce has reduced the ratio of uniform staff to persons in custody from 1.37 in 2019 to 0.83 in 2025. A graph that reflects the total number of staff as well as the average daily population of those in custody is presented in Appendix F, Table 9. That said, the Department continues to have one of the largest complements of uniformed staff that the Monitoring Team has encountered in its decades of working in the field. In fact, DOC's Consultants report that it is "'puzzling' that, despite the fact that DOC's staff-to-inmate ratio (almost 1 to 1) is well above the national ratio of 1 to 4, DOC reports staffing shortages and fails to follow basic jail management policies." DOC's Consultants go on to reiterate prior findings by the Monitoring Team that "[t]he staffing shortages are not a personnel problem; they are a resource allocation problem."

The Department's ability to efficiently deploy its staff in the facilities on any given day is impacted by a multitude of issues—from the need to address anticipated and unanticipated gaps in coverage to the convoluted, paper-driven system for timekeeping. These issues are governed by internal rules and policies, collective bargaining agreements, and a variety of local, state, and federal laws. Many of the Department's staffing policies and protocols are typical of a correctional operation. However, the Department's particular assignment practices (*e.g.*,

assigning staff to roles that do not directly supervise incarcerated individuals, even when housing unit posts are not covered), tracking, and enforcement of the various regulations are burdensome and unreliable, creating loopholes that contribute to numerous gaps in coverage that require reassigning staff from other duties (*e.g.*, recreation, escorts, ancillary services), requiring staff to work significant overtime, or worst case, leaving housing unit posts unmanned.

The Department has continued to address and sustain improvements to some of the policy and procedural weaknesses that underlie its problem with staff absenteeism, including managing sick leave and modified duty (*i.e.*, MMR). The Department has also taken concrete steps to untangle problems related to Personal Emergencies ("PE") and Family Medical Leave Act ("FMLA") use.[17] The work of the Staff Efficiency Committee is also continuing to untangle and improve the Department's staffing plan and hiring practices in order to address various interrelated staffing issues.

Unfortunately, as the Department's ability to manage certain staffing issues has improved, new issues regarding staff absenteeism emerged with FMLA and Personal Emergency leave. DOC has made significant efforts to better manage FMLA use and has started to also improve its practices in managing Personal Emergency leave, but large numbers of staff still do not report to work on any given day. During this Monitoring Period, *each day,* an average of 370 staff were out sick, 147 staff were out on FMLA, 39 staff were on Personal Emergency, eight staff were AWOL, and 248 staff were on MMR status (*See* Appendix F, Table 3). It is important to note the staff absenteeism numbers do not account for staff who are out on scheduled vacation or are

---

[17] The Department has developed and adopted a new policy to manage and track FMLA. It was implemented on June 15, 2025.

permitted to come in late when they have worked a double shift.[18] The Department also struggles to maintain sufficient numbers of supervisors as discussed in the compliance assessment for First Remedial Order (dkt. 350), § A, ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3. The supervisory ranks also struggle with absenteeism and are plagued with significant overtime.

**UNMANNED POSTS & STAFF OFF POST**

Two situations routinely occur throughout the jails where people in custody are left unsupervised—first, when a housing unit does not have a staff person assigned because of insufficient numbers of staff reporting to work, and second, when staff leave their assigned post without being properly relieved. Leaving a housing unit unstaffed or unmanned, however briefly, should never occur. Further, pursuant to the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 6, staff are not permitted leave their assigned post without the permission of a supervisor, and those staff assigned to housing unit posts are not permitted to leave their post until they have been properly relieved or an exigent circumstance exists. On October 20, 2023, the Department issued a teletype regarding staff's obligations to remain on post until properly relieved, and that abandoning one's post may result in disciplinary action.

Despite these efforts, staff continue to be found off post across all facilities and can be easily observed leaving their posts on Genetec video. The table below shows the number of NCU's random security audits conducted between January 2022 and June 2025, and the proportion identifying that staff were off post.

---

[18] Time Due is an approved delay in arrival that occurs when a staff member previously worked a double shift—they are guaranteed at least 10 hours off before starting another shift.

| NCU Security Audits' Findings regarding Staff Off Post *January 2022-June 2025* | | |
|---|---|---|
| **Date Audited** | **# of NCU Audits Completed** | **# of Audits that found Staff Off Post** |
| January-June 2022 | 59 | 42 (71%) |
| July-December 2022 | 37 | 32 (86%) |
| January-June 2023 | 19 | 14 (74%) |
| July-December 2023 | 31 | 26 (84%) |
| January-June 2024 | 37 | 28 (76%) |
| July-December 2024 | 34 | 20 (59%) |
| January-June 2025 | 30 | 17 (57%) |

NCU's findings of staff off post indicate that this problem remains pervasive. Over 50% of the random audits during the current Monitoring Period found that staff were off post for some period of time. While the proportion of audits finding staff off post has decreased, the fact that over half of the audits continue to detect a practice that should *never* occur, absent exigent circumstances, is alarming.

When staff are off post, they are not maintaining the safety and security of those individuals in the housing unit, and are unable to abate any possible issues, such as medical emergencies or interpersonal conflicts, as they arise. For instance, during this Monitoring Period, at least 114 uses of force occurred when a staff member was not on post as shown in Table 8 of Appendix B. Below, the Monitoring Team provides an example of an incident that occurred with a staff off post. This example was selected from other similar incidents reviewed by the Monitoring Team and is not an isolated event. In fact, additional examples of incidents occurring when staff are not on post are also included in other sections of this report.

**Fight On Housing Unit Without Staff Present Resulting in UOF with Head Strikers in May 2025**: *In May 2025 in a housing unit at OBCC, an altercation occurred when an officer was not present in the housing area. One individual slapped another near the shower area, prompting the second individual to throw objects and later retrieve a broom from an unsecured janitor's closet. The individual struck the first person with the broom, breaking the handle, after which the first individual pursued him and repeatedly punched him in the face and cornered him against a wall. When an officer entered the housing area to intervene, the broom-wielding individual suddenly punched the officer in the face, leading the officer to grab the individual's shirt and deliver several closed-fist strikes to his head and face before securing him against the wall. A third individual then picked up the broken broomstick and struck the restrained individual in the head twice as the officer attempted to escort him out of the housing area. All individuals in custody involved refused evaluation and none had visible injuries. The officer reported tenderness and swelling. This is case example 5 of Appendix L.*

The fact that in this Monitoring Period over 100 incidents occurred when staff were not on post is concerning. While the number of incidents may only appear to be a small proportion to the overall number of use of force incidents in this Monitoring Period, that is not the appropriate context to view such incidents. In each of these cases, the appropriate context to consider is that the staff's absence in each of these cases means that all such incidents were potentially avoidable, because had staff been present and conducting their duties appropriately, they may have been able to prevent, deter or mitigate the incident that led to the use of force.

EXCESSIVE USE OF OVERTIME

Another indicator of the problematic allocation of staff is the Department's reliance on overtime. Staff in the facilities report routinely being required to work overtime on a second shift, and in some cases, end up working at least part of a third shift. There were 240 instances in this Monitoring Period where staff worked into a third shift and over 20.28 hours (*See* Appendix F, Table 7).[19] In this Monitoring Period, *overtime payouts averaged over $26 million per month for uniform staff* (*See* Appendix F, Table 8).[20] DOC estimates that it will spend approximately $325 million in overtime for uniform staff in calendar year 2025. Notably, in fiscal year 2025 (July 2024-June 2025), over 200 staff (including a Deputy Warden, 30 ADWs, 72 Captains, 55 Correction Officers, and 59 operations staff) earned *more* than the Commissioner of the Department in large part because of overtime payouts.[21] More detailed staffing data can be found in Appendix F of this report.

The significant amount of overtime worked by members directly impacts the wellbeing of the workforce. Staff and leadership routinely report the fatigue, stress, family disruption, and tremendous work-life imbalance that result from the ongoing accumulation of a tremendous number of hours worked. It not only creates an unmanageable cycle of absenteeism/overtime but also undercuts any effort to ensure that staff arrive to work with the appropriate mindset, patience, physical wellness, and alertness that the job demands. Conversely, the additional

---

[19] The Department uses 20.28 hours as a marker to identify staff that worked two full 8-hour shifts and *at least* half of a third 8-hour shift. The reason the Department makes this calculation is that most staff working into a third shift may not work the *whole* third shift, but the Department wanted to identify those staff that are working beyond two full shifts.

[20] The month in which overtime is paid does not always reflect the month in which the overtime was worked by staff given lags in the processing and payment of overtime. However, the overall total of overtime paid is so large it certainly reflects a significant amount of overtime worked.

[21] This information was compiled through an assessment of https://www.seethroughny.net/payrolls.

income earned via overtime can become a perverse incentive to continue to perpetuate the imbalance and endure the toll taken on the individual staff member.

The Department has reported that there are procedures in place to monitor the use of overtime by staff which are discussed in more detail in Appendix K. While some procedures are in place, the Monitoring Team strongly recommends that the use and management of overtime must be more closely scrutinized and that additional focus on limiting the use of overtime and reducing potential opportunities for abuse be identified and implemented.

CONCLUSION

Significant work remains for DOC to adequately deploy and manage its staff. Short-term and discrete initiatives that are essential include the need to conduct a staffing analysis, which has been languishing for years.[22] The Department reports it is now putting out a bid for procurement of a staffing analysis.[23] Further, continued work to address the discrete items required by the Action Plan should also support DOC's efforts to properly deploy its staff. A compliance assessment regarding the Department's efforts to reduce the use of uniform staff in civilian posts, reduce the use of Awarded Posts, and maximize staff schedules is included in the individual compliance assessment for each of these provisions in this report.

---

[22] A staffing analysis is necessary to provide critical information on the number and duties of each post in the facility as well as the number of uniform staff needed to ensure adequate coverage and the calculation of an accurate relief factor. DOC's Consultants appear to be concerned that addressing concrete recommendations such as a staffing analysis will distract from broader initiatives that may *also* be necessary to ensure efficient deployment and supervision of staff. The Monitoring Team believes such concerns are unfounded. Addressing the systemic issues inherent in this agency will necessarily involve broader initiatives *and* a series of discrete initiatives, including identifying the number and duties of each post within a command.

[23] The Monitoring Team has repeatedly requested information about the Department's procurement for a staffing analysis and the corresponding documentation. This request for information remains outstanding for over six weeks despite DOC's repeated reports to the Monitoring Team that the requested information already exists and can be produced.

Additional work, beyond these discrete matters, is clearly necessary. DOC's Consultants echoed recommendations from the Monitoring Team by recommending that additional areas for exploration regarding staff management practices must include evaluating "the entitlements granted over decades of collective bargaining, including unlimited sick time, and the cultural challenges of expectations, favoritism, apathy, and other beliefs that allow staff to avoid working where they are needed and doing what they should be doing." DOC's Consultants conclude that "[m]ajor organizational changes are needed to address core problems, including a lack of well-trained, well-supervised correctional staff consistently deployed in the housing units."

The Monitoring Team has recommended for years that more work to maximize deployment of staff is needed. The Department and incoming Remediation Manager, in consultation with the Monitoring Team, should prioritize initiatives focused on maximizing staff deployment, improving DOC's supervisory structure, and developing a sustainable structure for the overall operations of the Department.

## ASSESSMENT OF THE DEPARTMENT'S USE OF FORCE AND SECURITY PRACTICES

The Department's use of force and security practices are deeply interconnected, and weaknesses in one inevitably compromise the other. Poor security practices create disorder and conditions where violence becomes more likely and contribute to the need to use force that could have ultimately been avoided, but for the poor security practices.

When staff employ sound security practices, they reduce opportunities for interpersonal violence and minimize the need for force. The Department's ability to safely and effectively operate the jails and to use force appropriately depends on its ability to maintain safe, orderly environments through consistent, proactive security practices as well as ensuring that force is used only when necessary and is proportional to the threat. Unfortunately, ongoing poor security practices and the use of excessive and unnecessary force in the jails continue to contribute to a high risk of harm to both persons in custody and staff.

Much of the harm occurring in the jails is the result of poor security practices in which staff do not properly utilize security hardware (*e.g.*, locks and gates), supervise and control the environment, enforce basic requirements, or search and escort people according to sound correctional practice. Staff too frequently do not have control of housing areas or other areas they supervise. This failure to enforce basic security practices fundamentally breaches their responsibility to protect individuals from harm. The Monitoring Team has reported on the deficiencies in basic security practices for years. Unfortunately, little to no progress has been made in improving security practices within the Department. Accordingly, the detailed assessment provided in the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 22-26 continues to reflect the current state of affairs.

28

The Department's use of force practices remain an area of concern; uses of force still occur far too frequently and troubling practices resulting in unnecessary and excessive force remain deeply entrenched. The overall risk of harm related to the use of force, the overarching target of the reform effort, remains all too high.[24] However, after nearly 10 years since the Consent Judgment went into effect, there are signs that staff's use of force practice has started to change as explained further in this report and in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 15 to 22.

### DEPARTMENT'S FINDINGS REGARDING PROBLEMATIC SECURITY PRACTICES & USE OF FORCE

A foundational component of the reform effort is the requirement that the Department properly identify and investigate staff's practices and use of force to identify any potential violations and then to impose appropriate consequences and/or work with staff to improve those unsound practices. Below is a summary of the Department's findings and actions during the current Monitoring Period. When reviewing these findings, it is important to note that while the Department has made some progress in its ability to identify potential violations, it does not reliably detect all problems with staff practice, which means that this data does not capture the entire universe of violations of Department policy.

- **Immediate Corrective Action for Staff Misconduct**: For incidents that occurred in the 20th Monitoring Period, the Department took 2,391 immediate corrective actions for UOF-related misconduct. This includes three placements on modified duty or no inmate contact, 28 suspensions, 305 command disciplines, and 2,024 counseling and corrective

---

[24] It is important to emphasize the assessment of the Department's use of force must consider the impact of the use of force and not merely focusing on whether an individual involved in the incident sustained a physical injury. The fact that an individual did not sustain an injury during a use of force does not negate the fact that the force may have been unnecessary or excessive nor does it avoid the disruption that every use of force creates for the smooth operation of the jails and essential service delivery.

interviews. These numbers include corrective action recommended by ID and Rapid Reviews.

- **Action by the Investigation Divisions Regarding UOF Incidents**: For incidents that occurred in the 20th Monitoring Period, ID took some corrective action or referred a case for a Full ID investigation for 2,791 uses of force, which is 78% of all incidents that occurred. Additionally, ID determined that at least 246 incidents involved excessive and/or unnecessary force by staff and/or may have been avoided had staff taken different actions, which is 7% of all incidents that occurred. There are 256 investigations still pending for incidents that occurred during this Monitoring Period, 88% of which are Full ID investigations. As discussed in other sections of this Report, ID's assessments still do not appear to identify all relevant violations so additional violations likely occurred but were not identified.

- **Rapid Review Findings by Facility Leadership of UOF Incidents**: For incidents in the 20th Monitoring Period, Rapid Reviews recommended 3,089 corrective actions for 1,666 staff members. The Rapid Reviews identified a policy and/or procedural violation in 1,896 uses of force during this Monitoring Period, which was 53% of all incidents that occurred. In addition, the Rapid Reviews determined that 171 uses of force during this Monitoring Period may have been avoided had staff taken different actions, which is 5% of all incidents that occurred. This is notable given that the Monitoring Team finds that while the Rapid Reviews do identify some violations, they consistently fail to identify *all* violations and avoidable incidents.

- **Command Disciplines Recommended via Other Sources**: For incidents that occurred in the 20th Monitoring Period, staff were referred for 1,069 Command Disciplines from

sources other than the Rapid Reviews, for reasons such as being AWOL, being off post, Departmental property violations, inadequate supervision, inefficient performance of duties, insubordination, tour wand violations, and use of force misconduct identified outside of the Rapid Review process. A total of 692 of these 1,069 Command Disciplines (65%) resulted in substantial penalties or referral for formal disciplinary charges.

- *Nunez* **Compliance Unit Findings of Problematic and Lax Security Practices**: The *Nunez* Compliance Unit continues to audit security practices by randomly selecting a housing unit for a 24-hour period of Genetec review. From January through June 2025, NCU conducted 30 audits, every month NCU audited one audit of each of the five main commands (EMTC, GRVC, NIC, OBCC, and RNDC).

  **The findings of NCU's security audits in this Monitoring Period reflect problematic staff practices, with little to no change, since the audits began in late 2021**. The random audit methodology (rather than selecting units/times that are known to be problematic) provides further evidence of the widespread nature of the problems. The findings of nearly all audits included a combination of the following:

  o *Staff Frequently Abandon Housing Areas*: Officers were routinely off post during varied tours, sometimes for extended periods of time, leaving entire housing areas unsupervised.[25] These findings are also discussed in the "Maximizing Staff Deployment" section and the compliance assessment of Improvement of Routine Tours (Action Plan § A, ¶ 1(d)) of this report.

---

[25] The Department reported these situations often occur because either there are insufficient numbers of staff at the beginning of each tour or assigned staff going off post during their tour because of the burden of working double shifts. Other sections of this report describe the Department's efforts to improvement deployment of staff.

o _Cell Doors Left Unsecured During Active Supervision_: Staff generally failed to ensure all cell doors were secured. People in custody were seen moving freely in and out of each other's cells. Some staff even stood near open cells without taking corrective action.

o _Tours Often Incomplete or Performed Incorrectly_: Even when staff conducted tours, they frequently failed to use the tour wand correctly or skipped required wand points. Some staff relied solely on visual checks without using the wand, especially on midnight shifts.[26]

o _Logbooks Consistently Incomplete or Inaccurate_: Required documentation of services (e.g., showers, recreation, legal visits, law library) was frequently missing, even when those services were visibly provided.

o _Supervisor Tours Are Inconsistent in Quality_: While supervisor tours occurred regularly, their quality varied:

   ▪ Some were cursory walk-throughs with no inspection.

   ▪ Others, particularly those by ADWs or above, included more robust checks (e.g., pulling on doors, using flashlights).

o _Senior Leadership Presence Was Sporadic_: While some audits captured meaningful engagement by Wardens, ADWs, and Tour Commanders, such visits were infrequent and their impact on housing area practices was unclear.

---

[26] DOC utilizes a tool called a Tour Wand to track and log housing unit tours. Both NCU as well as the Senior Deputy Commissioner's Office track compliance with the use of the tour wand in order to assess staff's practice with conducting routine tours. NCU correctly identifies and reports when staff fail to follow policy and not use the tour wand even if they physically conduct the tour. Adhere to Department's own policies is essential. In this case, DOC has pointed to this policy as a component of its strategy to achieve compliance with the _Nunez_ Court Orders.

- **Reports from DOC's Leadership of Problematic Security Practices**: NCU's findings are consistent with reports from DOC's leadership. For instance, a veteran Warden, newly assigned to a facility, recently reported to the Monitoring Team her initial observations of practices and operations of her newly assigned facility. She reported that she found staff engage in poor practice and no one corrects them, people in custody are not given clear instructions by staff, and staff move to chemical agents too quickly with no effort to communicate or de-escalate. These observations are consistent with reports from other Department Wardens and the Monitoring Team's own observations and highlight how fundamental lapses in basic supervision, communication, and professional conduct continue to perpetuate the very conditions that fuel dysfunction and force that increase the risk of harm to those in custody.

- **DOC's Lock-in and Lock-out Procedures:** In late 2023, the Department began to focus on properly implementing the evening lock-in (9:00 p.m.) and consulted with the Monitoring Team on its plans as required by the Court's August 10, 2023 Order **§ I, ¶ 4**. The Department elected to focus first on the 9:00 p.m. lock-in before addressing compliance with the 3:00 p.m. lock-in. On October 31, 2023, the Department issued a teletype articulating the requisite procedures and required each facility to devise a lock-in plan. As shown in the graph below, evening lock-in is now better managed than it was in late 2023, with nearly all lock-ins being completed within one hour of the designated time.



While lock-in is reported as generally completed by 10:00 p.m. (within an hour of when it is to occur), incidents continue to occur after lock-ins have ostensibly been completed. DOC leadership routinely report to the Monitoring Team that they identify situations in which individuals in custody are out after lock-in and incidents continue to occur after lock-in. While it is an improvement that lock-in is occurring, the purpose of lock-in is to promote safety and security by ensuring that people in custody *remain* locked in their cells or on their dorm beds overnight. Unfortunately, that still is not occurring as it should be.

- **Failed Door Security Pilot**: The Department's inability to *ensure* staff implement basic security practices, such as lock-in, is starkly represented in the failed Door Security Pilot. Despite the focus and attention of seasoned and strong Department leadership and significant oversight, the pilot in *three* housing units in *three* different jails which focused on ensuring that the doors remained secured failed. Failure to adhere to policy often was

not identified, and even when it was identified recommended accountability was often not processed. Ultimately, the purpose of this pilot was to ensure that staff implemented basic correctional practices. The Department was unable to ensure that staff and supervisors on these housing units consistently secured the cell doors.

- **Poor Control Station Security**: The Department is required to revise and implement a protocol to ensure the Control Station Door is properly secured pursuant to the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 5. The Department has not issued any policy or plan to improve staff practices beyond the issuance of a teletype in October 2023 reminding staff of their obligation to secure the control station doors. Accordingly, there are no new updates beyond those provided in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 180-181.

- **Department's Safety Plan**: Mr. Raney, one of DOC's Consultants, presented a Safety Plan in August 2025 ("Safety Plan") that he reported was developed in consultation with the Department. The Commissioner reported to the Monitor and Deputy Monitor that the Safety Plan reflects the plan of the Department. However, the Department reports that the Safety Plan remains in draft form, as of the filing of this report, and certain recommendations still remain under consideration by the Commissioner.

    While the Safety Plan does include some useful commentary and suggestions, overall, it does not provide any concrete recommendations that would materially advance reform toward the core issues of the *Nunez* Court Orders. In fact, in some areas, it appears to either excuse or minimize the Department's current state of affairs.[27] While the

---

[27] In many cases, the Safety Plan appears to include the same or similar arguments to those made by the DOC Consultant's in their review of the 20th Monitor's Report. The concerns about both excusing and minimizing the current state of affairs is discussed in the "Advancing the Nunez Reforms & Assessing Compliance" section of this report.

Safety Plan does not address staff *practice* regarding security or use of force, it does address the following:

- o Changes to the Department's process and practices for management of incarcerated individuals, including improvements to the classification tool, creation of an Honors Dorm, and further enhancements to the housing units for individuals in custody following acts of violence.

- o Identification of discrete local regulations[28] that inhibit the Department's ability to implement certain security practices related to the introduction of contraband and out-of-cell time.

- o Changes to the Rapid Review process and investigations of use of force with the goal of improving the timeliness of accountability.

- o General improvements related to the analysis of data and increasing accountability within the facilities. The Safety Plan, however, does not identify what specific practices are to be changed to achieve the policy goals.

      To date, the Department has not presented a Security Plan, as first required in September 2021, that addresses *changing* staff practice and improving the Department's security practices as required by the Second Remedial Order ¶ 1(i)(a) and Action Plan § D., ¶ 2(a)).[29] The compliance assessment regarding the Department's obligation to develop and implement a Security Plan in this report also provides additional detail regarding the current conditions and deficiencies

---

[28] This includes Board of Correction Minimum Standards § 1-11(e)(1)(i), § 1-11(e)(3), § 1-09(f), § 1-09(h), § 1-12 and SCOC regulation § 7008.8.

[29] This includes a plan to address "unsecured doors, abandonment of a post, key control, post orders, escorted movement with restraints when required, control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing officer keys and OC spray."

that need to be addressed. The compliance assessment of Searches and Identify/Recover Contraband in this report provides additional detail about the important steps the Department is taking to improve its search practices and procedures.

**TRENDS IN UOF AND VIOLENCE METRICS, 2016-2025**

One component of the Monitoring Team's methodology for assessing the Department's compliance is to evaluate data of key metrics and corresponding trends. To assess quantitative data from the current Monitoring Period, the Monitoring Team utilized three points of comparison.[30] Data underlying each of these graphics is presented in Appendix B.

- **Comparison of 2016 UOF/Violence Metrics**

First, data were compared to 2016 when the Consent Judgment went into effect, when the original use of force definition governed. As shown below, rates of nearly all key indicators are substantially higher/worse than 2016.[31]

---

[30] The DOC's Consultants took issue with this comparison of current rates of various metrics to those in 2016 and 2018 and suggesting that analysis should be limited to comparisons to 2021, five years after the Consent Judgment went into effect. The Monitoring Team provides greater detail on the need for additional comparison points in the "Advancing the Nunez Reforms & Assessing Compliance" section of this report.

[31] Class A, B, and C injury data is *incident based*, meaning that it identifies the number of incidents when one or more injuries occurred, and does not represent the number of injuries. For these reasons, calculating a rate using a denominator of the number of people in custody would not be appropriate, so these data present the proportion of all use of force incidents.



- **Comparison of 2018 UOF/Violence Metrics**

Next, data were compared to 2018 when the New Use of Force Directive (which included a definition for use of force while the prior Directive did not) went into effect.[32] As shown below, rates of nearly all key indicators are substantially higher/worse than 2018.



---

[32] The original Use of Force Directive, 5006R-C, did not affirmatively state what constituted a use of force. It only stated what was *not* considered a use of force "Physical contact between an inmate and employee used in a nonconfrontational manner to apply mechanical restraints or to guide the inmate shall not be reported as a use of force." The new Use of Force Directive, 5006R-D implemented a more prescriptive and expansive definition: "A Use of Force is any instance where staff use their hands or other parts of their body, objects, instruments, chemical agents, electronic devices, firearms, or any other physical method to restrain, subdue, or compel an Inmate to act or stop acting in a particular way. The term 'Use of Force' does not include moving, escorting, transporting, or applying restraints to a compliant Inmate."

- **Comparison of 2021 UOF/Violence Metrics**

Finally, data were compared to 2021 which was the apex of the Department's staffing crisis and a time when rates of violence skyrocketed. As shown below, all key indicators are lower/better than 2021 (the rate of fights is the same).[33] This graphic also includes serious injuries to incarcerated individuals. [34]



UOF rate is 31% lower
% of UOF with A injury is 77% lower
% of UOF with A or B injury is 70% lower
Rate of Stabbing/Slashing is 48% lower
Rate of Fights is the same
Rate of serious injury to inmates is 22% lower
Rate of Assault on Staff w UOF is 35% lower
Rate of Assault on Staff without UOF is 81% lower
Rate of fires is 81% lower

Same/Better than 2021

Worse than 2021

Improvements from the apex of the staffing crisis are important and should be recognized. However, the goal of the Consent Judgment is to improve upon the conditions that existed in 2016, which the City then agreed to remedy. The goal is not to improve upon conditions that further deteriorated years after the reform effort began.

---

[33] The DOC's Consultants repeatedly raise concerns that the Department's progress since 2021 has not been acknowledged by the Monitoring Team. This is simply untrue. This report, as in every other one since 2021, has recognized the Department's progress in reducing the use of force rate in numerous reports: Monitor's May 11, 2021 Report, pgs. 282 and 289; Monitor's June 30, 2022 Report, pgs. 13 and 19; Monitor's October 28, 2022 Report, pgs. 60 and 120; Monitor's April 3, 2023 Report pgs. 36, 48 and 55; Monitors June 8, 2023 Report, pgs. 8 and 11; Monitor's July 10, 2023 Report, pgs. 12-13, 15, 59 and 60; Monitor's December 22, 2023 Report pg. 88; Monitor's April 18, 2024 Report, pgs. 31-32, 60-61, and 153; Monitor's November 22, 2024 Report, pg. 166; Monitor's May 22, 2025 Report, pgs. 13-14.

[34] Serious injuries to inmates include those sustained via accidents, fights, etc. This data does *not* include injuries sustained via the use of force. The Department did not collect this data in 2016 or 2018. The Department also did not collect data on assaults on staff without a use of force in 2016 or 2018.

That conditions in the jails have not further deteriorated from the apex of the staffing crisis in 2021 is obviously positive. However, the rates of fights, stabbings/slashings, and serious injuries continue to be of serious concern. Further, use of force rates have not improved since the Consent Judgment went into effect and as discussed below, qualitative data also reveals that force is used too often, is often used in violation of policy, and in many instances, is used when the use of force could have been avoided.

- **Fights Between Incarcerated Individuals**

The rates of fights between incarcerated individuals is worthy of further examination as it contributes to a high risk of harm. The Department has not made any material progress in reducing the number of fights since the inception of the Consent Judgment.[35] The number of fights has increased since 2016 and the rate of fights during the current Monitoring Period is the *same* as during the apex of the staffing crisis in 2021. The failure of staff and supervisors to operate the housing units utilizing sound correctional practices is a persistent contributing factor to interpersonal tensions that often escalates to violence.

From January 2024 to June 2025, about 50% of all fights occurred in dorm housing units, approximately 35% of all fights occurred in celled housing units and about 15% of fights occurred in other locations within the jails. The Department has recently suggested that excessive idle time and reduced access to programming, particularly in dorm settings, is contributing to the number of fights. DOC further claims that problematic security practices do not appear to be the driving factor of fights in dorm settings.

---

[35] The Department refers to fights as assaults between incarcerated individuals that include punches, kicks, stomps, and assaults with other types of weapons (e.g., broom handles, hot water, etc.). Fights have the potential to cause serious injuries such as broken bones, lacerations, and head injuries and they are also by far the most common type of violence in the jails. Assaults between incarcerated individuals that involve a sharpened weapon are categorized as either stabbings or slashings.

The basis of the Department's belief that problematic security practices are not as pervasive in dorm housing compared to celled housing units is unknown. Given their different layouts and security features, the security and management of the two housing types will obviously differ. [36] However, NCU's housing security audits of six dorm housing areas in this Monitoring Period identified recurring deficiencies, including staff off-post, failure to tour, and perfunctory tours. These findings are consistent with the Monitoring Team's reviews of incidents in dorm housing areas and indicate that addressing the high rate of fights in dorm housing must attend to deficient staff practices that contribute to this form of violence.

From the Monitoring Team's reviews and observations, staffs' and supervisors' poor security practices are pervasive across the system, regardless of housing unit type. Below are examples of several incidents from the current Monitoring Period that illustrate the risk and actual harm faced by both staff and incarcerated individuals in dorm settings as a result of problematic security practices. These examples are not isolated events.

- o *Fight & UOF on an Unmanned Post in Dorm Housing in February 2025*: The introduction of this report includes incident example #2 in Appendix L that reflects a group assault that occurred in the bathroom area of a dorm at EMTC while the housing area was unsupervised/no B post officer on the floor.

- o *Large Scale Fight & UOF with Poor Security Practices in Dorm Housing in March 2025*: In an incident in March 2025, in a dorm housing unit in OBCC, several individuals in custody began to assault another individual repeatedly. The floor Officer failed to intervene promptly, moving about the housing area without urgency and without deploying chemical agents or taking other effective action to stop the assault. When the Officer eventually escorted the victim toward the housing area's door, individuals again rushed toward the victim and delivered

---

[36] The physical layout and basis for placement in celled housing units and dorm units are different. Celled housing units having individual rooms with locked doors for each incarcerated individual while dorm units have one large room with many beds lined up next to one another. The Department's determination on whether to place individuals in dorm or celled housing is based on their classification score, a risk assessment tool that identifies the likelihood that an individual may engage in misconduct within the jail. The dorm housing units are generally utilized for individuals with a minimum or medium classification score while celled housing is used for individuals with a medium or high classification score.

> *further blows, prompting more staff to respond. Staff arrived to secure the area,*
> *but several individuals refused orders to return to their beds. Staff then deployed*
> *chemical agents on these passively resistant individuals from a distance of less*
> *than 3 feet, and utilized an MK-9 cannister, which is prohibited. Most individuals*
> *refused medical evaluation, but those who obtained medical treatment had*
> *various injuries including mild swelling to one person's cheek, a small abrasion*
> *to the forehead, and a delayed report of hand pain that required treatment. The*
> *Rapid Review found the floor Officer did not act promptly to quell the initial fight*
> *and another staff member who failed to open the door to allow the victim to exit*
> *during the disturbance. Investigators noted a number of issues, including delayed*
> *deployment of chemical agents and staff use of profanity captured on body-worn*
> *camera. This is incident is example 1 in Appendix L.*

DOC has also reported its belief that the fights in dorm housing are the result of too much idle time. Dormitory housing for adults does not receive the volume of programming available in other parts of the system (e.g., young adult housing at RNDC, RESH, SMU). This dearth of programming was exacerbated by cuts to the programming budget in 2023. While much of that funding has now been restored, the process for bringing program providers back to the jails has been mired in the City's bureaucracy. DOC's obligations to find strategies to reduce idle time, reduce the number of fights and improve security practices remains, nonetheless.

The primary reason for approximately 40% of all uses of force from January 2024 to June 2025 are reported to be associated with fight interventions. The Department's Safety Plan appeared to suggest that all uses of force to intervene in fights are essentially acceptable because staff have an obligation to intervene to prevent an assault in progress. This is true and required by DOC policy. However, the additional commentary in DOC's Safety Plan that any use of force for the purpose of intervening in a fight must simply be accepted is troubling. Not every use of force in response to a fight is properly executed or proportional, and some fights could be avoided altogether with sound security practices and improved skills for de-escalating interpersonal conflict. Both the dynamics contributing to the fight and the force utilized must be

part of the assessment of each event. The Department has an obligation to: (1) implement interventions to reduce the number of fights and (2) ensure staffs' response to the fight is both appropriate and proportional. Simply because staff have an obligation to intervene when a fight occurs does not automatically mean that the force used was appropriate. The Department's own investigations reflect problematic staff practices when using force to stop fights and, in some cases, practices that contribute to fights occurring in the first place. Accordingly, messaging that suggests blanket approval of force when used to intervene in a fight does not adequately protect people in custody, nor is it consistent with the Department's policies and directives or the reform effort.

Interpersonal conflict is a dynamic inherent in any jail setting and the Department has an obligation to protect individuals in custody from harm associated with such conflict. The current rate of fights cannot be accepted as a reasonable baseline in either celled or dorm housing. The Department has identified *some* of the root causes (e.g., idle time, gang rivalries and other preexisting conflicts from the community, stress from incarceration and frustration from the lack of dependable service delivery) and reports that more programming will be available in early 2026 and efforts to ensure that services become more reliable. However, a far more multifaceted approach to reducing violent interpersonal conflict is needed, including improved security practices, targeted strategies for addressing gang violence and a robust array of consequences that can be deployed in response to an individual's involvement in violent misconduct.

### MONITORING TEAM'S ASSESSMENT OF SECURITY AND USE OF FORCE

The assessment of the Department's use of force must consider a number of contextual factors and other changes in practice as described below and in other sections of this report such as "Advancing the Nunez Reforms & Assessing Compliance." These include:

- A clear definition of UOF that includes a broad range of physical and chemical interventions.

- Improvements in reporting UOF such that most instances of force now appear to be reported.[37]

- "Minor UOF," which are generally low-grade uses of force that do not result in injury now comprise the largest proportion of use of force incidents.

- Fewer Emergency Response Team activations and a commensurate increase in Level A responses, where the incident is handled by facility supervisors and individual responders.

As also explained in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 15-22, since the inception of the Consent Judgment in 2016, the Department has made progress on a variety of provisions of the Consent Judgment that sought to alter staff's behavior with respect to using force (improved training, changes to policies addressing problematic tactics, reduced reliance on Emergency Response Teams, improvements in identifying and investigating force-related misconduct, and improvements to the system for providing and ensuring timely discipline for such misconduct). These changes have altered the Department's use of force practices in several ways:

- The most egregious incidents of excessive use of force have decreased.

- Large, chaotic disturbances involving numerous staff and people in custody with multiple applications of unnecessary or excessive force occur much less frequently.

---

[37] *See* Monitor's November 22, 2024 (dkt. 802) at pg. 16.

- The use of head strikes to retaliate against or punish a person in custody has decreased, although they still occur too frequently.

- Force involving the use of tactical equipment (batons, tasers, OC grenades, stun shields, etc.) is rare.

- Emergency Response Teams and Probe Teams respond to incidents much less frequently and, when they are deployed, team members display hyper-aggressive behavior less often.

- Injuries caused by the use of force occur less frequently.[38]

Positive changes in the Department's use of force practices deserve acknowledgement, not only because they suggest a change in the trajectory of reform but also because incremental steps like these are critical to achieving full compliance with the *Nunez* Court Orders.[39] That said, uses of force still occur too frequently, present an unreasonable risk of harm, and remain intrinsically tied to the Department's entrenched deficiencies in security practices.

### THE MONITORING TEAM'S ONGOING CONCERNS ABOUT DOC'S USE OF FORCE AND SECURITY PRACTICES

During its routine review of use of force incidents, the Monitoring Team also continues to find pervasive unnecessary and excessive uses of force. These are described in detail in the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 29-38 and continue to reflect the current state of affairs. Critically, in this Monitoring Period, the Department has not reported that it has taken

---

[38] As discussed below, the Monitoring Team remains concerned about the unreasonable ***risk of harm*** that is presented by DOC's use of force practices.

[39] The DOC's Safety Plan raised concerns that the Department has not been recognized for the reductions in the use of force rate since the apex of the crisis. This concern appears unfounded as this report, and previous Monitor reports, have identified and described the notable reduction of use of force since the apex of the crisis in 2021. However, the Department's use of force rate remains *significantly* higher than the rate at the time the Consent Judgment went into effect in 2016 or at the time the New Use of Force Directive was adopted in 2018. The interpretation of use of force data in the DOC's Safety Plan focused exclusively on reductions since 2021.

any steps to address or alter staff practice related to force except providing refresher training, which has been slow to roll-out.[40] Further, no progress has been made with respect to improving the basic security practices of staff or supervisors within the jails.

For the reasons outlined below, the Department remains in Non-Compliance with the provision requiring implementation of the New Use of Force Policy. These findings are based on the Monitoring Team's extensive review of information provided by the Department. In order to help illustrate the issues identified below, the Monitoring Team has included references to recent incidents that illustrate the risk and actual harm faced by both staff and incarcerated individuals. These examples included in Appendix L of this report were selected from hundreds of similar incidents reviewed by the Monitoring Team and are reflective of pervasive issues, not isolated events. The Monitoring Team remains concerned about the following specific aspects of the Department's use of force and security practices:

- **Precipitating Staff Conduct and Failure to De-escalate**: Staff often fail to utilize de-escalation effectively and resort to using force as an initial response. Staff also engage in conduct that serves to precipitate or escalate situations that result in the use of force. For example, staff engage in hyper-confrontational, argumentative behavior and have an overall demeanor that often escalate situations rather than using appropriate de-escalation tactics to diffuse the situation. In other cases, in their interactions with PICs, staff too often utilize unprofessional conduct including threats,

---

[40] DOC reports that as of October 2025, ~ 14% of staff have received the use of force refresher training and ~ 13% of staff have received the Defensive Tactics training. These trainings are delivered together as a two-day course that was first rolled out in August 2023. They are offered on a weekly basis. Despite this schedule, the Department reports limited progress in training staff, primarily due to instructor shortages driven by broader staffing constraints. Because of safety requirements governing instructor-to-participant ratios, the Training Division has been forced to cap class sizes, significantly limiting class offerings.

profanity, and/or racial epithets. Illustrative examples of this can be found in incident examples 4, 6 and 9 of Appendix L.

- **Poor Security Practices**: Staff's poor security practices often result in a need to use force that likely would not be necessary if standard and sound correctional practices had been utilized. For instance, incidents have occurred because staff fail to: enforce basic requirements such as securing doors, ensure individuals do not congregate in cells or vestibules, utilize security hardware (*e.g.*, locks and gates), supervise and control the environment, and utilize reasonable search and escort procedures. Illustrative examples of this can be found in incident examples 2,7 and 13 of Appendix L.

- **Excessive or Unauthorized Use of Chemical Agent/OC Spray**: Policy permits the use of OC to enforce an order only when there is an <u>immediate</u> need for compliance. This requirement is routinely ignored by staff particularly in instances when the situation involves an anticipated use of force. In such cases, staff are required to first respond by giving the PIC(s) time and distance to comply, engage in interpersonal communication, and only then use OC if necessary. In other instances, when the use of OC is permitted by policy (*e.g.*, in response to an imminent risk of harm, such as a fight), staff continue to disperse unnecessary and/or excessive applications and also apply chemical agents from an unsafe distance. Illustrative examples of this can be found in incident examples 1, 15 and 18 of Appendix L.

- **Staff Failure to Intervene**: Staff too often fail to act or intervene in situations in which a response and/or force is necessary and appropriate, even in situations involving an obvious risk of harm, such as a fight or a developing disturbance. The

Monitoring Team has continuously opined that in many circumstances, a safe, properly executed, well-timed physical or chemical intervention that is proportional to the extant threat can reduce the unreasonable risk of harm to PICs and staff. In too many instances, staff fail to act or are off-post and thus are unavailable when action is required. Illustrative examples of this can be found in incident examples 3, 7, 11, and 12 of Appendix L. The "Death of People In Custody" section of this report includes a more detailed discussion regarding the Monitoring Team's concerns about use of force and problematic responses to individuals engaged in self-harm.

- **Painful Escort Holds and Inappropriate Take-Down Techniques**: Staff continue to use painful escort holds and other concerning escort tactics as well as overly aggressive takedowns instead of employing controlled, secure restraint methods. These tactics often cause PICs to react defensively, which staff then misinterpret as resistance, escalating the encounter into unnecessary and dangerous uses of force. Such interventions frequently result in PICs' faces or heads striking hard surfaces, especially when rear-cuffed, creating significant risk of injury to both staff and PICs. Controlled team restraints that avoid obstacles and cease advancement once a threat subsides are far safer and consistent with proper use of force principles. The risk of harm from such tactics cannot be overstated. The Monitoring Team highlighted one such case in its May 26, 2023 report, which resulted in an individual being paralyzed as a result of a harsh takedown to the floor.[41] Illustrative examples of this can be found in incident example 8, 9 and 15 of Appendix L.

---

[41] *See*, Monitor's May 26, 2023 Report (dkt. 533) at pgs. 2 to 4.

- **Failure to comply with Anticipated Force Procedures**: Officers fail to utilize the anticipated use of force protocol. Supervisors are often absent or late, handheld video cameras and body-worn cameras are frequently not activated, and mental health interventions or de-escalation attempts are rarely documented before planned extractions or searches. Instead of using the structured process outlined in the UOF Directive, many anticipated events unfold spontaneously and chaotically, showing that staff routinely bypass planning, coordination, and non-force interventions required by the Directive. Illustrative examples of this can be found in incident example 4 and 8 of Appendix L.

- **Ongoing Interpersonal Violence**: The current level of interpersonal violence is antithetical to a safe and orderly jail operation. The rates of various metrics, including stabbings and slashings, fights and fire-setting, are substantially higher than those observed at the time the Consent Judgment went into effect. These metrics continue to illustrate the need for drastic changes to the jails' operations targeting the underlying causes of violence and interpersonal conflict, not the least of which is staffs' commitment and ability to effectively supervise the housing units. Fights among people in custody have been the most frequent reason why force is used since the inception of the Consent Judgment and, unfortunately, no progress has been made to *reduce* the number of fights that could have been prevented with better post management, span of control, door control, and general supervision. Instead, the Department's culture remains reactive in that staff intervene only after violence breaks out. Illustrative examples of this can be found in incident examples 1, 2, 5, and 13 of Appendix L.

- **Uses of Force During Searches**: A significant number of use of force events occur during searches (*e.g.*, flowing from a search operation, as part of the admission process, or while in Intake following a use of force), particularly in cells or other areas designated for strip searches that do not have camera coverage. Their prevalence raises serious questions about the search methods and demeanor of staff when conducting the searches. Adding to these concerns, a significant number of these incidents lack video evidence despite PIC allegations of excessive or unnecessary force, often because the involved staff were not wearing BWCs, failed to have the devices powered on, or did not activate them at the appropriate time. An illustrative example of this can be found in incident example 17 of Appendix L.

- **Use of Head Strikes and Inappropriate Take-Down Techniques**: The frequency of incidents involving head strikes remains a significant concern especially given the serious risk of harm. Further, harsh takedowns of individuals in which individuals hit their head and other sensitive areas of the body also continue to occur. A more detailed discussion is included in the compliance assessment of the Use of Force Policy provision of this report. Illustrative examples of this can be found in incident examples 4, 5, 6, 8, and 9 of Appendix L.

- **Ongoing Risk of Harm**: The Department's use of force practices continue to present an unreasonable risk of harm. Reducing the *risk of harm* is the overarching target of the reform effort. Reducing the number of injuries is important, but when assessing the Department's use of force, merely focusing on whether an individual involved in the incident sustained a physical injury does not provide a comprehensive picture because it fails to consider the impact of the use of force on the individual, regardless

of whether an injury was sustained.[42] The fact that the individual did not sustain an injury does not negate the fact that the force may have been unnecessary or excessive nor does it avoid the disruption that every use of force creates for the smooth operation of the jails and essential service delivery. The Monitoring Team routinely identifies incidents in which there is no injury associated with the use of force (and therefore are classified as Class C) that present a risk of harm and do not comport with DOC policy. Illustrative examples of Class C use of force incidents that pose a risk of harm can be found in incident examples 6, 9, 11, 15, 16, and 18 of Appendix L.

## CONCLUSION

The Monitoring Team remains deeply concerned about the current conditions and high risk of harm in the jails. The unfortunate and dangerous side effect of the high rates of use of force, violence and entrenched dysfunction in the jails is that they have become normalized and have seemingly lost their power to instill a sense of urgency among those with the authority to make changes. This normalized dysfunction is exacerbated further by certain claims in DOC's Safety Plan that appear to be an attempt to further normalize the extant conditions and minimize the current risk of harm in the jails. These include:

- **Minimizing In-Custody Deaths**: Suggesting that DOC's mortality data is lower compared to nationwide data from 2019 and using this comparison to suggest that there has been an inappropriate focus on in-custody deaths and that DOC's security practices have improved lacks essential context available in DOC's own data and fails

---

[42] DOC's Consultants appear to suggest that if a Use of Force incident does not have an injury then it serves a "positive metric." This is simply false.

to consider the actual facts associated with these tragic incidents. For instance, the Department's mortality rate rose from .78 in 2024 to 2.1 in 2025—a 170% increase *this year*. Further, in at least 12 of the 15 deaths in 2025, poor operational and security practices were identified, including PIC access to illicit substances, inadequate supervision, and lapses in security and the provision of medical care.

- **Excusing Poor Security Practices**: Attributing staff failures to adhere to basic jail management policies and procedures to external factors such as bail reform and the corresponding hardening of the population, limits on out-of-cell time, regulations regarding package and mail searches, and the gang affiliations of those in-custody is concerning. While these factors can certainly add to the complexities of the work, they do not diminish DOC staffs' obligation to comply with the Department's policies or DOC's obligation to ensure such compliance.

- **Excusing DOC's Use of Force Rates**: Various commentary in DOC's submissions to the Monitoring Team and the Court appear to suggest that UOF incidents without injuries are not cause for concern, that UOF to intervene in fights is are generally acceptable, that concerns about the use of head strikes is misplaced (and DOC's Consultants have suggested the standard prohibiting the use of head strikes is too high), and that only progress since 2021 should be considered when evaluating the Department's use of force.

The Department's problematic security practices and concerning levels of use of force are a direct result of the various dysfunction of the Department's operations from its failure to maximize deployment of staff, to provide adequate supervision of staff and to implement critical and core provisions of the Use of Force Directive, §§ II, V, and VI. While some progress has

been made regarding the Department's use of force, the overall pattern and practice of problematic security practices and the utilization of unnecessary and excessive force has not materially improved. Unless and until the Department makes material changes in its operations **and** staff fully embrace the reform effort in both spirit and practice, the implementation of sustainable reform regarding the use of sound correctional practices and adherence to the UOF Directive will remain elusive.

# MANAGING BEHAVIOR OF PEOPLE IN CUSTODY

An important aspect of facility safety is the framework for managing the behavior of people in custody—both how positive behavior is incentivized and how negative behavior is penalized. Facilities must have a robust array of interventions of both types in order to shape behavior of different types, severities and frequencies appropriately. The Department's strategy for shaping the behavior of people in custody has been dominated by consequences for misconduct. Since all Punitive Segregation units were closed as of 2018, the Department has developed various program models with differing levels of restriction in an effort to build an appropriate continuum of sanctions.[43] Historically, the Department has taken few steps to incentivize positive conduct, aside from occasional special events and short-term initiatives with the Young Adult population. This section discusses the Department's work in both areas—a newly implemented Honors Unit to incentivize positive conduct, and any update on the Department's work to develop options for responding to negative behaviors. Finally, the report provides an update on the Monitoring Team's assessment of Local Law 42.

## INCENTIVIZING POSITIVE BEHAVIOR AMONG PEOPLE IN CUSTODY

When people in custody meet behavioral expectations and refrain from violence, the Department should respond in a manner that increases the likelihood that their positive behavior will continue. This occurs by reducing frustration among PIC by ensuring that mandated services are delivered reliably, by setting clear behavioral expectations and providing rewards when

---

[43] A description of the history of DOC's efforts to eliminate solitary confinement and to manage individuals who commit serious acts of violence while in custody can be found in the Monitor's January 31, 2025 Report (dkt. 814) at pgs. 29 to 33.

individuals meet those expectations. The Department recently opened an Honors Unit that is intended to operate as an incentive for people in custody to be infraction-free.

- **Honors Unit**

The Honors Unit at GRVC was developed beginning in mid-2025 as part of the Department's effort to incentivize positive behaviors and also work on improved housing security. The unit was designed by the DC of Security's office alongside the Back-to-Basics initiative, described in the compliance assessment of the Security Plan section of this report. The concept for the Honors Unit is to house individuals who have been infraction-free for at least 120 days in a special housing unit where individuals receive enhanced privileges and greater access to both on- and off-unit programming as an incentive for continued compliance with facility rules. DOC is also closely scrutinizing the housing unit to ensure staff in the Honors Unit utilize sound correctional practice and strong security fundamentals.

Participants are required to sign a contract stating that they understand the specified expectations for cleanliness, respect, and rule adherence, and acknowledge that they will be removed from the unit in response to any infraction for which they are found guilty. Planned incentives include exclusive commissary options, thicker mattresses, gaming systems, an in-unit washer and dryer, enhanced recreation, and access to a driving simulator. The Honors Unit is envisioned as a privilege-based environment that reinforces prosocial behavior and compliance through tangible rewards. An initial corps of 10 staff was specifically selected and are consistently assigned to the unit day-to-day. The unit was populated with 26 individuals in early November 2025.

In addition to setting clear behavioral criteria for admission, an important aspect of incentive programs is that the reward (i.e., privileges, programs and activities) *must be* delivered

consistently. In other words, the Department *must* provide the services and programs that were promised. This is critical given DOC currently struggles to provide mandated services reliably and routinely and the Honors Unit is operationally unique. Accordingly, the Department must be vigilant in assessing whether the unit is operating as designed and immediately take steps to remove obstacles to delivering the services and benefits in order to realize the value of the incentives. The Department has previously attempted to implement incentive programs that did not succeed for a variety of reasons (e.g., poor behavior tracking, lack of consistency in delivering rewards, leadership changes that did not continue to prioritize the programs). In order for the Honors Unit to be sustainable, these common pitfalls must be recognized and actively counteracted.

### MANAGING PEOPLE WITH KNOWN PROPENSITY FOR VIOLENCE

Operating and safely managing a program for detainees with a known and recent propensity to engage in violent predatory behavior is both challenging and essential. The approach must recognize the substantial and sometimes life-threatening harm already inflicted and the mandate to prevent further victimization of people in custody and staff. Housing and programming for individuals with a known propensity for violence must be designed to address the proximal causes of violence, and security practices must be properly implemented; the complexity of achieving an appropriate balance between these two components cannot be overstated. Concentrating people with known propensities for violence in the same location requires unique security enhancements, particularly during time spent in congregate activities, given their deeply rooted pre-existing interpersonal conflicts. To ensure the security, safety, and effectiveness of these housing units, staff must actively supervise all out-of-cell activities and

provide structured activities and rehabilitative services to reduce idle time and the likelihood of individuals committing subsequent acts of violence.

The Monitor's January 31, 2025 report (dkt. 814) at pgs. 12 to 28 provides a summary of the generally accepted practice for managing individuals following serious acts of violence and those who otherwise pose an unreasonable and demonstrable risk to safety and security. This includes how these practices are defined, the harms and status of solitary confinement in the United States and how restricted housing models are being used to address the risks posed by those who engage in acts of violence while in custody. This informs the Monitoring Team's work with the Department and corresponding assessments.

This section describes the Department's housing strategies including, Enhanced Supervision Housing at RMSC ("RESH"), the Special Management Unit ("SMU"), and the use of NIC/Involuntary Protective Custody to manage individuals who for a variety of reasons, cannot be housed in either RESH or SMU or in secure mental health programs such as Clinical Alternatives to Punitive Segregation ("CAPS").

- **Enhanced Supervision Housing at RMSC ("RESH")**

In March 2023, the Department implemented a revitalized Enhanced Supervision Housing program ("ESH," now called "RESH" because of its location in the RMSC facility). RESH is intended to house those individuals who engage in serious violence while in custody in a highly structured environment in order to limit their ability to harm others in custody or staff.

　　o　*RESH Program Design*

RESH has two levels: Level 1, in which individuals' movements are restricted during out-of-cell time via restraint desks and where individuals recreate in individual pens, and Level 2, in which individuals have freedom of movement during congregate activities and may

participate in congregate outdoor recreation. During their seven hours out-of-cell per day, individuals in both Levels may access structured programming led by a Program Counselor or community vendor for four hours and are afforded three hours of recreation. Each person must meet individualized programming requirements and remain infraction-free to promote to a less restrictive setting (*i.e.*, from Level 1 to Level 2 and from Level 2 to the general population). Each individual's progress is reviewed every 15 days, and individuals are eligible to be promoted to a less restrictive setting upon review by the RESH Committee every 30 days. The RESH Committee is multi-disciplinary, and reviews information about each individual's behavior submitted and discussed by custody staff, and each individual's program engagement submitted and discussed by staff from the Programs Division. The program design, developed by the Department in collaboration with Dr. James Austin (the DOC's Consultant on restrictive housing) and the Monitoring Team, is sound and incorporates many features found in jurisdictions that have successfully reduced their reliance on extended solitary confinement.

- o *RESH Rates of Violence and Use of Force*

The Monitoring Team continues to track the rates of violence and use of force in RESH. Average monthly rates of violence have significantly decreased following RESH's initial implementation in the 17th Monitoring Period (July to December 2023), as shown in the table below and discussed in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 27-31.

| RESH's Average Monthly Rates of Key Violence Metrics | | | | | |
|---|---|---|---|---|---|
| | **Use of Force** | **Stabbings/ Slashings** | **Fights** | **Assault on Staff** | **Fires** |
| July-Dec 2023 | 39.2 | 3.8 | 7.2[44] | 8.4 | 7.8 |
| Jan-June 2024 | 42.8 | 3.2 | 4.9 | 9.3 | 11.9 |

[44] Data on fights for November/December 2023 was not available; the average for this period includes data from only the first four months of the Monitoring Period.

58

| | | | | | |
|---|---|---|---|---|---|
| July-Dec 2024 | 22.1 | 1.3 | 3.8 | 6.8 | 2.9 |
| Jan-June 2025 | 27.6 | 1.5 | 6.8 | 6.9 | 4.5 |
| **% decrease from 2023** | **- 30%** | **- 61%** | **- 6%** | **- 18%** | **- 42%** |

The rates of some of the metrics related to violence have remained lower than the apex in 2023, but certain metrics ticked upward compared to the previous Monitoring Period. More specifically, compared to the previous Monitoring Period, increases were observed in the use of force rate (up 25%, from 22.1 to 27.6), the rate of fights (up 79%, from 3.8 to 6.8), and the rate of fires (up 55% from 2.9 to 4.5). All metrics remain lower than when RESH first opened, some substantially, but the increases observed during the current Monitoring Period are concerning. Deeper analysis of these data revealed that the increases were driven by Level 2, which eclipsed positive changes that occurred in Level 1. Although the use of force rate increased in both levels (+ 23% in Level 1 and + 38% in Level 2), the rate of assaults on staff increased 33% in Level 2 but decreased 13% in Level 1. Even more pronounced, in Level 2, the rate of stabbings/slashings and fights increased 52% and 62%, respectively, while both decreased to *zero* in Level 1. In other words, these data reveal consistent improvements to safety in Level 1, but worrisome decreases in safety in Level 2.

   o  *Monitoring Team's RESH Case File Review*

To better understand the program's implementation, the Monitoring Team reviewed the case files of 15 individuals admitted to RESH in April 2025, including documents related to their qualifying offense, adjudication, and placement in RESH; information about program engagement; and the substance of the 30-day reviews of their placement. These findings revealed multiple areas where RESH's operation closely conformed to policy requirements including admitting only those found guilty of a qualifying offense (typically, stabbing/slashings and

assaults on staff), timely reviews that included time spent in pre-hearing detention[45] toward the

15- and 30-day review timelines, and consistent availability of out-of-cell programming and

adequate engagement among PICs to progress to less restrictive settings.

      The Monitoring Team also noted several issues warranting the Department's attention

including duplicative paperwork for authorizing pre-hearing detention; conflicting policy

requirements regarding the timelines for Adjudication Hearings among those in pre-hearing

detention; lengths of stay in pre-hearing detention beyond the seven days permitted by the RESH

policy; unclear expectations regarding how RESH committee members should consult/make

admission decisions (whether in person or via email); misleading documentation regarding

visitation (which is consistently provided to those in RESH despite the referring facilities'

attempts to impose a restriction); and the lack of a tracking log that could be utilized to collect

aggregate information regarding referrals, admissions/denials, lengths of stay, etc. These issues

do not appear to have negatively impacted who is admitted to RESH (i.e., the Monitoring Team's

review and that of Dr. Austin indicate that only those found guilty of a qualifying offense are

being placed in RESH), nor the length of stay in Level 1 and Level 2 (i.e., the RESH Committee

maintains records that demonstrate the length of stay is extended only when an individual

commits subsequent violence while in RESH or refuses to engage in the programming that is

offered). That said, the identified issues must be rectified to improve the clarity of the required

---

[45] People in PHD are housed in Level 1 housing but are kept separate from those admitted to RESH. Those in PHD have the same restrictions, conditions and out-of-cell time as those in Level 1. Per the RESH policy, if the Deputy Commissioner of Facility Operations/designee finds there is reasonable cause to suspect than an individual has committed an offense that qualifies them for placement in RESH (and they are not excluded from RESH due to a serious mental illness or serious physical disability), they may be placed in Pre-Hearing Detention (PHD) for up to seven days pending their Adjudication Hearing. However, the Inmate Disciplinary Due Process policy states that hearings for those in PHD shall be completed with 3 business days of the individual's transfer to PHD whenever possible. During its onsite visit in July 2025, the Monitoring Team recommended that the Department reconcile these policies, and ensure their compliance with HALT.

procedures and protections, and to permit the compilation of aggregate statistics about the flow of individuals into and out of RESH.

During an on-site visit in July 2025, each of these concerns was communicated to various Department leaders who engaged in a spirited and collaborative discussion about the underlying problems and potential solutions. As of the filing of this report, the Department has not provided an update to the Monitoring Team on how it intends to address the Monitoring Team's findings. Importantly, the identified problems were largely procedural and did not impact either out-of-cell time or programming, both of which are hallmarks of the Department's efforts to balance necessary security measures with opportunities for meaningful social interaction.

  o  *RESH's Current Operation*

Throughout the current Monitoring Period, RESH continued to be led by the Warden whose leadership the Monitoring Team has praised in previous reports.[46] She continued to demonstrate a command of the issues that have undercut the safe operation of RESH and solid plans to address them (*e.g.*, more thoughtful housing decisions for those in Level 2 and improvements to the reliability of mandated service delivery). She also continued to elevate the skills of her staff by consistently identifying and addressing staff's poor practice, particularly regarding escorts and searches, and held Captains accountable when they did not provide proper supervision and guidance to RESH officers. The Warden also focused on mandated services, even as high levels of staff absenteeism required significant amounts of overtime in order to meet their obligations, because of her commitment to fairness and strong belief that programming and recreation reduce violence and are integral to the success of the units. Similarly, despite several

---

[46] The Warden was transferred to OBCC in September 2025 as part of a larger Department leadership reorganization.

vacant positions, Programs Division staff continued to work significant overtime in order to ensure that each housing unit received access to four hours of programming per day, with few exceptions. Finally, the Department continued efforts to better differentiate the restrictions and privileges associated with the two levels of RESH and the SMU, which was finalized after the current Monitoring Period ended.

Three notable issues arose during 2025. First, as noted above, for a variety of reasons (*e.g.*, crowding in the general population units and related bursts of violence), RESH's population reached an all-time high in April 2025 (184 people, when the population is typically under 160). The Warden reported that this exacerbated the level of violence due to pre-existing interpersonal conflicts, the negative effects of crowding on the incarcerated population, and a lack of flexibility in housing assignments. The Warden took initiative to collaborate with Department leadership to temporarily narrow the criteria for RESH placement (*i.e.*, to temporarily exclude from RESH those aged 22 and older found with contraband weapons, referring them instead to SMU), which resolved the problem in short order.

Second, as noted above, problems with staff absenteeism were particularly pronounced during the current Monitoring Period. Historically, for safety reasons, RESH kept individuals in a housing unit, locked in their cells if only two of the four floor officer posts were manned. While this did not occur all the time, it occurred often enough to create concern among RESH leadership that people in custody were being unfairly deprived of out-of-cell time. Just after the current Monitoring Period ended, the Warden changed this practice and required the daily schedule and out-of-cell time to be fully implemented even when only two floor officer posts were filled. Any impact on the level of violence and changes to staff absenteeism will be evaluated during the subsequent Monitoring Period. In September 2025, the RESH's Warden was

reassigned to another facility, and an Acting Warden was appointed. Thus far, the Acting Warden has demonstrated candor, a strong grasp of the issues affecting RESH, and a commitment to sensible, solutions-oriented leadership focused on safety and effective operations.

Finally, after the conclusion of the Monitoring Period, the required process for transferring and housing individuals in Level 2 was briefly subverted by the Assistant Chief of Security and OSIU, which began making Level 2 housing decisions outside of the prescribed process. The established practice, fortified by the previous Warden, is for the RESH Committee (in collaboration with CMCMU and CIB) to determine the safest Level 2 housing area for each individual to avoid any pre-existing tensions. Recently, for a short time, the Assistant Chief of Security and OSIU took control of these assignments. A significant uptick in violence occurred. After the current RESH Warden expressed concerns to the Deputy Commissioner of Security, the problem was rectified and the previously established practice resumed. The subversion of the required processes and predictable ensuing violence are obviously concerning.

- **Special Management Unit ("SMU")**

In early February, 2025, the Department opened a pilot unit for its Special Management Unit ("SMU") at OBCC.[47] Developed in consultation with Dr. James Austin, SCOC and the Monitoring Team, the program targets those who frequently engage in violence, but who have not engaged in the extreme forms of violence that warrant placement in RESH. With some exclusions, an incarcerated individual may be placed in SMU if their presence in the facility's general population would pose an unreasonable and demonstrable risk to the safety of others or

---

[47] Prior to the Special Management Unit ("SMU") policy being finalized, the Department, Monitoring Team and Dr. Austin previously referred to the concept for this program as "GP-Max" or the "OBCC Annex."

the security of the facility.[48] Placement occurs upon recommendation from facility leadership, a determination by a Hearing Officer that placement is appropriate, and final approval by the Custody Management Centralized Movement Unit ("CMCMU").

Initially, the Department opened a single unit, and the SMU population remained low (*i.e.*, less than 10 individuals) for several weeks so that the daily routine and schedule could become established. The population gradually increased throughout the current Monitoring Period, to approximately 20-25 people in custody. While Dr. Austin reported to the Court that following a 90-day pilot test of the program in two units the program capacity would be increased to 300 beds,[49] but the program has not expanded. The Department has reported it has been hesitant to expand the SMU due to a lack of available bedspace/housing units.

The SMU was designed to increase the level of supervision and structure beyond that of general population housing, where individuals referred to SMU have engaged in serious or persistent violence. Key program elements include:

- higher staff to PIC ratios (each SMU unit has two B-officers),

- lockout limited to 7-hours per day,

- more frequent pat frisking and searches using a handheld metal detector, along with cell searches and searches of common areas,

- all mandated services,

---

[48] A person may be considered for placement in the SMU if they are being considered for release from RESH, were referred to RESH but did not meet the qualifying offense criteria for such placement, are leaders of a security risk group ("SRG"), have been actively involved in organizing or perpetrating SRG-related violence, have one Grade I or three or more Grade II infractions in a 6-month period, or have participated in an incident that threatened the safety and security of the facility. The following individuals are excluded from SMU: those with a serious mental illness, those with serious physical disabilities or conditions, those assigned to women's housing or Special Consideration Housing. Young Adults aged 19 to 21 may be held in SMU if they are provided access to educational programming.

[49] *See* the Declaration of James Austin dated March 19, 2024 (dkt. 689-9 at ¶¶ 21-24).

- a Supportive Services Plan ("SSP") for each individual that focuses on developing the skills needed to avoid interpersonal conflict and violence,

- weekly group and individualized programming from a Programs Division counselor to advance progress toward SSP goals, and

- regular reviews to determine readiness for return to the general population. Policy requires a placement review every 60 days, but Department leadership often conducts more frequent reviews to motivate positive behavior.

    ○ *Program Operations and the Monitoring Team's SMU Case File Review*

In addition to holding monthly calls with OBCC's Warden and the DW assigned to the SMU, the Monitoring Team reviewed both aggregate data and individual case files to better understand SMU's initial implementation in this Monitoring Period. Between February and May 2025, 102 individuals were referred to SMU. Of these referrals, 75% were accepted and 25% were denied. Most of those admitted stayed less than 30 days, leaving the program prior to the anticipated 60 days for a variety of reasons (*e.g.*, misconduct warranting RESH placement, intelligence suggesting the person was being targeted for violence, transfer to state custody, or because they were incident-free and a less restrictive unit was appropriate). Unfortunately, a significant proportion (about 40%) of the early admits to SMU engaged in serious violence and were transferred to RESH. About 10% of those admitted were discharged from the program and transferred to the general population at about the 60-day mark after completing all program requirements.

Some positive trends revealed by the Monitoring Team's case file review included the availability of quality data for program tracking and assessing aggregate trends; consistent adherence to all procedural timelines (*e.g.*, CMCMU's determination of placement, notice of

placement to the incarcerated individual, placement hearings, SMU orientation, Supportive Services Plan development, and 60-day placement reviews); about half of those referred attended the Placement Hearing and the hearing officer consistently asked if the individual wanted a facilitator and/or interpreter; and an appeal was processed timely for the one individual who contested placement. Significantly, individuals in the SMU received considerably more programming than those in a typical adult general population housing unit. Most of those whose case files were reviewed attended programs four times per week and often participated in multiple sessions per day.

One notable dynamic in SMU's early implementation was its intersection with RESH. Over half of those admitted to SMU were referred from RESH-Level 2 as a "step-down" prior to their return to the General Population. The use of SMU as a step-down from RESH is permissible by policy and may occur for valid reasons (e.g., broader security concerns beyond the incident that resulted in RESH placement), but neither the SMU referral paperwork nor the Adjudication Captain who conducted the placement hearings explained why these individuals were being referred for a "step down" in any detail. The Warden/DW at OBCC reported that those admitted from RESH perceived their placement to be unfair, a.k.a. "double jeopardy," and this concern was also heard by the Monitoring Team via the audio recordings of the Placement Hearings. However, none of the individuals filed a formal appeal. Because SMU currently is only one unit, those referred from RESH consumed most of the available bedspace for a period of time and thus limited the ability to refer those from General Population who met admission criteria. In the short term, this significantly compromised the ability to assess whether SMU is an effective strategy for responding to those who frequently engage in violence while in the *general*

*population*. Following the end of the current Monitoring Period, this pattern began to change, and proportionally fewer admissions were referred as a step-down from RESH.

The Monitoring Team's case file review also surfaced a few issues that warrant the Department's attention. Many of the referral documents lacked sufficient detail to indicate the specific behaviors or circumstances that warranted referral (*i.e.*, the documents indicated the referral criteria that were met, but did not describe the relevant behaviors or frequency of misconduct); the Placement Hearings were not particularly deliberative, seeming only to read the paperwork to the individual without responding adequately to the PICs' questions, concerns or requests for follow-up; and SSPs were vague, not individualized and did not provide any evidence that the counselor actually discussed the individual's behavior with them. These concerns were shared with the Department during an on-site meeting in July 2025. Both the Warden and DW were particularly enthusiastic about the program, were open to feedback, and appeared to be committed to operating the program with fidelity.[50]

The issues noted above are typical of the early implementation experience of new programs, particularly those that have unique security features and additional program offerings that must be harmonized. That said, while the SMU itself is a new concept, the procedural problems identified echo problems that the Monitoring Team has identified when assessing other iterations of housing strategies (*e.g.*, the Secure Unit, previous version of ESH). The Department is encouraged to examine the record of documented problems with procedural fairness and program fidelity in further enhancing SMU's operations. Notably, the issues raised above are largely procedural/documentation related and did not negatively impact the individuals' time out-

---

[50] In October 2025, OBCC's Warden was transferred to another facility. The Deputy Warden assigned to SMU remained at OBCC and continues to oversee the program.

of-cell or access to programming, both of which are essential elements of the approach. While access to programming does not appear to be compromised by these problems, the lack of individualization and detail in the SSPs will limit the rehabilitative value of any programming that is provided. The Department has been working with Dr. Austin to evaluate the program's effectiveness and, if the study indicates that the SMU is an effective strategy to respond to and manage violence within the Department, Dr. Austin has encouraged the Department to expand the program capacity significantly, based on his analysis and projections.[51]

- **NIC/Involuntary Protective Custody**

The Department continues to use four celled units at NIC to house certain individuals with a variety of security needs, including those who must be isolated until they pass a secreted weapon, those who are particularly vulnerable to retaliation, those subject to Court-ordered lockdowns and certain individuals who pose acute security risks. The original unit configurations have unusual physical layouts that limit social interaction (*i.e.*, the portion of the cell containing the bunk/sink/toilet is connected to an individual space that is larger, but can only be utilized by a single individual; units have no functional space for congregate programming; hallways are impractically narrow; lines of sight are poor). Accordingly, the Monitoring Team has recommended that the Department limit its use of NIC as much as possible (particularly once other programs such as the SMU came on-line), develop procedures to ensure adherence to specific placement criteria and procedural due process, and implement various protections to prevent undue isolation and to safeguard against decompensation.

There have been some notable changes to the Department's use of NIC since the Monitoring Team first shared feedback in January 2024. First, the Department renovated some of

---

[51] *See*, also, Dr. James Austin March 19, 2024 Declaration (dkt. 689-9) at ¶ 22.

the housing units with concerning physical layouts during the 19th and 20th Monitoring Periods. The individual dayrooms were removed from the cells and as a result, the narrow hallways were removed, and the units now have congregate dayroom areas. The newly renovated units were reopened during the 20th Monitoring Period and no longer house individuals with acute security risks and/or involuntary protective custody status and instead house general population PICs or those serving civil sentences in DOC custody.

However, four units with the older layout do continue to house individuals with acute security risks and/or those in involuntary protective custody. While the Department has decreased its reliance on NIC for this purpose as recommended by the Monitoring Team and has made physical changes to some of the units such that they can no longer be used for this purpose, the Department has not updated its policies outlining the use of these units as recommended in the Monitoring Team's feedback. The Department has significantly decreased its reliance on the units at NIC by almost half. These units in NIC are being used less for addressing individuals that pose certain security risks than when the Monitoring Team first raised concerns in January 2024 (*i.e.*, the population was 41 in January 2024 and 19 in September 2025). Of those housed in NIC in September 2025, over half (63%; n=12) were placed in NIC for involuntary protective custody, four (21%) were placed in NIC following a positive body scan/secreted weapon, and three (16%) were in Court-ordered lockdown. In terms of the length of stay, 42% (n=8) had been in NIC for less than 30 days, 26% (n=5) had been in NIC for between 30 and 100 days, and the remaining 32% (n=6) had been in NIC for over 100 days.

From January to June 2025, six NCU audits of three NIC housing areas showed regular and meaningful officer tours, consistent supervisor presence, and timely delivery of required services. While most tours and services (e.g., showers, recreation, medical services, religious

services, law library) occurred as scheduled, recreation participation was low, documentation issues like missing logbook entries were observed, and there were instances where flashlights were not used during nighttime tours. Overall, the audits found consistent supervision though recordkeeping and engagement in services still need strengthening.

That fewer individuals are housed in these NIC units is certainly positive, although the Monitoring Team continues to recommend that the Department finalize the policy and procedures governing the use of NIC for these purposes, implement the necessary protections to prevent undue isolation and to safeguard against decompensation, and provide appropriate and routine programming to those housed on the units. The findings of the audit are encouraging. It's important that routine audits of the practices at NIC continue to ensure that all policy and operational requirements are being met.

- **Behavioral Health Unit**

A substantial proportion of incidents involving serious violence (e.g., stabbings/slashings, assaults that cause serious injury) are committed by individuals who have serious mental illnesses or medical conditions that exclude them from placement in RESH and the SMU. However, the Department lacks a dependable intervention for addressing serious violence among those with serious mental illnesses and medical conditions. Some of these individuals are placed in the Clinical Alternative to Punitive Segregation ("CAPS") program, but this program has limited capacity and was also closed for a period of time in 2025. In late 2023/early 2024, both the Monitoring Team and Dr. Austin provided extensive technical assistance to help the Department develop the program model for a Behavioral Health Unit ("BHU") that would provide the necessary treatment-intensive intervention for these individuals. In March 2024, Dr. Austin reported to the Court that the BHU's "program design and required staffing levels will be

completed in the next 90 days and the BHU can be implemented this summer after prior approval of the Monitor."[52] However, the program never was fully implemented, and it is unclear why the program was abandoned. The Department continues to lack an appropriate intervention for people with serious mental illnesses and medical conditions who commit serious violence but are excluded from other forms of restrictive housing, although a significant portion of serious violence continues to be committed by these individuals.

### LOCAL REGULATIONS REGARDING HOUSING FOR INDIVIDUALS INVOLVED IN SERIOUS ACTS OF VIOLENCE

Standards and regulations have been developed by DOC's various oversight entities (e.g. Board of Correction and the State Commission of Correction) and local regulation regarding the Department's interventions and housing strategies related to those who engage in serious acts of violence while in custody.

In 2021, the Humane Alternatives to Long-Term Solitary Confinement Act ("HALT Act") was adopted and limits the duration of "segregated confinement" (i.e., less than 7 hours out of cell time per day) to a maximum of 15 consecutive days. The use of segregated confinement with certain vulnerable populations (those under age 21, those over age 55, pregnant women and those with serious mental illnesses and physical disabilities) is prohibited. HALT also establishes Residential Rehabilitative Units (RRUs) which offer at least 7 hours of out of cell time per day (6 hours of rehabilitative programming and one hour of recreation).

In 2022, the Board of Correction codified the Risk Management Accountability System ("RMAS") which was designed to replace the Department's legacy practice of solitary confinement (known as "Punitive Segregation") with a different model for responding to serious

---

[52] *See*, Declaration of James Austin dated March 19, 2024 (dkt. 689-9) at ¶ 28.

institutional violence. RMAS provided for a range of programming and services and limited out-of-cell time to 10 hours per day. However, the Department never implemented RMAS due in part to the Monitoring Team's finding that the Department's inability to properly implement the program would create significant safety risks to incarcerated people and staff.[53]

Subsequently, the City Council passed Local Law 42 on December 20, 2023.[54] LL42 amends the New York City Administrative Code by banning the use of solitary confinement, imposing 14 hours of mandatory out-of-cell time for all incarcerated individuals, setting additional requirements for the use of restrictive housing, de-escalation, emergency lock-ins, and restraints, and imposing specific conditions for special housing units (*e.g.,* mental health units, contagious disease units, protective custody units, housing for people who are transgender or gender non-conforming, and housing to promote school attendance).

Since the summer 2024, the Court has directed the Monitoring Team to engage in focused analytical work, to meet and confer with the Defendants and the Parties about these issues, and to provide multiple status updates.[55] The analysis of the interplay between *Nunez* requirements and LL42 is complicated.[56] Neither set of requirements allows for simple comparisons to identify elements that are directly at odds with one another. The requirements of the *Nunez* Court Orders tend to be more global and conceptual and, in many cases, leave specific operational issues to be addressed via consultation with and approval of the Monitor. On the other hand, LL42

---

[53] *See*, Monitor's June 30, 2022 Report, pgs. 22-27 and Monitor's January 31, 2025 Report (dkt. 814) at pgs. 30 to 31

[54] The Mayor of New York subsequently vetoed the bill on January 19, 2024, but it was signed into law by the City Council on January 30, 2024, overriding the Mayor's veto.

[55] *See* the Court's June 7, 2024 Order (dkt. 726), July 23, 2024 Order (dkt. 759), July 25, 2024 Order (dkt. 761), October 25, 2024 Order (dkt. 791), July 2, 2025 (dkt. 875), August 19, 2025 (dkt. 896), and December 19, 2025 (dkt. 940).

[56] The Monitoring Team's framework for evaluating LL42 is described at pgs. 5 to 10 of the January 31, 2025 Report.

requirements regulate more discrete and specific elements of practice. Therefore, the analysis must look holistically at the requirements of the *Nunez* Court Order for the relevant functions (i.e., managing individuals after serious acts of violence, restraints/escorts, de-escalation, and emergency lock-ins), overlay the operational impact of the LL42 requirements to identify those that may be discordant, and also understand and balance certain other requirements, such as compliance with HALT, which is specifically required by the *Nunez* Court Orders.[57] The Monitoring Team updated the Court on its work to assess the intersection of LL42 and the *Nunez* Court Orders on October 24, 2024 (dkt. 789) and November 22, 2024 (dkt. 802). The Monitor filed a comprehensive report on January 31, 2025 (dkt. 814) describing all work completed to date regarding the analysis of LL42.

The Monitor's January 31, 2025 Report determined that certain provisions of LL42, as currently designed, would undermine and are antithetical to the purpose of the *Nunez* Court Orders to provide a "constitutionally sufficient level of safety for those who live and work on Rikers Island"[58] and would impede the Department's compliance with the *Nunez* Court Orders. Further, to the extent that the Monitor is required to approve or direct certain DOC practices that include the problematic components of LL42, the Monitor will not approve or direct such practices absent modifications to those requirements for the reasons stated in the Monitor's January 31, 2025 Report.[59] This remains true as of the filing of this report.

---

[57] *See* Action Plan, § E, ¶ 4 which states the Department's "housing and management strategy [for individual's following serious acts of violence] must comply with the HALT Act."

[58] *See* Court's November 27, 2024 Order (dkt. 803) at pg. 54.

[59] This includes, but is not limited to, the following provisions of the *Nunez* Court Orders: Consent Judgment, § IV, ¶ 3(p); First Remedial Order, § A, ¶ 3; Action Plan, § D, ¶ 3 and § E, ¶ 4; and August 10, 2023 Order, § I, ¶ 3 and § I, ¶ 4.

In late 2024, the City Council and Public Advocate brought suit against Mayor Adams contending that his Emergency Orders suspending the implementation of LL42 were unlawful ("the Article 78 litigation").[60] In February 2025, the Court's issued an order advising the Monitoring Team to cease any additional analytical work on LL42 until further directed by the Court in light of the pending Article 78 litigation. *See*, February 5, 2025 Order (dkt. 815). The Article 78 litigation was resolved in July 2025 and found the Mayor's Executive Order suspending LL42 was improper. In response, the City sought a temporary injunction of certain provisions of LL42 in July 2025 from the Court in *Nunez*. The Court convened a status conference and granted the temporary injunction on July 3, 2025 (dkt. 875). At that time, the Court also advised the Monitoring Team that it could proceed with their work regarding areas where LL42 requirements were in conflict with the *Nunez* Court Orders. The injunction has since been amended twice at the Monitor's recommendation.[61]

The Monitoring Team's work on LL42 coincided with its work on a significant number of competing matters in this case including the Court's order to appoint a Remediation Manager and preparing the Monitor's 20th Report. All of these matters were urgent, complex and important. The convergence required the Monitoring Team to set certain priorities because all of the matters could not be addressed simultaneously. In October and November 2025, the Parties to the *Nunez* litigation as well as the Limited City Intervenors provided the Monitoring Team with multiple submissions containing relevant considerations for rendering more detailed recommendations regarding the Monitor's position on the provisions of LL42 that intersect and potentially conflict with the Monitor's approval obligations under the *Nunez* Court Orders. In December 2025, the

---

[60] *See*, Appendix G of the Monitor's January 31, 2025 Report (dkt. 814).

[61] The temporary injunction was modified on August 19, 2025 (dkt. 897) and on October 21, 2025 (dkt. 923).

Monitoring Team sought additional information from the Parties. Also in December 2025, DOC's Consultants provided information to the Monitoring Team regarding the Department's restrictive housing strategy that also merits additional consideration. In short, the Monitoring Team's work to develop recommendations that would better align LL42 with the requirements of the *Nunez* Court Orders continues.

## CONCLUSION

The Department's effort to establish an incentive-based housing unit to encourage positive behavior is an important addition to its array of strategies to manage the behavior of people in custody. The Department also needs programs like RESH and SMU to manage individuals who commit serious acts of violence while in custody, and the Monitoring Team recognizes the need to house certain PICs with acute security needs at NIC for periods of time. In addition, the Monitoring Team strongly supports both the way the Department has worked to improve safety by addressing security concerns and the amount of programming available in RESH and SMU, as well as the measured approach it has taken with the initial implementation and expansion of these programs. Moving forward, the Department is encouraged to ensure it has appropriate options to address violence among people with various conditions that disqualify them from placement in RESH/SMU (*e.g.*, considering whether CAPS has sufficient capacity or resurrecting planning for the BHU), and to ensure each option is governed by an appropriate policy (*e.g.*, NIC). Particularly with regard to RESH, high levels of staff absenteeism must be addressed. Finally, the Department must audit and ensure strong adherence to placement criteria, timelines, individualized programming, mandated service delivery, program offerings and review and release criteria.

# DEATH OF PEOPLE IN CUSTODY

A key indicator when assessing trends in facility safety is to evaluate deaths in custody. To date in 2025, 15 individuals died in Department custody or shortly after release.[62] The Department and other external agencies, including the NYS Attorney General, SCOC, and Board of Correction investigate each death in custody. The Department also conducts meetings two days, seven days, and 30 days after any death in custody, called "Joint Assessment and Review" or "JARS". These JARS are intended to create an open forum for DOC and CHS to jointly review the circumstances of each death, identify systemic failures, improve coordination, and develop corrective actions.

## ASSESSMENTS OF DEATHS

Any death in custody is a tragedy and every death in custody, including by suicide, should raise concern and must be closely scrutinized to ensure all steps were taken to prevent the loss of life, and if they were not, to hold staff accountable and change practice (as necessary) to prevent any lapses from occurring in similar situations going forward. When reviewing deaths in custody, the review must always answer the fundamental questions of how that individual died while in custody and was that death preventable. **The critical assessment is whether adequate security and operational practices were in place that could have prevented that death**. This necessarily requires an assessment of the actual incidents. A more detailed discussion of the Monitoring Team's methodology for assessment of the Department's practices is discussed in the "Advancing the Nunez Reforms & Assessing Compliance" section of the report.

---

[62] Five people died during the 20th Monitoring Period. Pursuant to the June 13, 2023 Court Order, the Department has been providing the Monitoring Team with an initial report of each death in custody "as soon as practical, but no later than 24 hours after it occurred."

The Department's Safety Plan and DOC's consultants have presented commentary on data regarding DOC's in-custody deaths. DOC's Safety Plan noted "there has been considerable attention to the adverse outcomes that happen on Rikers Island, with little acknowledgment that the rates of suicide are among the lowest in the nation.[63]" The Department's Safety Plan later reports "There is little acknowledgement of how few people die in custody, especially from suicide, as compared to other jails. This speaks volumes about the mental health care."[64] DOC's Consultants have provided further commentary noting that DOC's mortality rate decreased in 2023 and 2024; don't address the impact of the fact that the mortality rate increased in 2025 was not addressed. The Department's Safety Plan and DOC's consultants claim that the Monitoring Team's presentation of DOC data regarding in-custody deaths has not been appropriately contextualized. This is inaccurate as such context has been provided in the Monitor's Reports.[65]

This commentary on the data appears to suggest that an assessment of the circumstances and available objective evidence for the events that occurred between 2023 and 2025 was either not conducted or irrelevant. The characterizations of in-custody deaths in DOC's Safety Plan and by DOC's Consultants appears to suggest that concern about the in-custody deaths is misplaced because, compared to nationwide data from 2019, DOC's current data generally appears favorable, and that this context somehow negates any commentary on the circumstances

---

[63] The Monitoring Team requested the data underpinning these claims about suicide rates. DOC did not respond to this request. DOC's consultants subsequently advised the Monitoring Team of its belief that the Department does not need to respond to the Monitor's request because the Monitoring Team should have known that this vague reference was based on comparisons to 2019 statistics from Bureau of Justice Statistics (BJS). This is not a valid basis to withhold information from the Monitoring Team.

[64] A number of in-custody deaths, particularly the death of Mr. Billa (discussed below) raise questions about the veracity of such a claim. It is unclear how a conclusion about mental health care in DOC can be drawn simply from comparing DOC's data to national data that is six years old. It is the Monitoring Team's understanding that DOC's Consultants have not conducted any assessment of the mental health care provided at DOC.

[65] *See*, for example, Monitor's October 28, 2022 Report (dkt. 472) at pgs. 20 to 22, where DOC's data was presented alongside data from other large metropolitan jail systems.

surrounding these events and whether they may have been preventable. Data regarding the number and rates of death in custody are informative, but a comparison of DOC data to six-year old data from other systems is ***not*** dispositive about the import of these events on the Department's facility safety. The comparison of DOC's data to national data is also questionable. The last year for which reliable nationwide data is available is 2019.[66] More recent data lacks consistency with prior reporting formats and serious methodological questions about the veracity and completeness of the data has limited its utility.[67] Further, comparison of nationwide systems can be informative, but must be considered carefully, given potential distinctions among facilities nationwide and those of the DOC.[68] For these reasons, the Monitoring Team does not believe that any meaningful conclusions can be drawn by comparing DOC's current data to national data that is six years old and newer data is understood to be unreliable.

Most concerning about this commentary is that it appears to be an attempt to minimize these deaths in-custody, normalizes preventable fatalities, and undermines the necessary corrective action that must be taken to reduce future loss of life. Overall, the suggestion that DOC should be commended for its mortality rates because they appear lower than nationwide data from 2019, and suggesting that further scrutiny of individual deaths is unfair or unwarranted, is deeply troubling and fundamentally inconsistent with sound correctional practice, basic principles of accountability, and mitigating the risk of harm.

---

[66] U.S. Department of Justice, Bureau of Justice Statistics. (2021). *Mortality in Local Jails, 2000–2019 – Statistical Tables*. (NCJ 301368). https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf

[67] Mahajan, I., A. Flagg, and A. Sankin. (August 7, 2025). *Why Doesn't the U.S. Government Know How Many People Die in Custody?* The Marshall Project. https://www.themarshallproject.org/2025/08/07/deaths-in-custody-reporting-act-problems and Sankin, A. and I. Mahajan. (August 7, 2025). *How We Analyzed the Justice Department's Death in Custody Data.* https://www.themarshallproject.org/2025/08/07/dcra-leak-data-analysis-methodology

[68] DOC's consultants have repeatedly cautioned about comparisons across systems, but, in this particular case appear to suggest it should occur.

**DOC'S MORTALITY RATE AND OBJECTIVE EVIDENCE OF DEATHS**

The number of in-custody deaths and their causes, between January 2015 and December 22, 2025, are presented in Appendix C. The rates have fluctuated throughout the past 15 years (ranging between ~0.5 and ~2.0), but reached an all-time high in 2022 (3.37). The rate decreased to 0.78 in 2024, but increased 170% to 2.1 in 2025.

The Monitoring Team's assessment of the objective evidence surrounding deaths in-custody (or shortly after release) revealed a commonality of both security and operational lapses that may have contributed to the circumstances resulting in the individual's death. While not every death in custody can be prevented, it appears that in at least 12 of the 15 deaths, poor operational and security practices were identified, including PIC access to illicit substances, inadequate supervision, and lapses in security and medical care. Several individuals died from synthetic cannabinoid intoxication. Other deaths were due to opioid overdose, possible medical neglect, or suicide (or possible suicide), often in units where staff failed to conduct meaningful tours, detect visible signs of distress, appropriately manage people in custody, or maintain proper post coverage. A few deaths stemmed from natural causes or serious illness. The medical responses varied in quality, with some cases indicating delayed recognition of the gravity of the situation or inconsistent application of life-saving measures. At least two deaths occurred in specialized housing units that have medical staff assigned directly to the unit and in both cases there were questions about the adequacy of supervision and other responsibilities of both DOC and CHS staff. While the investigations remain open for most of these incidents, the Department

imposed staff discipline, including suspensions and terminations, in six of these events for policy violations such as abandoning post or inadequate touring .[69]

### SUMMARIES OF DEATHS IN 2025

Below is a brief summary of deaths of people in-custody or of those who died shortly after release occurring between January 2025 and the date of this report: [70]

- **Ramel Powell**. On the evening of February 19, 2025, Mr. Powell was found unresponsive in his assigned cell in a housing area at GRVC. Staff initiated emergency medical procedures, and he was pronounced deceased in the early morning hours of February 20. OCME determined that Mr. Powell died from acute MDMB-4en-PINACA intoxication, a synthetic cannabinoid. Video evidence showed people in custody openly smoking in the dayroom area and carrying Mr. Powell, who appeared severely impaired, into his cell while the assigned housing officer looked on and failed to intervene. For more than five hours thereafter, the housing area Officer conducted multiple superficial tours without meaningfully checking the cell, despite clear signs of drug activity and no visible movement from Mr. Powell. Investigators also found 121 pills in Mr. Powell's cell, including Tramadol and synthetic cannabinoid (K2)-laced papers. The Department found that the housing unit Officer failed to maintain proper observation of people in custody, failed to detect or act on obvious signs of drug use, and failed to conduct

---

[69] Routine tours should be conducted at irregular times by correctional officers and supervisors. The tours should confirm individuals in custody are present, alive, and an assessment of their well-being. The tours should also include inspections for contraband, rule violations and ensuring cells and common areas are secure.

[70] All deaths are currently under investigation by external agencies and/or the Department of Correction. The causes of death for some individuals remain pending with the Office of the Chief Medical Examiner of the City of New York.

adequate cell tours. The officer was terminated as a result of this incident. Investigation into the incident is ongoing.

- **Terrence Moore**. On February 24, 2025, while in the Manhattan Courts, Mr. Terrence Moore experienced a medical emergency. Staff initiated emergency response procedures, and he was transported to a local hospital, where he was pronounced deceased. OCME determined that the cause of death was an accident due to substance use, specifically 5-Fluoro-MDMB-PINACA/5-Fluoro-EMB and PINACA and MDMB-4en-PINACA toxicity. Investigation into the incident is ongoing.

- **Ariel Quidone**. On March 13, 2025, Mr. Quidone experienced a serious medical emergency while housed in a housing area at RNDC. In the days before his death, Mr. Quidone had complained of significant pain from recent surgery and appeared visibly unwell. On March 13, 2025, he was seen on video vomiting multiple times and moving sluggishly in the housing area and clinic. That day, he received medical attention and was transported to the hospital, where he passed away on March 16, 2025. Mr. Quidone's cause of death is pending OCME confirmation. Investigation into the incident is ongoing.

- **Sonia Reyes**. In the early morning hours of March 20, 2025, Ms. Reyes was found unresponsive in her cell in a housing unit at West Facility. On-site medical personnel initiated emergency procedures, and EMS responded shortly thereafter. Ms. Reyes was pronounced deceased at the facility. The Department determined a housing area officer failed to conduct meaningful tours and, as a result, the officer received a Command Discipline. The OCME determined that Ms. Reyes' cause of death was suicide by hanging. Investigation into the incident is ongoing.

- **Dashawn Jenkins**. On March 31, 2025, in a housing area in GRVC, Mr. Jenkins was observed in medical distress during a scheduled lock-in tour. Facility staff initiated emergency procedures, including the administration of Narcan and CPR. Despite continued resuscitation efforts by medical personnel, Mr. Jenkins was pronounced deceased later that evening. Video showed that officers assigned to the housing area failed to conduct meaningful tours and left the area unsupervised. It also appears that there are questions about the logbook entries. The Department reported that two officers were suspended because of this incident – one for failing to tour and supervise and the other for allowing the B-post officer to enter the A station. One of the officers was later terminated while serving the suspension. A recommendation was also made to extend the area supervisor's probationary period by six months for failing to take corrective action during each tour of the housing area. The official cause of death for Mr. Jenkins remains pending. Investigation into the incident is ongoing.

- **Benjamin Kelly.** On June 20, 2025, Mr. Kelly was found unresponsive in his cell at EMTC with a sheet tied around his neck. Staff cut him down, initiated CPR, and called a medical emergency. Medical staff responded, administered multiple doses of Narcan and applied an AED, but Mr. Kelly was pronounced deceased shortly thereafter. The OCME found the cause of death to be suicide by hanging. Mr. Kelly had a history of substance use and prior self-harm and had recently been removed from suicide watch. Investigation into the incident is ongoing.

- **James Maldanado.** On June 20, 2025, shortly after arriving at EMTC from Staten Island Court, Mr. Maldanado was found unresponsive on a DOC transport bus. Witnesses reported that he appeared ill during the ride and had asked for medical help, and one

officer noted his clothes were soiled before transport. Upon arrival at EMTC, staff initiated CPR, administered Narcan, and used a mechanical chest compression device, but Mr. Maldonado could not be revived. The OCME determined the cause of death to be acute intoxication due to the combined effects of fentanyl, morphine, and methadone. Investigation into the incident is ongoing.

- **Christian Collado.** On July 9, 2025, Mr. Collado passed away at Bellevue Hospital while in Department custody. His death was attributed to stage 4 ampullary adenocarcinoma with liver metastasis. He was receiving palliative care, and his brother was present at the time of his passing.

- **Edwin Quispe.** On July 22, 2025, Mr. Quispe was found unresponsive in a bathroom at EMTC. Video showed him entering and exiting the bathroom before reentering and remaining inside for approximately 45 minutes. Other individuals later alerted staff that Mr. Quispe needed assistance and emergency procedures were initiated. Despite medical intervention, Mr. Quispe was pronounced deceased. The Department reported that the assigned officer had left his post without authorization and was suspended for 30 days. The official cause of death remains pending with the OCME. Investigation into the incident is ongoing.

- **Ardit Billa.** On August 23, 2025, Mr. Billa was found deceased in his cell at GRVC. In the days prior, he reportedly isolated himself, refused social services, and was not compliant with prescribed medication. Video footage showed both DOC staff and CHS staff noting foul odors and sanitation issues from his cell hours before his body was discovered, with some spraying what appeared to be air freshener in front of his cell. The video also showed three officers and a supervisor using a broomstick and sliding it under

the door to poke Mr. Billa's body. When staff finally entered the cell, Mr. Billa was found naked, partially submerged headfirst in the toilet, and covered in feces. Despite resuscitation attempts, he was pronounced dead at the scene. One Captain and three Correction Officers were suspended as a result of this incident. The captain received a 28-day suspension without pay for failing to properly tour and check for signs of life in the housing area. Two Correction Officers were each suspended for 30 days without pay for being off post for an extended period of time, leaving their assigned area unsupervised. A third Correction Officer received a 15-day suspension without pay for allowing an unauthorized staff member to remain on post for an extended period. The official cause of death remains pending with the OCME. Investigation into the incident is ongoing.

- **Jimmy Avila.** On August 30, 2025, Mr. Avila was found unresponsive in his cell at West Facility in an apparent suicide. When staff arrived to administer medication, they discovered him in an asphyxiated position with a ligature tied to the bed fixture. The officer cut him down and initiated CPR while medical and EMS personnel responded, but Mr. Avila was pronounced deceased shortly thereafter. The official cause of death remains pending with the OCME. Investigation into the incident is ongoing.

- **Carlos Cruz.** On September 3, 2025, Mr. Cruz was found unresponsive in a cell at GRVC. Video footage showed disorder in the housing area prior to the incident, with people moving freely between cells without staff intervention. Other incarcerated individuals alerted staff that Mr. Cruz was in distress. Officers entered the cell, administered Narcan, and initiated a medical emergency, but Mr. Cruz was pronounced deceased. The Department reported multiple failures in supervision, including improper tours and inadequate response to the emergency. One officer was suspended for 30 days

and a captain was suspended for 15 days for failing to conduct meaningful tours. The official cause of death remains pending with the OCME. Investigation into the incident is ongoing.

- **Edwin Ramos.** On November 21, 2025, Mr. Ramos was found unresponsive and unconscious, but with a pulse, on the floor of a bathroom in a dorm-style housing area in OBCC. Mr. Ramos fell to the ground in the bathroom, though the cause of the fall and his resulting unconsciousness is unknown. The B-post officer assigned to the housing area promptly responded to the bathroom after Mr. Ramos fell, initiated a medical emergency, and administered Narcan and chest compressions. Despite resuscitation attempts by both uniform DOC staff and medical CHS staff, Mr. Ramos remained unresponsive. He was transported to the hospital, where he was pronounced deceased. While the B-post officer routinely walked around the housing unit, there were multiple PICs walking around and congregating in both the bedroom area and bathroom even though it was during nightly lock-in hours when PICs are supposed to be restricted to their beds and bathroom use should be limited to one PIC at a time. Video also shows the B-post officer removing what appears to be a burnt rolled-up piece of paper from an unconscious PIC's hand while touring the unit after Mr. Ramos was found unresponsive in the bathroom. The official cause of death remains pending with the OCME. Investigation into the incident is ongoing.

- **Aramis Furse.** On December 7, 2025, Mr. Furse was found unresponsive in a cell at OBCC. Video shows that the B-post officer for the housing unit did not conduct a tour for over a half hour prior to finding Mr. Furse unresponsive in his cell. Even though this incident occurred after nightly lock-in, other incarcerated individuals were seen freely

entering and exiting their cells and congregating in the dayroom area. It appears that these other incarcerated individuals alerted the B-post officer that Mr. Furse was in distress. The B-post officer entered the cell, initiated a medical emergency, and administered Narcan. Despite resuscitation attempts by medical CHS staff and FDNY EMS staff, Mr. Ramos remained unresponsive. He was transported to the hospital, where he was pronounced deceased. The B-post officer was suspended for 30 days for inefficient performance of duties. The official cause of death remains pending with the OCME. Investigation into the incident is ongoing.

- **Kyron Randall.** On December 21, 2025, while housed in a mental observation area at GRVC, Mr. Randall experienced a medical emergency. Incarcerated individuals reported to staff that Mr. Randall had not left his cell all day and had been visibly sick for several days. A nurse briefly stopped at his cell. Additional medical staff arrived. At the time Mr. Randall was in obvious distress and difficulty breathing. However, a medical staff member instructed others not to touch him due to concerns that he might be "infectious" and so he was not removed from his cell. Twenty minutes later, a Captain arrived, and staff reported that EMS had been called. At the time, Mr. Randall was lying face down on the cell floor, unable to communicate, and staff discussed next steps. Mr. Randall was eventually removed from the cell approximately 40 minutes after a nurse first came to his cell. Mr. Randall was transported to the hospital, where he was pronounced deceased shortly after midnight. Investigation into the incident is ongoing. The official cause of death remains pending with the OCME. Investigation into the incident is ongoing.

## INCIDENTS OF SELF-HARM

The Monitoring Team has long raised concerns about staff response to self-harm incidents. The Monitoring Team's extensive review of incidents has identified a pattern in that staff utilize harmful interventions (*e.g.*, OC spray) or intentionally ignore or fail to intervene in an attempted suicide or events where individuals attempt to harm themselves (*e.g.* banging head).[71] Three illustrative examples of such incidents are described below. These examples were selected from similar incidents reviewed by the Monitoring Team and are not isolated events.

- **Delayed and Problematic Response to Two Individuals Engaging in Self Harm in November 2024**: *In GRVC Main Intake, two individuals in custody engaged in self-harm, one cutting his forearms with an unknown object and another tying institutional linen around his neck and securing it to a vent. Staff were outside the pen and were visible on video walking through the area and conversing, appearing not to recognize the escalating behavior in the Intake Pen. After several minutes, staff finally approached, observed the ligature and the ongoing cutting, and issued orders for the individuals to stop. An officer opened the pen and deployed chemical agents toward the individual with the linen. Staff then entered the pen and cut the ligature with a 911 knife. When both individuals refused orders to lie on the floor, officers guided them down using control holds, including one officer briefly placing a knee on an individual's back while securing restraints. Medical staff later documented superficial lacerations on the forearms of the individual who had been cutting himself, while the other individual was referred for suicide risk assessment. The Rapid Review found the incident avoidable due to the delay in staff detecting the self-harm, the failure to search the individuals before placement in the pen, and the brief knee placement, leading to a corrective interview and retraining. The Investigation Division further identified for missing staff reports and staff use of profanity captured on body-worn camera. This is example 12 in Appendix L.*

- **Delayed Response to Self-Harm Event in March 2025**: *In a housing area in GRVC, an officer assigned to the area was observed on video playing dominoes with another individual in custody rather than monitoring the housing area, during which time an individual in a nearby cell, who was on suicide watch, tied a torn piece of institutional clothing tightly around his neck. When the officer eventually approached the cell and the*

---

[71] The fact that such a pattern exists does not mean that staff always act inappropriately. For example, DOC provided the Monitoring Team with an example from this Monitoring Period in which it reported that the Department awarded a staff member a medal for their quick response to an individual's act of self-harm and protected them from further harm.

*individual refused orders to remove the ligature, the officer entered, deployed chemical agents, and pulled the individual off the bed, while another officer cut the cloth from his neck with a 911 knife. The individual was then escorted out for decontamination and placement in a holding pen. Medical staff later documented abrasions on the individual's forearm, though the individual was not promptly produced for medical evaluation. No staff injuries were reported. The Rapid Review determined the incident was avoidable and identified concerns with the officer's inattention to the housing area and failure to maintain proper observation of a person on suicide watch. The Investigation Division identified violations for delayed medical attention and insufficient detail in staff reporting. This is example 10 in Appendix L.*

- **Delayed Response & OC Spray Use in Self-Harm Event in May 2025**: *In a housing area in GRVC, an individual deliberately prepared to hang himself in clear view of multiple officers, tying a sheet around his neck, climbing onto a TV mount, and securing the ligature to the upper-tier railing while staff failed to intervene with any sense of urgency. Rather than immediately cutting the ligature, officers deployed OC spray as the individual was hanging and partially suspended from the TV mount. The individual was ultimately taken down after another individual in custody lifted his legs so staff could cut him down, resulting in the individual falling to the ground and convulsing. While the individual is on the floor, a Captain enters the housing area, and BWC captures him yelling, "Bring that dumbass outside, bring him out here, bring him outside." The individual coughs from the impact of the chemical agents and the Captain can be heard saying, "Somebody grab a shirt for him. Don't give him no water". Once restrained near the housing area door, one officer is captured on BWC saying "All that for a female" and the Captain is captured saying "You gotta hang up every day then, because you not gonna get a female anytime". Medical staff documented a visible ligature mark on the neck. The Investigation Division identified serious staff misconduct, including delayed response to self-harm, reliance on chemical agents as an initial intervention, inaccurate reporting, and use of inappropriate language by staff. This is example 11 in Appendix L.*

## DOC's Efforts to Address Acts of Self-Harm

In the fall of 2022, the Department developed a Suicide Prevention Task force.[72] The

Department reported the Suicide Prevention Task Force was established to provide a senior-level,

cross-disciplinary forum for identifying systemic gaps in suicide prevention, reviewing policies,

---

[72] For more information on the Suicide Prevention Task Force, *see* Monitor's Report April 3, 2023 Report (dkt. 517) at pgs. 70 to 71.

training, data, and operational practices, and coordinating DOC and H+H efforts to reduce self-harm and suicide risk among incarcerated individuals through targeted reforms, improved oversight, and data-driven interventions. The Department reports that in this Monitoring Period that 15 uniformed and non-uniformed staff graduated from the Department's Emergency Medical Technician training program.

The Court's August 10, 2023 Order required the Department and CHS to engage a qualified expert in the prevention and response to self-harm in correctional settings to conduct an assessment of various DOC and CHS practices. Dr. Belavich, a qualified expert in the prevention and response to self-harm in correctional settings, completed his assessment of the Department's suicide prevention practices in January 2024. Dr. Belavich consulted with the Monitoring Team during his assessment. A copy of his final report was filed with the Court on March 19, 2024 as Exhibit A to the Saunders Declaration (dkt. 689-12). The report includes several recommendations that the Monitoring Team has encouraged the Department to implement. The Commissioner advised the Court in her March 19, 2024 declaration (dkt. 689-1) at ¶ 44 that the Department intended to implement the recommendations from Dr. Belavich. However, the current status of DOC's implementation is unknown.

Along with the work by Dr. Belavich, the Monitoring Team has attempted to support DOC's efforts to improve its practices in addressing incidents of self-harm. In December 2023, the Monitoring Team shared a summary of its findings from its monitoring of incidents for further discussion. Despite repeated follow-ups, the Department has not responded to the Monitoring Team's feedback or otherwise engaged the Monitoring Team on this feedback almost two years later.

In February 2024, the Monitoring Team issued feedback recommending that the Department revise its Chemical Agent Directive to explicitly prohibit the use of chemical agents when an individual is attempting to hang themselves with a ligature around the neck that is attached to another object. This recommendation was based on the Monitoring Team's review of incidents in which staff immediately defaulted to chemical agents in ligature situations. The Monitoring Team found that the use of chemical agents in these circumstances increases the risk of serious harm by impairing breathing, vision, and motor control, potentially accelerating asphyxiation, escalating panic, and interfering with timely rescue and life-saving interventions.

In response to the Monitoring Team's feedback, in May 2025, the Department updated its Chemical Agent Directive to prohibit the use of chemical agents when an individual is attempting to hang themselves with a ligature around the neck that is attached to another object. However, the Monitoring Team's broader feedback, shared in December 2024, on the use of chemical agents and corresponding recommendations to revising the training remains outstanding. That feedback addressed the historical misuse and overuse of chemical agents and identified serious deficiencies in the Department's response to self-harm incidents, emphasizing that chemical agents should be explicitly prohibited in self-harm and ligature situations because their use increases risk and conflicts with accepted standards of care.

In September 2025, the Monitoring Team's review of incidents suggested that the 911 knives (emergency cut down knives) that staff must carry as part of their uniform may not be properly maintained. Accordingly, the Monitoring Team recommended that the Department's Suicide Prevention Task Force assess how the 911 knives are sharpened, how frequently they are checked, and who checks them to ensure they are appropriately maintained as dull or improperly

maintained tools can delay ligature removal and significantly increase the risk of serious injury or death in time-critical self-harm incidents. The Department has not responded to this feedback.

**CONCLUSION**

The deaths of multiple persons in custody (or shortly after release) in 2025 is tragic. Such negative outcomes also highlight the impact that poor security practices, supervision, and clinical care may have on persons in custody. These incidents underscore the need for consistent accountability, stronger contraband control, and more vigilant housing area management. Sustained collaboration between DOC and CHS is also critical to identify root causes, implement corrective actions, and prevent similar tragedies in the future. Additional information regarding in-custody deaths can also be found in Appendix C of the report. Appendix C includes: Causes of Death (Table 1), Mortality Rates (Table 2), and Corrective Actions Taken by DOC related to In-Custody Deaths from 2022 to 2025 (Table 3).

# ADVANCING THE NUNEZ REFORMS & ASSESSING COMPLIANCE

This section of the report discusses the overarching obligations regarding advancing the *Nunez* Court Orders, the Monitor's Compliance Assessments and how these must combine to provide a clear roadmap for reform. Although these matters are complicated, all stakeholders benefit from a well-organized, parsimonious roadmap and compliance assessments that use a robust methodology to assess the various facets of each provision. To advance the reform the Defendants must fulfill their own obligations while working cooperatively and collaboratively with the Court, Monitor, incoming Remediation Manager, and other relevant stakeholders to create the synergy necessary to reform the City's jails properly.

## ROLE AND RESPONSIBILITIES OF DEFENDANTS AND THE MONITOR

The obligation to materially and substantially improve the conditions in the jails and to implement a wide range of systemic reforms under the *Nunez* Consent Judgment rests with the City and the Department (collectively the "Defendants").[73] This includes developing and refining policies and procedures and implementing various practices, which the Consent Judgment defines as "putting in place the policy, procedure, system, or other remedial measure, including informing, instructing, or training all appropriate personnel as needed or as required by this Agreement, and consistently following, applying, or using the policy, procedure, system, or other remedial measure."[74] Defendants have both agreed and pledged to the Court their intent to comply with the *Nunez* Court Orders and their intent to seek additional Court relief if needed to address persistent obstacles.[75]

---

[73] *See* Joint Memorandum of All Parties in Support of Motion for Final Approval of Consent Judgment (dkt. 233) at pg. 4 and Transcript of Fairness Hearing on October 21, 2015 at pg. 7: 16 to 21.

[74] *See* Consent Judgment §III, ¶ 17.

[75] *See*, for example, Letter from the City of New York dated June 10, 2022 (dkt. 463) at pg. 1.

The Monitor is an agent of the Court. The Monitor's role is one of oversight and to provide to the Court and the Parties with a neutral and independent assessment of the Defendant's efforts to comply with the *Nunez* Court Orders. The Monitor must assess compliance with court-ordered reforms and explain the basis for such findings. To that end, the Consent Judgment requires the Monitor to describe "the efforts the Department has taken to implement the requirements of this Agreement and [evaluate] the extent to which the Department has complied with each substantive provision of this Agreement (the "Monitor Report")."[76] The Court has explained "[t]he Monitoring Team's dedicated reporting, formal and informal, has put Defendants, Plaintiffs, the Government, the Court, and the public on notice of these myriad failures to comply with Court orders over the years since the original Consent Judgment went into effect."[77]

The Monitor cannot fulfill his duties without active participation by Defendants, but the Monitor must remain neutral and independent. The Court has repeatedly made this clear. "[T]he Consent Judgment requires the Department to 'encourage all Staff Members to cooperate fully with the Monitor' and likewise demands that '[n]o Party, or any employee or agent of any Party, shall have supervisory authority over the Monitor's activities, reports, findings, or recommendations.'"[78]

The Monitoring Team also serves as a resource for the Department and it has worked consistently to provide technical assistance to Defendants in their efforts to advance reform.[79]

---

[76] *See* Consent Judgment, § XX, ¶ 16.

[77] *See* November 27, 2024 Order (dkt. 803) at pg. 40.

[78] *See* October 30, 2023 Order (dkt. 590) at pg. 2.

[79] *See* Consent Judgment § XX, ¶ 24.

This technical assistance includes substantive feedback on policies, procedures, and training programs to ensure compliance with the *Nunez* Court Orders. Since the implementation of the Consent Judgment, the Monitoring Team has shared over 900 written feedback documents to support the Department's efforts to comply with the *Nunez* Court Orders as well as informal feedback through discussions with City and DOC leadership and staff. The Court has noted that the Monitoring Team has "tirelessly made themselves available to provide recommendations and collaborate with Defendants to improve the unacceptable conditions in the Rikers Island jails."[80]

In 2025, the Monitoring Team provided technical assistance, both formal and informal, more than 100 times on draft/revised policies (*i.e.*, SMU, chemical agents, Command Discipline, promotional screening, special unit screening, facility added posts), training curricula (*i.e.*, BWC, electronic logbooks, pre-promotional trainings for Captains, ADWs, and DWs, Clinic Dashboard), and other issues such as incident reporting and classification. The Monitoring Team has also provided feedback and observations on a variety of Department practices including use of force techniques and procedures (*i.e.*, escorts and head strikes, incident reporting and report submission, Rapid Reviews, BWC equipment, medical wait times), safety and security practices (*i.e.*, searches for contraband, door security, post orders, proper use/maintenance of 911 knives), practice audits (*i.e.*, security and intake audits, NCU's audits of stabbing/slashing incidents), staff corrective action and discipline (*i.e.*, E.I.S.S. procedures, investigations of incidents and staff misconduct, practices for Memorandum of Complaints, scheduling OATH pre-trial conferences), and larger initiatives (*i.e.*, the RNDC Action Plan).

Information sharing, consultation and collaboration encompasses a lot of work for all involved and is absolutely essential to advance the reform effort. Case in point, the areas in

---

[80] *See* Court's November 27, 2024 Order at pg. 40.

which DOC has sustained the most progress are those where the Department has engaged in deep collaboration with the Monitoring Team (*e.g.*, RNDC Action Plan, RESH, initiatives within ID).

To be certain, the Court has clearly articulated separate roles for the Monitor and Defendants. The Consent Judgment specifically states, "[t]he Monitor will not, and is not intended to, replace or assume the duties of the Commissioner, any of [their] staff, or any other City officials." Consent Judgment §XX, ¶ 4. Notably, for specific requirements, the Monitor is required to approve key policies to ensure the prescribed practices are sound and meet the requirements of the Court Orders. *See*, for example, Court's November 27, 2024 Order at pg. 40. It must be emphasized that the Court's Orders clearly place the responsibility to alter practice in the jails and to comply with the *Nunez* Court Orders on Defendants.

### MONITORING TEAM'S ASSESSMENT OF COMPLIANCE

To make the required compliance assessments, the Monitoring Team must appraise the substance of the requirements and measure the Department's performance against defined compliance standards, while utilizing a methodology that fits the contours of the requirement and that distinguishes between superficial changes and sustainable, material improvements. Specifically, the Monitor is "responsible for independently verifying any representations from the Department regarding its progress toward compliance."[81] The Court grants the Monitor broad access to obtain information that he deems, in his sole discretion, necessary to fulfill his responsibilities.[82] In response, the Department is required to produce timely, accurate and

---

[81] *See* Consent Judgment, § XX, ¶ 18.

[82] *See*, for example, Consent Judgment § XX, ¶ 8 and October 30, 2023 Order.

reliable information to the Monitor and to provide the Monitor with unfettered access to Department leadership and staff.[83]

- **Provisions Subject to a Compliance Rating**

For the past four years, the Monitoring Team has been required to assess compliance with only a subset of the hundreds of provisions in the *Nunez* Court Orders.[84] These include approximately 25 provisions that prioritize four key areas for improvement to properly undergird the reform effort: (1) security practices and procedures that are deeply flawed, inconsistent with best practice and, in some cases, illogical, (2) inadequate supervision of line staff and facility leadership who do not possess the requisite expertise and ability to lead, (3) staffing practices and procedures that have resulted in ineffective deployment across the agency, and (4) limited and/or extremely delayed accountability for staff misconduct.

The Monitoring Team has rated the Department's compliance with only this subset of 25 provisions for the past six Monitoring Periods.[85] During this Monitoring Period, an additional 15 provisions with which the Department was found in contempt were added to the list of provisions that require a compliance assessment.[86] In total, the Monitoring Team currently assesses compliance with 40 of the hundreds of provisions contained in the *Nunez* Court Orders.

The main body of this report includes 25 individual "sections" that address these 40 provisions. Several provisions are interrelated and thus are addressed together. Further, updates

---

[83] *See*, for example, June 13, 2023 Order § I, ¶¶ 4 and 6.

[84] Over four years ago, the Monitoring Team recommended that, in order to stimulate reform, the Department focus on and prioritize a select group of provisions. *See*, Monitor's December 6, 2021 Report (dkt. 431) at pgs. 10 to 12. Accordingly, the Action Plan limited the number of provisions subject to compliance ratings so that the Department could concentrate its efforts on the foundational requirements for advancing reform.

[85] *See*, Action Plan § G, ¶ 5.

[86] *See*, July 10, 2025 Order (dkt. 921).

on relevant portions of the 2023 *Nunez* Court Orders[87] are also discussed in the individual "sections," although compliance ratings are not applied pursuant to the Court's July 10, 2025 Order (dkt. 879).

Each "section" of the report provides a "Compliance Assessment Overview" which explains the history of the Department's level of compliance to date. Recently, various stakeholders have recommended changes to the format of this section and the Monitoring Team intends to revise its structure in future reports where appropriate. A list of the 40 provisions for which the Monitoring Team provides a compliance rating, including the compliance ratings from the 14th Monitoring Period to the present, is provided in Appendix A.

- **Monitoring Team's Methodology for Assessing Compliance**

The compliance standards that the Monitoring Team must utilize are defined by Consent Judgment § XX, ¶ 18:

- "Substantial Compliance" shall mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision.

- "Partial Compliance" shall mean that the Department has achieved compliance on some components of the relevant provision of this Agreement, but significant work remains.

- "Non-compliance" shall mean that the Department has not met most or all of the components of the relevant provision of this Agreement.

A comprehensive methodology for assessing compliance and the current state of affairs requires the Monitoring Team to evaluate multiple measures in each key area of the *Nunez* Court

---

[87] The 2023 Orders include the June 13, 2023 Order (dkt. 550), August 10, 2023 Order (dkt. 564), October 10, 2023 Order (dkt. 582), December 14, 2023 Order (dkt. 656), and December 20, 2023 Order (dkt. 665).

Orders. No single metric adequately represents the multi-faceted nature of most of the requirements. Quantitative data is a necessary component of any analysis, but relegating a nuanced, complex, qualitative assessment of progress to a single, one-dimensional, quantitative metric is not practical or advisable. Data—whether qualitative or quantitative—cannot be interpreted in a vacuum to determine whether progress has been made or compliance has been achieved. For example, meeting the requirements of the Use of Force Policy provision of the Consent Judgment relies on a series of closely related and interdependent requirements working in tandem to ultimately reduce and, hopefully eliminate, the use of unnecessary and excessive force. No single metric can determine whether the Use of Force Policy has been properly implemented. Analogous situations appear throughout this report, whether focused on discussions about the Department's efforts to improve safety in the facilities, to make the process of imposing staff discipline timelier and more effective, or to address its staffing needs. The Monitoring Team therefore uses a combination of quantitative data, qualitative data, contextual factors, and references to sound correctional practice to assess the Department's progress toward achieving compliance with the requirements of the *Nunez* Court Orders. This information is gathered in a variety of ways, as discussed below and also in the "Trends in UOF and Violence Metrics, 2016-2025" subsection of the "Assessment of the Department's Use of Force and Security Practices" section of this report.

DOC and its consultants have asserted that the standards for assessing compliance should be altered.

With respect to Substantial Compliance, DOC has raised concerns that the standard expects perfection. This is incorrect. The *Nunez* definition of Substantial Compliance states that

practice must "not deviate **significantly** from the terms of the relevant provision."[88] (Emphasis added.) Neither the definition nor any of the Monitoring Team's findings to date have held the Department to a standard of perfection or 100% compliance. In fact, the Monitor has explicitly stated that perfection is not required.[89]

DOC and its Consultants have also advocated that the Monitor should unilaterally apply a new and different definition and standard for Non-Compliance than what is required by the Consent Judgment. Specifically, that the definition of Non-Compliance should be revised to reflect whether the Department is "making no or minimal *effort* to reach compliance," rather than the current definition which states that "the Department has not met most or all of the components of the relevant provision of this Agreement."[90] The Monitoring Team is not aware of any Consent Decree that utilizes the definition of Non-Compliance proposed, including any of the cases in which DOC's Consultants have experience.

Moreover, it is critical to note that the Monitoring Team is not empowered to unilaterally alter the definition in the Consent Judgment. Furthermore, altering the definition of Non-Compliance to one which emphasizes *effort* over *the required change in practice and outcomes* is not, in our view, appropriate. The foundation of every provision of the Consent Judgment is that the Department's efforts result in a change in practice that cures the violation of constitutional rights. One need only to review the past record in this case to identify many scenarios where the Department's efforts did not produce the intended result and staff and people in custody continued to suffer a grave risk of harm and often, *actual* harm. Yet it appears DOC is

---

[88] *See*, Consent Judgment § XX, ¶ 18

[89] The Monitor explicitly reported "[s]ystem reform does not require perfection in order to be meaningful. A realistic approach as to what can be achieved and sustained must be the foundation." *See*, Monitor's December 6, 2021 Report (dkt. 431) at pg. 11.

[90] *See*, Consent Judgment § XX, ¶ 18

contending that even *minimal* effort, ineffective or unsustainable as it may be, should be sufficient to avoid a finding of Non-Compliance. Simply lowering the standards the Department has to meet to achieve compliance does not advance the reform effort.

- **Considerations for Quantitative Metrics**

The Monitoring Team evaluates a number of quantitative metrics in its work. However, two cautions are needed when considering quantitative metrics. First, the use of numerical data suggests that there are specific thresholds or rates that specify a certain point at which the Department passes or fails. There are no national standards regarding a "safe" use of force rate, a "reasonable number" of unnecessary or excessive uses of force, nor an "appropriate" rate at which staff are held accountable.[91] Consequently, the Monitoring Team uses a multi-faceted strategy using quantitative and qualitative information for assessing compliance that evaluates all inter-related issues.

Second, there are infinite options for quantifying the many aspects of the Department's approach and results. Just because something *can* be quantified, does not mean it is necessarily useful for understanding or assessing progress. The task is to identify those metrics that actually provide insight into the Department's processes and outcomes and that are useful to the task of problem solving. If not anchored to a commitment to advance and improve the processes and outcomes that underpin the requirements of the *Nunez* Court Orders, the development of metrics merely becomes a burdensome and bureaucratic distraction.

---

[91] Notably, this is why the Consent Judgment, the underlying *Nunez* litigation, the CRIPA investigation, the Remedial Orders, or the Action Plan include specific metrics the Department must meet with respect to operational and security standards that must be achieved.

DOC's Consultants have proposed that the methodology to determine Substantial Compliance should be changed from one that is multifaceted to one utilizing a quantitative standard, for example, a 90% performance level for a select group of quantitative metrics. This proposal is problematic and in practice will lower the standard for achieving compliance given it essentially limits the assessment of complex issues to a narrow set of quantitative metrics. As discussed above, this work is nuanced and complex and so a multifaceted approach to compliance is necessary. Notably, the Monitoring Team is not aware of any definition of Substantial Compliance that requires only a specific set of quantified metrics to be met.[92]

The Monitoring Team is perpetually reviewing its methodology for assessing compliance and, where appropriate, continues to consider whether *additional* metrics, including quantitative metrics with set standards, may be appropriate to utilize. Certain requirements are better suited for such a methodology that includes quantitative metrics with set standards than others. To the extent that the Monitoring Team adopts such a methodology in its assessment of any provision, the standard will be identified in its discussion of the relevant compliance rating.

- **Considerations for Assessing Compliance**

It is axiomatic that reform is intended to improve upon the conditions extant at the time the Court first entered the Consent Judgment and that the initiatives implemented as required by the *Nunez* Court Orders actually improve practice. It must also be emphasized that the various Remedial Orders that were entered following the Consent Judgment were all intended to create

---

[92] The Monitoring Team has not identified any definition of Substantial Compliance that includes a specific numeric threshold, including the nine Consent Decrees where the DOC's Consultants served as Monitors or Receiver, any of the Consent Decrees posted on the U.S. Department of Justice's Special Litigation Section's website containing its "Cases and Matters,"[92] (available at: https://www.justice.gov/crt/special-litigation-section-cases-and-matters#corrections) nor any other cases with which members of the Monitoring Team are familiar.

the capacity to comply with the requirements of the Consent Judgment. None of the *Nunez* Court's Orders "move the goal posts" or materially change the Department's obligation to fully comply with the Consent Judgment. For this reason, the Monitoring Team compares current performance levels and key outcomes to various periods of time, including those at the time the Consent Judgment went into effect as well as other pertinent markers such as when a policy was adopted and implemented. The Monitoring Team has taken this same approach throughout the duration of its work.

DOC's recent Safety Plan, and its Consultants, reiterate legal arguments made in its opposition to the motion for contempt that any assessment of DOC's use of force practices and other factors related to the risk of harm should be limited to comparisons of 2021 data. The contention is that comparisons to earlier time periods (*e.g.*, 2016) are both irrelevant and inappropriate. The Court has rejected the argument that comparisons of data should be limited to 2021 *twice*.[93] The Court has explained that the *Nunez* "Court orders [are] designed to remedy consistently unconstitutional levels of violence and disorder in the jails."[94] To that end, the Court's November 26, 2024 Contempt Order (dkt. 803) expressly finds that current data must be compared to the state of affairs in 2016.[95] The Monitoring Team does agree that comparison of data with 2021 is one of *several* appropriate time periods to assess because it reflects the apex of

---

[93] *See*, for example, the Court's November 26, 2024 Order at 48 and the Court's October 16, 2025 Order at pg. 6.

[94] *See*, for example, the Court's November 26, 2024 Order (dkt. 803) at pg. 50.

[95] DOC's Consultants appear to also make a poorly reasoned legal argument that comparing current performance levels to those in 2016 is inappropriate because the Consent Judgment was entered to simply protect the rights of those incarcerated. They appear to contend that constitutional violations were not present in 2016 when the Consent Judgment was entered. This legal argument, beyond the DOC's Consultants' expertise, ignores the fact that Defendants have repeatedly "agreed that the proposed relief is narrowly drawn, extends no further than is necessary to correct the alleged violations of federal rights, is the least intrusive means necessary to correct these violations…" *See* Consent Judgment § XXII. *See* also Joint Memorandum of All Parties in Support of Motion for Final Approval of Consent Judgment (dkt. 233) at pgs. 7 to 8.

the staffing crisis. Comparison of various metrics across time is informative. This is why the Monitoring Team compares various metrics and qualitative indicators to a variety of different points in time, including 2016, 2018, and 2021, and has done so *for years*.

The Monitoring Team intends to continue to assess progress utilizing a variety of metrics across relevant time periods. However, suggestions that discrete data points should be evaluated only for specific periods of time, and over five years of case history should be ignored appear to be an attempt to simply lower the bar and expectations of what this case is intended to accomplish.

- **External Factors that Impact Department Operations**

It must be recognized that since the Consent Judgment was entered, the context that the jails operate within has changed due to external factors. One of the most obvious externalities is the COVID-19 pandemic which began in March 2020. The pandemic triggered a staffing crisis that exacerbated decades-long mismanagement of the Department's most important resource—its staff—which then cascaded into additional problems in many of the areas that impact jail safety (*e.g.*, failure to provide mandated services which generates frustration; levels of stress among people in custody and staff which can trigger poor behavior; interruptions in programming that increase idle time). In addition, bail reform enacted by the State in 2020 has changed the composition of the jails' incarcerated population. Individuals with less serious offenses who previously may have been incarcerated are generally no longer detained pending trial. While this has had the effect of reducing the overall jail population, it has resulted in a higher concentration of detainees with more serious charges in the jails. Relatedly, the Department abolished Punitive Segregation (*i.e.*, solitary confinement) in 2019 and initially struggled to implement a safe and effective strategy for addressing violent misconduct by people in custody.

In addition, the City's efforts to close Rikers have included decommissioning several jails, thereby decreasing the overall available bed space in the Department's facilities. Further, the law requiring closure of all the facilities on Rikers by 2027 potentially restricts the Department's access to capital funding.[96] Finally, in 2025, staffing issues in the New York State prison system significantly impacted the Department's population. For almost a year, between 500 and 1,000 individuals who should have been transferred to the state prison system remained in the Department's custody, which led to a cascade of negative effects (*e.g.*, stress and frustration among people in custody, increased population and corresponding decreased bedspace, more crowded housing units, etc.).

DOC's Safety Plan, and its Consultants, continue to repeat arguments made in Defendants' opposition to the motion for contempt/appointment of a Receiver that certain external factors such as bail reform and increased length of stay are the cause of current conditions in what appear to be an attempt to shift blame and excuse current conditions. However, the Court has explained with respect to both bail reform and the increased length of stay that "[c]ritically, none of these changes [including the new UOF directive, additional

---

[96] DOC reports it has not been able to obtain funding for capital projects for facilities on Rikers Island because a project must be deemed "capital eligible" to obtain capital funding. In December 2025, the City explained whether a project is "capital eligible" is informed by NYS Local Finance Law Sections 10 and 11, NYC Charter Chapters 9 and 10, Comptroller's Directive 10, and Generally Accepted Accounting Principles (GAAP). Comptroller's Directive 10, Section 3 sets forth baseline eligibility criteria for capital projects. "Baseline Eligibility Criteria" are "baseline standards of purpose, cost, useful life, and replacement that must be met in order for a project to be eligible for capital financing." Comptroller's Directive 10, Section 3. A Capital Project's expected useful life, for City Purposes, "must be at least: 1. five years for projects other than those consisting of computer hardware, software, networks, and information technology systems…" Comptroller's Directive 10, Section 3.4. In the case of the facilities on Rikers Island, the useful life is less than 5 years because NYC Administrative Code §4-215 (a)(1) requires that by August 31, 2027 the City no longer utilize Rikers Island to house incarcerated people. If upon review of a proposed capital project, it is deemed not capital eligible by OMB, DOC can apply to the Comptroller for a waiver of the Directive 10 criteria. DOC reports that OMB advised it will review any proposed capital projects submitted by DOC for work on Rikers Island on a case by case basis to determine capital eligibility. The Comptroller's Office, under the previous Administration, advised it will would not grant a waiver to provide capital funding nonetheless, under Directive 10, if a project does not meet the baseline eligibility criteria.

surveillance cameras, bail reform, and increased length of stay] since 2016 explain DOC's failure to implement the use of force directive, as required by § IV, ¶ 1 of the Consent Judgment, or to take consistent, deliberate action in collaboration with the Monitoring Team to make the fundamental changes required to comply with the key safety, security and accountability requirements that are the subjects of the contempt motion practice that is before the Court." *See*, November 26, 2024 Order at pg. 48.

To be certain, there are, of course, discrete regulations that may exacerbate rather than reduce the risk of harm and therefore impede the reform effort. For instance, the Department and the Monitor have raised concerns that certain provisions or discrete requirements in Local Law 42 may negatively the Department's operations.[97] However, it must be emphasized that DOC **does** have agency in managing the jails and the external factors do not change the City's obligation to provide safe and humane treatment to those within its jails and any suggestion that appears to excuse this obligation is troubling. In fact, Defendants have repeatedly claimed that reforming the jails is within their power and control.

While these externalities are important for understanding shifts in the size and characteristics of the jail population and the resulting dynamics that surround jail safety, they do not excuse failure to comply with the *Nunez* Court Orders or obviate or diminish the Defendants' obligations to provide for safe and humane operation of the jails. The constitutional minimum of care and safety that must be afforded to all incarcerated individuals has remained the same and continues to be the standard by which all reform must be measured.

---

[97] *See* Monitor's January 31, 2025 Report (dkt. 814). *See also*, Monitor's June 30, 2022 report (dkt. 467) at pgs. 22 to 27.

- **DOC's Production of Information**

In order for the Monitoring Team to render its determinations and independently verify the Department's representations about its progress, the Monitoring Team must assess a wide variety of information from many sources.

Consulting, engaging, and providing information to the Monitoring Team is a tremendous undertaking that requires significant resources. Defendants routinely report on the significant amount of information they provide to the Monitor and that the Monitor routinely communicates with Department leadership and staff,[98] assertions which the Monitoring Team has consistently acknowledged.[99]

The Monitoring Team has always been mindful that any request for information will necessarily impact on the Department's already constrained resources. For this reason, the overwhelming majority of the Monitoring Team's requests are for information that the Department maintains in the ordinary course of business. A significant number of requests pertain to information that the Department provides on a routine basis or schedule, which the Department has reported is easier to accommodate. The Monitoring Team also routinely speaks with DOC staff about strategies for reducing the potential burden of the Monitoring Team's requests. As part of the ongoing effort to ensure efficiencies, in 2025, the Monitoring Team reduced the number of requests for information submitted by a third compared to the year prior.

---

[98] *See* City's April 25, 2023 Letter to the Court (dkt. 523) at pgs. 6 to 7, City's August 9, 2023 Letter to the Court (dkt. 562) at pg. 7, City's October 28, 2023 Response to the Motion to Compel (dkt. 589) at pg. 1, City's November 28, 2023 Letter to the Court (dkt. 614) at pgs. 3 to 4, and Kimberly Joyce's Declaration of November 28, 2023 (dkt. 614-4).

[99] *See*, for example, Monitor's November 8, 2023 Report (dkt. 595) at pg. 56, Monitor's August 7, 2023 Report (dkt. 561) at pgs. 7 to 8, Monitor's July 10, 2023 Report (dkt. 557) at pgs. 148 to 149, Monitor's June 8, 2023 Report (dkt. 541) at pgs. 37 to 38, Monitor's May 26, 2023 Report (dkt. 533) at pgs. 16 to 17.

Despite the Monitoring Team's efforts, DOC continues to struggle to produce all requested information in a timely manner and a significant number of requests for information and responses to feedback remain unanswered and outstanding, a significant number of which remain pending *for years*. As of November 2025, there are currently requests for the investigation report for *over* 60 use of force incidents, *over* 70 feedbacks,[100] and *over* 50 requests for information and/or documentation from the Monitoring Team that are not yet complete or are pending a response from DOC, covering a wide variety of topics and issues.[101] Many of these requests and feedback have been pending since 2023. Notably, a considerable number of outstanding requests are for information that DOC has said it maintains in the ordinary course of business but for some reason is unable to produce.

Despite DOC's claimed commitment to transparency and purported affinity for working with the Monitoring Team, it recently reported that limits should be placed on the Monitor's access to information including limits on what information can be requested and when/how the information can be requested apparently because DOC cannot manage the workload and therefore it is burdensome. DOC's reported claims of undue burden are spurious. DOC points to the fact that calls with staff across the agency from the Monitoring Team amount to about 15 hours *a month*[102] (most calls with staff or leadership last 30 minutes to 1 hour once a month). As noted above, significant efforts have been made by the Monitoring Team to reduce the

---

[100] Many of the Monitoring Team's feedbacks contain multiple, discrete recommendations within one feedback document.

[101] Multiple times a year, the Monitoring Team develops a list of outstanding requests and feedbacks to the Department as an administrative courtesy. The purpose is to help DOC identify what information requests may remain outstanding and require a response. The *Nunez* Manager has repeatedly advised the Monitoring that the Legal Division finds these lists are a helpful aid to the Department in managing its workload.

[102] For instance, it appears that DOC has been tabulating the duration of phone calls with the Monitoring Team. It is puzzling that DOC has committed finite resources to calculating the number of minutes it speaks to the Monitoring Team especially since such work doesn't appear to advance the reform effort in any meaningful way.

information production burden on DOC related to the requirements of the *Nunez* Court Orders. In fact, these claims of burden appear to actually be driven by the fact that the Department has dedicated insufficient resources to addressing the requirements of the *Nunez* Court Orders. DOC staff and leadership routinely report to the Monitoring Team that the Department does not have sufficient resources to address the work of the *Nunez* Court Orders and that the same small group of individuals are responsible for managing a myriad of tasks. It also appears, in at least some cases, that these attempts to limit information to the Monitor is simply an attempt by the Department to have authority over the Monitor's work and to limit his independence.

That it requires significant time, effort, and resources to advance the reform effort and work with the Monitoring Team is not a basis to suggest it should not happen or be limited. The fact that DOC has insufficient resources to support and address the requirements of the *Nunez* Court Orders is not a basis to place limits on the Monitor's access to information. In fact, it is the opposite, DOC should be seeking additional resources to ensure that it can address the requirements of the *Nunez* Court Orders, including responding to the Monitoring Team's requests and feedback. Suggesting that the Monitor's access to information or DOC's obligation to collaborate on feedback to improve practices should be curtailed simply because DOC has insufficient resources to address is unacceptable.

- **Communication with DOC Staff**

The Commissioner and Department leadership have long encouraged the Monitoring Team to speak directly and routinely with staff in order to obtain a firsthand understanding of operations, initiatives underway, and potential obstacles to reform. The Department has also reported that providing information to the Monitoring Team via phone is often a more efficient manner to share information and collaborate. Therefore, the Monitoring Team meets monthly via

phone with a variety of DOC leaders to obtain updates on the work underway and their perspective on the current state of affairs. The Monitoring Team's routine discussions include calls with the Senior Deputy Commissioner, Deputy Commissioner of Security, Deputy Commissioner of Administration, Deputy Commissioner of IT, Deputy Commissioner of ID, Deputy Commissioner of the Trials Division, Deputy Commissioner of Programs, Facility Commanding Officers, as well as representatives from the Staff Efficiency Committee and RNDC Action Plan team, among others. Each call generally lasts between 30 minutes and 1 hour. As a courtesy, the Monitoring Team permits representatives from the Legal Division and *Nunez* Compliance Unit to participate and observe these discussions.

*Ad hoc* calls and other meetings initiated by both the Monitoring Team and the Department occur frequently as well. The Monitoring Team may contact various leaders and staff on an informal basis, sometimes without other DOC staff present, which is expressly permitted by the *Nunez* Court Orders.[103] Usually, this occurs for the sake of efficiency in order to obtain information about a specific issue or to seek information relating to a discrete question. In other cases, private discussions are intentional and purposeful; to obtain information that DOC leadership or staff want to share outside the presence of others or in order to independently verify claims of compliance made by the Department. Certain DOC leadership and staff also continue to advise the Monitoring Team that they are more comfortable speaking with the Monitoring Team only outside the presence of other DOC leadership and staff.

The Monitoring Team has long relied[104] on anonymous sources to obtain relevant information regarding the Department's effort to address the *Nunez* Court Orders and continues

---

[103] *See*, e.g. Consent Judgment § XX, ¶ 8 and June 13, 2023 Order § I, ¶ 6,

[104] *See*, for example, Monitor's November 30, 2023 (dkt. 616) at pg. 2.

to value the input of these individuals. The Monitoring Team continues to learn important information—that should have been provided via formal channels—via anonymous sources. For instance, on multiple occasions in 2025, the Monitoring Team learned from anonymous sources about initiatives underway that did not appear to be aligned with the *Nunez* Court Orders and about which the Monitoring Team had not been consulted. But for the report by these anonymous sources (who are credible, reliable and whose information was independently substantiated), the Monitoring Team (and, in some cases, even other DOC leadership) would have been unaware that the initiatives were underway. In each of these cases, the Department should have proactively initiated consultation with the Monitoring Team, but did not do so.[105] Proactive consultation would have immediately revealed that some of the proposals being developed were misaligned with the Court's Orders and appeared to reintroduce some of the very practices the *Nunez* Court Orders sought to eliminate. Proactive consultation would have ensured that the Department's finite resources were focused on initiatives that are aligned with the Court's Orders and avoided the unnecessary work that had to be undertaken to address issues that could have been avoided if consultation occurred as required.

In summer 2025, anonymous sources went on to report to the Monitoring Team that DOC leadership were frustrated by the Monitoring Team's ability to learn information from anonymous sources, especially in one situation where the Monitoring Team learned about work

---

[105] In at least one of these cases while the Department initially acknowledged that consultation should have occurred but did not, it subsequently sought to excuse the lack of consultation by mischaracterizing what occurred. The Department attempted to excuse its failure to consult by mischaracterizing what transpired in a letter sent to the Monitoring Team six weeks after the event. This communication attempted to mischaracterize the situation and provided information that was not consistent with the contemporaneous communications sent at the time consultation was to occur but did not. DOC's attempt to mischaracterize the situation also was not consistent with the contemporaneous reports from *multiple* DOC staff, including the author of the subsequent letter, who all reported to the Monitoring Team that consultation should have occurred, but did not. Importantly, multiple DOC leaders reported to the Monitoring Team that relevant *internal* stakeholders also had **not** been consulted and that necessary *internal* consultation only occurred as a result of the Monitoring Team's inquiries about the issue.

underway in which consultation should have occurred but did not and involved proposals to Department practice that did not appear aligned with the *Nunez* Court Orders. While the Monitor is permitted to speak with staff confidentially and outside the presence of other staff, efforts were undertaken by DOC leadership to determine the Monitor's sources of information. DOC leadership interviewed staff to ask if they shared information with the Monitoring Team and the Department searched staff emails to try and identify the staff member that provided communications to the Monitoring Team that it appears the Department did not want the Monitoring Team to have. Despite these efforts, the Monitoring Team does not believe that the Department was able to identify the Monitoring Team's sources. Given the dynamics and the history of this case, it is concerning that DOC leadership would undertake such an effort to determine the source of confidential communications with the Monitoring Team given its possible chilling effect on future communications with the Monitoring Team.

Beginning in summer 2025, DOC leadership and its consultants began to suggest that the Monitoring Team should not be able to speak to staff outside the presence of other staff. The *Nunez* Court Orders are clear that the Monitor can have confidential discussions with staff outside the presence of others and clearly do not permit the Department the authority to withhold access to information based on the Department's *own* opinions about how or what the Monitor may access.[106] Despite the fact the *Nunez* Court Orders are clear and the Commissioner's report that she is "fully familiar"[107] with the *Nunez* Court's Order, in summer 2025, the Commissioner reported her mistaken belief to the Monitor that the Monitoring Team should not speak with

---

[106] *See*, June 13, 2023 Order, § I, ¶ 6 and Consent Judgment, § XX, ¶ 8.

[107] *See*, December 14, 2023 Status Conference Transcript at pg. 32:15-20.

Department staff outside the presence of the *Nunez* Manager.[108] In winter 2025, the Monitor, during a call, challenged a DOC leader about concerns regarding the current state of affairs. In response, a member of the DOC leadership team reported to a member of the Monitoring Team that DOC would restrict the Monitor's ability to speak with staff if the Department did not agree with the Monitor's tone/line of questioning and would only permit staff to participate in communication with the Monitoring Team if the Law Department was present. The Department has not yet attempted to implement this approach, but it is concerning first that such a threat would be made, and secondly, that it would be made by DOC leadership charged with managing the *Nunez* Court's Orders and, finally, because such action is expressly prohibited by the Court's Orders.

In what appears to be another attempt to limit communication with the Monitor, DOC reported to its Consultants[109], who in turn advised the Monitoring Team, that some staff are "reluctant to have open and honest conversations with the Monitoring Team out of fear that there will be a spontaneous reaction by the Monitoring Team, rather than further thoughtful discussion." Given these alleged reports, the Department again recommended that such communications with the Monitoring Team should be limited or only occur in the presence of others. Certain staff may well be hesitant to speak with the Monitoring Team. There is a history in this case in which staff were actively discouraged from speaking with the Monitor. It is why the Commissioner advised all staff that "[c]ommunication, collaboration, and transparency are

---

[108] The Monitoring Team advised the Commissioner of the relevant Court Orders that permit the Monitor to speak confidentially with staff and that such discussion can occur outside the presence of other staff as necessary and appropriate and that the Monitoring Team would continue to do so when appropriate and necessary *See*, June 13, 2023 Order, § I, ¶ 6 and Consent Judgment, § XX, ¶ 8. As discussed throughout this report, the Monitor routinely permits, as a courtesy, members of the *Nunez* Legal Team and the *Nunez* Compliance Unit to participate in its phone calls and meetings with staff.

[109] DOC has not advised the Monitoring Team of this claim directly for unknown reasons.

not only essential for dealings with the federal monitor – they are essential for our success as a department.".[110]

To the extent that such a perception exists, it is incumbent *upon DOC leadership* to address and correct such misperceptions as required by the *Nunez* Court Orders.[111] In fact, such reports should animate DOC to work with its staff to encourage transparency and candor and improve staff's knowledge and awareness of *Nunez* requirements in order to *ensure* compliance with the *Nunez* Court Orders and that the pledges[112] by the Commissioner and other City and DOC officials of transparency and collaboration with the Monitor are maintained. Despite the fact that the Department is on notice that staff may not be engaging with the Monitoring Team as they should, the Department has not reported taking any steps to ensure staff are encouraged to work with the Monitoring Team and instead has made various attempts to limit transparency.

The fact that DOC does not agree with the Monitoring Team's tone or line of questioning, or allegations that staff are reluctant to speak with the Monitoring Team are not a basis to limit engagement with the Monitoring Team or to suggest that staff communications with the Monitoring Team require greater scrutiny by City or DOC leadership. In fact, as noted above, confidential communications are critical to the Monitor's work. In some case, but for such communications, the Monitor would not have learned about initiatives underway that may violate the Court's Orders. Proposals that seek to limit the Monitoring Team's ability to engage with staff outside the presence of other staff would unquestionably curtail transparency about the operations of the Department and have a chilling effect on the Monitoring Team's work. Further,

---

[110] *See*, Monitor's February 26, 2024 Report (dkt. 679) at Appendix A.

[111] *See*, for example, Consent Judgment, § XX, ¶13 and June 13, 2023 Order § I, ¶ 1.

[112] *See*, Transcript of December 14, 2023 Court Conference at pg. 32: 15-20; and 45:11-20 and Appendix A of the Monitor's February 26, 2024 Report (dkt. 679).

it would inherently undermine the Monitor's independence and appear to give Defendants supervisory authority over the Monitor's access to information which is explicitly prohibited by the *Nunez* Court Orders.[113]

### RE-ORGANIZATION AND PRIORITIZATION OF THE *NUNEZ* COURT ORDERS

The Monitoring Team has previously advised the Court and the Parties that the provisions of the *Nunez* Court Orders must be prioritized and streamlined given the volume of requirements and the compounding complexity each time a new Order is added or an existing Order is modified.[114]

The sheer number of orders and requirements in this case have created a dizzying array of interrelated requirements that are difficult to prioritize and that make tracking progress very challenging. With over 10 Orders containing in excess of 500 provisions, the utility of the *Nunez* Court Orders to function as a clear roadmap has diminished. Further, the current structure of the *Nunez* Court Orders must also be improved in order to provide the Remediation Manager with the best possible resource for understanding the Contempt Provisions and the Department's obligations. In addition, the Department continually brings new leadership on board, and these individuals must also have easy access to the Court's requirements so that they may direct the Department's work accordingly.

The Monitoring Team has initiated a streamlining project of the *Nunez* Court Orders. Via the streamlining project, the Monitoring Team will develop a more user-friendly product to address these various needs. The initial phase of creating a user-friendly resource for the *Nunez*

---

[113] *See*, Consent Judgment § XX, ¶ 23 and October 30, 2023 Order (dkt. 590).

[114] *See*, for example, Monitor's March 16, 2022 Report (dkt. 438) at pgs. 63 to 66 and Monitor's April 18, 2024 Report (dkt. 706) at pgs. 166 to 167.

Court Orders is expected to be completed in the first quarter of 2026. The Monitoring Team believes this project will support the collective efforts to evaluate, prioritize, and streamline the *Nunez* Court Orders and ensure that the Orders provide the necessary guidance and clarity to advance the reform effort.

DOC's Consultants recently shared proposals regarding the management of *Nunez* Court Orders. First, it was proposed that notwithstanding the Court's finding of contempt[115] that monitoring should immediately cease for the provisions regarding 18-year-olds for a variety of illogical legal arguments[116] and that fail to even consider the history or context that brought about these provisions. [117] The Monitor, of course, cannot unilaterally alter a Court Order and cannot summarily elect to not assess compliance with court-ordered provisions. Such a proposal is wholly improper and impractical.

Second, it was proposed that all of the Court's Remedial Orders should summarily be eliminated. The basis for such a proposal is difficult to decipher as it is both confusing,

---

[115] *See*, November 26, 2024 Order (dkt. 803) at pgs. 37 to 40.

[116] Despite no legal expertise or authority, DOC permitted DOC's Consultants to make legal arguments and purported judicial findings that provisions regarding 18-year-olds are not constitutionally required, that requirements related to 18-year-olds are "inconsistent with the constitutional rights of all PICs" and that there is no "empirical evidence that 18-year-old males require direct supervision in housing units while others do not."

[117] It does not appear that the DOC advised, nor that DOC's Consultants reviewed the SDNY's findings letter that formed the foundation for these provisions or were aware of the history or basis for the Court imposing these requirements that Defendants agreed to. *See*, SDNY's August 4, 2014 letter regarding CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island *available at*: https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/SDNY%20Rikers%20Report.pdf

inaccurate,[118] and contradictory.[119] Without explanation, the DOC's Consultants go on to suggest that overall, the *Nunez* Court Orders should include "fewer than 50 provisions, and more likely half that." The proposal to summarily eliminate provisions is arbitrary and inappropriate.

Prioritization, re-organization, and evaluation of the *Nunez* Court Orders is necessary and must occur in a methodical and thoughtful manner to ensure that the *Nunez* Court Orders continue to advance the reform effort. To that end, the Monitoring Team will be consulting the *Nunez* Parties on its work and will provide routine updates to the Court.

## CONCLUSION

The Monitoring Team's neutral, independent and nuanced assessment of compliance is critical to the reform effort. While the array of potential quantitative metrics, qualitative assessments, and an appropriate appreciation of externalities mean that the Monitoring Team's discussions about the current state of affairs can be cast in a variety of ways, and all vantage points are necessary to the efforts to fully understand the Department's trajectory. Depending on the comparison point selected, conclusions about the magnitude or pace of progress or the lack thereof will differ. The Monitoring Team has dutifully examined changes in metrics and patterns in staff behavior using a multifaceted methodology in order to gain deep insight into the factors that may be catalyzing or undercutting progress. These explorations are useful for purposes of understanding and problem solving, but they do not in any way countermand the overarching

---

[118] DOC's Consultants advise that the Monitor should "recommend terminating the Remedial Orders and their associated monitoring requirements." No explanation or evidence is provided to substantiate this recommendation, but it appears to be based on the false premise that the Remedial Orders "were created by the monitoring process rather than the Consent Judgement." This is simply inaccurate. The Remedial Orders clearly address a variety of substantive requirements (*e.g.*, security practices, staffing, supervision, reporting, etc.) and are intended to address DOC's inability to implement the reforms needed to achieve compliance with the Consent Judgment. *See*, for example, Court's November 27, 2024 Order (dkt. 803) at pgs. 5 to 11.

[119] Incomprehensively, the Consultants suggest eliminating some of the Remedial Order provisions that address the very issues where the DOC's Consultants recommend *additional* focus by DOC and the Monitor and that Court intervention may be needed (*e.g.* out of cell time for restrictive housing, staffing, and staff supervision).

requirement for the Department to materially improve the jails' safety and operation relative to the conditions that existed at the time the Consent Judgment went into effect.

The reform requires ongoing problem-solving efforts and constructive engagement between the Department and the Monitoring Team. It is for this reason that the Monitoring Team has worked diligently to understand and unpack the Department' operations and provide technical assistance as appropriate.

The Monitoring Team remains open to thoughtful recommendations and proposals that are advanced in good faith, grounded in evidence, and consistent with the *Nunez* Court Orders. However, impractical and ill-informed recommendations that seek to relitigate settled rulings, to lower the standards for achieving compliance, and eliminate critical requirements do not advance the reform effort. Instead, such efforts have the effect of further embedding the problematic culture in the Department that the *Nunez* Orders were created to address.

## UPDATE ON THE 2023 *NUNEZ* COURT ORDERS

This section provides an update on the Department's work related to five of the Court Orders entered in 2023.[120] Collectively, these Orders were intended to catalyze improvement in the Department's management of the various requirements, its work with the Monitor, and its efforts to address fundamental security, reporting, and management practices to bring about immediate relief from the ongoing risk of harm faced by people in custody and staff.

### JUNE 13, 2023 ORDER (DKT. 550)

The Court entered an Order on June 13, 2023 regarding the City's and Department's obligation to work transparently and diligently with the Monitor and his team, including providing relevant information as requested and notifying the Monitor of serious incidents in the jails, including deaths in custody as described in more detail in the "Death of People in Custody" section of this report.

Repeated issues with transparency and candor resulted in the Court issuing a series of Orders to ensure that the Department collaborates in good faith with the Monitoring Team. Several such requirements are included in the June 13, 2025 Order. Collectively, they reinforce the DOC's responsibility to communicate its obligations under the *Nunez* Court Orders to all Department leadership and staff (§ I, ¶ 1), produce timely, accurate and reliable information to the Monitor (§ I, ¶ 4), engage in proactive communications with the Monitor related to the *Nunez* Court Orders (§ I, ¶ 5), and provide the Monitor with unfettered access to Department leadership and staff (§ I, ¶ 6). Further, in order to support the work of the Monitor and advance progress toward the *Nunez* Court Orders, the Department was also required to appoint a *Nunez* Manager

---

[120] These five orders are the June 13, 2023 Order (dkt. 550), August 10, 2023 Order (dkt. 564), October 10, 2023 Order (dkt. 582), December 14, 2023 Order (dkt. 656), and December 20, 2023 Order (dkt. 665).

and provide sufficient resources to conduct this work (§ I, ¶ 7). The Court provided additional clarification in its October 30, 2025 Order and in the Court's findings discussed during the December 14, 2023 Status Conference.

As discussed in each Monitor's Report to date, the Department engages with the Monitoring Team routinely and provides a significant volume of information in response to the Monitoring Team's requests. Further, the Department has promptly notified the Monitoring Team of all deaths in custody. The *Nunez* Manager remains in place, and her team includes a Deputy *Nunez* Manager, a full-time administrative assistant, and several lawyers. However, the *Nunez* Manager's team and others (including the *Nunez* Compliance Unit, Strategic Initiatives, and the Legal Division) still do not appear to have sufficient resources to facilitate the Department's and Monitoring Team's work to advance the reform. As discussed throughout this report, an array of Court-ordered requirements, including policy development and practice changes, continue to languish, sometimes for years. In addition, a significant number of the Monitoring Team's requests for information remain outstanding for extended periods of time, including information that the Department reportedly maintains during its ordinary course of business and thus should be straightforward to produce. The Department's ongoing failure to keep pace with the flow of information needed to both advance practice changes and support the Monitoring Team's duty to keep the Court apprised of the Department's progress suggest that current staffing levels in critical divisions are inadequate. Additional resources are needed to ensure that key individuals are involved in initiatives that must be in alignment with the *Nunez* Court Orders, and that responses to the Monitoring Team's requests for information are timely and accurate.

Concerningly, some of the practices the 2023 Orders sought to eliminate have reemerged. In some instances, it appears that certain individuals (including DOC's Consultants) have been

empowered by the Commissioner to potentially direct Department actions in a manner that is not consistent with *Nunez* Court Orders. For instance, in some cases initiatives are developed without necessary pro-active consultation with the Monitoring Team as it should have.[121] The Department's failure to proactively consult with the Monitoring Team, in some cases, have resulted in the Department developing initiatives that did not appear to align with the *Nunez* Court Orders. This underscores the importance of timely, proactive consultation to ensure the maximal use of scarce resources and to ensure that projects are viable. Also concerning is that in some cases, certain individuals and Consultants have been empowered to develop plans without the appropriate history and context of the Department's obligations under the *Nunez* Court Orders. Finally, in its work on at least one project, the Department failed to identify and correct false and misleading information, mischaracterizations of the record, and work that was neither rooted in the law nor consistent with the *Nunez* Court Orders. Given the admonishments and safeguards put in place by the 2023 Court Orders, the fact that these issues have reemerged is disturbing.

Finally, DOC's commitment to encourage staff to embrace the reform effort and to engage the Monitoring Team with complete candor appears to be waning. For example, the Department reported that certain staff expressed concerns about being candid with the Monitoring Team, but the Department did not report taking any steps to dissipate these concerns

---

[121] For example, DOC did not proactively consult the Monitoring Team about its work with the DOC's Consultants to develop recommendations to achieve compliance with the *Nunez* Court Orders. The Consultants' recommendations are directly relevant to the Monitor's work, and consultation and collaboration are essential to advance reform. Proactive engagement with the Monitoring Team would seem both necessary and appropriate. The Department's silence on this issue and failure to consult is particularly stark given the frequent and routine communication between the Department and the Monitoring Team. The Department is not absolved of its failure to proactively and candidly advise the Monitoring Team of its work simply because one of DOC's Consultants advised the Monitor of the report two days in advance of it being transmitted. Additional examples of the Department's failure to consult the Monitoring Team are discussed in the "Advancing the Nunez Reforms & Assessing Compliance" section of this report.

or to reinforce staff's obligations to be transparent and candid with the Monitor. This failure to act runs contrary to the Department's oft-repeated commitment to transparency and collaboration.

Overall, the Department must be more vigilant and unwavering in its commitment to collaborate and communicate openly with the Monitoring Team in order to meet its obligations outlined in the Court's June 13, 2023 Order and other requirements[122] intended to promote a functional relationship with the Monitoring Team.

### AUGUST 10, 2023 ORDER (DKT. 564)

The Court entered an Order on August 10, 2023 to address several critical items needed to reduce the imminent risk of harm that had languished. The purpose of this Order was for the Department to prioritize these actions as other remedial relief was being contemplated. These steps were intended to be immediate, *interim measures* to ensure a proper focus and pace for initiatives that have direct bearing on the imminent risk of harm.

**UOF, Security and Violence Indicators (§ I, ¶ 1)**: The Monitor's February 26, 2024 (dkt. 679) Report describes the Department's efforts to address this requirement (*see* pgs. 5-7). A more detailed description of the new meeting format is described in the compliance assessment of the First Remedial Order, § A, ¶ 2 (Facility Leadership Responsibilities) in this report.

**Revised Search Procedures (§ I, ¶ 2)**: This is addressed in the compliance assessment for Action Plan § D, ¶ 2(d) & (e) (Searches and Identify/Recover Contraband).

**Revised Escort Procedures (§ I, ¶ 3)**: This is addressed in the compliance assessment for Action Plan § D, ¶ 2(f) (Escort Procedures).

---

[122] *See*, e.g., Consent Judgment § XX, ¶¶8 and 13 and October 30, 2023 Order.

**Lock-in and Lock-out Procedures (§ I, ¶ 4)**: This is addressed in the "Assessment of the Department's Use of Force and Security Practices" section of this report.

- **Control Station Security (§ I, ¶ 5)**. This is addressed in the "Assessment of the Department's Use of Force and Security Practices" section of this report.

- **Staff Off Post (§ I, ¶ 6)**. This is addressed in the "Assessment of the Department's Use of Force and Security Practices" section and the "Maximizing Staff Deployment" section of this report.

**Special Teams Training (§ I, ¶ 7)**: This is addressed in the compliance assessment for First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams).

**Special Teams Command Level Orders (§ I, ¶ 8)**: This is addressed in the compliance assessment for First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams).

**Screening and Assignment of Staff to Special Teams (§ I, ¶ 9)**: This is addressed in the compliance assessment for First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams).

**Revised Pre-Promotional Screening Policies and Procedures (§ I, ¶ 10)**: This is addressed in the compliance assessment for Consent Judgment, § XII, ¶ 1-3 (Screening & Promotions).

**ID Staffing (§ I, ¶ 11)**: ID staffing levels are addressed in the compliance assessment for Consent Judgment, § VII, ¶¶ 1 & 11 (Investigations of Use of Force Incidents).

**Additional Reporting by the City and Department Regarding Intake (§ I, ¶ 12)**: The City and Department filed two reports regarding intake,[123] satisfying this provision. The

---

[123] See, City's September 15, 2023 Submission (dkt. 571) and City's November 15, 2025 Submission (dkt. 598).

Monitoring Team also provides an update on intake and the status of processing new admissions in Appendix H of this report.

- **Command Discipline ("CD") Directive (§ I, ¶ 13)**: This is addressed in the compliance assessment of Consent Judgment § VIII., ¶ 1 & § VIII., ¶ 3(c) (Timely, Appropriate, and Meaningful Accountability).

- **External Assessment (§ I, ¶ 14)**: This is addressed in the "Death of People in Custody" section of this report.

### OCTOBER 10, 2023 ORDER (DKT. 582)

On October 10, 2023, the Court issued an Order directing Defendants to engage with the Monitoring Team on immediate initiatives to address the risk of harm and issues regarding incident reporting, as identified in the Monitor's October 5, 2023 Report (dkt. 581). The Order also reminded Defendants of their obligations to collaborate with the Monitor and to comply with the *Nunez* Court Orders.

- **Immediate Security Plan**: This is addressed in the compliance assessment for the Second Remedial Order, ¶1(i)(a) and Action Plan, § D, ¶ 2(a) (Security Plan). The Department's Safety Plan is also discussed in the "Assessment of the Department's Use of Force and Security Practices" section of this report.

- **Immediate Reporting Initiatives**: This is addressed in the compliance assessment for Consent Judgment § V., ¶ 2 (Independent Staff Reports).

### DECEMBER 14, 2023 ORDER (DKT. 656)

On December 14, 2023, the Court issued an Order regarding changes the Defendants must make to incident reporting practices in light of the findings in the Monitor's October 4, 2023 Report (dkt. 581) and the Monitor's November 8, 2023 Report (dkt. 595).

- **List of Reporting Policies (§ 1, ¶ a)**: These requirements are addressed in the compliance assessment for Consent Judgment § V, ¶ 2 (Independent Staff Reports).

- **Stabbing and Slashing Definition (§ 1, ¶ b)**: These requirements are addressed in the compliance assessment for Consent Judgment § V, ¶ 2 (Independent Staff Reports).

- **Definitions of Incident Categories (§ 1, ¶ c)**: These requirements are addressed in the compliance assessment for Consent Judgment § V, ¶ 2 (Independent Staff Reports).

- **Comprehensive COD Policy (§ 1, ¶ d)**: These requirements are addressed in the compliance assessment for Consent Judgment § V, ¶ 2 (Independent Staff Reports).

DECEMBER 20, 2023 ORDER (DKT. 665)

On December 20, 2023, the Court found the Department in contempt of Action Plan § D, ¶ 3 and § E, ¶ 4 (dkt. 465) and § I, ¶ 5 of the June 13, 2023 Order (dkt. 550). On February 27, 2024 (dkt. 680), the Court found that the Department purged its contempt because it complied with the three enumerated requirements set out by the Court related to:

- (1) the sufficiency of the role, authority, and resources dedicated to the *Nunez* Manager,

- (2) developing and implementing a high-profile communications program to make clear the responsibility—shared by Department leadership and staff alike—to proactively collaborate with the Monitoring Team, and

- (3) developing a set of data and metrics for use of force, security, and violence indicators that will be routinely evaluated by Department leadership to identify trends regarding unnecessary and excessive uses of force and violence in order to identify their root causes and to develop effective strategies to reduce their occurrence as required by the August 10, 2023 Order § I, ¶ 1 (discussed above).

## COMPLIANCE ASSESSMENTS

---

**FACILITY LEADERSHIP RESPONSIBILITIES (FIRST REMEDIAL ORDER § A., ¶ 2)**

*First Remedial Order § A., ¶ 2. Facility Leadership Responsibilities.* Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.

*August 10, 2023 Order § I, ¶ 1 UOF, Security and Violence Indicators.* By, September 30, 2023, the Department, in consultation with the Monitor, shall develop a set of data and metrics for use of force, security and violence indicators that will be routinely evaluated by Department leadership to identify trends and patterns regarding unnecessary and excessive force and violence in order to identify the root cause of these issues and develop strategies to address them. Upon request by the Monitor, the Department shall provide data regarding use of force, security, and violence indicators and permit observation of meetings in which such information is evaluated by Department leadership.

---

This provision was imposed by the Court in the First Remedial Order (dkt. 350), § A, ¶ 2. The goal of this provision is to ensure that the leadership of each facility is consistently and reliably identifying pervasive operational deficiencies, poor security practices, and trends related to problematic uses of force and that they address these patterns so that supervisors and staff alike receive the guidance and advice necessary to improve practices. Facility leadership is required to routinely analyze available data regarding uses of force, including the daily Rapid Reviews, to determine whether any operational changes or corrective action plans are needed to reduce the use of excessive or unnecessary force, the frequency of use of force incidents, serious injuries or other harm to incarcerated individuals or staff resulting from use of force incidents.

### Compliance Assessment Overview

The first compliance assessment for First Remedial Order (dkt. 350), § A, ¶ 2 occurred for the 11th Monitoring Period (July to December 2020). At that time, the Department was found to be in Non-Compliance where it remained through the 17th Monitoring Period (July to December 2023).[124]

---

[124] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pgs. 34-37 in section "Failure to Adequately Supervise Staff and Facility Leadership" of the Order.

In the 18th Monitoring Period (January to June 2024), the Department moved into Partial Compliance and has maintained that rating through this 20th Monitoring Period (January to June 2025).

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 1 as it relates to facility leadership's requirement to routinely analyze available data, but a compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Facility Leadership's Communication with Monitoring Team**

In this Monitoring Period, the Department's executive leadership largely remained consistent with the previous Monitoring Period. Historically, facility leadership has experienced significant turnover, with leadership assignments frequently changing. As noted in prior reports,[125] this instability undermined sustained progress. Continuity of leadership is important, but, of course, changes in leadership may occur for a number of legitimate reasons (*e.g.,* a leader elects to leave the Department, or the leader is not meeting expected standards) so changes can and should be made as needed. Following the close of the Monitoring Period, at the direction of the Commissioner, many of the Wardens and Deputy Wardens at each of the major commands were changed. This action represented the most significant leadership change under the current Commissioner.

With respect to the role of Department leaders, it is critical that they can and should identify staff practices and other operational issues that merit attention by utilizing incident-level data (*e.g.*, Rapid Reviews and other indicators extracted from the COD reports) to identify patterns in persons, places, times and circumstances that lead to a use of force and in which

---

Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

[125] *See* Monitor's March 16, 2022 Report (dkt. 438) at pgs. 7 and 17; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 42-43; and Monitor's May 11, 2021 Report (dkt. 368) at pgs. 8-10.

problematic practices tend to occur. Using that information they should develop and implement targeted strategies that focus on those people, places, times or circumstances to reduce the likelihood of problematic staff conduct.

The Monitoring Team continues to meet monthly with facility leadership across the jails, creating a routine forum to discuss facility operations, recent metrics, initiatives, and emerging and ongoing challenges. These meetings are a cornerstone of transparent communication and collaboration. Facility leaders engage in these discussions with candor and are open to the Monitoring Team's input on potential ways to address ongoing issues. The Monitoring Team has observed that facility leaders are often aware of the challenges highlighted by the Monitoring Team and, in many cases, are already working toward solutions. These meetings also allow facility leadership to provide additional context and clarity that is not discernable by data alone, like reasons for increased tension and incidents in housing areas or why there was an uptick in staff absences over a weekend. Leaders appear to be leveraging tools such as the ACT Dashboard and other data reports to inform their decisions, while also using available platforms and facility tours to stay connected to on-the-ground operations. This proactive and engaged approach demonstrates that some facility leadership clearly have the potential to usher in meaningful reform, though this has not been the case across the board.

Despite the fact that facility leaders appear to acknowledge the current issues inhibiting the reform effort, challenges persist as described in our prior reports.[126] First, many issues facility leadership face are tied to systemic problems across the Department like staff absenteeism, or high housing counts due to the retention of state ready individuals. Facility leaders frequently point out that these challenges are Department-wide and conclude that solutions are outside their control. However, these challenges impact numerous areas of facility operations like recreation, barbershop access, programming and visits. This is why, even though these issues are occurring at a macro-level, it is critical for facility leadership to create solutions that mitigate the impact that is specific to their staff and facility operations. Second, facility leadership can at times still rely on surface level justifications and do not always display an understanding of root causes or new ways to address old problems. For example, slashing or stabbings are often attributed to conflicts among Security Risk Groups (gangs) but facility leaders do not consider whether

---

[126] *See* Monitor's May 22, 2025 Report (dkt. 850) at pgs. 45-46.

underlying security practices liked failed pat frisks or lack of supervision contributed to the incident. The Monitoring Team continues to urge leadership to take ownership of the challenges in their facilities and move beyond traditional or outdated strategies that have proven ineffective and instead develop innovative, resource-conscious solutions that are tailored to the realities of their facilities.

The Monitoring Team remains encouraged by the commitment and candor of most of the facility leaders but notes that continued progress will depend on their ability to continue to improve their problem-solving ability and embrace new solutions and deeper, more sustainable change.

## ACT Dashboard and Meetings

The Department has continued its efforts to strengthen facility oversight and data-informed leadership through the monthly "Assess, Collaborate, Transform" (ACT) meetings and the ACT Dashboard, both introduced during in the 18th Monitoring Period.[127] These initiatives were developed under the Commissioner's direction to address the Court's August 10, 2023 Order (dkt. 564), the Department was required to develop a set of data and metrics for use of force, violence, and security indicators, and for Department leadership to routinely evaluate this information to identify patterns and trends to address root causes. The ACT Dashboard and meetings were designed to improve upon the former TEAMs meetings, which often lacked meaningful engagement and failed to provide actionable insights. The revised structure and tools of the ACT meetings were designed to promote a more dynamic, solution-oriented approach to facility management by increasing staff participation, incorporating a Socratic-style method of questioning, and using the new dashboard with numerous violence and security metrics. These elements distinguish ACT from the prior TEAMS model by shifting meetings from a largely report-out format to a more interactive process that prompts facility leadership to analyze what is occurring in their areas and, critically, to articulate why those conditions are happening and what corrective steps are needed.

---

[127] The ACT Dashboard integrates data from multiple systems into a single, interactive, and visually intuitive platform. It allows facility leadership to track key metrics—such as the use of force, slashing and stabbings, serious injuries, Narcan deployments, and fires by location, individuals involved, and time of day. The goal of this system is to help leadership to identify trends and make informed operational decisions to reduce violence and prevent incidents. *See* Monitor's November 22, 2024 Report (dkt. 802) at pgs. 47-48.

The ACT Dashboard remains active and has proven to be a flexible tool capable of evolving with the Department's needs. Between January and June 2025, the system underwent a series of updates. Incident tracking was expanded to include new categories, and the data is automatically refreshed at greater frequency to provide near-real-time updates. The method for calculating incident rates was changed to improve accuracy. Finally, a Year-Over-Year Comparison page was introduced to make it easier to analyze trends in key security indicators across time periods. Facility leaders report that they continue to rely on the Dashboard to better understand the number and types of incidents occurring in their facilities. The Monitoring Team encourages the Department to continue monitoring the use of the Dashboard to ensure it remains actively leveraged by staff across facilities and is embraced by leadership at all levels, including Deputy Wardens and Assistant Deputy Wardens.

ACT meetings continued in this Monitoring Period, and four were held during the Monitoring Period. The structure remained the same, with the first half of each meeting dedicated to a focused review of a particular issue (*e.g.*, infractions or avoidable UOF) through a review of data and trends presented in the ACT Dashboard. The second half involves case studies that allow facility leaders to analyze incident footage, examine procedural responses, and consider how alternative approaches might have produced better outcomes. These exercises are particularly effective in encouraging facility leadership to critically examine assumptions, reflect on missteps, and recognize positive practices. For example, during this Monitoring Period, one ACT meeting included facility-led presentations that followed up on challenges they previously presented on in November 2024 and the steps they had taken to address them. This format offered a platform for facility staff to reflect more concretely on their efforts and articulate the rationale behind their strategies and overall progress in addressing their challenges.

The Monitoring Team attends all ACT meetings and has observed them to be a valuable venue for direct engagement among the Commissioner, executive leadership, and facility teams. While ACT meetings continue to contain positive engagement among Department leadership there remains some area for improvement. The length and breadth of the meetings can sometimes detract from their focus, and not all topics covered align with the most pressing facility-level concerns. Additionally, some topics that are covered only briefly could merit additional discussion and assessment (*e.g.,* de-escalation). Some presentations also rely more on anecdotal examples rather than data-driven assessments, which can limit their effectiveness. Nevertheless,

there have been encouraging discussions and a greater emphasis on critical thinking and accountability. When facility leaders use data to clearly define a problem, and then track the impact of specific interventions, these sessions become significantly more compelling and productive.

Overall, ACT meetings have become a promising tool for building leadership capacity and addressing core operational issues. Continued refinement of the structure and content of these meetings, such as incorporating deeper analysis of systemic concerns like staffing shortages, could further enhance their impact.

## Weekly Operational Leadership Meetings

The Department reports that operational Leadership meetings continue to occur between executive staff and facility leaders weekly. Participants typically include Deputy Commissioners, Associate Commissioners, Assistant Commissioners, Directors, Wardens and, at times, Assistant Deputy Wardens, Captains, and Officers. The meetings are chaired primarily by the Senior Deputy Commissioner and serve as an opportunity to discuss critical topics and Department updates. During each session, key leaders share insights and presentations and provide briefings on essential issues, discuss policy changes, and highlight ongoing projects and initiatives. Additionally, representatives from various divisions—such as the Policy and Procedures Unit ("PPU"), Early Intervention, Support and Supervision ("E.I.S.S."), Trials, and Correction Intelligence Bureau ("CIB")—may discuss their work, fostering inter-departmental awareness and collaboration. The Department reports the meetings' engaging format is regarded as more valuable than traditional methods of communication such as teletypes.

## Meetings between Facility Leadership and the Deputy Commissioner of Security Operations

The Deputy Commissioner of Security's engagement with facility leadership has evolved since he was first appointed to the position in November 2024. The DC of Security interacts with facility leadership in a number of ways - through Operational Leadership, ACT meetings, his routine tours of facilities, and while leading the daily Use of Force Rapid Review calls. The DC of Security required Wardens to participate and framed these calls as both accountability mechanisms and learning opportunities where facility leaders engaged in open discussion to evaluate incidents critically, move away from rote practices, and adopt a more analytical,

problem-solving orientation. The approach initially emphasized coaching and counseling, but the Department has reported that it intends to utilize discipline more given the fact that these issues continue to persist and little change in practice has been demonstrated. Nevertheless, the core focus remains on fostering reflection about underlying causes of security and operational issues. Following the close of the Monitoring Period, the daily Use of Force Rapid Review calls have since been delegated to Associate Commissioners, but the DC of Security occasionally fills in when they are not available. This is discussed in more detail in the compliance assessment of First Remedial Order (dkt. 350), § A, ¶ 1.

In June 2025, the line of reporting changed for Wardens, and the Wardens now all report to the DC of Security. Since then, the DC of Security has implemented more structured oversight of Wardens. The DC of Security holds monthly one-on-one data reviews with each Warden using the ACT dashboard, along with bi-weekly group sessions. These forums are intended to build ownership, reinforce accountability, and strengthen Wardens' capacity as managers who can meaningfully shape the operations of their facilities. The Deputy Commissioner of Security has reported his relationship with facility leadership as grounded in trust and receptiveness. The Monitoring Team is encouraged by the DC of Security's constructive relationship with Wardens and its demonstrated commitment to mentoring facility leaders.

## **Executive Leadership Tours**

The Department's initiative to embed executive leadership more deeply into facility operations through regular tours continued during this Monitoring Period. These Executive Leadership Tours, launched in December 2023, require about 60 senior leaders, including Deputy Commissioners, Associate Commissioners, Assistant Commissioners, Executive Directors, the *Nunez* Manager and Directors, to tour at least one facility every two weeks. Following each tour, staff are expected to address any issues identified onsite before the tour is complete. If broader issues or concerns are identified, they are asked to raise those matters either with leadership of the specific division responsible for the matter or the Commissioner's office.[128] Finally, leadership are also encouraged to incorporate their insights into broader strategic planning.

---

[128] Given the significant number of tours that occur each week and the extensive work it would take to track the variety of issues that may be found on such tours, the Department determined that comprehensive tracking of the findings from each tour was not a reasonable use of resources. Leadership are expected to reasonably address matters as they occur during the tours.

Ensuring that leadership are directly engaged with the staff operating the jails and observing operations first hand is important. However, because the Department does not document these tours or track the issues identified and resolved, the Monitoring Team is unable to assess whether this initiative has produced measurable improvements in facility operations.

These tours are intended to serve multiple purposes. First, to ensure agency leadership remains connected to the conditions and culture in the jails. Second, to convey agency expectations and values directly to staff, and third, to offer executive-level expertise where needed. They are not a substitute for direct supervision by on-site staff but represent an important supplement to the Department's overall leadership and accountability structure.

The content and structure of the Executive Leadership Tours was sustained throughout 2025 and remains a meaningful step toward instilling greater visibility and leadership presence within the facilities. They also reinforce the Department's intention to align facility operations more closely with agency-wide expectations and reform goals.

## Conclusion

Facility leaders possess both visibility into their facilities and institutional backing to address the problems they find. Facility leaders continue to engage the Monitoring Team with candor and transparency. They have a significant number of tools to support their work, including data dashboards, incident reports, Rapid Reviews, and NCU audits. Facility leaders routinely meet with senior management to discuss operations, security, and emerging patterns. With access to executive support (*e.g.*, the Deputy Commissioner of Security) and the development of cross-functional working groups, some initiatives have made headway, such as RNDC's action plan for Young Adult management.

The Department has made organizational and technological improvements that give facility leaders access to more information than ever before. The challenge now is to use that information more effectively. Rather than relying on broad or passive measures (*e.g.,* "walking and talking" or memorandums and roll call), facility leaders must apply the data to identify root causes, develop concrete action plans, and track whether those plans are working. This means setting clear expectations through the ranks, ensuring accountability for follow-through, and adjusting strategies when results fall short. By taking a more thoughtful and problem-focused approach, leadership can begin to turn information into progress. While growing pains continue,

facility leaders appear to be engaging in good faith and open collaboration with the Monitoring Team. The pace of progress is at times frustrating but continues to move in an encouraging direction. As such, the Department remains in Partial Compliance with this provision.

| COMPLIANCE RATING | First Remedial Order § A., ¶ 2. Partial Compliance |
|---|---|

| NEW USE OF FORCE DIRECTIVE (CONSENT JUDGMENT § IV., ¶ 1) |
| --- |
| _Consent Judgment § IV., ¶ 1. New Use of Force Directive._ Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor. |

This provision of the Consent Judgment requires the Department to develop, adopt, and implement a comprehensive Use of Force Policy with particular emphasis on permissible and impermissible uses of force.

## Compliance Assessment Overview

The first compliance assessment for Consent Judgment § IV, ¶ 1, occurred during the 1st Monitoring Period (November 2015 to February 2016). Since that first rating, the Monitoring Team split its rating into four subparts: (1) develop, (2) adopt, (3) implement, and (4) Monitor approval. The Department was initially found in Substantial Compliance for developing and obtaining Monitor approval for the Use of Force policy but was found in Partial Compliance for adopting and implementing the policy. These ratings were sustained through the 4th Monitoring Period (January to June 2017). In the 5th Monitoring Period (July to December 2017), a new Use of Force policy went into effect, and the Department was placed into Substantial Compliance for developing, adopting, and obtaining monitor approval for the policy but was found in Non-Compliance for implementing the new policy. These ratings have remained the same through the current 20th Monitoring Period (January to June 2025).[129]

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with Consent Judgment § IV, ¶ 1. The Court explained the basis for this finding at pages 16 to 18 in section "Failure to Implement the Use of Force Directive" of the Order.

---

[129] A compliance rating for this provision was not assessed for the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for suspending compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

**Methodology**

The Monitoring Team utilizes both quantitative and qualitative data to assess the risk of harm in the jails, to determine whether the Use of Force Directive has been properly implemented, and to assess whether security practices are sound. It must be emphasized that the numerical data must be utilized *in context* because, alone, it suggests there is a line in the sand that specifies a certain point at which the Department passes or fails.[130] There are no national standards regarding a "safe" use of force rate, a reasonable number of "unnecessary or excessive uses of force," nor an "appropriate" rate at which staff are held accountable.[131] The Monitoring Team's multi-faceted strategy for assessing compliance requires an assessment of all inter-related issues, because each of the main Consent Judgment and Remedial Order requirements is more than simply the sum of its parts. It is critical to not only contextualize the information, but also to compare the Department's performance with the operation of other jail systems.[132] The Monitoring Team reviews extensive information to make its findings including a review of thousands of use of force incidents, discussion with DOC leadership, staff, and other individuals, the review and assessment of various data points, as well as DOC's own findings regarding incidents that occur.[133]

The Monitoring Team's assessment appreciates that the use of force is necessary at times. Further, the Monitoring Team's assessment accounts for the fact that all uses of force are not the

---

[130] The Monitoring Team's methodology for assessing the Department's compliance with the *Nunez* Court Orders, including the use of force is detailed in the "Advancing the Nunez Reforms & Assessing Compliance" section of this report. It must be emphasized there is no single metric that can determine whether the Use of Force Policy has been properly implemented, and as explained in that section, a thoughtful and multi-faceted methodology is applied.

[131] Notably, neither the Consent Judgment, the underlying *Nunez* litigation, CRIPA investigation nor Remedial Order, include metrics or qualitative measures related to the concerning practices identified or potential corrective measures.

[132] The Safety Plan appeared to raise concerns that DOC's use of force rates must be considered in context and must acknowledge the unique facets of DOC's policies, procedures and practices. The Monitoring Team agrees, which is why it has provided detailed analysis of use of force since the inception of the Consent Judgment. Beyond noting that the DOC has different policies and procedures than other systems, the Safety Plan does not recommend any additional contextual information regarding DOC's use of force data or practices for consideration. The Safety Plan does provide information on DOC's use of force rates and data on the reasons for force. This data (and others) is discussed in this Report.

[133] For this Monitoring Period, this review included over 2,900 intake investigations completed by ID, over 3,600 initial reports of use of force events, the Rapid Reviews for each UOF incident that occurred during the Monitoring Period, 6,600 initial reports of all other serious events (including assaults on staff, stabbing/slashing, fights and other acts of violence), across the five main commands.

same. This is true in terms of mechanics—some are unremarkable, where all parties remain standing and staff apply very minimal pressure or make minimal physical contact with PICs, while others are aggressive, where PICs are propelled into hard objects with significant force. This is also true in terms of intent—some uses of force are limited to safely removing an individual from a dangerous situation, while others exact serious harm for the purpose of retaliation or punishment.

## UOF Policy

The Department maintains a Use of Force ("UOF") Policy as well as a number of standalone policies that address additional requirements related to the use of force and the requirements of the *Nunez* Consent Judgment. The Department previously achieved Substantial Compliance with the development and adoption of the Use of Force Policy, which received the Monitor's approval prior to the Effective Date of the Consent Judgment in 2015. The Use of Force Policy required by the Consent Judgment went into effect on September 27, 2017, with the corresponding New Disciplinary Guidelines effective as of October 27, 2017. The Use of Force Policy is not based on new law, nor does it abandon core principles from its predecessor. Instead, the new policy retains the core principles of the previous policy while providing further explanation, emphasis, detail, and guidance to staff on the steps officers and their supervisors must take in response to threats to safety and security. The overarching goal of the directive is to alter staff practices in order to reduce the ***risk of harm*** related to the use of force.

## Standalone Policies

In addition to the Use of Force Policy, the Department must consult and obtain Monitor approval on a number of standalone policies regarding the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, lethal force, and canines.[134] The Emergency Services Unit ("ESU") also maintains approximately 10 Command Level Orders ("CLOs"), including two that govern the use of specialized chemical agent tools (*i.e.*, the Sabre

---

[134] At times, the Department has failed to consult and/or seek the Monitor's approval of revised policies, which has been discussed in various Monitor's Reports. *See, for example,* Monitor's November 30, 2023 Report (dkt. 616) at pgs. 33 and 37. Following the appointment of the new Commissioner in December 2023, these issues have not reemerged.

Phantom Fog Aerosol Grenades). Several of these policies require revision, including the ESU's CLOs as well as the Department's policies on restraints, searches, and Emergency Response Teams.[135] The need for revision has been extensively documented in prior Monitor's Reports, most recently in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 42-43. The Department has long reported that it is in the process of revising a number of policies that it then plans to submit to the Monitoring Team for consultation and feedback. None were provided during this Monitoring Period.

### Training on UOF Policy

The Department has initiated the UOF and Defensive tactics refresher training but less than 15% of staff have received both trainings. These trainings are delivered together as a two-day course and were rolled out in August 2023. They are offered on a weekly basis. Despite this schedule, the Department reports limited progress in training staff, primarily due to instructor shortages driven by broader staffing constraints. Because of safety requirements governing instructor-to-participant ratios, the Training Division has been forced to cap class sizes, significantly limiting throughput. Compounding this challenge, the training is an annual requirement, meaning the Department must continually retrain staff while simultaneously trying to reach those who have not yet completed the course, making it difficult to achieve meaningful overall progress.

The Department has not reported taking any other steps to address staff's practices regarding use of force except for addressing individual actions following an incident as they deem appropriate and necessary.

### Implementation of UOF Policy

The Monitoring Team conducts extensive analysis and has provided detailed reporting on the Department's problematic use of force and corresponding security failures, many of which are further described in this report and prior reports.[136] The Monitoring Team's ongoing findings,

---

[135] *See* other sections of this report and Monitor's November 8, 2023 Report (dkt. 595) at pgs. 12, 14-16, and 40-41.

[136] *See* Martin Declaration (dkt. 397) Exhibit E "Citations to Monitoring Team Findings re: Security Failures" and Monitor's December 6, 2021 Report (dkt. 431) at pgs. 17-23; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 7-30; Monitor's April 27, 2022 Report (dkt. 452) at pgs. 2-3; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 13-17; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-77; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68; Monitor's October 10, 2024 Report (dkt. 581) at pgs. 4-19;

described in the "Assessment of the Department's Use of Force and Security Practices" and "Death of People In Custody" sections of this report, are the basis for the compliance rating regarding the UOF Policy's implementation. Appendix L includes illustrative examples of the incidents that reflect the findings of the Monitoring Team. These incidents are representative of the patterns identified by the Monitoring Team and are **not** isolated events.

The force employed by Department staff often does not comply with the Department's Use of Force Policy (or the requirements of the Consent Judgment). In particular, force is still used too frequently,[137] head strikes in circumstances outside of those permitted by policy are still used too often;[138] excessive or unauthorized use of chemical agent/OC spray is ongoing;[139] problematic and/or painful escorts continue;[140] unsafe take-down techniques occur too frequently;[141] use of force during searches occurs in situations in which it does not appear necessary; precipitating staff conduct creates situations in which force is then needed;[142] conversely, staff sometimes fail to act when they should;[143] staff fail to intervene in self-harm attempts;[144] and finally, staff's failure to adhere to basic security practices creates situations in which force is needed.

### Department's Use of High Impact Force & Head Strikes

The use of high-impact force, predominantly head strikes, remains a key area of focus in the Monitoring Team's assessment of the Department's use of force. Because the tactic inherently involves such a high risk of harm it should be used *infrequently and only under very specific circumstances.* The Department, given its history of abusive practices, agreed to these

---

Monitor's November 8, 2023 Report (dkt. 595) at pgs. 2-3 and 6-28; Monitor's December 12, 2023 Report (dkt. 666) at pgs. 6-22; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 29-38; Monitor's November 22, 2024 Report (dkt. 802) at pgs. 11-18.

[137] *See*, for example, Consent Judgment, § IV, ¶ 3(a) and UOF Directive § II (A) and (B).

[138] *See*, for example, Consent Judgment, § IV, ¶¶ 3(b), (g)(v) and UOF Directive § II (G) and § V(A)(8).

[139] *See*, for example, Consent Judgment, § IV, ¶ 3(d) and UOF Directive § II (C) and §VI (B)(1)(g).

[140] *See*, for example, Consent Judgment, § IV, ¶ 3(c)(vii) and UOF Directive § II V(B)(1)(d).

[141] *See*, for example, Consent Judgment, § IV, ¶ 3(b), (g)(v) and UOF Directive § II (C) and (G) and §VI (1)(f)(ix).

[142] *See*, for example, Consent Judgment, § IV, ¶ 3(k) and (m) and UOF Directive § II (B) and (C).

[143] *See*, for example, Consent Judgment, § IV, ¶ 3(m) and UOF Directive § II (I).

[144] *See*, for example, Consent Judgment, § IV, ¶ 3(m) and UOF Directive § II (I).

prohibitions. The Consent Judgment, § IV, ¶ 3(b), clearly and unambiguously states that there is "an explicit prohibition on the use of high impact force, including…strikes or blows to the head, face, groin, neck, kidneys, and spinal column…", except in a situation in which a staff member or other person "is in imminent danger of death or serious bodily injury ***and*** where lesser means are impractical or ineffective" (emphasis added). The Consent Judgment also explicitly states that "Blows or strikes ***shall never be utilized*** if control holds, grasping, or pushing would be effective in restraining an Inmate." *See*, Consent Judgment, § IV, ¶ 3(g)(v) (emphasis added).

Notably, the use of high-impact force to retaliate against or punish a person in custody has decreased. However, despite policy limitations on the circumstances that high impact force and head strikes may be used, Staff continue to use head strikes in routine or low-level encounters where lesser means (*e.g.*, control holds, pushes, or escorts) would have been practical and effective. This indicates that high impact force (e.g. head strikes, wall slams, etc.) are still being used as a default defensive tactic to respond to all levels of resistance, rather than utilized as a last resort when no other means are available. The Monitoring Team's assessment of incidents where head strikes or prohibited neck restraints are used shows that this often occurs during takedowns, wall placements, or other physical control efforts as a result of the use of unsafe or overly aggressive tactics in general. This is not only a violation of the UOF Directive but also seriously increases the risk of harm to individuals in custody. The illustrative examples in Appendix L include a number of case examples in which high impact force, including head strikes, were used in situations when they should not have been.

DOC does not maintain data on the use of high impact force but does maintain data on the use of head strikes. During this Monitoring Period, DOC reports that there were 116 use of force incidents involving head strikes and approximately 100 additional incidents involving allegations that head strikes were used, but were not reported by Staff.[145] Of the 116 cases of confirmed head strikes, the Department reports that it expects that at least 30 of these incidents will result in charges because the use of head-strikes was not consistent with policy. However,

---

[145] This data captures *allegations* that a head strike *tactic* was used in either a reported or unreported use of force incident. Data is not currently maintained to determine how many allegations that a use of head strike tactic was used in fact occurred. This data of *allegations* of the use of a head strike *tactic* is *different* from general allegations that a use of force *incident* itself may have been unreported by staff as required by policy.

the majority of investigations into these cases remain pending.[146] For a tactic that should be rarely used, it is concerning that at least 1 in every 4 (30 of 116 = 26%) head strikes used during this Monitoring Period were not consistent with policy. Further, while there has been improvement in the Department's internal review processes (*i.e.*, Rapid Reviews and Intake Investigations), such reviews still do not identify all staff misuse of high-impact force, including head strikes. Finally, it is important to note that the outcomes of such investigations do not negate the Department's obligation to ensure that the use of high-impact force and head strikes by staff must be in strict adherence with policy and must be used as infrequently as possible given the serious risk of harm associated with the use of such tactics.

Despite the fact that DOC reports that at least 30 of the 116 cases involving head strikes during this Monitoring Period were identified as being inconsistent with policy, DOC's Consultants claim that DOC is unaware of example cases in which there was problematic high impact force or the use head strikes when it should not have occurred. In order to illustrate the problematic tactics employed by staff, the following examples are provided. These incidents are representative of the patterns identified by the Monitoring Team and are **not** isolated events.

- **Use of Head Strikes When No Imminent Threat of Death or Serious Bodily Injury Resulting in a Staff Hand Fracture**: *In April 2025, in the OBCC Visit Area, an individual in custody refused multiple staff orders to leave after his visit concluded, leading several officers and a supervisor to attempt verbal de-escalation for nearly twenty minutes. When an officer approached, the individual stepped toward him and pushed him in the chest, causing the officer to stumble backward and drop his gas mask. Staff then used force to restrain the individual. Video shows an officer delivering head strikes, another officer delivering a knee strike to the individual's head while he was hunched over, and multiple officers holding the individual by the head, upper body, and legs as they attempted to bring him to the ground and apply restraints. Once restrained, the individual was escorted to Intake, where he complained about staff actions but refused medical evaluation; no injuries were documented despite multiple head strikes*

---

[146] As noted elsewhere in the Report, while DOC's use of force investigations have improved, additional improvement is needed. Accordingly, it is possible that additional incidents may have merited charges, but they were not brought.

*captured on video. The officer utilizing head strikes reported sustaining a fracture to his right hand. This is example 4 in Appendix L.*

- **Use of Head Strikes on an Individual Engaged in Self-Harm***: In June 2025, staff approached the cell of an individual who had tied an institutional shirt around his neck and secured it to the cell window. As soon as staff opened the cell, the individual untied the shirt and threw it toward an officer, after which the officer immediately entered the cell and delivered a closed-fist strike to the back of the individual's head, followed by multiple additional striking motions while the individual backed against the wall in a defensive posture. Several officers then entered the cell, applying force that included head-area pressure, and multiple closed-fist strikes to the torso. Multiple staff used profanity such as "turn the f\*\*\* around," which was captured on body-worn camera. Supervisors were present throughout the incident, with video capturing the supervisor saying "not in the face" as officers continued to strike the individual. The supervisor then looked directly at the body-worn camera before it was deactivated. Medical staff later documented visible injuries to the individual's torso, rib area, arm, and scalp, and noted delayed production for medical evaluation; no staff injuries were reported. This is example 6 in Appendix L.*

In the cases above, the Department found and sustained misconduct and determined that the use of head strikes in these two instances was not consistent with policy.

- **Department's Internal Evaluation of Head Strike Data**

Following the end of the Monitoring Period, DOC reportedly spent significant time internally evaluating its data on head strikes and developed a report for the Monitor that appears to be an attempt to minimize the problem. Multiple staff anonymously reported to the Monitoring Team their concerns that although the Department leadership was spending significant time evaluating the data regarding head strikes, it was not evaluating the circumstances surrounding the use of head strikes, whether the use of the head strikes was consistent with policy, or trying to develop strategies to limit the use of head strikes and other high impact force techniques. The Department reported to the Monitoring Team that it "takes all head strikes very seriously and will continue to thoroughly assess each instance a head strike is utilized, and will continue to address security issues to prevent such uses of force." However, the

DOC has not reported taking any concrete steps to work with Staff to eliminate the use of prohibited head strikes or high impact force.

Following the DOC's report to the Monitor about its head strike data, it purportedly continued to evaluate this with its Consultants in what appears to be an attempt to minimize the implications of the data. As part of this work, DOC's Consultants recommended that the prohibition on the use of head strikes should be lifted and a more lenient standard should be utilized in order to permit the use of head strikes in a larger number of circumstances. In short, they recommended that only "intentional" head strikes should be considered a violation of policy.[147] Given the DOC's current practices, on-going failure to comply with policy, pattern and practice of the use of high impact force/head strikes that served as the basis for the requirement in the Consent Judgment, and the serious risk of harm associated with this tactic, the suggestion of a more lenient, permissive standard is inherently antithetical to the reform effort.

- **Department's Dismissal of Allegations Regarding Improper Head Strikes**

Compounding the concerns about the Department's use of head strikes is the fact that people in custody frequently allege staff utilized head strikes during an incident even when Staff don't report that they used head strikes. Allegations about the use of head strikes are prevalent when uses of force occur in locations that do not have full coverage from stationary cameras for privacy reasons (*e.g.*, within cells of housing areas, in bathrooms, areas for strip searches, clinic exam rooms).[148] Allegations of the use of head strikes are also frequently made in cases when BWC footage is missing, staff did not activate the BWC, or camera angles did not capture the full scope of staff actions. The lack of video footage makes ascertaining what occurred very difficult. However, the large number of allegations, itself, is cause for further scrutiny. The Monitoring Team's review of these allegations reveals some common patterns. For instance, frequent allegations center on the use of head strikes during strip searches and a number of allegations relate to situations where body worn cameras and/or handheld cameras should have been present and activated by staff but were not.

---

[147] The basis for the DOC's Consultants position is unknown. Notably, one of the two DOC Consultants has not reported any experience in the monitoring of use of force cases in their resume presented to the Court. *See*, Declaration of James Austin, dated March 19, 2024 (dkt. 689-9) at Exhibit A.

[148] These are generally locations in which camera coverage is expressly prohibited. *See*, Consent Judgment § III, ¶ 8.

While the lack of video footage makes conclusions about what occurred difficult, this does not absolve DOC from the obligation to carefully investigate these incidents and ascertain if there is any veracity to the allegations, especially given their volume. These allegations should not be summarily ignored as DOC and its Consultants appear to contend. The Monitoring Team recommends that the Department carefully review all allegations of head strikes to identify potential patterns regarding the time, place and circumstances where they are alleged to occur. Further, given the high number of allegations, DOC should consider whether additional improvements to video coverage are needed.

- **Summary**

Overall, the use of high impact force and head strikes continues to occur in situations where there is no imminent danger of death or serious bodily injury and when lesser means could have effectively resolved the situation. In other words, this dangerous practice continues to be used in situations where the tactics are prohibited by policy. The combination of using head strikes as a default tactic, the frequency with which head strikes occur during the application of other defensive tactics, and the large number of allegations that staff use head strikes in locations without video coverage reflect that staff practice has not materially altered with regard to this critical provision of the Consent Judgment and the UOF Directive. Further, it remains troubling that DOC's exclusive focus on the problem has been to attempt to minimize the importance of this issue and to compromise the extant standards in a manner that would likely increase the Department's use of head strikes rather than taking concrete steps to eradicate the use of high impact force or head strikes when not permitted by policy. Accordingly, a significant risk of harm remains, resulting from staff's use of high impact force and head strikes.

## Conclusion

As described in the Monitor's May 22, 2025 Report (dkt. 850), the Department has demonstrated progress towards implementing the UOF Policy since the initiation of the Consent Judgment and is now showing movement toward achieving Partial Compliance. Other sections of this report describe the Department's work during this Monitoring Period regarding operations, security, investigations, and accountability. However, the Department has not yet implemented most or all of the components of the UOF Policy.

Substantially reducing the frequency of unnecessary and excessive uses of force will require adequate staffing, revisions to the standalone policies (identified above), quality training and supervision, strict adherence to sound security practices and basic operations, and reliable and appropriate staff accountability. To further advance in the implementation of this provision, the Department must demonstrate a sustained and measurable reduction in these harmful practices and ensure staff are consistently applying safe and proportional tactics. The Monitoring Team has long recommended that the Department address several critical issues, such as the persistent use of head strikes (especially against those in restraints), inappropriate takedown techniques, failures to de-escalate, excessive or unauthorized uses of chemical agents, and the continued reliance on painful escort holds, all of which illustrate the continued use of unnecessary and excessive force. The Department did not report any specific or concerted steps taken during this Monitoring Period to curtail or improve staff's UOF practices.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § IV., ¶ 1. (Develop)** Substantial Compliance<br>**Consent Judgment § IV., ¶ 1. (Adopt)** Substantial Compliance<br>**Consent Judgment § IV., ¶ 1. (Implement)** Non-Compliance<br>**Consent Judgment § IV., ¶ 1. (Monitor Approval)** Substantial Compliance |

| **INDEPENDENT STAFF REPORTS (CONSENT JUDGMENT § V., ¶ 2)** |
|---|
| _Consent Judgment § V., ¶ 2. Independent Staff Reports._ Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor. <br><br> _October 10, 2023 Order. Immediate Reporting Initiatives._ The Department, in consultation with the Monitor, shall immediately develop and implement, by October 25, 2023, protocols to address the deficiencies in the Department's internal reporting structures and notifications to the Monitor as described in the "Incident Reporting" Section of the [October 5, 2023] Status Report. (See Status Report at 10-12.) <br><br> _December 14, 2023 Order § 1. Department's Incident Reporting Practices._ The Department shall develop and implement a comprehensive and streamlined policy and procedures for all incidents and events that must be reported (New COD Policy). The policy and procedures shall be subject to the approval of the Monitor. Accordingly, by the dates set forth below, the Department, in consultation with the Monitor, shall: <br>    a. By December 15, 2023: Provide the Monitoring Team will the full list of Department policies that must be reviewed for potential consolidation into the new COD policy. <br>    b. By December 22, 2023: Review, revise, and implement updated definitions of Stabbing and Slashing to ensure that the definitions are clear and concise and will result in the collection and reporting of reliable and accurate data. The definitions for Stabbing and Slashing shall be subject to the approval of the Monitor. <br>    c. By February 2, 2024: Review, revise, and implement updated definitions for the various incident categories maintained by the Department, including all security indicators related to violence, including but not limited to use of force, use of force (allegation), assault/attack on staff, inmate-on-inmate fight/assault, inmate-on-inmate sexual assault, and staff sexual misconduct, to ensure that the definitions are clear and concise and will result in the collection and reporting of reliable and accurate data. The definitions of the various incident categories shall be subject to the approval of the Monitor. <br>    d. By May 31, 2024: The Department shall implement the New COD Policy. |

Pursuant to Consent Judgment § V, ¶ 2, the Department is required to accurately and timely report when force is used as part of its overall goal to manage use of force effectively. The assessment below covers five critical areas related to reporting force: notifying Supervisors that a use of force ("UOF") occurred, submission of complete, independent, and timely reports, the classification of UOF incidents, allegations of use of force, and reporting of use of force by non-DOC staff who either witnessed the incident and/or relay reports from incarcerated individuals.

## Compliance Assessment Overview

The first compliance assessment for Consent Judgment § V, ¶ 2 occurred for the 3rd Monitoring Period (August to December 2016). At that time, the Department was found to be in Partial Compliance where it has remained through this 20th Monitoring Period (January to June 2025).[149]

---

[149] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's October 10, 2023 Order (dkt. 582) and the Court's December 14, 2023 Order (dkt. 656) as they also relate to incident reporting, but compliance ratings are not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Notifying Supervisor of UOF**

From January to June 2025, 3,625 use of force incidents were reported by supervisors to the Central Operations Desk, and approximately 6,760 uses of force or use of force witness reports were submitted for incidents occurring in this Monitoring Period. To assess whether staff are timely and reliably notifying a supervisor of a UOF, the Monitoring Team considers whether there is evidence that staff are not reporting force as required. This includes consideration of allegations as well as reports from outside stakeholders (*e.g.*, New York City Health + Hospitals ("H+H") and Legal Aid Society ("LAS")) about potential unreported UOF. As discussed in more detail below, the number of allegations of use of force remains low and only a small fraction are substantiated. Further, all but one of the 55 reports of UOF from H+H and LAS were already under investigation before those reports were submitted to DOC.[150] Overall, unreported uses of force appear to be an infrequent occurrence.

**Independent, Complete, and Timely Staff Reports**

Staff members are required to submit independent and complete UOF reports. The Department's Use of Force Directive requires staff to independently prepare a staff report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force. Staff reports are essential to use of force investigations, requiring staff members to describe events in their own words. Staff must provide accurate details about the tactics used or observed, the level of resistance or threat, and the reasons why force was necessary.

The Department maintains a centralized, reliable, and consistent process for submitting and tracking UOF Reports. The number of reports submitted by staff is significant and most of those reports are submitted and uploaded in a timely fashion. Overall, the Intake Investigations

---

December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

[150] In this Monitoring Period, 45 out of the 46 reports from H+H staff alleging UOF were already under investigation by ID before H+H's reports were submitted. Further, all 10 of the UOF allegations submitted by LAS in this Monitoring Period had already been reported before receipt of the allegation via LAS.

of UOF incidents appeared to generally have access to staff and witness reports with enough time to conduct the investigations.

During this Monitoring Period, more than 6,760 reports were submitted. The large number of reports submitted generally indicates compliance with the requirement that staff must submit reports. The Monitoring Team's review of reports revealed a general tendency toward independent preparation by the staff. However, the quality of reports remains inconsistent, which has long been reported and is consistent with prior findings highlighted in the Monitor's May 29, 2020 Report (dkt. 341) at pgs. 89-91. The Monitoring Team continues to routinely identify reports that are incomplete, vague, or inconsistent with the evidence. The Department itself continues to identify issues with staff reporting practices. For the 2,873 Intake Investigations closed in this Monitoring Period (covering incidents occurring between December 2024 and June 2025), the Investigation Division ("ID") identified 610 incidents (21%) with report writing issues. The proportion of closed investigations that identify report writing issues remains largely unchanged, indicating that deficiencies in staff reporting practices persist despite ongoing identification of these issues by the Department and the Monitoring Team.

Staff members are also required to submit their reports as soon as practicable after the use of force incident, or the allegation of the use of force unless the staff member cannot prepare a report within this timeframe due to injury or other exceptional circumstances. The table below demonstrates the number and timeliness of staff reports for actual and alleged UOF from 2018 to June 2025.

| Timeliness of Staff Report | | | | | | |
|---|---|---|---|---|---|---|
| | Actual UOF | | | Alleged UOF | | |
| Year | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 24 Hours | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 72 Hours of the Allegation |
| Jan. to Dec. 2018 | 15,172 | 12,709[151] | 83.77% | 139 | 125[152] | 89.93% |
| Jan. to Dec. 2019 | 21,595 | 20,302 | 94.01% | 190 | 134 | 70.53% |
| Jan. to Dec. 2020 | 19,272 | 17,634 | 91.50% | 136 | 94 | 69.12% |
| Jan to Dec. 2021 | 22,103 | 17,064 | 77.20% | 111 | 45 | 40.54% |
| Jan to Dec. 2022 | 17,700 | 14,776 | 83.48% | 93 | 42 | 45.16% |
| Jan to Dec. 2023 | 14,957 | 11,924 | 79.72% | 82 | 40 | 48.78% |
| Jan to Dec. 2024 | 16,307 | 13,116 | 80.43% | 93 | 48 | 51.61% |
| Jan to Jun 2025 | 8,306 | 6,766 | 81.5% | 31 | 13 | 41.9% |

During this Monitoring Period, 82% of reports were submitted within the 24-hour deadline. Among the facilities, performance was mixed. Previous issues with timeliness of reporting improved at GRVC, while submission rates at RESH declined. In March 2025, the Monitoring Team shared feedback with the Department and RESH leadership, noting that NCU reported that only 70% of reports were submitted on time in the prior Monitoring Period and requesting an explanation for the persistent delays and steps the facility would take to improve compliance. In April 2025, RESH leadership reported that Supervisors were counseled to ensure staff are submitting reports timely, however the facilities results continued to be inconsistence After the close of the Monitoring Period, the Monitoring Team shared another feedback which

---

[151] NCU began the process of auditing actual UOF reports in February 2018.

[152] NCU began collecting data for UOF allegations in May 2018.

described the Department's multi-year decline in timeliness, highlighted facility-level disparities, and requested that the Department identify barriers to timely submission, implement targeted strategies to return to the 2019–2020 performance levels (when over 90% of reports were submitted on time despite higher volumes), and develop a plan to improve the timeliness of allegation reports. The Department has not responded to this feedback, nor has it provided information on any initiatives to address the concerns identified by its own internal audits. As a result, the Monitoring Team cannot determine whether the Department has taken corrective action or whether timeliness is likely to improve absent targeted intervention.

Obtaining reports related to allegations of use of force typically takes longer because the staff members involved must first be identified and notified that a report is required. Only then can the report be written and submitted. The staff member may or may not be working on the day when the allegation is received and reviewed, so it generally takes longer to obtain reports for allegations than the 24-hour time frame set for reports to be submitted following a *reported* use of force incident. This is why the time frame for submission of allegation of use of force is evaluated at 72 hours after receipt of allegation instead of 24 hours after the incident. In this Monitoring Period, 13 of the 31 (42%) reports for alleged UOF incidents were submitted within 72 hours. The Department has averaged around 50% of alleged reports being submitted within 72 hours for several Monitoring Periods, so the percentage of reports submitted within 72 hours during this Monitoring Period represents a significant decrease from the average. It is worth noting from January to December 2018, a significantly higher number of reports were submitted (n=125) and 90% were submitted within the 72-hour period. The time for submission of allegation reports is trending in the wrong direction and needs to be improved.

## Classification of UOF Incidents

The Department is required to immediately classify all use of force incidents as Class A, B, C, or P when an incident is reported to the Central Operations Desk ("COD"). Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of the report to COD to receive an injury classification of Class A, B, or C.

The chart below identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from January 2018 to June 2025.

| COD Sets Reviewed | 2018 6th & 7th MP | 2019 8th & 9th MP | 2020 10th & 11th MP | 2021 12th & 13th MP | 2022 14th & 15th MP | 2023 16th & 17th MP | 2024 18th & 19th MP | Jan to June 2025 20th MP |
|---|---|---|---|---|---|---|---|---|
| **Total Incidents Reviewed** | 929 | 1,052 | 1,094 | 1,644 | 1,585 | *2,164* | 2,249 | 1,133 |
| **Total Incidents Classified Within COD Period** [153] | 909 (98%) | 1,023 (97%) | 1,079 (99%) | 1,226 (75%) | 1,238 (78%) | *1,991 (92%)* | 2,029 (90%) | 816 (72%) |
| **Number of Incidents that were not classified within the COD Period** | 20 (2%) | 29 (3%) | 15 (1%) | 418 (25%) | 347 (22%) | *173 (8%)* | 220 (10%) | 317 (28%) |

While the Department has maintained its ability to classify the majority of incidents in a timely manner, the rate of timely classification has been declining steadily since January 2024. As demonstrated in the chart above, in 2024, 90% of all incidents audited were classified within the COD period. From January to June 2025, only 72% of all incidents audited were classified within the COD period. Ideally, the Department should aim to return to the high rates of timely classification from 2018 to 2020 (ranging from 97% to 99%). Instead, the rates have been steadily declining. The Monitoring Team intends to continue to closely evaluate the timing and accuracy of reclassifications.

**Alleged Use of Force**

In order to evaluate the full extent of force employed within the Department, it is crucial to evaluate both reported instances of force by staff and substantiated *allegations* of the use of force. Hence, the Department maintains distinct tracking for allegations of force use, representing instances where staff purportedly used force on an incarcerated individual which had not been previously reported by staff. It is important to note that an allegation of a use of force does not inherently confirm the actual utilization of force; that determination is established through the investigative process.

The number of allegations has generally declined since 2016. As demonstrated in the chart below, 66 UOF allegations were reported from January to June 2025.

---

[153] The data is maintained in a manner that is most reasonably assessed in a two-week period ("COD Period"). The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less is sufficient to demonstrate compliance.



Overall, the number of allegations that a use of force incident occurred, but was not reported, is small compared to the total number of uses of force reported by staff. From January to June 2025, there were 66 allegations of force while 3,625 uses of force were reported by staff. The number of allegations in 2024 was the lowest reported since the Consent Judgment came into effect, and the number of allegations in 2025 to-date is on track to be roughly equivalent to or lower than 2024. The Monitoring Team has continued to find that generally, of the small group of allegations, only a fraction are substantiated, which are typically for failing to report minor uses of force, and instances of excessive or unnecessary unreported uses of force are rare. That said, all allegations of use of force must be appropriately investigated and all instances of unreported use of force are cause for concern.

**Reporting of Violent Incidents**

The Department was required by the Court's October 10, 2023 Order (dkt. 582) to address the deficiencies in the Department's internal reporting structures and notifications to the Monitor as described in the Monitor's October 5, 2023 Report in the "Incident Reporting" Section of the Status Report at pgs. 10 to 12. The Department issued two teletypes, on October 6 and 20, 2023, that reminded staff of their incident reporting obligations. The teletypes also

rescinded the January 31, 2023 memo that permitted undue subjectivity and discretion in incident reporting (*see* Monitor's November 8, 2023 Report (dkt. 595) at pgs. 29-37). The Department and Monitoring Team subsequently collaborated to revise the definition for "stabbing/slashing," which was approved by the Monitor on February 16, 2024. The Department issued a teletype with the approved definition in October 2024. In advance of promulgating the updated definition, the Department also conducted a training for all ADWs to coincide with the roll-out of the new criteria for classifying these events. The Monitoring Team has continued to closely scrutinize incidents of stabbings, slashings, or incidents resulting in serious injuries. The concerns the Monitoring Team previously reported regarding the veracity of reporting of violent incidents in 2023[154] appear to have been abated. In other words, it appears that incidents of violence are generally being reported as they should. Additional work related to the Department's reporting obligations is discussed in the section below regarding the December 14, 2023 Order (dkt. 656).

**Non-DOC Staff Reporting**

Non-DOC staff members who witness a use of force incident are required to report the incident in writing directly to a supervisor and medical staff are required to report to a supervisor when they have reason to suspect that an Inmate has sustained injuries due to a use of force, but the injury was not reported as such to the medical staff. Reports from non-DOC staff are vital, as they can sometimes identify incidents that would otherwise go unreported. They often provide additional context or information not captured in other reports, and even when they simply corroborate other accounts, they add significant value. This underscores the importance of anyone who witnesses a use of force submitting a report.

*DOE Staff Reporting:* The Department of Education ("DOE") previously developed staff training and reporting procedures, in consultation with the Monitoring Team, to address the requirements of this provision and the December 4, 2019 Order (dkt. 334) clarifying the requirement for DOE to submit reports. The Monitoring Team has not received any reports from DOE staff that may have witnessed a UOF. The Monitoring Team evaluated incidents that occurred in the 19th and 20th Monitoring Period that occurred in school settings and identified 11 incidents in which it appeared that DOE staff may have witnessed a UOF incident, but there were no reports submitted. The Monitoring Team has shared feedback with DOE in an effort to ensure that the

---

[154] *See* Appendix B of the October 5, 2023 Report and Appendix D of the November 8, 2023 Report.

steps taken to create the necessary reporting structures are implemented. Following the close of the Monitoring Period, in October 2025, in response to the Monitoring Team's feedback, the City reported that DOE staff reviewed the incidents identified by the Monitoring Team in which DOE staff appeared to witness a Use of Force, but did not submit the required reports. DOE acknowledged that reports should have been completed in those instances and implemented steps to reinforce compliance with the *Nunez* reporting obligations. First, DOE and staff from the Law Department conducted professional development training for staff on Use of Force reporting requirements. The training materials, which clearly outlined the definition of Use of Force, mandatory reporting responsibilities, and timelines, were distributed to staff along with updated reporting forms. To ensure sustained compliance, DOE designated the school principal to oversee on-site adherence to reporting requirements, made reporting forms readily accessible in the principal's office, and committed to providing regular reminders to staff. DOE also assigned primary contacts for ongoing coordination with the Monitoring Team and DOC and updated the distribution list to ensure proper routing of witness reports to DOC officials, the Monitoring Team, and DOE Legal. The Monitoring Team received the first witness report shortly thereafter. Overall, these targeted steps were well-conceived, timely, and appear effective. The training of staff, clarification of procedures, and new oversight reflect a thoughtful approach that quickly yielded results.

*H+H Reporting*: H+H (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for staff reporting. H+H staff submitted a total of 46 reports in this Monitoring Period; 35 reports were H+H witness reports of UOF incidents and 11 reports relayed UOF allegations from an incarcerated individual. The chart provides an overview of the reports provided by H+H staff since January 2018.

| Submission of H+H Staff Reports[155] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2018 (6th & 7th MP) | 2019 (8th & 9th MP) | 2020 (10th & 11th MP) | 2021 (12th & 13th MP) | 2022 (14th & 15th MP) | 2023 (16th & 17th MP) | 2024 (18th & 19th MP) | Jan-Jun 2025 (20th MP) |
| Grand Totals | | | | | | | | |
| Total Reports Submitted | 53 | 39 | 56 | 97 | 52 | 26 | 78 | 46 |
| Total UOF Incidents Covered | 53 | 38 | 46 | 85 | 42 | 27 | 59 | 41 |
| Witness Reports | | | | | | | | |
| # of witness reports submitted | 29 | 18 | 45 | 70 | 36 | 18 | 59 | 35 |
| # of actual or alleged UOF incidents covered by submitted reports | 31 | 15 | 36 | 64[156] | 25[157] | 18 | 45[158] | 31[159] |
| Relayed Allegations from Incarcerated Individuals | | | | | | | | |
| # of reports of allegations of UOF relayed from an Incarcerated Individuals | 24 | 21 | 11 | 27 | 16 | 8 | 19 | 11 |
| # of actual or alleged UOF incidents covered by submitted reports | 22 | 23 | 10 | 22[160] | 19[161] | 9 | 15[162] | 11[163] |

---

[155] *See* the Monitor's November 22, 2024 Report (dkt. 802) at pg. 79 for data on H+H reports submitted in July-December 2017 (the 5th MP).

[156] On one occasion for one use of force incident, we received both a witness report and a relayed allegation report for the same incident.

[157] On two separate occasions for two separate use of force incidents, we received both a witness report and a relayed allegation report for the same incident.

[158] On one occasion for one use of force incident, the Monitoring Team received both a witness report and a relayed allegation report for the same incident.

[159] On one occasion for one use of force incident, the Monitoring Team received both a witness report and a relayed allegation report for the same incident.

[160] On one occasion for one use of force incident, we received both a witness report and a relayed allegation report for the same incident.

[161] On two separate occasions for two separate use of force incidents, we received both a witness report and a relayed allegation report for the same incident.

[162] On one occasion for one use of force incident, the Monitoring Team received both a witness report and a relayed allegation report for the same incident.

[163] On one occasion for one use of force incident, the Monitoring Team received both a witness report and a relayed allegation report for the same incident.

As reported in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 79-80, following a decrease in the number of H+H reports submitted in 2023, the Monitoring Team shared feedback with H+H leadership recommending that they engage in a renewed effort to ensure H+H staff are reporting as required. In response, H+H reported that they started facilitating three types of reminders to staff regarding their *Nunez* reporting obligations – verbal reminders to staff at quarterly leadership meetings, quarterly email reminders to all staff, and a new pop-up message in the electronic medical records system that appears each time a staff member logs in. Since these reminders were implemented in the 19th Monitoring Period, there has been a notable increase in reports submitted by H+H staff. The increased number of reports submitted by H+H staff was sustained during the 20th Monitoring Period (n=46).

The Monitoring Team appreciates the progress that has been made with respect to reporting but continues to monitor to ensure that reporting occurs when it should. It is difficult to know whether H+H staff submitted reports for every incident witnessed as it is not always clear what incidents H+H staff may have, in fact, witnessed. The Monitoring Team continues to review certain data as well as specific incidents. In particular, the Monitoring Team reviews incidents that occur in the clinics and whether staff submit reports.[164] The Monitoring Team also routinely reviews a sample of uses of force that occurred in which the COD report and/or ID intake investigation contained mentions of medical staff that were likely present in the surrounding area when the use of force occurred.

This Monitoring Team's review identified at least some incidents occurring between January 2023 and June 2025 in which it appears that H+H staff may have witnessed a UOF, but a report was not submitted. The Monitoring Team provided these incidents to H+H for review, both to determine whether individual follow-up on these cases was needed and, more broadly, to reinforce the broader reporting requirements to all staff. H+H responded that it determined at least 58 staff should have submitted UOF reports (for 25 unique UOF incidents). In response, depending on the case, H+H gave the staff verbal warnings, formal counseling, or disciplinary

---

[164] With respect to incidents occurring in the clinics, between January and June 2025, 146 use of force incidents occurred in clinic areas and only six of those incidents (4%) had corresponding reports submitted by H+H staff. It is worth noting that just because an incident occurred in a clinic area does not mean H+H staff witnessed the incident. However, the number of incidents that occurred in a clinic versus the number of reports received suggests it is possible that additional incidents were observed but not reported.

action. The broader initiatives that H+H has implemented to reinforce the reporting requirements to H+H Staff in response to the Monitoring Team's findings are discussed above.

Overall, the sustained improvement observed in H+H reporting is notable. The reports submitted by H+H staff are crucial to the investigation of use of force incidents, so continued and sustained focus on ensuring that H+H staff are reporting as required is critical.

### Overarching Work Regarding Department's Reporting

On December 14, 2023, the Court issued an Order (dkt. 656) regarding changes the Defendants must make to incident reporting practices in light of the Monitoring Team's findings in the Monitor's October 4, 2023 Report (dkt. 581) and the Monitor's November 8, 2023 Report (dkt. 595). A brief update on the specific requirements of that order are included below given its impact on the Department's overall reporting practices.

- **List of Reporting Policies (§ 1, ¶ a).** On December 15, 2023, the Department provided the Monitoring Team with a list of 75 Department policies[165] that must be reviewed for potential consolidation into a comprehensive Incident Reporting policy.

- **Stabbing and Slashing Definition (§ 1, ¶ b).** The Department and Monitoring Team collaborated to revise the definition for "stabbing/slashing." The Department trained ADWs on the new definition in advance of issuing a teletype with the approved definition in October 2024.

- **Definitions of Incident Categories (§ 1, ¶ c).** Defining incident categories will be part of the effort to develop a comprehensive Incident Reporting policy.

- **Comprehensive COD Policy (§ 1, ¶ d).** The Department is undertaking a comprehensive and ambitious effort to reform its incident reporting process by developing an overarching Incident Reporting policy. This initiative, which will consolidate over 120 existing policies and involves coordination across numerous Divisions, is being led by the Department's Division of Strategic Operations. The Department's leadership consults with the Monitoring Team routinely and provides updates on work completed to date. Notably, the Department is not only overhauling its policies and aligning definitions with SCOC and other regulatory standards but is also developing a new electronic Incident

---

[165] As noted in the bullets below, the Department reported the number of policies that require revision increased as it identified additional policies where revisions were necessary.

Reporting System featuring a better user interface and reporting capabilities, which will also contribute to better data production. This is a significant undertaking that reflects the depth of this reform effort.

In this Monitoring Period, the Department's reporting initiative has evolved from the planning stages to operationalizing the new reporting process. This transition from planning to implementation marks significant progress. In October 2025, as part of the project's routine updates, the Monitoring Team received a demonstration of the new Incident Reporting System, which appeared user-friendly, well-organized, and centrally structured for accurate and efficient data tracking. The Department has undertaken a substantial effort to index and categorize a large number of incidents into both general and subcategories while consolidating reporting timeframes (15 minutes, one hour, or 8 hours). The Department also developed tailored distribution lists for each incident category to ensure that only the appropriate staff receive notifications. As of late 2025, the Department has conducted system stress testing, identified a potential new location for the COD trailer, developed definitions and categories, and continued to review relevant policies to make appropriate revisions. The next phase will focus on finalizing incident definition and categories, developing a new policy, followed by staff training and communication, and eventually a rollout of the new system. While timelines continue to evolve, given the scale of the initiative, the Strategic Operations Division and other stakeholders have demonstrated a disciplined, thoughtful commitment to strengthening the Department's reporting infrastructure.

## Conclusion

Overall, the Department continues to generally report use of force incidents as required, and most are classified within a reasonable period of time. While thousands of individual staff reports are submitted, many of them timely, there remains room for improvement. Continued delays in report submission from certain facilities and broader delays in incident classification hinder the timely assessment of these reports. Additionally, the quality, specificity, and accuracy of staff reports have largely remained consistent since monitoring began and improvement is still needed to ensure reports accurately capture what occurred. The Department therefore remains in Partial Compliance with this requirement.

| COMPLIANCE RATING | **Consent Judgment § V., ¶ 2.** Partial Compliance |
|---|---|

| PROVIDING MEDICAL ATTENTION FOLLOWING A USE OF FORCE INCIDENT (CONSENT JUDGMENT § V., ¶ 22) |
|---|
| *Consent Judgment § V., ¶ 22. Providing Medical Attention Following Use of Force Incident.* All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any. |

Given the potential for injury, incarcerated individuals involved in uses of force and fights should receive prompt medical attention. There is no generally accepted standard for the specific period of time when medical treatment must be provided after an incident, which is why the provision simply requires medical treatment to be provided "as soon as practicable" after the incident. As a management tool, time markers are useful. Accordingly, the Department's Directive 4516R-B "Injury to Inmate Reports" requires individuals to be afforded medical attention as soon as practicable, but no more than four hours following a UOF incident or inmate-on-inmate fight. The Department's policy also sets forth guidelines for affording expedited medical treatment. PICs who appear to have specific conditions or complain of having such conditions (*e.g.* loss of consciousness, seizures, etc.) must be produced directly to a clinic (and not taken to an intake location) following a UOF or fight. The timelines set by this policy are within the generally accepted practice, and thus the Monitoring Team measures compliance using the Department's four-hour standard.

## Compliance Assessment Overview

The first compliance assessment for Consent Judgment § V, ¶ 22 occurred for the 3rd Monitoring Period (August to December 2016). At that time, the Department was found to be in Partial Compliance and remained so through the 6th Monitoring Period (January to June 2018). The Department was found to be in Substantial Compliance from the 7th Monitoring Period (July to December 2018) through the 11th Monitoring Period (July to December 2020). The Department returned to Partial Compliance from the 12th Monitoring Period (January to June 2021) through the 16th Monitoring Period (January to June 2023).[166] The Department achieved

---

[166] A compliance rating for this provision was not awarded in the 13th Monitoring Period because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time

Substantial Compliance again in the 17th Monitoring Period (July to December 2023). In the 20th Monitoring Period (January to June 2025) the Department returned to Partial Compliance.

**Medical Wait Times**

The Department's progress in providing timely medical care following a UOF event from January 2018 to June 2025 is shown in the table below.

| Wait Times for Medical Treatment Following a UOF | | | | | |
|---|---|---|---|---|---|
| | # of Medical Encounters Analyzed | % Seen within 2 hours or less | % Seen within 4 hours | % Seen within 6 hours | % Seen 6 hours or more |
| **2018** | 9,345 | 37% | 73% | 89% | 13% |
| **2019** | 11,809 | 43% | 81% | 92% | 9% |
| **2020** | 10,812 | 46% | 82% | 92% | 9% |
| **2021** | 14,745 | 39% | 70% | 81% | 20% |
| **2022** | 12,696 | 51% | 74% | 83% | 19% |
| **2023** | 11,513 | 54% | 81% | 91% | 10% |
| **2024** | 11,014 | 45% | 81% | 91% | 9% |
| **Jan-Jun 2025** | **5,849** | **38%** | **76%** | **88%** | **12%** |

During the current Monitoring Period, the proportion of UOF-related medical encounters occurring within four hours decreased to 76%, from 81% in 2023/2024. This decrease is mainly attributable to lower performance levels at EMTC (66%) and OBCC (75%) which together account for over half of the cases where medical attention following a use of force was needed. During the Monitoring Period, there was no evidence that Department or facility leadership at EMTC or OBCC took steps to investigate or otherwise address the lower performance levels of medical wait times at these two facilities, despite the fact that NCU conducts and provides monthly audit results to Facility leadership. [167]

---

were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

[167] In response to an inquiry from the Monitoring Team, the Department reported that the decrease in EMTC's ability to provide medical attention within 4 hours was the result of a confluence of events, including the need to conduct medical assessments for new admissions, address other medical emergencies, and the overall volume of UOFs that require medical attention. In some cases, new admissions who were involved in a UOF did not receive medical attention until the regular new admission medical assessment process, as opposed to being triaged for medical

**Electronic Clinic Production Dashboard**

Historically, the Department relied on paper-based methods to record clinic appointments, resulting in inconsistencies in documenting sick call requests and making it difficult to ensure that all individuals requesting medical care were actually seen. To address these issues, the Department collaborated with the Strategic Operations Division, Training and Development, Information Technology Division, and Health Affairs to create an Electronic Clinic Production Dashboard. This dashboard utilizes software to modernize and centralize the tracking of clinic production across all facilities to improve clinic production compliance and provide a comprehensive view of all scheduled and unscheduled clinic activity. The Department finalized the training curriculum for the dashboard and began training staff in late October 2025, with the initial pilot rolled out at the North Infirmary Command on November 18, 2025. The Department provided a demonstration of the Dashboard to the Monitoring Team, which found it to be a modern, efficient, and a significant improvement over the previous manual process.

**Conclusion**

This provision is well-suited to the use of setting quantitative metrics to assess compliance (i.e., the proportion of cases that receive medical attention following a UOF within 4 hours, which is the standard set by Department policy). In response to feedback for greater clarity on the threshold for substantial compliance for this provision, the Monitoring Team determined that 80% is an appropriate standard.·[168] Given that the systemwide average for providing timely medical attention is 76%, the Department is in Partial Compliance.  In addition to maintaining current performance levels at other facilities, improvements to providing timely medical care at EMTC and OBCC are needed to achieve Substantial Compliance.

| COMPLIANCE RATING | Consent Judgment § V., ¶ 22. Partial Compliance |
|---|---|

attention within the required 4-hour time frame. EMTC has previously managed these issues without compromising access to care following a UOF and must reinvigorate the strategies that allowed it to meet required timelines. The Department reports that following the close of the Monitoring Period, EMTC began addressing this issue.

[168] The Monitoring Team's review of the historical record of compliance ratings indicated that most of the compliance ratings to date have been congruent with an 80% threshold for Substantial Compliance, although three exceptions were identified. In the 7th Monitoring Period, Substantial Compliance was assessed with a 74% performance level; in the 8th Monitoring Period, Substantial Compliance was assessed with a 78% performance level; and in the 16th Monitoring Period, Partial Compliance was assessed with an 82% performance level). Despite the small number of exceptions, the Monitoring Team believes that 80% is an appropriate threshold for Substantial Compliance going forward.

---

**INTERIM SECURITY PLAN (SECOND REMEDIAL ORDER ¶ 1(I)(A) AND ACTION PLAN § D., ¶ 2(A))**

*Second Remedial Order ¶ 1(i)(a). Interim Security Plan.* Develop, in consultation with the Monitor, and implement an interim Security Plan that describes, in detail, how various security breaches will be addressed by October 11, 2021. This plan shall address, among other things, the following issues: unsecured doors, abandonment of a post, key control, post orders, escorted movement with restraints when required, control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing officer keys and OC spray.

*Action Plan § D., ¶ 2(a). Interim Security Plan.* The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: (a) the interim Security Plan required by ¶ 1(i)(a) of the Second Remedial Order.

*October 10, 2023 Order. Immediate Security Plan.* The Department's Executive Leadership, including the Senior Deputy Commissioner, the Security Manager, the Classification Manager, and the Staffing Manager, shall convene a meeting with the Monitor, no later than October 18, 2023, to devise a plan that can be implemented immediately to ameliorate the unacceptable levels of harm in the New York City jails.

---

The Department is required to develop a comprehensive Security Plan pursuant to the Second Remedial Order (dkt. 398), ¶1(i)(a) and the Action Plan (dkt. 465), §D, ¶2(a). The Department has struggled to develop a comprehensive and effective Security Plan.[169] Previous iterations of security plans have failed to adequately address standard, basic security protocols that are necessary to reduce unnecessary, inappropriate, and/or excessive uses of force and other forms of institutional violence as required by the *Nunez* Court Orders.

**Compliance Assessment Overview**

Prior to this Monitoring Period, the Monitoring Team provided updates on the Department's efforts to achieve compliance with the Second Remedial Order (dkt. 398), ¶ 1(i)(a) and the Action Plan (dkt. 465), §D, ¶ 2(a), but did not provide compliance ratings because they were not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team was required to do so. The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with the requirements to develop the Security Plan in the Second Remedial Order (dkt. 398), ¶ 1(i)(a) and the Action Plan (dkt. 465), §D, ¶ 2(a). The Court explained the basis for these findings at pgs. 22-26 in the section "Failure to Correct

---

[169] *See*, Monitor's October 14, 2021 Report (dkt. 403) at pg. 5; November 17, 2021 Report (dkt. 420) at pgs. 2-3; Monitor's December 1, 2021 Report (dkt. 429) at pg. 7; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 15-20; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 21-22, and 44-46; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-81; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 37-39; Monitor's June 8, 2023 Report (dkt. 541) at pgs. 35-36; July 10, 2023 Report (dkt. 557) at pgs. 31-33; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 3, 17-23, 44, and 56; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 20-29, 32, 164, and 166; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 14-18, and 185-186.

Failures in Security and Basic Correctional Practice" of the Order. Beginning in this Monitoring Period, a compliance rating will now be provided for these provisions pursuant to the Court's July 10, 2025 Order (dkt. 879).

For this Monitoring Period, the Department is in Non-Compliance with provisions to develop a Security Plan in the Second Remedial Order (dkt. 398), ¶ 1(i)(a) and the Action Plan (dkt. 465), §D, ¶ 2(a).

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's October 10, 2023 Order (dkt. 582) as it also requires the Department to develop an immediate security plan, but a compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Security Deficiencies and Priority Areas for Improvement**

The Monitoring Team's ongoing findings, described in the "Assessment of the Department's Use of Force and Security Practices" and "Death of People In Custody" sections of this report, and are the basis for the compliance rating. The Monitoring Team has established a lengthy, detailed record of the deficiencies in staff's basic security practices and the impact they have on facility safety.[170] The Monitoring Team's reporting is consistent with the security audits conducted by the Department's *Nunez* Compliance Unit. The patterns discussed in the Monitor's prior reports remain an accurate description of the jails' dysfunction today. The illustrative case examples in Appendix L are replete with examples that demonstrate the risk of harm that flow from these deficient security practices.

One of the most fundamental, yet most critical elements of correctional security is ensuring that doors are properly secured. This is why addressing unsecured doors is the first requirement of the Security Plan, pursuant to the Second Remedial Order. This requirement was imposed in September of 2021 and over four years later, the Department's staff still does not

---

[170] *See* Martin Declaration (dkt. 397) Exhibit E "Citations to Monitoring Team Findings re: Security Failures" and Monitor's December 6, 2021 Report (dkt. 431) at pgs. 17-23; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 7-30; Monitor's April 27, 2022 Report (dkt. 452) at pgs. 2-3; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 13-17; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-77; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68; Monitor's October 10, 2024 Report (dkt. 581) at pgs. 4-19; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 2-3 and 6-28; Monitor's December 12, 2023 Report (dkt. 666) at pgs. 6-22; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 22-29; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 11-18.

consistently secure doors. Additionally, staff fail to supervise and control the environment, consistently enforce basic rules, or search and escort people according to sound correctional practice and frequently do not have control of housing areas or other areas they supervise. This failure to implement basic security practices fundamentally breaches the Department's responsibility to provide a safe and secure environment and to protect individuals from harm.

The Monitoring Team has repeatedly encouraged the Department to develop procedures to, among other actions, ensure that:

- Staff lock doors, remain on post, secure cuffing ports, clear window obstructions, secure gates, control keys and OC spray, communicate effectively with the A-post and corridor posts, not permit PICs to congregate in cells or vestibules, and ensure that PICs remain in the dayroom areas during lock-out.

- Staff immediately address and correct visible infractions (*e.g.*, smoking, passing contraband, brandishing weapons) to prevent normalization of disorderly conduct.

- Staff regularly conduct meaningful tours of the units to verify the welfare of individuals in their cells and *actively* supervise interactions among individuals in the dayroom.

- Staff prevent interpersonal conflict among PICs from escalating to physical altercations through improved management and supervision of housing units.

- Staff embrace and better utilize de-escalation tactics, particularly to prevent passive resistance from escalating to the use of force.

- Supervisors maintain a regular, constructive presence on the housing units to both elevate staff skill and to resolve problems.

- Prosocial behavior is incentivized, and rules are properly enforced, including the application of meaningful consequences for misconduct by incarcerated individuals.

- Staff strictly enforce lock-in times.

- The introduction of dangerous contraband is minimized, and searches are conducted effectively and safely to detect and seize contraband when prevention fails, without escalating to unnecessary or avoidable uses of force.

- Staff utilize an appropriate and authorized continuum of responses to safety and security threats, from least restrictive to more restrictive.

- Staff refrain from using head strikes or techniques that result in PICs striking their heads against stationary objects or other objects, particularly while in restraints, in contravention of generally accepted correctional practice and Departmental policy.

- Staff utilize appropriate escort techniques to avoid escalation.

- Emergency response teams are used only in the event of a true emergency.

- A robust strategy is developed for managing those with a propensity for violence that ensures an effective, proportionate response to those who commit serious violence while in custody.

- Data and analytics (*e.g.*, ACT Dashboard, contraband data, VMU findings, UOF data) are routinely analyzed to identify trends, inform security strategies, and evaluate the effectiveness of initiatives.

Clearly, the list of practices that need improvement is extensive. Given the breadth of required improvements, it is clear that no single initiative or plan can fully resolve all security-related concerns at once. It is also why there are discrete requirements in the *Nunez* Court Orders to address certain specific security practices (*e.g.,* Emergency Response Teams; Searches and Contraband; Managing Individuals Following Serious Acts of Violence). Accordingly, the Security Plan and other corresponding requirements must be implemented within a structured and incremental framework that prioritizes the most urgent issues and builds the foundation for broader reform, while remaining flexible and adaptive enough to enable the agency to make modifications as unanticipated challenges or other changes arise.

Fundamentally, a Security Plan must also be able to withstand changes in leadership, whether at the City, Department or facility level. Regardless of such leadership changes, the Security Plan's fundamental targets (*i.e.*, security practices) and intended outcomes (*i.e.*, reducing the use of force and violence) must remain stable and consistent. Too often, this

Department develops plans that are abandoned before they are ever fully implemented.[171] In this case, the Department has still not developed a comprehensive Security Plan.

**Department's Efforts to Improve Security Practices**

The Department has struggled to develop a Security Plan. The plans developed between September 2021 (when the Second Remedial Order was entered) through November 2023 are described in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 17-21. The Department subsequently produced a Security Plan on June 24, 2024 by the former Deputy Commissioner of Security.[172] The June 2024 plan failed to address longstanding deficiencies in staff practices, lacked data-driven strategies, and left the Monitoring Team uncertain about the Department's capacity and resources to successfully implement the proposed long-term initiatives. Accordingly, the Monitoring Team recommended the Department adopt an approach that focuses on discrete and basic elements of sound correctional management such that each deficiency can be approached more directly and intensively, including the Door Security Pilot.

In May 2025, the current Deputy Commissioner of Security and the Department's Consultant to the Commissioner briefed the Monitoring Team on a Security Improvement Plan with four discrete areas of focus. As of the filing of this report, the Department has not taken action on most of these already discrete and narrow items:

- **Security Operations**: DOC reported it intends to make improved efforts to address the mail and search procedures (noted below and discussed in the Searches and Contraband section of this report), distribute of Nalaxone, utilize ESU/SST/SRT support of housing officers,[173] and distribute of Security bulletins.[174] The plan did not include any initiatives intended to alter staff security practices.

---

[171] *See* Monitor's November 8, 2023 Report (dkt. 595) at pgs. 14-23.

[172] The Department first shared an updated Security Plan on May 23, 2024, but shortly after its submission the Department reported the plan was being revised. Consequently, the Monitoring Team did not provide feedback on the May 23, 2024 Security Plan.

[173] It does not appear that this initiative has been implemented.

[174] The Monitoring Team is not aware of the development of any security bulletins, which should be developed in consultation with the Monitoring Team.

- **Policies and Procedures**: This includes revisions to the policies regarding searches, escorts, chemical agents, ESU policies, and unusual incidents. To date, drafts of these policies have not been shared with the Monitoring Team.

- **Information Technology and Systems**: This includes the development of the centralized incident reporting system (discussed in the Use of Force Reporting section of this report), a pilot of Electronic Logbooks, distribution of Body Worn Cameras, email accounts for Uniform Staff (which is now complete), ID cards for PICs, and documenting infractions electronically.[175] The Department has made progress in advancing these technology initiatives as discussed in other sections of this report.

- **Housing and Infrastructure**: This includes the development of Model Housing Units (discussed in the Back to Basics bullet below), implementation of the Special Management Unit (discussed in the Managing Behaviors of Individuals in Custody section of this report), the Door Security Pilot (discussed in both the Assessment of the Department's Use of Force and the Security Practices sections of this report and below), NCU Security Audits (also discussed in both the Assessment of the Department's Use of Force and the Security Practices section of this report), and improved screening technology.

A more fulsome discussion of the concrete steps the Department has taken to address specific security practices is described below:

- **Door Security Pilot Units**. The Department's Door Security Pilot, managed by Facility Operations and launched in single housing areas at OBCC, GRVC, and RNDC in August 2024, aimed to ensure cell door security. People in custody were offered options to enter their cells at a set schedule and lock-in was enforced at designated times. The plan aimed to enhance compliance with securing cell doors by implementing improved supervision, consistent staffing, and environmental enhancements in select housing areas. Initial audits conducted by Facility Operations showed some improvement in overnight lock-in compliance, but progress ultimately plateaued, revealing deep-seated challenges in sustaining change. Despite repeated interventions, including post-order revisions,

---

[175] Updates on these initiatives and more are included in Appendix I of this report.

leadership meetings, and increased oversight, housing area officers continued to fail to enforce door security, and supervisors failed to provide effective coaching to their staff. When a violation occurred, it was not consistently identified and, when it was, many of the recommended corrective actions were not processed. By mid-2025, the Department reported that it intended to abandon the pilot because it was not successful and it intended to try a different initiative. While the pilot did not result in improved practice, it provided valuable insight into the cultural resistance, leadership shortcomings, and inconsistent supervision that continue to undermine basic correctional practices. The trajectory of the pilot underscores how even targeted, well-resourced efforts face significant resistance and fail to reform day-to-day practice in any sustainable fashion.

- **Back to Basics**: In mid-2025, the Department reported it intended to create pilots in two housing units at GRVC, the "Back-to-Basics" and "Honors Dorm", both under the oversight of the DC of Security. An update on the Honors Dorm is provided in the Managing Behavior of People in Custody section of this report. The Back-to-Basics pilot plan retains some features of the door security pilot but also introduces new elements like real-time hands-on training of line staff, scenario-based training, and NCU video audits with a scorecard to measure outcomes. The Department has struggled to initiate the Back-to-Basics pilot, facing many of the challenges previously cited from the unsuccessful Door Security pilot.

- **Searches and Contraband**. A discussion of the progress the Department has made in improving search tactics and increasing contraband recovery is discussed in the compliance update of Searches and Contraband (Action Plan (dkt. 465), § D, ¶ 2(d), 2(e) and August 10, 2023 Order (dkt. 564), § I, ¶ 2) in this report.

- **Re-deployment of BWCs**. The Department has reinstated the use of body worn cameras throughout all of the jails. The Department continues to make steady progress in the rollout and training for Body-Worn Cameras (BWCs). As of November 2025, updated BWCs have been rolled out at the Training Academy, Bellevue, RESH, RNDC, RMSC, ESU, SOD, SST, SRT, OBCC, EMTC and OBCC. More than 70 percent of the uniformed staff have been trained and equipped with the new BWCs. However, several challenges persist. Staff often fail to activate their cameras consistently, which is

reflected in many of the illustrative example cases used in this report. The Training Division has also identified a technical limitation that the current BWC models cannot reliably function over two full tours, prompting the Department to consider potential policy adjustments. Additionally, the Department reports that staff skepticism on the use of BWC remains a barrier to consistent use. The Department reports that many officers perceive the cameras as a disciplinary tool rather than a safeguard, expressing concerns that footage is used to identify minor violations rather than to serve as objective records of what occurred and substantiate good practice when it occurs. A working group has been convened to discuss potential revisions to the policy, training, and communication strategy in order to improve staff's use of BWCs.

- **Emergency Response Teams**. The Department has also improved its security practices by reducing its overreliance on Emergency Response Teams, which have been plagued by dysfunction and misconduct since the Consent Judgment was entered. Progress in this area is discussed in the compliance assessment of the Facility Emergency Response Teams (First Remedial Order (dkt. 350), § A., ¶ 6) in this report.

- **Managing Individuals Following Serious Acts of Violence**. The Department recently developed an Honors Dorm to incentivize positive behavior among people in custody. It also has two options in its continuum for managing those who engage in serious acts of violence—RESH and the SMU. The Department has worked to expand and improve its strategy for managing behavior, which is discussed in detail in the Managing Behavior of Individuals in Custody section of this report.

### DOC's Safety Plan

During this Monitoring Period, the Department developed a Safety Plan with its Consultant to the Commissioner, Mr. Raney. The Safety Plan was provided to the Monitoring Team in August 2025 and the Commissioner reported to the Monitor and Deputy Monitor this plan reflected the Department's plan. It was explained to the Monitoring Team that the goal and purpose of DOC's Safety Plan is to improve safety across the Department so its focus is broader than the requirements of the *Nunez* Court Orders, but also addresses them.

The Monitoring Team has addressed a number of its concerns with the Safety Plan in the "Introduction" and the "Assessment of the Department's Use of Force and Security Practices"

and are incorporated by reference here. Below is a summary of the matters addressed in the Safety Plan:

- **Regulations Impeding Reform**: The Safety Plan explains that certain regulations constrain the Department's ability to reasonably provide a safe and secure environment, in particular as it relates to: limitations on out of cell time, limitations on searches for contraband (especially via the mail), limitations on funding for physical plant improvements, and certain reporting requirements imposed by the *Nunez* Court Orders. [176] Concern was also raised that the Consent Judgment has created narrow focus on specific provisions versus an assessment of the jails' broader operations. The Safety Plan also suggests there is an improper focus on in-custody deaths and there has not been an acknowledgement that the rate of suicide is lower at DOC than in other systems. [177] Further, the Safety Plan suggests the focus on DOC's high use of force rate may be misplaced because comparisons to other systems is likely not appropriate given DOC has different policies and procedures from other systems. [178]

- **Classification and Housing**: The Department provided reports about changes the Department is making to the classification process to improve the housing decisions of individuals. The Department reports that all Classification Officers now report to the Classification Division ("CMCMU") and not to facility Wardens. No housing decisions shall be made by non-classification staff unless there is an emergency security situation. Even in those cases, CMCMU must review and approve the emergency housing decision. DOC reports that its consultant Dr. James Austin is also working with leadership of

---

[176] It does not appear that there was internal DOC consensus about whether or not alterations to the Department's reporting requirements for use of force were appropriate. No evidence was cited or provided about how or why the current use of force reporting requirements of the Consent Judgment impede Staff practice in any way. In fact, the proposal to limit staff reporting appears to create *more* of an administrative burden *not less* given the need for individualized assessments of which incidents may require a report and which do not and also the work necessary to ensure the individual staff reports are received.

[177] In particular, the Safety Plan explains that "there has been considerable attention to the adverse outcomes that happen on Rikers Island, with little acknowledgment that the rates of suicide are among the lowest in the nation." Later noting, "[t]here is little acknowledgment of how few people die in custody, especially from suicide, as compared to other jails." This is addressed in more detail in the "Deaths in Custody" section of this report.

[178] The Safety Plan notes "[a]dditionally, comparisons are drawn to other jail systems when those other systems do not have the same policies and restrictions as the NYCDOC. For example, the rate of force appears high at first glance, but many of the reported uses of force in the NYCDOC are insignificant and would not be reported in other jurisdictions."

CMCMU to evaluate certain scoring factors of the classification instrument to determine if modifications are necessary.

- **Restrictive Housing**: Data and analysis regarding individuals involved in three or more fights were provided. Further, it was recommended that additional capacity for RESH and SMU are necessary along with additional limitations on out-of-cell time.

- **Behavior Management**: Commentary was provided that the Department has a weak system for deterring violent behavior and rewarding positive behavior by individuals in custody. A proposal for the creation of an Honors Dorm to incentivize positive behavior was recommended (discussed in Managing the Behavior of People in Custody section of this report). In order to deter fights, a system of graduated out-of-cell time for certain housing units was also proposed. The Safety Plan does not address reducing idle time and improving the provision of programming despite the reports from DOC that it is driving a large number of fights in the system.

- **Contraband Control**: Five distinct matters to support the control of contraband were identified: (1) the need for additional Facility repairs (which are constrained by capital spending prohibitions), (2) procurement of new Body Scanners that can be used on individuals more frequently than the Department's current scanners, (3) improved management of the mail (discussed in the Searches and Contraband section of this report), (4) centralization of shipping of parcels, and (5) potential restrictions on contact visits. The Safety Plan does not address efforts to curtail the potential introduction of contraband by staff or others that work in the jails.

- **Use of Force**: The Department's use of force were essentially excused and minimized in the Safety Plan. UOF data was highlighted to demonstrate the reduction in the UOF rate since 2021 and that the primary reason for UOF is fights.[179] Recommendations to changes in the investigative process were described that were purported to support improved accountability. Commentary was provided that found the Rapid Review process occurs too quickly and the investigation process takes too long, and the overall

---

[179] The Monitoring Team's assessment of this data and commentary regarding this data is addressed in the "Assessment of the Department's Use of Force and Security Practices" section of this report.

process was inefficient. Recommendations were made to improve the Rapid Review process and streamline the investigation process. These are discussed in more detail in the "Use of Force Reviews" and "Use of Force Investigation" sections of this report. DOC's Safety Plan also suggested possible changes to the injury classification of UOF.[180]

- **Escorts**: A recommendation to procure an Emergency Restraint chair was made to address concerns regarding painful escorts. The Department subsequently procured five chairs, which DOC reports will be distributed after a policy has been drafted and staff have been trained.

- **Training**: A recommendation was made to improve Field Officer Training to ensure adequate training is provided on basic skills and high-risk topics.

- **Technology**: Concerns were raised about poor management of data and information and the reliance on paper-based systems. Recommendations were made to procure off the shelf systems rather than using the City's preference for building applications internally in order to obtain systems more quickly.

- **Accountability**: Reinforcement of timely intervention to address and improve staff's behavior was emphasized and encouraged to improve the timeliness of responses. The current accountability process was criticized as illogical and ineffective contending that delegation of primary responsibility for corrective actions to levels of uniform staff was inappropriate.[181]

---

[180] The Safety Plan describes and criticizes the Department's process for injury classification of UOF in two different sections. First it notes that the *initial* injury classification of a UOF cannot be updated. Second, it notes that the injury classification of UOF includes injuries that may not have occurred as a result of the UOF. In both cases, these criticisms appear misplaced. DOC can and does update the initial injury classification of UOF when necessary (albeit sometimes after a delay). Further, the Department confirmed that the injury classification of a UOF is intended to only capture an injury that occurred during the UOF. Accordingly, it appears that the Department's current practices for injury classification of UOF already address the concerns identified by the Safety Plan. It is unclear if additional recommendations regarding the injury classification of UOF are being made.

[181] The reference to corrective action and delegation is unclear. The Monitoring Team sought clarification to understand what practices were being addressed in this commentary. Clarification was not provided.

- o _Key Performance Indicators_: Recommendations were made to utilize key performance indicators (e.g. fights, stabbings/slashings, uses of force, serious injuries to PICs, overdoses (if reliable data can be developed), and suicides).[182]

- o _Baseline of expectations for each rank_: Recommendations were made to create meaningful job descriptions for each rank with corresponding evaluation systems to measure performance that are objective.

While DOC's Safety Plan is well intended and includes a number of reasonable recommendations, it does not include any initiatives to change actual staff practice, especially as it relates to security or the use of force. As noted in other sections of this report, the DOC Safety Plan fails to include any concrete initiatives to improve the security practices of DOC staff. Further, the commentary in many respects seeks to minimize the current state of affairs and attempts to shift blame for the current state of affairs to external actors. Accordingly, while the DOC Safety Plan includes a number of reasonable recommendations, it is not a reasonable plan to improve the Department's security practices.

## Next Steps and Conclusion

The Department has attempted various initiatives to improve security, including routine meetings with uniform leadership, specialized pilots in selected housing areas, hands-on training efforts, and contraband interdiction strategies. However, despite these interventions, poor security practices remain normalized and ubiquitous throughout the Department. The plans initiated have not met the rigor, scope, or depth to permeate the systemic issues or entrenched practices. The Department must continue to peel back the layers of resistance and dysfunction and utilize proven strategies for effective culture change, like building and guiding credible leadership, establishing a sense of urgency and a clear mission, earning staff buy-in and engagement, ensuring clear communication and transparency, and providing robust training and reinforcement.

| COMPLIANCE RATING | **Second Remedial Order ¶ 1(i)(a).** Non-Compliance<br>**Action Plan § D., ¶ 2(a).** Non-Compliance |
| --- | --- |

---

[182] The proposed key performance indicators are all reasonable. The Monitoring Team has observed them utilized in various meetings with leadership. It is not entirely clear what changes are being contemplated to utilize the key performance indicators. The Monitoring Team sough clarification, but it was not provided.

> ### SEARCHES AND IDENTIFY/RECOVER CONTRABAND (ACTION PLAN, § D., ¶ 2(D) AND (E)AND AUGUST 10, 2023 ORDER, § I., ¶ 2)
>
> _Action Plan, § D, ¶ 2(d). Searches_. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: : [ . . . ]
>
> (d) improved procedures on how searches are conducted, including addressing the Monitor's feedback that was provided in 2021.
>
> _Action Plan, § D, ¶ 2(e). Identify/Recover Contraband_. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: [ . . . ]
>
> (e) enhanced efforts to identify and recover weapons and other contraband.
>
> _August 10, 2023 Order § I, ¶ 2. Revise Search Procedures_. By October 30, 2023, the Department, in consultation with the Monitor, shall reconstitute its search procedures and practices to ensure searches are conducted in an efficient, timely, safe manner and to reduce the possibility of a use of force. The new search procedures shall be subject to the approval of the Monitor.

The Department's search procedures have been the subject of concern because they are among the most frequent settings for uses of force, many of which could have been avoided.[183] Experiences in other jail systems, where searches are not accompanied by use of force events at the level observed in this Department, suggest that the Department's staff search practices need refinement. In addition, the continued prevalence of dangerous contraband leads the Department to search its facilities frequently. For these reasons, improved search procedures are required by the Action Plan (dkt. 465), § D, ¶ 2 (d) and the August 10, 2023 Order (dkt. 564), § I, ¶ 2. Relatedly, the Department is required by Action Plan (dkt. 465), § D, ¶ 2 (e) to enhance efforts to identify and recover weapons and other contraband.[184]

**Compliance Assessment Overview**

Until this Monitoring Period, the Monitoring Team provided an update on the Department's efforts to achieve compliance with Action Plan § D, ¶¶ 2 (d) and (e), but did not

---

[183] _See_, for example, Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13-14 and 128; Monitor's October 17, 2018 Report (dkt. 317) at pg. 42; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 16, 29, and 75; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24, 43-44, 48 and 124; Monitor's December 6, 2021 Report (dkt. 431) at pg. 26; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 22 and 71-72; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 71-72, 81, and 117; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 54 and 138; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 42-43; December 22, 2023 Monitor's Report, (dkt. 666) at pgs. 17-22; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 69-75, 159; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 65-66 and 177-178.

[184] Contraband generally includes, but is not limited to, weapons, cell phones, illegal drugs, alcohol, cigarettes/tobacco, currency, and prescription drugs (_i.e._, suboxone, prescription pain killers, anxiety medication, etc.).

provide a compliance rating because they were not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team was required to do so. The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with requirements related to searches and contraband recovery in Action Plan § D, ¶¶ 2 (d) and (e). The Court explained the basis for these finding at pgs. 22-26 in section "Failure to Correct Failures in Security and Basic Correctional Practice" of the Order. Beginning in this Monitoring Period, a compliance rating will now be provided for these provisions pursuant to the Court's July 10, 2025 Order (dkt. 879).

As described below, the Department has started to take steps to improve its search practices and to identify contraband. While these steps are important to achieve compliance with the requirements of the *Nunez* Court Orders, the Department must develop and adopt more disciplined search protocols to reduce the level of staff misconduct and potential harm to people in custody associated with searches. Therefore, the Department was found in Partial Compliance with Action Plan (dkt. 465), § D, ¶¶ 2 (d) and (e) this Monitoring Period.

In this section, the Monitoring Team also provides an update on the Department's efforts to achieve compliance with the August 10, 2023 Order (dkt. 564), § I, ¶ 2 as it relates to the work of the other provisions, but a compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

### Number of Searches and Contraband Recoveries

Searches only have value when possessing contraband is either deterred or detected, and so in order to justify the operational disruption and to decrease the risk of unnecessary or excessive force, the Monitoring Team has long encouraged the Department to optimize its search strategy and protocols. Once contraband is detected, Department leadership should also convene to share information, discuss root cause of entrance and develop potential mitigation strategies.

Data regarding the overall number of searches conducted and recovered contraband is provided for context below. However, the Monitoring Team does not believe that reasonable conclusions can be drawn from this data alone. There is no set number of searches that must occur during a set period of time, as the need is determined by the facts on the ground. In fact, as discussed above and throughout this section, the use of searches must be done appropriately yet judiciously.

The table below shows the number of searches performed from 2022 to 2024.

| Searches | | | | |
|---|---|---|---|---|
| | **2022** | **2023** | **2024** | **Jan.-Jun. 2025** |
| Facility Searches | 195,348 | 135,324 | 117,347 | 53,159 |
| Special Searches[185] | 1,390 | 658 | 278 | 189 |
| **Total** | **196,738** | **135,982** | **117,625** | **53,348** |

The number of facility searches has generally decreased since 2022. Further, the number of special searches (which are conducted by Special Teams) has decreased, which, as discussed above and in more detail in the compliance assessment for the First Remedial Order (dkt. 350), § A, ¶ 6 (Emergency Response Team), is positive given the accompanying issues regarding use of force that occurred during those events. A reduction in searches is not necessarily negative as long as it does not compromise security as it limits disruption to out-of-cell time and disruption to access to programs and services. As part of its overall operations, it is important for the Department to examine whether search activity remains proportionate to population levels and operational needs. In addition, indicators that contraband are present in the facility (e.g. overdoses requiring Narcan) should also inform the Department's assessment as to the frequency and effectiveness of searches.

The primary goal for searches is to identify contraband if it is present. There is no way to know the total amount of contraband flowing within a facility, and therefore, it is impossible to determine whether any fluctuation in the amount of contraband recovered is positive or negative. The table below shows the volume of contraband recovered between 2021 and June 2025.

| Contraband Recovery[186] | | | | | |
|---|---|---|---|---|---|
| | **2021** | **2022** | **2023** | **2024** | **Jan.-Jun. 2025** |
| Drugs | 1,049 | 1,421 | 1,245 | 889 | 408 |
| Weapons | 3,144 | 5,507 | 2,061 | 1,602 | 1,215 |
| Escape-Related Item | 196 | 525 | 292 | 221 | 27 |

---

[185] This includes searches by the Emergency Services Unit, the Special Search Team, the Canine and/or Tactical Search operations.

[186] The calculation of the data for contraband recovery varies depending on the type of contraband that is recovered. For example, drug contraband is counted by incident, not the actual number of items seized so if three different types of drugs were recovered in one location, this is counted as a single seizure. In contrast, when weapons are seized, each item recovered is counted separately so if three weapons were seized from a single individual, all three items are counted.

| Contraband Recovery[186] | | | | | |
|---|---|---|---|---|---|
| | **2021** | **2022** | **2023** | **2024** | **Jan.-Jun. 2025** |
| Other | 878 | 1,145 | 794 | 558 | 286 |

As demonstrated above, the number of weapons recovered in this Monitoring Period almost exceeds the total number found in 2024, while there were far fewer searches.[187] It is not always possible to ascertain which factors are behind the changes in the amount of contraband recovered, given that the volume of contraband in the facility at any given time is unknown. While the Monitoring Team is not in a position to draw conclusions from the variations in the data presented above, the Department must closely examine these findings. For example, the notable increase in recovery of weapons while conducting fewer searches merits additional scrutiny by the Department. The Department should assess whether this trend reflects improvements in search quality or technology, more effective targeting of searches, or an increase in the presence of weapons in the jails. Effective interdiction efforts require a deliberate analysis to understand how contraband enters the facilities, how current detection and search practices might be circumvented, and what adjustments are needed to strengthen contraband prevention strategies. While the Department has made efforts to improve its identification and recovery of contraband and taken initial steps to improve tracking of searches and contraband recovery, it does not appear that the Department has engaged in a deliberate analysis to better identify the sources of how contraband is introduced into the system.

**Searches and the Use of Force**

Searches of facility spaces, visitors, staff and incarcerated individuals are essential for a safe correctional operation to prevent the introduction, decrease the possession, and increase the detection and seizure of dangerous contraband, particularly weapons and drugs given the direct harm these can present to people in custody. That said, all searches have an operational impact and, therefore, must be used judiciously. Searches are also staff-intensive and thus must be targeted strategically, focusing on the spaces and situations where contraband is most likely to be detected in order to maximize the cost-benefit of the search operation.

---

[187] The definitions of the contraband categories remained the same in 2024 and 2025.

The Department does not specifically track the number of use-of-force incidents that occur during searches. However, a rough estimate by the Monitoring Team, based on COD reports, suggests that approximately 490 use of force incidents occurred during searches in the current Monitoring Period (which is similar to the numbers observed in prior periods. This accounts for about 14% of all use-of-force incidents. Consequently, it is critical for the Department to ensure that searches are conducted in a manner to minimize the possibility of force.

The Monitoring Review of use of force incidents involving searches reveals that searches are often poorly planned and inadequately supervised. Consequently, instances of predictable resistance escalate into confrontations that could have been prevented through clear structure, effective communication, and proactive planning. In many cases, staff conducting the search often conflate assertiveness with control and fail to use practices that minimize the likelihood of force. Many use-of-force incidents occur during a search because staff lack tactical coordination, do not use necessary de-escalation tactics, or supervisors do not provide instruction, address potential problems before they escalate, or properly intervene when necessary. In many cases, chemical agents are deployed in response to minor resistance, and these incidents are frequently escalated into larger conflicts.

Below the Monitoring Team outlines key observations identified in searches that result in Use of Force:

- **Lack of Tactical Planning:** Searches are done without a defined tactical plan or briefing. Even if a tactical plan is developed, staff do not appear to adhere to it. Instead, staff operate impulsively, issuing overlapping commands and inconsistently responding to resistance.

- **Failure to Use Anticipated Use of Force Protocols:** Situations involving predictable resistance (refusal to strip, religious objections, suspected contraband) are not treated as anticipated force situations. Staff instead default on the immediate use of force without notifying supervisors or using time and space to de-escalate.

- **Overreliance on Chemical Agents:** Staff regularly deploy chemical agents as an immediate response to verbal refusal or passive resistance, often at unsafe distances and excessive quantities.

- **Poor Supervision and Operational Oversight:** Supervisors frequently fail to organize, direct, or intervene effectively during searches. In many cases, supervisors are present but passive, allowing staff to engage in unprofessional behavior or unsafe tactics without correction.

- **Security and Procedural Lapses:** Searches are often done when obvious security risks are present, such as unsecured doors, prohibited congregation of people in custody, and poor span of control.

- **Failure to use Body-Worn Cameras:** A significant number of searches resulting in the use of force lack video evidence, despite allegations by people in custody of excessive or unnecessary force. In many of these instances, the staff involved were either not wearing Body-Worn Cameras, failed to have the devices powered on, or did not activate them at the appropriate time.[188]

- **Contraband Recovery Driving Confrontation:** When contraband is suspected, staff often prioritize immediate recovery instead of considering the least aggressive way to recover the contraband. Search staff are often observed rushing into a cell and conducting a haphazard search while in close proximity to the person in custody. Staff should also attempt to retrieve contraband in a calm and controlled manner.

- **Unprofessional Conduct:** Staff engage in a hyper-confrontational manner with verbal hostility, profanity, or taunting behavior during searches. This tone often provokes further resistance from individuals in custody and fuels unnecessary confrontations.

Appendix L of this report includes illustrative examples of incidents that demonstrate these issues and the risk of harm that flows from these lapses.

---

[188] To be certain, BWC are not expected to be utilized in all searches. Pursuant to DOC policy, staff should not activate their BWC during "[s]trip searches unless the individuals' resistance during one of these searches reasonably causes an officer to believe that a use of force incident or an assault on staff is about to occur or occurs." Further, staff should not use BWC in "[p]laces where a reasonable expectation of privacy exits such as, but not limited to, clinic areas dedicated to treatment of incarcerated individuals, hospital emergency rooms, locker rooms and restrooms, unless an individuals' resistance in one of these locations reasonably causes an officer to believe that a use of force incident or an assault on staff is about to occur, or occurs."

**Department's Efforts to Improve Search Practices**

In this Monitoring Period, the Department has taken certain steps to address its search practices. In particular, with the management of searches as well as the development of policies, procedures and training.

- **Management of Search Teams**

The Department has moved away from using ESU (and other Special Teams) to conduct most searches. Between January and June 2025, the Special Teams were involved in less than 200 searches compared with over 1,000 searches in 2022. Although the number of uses of force during searches remains too high, the fact that the more egregious incidents during searches by Special Teams have decreased is an important improvement. This is discussed in more detail in this Report in the compliance assessment for First Remedial Order § A., ¶ 6, Facility Emergency Response Teams.

The Department now schedules Tactical Search Operations (TSOs) through the Chief of Security. These tactical searches involve a comprehensive sweep of the entire facility using a dedicated Special Search Team that is specifically trained to conduct searches and is supposed to conduct those searches in an organized, professional and effective manner. Facilities are also expected to conduct their own searches, in targeted or randomly selected areas, using assigned security staff, signaling a structural change in how searches are conducted and supervised. Below is a summary of additional work underway:

- o _Tactical Searches_. Tactical searches are ordered more strategically, and teams now search the facilities' common areas (kitchens, chapel, law library, etc.), not just housing units. These searches into additional locations have recovered a significant number of weapons. The Deputy Commissioner of Security has also been personally involved in where and when they use the tactical searches to be more effective.

- o _Facility Searches_. The DC of Security has begun to scrutinize the facility searches—their frequency, methods, record-keeping, and results. Comparisons between facility searches and tactical searches occurring on the same day reveal

stark differences in the volume of contraband seized. The quality of facility searches is a priority area for improvement.

o *Information Sharing*. The Office of Security is sharing information regarding the location of contraband finds so that facility search teams can adopt similar methods and search similar locations.

o *Pat Frisks*. The Department reports that staff technique in pat-frisking of incarcerated individuals is often superficial and so it has become an area of heightened focus by the Office of Security. During the daily evaluation of UOF incidents, Department leadership report they evaluate the quality of pat frisks (to the extent applicable) to identify staff with poor technique so they can receive better guidance, retraining or corrective action as appropriate. DOC reports it routinely identifies the need to provide staff with additional guidance on how to conduct a proper pat frisk.

o *Training Videos*. In May 2025, the Department shared training videos developed by the DC of Security and the Training Division on proper cell search procedures and pat frisk search techniques. The Monitoring Team reviewed the videos and provided feedback, emphasizing that when playing the videos, Supervisors should offer guidance on body-worn cameras, communication with PICS, and the care and respectful management of personnel items, such as family photos or letters. Near the end of the Monitoring Period, the videos were shown during roll call, but the Department reported that due to some staff working double shifts, not all intended staff were able to see the videos.

o *Improved Tracking*. Starting May 2025, the Department began piloting a digital platform designed to streamline the documentation of Department search operations, replacing the prior paper-based process. The software, which features an intuitive interface accessible on tablets, phones, and computers, allows staff to log search details, including participating staff, PICS, and recovered contraband. The Special Search Team (SST) was trained on the system, with the Emergency Services Unit (ESU) to follow. In Phase 2, the

Department and IT plan to expand the system to facility-level searches and explore ways to aggregate and analyze the collected data.

- **Revisions to the Department's Search Policy and Procedures**

In this Monitoring Period, the Department took some concrete steps towards addressing the Monitoring Team's long-standing feedback that, to date, has gone unaddressed. The Monitoring Team first shared strategies for improving staffs' search techniques to avoid catalyzing a need to use force and to reduce the on-scene chaos that often accompanies search operations in June 2021.[189]

In April 2025, the Department provided a detailed plan to address the process for updating the Department's various search policies as well as a plan for the training and roll-out of new search procedures. The Department identified 11 policies that require revision,[190] the scope of the revisions necessary, the various considerations that the revisions must incorporate including feedback from the Monitoring Team as well as compliance with various local, state and federal regulations, the internal and external stakeholders that must review any proposed revisions (including the Monitoring Team and the SCOC), and, finally, a timeline for the development, review, training and ultimate implementation of the revised policies. The project has six phases, which, given the project's scope, is a reasonable approach and creates clear milestones and accountability to ensure the project stays on track. The Department expects that this process will take about 12 to 14 months as it accounts for internal and external review cycles as well as the reconciliation and revision of a wide range of related documents.

The Monitoring Team found the overall plan was comprehensive and thoughtful, and did not have any substantive feedback on the proposal. The Monitoring Team strongly recommended

---

[189] In 2021, the Monitoring Team recommended: (1) the span of control for searches should be limited in order to reduce the number of excessive staff involved in searches; (2) a specific plan must be devised before each search takes place; (3) facility leadership must be involved in any planning for a search that includes external teams like ESU; and (4) specific procedures are delineated for conducting searches in celled and dormitory housing and common areas so that searches are completed in an organized and efficient manner and are not chaotic and unnecessarily disruptive. The Monitoring Team again provided extensive feedback and recommendations on the revised policy and procedures in October 2023.

[190] The Department previously reported only three policies related to searches required revision, however, the Department reported it has now conducted a deeper assessment of the changes needed and determined eleven policies require revision.

that the Department prioritize strict adherence to the proposed project timeline and take proactive measures to prevent delays in any phase.

**Contraband Recovery**

    The Department has long struggled to stymie the control of contraband.[191] Generally, contraband is introduced through four primary methods: visitors, individuals who work in the jails, the mail, and the re-purposing of materials from the physical plant. It must be emphasized that it is equally important to both mitigate the introduction of contraband and to detect it once it has entered the facilities. As noted above, the Department's ability to improve its overall search procedures will inherently improve its ability to deter and detect contraband. The Department reports that it has also taken certain steps to increase its rate of contraband detection and recovery.[192]

- **Body Scanners**: The Department has installed body scanners at the staff entrances for RMSC,[193] RNDC, OBCC, EMTC, and GRVC.[194] At the point of entry for each facility, uniformed staff scan personal property using an x-ray/line scan machine and scan each staff member, service provider, and any other individual that may come to the jails (*e.g.*, external oversight) using walk-through metal detectors and handheld wands (if necessary). Individuals are also randomly selected for body scanning at those facilities with body scanners at the staff entrance.

  - *New Technology & More Frequent Use*: The Department reported that it began procurement to upgrade the existing body scanners to a new version

---

[191] *See* DOI's report on Contraband Smuggling in the City's Jails and Critical Recommendations for Improved Security Measures, November 2024 at https://www.nyc.gov/assets/doi/reports/pdf/2024/ContrabandRpt.11.20.2024.pdf.

[192] In the past, the former Commissioner appeared to suggest the *exclusive* source of contraband was through the mail. While mail can be a source of contraband, there are other avenues in which contraband enters the facilities. Upon the appointment of the current Commissioner in December 2023, the Department has approached the search and detection of contraband by trying to intercept *any* avenue in which contraband may be introduced into the facility.

[193] Since RESH is physically located within the RMSC building, staff that work in RESH use the staff entrance to RMSC and therefore pass through RMSC's metal detectors and/or body scanners when entering the facility.

[194] Currently, NIC and WF only have metal detectors and do not have body scanners at their staff entrances, but the Department has reported that it plans on acquiring and installing the new versions of the body scanners at these facilities once the procurement has been completed.

that can detect smaller objects. It will likely cost between $5 and $25 million, depending on the number of scanners. DOC Consultant to the Commissioner Gary Raney recommended that staff, volunteers, and PICs[195] should be scanned far more frequently[196] than they are now once the new scanners are procured as the potentially hazardous radiation from the existing scanners is no longer an issue with the new technology.[197] Additionally, the new scanners are expected to process people much faster so they can be used more frequently. The Department's funding request for the new body scanners has been approved, and steps are being taken to procure and receive the new body scanners in 2026.

- **Mail Detection**. The Department has focused on evaluating the introduction of contraband via the mail. Given the ongoing and complex challenges of the fact that paper can be soaked with a variety of elicit substances and drugs,[198] managing the introduction of paper mail has been a focus for DOC. This is a complex and evolving type of contraband that has been difficult to identify and address. This type of contraband has been smuggled into the jails in a variety of forms through the mail, including religious materials, comic books, legal documents, and other legitimate-

---

[195] For instance, currently PICs are not scanned following contact visits because the scanner is located in the Intake and in order to ensure the limit on the number of scans is not exceeded.

[196] DOC's Consultant to the Commissioner noted that while scanning everyone at every entry point would be ideal, it is likely impractical. DOC's Consultant to the Commissioner advised that scanning a random sample of 10 to 20% of people will deter the entry of contraband.

[197] The Department reports that it has some limitations from using the scanner on individuals in custody pursuant to local regulations. The Department reports standardized limitations on radiation exposure from body scanners are governed by the NYC Health Code, consistent with the American National Standards Institute (ANSI). ANSI permits a maximum exposure of 250 microsieverts (μSv) within a 12-month period; the NYC Health Code further restricts correctional body scanners to half of that limit, resulting in a maximum exposure threshold of 125 μSv per individual in a 12-month period. Each full body scan with the Smiths Detection Scanner is ~2 μSv, so a person can be scanned about 62 times a year with the Department's current machines. *See*, Title 24 of the Department of Health and Mental Hygiene Rules Chapter § 33-05 Annual Scanning Limitations (https://codelibrary.amlegal.com/codes/newyorkcity/latest/NYCrules/0-0-0-114094).

[198] *See*, Kauai, D., Rivera Blanco, LE, Krotulski, A, *et al*. Identification and health risks of an emerging means of drug use in correctional facilities. *JAMA Network Open.* 2024: 7(12): e2451951. doi:10.1001/jamanetworkopen.2024.51951available at: https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2828392.

appearing paperwork.[199] The Department has worked to revise its process for managing the mail to mitigate the introduction of this contraband.

- o *Efforts to Assess the Mail*: DOC has obtained additional technology to assess materials received through the mail.[200] Further, as of April 2025, DOC has consolidated the assessment of mail into a centralized trailer on Rikers Island instead of having this process occur in each facility. Mail is received by the Department's trailer in Queens and is sorted out and then sent to the new centralized trailer for mail on Rikers Island for line scan, K9 search, and further investigation by staff. Any contraband recovered is tested and secured in an evidence locker in the dedicated lab area. All processes are done in separate areas of the trailer to ensure smooth workflow.[201]

- o *Additional Recommendations for Improving Evaluation of Mail*: As described in this Report in the compliance assessment for Second Remedial Order, ¶1(i)(a) and Action Plan, §D, ¶2(a), Interim Security Plan, DOC's consultant to the Commissioner recommended that the Department further enhance its evaluation of the mail by: (1) utilizing electronic mail via tablets (which PIC already have access to), (2) electronically scanning the mail so it is available digitally, (3) open non-privileged mail in a centralized processing center; (4) limit parcel delivery to come from centralized distributors, such as Amazon, Target, and Barnes & Noble. All four of these recommendations are consistent with sound correctional practice and are consistent with the steps taken by other systems around the country to mitigate the introduction of contraband. Current regulations by the BOC do not permit electronically scanning the mail

---

[199] *See* https://www.nyc.gov/assets/doi/reports/pdf/2024/ContrabandRpt.11.20.2024.pdf at pg. 7

[200] DOC utilizes multiple narcotic screening machines. The Department utilizes the Smiths Detection Ionscan 600 and the Rapiscan Itemiser 4DN machines. The Department reports these screening machines are highly sensitive and test at an extremely high accuracy rate. DOC reports that the MobileDetect Field Testing kits ("field tests") are now only used as a 'preliminary' presumptive test. If there is a presumptive positive result, the item is taken to one of the machines for confirmation of the presence of a narcotic or cannabis. The machines will print out the results indicating the actual substance detected plus the concentration amount present in the tested sample.

[201] In July 2025, the Monitoring Team visited the trailer and was provided a tour by the supervising captain who appeared professional, knowledgeable and committed to the mission of contraband reduction. The inspection process appeared thoughtful, but the tracking process is manual.

or opening non-privileged mail outside the presence of incarcerated individuals[202] and variance requests to permit the Department to adopt these recommendations have been denied. The ability to detect contraband through the mail is difficult and has become an increasing problem as fast paced changes to chemicals can permit the transmission of contraband more easily through the mail. Local regulations appear to place a variety of limitations on the Department's ability to search the mail that appear more restrictive than other systems across the country and have the unintended consequence of impeding the Department's ability to utilize technology in a manner that can support the overarching goal of detecting and mitigating the introduction of contraband. As demonstrated through the recommendations of DOC's consultant, the Department has a number of different ways it can work to mitigate the introduction of contraband via the mail. While there are a number of ways to mitigate and detect contraband in the mail, the Department certainly needs the ability to do more than it can currently accomplish under local regulations. Accordingly, the Monitoring Team encourages the City and the Department to identify ways it can enhance its ability to detect contraband in the mail as the Department reports an ongoing presence of contraband through the mail.

- **Improved Physical Plant**: The Department has identified a number of physical plant improvements (*e.g.,* replacing Lexan with security glass and obtaining additional fencing) it believes could improve overall conditions, improve security and mitigate access to contraband. The poor conditions of the Department's physical plant permit greater access to potential makeshift weapons and contraband. Further, problematic maintenance issues further impact security such as problematic locking mechanisms which means some doors may not be able to be secured.[203] The City reports that there are a variety of complex requirements regarding funding related to physical

---

[202] *See*, Board of Correction Minimum Standards § 1-11(e)(1)(i).

[203] It must be emphasized, there is often an imbalanced focus on the locking mechanism, when, in fact, staff fail to secure the door. Locking mechanism have been replaced for years in this agency and unsecured doors remain an ongoing and persistent problem.

improvements. For instance, traditional Capital funding is purportedly limited by law because the jails will not be in use for more than five years given the law that Rikers must be closed by 2027.[204] The City reports that there may be are other avenues to obtain funding, beyond Capital funding, and those are being explored.

Overall, the steps taken by the Department are critical to enhancing search practices and stymieing the flow of contraband into the facilities.

## Conclusion

As required by Action Plan (dkt. 465), § D, ¶ 2 (d) and § I, ¶ 2 of the August 10, 2023 Order (dkt. 564), the Department has started to improve procedures on how searches are conducted in order to achieve compliance with this requirement, but significant work remains. In particular, work remains regarding improvement of search practices and the finalizing of search-related policies and procedures. As required by Action Plan (dkt. 465), § D, ¶ 2 (e), the Department has made enhanced efforts to identify and recover weapons and other contraband by enhancing practices to identify contraband brought in through staff and visit searches as well as working to improve staffs' search practices of facilities, incarcerated individuals, and the mail. Given the ongoing frequent presence of contraband, significant work remains in order for the Department to both mitigate the introduction of contraband and find it, if it does, in fact, enter the facilities through **all** avenues of introduction. As noted above, the Monitoring Team also recommends the Department will require the ability to assess the introduction of contraband through the mail in more ways then is currently permitted under local regulation.

---

[204] DOC reports it has not been able to obtain funding for capital projects for facilities on Rikers Island because a project must be deemed "capital eligible" to obtain capital funding. In December 2025, the City explained whether a project is "capital eligible" is informed by NYS Local Finance Law Sections 10 and 11, NYC Charter Chapters 9 and 10, Comptroller's Directive 10, and Generally Accepted Accounting Principles (GAAP). Comptroller's Directive 10, Section 3 sets forth baseline eligibility criteria for capital projects. "Baseline Eligibility Criteria" are "baseline standards of purpose, cost, useful life, and replacement that must be met in order for a project to be eligible for capital financing." Comptroller's Directive 10, Section 3. A Capital Project's expected useful life, for City Purposes, "must be at least: 1. five years for projects other than those consisting of computer hardware, software, networks, and information technology systems…" Comptroller's Directive 10, Section 3.4. In the case of the facilities on Rikers Island, the useful life is less than 5 years because NYC Administrative Code §4-215 (a)(1) requires that by August 31, 2027 the City no longer utilize Rikers Island to house incarcerated people. If upon review of a proposed capital project, it is deemed not capital eligible by OMB, DOC can apply to the Comptroller for a waiver of the Directive 10 criteria. OMB advised it will review any proposed capital projects submitted by DOC for work on Rikers Island on a case by case basis to determine capital eligibility. The Comptroller's Office, under the previous Administration, advised it will would not grant a waiver to provide capital funding nonetheless, under Directive 10, if a project does not meet the baseline eligibility criteria.

| | |
|---|---|
| **COMPLIANCE RATING** | **Action Plan, § D, ¶ 2(d).** Partial Compliance<br>**Action Plan, § D, ¶ 2(e).** Partial Compliance |

| ESCORT PROCEDURES (ACTION PLAN § D., ¶ 2(F) AND AUGUST 10, 2023 ORDER, § I., ¶ 3) |
| --- |
| *Action Plan § D., ¶ 2(f). Escort Holds*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: (f) improved escort techniques to eliminate the unnecessary use of painful escort holds. |
| *August 10, 2023 Order § I., ¶ 3. Revise Escort Procedures*. By, October 30, 2023, the Department, in consultation with the Monitor, shall revise its escort procedures and practices to eliminate the use of painful escort holds. The new escort procedures shall be subject to the approval of the Monitor. |

Painful escorts and poor escorting practices have contributed to unnecessary uses of force for years. It is why the Action Plan (dkt. 465), § D, ¶ 2(f) requires the Department to have improved escort techniques to eliminate the unnecessary use of painful escort holds and improve security practices and procedures. Given the Department's lack of progress on this issue, the Court ordered on August 10, 2023 (dkt. 564), § I, ¶ 3 that the Department must revise its escort procedures and practices to eliminate the use of painful escort holds and improve escort holds generally. The new escort procedures shall be subject to the approval of the Monitor.

**Compliance Assessment Overview**

Until this Monitoring Period, the Monitoring Team provided an update on the Department's efforts to achieve compliance with Action Plan § D, ¶ 2(f), but a compliance rating was not provided because it was not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team is required to do so.

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Action Plan § D, ¶ 2(f). The Court explained the basis for its finding at pgs. 22-24 in the section "Failure to Correct Failures in Security and Basic Correctional Practice" of the 2024 Contempt Order.

Beginning in this Monitoring Period, a compliance rating will now be provided for Action Plan § D, ¶ 2(f) pursuant to the Court's July 10, 2025 Order (dkt. 879). As discussed in more detail below, the Department has made no meaningful progress toward achieving compliance with Action Plan § D, ¶ 2(f) and therefore is in Non-Compliance with this requirement. The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the August 10, 2023 Order (dkt. 564), § I, ¶ 3, but a compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

**UOF and Escort Techniques**

The Monitoring Team has long been concerned about the number of uses of force that occur when staff escort individuals from one place to another. In this Monitoring Period, the Department reported that the reasons for force for approximately 10% (n=378 incidents) were due to resistance during escort holds.[205] The Monitoring Team's assessment of use of force incidents suggests that in this Monitoring Period over 1,200 uses of force involved escorts.[206] While not all incidents of force involving escorts involve poor escort practices or inappropriate and/or painful escort techniques, the sheer number of incidents involving escorts are notably higher than what the Monitoring Team has observed in other correctional systems. Routine discussions with Department leadership and Wardens reflect that they routinely identify that escorts are not occurring as they should with repeated reports that are seeking to provide guidance to staff on escorting procedures.[207]

The Monitoring Team's review of use of force incidents indicates that the reasons for such a large number of use force incidents during escorts are multi-faceted and outlined below:

- **Lack of Physical control**: Staff frequently do not maintain proper physical control during an escort hold when it is required (*e.g.,* following a use of force). Staff often rely on one-hand grips, or no escort holds at all, instead of using a proper two-point escort. In these instances, staff will allow a person in custody to freely walk down a corridor, sometimes, at a significant distance from staff, which creates a security risk. An illustrative example of a concerning bent wrist hold can be found in incident examples 16 of Appendix L.

- **Limited Adherence to Routine Security Practices**: Routine security is often poor when conducting escorts. Staff fail to have appropriate situational awareness or take proactive security measures. For example, escorts will be conducted with doors, gates, and corridors not being secured, which creates obvious security risks.

---

[205] The Department's data regarding the reason for force only identifies the *primary* reason for the use of force. If the reason for force may include multiple reasons, only the primary reason is reported. Accordingly, it is likely that the number may, in fact, be greater then 378 incidents.

[206] At least 2,000 incidents involved escorts in both 2023 and 2024.

[207] Along with identification of the issue through various discussions with facility leadership, in the first half of 2025, Rapid Reviews identified 216 incidents with escort related violations. These violations ranged from improper escort techniques, escorting individuals without proper attire, poor situational awareness, security violations and supervisory failures.

Additionally, staff do not effectively manage corridor movement, allowing individuals who should otherwise be separated to cross paths. Staff also do not appear to routinely ensure the Body-Worn Cameras are available for searches either because they are not being worn or because the device is not powered on/failed to activate.[208] An illustrative example of can be found in incident example 19 of Appendix L.

- **Painful Escorts**: Staff still use painful escorts on compliant people in custody which often results in unnecessary and excessive force. The Monitoring has previously reported that staff often default to escort techniques that generate pain, provoke resistance, and unnecessarily escalate routine movements into use of force incidents. Specifically, the bent wrist hold and the upward arm bend. In the bent wrist technique staff grasps one wrist of an individual who is handcuffed behind their back then applies excessive pressure, bending the wrist up, causing significant pain that often triggers a defensive reaction. The second technique occurs when staff bends the arm of a rear-cuffed individual upward behind their back. This maneuver also inflicts pain. These techniques often elicit a defensive response from the individual being escorted, which staff often misinterpret as active resistance like twisting or pulling away from escort staff. Such situations too often then escalate to aggressive takedowns or pinning individuals against the wall, and because the individual under escort is rear-cuffed and unable to protect themselves, the risk of injury increases significantly. Staff have become accustomed to defaulting to the wrist-based grip that often induces pain, when a simple modification, such as placing the hand on the forearm instead, would maintain control while significantly reducing tension and the likelihood of escalation.[209] The Monitoring Team shared examples of such incidents with the

---

[208] To be certain, BWC are not expected to be utilized in all searches. Pursuant to DOC policy, staff should not activate their BWC during "[s]trip searches unless the individuals' resistance during one of these searches reasonably causes an officer to believe that a use of force incident or an assault on staff is about to occur or occurs." Further, staff should not use BWC in "[p]laces where a reasonable expectation of privacy exits such as, but not limited to, clinic areas dedicated to treatment of incarcerated individuals, hospital emergency rooms, locker rooms and restrooms, unless an individuals' resistance in one of these locations reasonably causes an officer to believe that a use of force incident or an assault on staff is about to occur, or occurs."

[209] The Monitoring Team is aware that the Department is required to utilize the PARAM (Post Apprehension Responsibility Aware Measures) technique by the New York State Division of Criminal Justice Services. This escort hold was designed to apply pressure in instances of non-compliance. However, the Monitoring Team observed that

Department in May of 2025 and as of the filing of this Report, the Department has not responded or otherwise engaged the Monitoring Team in discussion of these incidents.[210] An illustrative example of a bent wrist hold can be found in incident example 15 of Appendix L. Despite the Court's finding of contempt and the fact that DOC has not taken any concrete steps to alter its escort practices, the Department has reported to the Monitoring Team that it does not believe that there is an issue with the use of painful escort techniques because no grievances by individuals in custody were filed with complaints about the use of painful escorts in 2023 and 2024.[211]

- **Failure to Use Enhanced Restraints**: Not all individuals in custody are escorted in the same manner. Individuals with a history of carrying or using weapons may be subject to enhanced restraint procedures when moving anywhere outside of their housing unit because the individual presents a heightened security risk. Enhanced restraints can involve the use of security mitts, handcuffs, waist chains and leg irons. The Monitoring Team has identified incidents where staff do not utilize enhanced restraints on an individual when required.[212] Then, during the escort, an issue occurs that likely could have been prevented had the proper enhanced restraints been in use. An illustrative example of staff failing to use enhanced restraints when they should have can be found in incident example 19 of Appendix L.

---

staff have defaulted to using the PARAM technique as standard escort practice, even against compliant, handcuffed individuals.

[210] The Monitoring Team routinely advises the Department of outstanding feedback, such as this one, in which it is awaiting a response.

[211] The Monitoring Team is uncertain that evaluating grievances for this purpose is informative or productive given that the Monitoring Team's review of incident routinely identifies problematic escorts so the absence of a grievance does not equate to the absence of the problem. The fact that no grievances have been filed regarding escorts most likely suggests that individuals in custody may not be aware that they can file a grievance related to this matter than suggesting that the absence of the issue. The Monitoring Team has shared this feedback with DOC multiple times in 2024. The Department has not provided reports from OCGS regarding escorts to the Monitoring Team since January 2024. However, in November 2025, the Department reported it believes the painful escort report produced by OCGS is accurate and that DOC believes PICs are aware that they can grieve painful escorts or make an allegation of a UOF through the usual channels apparently suggesting that no such reports or allegations have been made. A review of ID investigations routinely reflects allegations of the use of painful escort techniques. Accordingly, the Department's position does not appear consistent with the objective evidence of use of force incidents routinely reviewed by the Monitoring Team.

[212] It is not entirely clear why enhanced restraints are not used when required. It is unclear if it is because the staff on duty was unaware that the individual has been adjudicated to use enhanced restraints, or because staff simply just failed to utilize them, or some other reason.

- **Poor Supervision of Escorts**: When present during escorts, Supervisors often fail to properly coach staff and correct lapses in security practice. Even when Supervisors are present, staff step away mid-escort, skip search procedures, or fail to activate BWCs and are not actively being corrected by supervisors during the escort. Without appropriate supervision, there is no reinforcement of sound correctional practices, allowing procedural shortcuts to become normalized. An illustrative example of a captain failing to properly supervise an escort can be found in incident example 19 of Appendix L.

Over time, the issues above cultivated a culture in which improper escort practices are now standard practice and eroded accountability. The Monitoring Team has found that staff lack clear, consistent instruction on how to apply escort holds safely, and conduct escorts in a secure and consistent manner. This results in practices that lack control, fail to mitigate risks and often escalate tension.

### Escort Procedures

Overall, the Monitoring Team has found that staff lack clear, consistent instruction on how to apply escort holds safely, resulting in misuse that typically escalates tension and resistance rather than maintaining control.[213] Staff have become accustomed to defaulting to the wrist-based grip that induces pain, when a simple modification, such as placing the hand on the forearm instead, would maintain control while significantly reducing tension and the likelihood of escalation.

As part of the Monitoring Team's recommendations on improvements to the escort hold, the Monitoring Team recommended an alternative technique in September 2023. However, in May 2024, the Department formally rejected this recommendation, citing potential safety concerns, but did not offer an alternative approach or next steps.

---

[213] The Monitoring Team is aware that the Department is required to utilize the PARAM (Post Apprehension Responsibility Aware Measures) technique by the New York State Division of Criminal Justice Services. This escort hold was designed to apply pressure in instances of *non-compliance*. However, the Monitoring Team observed that staff have defaulted to using the PARAM technique as standard escort practice, even against compliant, handcuffed individuals.

Following the close of the Monitoring Period, Gary Raney, DOC's Consultant to the Commissioner, submitted a plan to the Monitoring Team that included a recommendation for the Department to use modern-day transport devices, commonly referred to as Emergency Restraint Chairs. In particular, Mr. Raney recommended to the Department that if a PIC is in a fight and continues to be combative after being handcuffed, there may be a struggle as they are escorted out of the area. Mr. Raney explained that emergency restraint chairs provide more comfort and safety to the PIC while allowing staff to move them down the corridor with minimal risk of injury or the use of force. Mr. Raney reported that DOC currently has transport chairs available, but they are not designed for correctional use and should be replaced. Following the close of the Monitoring Period, the Department reported it had procured the Emergency Restraint Chairs and would develop a training and policy before use.

## Conclusion and Next Steps

In May 2025 the Monitoring Team shared examples of incidents involving painful escorts with the Department and met with the Deputy Commissioner of Security to discuss management of this issue. However, despite numerous rounds of feedback, training adjustments, and operational data indicating the harm caused by improper and painful escort practices, they remain embedded in the Department's practice and no substantive efforts have been made to change staff practice.[214] These issues represent an ongoing risk of harm to individuals in custody. The Department has not proposed any solutions to address this issue.

| COMPLIANCE RATING | Action Plan § D., ¶ 2(f). Non-Compliance |
|---|---|

---

[214] *See* Monitor's October 31, 2016 Report (dkt. 291) at pg. 110; Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13 and 149; Monitor's October 10, 2017 Report (dkt. 305) at pg. 8; Monitor's April 18, 2018 Report (dkt. 311) at pgs. 18-21; Monitor's April 18, 2019 Report (dkt. 327) at pg. 24; Monitor's October 28, 2019 Report (dkt. 332) at pgs. 3-4; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 30-31, 39 and 79; Monitor's October 23, 2020 Report (dkt. 360) at pg. 3, 13, 17, 29 and 31; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24-25 and 46-47; Monitor's June 8, 2023 Report (dkt. 541) at pg. 6; Monitor's July 10, 2023 Report (dkt. 557) at pg. 45; and Monitor's November 8, 2023 Report (dkt. 595) at pgs. 12 and 14-15.

| **FACILITY EMERGENCY RESPONSE TEAMS (FIRST REMEDIAL ORDER § A., ¶ 6)** |
|---|
| *First Remedial Order § A., ¶ 6. Facility Emergency Response Teams.* Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (*i.e.*, probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented. |
| *August 10, 2023 Order § I., ¶ 7. Special Teams Training.* By, August 31, 2023, the Department, in consultation with the Monitor, shall develop a training program and provide such training to Special Teams[215]. The training program shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of the training program shall include, among other things, procedures and protocols for use of force, conducting searches, and responding to alarms and emergency situations in a manner that ensures the safety of incarcerated individuals and staff. The content of the training programs shall be subject to the approval of the Monitor. |
| *August 10, 2023 Order § I., ¶ 8. Revise Special Teams Command Level Orders.* By, November 30, 2023, the Department, in consultation with the Monitor, shall review and revise as necessary all of Special Teams command level orders related to the use of force. The new Special Teams command level orders related to the use of force shall be subject to the approval of the Monitor. |
| *August 10, 2023 Order § I, ¶ 9. Screening and Assignment of Staff to Special Teams.* By, October 30, 2023, the Department, in consultation with the Monitor, shall revise and implement its screening and assignment process for the initial assignment to Special Teams and routine reassessment of Special Teams staff to ensure the staff assigned to Special Teams are appropriately fit for duty. The Department's screening policy and reassessment procedures shall be subject to the approval of the Monitor. |

The First Remedial Order (dkt. 350), § A, ¶ 6 was imposed by the Court in order to address concerns that uniform staff often over-relied on Emergency Response Teams and that the Emergency Response Teams needlessly exacerbated situations, were often overstaffed, and routinely responded to incidents with a show of force that was disproportionate to what triggered the incident. The Action Plan, § D, ¶ 2(c) reiterated this obligation, again requiring DOC to "implement improved security practices and procedures, including . . . reduced reliance and appropriate composition of Emergency Response Teams required by § A, ¶ 6 of the First Remedial Order and to address the Monitor's feedback that was provided in 2021."

---

[215] Special Teams is defined as the Emergency Services Unit and any functional equivalent unit, including, but not limited to the Strategic Response Team and the Special Search Team.

The Court entered an Order on August 10, 2023 (dkt. 564) to address several critical items identified by the Monitoring Team that were needed to reduce the imminent risk of harm but that had continuously languished. This included training for Special Teams (§ I, ¶ 7), revisions to Command Level Orders for Special Teams (§ I, ¶ 8) and Screening and Assignment of Staff to Special Teams (§ I, ¶ 9). Given the requirements of the August 10, 2023 Order (dkt. 564) are related to the other provisions regarding Emergency Response Teams, updates on the Department's efforts to achieve compliance are included in this section.

The section describes the historical concerns regarding responses by Emergency Response Teams, the Department's progress in reducing the deployment of Emergency Response Teams, and an update on the Selection, Training, and Oversight of Emergency Response.

**Compliance Assessment Overview**

The Monitoring Team first rated compliance with First Remedial Order (dkt. 350), § A, ¶ 6 during the 11th Monitoring Period (July to December 2020) and found Non-Compliance, which remained the same until the 15th Monitoring Period (July to December 2022).[216] Beginning in the 16th Monitoring Period (January to June 2023), some signs of progress began to emerge, and the Department was placed in Partial Compliance with some portions of this provision and remained in Non-Compliance with other portions.[217]

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with First Remedial Order (dkt. 350), § A, ¶ 6. The Court explained the basis for its finding at pgs. 34-37 in section "Failure to Curb the Emergency Response Teams' Excesses" of the Order.

---

[216] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

[217] *See* Monitor's May 11, 2021 Report (dkt. 368) at pgs. 116-120; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 49-51; Monitor's October 28, 2022 Report (dkt. 472) at pgs.116-119, Monitor's April 3, 2023 Report (dkt. 517) at pgs. 137-143; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 34-42; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 17-22; and Monitor's April 18, 2024 report (dkt. 706) at pgs. 69-76.

In the 18th Monitoring Period (January to June 2024), the Department achieved Partial Compliance with the portions of the provision related to developing a protocol, reviewing responses and documentation, and deploying response teams, but remained in Non-Compliance with the portion of the provision related to responding to misconduct by response team members.[218] In the 19th Monitoring Period (July to December 2024), the Department achieved Partial Compliance with all portions of the provision, which it has maintained in the current Monitoring Period. In this section, the Monitoring Team also provides an update on the Department's efforts to achieve compliance with the August 10, 2023 Order (dkt. 564), § I, ¶ 7-9 as it relates to the work of First Remedial Order (dkt. 350), § A, ¶ 6, but compliance ratings are not provided pursuant to the Court's July 10, 2025 Order (dk. 879).

**Historical Concerns Regarding Emergency Response Teams**

The overall goal of these provisions is to minimize unnecessary or avoidable uses of force by Emergency Response Teams. There are two types of Emergency Response Teams utilized by the Department: (1) Facility Response Teams or Probe Teams, which are teams of facility-based staff and (2) Special Teams[219] which include the Emergency Services Unit ("ESU"), a specialized team of staff specifically dedicated and trained to respond to emergencies across the Department; the Security Response Team ("SRT") and the Special Search Team ("SST")[220], which function similarly to ESU and are deployed to facilities as part of operational security efforts.

The Monitoring Team has consistently raised concerns about the Department's overreliance on Emergency Response Teams, particularly regarding deployment practices, staff conduct, and team composition.[221]

---

[218] *See* Monitor's November 22, 2024 (dkt. 802) at pgs. 62-69.

[219] Special Teams are defined, pursuant to the August 10, 2023 Order (dkt. 564), ¶ 7 as the Emergency Services Unit and any functionally equivalent unit, including, but not limited to the Strategic Response Team and the Special Search Team. The Special Teams are generally utilized in the facilities in the same manner as a Probe Team.

[220] The Department reports that Special Search Teams "SST" is comprised of any available facility staff that are only convened if there is a need for a special search.

[221] *See* Monitor's May 11, 2021 Report (dkt. 368) at pgs. 38-50 and 116-120; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 49-51; Monitor's June 3, 2021 Report (dkt. 373) at pgs. 3-4; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 137-143; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 34-42; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 17-22; and Monitor's April 18, 2024 report (dkt. 706) at pgs. 69-75.

Key issues included:

- **Inappropriate Deployment**. Teams were often used in situations that should be resolved by housing unit staff or supervisors. Even when Level A alarms were triggered, Level B (tactical) teams were frequently deployed unnecessarily and often arrived after the incident had been resolved. Response times were frequently delayed, limiting the teams' effectiveness.

- **Excessive Staffing**. Deployments often involved more staff than was needed, contributing to tension and confusion, especially during "all available staff" calls. Escorts after an incident were frequently conducted by multiple team members, when one staff person would have sufficed.

- **Escalatory Tactics**. Response team members often took a hyper-confrontational approach, which increased the likelihood of unnecessary or excessive force. Painful escort holds and other problematic tactics were also regularly used.

- **Inadequate Selection Criteria**. Despite longstanding recommendations from the Monitoring Team, the Department lacked clear standards for assigning staff to Emergency Response Teams, resulting in team members with histories of problematic force being retained.[222]

- **Chaotic Search Operations**. Emergency Response Teams were often deployed to conduct searches that were poorly organized, increasing the risk of unnecessary force and disorder.

## Progress in Reducing Team Deployment

Beginning in the 18th Monitoring Period (as noted in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 62-69), the Department began to make progress in limiting its reliance on Emergency Response Teams. Simply put, since the imposition of the First Remedial Order in August 2020, Emergency Response Teams are deployed much less frequently which reduces the risk of avoidable, unnecessary or excessive uses of force.

---

[222] The Department reported in August 2023 that it intended to assign specific staff to the Emergency Response Teams based in the facilities. However, as of the filing of this report, the Department has not provided any revised policies or procedures to suggest it has taken any concrete steps to implement this plan.

Of the 3,561 uses of force from January 2025 to June 2025, the Department reports that 265 (7%) involved Probe Team deployments and 112 (3%) involved Special Teams reflecting an ongoing reduced reliance on Probe Teams. While the reliance on Emergency Response Teams has decreased, their deployments, especially by Probe Teams, continue to raise concerns, and so the Department must continue to focus on improving their conduct and accountability.

The reduction in Emergency Response Team usage was driven by several factors:

- **Increased Use of Level A Responses & Reduced Level B Responses**. The Department has increasingly relied on Level A responses, which deploy facility supervisors and small number of available officers, rather than Level B alarms that activate Emergency Response Teams. Historically, Level B alarms were frequently used as the default response to incidents that housing area officers could not manage. However, internal data from the Department and the Monitoring Team's review of thousands of incidents indicate that Level A responses are now more common. This shift signals a strategic move toward resolving incidents through supervisory leadership rather than the use of Probe Teams or Special Teams.

- **Reduced Reliance on ESU for Incidents and Searches**. When Level B responses are initiated (which is less frequently, as noted above), facilities are now less likely to request Emergency Services Unit (ESU) or other Special Teams to respond. To that end, ESU was involved in less than five use of force incidents in this Monitoring Period, which is a significant reduction from previous years when ESU's involvement in use of force was common. Now, either the Probe Team or other available personnel (such as corridor officers or escort teams) respond to the location. The Department reports that since ESU no longer routinely responds to incidents, the unit is now responsible for managing other high-risk or unusual incidents like escorting high profile people in custody, conducting statewide transports, providing specialized training, and maintaining a 24/7 presence across all tours. This is an important change from the previous over-reliance on ESU for incidents and reflects a broader effort to handle situations internally without defaulting to Special Team involvement.

  - The Department has also moved away from using ESU (and other Special Teams) to conduct searches. Between January and June 2025, the Special Teams were

involved in less than 200 searches compared with over 1,000 searches in 2022. The Monitoring Team previously documented significant concerns with ESU's performance during search operations, including disorganized execution, aggressive tactics, and unprofessional conduct, all of which frequently contributed to avoidable uses of force. In response, the Department now schedules Tactical Search Operations (TSOs) through the Chief of Security. These tactical searches involve a comprehensive sweep of the entire facility using a dedicated Special Search Team that is specifically trained to conduct searches and is supposed to conduct those searches in an organized, professional and effective manner. Facilities are also expected to conduct their own searches, in targeted or randomly selected areas, using assigned security staff, signaling a structural change in how searches are conducted and supervised. These changes reflect an effort by the Department to address previously identified deficiencies in ESU-led search operations. However, the Monitoring Team remains attentive to the risk that specialized teams may replicate problematic practices if not properly supervised and will continue to evaluate SST-led searches for organization, professionalism, effectiveness, and use-of-force outcomes.

- **Improved Conduct of Special Teams**. When Special Teams are deployed, their on-scene conduct has improved in some instances and the escalation of tension through their confrontational behavior has decreased, although it does still occur. Importantly, use of tactical equipment such as OC grenades or tasers has ceased. However, despite improved conduct, the Special Teams response often lacks consistency and structure. Staff often do not use an approach that focuses on active listening, de-escalation and containment of risk, like unsecured doors. Instead, responses depend too heavily on the individual preferences of the Special Team and often default to reactionary measures instead of clear standard operating procedures that focus on regaining control of a situation and utilizing de-escalation as much as possible. Upon arriving in an area, the priority should be to contain the conflict and then terminate the incident with the least disruption possible. Having Special Team staff conduct regular incident debriefs after an incident could help staff reflect on their actions, identify patterns, and improve their approach. Ultimately, a more disciplined, structured, and skills-based response is needed to ensure

incidents are managed safely and effectively. While additional work is needed to ensure that Special Teams manage incidents effectively and professionally, the use of excessive or unnecessary force by these teams has diminished.

Overall, the Department's decreasing reliance on Emergency Response Teams reflects a meaningful effort to address past concerns, to professionalize team members' behavior, and to move toward more sustainable ownership of security operations by the facilities. As a result of the decrease in Emergency Response Teams, the Monitoring Team has also observed improved response times to incidents. While there has been improvement, the Department's written guidance regarding search procedures still needs to be updated and revised to reflect how searches are currently being conducted, as discussed in other sections of this report.

**Selection, Training, and Oversight of Emergency Response Teams**

Beyond deployment of Emergency Response Teams, another key area of focus under this provision is the selection, training and oversight of Emergency Response Team members. As discussed in more detail below, further improvement is necessary to embed these requirements in Department policies and procedures and to ensure they occur in practice in order to continue and sustain progress.

- **Facility Response Team Selection**. Historically, the Department lacked clear criteria for assigning staff to these teams, particularly within the facilities given that all staff continue to respond when a Probe Team is called.[223] For this reason, the Monitoring Team continues to recommend that the Department eliminate the requirement for all-staff response when a facility response team is necessary and instead set specific criteria for who may participate on the team and to ensure that they are selected appropriately. These precautions are needed to prevent staff with histories of excessive use of force from serving on response teams.

- **Screening and Assignment of Staff to Special Teams (August 10, 2023 Order § I, ¶ 9)**. In September 2023, the Department shared proposed revisions to the policy regarding screening and assigning staff to Special Teams. The Monitoring Team provided feedback in October 2023. The Department has not yet provided a revised draft of the policy to

---

[223] *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 20-22.

address the Monitoring Team's feedback. DOC reports that other initiatives have taken priority which is why this policy has not yet been updated. Following the close of the Monitoring Period, the Monitoring Team met with the *Nunez* Manager and representatives of the Policy and Procedures Unit to share some recommendations regarding the development of certain stop gaps in its procedures until the policy is updated. The Department reported it would work on developing such stop gaps, but none have been provided as of the filing of this report.

- **Selection for Special Teams**. The number of staff assigned to Special Teams has declined in recent years. Notably, in 2020 and 2021, the Emergency Services Unit had upwards of 200 members.[224] By December 2023, 91 staff (60 staff on the permanent team and 31 on the support team) were assigned to the Emergency Services Unit (ESU) and the staff assigned to ESU has essentially remained the same through June 2025. Beginning in late 2024 and continuing into 2025, the Department screened over 40 staff for potential placement on ESU and ultimately assigned 20 new members to ESU's Permanent and Support Team to replace staff. The screening process did raise some questions. First, it appears that the staff identified for screening were staff that had previously served on ESU and so the openings were not otherwise advertised to other staff. Further, the Department was only able to provide screening materials for some, but not all of the staff assigned apparently suggesting that only staff assigned to the permanent team of ESU needed to be screened.[225] Finally, routine ongoing screening of staff once they have been assigned to ESU does not occur as required. Most of the staff added to the unit during this period of time does not necessarily raise questions about their fitness for appointment, however, the history of problematic screening and assignment to this unit reinforces the

---

[224] The ESU Team is comprised of both a Permanent Team (staff who are officially assigned to ESU) and a Support Team that are technically assigned to a facility command and report to that command unless ESU needs additional staff, at which point they will be redeployed to ESU instead. The Monitoring Team has found that a large number of staff on the Support Team are routinely called to participate in ESU activities and are ostensibly part of the team full time.

[225] DOC policy requires screening for both the Support and Permanent Teams of ESU and the August 10, 2023 Order (dkt. 564) requires screening for all Special Teams.

importance of adherence to screening practices.[226] Following the close of the Monitoring Period, the Monitoring Team shared feedback with the Department of its findings.

- **Training for Special Teams**. As required by the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 7, the Department created training in February 2024 for Special Teams to ensure that they have sufficient guidance on practices and address areas of concern identified by the Monitoring Team.[227] The revised training addresses core competencies such as de-escalation, proportional use of force, and proper restraints, while also addressing historical problem areas like painful escorts and prohibited holds.[228] The Department began delivering new training modules to Special Team staff in April 2024. The training is intended to be delivered more than once a year, with updated scenarios and content. The Department reports that all staff assigned to Special Teams have completed the training at least once with approximately 27 staff having completed one of the modules (Trials and Litigation) twice.[229]

- **Rapid Review of Emergency Response Teams Response**. Beginning in May 2023, a separate Rapid Review process was implemented in which an ADW reviews incidents strictly for the purpose of evaluating the conduct of Special Teams.[230] As with the Rapid

---

[226] *See* Monitor's April 18, 2024 Report (dkt. 706) at pgs. 74-75.

[227] The Department first initiated this training in June 2023, but the Monitoring Team found that the training was inadequate and contradicted DOC policy and *Nunez* Court Orders. *See* Monitor's April 18, 2024 Report (dkt. 706) at pg. 75.

[228] The full curriculum consists of eight modules. However, the Monitoring Team recommended temporarily excluding Module 5, as it pertains to searches given the Department is currently revising its policies on search procedures.

[229] In response to feedback from the Monitoring Team in December 2024, the Department revised its practices for tracking the delivery of the Special Team training. Oversight of attendance and compliance are now managed jointly by the Emergency Services Unit and the Training and Development Division (TDD). Attendance is now tracked in real time in the Department's Learning Management System (LMS), noncompliance is addressed within five days, and auditors verify proper implementation.

[230] The Special Team Rapid Review template includes the date, time, location, and camera information for the incident; the names and shield numbers of staff involved in the incident; an assessment of whether the incident was avoidable and/or anticipated and why; identification of any procedural violations, painful escort techniques, or staff actions that were not in compliance with the use of force ("UOF"), chemical agent, or self-harm policies and procedures; and any recommendations for corrective action, discipline, or removal from the Special Teams for each staff member involved in the incident. The format of the Special Team Rapid Review template was revised during the 17th Monitoring Period for data entry to be more streamlined, and while the 2023 Rapid Reviews did not initially contain a prompt to assess whether the Special Team deployment was necessary, this question was added in response to the Monitoring Team's recommendation and is addressed in all the 2024 Rapid Reviews.

Reviews more generally (discussed in the Compliance Assessment First Remedial Order (dkt. 350), § A., ¶ 1), the Rapid Reviews generally identify areas in which corrective action for individual staff may be necessary, but the reviews still struggle to reliably identify whether the *incidents* themselves may have been unnecessary or avoidable. However, as noted above, the frequency of such incidents is lower than in previous years.

- **Special Teams Command Level Orders (August 10, 2023 Order § I, ¶ 8)**. The Department reports that ESU has nine Command Level Orders ("CLOs") and that the other Special Teams (including SST and SRT) do not have any.[231] The CLOs have not been updated. There are no new updates beyond those provided in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 182-183.

The Department's reduced dependence on ESU for incidents and searches, updated training and specialized Rapid Reviews is notable progress. If sustained, these practices reflect a shift toward empowering supervisors, reducing unnecessary tactical responses, and professionalizing team behavior. Together, they offer the potential for a meaningful cultural change in how the Department uses Emergency Response Teams.

## Conclusion

The Department has taken substantial steps toward achieving the goals of First Remedial Order (dkt. 350), § A, ¶ 6. Most importantly, the frequency of Emergency Response Team deployments continues to be limited especially in situations that over-utilized tactical force. This development reduces the risk of hyper-confrontational incidents and signals a shift toward more appropriate, measured incident response. While more work remains, the Department has begun to minimize unnecessary and excessive uses of force by Emergency Response Teams. In order to achieve Substantial Compliance, the Monitoring Team continues to recommend, as outlined above, the conduct of Probe Teams must be improved as well as the organization and management of Special Teams. Further, written procedures related to Emergency Response Teams must be revised and implemented to ensure that the improved practices of all Emergency

---

[231] As noted elsewhere in this report, it took the Department months to confirm the number of relevant policies related to ESU.

Response Teams are sustained in the future. As discussed above, significant work remains to address the requirements of the August 10, 2023 Order.

| COMPLIANCE RATING | **First Remedial Order § A., ¶ 6.** Partial Compliance |
|---|---|

---

**REVISED DE-ESCALATION PROTOCOL (FIRST REMEDIAL ORDER § A., ¶ 3)**

*First Remedial Order § A., ¶ 3. Revised De-Escalation Protocol.* Within 90 days of the date this Order is approved and entered by the Court ("Order Date"), the Department shall, in consultation with the Monitor, develop, adopt, and implement a revised de-escalation protocol to be followed after Use of Force Incidents. The revised de-escalation protocol shall be designed to minimize the use of intake areas to hold Incarcerated Individuals following a Use of Force Incident given the high frequency of Use of Force Incidents in these areas during prior Reporting Periods. The revised de-escalation protocol shall address: (i) when and where Incarcerated Individuals are to be transported after a Use of Force Incident; (ii) the need to regularly observe Incarcerated Individuals who are awaiting medical treatment or confined in cells after a Use of Force Incident, and (iii) limitations on how long Incarcerated Individuals may be held in cells after a Use of Force Incident. The revised de-escalation protocol shall be subject to the approval of the Monitor.

The discussion below provides a compliance assessment of the Department's efforts to reduce its reliance on intake units in general operations pursuant to the requirements of the First Remedial Order (dkt. 350), § A, ¶ 3. This assessment also includes references to the Action Plan (dkt. 465), § E, ¶ 3 (a) (which adopts ¶ 1 (c) of the Second Remedial Order (dkt. 398) regarding tracking of inter/intra facility transfers), and Action Plan (dkt. 465), § E ¶ 3 (b) (which requires the new leadership to address these requirements) given these orders' interplay with the First Remedial Order (dkt. 350), § A, ¶ 3. Together, these provisions require the Department to identify the various processes that are negatively impacting intake's orderly operation and address them with new procedures.

**Compliance Assessment Overview**

The first compliance assessment for First Remedial Order, § A, ¶ 3 occurred in the 11th Monitoring Period (July to December 2020). At that time, the Department was found to be in Non-Compliance and remained in Non-Compliance in the 12th Monitoring Period (January to June 2021).[232] The Department has made progress on this provision and beginning in 2022, the Department moved into Partial Compliance in the 14th Monitoring Period (January to June 2022) and has remained so through this 20th Monitoring Period (January to June 2025).

The Monitoring Team also provides an update on the Department's efforts to process new admissions as required by the Second Remedial Order (dkt. 398), ¶ 1 (i) (c) and the Action Plan

---

[232] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

(dkt. 465), § D, ¶ 2(b) and § E, ¶ (3)(a)-(b) as these provisions relate to the work of First Remedial Order, § A, ¶ 3. This update is included in Appendix H of this Report.

## Reducing Reliance on Intake and Improving De-escalation

Reducing reliance on the use of intake and de-escalation serves an important harm-reducing function. These provisions underscore the need for the Department to establish a robust process for de-escalating those involved in incidents of violence and/or use of force ("UOF") to ensure that the risk of harm they may present to themselves, or others has been abated. When an individual is agitated to the point that they present an imminent risk of harm to another person's safety or when they have engaged in behavior that has physically harmed another person, that individual needs to be separated from potential victims so that the *risk* of harm to others can be abated and the person can safely return to the milieu. The risk of harm must necessarily consider the *potential* infliction of pain and/or injuries to others and should not be limited to only assessing the risk of serious injuries[233].

Historically, the Department has transported incarcerated individuals to intake to separate and de-escalate them following incidents of violence or use of force, a practice which creates additional chaos and subverts the intended function of intake units. As a result, the Monitoring Team has focused on reducing the use of intake units for this purpose but also emphasizes the need for the Department to develop routine procedures to properly de-escalate those involved in use of force incidents and other acts of violence.

To ascertain the Department's progress in minimizing the use of intake, the Monitoring Team assesses the use of force in intake, available data regarding the time individuals stay in intake areas, and the Department's ability to manage individuals *outside* of intake. The Monitoring Team also makes observations from site visits of intake areas and its assessments of use of force incidents.

## Use of Force Incidents in Intake Areas

The Monitoring Team continues to evaluate the frequency with which use of force occurs in the intake areas. The Monitoring Team has previously noted that intake's chaotic environment

---

[233] Notably, while a risk of harm can be ascertained, it is unclear how a risk of *serious injury* could even be reasonably ascertained.

and longer processing times (which are often mutually reinforcing) can result in a greater frequency of the use of force. Therefore, efficient intake processing and reducing the reliance on intake following uses of force are critical.

Overall, the number and proportion of use of force in intake has decreased significantly since the Second Remedial Order (dkt. 398) was entered in September of 2021, at the peak of the concerning practices in intake and is also below the numbers that occurred in 2019 and 2020 that resulted in the imposition of the First Remedial Order.

Between January and June 2025, 383 use-of-force incidents occurred in intake, making up roughly 11% of the Department's 3,483 total incidents. However, 56% of the 383 incidents (n=216), occurred in EMTC (n=107) and OBCC (n=109). These two facilities have the highest population of all facilities and therefore may have more active intake areas. Overall, while there has been improvement in decreasing the number of incidents within the intake areas, the number of incidents remains higher than it should, and further reductions are necessary. The uses of force in intake areas merits greater scrutiny and focus on security and active supervision from facility leadership.

The Department must remain vigilant in evaluating whether the force occurring in intake areas is necessary and unavoidable and whether intake operations are orderly and secure.

| Use of Force in Intakes (Department-wide) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **Jan. to June 2024** |
| **# of UOF in Intakes** | 913 | 1123 | 992 | 1483 | 963 | 767 | 844 | 383 |
| **Total UOF** | 5,901 | 7,169 | 6,467 | 8,194 | 7,005 | 6,784 | 6,979 | 3,561 |
| **% of UOF in Intakes** | *15%* | *16%* | *15%* | *18%* | *14%* | *11%* | *12%* | *11%* |

**Intake Data Tracking**

Inter/intra facility transfers must be tracked pursuant to ¶ 1 (c) of the Second Remedial Order (dkt. 398). Historically, the Department did not track inter/intra facility transfers in any systematic way. In 2023, the Department launched several initiatives aimed at improving the tracking of inter- and intra-facility transfers, with the goal of preventing individuals from remaining in intake beyond 24 hours. These reforms were documented in the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 12–13, which detailed, among other measures, the mandate that intake staff utilize the Inmate Tracking System ("ITS") to monitor such transfers.

The Department reports that the quality assurance process developed in 2023 to track inter/intra-facility transfers in ITS and prevent individuals from languishing in intake is still in effect and under management of facility operations. As part of this process, a facility operations team member monitors the live video feed of all intake units. Every four hours, they receive an update from each facility, including the names of those in intake, a screenshot of the ITS system, and a Genetec photo for each pen. They then verify whether any individuals have been in intake for four hours or more and, if necessary, contact the facility to expedite their movement. During site visits this Monitoring Period, intake staff reported to the Monitoring Team that facility operations staff consistently reach out to intake areas to inquire about any individual who remains in intake for longer than four hours.

In addition to a quality assurance process, the Department reports it uses ITS-generated data to produce reports and to evaluate information such as the average time, minimum time, and maximum time in intake as part of its overall effort to evaluate how long individuals are intake. This information is currently shared with facility and Department leadership daily to monitor overall performance The availability of this information to facility leadership is important and the Monitoring Team encourages the use of data to evaluate operations and drive decision-making so long as the Department ensures the data is accurate and reliable.

Generally, the issue of inter/intra facility transfers languishing in intake is not a widespread or a persistent problem. However, the Department is still not tracking all individuals in ITS, including Court transfers. The Department maintains a list of all individuals who are required to be produced to Court but there still does not appear to be a process to track how long these individuals may wait in an intake pen. Second, as noted in the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 12-13, some inter/intra facility transfers are still not entered into ITS in a timely manner. During site visits, the Monitoring Team continues to observe individuals in intake cells who have not yet been entered into the ITS. Staff frequently explain that the individuals have only recently arrived, and that staff were diverted to more urgent tasks, assuring that they will update the system promptly.

The Monitoring Team maintains its recommendations from the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 87-88 suggesting that the Department would benefit from taking additional steps to manage the use of intake, including assessing root causes of staff's failure to enter individuals into ITS, and developing a practical quality assurance process. While individuals languishing in intake do not appear to be at as great a risk, the frequency of use of force in intake suggests that ongoing oversight is necessary to ensure that these units are managed in a safe manner.

### Reduced Reliance on Intake & De-Escalation Units

As part of its effort to eliminate the reliance on intake areas, in 2022 the Department promulgated Directive 5016 "De-escalation Unit," which establishes the Department's policy and procedures for de-escalating individuals outside of facility intakes.[234]

While the First Remedial Order does not require the use of de-escalation units, the Department opened a de-escalation unit[235] in each facility in July 2022 as one alternative for staff to use instead of intake. However, the use of de-escalation units was not faithfully implemented

---

[234] The policy prohibits the use of intake pens for post-incident management or violence prevention and indicates that intake should only be used for facility transfers, court processing, discharges, and transfers to medical appointments, cadre searches, body scans, and new admissions.

[235] An unoccupied housing unit in each facility with cells with secured doors, a bed, a toilet, and a sink were used as de-escalation units. Showers were available in each housing unit.

and nearly all facilities ceased using them.[236] EMTC leadership reports that it maintains and uses its de-escalation unit since their intake area is reserved for processing of new admissions. Given the limited use of de-escalation units, in October 2023, in consultation with the Monitoring Team, the *Nunez* Compliance Unit ("NCU") ceased auditing de-escalation units.

The discontinuation of de-escalation units does not inherently mean that facilities take all incarcerated individuals to intake following a UOF incident. The Department reports that out of the over 33,000 non-new admissions intake arrivals processed between January and June 2025, 5,032 or 15% were due to incident management. The number of individuals placed in Intake due to incident management remains high and worthy of ongoing scrutiny given the setting is not generally an appropriate setting to manage individuals following an incident.

NCU's audits and reports from facility leadership found that some incarcerated individuals are returned to their assigned cell to de-escalate, are immediately rehoused, or are taken directly to the clinic for medical care.[237]

However, it is worth emphasizing that it has been over two years since the Department ceased utilization of de-escalation and facility staff have not received formal guidance on post-incident protocols or managing incarcerated individuals following an incident without the use of de-escalation units. Appropriate guidance regarding how best to manage the de-escalation process is necessary or facilities may revert back to the practice of relying solely on intake areas for post incident management

The Monitoring Team continues to strongly recommend that the Department update its policy/guidance to staff about post-incident management given de-escalation units are no longer utilized. While the current policy prohibits staff from bringing individuals to intake following an

---

[236] The Department ceased utilization of de-escalation units at RMSC in August 2022, GRVC in October 2022, and RNDC in June 2023. No de-escalation units were created at NIC/WF, or at OBCC when it was re-opened in July 2023

[237] The NCU audits covering January to June 2023 (the 16th Monitoring Period) found that 49 of 84 individuals (58%) (compared with 71% in July to December 2022) were not taken to intake and instead were taken back to their assigned cell to de-escalate, immediately rehoused, taken directly to the clinic for medical care, or were placed in a de-escalation unit (specifically, six individuals were placed in a de-escalation pen during this time). 35 of 84 individuals (42%) were brought to intake areas. *See* the Monitor's December 22, 2023 Report (dkt. 666) at pgs.13-14.

incident, it lacks sufficient guidance on how staff should manage individuals following an incident now that the de-escalation units are not an option.

**Conclusion**

The improved conditions observed in intake since 2022 have been sustained and these areas are no longer as chaotic and disorderly as they were in 2021. However, several challenges remain and therefore the Department remains in Partial Compliance with this provision. First, additional work is needed to consistently track individuals in ITS. Specifically, staff must be more consistent in entering individuals immediately upon their arrival and the Department must address how to track individuals for inter/intra-facility reasons like court production. Second, more work needs to be done to reduce use of force in intake areas. Finally, the Department needs to develop and communicate updated guidance for de-escalating those involved in use of force incidents. The development of a consistent strategy for de-escalation following an incident is critical to this provision. The de-escalation process must allow for the identification of the individual's distress, to offer various strategies to address the interpersonal conflict or tension, and to continually re-assess the person to determine whether the risk of harm has subsided. The time required for the risk of harm to subside depends both on the individual (*i.e.*, some have more well-developed skills for coping with emotional dysregulation than others) and the situation (*i.e.*, some types of situations cause a higher level of distress than others), and thus the duration must be individually determined for each de-escalation period.

| COMPLIANCE RATING | **First Remedial Order § A., ¶ 3.** Partial Compliance |
|---|---|

| YOUNG ADULTS - PREVENT FIGHT/ASSAULT (CONSENT JUDGMENT § XV., ¶ 1) |
|---|
| _Consent Judgment, § XV., ¶ 1. Prevent Fight/Assault._ Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 810).*

This provision requires the Department to manage units where 18-year-olds are housed in a manner that protects them from an unreasonable risk of harm, by preventing violent conduct and de-escalating confrontations as soon as practicable and reasonably safe to do so.

## Compliance Assessment Overview

The first compliance assessment for Consent Judgment, § XV, ¶ 1 occurred for the 3rd Monitoring Period (August to December 2016), in which the Department was found in Partial Compliance, which it sustained until the 6th Monitoring Period (January to June 2018). However, particularly following GMDC's closure in late 2018 (and the subsequent transfer of 18-year-olds to RNDC),[238] RNDC's conditions deteriorated, and the compliance rating was downgraded to Non-Compliance where it remained from the 7th Monitoring Period (July to December 2017) to the 17th Monitoring Period (July to December 2023).[239] However, in the 18th Monitoring Period (January to June 2024), the Monitoring Team found that the Department had begun to address core issues and moved the Department into Partial Compliance, where it remained in the 19th Monitoring Period (July to December 2024).

---

[238] The Monitor's April 18, 2018 Report (dkt. 311) at pgs. 144-150 and the Monitor's October 17, 2018 Report (dkt. 317) at pgs. 149-150 describe the transfer of 16- and 17-year-olds from Rikers Island to the Horizon Juvenile Center, the closure of GMDC and subsequent transfer of 18-year-olds to RNDC.

[239] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Consent Judgment, § XV, ¶ 1. The Court explained the basis for its finding at pgs. 37-40 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order. The Monitoring Team has long been concerned about violence at RNDC, where the majority of 18-year-olds are held (along with those aged 19 to 21).[240] However, the Department has begun showing key elements of progress in the last two Monitoring Periods, including steady decreases in the use of force and facility violence during the previous two years and the development of and sustained focus on the RNDC Programs Action Plan ("RNDC Plan"). The Department sustained this progress throughout the current Monitoring Period. Therefore, the Department remains in Partial Compliance with this provision.

**RNDC's Current Facility Population/Composition**

Since the Consent Judgment went into effect, the number of 18-year-olds in custody has declined significantly. In 2016, the Department held approximately 200 18-year-olds, compared to approximately 47 18-year-olds in 2025. This age group typically represents about 1 or 2% of the total population in custody. The Department has historically concentrated its population of young adults aged 18- to 21-years old at RNDC (particularly with GMDC's closure in 2018), but RNDC's total population has changed in both size and composition over the past several years. In 2019, RNDC's average daily population of 470 was predominantly young adults. In contrast, in December 2024, the facility's average daily population of 1,365 was 36% young adults and 64% adults. These proportions remained approximately the same during the current Monitoring Period.

**RNDC's Rates of Use of Force and Violence**

The table below identifies the rates of use of force and violence for the entire RNDC facility. Comparing the rates from early 2022 to the current Monitoring Period reveals significant decreases. RNDC's use of force rate decreased 53%, the rate of stabbings/slashings decreased 69%, the rate of fights decreased 15%, and the rate of fires decreased 25%. These are all very

---

[240] The Monitor's December 22, 2023 Report (dkt. 666) at pg. 87 includes specific citations to various reports from 2022 and 2023 that discuss in detail RNDC's circumstances and the Department's efforts to address them.

positive changes that can drastically change the tenor of a facility and the chaos and disorder that people housed in that facility experience.

| RNDC's Rates of Use of Force and Violence, January 2022 to June 2025 | | | | |
|---|---|---|---|---|
| | **Use of Force** | **Stabbing/Slashing** | **Fights** | **Fires** |
| Jan-Jun 2022 | 15.1 | 1.6 | 10.4 | 2.0 |
| Jul-Dec 2022 | 9.9 | 0.76 | 9.3 | 1.2 |
| Jan-Jun 2023 | 8.1 | 0.59 | 7.0 | 1.3 |
| Jul-Dec 2023 | 7.9 | 0.92 | 7.8 | 3.0 |
| Jan-Jun 2024 | 5.7 | 0.60 | 7.5 | 1.2 |
| Jul-Dec 2024 | 7.9 | 0.6 | 9.7 | 0.6 |
| Jan-Jun 2025 | 7.1 | 0.5 | 8.8 | 1.5 |

These data provide a useful context for understanding the environment within which the RNDC Plan is being implemented and highlight that overall facility conditions have improved over the past three years.

### RNDC's Programs Action Plan ("RNDC Plan")

In January 2024, the Department developed the RNDC Programs Action Plan ("RNDC Plan"), which includes the following key components:

- Consolidating the number of housing units where 18-year-olds (and other Young Adults) may be housed and reducing the maximum unit size from 25 to 15 individuals.
- Renovating the Young Adult housing units to abate hazardous environmental conditions and to improve the aesthetic appeal of the units.
- Sustaining the condition of the renovated units by focusing both staff and incarcerated individuals on the ongoing sanitation of the units.
- Consistently assigning staff, including officers, captains and Assistant Deputy Wardens ("ADWs"), to the same housing units day-to-day, along with members of the facility's security team, which will function similarly to the Young Adult Response Team ("YART") used in the past.
- Training assigned staff to better understand the target population and the approach to managing their behaviors and solving problems.

- Utilizing Unit Management as the overarching framework for the designated units, which should provide a platform for the implementation of key components of Direct Supervision (*e.g.*, proactive supervision and de-escalation, consistent service delivery, rewards for positive behavior, etc.) and improving basic security practices.

- Enhancing the program offerings provided by both Department staff and outside vendors in order to reduce idle time.

The agency and facility leaders responsible for implementing the plan continued to collaborate closely with the Monitoring Team throughout the current Monitoring Period. Not only does the substance of the plan hold promise for ameliorating the dangerous conditions at RNDC, but the Department's ongoing commitment to its implementation and expansion is encouraging. Specific strategies implemented during the monitoring period are discussed in detail in the compliance assessment for Consent Judgment, § XV, ¶ 12, Direct Supervision.

The Department's Office of Management, Analysis and Planning ("OMAP") developed a sophisticated data dashboard for the RNDC team to monitor the Plan's impact on reducing the use of force and violence.[241] The dashboard provides real-time access to the rates of various performance indicators in the units targeted by the RNDC Plan.[242] The Monitoring Team encouraged the Department to determine the baseline rate for YA units at RNDC during the calendar year prior to the RNDC Plan (CY 2023) in order to better assess whether the strategies included in the plan were having a demonstrable impact on facility safety. This allows the assessment of the RNDC Plan's impact to be focused on how conditions may have changed for the specific target population, rather than relying on facility-wide statistics that have confounding factors (such as the large number of adults housed at RNDC).

---

[241] OMAP calculates the number and rate of each metric for the units covered by the RNDC Plan each month, and they are presented to and discussed with the Monitoring Team during monthly meetings.

[242] Because the dashboard is a management tool, not a research tool, OMAP developed a rate calculation that provides more specificity than the standard rates which are typically calculated using the monthly average daily population as the denominator. Instead, the rate used in the dashboard is the "rate per 1,000 PIC *per day*," which uses daily population counts and provides more accurate, real-time data to facility operators.

The table below shows the key changes in safety-related indicators in the units covered by the RNDC Action Plan by comparing rates of violence and use of force to those in young adult housing areas before the RNDC Plan was implemented.

| RNDC Programs Action Plan's Key Performance Indicator Rates, July 2024 to June 2025 | | | | |
|---|---|---|---|---|
| Incident Type | YA Baseline Rate (CY 2023) | Jul-Dec 2024 | Jan-Jun 2025 | 20th MP % change from baseline |
| Use of Force | 3.0 | 2.1 | 2.2 | -27% decrease |
| Stabbing/Slashing | 0.5 | 0.3 | 0.2 | -60% decrease |
| Fights | 2.7 | 3.5 | 3.9 | +44% increase |
| Serious Injuries | 0.4 | 0.3 | 0.4 | same |
| Assault on Staff | 1.0 | 0.2 | 0.3 | -70% decrease |

As indicated in the table above, substantial decreases in the rates of all key metrics, except fights, have been observed since the RNDC Plan went into effect. It is particularly notable that the rates of UOF, stabbing/slashing and fights are significantly lower than the rates for the entire facility, presented above. This is indicative of a significantly safer environment in housing units where 18-year-olds are housed.

**Monitoring Team Recommendations**

As implementation becomes broader and deeper, the Monitoring Team has encouraged the RNDC team to develop strategies to monitor the delivery of group incentives, to ensure each unit has a posted daily schedule and to begin to consider how adherence to that schedule could be assessed to fulfill its obligation to assess the implementation of Direct Supervision, as discussed in the compliance assessment of Consent Judgment § XV, ¶ 12, below. The Monitoring Team has also encouraged the RNDC team to consider how the improved conditions of confinement could be leveraged to address persistent security problems (*e.g.*, unsecured cells, enforcing lock-in, officers off post, etc.) in new ways. The RNDC Action Plan Dashboard provides detailed information on the locations, days and times where incidents occur and identifies the PICs who are involved in the highest number of incidents. These data present an excellent opportunity for problem-solving strategies that address facility hot spots and for individualized behavior management strategies to reduce violent behavior. The Monitoring Team

continues to engage with the RNDC team on a monthly basis and remains available to provide technical assistance on any of these topics.

**Conclusion**

The RNDC Plan is distinguished from other efforts the Department has made to address the risk of harm to young adults not just because of its positive outcomes but also because it is an example of a strategy built on good correctional practice (such as consistently assigned staff, reduced idle time, and incentives for positive conduct) that has the requisite leadership, sustained attention, and tools for assessing the plan's impact on facility safety. This is a significant achievement. The Monitoring Team collaborated closely with the Department as it developed and refined the Plan's components and throughout its implementation. The Department has developed several creative strategies to leverage its programming assets and to develop incentives for positive behavior. It has also been open to technical assistance regarding various aspects of the Plan's strategies to improve staffing, security practices, increase programming, and to evaluate the impact on violence.

In summary, the Department continues to demonstrate a concerted effort to improve facility safety at RNDC in an effort to better protect 18-year-olds in custody from an unreasonable risk of harm. During the current Monitoring Period, the Department expanded implementation of key strategies to additional areas targeted by the RNDC Plan. Implementation is now fully underway in Building 2 and Building 3 and expansion continues to MODs 1 and 2, as discussed in detail in Consent Judgment, § XV, ¶¶ 12 and 17, below. During subsequent Monitoring Periods, the facility intends to continue expansion by ensuring Unit Managers are assigned to cover all areas, consistently assigning staff, enriching programming, and broadening the implementation of incentives for positive conduct in the remaining units. The RNDC Plan's results remain very promising, and continued reduction in the key violence metrics are expected once all of the strategies are robustly implemented in each area targeted by the RNDC Plan (as discussed in ¶ 12 and ¶ 17 below). While the risk of violence remains real, the Department's incremental expansion to additional housing areas and its sustained focus on problem-solving strategies are sufficient to sustain the Partial Compliance rating.

| COMPLIANCE RATING | **Consent Judgment § XV., ¶ 1. (18-year-olds)** Partial Compliance |
|---|---|

| **YOUNG ADULTS - DIRECT SUPERVISION (CONSENT JUDGMENT § XV., ¶ 12 & FIRST REMEDIAL ORDER § D., ¶ 3)** |
|---|

*Consent Judgment § XV., ¶ 12. Direct Supervision.* The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

*First Remedial Order § D., ¶ 3.* For all housing units at RNDC that may house 18-year-old Incarcerated Individuals, the Department, including RNDC Supervisors, shall take necessary steps to improve the implementation of the Direct Supervision Model with an emphasis on the development of proactive and interactive supervision; appropriate relationship building; early intervention to avoid potential confrontations; de-escalating conflicts; rewarding positive behavior; and the consistent operation of the unit.

*First Remedial Order § D., ¶ 3(i).* The Department, including RNDC Supervisors, shall reinforce the implementation of the Direct Supervision Model with Staff through, among other things, appropriate staff supervision, coaching, counseling, messaging strategies, or roll call training.

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 810).*

This provision requires the Department to implement the Direct Supervision model in all units that house 18-year-olds. To implement Direct Supervision, the Department must emphasize proactive and interactive supervision, appropriate relationship building, early intervention to avoid potential confrontations, de-escalation, rewards for positive behavior and consistent operations on each unit, including the implementation of daily unit schedules. The Department's long-standing inability to implement a Direct Supervision model resulted in the imposition of related provisions in the First Remedial Order (dkt. 350), § D, ¶¶ 3 and 3(i). As part of the additional remedial relief, the Department is required to periodically assess the extent to which these various aspects are being properly implemented, along with adherence to the daily schedule in each housing unit. The *Nunez* Compliance Unit ("NCU") consulted with the Monitoring Team to develop a protocol for this assessment in early 2021, but audits were never produced because RNDC was in such disarray. Housing units did not have posted daily schedules and were not staffed by the same people day-to-day, which precluded the consistency, predictability and relationship development that is at the core of the Direct Supervision model.

## Compliance Assessment Overview

The first compliance assessment for Consent Judgment, § XV., ¶ 12 occurred for the 1st Monitoring Period (November 2015 to February 2016) and the Department was found in Partial Compliance, where it remained through the 6th Monitoring Period (January to June 2018). The provision was then found in Non-Compliance in the 7th and 8th Monitoring Periods (July 2018 to June 2019), but was again moved to Partial Compliance in the 9th and 10th Monitoring Periods (July 2019 to June 2020). The provision was then moved back to Non-Compliance from the 11th through the 18th Monitoring Period (July 202 to June 2024).[243] In the 19th Monitoring Period (July to December 2024), the Department was upgraded to Partial Compliance.

The first compliance assessment for First Remedial Order (dkt. 350), § D., ¶¶ 3 and 3(i) occurred for the 11th Monitoring Period (July to December 2020), and the Department was found in Non-Compliance, where it remained through the 12th Monitoring Period (January to June 2021).[244] Since the 14th Monitoring Period (January to June 2022), the Monitoring Team provided an update on the Department's efforts to achieve compliance with this provision, but did not provide a compliance rating because it was not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team was required to do so. Beginning in this Monitoring Period, a compliance rating will again be provided for this provision pursuant to the Court's July 10, 2025 Order (dkt. 879).

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with Consent Judgment, § XV, ¶ 12 and First Remedial Order (dkt. 350), § D, ¶ 3 and 3(i). The Court explained the basis for its finding at pgs. 37-40 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order.

---

[243] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74. This provision was not rated in the 14th or 15th Monitoring Periods because the focus was on the Commissioner's Violence reduction Plan for RNDC. *See* the Monitor's October 28, 2022 Report (dkt. 472) at pgs. 171-172 and the Monitor's April 3, 2023 Report (dkt. 517) at pg. 218.

[244] See the preceding footnote as to why a compliance rating was not awarded for this provision in the 13th Monitoring Period.

The Department was most recently found in Partial Compliance for Consent Judgment, §
XV, ¶ 12 in response to RNDC's progress in implementing core components of Direct
Supervision related to consistent staffing, improved rapport among staff and PIC, de-escalation,
program enhancements and incentives. Partial Compliance was maintained for Consent
Judgment, § XV, ¶ 12 during the current Monitoring Period. First Remedial Order (dkt. 350), §
D., ¶¶ 3 and 3(i) are also in Partial Compliance.

### Key Concepts of Direct Supervision

Beginning in early 2024, with the implementation of the RNDC Programs Action Plan
("RNDC Plan"), the Department began to build a foundation upon which the elements of Direct
Supervision could rest. An essential first step was the implementation of a staffing strategy that
assigned a Unit Manager and consistently assigned staff to the same unit day-to-day (*see* Consent
Judgment, § XV, ¶ 17, below). Once assigned and properly supervised, these staff are responsible
for proactively supervising the units and intervening early to de-escalate conflicts, assisted by the
assigned Security Team members. Collectively, assigned housing unit staff, supervisors, Security
Team members, and staff from the Programs Division are responsible for implementing the daily
unit schedule which provides much needed predictability and thus reduces the level of frustration
experienced by many PICs when services are not delivered reliably. These strategies are now
well established in one of the four areas addressed by the RNDC Plan (Building 2) and to various
extents, have been rolled out in the remaining three units (Building 3, Mod 1 and Mod 2).

Consistent staffing is the key strategy upon which most of the other components of Direct
Supervision rest. As discussed in Consent Judgment, § XV, ¶ 17, below, the original Unit
Manager was promoted during the current Monitoring Period, and the remaining ADW and DW
promotions need to occur before RNDC can replace that individual and appoint Unit Managers
to the remaining units. Officers and captains have reportedly been assigned to all four areas
covered by the RNDC Plan, and NCU has begun to audit their consistency.

During the current Monitoring Period, the Department broadened and deepened its
implementation of various strategies, as discussed below.

- **Maximum Unit Size**. In each housing unit where 18-year-olds may be placed, the
  unit size is capped at 15 individuals. This, along with consistently assigning the
  same staff to the units day-to-day, facilitates efforts to develop rapport and

implement proactive supervision and to de-escalate conflicts among incarcerated individuals. Due to a backlog of state-ready PICs, RNDC experienced considerable pressure to increase the unit size, but was steadfast in maintaining the population caps. Populations occasionally reached 16 or 17 young adults, but only for short periods of time.

- **Daily Huddles**. Each day, the individual serving in the Unit Manager role/Lead Captain assigned to the areas covered by the RNDC Plan holds a "huddle" with the staff and PICs to discuss any issues that need to be resolved.

- **Daily Unit Schedules**. During the current Monitoring Period, the facility integrated the various schedules for recreation, barbershop, laundry, law library, religious services, the PEACE Center, counselors and programming into a comprehensive daily schedule for each housing unit. Each schedule identifies the day/time that each service is provided to the unit and is posted in a space visible to both PIC and staff. Such clarity is essential for transparency and predictability, so that both staff and PIC have a shared understanding of the activities and services each day.

- **Programming**. One of the core objectives of the RNDC Plan is to increase the volume of structured programming/decrease idle time. The Department's Programs Division continues to richly resource the 15 housing areas designated in the plan (six units in Building 2, five units in Building 3, and four units in Mod 1 & Mod 2) relying both on Programs Staff (*e.g.*, Program Counselors, Social Service providers) and community partners (*e.g.*, King of Kings, SCO, Stella Adler). These investments significantly reduce idle time for the individuals housed in each area addressed by the RNDC Plan.

  - Throughout the Monitoring Period, Department staff and community partners were scheduled to provide structured programming for an average of about three hours per day to units in Building 2, about 1.5 hours per day in Building 3, and about one hour per day in the MODs (where all individuals also attend school five hours per day on weekdays). The Programs Division's goal is to provide all units covered

by the RNDC Plan with four hours of programming per day, five days per week, via a combination of Programs Staff and community based organizations. In addition, at the end of the current Monitoring Period, all of the units but one (93%) had access to five hours of school, five days per week.

o   The RNDC team continues to track data from the Programs Division's database that shows the extent to which the scheduled programs occur or are cancelled, the reason for cancellations and the level of engagement in each housing unit. During the current Monitoring Period, approximately 83% of programs occurred as scheduled (monthly range 77%-89%), which is similar to the previous Monitoring Period (78%). On average, about 58% of the PICs in each housing unit participated in the programs offered (monthly range 54-64%). Some housing units had much higher rates of participation than others (~85% versus ~45%). Of the 17% of scheduled programs that were cancelled, the largest proportion was cancelled because staff were sick, on leave, or the program was scheduled on a holiday. In the middle of the Monitoring Period, a significant proportion of program cancellations were due to facility lockdowns (~40% of all program cancellations).

- **Incentive Program**. RNDC has developed several strategies to incentivize PICs to follow the rules and to resolve conflict without violence. The ability to incentivize/reward individuals for pro-social conduct is a key tenet of Direct Supervision. Incentives include:

  o   In December 2024, the RNDC Team began offering weekly "Late Nights" (*i.e.*, lockout is moved back to 10p instead of 9p; individuals can remain in the dayroom where they can watch TV or play video games) as group incentive for units in Building 2. "Late Night" was offered to units in Building 3 toward the end of the Monitoring Period. Housing units were eligible for the Late Night if they were incident-free and had acceptable sanitation practices during the week. However, during the current

Monitoring Period, Late Nights were often cancelled due to staffing shortages, tactical search operations, and/or communication problems.

o The Department reported that a variety of other on-unit group incentives are routinely offered to housing units including movie nights, celebrations for those who "age out" and are transferred to adult units, and special programming. RNDC is reportedly developing a tracking system to identify how often housing units earn the incentives, and the reasons that any of the incentives could not be delivered.

o Each month, a variety of off-unit Special Events continue to be available to individuals who have met established criteria (*e.g.*, incident-free for a month, lock-in compliance, met a specific program engagement threshold, etc.). During the current Monitoring Period, the facility held events such as family days, Mother's Day and Father's Day events, trips to the Children's Museum, and various tournaments. The Monitoring Team continues to encourage the RNDC team to keep track of the number of YAs who earn off-unit incentives each month.

- **Grievances**. One way to assess the experience of the individuals housed on the units designated by the RNDC Plan is to examine the volume and types of issues they grieve. During the current Monitoring Period, the most frequent concern was the lack of daily access to recreation. Smaller numbers of grievances were filed for concerns about access to medical/mental health/education services, facility lockdowns and concerns about safety. A few grievances were related to staff, but typically concerned staff in ancillary areas (*e.g.*, corridor, clinic, school, etc.), not housing staff. That the RNDC team is routinely monitoring grievances and searching for patterns is another example of the team's commitment to addressing issues of concern for the people in custody.

**Steps to Implement Direct Supervision**

Moving forward, to meet the requirement regarding Direct Supervision, the RNDC team needs to: (1) expand the strategy to achieve consistent staffing (and related rapport building and de-escalation goals) to the MODs, verified by regular audits by NCU; (2) maximize the

availability of structured programming to all areas covered by the plan, and maximize/incentivize engagement; (3) demonstrate the reliable implementation of daily unit schedules per the First Remedial Order (dkt. 350), § D, ¶ 3 (ii), which requires periodic assessments of the extent to which the various aspects of Direct Supervision are being properly implemented, along with adherence to the daily schedule in each housing unit; and (4) expand the availability of group and individual incentives to all units covered by the Plan, and track the frequency of their delivery.

For the past 18 months, the Department has demonstrated a continuing commitment to integrate the core elements of Direct Supervision into the standard operation of units that house 18-year-olds and other young adults designated by the RNDC Plan. Progress has been steady and certain elements of the strategy are now firmly into place in some, but not all, of the housing areas covered by the plan. Throughout the Monitoring Period, members of the Monitoring Team have conducted tours of RNDC housing units, to assess housing conditions, security practices and supervision. The Monitoring Team's observations confirm that units have a smaller census, that staff familiar with the young adult population are consistently assigned, and staff have received young adult–specific training. These changes to basic operations have resulted in greater order, reduced tension, and more consistent support for uniform staff from Supervisors, the Unit Manager and the facility's Security Team. RNDC's struggles with staff availability may have slowed progress in certain ways, given the difficulty in providing access to some services (*e.g.*, recreation) and the group and individual incentives. The work needs to be expanded as discussed above in order to achieve Substantial Compliance, but the RNDC team's progress in consistently assigning staff, improving relations between staff and people in custody, capping unit size, developing comprehensive daily unit schedules, and implementing certain incentives are sufficient to maintain Partial Compliance. Given the overlapping requirements, progress on ¶ 12 of the Consent Judgment also reflects progress on § D ¶ 3 and 3(i)of the Remedial Order.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § XV., ¶ 12. (18-year-olds)** Partial Compliance<br>**First Remedial Order § D., ¶ 3.** Partial Compliance<br>**First Remedial Order § D., ¶ 3(i).** Partial Compliance |

| **YOUNG ADULTS - CONSISTENT ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XV., ¶ 17 & FIRST REMEDIAL ORDER § D., ¶ 1)** |
|---|

*Consent Judgment § XV., ¶ 17. Consistent Assignment of Staff.* The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

*First Remedial Order § D., ¶ 1.* For all housing units at RNDC[245] that may house 18-year-old Incarcerated Individuals, the Department shall enhance the implementation of a staff assignment system under which the same correction officers, Captains, and ADWs are consistently assigned to work at the same housing unit and on the same tour, to the extent feasible given leave schedules and personnel changes.

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 810).*

Consent Judgment, § XV., ¶ 17 requires units where most 18-year-olds are housed to have consistently assigned officers and Supervisors day-to-day. In order for the Department to adopt a consistent staff assignment model, staff must reliably report to work as scheduled, and the Department must implement a staff deployment strategy that prioritizes the required consistency across units. Previously, the Department's inability to comply with this provision resulted in additional remedial relief, including a provision regarding staff assignments in the First Remedial Order (dkt. 350), § D, ¶ 1. In addition to requiring the Department to enhance its efforts to consistently assign staff to the same housing unit day-to-day, the First Remedial Order also requires the Department to implement a quality assurance process to assess the extent to which the consistent staffing requirements are met each month.

**Compliance Assessment Overview**

The first compliance assessment for Consent Judgment, § XV, ¶ 17 occurred for the 6th Monitoring Period (January to June 2018) when a strategy for consistent staffing was first implemented at RNDC, and the Department was found to be in Partial Compliance, which it sustained through the 10th Monitoring Period (January to June 2020). However, the effort was

---

[245] The majority of 18-year-old Incarcerated Individuals are currently housed at RNDC. To the extent that the majority of 18-year-old Incarcerated Individuals are housed at another facility in the future, the provisions in § D shall apply to all housing units in that facility that may house 18-year-old Incarcerated Individuals.

not sustained, and the Department was found in Non-Compliance beginning in the 11th Monitoring Period (July to December 2020) through the 18th Monitoring Period (January to June 2024).[246] In the 19th Monitoring Period (July to December, 2024), the Department was upgraded to Partial Compliance because RNDC had implemented a system for consistently assigning staff to work some of the units that are part of the RNDC Programs Action Plan (where all 18-year-olds are housed), an audit strategy to assess the consistency of staffing in those units, and the performance level of units in Building 2 were sufficient.

The first compliance assessment for First Remedial Order (dkt. 350), § D., ¶ 1 occurred for the 11th Monitoring Period (July to December 2020), and the Department was found in Non-Compliance, where it remained through the 12th Monitoring Period (January to June 2021).[247] Since the 14th Monitoring Period (January to June 2022), the Monitoring Team provided an update on the Department's efforts to achieve compliance with this provision, but did not provide a compliance rating because it was not one of the select group of provisions defined by Action Plan (dkt. 564), § G, ¶ 5(b) for which the Monitoring Team was required to do so. Beginning in this Monitoring Period, a compliance rating will again be provided for this provision pursuant to the Court's July 10, 2025 Order (dkt. 879).

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with Consent Judgment, § XV, ¶ 17 and First Remedial Order (dkt. 350), § D, ¶ 1. The Court explained the basis for its finding at pgs. 37-40 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order.

Continued progress was evident during the current Monitoring Period and the Department sustained its Partial Compliance rating for Consent Judgment, § XV, ¶ 17. The Department was also found in Partial Compliance for First Remedial Order (dkt. 350), § D., ¶ 1.

---

[246] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

[247] See the preceding footnote as to why a compliance rating was not awarded for this provision in the 13th Monitoring Period.

**Current Status of Consistent Staffing via the RNDC Programs Action Plan**

As described in CJ § XV ¶ 1 above, in early 2024, the Department produced the RNDC Programs Action Plan ("RNDC Plan") to improve conditions and facility safety at RNDC where most 18-year-olds are housed. Implementation began in earnest in July 2024. The cornerstone of the RNDC Plan is to consistently assign staff to each of the four locations where 18-year-olds can be assigned (Building 2, Building 3, MOD 1 & MOD 2). This includes officers, captains, members of the facility's Security Team, and an Assistant Deputy Warden ("ADW") who functions as a Unit Manager.

Given that the overall goal of the RNDC Plan is to reduce conflict and violence, structuring the units' staffing to permit the development of appropriate familiarity, cooperation and trust is essential for the type of problem-solving that must occur. As such, consistently assigning staff to the targeted units day-to-day is the core strategy that the other components of the RNDC Plan rest upon. That said, given that staff cannot work 7-days per week, have a variety of benefits (vacation, sick leave, etc.) and are also required to attend annual training on a variety of topics, it is unrealistic to expect that the assigned officers will be present on the unit every single day. A reasonable approach to assessing compliance must incorporate this reality and must focus on the extent to which the facility has assigned staff to cover each post on all tours, has appropriate backup staff to fill in when the assigned staff is unavailable, and is able to avoid deploying assigned staff to other units whenever possible. More globally, reasonable efforts to control unnecessary staff absenteeism must also be considered.

During the current Monitoring Period, the steady staffing objective was maintained in the original locations (Building 2) and expanded to the remaining locations (Building 3 and MODs 1&2), with a few exceptions. NCU audited the performance level in both Buildings 2 & 3. The RNDC Plan team observed that the benefits of the steady staffing initiative include staff (including the assigned Security staff) better functioning as a team, better staff supervision by the assigned captains, and a more orderly, safer environment on the units due to expectations becoming more clear and more consistent. Morale among the staff is reportedly higher on these units (also noted by the Monitoring Team during site visits), evidenced by reduced absenteeism and very few requests from assigned staff to transfer to a different unit. The units' leadership and the results of NCU's audits for both captains and officers are discussed in detail below.

**Unit Managers**

When implementation of the RNDC Plan began in earnest in July 2024, an ADW with previous experience implementing Direct Supervision was selected to be the Unit Manager for Building 2. This individual was promoted to DW in March 2025, and due to other promotions and reassignments, the number of remaining ADWs at RNDC was too small to both cover the Tour Commander role and to replace the Unit Manager. As a result, the facility must wait for the incoming ADW promotions in order to fill this vacancy and to appoint Unit Managers for the other locations covered by the RNDC Plan. In the interim, RNDC's ED of Programs shared the responsibilities of the Unit Managers with a "Lead Captain" who has been working in these units since the RNDC Plan's inception. At the end of the current Monitoring Period, the facility was still waiting for the promotions to stabilize, for the incoming ADWs to be trained, and to assess the ADWs' performance before deciding the best candidates for the Unit Manager role. A qualified ADW was appointed to the Unit Management position thereafter, and Area Supervisors (Captains) have been identified for all housing areas covered by the RNDC Plan.

**NCU's Consistent Staffing Audits**

**Methodology**

Each month, NCU utilizes data from the Department's electronic scheduling system, InTime, to assess the extent to which posts in the RNDC Plan's units were worked by captains and officers who are steadily assigned to the post day-to-day (*i.e.*, "steady staff").[248] A post is considered to have been worked by a steady officer if it was worked by: (1) the assigned 4-day or 2-day staff for that tour; (2) the assigned 4-day or 2-day staff for that post on a different tour; (3) staff who are normally assigned to an adjacent post on that unit (*e.g.*, the North or South side, or A or B post—this applies to officers only since captains are assigned to the entire building).[249]

---

[248] For the captains, the audit assesses the captain's post (typically assigned to an entire building), every day, for all three tours, totaling about 90 posts each month. For the officers, the audit assesses the A and B posts, every day, for all three tours, totaling between 700-800 posts each month.

[249] Prior to NCU's most recent work to assess consistent staffing under the RNDC Plan, it last audited this provision in June 2021. The methodology used in the 2021 audits was much narrower (i.e., gave credit for consistency only when the assigned 4-day and 2-day staff worked the unit). The Monitoring Team determined the current, more expansive methodology to be reasonable (i.e., gives credit for consistency when staff who typically work the post on a different tour or on the adjacent side work the post in question). It is also important to recognize that the 2021 audits were conducted before the Department converted to InTime, and so the audits involved deciphering

The relevant Remedial Order provision also requires ADWs to be consistently assigned. An ADW serves as the Unit Manager for all of the housing areas covered by the Action Plan and consistently serves in that role on the days he is scheduled to work.[250]

Audits of captains and officers in Building 2 began during the previous Monitoring Period, and audits of Building 3 were initiated during the current Monitoring Period. NCU has yet to begin auditing the performance level of MODs 1 & 2, although steady staff have reportedly been assigned to most of the housing areas. Due to the complexity of the audits and the limit of NCU's resources, the Monitoring Team believes it is reasonable for NCU to audit *one* Building or the MODs each month (rather than all Buildings/MODs every month). Not only will such an approach conserve valuable NCU resources, but it will provide sufficient information for the Monitoring Team to assess the level of compliance with this provision.

### Results

Steady staffing rates in Building 2/Building 3 during the current Monitoring Period continued to demonstrate adherence to the objective of assigning staff and supervisors to the same unit day-to-day.

- **Captains.** Steady staffing rates for captains ranged between 58% and 82% each month, with an average for the Monitoring Period of 67%. These performance levels are similar to the previous Monitoring Period.

- **Officers.** Steady staffing rates for officers ranged between 68% and 78% each month, with an average for the Monitoring Period of 71%. These performance levels are similar to the previous Monitoring Period.

  - Deeper analysis of the data revealed that on days where posts were "steadily staffed," most of the time (64%), the post was worked by the assigned 4-day or 2-day staff. Posts were worked by staff assigned to the post on a different tour 24% of the time, and by staff normally assigned to

---

handwritten/corrected schedules, and thus the findings were not as reliable as they are now. For these reasons, comparisons between the results of the 2021 audits and the current audits are not advised.

[250] Due to short staffing, the Unit Manager is sometimes shift reduced to work as the Tour Commander, but also reportedly also functions as the Unit Manager during those times (e.g., continues to huddle with staff, meet with PICs and conducts frequent rounds to the units covered by the Action Plan).

an adjacent post 12% of the time. These proportions are consistent with the previous Monitoring Period. Each of these meet the core goals of steady staffing—knowing the unit's daily schedule and being familiar with both the individuals assigned to the unit and the other staff assigned.

- Because of the relatively small number of captains' posts (just one per building) and the small number of captains assigned, the performance level has more variation than that of the steady officers, which involve a much larger number of posts and staff.

| NCU's Steady Staffing Audit Results—Captains | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 19th MP | Jan 2025 | Feb 2025 | Mar 2025 | Apr 2025 | May 2025 | Jun 2025 | **20th MP Average** |
| Location | B2 | B2 | B2 | B2 | B3 | B3 | B2 | |
| # posts | 73% | 93 | 84 | 84 | ~ | 93 | 90 | 67% |
| % Steady | | 74% | 58% | 69% | ~ | 82% | 54% | |
| NCU's Steady Staffing Audit Results—Officers | | | | | | | |
| | 19th MP | Jan 2025 | Feb 2025 | Mar 2025 | Apr 2025 | May 2025 | Jun 2025 | **20th MP Average** |
| Location | B2 | B2 | B2 | B2 | B3 | B3 | B2 | |
| # posts | 72% | 837 | 756 | 756 | ~ | 744 | 810 | 71% |
| % Steady | | 71% | 78% | 68% | ~ | 68% | 71% | |
| *Results are not reported for April 2025 because it was later determined that the auditor did not have a current roster of the staff who had been steadily assigned to Building 3, so the results were not accurate.* | | | | | | | |

NCU also tracks the reason why the post was not worked by the steady captain or officer, separating those which NCU considers to be "within the facility's control" (*e.g.*, assigned captain or staff was directed to work on a different housing unit, or auditor was unable to determine who worked based on data entered into InTime ) and "not within the facility's control" (*e.g.*, training, mutuals, sick, time due, personal emergency, etc.). This data provides useful insight into various dynamics that could be tackled to increase the consistency of staffing in the RNDC Plan units.

- **Captains**. Few interruptions to the consistent assignment of staff were caused by Tour Commanders directing the assigned captain to work elsewhere (an average of only 7% per month)

- **Officers**. Very few interruptions to the consistent assignment of staff are caused by Tour Commanders directing the assigned staff to work elsewhere (an average of only 2% per month).

- These results indicate that RNDC is adequately protecting the steady staffing goal of the RNDC Plan, which is particularly impressive given the problems with staff absenteeism that have plagued the facility at large. Protecting the staff assigned to the designated units from deployment elsewhere is particularly critical given that the failure to do so was one of the core factors that undermined the Department's previous attempt to address the requirements of this provision.

- In addition, if the data captured by InTime were more straightforward and easily extracted, the proportion of "Could Not Determine" (an average of 8% per month for officers) would decrease and it is possible that the "% Steady" statistic would be even higher. The Department is encouraged to continue to address the usability and accuracy of InTime data.

| Facility-Controlled Reasons that Assigned Staff Did Not Work Post—Captains | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 19th MP | Jan 25 | Feb 25 | Mar 25 | Apr 25 | May 25 | Jun 25 | **20th MP** |
| Location | | B2 | B2 | B2 | B3 | B3 | B2 | |
| # posts | | 93 | 84 | 84 | ~ | 93 | 90 | |
| Could Not Determine | 12% | ~ | ~ | 2% | ~ | ~ | 10% | 2% |
| Assigned Elsewhere | 3% | 3% | 17% | 5% | ~ | ~ | 8% | 7% |
| Facility-Controlled Reasons that Assigned Staff Did Not Work Post—Officers | | | | | | | | |
| | 19th MP | Jan 25 | Feb 25 | Mar 25 | Apr 25 | May 25 | Jun 25 | **20th MP** |
| Location | | B2 | B2 | B2 | B3 | B3 | B2 | |
| # posts | | 837 | 756 | 756 | ~ | 744 | 810 | |
| Could Not Determine | 14% | 9% | 9% | 8% | ~ | 5% | 10% | 8% |
| Assigned Elsewhere | 1% | 1% | 1% | 2% | ~ | 4% | 1% | 2% |

The table below shows the proportion of posts that were not worked by the steady staff for reasons NCU considered to be "outside the facility's control." For the most part, these include reasons that the captain or officer did not come to work (*e.g.*, mutual/shift trading, leave,

sick, personal emergency and AWOL) and the downstream effects (*e.g.*, Time Due and 10-hour exemptions that protects staff who have already worked a double shift).

- **Captains**. Collectively, these reasons impacted about 18% of the posts reviewed. In about 4% of the posts reviewed, the steady captain was not permitted to work their assigned shift because of the 10-hour exemption that protects staff who have already worked a double shift.

- **Officers**. Collectively, these reasons impacted about 13% of the posts reviewed. In about 4% of the posts reviewed, the steady staff was not permitted to work their assigned shift because of the 10-hour exemption that protects staff who have already worked a double shift.

- These two dynamics (staff who did not come to work, and the relief provided to staff who work overtime) are intertwined with the Department's efforts to address staff absenteeism and should decrease as the Department adopts effective strategies in this area.

| Dynamics Influencing Steady Staffing that NCU Considers Outside Facility Control—Captains | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 19th MP | Jan 25 | Feb 25 | Mar 25 | Apr 25 | May 25 | Jun 25 | 20th MP |
| Location | | B2 | B2 | B2 | B3 | B3 | B2 | |
| # posts | | 93 | 84 | 84 | ~ | 93 | 90 | |
| Mutual | 3% | ~ | 6% | 2% | ~ | ~ | 6% | 3% |
| Leave | 1% | ~ | ~ | ~ | ~ | ~ | 4% | 1% |
| Sick | ~ | 4% | 2% | 10% | ~ | 4% | ~ | 4% |
| Personal Emergency | 1% | ~ | ~ | ~ | ~ | ~ | 2% | <1% |
| AWOL | <1% | 1% | ~ | ~ | ~ | ~ | ~ | <1% |
| Time Due | ~ | 1% | 1% | 1% | ~ | ~ | ~ | <1% |
| 10-hour Exemption | 2% | 5% | ~ | 7% | ~ | 1% | 7% | 4% |
| Vacation | 3% | 11% | 16% | ~ | ~ | 11% | 9% | 9% |
| Dynamics Influencing Steady Staffing that NCU Considers Outside Facility Control—Officers | | | | | | | | |
| | 19th MP | Jan 25 | Feb 25 | Mar 25 | Apr 25 | May 25 | Jun 25 | 20th MP |
| Location | | B2 | B2 | B2 | B3 | B3 | B2 | |
| # posts | | 837 | 756 | 756 | ~ | 744 | 810 | |
| Mutual | 3% | 2% | 2% | 2% | ~ | 3% | 3% | 2% |
| Leave | 3% | 10% | 4% | 4% | ~ | 5% | 5% | 6% |

| Sick | 1% | 3% | 1% | 3% | ~ | 3% | 3% | 3% |
| Personal Emergency | 1% | 2% | 1% | 1% | ~ | 2% | 1% | 1% |
| AWOL | 1% | <1% | <1% | <1% | ~ | 1% | <1% | <1% |
| Time Due | <1% | <1% | ~ | 1% | ~ | 1% | 1% | 1% |
| 10-hour Exemption | 4% | 3% | 3% | 6% | ~ | 5% | 5% | 4% |
| Vacation | 1% | 6% | 2% | 5% | ~ | 2% | 2% | 3% |

## Conclusion

Overall, the implementation of consistent staffing in the units under the RNDC Plan (*i.e.*, those where 18-year-olds are housed) remains solid, with about 70% of posts worked by the assigned staff on any given day (71% for officers and 67% for captains). This is an important achievement given the various problems that undermined the Department's previous attempt to address the requirements of this provision. Efforts to improve the accuracy/usability of InTime data and strategies to address staff absenteeism/overtime may result in an even higher proportion of staff working their assigned posts. To achieve Substantial Compliance with this provision, the Department must demonstrate a similar level of consistency across all areas targeted by the RNDC Plan (Buildings 2 & 3, MODs 1 & 2). RNDC reports that Unit Manager assignments for each area are being considered and that most of the posts in Building 3 and MODs 1 & 2 have been assigned to specific captains and officers, although Building 3 has only been audited once and the MODs have not yet been audited. In the next Monitoring Period, NCU is encouraged to alternate the areas audited each month to demonstrate that the consistency reported here can be demonstrated more broadly and over a longer period of time. The continued progress in this area is sufficient to maintain Partial Compliance. Given the overlapping requirements, progress on ¶ 17 of the Consent Judgment also reflects progress on § D., ¶ 1 of the First Remedial Order.

| COMPLIANCE RATING | **Consent Judgment § XV., ¶ 17. (18-year-olds)** Partial Compliance<br>**First Remedial Order § D., ¶ 1.** Partial Compliance |
|---|---|

| SCREENING & PROMOTIONS (CONSENT JUDGMENT § XII., ¶¶ 1-3) |
| --- |

*Consent Judgment § XII., ¶ 1. Promotions.* Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the

(a) [Use of Force history for the last 5 years]

(b) [Disciplinary history for the last 5 years]

(c) [ID Closing memos for incidents in the last 2 years]

(d) [Results of the review are documented]

*Consent Judgment § XII., ¶ 2.* DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

*Consent Judgment § XII., ¶ 3.* No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

*August 10, 2023 Order § I, ¶ 10. Revise Pre-Promotional Screening Policies and Procedures.* By, October 30, 2023, the Department, in consultation with the Monitor, shall revise its pre-promotional screening policies and procedures to address the issues identified by the Monitor in each of its Court filings in 2023.

Strong leadership and supervision are crucial to the Department's efforts to reform the agency. The requirements of Consent Judgment § XII, ¶¶ 1-3 are designed to ensure that those staff selected for promotion to supervisory ranks are appropriately screened for selection. The requirements of the First Remedial Order (dkt. 350), § A, ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3(ii-iii) are designed to increase the number of supervisors working in the facilities and improve the quality of supervision, and these provisions are discussed separately in the compliance assessment for First Remedial Order (dkt. 350), § A, ¶ 4.

**Compliance Assessment Overview**

The first compliance assessment for Consent Judgment § XII, ¶ 1 was for the 3rd Monitoring Period (August to December 2016). At that time, the Department was found to be in Partial Compliance and remained so through the 4th Monitoring Period (January to June 2017). The Department was found in Substantial Compliance from the 5th Monitoring Period (July to

December 2017) through the 12th Monitoring Period (January to June 2021).[251] The Department was found in Partial Compliance in the 15th Monitoring Period (July to December 2022) and then moved to Non-Compliance from the 16th Monitoring Period (January to June 2023) through the 17th Monitoring Period (July to December 2023). The Department again achieved Partial Compliance in the 18th Monitoring Period (January to June 2024), which it has maintained through this 20th Monitoring Period (January to June 2025).

The first compliance assessment for Consent Judgment § XII, ¶ 2 occurred for the 3rd Monitoring Period (August to December 2016). At this time, the Department was found to be in Partial Compliance and remained so through the 4th Monitoring Period (January to June 2017). The Department achieved Substantial Compliance from the 5th Monitoring Period (July to December 2017) through the 9th Monitoring Period (July to December 2019), before being found in Non-Compliance in the 10th Monitoring Period (January to June 2020). The Department again achieved Substantial Compliance from the 11th Monitoring Period (July to December 2020) through the 12th Monitoring Period (January to June 2021).[252] The Department continued to be found in Substantial Compliance in the 15th Monitoring Period (July to December 2022). The Department moved into Partial Compliance from the 16th Monitoring Period (January to June 2023), which it has maintained through this 20th Monitoring Period (January to June 2025).

The first compliance assessment for Consent Judgment § XII, ¶ 3 occurred for the 3rd Monitoring Period (August to December 2016). At this time, the Department was found to be in Partial Compliance and remained so through the 4th Monitoring Period (January to June 2017). The Department achieved Substantial Compliance from the 5th Monitoring Period (July to December 2017) through the 9th Monitoring Period (July to December 2019), before being found in Partial Compliance in the 10th Monitoring Period (January to June 2020). The Department

---

[251] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74. A compliance rating for this provision was not awarded in the 14th Monitoring Period (January-June 2022) because no staff were promoted during this Monitoring Period.

[252] See the preceding footnote regarding why this provision was not rated for the 13th and 14th Monitoring Periods.

again achieved Substantial Compliance from the 11th Monitoring Period (July to December 2020) through the 12th Monitoring Period (January to June 2021).[253] The Department continued to be found in Substantial Compliance in the 15th Monitoring Period (July to December 2022) and then moved to Partial Compliance from the 16th Monitoring Period (January to June 2023) through the 18th Monitoring Period (January to June 2024). The Department again achieved Substantial Compliance in the 19th Monitoring Period (July to December 2024) and sustained it in this 20th Monitoring Period (January to June 2025).

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 10 as it requires the Department to revise and implement an updated pre-promotional screening policy, but a compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Promotion of Staff**

The Monitoring Team continues to emphasize that the staff the Department chooses to promote sends a message about the leadership's values and the culture it intends to cultivate and promote, and their behavior sets an example for officers.[254] Given the impact that promotion selections have on the overall departmental culture, the Monitoring Team closely reviews the screening materials and scrutinizes the basis for promoting staff throughout the Department. Active, effective supervision is fundamental to the changes in departmental culture and practice that are needed to effectuate the reforms required by the *Nunez* Court Orders. The long-standing supervisory void— in both number and aptitude— is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to its security operation.[255]

This compliance assessment covers the following: the number of staff promoted since 2017, the status of the Department's revision of the pre-promotional screening policy, a summary

---

[253] See the preceding footnote regarding why this provision was not rated for the 13th and 14th Monitoring Periods.

[254] As discussed in detail in the Monitor's October 28, 2019 Report (dkt. 332) at pg. 199; the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 210-216; the Monitor's July 10, 2023 Report (dkt. 557) at pgs. 74-77; the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 78-86; the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 9, 68 and 146; and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 61 and 160-161.

[255] *See* the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 26-28 for further discussion of the aspects contributing to the Department's supervisory deficit.

of all staff promoted from January to June 2025, and the Department's compliance with the screening process for these individuals.

### Overview of Staff Promotions from January 2017 to June 2025

The Department promoted the following number of staff to each rank through June 30, 2025:[256]

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Jan-Jun 2025 |
|---|---|---|---|---|---|---|---|---|---|
| Captains | 181 | 97 | 0 | 0 | 0 | 0 | 26 | 50 | 0 |
| ADWs | 4 | 13 | 3 | 35 | 0 | 26 | 10 | 0 | 0 |
| Deputy Wardens | 5 | 3 | 8 | 0 | 1 | 0 | 5 | 0 | 13 |
| Wardens | 2 | 5 | 1 | 2 | 4 | 0 | 0 | 3 | 1 |
| Chiefs | 3 | 2 | 3 | 0 | 4 | 0 | 0 | 2 | 0 |

### Screening Policy

The Department addresses the requirements of ¶¶ 1 to 3 in Directive 2230 "Pre-Promotional Assignment Procedures." The Directive has been revised a number of times since it was first updated in the Third Monitoring Period.[257] In March 2023, the Monitoring Team submitted feedback to the Department with recommended revisions to the policy as outlined in the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 80-81. After the Monitoring Team submitted these recommendations, the Department reported they would revise the policy before the next round of promotions but failed to do so and promoted additional staff.[258] As a result, the Court issued its August 10, 2023 Order (dkt. 564) requiring the Department to update its policy and procedures related to the pre-promotional screening process in consultation with and subject to the approval of the Monitor.

---

[256] Since June 30, 2025, there have been additional staff promoted to leadership roles, including staff promoted to the rank of Captain, ADW, and Warden. The Monitoring Team will provide more information about these promotions in the upcoming report on the 21st Monitoring Period.

[257] The Directive was previously revised in the 8th Monitoring Period (see Monitor's October 28, 2019 Report (dkt. 332) at pg. 198). The Directive was described more generally in the Monitor's April 3, 2017 Report (dkt. 295) at pgs. 190-192. Additional revisions were made in November 2022 (the 15th Monitoring Period) as described in the April 3, 2023 Report (dkt. 517) at pgs. 211-212 and in May 2023 (the 16th Monitoring Period) as described in the December 22, 2023 Report (dkt. 666) at pg. 80.

[258] See the Monitor's July 10, 2023 Report (dkt. 557) at pg. 162; the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 12-15, 47, 64-68, and 195-196; the Monitor's June 27, 2024 Report (dkt. 735) at pg. 3; and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 12, 56-61, 191, and 224-227.

The policy governing pre-promotional screening has not yet been revised pursuant to the Court's August 10, 2023 Order (dkt. 564). However, at the end of the current Monitoring Period, the Department prepared a comprehensive summary of all the revisions that need to be made to the policy. The Department consulted and sought feedback from the Monitoring Team on the work to be done. To help facilitate the revision process, following the close of the Monitoring Period, the Monitoring Team submitted feedback to the Department consolidating all the recommended revisions to the pre-promotional screening policy.[259] While the policy has not yet been revised, the Department has started to incorporate the Monitoring Team's recommendations into its screening process in *practice* as discussed in more detail below.

**Overview of Promotions in This Monitoring Period**

A total of 14 staff were promoted in this Monitoring Period. One staff member was promoted to Warden, and 13 staff were promoted to Deputy Warden. A brief summary of those promoted is outlined below:

- **Promotion to Warden:**[260] In March 2025, one individual was appointed to serve as the Warden. The Monitoring Team received all the screening materials and forms completed for this individual's promotion. All Divisions conducted pre-promotional screening, and this individual was recommended by all Divisions. Additionally, this individual did not have two Class A/B UOF violations within the past five years pursuant to the Consent Judgment, § XII, ¶ 2 nor pending UOF-related disciplinary charges pursuant to the Consent Judgment, § XII, ¶ 3. Prior to the promotion, the individual was not formally interviewed by the Promotional Board or Commissioner pursuant to the Department's pre-promotional screening policy, however these interviews are not required by the Consent Judgment.

---

[259] The Monitoring Team's March 2023 and July 2025 recommendations to improve practice include recommendations that were made for many years prior to March 2023 and July 2025. Some of the March 2023 and July 2025 recommendations for improved practice were previously addressed for a short period of time and then the prior practice re-emerged, while other recommendations for improved practice were never addressed and so the concerning practices continued unabated. *See* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 80-81 and the Monitor's November 22, 2024 Report (dkt. 803) at pgs. 162-164.

[260] The requirements for promoting a staff member to Warden under the current screening policy are described in the Monitor's April 18, 2024 Report (dkt. 706) at pg. 149.

- **Promotions to Deputy Warden:** In March 2025, 13 individuals were appointed to the rank of Deputy Warden. The Monitoring Team received all the screening materials and forms completed for these individuals' promotions. All Divisions conducted pre-promotional screening, and 10 of the 13 individuals were recommended by all Divisions. Three candidates were not recommended for promotion by one Division. The Monitoring Team reviewed the disciplinary histories of these individuals and DOC provided the Monitoring Team with the basis for electing to promote each of these individuals despite the recommendation not to promote, all of which appeared reasonable. None of the 13 staff had two Class A/B UOF violations within the past five years pursuant to the Consent Judgment, § XII, ¶ 2 nor pending UOF-related disciplinary charges pursuant to the Consent Judgment, § XII, ¶ 3.

**Assessment of Screening Materials**

The screening requirements of the Consent Judgment were developed to guide the Department's identification of Supervisors with the proper experience and performance. In particular, the Consent Judgment requires the Department to consider a staff member's use of force and disciplinary history (¶ 1(a)-(d)) and mandates that staff members may not be promoted if they have guilty findings on certain violations (¶ 2)[261] or pending UOF disciplinary charges (¶ 3). The promotion process itself is guided by multiple factors and is depicted in the Monitor's April 3, 2024 Report (dkt. 517) at Appendix C (Flowchart of Promotions Process).

---

[261] Violations of Consent Judgment § XII. Screening & Assignment of Staff, ¶ 2 are herein referred to as "2-in-5" violations. According to this provision, staff may not be promoted if they have been found guilty of certain violations twice within five years unless the Commissioner finds that there are exceptional circumstances that merit their promotion.

**Review of Candidates (¶ 1)**

The Monitoring Team's review of the screening materials for the 14 staff promoted during this Monitoring Period satisfied the requirements of the "Review" as defined by ¶ 1. All 14 staff were screened close in time to their date of promotion.

Even though the Department has not yet formally revised its policy, it did incorporate some of the Monitoring Team's recommendations from the March 2023 feedback into its pre-promotional screening during this Monitoring Period as described below:[262]

- **Document the Basis for Staff Promoted with Negative Recommendations from a Division**. The Monitoring Team recommended that any candidate who is not recommended for promotion on one or more screening forms be appropriately scrutinized and, if the Department determines that they should be promoted, that appropriate information is available for Monitoring Team's review. It must be emphasized that because someone was not recommended for promotion does not mean that they should be automatically disqualified from promotion. However, it does require greater scrutiny, and therefore, the Monitoring Team has requested the Department provide the basis for promotion when promoting staff with negative recommendations. The Department provided the Monitoring Team with its reasonable basis for electing to promote each of the three individuals that were not recommended by one Division during the screening process.

- **Review Personnel Determination Review ("PDR") Records**. The Monitoring Team recommended that the Department should designate a specific Division to conduct a holistic review of PDR records. The Department reported the PDR records were evaluated for staff promoted during this Monitoring Period and documented the findings.

- **Consult Both ID Units**. The Monitoring Team recommended that the Department should consult with both the ID Special Investigations Unit ("SIU") and the ID UOF Unit in future pre-promotional screening processes and document the review and

---

[262] These recommendations were also incorporated into the Department's pre-promotional screening for staff promoted in the 18th and 19th Monitoring Periods as described in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 163-164 and the Monitor's May 22, 2025 (dkt. 850) at pgs. 116-118.

recommendations of both units. The Department reported that both ID and SIU were consulted as part of the screening process in this Monitoring Period.

- **Conduct a Holistic 2-in-5 Assessment**. The Monitoring Team recommended that the Department designate a central person or Division to evaluate PDRs, Command Disciplines ("CDs"), and Memorandum of Complaint ("MOC") charges together when doing the 2-in-5 assessment. The Legal Division conducted and documented this holistic 2-in-5 assessment as part of the completed screening process in this Monitoring Period.

- **Comply with Directive 2230 when Conducting Pre-Promotional Screening**. The Monitoring Team recommended the Department comply with its own pre-promotional screening policies and procedures. In this Monitoring Period, while most requirements of the policy were followed, one staff member was promoted to Warden without undergoing interviews with both a Promotions Board and the Commissioner as required under the current policy. Given that this individual had served as an Acting Warden prior to their promotion, the need to explore their qualifications and methodology through a formal interview process is likely less critical given their demonstrated ability to serve in the role. That said, it is important for DOC to ensure it follows its own policies and procedures.

Overall, the Department has taken steps to address the Monitoring Team's recommendations. It is critical for the Department to revise its policies and procedures and ensure that the policy is followed, and the screening process is conducted with integrity in order to achieve Substantial Compliance.

## Disciplinary History (¶ 2)

Staff members may not be promoted if they have been found guilty of certain violations twice within five years unless the Commissioner finds that there are exceptional circumstances that merit promotion. The Monitoring Team has previously reported on concerns about this

process.[263] The Legal Division has taken steps to improve this process (as discussed above).[264] The 2-in-5 assessments for the 14 staff promoted included Negotiated Plea Agreements ("NPAs"), PDRs, and CDs. None of the staff promoted in this Monitoring Period met this threshold for exclusion. The Monitoring Team's review of available records confirmed this finding. This 2-in-5 assessment is an important step forward in improving the pre-promotional screening process, but the policy must be revised to ensure the holistic 2-in-5 assessment is always completed in practice going forward.

The Department remains in Partial Compliance with this provision. While steps have been taken to conduct a holistic 2-in-5 assessment during the pre-promotional screening process, the Department must also revise its policy to include the 2-in-5 assessment in order to achieve Substantial Compliance with this provision.

### Pending Disciplinary Matters (¶ 3)

The Department's screening process for promotion assesses whether the candidates have pending discipline for use of force related misconduct. At the time of promotion, none of the 14 staff promoted in this Monitoring Period had pending disciplinary charges. Accordingly, the Department is in Substantial Compliance with this provision.

---

[263] These concerns are explained in further detail in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 212-215, Monitor's December 22, 2023 Report (dkt. 666) at pg. 85, and Monitor's April 18, 2024 Report (dkt. 706) at pgs. 150-151.

[264] In the 19th Monitoring Period, the Legal Division conducted a holistic 2-in-5 assessment for the first time since the Monitoring Team's March 2023 feedback was submitted. *See* the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 117-118.

**<u>Conclusion</u>**

The screening process in this Monitoring Period reflects sustained improvements taken by the Department to conduct its pre-promotional screening process with increased fidelity and to address the Monitoring Team's recommendations and the requirements of the *Nunez* Court Orders. However, the Department must update its policies and procedures, pursuant to the August 10, 2023 Order (dkt. 564), to ensure they reflect the requirements of the *Nunez* Court Orders and so the screening process is conducted consistently and with fidelity.

| COMPLIANCE RATING | **Consent Judgment § XII., ¶ 1.** Partial Compliance<br>**Consent Judgment § XII., ¶ 2.** Partial Compliance<br>**Consent Judgment § XII., ¶ 3.** Substantial Compliance |
|---|---|

**SUPERVISION OF CAPTAINS (FIRST REMEDIAL ORDER § A., ¶ 4 AND ACTION PLAN § C., ¶ 3 (II-III))**

*First Remedial Order ¶ 4. Supervision of Captains.* The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned and shall be subject to the approval of the Monitor.

    i.    Within 60 days of the Order Date, RNDC, and at least two other Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.

    ii.    Within 120 days of the Order Date, at least three additional Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.

    iii.    By December 31, 2020, all Facilities shall satisfy the requirements of this provision.

*Action Plan § C., ¶ 3(ii). Increased Assignment of Captains in the Facility.* Complete a full evaluation of the assignment of all Captains and develop and implement a plan to prioritize assignment of Captains to supervise housing units to increase Captain presence on housing units.

*Action Plan § C., ¶ 3(iii). Improved Supervision of Captains.* Substantially increase the number of Assistant Deputy Wardens currently assigned to the facilities or a reasonable alternative to ensure that there is adequate supervision of Captains.

This provision of the First Remedial Order (dkt. 350), § A., ¶ 4, in conjunction with Action Plan (dkt. 465), § C, ¶ 3 (ii-iii), requires the Department to improve staff supervision by promoting and deploying additional ADWs within the facilities to better supervise captains. The goal of these provisions is to ensure that captains are properly managed, coached, and guided in order to elevate their skill set, so that they in turn better supervise the officers on the housing units. Thus, an assessment of adequate supervision requires an examination of both layers of supervision — ADWs and captains. The Department's inability to achieve substantial compliance with this provision and other provisions related to its overall management resulted in additional remedial relief, including two provisions in the Action Plan (dkt. 465) (§ C, ¶ 3 (ii-iii)) requiring an increase in the number of captains and ADWs assigned to the facilities. Action Plan (dkt. 465), § C, ¶ 3 (ii) requires the Department to evaluate the assignments of all Captains and to implement a plan prioritizing captains' assignments to supervise housing units in the facilities. In addition, Action Plan (dkt. 465), § C, ¶ 3 (iii) further requires the Department to increase the number of ADWs assigned to the facilities to ensure captains are adequately supervised.

## Compliance Assessment Overview

Compliance with the First Remedial Order (dkt. 350), § A., ¶ 4 was first assessed in the 11th Monitoring Period (July to December 2020), during which the Department was found in Partial Compliance. The compliance assessment then regressed to Non-Compliance for the 12th and 14th Monitoring Periods,[265] before it was placed back in Partial Compliance in the 15th Monitoring Period. However, the compliance assessment again regressed back to Non-Compliance in the 16th Monitoring Period (January to June 2023) and has since remained in Non-Compliance. Until this Monitoring Period, the Monitoring Team provided an update on the Department's efforts to achieve compliance with Action Plan (dkt. 465), § C, ¶¶ 3 (ii) and (iii), but did not provide a compliance rating because they were not one of the select group of provisions defined by Action Plan (dkt. 465), § G, ¶ 5(b) for which the Monitoring Team was required to do so. Beginning in this Monitoring Period, a compliance rating will now be provided for these provisions pursuant to the Court's July 10, 2025 Order (dkt. 879).

The Court's 2024 Contempt Order (dkt. 803) found Defendants in contempt for failing to comply with the First Remedial Order (dkt. 350), ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3 (ii-iii). The Court explained the basis for its finding at pgs. 26 to 31 in section "Failure to Adequately Supervise Staff and Facility Leadership" of the Order.

For the current Monitoring Period, the Department remains in Non-Compliance with First Remedial Order (dkt. 350) § A., ¶ 4 as well as Action Plan (dkt. 465), § C, ¶ 3 (ii-iii).

## Goals of Supervision

Changing staff practice will require an infusion of correctional expertise in a form that reaches more broadly, deeply, and consistently into staff practice than facility leadership has been able to accomplish to date. Improving staff practice requires not only an appropriate number of supervisors but also supervisors who provide *quality* supervision. Improved practice

---

[265] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

by line staff requires ongoing, direct intervention by well-trained, competent supervisors—guiding and correcting staff practice in the moment as situations arise. Increasing staff's ability and willingness to utilize proper security practices rests on the supervisors' ability and willingness to confront poor practices and teach new ones. Definitive steps to ensure that staff are available in sufficient numbers and are properly assigned are important. It is equally critical that staff *actually do their jobs*, which requires thorough training, skill mastery, and the confidence to implement the expected practices and to enforce rules. Only with this type of hands-on supervision will the Department be able to confront and break through staff's inability, resistance, and/or unwillingness to take necessary actions.

## Organizational Structure and Number of Supervisors

The Monitoring Team has long reported its concerns that the Department's organizational structure may impede the ability to provide effective supervision. Most correctional systems have three supervisor ranks, but this Department has only two (Assistant Deputy Warden and Captain). Because most ADWs serve as Tour Commanders, in practice, captains are the only uniform supervisors routinely available to provide hands-on oversight of officers, and captains are not actively supervised by ADWs. In most systems, an additional supervisory rank fills these gaps. Without this additional level of supervision, captains are left without the necessary active supervision to develop the skills needed for their roles.

The problem presented by the Department's truncated chain of command is further exacerbated by the insufficient number of individuals holding the two ranks. Many of the facilities' leaders have reported during routine updates to the Monitoring Team that they believe they have insufficient numbers of captains, which is negatively impacting their operations. Two tables that identify the number and assignment of ADWs and captains at specific points in time from July 18, 2020 to June 21, 2025 are included in Appendix F, Tables 1 and 2. As of the end of this Monitoring Period, the number of supervisors remained insufficient to provide the type of *intensive* supervision—throughout the chain of command—that is needed to elevate officers' skills, which is similar to the findings of the previous four Monitoring Periods.[266]

---

[266] *See* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 15-16, the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 64-68, the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 56-61, and the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 120-127.

- **ADW Assignments**. Both the First Remedial Order (dkt. 350), § A, ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3 (iii) require an increase in the number of ADWs. While the number of available ADWs assigned to the facilities has increased during certain periods of time, the number of ADWs currently assigned to the facilities (n=46) is 12% lower than when the First Remedial Order went into effect (n=52 as of July 18, 2020) and 6% lower than when the Action Plan went into effect (n= 49 as of June 18, 2022). This is notable given that the current number of ADWs available Department-wide (n=69) is 5% higher than when the First Remedial Order went into effect (n=66). In other words, the overall number of ADWs in the Department has increased, but the number of ADWs in the facilities has not. In fact, the proportion of ADWs assigned to the facilities decreased from 79% as of July 18, 2020, to 67% as of June 21, 2025. This is the lowest proportion of ADWs assigned to the facilities since July 2020. Between the last Monitoring Period and this Monitoring Period, there was also a decrease of over 20% in the number of available ADWs in both the facilities (n=60 and 46, respectively) and Department-wide (n=87 and 69, respectively).

- **Captain Assignments**. Since 2020, both the number and proportion of captains assigned to work in the facilities has steadily decreased. The number of captains decreased by 37% (from 558 as of July 18, 2020, to 350 as of June 21, 2025) and the proportion of captains assigned to the facilities decreased slightly (from 69% as of July 18, 2020, to 66% as of June 21, 2025). In other words, one-third of all available captains are *not* assigned to facilities or court commands. This is one of the lowest proportions of captains assigned to the facilities since July 2020.

The overall dearth of supervisors will continue to require significant focus and attention in order to both obtain the necessary numbers and, crucially, to ensure the individuals have the requisite skill set to properly supervise their subordinates.

## Scheduling

Since 2023, the Department has maintained the revised scheduling process for DWs and ADWs, which addressed prior scheduling issues.[267] In particular, ADWs' schedules now

---

[267] The prior issues regarding scheduling were discussed in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 32-43; the Monitor's October 28, 2022 (dkt. 472) at pg. 35; the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 17-

distribute the number of ADWs more evenly across the three tours and weekdays/weekends. In addition, the DWs are scheduled consistently, including on the weekends,[268] however they are not scheduled to work overnight.[269]

While it is a notable improvement that there is more evenly distributed supervision across the daily and weekly schedules, there is still no consistent scheduling of ADWs and captains within the facilities, which means that the same supervisors are not consistently working with the same staff. While many ADWs are consistently assigned to the same tours, many captains work different tours and housing units on each shift. This lack of continuity impedes the supervisors' abilities to serve as effective mentors or follow through on resolutions to staff and PIC concerns. This further compounds the challenges presented by the insufficient number of supervisors assigned to the facilities.

**Training for Supervisors**

Ensuring that supervisors have an appropriate skill set to supervise their subordinates begins with training those who are selected for promotion. The Monitoring Team has worked closely with the Department's Training Division over the last three Monitoring Periods to finalize a number of training programs for supervisors. The Monitoring Team has found significant improvement in the quality of the training programs and Department's engagement with the Monitoring Team than in the past.[270] Below is an update on the training in this Monitoring Period. In addition, at the end of this Monitoring Period, the Department reported that it is in the process of retaining a consulting group to conduct an assessment of supervisors and support training and guidance of supervisors.[271]

---

22; the Monitor's October 5, 2023 Report (dkt. 581) at pgs. 9-10; the Monitor's April 18, 2024 Report (dkt. 706) at pg. 16; and the Monitor's May 24, 2024 Report (dkt. 712) at pg. 15.

[268] Prior to the scheduling changes made by the former Staffing Manager, DWs were not scheduled to work on weekends.

[269] More details regarding supervisory scheduling are provided in the Monitor's April 18, 2024 Report (dkt. 706) at pg. 66; the Monitor's November 22, 2024 Report (dkt. 802) at pg. 58; and the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 123-124. While many of these prior reports describe scheduling processes that were changed or implemented by the prior Staffing Manager, the Department reports that these processes remain in place under the current Staffing Manager.

[270] See, for example, Monitor's July 10, 2023 Report (dkt. 557) at pgs. 71-83.

[271] This initiative is still in the early stages and the group hasn't been formally retained.

- **In-Service Captain Leadership Training**: In the 18th Monitoring Period, the Department's Training and Development Division, in collaboration with the Monitoring Team, developed a Captains Leadership Training in response to concerns raised during exit interviews by resigning officers about strained relationships and a lack of support from captains. The training is a well-structured leadership program that covers core skills, uses practical and interactive materials, and incorporates Monitoring Team feedback to address captains' leadership gaps. The Department began conducting the Captain's In-Service Leadership Training at the latter end of 2024,[272] and by the end of the current Monitoring Period, 30% of captains have completed each of the three lesson plans. The Department reports the slow completion of the training is due to staffing challenges. Separately, the Department reported that a new Captain class began in October 2025, entered on-the-job training in November 2025, and graduated in December 2025. Members of this cohort received the recently developed pre-promotional Captain's training prior to assuming their roles.

- **Pre-Promotional Deputy Warden Training**: In this Monitoring Period, the Monitoring Team worked closely with the Training and Development Division to finalize and roll out the pre-promotional training for Deputy Wardens. While the training was developed on an accelerated timeline, the Training Division significantly strengthened the program by adding case studies, sample reports, and focused guidance on supervisory responsibilities tailored to the Deputy Wardens within this Department, in response to feedback from the Monitoring Team. The final 10-day course evolved from a theoretical framework into an action-oriented curriculum covering leadership development, operational oversight, crisis response, and administrative management. The training rolled out on March 10, 2025, and all 14 pre-promotional Deputy Wardens completed the training.

- **Pre-Promotional ADW Training:** The Monitoring Team also worked with the Training Division to develop a new pre-promotional ADW Training program. The ADW training program presents a significant opportunity for first-line managers. With over thirty modules, the curriculum strikes a balance between operational instruction, such as

---

[272] The captains' pre-promotional training curricula was also discussed in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 60-61.

logbook management, case management systems, data integrity, and incident response, and leadership development through frameworks like servant leadership and team building. Many lesson plans incorporate interactive activities, real world case studies, and applied exercises, ensuring that ADWs not only understand theory but can also connect it to daily practice. The Monitoring Team's feedback on the material focused on making the training more practical, precise, and sustainable. The feedback frequently emphasized the need for consistency with Department directives and correctional best practices, particularly in modules like Incident Command, where outdated or conflicting guidance risked confusion. Collectively, the Monitoring Team's feedback was intended to ensure that the program continues to evolve into a practical, policy-compliant, and sustainable foundation for effective leadership. The training rolled out on August 3, 2025, and 23 members of service completed the training. While this program is pre-promotional in nature, the Monitoring Team notes that the scope of responsibility and operational stress placed on ADWs suggests that targeted in-service training for incumbent ADWs may also be beneficial.

## Quality of Supervision

The routine review of management of the housing units demonstrates a lack of sufficient supervision. Basic correctional practices are simply not administered routinely. Currently, the supervisory ranks are unprepared to support the weight of the strategies that place them at the center of officers' skill development.[273] Many of those holding the ranks of ADW and captain have only marginal competence in the skills necessary to provide *effective* supervision. Compounding the problem is too few supervisors in the rank of captain and ADW.

The dynamic between captains and officers is crucial for maintaining order and security within housing areas, yet the dynamic appears fundamentally compromised in this Department. Captains must embody the role of mentors, attentively listen to frontline staff, and actively work towards resolving issues, thereby fostering a supportive environment and effective operation. Unfortunately, the relationship between officers and captains is too often described in ways

---

[273] This section incorporates the discussion from the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 25-28, the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 14-16, the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 64-68, the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 56-61, and the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 120-127.

suggesting that it subverts progress rather than accelerates it. Captains often appear to be either unclear about their responsibilities or fail to embrace them according to reports from facility leadership and staff and as observed during the Monitoring Team's work on site. This often leads to a superficial execution of duties, where captains do not appear to routinely conduct substantive tours or, in some instances, fail to conduct tours at all. Too often, captains conduct tours but often fail to tour the whole unit or address obvious issues within their assigned housing areas. For example, officers report concerns such as incarcerated individuals' frustration over inadequate supplies or service disruptions, but captains do not investigate the underlying causes nor seek solutions, choosing instead to move on to the next task. This abdication of responsibility leaves officers feeling unsupported and disinclined to fulfill their own duties.

In addition to the captains' need for intensive guidance, ADWs also need substantial and quality coaching, supervision, and mentoring from their superiors to develop into the type of supervisor that is so sorely needed in this Department. The task of cultivating the ADWs will largely fall to the Deputy Wardens and Wardens/Assistant Commissioners in each command, which brings yet another layer of complexity to the supervision problem and the task of reforming the Department's practices.

## Conclusion

Overall, the Department continues to struggle with adequate supervision. The Department has taken important steps in improving and refining its training programs for supervisors and actively engaging the Monitoring Team in development of reasonable training programs. However, the decreasing number and proportion of ADWs assigned to facilities is compounding the Department's long-standing inadequacies regarding staff supervision. The lack of quality staff supervision is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to basic security practices and operations. Yet accountability for inadequate supervision at all levels remains elusive as discussed in more detail in the "Accountability for High Level Supervisors" section in the compliance assessment for Consent Judgment, § VIII., ¶ 1 and § VIII., ¶ 3 (c). As a result, the Department remains in Non-Compliance with these provisions.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § A., ¶ 4.** Non-Compliance<br>**Action Plan § C., ¶ 3(ii).** Non-Compliance<br>**Action Plan § C., ¶ 3(iii).** Non-Compliance |

| IMPROVED ROUTINE TOURS (ACTION PLAN, § A., ¶1(D)) |
|---|
| _Action Plan, § A., ¶ 1(d). Improved Routine Tours_. The Department shall conduct routine tours, including, but not limited to, tours of the housing units every 30 minutes. The Department shall immediately institute improved practices to ensure that routine touring is occurring, including the use of the "tour" wand by Correction Officers during each tour conducted. The Office of the Commissioner shall audit the electronic records of tours conducted by uniform staff to ensure compliance with touring requirements. |

Routine and adequate touring of housing units is a fundamental component of sound correctional practice. For years, the Monitoring Team has found that officers and captains do not tour the units as often as required and that their tours are often not substantive or meaningful (_e.g._, they do not look into the cell door windows to verify the safety of the individual). Staff's failure to adequately tour the housing units has contributed to the units' overall state of dysfunction and to the high rates of unnecessary and excessive uses of force and serious acts of violence. The lack of adequate touring has also been identified as a contributing factor in several deaths in custody. As a result of the deficiencies in staff tours, the Action Plan includes requirements to improve routine housing unit tours § A, ¶ 1(d).

**Compliance Assessment Overview**

Until this Monitoring Period, the Monitoring Team provided updates on the Department's efforts to achieve compliance with Action Plan § A, ¶¶ 1(d), but did not provide a compliance rating because it was not one of the select group of provisions defined by Action Plan § G, ¶ 5(b) for which the Monitoring Team was required to do so.

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding on pg. 15 in section "Deaths in Custody" and on pg. 23 in section "Failure to Correct Failures in Security and Basic Correctional Practice" of the Order.

Beginning in this Monitoring Period, a compliance rating will now be provided for this provision pursuant to the Court's July 10, 2025 Order (dkt. 879). In this Monitoring Period there has been no meaningful progress in the Department's efforts to achieve compliance with this provision and they are found in Non-Compliance.

## Background

Staff must visually inspect the housing units, particularly when incarcerated individuals are confined to their cells, to ensure the welfare of people in custody, to respond to their concerns and to address any problems that arise. These tours should occur at regular intervals throughout each shift, every 30 minutes for officers and three times (each at least one hour apart) per 8-hour shift for captains. Since the inception of the Action Plan, even with its specific requirements related to housing unit tours, meaningful change in staff touring has not been observed.

## DOC's Assessment of Staff Tours

DOC has a number of ways through which it can assess whether staff tours occurred. First, staff are required to utilize tour wands to demonstrate that staff walked throughout the housing unit. These tour wands provide data regarding how frequently they are used by officers and captains. The Department and facility leadership also conduct quality assurance of this data. Finally, NCU's routine security audits also assess the use of tour wands and the quality of staff tours. Each of these initiatives is discussed in more detail below.

- **Utilization of Tour Wands by Facility Staff**. As part of the effort to ensure that touring occurs as required, the Department procured the Watch Tour system that includes tour wands, sensors installed in key locations on the housing units, and a software package to monitor the extent to which tours occur at the required frequency. Tour wands are used by officers working in housing units and captains assigned to housing units. Tour wand data simply confirms that the staff member moved throughout the unit and pressed the wand over the sensors, but it does not verify whether the tour actually occurred or was meaningful.

- **Tour Wand Data Analysis**. The tour wands can produce electronic information, but that basic data has not yet been maximized to develop a reliable quality assurance program about the actual performance level of staff. The data from the tour wands is available on a dashboard (developed by DOC) that can be viewed in real time by facility leadership.[274]

---

[274] An example of some of the information it produces can be found in Exhibits A and B to the Declaration of Captain Gamien Batchelor (dkt. 689-7). The functionality of the dashboard permits leadership to identify close in time whether or not staff walked through a housing unit as they should. Retrospectively, the dashboard also permits a visual inspection of the tours completed on a set of housing units for a particular day/shift (which are represented by a series of dots and Xs), although the dashboard is limited in terms of the lookback window because of the large

However, the Department is not able to produce aggregate data regarding the proportion of housing units that met the "target" number of tours on any given day/shift, nor does it compute other performance metrics. As a result, there is currently no reliable data to assess compliance over time and whether progress has been made or not. The Department reports that the Office of Management, Analysis and Planning ("OMAP"), in consultation with facility operations, has been developing an improved technique to aggregate tour wand data relating to performance on a daily basis for each housing area and will consult the Monitoring Team once it is developed. No concrete update has been provided since the Monitoring Team recommended that the Department improve its ability to assess this data in June 2024.

- **Quality Assurance of Tours by Department & Facility Leadership**. The Department also utilizes the data from the tour wands as part of a quality assurance initiative conducted by the Senior Deputy Commissioner's Office (and separate from the NCU audits) to determine if tours have occurred as required. To date, the Department's quality assurance program is inefficient, burdensome and does not produce results that support the overall goal of ensuring that tours occur as required. First, the overall management of this initiative has not had the consistent, sustained leadership needed to develop and implement an adequate quality assurance program.[275] The current quality assurance process is also cumbersome and time-consuming for both the SDC's team that conducts the audit and the facilities.[276] Additionally, the Department has not aggregated the

---

volume of data that must be processed. The dashboard also includes variables for whether the frequency of tours met the intended "target," the number of tours that were late, and the longest duration between tours.

[275] Since the tour wand auditing began in fall 2023, the management of this process has changed multiple times across at least three different offices (the Office of Commissioner, the Office of the Senior Deputy Commissioner, and the Office of the Deputy Commissioner of Facility Operations). Currently, the process has been managed by the Office of the Senior Deputy Commissioner ("SDC") since March 2024, however the leadership of the team under the SDC's office changed three times between March 2024-March 2025. DOC reported to the Monitoring Team that Captain Batchelor, who submitted a declaration to the Court on March 18, 2024 (dkt. 689-7) as the individual in charge of the Tour Wand Compliance Unit, was reassigned and no longer in charge of this unit. The Department then reported that an ADW was assigned to manage the unit, but this ADW was promoted and reassigned in March 2025. The Department reports that another captain, who previously worked on the tour wand auditing team underneath the supervision of the former ADW, has been assigned to manage the unit since March 2025.

[276] The Office of the SDC has a laborious process for reviewing the tour wand dashboard and creating a table containing an entry for every tour that identifies whether the tour was in compliance or not, which is then shared with each facility. Each facility then verifies each tour deemed "not in compliance" to determine whether the SDC audit's assessment is accurate, or if there were reasonable, mitigating factors that prevented the officer or captain

information developed in any way to determine the overall results of each audit or trends over time. The Department has reported that it intends to revise the current quality assurance program but has not done so yet.

- o In June 2024, the Monitoring Team shared a comprehensive written feedback with the Department that included recommendations for bringing greater efficiency, clarity and utility to its audit process so that the Department can produce valid metrics that assess compliance and progress over time and track and confirm any corrective action that may be taken for deficiencies. The Department has not substantively responded to this feedback, but it reported it is working to improve its data tracking and revising the quality assurance process and will consult the Monitoring Team on these changes once developed. Accordingly, the audits are still conducted the same way they have always been, and there is no concrete update in the development of a more efficient auditing process.

- **NCU Audits**. The NCU's random security audits of housing units are replete with examples of staff who were off post (and thus could not tour), who failed to tour, and who tapped the sensor with the tour wand but took no action to verify the individuals' safety inside of cells. The findings from these NCU audits are demonstrated in the table below. NCU's findings are consistent with the Monitoring Team's findings via observations of staff practice while on site and during its routine review of use of force incidents, violent incidents, and in-custody deaths.

| NCU Security Audits' Findings regarding Staff's Deficient Touring Practices *January 2022-June 2025* | | | | |
|---|---|---|---|---|
| **Date Audited** | **# of NCU Audits Completed** | **# of Audits that found Staff Off Post** | **# of Audits that found Staff Failed to Make All Required Tours** | **# of Audits that found Staff Failed to Conduct Meaningful Tours** |
| January-June 2022 | 59 | 42 (71%) | 17 (29%) | 14 (24%) |
| July-December 2022 | 37 | 32 (86%) | 10 (27%) | 7 (19%) |
| January-June 2023 | 19 | 14 (74%) | 7 (37%) | 6 (32%) |

from using the tour wand as required. Genetec surveillance video footage is often reviewed for this purpose, which is incredibly time consuming.

| NCU Security Audits' Findings regarding Staff's Deficient Touring Practices *January 2022-June 2025* | | | | |
|---|---|---|---|---|
| **Date Audited** | **# of NCU Audits Completed** | **# of Audits that found Staff Off Post** | **# of Audits that found Staff Failed to Make All Required Tours** | **# of Audits that found Staff Failed to Conduct Meaningful Tours** |
| July-December 2023 | 31 | 26 (84%) | 18 (58%) | 20 (65%) |
| January-June 2024 | 37 | 28 (76%) | 19 (51%) | 19 (51%) |
| July-December 2024 | 34 | 20 (59%) | 10 (29%) | 14 (41%) |
| January-June 2025 | 30 | 17 (57%) | 7 (23%) | 10 (33%) |

The Department's recordkeeping regarding staff's failure to tour, as described above, does not permit the development of aggregate data, in particular because most of the data is maintained in multiple Excel spreadsheets, logbooks, and/or is otherwise not amenable to aggregation. However, the NCU audits, corrective action (described below), and the Monitoring Team's routine discussions with facility leadership and assessment of incidents reinforces that touring is not occurring at the frequency or with the quality which is required.

**Corrective Action**

The Monitoring Team continues to review various disciplinary records produced by the Department, including the Excel spreadsheets tracking corrective interview referrals for staff identified through the tour wand auditing process, in order to identify discipline related to the failure to conduct meaningful housing unit tours.

The Monitoring Team has identified the following corrective action related to potentially deficient touring practices.[277]

- **Corrective Interview Referrals from the Quality Assurance Program**. As a result of the quality assurance program conducted by the Senior Deputy Commissioner's Office

---

[277] This summary is intended to update the information previously reported in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 76-79; the Monitor's May 24, 2024 Report (dkt. 712) at pgs. 7-14; the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 259-261; and the Monitor's March 22, 2025 Report (dkt. 850) at pgs. 131-133.

described above, 1,461 corrective interview referrals were *made* for staff who failed to complete all required tours during January-June 2025 (it is unknown whether they occurred). However, the quality assurance audits do not maintain data to confirm whether the recommended corrective interviews took place.

- **Rapid Reviews**. The following table demonstrates the corrective actions that facility leadership recommended, via Rapid Reviews, for staff's potentially deficient touring practices.

| Corrective Action for Deficient Touring *Recommended* via Rapid Reviews[278] *January 2022-June 2025* | | | | |
|---|---|---|---|---|
| **Date of UOF Incident** | **# of Staff Referred for Suspension** | **# of Staff Referred for Formal Charges** | **# of Staff Referred for a Command Discipline** | **# of Staff Referred for a Corrective Interview** |
| January-December 2022 | 1 | 0 | 3 | 1 |
| January-December 2023 | 0 | 4 | 17 | 10 |
| January-December 2024 | 0 | 2 | 18 | 6 |
| January-June 2025 | 1 | 0 | 10 | 6 |

- **Formal Discipline**. Between January 2022 and August 2025, the Department has brought 64 cases against 60 staff members for issues related to touring.[279] Of these 64 cases, 44 were resolved with an NPA, 10 were administratively filed, two had deferred prosecutions due to the resignation of the staff member, and eight remain pending.

- **Discipline for Touring Practices Related to In-Custody Deaths**. From January 2022 to June 2025, a total of 28 staff were disciplined due at least in part to deficiencies in their touring practices in cases where an individual died in custody. *See* Table 3 of Appendix C. Twenty-two staff members (two ADWs, eight captains, and 12 officers) were suspended. One officer was suspended and then terminated. Four officers were disciplined via NPA with the loss of compensation days and limited probation. An MOC for one officer was filed and remains pending. It is of course notable that the sheer number of staff disciplined for failures to tour related to deaths of individuals in custody

---

[278] This table only demonstrates *recommendations* made for corrective action via the Rapid Reviews. This data does not confirm whether the corrective action was carried out and conducted as recommended.

[279] Some of the cases include additional charges beyond those related to touring. For example, in one case, a staff member may be disciplined for both inadequate touring and a chemical agent violation.

illustrates just how commonplace touring deficiencies are within the Department and the harm that can and does result when staff fail to conduct meaningful tours.

Given the frequency with which touring deficiencies occur, and the frequency with which serious incidents occur from staffs' failure to conduct proper tours, a larger number of corrective actions would be expected.

## Conclusion & Next Steps

Overall, tours by officers and captains do not appear to be occurring as required and the current processes in place contribute little to the effort to improve staff practice. Further, given the frequency with which these deficiencies are observed, and the harm that flows from them, the number of corrective measures does not appear commensurate with the number of violations observed. It is critical that staff conduct tours as required. In the Monitoring Team's experience, this is an area in which active supervision of uniform staff would support a change in practice, and therefore tours by captains must be closely scrutinized as captains serve as role models for those staff working in the housing units. Officers often report that they do not feel adequately supported by their supervisors, so supervisors taking time to conduct quality tours of housing units would not only serve as a means of demonstrating improved practice to officers, but they can also be used to build rapport with their staff. The procedures currently used by the quality assurance program, while well-intended, must be reevaluated so that these resources are used in a manner that supports actual change in staff touring practices.

| Compliance Rating | Action Plan § A., ¶1(d). Non-Compliance |
|---|---|

| **FACILITY USE OF FORCE REVIEWS (FIRST REMEDIAL ORDER § A., ¶ 1)** |
|---|

> *First Remedial Order § A., ¶ 1. Use of Force Reviews.* Each Facility Warden (or designated Deputy Warden) shall promptly review all Use of Force Incidents occurring in the Facility to conduct an initial assessment of the incident and to determine whether any corrective action may be merited ("Use of Force Review"). The Department shall implement appropriate corrective action when the Facility Warden (or designated Deputy Warden) determines that corrective action is merited.
>
> i. The Department, in consultation with the Monitor, shall implement a process whereby the Use of Force Reviews are timely assessed by the Department's leadership in order to determine whether they are unbiased, reasonable, and adequate.
>
> ii. If a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline.

This provision requires facility leadership to conduct a close-in-time review of all use of force incidents ("Rapid Reviews" or "Use of Force Reviews"). Further, this provision requires the Department to routinely assess Rapid Reviews to identify any completed reviews that may be biased, unreasonable, or inadequate and address them with appropriate corrective action.

**Compliance Assessment Overview**

The first compliance assessment for First Remedial Order (dkt. 350), § A, ¶ 1 occurred for the 11th Monitoring Period (July to December 2020) and the Department was found to be in Partial Compliance, where it has remained through this 20th Monitoring Period (January to June 2025).[280]

**Background**

Rapid Reviews are intended to identify procedural violations, recommend corrective action for staff misconduct, and also identify incidents that could have been avoidable had staff made different choices in the moment. Close-in-time use of force reviews are an essential tool for improving staff practice: they allow facility leadership to identify poor practice and to provide feedback to staff while the circumstances surrounding their decision-making are still

---

[280] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

fresh in their minds. Both the Department and Monitoring Team rely on these findings to identify patterns and trends.

**Rapid Review Assessments of UOF Incidents**

During this Monitoring Period, all actual use of force incidents (n=3,562) were assessed via a Rapid Review, which found that 53% of incidents had some type of violation of the UOF or Chemical Agent policy. The findings of the Rapid Review can be found in Table 1 of Appendix D. These findings by facility leadership are consistent with the findings of ID and the Monitoring Team, which continue to find a high proportion of incidents involve violations of Department policy. While not all violations of policy necessarily reflect the use of unnecessary and excessive force, as discussed in other sections of this report, staff practice regarding the use of force remains an area of concern.

While the Rapid Reviews identify many issues, the Rapid Reviews do not identify all poor and/or dangerous practices and/or fail to acknowledge circumstances that indicated the incident was avoidable and the use of force was unnecessary. In particular, the Rapid Reviews most often fail to identify indicators that incidents were avoidable and explain how operational failures or staff misconduct contributed to incidents that may not have occurred had staff taken different actions.[281]

- **Avoidable Incidents**: In many cases, various security and operational issues and failures may have contributed to the need to use force, but *if* they had been addressed, the need for force likely could have been avoided. Identification of these incidents and issues is critical as they help to ensure that these practices can be abated and do not occur in the future. In this Monitoring Period, the Rapid Reviews found that 5% of the incidents were avoidable. This finding does not appear to identify all cases that may have been avoidable based on the Monitoring Team's review of ID's investigations and independent assessment of use of force incidents, which suggest that far more than 5% of incidents could have been

---

[281] To illustrate the common shortcomings that the Monitoring Team finds in Rapid Reviews, during this Monitoring Period, the Monitoring Team shared illustrative examples of incidents with the DC of Security that raised concerns about whether the Rapid Review sufficiently addressed the issues that could have been addressed during the initial review.

avoided.[282] Notably, the proportion of incidents identified as avoidable have decreased over time (*e.g.*, in 2021, 22% of incidents were found to be avoidable compared with 5% in January to June 2025). The Monitoring Team has not identified any material change in practice that would account for such a significant decrease, and the Monitoring Team's routine assessments of incidents continue to reveal incidents that were avoidable but not identified as such in the Rapid Reviews.

- **Unidentified Operational Failures and Staff Misconduct**: Rapid Reviews do not always identify various types of poor practice and violations, such as unnecessary or excessive use of chemical agents, use of painful escorts, failure to follow anticipated force protocols, and dangerous takedown techniques. As a result, there are missed opportunities to provide much needed coaching and/or immediate corrective action. The Rapid Reviews' deficiencies thus contribute to the persistence of the security and operational problems plaguing the jails, patterns of excessive and unnecessary uses of force, and the intransigence of the problematic culture.

- **Minor Violations**: The Rapid Reviews continue to cite violations for issues that do not appear relevant to the use of force or security, such as uniform violations. Given the issues currently facing the Department, the Monitoring Team has recommended that the reviews should focus on the salient and relevant violations that occur.

The lack of accountability for Facility Supervisors for ongoing operational failures remains stark. The Department reports that there was no accountability for facility leadership for any incomplete, inaccurate, unreasonable, or biased Rapid Reviews in this Monitoring Period (January-June 2025). The lack of accountability for ongoing operational and management

---

[282] Further exploration of avoidable incidents that were not identified in the Rapid Reviews is available in Table 8 in Appendix B. In this Monitoring Period, the Rapid Reviews determined that less than 8% of all uses of force involving unmanned posts were avoidable. This finding is dubious given the likelihood that if the post was staffed as it should have been, the need for force would likely have been avoided in more than 8% of those cases.

failures for supervisors (generally in the role of ADW and above) likely contributes to the fact that such issues persist.

## Corrective Action Recommendations from Rapid Review Assessments of UOF Incidents

The Monitoring Team has long encouraged the use of close-in-time corrective actions to address problematic conduct in order to support the overall effort to change practice. In response to identified problems with staff practice, Rapid Reviews can recommend various types of corrective action, including counseling (either 5003 or corrective interviews), re-training, suspension, referral to Early Intervention, Support and Supervision Unit ("E.I.S.S."), Correction Assistance Responses for Employees[283] ("C.A.R.E."), Command Discipline ("CD"), and a Memorandum of Complaint ("MOC"). In this Monitoring Period, the following number of corrective actions were recommended: 1,173 5003 Counseling; 913 Corrective Interviews; 771 command disciplines; 168 retraining, 32 MOCs, 24 suspensions, two referrals to E.I.S.S., two referrals to C.A.R.E., and five referrals for no inmate contact. The number of corrective action referrals for prior Monitoring Periods is included in Table 2 in Appendix D.

Since January 2021, 5003 counseling, corrective interviews, and command disciplines were the most frequently recommended corrective actions via Rapid Reviews. Combined, the referrals for these three types of corrective action made up about 90% of all corrective actions recommended via Rapid Reviews during each of the past nine Monitoring Periods. This Monitoring Period reflects the highest number (n=2,086) of counseling/corrective interviews recommended since the 12th Monitoring Period. The number and proportion of CDs recommended via Rapid Reviews has varied over the past nine Monitoring Periods, but this Monitoring Period reflects both one of the lowest *numbers* of CDs recommended (n=776) and

---

[283] C.A.R.E. serves as the Department's Wellness and Employment Assistance Program. C.A.R.E. employs two social workers as well as a chaplain and peer counselors who provide peer support to staff. The services of C.A.R.E. are available to all employees of the Department. The Department reports that the members of the unit are tasked with responding to and supporting staff generally in the day-to-day aspects of their work life as well as when unexpected situations including injuries or serious emergencies occur. C.A.R.E. also works with staff to address morale, productivity, and stress management, and provide support to staff experiencing a range of personal or family issues (*e.g.,* domestic violence, anxiety, family crisis, PTSD), job-related stressors, terminal illness, financial difficulties, and substance abuse issues. The C.A.R.E. Unit also regularly provides referrals to community resources as an additional source of support for employees. Staff may be referred to the C.A.R.E. use by a colleague or supervisor or may independently seek assistance support from the unit.

the lowest *proportion* of CD recommendations (25% of all corrective action recommendations during this Monitoring Period) since 2021.

Department leadership has reported to the Monitoring Team the importance of providing guidance and counseling to staff. There is no question that counseling, if actually provided as recommended and carried out with fidelity, is of great support to staff.[284] Given the large number of counseling sessions recommended and the pervasive security concerns and staff misconduct throughout the facilities, it is unclear to the Monitoring Team whether the sessions provide the guidance necessary for staff to understand their actions and how to handle similar situations in a better manner going forward. While change in staff behavior will not necessarily or simply change with a counseling session, the fact that little to no change in cited violations has been observed raises questions as to whether these sessions are occurring as recommended and providing staff with the practical guidance they need. E.I.S.S. leadership reported that staff have advised during their meeting with E.I.S.S. staff that most corrective interviews and counseling sessions do not provide sufficient practical guidance on alternative actions that could have been taken so that staff can use these more appropriate actions when they are placed in similar situations in the future.

### Proposed Modifications to the Rapid Review Process

During this Monitoring Period, the Deputy Commissioner of Security began to consult the Monitoring Team about potential revisions to the Rapid Review process, both in terms of oversight and improvements to the process itself.[285] The Department's Consultant to the Commissioner suggested that certain wholesale changes to the Rapid Review process may be more appropriate and that the facilities' reviews should function more like investigations. The Monitoring Team advised the Department that it agreed that the Rapid Review process needs improvement. However, with respect to the proposal that facilities would begin to conduct

---

[284] The Department gathers data on whether the 5003 counseling sessions and corrective interviews recommended via Rapid Reviews occurred. Approximately 95% of the counseling and interviews recommended during this Monitoring Period did in fact occur. However, this data is merely quantitative, not qualitative, so it does not reflect whether these sessions are meaningful or not.

[285] Prior reports have discussed the Department's efforts to improve the quality of its Rapid Reviews. *See* the Monitor's October 5, 2023 Report (dkt. 581) at pgs. 1, 12 and 21; the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 67-68; the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 6-9; the Monitor's April 18, 2024 Report (dkt. 706) at pg. 56; and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 44-45.

"investigations," the *Nunez* Court Orders require, upon consent of all Parties, that ID conduct all investigations in response to various findings regarding the quality and integrity of prior use of force investigations conducted by the facilities. No evidence has been provided to suggest the facilities currently have the capacity or ability to conduct investigations such that a potential request to reintroduce investigations by facility leadership would be appropriate. In fact, current staffing limitations and other findings suggest that there is not currently a basis to suggest that facilities could feasibly conduct investigations of use of force at this juncture. In response to the Monitoring Team's concerns, the Department reported that it intends to focus on revising the Rapid Review process instead of tasking the facilities with investigative actions and assessments.

Following the close of the Monitoring Period, the Department provided an initial proposal for revising the Rapid Review process, and the Monitoring Team provided feedback recommending that staff have sufficient training, appropriate leadership retains oversight of the Rapid Reviews, a reasonable implementation plan is created, and the work of the Rapid Reviews does not inappropriately interfere with the investigative actions of ID.[286] The Department subsequently provided the Monitoring Team with a proposal regarding the new process and demonstration of an electronic form to conduct the Rapid Reviews. While the new form reflects the same information and corrective action referrals captured in the old Rapid Review template, the new form is more user-friendly and promotes more detailed incident summaries, improved identification of policy violations, better data aggregation, and fewer typos and human errors.

---

[286] The Monitoring Team learned in early October 2025 that DOC's Consultant to the Commissioner unilaterally advised Facility Commanding Officers that the Rapid Review process was imminently going to change and the details provided about the "new" process included features that were not consistent with the *Nunez* Court Orders. The plan disseminated by the DOC's Consultant to the Facility Commanding Officers was inconsistent with plans the Department provided to the Monitoring Team and was also presented in a confusing and haphazard manner. The Monitoring Team only learned about the plan from an anonymous source and learned key Department stakeholders were also unaware it had been disseminated. The Monitoring Team immediately advised the Deputy Commissioner of Security of its grave concerns that the plan was disseminated and made a strong recommendation that the disseminated plan be retracted so that a proper plan could be developed that ensured both internal coordination and consultation along with consultation with the Monitoring Team. DOC advised that it retracted the plan, would work to develop a comprehensive plan, and would consult the Monitoring Team before any changes to the Rapid Review process were initiated. Six weeks after this incident, the Department attempted to mischaracterize the plain meaning of the DOC's Consultant's communication and attempt to argue that the Monitor's concerns about consultation were misplaced. This letter, shared six weeks after the incident, was inconsistent with contemporaneous discussions the Monitoring Team had with multiple DOC stakeholders who all confirmed that consultation should have occurred, but didn't, and that but for the Monitor's identification of the issue that internal consultation amongst DOC stakeholders would not have occurred as it should have. This letter was written by a DOC stakeholder who initially confirmed the lack of internal coordination and consultation.

Given the increased level of detail in these forms, the Deputy Wardens completing the Rapid Reviews will now have 2 business days to complete their reviews, compared to the 1 business day under the current process. The Department anticipates this will improve the quality of the Rapid Reviews, as the additional time means the DWs will also have more information available, such as injury forms and staff reports, when doing their reviews. The new process will also introduce an additional feedback loop by requiring the Commanding Officers of the facilities to independently review the incident, provide their assessment, and document whether they agreed with the Deputy Warden's summary and assessment within 1 business day. Facility Operations will still conduct daily reviews and meetings with facility leadership and ID will conduct bi-weekly meetings with facility leadership to discuss the Rapid Reviews and provide additional feedback. The Department reports that these additional layers of review are to ensure that leadership and ID are consistently identifying the same violations and misconduct. A more detailed assessment of this process will be provided in the next Monitor's Report.

## Conclusion

The Rapid Review concept is grounded in sound correctional practice and has elevated the quality of staff practice in other jurisdictions. However, catalyzing improved practice requires both Department and facility leadership to possess a strong command of the security protocols and procedures that must be utilized on a daily basis, to develop skills to guide and coach their staff toward sound correctional practice, and to ensure that staff are supervised in a manner that allows them to address these issues in real time. Further, while the Rapid Reviews certainly identify a number of issues that must be addressed, the concern is that they do not reliably identify *all* relevant issues that could be identified via a video review, and thus are sometimes incomplete. While the Monitoring Team has long reported on the inadequacies of the Rapid Reviews, facility leaders are not consistently held accountable for the ongoing management and operational deficiencies occurring in the jails and the failure to consistently identify all of them.

While Rapid Reviews provide some insight into Department practice and— when used properly—benefit the larger goal of improving staff practice, their full potential is not yet realized. While the new Rapid Review process does appear to have potential to improve the quality and consistency of the Rapid Review assessments, the new process must be closely

supervised and the built-in feedback loops must be conducted with independence and fidelity to ensure that the Rapid Review quality is elevated above the current levels.

| COMPLIANCE RATING | **First Remedial Order § A., ¶ 1.** Partial Compliance |
|---|---|

| |
|---|
| **INVESTIGATIONS OF USE OF FORCE INCIDENTS (CONSENT JUDGMENT § VII., ¶ 1, § VII., ¶ 9 (A)) & § VII., ¶ 11)** |
| *Consent Judgment § VII., ¶ 1. Thorough, Timely, Objective Investigations.* As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented. |

*Consent Judgment § VII., ¶ 9. Timing of Full ID Investigations.* All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

    a.    *Timeliness* [. . .]

        ii.    Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:

            1.    ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

            2.    The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

*Consent Judgment § VII., ¶ 11. Staffing of ID Investigators.* The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

*August 10, 2023 Order § I, ¶ 11. ID Staffing.* By, December 31, 2023, the City shall ensure that the Department's ID Division maintains at least 21 supervisors and 85 investigators to conduct use of force investigations unless and until the Department presents an internal staffing analysis and can demonstrate to the Monitor that fewer staff are necessary to conduct thorough, timely, and objective investigations of all Use of Force Incidents as required by the Nunez Court Orders.

This compliance assessment provides an overview of the status of investigations for all use of force ("UOF") incidents through June 30, 2025. This section addresses compliance with three provisions of the Consent Judgment regarding investigations. First, Consent Judgment, § VII., ¶ 1 requires DOC to "conduct thorough, timely, and objective investigations of all use of force incidents to determine whether staff engaged in the excessive or unnecessary use of force or otherwise failed to comply with the New Use of Force Directive." Second, Consent Judgment, § VII., ¶ 9(a) requires the investigation of Full ID Investigations to be completed within 120 days

or less. Finally, Consent Judgment § VII., ¶ 11 requires the Department to have adequate staffing levels for the Investigation Division. Compliance with these provisions is taken in turn below.

This includes a history of the Monitoring Team's Compliance Assessments for the Investigations provisions, the Investigation Division's ("ID") leadership and their focal points, enhancements being made to the investigation process, the status of ID staffing, an assessment of the status and timing of Intake Investigations and Full ID Investigations, the status of law enforcement referrals for potential criminal misconduct, details about the Use of Force Priority Squad, an assessment of the quality of investigation findings, and the outcomes of investigations, including referrals for Full ID investigations, identification of staff misconduct, and referrals for corrective action.

### Compliance Assessment Overview

High-quality investigations are essential to reducing the frequency of unnecessary and excessive uses of force, which is at the heart of the *Nunez* matter. The Department's Investigations Division and the compliance assessments for the three provisions noted above have gone through periods of both progress and regression since the Consent Judgment went into effect. A brief history of these fluctuations is provided below.

The Monitoring Team first rated compliance with Consent Judgment, § VII, ¶ 1 requiring the Department to conduct thorough, timely, objective investigations for the 5th Monitoring Period (July to December 2017), during which the Monitoring Team found the Department in Non-Compliance. The Monitoring Team continued to find the Department in Non-Compliance for the following four Monitoring Periods (January 2018 to December 2019), but in 2020 and 2021, the Department significantly improved the quality of investigations. For the first time, in 2020 during the 10th Monitoring Period (January to June 2020), the Department achieved Partial Compliance. The Department maintained this rating through four more Monitoring Periods (July 2020 to June 2022).[287] However, following the entry of the Action Plan in June 2022, the

---

[287] A compliance rating for this provision was not awarded in the 13th Monitoring Period because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438).

Department's progress was offset by a sudden and significant regression in the quality of investigations. As a result, in the 15th Monitoring Period (July to December 2022), the Department returned to Non-Compliance with this requirement, where it remained for the next three Monitoring Periods (January 2023 to June 2024).[288] However, in the 19th Monitoring Period (July to December 2024), there was notable and significant improvement in the quality and timing of investigations, and the Department was moved into Partial Compliance with this provision.[289] This progress has been maintained, and so the Department remains in Partial Compliance with this provision during the 20th Monitoring Period (January to June 2025).

The Monitoring Team first rated compliance with Consent Judgment, § VII., 9(a) regarding the timing of Full ID Investigations in the 6th Monitoring Period (January to June 2018), for which the Department was found in Partial Compliance. However, the compliance rating fell to Non-Compliance in the following Monitoring Period and has since remained in Non-Compliance with this provision for the 15 consecutive Monitoring Periods (July 2018 to June 2025).

The Monitoring Team first rated compliance with Consent Judgment, § VII., 11 regarding the Staffing of ID Investigators provision in the 3rd Monitoring Period (August to December 2016), during which the Department was found in Partial Compliance. For the following eight consecutive Monitoring Periods (January 2017 to June 2021),[290] the Department remained in Partial Compliance. The Monitoring Team did not provide compliance ratings for this provision after the 12th Monitoring Period but did provide routine updates on ID staffing in many of its subsequent reports.[291] The Monitoring Team began rating this provision again during the last

---

The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

[288] *See* the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 100-102 and 155-171, the Monitor's April 24, 2023 Report (dkt. 520) at pgs. 1-4, the Monitor's December 22, 2023 (dkt. 666) at pgs. 33-45, the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 88-104, and the Monitor's November 22, 2025 Report (dkt. 802) at pgs. 82-103.

[289] *See* the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 139-157.

[290] The Monitoring Team withheld its compliance rating for this provision during the 5th Monitoring Period. *See* the Monitor's April 18, 2018 Report (dkt. 311) at pgs. 104-105.

[291] *See* the Monitor's October 28, 2022 Report (dkt. 472) at pgs. 137-138; the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 167-169; the Monitor's December 22, 2024 Report (dkt. 666) at pgs. 41-43; the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 90-92, 163, and Appendix A; and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 84-86, 183, and Appendix A.

Monitoring Period (July to December 2024), during which it was found in Partial Compliance.[292] It remains in Partial Compliance for this 20th Monitoring Period (January to June 2025).

The Court's November 26, 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with all three provisions. The Court explained the basis for its finding at pgs. 18-26 in section "Failure to Conduct Adequate Use of Force Investigations and Hold Staff Accountable" of the Order.

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 11 as it relates to ID staffing levels, but a compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

### Investigations Division Leadership

The Investigations Division is instrumental in the Department's efforts to identify excessive, avoidable, and/or unnecessary uses of force as it is tasked with conducting neutral and objective investigations into all use of force incidents. As a part of the investigation process, ID also identifies staff misconduct and recommends appropriate discipline for staff who use force in a manner that is not permitted by policy. As such, the Monitoring Team has routinely evaluated the Division's leadership, staffing, and the timeliness and quality of its work product to assess progress toward compliance with the *Nunez* Court Orders. A description of the issues plaguing the ID Division between 2020 and 2024 are described in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 142-145.

The leadership of ID has continued the work started in 2024 of returning ID to its previous emphasis on transparency and neutrality and rebuilding a culture focused on the quality of the work product. Current ID leadership not only explicitly communicated with all ID staff that they could and should conduct all investigations without fear or favor and in a neutral manner, but they also took steps to rebuild trust with staff, so they again felt empowered to conduct proper investigations without fear of retribution. A description of the work initiated in 2024 and continued into this Monitoring Period are described in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 144-145. The impact of this leadership has been seen in ongoing

---

[292] *See* the Monitor's May 22, 2025 Report (dkt. 157) at pgs. 145-156, 157, Appendix B Tables 1(a), 1(b) and 2.

improvements in ID's investigations described in this section. Given the focus and resulting improvement on investigation quality in 2024, ID leadership began focusing on the efficiency and timeliness of investigations in 2025 by addressing backlogs that had accumulated and creating efficient processes to ensure the timeliness of investigations going forward without detrimentally impacting the investigation quality. These efforts and the progress made are discussed in more detail below.

**Enhancements to the Investigation Process**

As initially previewed in the Monitor's May 22, 2025 Report (dkt. 850), the Department and the Monitoring Team have been exploring making improvements in the identification and streamlining of investigations for those incidents where the use of force was necessary and no violations occurred. The Monitoring Team also recommended that the Department explore how it can balance its investigatory requirements with a more streamlined investigation report to maximize ID's efficiency without sacrificing quality.

There is no question that the investigation process has to be improved. The Department conducts more investigations into use of force than any other system in the country. This is because of both the breadth of the definition of the use of force and the investigation requirements of the *Nunez* Court Orders. As noted in other sections of the report, there is a wide spectrum of types of use of force employed and the potential violations (if any). This means that some incidents may not merit the same scrutiny as others and there must be necessary flexibility.

The fact that Department staff engage in thousands of uses of force each year is important context for the need to create the most efficient investigatory process that is capable of meeting the *Nunez* Court Order's requirements for thorough, timely, and objective investigations and when misconduct is identified, staff discipline. For these reasons, the Department's approach to investigating whether staff's use of force complies with policy must offer sufficient flexibility to ensure that the rigor of the investigation matches the severity of the incident.

Given that some incidents may not merit the same scrutiny as others, the Department currently utilizes two types of investigations— Intake Investigations and Full ID Investigations. Each and every use of force that occurs in this Department receives an Intake Investigation, and a subset of those uses of force (*i.e.*, meeting certain requirements specified in the *Nunez* Court Orders and/or with circumstances that warrant additional scrutiny) are referred for Full ID

Investigations. Intake Investigations are a more streamlined and efficient investigation than the preliminary reviews that were previously conducted.[293] Intake Investigations include a thorough and comprehensive collection, review, and summary of all available reports, statements, video footage, and any other relevant materials and information surrounding the use of force, including what led up to it and what followed thereafter. The findings of this review and investigation are extensively documented in the Intake Investigation reports, with information on any staff misconduct or security lapses identified, and referrals or follow up on corrective action or formal discipline when necessary. However, additional improvement and efficiencies are necessary.

Full ID Investigations review the same materials as Intake Investigations but also expand upon these steps and conduct more in-depth investigative actions (*e.g.*, MEO-16 interviews) for a more comprehensive assessment of what occurred. While the *Nunez* Court Orders do set requirements for certain categories of cases that require Full ID Investigations, they are also used when a review of the materials available at the Intake Investigation level do not provide enough information for the investigator to come to a final conclusion, such as incidents where there is no video coverage, where PICs allege staff misconduct, or additional context is needed to determine what occurred. This two-tiered process brings an extraordinary level of scrutiny to the Department's use of force practices but can have an unintended consequence of undermining certain other *Nunez* requirements, including timeliness which can then have a corresponding impact on the quality of investigations as backlogs emerge. This has a cascading effect that the corrective action or formal discipline for staff misconduct is then also further delayed.

Currently, all incidents that undergo Full ID Investigations are first subject to an Intake Investigation, which means that many of the initial investigatory steps from the Intake Investigation are repeated by Full ID investigators (*e.g.*, reviewing and summarizing video evidence), needlessly consuming investigators' time with duplicative work. This duplicative process also increases the overall length of time to finish the investigation of an incident as the Full ID investigators cannot begin their investigation until the Intake Investigation is complete, even though many of the same investigatory steps will again be repeated. While an Intake Investigation may still justifiably result in a recommendation for a Full ID investigation in cases where a solid conclusion could not be drawn or additional context is needed, there is room for

---

[293] *See*, for example, Monitor's October 20, 2023 Report (dkt. 360) at pg. 40.

efficiency in the investigation process for those specific categories of cases that *always* require Full ID Investigations under the *Nunez* Court Orders. In addition, requiring an Intake Investigation for all incidents means that all incidents receive the same initial level of scrutiny, even those where a thorough and objective review of the immediately available objective evidence suggests that the intervention was minor, conformed to Department policy, and no further investigative steps would reveal potential violations. Finally, investigative reports have become overly detailed, with lengthy and superfluous word-for-word recitations of staff statements that are otherwise contained in the investigation package, lacking an efficient synthesis and synopsis. Accordingly, improvements to these reports are necessary.

ID Leadership and the Monitoring Team recognized this as an opportunity to build important flexibility and efficiencies into the investigation framework so that the Investigation Division is better positioned to meet the timeliness and quality requirements of the *Nunez* Court Orders, by making investigators' workload more manageable, allowing Full ID investigations to begin closer-in-time, and freeing up Supervisors to provide more oversight and guidance on the *quality* of the investigators' work product. In so doing, the overall goal of timely and appropriate discipline for those incidents that warrant it will also become more attainable.[294] It is critical that discipline occurs as close in time as possible to the incident's occurrence given that its efficacy in changing staff's practice and mentality does fade over time as the staff's memory of the incident fades. However, this need for timely discipline must still be balanced with the need for thorough and objective investigation to determine and support the *appropriate* disciplinary actions.

During the current Monitoring Period, the Department and Monitoring Team collaborated closely to develop a new framework to better align the rigor of the investigation with the characteristics of the use of force incident. The framework provides for:

---

[294] As noted in the compliance assessment for First Remedial Order § A, ¶ 1, DOC's Consultant recommended that certain lower-level incidents should be investigated by the facility instead of ID. DOC's Consultant nor DOC provided any evidence that the conditions that created the need for ID to conduct all investigations of force have materially changed since the Court's First Remedial Order (entered upon consent of all parties) was entered in August 2020 requiring ID to conduct investigations of all UOF. In fact, the ongoing staffing crisis and limited capacity that facility staff have demonstrated in assessing staff conduct only appear to reinforce that facilities are not currently in a position to conduct quality, reliable, and timely investigations of force.

- Initial vetting by ID to determine the level of scrutiny that appears to be warranted, after reviewing staff reports and video footage of the incident.[295] At this initial vetting stage, investigators will review all relevant video from security cameras and Body Worn Cameras, all available staff reports, facility logs, and any other evidence available at the time of review.

- ID will then assign one of three levels of scrutiny based on this assessment, depending on the evident concerns about whether staff's conduct conformed to policy requirements:

    o Category 1 includes those incidents requiring Full ID Investigations per the *Nunez* Court Orders Consent Judgment § VII, ¶ 8, as revised by the First Remedial Order (dkt. 350), § E and Exhibit A. These cases will be subject to a Full ID investigation as required by the *Nunez* Court Orders. Under this approach, the goal is to refer cases more quickly for a Full ID investigation instead of the prior practice which awaited completion of a full Intake Investigation before the case was transferred to Full ID Investigators.

    o Category 3 includes incidents in which the force used was not anticipated, minimal, reasonably necessary, and consistent with Department directives. These incidents involve soft-hand techniques and OC spray, and do not involve tactical weaponry, high-impact force, or result in any staff or PIC injuries. In addition, all staff and PIC statements must be consistent with one another and available evidence. These cases will be referred to the Intake Squad for an Intake Investigation. Intake Investigators will review all information required for the Intake Investigation with the goal that the investigation report will be more streamlined and efficient. If during the

---

[295] At the initial vetting stage, ID staff will determine which category of investigation an incident will fall under. However, if further investigation reveals information that would subject an incident to a different category of investigation, the category may be changed at any point so that that the incident receives the appropriate level of scrutiny.

course of the investigation, it is determined that the case meets the criteria for Category 1 or 2 then the case will be upgraded.

o   Category 2 incidents include any incidents that do not fall into Categories 1 or 3 as described above. Category 2 incidents will be subject to Intake Investigations. As discussed elsewhere, steps are being taken to improve the overall quality of the Intake Investigations to ensure the investigations are conducted as efficiently as possible without sacrificing the quality of those investigations. Cases can be upgraded to a Full ID Investigation (Category 1) if subsequent investigation determines that the case merits greater scrutiny.

Among the many expected benefits of this new framework are the redistribution of the Investigation Division's workflow such that individual investigators will not be as overwhelmed, cases meeting criteria for Full ID Investigations will be opened more quickly, required investigation timelines will become easier to meet, and Supervisors will be able to focus on other needed improvements, including how to best present and streamline the information contained in the investigators' reports. The overall goal is to increase the efficiency of ID as much as possible, without sacrificing the quality of investigations.

This approach will be piloted in the next Monitoring Period to determine its feasibility.

## **ID Staffing**

The City is required to ensure that the Department has appropriate resources to conduct timely and quality investigations. Adequate staffing and appropriate case assignments are critical to this task, and Consent Judgment § VII ¶ 11 requires ID to have a sufficient number of investigators. Further, the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 11 requires the Department to maintain a minimum of 21 Supervisors and 85 investigators. Although the Division has not met these staffing targets (as of June 2025, the Division had 17 Supervisors and 72 investigators) and staffing remains insufficient to manage its overall caseload, ID has made important progress toward this requirement in 2024 and early 2025.[296]

---

[296] In 2024, for the first time in several years, ID experienced a net gain in the number of investigators.

In this Monitoring Period, ID was able to mitigate attrition by hiring as many new staff as the number of staff who left the Department; 19 staff departed[297] and 18 staff were hired.[298] One of the most important hires during this Monitoring Period was the appointment of a second Director within the Intake Unit to provide more direct support and supervision to investigators, and to address the backlog of investigations and prevent a similar backlog from recurring. Detailed data on ID's staffing levels are presented in Tables 3(a), 3(b), and 4 in Appendix D.

With respect to those staff that have departed, ID reports that most staff who resigned in early 2025 did so for personal reasons (*e.g.,* moving out of state, for medical reasons, or to focus on other responsibilities). The ability to minimize the impact of attrition has relieved some of the chronically heavy workload for ID investigators and as a result, has increased staff morale. The stability and support of leadership within the Division have also helped to support staff morale and retention.

ID's efforts to minimize the impact of attrition is important, but ultimately, the City must be in a position to support the Department's ability to have its full staffing compliment required under the *Nunez* Court Orders in order for ID to complete its work in a timely manner. Additional hiring is still necessary for ID. One factor that continues to undercut ID's ability to achieve the staffing requirements is the salary range for investigators, which is on the lower end of the scale compared to similar roles in other City and State agencies. Coupled with the heavy workload and work location for ID's investigators, the salary level often leads qualified candidates to take similar positions elsewhere. The Department and ID leadership report that they have repeatedly made requests to the City to improve salaries for ID staff, but those requests have generally been denied. The Monitoring Team continues to recommend that the City take steps to ensure competitive salaries to better support both the hiring of new staff and the retention of existing staff within ID.

**Status of Investigations**

Given the volume of UOF incidents, ID's workload remains high. All use of force cases receive an Intake Investigation (formerly called a Preliminary Review), which means thousands

---

[297] It appears attrition in 2025 may be on track to exceed the 32 staff departures in 2024, but remains below the height of attrition in 2022 and 2023 when 61 and 93 staff departed respectively.

[298] Hiring in 2025 may fall far below hiring in 2023 and 2024, when 68 and 51 new staff were hired respectively, but may be more in line with 2022, when 36 new staff were hired.

of Intake Investigations are conducted each year. A subset of those cases may then be referred for a Full ID Investigation where a more in-depth investigation occurs. Detailed data on the Status of Investigations for all UOF Incidents is presented in Table 5 in Appendix D. The time required to complete investigations, the quality of investigations, and their outcomes are discussed in more detail below.

Given the focus and resulting improvement on investigation quality in 2024, ID leadership began focusing on the timeliness of investigations in 2025 by addressing backlogs that had accumulated and creating processes to ensure the timeliness of investigations going forward. In 2024, the DC of ID reported to her staff that the quality must be prioritized even if it increased the time it took to complete investigations.[299] In her view, several rounds of feedback and revision between investigators and supervisors were necessary to improve the quality of investigations, which made the timelines required under the *Nunez* provisions difficult to meet. Although this process delayed progress on the timeliness component, the Monitoring Team believed that the focus on the quality of investigations was appropriate at that point in time.

While the investigation backlogs began under the former Deputy Commissioner and former Assistant Commissioner of ID, they continued to grow in 2024 under ID's new leadership because of the enhanced focus on investigation quality. Significant progress has been made to the timeliness of investigations, most particularly intake investigations. (*see* Table 5 in Appendix D). The intake investigation backlog was cleared out during this Monitoring Period, and incoming intake investigations have continued to be completed in a timely manner. While some progress was made in the timeliness of full ID investigations, significant work remains to both resolve the large backlog of full ID investigations and ensure the timeliness of incoming full ID investigations.

## Timeliness of Investigations

One of the underpinnings of addressing and correcting staff misconduct is for the response to misconduct to occur close-in-time to the incident. An efficient process for investigating potential misconduct is therefore essential.

---

[299] *See* the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 146-147.

- **Intake Investigations**. Intake Investigations are required to be completed within 25 business days of the incident's date, although the Monitoring Team has utilized 30 business days as the applicable time frame when determining "timeliness" as it provides a reasonable grace period beyond the deadline. During this Monitoring Period, ID leadership's focus shifted to improving the timeliness of Intake Investigations and significant work was undertaken to return to completing the intake investigations in a timely manner. As a result, the timing to complete Intake Investigations for incidents that occurred in the 20th Monitoring Period (January to June 2025) drastically improved, with 84% closed within 30 business days or less, 15% closed or pending within 31-60 business days, and only 1% closed or pending beyond 60 business days. [300] This means that as of September 15, 2025, 99% of intake investigations for incidents that occurred in this Monitoring Period were closed or remained pending within 60 business days, compared to only 77% during the last Monitoring Period.

    During this Monitoring Period, the Intake Unit returned to completing incoming intake investigations in a timely manner and also addressed a significant backlog of intake investigations that had accumulated for incidents that occurred in 2024, but there is ongoing room for improvement to conduct investigations more efficiently. As of January 15, 2025, 19% of incidents that occurred in 2024 were still pending intake investigations. By March 19, 2025, less than 1% of intake investigations for 2024 incidents remain pending. In other words, in approximately two months, the Intake Unit closed the intake investigations for over 1,300 incidents that occurred in 2024. The Assistant Commissioner of ID reported that a large number of cases were pending supervisory review and approval, so the Intake Directors was given a target number of backlogged investigations that they should aim to close each month. The appointment of a second Intake Director at the start of this Monitoring Period helped in the management and completion of this process. Given that the Intake Unit has managed to complete

---

[300] Under the leadership of the former Assistant Commissioner, the time to close intake investigations increased abruptly in 2023 for the first time since the inception of Intake Investigations. *See* the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 92-93 and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 87-88. The increase in timing to complete Intake Investigations continued into the 18th Monitoring Period (January to June 2024), during which 63% were closed within 30 business days or less. The timing to complete Intake Investigations continued to further increase during the 19th Monitoring Period (July to December 2024) with 52% closed within 30 business days or less, 23% within 31-60 business days, and 25% beyond 60 business days.

investigations for incoming 2025 incidents in a timely manner, there does not appear to be any backlog in intake investigations emerging at this time, however, ID must be cautious and keep a close eye on the number of pending intake investigations to ensure that another backlog does not re-emerge.

- **Full ID Investigations**. When a case merits additional scrutiny beyond an Intake Investigation, a Full ID Investigation must be conducted. Full ID Investigations must be completed within 120 days of the incident's date. The status of Full ID Investigations for all incidents that occurred between January 2024 and June 2025 (n=1,037) is demonstrated in Table 6 in Appendix D.[301] ID has long struggled to complete Full ID Investigations in a timely manner and the proportion of Full ID Investigations closed or pending beyond the 120-day deadline remained steady during this Monitoring Period. Only 15% (n=154) of Full ID Investigations were closed or are still pending within the 120-day timeline, and the remaining 85% were either closed or remained pending outside the required time frame. As of September 15, 2025, full ID investigations remained pending for 720 uses of force that occurred in 2024 and the first half of 2025 (*see* Table 5 in Appendix D). Therefore, the Department remains in Non-Compliance with the timing requirement for Full ID Investigations.

    ID reported that Full ID investigations have been delayed due to both workload and because of a backlog of MEO-16 interviews.[302] The MEO-16 interview backlog is due, at least in part, to the lack of availability of union counsel, and the Department has taken steps to address the MEO-16 interview backlog and ensure that scheduling MEO-16 interviews does not slow pending investigations. ID is now conducting MEO-16 interviews for officers on multiple days. In order to accommodate these additional interview slots, DOC worked with the Office of Administrative Trials and Hearings ("OATH") to *temporarily* reduce the number of days that OATH pre-trial conferences are

---

[301] The period of incident dates of January 2024-June 2025 was selected as it captures *all* pending full ID investigations as of the end of this Monitoring Period. All investigations, including full ID investigations, have been completed for uses of force that occurred prior to January 2024. Given that full ID investigations can take months to complete, it is common that a full ID investigation will be completed in a different Monitoring Period than the Monitoring Period in which it occurred.

[302] MEO-16 interviews are conducted by ID investigators and are intended to gather more information from the staff involved in the incident, as well as the staffs' perspective on whether they engaged in misconduct. If they so choose, staff may be represented by counsel, including union counsel, at these MEO-16 interviews.

convened to three days per week instead of four (this is discussed in more detail in this report in the compliance assessment for First Remedial Order (dkt. 350), § C ¶ 4 & ¶ 5) so that counsel could be available for both MEO-16 interviews and OATH pre-trial conferences. While the Department previously worked with the union to increase the number of MEO-16 interviews involving captains each week, there continues to be an ongoing issue that captains' counsel are not available for a sufficient number of MEO-16 interviews. The Department must work to ensure that MEO-16 interviews occur when they are necessary. Of course, ID must also be strategic about which investigations require an MEO-16 interview (which are time consuming and limited in number every week) in order to appropriately triage the cases in the backlog and prescribe the necessary steps for completion.

During this Monitoring Period, the Full ID Director worked with a team of Full ID investigators to categorize the backlog of pending Full ID cases according to the amount of additional investigation necessary to close the case. This categorization was done to enable the Division to strategically allocate resources and appropriately prioritize cases in order to address this backlog as efficiently as possible. This team identified a subset of Full ID investigations that are being triaged by a number of Full ID investigative teams to close them out expeditiously to reduce the backlog. ID leadership reported that those cases that need the least amount of additional investigative steps and those cases that are approaching their statutes of limitations for staff disciplinary charges are being prioritized for closure. With the support of the reinstated Associate Commissioner who developed effective strategies for addressing a backlog of investigations in 2020/2021 and addressed the recent backlog of intake investigation, Full ID's investigators and supervisors are focusing on the necessary steps to ensure that the backlogged cases are closed appropriately.

The proposed revisions to the investigation process, described above, are expected to help support ID's ability to conduct investigations more efficiently, relieve the burden on ID's staff, and allow ID leadership to reallocate staff resources as needed (for example, to assist with the current Full ID backlog). However, even with the efforts undertaken so far and efforts to be piloted, it appears that additional staffing is needed to ensure that ID, particularly the Full ID team, can appropriately manage its cases loads.

The City must support the Department in its efforts to achieve the staffing requirements under the *Nunez* Court Orders.

**Law Enforcement Referrals**

The Department and the relevant law enforcement agencies are required to routinely collaborate and communicate about the status of cases that are referred for potential prosecution. Historically, this occurred more formally through a monthly meeting, but now it occurs more informally via email exchange. Detailed data on Law Enforcement Referrals are presented in Table 7 in Appendix D.

The timing to complete an investigation is tolled if a law enforcement agency is investigating the incident for potential criminal misconduct. ID is required to swiftly refer any staff member whose conduct in a use of force incident appears to be criminal in nature to the Department of Investigation ("DOI"). ID has promptly made referrals for behavior that appears to be criminal in nature.

The Monitoring Team has observed that, despite serious concerns about the inappropriateness of staffs' behavior, the majority of cases do not appear to rise to the level of criminal misconduct. This observation aligns with the small number of criminal prosecutions recorded thus far. It must be emphasized that cases that are rejected for criminal prosecution often include very concerning conduct that the Department can and must address administratively. For instance, some cases being considered for criminal prosecution are also identified via the Action Plan requirement § F, ¶ 2 and should be prioritized for administrative resolution if they will not be criminally prosecuted.

In the 10 years since the effective date of the Consent Judgment, 166 use of force cases have been referred to DOI or DOI has assumed responsibility for the investigation independent of a referral from ID. Of that relatively small subset of 166 UOF cases, only **eight** cases have resulted in criminal charges over the life span of the Consent Judgment. As of July 14, 2025, 15 cases were still pending investigation with law enforcement; five of which were with the Bronx District Attorney's Office, two were with the Manhattan District Attorney's Office, one was with the Southern District of New York, and seven were with the Department of Investigation.

While the timeliness of law enforcement agency reviews of cases for potential criminal charges has improved over the life of the Consent Judgment, it is still a protracted process. The

impact is that some of the most egregious cases that do not quite rise to the level of criminal prosecution may take longer to resolve with discipline because the initial evaluation by Law Enforcement is delaying accountability on cases that should, in fact, be prioritized. The Monitoring Team continues to urge that the cases evaluated by Law Enforcement be prioritized and not allowed to languish amid broader caseload demands.

**Use of Force Priority Squad**

The Use of Force Priority Squad ("UPS") is an important management tool to address some of the most serious and complex use of force cases. Having a dedicated unit helps ensure that these cases receive necessary scrutiny and attention so that the most egregious misconduct is promptly identified and appropriate corrective action can be taken. During this Monitoring Period, 54 cases were assigned to UPS and included a variety of egregious incidents, including cases in which staff members were suspended, cases that were returned to ID following an assessment for criminal charges by law enforcement, eight cases that were identified for expeditious resolution via the F2 process, and one case recommended by the Monitoring Team. UPS also assisted in closing out Full ID investigations for incidents that occurred in 2024 as a part of the larger effort by ID leadership to address the Full ID backlog.

UPS closed 28 cases during the current Monitoring Period, 25 of which were referred for formal discipline and closed with charges.[303] Of the 28 cases closed during the current Monitoring Period, only eight incidents (29%) were closed within 120 days of the incident date, however all eight of these incidents occurred and were referred to UPS during the current Monitoring Period or at the end of the last Monitoring Period, which demonstrates UPS's ability to manage an increased capacity of cases as described above. There were 20 incidents that took over 120 days to close, most of which occurred in 2023 or early 2024 and were a part of a backlog of pending cases that had accumulated while UPS was understaffed and recovering from this period of understaffing.

---

[303] This is similar to the number of cases closed by UPS in the last Monitoring Period (n=27) and the number of cases closed by UPS in past Monitoring Periods (*e.g.*, 26 cases were closed in the 17th Monitoring Period). In the 18th Monitoring Period (January to June 2024), ID reported that UPS closed fewer investigations (n=11) because of both staff attrition and UPS staff assisting on the Lookback Audit. *See* the Monitor's November 22, 2024 Report (dkt. 802) at pg. 91. However, ID reported that during the last Monitoring Period, additional investigators were assigned to UPS, and the Lookback Audit was completed. This allowed UPS to increase, and since maintain, its caseload.

At the end of the current Monitoring Period, UPS had 78 pending cases, 11 of which were on hold pending review by DOI. Of the remaining 67 cases that were pending investigation with UPS, 42 of these 67 cases (63%) were pending beyond 120 days of the incident date. At the end of the last Monitoring Period, a lower number of cases were pending (n=51).[304] While it is promising that UPS has been able to return to closing its typical caseload, it seems that additional resources may be needed as the number of cases pending with UPS continues to grow. This backlog of cases must be addressed and efforts made to ensure future backlogs do not occur.

## Quality of Investigation Findings

There has been improvement in the quality of Intake Investigations following significant focus and efforts from ID leadership. The Monitoring Team reviews thousands of Intake Investigations. The Monitoring Team's extensive review of these investigations has revealed that while there is variation in the quality of investigations, since 2024, the Monitoring Team has found that Intake Investigations have improved in assessing available evidence, identifying potential violations, and recommending appropriate action or further investigation when necessary.

- **ID's Quality Assurance Program**: ID began a quality assurance program in spring 2023 to assess completed investigations, and if needed, to reopen cases for further investigation. A dedicated Quality Assurance Team consisting of one attorney and two senior investigators was created to specifically review completed Intake Investigations. Additionally, the Director of the Full ID Unit reviews a selection of Full ID Investigations that were closed with no charges each month.[305] The number of case audits and the corresponding findings of the Intake and Full ID QA audits can be found in Tables 8(a), 8(b), 9(a), and 9(b) in Appendix D.

  That ID has created and maintained an internal QA process is an important step. ID's own findings demonstrate that additional work is necessary to ensure that the quality of

---

[304] *See* the Monitor's May 22, 2025 Report (dkt. 850) at pg. 151.

[305] ID leadership reported that fewer Full ID audits were conducted this Monitoring Period because Full ID leadership was focused on categorizing and addressing the backlog of Full ID investigations as described in the compliance assessment for Consent Judgment § VII., ¶ 1 and § VII., ¶ 9 (a). Additionally, as a part of the broader efforts to improve investigation quality, ID leadership reviewed more Full ID investigations that were near-final but not yet closed so that they could coach the investigators on how to resolve any quality concerns.

investigations is adequate to meet the requirements of the *Nunez* Court Orders. In this Monitoring Period, the QA audits identified an issue with 32% of Intake Investigations closed between January-June 2025. The most frequently identified issues were:

- o Failing to preserve and/or request Genetec, handheld, or BWC footage (34 incidents)
- o Failing to collect documentation such as staff use of force or witness reports, injury reports, or PIC photos (25 incidents)
- o Clerical errors or typos (13 incidents)
- o Incomplete or inaccurate investigation closing reports (10 incidents)
- o Failing to interview the involved person(s) in custody (8 incidents)
- o Failing to identify staff violations of use of force policies and procedures (7 incidents)
- o Failing to thoroughly address an allegation by a person(s) in custody (4 incidents)
- o Failing to identify delayed medical attention for people in custody following a use of force incident (4 incidents)
- o Failing to appropriately classify the use of force incident by injury type (4 incidents)
- o Failing to identify staffs' use of profanity during an incident (3 incidents)
- o Failing to identify factors that could have otherwise made the incident avoidable (2 incidents)

The Monitoring Team's findings on the quality of Full ID investigations are consistent with the QA audits. Overall, the Monitoring Team finds that the Intake Investigations adequately identify the most concerning violations and result in appropriate outcomes, but there is still room for improvement in the identification of every violation in an incident. While the sample size of the audits of Full ID investigations is too small to enable the Monitoring Team to draw definitive conclusions about the audit, the audit findings that are available affirm the Monitoring Team's findings that there is room for improvement in the quality of Full ID investigations. As discussed above, ID leadership has engaged in significant efforts to improve the quality of investigations, and the work of the ID pilot should also support the efforts to improve

quality as the investigation process will be streamlined. ID should continue to closely monitor its internal audit results to support its efforts to improve quality of investigations.

- **Monitor's Recommendations to Review and Reevaluate Selected Investigations**. The Monitoring Team submits feedback to the Department recommending additional review for certain investigations where it appears that the objective evidence was not adequately investigated or analyzed. This is an attempt to mitigate the possibility that staff are not held responsible for certain misconduct because the investigation was inadequate or to identify similar shortcomings that the Monitoring Team has identified in multiple investigations. The number of recommendations shared by the Monitoring Team significantly decreased during the last Monitoring Period, and has continued to decrease during this Monitoring Period. This suggests that there has been some improvement in the quality of ID investigations.

## Outcome of Investigations

Intake Investigations can be closed in various ways, including, with no action, with a referral for further investigation via a Full ID Investigation (as discussed above), or with a referral for some type of disciplinary or corrective action (*e.g.*, MOC, PDR, Command Discipline, Re-Training, Facility Referral).

- **Referrals for Full ID Investigations**. When conducted properly, most cases can and should be addressed via the Intake Investigation and should not require a Full ID investigation. Accordingly, the majority of cases are closed following an Intake Investigation, but those that merit additional scrutiny, either because they meet specific criteria (*e.g.*, Class A Incidents or Head-strikes) or because additional inquiry is necessitated by the facts of the case, must be referred for a Full ID Investigation. ID's improvement in reliably identifying cases for Full ID Investigations continued in this Monitoring Period.[306] Detailed data on the number and percentage of Full ID Referrals is presented in Table 10 in Appendix D.

---

[306] In 2022, ID was not referring cases for Full ID investigations as required, with only 3% of cases being referred for Full ID investigations. *See* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 36-37. As noted above, beginning in 2023, a Lookback Audit was conducted for a select group of investigations for 2022 incidents, during which cases that were not initially referred to Full ID but should have been were referred for Full ID during the audit. In 2023, referral practices began to improve, and those

While the proportion of cases referred for Full ID Investigations in the 20th Monitoring Period (8%) has gone down from what was seen in 2020 and 2021 (17-19%), the Monitoring Team's review of Intake Investigations suggests that this proportion of cases referred appears reasonable. At least some of the decline in Full ID referrals is attributable to the reduction in certain categories of cases that result in automatic Full ID referrals (*e.g.,* a reduction of Class A cases). ID leadership also reported that when the Intake Investigations were first implemented, ID was overinclusive in the referrals for Full ID Investigations, but with time, they have refined their referral practices on more marginal cases and have adjusted to the full ID referral categories updated in 2020.[307]

- **Identifying Misconduct and Referrals for Discipline**. As the quality of Intake Investigations (and Rapid Reviews) has improved, the proportion of cases without any action has decreased and there has been a corresponding increase in corrective action recommendations to address identified violations. The findings of these investigations are discussed below.

  - <u>*No Action*</u>. With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the facility via Rapid Review and ID determined that the action recommended in the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better understood as cases in which either no violation was identified, or ID *did not identify additional staff behaviors requiring disciplinary or corrective action beyond what had already been identified and taken by the facilities*. Detailed data on the outcome of Intake Investigations is presented in Table 10 in Appendix D. The intake investigations resulted in no additional action for 22% of incidents that occurred during this Monitoring Period, which is the lowest proportion of cases closed with no additional action since tracking began.

---

improvements have continued. *See* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 36-37 and the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 94-95. In early 2024, the Monitoring Team continued to identify some cases that should have been referred for a Full ID Investigation but were not.

[307] *See* the First Remedial Order (dkt. 350), § E., ¶ 1.

o *Actions Taken*. The proportions for most actions taken upon the closure of intake investigations have remained relatively steady, however the number and proportion of facility referrals have been steadily increasing since ID began its renewed focus on improving the quality of investigations from 35% in the 15th and 16th Monitoring Periods; to 62% in the 20th Monitoring Period.

o *Facility Referrals*. The increase in ID's use of facility referrals is a sign of improvement in ID's identification of policy violations. The use of facility referrals is important as the facilities must address the issues identified by ID. ID's findings cannot be limited to addressing individual staff members or in a vacuum. Historically, facility referrals have not been addressed consistently. In order to address consistency and given the increase in facility referrals, ID leadership reported that during this Monitoring Period, one ID staff member was designated to send out and follow up on all facility referrals to centralize the process and work with the facilities to ensure the referrals result in an appropriate resolution.

o *Referrals for Formal Discipline*. The data on the overall number of use of force incidents with charges is demonstrated in Table 12 in Appendix D. Most referrals to the Trials Division for formal discipline for use of force related misconduct derive from Full ID Investigations. While Intake Investigations can also lead to formal discipline referrals, this typically only occurs for 1% of Intake Investigations, as demonstrated in Table 10 in Appendix D.

  ▪ The overall rate of referral for formal discipline from use of force investigations has decreased since 2022. Some of this was to be expected given that the CD policy was expanded to permit a broader scope of misconduct to be addressed with a CD, which the Monitoring Team approved and is discussed in more detail in the compliance assessment for Consent Judgment, § VIII. ¶¶ 1 & 3. The data on ID's overall rate of formal disciplinary referrals for incidents that occurred in 2024 and 2025 is impacted by the significant backlog of Full ID Investigations, as it is expected that more formal disciplinary charges will be filed as the pending Full ID investigations are closed. The

number of pending Full ID investigations is available in Table 5 in Appendix D.

- ▪ The proportion of use of force incidents in which at least one staff member was referred for formal discipline has remained relatively consistent over time, averaging around 7% between 2016 and 2021 and approximately 6% in 2022 and 2023. While concerns were raised in 2022 and 2023 regarding the quality of referrals, subsequent reviews and corrective action by ID have helped address and reverse some of the earlier regression.[308]

- **Unnecessary and Excessive Force**. The data on the number and proportion of cases that ID determined were "unnecessary," "excessive," and "avoidable" is demonstrated in Table 11 in Appendix D. As for the ultimate conclusions of the investigations, for Intake Investigations, findings included a statement of whether the incident was "unnecessary," "excessive," and "avoidable."[309] The Department conducted an assessment of Closed Full ID cases to determine if any were deemed unnecessary or excessive. Based on the data, ID determined that 13% of investigations closed for uses of force that occurred in 2023, 10% of uses of force that occurred in 2024, and 7% of uses of force that occurred in January-June 2025 were excessive and/or unnecessary and/or avoidable. The findings for 2024 and 2025 must be viewed with caution because of the number of cases that remain pending, particularly pending Full ID investigations, which often include more egregious incidents.

---

[308] The data for 2022 and 2023 incidents includes referrals that were made as part of the Lookback Audits in which the original case findings did not identify misconduct, but the subsequent review resulted in a finding that merited the referral for formal discipline charges. Further, data for investigations of 2024 and 2025 incidents is not final given the significant number of pending Full ID Investigations.

[309] The Department and the Monitoring Team have not finalized an agreed upon definition of these terms. The categorizing of investigation findings and developing corresponding data is complicated, particularly because qualitative information with slight factual variations must be categorized consistently. A concrete, objective and shared understanding of what each category is intended to capture is necessary to ensure reliable and consistent findings. Efforts were made in summer 2021 to finalize common definitions, but they were never finalized. In this Monitoring Period, the Department reported it initiated work on evaluating these definitions and others. At the end of the Monitoring Period, the Monitoring Team shared preliminary feedback with the Department that some of the potential revisions under consideration did not appear aligned with the requirements of the Court Orders or advance the reform effort. In response, DOC reported it intended to focus first on revising the definition of avoidables.

**Conclusion**

The Investigation Division has emerged from the state of turmoil that began in 2022 and ended in Spring 2024. Addressing the damage from ID's mismanagement will take time, especially since ID had additional progress that needed to be made even before the turmoil began in 2022. But it must be emphasized that since Spring 2024, important and significant steps forward have been made. Key reform-minded leadership remains in place guiding the work of ID. ID investigators, supervisors, and leadership have been working diligently, and the Division is recovering lost ground. The quality of investigations has improved and the regression in the quality of investigations has ceased (although more work remains to ensure consistent quality of investigations). To that end, ID is embarking on new initiatives to further improve the quality and efficiency of investigations. ID is taking appropriate steps towards addressing the investigation backlogs and steps are being taken to ensure that investigations are completed in a timelier manner. While additional staff are still necessary, ID has made important gains in staffing by slowing attrition and improving hiring. While significant work remains, ID has achieved Partial Compliance with § VII, ¶¶ 1 and 11.

With regard to the closure of Full ID Investigations, the Division is still attempting to properly manage the backlog and, for the reasons discussed above, remains in Non-Compliance with the requirements to timely complete investigations pursuant to Consent Judgment § VII, ¶ 9(a).

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § VII., ¶ 1.** Partial Compliance <br> **Consent Judgment § VII., ¶ 9(a).** Non-Compliance <br> **Consent Judgment § VII., ¶ 11.** Partial Compliance |

| EARLY WARNING SYSTEM (CONSENT JUDGMENT § X., ¶ 1) |
|---|

*Consent Judgment § X., ¶ 1. Early Warning System.* Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

    a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

    b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

    c.    On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

This provision of the Consent Judgment requires the Department to have a system to identify and correct staff misconduct at an early stage, which the Department has elected to do through the Early Intervention, Support and Supervision Unit ("E.I.S.S."). Further, § A, ¶ (3)(c) of the Action Plan (dkt. 465) requires the expansion of E.I.S.S. to support staff on disciplinary probation and supervisors during their probationary period. This provision also requires each facility to designate at least one supervisor responsible for working with the E.I.S.S. Unit to support the uniform staff who are in the E.I.S.S. program and to address any supervision deficiencies that are identified.

**Compliance Assessment Overview**

The first compliance assessment for Consent Judgment § X, ¶ 1 occurred for the 2nd Monitoring Period (March to July 2016). At that time, the Department was found to be in Partial Compliance and remained so through the 3rd Monitoring Period (August to December 2016). In the 4th Monitoring Period, the compliance rating was withheld as focus was on developing the concept for a new Early Warning System.[310] The Department was found to be in Partial Compliance from the 5th Monitoring Period (July to December 2017) through the 11th Monitoring Period (July to December 2020). The Department moved into Non-Compliance in

[310] *See* the Monitor's October 10, 2017 Report (dkt. 305) at pgs. 150-153.

the 12th Monitoring Period (January to June 2021),[311] and then back to Partial Compliance from the 14th Monitoring Period (January to June 2022) through the current 20th Monitoring Period (January to June 2025).

**Staff Actively on E.I.S.S. Monitoring**

The goal of E.I.S.S. is to identify and support staff whose use of force ("UOF") practices would benefit from additional guidance and mentorship to improve practice and minimize the possibility that staff's behavior escalates to more serious misconduct. In total, during this Monitoring Period, 110 staff were on E.I.S.S. monitoring. Below is a chart of the number of individuals on Monitoring in each Monitoring Period since 2020.

| Staff Actively Monitored[312] on E.I.S.S. Program | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Jan. to Jun. 2020 (10th MP) | Jul to Dec. 2020 (11th MP) | Jan. to Jun. 2021 (12th MP) | Jul to Dec. 2021 (13th MP) | Jan. to Jun. 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to Jun. 2023 (16th MP) | July to Dec. 2023 (17th MP) | Jan. to Jun. 2024 (18th MP) | July to Dec. 2024 (19th MP) | Jan. to Jun. 2025 (20 MP) |
| 96 | 106 | 91 | 37 | 80 | 97 | 137 | 135 | 143 | 72 | 110 |

As the chart demonstrates, the number of individuals actively monitored in the 20th Monitoring Period increased compared to the 19th Monitoring Period. This increase is primarily due to the addition of 28 entry-level probationary officers from GRVC and RNDC who recently joined the program. Of the 110 staff actively monitored this Monitoring Period, 40% (n=44) were entry-level probationary staff while 52% (n=58) are monitored for conduct related to UOF incidents[313]. The number of staff enrolled in the program for other reasons (*e.g.*, medical incompetence, AWOL, promotions) only represents a small share of those under active monitoring. The decrease of staff on monitoring for other reasons underscores E.I.S.S.'s focus on working with staff members that are either newly hired by the Department or staff that have UOF

---

[311] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

[312] The total number of actively monitored staff for each Monitoring Period includes all staff who began monitoring during the period, remained in monitoring throughout the Monitoring Period, completed monitoring, or had been enrolled in monitoring (but not yet started).

[313] Currently, only probationary staff assigned to GRVC and RNDC are enrolled in the program, but the Department has reported an interest in enrolling all probationary staff in the program if there are sufficient resources.

related needs. The program does not currently include additional focus on the Action Plan's requirement to expand to include supervisors and staff on disciplinary probation.

**Priorities and Focus of E.I.S.S. Work**

During this Monitoring Period, E.I.S.S. continued to prioritize engaging probationary officers, particularly those assigned to GRVC and RNDC. E.I.S.S. reports that the decision to prioritize probationary correction officers was informed by facility tours and conversations with probationary officers, who E.I.S.S. determined could benefit from additional guidance and mentorship opportunities. The primary objectives of focusing on this group were to improve retention, morale, and early-career support by providing clear guidance on security practices, use of force, and housing area responsibilities. E.I.S.S. hopes to provide probationary officers with a safe environment to talk about the job, share recommendations for improved facility operations, and vent frustrations.

**Screening and Placement of Staff for E.I.S.S. Monitoring**

When a staff member is referred to E.I.S.S. for potential monitoring, the E.I.S.S. team conducts a screening of the staff member's history over the past few years to determine whether they would benefit from monitoring. E.I.S.S.'s has long reported that the screening process is both lengthy and time-consuming, which suggests additional efficiencies can be made. For tenured staff, this process is typically more extensive and time-consuming, as these employees generally have longer employment histories and may have been involved in a greater number of use of force incidents that require review. E.I.S.S. staff's review includes an assessment of the staff members' disciplinary records, UOF investigations, written reports, and video footage, and creates a summary of findings that informs a determination on whether the individual should be placed on monitoring. In contrast, the screening of probationary staff is reported to require less time, given their limited tenure with the Department and generally their involvement in fewer UOF incidents. However, E.I.S.S. still reviews employment records for probationary staff to identify any early indicators of concern, including any records that the staff member had counseling, corrective interviews, or was found to have engaged in procedural errors or violations of Department rules and regulations. The Monitoring Team has long recommended, the screening of staff, particularly tenured staff, could be conducted more efficiently, and this was shared in written feedback on October 2024 (which was subsequently discussed in 2025

during routine updates). In response, E.I.S.S. reports that beyond revisions made in 2020, it does not believe there are additional efficiencies that can be incorporated. The table below depicts the staff screened, staff placed on Monitoring, and the status of the staffs' monitoring period between January 2020 and June 2025.

| Overview of E.I.S.S. Program | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **Jan. to Jun. 2023 (16th MP)** | **July to Dec. 2023 (17th MP)** | **Jan. to June 2024 (18th MP)** | **July to Dec. 2024 (19th MP)** | **Jan. to Jun. 2025 (20th MP)** |
| *Screening* | | | | | | | | | |
| Tenured Staff Screened[314] | 218 | 117 | 117 | 96 | 66 | 30 | 59 | 35 | 15 |
| Probationary Staff Screened | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42 | 43 |
| Total Staff Screened | 218 | 117 | 117 | 96 | 66 | 30 | 59 | 77 | 58 |
| Tenured Staff Placed on Monitoring[315] | 75 | 77 | 99 | 89 | 63 | 26 | 41 | 14 | 9 |
| Probationary Staff Placed on Monitoring | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 41 | 43 |
| Total Staff Placed on Monitoring | 75 | 77 | 99 | 89 | 63 | 26 | 41 | 55 | 52 |
| *Monitoring* | | | | | | | | | |
| Tenured Staff that Began Monitoring Term | 86 | 46 | 69 | 84 | 61 | 23 | 21 | 17 | 15 |
| Probationary Staff that Began Monitoring Term | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 28 |

---

[314] The number of staff screened for each Monitoring Period may include some staff who were screened in prior Monitoring Periods and were re-screened in the identified Monitoring Period.

[315] Not all staff selected for monitoring have been enrolled in the program. Certain staff left the Department before monitoring began. Other staff have not yet been placed on monitoring because they are on extended leaves of absence (*e.g.*, sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not initiate a staff's monitoring term if the staff member has subsequently been placed on a no-inmate contact post due to the limited opportunity for mentorship and guidance.

| Overview of E.I.S.S. Program | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **Jan. to Jun. 2023 (16th MP)** | **July to Dec. 2023 (17th MP)** | **Jan. to June 2024 (18th MP)** | **July to Dec. 2024 (19th MP)** | **Jan. to Jun. 2025 (20th MP)** |
| Total Staff Began Monitoring Term | 86 | 46 | 69 | 84 | 61 | 23 | 21 | 34 | 43 |
| Staff Completed Monitoring | 38 | 21 | 25 | 25 | 17 | 8 | 4 | 20 | 9 |

During this Monitoring Period, a total of 58 staff were screened for placement.

- 15 Tenured Staff were screened this Monitoring Period for UOF related reasons based on referrals from ICDU, Facility Leadership, the Monitoring Team, the *Nunez* Manager or as a result of UOF litigation. For the 15 tenured staff screened, the outcomes were:
    - o 9 were placed on monitoring for UOF related reasons
    - o 4 staff had outcomes still pending
    - o 2 staff members were not placed on monitoring but received counseling from E.I.S.S.
- 43 Probationary staff at GRVC and RNDC were screened and all were placed on Monitoring.

E.I.S.S. leadership report that probationary officers have demonstrated needs related to UOF and security practices and therefore appropriately fall within the program's scope. This approach to the utilization of E.I.S.S. represents a shift from prior years, when the program predominantly focused on tenured staff with identified UOF concerns. As a result, while the unit continues to work with staff to try and improve UOF-related practices, the program has grown to significantly focus on probationary officers (now 40% of the caseload).

**E.I.S.S. Meetings with Staff**

Once placed under monitoring, the individual in monitoring will review any subsequent use of force incident in which they are involved with members of the E.I.S.S. unit. E.I.S.S. has set a goal to try to meet with staff on monitoring once every other month to discuss these

incidents and any other performance-related issues.[316] In practice, it does not appear that E.I.S.S. is able to routinely meet with staff as designed.

E.I.S.S.' ability to conduct meetings continues to be limited. Meetings that are scheduled often do not occur[317] E.I.S.S. reports that it schedules meetings based on staff availability information provided by the facility. Despite this coordination, E.I.S.S. reports that many meetings do not occur due to staffing shortages. In some instances, staff must remain on post because the facility is unable to provide relief. In others, the staff member is unavailable because they are not at work—for example, due to a previously unreported mutual, FMLA leave, or a personal emergency. The ability to schedule meetings is further limited by competing command obligations and administrative demands, including screening referrals, reviewing use-of-force incidents and video, preparing required documentation and reports, and attending various Department leadership meetings.

In the last Monitoring Period, E.I.S.S. reported that it felt that nothing could be done to improve the efficiency of the scheduling process. Despite this, the Monitoring Team strongly recommended that E.I.S.S. work with stakeholders to improve the scheduling of meetings. In response E.I.S.S. implemented a revised protocol aimed at improving coordination with facility leadership. However, the issues persisted in this Monitoring Period. Between March and May 2025 only 51% of the meetings scheduled (98 of 191 meetings) occurred. The Monitoring Team again shared feedback on this issue during this Monitoring Period. In response, E.I.S.S. reported it would develop a process of sharing reminders of scheduled E.I.S.S. appearances to facilities and then following up with a report of any staff no-shows. Additionally, E.I.S.S. meetings were added to the legal schedule to emphasize that they were official business. The Deputy Commissioner of Administration also reportedly shared a memorandum reminding facility staff of their obligation to attend these meetings. Despite these actions, no meaningful improvement in

---

[316] E.I.S.S. leadership has reported that due to staffing constraints it cannot meet with staff on E.I.S.S. more frequently. E.I.S.S. had originally hoped to meet with staff on a monthly basis. In particular, E.I.S.S. believes that additional ADWs are necessary in order to conduct these meetings.

[317] E.I.S.S. reports that scheduling the check-in meetings is tracked internally by the E.I.S.S.'s principal administrative aid. To notify staff of their meetings, E.I.S.S. sends an email notification to the staff member's facility. The facility is then responsible for giving the notification to the staff and requiring them to sign it before the facility emails it back to E.I.S.S. On the day of the meeting, the facility is expected to relieve the staff member so they can attend the E.I.S.S. meeting.

attendance occurred. When asked if any additional steps can be taken to improve attendance, E.I.S.S. did not provide any. E.I.S.S. staff have reported that these attendance issue are not within the unit's control and therefore not much more can be done about it. Regardless of who's responsibility it is to ensure attendance, the Department must make greater efforts to ensure that when meetings are scheduled that they, in fact, occur.

The current scheduling process is both inefficient and a waste of resources. There certainly does not appear to be a reasonable basis to expect that only 50% of meetings scheduled will in fact occur. This inherently undermines the work of E.I.S.S. and is a waste of time for all involved from both scheduling to preparing for the meetings. When meetings are scheduled, they should, in fact, take place barring extraordinary circumstances. Accordingly, the process for scheduling must be evaluated and revised.

### Management of E.I.S.S.

The overall management of E.I.S.S. has been stagnant. The Monitoring Team has long recommended that creative work and solutions are needed to leverage the work of E.I.S.S. even with more limited resources. At its inception, the then Director of Risk Management was able to make great strides with the program with even less resources than the unit currently possess.

o *Reporting Structure for E.I.S.S.*

In October 2024, the Monitoring Team recommended that the Department evaluate E.I.S.S.'s position in the organization structure and ensure that the leadership overseeing E.I.S.S. is best positioned to support the Assistant Commissioner. During this Monitoring Period, the Department reported that the Assistant Commissioner of E.I.S.S. will now report to the Senior Deputy Chief of Staff. The Monitoring Team met with the Assistant Commissioner of E.I.S.S. and the Senior Deputy Chief of Staff in June 2025 to discuss priorities for the unit, emphasizing strengthening engagement with Department Leadership, evaluating alternative staffing solutions to ensure the unit can maximize its resources, and finding ways to improve efficiencies with both the screening process and scheduling of meetings.

o *Staffing Needs for E.I.S.S.*

E.I.S.S. has long been operating under staffing constraints. The unit operated with one Assistant Commissioner, an ADW, and a Captain. The Director position was vacant for over a year, and the process to fill it was very protracted and required the Monitoring Team's repeated

follow-up to instigate further action.[318] The position was finally filled in February 2025. The unit also experienced prolonged absences of key support personnel, including its Principal Administrative Aide and its assigned Correction Officer.

E.I.S.S. reports that the appointment of a director in 2025 has meaningfully bolstered capacity by taking on time-consuming administrative preparation, covering meetings and screenings in the Unit Head's absence, and leading Warden-level meetings at GRVC and RNDC. These contributions alleviated some of the burden on existing staff and improved communication with facility leadership, but overall, the unit reports that it continues to operate with insufficient personnel, limiting its ability to reliably conduct meetings, process referrals, and manage its caseload.

Additionally, E.I.S.S. leadership reports that the lack of uniformed personnel within the unit has been cited as a barrier to effective mentorship, credibility, and rapport with monitored staff. E.I.S.S. Leadership reports they have made repeated requests for uniform staff in the rank of ADWs and officers, but the requests have been denied, given the Department's broader staffing challenges. E.I.S.S. leadership has reported that only individuals with direct correctional experience can credibly mentor staff. While mentorship from individuals with similar backgrounds is clearly valuable, the suggestion that mentorship can only occur from individuals with the same background as those being mentored is simply not true.

In this Monitoring Period, the Monitoring Team recommended that E.I.S.S. explore staffing strategies beyond the traditional reliance on uniformed staff, given the Department's long-standing staffing shortages. Specifically, the Monitoring Team urged E.I.S.S. to consider leveraging civilian personnel, including former uniformed employees, and forming interdivisional partnerships to broaden its staffing pool and create a more sustainable structure. In response, the Department proposed hiring three additional Directors, classified as civilian hires, but would be individuals with uniform experience within the last three to five years of service. The proposed Director positions serves as a compromise, addressing both the

---

[318] The position was first posted in April 2024, more than five months after it was vacated, reportedly due to bureaucratic delays, and only after the Monitoring Team repeatedly followed up to ascertain the status of the open position. The initial posting did not identify any qualified candidates so the position had to be posted again. It took an additional five months for the new post to be posted because of bureaucratic red tape, and, again, only after repeated follow-up from the Monitoring Team. In order to attract a broader pool of candidates, the new posting revised the title and eliminated the requirement that the candidate must be an attorney.

Department's personnel limitations and the need for facility-based liaisons to fill longstanding gaps left by the absence of ADW ICO Liaisons. The Department did not ultimately approve the Unit's proposal to hire three new Directors with prior correctional experience, but instead authorized a single Program Manager position. That posting, open from late July to early August 2025, only resulted in the identification of two viable candidates, prompting the Department to extend the posting through October 2025.

The efficacy of the E.I.S.S. program does not need to rely solely on E.I.S.S. to conduct mentoring. Effective mentoring can and should be completed by facility leadership. E.I.S.S. can supplement such work and also provide a serving and supporting role, coordinating and checking in with facility leaders.

    o   *Staff Referrals to E.I.S.S.*

Given E.I.S.S.'s report that referrals for the program had decreased from the facilities, the Monitoring Team also recommended that E.I.S.S. leadership ensure the Deputy Commissioner of Security and Assistant Commissioners of Operations fully understood the referral process, including through Rapid Reviews, and that facility leadership be better informed about E.I.S.S.'s work as it appeared the decrease in referrals was likely due to lack of knowledge about the program versus a decreased need in the program. In response, the E.I.S.S. emphasized that it conducted a previous presentation at an Operational Leadership in 2024, where E.I.S.S's mission and processes were outlined, and noted that E.I.S.S. reiterated its availability and referral pathways at subsequent leadership meetings. The Monitoring Team again recommended that increased engagement between E.I.S.S. and Department leadership would be advantageous. To further address the concern, E.I.S.S. reported meeting with Associate Commissioners of Operations in June 2025 to reinforce the referral process during their daily UOF calls with facility leadership. Since this meeting, there has been a small increase in UOF referrals.

**Conclusion**

The E.I.S.S. unit continues to screen, onboard, and meet with some staff, but the program remains significantly underutilized and ineffective given the competing priorities and persistent crises confronting the Department. As implemented, the unit operates as a diminished version of what was envisioned in the Consent Judgment and Action Plan. Prior reported initiatives such as dedicated uniform staff at each Facility to provide close mentorship and oversight or monitoring

probationary staff have had to be abandoned due to staffing constraints and no alternative initiatives have been implemented. Further, ensuring that routine meetings occur is a struggle.

Overall, it appears management is relatively complacent with the current state of operations, either believing they cannot or are unwilling to bring the level of initiative and assertiveness necessary to make the Division as efficient as possible, even with the current constraints. The Monitoring Team certainly appreciates the difficulty in operations under the various constraints within the agency, that said, the Monitoring Team believes that more initiative can be utilized to maximize the efficacy of E.I.S.S. even under the current circumstances. While many of the unit's challenges stem from Department-wide deficiencies in staffing and resource allocation, attempts to mitigate them have generally only occurred in response to sustained pressure from the Monitoring Team.

Given the Department's entrenched problems with staff misconduct and poor use of force, prioritizing close and consistent supervision and intervention with these high-risk individuals remains essential if the unit is to meet its intended goals and achieve substantial compliance with this provision.

| COMPLIANCE RATING | Consent Judgment § X., ¶ 1. Partial Compliance |
|---|---|

| **TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY (CONSENT JUDGMENT § VIII., ¶ 1 & § VIII., ¶ 3 (C))** |
|---|
| *Consent Judgment, § VIII., ¶ 1. Timely, Appropriate, and Meaningful Accountability.* The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations"). |
| *Consent Judgment, § VIII., ¶ 3. Use of Force Violations.* In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:<br><br>. . .<br><br>    c.   The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances. |
| *August 10, 2023 Order § I, ¶ 13. Revise Command Discipline Policy and Procedures*. By November 30, 2023, the Department, in consultation with the Monitor, shall develop and implement appropriate controls and procedures regarding the adjudication of Command Discipline, including but not limited to the following:<br><br>    a.   timely processing of cases so that a minimal number of cases are dismissed due to procedural errors;<br>    b.   quality assurance measures to ensure that all Command Disciplines impose an appropriate outcome and do not merely default to the lowest level sanction, unless proportional to the severity of the misconduct;<br>    c.   appropriate mechanisms to ensure cases that require referral for formal discipline via MOCs are completed as required by policy, including but not limited to, when the conduct merits formal discipline or when a staff member has exceeded the number of allowable CDs in a given time period; and<br>    d.   appropriate tracking of any appeal to the Legal Division and the outcome of the appeal.<br>The Department's Command Discipline policy and procedures shall be subject to the approval of the Monitor. |

This compliance assessment evaluates the provisions that require the Department to impose timely, appropriate, and meaningful accountability for staff's use of force ("UOF") related violations (Consent Judgment, § VIII, ¶ 1) and the expeditious prosecution of cases for formal discipline by the Trials Division (Consent Judgment, § VIII, ¶3 (c)). This compliance assessment covers the period January to June 2025, the 20th Monitoring Period.

The provisions discussed in this section are each distinct but intrinsically interrelated because they all relate to the Department's staff accountability system. Progress towards compliance with the provisions discussed in this assessment depends heavily on the Department's success in other areas, particularly in identifying misconduct via Rapid Reviews

and use of force investigations. Once identified, discipline must be both timely and proportional to the severity of the misconduct in order to drive meaningful change.

**Compliance Assessment Overview**

The first compliance assessment for Consent Judgment § VIII ¶ 1 occurred for the 4th Monitoring Period (January to June 2017), and the Department was found in Non-Compliance, where it remained until the 12th Monitoring Period (January to June 2021).[319] The Department achieved Partial Compliance in the 14th Monitoring Period (January to June 2022) and maintained that rating in the 15th Monitoring Period (July to December 2022), but was then downgraded to Non-Compliance in the 16th Monitoring Period (January to June 2023), where it remained through the 18th Monitoring Period (January to June 2024). The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Consent Judgment § VIII ¶ 1. The Court explained the basis for its finding at pgs. 18-22 in section "Failure to Conduct Adequate Use of Force Investigations and Hold Staff Accountable" of the Order. In the 19th Monitoring Period (July to December 2024), the Department achieved Partial Compliance with Consent Judgment § VIII ¶ 1, which was sustained during the current 20th Monitoring Period (January to June 2025).

The history of compliance with Consent Judgment § VIII ¶ 3 (c) is more nuanced. The Monitoring Team first assessed compliance with this provision in the 3rd Monitoring Period (August to December 2016), finding Non-Compliance, but then did not rate the provision in the 4th Monitoring Period (January to June 2017) as focus was on developing a new process to ensure timely service of charges.[320] However, since the 5th Monitoring Period (July to December 2017), the Monitoring Team began rating the various requirements of this provision separately.

- **Serving Charges**. The Department has been in Substantial Compliance with the requirement regarding serving charges since the 5th Monitoring Period (July to December

---

[319] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

[320] *See* the Monitor's October 10, 2017 Report (dkt. 305) at pgs. 175-180.

2017). As discussed further below, the Department remains in Substantial Compliance with this requirement for the current 20th Monitoring Period (January to June 2025).

- **Administrative Filing**. The Department was in Substantial Compliance with this requirement from the 5th Monitoring Period (July to December 2017) to the 15th Monitoring Period (July to December 2022). The Monitoring Team did not provide a compliance rating with this requirement from the 16th to 18th Monitoring Periods.[321] The Monitoring Team finished its assessment and provided a compliance rating in the 19th Monitoring Period (July to December 2024), and the Department achieved Substantial Compliance rating with this provision. As discussed further below, despite the ongoing increase in administratively filed cases, the Department has sustained its Substantial Compliance with the requirements regarding administrative filing during the current 20th Monitoring Period (January to June 2025).

- **Expeditiously Prosecuting Cases**. The Monitoring Team first assessed compliance with the requirements related to prosecuting cases as expeditiously as possible in the 5th Monitoring Period (July to December 2017), finding the Department in Partial Compliance. The Department maintained Partial Compliance through the 11th Monitoring Period (July to December 2020), but the compliance rating was downgraded to Non-Compliance in the 12th and 13th Monitoring Periods (January to December 2021). The Department again achieved Partial Compliance with this requirement in the 14th Monitoring Period (January to June 2022), where it remained through the current 20th Monitoring Period (January to June 2025).

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 13 as it requires the Department to revise and implement an updated Command Discipline policy, but a compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Elements of Meaningful Accountability**

---

[321] *See* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 61 and 66, the Monitor's April 18, 2024 Report (dkt. 7076) at pgs. 128-129 and 131, and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 131-132 and 134.

Swift, proportional accountability for staff misconduct is a cornerstone of the *Nunez* reforms. The goal of accountability is both to rebuke negative conduct and to decrease the likelihood of its recurrence. Decreasing the likelihood of subsequent misconduct occurs partially through deterrence, and also through awareness and skill development. Staff must be made aware of their policy violations and taught new skills for managing their job duties more effectively and appropriately, which is why corrective interviews, retraining, and counseling may be an effective response.

Further, shaping an individual's behavior requires prompt feedback. For this reason, the Monitoring Team has long supported the use of more immediate actions and the expansion of Command Disciplines in order to improve the timeliness and skill-based focus of accountability for staff misconduct. The proportionality of the response is also critical—egregious misconduct warrants a severe penalty, while less serious policy violations merit a response that enhances the staff person's ability to improve their job performance. That said, severe sanctions are not always necessary to catalyze change, and progressive discipline can provide opportunities for staff to correct their conduct after being made aware of their violations.

Finally, the response to misconduct must consider the recipient and what will be most effective in cultivating that individual's professional development—there is no "one-size-fits-all" approach. Both the circumstances of the event and the staff member's characteristics, history, and potential must be considered. It is therefore critical to understand that effectively responding to misconduct cannot be entirely formulaic—to be most effective, it must take into account a variety of individualized circumstances.

As discussed throughout this section, the Department responds to a large volume of policy violations committed by hundreds of staff members each month. The frequency of misconduct remains concerning, but the fact that the Department has made incremental improvements in identifying and responding to the behavior is nonetheless encouraging.

## General Trends in Accountability for Staff Misconduct

Although the numbers ebb and flow slightly year-to-year, between one and two thousand staff members are held accountable for misconduct each year. While the number of staff members ultimately held accountable is informative, this data cannot be viewed without the context of its larger purpose and whether it appears to be generally effective in improving staff

conduct. The threshold question is whether the accountability system is contributing to a necessary decrease in poor security practices and use of force related misconduct. To do so, these problems must be identified when they occur, and then they must be addressed with effective interventions to both hold staff accountable and improve their subsequent practice. While the Department identifies misconduct somewhat more reliably than in the past, there are still some violations that continue to go unaddressed because they were not detected. Importantly, the Monitoring Team has seen no appreciable decline in the volume of poor security practices and violations of the Use of Force Policy. Further, the Monitoring Team has found that accountability for misconduct is inconsistently applied and, in many cases, nonexistent.

The Department's data shows that the approach to imposing discipline has shifted over the past several years (*see* Table 1 in Appendix E for specific data in each area). More specifically:

- Fewer staff are being held accountable. The number of staff held accountable during this Monitoring Period is significantly lower than in previous Monitoring Periods. The Monitoring Team has not observed any significant decrease in the level of staff misconduct or security violations that would explain this decrease in the number of staff held accountable.

- Proportionally, formal discipline appears to being used less often, in only about one-third of all cases where staff discipline was imposed.[322]

- Overall, both the number and the proportion of UOF-related misconduct being addressed by Command Disciplines have gone down. In terms of Command Discipline outcomes, those Command Disciplines that result in deductions of one to 10 compensatory days has remained proportionally similar to previous years, but given the overall reduction in the number of Command Discipline referrals for UOF-related misconduct, Command Disciplines with one to 10 day deductions were imposed on far fewer staff.

- Corresponding increases in less severe accountability measures (Corrective Interviews, 5003 Counseling) have been observed. These measures lack routine

---

[322] It must be noted that data for investigations in 2024 and 2025 is not final, as there are 1,638 cases still pending with ID.

oversight and quality control to ensure they are conducted effectively in order to evaluate their impact and outcomes.

**Immediate Corrective Action (*see* Appendix E, Table 2 and Table 3)**

While the use of immediate corrective action has several benefits compared to formal discipline (it is imposed closer in time, is less procedurally burdensome), it must be properly administered. As discussed in detail below, the administration of Command Disciplines has multiple deficiencies. The use of suspensions has decreased compared to previous Monitoring Periods. In some cases, this may indicate a decline in problematic staff behavior that violates specific policies. For instance, the Department's efforts to curtail the abuse of sick leave has improved, which has reportedly reduced the frequency of the behavior and the Department's need to respond to it (e.g., there were 311 suspensions for this reason in 2022, and 69 during the current Monitoring Period). As for the use of suspensions for use of force related misconduct, while the proportion of suspensions for use of force reasons in this Monitoring Period was consistent with previous Monitoring Periods, the number of suspensions for use of force related suspensions has decreased. DOC reports that some of the decline in suspensions may be because of staffing shortages and so wanting to limit its use. This dynamic underscores the extent to which staffing issues are impairing the Department's ability to impose discipline and further underscores the agency's dysfunction.

For the segment of corrective actions that focus on skill development—Corrective Interviews and 5003 Counseling—this benefit will be realized only if the intervention is of sufficient quality.[323] In many cases it appears that the supervisory ranks are unprepared to support the weight of the strategies that place them at the center of officers' skill development. Many of those holding the ranks of ADW and Captain have only marginal competence in the skills necessary to provide *effective* supervision.

The interactions between staff and supervisors must address the circumstances surrounding the incident and clearly articulate the nature of misconduct and how it departs from expectations for appropriate conduct, with specific guidance on what the staff member could have done differently. Unfortunately, despite the fact that Corrective Interviews/5003 counseling

---

[323] Approximately 95% of the counseling and interviews recommended during this Monitoring Period did in fact occur. However, this data is merely quantitative, not qualitative, so it does not reflect whether these sessions are conducted with appropriate fidelity or not.

sessions are being utilized now more than ever, there has not been an observable improvement in staff conduct. In fact, staff repeatedly report that they do not feel supported by supervisors or have adequate guidance to do their job. E.I.S.S. has reported that staff advised them that staff do not find Corrective Interviews and Counseling sessions instructive. According to E.I.S.S. leadership, staff have reported that these meetings are often perfunctory exercises in which supervisors simply tell staff what they did wrong and then require them to sign a form. To achieve their intended purpose, the Department must critically evaluate the approach, content, and delivery of Corrective Interviews/5003 Counseling to ensure they are substantive, instructional, and collaborative. These interactions should provide an opportunity for constructive dialogue that actively engage staff in working through specific issues, developing understanding, and reinforcing expectations at an intellectual and practical level, rather than serving as purely procedural or disciplinary exercises. To that end, the Department must ensure that Corrective Interviews and 5003 Counseling are conducted by the most competent and skilled supervisors, those with the experience, judgment, and communication to effectively coach staff and model expected behavior. Continuing to routinely administer Corrective Interviews/5003 Counseling simply in order to say that action was taken, without evidence of corresponding changes to practice or outcomes, undermines the credibility and impact of the Department's accountability system.

### Accountability for High Level Supervisors (*see* Appendix E, Table 4)

Facility leadership (Wardens, Deputy Wardens, and Assistant Deputy Wardens) are almost never held accountable for misconduct or for the systemic failures within their facilities that violate Department policies related to security and use of force. When supervisors are not held to the same standards as their subordinates, it signals that accountability is optional and is not applied equitably. In a paramilitary organization such as the Department, the chain of command is foundational to effective management. It is incumbent that those in each supervisory rank closely review the conduct and efficacy of those in supervisory ranks beneath them (*e.g.*, DWs and Wardens should review the conduct and efficacy of ADWs and Captains and Department Chiefs and ACs should review the conduct and efficacy of the Wardens and DWs) and not solely scrutinize the conduct and efficacy of the line staff, in order to truly address systemic failures within the facilities and across the Department. When supervisors are not held accountable for their failures to manage the behavior of their subordinates, they may lose

motivation to elevate the skillset of their staff, mid-level managers become complacent, and line staff who *are* being held accountable perceive the system to be unfair.

- Wardens and Deputy Wardens were held accountable only four times between 2023 to 2025. ADWs were held accountable 65 times in 2023, 62 times in 2024, and 26 times in the first half of 2025. Further, few of the sanctions were significant with only 3 cases resulting in formal discipline or suspension between January 2024 and June 2025.

- Given the frequency of supervisory failures observed by the Monitoring Team during its routine review of incidents, the fact that supervisors are rarely, if ever, held accountable may begin to explain the lack of progress observed in the quality of staff supervision in this Department. Given that line staff report directly to and learn from their supervisors, repeated patterns of misconduct or security failures amongst line staff also signal a lack of appropriate supervisory intervention and management. An important element of discipline is to increase staff's skillset such that similar situations are handled appropriately in the future—failing to hold supervisors accountable for their management failures essentially ensures that their poor practices will continue. The lack of accountability in any form (*e.g.* counseling, corrective interview, or more formal discipline) for supervisors in the rank of ADW or above is stark.

## Command Discipline (*see* Appendix E, Tables 5(a), 5(b), 6(a) & 6(b))

Command Disciplines ("CDs") are one of the key pathways for holding staff accountable for use of force-related misconduct.[324] Because CDs can be imposed more quickly than formal discipline, they are a critical accountability tool. The Monitoring Team advocated for the expanded use and improved management of CDs for many years, which appeared to improve in 2024.[325] Unfortunately, much of the progress made during 2024 appears to have degraded during the current Monitoring Period. During 2024, the Department made significant efforts to centralize the adjudication of Command Disciplines under the new Informal Command

---

[324] The Department also utilizes Command Disciplines outside of the Rapid Review setting. 811 were issued during the current Monitoring Period. Some of these are related to use of force related misconduct, but most are not. *See* Appendix E, Table 6(a) for information regarding their outcomes.

[325] *See* the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 171-172, 227-230, and Appendix E, Tables 5 and 6.

Discipline Unit (ICDU). [326] While this centralization of CDs under ICDU initially appeared to be "a promising initiative designed to bring consistency and oversight to the CD adjudication process," many of the pervasive problems that characterized the facilities' adjudication of CDs in the past appear to have reemerged under ICDU's management, as discussed below. [327]

- **Revised CD Policy**: As required by the August 10, 2023 Order (dkt. 564), § I, ¶ 13, and with the Monitor's approval, the Department finally promulgated the new CD policy on January 13, 2025 with an implementation date of June 30, 2025 (so that staff have ample notice of the changes). [328] In general, the policy revisions included processing improvements and aligning the penalty grid with the severity of misconduct. More specifically, the new policy requires centralized processing and adjudication of CDs by ICDU, an increase in allowable penalties from five days to 10 days, changes to the schedule of violations, limits on the number of CDs that can be imposed within a 12-month period, addressing certain violations via formal discipline rather than a CD, a review by the ICDU Commanding Officer, and routine assessment of CD appeals by the Legal Division. More details regarding these revisions can be found in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 227-230.

The following observations were made regarding the CDs recommended via the facility's Rapid Reviews (*see* Appendix E, Tables 5(a) and 5(b) for detailed data).

- Rapid Reviews recommended significantly fewer CDs compared to previous Monitoring Periods. However, the Department's security audits, Rapid Reviews, and Monitoring Team's routine assessment of incidents have not identified any change in the frequency or

---

[326] *See* the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 119-120.

[327] *See* the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 171-172, 227-228.

[328] By way of background, the CD policy was initially updated on October 27, 2022 in order to both expand the use of CDs, which the Monitoring Team has long supported, and to address the processing issues identified by the Monitoring Team. The revisions were intended to ensure that, among other things: (1) CDs would no longer be dismissed for due process violations and (2) the Department did not automatically defer to the lowest level sanction (*See* the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 180-181). The revisions to the policy were intended to improve practice, but initially, the Department continued to dismiss a large number of CDs and appeared to rely excessively on the lowest level sanctions. In addition, in at least some cases, the Department issued CDs that precluded the issuance of formal discipline, which should never occur. As a result of these deficiencies, at the end of 2022, the Department reported its intention to revise the policy again but did not proceed with the revisions in a timely manner, resulting in a requirement to do so as part of the Court's August 10, 2023 Order (dkt. 564). The Monitoring Team shared feedback on revisions to the CD policy several times in 2023 and 2024.

level of staff misconduct and security violations. There were 771 CDs recommended via Rapid Reviews this Monitoring Period. This is 28% lower than the number of CDs recommended via Rapid Reviews during the 19th Monitoring Period and 46% lower than the number recommended during the 18th Monitoring Period.

- A total of 65% of these CDs resulted in a substantive outcome. Most CDs were closed with proportionally similar penalties to those observed in previous Monitoring Periods—31% resulted in deductions of 1-10 compensatory days, 6% referred the staff member for retraining, and 10% were elevated to formal MOC charges. However, because fewer CDs were recommended overall, while these proportions remained similar, there were fewer staff that received CDs resulting in these penalties. Proportionally fewer CDs were closed with reprimands and Corrective Interviews.

- ICDU continues to dismiss/close administratively proportionally fewer CDs (13%) than the high rates observed when the facilities administered CDs, but the Department must further improve its processes, particularly among those dismissed or administratively filed because of due to process violations and clerical errors.

- The number of CDs that were never entered into CMS increased substantially, to 13%. This results from failures at the facility level to create/enter in CMS the CDs recommended by the Rapid Review. In other words, the facilities are identifying misconduct and recommending CDs for staff in the Rapid Reviews, but NCU has found that the facilities are not actually initiating the paperwork needed for the CD to be adjudicated. It is incumbent upon the Department to ensure that it addresses identified misconduct and eliminate this issue.

Combining the outcomes discussed above, a total of 26% (n=200) of all CDs recommended via Rapid Reviews were either dismissed, closed administratively, or not entered into CMS. It is possible that a CD may not warrant a penalty for valid reasons such as factual findings, a staff member's resignation or termination, or the Investigation Division assuming responsibility for discipline when a complex incident requires further investigation—one of these reasons applied to 32% (n=65) of this subset of 200 CDs. However, CDs may also be dismissed, closed administratively, or not entered into CMS because of *due process violations or clerical errors*, which applied to 68% (n=135) of this subset of 200 CDs. This is a concerning increase compared to previous Monitoring Periods (47% in the 18th Monitoring Period and 56% in the 19th

Monitoring Period). These cases reflect the failure to properly manage an essential accountability tool. It is critical that the CD process is managed in a manner that reduces the number of due process violations and clerical issues. ICDU appears well-situated to manage this process and to coordinate the CD process through improved tracking and increased communication and collaboration with the facilities, but it does not appear that this is occurring. This may be because ICDU has reported that it has insufficient staffing and resources to both adjudicate the cases and *manage* the processing of CDs. Either way, it is incumbent on the Department to ensure that the CDs are both processed and adjudicated and the Department to determine how this will occur.

The following observations were made regarding the CDs recommended via sources *other than* the facilities' Rapid Reviews.[329] (*see* Appendix E, Tables 6(a) and 6(b) for detailed data).

- A larger number of CDs are recommended by sources other than Rapid Reviews. These CDs totaled 1,069 during the current Monitoring Period.

- A total of 65% of these CDs resulted in a substantive outcome: 31% resulted in 1-10 compensation days deducted, 18% were elevated to formal MOC charges, 9% resulted in a reprimand, 5% resulted in a corrective interview, and 2% resulted in a retraining referral.

- However**,** 35% of these CDs were dismissed. While this is a higher rate of dismissal than those recommended via Rapid Reviews, a smaller proportion (24%) of these CDs recommended via other sources were dismissed for due process violations and clerical reasons.

Given the number of serious issues identified with CD adjudication and processing, the Monitoring Team assessed a sample of CDs processed during this Monitoring Period to better understand the relevant nuances. The Monitoring Team reviewed all CDs for supervisor ranks that were closed in the CMS system in May and June 2025, including those that resulted in penalties and those dismissed/closed administratively due to clerical issues, due process violations, or any other reason. Of the 73 CDs for supervisors closed during this two-month

---

[329] Reasons behind these CDs vary, and include AWOL staff, staff off-post, Departmental property violations, inadequate supervision, inefficient performance of duties, insubordination, tour wand violations, and use of force misconduct identified outside of the Rapid Review process.

period, 20 CDs (27%) resulted in penalties, and 53 CDs (73%) were dismissed. Of those dismissed, 56% were for clerical errors and due process violations, and 44% were dismissed based on factual findings (typically, documentation disproved the original charge). These factual dismissals (and the effort and resources dedicated to processing them) may have been avoided with better record keeping that prevented the CD from being filed at the outset. Of the 20 CDs that resulted in penalties, only two cases (10%) were closed with penalties as delineated by the CD policy's penalty grid. The remainder (90%) were closed with reduced penalties that departed from what is delineated by the CD policy. The reduced penalties and the high rate of dismissals, particularly for due process violations and clerical errors, raise significant concerns about the fidelity with which the CD process is occurring.

Given these concerns, the Monitoring Team shared its findings with the Department along with a list of recommendations. The Monitoring Team recommended that ICDU and the facilities coordinate to reduce the number of CD closures due to clerical issues and due process violations, improve record-keeping such that resources are not wasted processing and adjudicating CDs where records could be easily provided to disprove charges, and ensure that the majority of CD penalties were aligned with the scheduled penalty grid set out by the CD policy. The Department has reported that it is discussing the Monitoring Team's feedback internally and working to address the recommendations.

Finally, if a staff member does not agree with the CD penalty imposed, they may: (1) refuse the CD penalty, which means the CD charges will be converted into a Memorandum of Complaint for formal discipline and will be processed through the Trials Division, or (2) appeal the CD penalty with the Legal Division. The Monitoring Team assessed the appeals resolved by the Legal Division from January to June 2025. The Legal Division decided 76 CD appeals, 70% of which affirmed the penalty, and 30% resulted in a reduced penalty or dismissal of the CD charges altogether. The Monitoring Team reviewed those appeals where the penalty was reduced or dismissed and found that most of the CD charges were related to staff absenteeism, and the reasons and documentation that the Legal Division provided for reducing the penalty appeared reasonable.

**Formal Discipline (*see* Appendix E, Table 7)**

In addition to Immediate Corrective Action, the other pathway to accountability in the Department's framework is formal discipline. The number of cases referred for formal discipline during the current Monitoring Period continued the downward trend observed since 2022. The Department reports that this is partly attributable to an intentional choice by leadership to use accountability options that can be implemented more quickly (*i.e.,* Command Discipline) and that focus on skill-building (*i.e.*, Corrective Interviews and 5003 Counseling). Concurrent increases in these options were discussed above, though it is worth noting the significant downward trend in the number of Command Disciplines for use of force-related misconduct. In addition to the Department's reported intention to use other accountability options, the ongoing backlog of Full ID cases is also contributing to the decrease in formal discipline. Perhaps due to its resulting smaller caseload, the Trials Division has begun to close cases closer in time to the date of the incident and cases are pending with the Trials Division for shorter periods of time following referral from ID.

Historically, between 500 and 1,000 cases based on incident date are referred for formal discipline each year. A large number of investigations for incidents that occurred in 2024 and 2025 remained pending with ID as of June 2025 (n=649 for 2024, n=989 for 2025), so the total number of referrals is not yet final and is expected to increase. So far, 265 cases have been referred for 2024 incidents, and 36 cases have been referred for 2025 incidents.

**Backlog of Cases Pending Formal Discipline (*see* Appendix E, Table 8)**

The number of cases pending with the Trials Division remains at a reasonable number, with no sign of a reemerging backlog. Compared to 2020-2022 when over 1,000 cases were pending at the end of each Monitoring Period, only 272 cases were pending at the end of the current Monitoring Period.

**Timeliness of Formal Discipline (*see* Appendix E, Table 9)**

Although the Trials Division's caseload size has recently become more manageable, the length of the process, even under ideal circumstances, means that the opportunity for *timely* discipline for the majority of cases has been lost. Even when the formal disciplinary process is operating as intended, which is not yet occurring, the timeline to fully resolve a case is *at least*

180 days. More specifically, the investigation may take up to 120 days (Consent Judgment, § VII, ¶ 9), 30 days are permitted for charges to be served (Consent Judgment, § VIII. ¶ 3), and at least a few months are required to prosecute and resolve the case (which may extend to approximately five months if a trial at OATH occurs). This extended timeline, even under ideal conditions, combined with the precursor of investigation, takes the resolution of the case long past the date the incident occurred, and underscores why the Monitoring Team has consistently emphasized the need for more immediate, close-in-time responses to staff misconduct.

Although the Department has eliminated its disciplinary backlog, it struggles to impose formal discipline in a timely manner from the date of the incident. 67% of the cases that were closed during the current Monitoring Period and 63% of the cases currently pending with the Trials Division address staff misconduct from incidents that occurred over one year ago.[330] In order to shorten the time between incident date and case closure, for formal discipline to be applied closer to the ideal scenario of ~180 days, both the investigative and adjudication processes must become more efficient.

**Length of Time that Cases Remain Pending with the Trials Division (*see* Appendix E, Tables 10 & 11)**

The Monitoring Team assesses the adjudication process from another vantage point: the length of time that cases have been pending with the Trials Division. Although formal staff discipline is not yet imposed in a timely manner compared to the date of the incident, the adjudication process within the Trials Division has become far more efficient then in the past. The Department's success in addressing the backlog of disciplinary cases in 2021/2022 led to substantial decreases in the length of time that cases remain pending. Compared to 2021/2022 when more than half of cases had been pending with the Trials Division for over a year prior to closure, during the current Monitoring Period, only 15% of cases had been pending with the Trials Division for that period of time.

For the past two and a half years (since the disciplinary backlog was resolved in 2022), the vast majority of cases (80% or more) were closed within one year of referral from ID to the

---

[330] Of these 171 cases that have been pending for more than one year, approximately 48 cases (28%) cannot be prosecuted due to external factors such as the staff member being out on military leave, sick leave or if the case is on hold while being evaluated for criminal prosecution by outside law enforcement agencies.

Trials Division. During the current Monitoring Period, 45% of cases were closed *within just three months* of being referred to the Trials Division by ID. Only a small proportion of cases closed during the current Monitoring Period (15%, or about 36 cases) had been pending for more than one year since being referred to the Trials Division.

Similarly, at the end of the current Monitoring Period, the Trials Division had a historically low number of pending cases (n=272, compared to over 1,000 cases in 2020 and 2021). Only 14% had been pending for more than one year since the service of charges, which is a significantly smaller proportion than in previous Monitoring Periods. About one-third (14%) of pending cases were awaiting final approval of the Deputy Commissioner of the Trials Division or the Commissioner.

Overall, these improvements are important, but during this Monitoring Period, at least 35% of the cases referred to the Trials Division were either closed or still pending *6 months or more* after the case was initially referred to the Trials Divisions. Further, the time for case processing continues to exceed the ideal processing time of ~180 days from the incident date. The Trials Division must continue to identify additional efficiencies to bring the Department closer to the requirement of timely accountability.

**Dispositions of Formal Discipline Cases (*see* Appendix E, Table 12)**

Data on the dispositions of formal discipline cases revealed the following:

- With the resolution of the disciplinary backlog in 2022, the backlog of full ID investigations, and the reduction in the use of formal discipline observed over the past couple years, Trials handles correspondingly fewer cases. During the current Monitoring Period, 269 cases were resolved.

- As is typical, most formal discipline cases were resolved via Negotiated Plea Agreements ("NPA"; 73%), and very few cases (only two) were resolved via OATH trials. [331]

---

[331] One of these OATH trials occurred at the end of 2024 and the final processing and imposition of discipline was completed by the Department in 2025. The other OATH trial occurred and the discipline was processed and imposed in 2025.

- Over the past few years, increasingly larger proportions of cases were administratively filed (from 10% in 2023, 22% in 2024 and 25% in 2025). This is discussed in more detail below.

Notable details about these trends are discussed below.

**Penalties Imposed via NPA (see Appendix E, Table 13)**

Although a variety of penalties are available via NPA (*e.g.*, reprimand, demotion, termination), nearly all NPAs impose a loss of compensatory days. During the current Monitoring Period, 83% of NPAs imposed a loss of less than 30 compensatory days and 16% imposed a loss of 30 days or more. In prior years, greater proportions of NPAs imposed losses of more than 30 days. To assess whether the penalties imposed were aligned with the requirement to impose *appropriate and meaningful* discipline, the Monitoring Team considers: (1) the time taken to impose discipline, (2) the specific facts of the case (including the aggravating and mitigating factors, the staff's prior history, and other circumstances as appropriate), and (3) the proportionality of the sanctions imposed. During this Monitoring Period, the Monitoring Team reviewed 137 cases where discipline was imposed after October 27, 2017[332] (when the revised Disciplinary Guidelines[333] went into effect to assess whether the actions taken were reasonable and aligned with the Disciplinary Guidelines. Overall, case outcomes remain largely reasonable. In a small number of cases the outcomes appeared to be questionable, but the presence of potential mitigating factors appeared to offset the concerns. Only a very small number of cases appeared to have unreasonable outcomes where it appeared that the use of lower-level sanctions may not have been aligned with the Disciplinary Guidelines.

One of the strategies for resolving the disciplinary backlog in 2022 was to make additional low-level sanctions available to the Trials Division via the formal disciplinary process (*e.g.*, resolving the case as a Command Discipline and/or expunging the case from the staff's record after one year). Although the Monitoring Team has continually encouraged judicious use of these conventions, the Department continues to consistently rely on them. 45% of all NPAs from the current Monitoring Period included these sanctions. *See* Appendix E, Table 14. The

---

[332] There were two cases closed in this Monitoring Period in which the incident date occurred before October 27, 2017. These two cases were not part of the assessment.

[333] *See* Monitor's April 18, 2018 Report (dkt. 311) at pgs. 120-121.

Trials Division reported that most of the NPAs that were settled with a CD were those in which a CD had been initially offered, but the staff member refused, which led to formal charges being issued, which were then ultimately resolved with a CD. Following the close of the Monitoring Period, the Monitoring Team has initiated discussions with the Trials Division about alternative means to manage these cases and further updates will be shared in future reports.

**<u>Cases in which Formal Discipline was Not Imposed (see Appendix E, Tables 12 and 13)</u>**

At times, cases referred for formal discipline do not ultimately result in a sanction being imposed either because the staff member resigns or retires before the prosecution is complete or because the charges are dismissed. Penalties imposed by formal discipline can also be changed or expunged through the appeals process.

- **Deferred Prosecution**. These are cases in which the staff member chose to leave the Department *with charges pending* and before the case was resolved. Such cases are categorized as "deferred prosecution" because no final determination has been rendered but the facts suggest the case should not be dismissed and the prosecution of these cases will proceed if the staff member returns to the Department. The proportion of cases disposed in this way has been very low for several years (less than 5%).

- **Administratively Filed Cases**. Administrative filings occur when the Trials Division determines that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a staff member resigns before charges are served).[334] In other words, these cases are dismissed. In 2024, 126 cases were closed via administrative filing, which is 22% of all formal disciplinary cases closed in 2024. In the first half of 2025, 66 cases were closed via administrative filing, accounting for 25% of all cases closed in 2025. Of these 66 cases, 71% (n=47) were filed either because the charges were determined to be unwarranted (n=23) or due to procedural or administrative issues (n=24), such as duplicate filings, statute-of-limitations expirations, or cases impacted by case law

---

[334] Administrative filing is not only determined by the Department and Trials Division but can also be an outcome as a result of the input from Administrative Law Judges at OATH.

limiting the Department's ability to impose formal penalties for uniform violations (*e.g.,* not wearing a duty belt or tie). The remaining 29% of cases were administratively filed due to other issues like the MOS having already resigned, retired, or been terminated. The Monitoring Team closely reviewed the 23 charges administratively filed because the charges were found to be unwarranted because they reflect circumstances in which the Trials Division reached a different conclusion than the Investigation Division and the facilities regarding whether staff misconduct occurred. The Monitoring Team's review found that the dismissal of these 23 cases appeared generally reasonable. These cases largely involved more minor use-of-force-related incidents or alleged failures to intervene or supervise. In most cases, objective evidence, particularly Genetec and body-worn camera footage, could reasonably be interpreted to suggest that the staff actions did not violate policy under rapidly evolving circumstances, even where the Investigation Division initially viewed the conduct as potentially chargeable. In these cases, the difference between the Investigation Division's assessment and the Trials Division's determination often reflected judgment calls on the evidentiary burden required to sustain discipline, especially where incidents unfolded quickly, involved competing safety concerns, or where video evidence may be ambiguous. There was a small subset of cases where the rationale for administrative filing rested more heavily on judgment calls regarding proportionality, supervisory responsibility, or the need to prove intent. In this small group of cases, the Monitoring Team did not identify a pattern suggesting a systemic disregard for accountability. Overall, the Monitoring Team finds that these administrative filings reflect a measured approach. The Monitoring Team will continue to review administratively field cases to ensure they are processed reasonably.

- **Appeals**. Another way that cases ultimately close without discipline (or with a penalty that varies from that imposed by the Commissioner) is via an appeal. A disciplinary decision made by the Commissioner is appealable to the Civil Service

Commission,[335] (which is authorized to make the final disciplinary decision[336]) or as an Article 78 proceeding. There were no Article 78 proceedings pending during the 20th Monitoring Period, so therefore no decisions were issued. Between January and June 2025, the Civil Service Commission issued seven decisions (three for use of force related misconduct, and four for other types of misconduct) and in six of the seven cases, the Civil Service Commission affirmed the Department's penalty. In one case for non-use of force misconduct, the Civil Service Commission modified a penalty from a 50-day suspension to a 40-day suspension. The OATH ALJ found the DOC staff member guilty of multiple conduct unbecoming charges, and the Civil Service Commission affirmed the findings of guilt, but reported that they reduced the "unduly harsh" penalty because the staff member had been with DOC for eight years with no previous discipline for similar misconduct, and was eventually granted work limitations due to a diagnosis of anxiety, a request that was pending at the time of the supposed violation. While this decision does raise concerns, it is not as concerning as the two decisions by the Civil Service Commission in 2023 that modified the disciplinary sanction imposed by the Department.[337]

## Conclusion

Establishing an effective accountability system for staff misconduct requires evaluating the interaction among its three critical subparts— (1) consistently identifying misconduct, (2) promptly applying corrective action, and (3) imposing meaningful and proportionate sanctions. The need to address these components together stems from their collective impact on staff

---

[335] Pursuant to Section 813 of the New York City Charter, the Civil Service Commission can decide appeals from permanent civil servants who were subject to disciplinary penalties following proceedings held pursuant to section 75 of the Civil Service Law. According to § 3-01 to 3-04 of Title 60 of the Rules of the City of New York, any civil service employee who receives a determination of guilty and/or a penalty can appeal to the Civil Service Commission within 20 days of the date of notice of the final disciplinary action. After receiving notice of a timely appeal, the Department has 30 days to submit the complete record of the disciplinary proceedings. The Civil Service Commission then reviews the record of the disciplinary proceeding, allows the parties to submit further written arguments, and may schedule a hearing before issuing a final decision. The Civil Service Commission then issues a written decision to affirm, modify, or reverse the determination being appealed. The Civil Service Commission may, at its discretion, direct the reinstatement of the employee or permit transfer to a vacancy in a similar position in another division or department, or direct that the employee's name be placed on a preferred list.

[336] The Civil Service Commission opinion notes "[t]his decision constitutes the final decision of the City of New York."

[337] *See* the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 129-130.

practices, the Department's culture, and, consequently, on overall security and safety within the facilities. Each provision addresses different aspects of the disciplinary process, yet their collective aim is to ensure a robust and effective system of accountability.

The discussion throughout this section and the compliance ratings below represent a systemic analysis, which acknowledges that improvement in one area can support the effectiveness of the whole system. This approach emphasizes the necessity of both an in-depth look at all related parts and a broader, holistic view to address challenges comprehensively in order to establish a practical and effective accountability framework. Thus, in order to establish a sustainable, consistent, and robust accountability system—integral to enhancing security and safety, and elevating staff conduct in alignment with the *Nunez* Court Orders— the Department must ensure all components of the disciplinary process are implemented reliably and monitored consistently. This responsibility extends not only to formal disciplinary proceedings, but also to facility-managed corrective actions that can more quickly and directly influence staff behavior.

- **Consent Judgment, § VIII, ¶ 1**. The Department has continued to work toward improving its ability to reliably identify misconduct to hold staff accountable for use of force-related violations (although work remains). While the Department does identify misconduct somewhat more reliably than in the past, the overall decline in the number of corrective actions taken demonstrates the ongoing need for improvement in this area given that the Monitoring Team has not identified a material decline in the level of staff misconduct or security violations observed by the Monitoring Team. In addition, a timely disciplinary process is essential for properly addressing use of force related misconduct. While the Department's system for holding staff accountable still has a variety of inefficiencies, it has made progress in adjudicating misconduct cases in a timely manner. Now that the Trials Division has addressed its backlog and is receiving fewer cases, cases are processed far more quickly than they have been in the past.[338] The Department's efforts to centralize the CD process should bring about additional efficiencies, however, some of the findings in this Monitoring Period suggest that there are certain breakdowns

---

[338] Half of the cases closed during the current Monitoring Period were closed within three months of being referred, and a very small number languished beyond one year. Similar performance levels are observed among the pending caseload, with a little less than half of the cases being pending for three months, and a small proportion that has been pending for more than one year.

that are undermining the effort to utilize CDs as designed and must be corrected. Significant work remains in order to achieve Substantial Compliance. The Department must not only maintain the current improvements, but also improve the efficiency of the investigation process (so that the overarching disciplinary *system* is efficient, from the time the misconduct occurs to the time the sanction is imposed), hold facility leadership accountable when they violate the use of force directive, enhance and closely monitor the efficacy of skill-based interventions (Corrective Interviews and 5003 Counseling) to change staff behavior and improve staff practice, and ensure that all disciplinary sanctions are, in fact, imposed and that the sanctions imposed are proportional to the misconduct.

- **Consent Judgment, § VIII., ¶ 3 (c)**. This provision has three parts. First, the Department achieved Substantial Compliance with the requirement related to service of charges in the 12th Monitoring Period and the Monitoring Team has observed no change in practice since then. Second, the Monitoring Team continues to find that charges generally are not dismissed without a proper basis, and the Department remains in Substantial Compliance. The third requirement focuses on the efficiency of the Trials process itself, and as described above, important improvements to closing cases in a timelier manner once referred to the Trials Division from ID have continued, and the Department remains in Partial Compliance with this requirement. In order to achieve Substantial Compliance, the proportion of cases closed within three months upon referral must continue to be sustained and improved. Further, ensuring that all approval of case closures occur in a timely manner is critical, and further improvement is needed in this area.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § VIII., ¶ 1.** Partial Compliance<br>**Consent Judgment § VIII., ¶ 3(c)**<br>• **Serving Charges**: Substantial Compliance (per the 12th Monitor's Report)<br>• **Administrative Filing**: Substantial Compliance<br>• **Expeditiously Prosecuting Cases**: Partial Compliance |

| IMMEDIATE CORRECTIVE ACTION & MONITOR RECOMMENDATIONS (FIRST REMEDIAL ORDER § C., ¶ 1 & § C., ¶ 2) |
|---|
| _First Remedial Order § C., ¶ 1. Immediate Corrective Action_. Following a Use of Force Incident, the Department shall determine whether any involved Staff Member(s) should be subject to immediate corrective action pending the completion of the Use of Force investigation, which may include counseling or re-training, reassignment to a different position with limited or no contact with Incarcerated Individuals, placement on administrative leave with pay, or immediate suspension (collectively, "immediate corrective action"). The Department shall impose immediate corrective action on Staff Members when appropriate and as close in time to the incident as practicable. The Department shall document and track any immediate corrective action taken, the nature of the initial corrective action recommended, the nature of the corrective action imposed, the basis for the corrective action, the date the corrective action is imposed, and the date of the Use of Force Incident resulting in the immediate corrective action. The requirements in this provision are not intended to alter the rights of Staff or the burden of proof in employee disciplinary proceedings under applicable laws and regulations. |
| _First Remedial Order § C., ¶ 2. Responding to Monitor Recommendations_. Upon identification of objective evidence that a Staff Member violated the New Use of Force Directive, the Monitor may recommend that the Department take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. Within ten business days of receiving the Monitor's recommendation, absent extraordinary circumstances that must be documented, the Department shall: (i) impose immediate corrective action (if recommended), and/or (ii) provide the Monitoring Team with an expedited timeline for completing the investigation or otherwise addressing the violation (if recommended), unless the Commissioner (or a designated Assistant Commissioner) reviews the basis for the Monitor's recommendation and determines that adopting the recommendation is not appropriate, and provides a reasonable basis for any such determination in writing to the Monitor. |

The First Remedial Order (dkt. 350), § C, ¶¶ 1 and 2, requires the Department to determine whether immediate corrective action should be taken against a staff member pending the completion of an investigation. Further, the Department must respond within 10 business days to any recommendations from the Monitor to take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The Action Plan (dkt. 465), § F, ¶ 2, introduced an additional requirement for the Department to expedite egregious cases on specific timelines to ensure those cases are closed as quickly as possible. Given that these three requirements are inextricably linked, they are addressed together herein.

**Compliance Assessment Overview**

The first compliance assessment for both the First Remedial Order (dkt. 350), § C, ¶¶ 1 and 2 occurred for the 11th Monitoring Period (July to December 2020). At that time, the Department was found to be in Partial Compliance with both provisions and remained so through the 19th Monitoring Period (July to December 2024).[339] While the Department was again found

---

[339] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the

in Partial Compliance of the First Remedial Order, § C, ¶ 1 during this current 20th Monitoring Period (January to June 2025), no rating is being given for the First Remedial Order, § C, ¶ 2 because the Monitoring Team did not make any recommendations pursuant to this provision during the 20th Monitoring Period.

The Monitoring Team provides an update on the Department's efforts to achieve compliance with Action Plan (dkt. 465), § F, ¶ 2 as it relates to the work of the other provisions, but a compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Monitor Recommendations for Immediate Corrective Action, etc. (First Remedial Order § C, ¶¶ 1 & 2)**

The use of immediate action is a critical tool for promptly addressing staff misconduct and promoting effective accountability to deter problematic conduct going forward. These actions, taken before the completion of a full use of force investigation, may include counseling or retraining, reassignment to a role with limited or no contact with incarcerated individuals, administrative leave with pay, or immediate suspension. Additionally, Command Disciplines are often imposed closer in time to the incident than formal discipline and are also considered part of this immediate response strategy. The overall disciplinary process is discussed in more detail in the compliance assessment for Consent Judgment, § VIII, ¶ 1 Staff Discipline & Accountability.

As part of this process, the Monitoring Team also submits feedback to the Department regarding certain investigations in which it appears that the objective evidence was not adequately investigated or analyzed and recommends that additional review may be necessary or appropriate. This is not intended to serve as a comprehensive review of all investigations by the Monitoring Team, but an attempt to mitigate the possibility that certain misconduct may not be addressed due to an insufficient investigation. Further detail about these recommendations is provided in this report in the compliance assessment for Consent Judgment, § VII, ¶ 1, Use of Force Investigations.

---

Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

Outlined below is a brief summary of the work that was completed in this Monitoring Period.

- **Immediate Corrective Action Taken**. In January-June 2025, Immediate Action was taken in 2,391 separate situations (in some cases, the same staff member may have been subject to immediate corrective action more than once for different incidents). Data regarding the immediate corrective action imposed for UOF-related misconduct is available in Table 2 in Appendix E. While the exact proportions of each type of action vary year-to-year, in this Monitoring Period a greater proportion of incidents with immediate corrective action resulted in counseling and corrective interviews (85%), and smaller proportions of incidents resulted in CDs for a deduction of one to 10 days (10%) or CDs for reprimands (3%). In other words, a greater proportion of staff misconduct was addressed with counseling and corrective interviews in January-June 2025 than in prior Monitoring Periods. The overall number of immediate corrective actions taken is large and with some exceptions, it generally appears that the most egregious cases are addressed close in time. Suspensions are a critical tool to addressing the most egregious cases close in time. Of the 28 suspensions for use of force-related misconduct in the 20th Monitoring Period, 12 were for the use of head strikes that did not appear consistent with DOC policy. It is notable that at least 12 staff utilized head strikes in such a manner that required a suspension. While it is promising that the Department identified this misconduct and took action so closely in time, it is concerning that such egregious misconduct persists. As discussed below and in the compliance assessment of Consent Judgment § VII, ¶ 1 (Thorough, Timely, Use of Force Investigations) and First Remedial Order § A, ¶ 1 (Use of Force Reviews), the Department's ability to identify instances of misconduct has become more reliable. However, despite this improvement in identifying staff misconduct that warrants immediate corrective action, the quality and efficacy of the immediate corrective action itself remain questionable given that such a high volume of corrective action has not resulted in a meaningful change in staff practice. This is discussed in more detail in the compliance assessment for Consent Judgment, § VIII, ¶ 1 Staff Discipline & Accountability.
- **Monitor Recommendations for Immediate Corrective Action**. The Monitoring Team does continue to identify some instances where certain immediate corrective actions

likely could have been taken but were not. The Monitoring Team is judicious in the recommendations that it makes to the Department regarding immediate action cases and only identifies those cases where immediate action should be considered, *and* the opportunity to provide *immediate* action remains viable. The Monitoring Team routinely reviews a significant amount of information related to use of force incidents but given the Monitoring Team's role there are inherent limitations on the scope of misconduct the Monitoring Team may identify and recommend for consideration of *immediate* action. For instance, if the Monitoring Team is reviewing investigation reports and identifies an incident that warranted immediate corrective action (and none was taken), but the incident occurred many months prior, the Monitoring Team does not share a recommendation for immediate action (referred to as a C2 recommendation) because the window of opportunity for taking immediate action has passed. The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe. The C2 recommendations shared by the Monitor are only a *subset* of cases in which the Department failed to take immediate corrective action and likely should have.[340] Given the limitations discussed above, between January and June 2025 (the 20th Monitoring Period), the Monitoring Team did not send any recommendations to take immediate corrective action nor to expedite investigations pursuant to § C, ¶ 2 of the First Remedial Order (dkt. 350). However, the Monitoring Team continues to make Action Plan (dkt. 465), § F, ¶ 2 recommendations, which are discussed in further detail below.

- **Overall Assessment of Immediate Corrective Action**. The prevalence of cases in which immediate action should be taken, especially the number of suspensions for use of head strikes, reflects the endemic harmful staff practices related to the use of force. Further, given the large volume of corrective interviews and 5003 counseling sessions imposed (via any pathway), the fact that poor practice remains so prevalent in this Department suggests that the quality of these interventions is insufficient and requires additional reinforcement through improved active supervision. A more detailed discussion regarding

---

[340] Recommendations to expedite the completion of investigations pursuant to the First Remedial Order (dkt. 350), § C, ¶ 2, as noted in the Monitor's October 28, 2022 Report (dkt. 472) at pg. 162, were not a fruitful avenue to ensuring those cases were addressed quickly. The Monitoring Team therefore now recommends expedited resolution of cases pursuant to the Action Plan (dkt. 465), § F, ¶ 2 (the "F2" process) for cases that merit expedited completion of investigations or discipline.

accountability and discipline is included in this report in the compliance assessment for Consent Judgment, § VIII, ¶ 1 Staff Discipline & Accountability. Active supervision is discussed in more detail in the compliance assessment for First Remedial Order § A, ¶ 4 & Action Plan § C, ¶ 3 (ii-iii).

**Expeditious Resolution of Egregious Misconduct (Action Plan § F, ¶ 2)**

The Action Plan (dkt. 465), § F, ¶ 2 ("F2") sets aggressive timelines for the investigation and prosecution of egregious cases. As discussed above, given the limitations on the Monitoring Team's ability to recommend immediate action, the Monitoring Team has focused on recommendations related to F2. This requirement went into effect in mid-June 2022. Pursuant to the Action Plan, a case identified as needing to be resolved in an expedited manner must be resolved as follows:

- Investigations must be completed within 30 business days of identification.

- Referral for Discipline must occur within 20 business days of the closure of the investigation.[341]

- Adjudication of Discipline must be completed within 35 business days of the case being filed with OATH.[342]

- Imposition of Discipline by the Commissioner must occur within 15 business days of receiving the Report and Recommendation from OATH.

Between mid-June 2022 and mid-August 2025, the discipline for 92 staff across a total of 84 use of force incidents have been closed through the expedited process as outlined above. The Department's ability to identify these cases continues to improve and has identified 58 of the 84 incidents identified as F2. The number of F2 cases identified has decreased each year since 2023,

---

[341] The case must be processed for discipline — including completion of the MOC, referral to the Trials Division, service of charges on the Respondent, production of discovery to the Respondent, provision of an offer for resolution to the Respondent, filing of the case with OATH, and scheduling of a pre-trial conference — within this time.

[342] Any and all disciplinary proceedings, including, but not limited to, convening a pre-trial conference, conducting a trial before OATH, and submission of a Report and Recommendation from the OATH Administrative Law Judge ("ALJ") must occur within this time.

which appears to be the result of fewer cases that merit such treatment. More detailed information on the number and outcome of F2 cases can be found in Table 15 in Appendix E.

In this Monitoring Period, 15 cases involving 15 staff were identified as F2 cases (13 by ID and 2 by the Monitoring Team), and 11 F2 cases involving 11 staff were closed.

- **Timelines**: ID continues to struggle with completing the investigations for F2 cases pursuant to the timelines set by the provision. Given that ID's Use of Force Priority Squad ("UPS") conducts the investigations for F2 cases, ID must continue to ensure that UPS has sufficient investigators in order to expeditiously resolve these F2 cases.[343] The ongoing delays in ID's completion of investigations diminishes the efficacy of this process as a means to impose close-in-time discipline and circumvent the protracted processing times that currently characterize most disciplinary matters in the Department. The Trials Division consistently expedites the resolution of F2 cases once ID has completed the investigations.

  o As of August 15, 2025, 20 cases are still pending. Eight cases are pending investigation with DOC's ID Division, six of which have been pending investigation with ID for over two months. Five cases are pending disciplinary resolution with DOC's Trials Division.[344] The remaining seven cases are on hold pending stand-down orders from DOI to allow DOI to complete its own investigation into the incident.[345]

- **Outcomes**: Overall, the F2 process has proven to be an effective tool in addressing certain egregious cases more expeditiously than they would otherwise be managed. Further, most F2 cases are resolved with generally reasonable outcomes. The outcomes of most of the 11 cases closed in the current Monitoring

---

[343] ID's UPS is discussed in more detail in the compliance assessment for Consent Judgment, § VII, ¶ 1, Use of Force Investigations.

[344] All five cases have only been pending with the Trials Division for less than one month. Four of the five cases pending with the Trials Division had investigations that took longer than two months. The fifth case pending with the Trials Division had also been pending investigation longer than two months, but that is because it was placed on an extended DOI hold and DOC could not proceed with the case during that time.

[345] Five of the seven cases on DOI hold have been pending longer than two months since they were identified for expeditious resolution. The other two cases were recently identified as F2 cases and recently placed on DOI holds.

Period generally appeared reasonable,[346] and all but two cases were closed within six months of being identified as an F2 case,[347] which is significantly more expeditious than the standard process for formal disciplinary charges. Cases of staff misconduct meriting expeditious resolution through the F2 process remain too high, but it is notable that the frequency with which they occur has decreased.

## Conclusion

- **First Remedial Order, § C, ¶ 1**. While the Department does impose some corrective action immediately after an incident and has improved its internal ability to identify incidents that merit immediate action, immediate corrective action is not reliably occurring and is not always proportional to the misconduct identified. The Department is therefore in Partial Compliance with this provision.

- **First Remedial Order, § C, ¶ 2**. The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe. The Monitoring Team does continue to identify some instances where certain immediate corrective actions likely could have been taken, but were not. Given the limitations noted above, the Monitoring Team did not make any recommendations in this Monitoring Period and so this provision is not rated.

- **Action Plan, § F, ¶ 2**. Although a compliance rating is not provided for this provision, it is informative of the Department's work to expedite and address the most concerning cases. This process is important and has resulted in more expeditious resolution of some particularly egregious cases. It is particularly noteworthy that ID has self-identified cases for expedited treatment, and the Trials

---

[346] As previously reported in the Monitor's May 22, 2025 Report (dkt. 850) at pg. 188, in one F2 case closed during this Monitoring Period, an OATH ALJ found guilt and recommended termination in a Report & Recommendation following an OATH trial. The staff member in this case was charged with unnecessary and excessive force for using an improper takedown, failing to turn on his body-worn camera during the incident, and submitting a false report about the incident. The Commissioner issued an Action of the Commissioner to *reduce* the penalty to 30 suspension days, 45 compensation days, and three years' probation. Additionally, the Action of the Commissioner was not imposed and signed off by the Commissioner until almost a year after the OATH ALJ issued their Report & Recommendation, which is well beyond the 15-day timeline for this step set by the provision. The outcome in this case is questionable.

[347] One case took longer than six months to close because it was pending final sign-off from the Commissioner for an extended period. The other case took longer than six months to close because it was placed on an extended DOI hold.

Division continues to consistently expedite the resolution of F2 cases once the investigations have been completed. Further, the number of cases identified by the Monitoring Team has been limited and has significantly decreased over the past year, a sign that ID has improved in its identification of these cases. This is notable given these cases reflect some of the most egregious cases that occur in the system. However, ID must ensure that the investigations for F2 cases are appropriately prioritized in order to meet the timelines set by the F2 process. A compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § C., ¶ 1.** Partial Compliance<br>**First Remedial Order § C., ¶ 2.** Not Rated |

**OATH PROCEEDINGS (FIRST REMEDIAL ORDER § C. 4/THIRD REMEDIAL ORDER, ¶ 2, FIRST REMEDIAL ORDER § C., ¶ 5 & THIRD REMEDIAL ORDER, ¶ 3)**

*Third Remedial Order ¶ 2. Increased Number of OATH Pre-Trial Conferences*. Paragraph C.4 of the First Remedial Order shall be modified to increase the minimum number of pre-trial conferences that OATH must conduct each month for disciplinary cases involving charges related to UOF Violations. Specifically, as of December 15, 2021, Paragraph C.4 shall be revised to read as follows: "All disciplinary cases before OATH involving charges related to UOF Violations shall proceed in an expeditious manner. During each month, Defendants shall hold pre-trial conferences before OATH for at least **150** disciplinary cases involving charges related to UOF Violations, absent extraordinary circumstances that must be documented. If there continues to be delays in conferencing cases despite this calendaring practice, OATH will assign additional resources to hear these cases. The minimum number of case conferences required to be held each month under this Paragraph may be reduced if the Monitor makes a written determination, no earlier than one year after the date of this Order, that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month."[348]

*First Remedial Order § C., ¶ 5. Applicability of Disciplinary Guidelines to OATH Proceedings.* The Disciplinary Guidelines developed pursuant to Section VIII, ¶ 2 of the Consent Judgment shall apply to any OATH proceeding relating to the Department's efforts to impose discipline for UOF Violations.

*Third Remedial Order ¶ 3. New OATH Procedures and Protocols.* Within 45 days of the date of this Order, the City, in consultation with the Monitor, shall develop, adopt, and implement a written plan to allow OATH to more expeditiously prosecute disciplinary cases involving charges related to UOF Violations. The plan shall include the following:

    i.   The steps OATH will take to increase the number ALJs and other staff who will be available to hear Department disciplinary cases, including the number of new ALJs and staff that OATH intends to hire by December 31, 2021.

    ii.   Improved procedures to ensure that OATH trials are promptly scheduled and completed without unnecessary delays, including scheduling trials within no more than three months of the initial pre-trial conference.

    iii.   The initiatives and procedures that ALJs will employ to encourage prompt agreed-upon resolutions of disciplinary cases when appropriate.

       The Office of Administrative Trials and Hearings ("OATH"), an administrative law court, adjudicates any contested discipline for tenured staff, pursuant to New York State Civil Service Laws § 75. OATH is a New York City agency, but it is separate and independent from the Department of Correction ("DOC"). Addressing the various requirements of the *Nunez* Court Orders related to accountability inherently requires that OATH practices be considered given their role in DOC's formal disciplinary process. To date, compliance with requirements to effectively hold staff accountable has been elusive. The Monitoring Team has long reported on OATH's involvement in the staff disciplinary process, in particular, concerns related to OATH's practices and precedents set that impact the ability to impose meaningful and adequate discipline

---

[348] The Action Plan (dkt. 465) requires a compliance assessment with First Remedial Order (dkt. 350), § C, ¶ 4, Timely, Appropriate, and Meaningful Staff Accountability. However, this provision was modified by the Third Remedial Order (dkt. 424), ¶ 2 so a compliance rating with Third Remedial Order, ¶ 2 is provided instead.

as required by Consent Judgment, § VIII, ¶ 1 and other provisions of the *Nunez* Court Orders.[349] As a result, the First Remedial Order, Third Remedial Order, and the Action Plan include specific requirements for OATH's practices, including requirements to increase the number of pre-trial conferences, improve efficiency, and to properly apply the Disciplinary Guidelines.

**Compliance Assessment Overview**

The first compliance assessment for First Remedial Order (dkt. 350), § C, ¶ 4 occurred for the 11th Monitoring Period (July to December 2020). At that time, the Department was found to be in Partial Compliance and remained so through the 14th Monitoring Period (January to June 2022).[350] The Department was found to be in Substantial Compliance in the 15th Monitoring Period (July to December 2023) and has remained so through the current 20th Monitoring Period (January to June 2025).

The first compliance assessment for First Remedial Order (dkt. 350), § C, ¶ 5 occurred for the 11th Monitoring Period (July to December 2020). At that time, the Department was found to be in Partial Compliance and has remained so through the current 20th Monitoring Period (January to June 2025).[351]

---

[349] The Monitoring Team's concerns regarding issues with the OATH process have been documented for several years. *See* Monitor's April 3, 2017 Report (dkt. 295) at pgs. 179-180 and 184-188; Monitor's October 17, 2018 Report (dkt. 317) at pgs. 126-128; Monitor's April 18, 2019 Report (dkt. 327) at pgs. 151-159 and Appendix C; Monitor's October 28, 2019 Report (dkt. 332) at pgs. 183-184 and 186-195; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 206-208; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 66-68 and 175-181; Monitor's December 8, 2020 Report (dkt. 365) at pgs. 5-9; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 99-103, 245-250, and 251-257; Monitor's June 3, 2021 Report (dkt. 373) at pgs. 6-16 and Appendix A; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 96-101 and 113-115; Monitor's December 22, 2021 Report (dkt. 435) at pgs. 4-12; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 31-39; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 94-98 and 162-166; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 189-193; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 135, 139-140, and 230; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 59, 71-75, and Appendix C; and the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 109, 124-125, 137-142.

[350] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

[351] A compliance rating was not provided for the 13th Monitoring Period. Please see the preceding footnote for the reason why.

The first compliance assessment for Third Remedial Order (dkt. 424), ¶ 3 occurred for the 14th Monitoring Period (January to June 2022). At that time, the Department was found to be in Partial Compliance and has remained so through the current 20th Monitoring Period (January to June 2025).[352]

## OATH Proceedings

The Monitor's November 22, 2024 Report (dkt. 802) at pgs. 141-148 described OATH's Role in DOC's Disciplinary Process, OATH's Internal Operating Procedures and Guidelines, Background on *Nunez* Reform Efforts with OATH, and OATH's Procedures and Protocols. These descriptions remain relevant and are incorporated by reference in this compliance assessment.

When the Department is unable to settle a disciplinary matter directly with a staff member, the Commissioner delegates responsibility to adjudicate the matter to the Office of Administrative Trials and Hearings ("OATH"). In these cases, an Administrative Law Judge ("ALJ") conducts a pre-trial conference in an attempt to facilitate a settlement. If a settlement still cannot be reached, a trial is scheduled before a different ALJ than the one who conducted the pre-trial conference. The trial ALJ assesses the evidence to evaluate whether or not the staff member has violated DOC policy. The ALJ then issues a written decision (a Report & Recommendation, or "R&R") with a *recommended* outcome, and if the ALJ determines the staff member violated policy, a proposed penalty. The DOC Commissioner has the authority to accept the ALJ's factual findings and recommended penalty or to modify them, as appropriate, in order to resolve the case. The permissible range of penalties is set by law and includes a reprimand, a fine of up to $100, a suspension without pay for up to 60 days, demotion in title, or termination. Accordingly, most of the discipline imposed by DOC (either through settlement or following an OATH trial) is within this same range of penalties. The DOC Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.[353]

---

[352] A compliance rating was not provided for the 13th Monitoring Period. Please see the preceding footnote for the reason why.

[353] Appeals to the Civil Service Commission and Article 78 appeals are discussed in more detail in this report in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

Given OATH's role in the administration of formal disciplinary charges for DOC employees, OATH ALJ's have a significant influence on and set precedents for the outcome of these cases. OATH ALJs can influence the outcomes of formal disciplinary charges when sharing their assessments at both pre-trial conferences and at trials, and through the R&Rs they issue. The Monitoring Team has long raised concerns that in some cases, certain factors emphasized by OATH ALJs appeared to influence outcomes that appeared disproportionately low to the level of misconduct.[354] One such example occurred during an OATH pre-trial conference that occurred during this Monitoring Period, which is discussed in more detail below in the "Assessment of OATH's Application of Disciplinary Guidelines" and Appendix J.

## Number and Outcomes of Pre-Trial Conferences

When pre-trial conferences are needed, they should occur promptly. Further, pre-trial conference dates need to be readily available because simply scheduling a pre-trial conference sometimes encourages DOC and the staff member to settle the case outside of OATH. Then, if the case is not successfully resolved, the full OATH disciplinary process can occur more quickly because the initial proceeding has already been scheduled.

- **Number of Pre-Trial Conferences**

Historically, pre-trial conferences were only held four to six days per month and their limited availability unreasonably delayed resolution for cases awaiting a pre-trial conference and those that proceeded to trial. As a result of the First and Third Remedial Orders, the number of pre-trial conferences increased exponentially. OATH is now required to schedule 150 UOF cases for pre-trial conferences each month, and to do so, OATH began to conduct conferences four days per week.

Beginning in February 2024, the City, Department and OATH reached an agreement, with approval from the Monitor, to temporarily adjust the pre-trial conference structure to schedule conferences on only three days per week instead of four.[355] The Department reported that the same number of pre-trial conferences could be supported by the three-day-per-week

---

[354] *See* the Monitor's April 18, 2019 Report (dkt. 237) at pgs. 151-158, 162-165, and Appendix C.

[355] This agreement is routinely evaluated by the City, Department, OATH and the Monitoring Team to determine whether the 3-day-per week schedule should be extended or whether the fourth day should be reinstated. The current agreement will remain in place through the end of 2025.

schedule. The purpose of this change was to allow respondents' counsel to be available to participate in more MEO-16 interviews regarding staff conduct in underlying investigations with ID each week. The Trials Division has reported that by January 2026, that that they will require the four-day-per-week schedule to be reinstated to continue efficiently processing cases. The Monitoring Team, which has approved the temporary schedule adjustment to this point, has also recommended to the City and Department that they must identify a strategy for transitioning back to the four-day-per-week structure that also ensures that MEO-16 interviews can continue to occur as needed.

Further, beginning in July 2024 through this Monitoring Period, the Monitoring Team approved the Department's request to modify the minimum number of pre-trial conferences required to be held each month given the reduced number of cases requiring pre-trial conferences.[356] During this Monitoring Period, the Monitor approved a reduction in the number of required pre-trial conferences to 50 per month for January through June 2025. This reflects the fact that the number of formal disciplinary cases requiring resolution decreased as discussed in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

A table showing the number of OATH pre-trial conferences scheduled from July 2020 to June 2025 is included in Table 16 of Appendix E. The Department scheduled 514 pre-trial conferences, which exceeds the 300 pre-trial conference threshold approved by the Monitor for this six-month period.

- **Resolution of Pre-Trial Conferences**

The Monitoring Team has long reported that the majority of cases can and should settle without the need for OATH. In this Monitoring Period, 125 of the 236 cases (53%) regarding UOF incidents were settled before the individual appeared at an OATH pre-trial conference.

With respect to those pre-trial conferences that were convened (*i.e.*, pre-trial conferences that were scheduled for cases that did not settle prior to the pre-trial conference date), it is important to assess how the cases were resolved.

---

[356] Pursuant to the terms of the Third Remedial Order (dkt. 424), the Monitor approved the reduction based on a written determination that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month.

- o 111 UOF pre-trial conferences were actually convened, which was generally similar to the number of pre-trial conferences convened in the last few Monitoring Periods,[357] even though this Monitoring Period, there were fewer cases *scheduled* for OATH pre-trial conferences.
  - ▪ 42 of 111 (38%) were settled at the pre-trial conference.
  - ▪ 35 of 111 (32%) required an additional pre-trial conference.
    - Generally, the need for an additional conference was reasonable. However, there were some conferences that could not be convened due to scheduling lapses that were within the control of the Department.[358]
  - ▪ 14 of 111 (13%) were scheduled for trial.
    - Notably, only one of the 14 cases actually had a trial. This means that *almost all* of the scheduled trial dates went unused because the cases settled in the interim between the pre-trial conference and before the trial occurred. Clearly, setting a trial date can help support resolution of the case, as demonstrated by the fact that most cases scheduled for trial are resolved before the trial occurs.
  - ▪ 20 of 111 (18%) were administratively filed.
    - One case was administratively filed due to statute of limitations, and a few cases were administratively filed following input from the OATH pre-trial conference ALJ. However, most were administratively filed before the PTC was convened, but after the Trials Division discussed the case with Respondent counsel and/or the Trials Division's review of the evidence and internal determination that the case should be dismissed. A more detailed

---

[357] 107 pre-trial conferences were convened in the 16th Monitoring Period, 109 pre-trial conferences were convened in the 17th Monitoring Period, 145 pre-trial conferences were convened in the 18th Monitoring Period, and 102 were convened in the 19th Monitoring Period.

[358] The Monitoring Team has previously reported on certain scheduling inefficiencies in DOC practices. *See the* Monitor's April 3, 2023 Report (dkt. 517) at pg. 201; Monitor's December 23, 2023 Report (dkt. 666) at pg. 73; and Monitor's April 18, 2024 Report (dkt. 706) at pg. 139. While there has been improvement since then, additional improvements in this area are needed. The Department reported that following the close of the Monitoring Period it initiated additional steps to improve the scheduling of OATH PTCs.

discussion regarding administratively filed cases is discussed in the compliance assessment of Consent Judgment, § VIII. ¶ 3.

Overall, the Monitoring Team continues to encourage OATH to help facilitate case resolution before and during the pre-trial conference whenever possible. Further, while trials serve an important function in any disciplinary system, they are time-consuming and resource intensive, and thus other pathways for resolution greatly contribute to the overall goal of timely discipline. There is clearly a benefit to scheduling a trial date, as it supports the resolution of a case. However, the fact that so few cases proceed to trial suggests that greater efficiencies in the scheduling of trials should be found to more expeditiously resolve cases.

- **Trials at OATH for Use of Force-Related Misconduct**

The number of trials conducted by OATH for use of force-related misconduct decreased significantly during the past two and a half years. The large number of trials conducted in 2021 and 2022 was due in large part to DOC's focus on closing out a backlog of egregious cases. The decrease in the number of trials in this Monitoring Period appears to reflect in part the overall decrease in the number of formal disciplinary cases that were closed, as discussed in this report in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

Historically, the process for scheduling and conducting trials and then issuing an R&R was very inefficient and convoluted. Trials were not only scheduled far after the pre-trial conference, but for trials requiring multiple hearings, the trial dates were scheduled over several months, and the R&R was issued months later. OATH began to reform its processes in 2021 in response to various recommendations from the Monitoring Team. For instance, OATH began scheduling all trials for UOF-related matters within 80 days of the pre-trial conference, and beginning on April 8, 2024, began scheduling all trials for UOF-related matters within 65 days of the pre-trial conference.[359] Further, OATH initiated a practice that all trials must be completed within three weeks of their commencement date instead of being spread out over multiple months. Finally, OATH set a deadline that all R&Rs must be issued within 45 days of the final trial date.

---

[359] During this Monitoring Period, OATH sought to reduce this number to 50 days, but this was placed on hold pending an Article 78 proceeding brought by Corrective Officer Benevolent Association. Following the close of this Monitoring Period, the Court dismissed the Article 78 petition, and OATH began scheduling trials for UOF-related matters within 50 days of the initial pre-trial conference.

The table below provides data on the number of trials conducted, the average number of days between a pre-trial conference and the trial, the length of time required to complete the trial, the average number of days for the ALJ to issue an R&R after the trial, and ultimately the length of time between a pre-trial conference and the issuance of the R&R. As demonstrated below, the amount of time that cases were pending with OATH was unreasonably long but has decreased in recent years.

| Start Date of Trial | Total Number of Trials by First Day the Trial Commenced | Average Days Between Pre-Trial Conference and Trial | Average Duration of Trial in Days | Average Days between Final Trial Date & R&R Issued | Average Days between Pre-Trial Conference and R&R Issued |
|---|---|---|---|---|---|
| 2016 | 1 | N/A | 1 | 38 | N/A |
| 2017 | 8 | 101 | 47 | 81 | 254 |
| 2018 | 2 | 125 | 27 | 28 | 179 |
| 2019 | 3 | 66 | 13 | 84 | 162 |
| 2020 | 4 | 240 | 78 | 239 | 557 |
| 2021 | 26 | 147 | 43 | 131 | 320 |
| 2022 | 15 | 84 | 14 | 45 | 142 |
| 2023 | 6 | 136 | 12 | 44 | 190 |
| 2024 | 6 | 50 | 2 | 62 | 117 |
| January-June 2025 | 1 | 18 | 3 | 27 | 47 |

There was only one trial that occurred in January-June 2025, and it occurred within 65 days of the pre-trial conference. This case was identified as an egregious case subject to expedited timelines for investigation and corrective action pursuant to the Action Plan (dkt. 465), § F, ¶ 2, which is discussed in more detail in the compliance assessment for that provision. The trial was completed within one week of when it started and only required two days of trial. The trial, which occurred during the end of March through the beginning of April 2025, addressed alleged staff misconduct during one use of force incident that occurred in November 2024. Overall, the timing of this case is an improvement over previous years when many OATH trials were conducted years after the use of force incident occurred because the cases had languished in DOC's backlog.

This improvement in the time required to resolve OATH trials is promising. The work must not only be sustained, but additional efficiencies are necessary to ensure that cases are prosecuted as expeditiously as possible. The Monitoring Team appreciates that OATH sought to reduce the time between pre-trial hearings and trial dates during this Monitoring Period, and that this proposal went into effect following the end of the Monitoring Period. Additional efficiencies,

such as this proposal by OATH, are critical to the sustained and continued improvement of the OATH process.

- **OATH Reports and Recommendations for Use of Force-Related Misconduct**

The chart below provides a breakdown of the use of force related R&Rs issued for trials that occurred between January 2016-June 2025 and the recommended outcomes. In some cases, an R&R can cover multiple staff members, so the chart evaluates the ALJ's findings by staff member.

| OATH ALJ's Report & Recommendations by Staff Member *(for use of force trials that occurred between January 2016-June 2025)* | | | | | | |
|---|---|---|---|---|---|---|
| **Year R&R was Issued** | **Total Number of R&Rs Issued & Number of Staff** | **Guilt** *Agreed with DOC's recommendation* | **Guilt** *Imposed More Than DOC Asked* | **Guilt on some, but dismissed some cases** *Imposed less than what DOC asked for, but found some guilt* | **Acquittal** | **ALJ Recommended Termination** |
| **2016** | 1 R&R covering 1 staff | 0 staff | 0 staff | 1 staff | 0 staff | 0 staff |
| **2017** | 5 R&Rs covering 5 staff | 0 staff | 0 staff | 4 staff | 1 staff | 0 staff |
| **2018** | 5 R&Rs covering 6 staff | 1 staff | 0 staff | 3 staff | 2 staff | 0 staff |
| **2019** | 2 R&Rs covering 5 staff | 0 staff | 0 staff | 0 staff | 5 staff | 0 staff |
| **2020** | 2 R&Rs covering 4 staff | 1 staff | 0 staff | 3 staff | 0 staff | 0 staff |
| **2021** | 17 R&Rs covering 21 staff | 16 staff | 0 staff | 4 staff | 1 staff | 7 staff |
| **2022** | 27 R&Rs covering 30 staff | 15 staff | 1 staff | 11 staff | 3 staff | 12 staff |
| **2023** | 6 R&Rs covering 7 staff | 4 staff | 0 staff | 2 staff | 1 staff | 4 staff |
| **2024** | 6 R&Rs covering 6 staff | 5 staff[360] | 0 staff | 1 staff | 0 staff | 3 staff |
| **Jan.-Jun. 2025** | 1 R&R covering 1 staff | 1 staff | 0 staff | 0 staff | 0 staff | 1 staff |

For the one trial for use of force-related misconduct that was conducted in January-June 2025, the R&R was issued within 27 days of the final trial date. This is noteworthy because in

---

[360] In two cases for two staff, the ALJ found the staff guilty of all charges, but recommended a lower penalty than what DOC sought at trial.

the past, OATH has taken extended periods of time, sometimes over a year, to complete R&Rs.[361] The one use of force R&R issued in January-June 2025 provided findings and recommended penalties for one staff. The ALJ found guilt and agreed with the penalty that DOC sought for the staff member, which was termination. DOC did impose this penalty, and the staff member appealed the decision with the Civil Service Commission. As of September 19, 2025, the appeal is still pending.

- **Assessment of OATH's Application of Disciplinary Guidelines**. The Monitoring Team has been closely examining pre-trial conference outcomes and R&Rs to assess whether the Disciplinary Guidelines have been properly applied. As noted in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 203-204, proper application of the Disciplinary Guidelines has improved since the Remedial Orders were imposed, although in some cases, questions remained regarding the application of precedent and whether it was consistent with the Disciplinary Guidelines in both pre-trial conferences and the R&Rs. A recent example of the impact of ALJ's input during a pre-trial conference on DOC's ability to impose meaningful discipline is provided in Appendix J and summarized below.

  - *Reduced Penalty Following Input from ALJ*: In this Monitoring Period, the input from an ALJ on a particularly egregious case resulted in the imposition of a lighter penalty than what the Department was seeking. In this incident, an officer with an extensive disciplinary history was charged for failing to efficiently perform his duties and for failing to immediately intervene in a PIC-on-PIC assault, failure to conduct meaningful tours, and providing a false statement during his MEO-16 interview. Video evidence shows the officer allowing PICs to freely congregate in and enter and exit a cell for nearly an hour and twenty minutes, during which a person in custody was seriously assaulted in his cell resulting in significant injuries, including a scalp laceration with bleeding and chipped cervical vertebrae. Per Department policy, multiple individuals are not permitted to be in a cell together given the security risk and risk of harm it

---

[361] For instance, the R&Rs issued for six use of force related trials that started in 2021 took at least six months to complete following the close of trial. Two of the six R&Rs took over a year to complete. One R&R issued during the 19th Monitoring Period took over 100 days to complete. *See* the Monitor's May 22, 2025 Report (dkt. 850) at pg. 198.

presents. When the officer finally removed the victim from the cell where he was assaulted, the victim was again assaulted by PICs in the housing unit corridor. Video evidence shows the officer near the PICs during the assault, but he waited before deploying chemical agents to break up the assault. During the pre-trial conference, the ALJ provided the Parties with a flawed analysis of the incident, DOC policy, and recommended the case settle for a lighter penalty then what the Department was seeking. Accordingly, while DOC intended to seek a penalty of 60 days with 2 years of full probation, the penalty had to be reduced to account for the ALJ's input. The case ultimately settled for 45 days with no more than 1-year limited probation.

The Monitoring Team is continuing to evaluate cases that merit additional scrutiny as to whether the applicability of the disciplinary guidelines was appropriate. A more fulsome assessment is underway and will be included in a future Monitor's Report.[362]

## Conclusion

OATH has made some improvements to its practices since the inception of the Consent Judgment, although concerns about OATH remain. Important improvements have been made to ensure that there are adequate numbers of pre-trial conferences and that the processes and practices related to Trials and issuance of R&Rs are both more efficient and occur more quickly than they had in the past. Pre-trial conferences are scheduled more quickly, trials are conducted and completed over a more reasonable period of time, and the R&Rs are issued more quickly than they were in the past. However, most, of these reforms, came only after the imposition of

---

[362] Further, in order to assess whether ALJs appeared to be properly prepared to hear cases involving DOC staff, the Monitoring Team requested training materials for ALJs assigned to the DOC Unit. OATH reported that staff are provided with information about recent OATH rulings involving DOC staff, legal research resources, copies of DOC Directives, Disciplinary Guidelines, and sick leave and absence-related policies. However, OATH declined to provide the training materials to the Monitoring Team, stating that they were subject to judicial privilege. This posture is at odds with the Monitoring Team's obligation to assess the sufficiency of training for investigators in ID and attorneys in the DOC's Trials Division in order to assess compliance with *Nunez* requirements about staff discipline. OATH's refusal to provide the training materials creates a situation in which neither DOC nor the Monitoring Team have any insight into the guidance provided to those responsible for adjudicating DOC's disciplinary matters and whether that guidance comports with the requirements of the *Nunez* Court Orders.

various Court Orders and corresponding scrutiny and recommendations from the Monitoring Team.

Even with the improvements made to date, modifications to practice are slow. This is concerning given that the overall disciplinary process, including the work conducted by OATH, is still incredibly time-consuming and can become mired in overly bureaucratic issues that impede prompt and appropriate resolution. Further enhancements to the disciplinary process are necessary so that cases can move as expeditiously as possible. This includes the development of additional efficiencies, removal of unnecessary bureaucracy, and the need for a posture that better supports the type of collaboration between OATH and DOC needed to meet the requirements of the *Nunez* Court Orders. The Monitoring Team is continuing to closely scrutinize the various facets of OATH's operation in order to identify whether additional enhancements or modifications to the Department's approach to delegating cases to OATH may be necessary.

- **First Remedial Order § C, ¶ 4 & Third Remedial Order ¶ 2**. OATH has met the requirement to convene the number of pre-trial conferences approved by the Monitor. Accordingly, Substantial Compliance with this provision has been achieved.

- **First Remedial Order § C, ¶ 5**. It appears there has been improvement in the application of the Disciplinary Guidelines to OATH Proceedings since the First Remedial Order was entered, but additional scrutiny by the Monitoring Team is ongoing to determine what additional steps are necessary to achieve Substantial Compliance.

- **Third Remedial Order ¶ 3**. OATH's procedures and protocols for UOF related disciplinary matters are more efficient than when the Remedial Orders were first imposed, but the pre-trial conference and trial process is still not efficient and impedes the ability to support expeditious processing for use of force related misconduct. Further enhancements to the OATH process are needed to support the overall goal of ensuring that proportional discipline is imposed timely.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § C., ¶ 4. & Third Remedial Order ¶ 2.** Substantial Compliance<br>**First Remedial Order § C., ¶ 5.** Partial Compliance<br>**Third Remedial Order ¶ 3.** Partial Compliance |

| TRIALS DIVISION STAFFING (CONSENT JUDGMENT § VIII., ¶ 4) |
|---|
| *Consent Judgment § VIII., ¶ 4. Trials Division Staffing.* The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.<br><br>*Action Plan, § F, ¶ 1. (a) Staffing Levels of Trials Division.* The City shall thereafter ensure that the Department's Trials Division maintains at least 25 agency attorneys and 4 directors, unless and until the Department can demonstrate to the Monitor with an internal staffing analysis that fewer agency attorneys and directors are necessary to timely address the disciplinary matters pending with the Trials Division. |

Consent Judgment § VIII., ¶ 4 requires the City and the Department to ensure the Trials Division has sufficient staff to expeditiously prosecute all disciplinary cases. The Department has long struggled to have sufficient staff to support the Division's caseload. The Action Plan (dkt. 465), § F, ¶ 1(a), requires the Department to ensure that the Trials Division maintains at least 25 agency attorneys and four Directors.

## Compliance Assessment Overview

The first compliance assessment for Consent Judgment § VIII, ¶ 4 occurred for the 3rd Monitoring Period (August to December 2016). At that time, the Department was found to be in Partial Compliance and remained so through the 10th Monitoring Period (January to June 2020). The Department was found in Non-Compliance for the 11th Monitoring Period (July to December 2020) to the 12th Monitoring Period (January to June 2021),[363] and then achieved Partial Compliance from the 14th Monitoring Period (January to June 2022) where it has remained through the 20th Monitoring Period (January to June 2025).

The Monitoring Team provides an update on the Department's efforts to achieve compliance with Action Plan, § F, ¶ 1(a), as it relates to the work of Consent Judgment § VIII, ¶ 4, but a compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

---

[363] A compliance rating for this provision was not awarded in the 13th Monitoring Period (July-December 2021) because the Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for this period. The Court's April 5, 2022 Order (dkt. 441) suspended the Monitoring Team's compliance assessment during the 13th Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report filed on December 22, 2021 (dkt. 435) as well as in the Special Report filed on March 16, 2022 (dkt. 438). The basis for the suspension of compliance ratings was also outlined in the Monitor's March 16, 2022 Report (dkt. 438) at pgs. 73-74.

**Recruitment Efforts**

During the current Monitoring Period, the Division reported continuing to actively review resumes and interview candidates with the goal of hiring two or three new attorneys and one legal coordinator.[364] The Trials Division's leadership reports that the process to hire or promote an individual remains protracted, taking many months, and involving a significant amount of bureaucratic "red tape." During this Monitoring Period, achieving salary parity for promoted staff and for staff holding equivalent positions was a particular challenge due to OMB's unreasonable refusal to address requests for increase salaries and other delays that required repeated follow-up (the specific requests and reasons for the delays are unknown). This impacts staff morale, and ultimately the Division's ability to recruit and retain staff, which further undermines their ability to comply with these provisions.

**Staffing Levels**

The table below provides an overview of the Trials Division's staffing levels at the end of each Monitoring Period from June 2020 to June 2025.[365] The Action Plan imposed specific hiring targets as a remedial measure to assist the Department in achieving compliance with the overall goal of expeditious prosecution. Since the inception of the Action Plan, the Trials Division has maintained at least four Directors as required. However, the overall number of Trials attorneys has fluctuated, occasionally improving, but always remaining below the 25 attorneys required by the Action Plan. The Trials Division has maintained an overall increase in the number of support staff.

Following the close of the Monitoring Period, the Department reported that the Trials Division intended to conduct a staffing analysis to determine whether adjustments to the staffing levels required by the Action Plan may be prudent. If the Department conducts a staffing analysis and provides it to the Monitoring Team, it will be discussed in the next Monitor's Report.

---

[364] The Department reported onboarding an additional investigator after the close of the Monitoring Period.

[365] For Trials Division staffing levels from the 6th to the 9th Monitoring Periods, *see* Monitor's November 22, 2024 Report (dkt. 802) at pg. 158.

| Trials Division Staffing | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| As of… | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 | June 2022 | Dec. 2022 | June 2023 | Dec. 2023 | June 2024 | Dec. 2024 | June 2025 |
| **Supervisors & Leadership** | **5** | **5** | **4** | **4** | **5** | **6** | **6** | **7** | **7** | **7** | **8** |
| - *Deputy Commissioner* | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Associate Commissioner* | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| - *Deputy General Counsel* | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Executive Manager Director* | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 |
| - *Director* | 3 | 3 | 2 | 2 | 2 | 4 | 4 | 5 | 5 | 5 | 6 |
| **Attorneys** | **17** | **18** | **18** | **17** | **19** | **27** | **20** | **23** | **23** | **20** | **20** |
| - *Agency Attorney* | 17 | 16 | 15 | 14 | 17 | 21 | 19 | 20 | 20 | 17 | 15 |
| - *Agency Attorney Intern* [366] | 0 | 2 | 3 | 3 | 0 | 1 | 1 | 3 | 3 | 3 | 5 |
| - *Contract Attorney* | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Attorneys on Loan from Other Agencies* | 0 | 0 | 0 | 0 | 0 | 5 | 0 [367] | 0 | 0 | 0 | 0 |
| **Administrative and Other Support** | **14** | **13** | **13** | **13** | **10** | **12** | **19** | **17** | **20** | **18** | **19** |
| - *Administrative Manager* | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 3 | 3 |
| - *Executive Coordinator* | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Office Manager* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Principal Administrative Associate* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 3 | 3 |
| - *Legal Coordinator* | 2 | 2 | 2 | 2 | 3 | 5 | 4 | 4 | 5 | 3 | 4 |
| - *Investigator* | 1 | 1 | 1 | 1 | 0 | 0 | 2 | 2 | 3 | 3 | 3 |
| - *Clerical Associate* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Program Specialist* | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Intern* | 1 | 1 | 1 | 1 | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| - *Front Desk Officer* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Community Coordinator* | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 1 |
| - *City Research Scientist* | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 |
| - *Correctional Standard* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 |
| **Total** | **36** | **36** | **35** | **34** | **34** | **45** | **45** | **46** | **49** | **45** | **47** |

Ultimately, the purpose of this requirement is to ensure that the Trials Division has a sufficient number of staff to prosecute cases as expeditiously as possible. During this Monitoring Period, at least 35% of the cases referred to the Trials Division were either closed or still pending *6 months or more* after the case was initially referred to the Trials Divisions. The Monitoring Team's assessment of the requirements to prosecute cases of staff misconduct, even those that advance to a trial, suggests that additional efficiencies are available including the likelihood that having additional attorneys and reducing caseload sizes would expedite prosecution. The timeliness of prosecution has improved since the Consent Judgment went into effect, but the

[366] Agency Attorney Interns are individuals who have graduated law school, hold a J.D., and are either scheduled to take the New York Bar Exam or awaiting New Tork Bar Exam results. Once Interns are admitted to the New York Bar and submit proof of admission, they are promoted to Agency Attorney Level 1.

[367] The MOU for attorneys on loan from other City agencies was terminated on February 1, 2023. Further, the attorneys on loan from DOC Legal were transferred back to Legal by April 14, 2023. *See* Monitor's October 28, 2022 Report (dkt. 472) at pg. 14 regarding a discussion on the attorneys on loan.

Department has not yet achieved Substantial Compliance with the requirement to prosecute cases as expeditiously as possible. The Monitoring Team continues to recommend that the City and Department remain vigilant in ensuring the Trials Division maintains adequate staffing levels,[368] and continue to work to obtain the 25 attorneys as required by the Action Plan (dkt. 465), § F, ¶ 1(a). Additional enhancements (*e.g.*, increasing salaries to competitive levels) may also be necessary to achieve compliance with this provision.

| COMPLIANCE RATING | Consent Judgment § VIII., ¶ 4. Partial Compliance |
|---|---|

---

[368] *See* Monitor's March 16, 2022 Report (dkt. 438) at pg. 62.

| |
|---|
| **MAXIMIZING DEPLOYMENT OF STAFF - REDUCTION OF UNIFORMED STAFF IN CIVILIAN POSTS (ACTION PLAN § C., ¶ 3(VII))** |
| *Action Plan § C., ¶ 3(vii). Maximizing Deployment of Staff – Reduction of Uniformed Staff in Civilian Posts.* The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below: [. . .]<br><br>(vii) Reduce the assignment of uniform staff to civilian posts, including Temporary Duty Assignment, in order to minimize the reliance on uniform staff for tasks that can and should be reasonably completed by civilians. |

The Department is required by Action Plan (dkt. 465), § C, ¶ 3(vii) to reduce the assignment of uniform staff to civilian posts in order to minimize the reliance on uniform staff for tasks that can and should be reasonably completed by civilians. This requirement flows from the Monitoring Team's 2022 staffing analysis which found that the use of uniform staff in positions that could be performed by civilians contributed to the overarching problem of insufficient numbers of uniform staff being available to work in the jails' housing units. A summary of various factors and complexities related to DOC's staffing practices is provided in Appendix K of this report and incorporated by reference in this compliance assessment.

## Compliance Assessment Overview

Until this Monitoring Period, the Monitoring Team provided an update on the Department's efforts to achieve compliance with Action Plan (dkt. 465), § C, ¶¶ 3(vii), but did not provide a compliance rating because it was not one of the select group of provisions defined by Action Plan (dkt. 465), § G, ¶ 5(b) for which the Monitoring Team was required to do so. The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pgs. 31-34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order. Beginning with this Monitoring Period, a compliance rating will now be provided for this provision pursuant to the Court's July 10, 2025 Order (dkt. 879).

This provision requires deep collaboration and cooperation between the Department and the City in order to achieve compliance. Accordingly, the Monitoring Team assesses compliance with both the work of the Department and the City because they are separate and distinct. In this Monitoring Period, the Department was found in Partial Compliance, and the City was found in Non-Compliance with Action Plan (dkt. 465), § C, ¶¶ 3(vii).

## Process to Recruit & Hire Civilians

The Department's ability to recruit and hire staff necessarily requires coordination with agencies outside of the Department. In particular, the Department's hiring and promotion efforts require consultation and a variety of different approvals from the City's Office of Management and Budget ("OMB") along with other agencies such as the Department of Citywide Administrative Services ("DCAS") and the Mayor's Office of Appointment. In particular, various constraints imposed by these agencies appear to have a negative impact on the Department's ability to recruit and hire staff as required by the various *Nunez* Court Orders.

- **Bureaucratic Hurdles**. Obtaining OMB approval both to initiate hiring and to ultimately hire civilians has been less than straightforward, involving multiple follow-ups, resubmissions, and long and unexplained periods of delay.[369] Depending on the role, the process may also require civil service testing and/or a dedicated candidate pool. Further, a large number of executive positions often require additional layers of approval, including Mayoral approval.[370] The Department must then recruit for the position, interview applicants, select a candidate, obtain multiple internal approvals, and then obtain final approval from OMB for hire and onboarding. The Department has reported this process is often so lengthy that identified candidates find other positions in the meantime and so the process must then begin anew. Further, these procedures for hiring are so cumbersome that they, ironically, present an obstacle to filling the vacant positions which have been established as a prerequisite for adding new civilian lines as discussed more below.

- **Budget Cuts**. Budget cuts have also resulted in a net *loss* of 400 civilian positions over the life of the Consent Judgment. The City has imposed various hiring freezes and limitations on hiring.[371] The practical impact of this is that DOC has been unable to keep up with attrition rates. Most recently, in October 2024, the

---

[369] *See*, Monitor's April 18, 2024 Report (dkt. 706) at pgs. 2, 17-18, 106, and 143; Monitor's May 24, 2024 Report (dkt. 712) at Cover Letter pgs. i-ii; Monitor's November 22, 2024 Report (dkt. 802) at pgs. 9-10, 107, and 157.

[370] The City proposed eliminating the need for Mayoral approval in its proposal for an Independent Compliance Director. *See* Defendants' Memorandum in Support of Their Proposal to Establish a Court-Appointed Compliance Director (dkt. 811-12) at pg. 13.

[371] This has included hiring freezes where staff can't be hired until either one or two people leave the agency and sometimes a "total" hiring freeze.

City waived the hiring freeze which only permitted DOC to fill one civilian position for every two positions that had been vacated.[372] This requirement was waived for DOC in October 2024. It must be noted that while DOC has had significant constraints placed on its ability to hire civilian staff, the Department's expenditures for overtime has increased significantly over the last five years. The Department spent almost $100 million in calendar year 2020 and the Department is on pace to spend $325 million in calendar year 2025.

- **Denial of New Needs Requests**. The Department's requests for additional positions ("new needs") in fiscal years 2025 and 2026 have both been denied.[373] It is our understanding that OMB's current reason for denying their requests is that the Department must fill all currently vacant positions, regardless of job title, before new positions will be established. This places the Department in an untenable position. It does not acknowledge that vacancies among certain hard-to-fill positions (*e.g.*, those that require specialized qualifications and those with low pay scales) are unrelated to other much-needed positions—potentially new ones—that the Department needs to achieve maximum civilianization. Herein lies the conundrum: the Department's ability to obtain lines to hire civilians to serve in positions currently held by uniform staff depends on the Department's ability to fill vacancies for other positions that are unrelated to the specific position identified for civilianization. For example, the Department has long had vacancies in engineer positions (that require unique education/certification) and cook positions (that offer non-competitive salaries) that are difficult to fill yet still needed operationally, and at the same time, needs new civilian positions to be established for other job duties that have historically been filled by uniform staff. These vacant positions, each with their unique roles, are not interchangeable, and all are equally necessary for the Department to operate with maximum efficiency and minimal overtime. Furthermore, turnover occurs across the Department all the

---

[372] In some cases in order to hire certain civilian positions, the Department has been using unbudgeted positions for civilian posts, but this practice means the position was never integrated into the formal staffing allocations, which means that when an unbudgeted position becomes vacant, it can be difficult to restaff given the issues discussed above along with the long delays and inefficiencies involved in the civilian hiring process.

[373] DOC requested 134 new needs in fiscal year 2025 and 82 new needs in fiscal year 2026.

time and some of the currently vacant positions have not been vacant for long. This dynamic must be accounted for in assessing the Department's request for additional new hires. It is simply untenable to require that all vacancies must be filled before the Department can even obtain the lines to start recruiting for civilian positions currently held by uniform staff.

- **Civilian Positions are Not Competitive in the Marketplace**. Once approval for hiring is provided by the City, recruiting civilians to work in a jail setting is also difficult for a variety of reasons including comparably low salaries, a protracted recruitment process, the nature and location of the work on Rikers Island or Bulova (Headquarters), and the negative public perception of the Department all of which reportedly dissuade potential candidates from applying for and accepting civilian positions.

The Department cannot effectuate the hiring of civilians without the City's cooperation. The current dynamic hinders the Department's efforts to comply with the related *Nunez* requirements. The Monitoring Team appreciates that the City's budgetary process is complex, and that the City has many considerations while managing hiring for the Department and other City agencies. That said, opportunities for greater efficiency are available throughout this process. It is critical for the City to develop efficiencies and provide the Department with the necessary authorization to hire civilian staff as needed. At the end of the Monitoring Period, the Monitoring Team submitted questions to the City to support the collective effort to make this process more efficient and streamlined. As of the filing of this report, the City has not provided the Monitoring Team with any response regarding possible improvements to the current practices.

**<u>Factors Contributing to the Department's Reliance on Uniform Staff in Posts that Could be Reasonably Completed by Civilians</u>**

Several dynamics must be explained to fully understand the Department's historical reliance on uniform staff to cover a variety of duties in the Department, including those that do not engage directly with people in custody.

- **Number of Uniform Staff versus Civilian Positions**. The sheer number and proportion of uniform staff employed by the Department has contributed to their

use in a wide variety of roles. Further, due to budget cuts, the number of authorized civilian positions has decreased by 400 from about 2,200 at the end of fiscal year 2016 to about 1,740 civilian positions (and about 1,500 civilian staff on payroll). Even though there has been a significant decrease in the number of uniform staff during this same period from 9,800 uniform staff to 5,900 uniform staff there are still (understandably) significantly more uniform staff employed by the Department then civilian staff.

- **Flexibility in Deployment, Tenure, and the Unique Nature of the Work**. Uniform staff can be deployed more flexibly than civilians and given, historically, the larger number of uniform staff compared to civilian staff they are re-deployed to posts outside of the command. In addition, using uniform staff in civilian roles may be reinforced by the fact that uniform staff often have longer tenures than civilian staff. The benefits that staff receive after "20 years of service" generally incentivizes uniform staff to remain working at the Department for entirety of this period of time and so there is generally less turn-over of uniform staff across the Department because of this incentive. Further, many staff have reported that having a uniform staff member on their team helps them to better navigate working with the facilities given the unique and complicated nature of DOC's practices and their familiarity with the Department's operations. In fact, uniform staff have been assigned to such a wide variety of roles for so long that both uniform staff and civilians have come to believe that, in many cases, these roles *must* be filled by uniform staff, and the convention has become part of the Department's culture.

- **Incentivizing Use of Uniform Staff.** Given these various dynamics, the Department has essentially been *incentivized* to utilize uniform staff in positions that could reasonably be filled by civilians. Under current conditions, the complex and protracted process to convert certain roles to civilian positions means that removing uniform staff from these roles would, in many cases, result in the position going unstaffed for a significant period of time and leaving the tasks and responsibilities unaddressed. In fact, the Staff Efficiency Committee has reported many divisions have been hesitant to identify positions that may be suitable for

351

conversion because they are concerned that the uniform staff currently performing the work will be abruptly removed from the role with no replacement. Although some duties may be superfluous and ripe for elimination, in the main, the uniform staff in these roles are performing essential functions, and any period of vacancy would be detrimental to the Department's operation. The City's work to transition certain roles to civilian positions must be addressed deliberately and with far more determination than displayed to date. In particular, before removing the uniform staff member filling the role, a suitable civilian candidate must be hired and immediately available to assume the role for this initiative to be a success.

These practices are difficult to untangle given that it requires increased budgetary, recruiting and hiring support from the City and OMB (and possibly other City agencies), all of which are complex and time consuming. The Staffing Efficiency Committee has been working to disentangle these complicated bureaucratic matters and to alter the Department's mindset to one recognizing that these positions can and should be filled by individuals who are not uniform staff. However, as discussed throughout this section, additional support from the City, OMB, and possibly other City agencies, is needed for the Committee's work to accomplish the larger goal.

### DOC's Efforts to Reduce Uniform Staff in Civilian Roles

For its part, the Department made important progress during the current Monitoring Period via its Staffing Efficiency Committee that untangled the various conventions used historically to place uniform staff in civilian roles, identified the full universe of civilian positions that are needed, and requested additional positions from the City to ensure that civilians can be hired for all essential functions.

Reducing the reliance on uniform staff to fulfill civilian roles has four essential parts: (1) identifying the roles suitable for a civilian, (2) obtaining approval, funding, and an increase in the authorized head count to post for those civilian positions, (3) recruiting and filling the position with a civilian, and (4) obtaining final approval for hire and setting the start date. While these four steps may seem simple, the reality of complicated City and agency bureaucracies means that actually accomplishing these tasks is neither simple nor straightforward.

The Department took a few initial steps towards this requirement after the Action Plan was initiated in 2022 through early 2024. These included: (1) all uniform staff working in the

Timekeeping office were transferred back to their commands in September 2023,[374] (2) conversion of at least 10 Deputy Warden positions to civilian Executive Director roles at COD, Visits, and Programs, and (3) seven uniformed positions at HMD were converted to civilian positions, and the selected civilian candidates began working in early November 2024. The Department previously reported several other attempts to address this issue more broadly over the years, but none were fruitful until late 2024.

In late 2024, the Department began a Staff Efficiency Committee ("SEC") to reorganize its staffing plan and hiring practices to address various interrelated staffing issues. The SEC includes the First Deputy Commissioner, the General Counsel, and leadership from the Finance Division, Office of Administration, Human Resources, Strategic Operations, the *Nunez* Manager and Deputy Manager, along with members of their teams. The Committee's holistic approach to addressing the staffing issues appears to be setting a foundation for real progress to be made. The Department reports the goal of the SEC is to focus on prioritizing the Department's uniform staffing for assignments in the locations where they are most needed— in the jails. As discussed in more detail below, the Committee has developed a logical plan and taken initial steps to tackle many of the underlying obstacles discussed above. These steps should allow the Department to hire civilians efficiently and ultimately reduce its reliance on the uniform workforce for duties that do not require their unique skillset:

- **Evaluating Divisions' Use of Uniform Staff**. The Committee strategically focused on six divisions that rely on the use of uniform staff to better specify the various job duties and determine whether any positions could be appropriately filled by a civilian. This included the Training and Development Division, Investigation Division, Transportation, Special Investigations Unit, Administration, and Health Management Division. As an initial effort, the Committee identified at least 10 positions that could be civilianized. Once budgeted, the Department can begin the process of advertising these positions and interviewing candidates.

---

[374] OMB denied the request to backfill the uniform positions with civilians. Properly staffing the Timekeeping office to ensure a backlog does not accumulate has required several part-time staff to be onboarded, the use of temporary employees from an agency, and temporarily assigning three uniform officers (who have other responsibilities in HR) to perform these functions.

- **Eliminating Unbudgeted Civilian Posts and Evaluating Civilian Vacancies**. The Committee determined that it must first focus on both evaluating its budgeted civilian lines (*i.e.*, civilian positions that are already authorized for hire) and identifying all unbudgeted civilian posts so that budgeted positions can be created where necessary. This is an essential first step toward sustainability—the full range of civilian positions must be accurately identified and budgeted so that they can be advertised and filled by a civilian candidate. In 2025, the Department identified over 60 unbudgeted civilian positions that have now become budgeted civilian positions, meaning that funding has been allocated so that position can be officially filled by another civilian should the position become vacant. In total, the Department identified approximately 250 civilian vacancies that are operationally necessary.[375] During this process, the SEC evaluated the vacancies within each division and determined that some could be repurposed and allocated to other divisions, either temporarily to fill an immediate need or permanently for budgetary efficiency. Accordingly, the SEC has accounted for all vacancies which will enable it to best identify what new positions the Department may need. The Committee has also identified and resolved a number of issues with the civilian lines assigned to various divisions.[376]

- **Improved Oversight and Management of Uniform Staff on Temporary Duty Status**. Temporary deployment ("TDY") is one of the primary ways that uniform staff are assigned to roles outside of the jails, and it is likely that many of these roles could be fulfilled by civilians. While intended to be temporary, many uniform staff have been serving in TDY positions for extended periods of time. The Department has taken steps to better manage TDY assignments. First, the Department closely scrutinized the list of TDY staff to ensure it was current and correctly identified each staff's assignment. Approximately 245 TDY staff were identified. In early 2025, the Department also

---

[375] The Department reports it is working to fill many of these vacancies (as discussed above, the time to fill vacancies can be lengthy). Further, the Department reports that its overall operational need for civilian positions exceeds the number of vacant civilian positions currently allocated to the Department.

[376] For example, the Department identified that the lines and posts for different Divisions needed to be reconciled because the positions were initially completed in a haphazard manner under the former Commissioner. For example, the lines for the ID Division and the Special Investigation Unit were particularly convoluted and needed to be untangled and reconciled with one another.

upgraded the legacy process for tracking TDY, which was manual and largely *ad hoc*, by modifying an existing staffing database to increase efficiency and accuracy of tracking. Also, to address the overarching goal of staff availability on the housing units and reduce unmanned posts, beginning in early 2025, the Department began to require TDY staff to report to work various posts in the jails once or twice per week. Towards the end of the Monitoring Period, the Committee began reviewing the duties of the positions to which these staff are temporarily assigned to determine whether they are suitable for conversion to a civilian position.

- **Maximizing Deployment of Uniform Staff to Posts That Operate the Jails**. More broadly, the Committee has begun the process to identify the universe of positions that have duties appropriate for civilians, as well as the universe of non-PIC-facing positions that *do* require a uniform staff member to serve in the role (*e.g.*, certain roles outside of jails require the person assigned to provide security and to be armed). Once appropriately categorized, the Department will proceed with steps to reconcile the job duties with the type of position (uniformed versus civilian) and to ensure the positions are properly categorized, authorized and budgeted by the City.

    - *Evaluating Awarded Posts for Roles to be Filled by Civilians*. The Office of Administration has reviewed the list of staff with Awarded Posts (discussed in more detail in the compliance assessment for Action Plan § C., ¶ 3(v)), Maximizing Deployment of Staff - Awarded Posts). An initial review was conducted to identify whether any of the positions were suitable for civilian staff. Upon further review, the Department reported that additional scrutiny of this list was necessary as certain positions that may initially appear as posts that could reasonably be completed by a civilian may, in fact, include security requirements that would require a uniform staff member to hold the position.

- **Improved Tracking and Management of Vacancies and Hiring Needs**. Progress toward compliance with this requirement depends on the efficient management of the civilian hiring process. The SEC has worked to ensure that it tracks hiring lines across divisions and reconciles any issues. As described above, the SEC also worked to eliminate unbudgeted civilian posts that are not needed and to convert those that are

needed to budgeted lines. This work was essential for the Department to make a credible request for additional needs to support hiring additional civilians.

- **New Need Requests**. The SEC identified new need requests for fiscal year 2026 and 2027. Among other requests, in 2026, the Department requested 50 new lines for the civilianization project. As that was denied, the Department refined the request to 35 new lines in 2027. Both requests have been denied.

**DOC's Efforts to Assess Uniform Staff Posts (Post Analysis)**

A corresponding component in ensuring that uniform staff are utilized in posts that require that specific skill set is also assessing the uniform staff posts in the command. A neutral and independent Post Analysis is required pursuant to Action Plan (dkt. 465), § C, ¶ 3(viii). Such an analysis is prerequisite to any effort focused on efficient staff deployment. A post analysis will provide critical information on the number and duties of each post in the facility as well as the number of uniform staff needed to ensure adequate coverage. In turn, this will allow the Department to deploy its workforce more efficiently, likely increase the number of staff who are available for assignment to the housing unit posts and likely reduce the need for staff to work overtime.

In fall 2024, the Department worked the New York State Commission of Correction ("SCOC") to purportedly conduct a post analysis. In June 2025, the SCOC completed its first assessment of EMTC and reports it will begin its next assessment in early 2026. While the report from the SCOC was useful, it was not a post analysis. Further, the SCOC's process has been protracted with only one report for one facility completed over a year after the project was initiated. At this pace, it will take years for this analysis to be completed. This is untenable. The Department reported that it reached the same conclusion as the Monitoring Team. The Department reported at the end of 2025 it has put out a bid for procurement of a staffing analysis.[377]

---

[377] The Monitoring Team has repeatedly requested information about the Department's procurement for a staffing analysis and the corresponding documentation. This request for information remains outstanding for over six weeks despite DOC's repeated reports to the Monitoring Team that the requested information already exists and can be produced.

**Recommended Next Steps**

The work to reduce the assignment of uniform staff to positions that could reasonably be completed by civilians is complicated because of the Department's history of poor tracking and management of its positions and the complexity of the bureaucracies that must be navigated. The Department, via the SEC, has made progress in addressing the various deficiencies in its legacy processes, and has improved the way it tracks and manages its civilian headcount and hiring. These processes have been difficult to untangle, but the SEC's progress is an important foundational step to move toward compliance with this requirement. That said, significant work remains to ensure that the Department minimizes the assignment of uniform staff to civilian posts, particularly via Temporary Duty Assignment. To advance progress, the Monitoring Team recommends the following steps:

- **Provide DOC with More "New Needs"**: The City must approve the both adequate funding for *existing* positions[378] and *additional* civilian positions the Department has requested to support its efforts to reduce the reliance on uniform staff. The City's ongoing denial of these needs for the Department leaves the agency in a position where it essentially must continue to use uniform staff in roles that are suited for civilians.

- **Continue to Identify Uniform Positions that Can be Converted**: The Department must continue to assess positions that could be performed by a civilian where the Department has temporarily assigned uniform staff to fill these necessary positions (*e.g.*, a uniform staff member assigned to the position of cashier).

- **Offer Competitive Salaries**: The City must work to ensure that civilian positions offer competitive salaries to both attract and retain qualified staff.

- **Streamline the Hiring Process and Accelerate Approvals**: OMB and other relevant City agencies must work to streamline the process for hiring and promotion. This will require eliminating inefficient and protracted follow-up inquiries and accelerating the timeline for approvals.

- **Post Analysis**: The Monitoring Team continues to strongly recommend the Department engage an external organization to support the development of a post analysis.

---

[378] DOC reports that it also requires adequate funds to cover upgraded positions and in-seat promotions of existing lines as well.

## Conclusion

Achieving substantial compliance with this provision will require deep collaboration and cooperation between the Department and the City. For its part, the Department has begun and must continue to untangle its complicated and historically poorly managed process for placing staff (whether uniform or civilian) in roles that do not require their unique expertise, identify the full universe of potential civilian positions, and ascertain whether and how many new civilian positions are operationally needed. As discussed above, the Department has made legitimate and concrete efforts in each of these areas and initial foundational progress is evident. Accordingly, the management of the Department's staffing records is in Partial Compliance with this provision.

The Department cannot effectuate the hiring of civilians and thus reduce the reliance on uniform staff in those roles without resources from the City and agencies charged with allocating and managing such resources such as OMB and DCAS. The City's inefficient, protracted hiring/on-boarding process for civilian staff and its illogical requirements for the approval of new positions for the Department have seriously undermined the Department's efforts. Therefore, the Defendants' are in Non-Compliance with the allocation of resources to reduce the assignment of uniform staff to civilian posts.

| COMPLIANCE RATING | **Action Plan § C., ¶ 3(vii).** |
|---|---|
| | *Management of Internal Staffing Records*. Partial Compliance |
| | *Defendants' allocation of resources to reduce the assignment of uniform staff to civilian posts.* Non-Compliance |

| **MAXIMIZING DEPLOYMENT OF STAFF - AWARDED POSTS (ACTION PLAN § C., ¶ 3(v))** |
|---|
| *Action Plan § C., ¶ 3(v). Maximizing Deployment of Staff – Awarded Posts.* The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below:<br><br>(v) Reduce the use of awarded posts so they are primarily utilized for those positions in which a particular skill set is required. A staff member with an awarded non-mandatory post must be re-deployed to a mandatory post if there are staffing shortages. |

The Action Plan (dkt. 465), § C ¶ 3(v) requires the Department to reduce the use of awarded posts so they are primarily utilized for those positions for which a particular skill set is required. The purpose of this requirement is to support the Department's efforts to maximize deployment of uniform staff given the Department's historical *practice* of using awarded posts for positions that were not on housing units or otherwise regularly engaged with incarcerated individuals. It also requires the Department to address its historical *practice* of managing staff on awarded posts in a manner that limited flexibility in re-deploying such staff when they were needed in more critical areas.

The efforts to untangle the Department's practice of awarded posts is long and complicated. Since the issuance of the Action Plan, the Department has taken a number of steps to address the use of awarded posts, although more work remains. This is discussed in more detail below.

**Compliance Assessment Overview**

Until this Monitoring Period, the Monitoring Team provided an update on the Department's efforts to achieve compliance with Action Plan (dkt. 465), § C, ¶¶ 3(v), but did not provide a compliance rating because it was not one of the select group of provisions defined by Action Plan (dkt. 465), § G, ¶ 5(b) for which the Monitoring Team was required to do so.

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pgs. 31-34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order.

Beginning in this Monitoring Period, a compliance rating will now be provided for this provision pursuant to the Court's July 10, 2025 Order (dkt. 879). As discussed in more detail below, the Department is in Partial Compliance with Action Plan (dkt. 465), § C, ¶¶ 3(v) this Monitoring Period.

**Department's Historical Practice of Awarded Posts**

The Department's staff deployment *practices* do not make the best use of its workforce. DOC's Consultants recently reaffirmed this explaining that DOC's current staffing shortages is "a resource allocation problem." A variety of staffing practices, including the use of awarded posts, which *in practice* has limited the Department's flexibility in deploying staff to places where they were most needed. The Department's use of an "awarded" post is governed by policy, but as discussed in more detail below, a number of *practices,* not codified in policy, have been entrenched in operations and impede the Department's overall ability to maximize the deployment of its staff.

Department policy requires that, when available, job assignments must be posted indicating the position is available and listing its responsibilities so that uniform staff may apply. The Department must consider various criteria when selecting a candidate (*e.g.*, seniority, work performance, attendance record, special skills, or required clearances) and thereafter assigns the specific post to the selected staff member. In *practice*, once staff are assigned or "awarded" the post, they essentially maintain the post in perpetuity and can only be moved out of the position under limited circumstances. Collectively, this staffing convention is referred to as "awarded posts."

The staffing analysis conducted by the Monitoring Team in 2022 found that 1,650 uniform staff, an unreasonably high number of staff, had awarded posts and many of those in positions that were not on the housing unit, assigned to the facilities, or regularly engaged with PICs. Consequently, both the Department's policy and its practices related to management of awarded posts meant that a large number of staff were not being utilized in the areas where staff were most needed.

The Department's *practice* of awarding posts goes beyond what is required by policy and introduces several restrictions on how staff are subsequently assigned. Below is a summary of the historical concerns regarding the practice of awarded posts.

- **Poor Management**: The awarded post process was not properly managed, allowing opportunity for favoritism and cronyism. In some commands, leadership created

"unofficial" awarded posts,[379] potentially numbering in the hundreds[380] that were awarded to staff who reportedly curried favor. This has had an adverse impact on staff morale, leaving other staff members feeling marginalized and confined to less desirable positions. The perception of an unfair system has impaired motivation among the workforce and negatively impacted work performance, thereby contributing to unsafe conditions within the jails.

- **Poor Record Keeping**: Until 2024, the Department's poor recordkeeping rendered it unable to produce an accurate list of posts that have been advertised as "awarded posts" and a current list of staff who have been officially awarded such positions.

- **Limited Flexibility**: In practice, once a staff member is awarded a post, they historically were not assigned to any other post, except in very limited situations (*e.g.,* when working overtime or during emergencies). Thus, when there is a critical need for staff in other locations, those with awarded posts were not reassigned to those posts. This is not codified in Department policy but has been an entrenched practice.

- **Location-Specific Posts**: While not in DOC policy, historically, often DOC *practice* for awarding a post to a housing unit was to award the post to a *physical* location that could not be changed. For example, if a staff member was awarded a post to a special programming housing unit and the physical location for that housing unit later moved to a different location within the facility, the staff member could not move with the housing unit, but instead had to stay assigned to the original physical location of the housing unit. This practice is illogical and subverts the goal of assigning staff with identified skillsets to work with a specific population to develop constructive rapport.

- **Posts with No/Limited Contact with the Incarcerated Population**: Historically, the majority of awarded posts were not on the housing units and for job assignments that do not actively engage with the incarcerated population.

---

[379] "Unofficial" awarded posts are those where a staff member is treated as if they had an awarded post with the same restrictions and protections afforded to those with formally awarded posts, but the post was not formally awarded pursuant to the Department's policy requirements.

[380] The Department's poor record keeping practices are such that it is impossible to quantify the number of unofficially awarded posts. Comparisons among the data reports submitted to the Monitoring Team suggest that hundreds of positions that were initially reported as awarded posts were in fact "unofficial."

Most of the restrictions on how staff have been assigned via awarded post were entrenched Department *practice* rather than policy requirements. In most cases, the Monitoring Team has not identified any Department policy or other regulation that would require such restrictions.

**Monitor Recommendations on Areas of Focus**

Given the entrenched practices regarding awarded posts, the Monitoring Team has shared the following recommendations with the Department in order to improve its practices:

- **Clarification of Policies and Procedures**: The Department should clarify exactly what Department policy requires and does not require in the administration of awarded posts and eliminate all unnecessary restrictions currently imposed in practice. Most significantly, regulations regarding how those with awarded posts can be re-assigned must be clarified and communicated to the various commands. The Department must ensure deployment of adequate staff in PIC-facing positions at all times and make certain that its policy relating to awarded posts does not undermine that goal.

- **Improvement Management:** The Department must properly manage the practice to eliminate the *ad hoc* restrictions, cronyism and favoritism that are antithetical to good staff deployment practice. This includes the ability to identify and track the posts that have been awarded to staff members. The Department must institute safeguards to ensure that the facilities and other entities that utilize awarded posts do not operate in a manner that contravenes the Department's policy or the staff deployment efforts established by leadership.

- **Evaluating Awarded Posts for Positions Outside of the Commands:** A significant proportion of awarded posts are in locations *outside of the facilities' housing units*. Given that proper coverage and supervision of the housing units are essential for the safety of both staff and people in custody, the Department should incentivize housing unit placements to attract those with specific skills, experience and/or interest to improve the interpersonal dynamics between staff and the incarcerated population.

In May 2024, the City negotiated an updated contract with the Correction Officer's Union ("COBA") for the period March 1, 2022 through April 30, 2027.[381] With respect to job assignments, the Contract includes the following clause, which was not previously in other agreements.

> "*When filling new and vacant job assignments within a command, the Department shall post the vacant job assignment to allow all Correction Officers within the command an opportunity to apply for the vacancy and assign the job assignment within a reasonable time after the application period is closed, consistent with existing policies established by the Department. The determination of the Department as to assignment to a Post shall not be grievable. Authorized union representatives may request to meet with facility leadership in the event that the Department's determination as to the posted job assignment is not consistent with the criteria established in policy (e.g., seniority, work performance, attendance record, special skills or required clearances).*"

COBA stated that this provision provides "guaranteed and contractually protected post awards."[382] COBA further reported it "negotiated mandatory post awards into the Contract for the first time in COBA's history. DOC must post and award posts going forward. DOC is also required to meet with COBA in the event that any of the post awarding factors are not followed. Factors are as follows – Seniority, work performance, attendance record, special skills or required clearances."[383]

With respect to the issue of job assignments within the agreement, the City has reported that "when the Department is filling a vacant position, it must be posted to allow interested officers the ability to apply and that assignments will be made in accordance with Department policy…[which was] already required by the COBA contract, and the Department policy already required posting of vacant positions. The May 10, 2024 agreement does not use the term 'awarded posts' and the purpose of the agreement is to make clear that the Department will, in fact, post vacant positions when they are available. The determination of how to fill a vacancy

---

[381] *See*, https://www.nyc.gov/assets/olr/downloads/pdf/collectivebargaining/2021-2026/coba-2022-2027-unit-agreement.pdf

[382] *See*, https://cobanyc.org/cobacontract2024/

[383] *See*, https://cobanyc.org/cobacontract2024/

after the position is posted and people apply is in the Department's discretion and the May 10, 2024 agreement states that the determination of the Department as to assignments is not grievable."

On March 28, 2025 COBA submitted a request for arbitration with the Office of Collective Bargaining seeking arbitration regarding a violation of the Collective Bargaining Agreement. In particular, COBA alleges that DOC has violated the 2024 COBA Unit Bargaining Memorandum of Agreement Section 6 and Operations Order 10/17[384] because "DOC has failed to post and award any job assignments at all since January 2025." COBA reports it is seeking "[a] finding that DOC violated Section 6 of the 2024 Unit Bargaining MOA and Operations Order 2/21; mandate that DOC comply with the CBA by posting and awarding all new and vacant job assignments in every command immediately and make every Officer whole in each and every way."

The impact of the contractual provision on the Department's ability to reduce the use of awarded posts is simply unknown. The City and COBA's positions appear at odds and there is pending litigation regarding the matter.

---

[384] Operations Order 10/17 was the Awarding Job Assignments within a Command issued on June 21, 2017. However, it was updated on March 9, 2021. It is unclear why Operations Order 10/17 was referenced in this grievance given it is no longer operative.

**Departments Efforts to Alter Practice for Awarded Posts**

Historically, the Monitoring Team has found relatively few obstacles to prevent the Department from addressing the problems associated with awarded posts (as noted above, it is unclear what impact the COBA agreement may have on the Department's practices). As with many of the agency's dysfunctional practices, the problem lies in differentiating policy from practice. Work has begun on developing appropriate safeguards to ensure that practice aligns with policy, but more work remains.

The following progress has been made in this area:

- **Significant Reduction in use of Awarded Posts & Elimination of "unofficial" Awarded Posts**: At the time the Action Plan was entered by the Court in June 2022, DOC reported it had about 1,650 staff with awarded posts, many of which were "unofficial" awarded posts. Through improved record keeping and tracking the Department now has 736 staff with awarded posts.[385]

- **Reliable Tracking of Awarded Posts**: The Department now maintains a reliable list of all staff who have been officially awarded a post.

- **Suspensions of Awarded Posts with Limited Exception**: The practice of awarding posts to specific staff members remains suspended except in a few select cases in which the Commissioner determined there was a specific need for an awarded post. The Monitor is consulted prior to a final determination by the Commissioner.

- **Safeguards Against "Unofficial" Awarded Posts**: The Office of Administration has put procedures in place through both its scheduling system and continued oversight of the scheduling process that mitigate the possibility that staff have an "unofficial" awarded post. The current process for scheduling simply doesn't allow for the widescale assignment of hundreds of staff to "unofficial" awarded posts that previously occurred. These various procedures are discussed in more detail in Appendix K of this report. To further minimize potential loop-holes in the staffing process, the Office of Administration

---

[385] The Department's historically poor record keeping practices related to awarded posts makes it impossible to quantify the number of unofficially awarded posts. However, both an assessment of practice and comparisons of the various reports submitted to the Monitoring Team in 2023 and 2024 suggest that hundreds of positions that were initially reported as awarded posts were in fact "unofficial."

drafted a policy regarding facility-added posts,[386] which to date, was a staffing practice that was not governed by any policy.[387] The combination of reliable tracking, improved staff scheduling practices, and the creation of policies around other staffing practices mitigates the possibility that practices such as unofficial awarded posts reemerge.

- **Evaluation of Awarded Posts**
  - _Civilian Posts_: As part of the Staff Efficiency Initiative, the Department reviewed the list of staff with awarded posts to better understand whether the position is PIC facing or not. An initial assessment was also done to determine whether certain positions could be filled by a civilian. The Department previously reported that over 50 staff were identified in posts that could potentially be filled by a civilian. However, the Department has subsequently reported that it is now unsure whether each of the posts identified can be civilianized because some may, in fact, require a uniform staff to complete the job and in other cases the Department does not have the lines to convert the positions to civilian lines. It is important to note that the elimination of hundreds of "unofficial" awarded posts has, in and of itself, significantly reduced the number of staff with "unofficial" awarded posts that were either posts that could be reasonably completed by a civilian or had limited PIC engagement. Further, it is important to note that certain posts outside of the command may, in fact, require a uniform staff member because it requires a specific skill set (e.g. driving the transportation bus or require having a firearm). The current list of staff with awarded posts does have some posts that appear can and should be reasonably completed by civilians. The Monitoring Team has encouraged DOC to identify those positions and incorporate in its broader staff efficiency initiative.
  - _Necessity of Awarded Posts_: At the end of the Monitoring Period, the Monitoring Team reiterated a recommendation that the Department conduct a critical assessment of awarded posts to determine whether the awarded post is necessary.

---

[386] Facility Added Posts are **_daily_** temporary posts added by the facility to address specific urgent operational needs.

[387] The Monitoring Team provided feedback on the policy following the close of the Monitoring Period.

In determining whether an awarded posts is necessary, we recommend that the Department consider, among other things:

- if the post does not require an eight hour shift then its use as an awarded post should be presumptively eliminated absent compelling circumstances;

- posts within commands that do not house incarcerated individuals should be closely scrutinized to determine whether awarded posts are necessary for those commands; and

- posts that do not directly engage with the incarcerated population on the housing unit should be closely scrutinized to determine whether awarded posts are necessary, if so, the basis for such a determination should be clear.

The Department has reported that this work will occur along with its ongoing assessment of staff with awarded posts.

- **Steady Staffing**: The Monitoring Team strongly supports the Department's use of assigning staff to steady posts without the need to make the post awarded. The Department has utilized steady staffing without awarding the post in certain select housing units, for instance in a few of the Young Adult housing units at RNDC (discussed in more detail in the compliance assessment for the Young Adult – Consistent Assignment of Staff section). Further, in this Monitoring Period, the Department reported it intended to expand the use of steady staffing to more posts in the jails, but that the posts would not be awarded. Following the close of the Monitoring Period, the Department assigned over 80 staff to steady PIC facing posts, but the posts are not "awarded."

- **Potential Modifications to Awarded Post Criteria**: In the last Monitoring Period, the Department reported to the Monitoring Team that it would like to reintroduce the practice of awarding posts on housing units in order to promote consistent staffing. While it is the Monitoring Team's understanding that staff may be consistently assigned to a post without the post being "awarded," the Department has opined that awarding posts has certain benefits. Agency leadership reports that they want to ensure a level playing field for staff such that in practice, available posts are advertised to all staff and that everyone has an equal opportunity to apply. The Department has also suggested that awarding posts promotes staff morale as those members awarded posts are consistently at work and have

better and stronger behavioral dispositions. Members who are awarded posts provide stability, have a sense of ownership, are more accountable for their actions, show increased job satisfaction and feel valued by the Department, among many other benefits. The Department has not subsequently engaged the Monitoring Team on what steps, if any, it would like to take to move forward on this initiative.

- o If *administered* appropriately, the Department's approach to utilizing awarded posts for positions on the housing unit or for positions with regular contact with incarcerated individuals is reasonable.[388] The Monitoring Team has strongly encouraged the Department to address the concerns about the policies and procedures regarding awarded posts. Once those concerns have been addressed so that the administration of awarded posts can occur with fidelity, it appears it would be both appropriate and reasonable to utilize awarded posts as contemplated by the Department.

## Data on the Use of Awarded Posts

The number of staff with awarded posts has continued to decline through attrition and the suspension of awarded posts with limited exception. Outlined below is a break-down of those staff with awarded posts. Tables 4, 5, and 6 of Appendix F include charts of the relevant data regarding Awarded Posts.

- **Total Numbers**. At the end of this Monitoring Period the Department had 736 staff with awarded posts. This is a decrease of 13% since April 2024 when 844 staff had awarded posts. Further noteworthy, while historical data is not available, the Department routinely reported that at least 1,650 staff had previously been treated as if they had an awarded post either officially or unofficially. As noted above, the Department has essentially eliminated all unofficial awarded posts.

- **Facility v. Non-Facility Posts**. Of the 736 staff with awarded posts, about 70% (n=528) were posts awarded within the facilities and one-third (n=208) were posts outside the

---

[388] In the Monitor's May 24, 2024 Report (dkt. 712) at pg. 25, the Monitoring Team advised that it encouraged the Department to implement awarded posts in a manner that incentivizes housing unit placements to attract those with specific skills, experience and/or interest to improve the interpersonal dynamics between staff and the incarcerated population.

facilities (*i.e.,* in court facilities, Special Operations Division, and Transportation Division).

- **PIC Facing Posts**. 402[389] (54%) of the 736 awarded posts within the facilities are PIC Facing. This designation includes housing units, along with corridor, clinic, front gate, fire safety, food service, activity, law library, education, meal relief, and security and visitation posts, among others.

  - *Housing Unit Posts*. 172 (23%) of the total 736 awarded posts are assignments to a specific housing unit.[390] As noted above, DOC has also steadily assigned staff to housing units without the post being awarded.

- **Non-PIC Facing Posts**. 334 (46%) of the 736 awarded posts are "non-PIC facing posts" including assignments to patrol, perimeter security, control rooms, gate security, and sanitation, as well as posts outside of the facilities. It should be noted that while DOC classifies some of these posts as "non-PIC facing posts," DOC reports that some of these positions may require a uniform staff member in the position because the role requires the individual to provide security, supervision of PICs, or require a fire arm.

- **Additional Awarded Posts in 2024 & 2025**. While the use of awarded posts has essentially been suspended, in December 2024, following consultation with the Monitoring Team, the Department awarded 76 staff to housing unit and Intake posts within the facilities. The Department did not award any posts between January and June 2025.

**<u>Conclusion</u>**

The Department has taken concrete steps to address the problems identified with regard to awarded posts. Most importantly, the significant number of staff that were treated as if they had an awarded post (whether or not they, in fact, had an awarded post) has decreased by over half since 2022. Further, the number of staff with Awarded Posts has continued to decrease and so there are currently 736 staff with Awarded Posts. Ongoing work remains to ensure that the revisions to the process for awarding post are clear and sustained so that prior practices are

---

[389] This is a subset of the 556 staff assigned to facilities.

[390] The proportion of posts on housing units was determined via the Monitoring Team's analysis. The location of some posts appeared obvious, but some of the others may or may not be in housing units. Accordingly, the data may not be precise but is certainly a well-informed estimate of the proportion.

eliminated and do not return. The Department must update its policies and procedures regarding both awarded posts and steady staffing to ensure both practices are managed with fidelity and are not confused with one another. Once revised policies and procedures have been implemented, the Monitoring Team believes further discussions about potential modifications to the use of awarded posts may be appropriate, in particular regarding the use of awarded posts for staff on housing units. The impact of the COBA contract and any corresponding litigation must also be monitored and tracked to determine how this may shape and inform the Department's ability to manage this process.

| COMPLIANCE RATING | **Action Plan § C, ¶ 3(v).** Partial Compliance |
|---|---|

---

**MAXIMIZING DEPLOYMENT OF STAFF - MAXIMIZE WORK SCHEDULES (ACTION PLAN § C., ¶ 3(VI))**

---

*Action Plan § C., ¶ 3(vi). Maximizing Deployment of Staff – Maximize Work Schedules*. The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below: (vi) Create and implement alternatives to the work schedule for uniform staff assigned to work in the facilities in order to minimize the use of a 4 by 2 schedule and optimize staff scheduling.

---

The Department must maximize staff work schedules as required by Action Plan (dkt. 465), § C, ¶ 3(vi). The purpose of this requirement is for the Department to optimize staff scheduling by implementing alternatives to the work schedule for uniform staff assigned to work in the facilities to increase the number of days a staff member works. Specifically, the Department is required to minimize the use of the 4x2 schedule in order to increase the number of days that a staff member works during the year.

## Compliance Assessment Overview

Until this Monitoring Period, the Monitoring Team provided an update on the Department's efforts to achieve compliance with Action Plan (dkt. 465), § C, ¶¶ 3(vi), but did not provide a compliance rating because it was not one of the select group of provisions defined by Action Plan (dkt. 465), § G, ¶ 5(b) for which the Monitoring Team was required to do so. The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pages 31 to 34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order. Beginning in this Monitoring Period, a compliance rating will now be provided for this provision pursuant to the Court's July 10, 2025 Order (dkt. 879).

## Lack of Efforts to Maximize Work Schedules

The Department previously reported that their ability to modify the 5x2 schedule as a potential alternative to the 4x2 schedule is limited by the collective bargaining agreement that was in effect prior to the issuance of the Action Plan.[391] DOC reported at the time the Action Plan was entered that "that the [Action] Plan is entirely within the power of the Commissioner, and more broadly the Mayor, to execute."[392] Historically, the Department has provided additional

---

[391] *See*, Declaration of Ronald Edwards, dated March 14, 2024, at ¶ 7 (dkt. 689-9).

[392] *See*, Letter from the City of New York dated June 10, 2022 (dkt. 463) at pg. 1.

days of to those who work 5x2 in order to equalize the number of days worked per year with those on a 4x2 schedule. This eliminates the optimization available via a traditional 5x2 schedule. However, the Department took no steps to address the matter in its most recent contract with the Correction Officer union ("COBA") signed in May 2024.[393] DOC has recently advised the Monitoring Team that the Office of Labor Relations did attempt to negotiate the schedule with the correction officer unions, but the correction officer union refused to negotiate. It is unclear when this attempt to negotiate with the unions occurred as this information was not provided to the Monitoring Team as part of the routine updates on contract negotiations period submitted to the Monitoring Team between November 2023 and April 2024 (see footnote). This report is also not consistent with the report the Commissioner and Acting General Counsel provided directly to the Monitor and Deputy Monitor in May 2024 (at the time a new agreement with COBA was reached on a new contract) in which they reported that this matter was not addressed in their contract negotiations. Further, DOC did not proffer that it attempted to negotiate this matter in any legal filings related to the contempt proceedings on this provision.[394] The Monitoring Team requested a meeting with the Office of Labor Relations to learn more about this report. The Monitoring Team's request is still pending.

---

[393] The Monitoring Team met with relevant City and DOC officials in fall 2023 to discuss this issue and the need to address these matters in the Department's labor contracts. The City and DOC reported they would keep the Monitoring Team apprised of any developments regarding contract negotiations and provided routine updates on the status of negotiations of labor contracts between November 2023 and April 2024. During this time, Department advised that following a meeting November 20, 2023 with COBA, no future meetings were planned. Less than one month later, on May 10, 2024, the Department reported to the Monitoring Team that it reached an agreement in principle with the COBA, without any prior notice to the Monitoring Team that negotiations were underway. DOC officials responsible for keeping the Monitor apprised of the status of the negotiations reported that they were unaware negotiations were underway until an agreement was reached.

[394] *See*, for example, filings at dkts. 688 to 692 filed on March 19, 2024, 762-3 filed on July 30, 2024, 764-2 at pg. 51 with no objection from Defendants filed on July 30, 2024, 821-1 filed on February 7, 2025.

There is no evidence the Department has made any progress toward complying with this requirement and thus the findings in the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 268-270 continue to apply.[395] The Department is in Non-Compliance with this provision.

| COMPLIANCE RATING | **Action Plan § C., ¶ 3(vi).** Non-Compliance |
|---|---|

---

[395] Two slight modifications to the findings in the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 268-270 are necessary. First, for staff on the 4x2 schedule, staff work four consecutive 8.5-hour workdays, followed by two consecutive days off, which results in staff being assigned to work 245 days not 243 days as previously reported. Second, staff assigned to the Department's 5x2 schedule who work in areas outside of a command work 8.25 hour workdays and only receive eight additional days, in comparison to those on 5x2 schedules within a command who receive 16 additional days off.

## CONCLUSION

This report brings into stark relief the urgent and ongoing need to advance the *Nunez* reforms given the conditions and the ongoing and serious risk of harm in the jails. Doing so in an environment characterized by significant uncertainty—the Court's forthcoming appointment of a Remediation Manager and the Mayor's selection of a Commissioner—makes an already complicated array of dynamics even more difficult to manage.

The extant conditions in the jails demand a commitment from all stakeholders to an overarching set of priorities and plans to advance the reform effort, while continuing to implement short-term initiatives that can more immediately minimize the risk of harm to individuals in custody and staff. The fact that this case has been ongoing for 10 years confirms the Monitoring Team's early caution that reforming the jails would not happen quickly nor could the necessary momentum for change rest on any single person or entity. Although immediate relief is needed, premature actions to repair entrenched, foundational issues without a carefully conceived plan will only set the Department further back. The record is replete with examples of the Department's well-intended but hastily created plans that were unsustainable and ultimately failed. **The elimination of the dysfunctional foundational patterns and practices underpinning the Department's operations is an absolute prerequisite to achieving sustained compliance with the broader *Nunez* Court Orders**.

The Department is ultimately responsible for operating the jails, but a variety of other stakeholders also play essential roles. All must work together in order to advance the reform effort. This report identifies certain regulations imposed by external stakeholders that impact the Department's operations. These regulations require meaningful scrutiny to determine how the obligations they impose on the Department can be addressed while also ensuring that DOC's

operations are anchored by sound correctional practice and comply with the *Nunez* Court Orders.

Some of this work is already underway regarding Local Law 42. Additional scrutiny of other

regulations as described in the report (e.g. in the Searches and Contraband section of the report)

may also be necessary. Further, the Mayor's recent Executive Order directing development of

implementation plans related to certain minimum standards of the Board of Correction will also

require consideration and action on the part of the stakeholders.[396]

Finally, the City and DOC must immediately disavow attempts to return to the very

practices that underlie the Court's findings of contempt and that have been repudiated by the

Court multiple times. Equally critical is for the City and DOC to reaffirm their intent to engage

in good faith and with transparency and candor with the Monitoring Team, incoming

Remediation Manager, and the Court. Anything less will permit the conditions underlying the

Court's contempt findings to fester and deepen the dysfunctional culture among staff, making

successful reform even *more* elusive.

---

[396] *See*, Mayor's Executive Order 1.1 *available at* https://www.nyc.gov/mayors-office/news/2026/01/emergency-executive-order-1-1.

# APPENDIX A: COMPREHENSIVE LIST OF PROVISIONS

**Comprehensive List of "Select Group of Provisions" & Provisions Subject to the Court's 2024 Contempt Order**

The table below includes a comprehensive list of 40 provisions that are subject to compliance rating pursuant to the Court's July 10, 2025 Order (dkt. 879). The table also identifies whether the provision is either: (1) the Select Group of Provisions subject to compliance assessments (Consent Judgment § XX, ¶ 18) as required by Action Plan § G, ¶ 5(b) **and/or** (2) the provisions that are subject to the Court's 2024 Contempt Order.

This chart references provisions in the Consent Judgment ("CJ"), the First Remedial Order ("FRO"), the Second Remedial Order ("SRO"), the Third Remedial Order ("TRO"), and the Action Plan ("AP").

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | Rating in 14th MP | Rating in 15th MP | Rating in the 16th MP | Rating in the 17th MP | Rating in the 18th MP | Rating in the 19th MP | Rating in the 20th MP |
|---|---|---|---|---|---|---|---|---|---|
| Facility Leadership Responsibilities (FRO, § A., ¶ 2) | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| New Use of Force Directive (CJ, § IV., ¶ 1) | Yes | Yes | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance |
| Independent Staff Reports (CJ, § V., ¶ 2) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Providing Medical Attention Following Use of Force Incident (CJ, § V., ¶ 22) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | Rating in 14th MP | Rating in 15th MP | Rating in the 16th MP | Rating in the 17th MP | Rating in the 18th MP | Rating in the 19th MP | Rating in the 20th MP |
|---|---|---|---|---|---|---|---|---|---|
| Interim Security Plan (SRO, ¶1(i)(a)) | No | Yes | | | | | | Concrete Steps Taken | Non-Compliance |
| Interim Security Plan (AP, § D, ¶ 2 (a)) | No | Yes | | | | | | Concrete Steps Taken | Non-Compliance |
| Facility Emergency Response Teams (FRO, § A., ¶ 6) | Yes | Yes | Non-Compliance | Non-Compliance | **Development of Protocol:** Non-Compliance **Review of Responses & Documentation:** Partial Compliance **Response to Misconduct:** Non-Compliance | **Development of Protocol:** Non-Compliance **Review of Responses & Documentation:** Partial Compliance **Response to Misconduct:** Non-Compliance | **Development of Protocol:** Partial Compliance **Review of Responses & Documentation:** Partial Compliance **Deployment of Teams:** Partial Compliance **Response to Misconduct:** Non-Compliance | Partial Compliance | Partial Compliance |
| Searches (AP, § D, ¶ 2 (d)) | No | Yes | | | | | | Concrete Steps Taken | Partial Compliance |
| Identify/Recover Contraband (AP, § D, ¶ 2 (e)) | No | Yes | | | | | | Concrete Steps Taken | Partial Compliance |
| Escort Holds (AP, § D, ¶ 2 (f)) | No | Yes | | | | | | Status Quo Remains | Non-Compliance |
| Improved Routine Tours (AP, § A, ¶1 (d)) | No | Yes | | | | | | Status Quo Remains | Non-Compliance |
| Revised De-escalation Protocol (FRO, § A., ¶ 3) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Prevent Fight/Assault – 18-year-olds | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | Rating in 14th MP | Rating in 15th MP | Rating in the 16th MP | Rating in the 17th MP | Rating in the 18th MP | Rating in the 19th MP | Rating in the 20th MP |
|---|---|---|---|---|---|---|---|---|---|
| (CJ, § XV., ¶ 1) | | | | | | | | | |
| Direct Supervision – 18-year-olds (CJ, § XV., ¶ 12) | Yes | Yes | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Reinforcement of Direct Supervision – 18-year-olds (FRO, § D, ¶ 3) | No | Yes | | | | | | Concrete Steps Taken | Partial Compliance |
| Reinforcement of Direct Supervision – 18-year-olds (FRO, § D, ¶ 3(i)) | No | Yes | | | | | | Concrete Steps Taken | Partial Compliance |
| Consistent Assignment of Staff – 18-year-olds (CJ, § XV., ¶ 17) | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance |
| Consistent Staff Assignment and Leadership (FRO, § D, ¶ 1) | No | Yes | | | | | | Partial Compliance | Partial Compliance |
| Conduct Rapid Reviews (FRO, § A., ¶ 1) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Thorough, Timely, Objective Investigations (CJ, § VII., ¶ 1) | Yes | Yes | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance |
| Timing of Full ID Investigations (CJ, § VII., ¶ 9(a)) | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance |
| ID Staffing (CJ, § VII., ¶ 11) | No | Yes | | | | | | Partial Compliance | Partial Compliance |
| Timely, Appropriate and Meaningful Discipline (CJ, § VIII., ¶ 1) | Yes | Yes | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | Rating in 14th MP | Rating in 15th MP | Rating in the 16th MP | Rating in the 17th MP | Rating in the 18th MP | Rating in the 19th MP | Rating in the 20th MP |
|---|---|---|---|---|---|---|---|---|---|
| Use of Force Violations (CJ, § VIII., ¶ 3(c)) | Yes | No | Serving Charges: Substantial Compliance (per the 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance (per the 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance (per the 12th Monitor's Report) Administrative Filing: Not rated Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance (per the 12th Monitor's Report) Administrative Filing: Not rated Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance (per the 12th Monitor's Report) Administrative Filing: Not rated Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance (per the 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance (per the 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance |
| Immediate Corrective Action (FRO, § C., ¶ 1) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Staff Accountability – Monitor Recommendations (FRO, § C., ¶ 2) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Not Rated |
| Expeditious OATH Proceedings (FRO, § C., ¶ 4/TRO ¶ 2) | Yes | No | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| New OATH Procedures and Protocols (TRO, ¶ 3) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Applicability of Disciplinary Guidelines to OATH Proceedings (FRO, § C., ¶ 5) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Trials Division Staffing (CJ, § VIII., ¶ 4) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Early Warning System (CJ, § X., ¶ 1) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | Rating in 14th MP | Rating in 15th MP | Rating in the 16th MP | Rating in the 17th MP | Rating in the 18th MP | Rating in the 19th MP | Rating in the 20th MP |
|---|---|---|---|---|---|---|---|---|---|
| Promotions (CJ, § XII., ¶ 1) | Yes | No | Not Rated | Partial Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Promotions (CJ, § XII., ¶ 2) | Yes | No | Not Rated | Substantial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Promotions (CJ, § XII., ¶ 3) | Yes | No | Not Rated | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Supervision of Captains (FRO, § A., ¶ 4) | Yes | Yes | Non-Compliance | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance |
| Increased Assignment of Captains in the Facility (AP, § C, ¶ 3 (ii)) | No | Yes | | | | | | Non-Compliance | Non-Compliance |
| Improved Supervision of Captains (AP, § C, ¶ 3 (iii)) | No | Yes | | | | | | Non-Compliance | Non-Compliance |
| Maximizing Deployment of Staff - Reduction of Uniformed Staff in Civilian Posts (AP, § C, ¶ 3 (vii)) | No | Yes | | | | | | Concrete Steps Taken | *Management of Internal Staffing Records*. Partial Compliance  *Defendants' allocation of resources to reduce the assignment of uniform staff to civilian posts.* Non-Compliance |
| Maximizing Deployment of Staff - Awarded Posts (AP, § C, ¶ 3 (v)) | No | Yes | | | | | | Concrete Steps Taken | Partial Compliance |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | Rating in 14th MP | Rating in 15th MP | Rating in the 16th MP | Rating in the 17th MP | Rating in the 18th MP | Rating in the 19th MP | Rating in the 20th MP |
|---|---|---|---|---|---|---|---|---|---|
| Maximizing Deployment of Staff - Maximize Work Schedules (AP, § C, ¶ 3 (vi)) | No | Yes | | | | | | Status Quo Remains | Non-Compliance |

# APPENDIX B:
# USE OF FORCE AND VIOLENCE INDICATORS

## Table 1: Number and Rate of UOF

The graph below shows the average monthly rate of use of force per 100 people in custody. The table shows the data for the last three Monitoring Periods.



| Systewide Use of Force January 2024 to June 2025 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2024 | 3589 | 598.2 | 6271 | 9.3 |
| July-December 2024 | 3480 | 580.0 | 6489 | 8.94 |
| January-June 2025 | 3625 | 604.2 | 7123 | 8.48 |

**Table 2: Number and Proportion of A, B, and C Uses of Force.**

The table below shows the number and proportions of uses of force in which at least one serious injury ("A"), a less serious injury ("B"), or no injury ("C") occurred. On the left-hand side of the table (the unshaded side), Column A shows that the raw number of serious injuries (A) increased steadily for several years after the Consent Judgment went into effect. The number of incidents involving serious injuries increased significantly in 2021 and 2022, and since then, the number decreased significantly. In column B, the trajectory of the trend is shaped differently, but the number of incidents involving less serious injuries has been at historical lows for the past two years. In other words, each year, fewer incidents occur in which people are harmed at the hands of staff (from just over 2,000 incidents in 2018, to fewer than 300 incidents in 2024, and about 200 incidents during the first half of 2025).

The shaded cells of the table show the proportion of As, Bs and Cs each year. As the proportion of As and Bs has decreased over time, the proportion of Cs—uses of force where no one is injured—has increased. In 2018, 37% of UOF incidents involved an injury (Class A and B, combined) compared to only about 6% during the current Monitoring Period. Conversely, in 2018, only about two-thirds of all use of force incidents (63%) did not result in injury, compared to about 93% during the current Monitoring Period. In other words, a much larger proportion of the uses of force occur without inflicting a *physical* injury on those involved. As discussed in other sections of this report, whether or not there was a *physical* injury does not mean that the incident did not cause harm or create a risk of harm.

| Number and Proportion of A, B and C Uses of Force | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Year** | **Number of UOF Incidents** | | | | **Proportion of A/B/C** | | |
| | **A** | **B** | **C** | **Total UOF** | **A** | **B** | **C** |
| 2016 | 74 | 1627 | 2950 | 4651 | 1.6% | 35.0% | 63.4% |
| 2017 | 134 | 1743 | 2903 | 4780 | 2.8% | 36.5% | 60.7% |
| 2018 | 136 | 1894 | 3871 | 5901 | 2.3% | 32.1% | 65.6% |
| 2019 | 166 | 1648 | 5355 | 7169 | 2.3% | 23.0% | 74.7% |
| 2020 | 178 | 960 | 5059 | 6197 | 2.9% | 15.5% | 81.6% |
| 2021 | 464 | 1033 | 6697 | 8194 | 5.7% | 12.6% | 81.7% |
| 2022 | 434 | 781 | 5790 | 7005 | 6.2% | 11.1% | 82.7% |
| 2023 | 165 | 380 | 6239 | 6784 | 2.4% | 5.6% | 92.0% |
| 2024 | 52 | 209 | 6719 | 6980 | 0.7% | 3.0% | 96.3% |
| **By Monitoring Period** | | | | | | | |
| J-J 24 | 21 | 87 | 3389 | 3497 | 0.6% | 2.5% | 96.9% |
| J-D 24 | 31 | 122 | 3330 | 3483 | 0.9% | 3.5% | 95.6% |
| J-J 25 | 44 | 155 | 3362 | 3625 | 1.2% | 4.3% | 92.7% |

**Table 3: Number and Rate of Stabbings and Slashings**

The graph below shows the average monthly rate of stabbings and slashings per 100 people in custody. The table shows the data for the past three Monitoring Periods.



| Systemwide Stabbings/Slashings January 2024 to June 2025 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2024 | 152 | 25.3 | 6271 | 0.41 |
| July-December 2024 | 146 | 24.3 | 6489 | 0.38 |
| January-June 2025 | 141 | 23.5 | 7123 | 0.33 |

*\*\*In October 2024, the Department began collecting data on "Attempted Slashings/Stabbings"\*\**

**Table 4: Serious Injuries to Inmates**

The graph below shows the number and average monthly rate of serious injuries to inmates ("SITI"), per 100 people in custody. Across the nearly six years that this data has been available, the monthly rate has varied +/- 20% at times but overall has been relatively consistent with an average monthly rate of 1.5. During this time, both AMKC and EMTC have contributed disproportionately to the number/rate of injuries. These statistics were developed using the *date the incident occurred,* and the data was current as of October, 2025.



The Monitoring Team analyzed injuries reported in CODs to determine the typical causes of serious injuries. Fights were the most prevalent cause (65% of reported injuries), followed by accidents (27%).[397] Small proportions of serious injuries were caused by self-harm (6%) and use of force (1%).[398] The Department does not include injuries caused by uses of force or stabbing/slashing in its SITI data.[399]

---

[397] Accidents include PIC injuries sustained from slipping and falling, engaging in recreational activities such as sports, slamming a body part in a door (most often fingers) in a way that was not self-harm, or experiencing an uncontrollable medical emergency (such as falling onto the floor during a seizure).

[398] [The Monitoring Team is evaluating the small number of cases in which it appears the serious injury may be associated with a use of force.]

[399] It appears in a small number of cases that some serious injuries were reported that were also a use of force.



The Monitoring Team also examined the time between the date the incident occurred and the date on which the severity of the injury was ultimately reported via COD. The date the injury is reported via COD is impacted by the time required for CHS to report the data to DOC, and for DOC to enter the information into the COD. As shown in the table below, the speed with which the severity of the injury was reported following an incident has improved over time. During the current Monitoring Period, in over half of the cases (52%), the severity injury was reported within 2 days, and the severity was reported for another 27% of cases within 3 to 10 days.



**Table 5: Number and Rate of Fights**

The graph below shows the average monthly rate of fights per 100 people in custody. The table shows the data for the past three Monitoring Periods.



| Systewide Fights January 2024 to June 2025 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2024 | 3491 | 581.8 | 6271 | 9.3 |
| July-December 2024 | 4075 | 679.2 | 6489 | 10.5 |
| January-June 2025 | 4036 | 672.7 | 7123 | 9.4 |

**Table 6: Number and Rate of Assaults on Staff with UOF**

The graph below shows the average monthly rate of assaults on staff (that also involve a use of force) per 100 people in custody. The table shows the data for the past three Monitoring Periods.



| Systemwide Assaults on Staff with UOF January 2024 to June 2025 | | | | |
|---|---|---|---|---|
| Months | Total # AOS w UOF | Average/month | ADP | Rate |
| January-June 2024 | 323 | 53.8 | 6271 | 0.86 |
| July-December 2024 | 456 | 76.0 | 6489 | 1.17 |
| January-June 2025 | 462 | 77.0 | 7123 | 1.08 |

**Table 7: Number and Rate of Assaults on Staff without UOF**

The graph below shows the average monthly rate of assaults on staff (not involving a use of force) per 100 people in custody. The table shows the data for the past three Monitoring Periods.



*The Department began tracking assaults on staff that did not involve a use of force in 2020. Prior years' data is not available.*

| Systewide Assaults on Staff without UOF<br>January 2024 to June 2025 | | | | |
|---|---|---|---|---|
| Months | Total #<br>AOS<br>no UOF | Average/month | ADP | Rate |
| January-June 2024 | 202 | 33.7 | 6271 | 0.54 |
| July-December 2024 | 145 | 24.2 | 6489 | 0.37 |
| January-June 2025 | 190 | 31.7 | 7123 | 0.44 |

**Table 8: Uses of Force Involving Incidents When a Staff Member is Not on Post**

The table below provides the number and proportion of uses of force involving "unmanned posts" as identified by the Department during each monitoring period from 2022 to June 2025. These incidents occurred proximal to posts to which no staff member was assigned *or* instances where the assigned officer left their post without being relieved (collectively "unmanned posts"). The first column lists the number of uses of force involving unmanned posts. The second and third columns identify the number and proportion of uses of force that involved unmanned posts **and** were avoidable (as identified by the Department's Rapid Reviews) specifically due to the lack of staff on post. In other words, the Department determined that these incidents likely could have been avoided had a staff member been present.[400]

While the number of use of force incidents involving unmanned posts may only appear to be a small proportion to the overall number of use of force incidents in this Monitoring Period, that is not the appropriate context to view such incidents. The appropriate context to consider is that the staff's absence in each of these cases means that all such incidents were potentially avoidable, because had staff been present and conducting their duties appropriately, they may have been able to prevent, deter or mitigate the incident that led to the use of force.

| Uses of Force Incidents When a Staff Member is Not on Post, 2022- June 2025 | | | |
|---|---|---|---|
| **Monitoring Period** | **# of UOF Incidents involving Unmanned Posts** | **# of UOF Incidents involving Unmanned Posts and that DOC Reported were Avoidable** | **% of UOF Incidents involving Unmanned Posts, that DOC Reported were Avoidable** |
| **Jan.-Jun. 2022** | 151 | *88* | *58.28%* |
| **Jul.-Dec. 2022** | 159 | *80* | *50.31%* |
| **Jan.-Jun. 2023** | 112 | *57* | *50.89%* |
| **Jul.-Dec. 2023** | 65 | *29* | *44.62%* |
| **Jan.-Jun. 2024** | 89 | *14* | *15.73%* |
| **Jul.-Dec. 2024** | 125 | *9* | *7.20%* |
| **Jan.-Jun. 2025** | 114 | *9* | *7.89%* |

---

[400] The data shows that over time, the Department has determined that significantly fewer incidents involving unmanned posts could likely have been avoided had a staff member been present. However, the Department has a long history of failing to identify indicators that incidents were avoidable as discussed in the compliance assessment for First Remedial Order § A, ¶ 1, which continued into the current Monitoring Period and so this data must be evaluated with caution.

**Table 9: Number and Rate of Fires**

The graph below shows the average monthly rate of fires per 100 people in custody. The table shows the data for the past three Monitoring Periods.



| Systewide Fires January 2024 to June 2025 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| January-June 2024 | 219 | 36.5 | 6271 | 0.6 |
| July-December 2024 | 102 | 17.0 | 6489 | 0.3 |
| January-June 2025 | 195 | 32.5 | 7123 | 0.46 |

# APPENDIX C:
# IN-CUSTODY DEATHS

The number of people who have died while in custody is tragic and is related, at least in part, to the poor conditions and security practices in the jails as set forth herein.

## Table 1: Causes of Death

An updated table on the number of people who have died, and their causes of death is provided below. In 2023, nine individuals died in custody or shortly after their release.[401] In 2024, five individuals died. Fifteen people have died in 2025.

| DOC Causes of Death 2015 to December 31, 2025 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
| Accidental | | | | | | | | 1 | | | | 1 |
| COVID-19 | | | | | | 3 | 2 | | | | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 5 | 4 | 4 | 1 | 54 |
| Overdose | | 2 | 1 | | | | 4 | 6 | 2 | 1 | 5 | 21 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 6 | 2 | | 2 | 20 |
| Drowned | | | | | | | | 1 | | | | 1 |
| Pending OCME Confirmation | | | | | | | | | 1 | | 6 | 7 |
| Undetermined Due to Death Outside of DOC Custody | | | | | | 4 | 2 | | | | 1 | 7 |
| Undetermined by OCME | | | 1 | | | 1 | | | | | | 2 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11** | **16** | **19** | **9** | **5** | **15** | **118** |

---

[401] If an incarcerated individual has a health condition that may merit release, the process has a few steps and must be ordered by the Court. The Department does not have any authority to release an individual because of a health condition although it may certainly identify and recommend individuals that should be considered for potential release. To the extent an individual has a health condition that may merit release, CHS may issue a clinical condition letter, with the patient's consent, which is then provided to the individual's defense counsel. Counsel then may petition the Court to release the individual. Release is not automatic, and an individual determination must be made by the Court. If the court determines release is appropriate, the Department is notified via a court order that the individual is being released on their own recognizance ("ROR"). However, the order does not specify a medical reason for the release.

**Table 2: Mortality Rate**

The table below shows the Department's mortality rate from January 2010 to December 31, 2025. The mortality rate in 2025 increased 170% from the last year and represents the third highest rate in the past decade, surpassed only by the rates from 2020 to 2022.

| Mortality Rate | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| **Annual ADP** | 13,026 | 12,421 | 12,083 | 11,692 | 10,913 | 9,890 | 9,802 | 9,224 | 8,397 | 7,388 | 4,543 | 5,574 | 5,639 | 6,054 | 6,380 | 7,155 |
| **Number of Deaths** | 17 | 12 | 21 | 24 | 10 | 11 | 15 | 6 | 8 | 3 | 11 | 16 | 19 | 9 | 5 | 15 |
| **Mortality Rate** | 1.31 | 0.97 | 1.74 | 2.05 | 0.92 | 1.11 | 1.53 | 0.65 | 0.95 | 0.41 | 2.42 | 2.87 | 3.37 | 1.49 | 0.78 | 2.10 |
| *Note: The Mortality Rate is per 1000 people in custody and uses the following formula: Rate = (# of deaths/average # of people in custody)*1000* | | | | | | | | | | | | | | | | |

**Table 3: Corrective Action Taken by DOC Related to In-Custody Deaths - 2022-2025**[402]

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| **Death of Tarz Youngblood on 2/27/2022** | | |
| CO 36 | NPA – Loss of 17 compensation days | Failed to conduct proper tours and check for signs of life |
| **Death of Dashawn Carter on 5/7/2022** | | |
| CO 1 | Suspended, resigned | Failed to make proper tours and made false entries in the logbook |
| CO 2 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 3 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 4 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Mary Yehuda on 5/18/2022** | | |
| CO 37 | NPA - Loss of 10 compensation days and 12 months limited probation | Off post, failed to conduct frequent tours, and made false entries in the logbook |
| CO 40 | NPA - Loss of 10 compensation days | Off post, failed to conduct frequent tours, and made false entries in the logbook |
| Captain 38 | Suspended - 7 days; and NPA - Loss of 10 compensation days | Failed to conduct proper tours and made false entries in the logbook |
| ADW 39 | Reprimand (Returned to Command) | Failed to produce a COD package |
| **Death of Emanuel Sullivan on 5/28/2022** | | |
| CO 41 | NPA - Loss of 30 days and 12 months limited probation | Failed to conduct proper tours and made false entries in the logbook |
| **Death of Anibal Carrasquillo on 6/20/2022** | | |
| CO 20 | Suspended - 30 days | Failure to conduct proper tour |
| CO 21 | Suspended - 30 days | Failure to conduct proper tour/Off post |
| **Death of Elijah Muhammad on 7/11/2022** | | |
| CO 5 | Terminated | Failed to notify supervisor or medical staff |
| **Death of Michael Lopez on 7/15/2022** | | |
| CO 6 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| CO 7 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 8 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Ricardo Cruciani on 8/15/2022** | | |
| Captain 9 | Suspended - 30 days | Failed to conduct tour |
| **Death of Michael Nieves on 8/30/2022** | | |
| CO 10 | Suspended - 30 days | Failed to render aid |
| CO 11 | Suspended - 30 days | Failed to render aid and provide timely report |
| Captain 12 | Suspended - 30 days | Failure to supervise |
| **Death of Erick Tavira on 10/22/2022** | | |
| CO 13 | Suspended - 7 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Gilberto Garcia on 10/31/2022** | | |
| CO 14 | Suspended - 7 days | Failed to conduct tour |

---

[402] Given that the investigations into these deaths remain open, additional discipline may be forthcoming.

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| **Death of Marvin Pines on 2/4/2023** | | |
| CO 15 | Suspended - 6 days | Failed to conduct tours/off post |
| CO 16 | Suspended - 6 days | Failed to conduct tour |
| Captain 17 | Suspended - 15 days | Failed to make proper tours and made false entries in the logbook |
| ADW 18 | Suspended - 30 days | Failed to conduct tours/supervise |
| ADW 19 | Suspended - 6 days | Failed to supervise |
| **Death of Felix Taveras on 7/4/2023** | | |
| CO 22 | Suspended - 30 days | Failed to intervene and lock in |
| CO 23 | Suspended - 15 days | Failed to intervene |
| CO 24 | Suspended - 30 days | Failed to conduct tour |
| ADW 25 | Suspended - 15 days | Failed to identify misconduct |
| **Death of Ricky Howell on 7/6/2023** | | |
| Captain 26 | Documented Counseling | Failed to call incident into COD within required time frame |
| **Death of William Johnstone on 7/15/2023** | | |
| Captain 27 | Suspended - 7 days | Failure to conduct proper tour |
| CO 28 | Suspended - 15 days | Permitting unauthorized person or employee on their post |
| CO 29 | Suspended - 30 days | Failure to conduct proper tour and abandoned post |
| CO 45 | Unknown | Failure to conduct proper tour |
| **Death of Curtis Davis on 7/23/2023** | | |
| CO 30 | Suspended - 30 days | Off post |
| CO 31 | Suspended - 15 days | Failed to secure post |
| ADW 32 | Suspended - 7 days | Failure to conduct proper tour |
| **Death of Manish Kunwar on 10/5/2023** | | |
| Captain 33 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 34 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 35 | Suspended - 30 days | Disobeying a direct order to relieve fellow CO |
| **Death of Ramel Powell on 2/19/2025** | | |
| CO 42 | Suspended 2/19/2025; Terminated effective 5/11/2025 | Failed to act and failed to conduct meaningful tours by checking for signs of life |
| **Death of Dashawn Jenkins on 3/31/2025** | | |
| CO 43 | Suspended – 30 days | Conduct unbecoming |
| CO 44 | Suspended – 30 days | Conduct unbecoming |
| **Death of Edwin Quispe on 7/22/2025** | | |
| CO 45 | Suspended – 30 days | Abandoned Post |
| **Death of Ardit Billa on 8/23/2025** | | |
| Captain 46 | Suspended – 28 days | Failure to conduct proper tour |
| CO 47 | Suspended – 30 days | Off post |
| CO 48 | Suspended – 15 days | Unauthorized person on post |
| **Death of Carlos Cruz on 9/3/2025** | | |
| CO 49 | Suspended – 30 days | Conduct unbecoming |
| Captain 50 | Suspended – 15 days | Conduct unbecoming |
| **Death of Aramis Furse on 12/7/2025** | | |
| CO 51 | Suspended – 30 days | Inefficient performance of duty |

# APPENDIX D:
# USE OF FORCE REVIEWS & INVESTIGATIONS

**Table 1: Outcomes of Rapid Reviews Conducted by the Facilities**

The table below shows the number and outcome of Rapid Reviews conducted by the facilities from January 2018 through June 2025.

| Rapid Review Outcomes, January 2018 to June 2025 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **Jul-Dec 2024** | **Jan-Jun 2025** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of UOF) | 6,899 (97% of UOF) | 6,067 (98% of UOF) | 7,972 (98% of UOF) | 6,889 (98% of UOF) | 6,740 (99% of UOF) | 6,969 (>99% of UOF) | 3,475 (>99% of UOF) | 3,562 (100% of UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 1,135 (16%) | 630 (9%) | 322 (5%) | 159 (5%) | 171 (5%) |
| **UOF or Chemical Agent Policy Violations** | | | 345[403] (11%) | 1,233 (16%) | 835 (12%) | 1,161 (17%) | 3,442 (49% of UOF)[404] | 1,643 (47% of UOF) | 1,896 (53% of UOF) |
| **Procedural Violations** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 3,296 (48%) | 2,545 (38%) | | | |
| **Corrective Action Imposed by Staff Member** | | | | | | | | | |
| **Number of Staff Recommended for Corrective Action[405]** | ~ | ~ | 2,040 | 2,970 | 2,417 | 2,756 | 3,149 | 1,533 | 1,666 |

[403] Data for 2020 UOF/Chemical Agent Policy Violations include only July-December.

[404] The Rapid Review template was revised so that staff now enter *all* violations in one place, including UOF Policy violations, Chemical Agent Policy violations, and Procedural Violations. This revision was intended to improve the accuracy of information entered into the Rapid Reviews by streamlining the entry of information and removing staff's need to distinguish between the types of violations at this stage of an incident review. This revised template went into effect in January 2024.

[405] This data captures referrals for corrective action as recommended by the Rapid Reviews shared with the Monitoring Team. The Rapid Review (and therefore this data) does not include information on whether the corrective action referrals were enacted as recommended.

**Table 2: Corrective Actions Recommended via Rapid Reviews Conducted by the Facilities**

The table below shows the number of corrective actions recommended[406] via Rapid Reviews conducted by the facilities from January 2021 through June 2025.

| Rapid Review Corrective Action Recommendations | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **Jan-Jun 2021 (12th MP)** | **Jul-Dec 2021 (13th MP)** | **Jan-Jun 2022 (14th MP)** | **Jul-Dec 2022 (15th MP)** | **Jan-Jun 2023 (16th MP)** | **Jul-Dec 2023 (17th MP)** | **Jan-Jun 2024 (18th MP)** | **Jul-Dec 2024 (19th MP)** | **Jan-Jun 2025 (20th MP)** |
| **5003 Counseling** | 1277 *37%* | 1327 *39%* | 1064 *34%* | 438 *17%* | 440 *19%* | 592 *27%* | 527 *19%* | 587 *21%* | 1173 *38%* |
| **Corrective Interview** | 572 *16%* | 713 *21%* | 947 *31%* | 582 *23%* | 441 *19%* | 555 *25%* | 628 *22%* | 817 *30%* | 913 *30%* |
| **Command Discipline** | 1229 *35%* | 1126 *33%* | 907 *29%* | 1216 *48%* | 1007 *44%* | 723 *33%* | 1431 *50%* | 1066 *39%* | 771 *25%* |
| **Retraining** | 311 *9%* | 123 *4%* | 108 *3%* | 184 *7%* | 221 *10%* | 154 *7%* | 200 *7%* | 207 *8%* | 168 *5%* |
| **MOC** | 33 *1%* | 30 *1%* | 25 *1%* | 74 *3%* | 105 *5%* | 83 *4%* | 31 *1%* | 14 *1%* | 32 *1%* |
| **Suspension** | 41 *1%* | 28 *1%* | 29 *1%* | 30 *1%* | 52 *2%* | 68 *3%* | 16 *1%* | 31 *1%* | 24 *1%* |
| **Referral to EISS** | 17 *<1%* | 15 *<1%* | 8 *<1%* | 1 *<1%* | 1 *<1%* | 4 *<1%* | 4 *<1%* | 12 *<1%* | 2 *<1%* |
| **Referral to CARE** | 2 *<1%* | 2 *<1%* | 3 *<1%* | 4 *<1%* | 0 *-* | 0 *-* | 0 *-* | 0 *-* | 1 *<1%* |
| **No PIC Contact** | 0 *-* | 1 *<1%* | 0 *-* | 0 *-* | 0 *-* | 1 *<1%* | 0 *-* | 0 *-* | 5 *<1%* |
| **5003 Counseling + Corrective Interviews + CDs** | 3078 *88%* | 3166 *94%* | 2918 *94%* | 2236 *88%* | 1888 *83%* | 1870 *86%* | 2586 *91%* | 2470 *90%* | 2857 *92%* |
| **Total # of Actions Recommended[407]** | **3482** | **3365** | **3091** | **2529** | **2267** | **2180** | **2837** | **2734** | **3089** |

---

[406] See the preceding footnote.

[407] Please note that this data counts the number of corrective action referrals. One individual staff member can be recommended for two or more different types of corrective action for their involvement in one incident.

**Table 3(a): ID Supervisors Assigned to UOF Cases**

The table below shows the number of supervisors assigned to ID's use of force investigation-level teams at specific times since 2020.

| ID Supervisors Assigned to UOF Cases | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Feb 2020 | Jan 2021 | Jan 2022 | Jan 2023 | Jun 2023 | Dec 2023 | Jun 2024 | Dec 2024 | June 2025 |
| Rapid Reviews | | | | | 2 | 2 | 2 | 2 | 3 |
| Intake Squad | 8 | 10 | 13 | 12 | 8 | 10 | 10 | 11 | 9 |
| Full ID | 15 | 10 | 7 | 3 | 3 | 5 | 5 | 4 | 4 |
| UPS | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 |
| **Total** | **24** | **21** | **21** | **15** | **14** | **18** | **18** | **18** | **17** |

**Table 3(b): ID Investigators Assigned to UOF Cases**

The table below shows the number of investigators assigned to ID's use of force investigation-level teams at specific times since 2020.

| ID Investigators Assigned to UOF Cases | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Feb 2020 | Jan 2021 | Jan 2022 | Jan 2023 | Jun 2023 | Dec 2023 | Jun 2024 | Dec 2024 | June 2025 |
| Rapid Reviews | | | | | 8 | 10 | 10 | 10 | 10 |
| Intake Squad | 32 | 51 | 51 | 51 | 32 | 35 | 31 | 38 | 33 |
| Full ID | 82 | 58 | 36 | 10 | 12 | 22 | 21 | 23 | 24 |
| UPS | 4 | 3 | 3 | 4 | 5 | 5 | 4 | 5 | 5 |
| **Total** | **118** | **112** | **90** | **65** | **57** | **72** | **66** | **76** | **72** |

## Table 4: Summary of ID Hires and Departures

The table below includes the number of ID staff hired and any net gains to ID's staffing between January 2022 and January 2025. A more fulsome discussion regarding the recruitment and hiring process is included in the compliance box for Consent Judgment § VII., ¶¶ 1 and 9(a) (Use of Force Investigations).

| | Total Investigator | Civilian Investigator | Uniform Investigator | Total Supervisor | Civilian Supervisor | Uniform Supervisor | Administrative/Clerical | Deputy Director | Director | Agency Attorney | Assistant/Associate Commissioner | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Summary of ID Hires & Departures** **Net Gains & Losses** | | | | | | | | | | | | |
| **January 2022 to December 2022** | | | | | | | | | | | | |
| **Hired 2022** | 28 | 28 | 0 | 3 | 2 | 1 | 0 | 2 | 1 | 0 | 2 | **36** |
| **Departed 2022** | 43 | 32 | 11 | 9 | 7 | 2 | 0 | 3 | 4 | 2 | 0 | **61** |
| **Net Gain/Loss** | **-15** | **-4** | **-11** | **-6** | **-5** | **-1** | **0** | **-1** | **-3** | **-2** | **2** | **-25** |
| **January 2023 to December 2023** | | | | | | | | | | | | |
| **Hired 2023** | 46 | 42 | 4 | 15 | 6 | 9 | 2 | 4 | 0 | 0 | 1 | **68** |
| **Departed 2023** | 60 | 47 | 13 | 22 | 11 | 11 | 2 | 4 | 2 | 0 | 3 | **93** |
| **Net Gain/Loss** | **-14** | **-5** | **-9** | **-7** | **-5** | **-2** | **0** | **0** | **-2** | **0** | **-2** | **-25** |
| **January 2024 to December 2024** | | | | | | | | | | | | |
| **Hired 2024** | 30 | 30 | 0 | 9 | 9 | 0 | 3 | 6 | 2 | 0 | 1 | **51** |
| **Departed 2024** | 20 | 20 | 0 | 6 | 6 | 0 | 2 | 3 | 0 | 0 | 1 | **32** |
| **Net Gain/Loss** | **10** | **10** | **0** | **3** | **3** | **0** | **1** | **3** | **2** | **0** | **0** | **19** |
| **January 2025 to June 2025** | | | | | | | | | | | | |
| **Hired Jan-Jun 2025** | 12 | 12 | 0 | 4 | 4 | 0 | 0 | 2 | 0 | 0 | 0 | **18** |
| **Departed Jan-Jun 2025** | 14 | 13 | 1 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | **19** |
| **Net Gain/Loss** | **-2** | **-1** | **-1** | **-1** | **-1** | **0** | **0** | **2** | **0** | **0** | **0** | **-1** |

**Table 5: Status of Investigations of UOF Incidents**

The table below shows the status of all investigations of UOF incidents that occurred between January 2020 and June 2025 *as of September 15, 2025*.[408]

| Status of Investigations of UOF Incidents Occurring Between January 2020 and June 2025 *as of September 15, 2025* | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **2020** | | **2021** | | **2022** | | **2023** | | **2024** | | **Jan.-Jun. 2024 (18th MP)** | | **Jul.-Dec. 2024 (19th MP)** | | **Jan.-Jun. 2025 (20th MP)** | |
| **Total UOF Incidents**[409] | **6,399** | | **8,413** | | **7,231** | | **6,958** | | **7,152** | | **3,590** | | **3,562** | | **3,630** | |
| **Pending Intake Invest.** | 0 | **0%** | 0 | **0%** | 0 | **0%** | 0 | **0%** | 1 | **<1%** | 0 | **0%** | 1 | **<1%** | 32 | **1%** |
| **Pending Full ID Invest.** | 0 | **0%** | 0 | **0%** | 0 | **0%** | 0 | **0%** | 495 | **7%** | 196 | **5%** | 299 | **8%** | 225 | **6%** |
| **Total Closed Invest.** | 6,399 | **100%** | 8,413 | **100%** | 7,231 | **100%** | 6,958 | **100%** | 6,656 | **93%** | 3,394 | **95%** | 3,262 | **92%** | 3,373 | **93%** |

---

[408] All investigations of incidents that occurred prior to 2020 were closed during previous Monitoring Periods and thus are not included in this table.

[409] Incidents are categorized by the date they occurred or were alleged to have occurred, and therefore these numbers fluctuate very slightly across Monitoring Periods as allegations are sometimes made many months after the incident is alleged to have occurred. The data are updated thereafter.

**Table 6: Status of Full ID Investigations**

The table below shows the status of Full ID Investigations for all incidents that occurred between January 2024 and June 2025 (n=1,037) *as of September 15, 2025.*[410]

| Status of Full ID Investigations for incidents that *occurred* between January 2024–June 2025 As of September 15, 2025 | | | | |
|---|---|---|---|---|
| *Pending* 120 Days or Less | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | Total |
| 53<br>5% | 101<br>10% | 217<br>21% | 666<br>64% | 1,037 |

---

[410] The period of incident dates of January 2024-June 2025 was selected as it captures *all* pending full ID investigations as of the end of this Monitoring Period. All investigations, including full ID investigations, have been completed for uses of force that occurred prior to January 2024. Given that full ID investigations can take months to complete, it is common that a full ID investigation will be completed in a different Monitoring Period than the Monitoring Period in which it occurred.

**Table 7: Law Enforcement Referrals**

The table below shows the number and status of cases, *as of July 14, 2025*, that have been referred to outside law enforcement agencies for investigation and potential prosecution.

| Law Enforcement Referrals[411] *As of July 14, 2025* | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | 2014 & 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total | |
| **Total** | **9** | **16** | **27** | **22** | **11** | **15** | **7** | **11** | **12** | **25** | **11** | **166** | |
| Criminal Charges Brought / Trial Underway or Complete | 0 | 2 | 0 | 2 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | **8** | **5%** |
| Pending Consideration with Law Enforcement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 9 | **15** | **9%** |
| Returned to ID for Administrative Processing | 9 | 14 | 27 | 20 | 9 | 14 | 6 | 11 | 11 | 20 | 2 | **143** | **86%** |

---

[411] Upon closer review of law enforcement referral data provided by the Department, the number of cases referred in some prior years have been updated.

**Table 8(a): Results of Intake Investigation Audits by Date of Initial Intake Investigation**

The table below shows the results of ID's internal quality assurance audits of closed Intake Investigations *as of September 15, 2025*. This data is categorized by the date the initial Intake Investigation was closed by ID.

| Results of Intake Investigation QA Audits *As of September 15, 2025* | | |
|---|---|---|
| **Date Initial Intake Investigation Closed** | **# of Investigations Audited** | **Audit Identified an Issue with the Initial Investigation[412]** |
| **January-June 2023** | 676 | 180 *(27%)* |
| **July-December 2023** | 632 | 135 *(21%)* |
| **January-June 2024** | 792 | 240 *(30%)* |
| **July-December 2024** | 711 | 172 *(24%)* |
| **January-June 2025** | 356 | 115 *(32%)* |

---

[412] As a result of the QA audit for these Intake Investigations, ID took additional action for these cases (e.g. updating the investigation's closing report, updating the video preservation, pursuing additional corrective action against the MOS involved in the use of force, counseling the investigator).

**Table 8(b): Number of Intake Investigation QA Audits Completed**

The table below shows the number of ID's internal quality assurance audits of closed Intake Investigations conducted in each Monitoring Period, *as of September 15, 2025*. This data is categorized by the date the QA audit was completed.

| Number of Intake Investigations QA Audits Completed *As of September 15, 2025* | |
|---|---|
| **Date QA Audit Completed** | **# of Investigations Audited** |
| **March-June 2023** | 418 |
| **July-December 2023** | 532 |
| **January-June 2024** | 836 |
| **July-December 2024** | 661 |
| **January-June 2025** | 616 |

**Table 9(a): Results of Full ID Investigation Audits by Date of Initial Full ID Investigation**

The table below shows the results of ID's internal quality assurance audits of closed Full ID Investigations *as of September 15, 2025*. This data is categorized by the date the initial Full ID Investigation was closed by ID.

| Results of Full ID Investigation QA Audits *As of September 15, 2025* | | |
|---|---|---|
| Date Initial Full ID Investigation Closed | # of Investigations Audited | Audit Identified an Issue with the Initial Investigation[413] |
| January-June 2022 | 2 | 1 |
| July-December 2022 | 0 | - |
| January-June 2023 | 21 | 18 |
| July-December 2023 | 17 | 11 |
| January-June 2024 | 21 | 9 |
| July-December 2024 | 13 | 8 |
| January-June 2025 | 6 | 2 |
| July-September 2025 | 6 | 2 |

---

[413] As a result of the QA audit for these Full ID Investigations, ID took additional action for these cases (e.g. updating the investigation's closing report, conducting further investigative actions, pursuing additional corrective action against the MOS involved in the use of force, counseling the investigator). The Monitoring Team excluded cases where the audit identified that the only issues with the initial Full ID investigation were grammatical issues.

**Table 9(b): Number of Full ID Investigation QA Audits Completed**

The table below shows the number of ID's internal quality assurance audits of closed Full ID Investigations completed in each Monitoring Period, *as of September 15, 2025*. This data is categorized by the date the QA audit was completed.

| Number of Full ID Investigation QA Audits Completed *As of September 15, 2025* | |
| --- | --- |
| **Date QA Audit Completed** | **# of Investigations Audited** |
| **April-June 2023** | 22 |
| **July-December 2023** | 16 |
| **January-June 2024** | 21 |
| **July-December 2024** | 14 |
| **January-June 2025**[414] | 7 |

[414] ID leadership reported that fewer Full ID audits were conducted this Monitoring Period because Full ID leadership was focused on categorizing and addressing the backlog of Full ID investigations as described in the compliance assessment for Consent Judgment § VII., ¶ 1 and § VII., ¶ 9 (a). Additionally, as a part of the broader efforts to improve investigation quality, ID leadership reviewed more Full ID investigations that were near-final but not yet closed so that they could coach the investigators on how to resolve any quality concerns.

## Table 10: Outcome of Intake Investigations

The table below shows the outcome of Intake Investigations from February 3, 2020 (the inception of Intake Investigations) through June 2025, *as of September 15, 2025*.[415]

| Incident Date[417] | July to Dec. 2020 (11th MP) | Jan. to June 2021 (12th MP) | July to Dec. 2021 (13th MP) | Jan. to June 2022 (14th MP) | July to Dec. 2022 (15th MP) | Jan. to June 2023 (16th MP) | Jul. to Dec. 2023 (17th MP) | Jan. to June 2024 (18th MP) | Jul. to Dec. 2024 (19th MP) | Jan. to June 2025 (20th MP) |
|---|---|---|---|---|---|---|---|---|---|---|
| Pending Intake Investigation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 32 |
| **Closed Intake Investigations** | **3,278** | **4,476** | **3,946** | **3,349** | **3,883** | **3,317** | **3,642** | **3,590** | **3,561** | **3,598** |
| *No Action*[418] | *1,278* *39%* | *1,385* *31%* | *971* *25%* | *1,259* *38%* | *2,002* *52%* | *1,571* *47%* | *1,156* *32%* | *1,023* *28%* | *872* *24%* | *807* *22%* |
| *MOC* | *11* *<1%* | *7* *<1%* | *5* *<1%* | *13* *<1%* | *20* *1%* | *42* *1%* | *36* *1%* | *17* *<1%* | *29* *1%* | *25* *1%* |
| *PDR* | *2* | *0* | *0* | *1* | *2* | *2* | *2* | *2* | *2* | *7* |
| *Corrective Interview* | | | | | | | *2* | *5* | *3* | *0* |
| *Command Discipline* | | | | | | *100* *3%* | *109* *3%* | *255* *7%* | *187* *5%* | *159* *4%* |
| *Re-Training* | *224* *7%* | *342* *8%* | *90* *2%* | *35* *1%* | *38* *1%* | *86* *3%* | *161* *4%* | *93* *3%* | *107* *3%* | *59* *2%* |
| *Facility Referral* | *1,160* *35%* | *1,901* *43%* | *2,181* *55%* | *1,642* *49%* | *1,354* *35%* | *1,146* *35%* | *1,803* *50%* | *1,816* *51%* | *2,006* *56%* | *2,230* *62%* |
| *Referred for Full ID* | *598* *18%* | *837* *19%* | *672* *17%* | *376* *11%* | *454* *12%* | *349* *11%* | *350* *10%* | *379* *11%* | *353* *10%* | *305* *8%* |
| *Data Entry Errors*[419] | *5* | *4* | *27* | *23* | *13* | *21* | *23* | *0* | *2* | *6* |
| **Total Number of Use of Force Incidents** | **3,278** | **4,476** | **3,946** | **3,349** | **3,883** | **3,317** | **3,642** | **3,590** | **3,562** | **3,630** |

[415] The Monitoring Team identified a data calculation error in its previous reporting of this data that did not fully account for the number of cases that received Full ID investigations. This chart has revised the data across Monitoring Periods to address this error. The Monitoring Team regrets the error.

[416] For the purpose of this chart, the results of the Intake Investigations only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC *and* a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart.

[417] The data on the outcomes of intake investigations for incidents that occurred between February 3, 2020 and June 30, 2020 was last included in the Monitor's November 22, 2024 Report (dkt. 802) at pg. 96.

[418] With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the facility via Rapid Review and ID determined that the action recommended in the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better understood as cases in which either no violation was identified, or ID *did not identify additional staff behaviors requiring disciplinary or corrective action beyond what had already been identified and taken by the facilities*.

[419] These investigations had data entry errors in the Intake Squad Tracker. The Monitoring Team was unable to determine the outcome for these cases but is working with the Department to fix these errors.

## Table 11: Investigation Findings

The table below shows the findings of Intake and Full ID Investigations that were closed *as of September 7, 2025*. The investigation findings included assessments of whether the incident was excessive, unnecessary, and/or avoidable.[420]

| Investigations Findings As September 15, 2025 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date[421]** | *July to Dec. 2020 (11th MP)* | *Jan. to Jun. 2021 (12th MP)* | *July to Jun. 2021 (13th MP)* | *Jan. to Jun. 2022 (14th MP)* | *Jul. to Dec. 2022 (15th MP)* | *Jan. to Jun. 2023 (16th MP)* | *Jul. to Dec. 2023 (17th MP)* | *Jan. to Jun. 2024 (18th MP)* | *Jul. to Dec. 2024 (19th MP)* | *Jan. to Jun. 2025 (20th MP)* |
| **All Incidents** | **3,278** | **4,476** | **3,946** | **3,349** | **3,883** | **3,317** | **3,642** | **3,590** | **3,562** | **3,630** |
| - *Investigations Closed at Intake* | 2,680 | 3,639 | 3,274 | 2,973 | 3,429 | 2,968 | 3,292 | 3,211 | 3,208 | 3,292 |
| - *Referred for Full ID[422]* | 598 | 837 | 672 | 376 | 454 | 349 | 350 | 379 | 353 | 305 |
| - *Closed Full ID Investigations* | 598 | 837 | 672 | 376 | 454 | 349 | 350 | 183 | 54 | 81 |
| *Findings of Investigations Closed at Intake* | | | | | | | | | | |
| Investigations Closed at Intake | 2,680 | 3,639 | 3,274 | 2,973 | 3,429 | 2,968 | 3,292 | 3,211 | 3,208 | 3,292 |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | *454* | *698* | *626* | *523* | *462* | *372* | *394* | *315* | *329* | *237* |
| • *Chemical Agent Violation* | *150* | *239* | *306* | *286* | *207* | *209* | *273* | *368* | *349* | *370* |
| *Findings of Closed Full ID Investigations* | | | | | | | | | | |
| Closed Full ID Investigations | 598 | 837 | 672 | 376 | 454 | 349 | 350 | 183 | 54 | 81 |
| • *Excessive, and/or Unnecessary* | *86* | *75* | *51* | *62* | *70* | *76* | *53* | *25* | *14* | *9* |
| *Findings of All Closed Investigations* | | | | | | | | | | |
| Closed Investigations | 3,278 | 4,476 | 3,946 | 3,349 | 3,883 | 3,317 | 3,642 | 3,394 | 3,262 | 3,373 |

[420] The Department and the Monitoring Team have not finalized an agreed upon definition of these terms. A concrete, objective and shared understanding of what each category is intended to capture is necessary to ensure reliable and consistent findings.

[421] The data on investigation findings for incidents that occurred between February 3, 2020 and June 30, 2020 was last included in the Monitor's November 22, 2024 Report (dkt. 802) at pg. 94.

[422] The Monitoring Team identified a data calculation error in its previous reporting of this data that did not fully account for the number of cases that received Full ID investigations. This chart has revised the data across Monitoring Periods to address this error. The Monitoring Team regrets the error.

| Investigations Findings *As September 15, 2025* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date**[421] | *July to Dec. 2020 (11th MP)* | *Jan. to Jun. 2021 (12th MP)* | *July to Dec. 2021 (13th MP)* | *Jan. to Jun. 2022 (14th MP)* | *Jul. to Dec. 2022 (15th MP)* | *Jan. to Jun. 2023 (16th MP)* | *Jul. to Dec. 2023 (17th MP)* | *Jan. to Jun. 2024 (18th MP)* | *Jul. to Dec. 2024 (19th MP)* | *Jan. to Jun. 2025 (20th MP)* |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | *540 (16%)* | *773 (17%)* | *677 (17%)* | *585 (17%)* | *532 (14%)* | *448 (14%)* | *447 (12%)* | *340 (10%)* | *343 (11%)* | *246 (7%)* |

**Table 12: Use of Force Incidents with Charges**

The graph below illustrates the changes in the number and proportion of use of force incidents from January 2016 to December 2025 where at least one staff member was referred for formal discipline charges. This data is calculated *as of June 30, 2025*.[423]



---

[423] The data for 2022 and 2023 incidents includes referrals that were made as part of the lookback initiative in which the original case findings did not identify misconduct, but the subsequent review resulted in a finding that merited the referral for charges. Furthermore, data for investigations in 2024 and 2025 is not final, as there are 1,638 cases still pending with ID.

# APPENDIX E:
# DATA RELATED TO RESPONSES TO STAFF MISCONDUCT

## Table 1: Accountability for Staff's Use of Force Related Misconduct

The table below shows the type of accountability imposed for staff's use of force-related misconduct, including support and guidance, corrective action via Command Discipline and Suspension, and formal discipline. The chart below only considers corrective action that has been imposed, and does not reflect corrective action that was recommended but never imposed.

| Accountability Imposed for Staff's Use of Force Related Misconduct, 2019 to 2025 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 [424] | 2020 | 2021 | 2022 | 2023 | 2024 | Jan.- Jun. 2024 18th MP | Jul.- Dec. 2024 19th MP | Jan.- Jun. 2025 20th MP |
| **Support and Guidance Provided to Staff** | | | | | | | | | |
| Corrective Interviews and 5003 Counseling | 2,700 [425] | 1,378 [426] | 3,205 | 2,532 | 1,723 | 2,455 | 1,114 | 1,341 | 1,973 |
| Corrective Interviews (resulting from CDs) | 53 | 32 | 38 | 76 | 79 | 400 | 276 | 124 | 51 |
| **Corrective Action—Command Discipline & Suspension** | | | | | | | | | |
| CD – Reprimand | 156 | 126 | 270 | 319 | 114 | 496 | 284 | 212 | 63 |
| CD resulting in 1-10 [427] days deducted | 879 | 673 | 794 | 739 | 798 | 857 | 530 | 327 | 242 |
| Suspension, by date imposed | 48 | 80 | 83 | 66 | 136 | 62 | 29 | 33 | 24 |
| *Total* | *1,083* | *879* | *1,147* | *1,124* | *1,048* | *1,415* | *843* | *572* | *329* |
| **Formal Discipline** | | | | | | | | | |
| PDR | 81 | 49 | 2 | 1 | 22 | 22 | 8 | 14 | 17 |
| NPA | 218 | 327 | 460 | 1,808 | 630 | 425 | 305 | 120 | 196 |
| *Total* | *299* | *376* | *462* | *1,809* | *652* | *447* | *313* | *134* | *213* |
| **Total Number of Staff Held Accountable** | | | | | | | | | |
| **Total** | **1,382** | **1,255** | **1,609** | **2,933** | **1,700** | **1,862** | **1,156** | **706** | **525** |

---

[424] Counseling that occurred in the 8th Monitoring Period was focused on a more holistic assessment of the staff member's conduct pursuant to specific standards set by Consent Judgment, § X, ¶ 2, Risk Management that has been subsequently revised. *See* Monitor's October 28, 2019 Report (dkt. 332) at pgs. 172-173.

[425] The identification of staff for counseling was in transition in the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. *See* Monitor's May 29, 2020 Report (dkt. 341) at pgs. 194-196.

[426] The Department completed the transition to its new process for identifying staff for counseling during this Monitoring Period. *See* Monitor's October 23, 2020 Report (dkt. 360) at pgs. 168-170.

[427] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the allowable penalty for a CD from a maximum of five days to 10 days.

## **Table 2: Immediate Corrective Action**

The table below shows the frequency of Immediate Corrective Action imposed for use of force related misconduct from January 2020 to June 2025, according to the date of the incident.

| Immediate Corrective Action Imposed for UOF Related Misconduct, by Incident Date | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Type** | **2020** | | **2021** | | **2022** | | **2023** | | **2024** | | **Jan.-June 2024** | | **July-Dec. 2024** | | **Jan.-June 2025** | |
| Counseling and Corrective Interviews[428] | 1,410 | 59% | 3,243 | 72% | 2,608 | 68% | 1,802 | 60% | 2,855 | 65% | 1,390 | 61% | 1,465 | 69% | 2,024 | 85% |
| Suspension | 80 | 3% | 83 | 2% | 75 | 2% | 124 | 4% | 60 | 1% | 27 | 1% | 33 | 2% | 28 | 1% |
| Modified Duty or No Inmate Contact | 5 | <1% | 6 | <1% | 16 | <1% | 14 | <1% | 35 | 1% | 14 | 1% | 21 | 1% | 3 | <1% |
| *Total Suspensions & Modified Duty/No Inmate Contact* | *85* | *4%* | *81* | *2%* | *91* | *2%* | *138* | *5%* | *95* | *2%* | *41* | *2%* | *54* | *3%* | *31* | *1%* |
| CD – Reprimand | 126 | 5% | 270 | 6% | 319 | 8% | 114 | 4% | 496 | 11% | 284 | 12% | 212 | 10% | 63 | 3% |
| CD resulting in 1-10[429] days deducted | 673 | 28% | 794 | 18% | 739 | 19% | 798 | 27% | 857 | 19% | 530 | 23% | 327 | 15% | 242 | 10% |
| **Total** | **2,379** | | **4,477** | | **3,848** | | **2,990** | | **4,398** | | **2,286** | | **2,112** | | **2,391** | |

---

[428] NCU confirmed that the reported Counseling and Corrective Interviews actually occurred.

[429] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the allowable penalty from a maximum of five days to 10 days.

**Table 3: Suspension**

The table below shows the number of suspensions imposed, and the reasons for the suspensions, *by the date the suspension* was imposed (versus the date of the incident).

| Reason for Staff Suspension, by Date of Suspension, 2020 to 2024 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Reason** | **2020** | | **2021** | | **2022** | | **2023** | | **2024** | | **Jan. to Jun 2024** | | **Jul to Dec. 2024** | | **Jan. to Jun 2025** | |
| Sick Leave | 39 | *11%* | 138 | *22%* | 311 | *45%* | 110 | *19%* | 67 | *22%* | 16 | *12%* | 51 | *29%* | 69 | *33%* |
| Conduct Unbecoming | 92 | *26%* | 128 | *20%* | 100 | *15%* | 160 | *28%* | 119 | *39%* | 64 | *48%* | 55 | *31%* | 58 | *28%* |
| Use of Force | 78 | *22%* | 82 | *13%* | 66 | *10%* | 136 | *23%* | 62 | *20%* | 29 | *22%* | 33 | *19%* | 24 | *12%* |
| AWOL | 0 | *0%* | 165 | *26%* | 99 | *14%* | 22 | *4%* | 0 | *0%* | 0 | *0%* | 0 | *0%* | 27 | *13%* |
| Arrest | 60 | *17%* | 70 | *11%* | 32 | *5%* | 23 | *4%* | 16 | *3%* | 4 | *8%* | 6 | *3%* | 3 | *1%* |
| Inefficient Performance | 44 | *12%* | 29 | *5%* | 39 | *6%* | 73 | *13%* | 24 | *8%* | 6 | *5%* | 18 | *10%* | 11 | *5%* |
| Electronic Device | 18 | *5%* | 4 | *1%* | 10 | *1%* | 9 | *2%* | 4 | *1%* | 1 | *1%* | 3 | *2%* | 2 | *1%* |
| NPA | 10 | *3%* | 6 | *1%* | 17 | *2%* | 19 | *3%* | 9 | *3%* | 4 | *3%* | 5 | *3%* | 5 | *2%* |
| Other | 6 | *2%* | 4 | *1%* | 11 | *2%* | 22 | *4%* | 2 | *1%* | 0 | *0%* | 2 | *1%* | 5 | *2%* |
| Contraband | 7 | *2%* | 5 | *1%* | 0 | *0%* | 3 | *1%* | 0 | *0%* | 0 | *0%* | 0 | *0%* | 2 | *1%* |
| Erroneous Discharge | 5 | *1%* | 0 | *0%* | 2 | *0%* | 0 | *0%* | 0 | *0%* | 0 | *0%* | 0 | *0%* | 0 | *0%* |
| Abandoned Post | 0 | *0%* | 0 | *0%* | 1 | *0%* | 4 | *1%* | 4 | *1%* | 2 | *2%* | 2 | *1%* | 0 | *0%* |
| **Total** | **359** | | **631** | | **688** | | **581** | | **307** | | **132** | | **175** | | **206** | |

**Table 4: Accountability for High Level Supervisors**

The table below shows the frequency with which Wardens, Deputy Wardens and Assistant Deputy Wardens were held accountable in 2023 and 2024.

| Accountability for Facility Leadership and Supervisors 2023 to 2025 | | | | | |
|---|---|---|---|---|---|
| | Jan-June 2023 | July-Dec 2023 | Jan-June 2024 | July-Dec 2024 | Jan-June 2025 |
| **Warden/Assistant Commissioner** | | | | | |
| Formal Discipline | 0 | 0 | 0 | 0 | 0 |
| Suspension | 0 | 0 | 0 | 0 | 0 |
| Command Discipline | 0 | 0 | 0 | 0 | 0 |
| 5003 Counseling | 0 | 0 | 0 | 0 | 0 |
| Corrective Interview | 0 | 0 | 0 | 0 | 0 |
| **Deputy Warden** | | | | | |
| Formal Discipline | 0 | 0 | 0 | 0 | 0 |
| Suspension | 0 | 0 | 0 | 0 | 0 |
| Command Discipline | 0 | 0 | 3 | 0 | 1 |
| 5003 Counseling | 0 | 0 | 0 | 0 | 0 |
| Corrective Interview | 0 | 0 | 0 | 0 | 0 |
| **Assistant Deputy Warden** | | | | | |
| Formal Discipline | 4 | 1 | 2 | 0 | 0 |
| Suspension | 5 | 5 | 1 | 0 | 0 |
| Command Discipline | 0 | 21 | 20 | 10 | 4 |
| 5003 Counseling | 1 | 6 | 3 | 6 | 15 |
| Corrective Interview | 5 | 17 | 10 | 10 | 7 |

**Table 5(a): Command Disciplines Recommended by Rapid Reviews**

The table below shows the status and outcome of Command Disciplines recommended by Rapid Reviews from January 2019 to June 2025. Data are current as of June 2025.

| Status and Outcome of Command Disciplines Recommended by Rapid Reviews, January 2019 to June 2025 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Status/Outcome | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Jan-Jun 2024 18th MP | Jul-Dec 2024 19th MP | Jan-Jun 2025 20th MP |
| Still Pending in CMS | 7 <1% | 15 1% | 65 3% | 64 3% | 97 6% | 44 2% | 17 1% | 27 3% | 86 11% |
| 1-10 Days Deducted | 879 54% | 673 47% | 794 34% | 739 35% | 798 46% | 857 34% | 530 37% | 327 31% | 242 31% |
| MOC | 122 7% | 108 8% | 281 12% | 128 6% | 110 6% | 141 6% | 42 3% | 99 9% | 80 10% |
| Reprimand | 156 10% | 126 9% | 270 11% | 319 15% | 114 7% | 496 20% | 284 20% | 212 20% | 63 8% |
| Retraining | ~ | ~ | ~ | ~ | 11 1% | 125 5% | 46 3% | 79 7% | 49 6% |
| Corrective Interview | 53 3% | 32 2% | 38 2% | 76 4% | 79 5% | 400 16% | 276 19% | 124 12% | 51 7% |
| Dismissed at Hearing or Closed Administratively | 360 22% | 399 28% | 745 32% | 608 29% | 421 24% | 330 13% | 183 13% | 147 14% | 98 13% |
| Never Entered in CMS [430] | 41 3% | 82 6% | 162 7% | 189 9% | 100 6% | 104 4% | 53 4% | 51 5% | 102 13% |
| **Total CDs Recommended** | **1,635** | **1,440** | **2,355** | **2,123** | **1,730** | **2,497** | **1,431** | **1,066** | **771** |

*Note: CDs pending for more than one year are not tracked in the CD reports analyzed for this table and therefore may still appear pending although it is likely that they have since been dismissed.*

---

[430] CMS is the Department's case management software.

**Table 5(b): Reasons that Command Disciplines Recommended by Rapid Reviews Were dismissed, Closed Administratively, or Not Entered into CMS**

The table below shows the breakdown of that Command Disciplines recommended by Rapid Reviews that were dismissed, closed administratively, or were never entered into CMS because of due process violations (DPV) or clerical errors.

| Reasons that Command Disciplines Recommended by Rapid Reviews Were Dismissed, Closed Administratively, or Never Entered into CMS *January 2021-June 2025* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Year of Incident** | **2021** | **2022** | **2023** | **2024** | **Jan-Jun 2024 18th MP** | **Jul-Dec 2024 19th MP** | **Jan-Jun 2025 20th MP** |
| **Total # of CDs Recommended** | **2,355** | **2,123** | **1,730** | **2,497** | **1,431** | **1,066** | **771** |
| Total # of CDs Dismissed, Closed, or Not Logged for Any Reason | 907 | 797 | 521 | 434 | 236 | 198 | 200 |
| % of All CDs Recommended | 39% | 38% | 30% | 17% | 16% | 19% | 26% |
| CDs Dismissed, Closed, or Not Logged for DPV or Clerical Errors[431] | 673 | 527 | 324 | 221 | 110 | 111 | 135 |
| % of All CDs Dismissed, Closed, or Not Logged for Any Reason | *74%* | *66%* | *62%* | *51%* | *47%* | *56%* | *68%* |
| CDs Dismissed, Closed, or Not Logged for Other Reasons[432] | 234 | 270 | 197 | 213 | 126 | 87 | 65 |
| % of All CDs Dismissed, Closed, or Not Logged for Any Reason | *26%* | *34%* | *38%* | *49%* | *53%* | *44%* | *32%* |

---

[431] A Command Discipline can also be dismissed or not entered in CMS for Due Process Violations ("DPV"), if the command discipline is not entered or processed in a timely manner according to policy. A Command Discipline can also be dismissed for clerical errors, such as date errors or misidentification of staff.

[432] A Command Discipline may be dismissed or not entered in CMS for factual reasons, because a staff member already resigned or left the Department, because ID took over all discipline and corrective action pending further investigation, or for factual reasons.

**Table 6(a): Command Discipline Recommended by Other Sources**

The table below shows the outcome of Command Disciplines recommended separately from the Rapid Review process. The Department began tracking these CDs systematically in January 2024. Reasons behind these CDs vary, and include AWOL staff, staff off-post, Departmental property violations, inadequate supervision, inefficient performance of duties, insubordination, tour wand violations, and use of force misconduct identified outside of the Rapid Review process.

| Outcome | Jan | Feb | Mar | Apr | May | Jun | 18th MP | Jul | Aug | Sep | Oct | Nov | Dec | 19th MP | Jan | Feb | Mar | Apr | May | Jun | 20th MP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Outcome of Command Disciplines Recommended by Other Sources** *January 2024-June 2025* | | | | | | | | | | | | | | | | | | | | | |
| 1-10 Days Deducted | 40 25% | 48 25% | 35 33% | 47 34% | 38 27% | 30 19% | *238 27%* | 40 38% | 42 36% | 48 29% | 39 23% | 50 32% | 45 44% | *264 33%* | 30 27% | 27 20% | 58 28% | 75 32% | 89 38% | 53 35% | *332 31%* |
| MOC | 10 6% | 20 10% | 16 15% | 10 7% | 20 14% | 3 2% | *79 9%* | 6 6% | 7 6% | 7 4% | 2 1% | 30 19% | 9 9% | *61 8%* | 13 12% | 14 11% | 44 21% | 70 30% | 26 11% | 21 14% | *188 18%* |
| Reprimand | 14 9% | 17 9% | 13 12% | 14 10% | 14 10% | 15 10% | *87 10%* | 9 9% | 13 11% | 30 18% | 29 17% | 22 14% | 12 12% | *115 14%* | 17 15% | 13 10% | 20 10% | 13 6% | 23 10% | 9 6% | *95 9%* |
| Retraining | ~ | ~ | 2 2% | 1 1% | ~ | ~ | *3 0%* | ~ | 1 1% | ~ | 2 1% | 4 3% | 3 3% | *10 1%* | 5 5% | 4 3% | 1 <1% | 3 1% | 3 1% | 3 2% | *19 2%* |
| Corrective Interview | 8 5% | 18 9% | 10 10% | 8 6% | 11 8% | 4 3% | *59 7%* | 10 10% | 24 21% | 19 11% | 14 8% | 18 12% | 8 8% | *93 11%* | 10 9% | 1 1% | 15 7% | 6 3% | 14 6% | 12 8% | *58 5%* |
| Dismissed | 88 55% | 89 46% | 29 28% | 59 42% | 59 42% | 104 67% | *428 48%* | 40 38% | 29 25% | 63 38% | 80 48% | 31 20% | 25 25% | *268 33%* | 36 32% | 74 56% | 70 34% | 66 28% | 79 34% | 52 35% | *377 35%* |
| **Total** | **160** | **192** | **105** | **139** | **142** | **156** | **894** | **105** | **116** | **167** | **166** | **155** | **102** | **811** | **111** | **133** | **208** | **233** | **234** | **150** | **1,069** |

**Table 6(b): Reasons that Command Disciplines Recommended by Other Sources Were dismissed**

The table below shows the breakdown of that Command Disciplines recommended separately from the Rapid Reviews that were dismissed because of due process violations (DPV) or clerical errors.

| Reasons that Command Disciplines Recommended by Other Sources Were Dismissed, Closed Administratively, or Never Entered into CMS *January 2021-June 2025* | | | | |
|---|---|---|---|---|
| **Year of Incident** | **2024** | **Jan-Jun 2024 18th MP** | **Jul-Dec 2024 19th MP** | **Jan-Jun 2025 20th MP** |
| **Total # of CDs Recommended** | **1,705** | **894** | **811** | **1,069** |
| Total # of CDs Dismissed | 696 | 428 | 268 | 377 |
| % of All CDs Recommended | 41% | 48% | 33% | 35% |
| CDs Dismissed for DPV or Clerical Errors[433] | 185 | 111 | 74 | 90 |
| % of All CDs Dismissed for Any Reason | *27%* | *26%* | *28%* | *24%* |
| CDs Dismissed for Other Reasons[434] | 511 | 317 | 194 | 287 |
| % of All CDs Dismissed for Any Reason | *73%* | *74%* | *72%* | *76%* |

---

[433] A Command Discipline can also be dismissed or not entered in CMS for Due Process Violations ("DPV"), if the command discipline is not entered or processed in a timely manner according to policy. A Command Discipline can also be dismissed for clerical errors, such as date errors or misidentification of staff.

[434] A Command Discipline may be dismissed or not entered in CMS for factual reasons, because a staff member already resigned or left the Department, because ID took over all discipline and corrective action pending further investigation, or for factual reasons.

**Table 7: Formal Discipline**

The table below shows the status of cases pending with the Trials Division and the number of cases still pending investigation, by the date the incident occurred. Data are current as of June 2025.

| Status of Disciplinary Cases & Number of Pending Investigations, by Date of Incident | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2016** | | **2017** | | **2018** | | **2019** | | **2020** | | **2021** | | **2022** | | **2023** | | **2024** | | **2025** | |
| **Total Cases** | 471 | | 621 | | 784 | | 1027 | | 695 | | 716 | | 668 | | 679 | | 265 | | 36 | |
| Closed Cases | 470 | 100% | 617 | 99% | 779 | 99% | 1017 | 99% | 690 | 99% | 714 | 99% | 662 | 99% | 571 | 84% | 166 | 63% | 3 | 8% |
| Pending Cases with Trials Division | 0 | 0% | 4 | 1% | 5 | 1% | 10 | 1% | 5 | 1% | 2 | 1% | 6 | 1% | 108 | 16% | 99 | 37% | 33 | 92% |
| **Unique UOF Incidents** | Number of unique UOF incidents not tracked. | | | | 466 | | 606 | | 450 | | 561 | | 415 | | 428 | | 210 | | 34 | |
| **Pending Investigations** | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 47 | | 649 | | 989 | |

**Table 8: Number of Cases Pending with the Trials Division**

The table below shows the number of cases pending formal discipline, as of the last day of the month in each Monitoring Period from 2018 to 2025. Data are current as of June 2025.

| Cases Pending Discipline for Use of Force Related Misconduct, 2018 to 2025 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | June 2018 | Dec. 2018 | June 2019 | Dec. 2019 | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 | June 2022 | Dec. 2022 | Jun. 2023 | Dec. 2023 | June 2024 | Dec. 2024 | June 2025 |
| MP | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th | 20th |
| Pending Cases | 146 | 172 | 407 | 633 | 1,050 | 1,445 | 1,917 | 1,911 | 1,129 | 409 | 435 | 337 | 240 | 270 | 272 |

**Table 9: Timeliness of Formal Discipline, by Incident Date**

The table below shows cases closed via NPA during the current Monitoring Period (n=196) as well as those that are still pending with the Trials Division at the end of the Monitoring Period (n=272). The table shows the length of time between the date of the incident and case closure, or for those cases not yet closed, the length of time between the date of the incident and the last day of the Monitoring Period (June 30, 2025).

| Time Between Incident Date and NPA Case Closure or Amount of Time Pending 20th Monitoring Period | | | | | |
|---|---|---|---|---|---|
| | Closed Cases | | Pending Cases | | Total |
| 0 to 1 year from incident date | 65 | 33% | 101 | 37% | 166 | 35% |
| 1 to 2 years from incident date | 91 | 46% | 109 | 40% | 200 | 43% |
| 2 to 3 years from incident date | 33 | 17% | 36 | 13% | 69 | 15% |
| More than 3 years from incident date | 7 | 4% | 26 | 10% | 33 | 7% |
| Total Cases | 196 | | 272 | | 468 | |

**Table 10: Time that Cases Were Pending with the Trials Division Prior to Case Closure**

The table below shows the length of time to case closure, calculated from the date the case was referred to the Trials Division to the date the Closing Memorandum was completed.

| Time from Referral to Trials Division to Completed Closing Memo, 2017 to 2025 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Time** | **2017** | **2018**[435] | **2019**[436] | **2020** | **2021** | **2022** | **2023** | **2024** | **Jan-Jun 2024 18th MP** | **Jul-Dec 2024 19th MP** | **Jan-Jun 2025 20th MP** |
| # Cases Closed | 492 | 521 | 271 | 387 | 736 | 2,052 | 754 | 638 | 371 | 267 | 232 |
| 0 to 3 months | 68 14% | 282 54% | 62 23% | 75 19% | 40 5% | 158 8% | 217 29% | 282 44% | 147 40% | 135 51% | 104 45% |
| 3 to 6 months | 64 13% | 92 18% | 65 24% | 65 17% | 88 12% | 175 9% | 216 29% | 156 24% | 104 28% | 52 19% | 71 31% |
| 6 to 12 months | 124 25% | 54 10% | 89 33% | 121 31% | 210 29% | 400 19% | 174 23% | 129 20% | 92 25% | 37 14% | 21 9% |
| 1 to 2 years | 146 30% | 51 10% | 35 13% | 98 25% | 284 39% | 782 38% | 119 16% | 55 9% | 25 7% | 30 11% | 25 11% |
| 2 to 3 years | 70 14% | 10 2% | 5 2% | 14 4% | 81 11% | 370 18% | 18 2% | 3 0% | ~ | 3 1% | 1 0% |
| 3+ years | 20 4% | 9 2% | 6 2% | 2 1% | 11 1% | 95 5% | 6 1% | 12 2% | 2 1% | 10 4% | 10 4% |
| Unknown | ~ | 23 4% | 9 3% | 12 3% | 22 3% | 72 4% | 4 1% | 1 0% | 1 0% | ~ | ~ |

---

[435] Data for 2017 and 2018 was calculated between MOC received date and date closing memo signed.
[436] Data for 2019 and 2020 was calculated between date charges were served and date closing memo signed.

**Table 11: Time that Current Cases Have Been Pending with the Trials Division**

The table below shows the length of time that cases have been pending with the Trials Division, calculated via the date that charges were served and the last day of the Monitoring Period.

| Time Pending | Pending Caseload, Time From Date Charges Served to Last Day of Monitoring Period | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | July-Dec 2019 | Jan-June 2020 | July-Dec 2020 | Jan-June 2021 | Jul-Dec 2021 | Jan-June 2022 | July-Dec 2022 | Jan-June 2023 | July-Dec 2023 | Jan-June 2024 | July-Dec 2024 | Jan-June 2025 |
| | 9th MP | 10th MP | 11th MP | 12th MP | 13th MP | 14th MP | 15th MP | 16th MP | 17th MP | 18th MP | 19th MP | 20th MP |
| Pending Service of Charges | 37 6% | 42 4% | 47 3% | 64 3% | 84 4% | 55 5% | 36 9% | 23 5% | 39 12% | 32 13% | 32 12% | 27 10% |
| 120 days or less | 186 28% | 373 36% | 325 22% | 420 22% | 217 11% | 137 12% | 124 30% | 214 49% | 135 40% | 67 28% | 83 31% | 90 33% |
| 121-180 days | 111 17% | 115 11% | 165 11% | 145 8% | 64 3% | 70 6% | 47 11% | 41 9% | 43 13% | 26 11% | 6 2% | 36 13% |
| 181-365 days | 202 30% | 278 26% | 467 32% | 511 27% | 501 26% | 182 16% | 77 19% | 64 15% | 62 18% | 44 18% | 17 6% | 37 14% |
| 365+ days | 80 12% | 219 21% | 413 29% | 701 37% | 930 49% | 616 55% | 105 26% | 82 19% | 42 12% | 48 20% | 42 15% | 38 14% |
| Awaiting Final Approval | 30 5% | 9 1% | 15 1% | 66 3% | 109 6% | 66 6% | 10 2% | 0 0% | 10 3% | 18 8% | 85 32% | 39 14% |
| Pending with Law Enforcement | 17 3% | 14 1% | 13 1% | 10 1% | 6 0% | 3 0% | 10 2% | 11 3% | 6 2% | 5 2% | 5 2% | 5 2% |
| **Total** | **663** | **1,050** | **1,445** | **1,917** | **1,911** | **1,129** | **409** | **435** | **337** | **240** | **271** | **272** |

**Table 12: Disposition of Formal Discipline Cases**

The table below shows the disposition of formal discipline cases closed by the Trials Division since 2017.

| Disposition of Formal Discipline Cases, 2017 to 2024 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Jan-Jun 2024 18th MP | Jul-Dec 2024 19th MP | Jan-Jun 2025 19th MP |
| # Cases Closed | 497 | 518 | 267 | 387 | 585 | 2,204 | 756 | 573 | 386 | 187 | 269 |
| NPA | 395 79% | 484 93% | 218 82% | 327 84% | 460 79% | 1,808 82% | 624 83% | 425 74% | 305 79% | 120 64% | 196 73% |
| Guilty at OATH | 4 1% | 3 1% | ~ | 3 1% | 16 3% | 41 2% | 23 3% | 2 0% | ~ | 2 1% | 4 1% |
| Administratively Filed | 77 15% | 22 4% | 34 13% | 33 9% | 33 6% | 148 7% | 74 10% | 126 22% | 74 19% | 52 28% | 66 25% |
| Deferred Prosecution | 21 4% | 7 1% | 13 5% | 20 5% | 75 13% | 203 9% | 32 4% | 20 3% | 7 2% | 13 7% | 3 1% |
| Not Guilty at OATH | ~ | 2 0% | 2 1% | 4 1% | 1 0% | 4 0% | 3 0% | ~ | ~ | ~ | ~ |

**Table 13: Penalties Imposed via NPA for Use of Force Related Misconduct**

The table below shows the penalties imposed for cases closed via NPA each year since 2017.

| Penalties Imposed via NPA for Use of Force Related Misconduct, 2017-2024 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Jan-Jun 2024 18th MP | Jul-Dec 2024 19th MP | Jan-Jun 2025 20th MP |
| # Cases | 395 | 484 | 218 | 327 | 460 | 1,808 | 624 | 425 | 305 | 120 | 196 |
| Refer for CD[437] | 71 18% | 67 14% | 3 1% | 1 0% | ~ | 11 1% | ~ | ~ | ~ | ~ | ~ |
| Reprimand | ~ | ~ | ~ | ~ | 7 1% | 77 4% | 69 11% | 21 5% | 21 7% | ~ | ~ |
| 1-5 Days | 31 8% | 147 30% | 52 24% | 80 24% | 69 14% | 462 26% | 156 25% | 149 35% | 101 33% | 48 40% | 77 39% |
| 6-9 Days | 14 4% | 19 4% | 6 3% | 14 4% | 29 6% | 163 9% | 88 14% | 84 20% | 63 21% | 21 18% | 26 13% |
| 10-19 Days | 62 16% | 100 21% | 56 26% | 83 25% | 110 24% | 447 25% | 147 24% | 101 24% | 74 24% | 27 23% | 41 21% |
| 20-29 Days | 74 19% | 58 12% | 42 19% | 46 14% | 64 15% | 157 9% | 51 8% | 30 7% | 21 7% | 9 8% | 11 6% |
| 30-39 Days | 42 11% | 42 9% | 21 10% | 32 10% | 43 10% | 170 9% | 51 8% | 18 4% | 11 4% | 7 6% | 7 4% |
| 40-49 Days | 27 7% | 30 6% | 3 1% | 17 5% | 54 11% | 96 5% | 20 3% | 5 1% | 4 1% | 1 1% | 7 4% |
| 50-59 Days | 14 4% | 4 1% | 17 8% | 17 5% | 18 4% | 80 4% | 14 2% | 7 2% | 2 1% | 5 4% | 5 3% |
| 60+ Days | 48 12% | 12 2% | 11 5% | 28 9% | 43 9% | 118 7% | 27 4% | 5 1% | 4 1% | 1 1% | 20 10% |
| Demotion | ~ | ~ | ~ | ~ | ~ | 6 0% | ~ | ~ | ~ | ~ | ~ |
| Retire/Resign | 12 3% | 5 1% | 7 3% | 9 3% | 23 6% | 22 1% | 1 0% | 5 1% | 4 1% | 2 1% | 2 1% |
| Termination(guilty at OATH or PDR) | ~ | 1 | ~ | ~ | 5 | 10 | 12 | 1 | ~ | 1 | 5 |

---

[437] As discussed in the Monitor's April 18, 2019 Report (dkt. 327) at pgs. 42-44, NPAs referred for CDs were previously adjudicated at the facilities after being referred from the Trials Division, a process which was rife with implementation issues. This problem has been corrected and now the Trials Division will negotiate a specific number of days (one to five) to be imposed, and those specific days will be treated as a CD, rather than an NPA (the main difference is the case remains on the staff member's record for one year instead of five years).

**Table 14: Cases Resolved via NPA with Provisions for CD or Expungement**

The table below shows the number and proportion of cases closed via NPA that included provisions for a Command Discipline or an Expungement.

| Cases Resolved via NPA with Provisions for Expungement or CD | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Closure Date | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Jan-Jun 2024 18th MP | Jul-Dec 2024 19th MP | Jan-Jun 2025 20th MP |
| # NPAs | 484 | 218 | 327 | 460 | 1,808 | 624 | 425 | 305 | 120 | 196 |
| NPAs with CD Provision | 187 39% | 45 21% | 76 23% | 74 16% | 535 30% | 253 41% | 224 53% | 160 52% | 64 53% | 82 43% |
| NPAs with Expungement | ~ | ~ | 36 11% | 96 21% | 420 23% | 55 9% | 25 6% | 22 7% | 3 3% | 7 4% |
| **Either CD or Expungement** | **187 39%** | **45 21%** | **112 34%** | **170 37%** | **955 53%** | **308 49%** | **249 59%** | **182 60%** | **67 56%** | **89 45%** |

431

**Table 15: Outcome of Closed Action Plan § F, ¶ 2 Cases**

The following chart shows the outcomes of cases identified for expeditious resolution pursuant to the Action Plan (dkt. 465), § F, ¶ 2 ("F2").

| Outcomes of Closed Action Plan § F, ¶ 2 Cases *As of August 15, 2025* | | | | | |
|---|---|---|---|---|---|
| **Year F2 Case Closed** | **Jun. to Dec. 2022** | **2023** | **2024** | **2025** | **TOTAL** |
| **Total # of Cases (by UOF)** | 13 | 36 | 22 | 13 | **84** |
| **# of Cases from ID (by UOF)** | 3 | 30 | 14 | 11 | **58** |
| **# of Cases from MT (by UOF)** | 10 | 6 | 8 | 2 | **26** |
| **Total Number of Staff with Closed F2 Cases** | **17** | **38** | **24** | **13** | **92** |
| **Closed w/ NPA for Resignation/Retirement** | 2 *12%* | 0 *0%* | 0 *0%* | 0 *0%* | **2** *2%* |
| **Closed w/ NPA for Suspension and/or Compensation Days** | 12 *71%* | 35 *92%* | 20 *83%* | 9 *69%* | **76** *83%* |
| **Closed via OATH Trial** | 0 *0%* | 1 *3%* | 1 *4%* | 2 *15%* | **4** *4%* |
| **Went to an OATH Trial, then Closed with an Action of the Commissioner** | 0 *0%* | 0 *0%* | 0 *0%* | 1 *8%* | **1** *1%* |
| **Administratively Filed** | 1 *6%* | 1 *3%* | 2 *8%* | 0 *0%* | **4** *4%* |
| **MOS Already Resigned/Retired or was Terminated for Other Matters** | 2 *12%* | 1 *3%* | 1 *4%* | 0 *0%* | **4** *4%* |
| **Charges Withdrawn as Further Investigation Found the MOS was Not Responsible** | 0 *0%* | 0 *0%* | 0 *0%* | 1 *8%* | **1** *1%* |

**Table 16: OATH Pre-Trial Conferences**

The table below presents the number of *use of force* related pre-trial conferences that were scheduled in each Monitoring Period since July 1, 2020 and the results of those conferences. This data is discussed further in the compliance box for First Remedial Order § C., ¶¶ 4 and 5 (OATH).

| Pre-Trial Conferences Related to UOF Violations | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | UOF # & Staff # | |
| # Required | Total # Scheduled | # of UOF PTC Scheduled | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
| July to December 2020 (11th MP) | | | | | | | | | | | |
| 225[438] | 372 | **303** | *0* | *111* | *10* | *44* | *124* | *12* | *2* | **274** | **198** |
| | | 100% | *0%* | *37%* | *3%* | *15%* | *41%* | *4%* | *1%* | | |
| January to June 2021 (12th MP) | | | | | | | | | | | |
| 300 | 670 | **541** | *0* | *282* | *4* | *85* | *136* | *33* | *1* | **367** | **331** |
| | | 100% | *0%* | *52%* | *1%* | *16%* | *25%* | *6%* | *0%* | | |
| July to December 2021 (13th MP) | | | | | | | | | | | |
| 350 | 575 | **379** | 185 | 87 | 4 | 18 | 58 | 26 | 1 | **284** | **239** |
| | | 100% | *49%* | *23%* | *1%* | *5%* | *15%* | *7%* | *0%* | | |
| January to June 2022 (14th MP) | | | | | | | | | | | |
| 900 | 1447 | **989** | 612 | 76 | 3 | 174 | 105 | 3 | 16 | **574** | **417** |
| | | 100% | *62%* | *8%* | *0%* | *18%* | *11%* | *0%* | *2%* | | |
| July to December 2022 (15th MP) | | | | | | | | | | | |
| 900 | 1562 | **902** | 621 | 42 | 0 | 153 | 74 | 0 | 12 | **584** | **466** |
| | | 100% | *69%* | *5%* | *0%* | *17%* | *8%* | *0%* | *1%* | | |
| Pre-Trial Conferences Related to UOF Violations | | | | | | | | | | | |

---

[438] The Remedial Order requirement came into effect on August 14, 2020, so was applicable for four and a half months in the Monitoring Period.

| # Required | Total # Scheduled | # of UOF PTC Scheduled | Results of Pre-Trial Conferences for UOF Cases | | | | | | | UOF # & Staff # | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
| **January to June 2023 (16th MP)** | | | | | | | | | | | |
| **900** | **1337** | **310** | 203 | 40 | 2 | 29 | 29 | 0 | 7 | **214** | **232** |
| | | 100% | *65%* | *13%* | *1%* | *9%* | *9%* | *0%* | *2%* | | |
| **July to December 2023 (17th MP)** | | | | | | | | | | | |
| **900** | **1079** | **373** | 264 | 29 | 14 | 32 | 24 | 1 | 9 | **254** | **264** |
| | | 100% | *71%* | *8%* | *4%* | *9%* | *6%* | *0%* | *2%* | | |
| **January to June 2024 (18th MP)** | | | | | | | | | | | |
| **900** | **942** | **384** | 239 | 38 | 7 | 44 | 21 | 1 | 34 | **228** | **273** |
| | | 100% | *62%* | *10%* | *2%* | *11%* | *5%* | *0%* | *9%* | | |
| **July to December 2024 (19th MP)** | | | | | | | | | | | |
| **375**[439] | **542** | **207** | 105 | 40 | 0 | 23 | 22 | 0 | 17 | **161** | **113** |
| | | 100% | *51%* | *19%* | *0%* | *11%* | *11%* | *0%* | *8%* | | |
| **January to June 2025 (20th MP)** | | | | | | | | | | | |
| **300**[440] | **514** | **236** | 125 | 42 | 0 | 35 | 14 | 0 | 20 | **162** | **175** |
| | | 100% | *53%* | *18%* | *0%* | *15%* | *6%* | *0%* | *8%* | | |

---

[439] The Monitoring Team approved a reduction in the number of required pre-trial conferences in July (100), August (75), September (50), October (50), November (50) and December (50).

[440] The Monitoring Team approved a reduction in the number of required pre-trial conferences in January (50), February (50), March (50), April (50), May (50), and June (50).

# APPENDIX F:
# STAFFING

## Table 1: Number of ADWs

The table below identifies the number and assignment of ADWs at specific points in time from July 18, 2020, to June 21, 2025. This data is discussed further in the compliance box for First Remedial Order § A, ¶ 4, Supervision of Captains.

| Facility | # of ADWs As of July 18, 2020 | # of ADWs As of Jan. 2, 2021 | # of ADWs As of June 26, 2021 | # of ADWs As of Jan. 1, 2022 | # of ADWs As of June 18, 2022 | # of ADWs As of Dec. 31, 2022 | # of ADWs As of June 16, 2023 | # of ADWs As of Dec. 23, 2023 | # of ADWs As of June 22, 2024 | # of ADWs As of Dec. 28, 2024 | # of ADWs As of Jun. 21, 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AMKC[442] | 9 | 21 | 13 | 12 | 9 | 12 | 16 | 0 | 1 | 0 | 0 |
| EMTC[443] | 0 | 0 | 0 | 0 | 0 | 8 | 10 | 11 | 11 | 11 | 8 |
| GRVC | 6 | 10 | 11 | 9 | 8 | 12 | 11 | 11 | 9 | 9 | 8 |
| MDC[444] | 6 | 2 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| NIC | 6 | 8 | 8 | 5 | 7 | 8 | 9 | 12 | 11 | 12 | 9 |
| OBCC[445] | 6 | 8 | 8 | 14 | 7 | 0 | 0 | 11 | 10 | 8 | 6 |
| RMSC | 5 | 6 | 6 | 5 | 4 | 5 | 6 | 14 | 11 | 8 | 7 |
| RNDC | 7 | 15 | 15 | 10 | 7 | 12 | 12 | 10 | 10 | 9 | 5 |
| VCBC[446] | 4 | 6 | 5 | 5 | 4 | 5 | 5 | 0 | 0 | 0 | 0 |
| Court Commands (BKDC, BXDC, QDC) | 3 | 4 | 3 | 3 | 3 | 3 | 2 | 3 | 3 | 2 | 2 |
| **Total # of ADWs in Facilities & Court Commands** | **52** | **80** | **70** | **64** | **49** | **66** | **72** | **73** | **67** | **60** | **46** |
| **Total # of ADWs Available Department-wide** | **66** | **95** | **88** | **80** | **67** | **82** | **89** | **91** | **85** | **87** | **69** |
| **% of ADWs in Facilities & Court Commands** | **79%** | **84%** | **80%** | **80%** | **73%** | **80%** | **81%** | **80%** | **79%** | **69%** | **67%** |

---

[441] The specific post assignments of ADWs within the Facility is not available so this data simply demonstrates the number of ADWs assigned per facility.

[442] AMKC was closed in August 2023.

[443] EMTC has been closed and opened in these Monitoring Periods. Until late 2022, staff that worked at EMTC were technically assigned to AMKC.

[444] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[445] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then reopened in July 2023.

[446] VCBC was closed in October 2023.

## Table 2: Number of Captains

The table below identifies the number and assignment of Captains at specific points in time from July 18, 2020, to June 21, 2025. This data is discussed further in the compliance box for First Remedial Order § A, ¶ 4, Supervision of Captains.

| Facility | Number of Captains & Assignments in the Department[447] | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | # of Captains As of July 18, 2020 | # of Captains As of Jan. 2, 2021 | # of Captains As of June 26, 2021 | # of Captains As of Jan. 1, 2022 | # of Captains As of June 18, 2022 | # of Captains As of Dec. 31, 2022 | # of Captains As of Jun 16, 2023 | # of Captains As of Dec. 23, 2023 | # of Captains As of June 22, 2024 | # of Captains As of Dec. 28, 2024 | # of Captains As of Jun. 21, 2025 |
| AMKC[448] | 91 | 111 | 97 | 87 | 81 | 80 | 65 | 13 | 7 | 7 | 5 |
| EMTC[449] | 0 | 0 | 0 | 0 | 0 | 38 | 37 | 37 | 39 | 43 | 45 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 | 61 | 43 | 50 | 62 | 59 |
| MDC[450] | 72 | 39 | 15 | 12 | 11 | 11 | 11 | 12 | 12 | 11 | 11 |
| NIC | 51 | 45 | 45 | 56 | 45 | 50 | 44 | 58 | 48 | 56 | 55 |
| OBCC[451] | 85 | 81 | 78 | 77 | 38 | 7 | 7 | 54 | 62 | 62 | 63 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 | 27 | 55 | 55 | 28 | 33 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 | 68 | 45 | 52 | 52 | 50 |
| VCBC[452] | 27 | 25 | 27 | 25 | 23 | 22 | 21 | 3 | 1 | 3 | 3 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 | 28 | 25 | 29 | 29 | 28 | 26 |
| Total # of Captains in Facilities and Court Commands | 558 | 523 | 499 | 474 | 416 | 427 | 366 | 346 | 354 | 352 | 350 |
| Total # of Captains Available Department-wide | 810 | 765 | 751 | 670 | 607 | 573 | 550 | 539 | 536 | 553 | 533 |
| % of Captains in Facilities and Court Commands | 69% | 68% | 66% | 71% | 69% | 75% | 67% | 64% | 66% | 64% | 66% |

---

[447] The specific post assignments of Captains within the Facility is not available so this data is the number of Captains assigned per facility.

[448] AMKC was closed in August 2023.

[449] EMTC closed and opened during some Monitoring Periods. Until late 2022, staff that worked at EMTC were technically assigned to AMKC.

[450] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are in fact assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[451] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then reopened in July 2023. DOC reported that these the Captains assigned to OBCC between July 2022 and July 2023 were on medically monitored status and were assigned to OBCC to monitor the staff locker room that was used for staff from other facilities.

[452] VCBC was closed in October 2023, but staff are still assigned to the facility in order to maintain the barge such that it does not physically deteriorate.

## Table 3: Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA

The tables below provide the monthly average from January 1, 2019 to June 30, 2025 of the total staff headcount, the average number of staff out sick, the average number of staff on medically monitored/restricted duty level 3, the average number of staff who were AWOL, the average number of staff who were on Personal Emergency leave, and the average number of staff on FMLA leave.[453]

| Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | Head-count | Average (Avg.) Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| 2019 Average | 10115 | 579 | 5.72% | 475 | 4.71% | | | | | | |
| 2020 Average | 9302 | 1070 | 11.49% | 464 | 5.02% | | | | | | |
| 2021 Average | 8454 | 1470 | 17.46% | 699 | 8.32% | 56 | 0.68% | 37 | 0.45% | 60 | 0.73% |
| 2022 Average | 7181 | 1085 | 14.95% | 586 | 8.13% | 17 | 0.23% | 30 | 0.42% | 51 | 0.71% |
| 2023 Average | 6479 | 512 | 7.87% | 384 | 5.93% | 12 | 0.19% | 38 | 0.58% | 72 | 1.12% |
| 2024 Average | 6065 | 385 | 6.35% | 292 | 4.81% | 11 | 0.18% | 43 | 0.71% | 112 | 1.85% |
| 2025 Average | 5928 | 368 | 6.20% | 217 | 3.63% | 6 | 0.10% | 39 | 0.65% | 140 | 2.34% |

[453] The AWOL, PE, and FMLA data is only available for August 1, 2021-January 26, 2022 and April 2022-June 30, 2025.

**Table 4: Location of Awarded Posts**

The tables below show how awarded posts were distributed across facilities and ranks at four recent points in time: April 30, 2024, November 13, 2024, March 31, 2025, and June 30, 2025.

| Location of Awarded Posts - April 30, 2024 | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| In Facility | 1 | 90 | 484 | 575 |
| Non-Facility | 6 | 27 | 236 | 269 |
| **TOTAL** | **7** | **117** | **720** | **844** |
| % In Facility Posts | 14% | 77% | 67% | 68% |
| % Non-Facility Posts | 86% | 23% | 33% | 32% |

| Location of Awarded Posts - November 13, 2024 | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| In Facility | 1 | 81 | 448 | 530 |
| Non-Facility | 5 | 26 | 218 | 249 |
| **TOTAL** | **6** | **107** | **666** | **779** |
| % In Facility Posts | 17% | 76% | 67% | 68% |
| % Non-Facility Posts | 83% | 24% | 33% | 32% |

| Location of Awarded Posts - June 30, 2025 | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| In Facility | 1 | 76 | 451 | 528 |
| Non-Facility | 5 | 21 | 182 | 208 |
| **TOTAL** | **6** | **97** | **633** | **736** |
| % In Facility Posts | 17% | 78% | 71% | 72% |
| % Non-Facility Posts | 83% | 22% | 29% | 28% |

**Table 5: PIC-Facing Awarded Posts in Facility**

Posts that are awarded "in facility," can be either PIC-facing posts, which involve direct day-to-day contact with individuals in custody, or non- PIC-facing posts, which do not. The table below provides additional detail about the number of awarded posts the Department considers to be PIC-facing. These posts are considered a subset of the "In Facility" posts reflected in Table 4.

| PIC-Facing Posts, by Facility<br>As Identified by the Department | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| April 30, 2024 | 1 | 69 | 360 | 430 |
| November 13, 2024 | 1 | 61 | 333 | 395 |
| June 30, 2025 | 1 | 56 | 345 | 402 |

**Table 6: Housing Unit Awarded Posts**

The table below reflects further analysis to determine the number of awarded posts that are assigned to a housing unit. These housing unit posts are considered a subset of the "In Facility" posts and, with a few exceptions, are also identified by the Department to be PIC-facing posts[454] as reflected in the table above.

| Housing Unit Posts As Identified by Monitoring Team Analysis | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** |
| April 30, 2024 | 1 | 30 | 135 | 166 |
| November 13, 2024 | 1 | 28 | 126 | 155 |
| March 31, 2025 | 1 | 26 | 151 | 178 |
| June 30, 2025 | 1 | 25 | 146 | 172 |
| **This table includes posts in which the location on a housing unit was not 100% certain, but is possible, in order to illustrate the maximum possible value.* | | | | |

---

[454] The Monitoring Team has identified 12 awarded posts that are possibly assigned to a housing unit, but which the Department does not consider to be PIC-facing.

**Table 7: Triple Tours**

The table below provides the annual total and daily averages of the total uniform staff headcount and triple tours from January 2021 to January 2025.

| Triple Tour Data[455] 2021 to June 2025 | | | |
|---|---|---|---|
| Year | Average Headcount | Total Triple Tours (per year) | Average Triple Tours (per day) |
| 2021 | 8,454 | 3549 | 10 |
| 2022 | 7,181 | 1431 | 4 |
| 2023 | 6,479 | 151 | 0 |
| 2024[456] | 6,065 | 601 | 2 |
| Jan. to Jun. 2025 | 5,928 | 240 | 1 |

---

[455] *See* Appendix F, Table 7 in the Monitor's May 22, 2025 Report (dkt. 850) for more detailed data on the monthly totals and averages of triple tours per month for January 2021-December 2024.

[456] For all data prior to January 2024, the Department calculated triple tours based on the number of staff who worked over 3.75 hours of their third tour. In January 2024, the Department began calculating this data based on the number of staff who worked over 4.28 hours of their third tour. Since some staff only work a short part of a third consecutive shift, using 20.28 hours as a threshold more accurately accounts for those staff who are working significant enough time to be considered a triple tour. In addition, in 2024, the Office of Management Analysis and Planning ("OMAP") conducted a review of triple tour data for quality assurance purposes and to improve efficiencies in its collecting and reporting of this data. Prior to 2024, each facility self-reported its triple tour data based on handwritten tour certification reports. Tour certifications are completed at the beginning of a tour and do not account for how long a staff member remains on that tour. In January 2024, the Department began calculating triple tours based on timesheet and payment data collected from the CityTime application. The Department has reported this has resulted in more reliable data.

## Table 8: Overtime Spending

The table below shows the Department's monthly overtime costs for uniform staff since January 2019. An important indicator of efficient workforce management is the level of an agency's use of overtime. Given the Department's problems with inefficient staff scheduling and deployment and abuse of leave benefits, overtime has become a routine strategy to increase staff availability on any given shift. Overtime can of course be used efficiently to address temporary staff shortages and unusual situations. However, using overtime to address chronic staffing issues, as this Department does, has significant fiscal consequences and an obvious negative impact on staff wellness and morale.

| Overtime Data for Uniform Staff[457] *January 2019-November 2025* | | | | | | | |
|---|---|---|---|---|---|---|---|
| Month | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| January | $12,860,000 | $9,800,000 | $12,066,000 | $18,847,000 | $22,893,000 | $21,227,000 | $26,192,000 |
| February | $12,392,000 | $7,983,000 | $14,037,000 | $18,226,000 | $20,819,000 | $19,936,000 | $22,967,000 |
| March | $14,194,000 | $8,426,000 | $15,218,000 | $20,969,000 | $23,855,000 | $21,759,000 | $27,271,000 |
| April | $13,941,000 | $13,340,000 | $15,394,000 | $20,783,000 | $22,414,000 | $21,533,000 | $27,108,000 |
| May | $14,135,000 | $7,926,000 | $15,850,000 | $21,423,000 | $23,358,000 | $22,450,000 | $27,355,000 |
| June | $11,894,000 | $5,647,000 | $15,887,000 | $21,721,000 | $22,490,000 | $21,566,000 | $26,920,000 |
| July | $14,273,000 | $5,817,000 | $18,860,000 | $22,064,000 | $23,758,000 | $24,282,000 | $27,991,000 |
| August | $14,592,000 | $6,815,000 | $19,719,000 | $22,453,000 | $22,434,000 | $22,125,000 | $27,764,000 |
| September | $11,714,000 | $6,022,000 | $20,137,000 | $22,006,000 | $18,871,000 | $23,756,000 | $28,304,000 |
| October | $12,146,000 | $7,168,000 | $21,485,000 | $22,901,000 | $19,712,000 | $26,186,000 | $29,253,000 |
| November | $11,458,000 | $8,268,000 | $19,514,000 | $22,215,000 | $19,462,000 | $25,506,000 | $26,002,000 |
| December | $11,439,000 | $11,687,000 | $19,546,000 | $22,276,000 | $20,261,000 | $25,791,000 | |
| Annual Overtime Spending | $155,038,000 | $98,899,000 | $207,713,000 | $255,884,000 | $260,327,000 | $276,117,000 | $297,127,000 |
| Average # of Staff | 10,115 | 9,302 | 8,454 | 7,181 | 6,479 | 6,065 | 5,877 |

[457] There can be lags in the reporting and payment of overtime. Staff must submit overtime paperwork and there is a processing lag that can result in overtime paid weeks and potentially months after it was worked. On occasion there are instances (i.e. collective bargaining settlements) that call for substantial retroactive overtime payments. Because of this, overtime data is never truly static and is subject to real-time changes. Because these changes are so frequent, they are not reflected in the data produced above.

**Table 9: Department's Average Daily Population and Staffing Levels**

      The chart below shows the Department's average daily incarcerated population since 2016, and the average uniform staff levels since 2019.



**Table 10: Training Academy Graduates**

The table below shows the number of new recruits that graduated from the Department's Training Academy to become corrections officers each year.

| CO Graduation Data 2013-2025 | |
| --- | --- |
| **Year of Academy Class Graduation** | **Total # of COs who Graduated** |
| 2013 | 342 |
| 2014 | 287 |
| 2015 | 955 |
| 2016 | 2,229 |
| 2017 | 1,144 |
| 2018 | 1,213 |
| 2019 | 381 |
| 2020 | 0 |
| 2021 | 120 |
| 2022 | 108 |
| 2023 | 274 |
| 2024 | 189 |
| 2025 | 174 |

**Table 11: Attrition**

The tables below show the number of staff that terminated their employment with the Department each year from January 2020-November 2025, broken down by rank and years of service.

| DOC Attrition Data, 2020 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Rank of MOS** | **Correction Officers** | | | | **Captains** | | | | **Senior Ranks (ADW and above)** | | | |
| **Years of Service with DOC** | Less than 5 Yrs | 5 to 10 Years | 10 to 20 Years | Over 20 Years | Less than 5 Years | 5 to 10 Years | 10 to 20 Years | Over 20 Years | Less than 5 Years | 5 to 10 Years | 10 to 20 Years | Over 20 Years | Total |
| **2020 Total** | 399 | 51 | 211 | 120 | 0 | 1 | 32 | 22 | 0 | 0 | 3 | 17 | 856 |
| **2021 Total** | 468 | 312 | 270 | 113 | 0 | 2 | 50 | 18 | 0 | 0 | 6 | 18 | 1257 |
| **2022 Total** | 144 | 455 | 381 | 98 | 0 | 2 | 49 | 18 | 0 | 2 | 5 | 8 | 1162 |
| **2023 Total** | 119 | 288 | 250 | 34 | 0 | 1 | 40 | 11 | 0 | 0 | 1 | 8 | 752 |
| **2024 Total** | 124 | 135 | 271 | 43 | 0 | 0 | 36 | 8 | 0 | 0 | 6 | 7 | 630 |
| **January-November 2025 Total** | 116 | 89 | 218 | 40 | 0 | 0 | 25 | 11 | 0 | 0 | 2 | 3 | 504 |

# APPENDIX G:
# LEADERSHIP APPOINTMENTS

**Leadership Appointments – January 2022 to January 5, 2026**

The table below identifies the leadership positions that were filled between January 2022 and January 5, 2026, including the date of appointment and the departure date, if applicable. The Department's leadership is discussed in the Leadership, Management, Supervision and Staffing section of the Report.

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Assistant Commissioner | Administration | 5/6/2024 | 1/25/2025 | Promoted to Deputy Commissioner of Administration |
| | | | | |
| Associate Commissioner | Administration | 11/25/2025 | | |
| | | | | |
| Deputy Commissioner | Administration | 9/6/2022 | 5/10/2024 | |
| Deputy Commissioner | Administration | 1/25/2025 | | |
| | | | | |
| Assistant Commissioner | AIU | 6/16/2022 | 4/27/2025 | Position Currently Vacant |
| | | | | |
| Executive Director | AIU | 5/11/2025 | | |
| | | | | |
| Agency Chief Contracting Officer (ACCO) | Central Office of Procurement | 9/18/2023 | 10/14/2024 | |
| Agency Chief Contracting Officer (ACCO) | Central Office of Procurement | 11/21/2024 | | |
| | | | | |
| Assistant Commissioner | CIB | 7/11/2022 | 11/10/2024 | |
| Assistant Commissioner | CIB | 9/30/2025 | | |
| | | | | |
| Assistant Deputy Warden / Executive Officer | CIB | 11/10/2024 | | |
| | | | | |
| Assistant Commissioner | Development and Advancement (ODA) | 6/5/2025 | | |
| | | | | |
| Deputy Commissioner / Chief Diversity Officer | Development and Advancement (ODA) | 2/26/2025 | | |
| | | | | |
| Assistant Commissioner | Early Intervention, Supervision, & Support | 11/13/2018 | | |
| | | | | |
| Acting EEO Officer | Equal Employment Opportunity | 2/10/2025 | 11/12/2025 | |
| | | | | |
| Assistant Commissioner/ EEO Officer | Equal Employment Opportunity | 8/2/2021 | 2/9/2025 | |
| Assistant Commissioner | Equal Employment Opportunity | 11/12/2025 | | |
| | | | | |
| Assistant Commissioner | Facilities & Fleet Administration (FMRD) | 9/4/2025 | | |
| | | | | |
| Associate Commissioner | Facilities & Fleet Administration (FMRD) | 9/11/2023 | 11/7/2024 | Promoted to Deputy Commissioner |
| | | | | |

448

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Deputy Commissioner | Facilities & Fleet Administration (FMRD) | 5/22/2023 | 10/27/2024 | |
| Deputy Commissioner | Facilities & Fleet Administration (FMRD) | 11/7/2024 | | |
| | | | | |
| Director, Energy Mgt Strategy | Facilities & Fleet Administration (FMRD) | 7/17/2023 | 5/4/2025 | Position eliminated |
| | | | | |
| Assistant Commissioner | Facility Operations, Classification & Population Management | 5/24/2023 | 5/21/2024 | Position eliminated |
| | | | | |
| Associate Commissioner | Facility Operations, Classification & Population Management | 8/22/2022 | 9/18/2025 | Title changed to AC of Security |
| Associate Commissioner | Facility Operations, Classification & Population Management | 6/20/2024 | 9/18/2025 | Title changed to AC of Facility Operations |
| Associate Commissioner | Facility Operations | 9/18/2025 | | |
| | | | | |
| Administrative Director of Facility Operations | Facility Operations, Classification & Population Management (CMCMU) | 10/28/2024 | 11/24/2025 | Position currently vacant |
| | | | | |
| Deputy Commissioner | Facility Operations, Classification & Population Management (CMCMU) | 7/25/2022 | 2/5/2024 | |
| Deputy Commissioner | Facility Operations, Classification & Population Management (CMCMU) | 10/15/2024 | 5/9/2025 | Position combined with Security Operations |
| Deputy Warden in Command / Acting Warden (Promoted 3/25/25) | Facility Operations - CJB, Hospital Prison Wards, Transportation, Courts | 9/14/2021 | 3/24/2025 | Promoted to Warden |
| Warden | Facility Operations - CJB, Hospital Prison Wards, Transportation, Courts | 3/25/2025 | 9/18/2025 | Promoted to Acting Assistant Chief |
| Acting Assistant Chief | Facility Operations - CJB, Hospital Prison Wards, Transportation, Courts, GRVC, RNDC, EMTC, RMSC/ESH | 9/18/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - EMTC | 4/24/2023 | 9/18/2025 | |
| Warden (Acting) | Facility Operations - EMTC | 9/18/2025 | 11/25/2025 | |
| Warden (prev. Acting Warden) | Facility Operations - EMTC | 11/25/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - GRVC | 4/24/2023 | 9/9/2024 | |
| Warden (Acting) | Facility Operations - GRVC | 9/9/2024 | 9/18/2025 | |
| Warden (Acting) | Facility Operations - GRVC | 9/18/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - NIC/WF | 6/20/2023 | 8/11/2024 | |
| Warden (Acting) | Facility Operations - NIC | 9/9/2024 | 9/18/2025 | NIC combined with WF |
| Assistant Commissioner | Facility Operations - WF | 11/13/2023 | 9/18/2025 | Position expanded to include NIC |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Assistant Commissioner | Facility Operations – NIC/WF | 9/18/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - OBCC | 4/24/2023 | 10/7/2023 | |
| Assistant Commissioner (formerly in Security Operations) | Facility Operations - OBCC | 5/6/2024 | 1/8/2025 | |
| Warden (Acting) | Facility Operations - OBCC | 1/8/2025 | 9/18/2025 | |
| Warden | Facility Operations - OBCC | 9/18/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - RMSC | 4/24/2023 | 5/6/2024 | Promoted to Assistant Commissioner of Administration |
| Warden | Facility Operations - RMSC | 10/17/2024 | | |
| | | | | |
| Warden | Facility Operations - RMSC/ESH | 10/17/2024 | 9/18/2025 | |
| Acting Warden | Facility Operations - RMSC/ESH | 9/18/2025 | | |
| | | | | |
| Warden | Facility Operations - RNDC | 10/17/2024 | 9/18/2025 | |
| Acting Warden | Facility Operations - RNDC | 9/18/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - VCBC | 4/24/2023 | 10/21/2023 | Position eliminated |
| | | | | |
| Assistant Commissioner | Finance | 9/8/2020 | 10/14/2024 | |
| Assistant Commissioner | Finance | 2/18/2025 | | |
| | | | | |
| Deputy Commissioner | Finance | 9/11/2023 | 4/25/2025 | Position currently vacant |
| | | | | |
| Assistant Commissioner | Health Affairs | 11/17/2023 | | |
| | | | | |
| Deputy Commissioner | Health Affairs | 1/30/2023 | 12/19/2025 | Position currently vacant |
| | | | | |
| Assistant Commissioner | Health Management Division | 10/10/2023 | | |
| | | | | |
| Chief Surgeon | Health Management Division | 4/18/2023 | 8/11/2023 | Position eliminated |
| | | | | |
| Medical Director | Health Management Division | 10/16/2025 | | |
| | | | | |
| Assistant Commissioner | Human Resources | 6/16/2022 | 4/9/2023 | |
| Assistant Commissioner | Human Resources | 8/8/2022 | 5/24/2024 | Position currently vacant |
| Assistant Commissioner | Human Resources | 10/1/2023 | 10/31/2025 | Promoted to Associate Commissioner |
| | | | | |
| Associate Commissioner | Human Resources | 4/7/2022 | 4/1/2023 | |
| Associate Commissioner | Human Resources | 5/24/2024 | 9/12/2025 | |
| Associate Commissioner | Human Resources | 10/31/2025 | | |
| | | | | |
| Deputy Commissioner | Human Resources | 10/16/2023 | 8/16/2024 | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Deputy Commissioner | Human Resources | 9/12/2025 | | |
| | | | | |
| Executive Director | Intergovernmental Affairs | 8/8/2022 | 4/15/2025 | |
| Executive Director | Intergovernmental Affairs | 10/14/2025 | | |
| | | | | |
| Deputy Commissioner | Investigations | 5/9/2022 | 4/1/2023 | |
| Deputy Commissioner | Investigations | 8/3/2023 | | |
| | | | | |
| Assistant Commissioner | Investigations | 12/11/2022 | 3/1/2023 | |
| Assistant Commissioner | Investigations | 8/8/2023 | 3/25/2024 | |
| Assistant Commissioner | Investigations | 10/16/2025 | | |
| | | | | |
| Associate Commissioner | Investigations | 12/15/2021 | 9/5/2023 | |
| Associate Commissioner | Investigations | 11/22/2024 | | |
| | | | | |
| Associate Commissioner | IT | 8/8/2022 | | Acting Deputy Commissioner from 4/10/2023 to 4/9/2024 |
| Associate Commissioner/ Deputy CIO IT Division | IT | 7/3/2023 | 4/9/2024 | |
| Associate Commissioner | IT | 11/18/2024 | | |
| | | | | |
| Deputy Commissioner | IT | 9/24/2017 | 6/1/2023 | |
| Deputy Commissioner (Acting) | IT | 4/10/2023 | 4/9/2024 | |
| Deputy Commissioner | IT | 4/9/2024 | | |
| | | | | |
| Deputy Commissioner | Legal | 8/8/2022 | 9/2/2023 | |
| General Counsel (Acting) | Legal | 12/12/2023 | 8/9/2024 | |
| General Counsel | Legal | 8/26/2024 | | |
| | | | | |
| Deputy General Counsel | Legal | 8/14/2023 | 11/5/2023 | |
| Deputy General Counsel (Acting) | Legal | 12/12/2023 | 7/30/2024 | |
| Deputy General Counsel | Legal | 10/21/2024 | | |
| Deputy General Counsel | Legal | 12/23/2025 | | |
| | | | | |
| Assistant Commissioner | Management Analysis & Planning | 1/17/2023 | 9/1/2023 | |
| Assistant Commissioner | Management Analysis & Planning | 8/29/2022 | | |
| Associate Commissioner | Management Analysis & Planning | 7/3/2022 | 9/19/2025 | During this period also served as Acting Deputy Commissioner – 4/24/2025 to 9/19/2025 |
| | | | | |
| Deputy Commissioner | Management Analysis & Planning | 4/18/2022 | 4/24/2025 | |
| Deputy Commissioner (Acting) | Management Analysis & Planning | 4/24/2025 | 9/19/2025 | |
| Deputy Commissioner | Management Analysis & Planning | 12/10/2025 | | |
| | | | | |
| Assistant Commissioner | Nunez Compliance Unit | 4/17/2023 | | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Assistant Commissioner | Nutritional Services Division | 11/3/2025 | | |
| | | | | |
| Agency Counsel and Senior Advisor to the Commissioner | Office of the Commissioner | 1/22/2024 | 4/4/2025 | |
| | | | | |
| Chief Of Staff | Office of the Commissioner | 2/14/2022 | 1/12/2024 | |
| Chief Of Staff / Bureau Chief | Office of the Commissioner | 5/24/2024 | | |
| | | | | |
| Commissioner | Office of the Commissioner | 1/1/2022 | 12/8/2023 | |
| Commissioner | Office of the Commissioner | 12/8/2023 | | |
| | | | | |
| Deputy Chief of Staff | Office of the Commissioner | 4/11/2022 | 4/18/2025 | |
| Deputy Chief of Staff | Office of the Commissioner | 8/18/2025 | | |
| | | | | |
| Senior Deputy Chief of Staff | Office of the Commissioner | 10/21/2024 | | |
| | | | | |
| First Deputy Commissioner | Office of the FDC | 3/5/2021 | 12/8/2023 | Promoted to Commissioner |
| First Deputy Commissioner | Office of the FDC | 2/2/2024 | | |
| | | | | |
| Senior Deputy Commissioner | Office of the SDC | 10/31/2022 | 2/3/2023 | |
| Senior Deputy Commissioner | Office of the SDC | 10/26/2023 | 5/17/2024 | |
| Senior Deputy Commissioner | Office of the SDC | 11/18/2024 | | |
| | | | | |
| Associate Commissioner | Operations | 11/9/2022 | 1/16/2024 | Position eliminated |
| Assistant Commissioner | Operations Research | 9/12/2022 | 6/16/2023 | Position eliminated |
| | | | | |
| Assistant Commissioner | Preparedness and Resilience | 4/11/2022 | 7/6/2025 | |
| Assistant Commissioner | Preparedness and Resilience | 12/3/2025 | | |
| | | | | |
| Assistant Commissioner | Program Operations | 3/18/2022 | 6/24/2023 | |
| Assistant Commissioner | Program Operations | 12/5/2023 | | |
| | | | | |
| Assistant Commissioner | Programs and Community Partnerships | 1/20/2020 | | |
| Assistant Commissioner | Programs and Community Partnerships | 11/21/2024 | | |
| Assistant Commissioner (appointed Associate) | Programs and Community Partnerships | 4/7/2022 | 7/21/2025 | |
| | | | | |
| Associate Commissioner | Programs and Community Partnerships | 3/14/2022 | 9/29/2023 | |
| Associate Commissioner | Programs and Community Partnerships | 11/13/2023 | 11/29/2024 | |
| Associate Commissioner | Programs and Community Partnerships | 7/21/2025 | | |
| | | | | |
| Deputy Commissioner | Programs and Community Partnerships | 9/6/2021 | 2/2/2024 | Promoted to First Deputy Commissioner |
| Deputy Commissioner | Programs and Community Partnerships | 11/29/2024 | | |
| | | | | |
| Assistant Commissioner | Public Information | 1/30/2023 | 7/28/2024 | |
| Assistant Commissioner | Public Information | 11/25/2025 | | |
| Assistant Commissioner | Public Information | 12/10/2025 | | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Deputy Commissioner | Public Information | 7/1/2022 | 4/14/2023 | |
| Deputy Commissioner | Public Information | 5/3/2023 | 6/30/2024 | |
| Deputy Commissioner | Public Information | 11/18/2024 | | |
| | | | | |
| Assistant Commissioner | Research Evaluation and Grants (OMAP) | 11/12/2025 | | |
| | | | | |
| Associate Commissioner | Security | 9/18/2025 | | |
| | | | | |
| Assistant Chief of Security | Security Operations | 5/24/2024 | | |
| | | | | |
| Assistant Commissioner | Security Operations | 4/3/2023 | 5/6/2024 | Moved to AC of OBCC |
| | | | | |
| Deputy Commissioner | Security Operations | 5/16/2022 | 10/29/2024 | |
| Deputy Commissioner | Security, Classification, Custody Management, and Facility Operations | 10/30/2024 | | Title expanded from prior position above |
| | | | | |
| Assistant Commissioner | Special Investigations Unit/PREA | 12/19/2022 | 7/18/2025 | |
| Assistant Commissioner | Special Investigations Unit/PREA | 12/23/2025 | | |
| | | | | |
| Deputy Commissioner | Strategic Operations | 4/8/2024 | | |
| | | | | |
| Assistant Commissioner | Strategic Operations - New Initiatives | 11/13/2023 | | |
| | | | | |
| Assistant Commissioner | Strategic Operations – Ops Analysis | 11/27/2023 | | |
| | | | | |
| Deputy Commissioner | Training Academy | 12/5/2022 | 1/16/2024 | |
| Deputy Commissioner | Training Academy | 1/17/2024 | 11/26/2024 | Acting Capacity |
| Deputy Commissioner | Training Academy | 11/26/2024 | | |
| | | | | |
| Assistant Commissioner | Training Academy | 9/6/2022 | 9/17/2022 | |
| Assistant Commissioner | Training Academy | 1/30/2023 | | Served as Acting Deputy Commissioner from 1/17/2024 to 11/26/2024 |
| | | | | |
| Assistant Commissioner | Trials | 11/12/2025 | | |
| | | | | |
| Associate Commissioner | Trials | 8/8/2022 | 8/2/2023 | |
| Associate Commissioner | Trials | 11/25/2025 | | |
| | | | | |
| Deputy Commissioner | Trials | 5/31/2022 | | |

# Appendix H:
# Update on Processing of New Admissions

The Monitoring Team provides an update on the subject of processing people newly admitted to the Department ("New Admissions") because it relates to a number of provisions[458] in the *Nunez* Court Orders related to the Department's use of intake, and because of the Court's March 13, 2023 Order (dkt. 511) regarding these operations.

New Admissions procedures remain as described in the Monitor's February 3, 2023 Report at pgs. 15 to 18 and Appendix A and the April 3, 2023 Report at pgs. 74 to 75. The New Admissions process is currently governed by Operations Order 22/07 dated December 14, 2007.[459] Overall, since the Monitoring Team began scrutinizing New Admissions data in the 17th Monitoring Period, the Department has been able to process *most* people in custody through intake within 24 hours, using either custody time or arrival time to calculate their stay in intake.

**Length of Stay in Intake for Male New Admissions**

The Department has been able to process most male New Admissions within 24 hours, using either custody time or arrival time to calculate their stay, since the Monitoring Team began scrutinizing the data in the 17th Monitoring Period as demonstrated in the chart below.

| Monitoring Period | Per Custody Time | | Per Arrival Time | |
|---|---|---|---|---|
| | # of People | % | # of People | % |
| July to December 2023 – 17th Monitoring Period | 8,668 | 94% | 8,848 | 96% |
| January to June 2024 – 18th Monitoring Period | 9,368 | 93% | 9,563 | 95% |
| July to December 2024 – 19th Monitoring Period | 9,046 | 91% | 9,260 | 93% |
| January to June 2025 – 20th Monitoring Period | 9,357 | 90% | 9,606 | 93% |

[458] There are at three distinct intake provisions contained in the Court's First Remedial Order, Second Remedial Order, and Action Plan in response to concerning reports about poor conditions and excessive lengths of stay in intake units. They are:

- First Remedial Order (dkt. 350): ¶ A(3) (Revised De-Escalation Protocol). This provision requires the Department to implement a de-escalation protocol to minimize the use of intake following use of force incidents.
- Second Remedial Order (dkt. 398): ¶ 1(i)(c). This provision requires the Department to process all incarcerated individuals, including new admissions and inter/intra facility transfers, through intake and place them in an assigned housing unit within 24 hours. The Department must also develop and implement a reliable system to track and record the amount of time an individual is held in intake and any instance when an individual remains in intake for more than 24 hours.
- Action Plan (dkt. 465): § D, ¶ 2(b) & § E, ¶ (3)(a)-(b). These Action Plan requirements re-iterate the intake-related requirements in the First and Second Remedial Orders (described above), in addition to requiring the Classification Manager and the Security Operations Manager to collaborate to reduce the reliance on intake and to timely process individuals through intake.

[459] The policy was updated in early 2023, but rescinded in June 2023 because the Department had not consulted with the Monitoring Team on the changes prior to promulgation. Revisions to the policy have not been prioritized, given the Department's need to focus on other higher-priority initiatives.

With respect to this Monitoring Period, new admission processing data from January to June 2025 identifies the proportion of male new admissions who were processed through new admission intake within the required 24-hour timeline. Two different data points can be utilized as the "start time" when tracking length of stay: the time that an individual is transferred from NYPD to NYC DOC custody, which typically occurs in a court setting ("custody time") *or* the time that an individual arrives at the intake unit at EMTC facility[460] on Rikers Island ("arrival time"). Both are considered separately in the analysis below.[461] The "end time" at which intake processing is considered complete is the time that the individual is either transferred to a housing unit or is discharged from custody (for those who make bail or are not returned to custody following a return to court or a hospital visit).

As shown in the section under the orange bar in the tables below, whether using custody time or arrival time as the starting point, most individuals from January to June 2025 were processed within a 24-hour period. Using "custody time" as the starting point, 90% of new admissions were processed through intake in under 24 hours. Using "arrival time" as the starting point, 93% of new admissions were processed through intake in under 24 hours. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below.

| Intake Processing Times for New Admissions Arriving at EMTC Intake January to June 2025 | | | | |
|---|---|---|---|---|
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **n=10,360** | **%** | **n=10,360** | **%** |
| Housed/Discharged within 24 hours | 9,357 | 90% | 9,606 | 93% |
| Housed/Discharged beyond 24 hours | 1,003 | 10% | 754 | 7% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **n=1,003** | **%** | **n=754** | **%** |
| 24-27 hours (≤ 3 hrs.) | 215 | 21.44% | 200 | 26.53% |

---

[460] A small group of individuals may be processed through an intake at West Facility for specific individual factors, including, but not limited to, health and security considerations.

[461] As noted in the Monitor's February 3, 2023 Special Report on Intake (dkt. 504), the Monitoring Team assesses the time each person arrives in the intake unit (*i.e.*, "arrival time") compared to the time the individual is transported to their assigned housing unit when calculating whether the 24-hour requirement has been met. Counsel for the Plaintiff Class has advised the Monitoring Team that it believes that the assessment of compliance should be based on the time an individual is taken into custody (*i.e.*, "custody time"). Discussions about the appropriate compliance standard will occur in conjunction with the discussion related to clock stoppages. Given that, this report provides outcomes using both data points for the Court's consideration.

| | | | | |
|---|---|---|---|---|
| 27-30 hours (3-6 hrs.) | 255 | 25.42% | 222 | 29.44% |
| 30-33 hours (6-9 hrs.) | 207 | 20.64% | 164 | 21.75% |
| 33-36 hours (9-12 hrs.) | 152 | 15.15% | 73 | 9.68% |
| 36-48 hours (12-24 hrs.) | 125 | 12.46% | 71 | 9.42% |
| More than 48 hours (≥24 hrs.) | 49 | 4.89% | 24 | 3.18% |

The data beneath the green bar in the table above shows the total length of stay for the small proportion of individuals whose processing did not meet the 24-hour timeline. In this Monitoring Period, of those individuals who did not meet the 24-hour timeline, most were housed within 9 hours (between 24 and 33 hours after admission), specifically, 677 of the 1,003 (68%) using custody time and 586 of the 784 (75%) using arrival time.

**Length of Stay in Intake for Female New Admissions**

The Department has been able to process most female New Admissions within 24 hours, using either custody time or arrival time to calculate their stay, since the Monitoring Team began scrutinizing the data in the 17th Monitoring Period as demonstrated in the chart below.

| Monitoring Period | Per Custody Time | | Per Arrival Time | |
|---|---|---|---|---|
| | # of People | % | # of People | % |
| July to December 2023 – 17th Monitoring Period | 796 | 93% | 818 | 95% |
| January to June 2024 – 18th Monitoring Period | 939 | 93% | 957 | 95% |
| July to December 2024 – 19th Monitoring Period | 973 | 92% | 1,001 | 95% |
| January to June 2025 – 20th Monitoring Period | 1,073 | 93% | 1,118 | 97% |

Female new admissions are processed through a separate intake at RMSC where they are also housed. As shown in the section under the orange bar in the RMSC tables below, whether using custody time or arrival time as the starting point, most female new admissions from January to June 2025 were processed within a 24-hour period. Using "custody time", 93% of new admissions were processed through intake in under 24 hours. Using "arrival time", 97% of new admissions were processed through intake in under 24 hours. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below.

**Intake Processing Times for New Admissions Arriving at RMSC Intake**

| January to June 2025 | | | | |
| --- | --- | --- | --- | --- |
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **n=1,155** | **%** | **n=1,155** | **%** |
| Housed/Discharged within 24 hours | 1,073 | 93% | 1,118 | 97% |
| Housed/Discharged beyond 24 hours | 82 | 7% | 37 | 3% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **n=82** | **%** | **n=37** | **%** |
| 24-27 hours (≤ 3 hrs.) | 39 | 47.56% | 15 | 40.54% |
| 27-30 hours (3-6 hrs.) | 20 | 24.39% | 9 | 24.32% |
| 30-33 hours (6-9 hrs.) | 10 | 12.20% | 4 | 10.81% |
| 33-36 hours (9-12 hrs.) | 3 | 3.66% | 1 | 2.70% |
| 36-48 hours (12-24 hrs.) | 5 | 6.10% | 4 | 10.81% |
| More than 48 hours (≥24 hrs.) | 5 | 6.10% | 4 | 10.81% |

The data beneath the green bar in the table above shows the total length of stay for the small proportion of female new admissions whose processing did not meet the 24-hour timeline. In this Monitoring Period, of those individuals who did not meet the 24-hour timeline, most were housed within 9 hours (between 24 and 33 hours after admission), specifically, 69 of 82 (8 84%) using custody time and 28 of 37 (76%) using arrival time.

**Temporarily Suspending New Admission Processing, a.k.a. Clock-Stoppage**

Historically, the Department has identified circumstances in which new admission intake processing is interrupted and has tolled its accounting of the processing time (*i.e.*, "stopped the clock") until the circumstance is resolved and processing can resume.[462] The situations in which the Department temporarily suspends its intake processing clock include when:

- An individual is returned to court before the intake process is completed.

- An individual refuses to participate in intake processing.

- An individual is transferred to a hospital or Urgi-Care (a clinic in another facility on Rikers Island) before the intake process is complete.

---

[462] *See* Monitor's February 2023 Report at pgs. 17 and 19-20 and Monitor's April 3, 2023 Report at 79 to 81.

- An individual makes bail and is released from custody before the intake process is complete.

Suspending intake processing appears logical (*e.g.*, processing cannot occur if the person is not physically present) and may also be functional (*e.g.*, Department or CHS staff need to know that an individual will not be presented for a certain procedure).

In January to June 2025, most individuals newly admitted to the Department (84.7% 8,775 of 10,360 for male new admissions; and 86%; 961 of 1,155 for female new admissions) were processed through intake without the process being suspended for any reason. Further, the fact that the intake process was suspended sometimes did not necessarily mean that the individual was not processed within 24 hours. In fact, among the 1,585 male new admissions whose intake process was suspended for some period, 595 were housed within 24 hours by custody time (38%) and 836 by arrival time (53%). For the 194 female new admissions whose intake process was suspended for some period, 113 were housed within 24 hours by custody time (58%) and 149 by arrival time (77%). Among those whose intake process was temporarily suspended and whose processing lasted more than 24 hours, the largest category of suspensions occurred when the individual was required to return to court (69% of male suspensions per custody time; 76% of male suspensions per arrival time; and 60% of female suspensions per custody time; 60% of female suspensions per arrival time).

Notably, although the Department tracks all clock stoppages, the data presented in the sections above regarding the 24-hour timeline utilized a continuously running clock, *without deducting any time when processing was suspended.* Accordingly, over 90% of individuals are processed within 24 hours even if the clock may be suspended for some period of time. There are legitimate reasons that the processing clock may need to be suspended, especially if the individual is not physically present in the processing facility. As demonstrated in the data, the majority of clock stoppages for individuals processed beyond 24 hours occurred in situations when the individual had to return to Court and so was not in the facility for some period of time.

**NCU's Audits to Verify Data Entry**

Concurrent with the implementation of the New Admission Dashboard, the *Nunez* Compliance Unit ("NCU") continued its audit strategy to corroborate the time entries in the

intake Dashboard for male new admissions at EMTC using Genetec footage.[463] Audit results from January to June 2025 are summarized for the 130 people who were newly admitted during the audits' sampling frames.[464]

- 123 of 130 people (95%) arrived in intake and were processed and transferred to a housing unit within the 24-hour timeline (confirmed via Genetec review).

- 128 of 130 arrival time entries (98.5%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the two inaccuracies, both stated a time *after* the person actually arrived.

- 119 of 127[465] housing time entries (94%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Among the eight inaccuracies, five stated a time *before* the person was actually transferred to a housing unit, and three stated a time *after* the person was actually transferred to a housing unit.

- 7 of the 130 people (5.4%) had "clock stoppages" during the intake process. Of these, one person was housed within 24 hours of their arrival time in intake and six people were not.

NCU's audits indicate that time entry errors are not common, but, when they do occur, they were primarily attributable to a small number of staff rather than being widespread data entry issues. In instances where multiple errors were attributable to a single staff member, NCU reports that the staff members will receive counseling. While data entry errors appear to be infrequent and not indicative of a systemic issue, the Monitoring Team recommends that intake supervisors continue to review staff accuracy and offer targeted support to those who may benefit from additional guidance.

---

[463] *See* Monitor's February 3, 2023 Report at pgs. 20 to 22 and Monitor's April 3, 2023 Report at pgs. 78 to 79. NCU does not conduct audits for female new admissions at RMSC.
[464] NCU confirms the status of all individuals in the intake to determine whether they are a new admission or if the individual may already have been in custody and is therefore in intake as an inter/intra facility transfer. Upon confirmation of the new admissions, the audit is limited to those individuals.
[465] Three individuals were excluded from the Housing Time calculation because they were discharged during their admission process and thus the housing time was not applicable.

**Recent Updates at EMTC**

In 2024, the Department reported several plan improvements to EMTC and the management of New Admissions, including opening an outside recreation yard, establishing an on-site X-Ray area, reopening a dental clinic, and commencing a construction project to expand the space in the Intake area. In this Monitoring Period, the Department reported that Intake was provided with a Cellsense Machine to improve search procedures, and confirmed there are approximately 7-9 correction officers, as well as a New Admissions Expeditor, a Captain and an ADW assigned daily to each tour in Intake.

**Conclusion**

The Department has taken important steps to ensure New Admissions are processed in a timely manner. The vast majority of individuals continue to be processed within 24 hours, including in instances when a clock stoppage is appropriate. As demonstrated by NCU's audit, the Department also continues to track New Admissions using the New Admissions Dashboard in a generally reliable and accurate manner. The Department must continue to remain proactive regarding the New Admissions procedures to effectively address the evolving challenges and fluctuations in population.

# APPENDIX I: UPDATES ON TECHNOLOGY INITIATIVES

Below is a list of IT initiatives that have recently been completed or are in various stage of progress.

## Security & Operations Initiatives

- **RapiScan Drug Detection System**: The Department has implemented portable drug detection machines capable of swabbing and identifying multiple types of drugs in incoming mail and packages with a high degree of reliability. These machines also support chain of custody by printing time-stamped slips that specify the substance detected. This initiative has been fully implemented.

- **Electronic Logbook**: The Department has developed an electronic logbook to replace the paper-based system used at A and B posts. This new system is expected to significantly improve recordkeeping and facilitate easier review and analysis of housing area activity. Staff have been trained and a pilot of the logbook launched in the Special Management Unit (SMU) of OBCC in October 2025.

- **Benchmark Analytics:** The Department participated in a demonstration of software that reviews data for the purpose of risk management. The Department is in early talks with the vendor and would like to pilot the technology in 2026.

- **Body Worn Cameras**: The Department completed the rollout of Body-Worn Cameras ("BWC") across all major facilities, including the installation of docking stations in each location. In total, more than 4,000 cameras were deployed systemwide.

- **PIC Identification Cards**: The Department acquired ID cards, clips, and printers needed to reissue identification cards to people in custody. These cards facilitate identification during service delivery and the movement of individuals. The ID cards were first piloted in RMSC, followed by deployment in RNDC, NIC, and WF, GRVC, OBCC, RESH, and EMTC. All PICs in these facilities now have ID cards.

- **Incarcerated Individual Service Delivery Tracker (IISD)**: The Department has developed a mobile and web-based application to document services provided to people in custody, such as recreation, clinic visits, court, and commissary. The application

includes barcode scanning to expedite identification. Development is complete, and the Department is coordinating rollout efforts.

- **Search & Contraband Tracking System (SSTS)**: The Department is piloting a tablet-based system for documenting ESU, SRT, and SST search operations in real-time, including team planning, contraband findings, and related notifications. This initiative is currently being piloted by SST, with 15 iPads distributed to Emergency Teams.

- **PIC Lookup System (Enhancements)**: Enhancements to the PIC Lookup System have been completed, allowing staff to more easily access comprehensive PIC profiles, including incident history, housing movements, program participation, infractions, and separation orders.

- **Incident Reporting System**: The Department is overhauling the incident reporting system to align with State Commission of Correction (SCOC) standards and streamline submissions to the State's eJustice platform. This initiative, which involved collaboration amongst many stakeholders in various divisions and units, is expected to launch in early 2026. It is discussed in more detail in the "Use of Force Reporting" section of this report.

- **Program Services Tracking**: A system is in place for the Division of Programs to track program delivery and attendance among PICs. This initiative has been implemented and continues to receive enhancements.

- **Clinic Production Tracking**: The Department collaborated with CHS to develop an electronic system to track clinic call-downs, production, and refusals. Escort officers will use a software program to document clinic attendance in real-time. Training and pilot of the new tracking is expected to take place in NIC in late 2025. It is discussed in more detail in the "Medical Wait Time" section of this report.

- **Infractions Reporting & Tracking System**: The Department has developed a system for electronically processing PIC infractions, from submission through adjudication. Phase 1 of this initiative was rolled out at WF in September 2025. All remaining facilities will be granted access to Phase 1 on a rolling basis, with implementation continuing through 2026. Phases 2 (investigations) and 3 (adjudication) remain under development.

- **Audits & Inspections Management System (AIMS)**: A web and mobile platform is being tested to allow units such as Fire Safety and Environmental Health to schedule and document inspections. A pilot was completed, and a full rollout is expected in late 2025.

- **Culinary Digital**: The Department is developing a web-based system to support Nutritional Services with recipe planning, inventory, menu compliance, and dietary tracking. This initiative is in progress and in coordination with a vendor who is in the process of gathering and documenting requirements.

- **Idemia LiveScan:** The Department has begun procurement of machines and software for the collection of fingerprints and other biometric data.

### HR, Administration & Training Initiatives

- **Attendance Tracking**: An electronic system is in place to replace paper sign-in sheets and provide real-time attendance data for uniformed staff. This initiative has been fully implemented.

- **E-Schedule**: The Department is developing a user-friendly scheduling interface that integrates with Attendance Tracking, allowing facility leadership to make real-time staffing decisions and reduce the reliance on paper forms. This initiative is currently in development.

- **TDY Tracker and Transfers**: An electronic tracker records UMOS transfers and temporary duty assignments and displays current work locations in the Employee Lookup System. This system has been fully implemented.

- **Electronic Form 22R**: An automated system for generating staff service records by pulling data from multiple sources has been developed, but implementation has been put on hold.

- **Vacation Bidding**: A digital system has replaced paper-based vacation scheduling, allowing staff to submit ranked vacation picks which are processed in compliance with operational orders. This system has been implemented but additional work is required so that the system can automatically allocate vacations to staff.

- **Recruitment Tracking**: A mobile/web application enables recruitment staff to log outreach efforts and track interested candidates for the CO exam. This initiative has been in place for over a year.

- **Good Guy Letter Tracking**: DOC now tracks requests for Good Guy Letters electronically to support retired officers seeking personal firearm licenses. This initiative has been in place since January. Feedback has been provided to I.T. and necessary adjustments are being made.

- **Officer Training Accountability System**: A system is in place to ensure compliance with training requirements by capturing photos during LMS courses for audit and identity verification. This initiative has been fully implemented.

- **ArmorerLink Firearms Tracking System**: This web-based platform manages firearm inventory, training, and qualifications and includes a mobile app for real-time documentation at the range. This initiative is fully implemented, and receives updates from the vendor when issues arise.

- **Email Accounts for All Staff**: The Department is extending email access to all staff, including COs, to enhance communication and enable digital services. Nearly all staff now have an active email address, but the Department is working on developing a communication campaign to increase use and engagement by staff to actually check and use their email accounts.

## Health Management Division (HMD)

- **Electronic Health Management System Enhancements**: The existing HMD system is being upgraded to support case management, medical fitness determinations, and tracking of MMR status. Enhancements to this system are currently underway.

- **FMLA Tracking**: HMD staff are now receiving FMLA requests directly from staff. Previously, these calls were made to the facility, unit, or Division for which the staff member worked. The FMLA requests are now being entered into a tracker and the electronic system for scheduling staff.

- **Workers Compensation Claims Tracking**: A new system is being developed to allow electronic submission and processing of workers' compensation claims. This initiative is in its initial development phase, which was recently set back by licensing issues.

## Investigations & Legal

- **Case Builder**: The Department is introducing a new case management platform to support multiple divisions and improve data quality and efficiency in investigations. The rollout of this platform has faced numerous delays, given the complexity, testing, and training conducted by the vendor. The Department expects this platform to go live in early 2026.

## Finance & Procurement

- **Budget Request & Procurement Tracking**: DOC has built a digital system for submitting and tracking budget and procurement requests, which will eventually integrate with the City's Passport system. This system is operational.

## Upcoming Projects

- **Self-Service Scheduling & Leave Requests**: A platform is being developed to allow staff to view schedules and request leave, OT, and mutuals from personal devices. This initiative is upcoming.

- **Human Capital Management System (HCM)**: The Department is preparing to implement an enterprise HR system that consolidates employee data and interfaces with city systems like NYCAPS and PMS. This initiative is on hold due to funding issues.

- **Jail Management System (IIS Replacement)**: Plans are underway to replace the aging IIS system with a modern platform for managing all PIC data and workflows. This initiative is upcoming.

- **PIC Banking System (IFCOM Replacement)**: The Department is preparing to replace the IFCOM system with a more robust solution for managing PIC finances. This initiative is upcoming.

467

- **Staff Body Scanning**: Requests for funding for upgraded body scanners have been submitted to improve detection capabilities and enable full staff scanning at facility entrances. The status of obtaining the scanners is unknown as it is dependent on obtaining necessary funding and approvals.

# APPENDIX J:
# OVERVIEW FOR JANUARY 2025 OATH PRE-TRIAL CONFERENCE OF 2023 UOF INCIDENT

**Overview for January 2025 OATH Pre-Trial Conference of 2023 UOF Incident**

The Monitoring Team has long reported its concern that OATH precedent can and does undermine the efforts to impose proportional and meaningful discipline for staff. The following case raises serious concerns about the assessment of a particularly egregious case during an OATH Pre-Trial Conference that appears to directly undermine the necessary accountability for serious misconduct.

On February 25, 2023, at AMKC in a general population housing unit, an incarcerated individual was assaulted twice – first in his cell and then on the tier when being escorted out of his cell following the first assault. For nearly an hour and twenty minutes (from 12:22 p.m. until 1:42 p.m.), video footage captured individuals entering and exiting a cell and the B-Officer taking no action during that period of time. The B-Officer conducted several tours while the events unfolded. While the B-Officer toured he never addressed the cell where the incident occurred, despite observing multiple individuals entering and exiting that very cell. The B-Officer was also captured off post approximately 3 times throughout the hour and twenty minutes. At one point, the Officer walked down the corridor and another person in custody made a gesture for the Officer to turn away and video captures the Officer complying. A few minutes later, the officer escorted the victim out of his cell. As they walked down the corridor, the victim walked ahead of the officer and was assaulted by other people in custody as the officer walked behind him slowly. The officer appeared to delay using chemical agents to intervene and stop the second assault.

The victim alleged in his statement to investigators that other people in custody had been extorting him for money, commissary, and his phone PIN, and that the B-Officer in the housing unit was aware of and complicit in the assault. The victim stated that he had been beaten inside his cell with a window crank placed in a sock, and that the Officer ignored his screams. The victim further claimed that when the Officer later opened the cell door to escort him to medical, he allowed other people in custody to continue to enter the cell. He claims the officer later passively stood by as the assault continued, even counting down "five seconds" before deploying OC spray.

The medical documentation reported that the victim sustained significant injuries, including a scalp laceration with bleeding, abrasions to his upper back and shoulder, and neck

tenderness. Subsequent evaluations revealed more severe trauma, including blunt force injuries to the head and chipped cervical vertebrae, requiring the victim to wear a neck brace for six weeks.

The Rapid Review of the incident conducted by a Deputy Warden concluded that the incident was avoidable and identified procedural errors, including that the Officer failed to properly escort the victim and monitor housing area activity.

The ID investigation found that the incident involved serious violations in staff conduct and potential complicity by the B-Officer in the housing unit. The full ID investigation also concluded that the incident was avoidable. ID found that prior to the Use of Force, the Officer was inefficient in the performance of his duties and failed to maintain the safety and security of the housing area, resulting in an act of violence in the victim's cell, serious injuries, and a Use of Force during an escort. Additionally, the Officer provided a false and misleading statement during his MEO-16 interview. ID recommended the Officer receive formal discipline.

The Officer was charged for failing to efficiently perform his duties and for failing to immediately intervene in an assault. He was also charged with having his head down while at his post and failing to conduct meaningful tours to ensure the care, custody, and control of the individuals secured in the housing area under his supervision. Furthermore, he was charged with providing a false statement during his MEO-16 interview on or about, July 27, 2023, when he stated that he had not been trained on how to use a Body Worn Camera, and that was why he was not wearing one during his tour on February 25, 2023. ID confirmed that the officer was in fact trained on how to use a Body Worn Camera at the time of the incident.

The Officer has an extensive disciplinary history with six sustained charges for serious violations, including: a 2014 DUI arrest resulting in a penalty of 10 suspension days and 12 months limited probation; in 2015 he was found guilty of 2 charges of conduct unbecoming and excessive use of force following an OATH trial resulting in a total penalty of 45 suspension days; in 2017 he was found to be AWOL resulting in a penalty of 10 days; in 2020 he settled a case for a false/inaccurate use of force report for a penalty of 30 days; and in 2022 he settled a case for failing to intervene for a penalty of 30 days.

During a pre-trial conference in this Monitoring Period before an OATH Administrative Law Judge, the Department reports that the ALJ provided the Parties a flawed analysis of the

incident and DOC's policy and, as a result, recommended the case settle for a lighter penalty then what the Department was seeking. DOC reported that the ALJ provided the following assessment:



The ALJ's recommendations were relayed in front of all Parties, which then made it difficult for the Department to maintain its initial offer of 60 days with 2 years of full probation. The Department settled the case for forfeiture of 45 compensatory days and 12 months of probation, limited to future failure-to-intervene violations. Notably, consideration for termination may have even been appropriate in this case, given the nature of the charges and the officer's extensive disciplinary history, which included charges and penalties for similar misconduct.

The analysis conducted by the ALJ is fundamentally flawed. Per Department policy, the Officer had an immediate obligation to intervene at the time that multiple individuals were in a

cell together given the security risk and risk of harm it presented. The fact that the officer conducted multiple tours and that was not addressed in and of itself is a basic failure of security practice and resulted in multiple assaults and a use of force. The subsequent conduct of the officer, including failing to appropriately secure the individuals while escorting the victim, as well as the delayed use of chemical agents only exacerbates the Officer's misconduct, not mitigates it. Finally, while this case is egregious in and of itself, the extensive disciplinary history of this officer only reaffirms the need for progressive discipline and greater imposition of discipline to align with the Department's Disciplinary Guidelines. The fact that the ALJ shared this flawed rationale and recommendation for a lighter penalty impacted the Department's negotiating power with the Officer's counsel and thus impeded the Department's ability to either settle for or pursue a trial for a more appropriate penalty.

Genetec from multiple camera angles captured the sequence of events leading up to and following the assault. The Monitoring Team provides the following screenshots from the Genetec angles as a means to illustrate the objective evidence available in this case.

**<u>Video Breakdown of incident</u>**



At 12:30:15, the officer is seen touring down the corridor. The door of the cell in question is open with multiple PICs inside. The officer does not address this during the tour.



At 12:57:43, the Officer is seen sitting at the B post desk witnessing multiple PICs congregate in front of the cell where the initial assault occurred. The PICs enter and exit the cell freely. The officer does not intervene.



At 1:13:29, a PIC gestures the A station to open the cell door in question, and the A station Officer opens the door.



At 1:41:06, the B post officer then stands in the corridor. As he walks down the corridor toward the cell in question, a PIC points his hand down and gestures the Officer to turn away and the officer appears to comply as he does turn away.



At 1:42:38 a few minutes later, the Officer then goes to the cell in question and escorts the victim out of the cell and down the corridor.



At 1:42:48 during the escort, the PIC that was just taken out of the cell walks in front of the Officer. The PIC is assaulted by multiple other individuals in front of the officer.



At 1:42:57 the Officer slowly walks toward the assault and then deploys chemical agents which terminates the assault. The Officer took about 10 seconds to deploy chemical agents after the assault began.

# APPENDIX K: STAFFING SUMMARY

Progress toward the goals and requirements of the *Nunez* Court Orders can be advanced only when an adequate number of staff are supervising those in custody and carrying out the jails' day-to-day operations. The impact of "insufficient staffing" arises repeatedly as an underlying dynamic in the Department's difficulty in achieving compliance with many provisions of the *Nunez* Court Orders, particularly the effort to quell violence, disorder and frustration in order to reduce the use of force. Not only must staff absenteeism be kept to a minimum, but staff must also be deployed efficiently and effectively, which the Department has long struggled to achieve.

The Department's ability to efficiently deploy its staff in the facilities on any given day is impacted by a multitude of events – both those that are anticipated (e.g., a staff's prescheduled vacation) and unanticipated (e.g., a staff member does not come to work due to a personal emergency). These issues are governed by internal rules and policies, collective bargaining agreements, and a variety of local, state and federal laws. Many of the Department's staffing policies and protocols are typical of a correctional operation. The Department continues to struggle with the assignment of staff to housing units – notably that significant overtime continues to be utilized and that unit posts may go unmanned during a tour.

In this section, the contours of five key aspects of staffing are presented: Post Assignments, Scheduling, Overtime, Time Keeping, and Obtaining Resources.

This section addresses how uniform staff are assigned to posts or functions throughout the Department. Uniform staff can be assigned to posts within the facilities (such as housing unit posts or others that support the operation, such as escorts, visitation, recreation, etc.) or outside of the facilities (such as posts related to transportation, the training academy, security operations, and at headquarters). Within the facilities, uniform staff assigned to PIC-facing posts continue to work significant overtime and some housing area posts continue to go unmanned. Part of the solution to address these problems is to increase the number of staff available to work the housing units by minimizing the use of uniform staff in positions that may be appropriate for civilian staff to fill or that do not require the specialized expertise of uniform staff. Further, post assignment practices must have sufficient flexibility so that staff can be assigned to all posts that need to be covered. For this reason, the Department's *historical practices* regarding awarding

staff a post in a particular location and prohibiting their assignment elsewhere based on operational need must be eliminated.

Various practices regarding post assignments are explained below.

_Facility Posts._ In a correctional setting, a "post" refers to an established work assignment at a specific location within the facility. The duties and responsibilities of the staff member assigned to the post are generally described in "post orders." The Department is required to obtain a neutral and independent post analysis pursuant to Action Plan § C, ¶ 3(viii) in response to recommendations from the Monitoring Team. Such an analysis is a prerequisite to any effort focused on efficient staff deployment because without it, the facilities' staffing strategy becomes a piecemeal approach lacking overall coherence and efficiency. A post analysis will provide critical information about the necessary number and duties of each post in a facility as well as the total number of uniform staff needed to ensure adequate coverage and dependable service provision. In turn, this will support the Department's effort to deploy its workforce more efficiently by providing guidance that will result in an increasing number of staff available for assignment to the housing unit posts, which will likely reduce the need for staff to work overtime.

Currently, the posts that are *authorized* to be filled by uniform staff within the facilities are set by the Table of Organization. Authorized posts are *budgeted*, meaning that funding for the post has been allocated by NYC's Office of Management and Budget. *Unbudgeted* posts are those that, while not funded, the Department believes are necessary for the jails' operation and are therefore approved. They are designated on the Table of Organization as "Temporary Posts" and include posts such as the Environmental Health Captain (added due to a Court Order) and posts in the RESH units, among others.

The facilities also have some discretion to create *unauthorized* posts, which are not on the Table of Organization. These posts are needed to address temporary conditions (e.g., additional staff are needed to meet staffing ratios based on the number of individuals in a unit) or to address specific incident-driven needs (e.g., such as hospital runs for injured PICs or PICs in medical distress).

At times, facilities have added Facility Added Posts and unauthorized posts with questionable justifications which undermines the goal of efficient staff deployment. Reducing and controlling the number of Facility Added Posts and unauthorized posts has been an ongoing issue for the Department and has been a focus of greater scrutiny by the Office of Administration in order to reduce any potential misuse.

The Department engaged the SCOC in fall 2024 to conduct a post analysis. The first report was completed in June 2025 for EMTC with work on the next facility scheduled to begin in early 2026. While the report from the SCOC was useful, it was not a traditional post analysis. Further, the SCOC's process has been protracted with only one report completed over a year after the project was initiated. At this pace, it will take years for this analysis to be completed. The Department reported it recognized the same constraints the Monitoring Team has with respect to the current approach and reports it is working to procure an outside entity to conduct a staffing analysis.

_Non-Facility Posts._ Uniformed staff may also be assigned to posts located outside the facilities. Among others, these include posts related to transportation (e.g., transporting PICs to court, or between facilities) and Security Operations Division (e.g., manning the secure staff entrances of the buildings). These posts also include positions in the training academy or to Headquarters where they may be tasked with duties related to administrative tasks, investigations, auditing, gathering and sharing information with external stakeholders (such as the Monitoring Team), and tracking Department data, among others. Some of these posts outside of the facility do require a uniform staff member, while other posts do not require the specialized expertise of uniform staff, but the Department currently depends on uniform staff in the absence of an available civilian hire.

_Posts That Do No Require Uniform Expertise_. The Department's reliance on uniform staff to fulfill roles that can be reasonably addressed by a civilian is perpetuated by several factors. First, the Department employs thousands of uniform staff, and each jail has many "lines" (i.e., positions) for uniform staff that can be flexibly deployed and utilized. In contrast, the lines for civilian staff are fewer in number and various bureaucratic hurdles to hiring make these positions difficult to establish. Further,

recruiting civilians to work in a jail setting has historically been difficult due to non-competitive salaries, a protracted recruitment process and the nature and location of the work. Additionally, civilian lines are more likely to be impacted by hiring freezes and budget cuts. In fact, over the past few years, the Department reports that City-wide hiring freezes and budget reductions have resulted in the loss of 400 budgeted civilian lines. Given the "20 years of service" requirement for retirement that promotes retention, uniform staff within the agency often have a longer tenure than civilian staff, and the positions have less turnover. Further, given the unique and complicated nature of DOC's operation, many administrators have reported that having a uniform staff member on their team helps them to better navigate working with the facilities. Collectively, these dynamics have caused the Department to utilize uniform staff in a variety of roles, including those that could reasonably be carried out by civilians. Uniform staff have been assigned to such a wide variety of roles for so long that both uniform staff and civilians have come to believe that, in many cases, these roles *must* be filled by uniform staff, and the convention has become part of the Department's culture. This practice is difficult to untangle given that it requires increased budgetary, recruiting and hiring support from the City and OMB, all of which are complex and time consuming. The Department's Staffing Efficiency Committee has been working to disentangle these complicated bureaucratic matters and to alter the Department's mindset to one recognizing that these positions can and should be filled by individuals who are not uniform staff. Additional support from the City and OMB is needed for the Committee's work to accomplish the larger goal.

*Temporary Duty Assignment*. Uniform staff can be deployed temporarily ("TDY") to a variety of posts. Even though TDY posts are intended to be temporary, many uniform staff have remained on TDY status for years. TDY is often used to address specific needs or projects (e.g., a position required to comply with a Court Order,) whereby a unit or facility command may request a staff member for a temporary duty assignment to a post that is not yet budgeted. The request is made initially to DOC's Office of Administration, although authorization is now required from the Senior Deputy Commissioner in an effort to reduce the frequency of TDY assignments. Previously, staff who were medically modified/returned ("MMR") were often assigned to TDY positions

outside the facilities. However, in early 2025, the Office of Administration redeployed MMR staff on TDY assignments back to their parent commands for assignment to posts that accommodate their particular restrictions (e.g., the A-post in a housing unit).

*Awarded Posts.* Awarded posts are those that are advertised and bid on by staff members who wish to be assigned to a specific facility location each day that they are scheduled to work. A number of *practices*, not codified in policy, have historically, limited the Department's ability to flexibly assign staff with awarded posts to other positions if needed. More specifically, although Department policy permits the reassignment of staff on awarded posts, in practice, for many years, staff with awarded posts were rarely reassigned based on operational need, even when coverage on the housing units was insufficient. The Department agreed via the Action Plan to significantly curtail the rigid use of awarded posts, using them primarily for positions where a specific skill set is required. The Department has reaffirmed that staff on Awarded Posts can be reassigned to the housing units when there is an operational need. The Department also reported that revisions to the Awarded Post policy are underway to ensure prior practices do not reemerge. The Office of Administration maintains a list of the posts that have been awarded to individual staff members.

*Steady Staffing*: In a few discrete areas, the Department has started to steadily assign staff to specific areas. First, with the staff working with young adults as part of the RNDC Action Plan. Second, in July 2025, the Department identified about 80 staff to steadily assign to posts. Finally, DOC reports that at RESH, it attempts to assign the same staff to housing units in either Level 1 or Level 2.[466]

*Staff Efficiency Project*: The Department has undertaken a staff efficiency project, to return members of service to support facilities and housing areas to supervise incarcerated individuals and fill the Department's civilian roles with civilian personnel. The Department reports the goal of the SEC is to focus on prioritizing the Department's uniform staffing for assignments in the locations where they are most needed— in the jails. The Committee has developed a logical plan and taken initial steps to tackle many

---

[466] DOC reports that while staff will generally be assigned to work in the same Level of RESH, they may not be assigned to the same housing unit within each level for each shift they work.

of the underlying obstacles including evaluating divisions' use of uniform staff; eliminating unbudgeted civilian posts and evaluating civilian vacancies; improved oversight and management of uniform staff on temporary duty status; identifying roles where uniform staff are/are not necessary, improved tracking and management of vacancies and hiring needs and identifying requests for new needs.

## Scheduling

Correctional facilities are 24/7 operations and tours must provide for continuous coverage of housing unit posts, among others. In addition to operating multiple tours, correctional facilities must also rotate the days that staff work and the days they have off to ensure a sufficient number of staff are available to work each day. One of the Department's initial steps in addressing the requirements of the Action Plan was to procure roster management software to replace the legacy system that relied on manually created, often handwritten schedules in each facility. The Department procured InTime software and established the SMART Unit within the Office of Administration to centralize the function of creating facility schedules.

*Daily Shift/Tour*. New York Administrative Code § 9-116 requires the Department to operate three tours per day and Department leadership has discretion to set the start/end times of each tour. All tours in the facilities are 8.52 hours, or 8 hours and 31 minutes.[467] The additional time beyond the standard 8 hours is intended to provide sufficient time for Roll Call and staff's movement to their assigned post. Commands are reportedly no longer able to assign staff to "split tours" (meaning that staff work part of one tour and part of the next tour),[468] nor do they use "the wheel"[469] routinely (where staff rotate through the three tours throughout the week).

---

[467] The length of tour for those working in facilities is specified in Ops Order 2290, which references a Memorandum of Understanding with COBA from 1978. Tours for positions outside the facilities are 8.25 hours, or 8 hours and 15 minutes.

[468] Certain posts may operate on a "split tour" in situations where they are assigned to a specialized Division. For example, uniform staff who supervise education programming may be scheduled on a split tour to conform to school hours. These uniform staff are assigned to the Programs Division, which is authorized to set staff schedules that are commensurate with the activity they are supervising.

[469] Per an October 23, 2006 agreement between the Office of Labor Relations and the union for the ADWs, they agreed that New York Administrative Code § 9-116 (Three platoon system) does not "adversely affect Assistant Deputy Wardens in any manner, nor will the Department of Correction deviate from its long-standing past practice of not assigning Assistant Deputy Wardens involuntarily to steady tours of duty except as has been the past practice."

*Weekly Schedule*. Each week, the SMART unit sets the "Legal Schedule" for the following week which shows each staff member's post assignment each day. A staff member's availability to be scheduled on any given day depends on their schedule, their squad, and whether they are full-duty or on modified duty.

- *Schedule*. In terms of the days worked per week, staff are generally placed on one of two schedules: either a 4x2 schedule (four days on, two days off) or a 5x2 schedule (five days on, two days off). The 4x2 schedule results in a staff member's days off changing week-to-week while staff members on a 5x2 schedule have the same days off each week. In most correctional systems, in a given calendar year, staff assigned to the 5x2 schedule are typically scheduled to work 261 days, while staff assigned to the 4x2 schedule are typically scheduled to work 245 days. However, in this Department, the number of days worked per year is similar for staff on either schedule because the Department provides those on 5x2 with an additional 16 days of compensatory time (i.e., days off) per year to equalize the number of appearance days for all staff. By equalizing the number of days off, the Department's practice erases the benefit, in terms of the number of staff available, of staff working a 5x2 schedule. The Department has long reported that their ability to modify the 5x2 schedule (as a potential alternative to the 4x2 schedule) is limited by the collective bargaining agreement. However, the Department did not address this issue when negotiating the most recent contract with the Correction Officers' union signed in May 2024 (this is discussed in more detail in the compliance assessment of Action Plan § C., ¶ 3(vi)).

- *Squad*. All staff assigned to a facility are assigned to a "squad," organized according to the days off. There are currently 3 squads, reduced from the 9 squads that operated historically.[470] The purpose of having fewer squads is to enable a larger number of staff to be assigned to each squad, which maximizes coverage and provides greater flexibility when constructing the daily roster.

---

[470] The Department previously operated additional squads when they utilized a significant number of split or alternative tours. As the Department focused on utilizing just three tours, the number of squads were reduced accordingly.

- *MMR*. If staff have a medical condition that limits their ability to perform all job functions, DOC's Health Management Division ("HMD") designates the staff member as MMR ("Medically Modified Returned", or "light duty"). These individuals are still required to work, but they are assigned to posts that are less physically demanding. Previously, MMR had three designated levels that dictated what roles staff at each level were permitted to fill. A policy change in November 2023 collapsed the levels into a single designation, which created the ability to make more individually derived job assignments. After 90 days on MMR, HMD reviews the staff member's status if they have not already returned to full duty, and reviews again after 180 days if the medical condition persists. If the staff member is unable to return to full duty at that time, they are placed on sick leave, and Medical Incompetence/Medical Separation proceedings are initiated, where staff are separated from the agency because they are unable to perform the functions of their job title. Civil Service Law sets specific timelines for the amount of time staff may be out while pregnant, following an injury sustained during a use of force, being assaulted by a PIC, or when they are diagnosed with a serious illness.[471]

---

[471] New York Consolidated Laws, Civil Service Law - CVS § 71. Reinstatement after separation for disability Where an employee has been separated from the service by reason of a disability resulting from occupational injury or disease as defined in the workmen's compensation law, he or she shall be entitled to a leave of absence for at least one year, unless his or her disability is of such a nature as to permanently incapacitate him or her for the performance of the duties of his or her position. Notwithstanding the foregoing, where an employee has been separated from the service by reason of a disability resulting from an assault sustained in the course of his or her employment, he or she shall be entitled to a leave of absence for at least two years, unless his or her disability is of such a nature as to permanently incapacitate him or her for the performance of the duties of his or her position. Such employee may, within one year after the termination of such disability, make application to the civil service department or municipal commission having jurisdiction over the position last held by such employee for a medical examination to be conducted by a medical officer selected for that purpose by such department or commission. If, upon such medical examination, such medical officer shall certify that such person is physically and mentally fit to perform the duties of his or her former position, he or she shall be reinstated to his or her former position, if vacant, or to a vacancy in a similar position or a position in a lower grade in the same occupational field, or to a vacant position for which he or she was eligible for transfer. If no appropriate vacancy shall exist to which reinstatement may be made, or if the work load does not warrant the filling of such vacancy, the name of such person shall be placed upon a preferred list for his or her former position, and he or she shall be eligible for reinstatement from such preferred list for a period of four years. In the event that such person is reinstated to a position in a grade lower than that of his or her former position, his or her name shall be placed on the preferred eligible list for his or her former position or any similar position. This section shall not be deemed to modify or supersede any other provisions of law applicable to the re-employment of persons retired from the public service on account of disability.

*Anticipated Gaps/Changes to the Weekly Schedule.* Each week, the SMART Unit must make certain adaptations to the standard weekly schedule.[472]

- *Vacation/Training.* Staff members with approved vacation leave, compensatory time and scheduled training are rescheduled accordingly. SMART addresses anticipated gaps in coverage using voluntary overtime (i.e., a staff member volunteers to work an additional shift if needed).

- *Mutuals.* Staff are permitted to trade shifts with other staff assigned to their squad so that they are off on a day that they are scheduled to work. Because this is a shift-for-shift trade, staff working a tour on a mutual are not paid overtime (but would be paid overtime if they work beyond the tour which they were working a mutual).

*Unanticipated Gaps.* Unanticipated gaps in coverage emerge each day from staff calling out for their assigned shift. These are addressed by the Control Room Captain in each facility who either "shift reduces" or utilizes overtime to address the gap. Shift reducing means pulling staff from an ancillary post (e.g., escort staff) and assigning the staff member to a housing unit post. The Department reports that it tries not to shift reduce operations that impact minimum standards (e.g., recreation or visitation) although depending on the number of call outs, this does occur. Alternatively, the Control Room Captain may assign a staff member to work overtime to fill unanticipated gaps (the use of overtime is discussed in more detail below). If neither option is available, a housing unit post may be left "unstaffed" (i.e., no staff are assigned to work the housing unit floor and the people in custody are supervised only by the A-station officer, who is physically separated in a booth and not permitted to enter the housing unit floor during that tour).

- *Late & Time Due.* Staff may also come to work late either because of factors that delay their arrival to the facility or because they are owed "time due." Time Due is a sanctioned delay in arrival that occurs when a staff member previously

---

[472] Facility leadership manages daily scheduling and are required to document all changes to the published schedule in InTime, which the Office of Administration right? continuously monitors for accuracy and compliance.

worked a double shift—they are guaranteed at least 10 hours off before starting another shift. This is discussed in more detail in the "Overtime" section below.

- *Sick Leave.* When staff are ill or injured for one or two days, they must call HMD and advise that they will not be reporting to work as scheduled. If they remain unable to work for a third day, they must call a hotline staffed round-the-clock by HMD. As the staff member calls out sick for an increasing number of days, different requirements and restrictions apply. Staff who are designated "chronic sick" (i.e., those who call out more than 12 times in a 12-month period) must notify HMD on their *first* day of illness/injury. Those who call out sick frequently or for multiple days in a row may also be placed on home confinement (which has been discussed at length in various Monitor's reports).[473] When home confinement is imposed, staff members are expected to remain at their home throughout the day, except for a four-hour period. If the staff member has a medical appointment outside of the approved four-hour period, they must report the appointment and its location to the HMD hotline so that HMD may confirm it. HMD takes a variety of steps to determine whether the staff member is at home when required and imposes corrective action when staff violate the requirement.

- *FMLA.* Managing staff's use of FMLA is complicated. The Family and Medical Leave Act (FMLA) is a federal law that allows staff to take up to 12 weeks of leave each year without the risk of losing their job.[474] Although permissible, most of the Department's staff members do not utilize FMLA as a "block," taken all at once, such as for a pregnancy/birth of a child. Instead, most staff member utilize their leave intermittently, taking separate blocks of time off.[475]

---

[473] *See*, for example, Monitor's October 28, 2022 Report (dkt. 472) at pgs. 41 and 51 and November 22, 2024 Report (dkt. 802) at pgs. 18 to 19.

[474] While FMLA is a type of leave, it provides for an allocation of leave time but is *not* a source of funding. Salaries are instead covered by staff's accumulated vacation or compensatory time; if none is available, the staff is permitted to take unpaid leave. An individual staff's allocation (i.e., amount of time they may take off) is calculated each year, based on the number of hours worked in the previous year, to include both scheduled time worked and mandated overtime. At a minimum, a staff member must have worked at least 1,250 hours in the preceding year to qualify. At the minimum level, a staff member may be allocated 480 hours of leave, or roughly 60 8-hour tours.

[475] In general, intermittent FMLA leave may be used to: attend a medical appointment, address a flare up of or recovery from a health condition that makes staff unable to perform the essential functions of their job or to assist family members who need medical care for a serious health condition.

o The process for receiving an FMLA allocation involves an application in which a health care provider must certify the circumstances/condition (e.g., staff member's health need, or a sick child or parent's serious health condition) and the services to be obtained (e.g., medical appointments, physical therapy). Notably, certain conditions (e.g., back pain, migraines) may not require a medical visit/services. The application is submitted to HR, which reviews the documents and notifies staff of their eligibility/designation (i.e., approval), and if so, how many hours of FMLA leave have been approved and the period in which the leave may be used. Until very recently, when a staff member wished to use FMLA leave, they notified the Control Room Captain or Tour Commander, who must record the use of leave in InTime.

o The Department is taking steps to better regulate the process for applying for and using FMLA leave by:

   ▪ Revising and reissuing the FMLA policy, Directive 2266 "Family and Medical Leave Act (FMLA)." The new policy went into effect on June 15, 2025, although some of its requirements are being rolled out more gradually.

   ▪ Reformatting the FMLA Certification form (i.e., application) to require a health care provider to complete a large portion of the document, rather than the staff member completing the form and needing only a signature from the provider, as is current practice.

   ▪ Requiring official legal documentation of the staff member's relationship to the individual to whom they are serving as caregiver (e.g., birth certificate, marriage certificate, court order, etc.).

   ▪ Requiring staff to call in their use of FMLA leave to HMD. This policy provision went into effect on September 8, 2025. HMD will verify, in the moment, whether the staff member has FMLA hours available to use. If the staff member has exhausted their allocation,

HMD will deny the request and order the staff member to report to work.

- Creating an FMLA Dashboard for facility Control Room Captains' reference.

- Requiring the staff member to provide verification that they attended a medical appointment, once they return to work;

- Tracking staff member's use of FMLA leave via InTime. For the future, the Department is also considering the use of an outside vendor for this purpose.

- If a staff member calls out for a scheduled tour, these hours will be deducted from the staff member's FMLA balance and will be deducted from the formula used to calculate the next year's allocation.

- If a staff member utilizes FMLA leave frequently and/or for a long period of time, the Department may (a) require the staff member to have a doctor recertify their condition/appointment schedule every 30 days; (b) conduct a "fitness for duty" evaluation to ascertain whether the staff member's condition substantially interferes with their ability to execute essential job functions. The outcome of these certifications and evaluations may result in removal of FMLA and/or evaluation of whether the staff member may continue to work at the Department.

- *Personal Emergency*. When a staff member has a personal emergency (e.g., emergency medical situation for a family member, car trouble, burst pipes, etc.), they must notify the Control Room Captain that they are unable to report to work as scheduled and the reason why. The Control Room Captain may approve or deny the request. If approved, the staff member must contact the Control Room Captain every two hours to update their status and when they will be able to report for duty. If the Control Room Captain does not approve the request, the

staff member must report to work. If the staff member does not report, the staff member must provide the facility with documentation verifying the emergency (e.g., emergency room documentation, receipt from mechanic or plumber, etc.) on their next scheduled workday.

> o *Pilot Initiative.* For three select facilities, the Office of Administration is now responsible for reviewing the required paperwork related to Personal Emergencies in order to ensure that staff who obtain leave for a personal emergency are, in fact, entitled to it. The Office of Administration requests copies of all such documentation from the facility and if it has not been produced, the staff member is given a Command Discipline.

- *AWOL.* A staff member is considered Absent without Leave ("AWOL") if they do not call out for their tour and do not report for duty as scheduled. The facilities' Control Room Captains are responsible for tracking staff's AWOL frequency in a designated logbook and entering the information into InTime. In 2021, the Department struggled with a surge of staff on AWOL,[476] which has since subsided. The Office of Administration began tracking AWOL occurrences in March 2025.

<u>*Tour Certification*</u>. When changes are made to the Legal Schedule to address any staff callouts or other gaps in coverage, the Control Room Captain is required to enter these changes into InTime as they occur. At the end of each tour, the Tour Commander completes a hard-copy Tour Certification form containing the same information. Ideally, InTime and the Tour Certification should be congruent when reconciled. The Tour Certification is the legacy system and will eventually be phased out with a digital version.

Shortly after InTime was introduced, the Office of Administration began routine audits of both InTime and the Tour Certification forms. Once a level of facility proficiency was reached, the audits were discontinued. In January/February 2025 in response to new concerns, the Office of Administration resumed its daily assessment of InTime and the Tour Certification to ensure accurate data entry. Further, following the

---

[476] *See* Monitor's August 24, 2021 Report (dkt. 378) at pg. 4.

close of the Monitoring Period, a Deputy Warden of Administration was assigned to each command and is responsible for reviewing the Tour Certifications, overtime usage, and reconciling any schedule changes with the needs of the facility. The DW of Administration meets daily with the DC of Administration. The DC of Administration reviews the command's operations with the DW and provides training, guidance, and mentorship in an effort to support and improve staff management and consistency across the facilities.

## Overtime

Staff are required to work 8.52-hour tours, five times per week, but they may also work additional tours (i.e., overtime). Overtime is calculated on a daily basis, meaning that staff are paid "time and a half" for working more than 8.52 hours in a 24-hour period. Staff may be compensated for working overtime either with additional pay or by accruing Compensatory Time (i.e., time off), and staff indicate their choice when completing their hard-copy, handwritten overtime slip. As noted above, staff may volunteer to work overtime but they may also be *mandated* to work overtime.

*Scheduled Overtime*. The Department can pre-schedule overtime to fill anticipated gaps in the schedule. SMART can schedules volunteer ("VOT") and mandatory ("MOT") overtime in advance.

*Mandatory Overtime*. If an insufficient number of staff have volunteered to work overtime and the daily roster continues to have gaps in coverage, staff may be mandated to work overtime. In order to determine who will be mandated to work overtime, a Captain in each facility's Personnel Office uses InTime to generate a list of staff members assigned to the tour/squad and the number of overtime hours each has accrued during the month (i.e., the "stick list"). The stick list is supposed to be posted in the Control Room window during each tour to bring transparency to the process. By policy, the Control Room Captain must use this list to assign overtime shifts to the staff members who have worked the fewest overtime hours so far during the month. However, exceptions and deviations do occur, some of which may not be legitimate, which undercuts the fairness of the process.

*Overtime Targets*. The Department's policy permits staff at each rank to work a certain number of overtime hours each month—57 hours for officers, 46 hours for Captains, and 42 hours for ADWs. Given the current rates of absenteeism, these targets are routinely exceeded by most staff each month. In an effort to ensure that overtime is distributed equitably, the Office of Administration restricts the amount of overtime that the top ~100 overtime earners can/must work during the subsequent month. If a staff member reappears among the highest overtime users in successive months, they may be "restricted to zero," meaning that they are not permitted to work any overtime in the subsequent month without permission from the Office of Administration.

*Time Due*: If a staff member works more than four hours of an overtime shift, the Department must provide a minimum of 10 hours off duty before requiring the staff member to report for their next scheduled tour. This is a legitimate accommodation for staff members who work additional hours in a 24-hour period. However, this protection does have a corresponding impact on subsequent tours. If a staff member works an overtime shift and is scheduled to work another shift that starts 8 hours later, that staff member is permitted to arrive two hours after their scheduled shift begins, to ensure the full 10 hours off duty. When this occurs, another staff member must cover the assigned post until the staff member with time due reports for duty.

*Overtime Pay & Management*. Overtime is not paid until the staff member's overtime slip is approved. Overtime timesheets are handwritten and manually entered into the City's Timekeeping software (discussed in more detail below). Overtime is managed by four different entities within the Department – the facilities (which assign mandatory overtime and sign overtime slips), the Office of Administration (which schedules staff to work voluntary overtime, sets overtime restrictions for individual staff members, and approves subsequent overtime for those with restrictions), Finance (which set overtime targets), and Human Resources (facilitates payment for overtime). OMAP recently created a dashboard that permits the Department to evaluate overtime accruals for individual employees. While the Department has been working to improve the assignment and administration of overtime, the current process continues to have some inefficiencies and staff continue to report unequal/unfair overtime assignments.

**Time Keeping**

The process for recording the number of hours worked by each staff member and entering the information into the City's timekeeping software depends on a variety of both modern, automated systems and antiquated handwritten records.

*ID Scanning.* When a staff member reports to work and leaves at the end of their tour/overtime shift, they scan the barcode on their Department ID. The scanning software records the actual time that the staff member enters and exits the facility. The scanning software is a separate platform from the scheduling software, InTime, and from the timekeeping software, CityTime. The IT Unit maintains the operability of the scanning system, manages the data, and ensures facility staff are trained to use the system. The Timekeeping Unit in Human Resources accesses the scanning data in its efforts to reconcile the information necessary to run payroll, described in detail below. While the scanning system began as a pilot, all facilities are now expected to utilize it. Reportedly, some commands resist this innovation and would prefer to utilize the legacy handwritten sign-in sheets.

*Payroll Data Entry.* The Timekeeping Unit within the Human Resources division enters the hours worked by officers, Captains and ADWs into the City's timekeeping software, CityTime. The process for collecting, organizing and entering the information relies on a combination of electronic data from InTime, the manually created Tour Certification, the legal schedule and handwritten slips completed when staff work overtime, take intermittent FMLA or Personal Emergency leave. Each day (except on holiday and weekends), uniform staff assigned to HR travel to each facility on Rikers Island to retrieve a "green bag" of documentation. [477] Timekeepers assigned to each command must first organize the information from the "green bag" and then reconcile the handwritten slips with the Tour Certification and In Time. The DWs of Administration are responsible for managing this effort to address any missing information or other issues with the paperwork in order to more efficiently manage the overtime paperwork. Furthermore, the Department reports that sometimes commands do not always have sufficient staff available to create and organize the paperwork, leading to delays in

---

[477] Uniform staff from commands located off-island drop off and pick up the green bags.

preparing the "green bag" which cascade into significant pressure on the timekeepers to meet the data entry deadlines required to produce staff members' paychecks on time. Once reconciled, the information is manually entered into CityTime by the assigned timekeepers. The Timekeeping Unit has multiple vacant positions initially created by the redeployment of its uniform staff to the facilities and then exacerbated by delays in obtaining authorization to fill the civilian positions intended to replace them. More recently, the hiring pool is very small, with few qualified applicants. The Department reports that a lack of salary parity with Timekeeping positions in other city agencies is also a barrier to filling the unit's vacancies.

## **Approvals for Hiring**

The Department's ability to recruit and hire staff necessarily requires coordination with agencies outside of the Department. In particular, the Department's hiring and promotion efforts require consultation and a variety of different approvals from the City's Office of Management and Budget ("OMB") along with other agencies such as DCAS and the Mayor's Office of Appointment. The process for approving of hiring is complicated and protracted. There are a variety of bureaucratic hurdles. These issues are further compounded by long standing budget cuts and ongoing denial of requests for new needs. Further, many of DOC's civilian positions are not competitive in the marketplace.

# APPENDIX L:
# ILLUSTRATIVE CASE EXAMPLES

**Illustrative Example 1: UOF Incident on Dorm Unit in March 2025**

In March 2025, in a Dorm Unit in OBCC, several individuals in custody began to assault another individual repeatedly. The floor Officer failed to intervene promptly, moving about the housing area without urgency and without deploying chemical agents or taking other effective action to stop the assault. When the Officer eventually escorted the victim toward the housing area's door, individuals again rushed toward the victim and delivered further blows, prompting more staff to respond. Staff arrived to secure the area, but several individuals refused orders to return to their beds. Staff then deployed chemical agents on the passively resistant individuals from a distance of less than 3 feet, and utilized an MK-9 canister, which is prohibited. Most individuals refused medical evaluation, but those who obtained medical treatment had reported injuries, including mild swelling to one person's cheek, a small abrasion to the forehead, and a delayed report of hand pain that required treatment.

The Rapid Review found the floor Officer did not act promptly to quell the initial fight, and another staff member failed to open the door to allow the victim to exit during the disturbance. The Investigation Division identified several policy violations, including a failure to activate a body-worn camera, a missing required witness report, an officer's omission of force used during the escort, and the improper use of an MK9 chemical agent when a lower-capacity device was available. Corrective actions included a command discipline, a corrective interview, documented counseling, and a facility referral to address the identified deficiencies.

Below are screenshots with descriptions of the incident.

Multiple individuals assault another individual while the officer looks on.



The victim is taken to the vestibule, where he is assaulted again, and the officer fails to intervene with urgency.



When the victim is removed from the area, additional staff arrive. An officer deployed chemical agents on passively resisting individuals.



A Supervisor also deploys chemical agents on a passively resistant individual.



**Illustrative Example 2: UOF Incident on Dorm Unit in February 2025**

In February 2025 at EMTC, a fight broke out between individuals in the bathroom area of a dorm housing unit when no officer was supervising the housing area (i.e., the B post was temporarily unmanned). The A station officer entered the housing area. When the officer stepped out of the A station, she failed to secure the door behind her. Once in the housing area, the A-station officer escorted a victim out of the area. The victim had a severe injury to the face with active bleeding, which can be seen on video. Additional staff arrived and escorted the victim out of the area. During this response, another individual in custody left the housing area without authorization, stood in the vestibule, and told a responding supervisor that he wanted to be rehoused. An officer then arrived, applied restraints, and escorted that individual through multiple corridors and stairwells toward another housing area, at times maintaining only a one-hand escort hold. Staff paused outside of a different housing area to wait for the housing area door to be opened. As the door was unlocked, the individual immediately pulled away from the staff. The officer pulled him toward a wall and secured him against it while the individual twisted and turned in resistance. While being held by the wall, the individual began banging his head against the surface, causing staff to briefly pull him away from the wall. The self-injurious behavior was not reported, and despite such behavior, the individual was not kept under continuous observation. The individual was later taken to a holding pen and produced for delayed medical evaluation more than eight hours after the incident, where he refused medical care.

The Rapid Review identified an unsecured control booth door, an unmanned housing area, an improper escort hold, and a failure to provide timely medical attention and respond appropriately to self-harm. The Investigation Division issued a facility referral for delayed medical care, missing staff reports, failure to secure the control booth door, and failure to report and monitor the individual's self-injurious behavior.

Below are screenshots with descriptions of the incident.

Multiple people in custody leave the bathroom after assaulting an individual



The victim of the assault crawls out of the bathroom. The A station officer arrives.



While in the vestibule, the victim's face can be seen severely injured with active bleeding.



Body worn camera further captured the extent of the individual's facial injuries.



**<u>Illustrative Example 3: UOF Incident on Dorm Unit in February 2025</u>**

In February 2025, a large-scale fight involving approximately 18 individuals erupted in a dorm unit at OBCC. Multiple participants armed themselves with institutional canes and improvised weapons. Video shows individuals striking each other repeatedly in the head and torso while the floor Officer attempted to intervene. The floor officer issued verbal commands but did not immediately deploy chemical agents, despite escalating assaults. As the violence continued, staff eventually used OC spray and physically disarmed one individual who was striking another with a cane, while others fled into the vestibule when the housing area door briefly opened. Several individuals sustained significant injuries, including facial and scalp lacerations requiring sutures and arm swelling requiring imaging, while others refused medical evaluation.

The Rapid Review and Investigation Division identified violations related to delayed use of chemical agents, missing incident photographs, and staff profanity captured on body-worn camera.

Below are screenshots with descriptions of the incident.

A large-scale fight erupts, and several individuals can be seen holding items like canes.



Several minutes later, in the corner of the housing area, an individual is assaulted.



Shortly thereafter, another 3 individuals are assaulted near the housing area door.



503

A separate individual is then assaulted in front of the housing area.



Another individual is assaulted.



The individual is dragged by his hair to the front of the housing area.



About 5 minutes after the large-scale fight broke out, additional staff arrived and secured the area.



**<u>Illustrative Example 4: UOF Head Strike Incident in April 2025</u>**

In April 2025, in the OBCC Visit Area, an individual in custody refused multiple staff orders to leave after his visit concluded, leading several officers and a supervisor to attempt verbal de-escalation for nearly twenty minutes. When an officer approached, the individual stepped toward him and pushed him in the chest, causing the officer to stumble backward and drop his gas mask. Staff then used force to restrain the individual. Video shows an officer delivering head strikes, another officer delivering a knee strike to the individual's head while he was hunched over, and multiple officers holding the individual by the head, upper body, and legs as they attempted to bring him to the ground and apply restraints. Once restrained, the individual was escorted to Intake, where he complained about staff actions but refused medical evaluation; no injuries were documented despite multiple head strikes captured on video. The officer utilizing head strikes reported sustaining a fracture to his right hand.

The Rapid Review identified violations including failure to activate body-worn cameras, improper use of head and knee strikes, and multiple head strikes by staff. ID found serious misconduct, resulting in suspensions for two officers for delivering prohibited strikes and failing to activate required video equipment.

Below are screenshots with descriptions of the incident.

The individual refuses to exit the visiting area.



Staff and the individual get face-to-face, and the individual pushes the staff.



The staff pushes the individual back and delivers a head strike



Another Officer gets involved and knees the individual in the head.



The first officer appears to pull his arm to deliver additional head strikes.



**Illustrative Example 5: UOF Head Strike Incident in May 2025**

In May 2025 in a housing unit at OBCC, an altercation occurred when an officer was not present in the housing area. One individual slapped another near the shower area, prompting the second individual to throw objects and later retrieve a broom from an unsecured janitor's closet. The individual struck the first person with the broom, breaking the handle, after which the first individual pursued him and repeatedly punched him in the face and cornered him against a wall. When an officer entered the housing area to intervene, the broom-wielding individual suddenly punched the officer in the face, leading the officer to grab the individual's shirt and deliver several closed-fist strikes to his head and face before securing him against the wall. A third individual then picked up the broken broomstick and struck the restrained individual in the head twice as the officer attempted to escort him out of the housing area. All individuals in custody involved refused evaluation, and none had visible injuries. The officer reported tenderness and swelling.

The Rapid Review classified the incident as avoidable, citing the unsecured closet, the officer being off-post, and the use of facial strikes. The investigation by the Investigation Division is pending.

Below are screenshots with descriptions of the incident.

509

Near a shower area, an individual hits another individual in the back of the head.



The initial victim then gets a broomstick and assaults the first individual. No officer is present to intervene.



The first individual then corners the initial victim and strikes him in the head.



The B-post officer arrives at the area, and the initial victim assaults the officer.



The officer throws close fist strikes at the individual.



**Illustrative Example 6: UOF Head Strike Incident in June 2025**

In June 2025, staff approached the cell of an individual who had tied an institutional shirt around his neck and secured it to the cell window. As soon as staff opened the cell, the individual untied the shirt and threw it toward an officer, after which the officer immediately entered the cell and delivered a closed-fist strike to the back of the individual's head, followed by multiple additional striking motions while the individual backed against the wall in a defensive posture. Several officers then entered the cell, applying force that included head-area pressure, and multiple closed-fist strikes to the torso. Multiple staff used profanity such as "turn the f*** around," which was captured on body-worn camera. Supervisors were present throughout the incident, with video capturing the supervisor saying "not in the face" as officers continued to strike the individual. The supervisor then looked directly at the body-worn camera before it was deactivated. Medical staff later documented visible injuries to the individual's torso, rib area, arm, and scalp, and noted delayed production for medical evaluation; no staff injuries were reported.

The Rapid Review flagged violations of the directive for unnecessary, excessive, and impermissible force and referred the matter to the Investigation Division. ID directed suspensions for the supervisor, and all involved officers were suspended. The investigation is still pending.

Below are screenshots with descriptions of the incident.

An individual crouches down with a shirt wrapped around his neck and tied to a window.



Staff enter the cell, and the individual stands in the middle of the pen.



The officer immediately throws a closed fist strike at the individual's head.



The officer throws another strike at the individual's head.



Staff take the individual down and press his head against a bed frame.



Another Officer throws a strike against the individual's body.



**<u>Illustrative Example 7: UOF Narcan Incident in January 2025</u>**

In January 2025 in a celled housing unit in RESH, an individual who had been released for a shower was observed openly handling and exchanging items that had been pushed under cell doors and appeared to ingest an unidentified substance before entering the shower area. Shortly afterward, he collapsed and rolled on the shower floor while officers stood outside the gate. Officers on body-worn camera remarked that the individual "took something" as he displayed signs of a potential overdose. Officers did not intervene to administer Narcan or other aid. When medical staff arrived and administered two applications of Narcan, the individual suddenly regained consciousness and broke free from the officers assisting him and assaulted a nurse by grabbing and pushing her into the wall. Multiple officers then used force, including control holds to the upper and lower body, as the individual continued kicking, twisting, and resisting while staff struggled to restrain him on the wet floor. After mechanical restraints were applied, the individual continued kicking while on the gurney until staff secured his legs for transport to the clinic. Medical staff later documented abrasions to the individual's shin, shoulder, and knee; no staff injuries were reported.

The Rapid Review identified failures to render timely aid during the medical episode and supervisory lapses, resulting in corrective interviews and command disciplines. The Investigation Division determined the force itself was minimal and necessary to stop the assault on medical staff, but issued referrals for failures to activate body-worn cameras and for incomplete staff reports.

Below are screenshots with descriptions of the incident.

The individual can be seen picking up contraband that was passed from under a cell door



The opposite camera angle partially shows an Officer seated at the B post desk.



Another camera angle fully captures the Officers by the B post desk, not supervising or intervening in the individual's activity.



The individual then goes to the shower area.



Approximately 11 minutes later, BWC captures the individual writhing on the ground.



Medical staff arrive as foam appears to come from the individual's mouth.



Medical staff, unwrap and apply Narcan.



The individual wakes up after the Narcan application and resists being restrained.



The individual is ultimately secured and removed from the area.



518

**<u>Illustrative Example 8: UOF Prohibited Hold Incident in March 2025</u>**

In March 2025 in a celled housing area at GRVC, an individual was standing in the rear of the housing area. An officer approached him and individual threw a closed-fist strike. The officer and the individual then proceed to exchange multiple strikes and grapple with one another. Additional officers arrived, and one officer placed the individual in a headlock while another delivered several closed-fist body strikes. The group then took the individual to the floor, where an officer maintained a forearm across the individual's head and neck area for approximately 50 seconds before repositioning and continuing to apply pressure. Staff eventually applied mechanical restraints, moved the individual to the wall, and escorted him through the vestibule to Intake, during which the individual twisted away from an escort hold but stopped resisting when officers secured a two-officer escort. The individual refused medical evaluation and had no visible injuries, while one officer reported tenderness to the bridge of the nose and wrist consistent with the earlier exchange of strikes.

The Rapid Review deemed the incident unavoidable, but referred it to the Investigation Division due to the use of multiple head strikes and the prolonged forearm pressure on the head and neck, which raised concerns about a prohibited neck restraint and potential positional asphyxia. The Full ID is pending.

Below are screenshots with descriptions of the incident.

An individual stands in the corner of the housing area.



An officer approaches and they exchange closed fist strikes.



Another officer arrives and engages in body strikes against the individual.



The officer uses a headlock to take the individual to the ground.



Once on the ground, an officer applies his forearm to the individual's neck for 50 seconds.



The individual is eventually restrained and removed from the area.



**<u>Illustrative Example 9: UOF Prohibited Hold Incident in June 2025</u>**

In June 2025 in West Facility, two officers entered a cell to provide commissary and retrieve an unauthorized plastic bag from an individual who uses a wheelchair. Staff communicated in a hyper-confrontational manner, including the use of derogatory comments captured on body-worn camera. After staff exited the cell, the individual walked toward the door, and an officer abruptly re-entered, took the individual down onto the bed, and applied force that included wrapping his arms around the individual's neck area, grabbing his hair, and delivering a strike to the side of the face, actions partially visible on video. One officer who entered the cell with a BWC appears to turn away from the incident, so it is not captured on camera. Another officer comments, "camera on" during the incident. The officer then secured the individual in rear wrist restraints while making additional inflammatory comments and later kicked the individual's wheelchair as they exited the cell. A response team escorted the individual to Intake. During the transport, BWC captured the individual in custody stating, "he choked me up, put me in a headlock, he's done, he said he was going to kill me." Medical staff documented no visible injuries, though the individual reported neck pain.

The Rapid Review referred the incident to the Investigation Division. The officer was issued a two-day suspension, and the Full ID investigation is pending.

Below are screenshots with descriptions of the incident.

After entering and retrieving a bag from the cell,
BWC captures the officer re-entering and grabs the individual who resides in the cell.



Another officer enters the cell and sees the first officer engaging in the force.



The officer turns away from the altercation and can be heard saying, "camera on".



Another officer's camera shows the first officer on top of the incarcerated individual.



The officer approaches the altercation, and the first officer can be seen on top of the incarcerated individual.



The officer's hands appear to be around the individual's neck.



The individual is secured and removed from the area. BWC captured the individual stating, "he choked me up, put me in a headlock, he's done, he said he was going to kill me."



**Illustrative Example 10: UOF & Self-Harm Incident in March 2025**

In March 2025 in a housing area in GRVC, an officer was assigned as an "ESO" (Enhanced Suicide Officer) to supervise an individual on suicide watch. Stationary video captured the officer playing dominoes with another individual in custody rather than supervising the individual on suicide watch. Meanwhile, the individual on suicide watch tied a torn piece of institutional clothing tightly around his neck. Another incarcerated individual alerted the officer to the individual's behavior. The officer eventually approached the cell, and the individual refused orders to remove the ligature. The officer entered the cell, deployed chemical agents, and pulled the individual off the bed, while another officer cut the cloth from his neck with a 911 knife. The individual was then escorted out for decontamination and placement in a holding pen. Medical staff later documented abrasions on the individual's forearm, though the individual was not promptly produced for medical evaluation. No staff injuries were reported. The Rapid Review determined the incident was avoidable and identified concerns with the officer's inattention to the housing area and failure to maintain proper observation of a person on suicide watch. The Investigation Division identified violations for delayed medical attention and insufficient detail in staff reporting

The Rapid Review determined the incident was avoidable and identified concerns with the officer's inattention to the housing area and failure to maintain proper observation of a person on suicide watch. The Investigation Division identified violations for delayed medical attention and insufficient detail in staff reporting, resulting in a facility referral and recommended discipline.

Below are screenshots with descriptions of the incident.

An officer responsible for constant watch of a cell is instead at a table playing dominoes.



Another incarcerated individual looks inside the cell.



The individual alerts the officer to what he saw inside the cell.



528

The officer opens the door and looks inside.



The officer deploys chemical agents and enters the cell, while another officer arrives.



The officers pull out the individual and use a 911 knife to cut an institutional uniform tied around the individual's neck.



The individual is then restrained and removed from the area.



**<u>Illustrative Example 11: UOF & Self-Harm Incident in May 2025</u>**

In a housing area in GRVC, an individual deliberately prepared to hang himself in clear view of multiple officers, tying a sheet around his neck, climbing onto a TV mount, and securing the ligature to the upper-tier railing while staff failed to intervene with any sense of urgency. Rather than immediately cutting the ligature, officers deployed OC spray as the individual was hanging and partially suspended from the TV mount. The individual was ultimately taken down after another individual in custody lifted his legs so staff could cut him down, resulting in the individual falling to the ground and convulsing. While the individual is on the floor, a Captain enters the housing area, and BWC captures him yelling, "Bring that dumbass outside, bring him out here, bring him outside." The individual coughs from the impact of the chemical agents, and the Captain can be heard saying, "Somebody grab a shirt for him. Don't give him no water." Once restrained near the housing area door, one officer is captured on BWC saying "All that for a female" and the Captain is captured saying "You gotta hang up every day then, because you not gonna get a female anytime." Medical staff documented a visible ligature mark on the neck.

The Rapid Review deemed the force unavoidable but issued counseling for the officer's use of profanity. The Investigation Division identified serious staff misconduct, including delayed response to self-harm, reliance on chemical agents as an initial intervention, inaccurate reporting, use of inappropriate language by staff, and referrals for retraining on timely response to self-injurious behavior.

Below are screenshots with descriptions of the incident.

An individual in a grey shirt picks up a sheet from the ground.



The individual climbs the left side of the tier with the sheet in hand. Staff do not respond with any urgency.



The individual ties the sheet to his neck and the top-tier railing. He stands on top of a TV fixture.



The individual gets off the TV fixture and hangs from the railing.
An officer deployed chemical agents.



Another officer uses a 911 knife to cut the sheet from the railing.



Other incarcerated individuals help prevent the individual from hanging.



The individual falls to the floor, and the other individuals walk away due to the chemical agents' impact. While the individual is on the floor, a Captain enters the housing area, and BWC captures him yelling, "Bring that dumbass outside, bring him out here, bring him outside."



The individual eventually gets to his feet and departs the area. The individual coughs from the impact of the chemical agents, and the Captain can be heard saying, "Somebody grab a shirt for him. Don't give him no water".



Once restrained near the housing area door, one officer is captured on BWC saying "All that for a female" and the captain is captured saying "You gotta hang up every day then, because you not gonna get a female anytime".



**Illustrative Example 12: UOF & Self-Harm Incident in November 2024**

In November 2024 at GRVC Main Intake, two individuals in custody engaged in self-harm, one cutting his forearms with an unknown object and another tying institutional linen around his neck and securing it to a vent. Staff were outside the pen and were visible on video walking through the area and conversing, appearing not to recognize the escalating behavior in the Intake Pen. After several minutes, staff finally approached, observed the ligature and the ongoing cutting, and issued orders for the individuals to stop. An officer opened the pen and deployed chemical agents toward the individual with the linen. Staff then entered the pen and cut the ligature with a 911 knife. When both individuals refused orders to lie on the floor, officers guided them down using control holds, including one officer briefly placing a knee on an individual's back while securing restraints. Medical staff later documented superficial lacerations on the forearms of the individual who had been cutting himself, while the other individual was referred for suicide risk assessment. The Rapid Review found the incident avoidable due to the delay in staff detecting the self-harm, the failure to search the individuals before placement in the pen, and the brief knee placement, leading to a corrective interview and retraining. The Investigation Division further identified for missing staff reports and staff use of profanity captured on body-worn camera.

The Rapid Review found the incident avoidable due to the delay in staff detecting the self-harm, the failure to search the individuals before placement in the pen, and the brief knee placement, leading to a corrective interview and retraining. The Investigation Division determined the force was minimal and necessary to stop active self-harm, but issued a facility referral for missing staff reports and profanity captured on body-worn camera.

Below are screenshots with descriptions of the incident.

Video captured the intake area filled with numerous staff and individuals.



An individual in a pen begins cutting his arms.



Approximately five minutes later, an individual stands in front of the pen and appears to point inside.



Staff do not enter the cell or look inside.



The individual continues to cut himself while another individual stands by a vent with a piece of cloth around his neck that is tied to the vent.



Approximately 2 minutes later, an officer and supervisors stand in front of the pen.



A few seconds thereafter, an officer deploys chemical agents and enters and uses a 911 knife to cut the cloth affixed to the vent.



The officer directs both individuals to the ground and places his knee on the back of the individual who attempted to hang himself.



**<u>Illustrative Example 13: Serious Injury to Incarcerated Person in October 2025</u>**

In October 2025, a serious injury to an incarcerated person occurred in a housing area at GRVC after an officer opened a cell door on the upper tier and allowed multiple individuals in custody to freely exit/enter cells and move about the tier. The video shows two individuals entering the cell and remaining inside unsupervised. About one minute and 15 seconds after the individuals entered the cell together, an officer opened the cell and addressed the individuals, but no one exited the cell. The officer then sat at the B-post desk. The video at this time captured other individuals in the same cell, indicating that the officer failed to address this issue on multiple occasions. Approximately two minutes after sitting at the B-Post desk, an individual in custody appeared to alert the Officer to check on the same cell. When the officer returned to the cell and opened the door, the perpetrator exited the cell with blood on his clothing. The officer then entered the cell, and body-worn camera video captured the victim of the assault, seated and the victim exited the cell with blood on his clothing and severe facial injuries. Medical staff documented extensive injuries, including a forehead hematoma, a periorbital hematoma with the eye swollen shut, facial lacerations, and a fractured nasal bone, requiring hospital treatment.

The Investigation Division substantiated misconduct related to the officer's failure to maintain cell security and supervision and the officer received a seven-day suspension.

Below are screenshots with descriptions of the incident.

539

An officer opens the cell door and lets an individual out.



The officer walks away from the cell.



A few seconds later, the individual released from the cell goes into cell next door. Two individuals are now in the cell together.



About one minute and fifteen seconds later, the officer returns to the cell with the two individuals inside, opens the door, and addresses the individuals inside. However, the individuals remain in the cell together.



The officer sits back at the B post.



While the officer is at the B post desk, another individual looks into the cell with the two individuals.



That individual goes into someone else's cell
in another instance of multiple individuals inside one cell.



About two minutes after the officer has been seated at the B-post desk,
an individual in custody appears to inform the officer to check the cell with two individuals
inside.



The officer goes to the front of the cell and looks inside.



The perpetrator steps outside of the cell and walks away.



Body Worn Camera captured images of the victim inside the cell.





Multiple supervisors arrive in the area.



The victim is escorted out of the area.



**Illustrative Example 14: UOF Serious Injury to Staff in February 2025**

In February 2025, in the OBCC mess hall during dinner service, an individual in custody suddenly ran up from behind and struck an officer in the head with his fists without provocation and while dozens of other individuals were present. The officer immediately collapsed face-down to the floor and appeared to be unconscious. Multiple officers responded at once, deployed chemical agents on the assailant, and took him to the ground to apply restraints, while other staff moved to assist the injured officer. As the assailant was being restrained, several nearby individuals attempted to advance toward and assault him, requiring officers to physically intervene and use chemical agents on additional individuals to secure the area and push the crowd back. More officers arrived and carried the injured officer out of the mess hall, while other staff separately escorted the restrained assailant from the area. Residual chemical agents caused coughing and irritation among individuals remaining in the mess hall. Medical evaluation confirmed the officer sustained severe head and facial injuries, including significant swelling and trauma requiring hospital transport and subsequent admission to intensive care.

The Rapid Review determined the incident was unavoidable and found that staff used force appropriately and promptly in response to an unprovoked assault in a large, crowded setting. The Investigation concluded that the force used was necessary and proportional to stop the assault and restore order, and the assailant was later criminally charged and disciplined for the attack.

Below are screenshots with descriptions of the incident.

The video captures many individuals in the Mess Hall for dinner, with Staff actively supervising.



An individual who is seated at a table stands up.



The individual suddenly runs toward an officer



The individual jumps and strikes the officer from behind.



The officer drops to the ground and appears to go unconscious.
The perpetrator is taken to the ground and restrained.



Other individuals began to assault the perpetrator while he was restrained.



The officer is carried out of the area while the area is secured.



**Illustrative Example 15: UOF Incident in December 2025**

Staff were escorting a fully restrained individual back to his housing area when he dropped to the floor in the housing vestibule, refused orders to stand, and began convulsing multiple times. Staff appeared to dismiss this behavior as malingering. In full view of six other officers, a correction officer sought entry into a sanitation closet although the door had already been secured, and a key was used by another officer to open the door. Although in a blind spot for stationary cameras, the officer who sought entry into the closet was captured on body-worn camera with his left leg bent and he appeared to be spraying chemical agents onto the sole of his shoe in the sanitation closet. The officer immediately thereafter exited the closet and stood immediately adjacent to the individual who was still fully restrained on the floor and placed the contaminated left boot next to the individual's face. Although the chemical agents did not appear, at that time, to affect the individual, surrounding staff began coughing while collectively pretending that no OC spray had been deployed. A few moments later the individual began convulsing and staff turned him on his side and moved him closer to the sanitation closet and nearer to what appeared to be orange boot prints on the floor in front of the closet. The individual can be heard on video claiming that there is OC on the floor. The same officer was then captured on body-worn camera applying a painful wrist-bend technique to the individual who screamed in pain. The officer calmly instructed the individual, "Don't resist, sir."

This incident is currently under investigation by the Investigation Division.

Below are screenshots with descriptions of the incident.

The individual is on the ground in the vestibule.



One officer requests to enter the janitor's closet to ensure it is secured, despite it already being locked. An officer uses a key to open it.



An officer enters the Janitor's closet and raises his leg.
The sound of chemical agents spraying is captured by the BWC.



The officer exits the closet and puts his boot heel near the individual's face.



The same officer then goes back to the janitor's closet, raises his leg again, and the sound of chemical agents spraying can be heard.



The officer begins to cough and at this point says "Man, this cold"



The Officer then hovers his OC covered boot near the individual's face.



Chemical agents can be seen on the smeared around the floor.



The officer again puts his boots near the individual's face.



While the individual is on the ground, the officer bends his wrist.



He does this again while the individual yells "you're breaking my wrist."
The officer responds "Don't resist sir".



The individual is eventually placed on a gurney with a spit mask.



**<u>Illustrative Example 16: UOF Incident in December 2025</u>**

Staff attempted to escort a restrained individual back to the holding area after court. The individual resisted by twisting and pulling away, eventually breaking free, but was then taken down to the ground by staff. Body-worn camera footage captured one officer (whose camera was improperly attached to his uniform and partially obstructed) yelling, "Don't leave marks," followed by visual footage of another officer apparently kicking the individual while he was restrained and on the ground. Once staff appeared to recognize the presence of the camera, they then began referencing a "face injury" and a "finger injury," that the staff allegedly sustained during the takedown.

The officer who engaged in the kick was suspended for thirty days. This incident is currently under investigation by the Investigation Division.

Below are screenshots with descriptions of the incident.

The BWC video opens partially obstructed.
The officer runs toward a use of force occurring during an escort.



As the officer gets closer to the use of force, BWC captures her saying, "don't leave no marks" while the individual is on the floor with one shoe and his legs and hands cuffed.



The BWC captures an officer raising his leg while the individual is down.



Then he drove his leg down and kicked the individual.



The individual is then escorted out of the area by the probe team.



**<u>Illustrative Example 17: UOF Incident in February 2025</u>**

In February 2025, in an OBCC housing area, officers conducted a series of cell searches during which two incarcerated individuals refused to comply with staff orders. During the search of his cell, one individual refused orders while undressed. Despite no observable threat, the officer deployed chemical agents. In his report, the officer claimed the individual was acting irate and aggressive, which was not consistent with the video. The incarcerated individual was ultimately secured and escorted to Intake for decontamination and later refused medical evaluation, with no visible injuries. As the search continued, a few minutes later another individual stood in front of his cell door and placed his hands toward an officer's chest, at which point the officer struck the individual in the face with a closed fist, and a physical altercation ensued. Video footage captured the closed-fist strike to the individuals face. Multiple officers then brought the second individual to the ground, applied mechanical restraints, deployed chemical agents toward the individual's face while he was on the ground. The individual was escorted to Intake, where he later received medical attention for an abrasion to his chin.

The Facility Rapid Review initially identified no violations, but referred the case because of the head strike for a Full Investigation. ID's initial assessment determined that the force used included a prohibited strike to the head. The Full ID investigation is pending.

Below are screenshots with descriptions of the incident.

Staff line up in front of a cell as part of search.



The individual inside is nude and does not comply with the staff's order to turn around.



Staff suddenly deploy chemical agents despite the individual
not appearing irate or aggressive.



The individual is then escorted out of the area dressed in only a sheet.



A few minutes later, a staff member stands in front of another individual's cell and the individual places his hands on the officer's chest.



The officer throws a closed strike at the individual's face.



The officer throws another closed first strike.



The individual is taken down and staff deploy chemical agents.



The individual is then taken out of the area.



**Illustrative Example 18: UOF Avoidable OC Usage Incident in October 2025**

In October 2025, in an OBCC housing area, staff placed an incarcerated individual in the vestibule with his mattress and belongings past evening lock-in at 9:00 p.m. where he sat for over 45 minutes. During this time, multiple staff come into the vestibule and acknowledge or speak with the PIC, though at times, he remained in the vestibule by himself. Around 9:30 p.m., multiple officers and a supervisor arrived in the vestibule and spoke with the PIC, then entered the housing unit. In the housing unit, the officers appeared to search the individuals' belongings. Around 9:45 p.m., another officer appeared in the vestibule and began speaking with the PIC, who was still seated on his belongings on the floor. The officer asked the PIC, "What's going on? I need for you to lock in," and the PIC responded, "No English." The officer then said, "I need you to lock in please, chemical agents will be utilized if you don't lock in." The PIC remained seated in the corner. Another officer can be heard shouting from the stairs into the vestibule, "The security team already knows about it." Then, the officer in the vestibule sprayed the chemical agents at the individual's face, less than 30 seconds after arriving in the vestibule, while stating "lock in please." Other officers arrived in the vestibule and reported the use of force to the captain in the housing unit. The officer who used the chemical agents told the individual, "Sir, I can't have you out here. I told you that chemical agents would be utilized." The captain, coughing and audibly frustrated, responded to the vestibule and asked the officer, "Why'd you spray him? What happened?" The officer responded that "Individual was refusing to lock in, and I gave him orders to lock in." The captain then asked, "Lock in where? He was given direct orders to stand here," The officer responded, "He was, I thought he was refusing," The captain then asked the officer, "Who did you ask?" and the officer responded, "I asked [the other officer in the stairwell], and she said that he was refusing to lock in." Throughout this conversation, the PIC can be heard wailing and hacking and can be seen trying to wipe the chemical agents out of his eyes and moving his body in pain in response to the chemical agents. The PIC was then escorted to the intake for decontamination.

In its investigation, ID determined that the force utilized in this incident was avoidable and not necessary and the officer failed to properly assess this incident, not utilizing conflict resolution or de-escalation tactics, with IPC skills. ID found his actions of utilizing force prior to requesting a supervisor with a passive-aggressive individual were not within policy and the force was not proportional in this incident. Furthermore, the force was not in accordance with the Use of Force Directive 5006R-D, and Departmental Rules and Regulations." The officer, who was on probationary status, was given a PDR. The Monitoring Team was not able to independently confirm the PDR was given in the routine disciplinary reports provided to the Monitoring Team.

Below are screenshots with descriptions of the incident.

Staff place an incarcerated individual in the vestibule of a
housing area with his belongings.



Staff leave the area and the individual quietly sits alone.



Around 30 minutes after being placed in the vestibule,
a Captain and Security officers speak with the individual.



Nearly fifty minutes after being placed in the vestibule, an officer enters the area and demands that the individual to lock in. The individual responds that he does not speak English.



Despite not being a threat or showing any aggression, the officer deploys chemical agents.



The Captain arrives in the area and informs the Officer that the individual was given direct orders to stay in the vestibule. The individual can be heard screaming from the effects of the chemical agents.



The Officers escort the individual out of the area for decontamination.



**Illustrative Example 19: UOF Improper Takedown Incident in April 2025**

In April 2025, an officer and captain were escorting an individual down a corridor in GRVC from the intake to his assigned housing unit when a use of force occurred. The individual was being escorted without restraints, despite being classified as Enhanced Restraint Status. The individual repeatedly refused to continue the escort, saying he was afraid of being stabbed in the housing unit because a stabbing occurred in that unit a few days prior. The officer and captain repeatedly dismissed the individual's concerns and continued the escort. When they walked past the unsecured and ajar door to the programming corridor, the individual entered the open door into the programming corridor and secured the door behind him. The staff present in the programming corridor ordered the individual against the wall and placed him in flex cuffs, and the individual complied while repeating his concern about his fear of being stabbed in the unit. Numerous staff, including multiple supervisors, from throughout the programming corridor arrived in the area to assist. An officer unlocked and opened the corridor door, and the officer who began the escort approached the individual and tried to remove his flex cuffs. One of the captains in the programming corridor gave repeated orders to the officer not to remove the flex cuffs, but the officer insisted "I'm not taking him to the house in restraints." However, the officer stopped trying to remove the flex cuffs and grabbed the individual's arm and pulled him towards the door. Multiple captains can be heard telling the officer to stop as the individual pulled away and eventually broke free from the officer's hold. ID reported the officer then "stepped towards [the incarcerated individual], wrapped both of his arms around [the incarcerated individual's] waist, lifted him up, and slammed him onto the floor." Multiple captains continued ordering the officer to stop and get off the individual while the individual could be heard saying "ow" repeatedly. The officer remained on top of the individual for over 20 seconds when he finally complied with the orders to stop. The officer stood up, but captains had to physically guide him away from the individual and out of the area. The other staff in the area took over the hold of the individual on the ground, assisting him to his feet, and verbally reassured him that they would help him. The other officers escorted the individual to the clinic, and along the way the individual stated, "I was just assaulted by the staff...I'm definitely scared." The individual sustained no visible injuries, but both staff and the individual reported that the individual hit his head on the floor during the takedown.

The Rapid Review found that the incident was avoidable due to the program corridor door being unsecured and referred all other determinations and corrective action recommendations to ID given the takedown. The Investigation Division is still completing a Full ID investigation of this incident, but an initial assessment found that the officer used an improper takedown and noted that staff did not restrain the PIC during escort as required by his Enhanced Restraint Status.

Below are screenshots with descriptions of the incident.

An unrestrained individual was being escorted by an officer and a captain down the main corridor. The doorway to the programming corridor is visibly open down the corridor.



The individual enters the open door to the programming corridor, shutting the door behind him.



The staff in the programming corridor order the individual to the wall, and he complies immediately, placing his arms above his head as he did so.



567

Staff from the programming corridor place the individual in flex cuffs against the wall while the officer that was initially escorting the individual remained locked outside in the main corridor (visible through the doorway window).



Staff open the door between the main corridor and programming corridor, and the officer who was initially escorting the individual tried to pull him back to the main corridor to continue the escort.



The individual pulled away from the officer who was trying to pull him to the corridor.



568

The officer stepped towards the individual , wrapped his arms around the individual waist, lifted the individual off the floor, and took him to the ground.
The individual is still rear-restrained in flex cuffs at this time.



The individual hits the ground.



While giving verbal orders to the officer to stop, multiple staff try to "tap out" the officer and take over physical control of the individual . The officer remained on top of the individual on the ground for over 20 seconds.



The officer stops and is physically guided out of the area by some of the captains present. A captain is seen with her hand on the officer's back guiding him away from the individual in the image below. Another captain can be seen pointing at the door telling the officer to leave.

