# Status Report
# by the
# *Nunez* Independent Monitor

**January 14, 2026**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Elly Davis
*Junior Analyst*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Sarah Geisler
*Junior Analyst*

Dennis O. Gonzalez
*Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Associate*

Emmitt Sparkman
*Subject Matter Expert*

# Table of Contents

**Introduction** ................................................................................................................ 1

- Procedural Background on Local Law 42 ........................................................... 1
- Update on Monitoring Team's Work .................................................................... 4

**Next Steps** ..................................................................................................................... 8

- Recommendation 1: Monitor Submission of Preliminary Findings to LL42 Parties ....... 8
- Recommendation 2: Structure for Meet and Confer Sessions .......................................... 9
- Recommendation 3: Monitor Update to the Court ............................................................ 9
- Recommendation 4: Suspend the December 19, 2025 Order (dkt. 940) ........................ 10
- Position of the Parties ...................................................................................................... 10

**Appendix A: Letter from Limited City Intervenors** ........................................... 12

# INTRODUCTION

We write to provide the Court with an update on work regarding Local Law 42 ("LL42") and recommendations concerning next steps.

Undoubtedly, the goal and intent of Local Law 42 is to support improved practice within the jails. In some cases, the provisions are laudable, consistent with sound correctional practice, and support the overall reform effort. Many of LL42's requirements will have a significant impact on fundamental operations within the New York City jails, affecting both individuals in custody and staff. Specifically, the requirements for using restraints will impact interactions with every individual in the Department's custody, in some cases multiple times per day. Other regulations directly affect security operations, including the rules for de-escalation confinement and emergency lock-ins. Although these measures occur less frequently than the use of restraints, the Department employs them to address specific, imminent threats to individuals' safety, with some situations involving a higher degree of risk and being more complex than others. In some cases, resolving a threat may require action on multiple fronts uniquely tailored to both the individual(s) and the situation, and managerial discretion is essential to enable correctional staff to assess and mitigate the risk of harm. Finally, housing individuals who have committed serious acts of violence is arguably one of the most complicated, but essential practices in any correctional system. This complexity arises from the interpersonal dynamics involved and the extreme safety risks these individuals pose to other persons in custody and staff.

**PROCEDURAL BACKGROUND ON LOCAL LAW 42**

The City Council passed Local Law 42 on December 20, 2023. The Mayor of New York subsequently vetoed the bill on January 19, 2024, but it was signed into law by the City Council on January 30, 2024, overriding the Mayor's veto. In early January 2024, pursuant to the *Nunez*

1

Court Orders,[1] the Commissioner requested the Monitoring Team's advice and feedback on how the requirements of LL42 might impact the Department's ability to comply with the *Nunez* Court Orders. On January 12, 2024, the Monitoring Team provided its initial assessment of LL42's implications for the City's and Department's efforts to address the unsafe conditions in the jails, protect individuals from harm, and implement sound correctional practices, all of which are necessary to comply with the *Nunez* Court Orders.

In late May/early June 2024, the Department advised the Monitoring Team (and subsequently the Parties to the *Nunez* litigation) that it was considering seeking relief from LL42's requirements via the Court in the *Nunez* matter, given the Department's concerns that LL42's requirements may impede the Department's ability to comply with several key areas of the *Nunez* Court Orders. Likewise, the City advised the Court of its intentions in a letter dated June 5, 2024 (dkt. 724). Following the City's submission of this letter, the Monitoring Team and the *Nunez* Parties met and conferred in June 2024. In July 2024, the Commissioner sought updated guidance and feedback from the Monitoring Team pursuant to the *Nunez* Court Orders,[2] on how the requirements of LL42 might impact the Department's ability to comply with the *Nunez* Court Orders. On July 22, 2024, the City filed a status report with the Court regarding its concerns related to the implementation of LL42 (dkt. 758). The status report included a

---

[1] *See* Consent Judgment, § XX, ¶¶ 24 and 25 and June 13, 2023 Order (dkt. 550), § I, ¶ 5. Combined, these provisions: (1) permit the Department to request the Monitor provide technical assistance or consultation on the Department's efforts to implement the requirements of the *Nunez* Court Orders, (2) permit the Department to request the Monitor provide a written response to a request regarding the Department's compliance with the *Nunez* Court Orders, and (3) requires the Department to proactively consult with the Monitor on any policies or procedures that relate to the compliance with the *Nunez* Court Orders and to obtain the Monitor's feedback on these initiatives. The Monitor has addressed similar issues in the past. *See, for example,* Monitor's March 5, 2018 Report (dkt. 309), Monitor's October 31, 2018 Letter to the Court (dkt. 319), and Monitor's June 30, 2022 Report (dkt. 467) at pgs. 22-27.

[2] *Id.*

declaration from Commissioner Lynelle Maginley-Liddie regarding her belief about "the deleterious effects that many of the provisions of Local Law 42 would have on the operations of the Department if they went into effect. Put simply, there would be an increase in violence and transportation of incarcerated individuals to court would become virtually impossible, among other adverse consequences." Declaration of Lynelle Maginley-Liddie, ¶ 2 (dkt. 758).

On July 27, 2024, the Mayor issued Emergency Executive Orders ("EEO") suspending the implementation of certain provisions of LL42. Since summer 2024, the Court has directed the Monitoring Team to engage in focused analytical work, to meet and confer with the Defendants and the Parties about these issues, and to provide multiple status updates.[3] The Monitoring Team updated the Court on its work to assess the intersection of LL42 and the *Nunez* Court Orders on October 24, 2024 (dkt. 789) and November 22, 2024 (dkt. 802). The Monitor filed a comprehensive report on January 31, 2025 (dkt. 814) describing all work completed to date regarding the analysis of LL42.

In late 2024, the City Council and Public Advocate brought suit against Mayor Adams contending that his Emergency Orders suspending the implementation of LL42 were unlawful ("the Article 78 litigation").[4] In February 2025, the Court issued an order advising the Monitoring Team to cease any additional analytical work on LL42 until further directed by the Court in light of the pending Article 78 litigation. *See*, February 5, 2025 Order (dkt. 815). The Article 78 litigation was resolved in July 2025, with the finding that the Mayor's Executive Order suspending LL42 was improper. In response, the City sought a temporary injunction of

---

[3] *See* the Court's June 7, 2024 Order (dkt. 726), July 23, 2024 Order (dkt. 759), July 25, 2024 Order (dkt. 761), October 25, 2024 Order (dkt. 791), July 2, 2025 (dkt. 875), August 19, 2025 (dkt. 896), and December 19, 2025 (dkt. 940).

[4] *See*, Appendix G of the Monitor's January 31, 2025 Report (dkt. 814).

3

certain provisions of LL42 in July 2025 from the Court in *Nunez*. The Court convened a status conference and granted the temporary injunction on July 3, 2025 (dkt. 875). At that time, the Court also advised the Monitoring Team to proceed with their work regarding areas where LL42 requirements were in conflict with the *Nunez* Court Orders. The injunction has since been amended twice at the Monitor's recommendation.[5]

**UPDATE ON MONITORING TEAM'S WORK**

The requirements of LL42 would require changes to the Department's policies and practices regarding the use of restraints, escorts, de-escalation, lock-in procedures and restricted housing. Each of these policy areas requires consultation and approval of the Monitor and, in some cases, the Monitor may direct the "Department to refine the initiative(s) as necessary to ensure compliance with [the *Nunez* Court Orders]. The Department must then implement the revised initiative(s), including any additional requirements from the Monitor."[6]

Since the Court's status conference in July 2025, the Monitoring Team has continued to carefully and thoughtfully consider the provisions of LL42, their interconnection with the *Nunez* Court Orders and the Monitor's approval obligations, has discussed these issues with the *Nunez* Parties, and continues to carefully review multiple submissions from the *Nunez* Parties and the Limited City Intervenors (collectively the "LL42 Parties") that were provided in October and November 2025.

---

[5] The temporary injunction was modified on August 19, 2025 (dkt. 897) and on October 21, 2025 (dkt. 923).

[6] This includes, but is not limited to, the following provisions of the *Nunez* Court Orders: Consent Judgment, § IV, ¶ 1 and ¶ 3(p); First Remedial Order, § A, ¶ 3; Action Plan, § D, ¶ 3 and § E, ¶ 4; and August 10, 2023 Order, § I, ¶ 3 and § I, ¶ 4.

The analysis of the interplay between *Nunez* requirements and LL42 is complicated.[7] Neither set of requirements allows for simple comparisons to identify elements that are directly at odds with one another. The requirements of the *Nunez* Court Orders tend to be more global and conceptual and, in many cases, leave specific policies and operational issues to be addressed via consultation with and approval of the Monitor. On the other hand, LL42 requirements regulate more discrete and specific elements of practice. Therefore, the analysis must look holistically at the requirements of the *Nunez* Court Orders for the relevant functions (i.e., managing individuals after serious acts of violence, restraints/escorts, de-escalation, and emergency lock-ins), overlay the operational impact of the LL42 requirements to identify those that may be discordant, and also understand and balance certain other requirements, such as compliance with HALT, which is specifically required by the *Nunez* Court Orders.[8]

The practicality and feasibility of implementing a specific practice in *this* jail system at this time and the likely outcomes from so doing must be evaluated and considered as part of the Monitoring Team's determination regarding approval/direction. The Monitoring Team's January 13, 2026 report brings into stark relief the extensive record of the Department's dysfunction and limited capabilities to manage the system in a manner consistent with sound correctional practice. **Simply put, the Department lacks the foundation to support the basic reforms required by the *Nunez* Court Orders.**

The Monitoring Team's work also reaffirms that the premature actions to repair entrenched, foundational issues without a carefully conceived plan will only set the Department

---

[7] The Monitoring Team's framework for evaluating LL42 is described at pgs. 5 to 10 of the January 31, 2025 Report.

[8] *See* Action Plan, § E, ¶ 4 which states the Department's "housing and management strategy [for individual's following serious acts of violence] must comply with the HALT Act."

5

back further. The record is replete with examples of well-intended but hastily created plans from the Department that were unsustainable and ultimately failed. The Monitoring Team must continue to emphasize that the elimination of the dysfunctional foundational patterns and practices underpinning the Department's operations is an absolute prerequisite to achieving safety in the system and sustained compliance with the broader *Nunez* Court Orders. It also requires the development of thoughtful plans that account for both the history and current conditions in the jails to develop sustainable reform. This includes any reforms that may be catalyzed by LL42.

All of these factors taken together reveal that certain provisions of LL42, as currently designed, would undermine and are antithetical to the purpose of the *Nunez* Court Orders to provide a "constitutionally sufficient level of safety for those who live and work on Rikers Island"[9] and would impede the Department's ability to comply with the *Nunez* Court Orders. The Monitoring Team's concerns center around the universal application of certain requirements that inherently require discretion or that impose heightened standards that are impractical or unsafe to operationalize. Accordingly, to the extent that the Monitor is required to approve[10] or direct[11]

---

[9] *See* Court's November 27, 2024 Order (dkt. 803) at pg. 54.

[10] "With respect to provisions of this Agreement that require the Monitor's approval, the Monitor's approval shall not be unreasonably withheld. Mere disagreement as to how best to achieve compliance with the terms of the Agreement is not enough to withhold approval; such approval may only be withheld when the Monitor reasonably believes that the Department's proposal is not consistent with the terms of the Agreement or the purpose of the relevant provision(s) and the requirements set forth in such provision(s). The Monitor shall indicate in writing whether the Monitor approves the Department's proposal within 30 days of receiving the Department's proposal." Consent Judgment, § XX, ¶ 26.

[11] "The Department shall consult with the Monitor on the system, plans, and initiatives to improve security practices as set forth in [Action Plan] § D., ¶ 2 of this order above. If the Department's proposed systems, plans or initiative(s) fail to adequately and reasonably address the requirements of § D., ¶ 2 above, the Monitor, within 15 business days, must advise the Department in writing that the plan is insufficient to achieve compliance with the provision. The Monitor may direct the Department to refine the initiative(s) as necessary to ensure compliance with the provision. The Department must then implement the revised initiative(s), including any additional requirements from the Monitor." Action Plan § D., ¶ 3.

certain DOC practices that include the problematic components of LL42, the Monitor will not approve or direct such practices absent modifications to those requirements. Further, given the Court's Order bestowing authority over the Department's Security Plan as well as the use of restraints and escorts to the Remediation Manager (hereafter "RM"), the RM must necessarily be engaged in any efforts related to these practices to ensure that they support the RM's mandate to achieve compliance with the *Nunez* Court Orders.

Finally, all of this work must also be considered within the context of a number of material changes that impact the management and operation of the jails given the Court's December 18, 2025 Order regarding the appointment of a RM, the inauguration of a new Mayor on January 1, 2026, and the Mayor's recent direction to the City and DOC to working together with the Monitor and the Parties to find a mutually agreeable approach to addressing the requirements of LL42 and compliance with the *Nunez* Court Orders. The forthcoming RM's authority over the *Nunez* Contempt provisions[12] overlap with certain aspects of the requirements of LL42 including those requirements related to the Department's Security Plan, restraints, and escorts.[13] Accordingly, the Monitor strongly believes the RM must have the opportunity to be substantively engaged in any work that is completed on these matters and consult with the Monitoring Team and the Parties.

---

[12] *See*, for example, Consent Judgment, § IV, ¶ 1/3(p); Second Remedial Order ¶ 1(i)(a); Action Plan § D, ¶ 2(a) and 2(f).

[13] As noted in the Court's December 18, 2025 Order, the RM will also need to seek approval from the Monitor to the extent required by the Contempt Provisions. *See*, December 18, 2025 Order at § V, ¶ G at pg. 30.

7

## NEXT STEPS

Given the complexity of this work, the conditions in the jails, and the material changes in the management and operation of the jails, the Monitor believes it is premature to make any final determinations regarding LL42, particularly given recent reports that the Parties are eager to work together to try to find a pathway forward. The Monitoring Team believes that additional discussions with the LL42 Parties as well as key operators (and the RM, once appointed) are needed to support the overarching goal of identifying agreement where possible and developing an operationally feasible plan that ensures compliance with the *Nunez* Court Orders. Accordingly, a report issued at this juncture would be both speculative and premature. The Monitoring Team proposes the following next steps.

**RECOMMENDATION 1: MONITOR SUBMISSION OF PRELIMINARY FINDINGS TO LL42 PARTIES**

The Monitoring Team proposes confidentially providing the LL42 Parties with the Monitoring Team's *preliminary* and *draft* findings that identify specific conflicts with LL42 Provisions and the *Nunez* Court Orders. This submission would be provided under the same terms that the Monitoring Team provides draft Monitor Reports,[14] consistent with the Court's Orders.[15] The Monitoring Team believes these draft findings and any corresponding discussions must occur in a confidential manner because this work is dynamic and must allow for candid and transparent discussions that facilitate the identification of potential areas of mutual agreement.

---

[14] *See* docket entries 290 and 304.

[15] Such an approach is also necessary to ensure compliance with the Monitor's obligations pursuant to Consent Judgment § XX, ¶ 28.

8

The Monitoring Team proposes providing this initial submission to the LL42 Parties no later than January 29, 2026.[16]

**RECOMMENDATION 2: STRUCTURE FOR MEET AND CONFER SESSIONS**

The Monitoring Team believes that meet and confer sessions must be appropriately sequenced and timed. Following the Monitor's initial submission described above, initial meetings should take place to address structural and legal issues and identify priorities. However, some of the topics to be discussed involve complex operational matters and will require direct participation from those who will operate the jails for the foreseeable future. This will include the RM. The timing for the meetings that must necessarily include the RM must ensure that the RM is on-boarded and oriented to the Department, and that the RM has the necessary latitude to appropriately prioritize the work that needs to be done to achieve compliance with the Contempt Provisions. These discussions should also include the Commissioner appointed by the new Mayor. Accordingly, meetings must be appropriately prioritized and synchronized to ensure that the RM can meaningfully participate in such meetings. As it has done in the past, the Monitoring Team is willing to schedule these meetings and ensure they are sequenced such that the necessary players, including the RM, are in place for meetings that require their involvement.

**RECOMMENDATION 3: MONITOR UPDATE TO THE COURT**

The Monitoring Team proposes, on the recommendation of the City, that a date certain is set to provide the next update to the Court on the work underway. The Monitoring Team

---

[16] The Monitoring Team anticipates that additional submissions may be necessary as the Monitoring Team continues its work and discusses these matters with the LL42 Parties. The Monitoring Team believes all submissions made during this process should be treated in the same confidential manner as the initial submission.

recommends this next update be provided by March 26, 2026.[17] Further, as has been the Monitoring Team's practice, if updates are necessary in advance of the due date, they will be provided. To the extent necessary, the Monitor will include proposed recommendations for next steps as well as any submissions the LL42 Parties and the RM may wish to include to supplement the Monitor's update.

**RECOMMENDATION 4: SUSPEND THE DECEMBER 19, 2025 ORDER (DKT. 940)**

Assuming the Court is amenable to the recommendations laid out above, the Monitoring Team proposes that the Court's December 19, 2025 Order (dkt. 940) outlining next steps is suspended in order to adopt the three recommendations discussed above.

**POSITION OF THE PARTIES**

The LL42 Parties share the following positions:

- **Position of Defendants**: *Defendants agree with the Monitoring Team's proposal to confidentially provide the LL42 parties with the Monitoring Team's preliminary and draft findings that identify specific conflicts with LL42 provisions and the Nunez Court Orders no later than January 29, 2026.*

    *Defendants do not agree with the Monitoring Team's proposal for structuring the meet and confer sessions insofar as the proposal delays having the parties meet and confer on the substantive aspects of a plan to comply with LL42 until after the appointment of a Remediation Manager. While defendants acknowledge that some aspects of LL42 overlap with the contempt provisions that will fall within the*

---

[17] The Monitoring Team believes that March 26, 2026 versus the City's proposed date of February 27, 2026 is a more feasible date to provide an update as it will permit sufficient time to schedule and hold necessary meet and confers meetings and also accommodates for various scheduling and logistical matters for the Monitoring Team.

10

*Remediation Manager's purview, defendants submit that stakeholders can begin conferring with the goal of making as much progress as possible in the short term. Defendants are committed to engage with the Monitoring Team and the LL42 parties so that we can discuss and address concerns and move forward as quickly as possible.*

*Defendants further appreciate the need for the Monitoring Team to provide updates to the court, but respectfully submit that updates, which may be interim and not final, need not wait until the appointment of a Remediation Manager. Therefore, defendants suggest that the Monitor provide a status update to the court by February 27, 2026.*

- **Position of the Plaintiff Class**: *The Plaintiff Class agrees with the position of the City Defendants and Intervenors that there is no cause to delay meeting and conferring about implementation of Local Law 42. The Plaintiff Class does not oppose the Monitor's request to provide its preliminary confidential report by January 29.*

- **Position of the United States Attorneys' Office**: *The SDNY agrees with Plaintiff Class' position.*

- **Position of the Limited City Intervenors**: *Please see the attached letter as Appendix A.*

11

# APPENDIX A:
# LETTER FROM LIMITED CITY INTERVENORS



Rob Rickner, Principal | (212) 300-6506 | rob@rmcivilrights.com

**Via Email**

January 13, 2026

Monitoring Team
c/o Anna E. Friedberg, Deputy Monitor
Tillid LLC
(646) 895-6567
afriedberg@tillidgroup.com

    Re:    *Response to the Monitoring Team's Proposed Next Steps*

Monitoring Team,

The Council and Public Advocate believe that the approach and framework currently in place (Dkt. 940) should remain in place. The Monitoring Team proposed this approach on July 16, 2025 after a lengthy meet-and-confer between all parties and intervenors (Dkt. 883 at 16-17). The plaintiffs and defendants largely agreed to this framework at that time (*see id.*)—and not a single person or entity suggested that the analysis or implementation of Local Law 42 should wait until after the Remediation Manager was appointed.

In August 2025, the Court ordered the parties to follow the approach that the Monitoring Team had laid out in its July 16, 2025 submission. That Court order required that (i) the Monitoring Team issue its final report on Local Law 42 by October 15, 2025, (ii) the parties meet and confer within three weeks of receiving that report, and (iii) the Monitoring team identify any outstanding disputes, and propose a briefing schedule, within 5 days after the meet-and-confer (Dkt. 896). This framework was preserved at the urging of the Monitor, with the consent of all plaintiffs and defendants, in four subsequent orders that made only modest adjustments to the deadlines (Dkts. 903, 914, 930, 940).

All parties and intervenors have relied on this approach and framework, for months. For example, the parties promptly and diligently engaged in detailed substantive analysis in response to the Monitor's various questions. The Council and the Public Advocate also made litigation decisions (such as forgoing appeals) in reliance on this framework. Had the Council and Public Advocate been informed months ago that the Court's July 2025 TRO would remain in place indefinitely, without any substantive changes, until the Remediation Manager was appointed and brought up to speed, the Council and Public Advocate would have sought immediate judicial relief because the Prison Litigation Reform Act clearly prevents such lingering "preliminary" relief. 18 U.S.C. § 3626(a)(2).



There is no sound basis for the Monitor's new request to delay—likely for multiple months—the parties' ability to put into place a concrete plan to implement Local Law 42. The only thing that has changed in the past week was the inauguration of a new Mayor. Under the new Mayor, the parties to *Nunez* are likely closer together, not further apart, when it comes to the requirements of Local Law 42.  The new Mayor has recognized the importance of the reforms required by Local Law 42 and urged that implementation of the law be done as soon as possible.[1]  There should be fewer disagreements, not more, between the parties about Local Law 42 going forward. And that fact provides no basis to delay tackling these critical issues; if anything, it increases the likelihood of prompt, cooperative action.

Nor does the prospect of a Remediation Manager's selection provide any justification for jettisoning the Court-ordered framework that has been in place for months. Everyone has long known that a Remediation Manager is likely to be selected soon. Indeed, that fact was *already considered* when deciding the approach that is currently in place (*e.g.*, Dkt. 883 at 13 (Monitor's July 2025 proposed framework for addressing Local Law 42, which expressly recognized the Remediation manager's future involvement in this litigation)). The future involvement of a Remediation Manager provides no good reason to put off planning now, as the Monitoring Team itself tacitly recognized when it formulated the framework that is currently in place. Furthermore, the Monitoring Team's sudden change of plans rests on hypothetical disagreements with the Remediation Manager that may never materialize; and such hypothetical disagreements provide no basis for further delay. The parties, who are experts in DOC operations, are ready to plan for implementing Local Law 42 right now. And they can certainly do so before the Remediation Manager is selected.

Sincerely,

/s/

Rob Rickner
*Attorney for the New York City Council
and Public Advocate Jumaane Williams*

---

[1] https://www.nyc.gov/mayors-office/news/2026/01/mayor-mamdani-signs-two-emergency-executive-orders