# Status Report
# by the
# *Nunez* Independent Monitor

**June 17, 2026**

THE *NUNEZ* MONITORING TEAM

Steve J. Martin
*Monitor*

Elly Davis
*Junior Analyst*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Sarah Geisler
*Junior Analyst*

Dennis O. Gonzalez
*Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Associate*

Emmitt Sparkman
*Subject Matter Expert*

**Table of Contents**

**Introduction** ...................................................................................................**8**

- Appointment of the Nunez Remediation Manager ........................................ 8
- Current State of Affairs ............................................................................... 10
- Monitoring Team Recommendations for Immediate Attention .................... 12
- DOC's Revised Organizational Chart ......................................................... 13
- Organization of the Report.......................................................................... 15
- Upcoming Court Filings .............................................................................. 17

**Leadership, Supervision, and Maximizing Staff Deployment** .......................**18**

- Leadership and Supervision ........................................................................ 19
- Maximizing Staff Deployment..................................................................... 22
- Conclusion and Next Steps ......................................................................... 27

**Assessment of the Department's Use of Force and Security Practices** ............**30**

- Trends in Use of Force and Violence Metrics, 2016-2025 .......................... 30
- Department's Findings Regarding Problematic UOF and Security Practices ............... 34
- Monitoring Team's Findings Regarding UOF and Security Practices.......................... 37
- Conclusion ................................................................................................... 39

**Managing Behavior of People in Custody** ......................................................**41**

- Classification................................................................................................ 41
- Incentivizing Positive Behavior Among People in Custody......................... 43
- Sanctions for Mid-Level Misconduct .......................................................... 43
- Managing People with a Known Propensity for Violence............................ 45
- Conclusion and Next Steps ......................................................................... 49

**Update on Work Underway Related to LL42** ..................................................**50**

- Next Steps & Recommendations .................................................................. 52

**Identifying and Addressing Staff Misconduct**................................................**54**

- Identifying Use of Force-Related Misconduct.............................................. 55
- Investigations of Non-UOF Incidents & Other Types of Staff Misconduct .................. 56
- Conclusion and Next Steps ......................................................................... 60

**Death of People In Custody**............................................................................**63**

- DOC's Mortality Rate and Objective Evidence of Deaths ............................... 63
- Summaries of Deaths in Custody in 2026 ..................................................... 64
- Incidents of Self-Harm & DOC's Efforts to Address Acts of Self-Harm ...................... 66
- Conclusion ....................................................................................... 68

## Update on the 2023 *Nunez* Court Orders ............................................... 69

- June 13, 2023 Order (dkt. 550) ................................................................ 69
- August 10, 2023 Order (dkt. 564) ............................................................. 70
- October 10, 2023 Order (dkt. 582) ............................................................ 73
- December 14, 2023 Order (dkt. 656) .......................................................... 74
- December 20, 2023 Order (dkt. 665) .......................................................... 75

## Compliance Assessments ............................................................... 76

- Considerations for Compliance Assessments ................................................ 76
- Conclusion ....................................................................................... 79
- Facility Leadership Responsibilities (First Remedial Order § A., ¶ 2) ........................... 81
- New Use of Force Directive (Consent Judgment § IV., ¶ 1) .................................... 86
- Independent Staff Reports (Consent Judgment § V., ¶ 2) ..................................... 92
- Providing Medical Attention Following A Use of Force Incident (Consent Judgment § V., ¶ 22) ................................................................................................ 98
- Interim Security Plan (Second Remedial Order ¶ 1(i)(a) and Action Plan § D., ¶ 2(a)) 101
- Searches and Identify/Recover Contraband (Action Plan, § D., ¶ 2(d) and (e) and August 10, 2023 Order, § I., ¶ 2) ..................................................................... 106
- Escort Procedures (Action Plan § D., ¶ 2(f) and August 10, 2023 Order, § I., ¶ 3) ...... 112
- Facility Emergency Response Teams (First Remedial Order § A., ¶ 6) ...................... 116
- Revised De-escalation Protocol (First Remedial Order § A., ¶ 3) ............................. 125
- Young Adults - Prevent Fight/Assault (Consent Judgment § XV., ¶ 1) ...................... 130
- Young Adults - Direct Supervision (Consent Judgment § XV., ¶ 12 & First Remedial Order § D., ¶ 3) ..................................................................................... 133
- Young Adults - Consistent Assignment of Staff (Consent Judgment § XV., ¶ 17 & First Remedial Order § D., ¶ 1) ........................................................................ 136
- Screening & Promotions (Consent Judgment § XII., ¶¶ 1-3) ................................. 139
- Supervision of Captains (First Remedial Order § A., ¶ 4 and Action Plan § C., ¶ 3 (II-III)) ...................................................................................................... 146
- Improved Routine Tours (Action Plan, § A., ¶1(d)) .......................................... 151
- Facility Use of Force Reviews (First Remedial Order § A., ¶ 1) .............................. 156
- Investigations Of Use Of Force Incidents (Consent Judgment § VII., ¶ 1, § VII., ¶ 9 (a)) & § VII., ¶ 11) ..................................................................................... 161
- Early Warning System (Consent Judgment § X., ¶ 1) ....................................... 170

- Timely, Appropriate and Meaningful Accountability (Consent Judgment § VIII., ¶ 1 & § VIII., ¶ 3 (c)) ............................................................................................... 176
- Immediate Corrective Action & Monitor Recommendations (First Remedial Order § C., ¶ 1 & § C., ¶ 2) ..................................................................................... 187
- OATH Proceedings (First Remedial Order § C. 4/Third Remedial Order, ¶ 2, First Remedial Order § C., ¶ 5 & Third Remedial Order, ¶ 3) ................................ 194
- Trials Division Staffing (Consent Judgment § VIII., ¶ 4) ............................... 200
- Maximizing Deployment of Staff - Reduction of Uniformed Staff in Civilian Posts (Action Plan § C., ¶ 3(vii)) ............................................................................. 202
- Maximizing Deployment of Staff - Awarded Posts (Action Plan § C., ¶ 3(v)) ............. 206
- Maximizing Deployment of Staff - Maximize Work Schedules (Action Plan § C., ¶ 3(vi)) ............................................................................................... 210

## Appendix A: Comprehensive List of Provisions ............................................. 212

## Appendix B: Use of Force and Violence Indicators ....................................... 220

- Table 1: Number and Rate of UOF .................................................................. 221
- Table 2: Number and Proportion of A, B, and C Uses of Force ....................... 222
- Table 3: Number and Rate of Stabbings and Slashings .................................... 223
- Table 4: Serious Injuries to Inmates ............................................................... 224
- Table 5: Number and Rate of Fights ............................................................... 226
- Table 6: Number and Rate of Assaults on Staff with UOF .............................. 227
- Table 7: Number and Rate of Assaults on Staff without UOF ......................... 228
- Table 8: Number and Rate of Fires ................................................................. 229
- Table 9: Uses of Force Involving Incidents When a Staff Member is Not on Post .......... 230
- Table 10: NCU Security Audits' Findings of Staff Off Post ............................ 231
- Table 11: Timeliness of 9 p.m. Lock-In .......................................................... 232
- Table 12 (a): RESH's Average Monthly Rates of Key Violence Metrics .......... 233
- Table 12 (b): RESH Level 1 and Level 2 Comparison ..................................... 233
- Table 13 (a): Number of Searches ................................................................... 234
- Table 13 (b): Number of Contraband Recoveries ............................................ 234
- Table 14: Use of Force Incidents in Intake Areas ........................................... 235
- Table 15: Head Strike Data ............................................................................. 236

## Appendix C: In-Custody Deaths ................................................................... 237

- Table 1: Causes of Death ................................................................................... 238
- Table 2: Mortality Rate ..................................................................................... 239
- Table 3: Investigations of In-Custody Deaths.................................................. 240
- Table 4: Corrective Action Taken by DOC Related to In-Custody Deaths, 2022-May 21, 2026 ................................................................................................................ 241

**Appendix D: Use of Force Reviews & Investigations .......................................245**

- Table 1: Outcomes of Rapid Reviews Conducted by the Facilities................................ 246
- Table 2: Corrective Actions Recommended via Rapid Reviews Conducted by the Facilities ........................................................................................................................ 247
- Table 3 (a): ID Supervisors Assigned to UOF Cases...................................................... 249
- Table 3 (b): ID Investigators Assigned to UOF Cases.................................................... 249
- Table 4: Summary of ID Hires and Departures .............................................................. 250
- Table 5: Status of Investigations of UOF Incidents........................................................ 252
- Table 6: Status of Full ID Investigations ........................................................................ 253
- Table 7: Law Enforcement Referrals ............................................................................... 254
- Table 8 (a): Results of Intake Investigation Audits by Date of Initial Intake Investigation ........................................................................................................................ 255
- Table 8 (b): Number of Intake Investigation QA Audits Completed ............................... 256
- Table 9 (a): Results of Full ID Investigation Audits by Date of Initial Full ID Investigation ........................................................................................................................ 257
- Table 9 (b): Number of Full ID Investigation QA Audits Completed ............................. 258
- Table 10: Outcome of Intake Investigations ................................................................... 259
- Table 11: Investigation Findings..................................................................................... 261
- Table 12: Use of Force Incidents with Charges .............................................................. 263

**Appendix E: Data Related to Responses to Staff Misconduct.........................264**

- Table 1: Accountability for Staff's Use of Force Related Misconduct............................ 265
- Table 2: Immediate Corrective Action............................................................................ 267
- Table 3: Suspension ........................................................................................................ 268
- Table 4: Accountability by Rank ..................................................................................... 269
- Table 5 (a): Command Disciplines Recommended by Rapid Reviews ............................ 271
- Table 5 (b): Reasons that Command Disciplines Recommended by Rapid Reviews Were Dismissed, Closed Administratively, or Not Entered into CMS...................................... 272

- Table 6 (a): Command Discipline Recommended by Other Sources ............................... 273
- Table 6 (b): Reasons that Command Disciplines Recommended by Other Sources Were Dismissed ...................................................................................................................... 274
- Table 7: Formal Discipline ........................................................................................... 275
- Table 8: Number of Cases Pending with the Trials Division .......................................... 276
- Table 9: Time from MOC Received to Charges Served ................................................. 277
- Table 10: Timeliness of Formal Discipline .................................................................... 278
- Table 11: Time for Commissioner Sign Cases from Date of Signature by DC of Trials.. 279
- Table 12: Disposition of Formal Discipline Cases ......................................................... 280
- Table 13: Penalties Imposed via NPA for Use of Force Related Misconduct .................. 281
- Table 14: Cases Resolved via NPA with Provisions for CD or Expungement ................. 282
- Table 15: Outcome of Closed Action Plan § F, ¶ 2 Cases .............................................. 283
- Table 16: OATH Pre-Trial Conferences ....................................................................... 284
- Table 17: Trials at OATH for Use of Force-Related Misconduct ................................... 287
- Table 18: OATH Reports & Recommendations for Use of Force-Related Misconduct... 288
- Table 19: Trials Division Staffing ................................................................................. 289
- Table 20: NCU Security Audits' Findings of Staffs' Touring Practices ........................... 291
- Table 21: Corrective Action for Deficient Touring Recommended via Rapid Reviews... 292

**Appendix F: Staffing ................................................................................................293**

- Table 1: Number of ADWs ........................................................................................... 294
- Table 2: Number of Captains ........................................................................................ 296
- Table 3: Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA ............. 298
- Table 4: Location of Awarded Posts ............................................................................. 299
- Table 5: Incarcerated Individual-Facing Awarded Posts in Facility ............................... 300
- Table 6: Housing Unit Awarded Posts .......................................................................... 301
- Table 7: Triple Tours ................................................................................................... 302
- Table 8: Overtime Spending ......................................................................................... 303
- Table 9: Department's Average Daily Population and Staffing Levels ........................... 304
- Table 10: Training Academy Graduates ........................................................................ 305
- Table 11: Attrition ....................................................................................................... 306
- Table 12: Overview of Staff Promotions ....................................................................... 307

**Appendix G: Leadership Appointments** ...........................................................**308**

**Appendix H: Intake** .............................................................................................**318**

- Table 1 (a): Length of Stay in Intake for Male New Admissions ................................... 320
- Table 1 (b): Length of Stay in Intake for Male New Admissions ................................... 321
- Table 2 (a): Length of Stay in Intake for Female New Admissions................................ 322
- Table 2 (b): Length of Stay in Intake for Female New Admissions ............................... 323

**Appendix I: Updates on Technology Initiatives** ................................................**328**

**Appendix J: Use of Force Reporting** ..................................................................**336**

- Table 1: Independent, Complete, and Timely Staff Reports ............................................ 337
- Table 2: Classification of UOF Incidents ....................................................................... 338
- Table 3: Alleged UOF ..................................................................................................... 339
- Table 4: H+H Staff Reporting.......................................................................................... 340
- Table 5: DOE Witness Reporting..................................................................................... 341
- Table 6: Medical Wait Times .......................................................................................... 342

**Appendix K: Risk Management** ..........................................................................**343**

- Table 1: Staff Actively on E.I.S.S. Monitoring............................................................... 344
- Table 2: Screening and Placement of Staff for E.I.S.S. Monitoring................................ 345

**Appendix L: Managing Individuals Under Age 19** ...........................................**347**

- Table 1: RNDC's Rates of Use of Force and Violence .................................................... 348
- Table 2: RNDC's Programs Action Plan ("RNDC Action Plan").................................... 349
- Table 3: NCU's Consistent Staffing Audits .................................................................... 350
- Table 4: NCU's Facility-Controlled Reasons that Assigned Staff Did Not Work Post .... 351
- Table 5: NCU's Reasons that Assigned Staff Did Not Work Post Outside of Facility Control .............................................................................................................................. 352

**Appendix M: RESH Operations & Data Summary** ..........................................**353**

**Appendix N: Summary of the Special Investigations Unit** ...............................**358**

**Appendix O: Summary of UOF Investigation Pilot** ..........................................**362**

**Appendix P: DOC Process Flow Charts**................................................................**367**

## INTRODUCTION

This is the Monitor's 21st compliance assessment for the period July to December 2025 (either "21st Monitoring Period" or "Monitoring Period"), covering the Department's efforts to advance its progress toward compliance with the *Nunez* Court Orders.[1]

Since the Monitor's January 13, 2026 Report (dkt. 948), a number of significant leadership changes have impacted the City's operations of the jails. A new Commissioner was appointed by the Mayor on February 16, 2026 and the *Nunez* Remediation Manager was appointed by the Court on February 23, 2026. Given the nature of the monitoring process, much of the information contained in this report occurred almost six months ago, under a prior City administration, and before the appointment of the Remediation Manager. While the changes in the Department's leadership structure are important to note, as of the filing of this report, there has been no material change in ameliorating the risk of harm in the jails and the reform effort continues to move at a glacial pace.

### APPOINTMENT OF THE NUNEZ REMEDIATION MANAGER

Following the close of the 21st Monitoring Period, the *Nunez* Remediation Manager was appointed, and he began to assemble his team. The Court explained the appointment of the *Nunez* Remediation Manager was necessary to "eradicate the principal barriers that have led to the current crisis and contempt findings—insufficiently resourced leadership; a lack of continuity in management; failures of supervision and cooperation between supervisors and line officers; a lack of skill or imagination to create and implement transformative plans; and an unwillingness or inability to cooperate with Monitoring Team recommendations to accomplish the urgently

---

[1] *See*, Court's July 10, 2025 Order (dkt. 879).

necessary changes in the safety profile of the jails." *See*, May 13, 2025 Order (dkt. 846) at pg. 35.[2]

The Remediation Manager has begun to assemble a team of professionals to support his work. The Remediation Manager Team ("RMT") includes a Chief of Staff, three counsel, four career correctional experts (who each have experience in jail and prison systems outside of New York City), a data analyst, and an administrative and operational professional. The Remediation Manager has also contracted with a consultant on restrictive housing.

As contemplated by the Court, the Monitoring Team has worked closely with the RMT and has offered both experience and expertise in this case. The RMT routinely communicates with the Monitoring Team and consults the Monitoring Team on various initiatives as required. In this early phase of the Remediation Manager's tenure, the initial focus has been on meeting stakeholders, obtaining the necessary background and context underpinning the decade of work already accomplished in this case, and developing a strategy for addressing the work that lies ahead.

Two of the RMT's key areas of focus to date have been finalizing the organizational chart (discussed below) and developing the Remediation Action Plan, both in consultation with the Monitoring Team. This process has been collaborative and constructive. Although the learning curve for the RMT is significant, the Monitoring Team has encouraged the RMT to move toward taking specific and concrete steps that will alter the reform trajectory and help the Department emerge from a perpetual state of planning and move toward operationalizing practices that will increase the safety of the jails.

---

[2] The background and procedural history that lead up to the appointment of the Remediation Manager is described in the Monitor's January 13, 2026 Report (dkt 947) at pgs. 1 to 4.

9

The Remediation Manager has embarked on a complicated and daunting mission and will have to make many difficult decisions. While this role requires obvious collaboration with the Department, the purpose of the Remediation Manager is to fundamentally *alter* the current operations of the Department and, in so doing, move the Department forward to achieve compliance with the *Nunez* Court Orders.

## CURRENT STATE OF AFFAIRS

The risk of harm in the New York City jails remains unreasonably high for those incarcerated and working within the City jails. The core focus of this case centers on the safe and humane management of the New York City jails in order to remediate the undue risk of harm. Throughout the tenure of this case, the Monitoring Team has consistently reported on the Department's poorly functioning systems and ineffective practices and procedures which combine to form a deeply entrenched culture of dysfunction that has persisted across decades and many administrations.

At any given time in the administration of the *Nunez* Court's Orders a multiplicity of active and interwoven institutional reform issues confront the Department. At the same time, a corresponding array of stakeholders' interests and priorities must also be weighed and considered. The reality of dealing with these complex dynamics is intense and complicated. The Monitoring Team identified a discrete set of problem centers underpinning the current state of affairs that remain an accurate representation of the Department's functioning:

- high rates of violence and uses of force that are normalized,

- inconsistent and poor security practices that are entrenched and normalized,

- no overall operational plan or set of priorities that is consistent and well thought-out,

10

- lack of clear and candid assessments of the current state of affairs,

- failure to proactively identify and address problems,

- lack of elementary skills at all levels of the operation,

- ongoing staff skepticism and lack of buy-in to the reform effort remain,

- ineffective and inefficient deployment and assignment of staff,

- inconsistent and unreliable accountability for uniform leadership,

- ongoing revolving door of Department and facility leadership with corresponding changes in plans,

- operating in a perpetual state of crisis, and

- significant bureaucracy.

Despite years of work and multiple Court Orders, these problem centers, regrettably, remain present with little to no change observed as of the filing of this Report. The practical reality is that ameliorating these problem centers will take time and certainly will not occur from one reporting period to the next. Thus, the Court has ordered that the Remediation Action Plan must address the "safety-related areas and actions that are most urgently in need of attention." The Monitoring Team has long recommended that immediate initiatives directly related to reducing needless risks of harm must be at the forefront of this work at all times, as mid- to longer-term initiatives are simultaneously developed and implemented.

The Monitor and the Monitoring Team cannot more strongly emphasize the need for immediate action to be taken. Recently, the Monitor recommended and strongly urged the Commissioner and the Remediation Manager to take immediate action to address classification

11

and security deficits relating to the management of the small group of individuals responsible for the majority of violence in the jails. Currently, these persistently violent individuals are dispersed throughout the jails with no dedicated management structure in place to abate their patterns of heightened violence, which creates an undue risk of harm to other incarcerated individuals and Department staff.

As part of this work, the Department <u>must</u> have the necessary resources and support. Material advancement of the reform effort will remain elusive, and the risk of harm will continue at unnecessarily high levels without immediate actions to address these issues.

**MONITORING TEAM RECOMMENDATIONS FOR IMMEDIATE ATTENTION**

To advance the reform effort, the Monitoring Team shares the following recommendations that should be prioritized for immediate attention:

- **Immediate Action to Mitigate the Risk of Harm**: Immediate, specific and concrete action needs to be taken to mitigate the current risk of harm in the system. As part of this work, the Monitor and the Monitoring Team have strongly recommended focusing on the small group of individuals who are engaged in the largest number of violent incidents.

- **Resources to Support the *Nunez* Reform Effort**: The Department must be provided additional and new resources to support the reform effort. This report identifies a wide array of Monitoring Team recommendations, feedback and requirements that are simply languishing including administrative support, project management support, support to develop and finalize policies, as well as individuals with legal/compliance/operational expertise to implement the outstanding work remaining. The reform effort cannot be catalyzed, let alone

12

sustained, without these resources. To date, despite significant and repeated feedback from the Monitoring Team, the Department's resources have not materially improved.

- **Concrete and Focused Set of Priorities to Advance the *Nunez* Reforms**: The Department and the RMT must develop an overarching plan that clearly defines the reform priorities and outlines how leadership, staffing, and resources will be allocated to address those priorities in a deliberate, concrete, and systematic way.

## DOC'S REVISED ORGANIZATIONAL CHART

The Department's organizational chart was revised in May 2026, in consultation with the Remediation Manager and Monitoring Team, and went into effect on June 1, 2026.[3] *See*, the Remediation Manager's May 5, 2026 Letter to the Court (dkt. 978). The Department has long struggled with an appropriate governance structure, at times failing to even have an operative organizational chart.[4] Accordingly, the fact that a public organizational chart has been developed is an obvious improvement. Notable changes to the organizational structure include the following:

- The Remediation Manager is incorporated into the Department's organizational structure with certain divisions reporting directly to the RM and others working in close collaboration with the RM.

---

[3] The Remediation Manager explained that while "[t]he Court contemplated the creation of the updated organizational chart for the jails would follow its approval of the Remediation Action Plan ("RAP"), an iterative roadmap to guide the RM's remedial work in concert with DOC. *See* February 18, 2026, Order (Dkt. 961), at 10–14. However, in establishing their respective offices, and throughout early conversations about how best to work together, the RM and the new DOC leadership, as well the Monitoring Team, agreed: determining who oversees which organizational structures is critical to collectively charting a new course for the jails. Thus, the RM, the Monitoring Team, and the DOC leadership updated the DOC organizational chart as the RM office simultaneously constructs the RAP." *See* Remediation Manager's May 5, 2026 Letter to the Court (dkt. 978) at pg. 1.

[4] *See*, May 13, 2025 Order (dkt. 846) at pg. 47.

13

- The Investigation, Intelligence, and Accountability Division was created and is managed by a Senior Deputy Commissioner[5] who reports directly to the Remediation Manager. Among other things, this new division reintegrates and consolidates the investigation division that was previously split by former Commissioner Molina. This division also includes the formal staff disciplinary process (via the Trials Division), the Command Discipline process (where long-needed reforms have languished), and the adjudication division.

- The Administration Division now reports to a Senior Deputy Commissioner rather than through the uniformed chain of command. The Administration Division now also works closely with the Remediation Manager Team, which will also help select the Deputy Commissioner of Administration. The change in reporting structure for this unit is crucial given the longstanding mismanagement of the uniformed workforce.

- The uniformed reporting structure has returned to the structure utilized in 2021 (and before) with uniformed staff appointed to the positions of Chief of Department and Chief of Security. The Commissioner eliminated the Senior Deputy Commissioner position that was essentially a civilian serving as the Chief of Department, as well as the Deputy Commissioner of Security,[6] which in 2022, had been the cornerstone of the approach to install those with experience in other jurisdictions to advance the reform. The Monitoring

---

[5] On June 1, 2026, the Department appointed the Remediation Manager's selection for the role who was the former Disciplinary Manager (who had been terminated by Commissioner Molina).  The Monitoring Team previously described the now Senior Deputy Commissioner and former Disciplinary Manager as a strong leader, who is highly competent, possesses the qualities and expertise needed to fill this role including strong competency in the core areas underpinning the *Nunez* reform effort, and has the creative thinking necessary to advance the reform effort. *See*, for example, Monitor's December 22, 2021 Report (dkt. 435) at pg. 8.

[6] The prior Commissioner eliminated the position of the Deputy Commissioner of Classification and Operations and assigned the relevant responsibilities to the Deputy Commissioner of Security.  Further, both Associate Commissioners of Facility Operations have left or will leave in the coming weeks. Finally, all but one of Assistant Commissioners who were appointed to serve in the role of Warden of the Facility have left the Department.

Team has strongly cautioned that reverting to an organizational structure similar to the one that gave rise to the need for external support in the first place will require additional support and improved oversight to ensure the structure functions in support of the reform effort.

- The Classification Division ("CMCMU") now reports separately and outside of the Department's security apparatus and has been elevated to report directly to the Chief of Department as the division had been marginalized and subsumed under security. The Monitoring Team has strongly recommended that the Department reinstitute a Deputy Commissioner of Classification and ensure this individual has significant expertise in classification. The Monitoring Team understands this recommendation is under consideration.

The new organizational chart provides an important foundation for the reform effort. Previously the organizational chart was generally undefined and did not have clear or adequate reporting lines. Further, certain reporting lines did not support or ensure that work was completed as it needed to be to advance the reform effort. Of course, an organizational chart alone will not ensure that leaders have the requisite expertise, that they will exercise their authority effectively, or coordinate their work in practice. However, the revised structure provides a stronger foundation for efficient management.

**ORGANIZATION OF THE REPORT**

This report has three distinct sections:

**Section I: Narrative Updates on Various DOC Operations and Practices**: A summary discussion about the current state of the jails and key aspects of the Department's functioning are discussed, including:

- Leadership, Development, and Maximizing Staff Deployment

- Assessment of the Department's Use of Force and Security Practices

- Managing Behavior of People in Custody

- Update on Work Underway Related to LL42

- Identifying and Addressing Staff Misconduct

- Death of People in Custody

- Update on the 2023 *Nunez* Court Orders

**Section II: Compliance Assessment with Select Provisions of the *Nunez* Court Orders**: This section includes a discussion about the Monitoring Team's approach to assessing compliance. This is followed by a detailed compliance assessment for 45 provisions from the *Nunez* Court Orders.

**Section III: Data and Information Appendices**: Relevant data and other corresponding information is included in the following appendices:

- Appendix A: Comprehensive List of Provisions

- Appendix B: Use of Force and Violence Indicators

- Appendix C: In-Custody Deaths

- Appendix D: Use of Force Reviews & Investigations

- Appendix E: Data Related to Responses to Staff Misconduct

- Appendix F: Staffing

16

- Appendix G: Leadership Appointments

- Appendix H: Intake

- Appendix I: Updates on Technology Initiatives

- Appendix J: Use of Force Reporting

- Appendix K: Risk Management

- Appendix L: Managing Individuals Under Age 19

- Appendix M: RESH Operations & Data Summary

- Appendix N: Summary of the Special Investigations Unit

- Appendix O: Summary of UOF Investigation Pilot

- Appendix P: DOC Process Flow Charts

**UPCOMING COURT FILINGS**

With respect to upcoming filings with the Court, the Remediation Manager is scheduled to submit the first Remediation Action Plan in mid-July 2026. The Monitoring Team intends to continue consulting with the RMT on the Remediation Action Plan. The Monitoring Team intends to submit its next report to the Court on September 30, 2026, which will provide an update on the current state of affairs and will include an update on the work related to LL42.

17

## LEADERSHIP, SUPERVISION, AND MAXIMIZING STAFF DEPLOYMENT

The DOC's ability to reform current operations and provide a safe and humane environment for people in custody necessarily requires strong leadership, adequate supervision, and appropriate deployment of staff. Unfortunately, the conditions in the jails continue to reflect the Monitoring Team's longstanding findings that "[t]here are persistent operational issues, including the use of inadequate or unreasonable security protocols which contribute to the use of excessive or unnecessary force and the frequency of use of force incidents in general. For years, steps were taken to create the foundation to address these issues, but too many [Department leadership,] facility Wardens [and uniformed supervisors] have simply made no progress in implementing initiative to reduce the persistent operational issues that have been developed to remedy Non-Compliance throughout the life of the Consent Judgment."[7]

Agency leaders must establish explicit expectations and provide clear direction for their staff, supervisors must provide adequate and consistent oversight and guidance to staff, and staff must be held accountable for their actions. A key element of this direction and supervision component is recognizing and elevating staff who embody the culture the Department is trying to promote, and guiding, correcting and holding accountable those who do not. Further, an obvious foundation for leading and directing a safe and humane culture is to properly deploy the agency's staff such that they can carry out the expected operations. For too long, the Department has been unable to meet these foundational goals, in large part because the Department's operations and leaders, managers, and supervisors do not appear to be aligned with sound correctional practice.

---

[7] *See*, Steve Martin's November 30, 2022 Declaration (dkt. 486) at 7.

This section discusses the dearth of expertise at the agency and facility leadership levels and the mismanagement of the Department's most important asset—its line staff.

LEADERSHIP AND SUPERVISION

The reform effort requires leadership and staff at all levels to embrace and execute changes in practice. The Commissioner sets the direction of the agency, assisted by Chiefs (the highest-ranking uniformed leadership in the command structure), along with Deputy Commissioners, Associate Commissioners, and Assistant Chiefs who supervise and direct the work of facility leaders and other Department divisions. The facility leaders (Wardens and ACs) oversee the operations, including the reform effort, in their assigned command, which is only possible when supported by facility managers (Deputy Wardens and Assistant Deputy Wardens) and Supervisors (Captains) who provide hands-on supervision with clear expectations, continuous role modeling, and who accept the responsibility for the skill development of the Correction Officers. All these leaders must have mastery of core correctional practices in order to lead responsibly and in alignment with the *Nunez* Court Orders. They must have a fundamental commitment to improve the way the facilities operate and have an ability to shepherd a wholesale change to the Department's operations and culture that embraces sound correctional practice and does not simply reinforce longstanding practices of how things have "always been done." Appendix G of this report provides a list of Leadership Appointments.

The Department has shortcomings at each level of leadership that have collectively stymied the reform effort. The underlying culture has yet to be dismantled and the commitment to sound correctional practice and humane treatment has yet to take hold in day-to-day practice.

- **Limited Expertise and Competency**: As the Court has found, much of the Department's limited progress can be attributed to the fact that "the 'dedicated team' of competent

senior leadership required for reform has been lacking for years."[8] The Court noted that this dynamic has not been altered by even well-intentioned Commissioners. The Monitoring Team's reports have identified the limitations of the uniformed leadership's competency and knowledge of sound correctional practice.[9] Unfortunately, this permeates all ranks of the agency, and few efforts have been made to elevate their skillsets so they can provide the leadership and supervision necessary to alter the Department's current culture and practices.

- **Erosion of Strategy to Infuse the Department with Outside Expertise**: Several *Nunez* Court Orders have required the Department to address the limited skillset of its leaders and supervisors by appointing leaders with the requisite expertise and experience from outside the Department.[10] The City and Department initially embraced this approach.[11] However, the majority of leaders hired from outside the agency to support the reform effort are no longer employed by DOC.[12] Unfortunately, in most cases, the process of

---

[8] *See* Court's May 13, 2025 Order (dkt. 846) at 51.

[9] *See* Monitor's May 11, 2021 Report (dkt. 368) at pgs. 6-7 and 228; Monitor's June 3, 2021 Second Remedial Order Report, (dkt. 373) at pg. 2; Monitor's September 23, 2021 Letter to the Court (dkt. 387) pgs. 6, 8; Monitor's November 17, 2021 Letter to the Court (dkt. 420) at pg. 7; Monitor's December 6, 2021 Report (dkt. 431) pgs. 12, 42-43; Monitor's December 22, 2021 Third Remedial Order Report (dkt. 435), 2-3, 12-13; Monitor's March 16, 2022 Report (dkt. 438) pgs. 2-5, 22, 56-57; Monitor's April 20, 2022 Report (dkt. 445), pgs. 5, 7-8; Monitor's February 3, 2023 Special Intake Report (dkt. 504), pg. 10; Monitor's February 26, 2024 Letter to the Court (dkt. 679) pg. 8; Monitor's June 27, 2024 Report (dkt. 735) pg. 2-3; Monitor's November 22, 2024 Report (dkt. 802) pgs. 12, 48-49, 56-57; Monitor's January 14, 2026 Report (dkt. 949) pgs. 16, 246-247.

[10] *See* the Action Plan (dkt. 465) at § A, ¶ 3(b), § B, ¶ 2, § C, ¶ 1, § D, ¶ 1, and § E, ¶ 1 and the Court's December 6, 2022 Order (dkt. 492).

[11] *See* Kim Joyce's November 30, 2022 Declaration (dkt. 485) at ¶¶ 3-14.

[12] In 2022/2023, the Department succeeded in bringing in a cadre of corrections professionals to the rank of Deputy Commissioner who had the critical outside perspective, expertise and management skills that had been lacking. In addition, several civilian Assistant and Associate Commissioners were hired either to support the uniformed Wardens, or to function as wardens themselves. Over time, however, the number of leaders hired from outside the Department has decreased steadily, as they resigned, positions were merged, and vacancies were filled by uniformed staff. During the tenure of three Commissioners, the commitment to this effort has waned, returning the Department, current day, to a place similar to where it started.

integrating new leaders from outside the agency into their positions at DOC was poorly managed. These leaders were not integrated in a manner that was constructive or effective, and in some cases, they appeared to become consumed by the seemingly intractable cultural and practical obstacles to reform. It is therefore not surprising that the infusion of individuals with outside expertise into various leadership positions, in most cases, did not last. Generally, these individuals were very capable and had much to offer, but their expertise was never fully utilized for its intended purpose—to elevate the skillsets of facility leaders who shoulder the day-to-day responsibility of implementing reform.

- **Return to Uniformed Leadership Structure:** Just after the end of the Monitoring Period, the current Commissioner returned to the structure utilized in 2021 (and before) with uniformed staff appointed to the positions of Chief of Department and Chief of Security. The Commissioner eliminated the Senior Deputy Commissioner position that was essentially a civilian serving as the Chief of Department, as well as the Deputy Commissioner of Security,[13] which in 2022, had been the cornerstone of the approach to install those with experience in other jurisdictions to advance the reform. The Monitoring Team has strongly cautioned that reverting to an organizational structure similar to the one that gave rise to the need for external support in the first place will require additional support and improved oversight to ensure the structure functions in support of the reform effort.

---

[13] The prior Commissioner eliminated the position of the Deputy Commissioner of Classification and Operations and assigned the relevant responsibilities to the Deputy Commissioner of Security.  Further, both Associate Commissioners of Facility Operations have left or will leave in the coming weeks. Finally, all but one of Assistant Commissioners who were appointed to serve in the role of Warden of the Facility have left the Department.

21

- **Inadequate Supervisory Staff in the Facilities:** From the rank of Warden down the chain of command, the facilities suffer from a dearth of effective uniformed managers and supervisors. In particular, efforts to develop the supervisors closest to the Correction Officers are stymied by insufficient numbers of supervisors and the generally poor quality of supervision, coaching, and guidance offered by Captains. The Department's truncated chain of command, which includes two instead of three supervisor ranks, further impedes the Department's ability to effectively supervise Officers and Captains.[14] This is discussed in more detail in the "Facility Leadership Responsibilities" Compliance Assessment of First Remedial Order (dkt. 350), § A., ¶ 2, as well as the "Supervision of Captains" Compliance Assessment of the First Remedial Order (dkt. 350), § A., ¶ 4, in conjunction with Action Plan (dkt. 465), § C, ¶ 3 (ii-iii).

The Monitoring Team continues to assert the need for expertise and experience from outside the Department to elevate practice such that the jails can meet basic criteria for safe and humane treatment. An infusion of capable leaders is particularly critical among managers and supervisors at the facility level to both increase their number and improve the quality of supervision they provide, which may necessitate the creation of new ranks for a more robust framework for staff development.

MAXIMIZING STAFF DEPLOYMENT

Progress toward the goals and requirements of the *Nunez* Court Orders can be advanced only when an adequate number of staff are supervising those in custody and effectively carrying out the jails' day-to-day operations. The Monitoring Team has long reported that the Department

---

[14] In most other correctional systems, three supervisory ranks directly oversee the line staff in facilities, while the Department only has two (Captains and ADWs).

struggles to manage its large number of staff productively, to deploy them effectively, to supervise them responsibly, and to elevate the base skill level of its staff. This has a direct, detrimental impact on the Department's ability to reduce the level of violence, improve security practices, and ensure the safety and well-being of staff and incarcerated individuals.

- **Problematic Staffing Practices**: Few, if any, of the circumstances contributing to the Department's inability to maximize the deployment of its staff improved during the current Monitoring Period. The conditions first identified by the Monitoring Team's staffing expert retained in 2022 and most recently described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 18 to 27 remain largely unchanged. A discussion of the Department's various staffing conventions that intersect with these problems (post assignments, scheduling, overtime, time keeping, and resources) is available in Appendix K of the Monitor's 20th Report (dkt. 947). Underlying the Department's inability to adequately staff the posts that directly supervise the incarcerated population are ineffective work schedules (*e.g.*, the use of a 4x2 instead of a 5x2 schedule), ongoing misuse and abuse of staff leave policies, and exorbitant levels of overtime, and deployment of uniformed staff to positions that could reasonably be filled by civilians. A discussion of the limited progress towards compliance with provisions related to increasing the use of civilian staff to fill roles currently occupied by uniformed staff, reducing the use of awarded posts, and maximizing staff schedules is included in the Compliance Assessment section of this report.

- **Current Staffing Numbers**: The genesis of the Department's staffing problems appears to be rooted in how the Department allocates and manages its staffing resources given that the Department continues to have one of the largest complements

23

of uniformed staff that the Monitoring Team has encountered in its decades of working in the field. It is important to note that there has been a continued decline in the number of uniformed staff on the payroll, as shown in Table 9 of Appendix F. The average number of uniformed staff during the current Monitoring Period was 42% lower[15] than in 2019 (5,877 versus 10,115). Further, the hiring of new staff has not kept pace with the rate of attrition. In 2025, the Department lost a total of 597 uniformed staff while only 270 new officers graduated from the Training Academy (*see* Tables 10 and 11 in Appendix F).

- **Staff Absenteeism**: The Department has continued to address and sustain improvements to some of the policy and management issues that underlie staff absenteeism, including work to better manage sick leave, modified duty ("MMR"), absent without leave ("AWOL"), the use of personal emergency ("PE") and Family Medical Leave Act ("FMLA"). However, staff absenteeism remains significant, with approximately 13% of uniformed staff absent on any given day in 2025, a proportion that has not changed significantly since the COVID-19 pandemic receded in late 2022 (*see* Appendix F, Table 3). These numbers do not account for those on scheduled vacation, in training, or who are permitted to come in late after working a double shift.

- **Unmanned Posts & Staff Off Post**: Two situations routinely occur throughout the jails where people in custody are left unsupervised—first, when a housing unit does not have a staff person assigned because an insufficient number of staff reported to

---

[15] During this period of time, the average daily population of incarcerated individuals only decreased about 3% from an average of 7,388 individuals in 2019 to an average of 7,155 individuals in 2025.

24

work, and second, when staff leave their assigned post without being properly relieved. Leaving a housing unit without an officer on the B post, however briefly, should never occur. Staff must be present at all times to maintain the safety and security of individuals in the housing unit and abate issues that arise, such as medical emergencies or interpersonal conflicts. As shown in Table 9 in Appendix B, at least 92 uses of force occurred during this Monitoring Period when a staff member was not on post, either because staff were not assigned to the post or the officer left their post without appropriate relief.[16] Facility leaders report to the Monitoring Team that they continue to struggle with unmanned housing areas due to a lack of available staff to assign to the posts. The Monitoring Team continues to observe unmanned posts during site visits.

Further, pursuant to the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 6, staff are not permitted leave their assigned post without a Supervisor's permission and staff assigned to housing unit posts are not permitted to leave their post until they have been properly relieved (absent an exigent circumstance). However, staff continue to be found off post across all facilities and can be easily observed leaving their posts on Genetec video. Table 10 in Appendix B shows the proportion of NCU's random security audits that identified that staff were off post, illustrating how pervasive this problem remains. During the current Monitoring Period, over 60% of

---

[16] While the number of incidents may appear to be small given the overall number of use of force incidents during this Monitoring Period, this is not the appropriate context to view such incidents. The proper context to consider is that the staff's absence means that *all* such incidents were potentially avoidable. Had staff been present and conducting their duties appropriately, they may have been able to prevent, deter or mitigate the incident that led to the use of force.

the random audits found that staff were off post for some period of time, which is alarming given that this practice should *never* occur.

- **Excessive Use of Overtime**: An important indicator of efficient workforce management is the use of overtime. This Department relies heavily on overtime to operate the facilities. Overtime can of course be used efficiently to address temporary staff shortages and unusual situations. However, using overtime to address chronic staffing issues, as this Department does, has significant fiscal consequences and an obvious negative impact on staff wellness and morale. Staff are also more likely to make errors when tired, thus the agency's excessive use of overtime negatively impacts overall staff performance and increases risk of harm to both staff and incarcerated individuals. Staff in the facilities are routinely required to work overtime on a second shift, and in some cases, may work at least part of a third shift. In 2025, there were 524 instances where staff worked at least half of a third shift (*i.e.*, over 20.28 hours; *see* Appendix F, Table 7). The Department spent over $25 million *per month,* totaling over $165 million for the Monitoring Period, to compensate staff who worked overtime. These are the highest overtime expenditures since the Monitoring Team began analyzing this data in 2019. *See* Appendix F, Table 8 for more detail. The use of overtime and any corresponding restrictions are managed by a variety of divisions and leadership. Given that, in practice, there are limited controls over the use of overtime.[17] Not only is this costly for the City, but it has an obviously deleterious impact on staff well-being. Staff and leadership routinely report the

---

[17] Appendix K of the Monitor's 20th Report (dkt. 947) discusses the Departments efforts to monitor and manage the use of overtime.

fatigue, stress, family disruption and work-life imbalance that result from working so many hours. This is antithetical to the demands of the job and the necessity for staff to arrive to work with the appropriate mindset, patience, physical wellness and alertness.

- **Facility-Added Posts**: Facility-added posts are daily temporary posts added by the facility that are purportedly added to address specific and urgent operational needs of the facility. This practice is not governed by policy. A draft policy was developed in this Monitoring Period and the Monitoring Team provided feedback. The status of this policy is unknown given the administration change.

## CONCLUSION AND NEXT STEPS

Although the Department has maintained several strategies designed to address the many convoluted dynamics that underpin the Department's inability to optimize staff deployment, tangible progress has been incremental at best. At the leadership level, the commitment to installing corrections professionals from outside the Department has degraded, restoring the insular track to uniformed leadership without an earnest and sustained effort to address the problem that the addition of outside experts was intended to solve. Just after the Monitoring Period ended, the Department contracted with a qualified external consultant to conduct a staffing analysis. This, in combination with the appointment of the Remediation Manager, is a promising shift that could infuse outside expertise and catalyze the type of overarching staff deployment strategy that has been needed for many years. The Monitoring Team continues to strongly recommend the Department's internal management structure must have an infusion of leaders from outside the Department who have the requisite operational expertise to direct, guide and implement the reform of the Department's operation.

In terms of next steps, the Monitoring Team recommends the following:

27

- **Improve Quality of DOC's Leadership and Supervision**: Concrete and specific action must be taken to elevate the quality of supervision throughout the Department. This could be done in a variety of ways, including an infusion of external support (ensuring they are appropriately integrated into the system) or via training, guidance, and coaching to elevate the skill set of current supervisors and leaders.

- **Increase Number of Supervisors**: The overall number of supervisors must be increased to ensure they have a workable span of control (*i.e.*, number of officers supervised).

- **Expand Supervisory Organizational Structure**: The Monitoring Team reiterates our longstanding recommendation for the Department to expand the organizational structure for Supervisors to include three ranks of supervisors instead of two.

- **Create Reliable List of Posts & Staff Assignments**: The Department must identify all posts it currently operates and then assess whether each of those posts is, in fact, necessary. An important corollary to that work, the Department must be able to reliably identify the posts to which each uniformed staff member is actually assigned. The City and the Department must dedicate the necessary resources to support the work of the external staffing analyst and the Department's internal resources to complete this work.

- **Simplify and Secure Overtime Controls**: The Department's practices for managing overtime are convoluted and susceptible to abuse. Given the volume at which overtime is used, more secure and straightforward practices are needed for managing and operating overtime. Appropriate and improved management of staff assignments and optimization of work schedules will also necessarily contribute to improved management of overtime. Further, the Monitoring Team recommends that an investigation of the Department's

28

overtime practices should be initiated, to the extent it has not been, given the significant
issues raised in both the management and use of overtime.

- **Optimize Staff Work Schedules**: DOC must develop a strategy to alter its current
  inefficient work schedule. In violation of the Court's Orders, DOC has taken **no** action in
  this area and must develop and execute a strategy for doing so.

- **Dedicate Resources for Civilian Support**: DOC ultimately cannot reduce its reliance on
  uniformed staff in posts across the agency unless sufficient civilian resources are
  available to take on the administrative work currently done by uniformed staff. To that
  end, the City must allocate appropriate resources both in terms of funds and process to
  transition positions and/or job duties to civilian staff in a streamlined and efficient
  manner.

## ASSESSMENT OF THE DEPARTMENT'S USE OF FORCE AND SECURITY PRACTICES

The Department's use of force and security practices are deeply interconnected, and deficiency in one area inevitably impacts the other. Together, poor security practices and excessive and unnecessary uses of force are the center of the vortex for the risk of harm. Poor security practices create disorder and conditions where violence becomes more likely, which contribute to the need to use force that may have been avoided if proper security measures were taken. These practice errors remain common in the jails, as do uses of force that are either unnecessary or excessive.

This section discusses data related to the use of force and violence in the jails, the Department's assessment of its security practices, and a summary of the Monitoring Team's findings in this area. The Monitor's January 13, 2026 Report (dkt. 947) at pgs. 28-29, 40-43, 45-51, and Appendix L provides a compendium of the security problems that are pervasive throughout the incidents that occur in the jails, and the excessive and unnecessary use of force that too often ensues. These problems remained unchanged during the 21st Monitoring Period.

### TRENDS IN USE OF FORCE AND VIOLENCE METRICS, 2016-2025

One component of the Monitoring Team's strategy for assessing compliance with the *Nunez* provisions is to evaluate trends in key metrics related to the use of force and various types of violence occurring in the jails. Detailed data are provided in Appendix B, "Use of Force and Violence Indicators." These data show few differences in outcomes for the current Monitoring Period and the previous Monitoring Period. Longer term trends are useful for assessing the trajectory of the reform effort, as shown in the graphs below.

These graphs illustrate the persistently high rates of most metrics related to violence and disorder in the jails. Notably, the use of force rate and the rate of fights remain at concerningly high levels. Modest improvements are taking shape in other areas, but overall, these data portray a dangerous jail system with a persistently elevated risk of harm.















The Monitoring Team compares current data to previous time periods for different

purposes. Most importantly, the Court has explained that the *Nunez* "Court orders [are] designed

to remedy consistently unconstitutional levels of violence and disorder in the jails."[18] To that

end, the Court's November 26, 2024 Contempt Order (dkt. 803) expressly finds that current data

must be compared to the state of affairs in 2016.[19] The Monitoring Team also makes

comparisons to other points in time, including 2018 (first full year of implementation of the new

---

[18] *See*, Court's November 26, 2024 Order (dkt. 803) at pg. 50.

[19] *See*, for example, the Court's November 26, 2024 Order (dkt. 803) at pgs. 50 and 52.

Use of Force Directive) and 2021 (the apex of the Department's staffing crisis), because these comparisons help to explain the context for *why* certain changes may have occurred.

- **Comparisons to 2016, When the Consent Judgment Went into Effect**: This point of comparison is anchored to a period of time when conditions were deemed unconstitutional, and also to a period when the Department's original use of force definition and policies governed practice.

| Comparison: 2016 Rates versus 2025 Rates | |
|---|---|
| **Current is Same/Better than 2016** | **Current is Worse than 2016** |
| <ul><li>38% reduction in UOF A with injury (1.6% versus 1.0%)</li><li>89% reduction in UOF with A or B injury (36.6% versus 3.9%)</li></ul> | <ul><li>111% increase in Use of Force (3.96 versus 8.37)</li><li>129% increase in Stabbings/Slashings (0.14 versus 0.32)</li><li>79% increase in Fights (5.11 versus 9.13)</li><li>51% increase in Assault on Staff with UOF (0.72 versus 1.09)</li><li>Rate of Fires was 0.0 versus 0.42</li></ul> |

- **Comparisons to 2018, When the New Use of Force Definition Went into Effect**: This point of comparison is anchored to the time when the New Use of Force Directive, which defined use of force and established new use of force protocols and requirements was promulgated and went into effect.

| Comparison: 2018 Rates versus 2025 Rates | |
|---|---|
| **Current is Same/Better than 2018** | **Current is Worse than 2018** |
| <ul><li>57% reduction in UOF A with injury (2.3% versus 1.0%)</li><li>87% reduction in UOF with A or B injury (34.4% versus 3.9%)</li></ul> | <ul><li>42% increase in Use of Force (5.9 versus 8.37)</li><li>255% increase in Stabbings/Slashings (0.09 versus 0.32)</li><li>47% increase in Fights (6.2 versus 9.13)</li><li>12% increase in Assault on Staff with UOF (0.97 versus 1.09)</li><li>Rate of Fires was nearly zero (0.02) versus 0.42</li></ul> |

- **Comparisons to 2021, When the Department's Staffing Crisis Hit an Apex**: This point of comparison is anchored to a time when the Department's staffing problems, exacerbated by the COVID-19 epidemic, reached a crisis level and intensified the risk of harm in the jails.

| Comparison: 2021 Rates versus 2025 Rates | |
| --- | --- |
| **Current is Same/Better than 2021** | **Current is Worse than 2021** |
| <ul><li>32% decrease in UOF (12.23 versus 8.37)</li><li>82% reduction in UOF A with injury (5.7% versus 1.0%)</li><li>79% reduction in UOF with A or B injury (18.3% versus 3.9%)</li><li>49% reduction in Stabbings/Slashings (0.63 versus 0.32)</li><li>25% reduction in Serious Injuries to Individuals (1.9 versus 1.42)</li><li>2% reduction in Fights (9.28 versus 9.13)</li><li>35% reduction in Assault on Staff with UOF (1.67 versus 1.09)</li><li>78% reduction in Assault on Staff without UOF (2.26 versus 0.49)</li><li>82% reduction in Fires (2.36 versus 0.42)</li></ul> | |

The high rates of violence and use of force are intertwined with the Department's failure to consistently implement basic security practices. This is discussed in detail below. The related issues of identifying and managing individuals in custody who are prone to violence and the Department's efforts to identify strategies to deal with this population are discussed elsewhere in this report.

**DEPARTMENT'S FINDINGS REGARDING PROBLEMATIC UOF AND SECURITY PRACTICES**

The Department generates a plethora of information about staff's failure to consistently implement basic security practices. These include:

- *Nunez* **Compliance Unit Audit Findings**: For several years, NCU has produced security audits that utilize a rigorous methodology and offer valuable insight into the

34

way in which housing units in each jail are managed. During the current Monitoring Period, NCU conducted 26 security audits. The findings for this Monitoring Period identify similar problems and practice deficiencies as those reported during the past five years of NCU's audits, beginning in 2021. These include:

- o   Staff frequently abandon housing area posts.

- o   Unsecured cell doors during times when staff were actively supervising the tier.

- o   Incomplete housing unit tours, improper use of tour wands, and poorly executed safety/welfare checks when incarcerated individuals were locked in their cells.

- o   Incomplete and/or inaccurate logbook entries.

- o   Cursory Supervisor tours (although those completed by ADWs tended to be more robust).

- o   Absence of meaningful presence of Wardens, DWs and Tour Commanders on the housing units.

- **Reports from Facility Leadership**: The Monitoring Team's routine communications with facility Wardens and Deputy Wardens indicate that many of these individuals are aware of these performance issues among their staff. While these facility leaders do, in some instances, make efforts to provide coaching and guidance—often utilizing video footage—the effectiveness of these efforts has not yet been determined. The pervasiveness of poor security practices and their connection to unnecessary uses of force contributes to the ongoing risks of harm to those in custody and Department staff.

- **Immediate Corrective Action for Staff Misconduct**: The Department took 2,469 immediate corrective actions for UOF-related misconduct during the current Monitoring Period and is similar to the last Monitoring Period (*see* Appendix E, Table 2). The extent

35

to which the volume and severity of these actions are commensurate with the underlying UOF-related misconduct identified during the period is discussed in more detail in the compliance assessment for First Remedial Order § C., ¶ 1 & § C., ¶ 2.

- **Rapid Review Findings**: During the current Monitoring Period, Rapid Reviews recommended 3,556 corrective actions for 1,967 staff members' UOF- related misconduct. This reflects a slight increase over the prior Monitoring Period, when Rapid Reviews recommended 3,089 corrective actions for 1,666 staff.  More information about the quality of Rapid Reviews can be found in the compliance assessment for First Remedial Order § A., ¶ 1.

- **Command Disciplines Referred by Other Sources**: In addition to those referred via Rapid Reviews, 1,395 staff were referred via other sources for Command Disciplines. Of these, 782 (56%) resulted in substantial penalties or referrals for formal disciplinary charges.

- **Actions Taken by the Investigations Division**: During the current Monitoring Period, ID took some type of corrective action or referred a case for a Full ID investigation, for 2161 uses of force, which is 59% of all incidents that occurred.[20] ID also determined that at least 206 incidents involved excessive force, unnecessary force, or force that may have been avoidable.

Although this information is generated through multiple structures within the Department and has been available to leadership within the Department for many years, the Department has yet to fully utilize this readily available information in the development of a comprehensive plan

---

[20] 15% of incidents that occurred this Monitoring Period were still pending intake investigation at the time this data was compiled (January 31, 2026). It is possible that this number increases as these investigations are closed.

to improve staff practice. Development of such a strategy is fundamental to the reform effort and must be prioritized by the Remediation Manager Team in order to address the various Contempt findings and minimize the ongoing risk of harm in the jails.

**MONITORING TEAM'S FINDINGS REGARDING UOF AND SECURITY PRACTICES**

Although a wide variety of problematic practices related to security and the use of force continue to negatively impact the Department, it has made progress in certain areas that has been sustained for a year or more. This includes:

- a clear definition of "use of force" that includes a broad range of physical and chemical interventions,

- ensuring that most use of force incidents are reported,

- experiencing fewer large, chaotic disturbances,

- using tactical equipment with significantly less frequency (*e.g.*, batons, tasers, OC grenades, stun shields),

- utilizing low-grade physical interventions in the majority of incidents,

- activating Emergency Response Teams far less often, and

- inflicting fewer injuries to people in custody and staff during use of force events.[21]

These advancements, if sustained, can be important building blocks for additional progress toward reform, as described throughout the remainder of this section.

The Monitoring Team has long reported its findings regarding these pervasive problems in basic security practices and their relationship to use of force events. The record in this case is

---

[21] *See* Monitor's November 22, 2024 Report (dkt. 802) at pg. 16; Monitor's May 22, 2025 Report (dkt. 850) at pgs. 15-22; and Monitor's January 13, 2026 Report (dkt. 947) at pgs. 43-45.

replete with descriptions of these issues and illustrative case examples.[22] Most recently, the

Monitor's January 13, 2026 Report (dkt. 947) provided a compendium of the pervasive problems

identified during the Monitoring Team's review of incidents from January-June 2025 (*see* pgs.

46- 51 and Appendix L). These same problems persisted throughout the current Monitoring

Period:

- Precipitating staff conduct (*e.g.*, hyper-confrontational, argumentative behavior, unprofessional conduct such as threats, profanity and racial epithets).

-  Failure to attempt de-escalation prior to resorting to the use of force.

- Poor security practices, such as failures to secure doors, to limit congregation in cells and vestibules, to utilize security hardware, to supervise and control the environment, and to utilize reasonable search and escort procedures.

- Excessive and unauthorized uses of chemical agents, particularly when immediate intervention is not required to address the extant risk of harm.

- Staff failures to intervene, even in situations involving an obvious risk of harm.

- Painful escort holds and aggressive takedown techniques.

- Failures to comply with Anticipated Use of Force protocols.

- Failures to reduce interpersonal violence through effective supervision and meaningful intervention.

- Prevalence of use of force during searches, particularly in areas that do not have camera coverage and when staff fail to activate their body worn cameras.

- Use of head strikes in circumstances not permitted by policy.

---

[22] *See* Monitor's April 18, 2024 Report (dkt. 706) at pgs. 29-38.

- Discounting the risk inherent in any use of force by limiting the perception of harm to only incidents that result in injury.

CONCLUSION

Overall, given the ongoing patterns and practices cited herein, the fact that the Department appears to have curtailed some of the most egregious uses of excessive force does not alleviate the Monitoring Team's continued concerns about the failure to properly implement the Use of Force Directive, reform staff practice and substantially reduce the risk of harm faced by people in custody and staff. The fact that many incidents end with force that appears facially necessary or low-level does not, in and of itself, show meaningful compliance because the assessment of compliance is not limited to the narrow question of whether staff avoided the worst possible tactic at the final moment of confrontation. The purpose of the reform is to improve the Department's *overall* management of force: preventing violence when possible, protecting people in custody from harm from each other and from staff abuses, requiring de-escalation where feasible, ensuring planned responses when force is anticipated, prohibiting provocative or retaliatory conduct, and requiring accurate reporting and accountability. When staff repeatedly fail in those antecedent and surrounding duties, their subsequent use of low-level force does not reflect a system that has properly embraced the duty to protect incarcerated individuals from harm. Instead, the patterns and practices described above reflect a system that is generating avoidable force events and then responding to them. For that reason, the reduction of the most extreme forms of violence at the hands of staff, while important, is better understood as a baseline expectation than as proof of compliance with the *Nunez* Court Orders. To conclude otherwise would risk treating the absence of the worst misconduct as evidence that reform has

39

been achieved, when the record instead shows a persistent and pervasive failure to satisfy the

core obligation to substantially reduce the risk of harm to those in custody.

## MANAGING BEHAVIOR OF PEOPLE IN CUSTODY

An important aspect of facility safety is the framework for managing the behavior of people in custody—both how positive behavior is incentivized and how negative behavior is penalized. An essential underpinning of this effort is to ensure people are appropriately classified according to their risk of institutional misconduct and assigning them to housing that is commensurate with their assessed level of risk. This section discusses the Department's work in these key areas: classification, incentivizing positive behavior, and managing those who engage in serious violence.

### CLASSIFICATION

An objective jail classification system is an essential tool for promoting safety by housing and managing people in custody according to their risk of institutional misconduct. In general, two key steps are involved: (1) assessing a person's level of risk by scoring a set of objective risk factors, totaling the number of points and assigning a custody level; and (2) assigning the person to a housing unit with security features commensurate to their custody level (generally, celled housing for people at higher risk of institutional misconduct, and dormitory housing for people at lower risk).

To assess each person's risk, the Department currently utilizes two classification forms (one for initial classification upon admission and another for reclassification at 60-day intervals and/or following serious institutional misconduct).[23] In January 2026, Dr. James Austin[24]

---

[23] For a period of time during the pendency of this case, the Department utilized a system called the Housing Unit Balancer ("HUB") for the purpose of custody classification and housing. Its use was discontinued in January 2022. *See* Monitor's October 31, 2016 Report (dkt. 291) at pgs. 130-131, Monitor's October 10, 2017 Report (dkt. 305) at pgs. 214-215 and 222-224; Monitor's October 17, 2018 Report (dkt. 317) at pgs. 170-171 and 176-177; Monitor's October 28, 2019 Report (dkt. 327) at pgs. 229-231 and 266-267; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 227-228 and 262-263; Monitor's March 16, 2022 Report (dkt. 438), pg. 53 to 56.

[24] James Austin, Ph.D., is a nationally recognized expert on population management, classification and restrictive housing. He was retained by DOC in 2021 pursuant to the Second Remedial Order (dkt. 415). He has provided the

assessed the Department's classification tools and found that they are reliable (*i.e.*, consistently applied), valid (*i.e.*, accurately classify people according to risk of misconduct) and meet industry standards.

Recently, there has been a reinvigorated effort to review the Department's classification process because of its interface with so many aspects of managing people in custody and reducing violence. The Department's August 2025 Safety Plan reported efforts to centralize the classification function in the Custody Management Centralized Movement Unit ("CMCMU"). While Dr. Austin validated the classification tool, he made a number of recommendations to enhance the classification process flowing from his January 2026 validation study (*see* Monitor's 20th Report at pgs. 170-171). In addition, because classification, security and supervision are so intertwined, the Monitoring Team's work on other issues has led to concerns about the extent to which housing assignments are aligned with individuals' custody levels, and how the Department might reformulate its policy and Housing Plan to better concentrate individuals with similar levels of risk in the same units. Doing so would allow staffing and supervision to be calibrated more effectively, since individuals with higher classification levels generally require greater supervision and security controls than those assessed as lower risk.

These and other questions are in the early stages of review, but the Monitoring Team has already rendered two important findings and corresponding recommendations. First, the Monitoring Team determined that the role of the CMCMU had been marginalized with the Department's organization structure and may have lost the necessary authority and priority to properly implement this essential tool. Accordingly, the Monitoring Team recommended

---

Court with two declarations outlining his work with DOC. *See*, Declarations of James Austin dated August 8, 2023 (dkt. 109-1) and March 13, 2024 (dkt. 689-9).  Dr. Austin's work with DOC was referenced in the Monitor's January 13, 2026 Report (dkt. 947) and referred to as "DOC's Consultants."

CMCMU needed to report separately from the security function and needed to be elevated. As a result, the ADW in charge of CMCMU now reports directly to the Chief of Department. Further, the Monitoring Team recommended that the Department must ensure the leadership of CMCMU have both the adequate authority and expertise in classification. To that end, the Monitoring Team has recommended that the Department reinstitute a Deputy Commissioner of Classification and ensure this individual has significant expertise in classification.

Beyond the need for improved leadership of classification, the Monitoring Team is collaborating with both the Department and the Remediation Manager Team to consider whether any additional changes are necessary in response to the recommendations flowing from Dr. Austin's January 2026 validation, as well as a review of DOC's practices more generally.

**INCENTIVIZING POSITIVE BEHAVIOR AMONG PEOPLE IN CUSTODY**

The Department opened an Honors Unit at GRVC in November 2025 to incentivize positive behavior among people in custody. Individuals who have been infraction-free for at least 120 days are eligible to apply for placement in a unit with an enhanced physical plant (*e.g.*, thicker mattresses, in-unit washer and dryer), more privileges (*e.g.*, exclusive commissary options, video game system), and greater access to both on- and off-unit programming (*e.g.*, enhanced recreation, driving simulator) as an incentive for continued compliance with facility rules. The Monitor's 20th Report (dkt. 947) discusses the unit's operation on pgs. 55-56.

**SANCTIONS FOR MID-LEVEL MISCONDUCT**

The rate of fights in 2024/2025 was nearly at a record level (*see* Appendix B, Table 5) and fights remain a primary reason that force is used in the jails.[25] In addition to increasing staff

---

[25] *See* Monitor's 20th Report (dkt. 947) pgs. 40-43.

skill in de-escalating interpersonal conflict before it becomes violent and ensuring staff actively supervise housing areas in a manner that reduces opportunities for such conflict to escalate, the Department must also develop an effective approach to deterring violent behavior among those in custody, including having appropriate consequences and sanctions. Since the inception of the Consent Judgment, the Monitoring Team has recommended that the Department fortify its process for responding to mid-level misconduct (*e.g.*, fights). *See*, Monitor's May 31, 2016 Report (dkt. 291) at pgs. 98 and 105-106. Infractions need to be written, served and processed in a fair and reliable manner, and the Department needs a variety of sanctions to respond meaningfully and proportionally to lower-level violent behavior and other less serious misconduct. During the current Monitoring Period, the Department introduced a new digital platform for staff to issue infractions. Subsequent phases of the project will include a module for Captains to investigate the alleged misconduct as well as a module for the Adjudication Captains to create an electronic record of due process hearings, dispositions and sanctions. This effort to modernize the infraction system is essential and, in addition to bringing critical integrity to the process, will permit the Department to utilize the data the system contains to inform its strategy for managing the behavior of those in custody. Additional information regarding the status of the electronic infraction system and other Department technology initiatives is provided in Appendix I.

In addition to finalizing the electronic infraction system, the Department must equip the facilities with meaningful options for responding to mid-level misconduct. The only sanction currently available is commissary restriction, which is widely recognized as ineffective. Historically, staff have reported low confidence in the efficacy of available sanctions and, as a result, do not always complete the infraction process. Creating a stronger response to mid-level

misconduct will therefore require not only more effective sanctions but also restoring staff confidence in the process and reinforcing the necessity of consistently using it. The Department's lack of effective responses to mid-level misconduct is a primary contributor to its limited ability to deter violence and reduce the use of force in the jails.

**MANAGING PEOPLE WITH A KNOWN PROPENSITY FOR VIOLENCE**

When an incident involving serious violence occurs, the facility where the incident took place refers the perpetrators of these incidents to Enhanced Supervision Housing at RMSC ("RESH") which is a restricted housing program that affords higher security levels, controlled movement, and intensive programming. Following the referral, several dispositions are possible. During the current Monitoring Period, about 1,000 people were referred to RESH (average 166 per month). Of these, 58% were admitted to RESH, 4% were referred/admitted to SMU, 25% met criteria but were denied admission to either program because they had a mental health or physical health issue that excluded them from the program, and 12% were denied because they did not meet criteria for either program. In other words, the Department does not yet have an appropriate intervention for a significant portion of incarcerated individuals who engage in serious violence (*i.e.*, the 25% who are excluded for a medical or mental health condition, and those whose violent behavior warranted a RESH referral, even if not quite serious enough for admission). The various responses to people who engage in serious violence are discussed in more detail below.

- **Enhanced Supervision Housing at RMSC ("RESH")**: In June 2024, the Department opened its Enhanced Supervision Housing at RMSC ("RESH"). The program's design and operation were discussed in detail in the Monitor's 20th Report (dkt. 947) at pgs. 57-63, along with the findings of the Monitoring Team's review of a sample of case files.

While the program continues to operate according to design in many areas as described in Appendix M, high levels of staff absenteeism and high rates of violence in the Level 2 units continue to present challenges to the orderly operation of the units. Appendix B, Table 12 (a) shows the reductions in most metrics since the unit first opened at RMSC. Appendix B, Table 12 (b) shows the significantly higher rates of interpersonal violence in Level 2 housing (which does not utilize restraint chairs).

- o *Placement Concerns*: When an individual is promoted from Level 1 to Level 2, typically the RESH Committee (in collaboration with CMCMU and CIB) identifies the appropriate Level 2 housing unit and tier in an effort to avoid placing individuals with known, pre-existing interpersonal conflicts on the same tier. During the current Monitoring Period, the required process for housing individuals in Level 2 was briefly subverted by the Deputy Commissioner of Security, Assistant Chief of Security and Operation Security Intelligence Unit ("OSIU"), which began making Level 2 housing decisions outside of the prescribed process, placing people with known interpersonal conflict and a propensity for engaging in serious violence on the same tier, where they had regular, unimpeded access to each other. Predictably, this resulted in an uptick of violence. In November 2025, the rate of fights in Level 2 increased 119% from its October 2025 level (from 14.9 to 32.7) and the rate of stabbings/slashings increased 290% (from 2.1 to 8.2). After the current RESH Warden expressed concern to the Deputy Commissioner of Security, the previous process, led by the RESH Committee and required by policy, resumed. This strategy was planned and implemented by leaders at the highest level of the agency and, if not for the

concern expressed by the facility Warden, would have continued. The Monitoring Team is not aware that any steps were taken to hold leadership accountable for initiating or permitting this practice to occur. This raises serious concern about the judgment of those leaders and their commitment to running a safe and humane jail system.

- **Special Management Unit ("SMU")**: The Department continued to operate the SMU throughout the current Monitoring Period. This program is discussed in detail in the Monitor's 20th Report (dkt. 947) at pgs. 63-68. The program's operation and dynamics were unchanged in this Monitoring Period.

- **NIC/Involuntary Protective Custody**: During the current Monitoring Period, the Department continued to utilize NIC to house individuals who pose a variety of security risks,[26] as described in the Monitor's 20th Report (dkt. 947) at pgs. 68-70. Following the end of the current Monitoring Period, the Department has essentially closed the NIC facility.[27] This is an important action because of the poor conditions and inhospitable physical plant of units used to house those who engaged in serious misconduct. The Monitoring Team is reviewing the subsequent housing assignments and management of individuals in Involuntary Protective Custody[28] to ensure their placement in a setting that provides the necessary level of protections, affords all minimum services and provides opportunities for meaningful human interaction.

---

[26] This includes individuals placed in separation status awaiting potential secretion of weapons, individuals placed under Court-ordered lock-down, and individuals placed in involuntary protective custody.

[27] The facility has not yet been officially decommissioned, but the Department has ceased use for housing individuals in custody. *See*, Monitor's April 23, 2024 Report (dkt. 975) at pgs. 10 to 11.

[28] The Monitoring Team shared feedback with the Department in July 2024 with recommendations regarding the process for placement of individuals in Involuntary Protective Custody. This feedback remains outstanding.

- **Behavioral Health Unit**: As noted above, during the current Monitoring Period, about 25% of incidents involving serious violence were committed by individuals who have serious mental illnesses or medical conditions that exclude them from placement in RESH and the SMU. This pattern has been discussed in several prior Monitor's Reports.[29] Historically, a very small number of these individuals were placed in the Clinical Alternatives to Punitive Segregation ("CAPS") program, but this program was not operable throughout the current Monitoring Period. This left the Department without options for responding to the serious violence committed by this population and so they were generally housed in General Population or Mental Observation units across the Department. The Monitoring Team continues to encourage the Department to develop a programmatic response to this behavior, such as a Behavioral Health Unit ("BHU"), that includes the necessary level of mental health support and services in the response to serious violence committed by these individuals.

- **Individuals Frequently Involved in Violence & Uses of Force**: The Monitoring Team has long reported that a small number of individuals are frequently involved in violence and/or uses of force. The Monitoring Team's ongoing work continues to reveal that the Department has yet to develop strategies to safely manage certain individuals in their care. Facing few consequences for their actions and without the type of behavior supports that are obviously indicated, a small subset of individuals continues to inflict harm against other individuals and staff unabated. While the Department has an established

---

[29] *See* Monitor's November 8, 2023 Report (dkt. 595) pg. 21; Monitor's November 30, 2023 Letter to the Court (dkt. 616) pg. 9; Monitor's April 18, 2024 Report (dkt. 706) pgs. 49-50; Monitor's November 22, 2024 Report (dkt. 802) pg. 35; Monitor's January 31, 2025 Report (dkt. 814) pgs. 24, 27; Monitor's January 13, 2026 Report (dkt. 947) at pgs. 70-71; and Declaration of James Austin dated March 19, 2024 (dkt. 689-9) at ¶ 28.

practice of labeling these individuals "problematic" and at times has collaborated with CHS to develop behavior plans via the Persons in Need of Supervision ("PINS") framework, neither the label nor the PINS interventions can be effective without a far more holistic approach to identifying, assessing and sustaining effective interventions to address the risks of harm these individuals pose. The Monitoring Team will renew its focus on this group of individuals as part of its assessment of both involuntary protective custody and potential restricted housing unit approaches.

**CONCLUSION AND NEXT STEPS**

Clearly, the Department has significant work to do to develop an effective continuum of strategies for managing the behavior of people in custody. This includes:

- Ensuring the Classification unit has both the expertise and authority to manage the process of assessing individuals' risk of institutional misconduct and ensuring people are assigned to housing units commensurate with their custody level.

- Developing a robust array of consequences for mid-level misconduct to address the high rates of less serious violence (fights) and the ensuing uses of force.

- Management of RESH must address the frequency of violence, particularly in the Level 2 housing units.

- A critical need to develop additional options to address the risks and needs of those who are frequently involved in violence (*e.g.*, create additional SMU beds) and those who engage in serious violence but are excluded from RESH due to mental health or physical conditions that contraindicate placement.

Together, these strategies could provide a pathway forward that would reduce the use of force and enhance safety for both those in custody and staff.

49

## UPDATE ON WORK UNDERWAY RELATED TO LL42

Outlined below is a summary of the work that has occurred during the 8-week period since the Monitoring Team's last report on April 23, 2026.

▪ **Engagement of the Monitoring Team, Department, Remediation Manager Team and other Stakeholders**: Leadership from the Department and Law Department, the Remediation Manager Team ("RMT") and the Monitoring Team ("MT") regularly engage on matters related to LL42 and to develop a pathway forward. The Department/Law Department, the RMT, and the MT have communicated with the LL42 Parties in various different forums. This included two meetings the Department convened with representatives from the Defender Organizations (including members of the LL42 Parties and additional organizations as well) to discuss a variety of issues related to the Due Process pilot project and other corresponding matters related to LL42.

▪ **Pilot Project Development**: The approach and goals of the pilot projects remain as described in the Monitor's April 23, 2026 Report at pgs. 13 to 15. Below are some interim updates:

   o Due Process Pilot: The Department, in close consultation with the MT, has been actively engaged in developing the framework for the Due Process pilot. This work has also been informed by input from the Defender Organizations as well. The Senior Deputy Commissioner overseeing the Adjudication Unit, who was appointed in June 2026, has now also begun working with the Department on these matters. The Department has identified a list of key tasks that need to be completed in order to finalize the development of the framework and has begun to

50

execute those tasks.  The framework for the pilot is expected to be completed by the end of the summer with the goal of initiating the pilot in the fall.

- o <u>Restrictive Housing Pilot Project</u>: The Department, RMT, and MT have identified and convened the necessary stakeholders to begin developing the RH Pilot. The initial work has focused on the philosophical/programmatic approach, addressing logistical matters, and how to address the MT's various findings and recommendations regarding enhancements to RESH.  An overarching work plan for the pilot project is under development and is expected to be completed by early Fall 2026.

- **Coordination of Monitor/Remediation Manager**: The MT and RMT have developed an internal plan to develop a joint approach regarding each of the LL42 provisions that have been stayed by the Court.  The goal is to complete this work in early Fall 2026.

- **Additional Resources**: The City has offered the Department some temporary, part-time administrative support for the development of the RH pilot project. The RMT and MT have also provided interim support to the Department to continue to advance the work of the two pilot projects. However, this is not sustainable and additional dedicated resources are needed.

Important work has continued regarding advancing the issues related to LL42.  However, as the MT has continued to emphasize, the reform effort must be responsibly balanced to ensure progress is advanced and the work to implement LL42 must be integrated into the inescapable realities of competing responsibilities and other priorities of the Department's operations.  The work related to LL42 has occurred simultaneously with other significant tasks including, but not limited to:

51

- The Commissioner's and Remediation Manager's development of their respective Leadership Teams;

- Routine consulting/collaborating with the MT as the leadership teams get up to speed and work to develop appropriate plans and priorities for their work;

- The Departments Revised Organizational Chart, which the Remediation Manager filed with the Court on May 5, 2026 (dkt. 978);

- Addressing the *Nunez* requirements more generally;

- Assessing Compliance with the *Nunez* Court Orders as outlined in this report; and

- Development of the Remediation Action Plan by the RMT, in consultation with the MT.

## NEXT STEPS & RECOMMENDATIONS

The MT, in consultation with the RMT, recommends the following next steps are taken with respect to LL42 issues. These recommendations necessarily contemplate and incorporate the balance needed to advance the work related to LL42 with the many other competing priorities of the other *Nunez* requirements.

- **Finalization of Pilot Projects' Framework**: Development of the framework for the pilot projects will continue throughout the summer. The goal is to complete the framework for the pilot projects by early Fall 2026.

- **Engagement of the LL42 Parties**: The LL42 Parties will continue to be engaged on an informal basis. Discussions to provide updates and opportunities for input will be convened when specific tasks are completed and/or to obtain input on other LL42 matters as necessary and appropriate. The purpose of these informal meetings and other confidential communications is to foster collaboration and to identify where agreement may be reached.  The MT also intends to provide a confidential written submission to the

52

limited City Intervenors in response to their requests after the MT has had an opportunity to more fully engage the RMT and DOC on various operational matters.

▪ **Assignment of Dedicated Administrative and Project Management Resources**: The MT continues to strongly recommend that the Department must be provided **new** and **more** resources (beyond what the Department currently has) that are dedicated to support the pilot projects and other *Nunez* matters that require administrative and project management support, as well as necessary support on policy development and operational/legal/compliance related issues.

▪ **Monitoring Team Updates to the Court**: In the short term, the MT intends to provide the Court with at least two more updates regarding LL42 work.  First, the MT will file a standalone report by September 30, 2026.  Second, an update will be included in the Monitor's December 2026 Report (assessing compliance for the 22nd Monitoring Period). The MT believes this schedule is appropriately balanced to ensure sufficient time for substantive work to occur between reports while also permitting the Department, RMT and MT to simultaneously address their significant responsibilities beyond those related to LL42.

## IDENTIFYING AND ADDRESSING STAFF MISCONDUCT

Timely detection of staff misconduct and adequate and prompt responses to the identified misconduct are essential for the Department to successfully reduce the unnecessary and excessive use of force and to encourage the safe and proportional use of force. In this section, the Monitoring Team provides an overview of the Department's ability to consistently identify misconduct and to respond with interventions that are likely to prevent re-occurrence. Effectively addressing the misuse of force requires: (1) reliably identifying misconduct when it occurs; (2) recommending proportional and effective responses to that misconduct; and (3) ensuring the responses are imposed in a timely manner.

These accountability functions are discussed together because a holistic assessment is needed to determine the current state of affairs. The Monitoring Team's assessment during each Monitoring Period considers a variety of factors including qualitative assessments of hundreds of investigations and relevant data about the corrective actions employed. Given the interrelated nature of these functions, no single standard or data point can determine whether the Department has achieved compliance. Further, the Monitoring Team's assessment of the Department's response to misconduct does not assume that there is a "correct" number of cases in which a certain type of corrective action should or could have been taken. Instead, the Monitoring Team's assessment incorporates the knowledge that the volume and severity of misconduct is variable and accountability comes in many forms and varies in both quality and impact. These assessments require not only an evaluation of the facts of each incident but also any aggravating and/or mitigating factors. The Monitoring Team's assessments also incorporate the concept of progressive discipline, recognizing that corrective action may, for good reason, look differently in its application across staff members. Finally, the Monitoring Team recognizes that the same

54

misconduct may reasonably be addressed in a number of ways (*e.g.,* Command Discipline and NPA could both be effective responses).

Below, the Monitoring Team summarizes the main issues that impact on the Department's efforts to identify and address staff misconduct and identifies certain areas where incremental progress is evident.

**IDENTIFYING USE OF FORCE-RELATED MISCONDUCT**

The Department has a reasonable foundation for identifying misconduct through a combination of Rapid Reviews[30], *ad hoc* reviews of use of force incidents by Department leadership, Intake Investigations, and Full ID Investigations.

- **Rapid Reviews**: The Facilities continue to conduct close-in-time reviews of nearly all use of force incidents. These reviews identify a variety of procedural and substantive issues, but some practice failures continue to escape detection, and some avoidable incidents continue to go unidentified. At the end of the Monitoring Period, DOC revised the Rapid Review process to require facility leadership to evaluate additional information while assessing an incident. The new process is illustrated in Appendix P and discussed in detail in the "Facility Use of Force Reviews" compliance assessment for First Remedial Order § A., ¶ 1. The Monitoring Team cautions that the new process must be closely monitored to ensure that the expanded reviews actually improve the quality of the assessments but do not delay the initiation of corrective actions.

---

[30] Rapid Reviews are also referred to as "Use of Force Reviews" by the Department, but the moniker Rapid Reviews will continue to be used in this report.

- **ID Investigations**: Investigation quality is improving. While the length of time to complete investigations is slightly less than in the past, the time required to complete investigations remains unduly protracted. In particular, Full ID investigators' workloads and an accumulation of MEO-16 interviews have created a backlog of Full ID Investigations, which generally represent cases involving the most serious misconduct. This is discussed in more detail in the "Investigations of Use of Force Incidents" compliance assessment for Consent Judgment § VII., ¶ 1, § VII., ¶ 9 (A)) & § VII., ¶ 11. During this Monitoring Period, ID implemented a streamlined process for case intake and now categorizes cases based on incident severity and the required level of investigative scrutiny, as illustrated in Appendix P and discussed in detail in Appendix O. As a result, investigations have become more streamlined and more focused on the salient issues. The new process also established bi-weekly calls between ID and facility leadership to share and discuss ID's findings. ID reports that the new process is a more efficient use of staff resources and, over time, is expected to shorten the time to close investigations. This will permit investigators to move through their caseloads more quickly, and allow ID to dedicate resources to the cases that require greater scrutiny.

INVESTIGATIONS OF NON-UOF INCIDENTS & OTHER TYPES OF STAFF MISCONDUCT

While ID investigates use of force-related misconduct, the Special Investigations Unit ("SIU") investigates most other types of staff misconduct. Previously, ID managed these investigations, but in 2023, former Commissioner Louis Molina created the SIU and separated the unit from ID in what appeared, at least in part, to be an effort to evade oversight and scrutiny. The Monitoring Team remains concerned about SIU's operations, lack of clearly defined scope of work, lack of policies and training, poor management and leadership, poor record- keeping,

56

and low-quality investigations, as discussed in more detail in Appendix N. The agency currently lacks reliable, consistent and appropriate accountability measures to investigate non-use-of-force-related misconduct. Following the close of the Monitoring Period, these two divisions were combined as part of the revisions to the Organizational Chart.

*Addressing Staff Misconduct*

The Department responds to the significant volume of staff misconduct in a variety of ways. These are described in the "Timely, Appropriate and Meaningful Accountability" compliance assessment for Consent Judgment § VIII., ¶ 1 & § VIII., ¶ 3 (c); the "Immediate Corrective Action & Monitor Recommendations" compliance assessment for First Remedial Order § C., ¶ 1 & § C., ¶ 2; and the "OATH Proceedings" compliance assessment for First Remedial Order § C. ¶ ¶ 4 and 5 and Third Remedial Order, ¶¶ 2 and 3.

Corrective action taken in response to misconduct can reasonably take different forms, based on aggravating and mitigating factors. However, the Department's responses to misconduct remain both protracted and inconsistent. As currently structured and practiced, the accountability system lacks sufficient reliability to ensure a demonstrable change in overall staff behaviors, as discussed below:

- **Efforts to Guide Staff Practice via Corrective Interviews and Counseling Sessions are Ineffective**: Thousands of corrective interviews and counseling sessions occur to address use-of-force-related staff misconduct – 3,641 in 2025 — yet there has been no demonstrable change or improvement in staff practice. There does not appear to be any standardized approach to guide these sessions, any meaningful quality control, or any overarching assessment of how these interventions are conducted and whether they are achieving their intended purpose. The Monitoring Team receives repeated reports that

57

these sessions are procedural and perfunctory at best, raising serious questions about their effectiveness as a tool for changing behavior.

- **Responses to Misconduct Are Inconsistent, Unreliable and Protracted**: Variation in the corrective action imposed for staff misconduct is often driven by factors unrelated to the conduct itself and instead is determined by whether the misconduct is detected, the individual's uniform rank, the individual imposing the discipline, or a staff member's personal relationships or connections. Also, administrative and clerical failures too often result in a failure to impose corrective actions. Further, when discipline is imposed, the process is too often protracted. Command Disciplines ("CDs"), the most timely form of discipline, can take up to 90 days after the incident to be imposed. Formal discipline too frequently can take over a year before it is imposed. These delays weaken the connection between the misconduct and the consequence, making discipline less effective as a corrective tool.

- **Supervisors Are Not Held Accountable**: Uniformed leadership have effectively been exempted from discipline, with most corrective action and discipline focused on Correction Officers and Captains and, in a few select cases, Assistant Deputy Wardens. Arguably certain personnel transfers (and compelled retirements) of high-ranking supervisors are in response to poor performance, but these moves are often made haphazardly and with little effort to address the poor performance before the transfer (or retirement) occurs. Transfers often occur for other administrative reasons, as well. The failure to hold uniformed leadership accountable sends a negative message to those below them in the chain of command and serves to further entrench the dysfunctional culture at the Department.

- **CD Process Has Not Been Implemented with Fidelity**: Despite significant efforts to improve the CD process, the Informal Command Discipline Unit ("ICDU") remains mired in ongoing dysfunction. Unit leaders have made long-standing claims of a lack of resources although corresponding efforts to improve efficiencies or otherwise obtain resources to support the work have not occurred. Too many cases continue to be dismissed for due process violations and clerical errors. Further, a review of CD outcomes and input from DOC leadership reflect ongoing efforts to mitigate the discipline being applied in situations where mitigation does not appear appropriate.

- **Formal Discipline Has Improved in Certain Ways but Constitutes a Small Proportion of Accountability**: Formal discipline is only a small portion of the overall accountability framework and is generally reserved for the most serious misconduct. The Trials Division has improved its processing times and has essentially eliminated its backlog. The use of formal discipline has declined as the Department uses CDs more often (given the expansion of the CD policy) and lower-level corrective interventions. However, most formal disciplinary cases still take over a year to close, with the exception of certain fast-tracked cases via the F2 process. The F2 process is discussed in more detail in the "Immediate Corrective Action & Monitor Recommendations" compliance assessment of Action Plan, § F, ¶ 2.

- **Staff Have a Distorted View of the Disciplinary Process**: DOC leadership and staff often express concern that staff are being "over-disciplined," but the available data does not support such a contention. Some misconduct escapes detection, and even when it is identified, far too many cases are either dismissed due to administrative and clerical errors or steps are taken to impose the lowest possible corrective action. Certainly, there

59

is no evidence that corrective action has been taken when it should *not* have been. This description by DOC leadership that the current accountability process reflects "over discipline" is not only inaccurate but undermines and dilutes the efficacy of the work underway.

## CONCLUSION AND NEXT STEPS

Improvements are apparent in certain areas— the Department is slowly beginning to identify misconduct more reliably, and the timeliness and quality of use of force investigations are improving. However, significant work remains. Serious operational concerns in SIU remain; accountability is inconsistent and unreliable, particularly for Supervisors; CDs are poorly managed and often dismissed due to error; and the formal disciplinary process remains protracted. Most importantly, the corrective actions that do occur have not improved staff practice, and serious questions about the efficacy of the disciplinary process, as it is currently operated, are warranted. The Department has not yet brought *all* the components of accountability— reliable identification of misconduct, proportional and effective responses, and timely imposition of those responses— to a level sufficient to create a robust accountability framework.

To address these problems, the Monitoring Team recommends that the Department must take the following steps:

- **Fully Implement New Investigatory Process & Address Full ID Backlog**: ID must continue to implement its new framework that early data suggests is contributing to more timely and higher quality investigations. However, a backlog of Full ID cases remains, and ID must reassess its allocation of resources and strategy for resolving these cases.

60

- **<u>Address Ongoing Delays in MEO-16 Interviews</u>**: New strategies are required to ensure MEO-16 interviews occur in a timely manner, as they often result in the delay of Full ID investigations. Two years of discussions between the DOC General Counsel and union stakeholders has not resulted in actionable steps toward improvement.[31]

- **<u>Reintegrate Investigations of Non-Use of Force Related Misconduct with ID</u>**: Along with the reintegration of SIU with ID, an overhaul of its practices and procedures is needed for the investigation of non-use-of-force-related misconduct to ensure that high-quality, neutral and independent investigations are conducted.

- **<u>Enhance the CD Process</u>**: The management of the CD process must be improved. The Department must evaluate the management and efficacy of its hearing process and ensure adequate staffing of the unit. The rate of dismissals resulting from due process violations and clerical errors is excessive, additional resources are needed, proceedings must occur in a neutral fashion, and outcomes should be aligned with the disciplinary matrix outlined in policy.

- **<u>Find Additional Efficiencies for the Formal Discipline Process</u>**: The Department must continue to work to find efficiencies in the formal disciplinary process so that cases are closed as close-in-time to the incident as possible.

- **<u>Directly Address Misperceptions About the Accountability System</u>**: The misperceptions about the accountability system must be addressed directly using objective information to explain to staff when discipline is imposed, why it is necessary

---

[31] The Monitoring Team has repeatedly advised the Department to elevate and address this issue and has attempted to provide solutions. It appears in some cases this feedback was simply ignored and in other cases was not addressed in a reasonable manner.

and how it is intended to improve staff practice, reinforce standards, and support safer

practices, not to simply punish staff arbitrarily.

## DEATH OF PEOPLE IN CUSTODY

A key indicator when assessing trends in facility safety is to evaluate deaths in custody. The critical assessment is whether adequate security and operational practices were in place that could have prevented that death.[32] The Monitoring Team's assessment of the objective evidence surrounding deaths in-custody (or shortly after release) in 2025 and 2026 continue to reveal a commonality that the longstanding security and operational lapses identified in DOC practices appear to contribute to almost all of deaths in-custody.[33] In 2025, it appeared the Department and its consultants attempted to minimize the deaths in custody, normalize preventable fatalities, and undermine the necessary corrective action that must be taken to reduce future loss of life. The Monitoring Team provided a detailed discussion of this deeply troubling approach to the reform effort and correctional management in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 12-16.

### DOC'S MORTALITY RATE AND OBJECTIVE EVIDENCE OF DEATHS

The number of in-custody deaths and their causes, between January 2015 and June 17, 2026, are presented in Appendix C, Table 1. The mortality rates have fluctuated throughout the past 15 years (ranging between ~0.5 and ~2.0) but reached an all-time high in 2022 (3.37). The rate decreased to 0.78 in 2024 but increased 170% to 2.1 in 2025.

---

[32] The Department and other external agencies, including the NYS Attorney General, SCOC, and Board of Correction investigate each death in custody. The Department also conducts meetings two days, seven days, and 30 days after any death in custody, called "Joint Assessment and Review" or "JARS". These JARS are intended to create an open forum for DOC and CHS to jointly review the circumstances of each death, identify systemic failures, improve coordination, and develop corrective actions. The Monitoring Team has recommended that JARS are convened even if the individual was released prior to their death.

[33] A detailed description of these issues is included in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 79-84.

**SUMMARIES OF DEATHS IN CUSTODY IN 2026**

Below is a brief summary of deaths of people in-custody or of those who died shortly

after release occurring between January 2026 and the date of this report: [34]

- **Barry Cozart.** On March 25, 2026, Mr. Cozart was found unresponsive in his cell in a
  housing area at GRVC during morning mail distribution. Staff initiated CPR and a
  medical emergency response, but Mr. Cozart was later pronounced deceased. A
  Monitoring Team review of housing area video from the 24 hours preceding the incident
  showed that the unit operated with little to no effective supervision, with incarcerated
  individuals moving freely throughout the housing area, including during overnight lock-
  in hours, without meaningful staff intervention. The video also showed repeated
  superficial tours by staff and supervisors throughout the night while individuals in
  custody were out of their cells and opening the cells of other individuals during the
  overnight lock-in. Mr. Cozart was last observed entering his cell shortly before overnight
  lock-in and was not discovered until approximately 11:00 a.m. the following day. Body-
  worn camera footage showed staff finding Mr. Cozart unresponsive on his bed with blood
  visible on the bedding and blood coming from his mouth during resuscitation efforts. The
  area supervisor and B post officer were both suspended for 30 days for inefficient
  performance of duties and perfunctory tours. The official cause of death remains pending
  with the OCME. Investigation into the incident is ongoing.

- **John Price.** On March 29, 2026, Mr. Price died at Elmhurst Hospital after experiencing a
  medical emergency while housed at EMTC. According to the Department, Mr. Price had

---

[34] All deaths are currently under investigation by external agencies and/or the Department of Correction. The causes of death for some individuals remain pending with the Office of the Chief Medical Examiner of the City of New York.

recently been transferred from NIC to EMTC as part of a housing area consolidation. Two days earlier, he reportedly complained of chest pain and shortness of breath and was transported to the hospital after EMS was called. The Department reported that Mr. Price had an extensive medical history, including heart stents and substance use issues involving cocaine and alcohol. Mr. Price was 49 years old and had been in custody since December 18, 2024. The official cause of death remains pending with the OCME. Investigation into the incident is ongoing.

- **Rajpattie Ramkellawan.** On May 18, 2026, Ms. Ramkellawan experienced a medical emergency in a housing area at RMSC after reportedly appearing altered and unwell in the period before the incident. Statements from incarcerated individuals indicate that she had been taking or seeking pills, may have taken methadone and/or other medication, was throwing up, and was "not right" the night before. Body-worn camera footage captures staff and incarcerated individuals attempting to wake Ms. Ramkellawan around 10:00 a.m. The video showed she appeared unresponsive and discolored, and individuals reported that she was foaming at the mouth. Staff deployed Narcan, called a medical emergency and began chest compressions before CHS staff arrived and took over treatment. The video showed medical staff then removing her from the housing area on a gurney. The official cause of death remains pending with the OCME. Investigation into the incident is ongoing.

- **Umais Khan.** On May 19, 2026, Mr. Khan was found unresponsive in his bed in a dorm area at EMTC after other incarcerated individuals attempted to wake him. Body-worn camera footage shows staff responding at approximately 10:55 a.m. Incarcerated individuals stated that Mr. Khan had a pulse, and Narcan was administered. Staff then

65

began chest compressions. Medical staff arrived about five minutes later and attempted treatment, but video appears to show medical staff ceasing treatment approximately twenty minutes later. According to the reports, several incarcerated individuals reported that Mr. Khan had been feeling sick the night before and had been taking medication for a medical condition. The Department reported that the involved officer was suspended because his tours were not meaningful and because he left post without authorization early in the morning to bring another incarcerated individual to court, although he later returned to post. The official cause of death remains pending with the OCME. Investigation into the incident is ongoing.

**INCIDENTS OF SELF-HARM & DOC'S EFFORTS TO ADDRESS ACTS OF SELF-HARM**

The Monitoring Team has long raised concerns about staff response to self-harm incidents. The Monitoring Team's extensive review of incidents has identified a pattern in that staff utilize harmful interventions (*e.g.*, OC spray) or intentionally ignore or fail to intervene in an attempted suicide or events where individuals attempt to harm themselves (*e.g.*, banging head).[35] Three illustrative examples of such incidents were provided in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 527-538. These examples were selected from similar incidents reviewed by the Monitoring Team and are not isolated events. No change in practice has been identified in this Monitoring Period.

---

[35] The fact that such a pattern exists does not mean that staff always act inappropriately. For example, DOC provided the Monitoring Team with an example from this Monitoring Period in which it reported that the Department awarded a staff member a medal for their quick response to an individual's act of self-harm and protected them from further harm.

66

The Department has made some efforts to address self-harm including the development of a Suicide Prevention Task force[36] in Fall 2022. Dr. Belavich[37] was retained in 2023 to conduct an assessment of DOC and CHS practices to prevent and respond to self-harm in correctional settings. Dr. Belavich issued a report[38] in January 2024. Implementation efforts by the Department and CHS have been slow. Following the close of the Monitoring Period, the Department shared updates on the steps taken to address the recommendations in Dr. Belavich's report. The Monitoring Team will assess those efforts and provide an update on the Department's progress in the next report.

The Monitoring Team has attempted to support DOC's efforts to improve its practices in addressing incidents of self-harm and shared feedback on practices. The Monitoring Team shared feedback in December 2023 regarding its findings of self-harm incidents that merit further discussion.  Further, feedback in September 2024 was shared regarding the need for uniformed staff to immediately render aid when individuals in custody experience medical emergencies. In May 2025, in response to other feedback from the Monitoring Team the Department updated its Chemical Agent Directive to prohibit the use of chemical agents when an individual is attempting to hang themselves with a ligature around the neck that is attached to another object. However, the Monitoring Team's broader feedback,[39] shared in December 2024, on the use of

---

[36] For more information on the Suicide Prevention Task Force, *see* Monitor's April 3, 2023 Report (dkt. 517) at pgs. 70-71.

[37] Dr. Belavich is a qualified expert in the prevention and response to self-harm in correctional settings.

[38] A copy of his final report was filed with the Court on March 19, 2024 as Exhibit A to the Saunders Declaration (dkt. 689-12).

[39] That feedback addressed the historical misuse and overuse of chemical agents and identified serious deficiencies in the Department's response to self-harm incidents, emphasizing that chemical agents should be explicitly prohibited in self-harm and ligature situations because their use increases risk and conflicts with accepted standards of care.

chemical agents and corresponding recommendations to revising the training remains outstanding. In September 2025, the Monitoring Team shared feedback that the Department's Suicide Prevention Task Force assess the use of 911 knives given observed concerns about the inability of the Department's tool(s) to cut quickly and effectively in emergencies.[40] In response, the Department reported it discussed the concerns at an Operational Leadership meeting, issued a security memo reminding staff of their obligations to routinely inspect and maintain their 911 knives, and procured sharpening devices for each command's Supervisor of Mechanics to hone the knives as needed.

## CONCLUSION

The tragic deaths in DOC custody (or shortly after release) highlight the impact that poor security practices, supervision, and clinical care may have on persons in custody. These incidents underscore the need for consistent accountability, stronger contraband control, and more vigilant housing area management. Sustained collaboration between DOC and CHS is also critical to identify root causes, implement corrective actions, and prevent similar tragedies in the future. Additional information regarding in-custody deaths can also be found in Appendix C of the report and includes: Causes of Death (Table 1), Mortality Rates (Table 2), Investigations of In-Custody Death (Table 3) and Corrective Actions Taken by DOC related to In-Custody Deaths from 2022 to 2025 (Table 4).

---

[40] That feedback included how the 911 knives are sharpened, how frequently they are checked, and who checks them to ensure they are appropriately maintained as dull or improperly maintained tools can delay ligature removal and significantly increase the risk of serious injury or death in time-critical self-harm incidents.

## UPDATE ON THE 2023 *NUNEZ* COURT ORDERS

This section provides an update on the Department's work related to five of the Court Orders entered in 2023.[41] Collectively, these Orders were intended to catalyze improvement in the Department's management of the various requirements, its work with the Monitor, and its efforts to address fundamental security, reporting, and management practices to bring about immediate relief from the ongoing risk of harm faced by people in custody and staff.

### JUNE 13, 2023 ORDER (DKT. 550)

Following repeated issues with transparency and candor, the Court entered an Order on June 13, 2023 regarding the City's and Department's obligation to work transparently and diligently and collaborate in good faith with the Monitor and his team, including providing relevant information as requested and notifying the Monitor of serious incidents in the jails, including deaths in custody.

As discussed in each Monitor's Report to date, the Department engages with the Monitoring Team routinely and provides a significant volume of information in response to the Monitoring Team's requests. Further, the Department has promptly notified the Monitoring Team of all deaths in custody. The *Nunez* Manager remains in place, but her team and others (including the *Nunez* Compliance Unit, Strategic Initiatives, and the Legal Division) still do not appear to have sufficient resources to facilitate the Department's and Monitoring Team's work to advance the reform. As discussed throughout this report, an array of Court-ordered requirements, including policy development and practice changes, continue to languish, sometimes for years, and a significant number of the Monitoring Team's requests for information remain outstanding

---

[41] These five orders are the June 13, 2023 Order (dkt. 550), August 10, 2023 Order (dkt. 564), October 10, 2023 Order (dkt. 582), December 14, 2023 Order (dkt. 656), and December 20, 2023 Order (dkt. 665).

for extended periods of time, including information that the Department reportedly maintains during its ordinary course of business and thus should be straightforward to produce. The Department's ongoing failure to keep pace with the flow of information needed to both advance practice changes and support the Monitoring Team's duty to keep the Court apprised of the Department's progress suggests that current staffing levels in critical divisions are inadequate and additional resources are needed. These resource needs are further heightened given the recent appointment of the Remediation Manager, whose team will also rely on the *Nunez* Manager as part of their work.

Some of the practices the 2023 Orders sought to eliminate with regards to the Department's candor and transparency as well as collaboration with the Monitoring Team remerged at the end of the 20th Monitoring Period and into the 21st Monitoring Period as discussed in more detail in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 108-114 and 119 to 121. As a result, the Monitoring Team has strongly recommended the new administration installed after the close of the Monitoring Period is more vigilant and unwavering in its commitment to collaborate and communicate openly with the Monitoring Team and ensure its critical Divisions are appropriately resourced in order to meet its obligations outlined in the Court's June 13, 2023 Order and other requirements[42] intended to promote a functional relationship with the Monitoring Team. The Monitoring Team has observed a positive shift in the approach to working with Monitoring Team upon the appointment of the new Commissioner.

**AUGUST 10, 2023 ORDER (DKT. 564)**

The Court entered an Order on August 10, 2023 to address several critical items needed to reduce the imminent risk of harm that had languished. The purpose of this Order was for the

---

[42] *See*, *e.g.*, Consent Judgment § XX, ¶¶8 and 13 and October 30, 2023 Order.

Department to prioritize these actions as other remedial relief was being contemplated. These steps were intended to be immediate, *interim measures* to ensure a proper focus and pace for initiatives that have direct bearing on the imminent risk of harm.

- **UOF, Security and Violence Indicators (§ I, ¶ 1)**: The Monitor's February 26, 2024 (dkt. 679) Report describes the Department's efforts to address this requirement (*see* pgs. 5-7). A more detailed description of the new meeting format is described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 128-130, and an update on the current status of these meetings and the corresponding data dashboard is provided in the compliance assessment of the First Remedial Order, § A, ¶ 2 (Facility Leadership Responsibilities) in this report.

- **Revised Search Procedures (§ I, ¶ 2)**: This is addressed in the compliance assessment for Action Plan § D, ¶ 2(d) & (e) (Searches and Identify/Recover Contraband).

- **Revised Escort Procedures (§ I, ¶ 3)**: This is addressed in the compliance assessment for Action Plan § D, ¶ 2(f) (Escort Procedures).

- **Lock-in and Lock-out Procedures (§ I, ¶ 4)**: Table 11 of Appendix B shows evening lock-in is now better managed than it was in late 2023, with nearly all lock-ins being completed within one hour of the designated time.[43] However, DOC leadership routinely report to the Monitoring Team that they identify situations in which individuals in custody are out after lock-in and incidents continue to occur after lock-in. While it is an improvement that lock-in is occurring, the purpose of lock-in is to promote safety and

---

[43] In late 2023, the Department began to focus on properly implementing the evening lock-in (9:00 p.m.) and consulted with the Monitoring Team on its plans as required by the Court's August 10, 2023 Order § I, ¶ 4. The Department elected to focus first on the 9:00 p.m. lock-in before addressing compliance with the 3:00 p.m. lock-in. On October 31, 2023, the Department issued a teletype articulating the requisite procedures and required each facility to devise a lock-in plan.

security by ensuring that people in custody remain locked in their cells or on their dorm beds overnight. Unfortunately, that still is not occurring as it should be.

- **Control Station Security (§ I, ¶ 5)**: The Department is required to revise and implement a protocol to ensure the Control Station Door is properly secured pursuant to the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 5. Despite the Monitoring Team recommendations, the Department has not issued any policy or plan to improve staff practices beyond the issuance of a teletype in October 2023 reminding staff of their obligation to secure the control station doors.  Accordingly, there are no new updates beyond those provided in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 180-181.

- **Staff Off Post (§ I, ¶ 6)**. This is addressed in the Maximizing Staff Deployment Section.

- **Special Teams Training (§ I, ¶ 7)**: This is addressed in the compliance assessment for First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams).

- **Special Teams Command Level Orders (§ I, ¶ 8)**: This is addressed in the compliance assessment for First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams).

- **Screening and Assignment of Staff to Special Teams (§ I, ¶ 9)**: This is addressed in the compliance assessment for First Remedial Order § A., ¶ 6 (Facility Emergency Response Teams).

- **Revised Pre-Promotional Screening Policies and Procedures (§ I, ¶ 10)**: This is addressed in the compliance assessment for Consent Judgment, § XII, ¶ 1-3 (Screening & Promotions).

- **ID Staffing (§ I, ¶ 11)**: ID staffing levels are addressed in the compliance assessment for Consent Judgment, § VII, ¶¶ 1, 9(a) & 11 (Investigations of Use of Force Incidents).

72

- **Additional Reporting by the City and Department Regarding Intake (§ I, ¶ 12)**: The City and Department filed two reports regarding intake,[44] satisfying this provision. The Monitoring Team also provides an update on intake and the status of processing new admissions in the compliance assessment of First Remedial Order, § A, ¶ 3 and Appendix H of this report.

- **Command Discipline ("CD") Directive (§ I, ¶ 13)**: The Department's revised CD policy, as discussed in detail in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 227-230, went into effect on July 1, 2025. Updates on CDs that have been filed since the new policy went into effect is provided in the compliance assessment of Consent Judgment § VIII., ¶ 1 & § VIII., ¶ 3(c) (Timely, Appropriate, and Meaningful Accountability).

- **External Assessment (§ I, ¶ 14)**: This is addressed in the "Death of People in Custody" section of this report.

**OCTOBER 10, 2023 ORDER (DKT. 582)**

On October 10, 2023, the Court issued an Order directing Defendants to engage with the Monitoring Team on immediate initiatives to address the risk of harm and issues regarding incident reporting, as identified in the Monitor's October 5, 2023 Report (dkt. 581). The Order also reminded Defendants of their obligations to collaborate with the Monitor and to comply with the *Nunez* Court Orders.

- **Immediate Security Plan**: This is addressed in the compliance assessment for the Second Remedial Order, ¶1(i)(a) and Action Plan, § D, ¶ 2(a) (Security Plan).

---

[44] *See*, City's September 15, 2023 Submission (dkt. 571) and City's November 15, 2025 Submission (dkt. 598).

- **Immediate Reporting Initiatives**: The compliance assessment for Consent Judgment § V, ¶ 2 (Independent Staff Reports), the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 156-157 provides a summary of the status of this work through the end of this Monitoring Period.

**DECEMBER 14, 2023 ORDER (DKT. 656)**

On December 14, 2023, the Court issued an Order regarding changes the Defendants must make to incident reporting practices in light of the findings in the Monitor's October 4, 2023 Report (dkt. 581) and the Monitor's November 8, 2023 Report (dkt. 595).

- **List of Reporting Policies (§ 1, ¶ a)**: The compliance assessment for Consent Judgment § V, ¶ 2 (Independent Staff Reports), the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 156-157 provides a summary of the status of this work through the end of this Monitoring Period.

- **Stabbing and Slashing Definition (§ 1, ¶ b)**: The compliance assessment for Consent Judgment § V, ¶ 2 (Independent Staff Reports), the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 156-157 provides a summary of the status of this work through the end of this Monitoring Period.

- **Definitions of Incident Categories (§ 1, ¶ c)**: The compliance assessment for Consent Judgment § V, ¶ 2 (Independent Staff Reports), the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 156-157 provides a summary of the status of this work through the end of this Monitoring Period.

- **Comprehensive COD Policy (§ 1, ¶ d)**: The compliance assessment for Consent Judgment § V, ¶ 2 (Independent Staff Reports), the Monitor's January 13, 2026 Report

74

(dkt. 947) at pgs. 156-157 provides a summary of the status of this work through the end of this Monitoring Period.

**DECEMBER 20, 2023 ORDER (DKT. 665)**

On December 20, 2023, the Court found the Department in contempt of Action Plan § D, ¶ 3 and § E, ¶ 4 (dkt. 465) and § I, ¶ 5 of the June 13, 2023 Order (dkt. 550). On February 27, 2024 (dkt. 680), the Court found that the Department purged its contempt because it complied with the three enumerated requirements set out by the Court as described in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 124.

## COMPLIANCE ASSESSMENTS

This section of the report discusses the Monitoring Team's process for assessing the Department's compliance with the court-ordered reforms and the basis for such findings. Outlined below is some additional context and detail for the Monitoring Team's work.

### CONSIDERATIONS FOR COMPLIANCE ASSESSMENTS

- **Roles and Responsibilities of Defendants and the Monitoring Team**: The roles and responsibilities of the Defendants and the Monitor remain unchanged from those explained in detail in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 92-95. Following the close of the 21st Monitoring Period, the Court appointed a Remediation Manager to address Defendant's contempt in complying with 18 provisions of the *Nunez* Court Orders. The Remediation Manager's work to advance compliance will be addressed in future Monitor's Reports.

- **Provisions Subject to a Compliance Rating**: For over four years, the number of provisions subject to compliance ratings have been limited to a selected group of priority issues.[45] The Monitoring Team currently assesses compliance with 40 of the hundreds of provisions contained in the *Nunez* Court Orders.[46] The 40 unique provisions are discussed

---

[45] Over four years ago, the Monitoring Team recommended that, in order to stimulate reform, the Department focus on and prioritize a select group of provisions. *See*, Monitor's December 6, 2021 Report (dkt. 431) at pgs. 10 to 12. Accordingly, the Action Plan limited the number of provisions subject to compliance ratings so that the Department could concentrate its efforts on the foundational requirements for advancing reform.

[46] These 40 provisions included two subsets. First, the 25 provisions that were prioritized for compliance assessments beginning in the 14th Monitoring Period under the Action Plan. *See*, Action Plan § G, ¶ 5. These 25 provisions were selected because they prioritize four key areas for improvement to properly undergird the reform effort: (1) security practices and procedures that are deeply flawed, inconsistent with best practice and, in some cases, illogical, (2) inadequate supervision of line staff and facility leadership who do not possess the requisite expertise and ability to lead, (3) staffing practices and procedures that have resulted in ineffective deployment across the agency, and (4) limited and/or extremely delayed accountability for staff misconduct. Second, beginning in the 20th Monitoring Period, an additional 15 provisions with which the Department was found in contempt were added to the list of provisions that require a compliance assessment. *See*, July 10, 2025 Order (dkt. 921).

in 25 individual "sections." Several provisions are interrelated and thus are addressed together. Further, updates on relevant portions of the 2023 *Nunez* Court Orders[47] are also discussed in the 25 individual "sections," although compliance ratings are not applied to the 2023 *Nunez* Court Order provisions pursuant to the Court's July 10, 2025 Order (dkt. 879).

  o  *History of Compliance Ratings*: A list of the 40 provisions for which the Monitoring Team provides compliance ratings is provided in Appendix A. This chart includes the compliance ratings for each of these 40 provisions since the inception of the Consent Judgment.

- **Consolidated Descriptive Findings for 21st Monitoring Period**: As described elsewhere in this report, and in other submissions to the Court, following the completion of the 21st Monitoring Period, a number of significant leadership changes impacted the Department's operations, most notably the appointment of a new DOC Commissioner and the Court's appointment of the Remediation Manager. Given these significant changes to the landscape, in this report, the Monitoring Team only provides a detailed narrative description for a compliance rating <u>if</u> the assigned compliance rating is different from that assigned in the 20th Monitoring Period as discussed in the Monitor's January 13, 2026 Report (dkt. 947). This approach was taken in order to permit the Monitoring Team the necessary time to work with the new Commissioner and Remediation Manager as they assumed their roles and to support the development of the Remediation Action Plan.

---

[47] The 2023 Orders include the June 13, 2023 Order (dkt. 550), August 10, 2023 Order (dkt. 564), October 10, 2023 Order (dkt. 582), December 14, 2023 Order (dkt. 656), and December 20, 2023 Order (dkt. 665).

- **Monitoring Team's Methodology for Assessing Compliance**: The Monitoring Team's comprehensive methodology for assessing compliance and the current state of affairs remains unchanged and is described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 97-105 (covered in the sections "Monitoring Team's Methodology for Assessing Compliance," "Considerations for Quantitative Metrics," "Considerations for Assessing Compliance," and "External Factors that Impact Department Operations"). The compliance standards that the Monitoring Team must utilize are defined by Consent Judgment § XX, ¶ 18:

  o "Substantial Compliance" shall mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision.

  o "Partial Compliance" shall mean that the Department has achieved compliance on some components of the relevant provision of this Agreement, but significant work remains.

  o "Non-compliance" shall mean that the Department has not met most or all of the components of the relevant provision of this Agreement.

- **DOC's Production of Information**: In order for the Monitoring Team to render its determinations and independently verify the Department's representations about its progress, the Monitoring Team must assess a wide array of information from many sources. DOC continues to struggle to produce all requested information in a timely manner and a significant number of requests for information and responses to feedback remain unanswered and outstanding, a significant number of which remain pending *for years*. This inherently impacts the Monitoring Team's work and, most importantly,

78

DOC's ability to advance the reform effort. The Monitoring Team has long reported that advancing the reform effort under the *Nunez* Court Orders requires significant time, effort, and resources and that DOC has insufficient resources to support and address the requirements of the *Nunez* Court Orders. The Monitoring Team continues to recommend that the City and the Department dedicate additional resources to this work, especially given the addition of the Remediation Manager and his Team. This issue is described in more detail in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 106-108.

- **Communication with DOC Staff**: The Monitoring Team routinely communicates with DOC staff of all ranks and in various divisions through both routine calls and ad hoc discussions. During the 21st Monitoring Period, previous DOC leadership engaged in a variety of actions and steps in what appeared to be an attempt to limit the Monitoring Team's access to information. This is discussed in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 108-114. The Monitoring Team reiterates its serious concerns about the actions taken by Department leadership throughout 2025 and reiterates the importance of transparency and collaboration. The new administration installed in the 22nd Monitoring Period has reported its commitment to transparency and collaboration with the Monitoring Team.

CONCLUSION

The Monitoring Team's neutral, independent, and nuanced assessment of compliance is critical to the reform effort. The Monitoring Team has dutifully examined changes in metrics and patterns in staff behavior using a multifaceted methodology to develop insight into the factors that may be catalyzing or undercutting progress. This insight is useful for technical assistance so that the Department may advance toward the overarching requirement to materially improve the

jails' safety and operations relative to the conditions that existed when the Consent Judgment went into effect.

---

**FACILITY LEADERSHIP RESPONSIBILITIES (FIRST REMEDIAL ORDER § A., ¶ 2)**

*First Remedial Order § A., ¶ 2. Facility Leadership Responsibilities*. Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.

*August 10, 2023 Order § I, ¶ 1 UOF, Security and Violence Indicators.* By, September 30, 2023, the Department, in consultation with the Monitor, shall develop a set of data and metrics for use of force, security and violence indicators that will be routinely evaluated by Department leadership to identify trends and patterns regarding unnecessary and excessive force and violence in order to identify the root cause of these issues and develop strategies to address them. Upon request by the Monitor, the Department shall provide data regarding use of force, security, and violence indicators and permit observation of meetings in which such information is evaluated by Department leadership.

---

This provision was imposed by the Court in the First Remedial Order (dkt. 350), § A, ¶ 2. The goal of this provision is to ensure that the leadership of each facility is consistently and reliably identifying pervasive operational deficiencies, poor security practices, and trends related to problematic uses of force and that they address these patterns so that supervisors and staff alike receive the guidance and advice necessary to improve practices. Facility leadership is required to routinely analyze available data regarding uses of force, including the daily Rapid Reviews, to determine whether any operational changes or corrective action plans are needed to reduce the use of excessive or unnecessary force, the frequency of use of force incidents, serious injuries or other harm to incarcerated individuals or staff resulting from use of force incidents.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pgs. 34-37 in section "Failure to Adequately Supervise Staff and Facility Leadership" of the Order.

**Compliance Assessment Overview**

The history of compliance ratings for this provision since the inception of the First Remedial Order is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period, the Department was in Partial Compliance with First Remedial Order § A, ¶ 2. The compliance rating for the 21st Monitoring Period remains the same, and the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order § I, ¶ 1 (dkt. 564), as it relates to facility leadership's requirement to routinely analyze available data. A compliance rating is not provided for this provision pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Relevant Data and Information**

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Facility Leadership's Communication with Monitoring Team**: Facility leadership's communication with the Monitoring Team remains consistent with the prior Monitoring Period. The Monitoring Team continues to hold monthly meetings with facility leadership, which provide a useful forum for candid discussion of facility operations, use of force and violence trends in each command, staffing, service provisions, and emerging challenges, but the quality of analysis and problem-solving varies significantly by facility and leader. Facility leaders can generally identify the most visible issues affecting their command, such as gang-related conflict, staffing shortages, high need individuals, idle time, and the impact of housing classification decisions, but their analysis often remains too surface-level and does not consistently connect available data to root causes, targeted interventions, or measurable outcomes. During this Monitoring Period, the Monitoring Team observed some encouraging examples of ownership and problem-solving, including efforts to stabilize RESH after problematic housing decisions. However, during many discussions, facility leadership simply articulate the same explanations for conditions such as SRG conflict, staffing shortages, or population pressures without identifying how these issues could be addressed to minimize their impact on operations. It does not appear that facility leadership routinely utilize data in their decision making, engage in multidisciplinary problem-solving,

follow through on corrective strategies, or receive active management and support from Department executive leadership.

- **ACT Dashboard and Meetings**: The ACT Dashboard[48] remains live and continues to serve as a central hub for facility data and analytics, but it still does not appear to be leveraged by facility leaders as consistently or meaningfully as it should be to identify trends, isolate root causes, or guide operational decisions. The Department held only one ACT meeting in this Monitoring Period. While the ACT meetings have included valuable discussions on door security, conducting meaningful tours, leadership responsibilities, and case studies, they often identify recurring issues without moving beyond general expectations or surface-level explanations and fail to identify specific corrective strategies and measurable follow-through. For example, discussions regarding concerns about delays in clinic production focused heavily on identifying the barriers for timely production, such as escort delays, staffing shortages and delays by service providers, but even though these obstacles are frequently identified, the meeting did not result in any discussion on how practice could be *changed* such that production times could be improved. Similarly, avoidable UOF case studies are discussed and repeatedly identify basic security failures, including unsecured doors, prolonged argumentative exchanges with incarcerated individuals, and inadequate de-escalation, but generally, there has been little to no discussion on how practice can actually be improved, often focusing instead on individual staff failures or concerns about "over discipline." Consequently, the ACT meetings appear to have limited value serving as a forum for either problem solving or accountability for improved practice. The Monitoring Team has recommended that the Department evaluate these meetings and assess whether the current format is effectively supporting the facility leadership in day-to-day management, problem-solving, and improving operations.

- **Weekly Operational Leadership Meetings**: The Department reports that weekly operational leadership meetings continue to occur between executive staff and facility leaders, including Deputy Commissioners, Associate Commissioners, Assistant

---

[48] The ACT Dashboard integrates data from multiple systems into a single, interactive, and visually intuitive platform. It allows facility leadership to track key metrics—such as the use of force, slashing and stabbings, serious injuries, Narcan deployments, and fires by location, individuals involved, and time of day. The goal of this system is to help leadership to identify trends and make informed operational decisions to reduce violence and prevent incidents. *See* Monitor's November 22, 2024 Report (dkt. 802) at pgs. 47-48.

Commissioners, Directors, Wardens, and, at times, Assistant Deputy Wardens, Captains, and Officers. These meetings provide a forum to share Department updates, discuss policy changes, review ongoing initiatives, and promote coordination across key divisions such as PPU, E.I.S.S., Trials, and CIB. The Department reports that this format is more engaging and useful than traditional written communications, such as teletypes. During this Monitoring Period, the Department has not been able to produce either agendas or minutes from these meetings despite the Monitoring Team's long-standing requests, and the Monitoring Team has not independently assessed these meetings.

- **Meetings between Facility Leadership and the Deputy Commissioner of Security Operations**: The former Deputy Commissioner of Security Operations continued to engage directly with facility leadership during the Monitoring Period through Operational Leadership meetings, ACT meetings, facility tours, and focused security initiatives. This engagement included efforts to reinforce basic security practices, strengthen Warden accountability, develop the GRVC "back to basics" and honors housing pilots, improve pat frisk and search practices, and use audits and video reviews to identify recurring deficiencies with staff practice. Despite these efforts, the Monitoring Team did not identify any significant changes in security practices and operations. Additionally, the DC of Security Operations left the Department after the close of the 21st Monitoring Period.

- **Executive Leadership Tours of Facilities**: Executive Leadership Tours continued during the Monitoring Period and are intended to keep senior leaders connected to facility operations, reinforce agency expectations, and identify issues requiring immediate or higher-level attention. As noted previously, the Department did not consistently document these tours nor track the issues identified and resolved, so the Monitoring Team could not assess whether the initiative produced any measurable improvements in facility practice.

**Conclusion**

Facility leaders have access to significant information (*e.g.,* ACT Dashboard and NCU audits), assess operations via Rapid Reviews, and have opportunities to engage with Department leadership via ACT Meetings, Operational Leadership Meetings, and Executive Leadership tours. Facility leaders also have candid discussions with the Monitoring Team about operations, although they appear limited in their ability to identify concrete strategies to actually alter and improve operations. Unfortunately, there has been no meaningful change in the operations of the

84

85

jails. The Department is encouraged to identify concrete measures through which facility leaders can be empowered to develop tangible, specific, and sustainable action plans, track outcomes, and ensure sustained follow-through through the chain of command.

| COMPLIANCE RATING | **First Remedial Order § A., ¶ 2.** Partial Compliance |
|---|---|

| NEW USE OF FORCE DIRECTIVE (CONSENT JUDGMENT § IV., ¶ 1) |
|---|
| *Consent Judgment § IV., ¶ 1. New Use of Force Directive.* Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor. |

This provision of the Consent Judgment requires the Department to develop, adopt, and implement a comprehensive Use of Force Policy with particular emphasis on permissible and impermissible uses of force.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with Consent Judgment § IV, ¶ 1. The Court explained the basis for this finding at pgs. 16-18 in section "Failure to Implement the Use of Force Directive" of the Order.

**Compliance Assessment Overview**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period, the Department was in Substantial Compliance with the requirements to develop, adopt, and obtain Monitoring Team approval for the Use of Force policy, and in Non-Compliance with the requirement to implement the policy. The compliance ratings for the 21st Monitoring Period remain the same: the Department remains in Substantial Compliance with the develop, adopt, and Monitoring Team approval components, and in Non-Compliance with the implementation component. Given that the compliance ratings have not changed, the Monitoring Team will not provide a detailed discussion of these findings per the Court's March 18, 2026 Order, ¶ 1 (dkt. 967).

**Relevant Data and Information**

The Monitoring Team uses both quantitative and qualitative information to assess the risk of harm in the jails, the Department's implementation of the Use of Force Directive, and the reliability of its security practices. Numerical data must be understood in context. There is no national standard establishing a "safe" use-of-force rate, an acceptable number of unnecessary or

excessive uses of force, or a precise rate at which staff must be held accountable. Accordingly, the Monitoring Team's assessment considers multiple sources of information, including thousands of use-of-force incidents, discussions with Department leadership and staff, relevant data trends, the Department's own findings, and comparisons to correctional practice in other jail systems.

The Monitoring Team also recognizes that force is sometimes necessary and that not all uses of force are alike. Some incidents involve minimal physical contact or low-level control techniques, while others involve aggressive tactics that create a substantial risk of injury. Likewise, some force is used to safely resolve a dangerous situation, while other force is avoidable, excessive, retaliatory, or punitive. The compliance assessment, therefore, considers not only the technique used but also whether the incident could have been prevented, whether staff attempted de-escalation, whether anticipated force procedures were followed, whether the force was executed properly, and whether the incident was accurately reported and reviewed.

- **UOF Directive and Related Policies:** The Department maintains a Use of Force ("UOF") Policy and several related standalone policies addressing force-related requirements under the *Nunez* Consent Judgment. The Department previously achieved Substantial Compliance with developing and adopting the UOF Policy, which went into effect on September 27, 2017, followed by the New Disciplinary Guidelines on October 27, 2017. The UOF Policy did not create a new legal standard or abandon the core principles of the prior policy; rather, it clarified and expanded guidance to staff and supervisors on how to respond to threats to safety and security with the overarching goal of changing staff practice and reducing the risk of harm associated with force.

- **Standalone UOF Policies**: In addition to the UOF Policy, the Department must consult with and obtain Monitoring Team approval for several standalone policies governing force-related tools and practices, including restraints, spit masks, hands-on techniques, chemical agents, electronic immobilizing devices, kinetic energy devices, batons, lethal force, and canines. The Emergency Services Unit ("ESU") also maintains several Command Level Orders, including orders governing specialized chemical agent tools such as Sabre Phantom Fog Aerosol Grenades. Several of these policies and orders

87

require revision,[49] including those related to restraints, searches, and Emergency Response Teams, and although the Department has long reported that revisions are underway, no revised policies were provided to the Monitoring Team during this Monitoring Period.

- **Training on UOF Policy**: The Department has continued to deliver the UOF Refresher and Practical Application of Force/Defensive Tactics Refresher trainings, which are offered together as a two-day course.[50] However, progress remains limited. As of the end of the Monitoring Period, only 30% of staff are current with the UOF Refresher and only 10% are current with Defensive Tactics Refresher. The Department reports that instructor shortages, staffing constraints, class-size limits required for safety, and the annual nature of the training requirement continue to significantly limit its ability to train staff at the necessary scale.

- **Implementation of UOF Directive**: The Monitoring Team provides the current status of the Department's problematic use of force and corresponding security failures in the "Assessment of the Department's Use of Force and Security Practices" section of this report, as well as in prior reports.[51] Throughout the current Monitoring Period, the force employed by Department staff often did not comply with the Department's UOF Directive nor the requirements of the Consent Judgment.

    o *Persistent Problematic Practices*: The Monitoring Team's review of incidents from this Monitoring Period revealed a continuing pattern and practice of unnecessary and excessive uses of force. In particular, force is still used too

---

[49] The need for revision has been extensively documented in prior Monitor's Reports, most recently in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 42-43.

[50] The Monitoring Team has shared feedback on the UOF Refresher training for supervisors in April 2024 which remains outstanding. The Monitoring Team also shared feedback on the Defensive Tactics training for new recruits in March 2023, which also remains outstanding.

[51] *See* Martin Declaration (dkt. 397) Exhibit E "Citations to Monitoring Team Findings re: Security Failures" and Monitor's December 6, 2021 Report (dkt. 431) at pgs. 17-23; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 7-30; Monitor's April 27, 2022 Report (dkt. 452) at pgs. 2-3; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 13-17; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-77; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68; Monitor's October 10, 2024 Report (dkt. 581) at pgs. 4-19; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 2-3 and 6-28; Monitor's December 12, 2023 Report (dkt. 666) at pgs. 6-22; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 29-38; Monitor's November 22, 2024 Report (dkt. 802) at pgs. 11-18.

frequently,[52] head strikes in circumstances outside of those permitted by policy are still used too often;[53] excessive or unauthorized use of chemical agent/OC spray is ongoing;[54] problematic and/or painful escorts continue;[55] unsafe take-down techniques occur too frequently;[56] use of force during searches occurs in situations in which it does not appear necessary; precipitating staff conduct creates situations in which force is then needed;[57] conversely, staff sometimes fail to act when they should;[58] staff fail to intervene in self-harm attempts;[59] and finally, staff's failure to adhere to basic security practices creates situations in which force is needed but could have been avoided. The frequency and severity of these problems is one of the core reasons that the Department continues to be in Non-Compliance with the requirement to properly implement the UOF Directive.

o *Department's Use of High Impact Force & Head Strikes*: In addition to the problems listed above, the Department's use of high-impact force, particularly head strikes, is a continued concern because the tactic inherently involves such a high risk of harm it should be used infrequently and only under very specific circumstances. The dynamics of the problem were described at length in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 138-143. Staff continue to use high impact force and head strikes in situations not permitted by policy and when lesser means could have effectively resolved the situation. Table 15 of Appendix B displays the Department's head strike data from January to December 2025. During 2025, the Department identified 206 actual head strike incidents and 195 additional allegations of head strikes.[60] About a third (69 of

---

[52] *See*, for example, Consent Judgment, § IV, ¶ 3(a) and UOF Directive § II (A) and (B).

[53] *See*, for example, Consent Judgment, § IV, ¶¶ 3(b), (g)(v) and UOF Directive § II (G) and § V(A)(8).

[54] *See*, for example, Consent Judgment, § IV, ¶ 3(d) and UOF Directive § II (C) and §VI (B)(1)(g).

[55] *See*, for example, Consent Judgment, § IV, ¶ 3(c)(vii) and UOF Directive § II V(B)(1)(d).

[56] *See*, for example, Consent Judgment, § IV, ¶ 3(b), (g)(v) and UOF Directive § II (C) and (G) and §VI (1)(f)(ix).

[57] *See*, for example, Consent Judgment, § IV, ¶ 3(k) and (m) and UOF Directive § II (B) and (C).

[58] *See*, for example, Consent Judgment, § IV, ¶ 3(m) and UOF Directive § II (I).

[59] *See*, for example, Consent Judgment, § IV, ¶ 3(m) and UOF Directive § II (I).

[60] People in custody continue to frequently allege that staff used head strikes even when staff do not report doing so, particularly in areas without full stationary camera coverage or where body-worn camera footage is missing, not activated, or does not capture the full interaction. While the lack of video evidence makes it difficult to determine

206) of the incidents in which head strikes were utilized either closed with charges or were expected to close with charges. For a tactic that is permitted only in the most exigent circumstances, this volume remains inconsistent with the level of force required by the UOF Directive. Even where some head strikes may ultimately be deemed justified, the frequency of actual head strikes, allegations of unreported head strikes, and cases resulting in or expected to result in charges show that the Department has not yet ensured that high-impact force is used only rarely and strictly within policy guidelines.

The Department has not yet developed a systemic approach to evaluating head strikes or identifying strategies to reduce their use, though the Monitoring Team recommends that it do so. In this Monitoring Period, Department leadership and its consultants spent time evaluating head strike data. That work appeared focused in part on minimizing the implications of the data and considering a more permissive standard, rather than developing a systemic strategy to reduce prohibited head strikes and ensure that high-impact force is used only rarely and within policy guidelines.

**Conclusion**

As described in the Monitor's May 22, 2025 Report (dkt. 850), the Department has demonstrated progress towards implementing the UOF Directive *since the initiation of the Consent Judgment* and is now showing movement toward achieving Partial Compliance. Other sections of this report describe the Department's work during this Monitoring Period regarding operations, security, investigations, and accountability.

Substantially reducing unnecessary and excessive force will require more than avoiding the most egregious forms of misconduct. The Department must ensure that staff prevent uses of force where possible, use de-escalation and planned responses when feasible, apply force safely

---

what occurred in any individual case, the volume and recurring circumstances of these allegations— including during strip searches and in areas where handheld or body-worn cameras should have been used—require further scrutiny. The Department must carefully investigate these allegations, assess whether patterns exist by location, staff, or incident type, and consider whether additional improvements to video coverage or BWC compliance are necessary. Of the 195 allegations of head strikes in 2025, the Investigation Division substantiated four of these allegations, and no staff received formal disciplinary charges as the head strikes were deemed incidental during take-down/being secured.

and proportionally when necessary, report uses of force accurately, and are held accountable when they violate policy. Persistent concerns, including head strikes, unsafe takedowns, excessive or unauthorized chemical agent use, painful escort holds, force during searches, and staff conduct that precipitates or escalates incidents, remain unresolved. During this Monitoring Period, the current practices remain essentially the same as those from the last Monitoring Period and the Department did not report any specific, concerted steps to meaningfully change these practices. Therefore, the Department remains in Non-Compliance with implementation of the UOF Directive.

| **COMPLIANCE RATING** | **Consent Judgment § IV., ¶ 1. (Develop)** Substantial Compliance<br>**Consent Judgment § IV., ¶ 1. (Adopt)** Substantial Compliance<br>**Consent Judgment § IV., ¶ 1. (Implement)** Non-Compliance<br>**Consent Judgment § IV., ¶ 1. (Monitor Approval)** Substantial Compliance |
| --- | --- |

<table>
<tr><td>

**INDEPENDENT STAFF REPORTS (CONSENT JUDGMENT § V., ¶ 2)**

</td></tr>
</table>

*Consent Judgment § V., ¶ 2. Independent Staff Reports.* Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

*October 10, 2023 Order. Immediate Reporting Initiatives*. The Department, in consultation with the Monitor, shall immediately develop and implement, by October 25, 2023, protocols to address the deficiencies in the Department's internal reporting structures and notifications to the Monitor as described in the "Incident Reporting" Section of the [October 5, 2023] Status Report. (See Status Report at 10-12.)

*December 14, 2023 Order § 1. Department's Incident Reporting Practices*. The Department shall develop and implement a comprehensive and streamlined policy and procedures for all incidents and events that must be reported (New COD Policy). The policy and procedures shall be subject to the approval of the Monitor. Accordingly, by the dates set forth below, the Department, in consultation with the Monitor, shall:

    a.  By December 15, 2023: Provide the Monitoring Team will the full list of Department policies that must be reviewed for potential consolidation into the new COD policy.

    b.  By December 22, 2023: Review, revise, and implement updated definitions of Stabbing and Slashing to ensure that the definitions are clear and concise and will result in the collection and reporting of reliable and accurate data. The definitions for Stabbing and Slashing shall be subject to the approval of the Monitor.

    c.  By February 2, 2024: Review, revise, and implement updated definitions for the various incident categories maintained by the Department, including all security indicators related to violence, including but not limited to use of force, use of force (allegation), assault/attack on staff, inmate-on-inmate fight/assault, inmate-on-inmate sexual assault, and staff sexual misconduct, to ensure that the definitions are clear and concise and will result in the collection and reporting of reliable and accurate data. The definitions of the various incident categories shall be subject to the approval of the Monitor.

    d.  By May 31, 2024: The Department shall implement the New COD Policy.

The Department is required to accurately and timely report when force is used as part of its overall goal to manage use of force effectively pursuant to Consent Judgment § V, ¶ 2. The assessment below covers five critical areas related to reporting force: (1) notifying Supervisors that a use of force ("UOF") occurred, (2) submission of complete, independent, and timely reports, (3) the classification of UOF incidents, (4) allegations of use of force, and (5) reporting of use of force by non-DOC staff who either witness the incident and/or relay reports from incarcerated individuals.

**Compliance Assessment Overview**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Partial Compliance. Given that the compliance rating has

not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

The Department's Use of Force Directive requires Department staff to independently prepare a staff report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force. For actual uses of force, these reports must be submitted within 24 hours; for alleged uses of force, the deadline is extended to 72 hours because the staff members involved must first be identified and notified that a report is required. The *Nunez* Court Orders also require non-DOC staff working in the facilities to report uses of force.

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Notifying Supervisor of UOF**: To assess whether staff are timely and reliably notifying a supervisor of a UOF, the Monitoring Team considers whether there is evidence that staff are not reporting force as required. This includes consideration of use of force allegations as well as reports from outside stakeholders (*e.g.*, New York City Health + Hospitals ("H+H") and Legal Aid Society ("LAS")) about potentially unreported UOF. As discussed in more detail below, the number of allegations of use of force remains low and only a small fraction are substantiated. Further, 43 of the 46 reports of UOF from H+H and LAS were already under investigation by ID before those reports were submitted to DOC.[61] Overall, unreported uses of force appear to be an infrequent occurrence.

- **Independent, Complete, and Timely Staff Reports**: Appendix J, Table 1 shows the number and timeliness of staff reports for actual and alleged uses of force from 2018 to 2025. From July to December 2025, 3,679 UOF incidents were reported by supervisors to the Central Operations Desk ("COD"), and over 7,000 UOF or UOF witness reports were submitted for incidents occurring in this Monitoring Period. During this Monitoring Period, 82% of reports for actual uses of force were submitted within the 24-hour

---

[61] In this Monitoring Period, 40 out of the 42 reports from H+H staff alleging UOF were already under investigation by ID before H+H's reports were submitted. Further, three of the four UOF allegations submitted by LAS in this Monitoring Period had already been reported before receipt of the allegation via LAS. The number of UOF allegations submitted by LAS has also continued to decrease (14 reports alleging force in 2025, compared to 27 in 2024 and 46 in 2023).

93

deadline, and 48% of reports for alleged uses of force were submitted within the 72-hour deadline. The percentage of timely reports for both actual and alleged uses of force remained roughly equivalent between the 20th and 21st Monitoring Periods, and the large number of reports submitted generally indicates compliance with the requirement that staff must submit reports. However, given that the proportion of timely submissions of use of force reports remained lower than the levels observed in 2019-2020, the Monitoring Team shared feedback with the Department during this Monitoring Period recommending that the Department work to improve the timeliness of report submission by identifying any barriers to the timely submission and addressing those.

The Monitoring Team's review of reports revealed a general tendency toward independent preparation by the staff. However, the substance and quality of reports remain inconsistent, which has long been reported and is consistent with prior findings highlighted in the Monitor's May 29, 2020 Report (dkt. 341) at pgs. 89-91. The Monitoring Team continues to routinely identify reports that are incomplete, vague, or inconsistent with the evidence. The Department itself continues to identify issues with staff reporting practices. The proportion of intake investigations closed during this Monitoring Period that identify report writing issues (15%) remains largely unchanged from previous Monitoring Periods, indicating that deficiencies in staff reporting practices persist despite ongoing identification of these issues by the Department and the Monitoring Team.

- **Classification of UOF Incidents**: The Department is required to immediately classify all UOF incidents as Class A, B, C, or P when an incident is reported to the COD. Class P is a temporary classification used to describe UOF incidents where there is not enough information available at the time of the report to COD to receive an injury classification of Class A, B, or C. Appendix J, Table 2 identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from 2018 to 2025. While the Department has maintained its ability to classify the majority of incidents in a timely manner, the rate of timely classification has been declining steadily since 2023. In 2023, 92% of all incidents audited were classified within the COD period. In 2025, only 77% of all incidents audited were classified within the COD period. However, there was some improvement between the 20th and 21st Monitoring Periods, with timely classifications

94

increasing from 72% to 82%. During this Monitoring Period, the Monitoring Team shared feedback with the Department inquiring about the reason for these delays and what steps it would take to alleviate the delays and improve practice, but the Department has not provided a response.

- **Alleged Use of Force**: The Monitoring Team evaluates both reported instances of force by staff and substantiated *allegations* of uses of force – instances when staff purportedly used force on an incarcerated individual and did not report it. As demonstrated in Appendix J, Table 3, the number of UOF allegations has steadily declined from 471 UOF allegations in 2016 to 131 UOF allegations in 2025. The number of allegations is small compared to the total number of uses of force reported by staff in 2025 (n=6,893), only a fraction of these allegations were substantiated, and instances of excessive or unnecessary unreported uses of force remained rare.

- **Non-DOC Staff Reporting**: Consent Judgment § V, ¶¶ 10-13 requires non-DOC staff members who witness a UOF incident to report the incident in writing directly to a supervisor, and medical staff are also required to report to a supervisor when they have reason to suspect that an incarcerated individual has sustained injuries due to a UOF, but the injury was not reported as such to the medical staff.

  o *DOE Staff Reporting:* The Department of Education ("DOE") previously developed staff training and reporting procedures, in consultation with the Monitoring Team, to address the requirements of Consent Judgment § V, ¶ 10 and the December 4, 2019 Order (dkt. 334) clarifying the requirement for DOE staff to submit witness reports. In the 21st Monitoring Period, in response to Monitoring Team feedback, DOE implemented steps to reinforce compliance with the *Nunez* reporting obligations. These steps included conducting professional development training for staff, designating the school principal to oversee on-site adherence to reporting requirements, making reporting forms readily accessible in the principal's office, and providing regular reminders to staff. Further, the Law Department worked with DOE and DOC to develop a process for submitting these reports. Almost immediately after the training, the first two DOE witness reports were submitted to DOC. Appendix J, Table 5 details the incidents in which it

95

appears DOE staff may have witnessed a UOF, and the reports submitted by DOE staff from July 2024 to December 2025.

o *H+H Reporting*: H+H (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for staff reporting. Since June 2023, there has been notable and sustained progress in H+H staff reporting following feedback from the Monitoring Team. *See* the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 79-80. H+H staff submitted a total of 42 reports in this Monitoring Period; 38 reports were H+H witness reports of UOF incidents, and 4 reports relayed UOF allegations from an incarcerated individual. Appendix J, Table 4 provides an overview of the reporting provided by H+H staff from 2018 to 2025.

During this Monitoring Period, the Monitoring Team identified and shared[62] an additional 11 incidents, most of which occurred in the 20th Monitoring Period, in which it appears that H+H staff may have witnessed a UOF, but a report was not submitted. H+H determined that at least 23 staff members should have submitted UOF reports for 10 of the UOF incidents, and due to the available camera angles, they were unable to identify the staff in the eleventh UOF incident. Following the close of the 21st Monitoring Period, the Monitoring Team identified and shared an additional 15 incidents, most of which occurred in the 21st Monitoring Period, in which it appears that H+H staff may have witnessed a UOF, but a report was not submitted. H+H determined that at least 48 staff members should have submitted UOF reports for all 15 UOF incidents. In response, depending on the case, H+H reported that they referred the staff who should have reported for documented verbal warnings or formal counseling.

Overall, the sustained improvement observed in H+H reporting is notable. The reports submitted by H+H staff are crucial to the investigation of UOF

---

[62] The Monitoring Team continues to monitor incidents that may be witnessed by H+H staff and share feedback with H+H to ensure that reporting occurs when it should as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 155-156. With respect to incidents occurring in the clinics, between July and December 2025, 182 UOF incidents occurred in clinic areas and only 14 of those incidents (8%) had corresponding reports submitted by H+H staff. It is worth noting that just because an incident occurred in a clinic area does not mean H+H staff witnessed the incident. However, the number of incidents that occurred in a clinic versus the number of reports received suggests it is possible that additional incidents were observed but not reported.

incidents, so continued, sustained focus on ensuring that H+H staff report as required is critical.

- **<u>Overarching Work Regarding Department's Reporting:</u>** On December 14, 2023, the Court issued an Order (dkt. 656) regarding changes the Defendants must make to incident reporting practices in light of the Monitoring Team's findings in the Monitor's October 5, 2023 Report (dkt. 581) and the Monitor's November 8, 2023 Report (dkt. 595). The Monitor's January 13, 2026 Report (dkt. 947) at pgs. 156-157 provides a summary of the status of this work through the end of 2025 and accurately reflects the work as of the end of the 21st Monitoring Period. The Department has consulted with the Monitoring Team throughout the development of the new incident reporting practices and the Monitoring Team has shared recommendations and feedback on enhancement to this process. This work is ongoing.

## **<u>Conclusion</u>**

Overall, the Department continues to generally report UOF incidents as required, and most are classified within a reasonable period of time. While thousands of individual staff reports are submitted, many of them timely, there remains room for improvement. Continued delays in report submission from certain facilities and broader delays in incident classification hinder the timely assessment of these reports. Additionally, the quality, specificity, and accuracy of staff reports have largely remained consistent since monitoring began and improvement is still needed to ensure reports accurately capture what occurred. The Department therefore remains in Partial Compliance with this requirement.

| COMPLIANCE RATING | **Consent Judgment § V., ¶ 2.** Partial Compliance |
|---|---|

| PROVIDING MEDICAL ATTENTION FOLLOWING A USE OF FORCE INCIDENT (CONSENT JUDGMENT § V., ¶ 22) |
|---|
| *Consent Judgment § V., ¶ 22. Providing Medical Attention Following Use of Force Incident.* All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any. |

Given the potential for injury, incarcerated individuals involved in uses of force and fights should receive prompt medical attention. There is no generally accepted standard for the specific period of time when medical treatment must be provided after an incident, which is why the provision simply requires medical treatment to be provided "as soon as practicable" after the incident. However, as a management tool, time markers are useful. Accordingly, the Department's Directive 4516R-B "Injury to Inmate Reports" requires individuals to be afforded medical attention as soon as practicable, but no more than four hours following a UOF incident or inmate-on-inmate fight. The Department's policy also sets forth guidelines for affording expedited medical treatment. Incarcerated individuals who appear to have specific conditions or complain of having such conditions (*e.g.,* loss of consciousness, seizures, *etc.*) must be produced directly to a clinic (and not taken to an intake location) following a UOF or fight. The timelines set by this policy are within the generally accepted practice, and thus the Monitoring Team measures compliance using the Department's four-hour standard.

**Compliance Assessment Overview**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Medical Wait Times**: This provision is well-suited to the use of setting quantitative metrics to assess compliance (*i.e.*, the proportion of cases that receive medical attention following a UOF within 4 hours, which is the standard set by Department policy), and the Monitoring Team determined that 80% is an appropriate standard.[63] Appendix J, Table 6 details wait times for medical treatment following Use of Force incidents from 2018 through December 2025. In the 20th Monitoring Period, 76% of UOF-related medical encounters occurred within four hours, and in the 21st Monitoring Period, 75% occurred within four hours.

  As detailed in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 160, the decrease in performance during the 20th Monitoring Period from prior Monitoring Periods was mainly attributable to low performance levels at EMTC (66%) and OBCC (75%). During this Monitoring Period, the low performance levels at EMTC (66%) and OBCC (68%) continued.

- **Electronic Clinic Production Dashboard**: The Department collaborated with the Strategic Operations Division, Training and Development, Information Technology Division, and Health Affairs to create an Electronic Clinic Production Dashboard. The Dashboard is intended to support compliance with BOC minimum standards requiring DOC to produce people in custody to clinic for sick call and other medical appointments. The system allows DOC to electronically record sick call requests, document whether individuals were produced, and track the outcome of the clinic visit, including whether the person was seen by CHS. The Monitoring Team worked with the Department on the training for the Clinic Production Dashboard, which was approved for use in November 2025. The Clinic Production Dashboard pilot launched on December 18, 2025 at NIC.

---

[63] The Monitoring Team's review of the historical record of compliance ratings indicated that most of the compliance ratings to date have been congruent with an 80% threshold for Substantial Compliance, although two exceptions were identified. In the 7th Monitoring Period, Substantial Compliance was assessed with a 74% performance level and in the 8th Monitoring Period, Substantial Compliance was assessed with a 78% performance level). Despite the small number of exceptions, the Monitoring Team believes that 80% is an appropriate threshold for Substantial Compliance going forward.

The IT Division and Strategic Operations Division are currently assessing options to expand the system to other facilities.

**Conclusion**

Given that the systemwide average for providing medical attention within 4 hours of the incidents is 75%, the Department remains in Partial Compliance. In addition to maintaining current performance levels at other facilities, improvements to providing timely medical care at EMTC and OBCC are needed to achieve Substantial Compliance.

| COMPLIANCE RATING | **Consent Judgment § V., ¶ 22.** Partial Compliance |
|---|---|

---

**INTERIM SECURITY PLAN (SECOND REMEDIAL ORDER ¶ 1(I)(A) AND ACTION PLAN § D., ¶ 2(A))**

*Second Remedial Order ¶ 1(i)(a). Interim Security Plan*. Develop, in consultation with the Monitor, and implement an interim Security Plan that describes, in detail, how various security breaches will be addressed by October 11, 2021. This plan shall address, among other things, the following issues: unsecured doors, abandonment of a post, key control, post orders, escorted movement with restraints when required, control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing officer keys and OC spray.

*Action Plan § D., ¶ 2(a). Interim Security Plan*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: (a) the interim Security Plan required by ¶ 1(i)(a) of the Second Remedial Order.

*October 10, 2023 Order. Immediate Security Plan*. The Department's Executive Leadership, including the Senior Deputy Commissioner, the Security Manager, the Classification Manager, and the Staffing Manager, shall convene a meeting with the Monitor, no later than October 18, 2023, to devise a plan that can be implemented immediately to ameliorate the unacceptable levels of harm in the New York City jails.

---

The Department is required to develop a comprehensive Security Plan pursuant to the Second Remedial Order (dkt. 398), ¶ 1(i)(a) and the Action Plan (dkt. 465), § D, ¶ 2(a). The Department has struggled to develop a comprehensive and effective Security Plan.[64] Previous iterations of security plans have failed to adequately address standard, basic security protocols that are necessary to reduce unnecessary, inappropriate, and/or excessive uses of force and other forms of institutional violence as required by the *Nunez* Court Orders.

## Court's 2024 Contempt Order

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with the requirements to develop the Security Plan in the Second Remedial Order (dkt. 398), ¶ 1(i)(a) and the Action Plan (dkt. 465), § D, ¶ 2(a). The Court explained the basis for these findings at pgs. 22-26 in the section "Failure to Correct Failures in Security and Basic Correctional Practice" of the Order.

## Compliance Assessment Overview

The history of compliance ratings for this provision is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

---

[64] *See*, Monitor's October 14, 2021 Report (dkt. 403) at pg. 5; November 17, 2021 Report (dkt. 420) at pgs. 2-3; Monitor's December 1, 2021 Report (dkt. 429) at pg. 7; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 15-20; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 21-22, and 44-46; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-81; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 37-39; Monitor's June 8, 2023 Report (dkt. 541) at pgs. 35-36; July 10, 2023 Report (dkt. 557) at pgs. 31-33; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 3, 17-23, 44, and 56; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 20-29, 32, 164, and 166; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 14-18, and 185-186.

In the 20th Monitoring Period, the Department was in Non-Compliance with the requirements to develop a Security Plan pursuant to the Second Remedial Order ¶ 1(i)(a) and the Action Plan § D, ¶ 2(a). The compliance rating for the 21st Monitoring Period remains the same. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order, ¶ 1 (dkt. 967).

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's October 10, 2023 Order (dkt. 582), as it also requires the Department to develop an immediate security plan. A compliance rating is not provided for this provision pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Relevant Data and Information**

The Monitoring Team has established a lengthy, detailed record of the deficiencies in staff's basic security practices and the impact they have on facility safety.[65] The Monitoring Team's reporting is consistent with the security audits conducted by the Department's *Nunez* Compliance Unit. The patterns discussed in the Monitor's prior reports remain an accurate description of the jails' dysfunction today.

These deficiencies include failures to secure doors, remain on post, conduct meaningful tours, maintain control of housing areas, address visible misconduct, conduct safe and effective searches and escorts, use de-escalation, activate body-worn cameras, and ensure supervisors actively direct and correct staff practice. These failures remain central to the Department's unsafe conditions because they increase the risk of violence, use of unnecessary or excessive force, contraband circulation, self-harm, and other preventable harm.

The Department has attempted to address some of these issues through discrete initiatives, but the same basic security failures continue to recur across facilities and incidents.

---

[65] *See* Martin Declaration (dkt. 397) Exhibit E "Citations to Monitoring Team Findings re: Security Failures" and Monitor's December 6, 2021 Report (dkt. 431) at pgs. 17-23; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 7-30; Monitor's April 27, 2022 Report (dkt. 452) at pgs. 2-3; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 13-17; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-77; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68; Monitor's October 10, 2024 Report (dkt. 581) at pgs. 4-19; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 2-3 and 6-28; Monitor's December 12, 2023 Report (dkt. 666) at pgs. 6-22; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 22-29; Monitor's November 22, 2024 Report (dkt. 802) at pgs. 11-18; Monitor's May 22, 2025 Report (dkt. 849) at pgs. 66-71; and Monitor's January 13, 2026 Report (dkt. 947) at pgs. 43-51 and 162-174.

Accordingly, the Department still needs a comprehensive, viable and durable Security Plan that prioritizes the most urgent deficiencies, establishes clear expectations for staff and supervisors, uses data to identify and measure progress, and is capable of being sustained through changes in facility and executive leadership. Without such a plan, the Department will likely continue to rely on isolated initiatives that do not meaningfully change day-to-day security practice.

- **Department's Efforts to Improve Security Practices**: The Department has struggled to develop and sustain an effective Security Plan. Prior plans, including the June 2024 Security Plan[66], did not adequately address longstanding deficiencies in staff practice, lacked sufficient data-driven strategies, and did not establish a clear path to improve day-to-day security operations. In May 2025, the former Deputy Commissioner of Security and the Department's security consultant briefed the Monitoring Team on a Security Improvement Plan organized around discrete areas, including security operations, policies and procedures, technology, and housing/infrastructure. During this Monitoring Period, the Department did not take action on most of these items as discussed in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 166-167.

  During this Monitoring Period, the Department developed a Safety Plan with its Consultant to the Commissioner, Mr. Gary Raney, which was provided to the Monitoring Team in August 2025 and described by the Department as a broader plan to improve safety across the jails. The plan identified several areas of focus, including classification and housing, restrictive housing capacity, behavior management, contraband control, use-of-force review processes, escorts, training, technology, accountability, and the use of key performance indicators. These are discussed in more detail in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 13-15, 35-37, 77-78, and 169-173. Some of the recommendations were reasonable and aligned with longstanding concerns, including the need to improve classification, address contraband, expand meaningful behavior-management options, and better define expectations for each rank. However, the Safety Plan did not provide a concrete strategy to *change actual staff security practice*, particularly the daily failures to secure doors, supervise housing areas, conduct

---

[66] The Department first shared an updated Security Plan on May 23, 2024, but shortly after its submission the Department reported the plan was being revised. Consequently, the Monitoring Team did not provide feedback on the May 23, 2024 Security Plan.

meaningful tours, enforce rules, de-escalate conflicts, and properly manage searches, escorts, and uses of force. In several respects, the plan also appeared to minimize the current state of affairs or attribute the Department's challenges primarily to external constraints rather than the Department's own operational and supervisory failures and deficiencies.

- **Update on Security Initiatives**: The Department continued several discrete security initiatives during this Monitoring Period, most of which were driven by the then-Deputy Commissioner of Security. These included efforts to improve searches and contraband interdiction, expand and strengthen body-worn camera ("BWC") use, reduce reliance on Emergency Response Teams, develop the GRVC 10A Honors Unit,[67] and create a GRVC 10B "Back-to-Basics" model unit focused on core correctional practices such as securing doors, conducting standing counts, enforcing rules, conducting proper pat frisks, and coaching housing area staff in real time. The Back-to-Basics model retained some elements of the prior Door Security Pilot,[68] but attempted to add more structured staff training, embedded support, and auditing through scorecards and video review. However, the trajectory of these initiatives demonstrates the Department's difficulty translating plans into sustained practice. The Door Security Pilot stalled at OBCC, RNDC, and GRVC and was ultimately narrowed to GRVC housing units 10A and 10B, where it merged into the Honors Unit and Back-to-Basics work. Even after these units opened in GRVC, the Department reported concerns about the pace of implementation, inconsistent staff application of basic rules, and the need for close monitoring by the then-Deputy Commissioner of Security's office. However, the units have continued to operate with low-to-no violent incidents and uses of force compared to the other GRVC units. The Department has made more concrete progress in certain related areas, including the continued deployment of updated BWCs, reduced reliance on Emergency Response Teams, and improvements in search and contraband-related practices, all of which are discussed in greater detail elsewhere in this report. Still, these initiatives remain

---

[67] The Honors Unit is described in more detail in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 55-56, and this description remains true for this Monitoring Period.

[68] *See* Monitor's November 22, 2024 Report (dkt. 802) at pgs. 15-16; Monitor's May 22, 2025 Report (dkt. 850) at pgs. 69-70; Monitor's January 13, 2026 Report (dkt. 947) at pgs. 34-35 and 167-168

fragmented and insufficient to substitute for a comprehensive Security Plan. Further, because many of these efforts were led by the then-Deputy Commissioner of Security and the Department's security consultant, both of whom left after the close of the Monitoring Period, the new administration must determine which initiatives should be sustained, revised, or replaced as part of a cohesive security strategy.

**Conclusion**

Poor security practices remain deeply entrenched across the Department. Staff continue to struggle with foundational correctional duties, and supervisors do not consistently coach, direct, reinforce, or hold staff accountable for their failures to perform those fundamental duties. The Department's repeated difficulty sustaining pilots and translating plans into daily practice demonstrates that the issue is not simply the absence of ideas, but the absence of a cohesive, durable, and rigorously managed strategy.

The work of developing an effective security plan is now in the hands of the Department's leadership and the Remediation Manager. Stakeholders must determine which prior initiatives should be sustained, revised, or discontinued, and must develop a security plan that can withstand leadership changes. That plan must establish clear priorities, define expectations by rank, build credible facility leadership, create urgency and buy-in, use data to measure whether practice is changing, and provide the training, supervision, reinforcement, and accountability necessary to change day-to-day staff behavior and performance in the housing areas.

| COMPLIANCE RATING | **Second Remedial Order ¶ 1(i)(a).** Non-Compliance<br>**Action Plan § D., ¶ 2(a).** Non-Compliance |
|---|---|

105

---

**SEARCHES AND IDENTIFY/RECOVER CONTRABAND (ACTION PLAN, § D., ¶ 2(D) AND (E)AND AUGUST 10, 2023 ORDER, § I., ¶ 2)**

*Action Plan, § D, ¶ 2(d). Searches*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: : [. . . ]

(d) improved procedures on how searches are conducted, including addressing the Monitor's feedback that was provided in 2021.

*Action Plan, § D, ¶ 2(e). Identify/Recover Contraband*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: [. . . ]

(e) enhanced efforts to identify and recover weapons and other contraband.

*August 10, 2023 Order § I, ¶ 2. Revise Search Procedures*. By October 30, 2023, the Department, in consultation with the Monitor, shall reconstitute its search procedures and practices to ensure searches are conducted in an efficient, timely, safe manner and to reduce the possibility of a use of force. The new search procedures shall be subject to the approval of the Monitor.

---

The Department's search procedures have been the subject of concern because they are among the most frequent settings for uses of force, many of which could have been avoided.[69] Experiences in other jail systems, where searches are not accompanied by use of force events at the level observed in this Department, suggest that the Department's staff search practices need refinement. In addition, the continued prevalence of dangerous contraband leads the Department to conduct searches in its facilities more frequently. For these reasons, improved search procedures are required by the Action Plan (dkt. 465), § D, ¶ 2 (d) and the August 10, 2023 Order (dkt. 564), § I, ¶ 2. Relatedly, the Department is required by Action Plan (dkt. 465), § D, ¶ 2 (e) to enhance efforts to identify and recover weapons and other contraband.[70]

---

[69] *See*, for example, Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13-14 and 128; Monitor's October 17, 2018 Report (dkt. 317) at pg. 42; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 16, 29, and 75; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24, 43-44, 48 and 124; Monitor's December 6, 2021 Report (dkt. 431) at pg. 26; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 22 and 71-72; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 71-72, 81, and 117; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 54 and 138; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 42-43; December 22, 2023 Monitor's Report, (dkt. 666) at pgs. 17-22; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 69-75, 159; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 65-66 and 177-178; Monitor's May 22, 2025 Report (dkt. 849) at pgs. 71-79; Monitor's May 22, 2025 Report (dkt. 849) at pgs. 71-79; and Monitor's January 13, 2026 Report (dkt. 947) at pgs. 174-188.

[70] Contraband generally includes, but is not limited to, weapons, cell phones, illegal drugs, alcohol, cigarettes/tobacco, currency, and prescription drugs (*i.e.*, suboxone, prescription pain killers, anxiety medication, etc.).

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with requirements related to searches and contraband recovery in Action Plan § D, ¶¶ 2 (d) and (e). The Court explained the basis for these finding at pgs. 22-26 in the "Failure to Correct Failures in Security and Basic Correctional Practice" section of the Order.

**Compliance Assessment Overview**

The history of compliance ratings for these provisions is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period, the Department was in Partial Compliance with Action Plan § D, ¶¶ 2(d) and (e). The compliance rating for the 21st Monitoring Period remains the same, and the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order, ¶ 1 (dkt. 967).

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order § I, ¶ 2 (dkt. 564), as it relates to searches and contraband recovery. A compliance rating is not provided for this provision pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Relevant Data and Information**

Searches of facility spaces, visitors, staff, and incarcerated individuals are essential to preventing and detecting dangerous contraband, particularly weapons and drugs. A significant amount of violence with weapons occurs in the jails, including ongoing high rates of stabbings and slashings. Drugs entering and circulating within the jails remain a serious security and safety issue, and acute intoxication or overdose has resulted in 19 deaths confirmed by the Office of the Chief Medical Examiner ("OCME") since 2019. These deaths involved fentanyl, heroin, methadone, synthetic cannabinoids such as MDMB-4EN-PINACA, and other substances or drug combinations, underscoring the significant risk of harm when drugs enter the facilities.

The frequency and manner in which searches are conducted must of course be appropriately planned and considered. Searches can be disruptive and may lead to avoidable uses

107

of force when they are not carefully planned, supervised, and executed. This remains a significant concern during the current Monitoring Period.

The Monitoring Team's review of incidents continues to show that searches resulting in force are often poorly planned, insufficiently supervised, or escalated by predictable issues, including the absence of an effective tactical plan or staff briefing, failure to anticipate resistance as a potential use-of-force event, overreliance on chemical agents for verbal refusal or passive resistance, supervisors who are present but do not direct or correct staff actions, unsecured doors and poor span of control, failure to activate body-worn cameras, overly aggressive efforts to recover suspected contraband, and unprofessional staff conduct that unnecessarily increases tension.

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Searches and the Use of Force**: The Department does not specifically track *use-of-force incidents that occur during searches*, but the Monitoring Team's review of COD reports suggests that approximately 414 use-of-force incidents in this Monitoring Period occurred during searches, accounting for about 12% of all use-of-force incidents in the 21st Monitoring Period. Given the frequency of force during searches, the Department must ensure that searches are targeted, disciplined, and led by supervisors who actively manage risk before staff action escalates into force.

- **Number of Searches and Contraband Recoveries**: Tables 13(a) and 13(b) of Appendix B provide the number of facility and special searches conducted from 2022 to 2025 and the volume of contraband recovered from 2021 to 2025 respectively. The total number of searches conducted has continued to decline from a peak in 2022 of 196,738 searches to about half that number in 2025 with 100,257 searches conducted. The continued reduction in special searches remains notable because these searches have historically raised concerns regarding operational disruption and use of force, yet reduced search activity must still be evaluated and balanced with the security needs and indicators of contraband risk. A review of the use of force and violent incidents, as well as in-custody deaths, that occurred in 2025 reflect a high prevalence of contraband, including weapons and drugs. In 2025, the Department recovered 826 drug items, 2,195 weapons, 89 escape-related items, and 500 other contraband items. Weapon recoveries increased in 2025

108

compared to 2024, even though the Department conducted fewer searches overall. This requires careful analysis to determine whether this reflects improved search quality, better targeting, changes in reporting, or an increase in weapons inside the facilities. The Department must continue moving beyond counting searches and recoveries and instead use this information to assess how contraband enters the facilities, whether search strategies are effective, and what adjustments are necessary to prevent contraband from circulating in the jails.

- **Department's Efforts to Improve Search Practices**: During this Monitoring Period, the Department continued to focus on search-related initiatives described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 180-182, including reducing reliance on ESU and other Special Teams for routine searches, scheduling Tactical Search Operations through the Chief of Security, emphasizing more targeted searches, focusing on improving pat frisk practices, and piloting a digital platform to improve search documentation.[71] Many of these initiatives were driven by the then-Deputy Commissioner of Security Operations who left the Department after the Monitoring Period ended.

- **Revisions to the Department's Search Policy and Procedures**: During the 20th Monitoring Period, the Department took concrete steps toward addressing the Monitoring Team's long-standing feedback regarding search practices. In April 2025, the Department provided a comprehensive plan to revise 11 search-related policies, incorporating internal and external review, Monitoring Team feedback, applicable regulatory requirements, training, and implementation through a six-phase process expected to take approximately 12 to 14 months. The Monitoring Team found the plan thoughtful and appropriately structured, but as of this Monitoring Period, the project has been delayed due to significant leadership changes and competing Department priorities, and no progress has

---

[71] At the end of the 20th Monitoring Period, the Department developed training videos on proper search procedures and pat frisk techniques and showed these videos to at least some staff at roll call. The Monitoring Team recommended that during the video presentations, additional guidance be provided on body-worn cameras, communication with incarcerated individuals, and the care and respectful management of personal items such as family photos and letters, but the Department never responded to these recommendations. In addition, the training videos were not shown to staff during the current Monitoring Period.

109

been made. The Department must reinvigorate this work and actually begin to implement the various strategies that were identified.

- **Contraband Recovery**: The Department has long struggled to control contraband, which is generally introduced through four primary methods: visitors, individuals who work in the jails, the mail, and the repurposing of materials from the physical plant. The Department's ability to improve its overall search practices is therefore directly tied to its ability to deter, detect, and recover contraband. During this Monitoring Period, the Department reported it continued several contraband-related initiatives previously underway and described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 183-187, including the use of body scanners (upgrades of body scanners remain in the procurement process), the continued use of the Mail Screening Distribution Unit, the use of CEIA cell phone detectors, ongoing scrutiny of visitors,[72] ongoing physical plant improvements, including replacing Lexan with security glass and adding fencing, and the introduction of Narcan (discussed below).

  o *Narcan Initiative:* In November 2025, the Department rolled out a Narcan initiative as a harm-reduction measure. The Department reports it intends to issue each uniformed staff member two single-use, 4-milligram doses of naloxone in a rescue pouch to be carried while on duty, maintain replenishment doses in facility control rooms, and require staff training on overdose response and naloxone administration. Narcan is a life-saving response, albeit after drugs have already entered the facility, so it is important to emphasize that this initiative must be paired with stronger contraband interdiction, search practices, mail screening, intelligence work, and staff and visitor screening to reduce the presence of drugs in the first instance.

**Conclusion**

The Department has taken steps to improve search practices and contraband interdiction, including reducing reliance on Special Teams for routine searches, improving mail screening and technology, focusing on pat frisks and cell searches. While the a reasonable plan for revising the

---

[72] During this Monitoring Period, DOC reported that CIB coordinated 97 visitor arrests, with commonly intercepted contraband including marijuana, tobacco, opioids, synthetic narcotics, dangerous articles, and rolling papers.

search-related policies was developed, it has not been implemented. Contraband remains a persistent and serious security concern resulting in significant harm to staff and incarcerated individuals. Weapons entering and circulating within the facilities create a significant risk of serious bodily injury and life-threatening harm, and narcotics and other intoxicants have already resulted in 19 deaths since 2019.

Significant work remains to ensure searches are targeted, disciplined, well-documented, and effective at detecting contraband without unnecessarily increasing disorder or the need for the use of force. Because many of the search-related initiatives were driven by prior security leadership, the new administration must evaluate, reinvigorate, and, where necessary, revise the Department's search and contraband strategy as part of its broader reform path forward.

| COMPLIANCE RATING | **Action Plan, § D, ¶ 2(d).** Partial Compliance<br>**Action Plan, § D, ¶ 2(e).** Partial Compliance |
|---|---|

| ESCORT PROCEDURES (ACTION PLAN § D., ¶ 2(F) AND AUGUST 10, 2023 ORDER, § I., ¶ 3) |
|---|
| *Action Plan § D., ¶ 2(f). Escort Holds*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: (f) improved escort techniques to eliminate the unnecessary use of painful escort holds.<br><br>*August 10, 2023 Order § I., ¶ 3. Revise Escort Procedures*. By, October 30, 2023, the Department, in consultation with the Monitor, shall revise its escort procedures and practices to eliminate the use of painful escort holds. The new escort procedures shall be subject to the approval of the Monitor. |

Painful escorts and poor escorting practices have contributed to unnecessary uses of force for years. It is why the Action Plan (dkt. 465), § D, ¶ 2(f) requires the Department to have improved escort techniques to eliminate the unnecessary use of painful escort holds and improve escort practices and procedures. Given the Department's lack of progress on this issue, the Court ordered on August 10, 2023 (dkt. 564), § I, ¶ 3 that the Department must revise its escort procedures and practices to eliminate the use of painful escort holds and improve escort holds generally. The new escort procedures are also subject to the approval of the Monitor.

### Court's 2024 Contempt Order

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Action Plan § D, ¶ 2(f). The Court explained the basis for its finding at pgs. 22-24 in the section "Failure to Correct Failures in Security and Basic Correctional Practice" of the 2024 Contempt Order.

### Compliance Rating History

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Non-Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Non-Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

The Monitoring Team has long been concerned about the frequency with which routine escorts result in uses of force. Escorts are a basic security practice that support the safe movement of an individual from one location to another and, in most cases, should not result in the need to use force. When force occurs during an escort, it often suggests that some aspect of the escort procedure has not worked as designed, either because of the use of an improper escort technique, lack of control, poor communication, poor supervision, or failure to de-escalate.

While not all incidents involving escorts are catalyzed by poor escort practices or inappropriate and/or painful escort techniques, the number of use-of-force incidents involving escorts are notably higher than what the Monitoring Team has observed in other correctional systems. During the current Monitoring Period, the Department reported that resistance during escorts was the primary reason force was used in 445 use-of-force incidents, representing approximately 12% of all use-of-force incidents. But those incidents capture only part of the issue. During this Monitoring Period, facility leadership identified 185 use-of-force incidents[73] via Rapid Reviews that involved escort-related issues, including improper technique, poor situational awareness, security violations, supervision failures, or escorting individuals without proper attire. The Monitoring Team's assessment of incidents in this Monitoring Period identified more than 1,300 use-of-force incidents in which force occurred during the movement or escort of an individual. Further, routine discussions with Department leadership and Wardens reflect continued reports of problems with escort practices, and ongoing efforts to provide guidance to staff on proper procedures, which have not yet resulted in improved practice. The Monitoring Team remains concerned about the frequency with which problems occur during escorts and the fact that, to date, no discernable improvement in practice has occurred. Outlined below is a summary of the issues observed:

- **Contributing Dynamics**: The Monitoring Team's review of use of force incidents continues to find the following problems regarding escort practices: lack of physical control, limited adherence to routine security practices (*e.g.,* situational

---

[73] This number does not appear to identify the full universe of violations, as the Monitoring Team's observation of practice suggests the problems are far more prevalent. Further, as discussed in other sections of this report, the Monitoring Team has found that facility leaders' Rapid Reviews do not reliably identify *all* violations.

awareness, unsecured doors/gates/corridors, poor management of corridor movement), painful escort holds (*e.g.*, bent wrist hold and upward arm bend), use of techniques designed for non-compliant individuals even when the incarcerated individual is compliant,[74] failing to use enhanced restraints when authorized, and poor supervision of escorts. These dynamics are discussed in detail in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 190-194 and no change was observed during the current Monitoring Period.[75] These persistent issues have cultivated a culture in which improper escort practices are standard practice. The Monitoring Team has found that staff still do not receive clear, consistent instruction on the safe application of escort holds nor how to conduct escorts securely. The resulting practices lack the necessary control, fail to mitigate risks, and often escalate tensions.

- **Alternative Techniques**: In September 2023, the Monitoring Team made recommendations to improve staff practice, including recommending an alternative escort technique. In May 2024, the Department formally rejected this recommendation, citing potential safety concerns, but did not offer an alternative approach or next steps and essentially asserted the status quo would remain. During the current Monitoring Period, one of DOC's Consultants recommended the use of an Emergency Restraint Chair in situations where an individual remains combative once handcuffed. DOC reports it has procured five Safe Guard Safety Chairs and is in the process of procuring ten additional chairs. DOC further

---

[74] The Department uses the PARAM (Post Apprehension Responsibility Aware Measures) technique developed by the New York State Division of Criminal Justice Services. This escort hold was designed to apply pressure in instances of non-compliance. However, the Monitoring Team continues to observe that staff default to using the PARAM technique as standard escort practice, even with compliant, handcuffed individuals.

[75] Notably, in the last Monitoring Period, the Department stated that it does not agree that staff utilize painful escort practices despite the Court's finding of Contempt with this requirement. To support this contention, the Department reported that no incarcerated individual grievances were filed for this reason in 2023/2024. The fact that incarcerated individuals may not have filed grievances on this issue is not dispositive that the problem does not exist. In fact, incarcerated individuals routinely allege problematic escort holds to ID investigators who are investigating the underlying UOF incident. It is unclear why incarcerated individuals should/would need to separately file a grievance about this issue when they can state their concerns directly to investigators who are charged with investigating UOF incidents. incarcerated individuals may not have filed grievances, but the Department's own findings (including Rapid Reviews and use of force investigations) and the Monitoring Team's observations of staff practice reflect a variety of problematic escort practices. Accordingly, the Department's position does not appear consistent with the objective evidence.

reported that the use of the Safe Guard Safety Chair is treated in the same manner as a gurney or other authorized carrying device and that the Department does not intend to issue specific policy guidance or formal training for its use. Facility staff were reportedly shown how to operate the chairs by ESU during the initial rollout. While the acquisition of this equipment may represent a potentially useful alternative to prolonged or unsafe escort techniques, the absence of a specific policy guidance on deployment criteria and supervision expectations and training on its use raises concerns about whether the chairs may be used appropriately and with sufficient safeguards. The Monitoring Team recommends that the Department develop such safeguards.

## Conclusion

Throughout 2025, the Monitoring Team has shared examples of incidents involving painful escorts with the Department and has met with various Department leaders to discuss the issue. However, despite numerous rounds of feedback, training adjustments, and operational data indicating the harm caused by improper and painful escort holds, they remain embedded in the Department's practice and no substantive efforts have been made to change staff practice.[76] These issues continue to present an ongoing risk of harm to individuals in custody and the Department has not proposed any solutions to address this issue. Therefore, the Department remains in Non-Compliance.

| COMPLIANCE RATING | Action Plan § D., ¶ 2(f). Non-Compliance |
| --- | --- |

---

[76] *See* Monitor's October 31, 2016 Report (dkt. 291) at pg. 110; Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13 and 149; Monitor's October 10, 2017 Report (dkt. 305) at pg. 8; Monitor's April 18, 2018 Report (dkt. 311) at pgs. 18-21; Monitor's April 18, 2019 Report (dkt. 327) at pg. 24; Monitor's October 28, 2019 Report (dkt. 332) at pgs. 3-4; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 30-31, 39 and 79; Monitor's October 23, 2020 Report (dkt. 360) at pg. 3, 13, 17, 29 and 31; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24-25 and 46-47; Monitor's June 8, 2023 Report (dkt. 541) at pg. 6; Monitor's July 10, 2023 Report (dkt. 557) at pg. 45; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 12 and 14-15; Monitor's November 22, 2024 Report (dkt. 802) at pgs. 11 and 178-179; Monitor's May 22, 2025 Report (dkt. 850) at pgs. 24 and 80-82; and Monitor's January 13, 2026 Report (dkt. 947) at pgs. 48 and 189-194.

| **FACILITY EMERGENCY RESPONSE TEAMS (FIRST REMEDIAL ORDER § A., ¶ 6)** |
|---|
| *First Remedial Order § A., ¶ 6. Facility Emergency Response Teams.* Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (*i.e.*, probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented.<br><br>*August 10, 2023 Order § I., ¶ 7. Special Teams Training.* By, August 31, 2023, the Department, in consultation with the Monitor, shall develop a training program and provide such training to Special Teams[77]. The training program shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of the training program shall include, among other things, procedures and protocols for use of force, conducting searches, and responding to alarms and emergency situations in a manner that ensures the safety of incarcerated individuals and staff. The content of the training programs shall be subject to the approval of the Monitor.<br><br>*August 10, 2023 Order § I., ¶ 8. Revise Special Teams Command Level Orders.* By, November 30, 2023, the Department, in consultation with the Monitor, shall review and revise as necessary all of Special Teams command level orders related to the use of force. The new Special Teams command level orders related to the use of force shall be subject to the approval of the Monitor.<br><br>*August 10, 2023 Order § I, ¶ 9. Screening and Assignment of Staff to Special Teams.* By, October 30, 2023, the Department, in consultation with the Monitor, shall revise and implement its screening and assignment process for the initial assignment to Special Teams and routine reassessment of Special Teams staff to ensure the staff assigned to Special Teams are appropriately fit for duty. The Department's screening policy and reassessment procedures shall be subject to the approval of the Monitor. |

The First Remedial Order (dkt. 350), § A, ¶ 6 was imposed by the Court in order to address concerns that uniformed staff often over-relied on Emergency Response Teams and that the Emergency Response Teams needlessly exacerbated situations, were often overstaffed, and routinely responded to incidents with a show of force that was disproportionate to what triggered the incident. The Action Plan, § D, ¶ 2(c) reiterated this obligation, again requiring DOC to "implement improved security practices and procedures, including . . . reduced reliance and appropriate composition of Emergency Response Teams required by § A, ¶ 6 of the First Remedial Order and to address the Monitor's feedback that was provided in 2021."

---

[77] Special Teams is defined as the Emergency Services Unit and any functional equivalent unit, including, but not limited to the Strategic Response Team and the Special Search Team.

116

The Court entered an Order on August 10, 2023 (dkt. 564) to address several critical items identified by the Monitoring Team that were needed to reduce the imminent risk of harm but that had continuously languished. This included training for Special Teams (§ I, ¶ 7), revisions to Command Level Orders for Special Teams (§ I, ¶ 8) and Screening and Assignment of Staff to Special Teams (§ I, ¶ 9). Given the requirements of the August 10, 2023 Order (dkt. 564) are related to the other provisions regarding Emergency Response Teams, updates on the Department's efforts to achieve compliance are included in this section.

The section describes the historical concerns regarding responses by Emergency Response Teams, the Department's progress in reducing the deployment of Emergency Response Teams, and an update on the Selection, Training, and Oversight of Emergency Response Teams

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with First Remedial Order (dkt. 350), § A, ¶ 6. The Court explained the basis for its finding at pgs. 34-37 in the "Failure to Curb the Emergency Response Teams' Excesses" section of the Order.

**Compliance Assessment Overview**

The history of compliance ratings for this provision since the inception of the First Remedial Order is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period, the Department was in Partial Compliance with all portions of First Remedial Order § A, ¶ 6. The compliance rating for the 21st Monitoring Period remains the same, and the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order § I, ¶¶ 7-9 (dkt. 564), as it relates to the work of First Remedial Order § A, ¶ 6. Compliance ratings are not provided for these provisions pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Relevant Data and Information**

The overall goal of these provisions is to minimize unnecessary or avoidable uses of force by Emergency Response Teams. There are two types of Emergency Response Teams utilized by the Department: (1) Facility Response Teams or Probe Teams, which are teams of facility-based staff and (2) Special Teams[78] which include the Emergency Services Unit ("ESU"), a specialized team of staff specifically dedicated and trained to respond to emergencies across the Department; the Security Response Team ("SRT") and the Special Search Team ("SST")[79], which function similarly to ESU and are deployed to facilities as part of operational security efforts. The three teams often appear to perform the same or overlapping functions and the Department has not articulated any clear basis for the need for the three distinct and separate teams. Further, the Monitoring Team has long raised concerns that these teams are deployed too frequently, staffed with more personnel than necessary, and sometimes use tactics that escalate incidents rather than stabilizing them. The core issues have included unnecessary tactical deployments, excessive staffing, delayed or poorly coordinated responses, problematic escort and search practices, and insufficient criteria for selecting team members, particularly where staff had prior histories of problematic uses of force.

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Progress in Reducing Team Deployment**: Since the imposition of the First Remedial Order in August 2020, Emergency Response Teams are deployed much less frequently which reduces the risk of avoidable, unnecessary or excessive uses of force. This initial reduction began in the 18th Monitoring Period (covering January 2024 to June 2024) as described in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 62-69. In this Monitoring Period, of the 3,614 uses of force from July to December 2025, the Department reports that 342 incidents, or 9%, involved Probe Team deployments and 75 incidents, or 2%, involved

---

[78] Special Teams are defined, pursuant to the August 10, 2023 Order (dkt. 564), ¶ 7 as the Emergency Services Unit and any functionally equivalent unit, including, but not limited to the Strategic Response Team and the Special Search Team. The Special Teams are generally utilized in the facilities in the same manner as a Probe Team.

[79] The Department reports that Special Search Teams "SST" is comprised of any available facility staff that are only convened if there is a need for a special search.

Special Teams.[80] The reduced use of ESU is particularly notable. ESU was involved in fewer than 12 use-of-force incidents during this Monitoring Period, and Special Teams are no longer being used to conduct searches at the same frequency as in prior years, when ESU and other Special Teams were involved in over 1,000 searches in 2022 compared to 356 searches in 2025. Perhaps not surprisingly, the Department's reduced reliance on Emergency Response Teams coincides with the Department's increased use of Level A responses. This overall decrease in the use of Emergency Response Teams is meaningful because Emergency Response Teams were historically overused, often arrived after incidents had already been contained, and sometimes escalated tension through excessive staffing, confrontational tactics, or disorganized search operations. However, the Department's reduced reliance on Emergency Response Teams has not eliminated the underlying concerns about how these teams operate when they are deployed. Probe Team responses in particular continue to require closer supervision, more consistent structure, and clearer expectations regarding containment, de-escalation, escort practices, and incident termination. Special Teams' conduct has improved in some respects, including the cessation of use of certain tactical equipment such as OC grenades and tasers, but responses can still depend too heavily on the preferences of individual team members rather than a disciplined, standardized approach. The Department must therefore continue to refine its written guidance, improve post-incident debriefs and accountability, and ensure that both Probe Teams and Special Teams are used only when necessary and in a manner that reduces, rather than increases, the risk of unnecessary force and potential for harm.

- **Selection, Training, and Oversight of Emergency Response Teams**: Beyond deployment of Emergency Response Teams, another key area of focus related to Emergency Response Teams is the selection, training and oversight of the members of these teams. As discussed in more detail below, further improvement is necessary.
  - o *Facility Response Team Selection*: The Department still has not established clear criteria for who may serve on facility response teams, and all staff continue to respond when Probe Teams are called. The Monitoring Team reiterates its long-standing

---

[80] The Monitoring Team remains concerned about the veracity of this alarm data provided by the Department. The data has not always appeared to reflect the complete number of alarms initiated. The Monitoring Team shared this concern with the Department in a November 2024 feedback, which remains outstanding.

recommendation that the Department eliminate all-staff responses and developing clear selection criteria to prevent staff with histories of problematic uses of force from serving on response teams.

o   *Screening and Assignment of Staff to Special Teams (August 10, 2023 Order § I, ¶ 9)*: In September 2023, the Department shared proposed revisions to the Special Teams screening and assignment policy,[81] and the Monitoring Team provided feedback in October 2023. In the fall of 2025, the Monitoring Team recommended the Department adopt stopgap measures until the policy had been revised. As of the filing of this report, the Department has not yet provided a revised draft and while *some* stopgap procedures appear to be in place, it generally appears the screening process is not occuring in a systematic or planned manner and, in other cases, no screening has occurred at all.

o   *Assignment to Special Teams*: The number of staff assigned to Special Teams has declined in recent years. It is difficult to track staff assignments to the SRT and SST. The Monitoring Team, as part of its feedback regarding screening policies and procedures noted above, has recommended that appropriate tracking of such staff assignments must be addressed. With respect to ESU, in 2020 and 2021, the Emergency Services Unit had upwards of 200 members.[82] From 2023 to mid-2025, the staff assigned to ESU decreased by more than half with less than 100 staff (approximately 60 or so staff with a permanent assignment and over 30 staff on the support team). In this Monitoring Period, the number of staff assigned to ESU increased to over 100. The monthly rosters shared reflected significant turn-over on a monthly basis with frequent additions and removals of staff, including multiple instances in which more than 10 staff were added or removed in a single month. Some staff would appear on the ESU roster one month, were removed the next, then added back to the roster a month or two later. In the 21st Monitoring Period, there were 34 removals resulting in 24 unique staff being removed from the roster and 50

---

[81] DOC policy requires screening for both the Support and Permanent Teams of ESU and the August 10, 2023 Order (dkt. 564) requires screening for all Special Teams.

[82] The ESU Team is comprised of both a Permanent Team (staff who are officially assigned to ESU) and a Support Team that are technically assigned to a facility command and report to that command unless ESU needs additional staff, at which point they will be redeployed to ESU instead. The Monitoring Team has found that a large number of staff on the Support Team are routinely called to participate in ESU activities and are ostensibly part of the team full time.

additions resulting in 36 unique staff being added to the roster. In total, there were 45 unique staff either added or removed from the ESU rosters during the 21st Monitoring Period. The Monitoring Team reviewed screening materials for 43 staff screened in 2025; however, the staff screened and those added and removed from the ESU rosters did not directly correlate. Ten staff added to ESU during this period were not screened in 2025, including one staff member who is new to ESU and nine staff who were re-added. In addition, five staff were added to ESU prior to the completion of their screening. Three additional staff were added to ESU with negative recommendations on their screening forms from the Trials Division, and in one case, the Legal Division.[83] These three staff were not recommended for ESU because of concerns that the Divisions identified with their history of use of force and use of force reporting, and the Department did not provide a basis as to why they chose to add these staff to ESU despite the negative recommendations. The fact that staff with negative screening recommendations may still be used in ESU-related roles raises additional concerns about whether the screening process is actually controlling who performs ESU or Special Team functions.

Further, while the Department did screen and add individuals to ESU this Monitoring Period who had not served on ESU in the recent past, the Department continues to rely heavily on previously assigned ESU staff to fill vacancies, rather than conducting broader, open selection processes. The Monitoring Team's independent review of staff added to the ESU roster showed that there were multiple staff added to ESU in this Monitoring Period that the Monitoring Team had previously recommended be removed from ESU in 2021 and who were in fact removed from ESU at that time. Additionally, there were staff added to ESU with previous violations for failing to secure doors, disobeying orders, failure to activate BWCs, permitting supervisees to use an improper escort technique, and more security violations. While many staff assigned to ESU during this period may not individually raise concerns, the inconsistencies in screening, the timing of assignments, the addition of staff with negative screening recommendations, and the re-assignment of previously flagged staff raise significant

---

[83] The Department reported that one of these staff is on military leave, while two were temporarily deployed to SOD and the Chief of Security's office, respectively. It is unclear why these staff were added to the ESU roster, especially with negative recommendations, if they are on leave or primarily reporting to and working in other Divisions.

121

concerns regarding whether screening is functioning as an effective mechanism to ensure staff suitability for assignment to ESU.

Separately, the Monitoring Team is aware that ESU and other Special Teams routinely "call-out" staff assigned to the facilities to do the work of ESU and Special Teams. It is the Monitoring Team's understanding that these "call-outs" happen almost daily and generally the same staff are "called-out" to the Special Teams. The Monitoring Team recommends that the process of utilizing "call-outs" to provide staff for ESU or other Special Teams is not an appropriate or efficient way to manage assignment of staff to ESU or Special Teams and does not appear consistent with the requirements of the *Nunez* Court Orders.

- *Screening of Staff After Appointment:* As required by the *Nunez* Court Orders, routine **ongoing screening** of staff to ensure fitness for the position once they have been assigned to and remain on ESU does not consistently occur for all ESU staff as required. During this Monitoring Period, the Monitoring Team met with the Department to advise them of this ongoing lapse and shared feedback, but the Department has not yet responded to this feedback or engaged in any consistent, ongoing screening.

- *Training for Special Teams*: As required by the Court's August 10, 2023 Order § I, ¶ 7, the Department created Special Teams training in February 2024 and began delivering it in April 2024, addressing de-escalation, proportional force, restraints, painful escorts, and prohibited holds. The Department reports that all Special Teams staff completed the training at least once between February 2024 and June 2025. However, no training was provided between July 1, 2025, to December 31, 2025, despite significant turnover on the ESU roster during this period, including the addition or re-addition of staff, making it unclear whether all staff added to ESU during the Monitoring Period had completed the required training before deployment.

o *Rapid Review of Emergency Response Teams Response*: Since May 2023, the Department has conducted a separate Rapid Review process in which an ADW reviews incidents to evaluate Special Teams conduct. As with the Rapid Reviews more generally (discussed in

122

the Compliance Assessment First Remedial Order (dkt. 350), § A., ¶ 1), these reviews generally identify individual staff issues but still do not reliably assess whether the deployment or incident itself was unnecessary or avoidable.

o   *Special Teams Command Level Orders (August 10, 2023 Order § I, ¶ 8)*: The Department reports that ESU has nine Command Level Orders ("CLOs") and that the other Special Teams (including SST and SRT) do not have any policies.[84] The ESU CLOs have not been updated. Further, the lack of any policies and procedures regarding SST and SRT creates a concerning vacuum that must be addressed. This is particularly problematic because the Special Teams appear to perform similar or overlapping functions, yet they are not governed by a unified or current policy framework that clearly defines their respective roles, deployment criteria, permissible practices, supervision requirements, or accountability mechanisms. Despite long-standing recommendations from the Monitoring Team, the Department has not issued any updated policies that set clear standards for *all* the Emergency Response Teams. There are no new updates beyond those provided in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 182-183.

**Conclusion**

The Department has taken meaningful steps toward achieving the goals of First Remedial Order (dkt. 350), § A, ¶ 6. Most notably, the frequency of Emergency Response Team deployments continues to be limited, particularly in situations that historically resulted in the overuse of tactical force. This reduction lowers the risk of unnecessarily confrontational incidents and reflects a shift toward more measured and appropriate responses at the facility level. However, these improvements in deployment have not been matched by sufficient progress in the selection, screening, and oversight of Emergency Response Teams. Significant concerns remain regarding the management of Special Teams, particularly ESU, where staffing increases during the latter half of 2025 were accompanied by substantial turnover in the roster, inconsistent screening practices, assignment decisions that were not reliably tied to screening outcomes, and the absence of any Special Teams training during the same period, making it unclear whether

---

[84] As noted elsewhere in this report, it took the Department months to confirm the number of relevant policies related to ESU.

123

staff added or re-added to ESU during the Monitoring Period had completed the required training before deployment.

In addition, longstanding gaps in staffing of SRT, SST, and Probe Teams remain, and inadequate supervision and expectations persist. The Department also has not sufficiently clarified the roles of the various Special Teams nor does it have adequate policy guidance regarding both assignment/screening to these teams or how they are deployed.  Accordingly, while the Department has made important progress in reducing reliance on Emergency Response Teams, substantial work remains to ensure that when these teams are deployed appropriately and that they operate reliably and consistently and utilize sound correctional practice and are supervised accordingly. Continued focus on staffing, strengthening selection criteria, enforcing screening requirements, and improving practices and supervision will be necessary to achieve Substantial Compliance and to sustain progress over time.

| COMPLIANCE RATING | **First Remedial Order § A., ¶ 6.** Partial Compliance |
|---|---|

124

| |
|---|
| **REVISED DE-ESCALATION PROTOCOL (FIRST REMEDIAL ORDER § A., ¶ 3)** |
| *First Remedial Order § A., ¶ 3. Revised De-Escalation Protocol.* Within 90 days of the date this Order is approved and entered by the Court ("Order Date"), the Department shall, in consultation with the Monitor, develop, adopt, and implement a revised de-escalation protocol to be followed after Use of Force Incidents. The revised de-escalation protocol shall be designed to minimize the use of Intake areas to hold Incarcerated Individuals following a Use of Force Incident given the high frequency of Use of Force Incidents in these areas during prior Reporting Periods. The revised de-escalation protocol shall address: (i) when and where Incarcerated Individuals are to be transported after a Use of Force Incident; (ii) the need to regularly observe Incarcerated Individuals who are awaiting medical treatment or confined in cells after a Use of Force Incident, and (iii) limitations on how long Incarcerated Individuals may be held in cells after a Use of Force Incident. The revised de-escalation protocol shall be subject to the approval of the Monitor. |

The discussion below provides a compliance assessment of the Department's efforts to reduce its reliance on Intake units in general operations pursuant to the requirements of the First Remedial Order (dkt. 350), § A, ¶ 3. This assessment also includes references to the Action Plan (dkt. 465), § E, ¶ 3 (a) (which adopts ¶ 1 (c) of the Second Remedial Order (dkt. 398) regarding tracking of inter/intra facility transfers), and Action Plan (dkt. 465), § E, ¶ 3 (b) (which requires the new leadership to address these requirements) given these orders' interplay with the First Remedial Order (dkt. 350), § A, ¶ 3. Together, these provisions require the Department to identify the various processes that are negatively impacting orderly operations in Intakes and address them with new procedures.

The Monitoring Team also provides an update on the Department's efforts to process new admissions as required by the Second Remedial Order (dkt. 398), ¶ 1(i)(c), and the Action Plan (dkt. 465), § D, ¶ 2(b), and § E, ¶ 3(a)-(b), as these provisions relate to the work of First Remedial Order, § A, ¶ 3. This update is included in Appendix H of this Report.

**Compliance Assessment Overview**

The history of compliance ratings for this provision since the first assessment of First Remedial Order § A, ¶ 3 is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

Reducing reliance on Intake for de-escalation serves an important harm-reducing function. These provisions require the Department to establish a reliable process for de-escalating individuals involved in violence and/or use-of-force incidents so that any continuing risk of harm to themselves or others is safely abated. When an individual is agitated or has engaged in conduct that harmed another person, the Department must be able to separate the individual from potential victims, stabilize the situation, and determine whether the individual can be safely returned to the housing area or requires another appropriate placement. That determination must account for the risk of pain, injury, or further violence, and should not be limited only to the risk of serious injury. Historically, the Department has transported incarcerated individuals to Intake following incidents of violence or force as a default method of separation and de-escalation. This practice creates additional disorder, burdens Intake operations, and subverts the intended function of Intake units, which is to process new admissions and inter-/intra-facility transfers. Accordingly, the Monitoring Team has focused both on reducing the use of Intake for de-escalation purposes and on ensuring the Department develops routine, facility-based procedures to de-escalate individuals and manage post-incident separation outside of Intake. To assess the Department's progress, the Monitoring Team reviews uses of force in Intake, available data regarding the amount of time individuals remain in Intake areas, the Department's ability to manage individuals outside of Intake, observations from site visits, and incident-specific reviews of use-of-force events. The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Use of Force Incidents in Intake Areas**: Table 14 of Appendix B identifies the number and proportion of use-of-force incidents that occurred in Intake areas from 2018 through 2025. In 2025, 823 (11%) of the Department's 7,736 total use-of-force incidents occurred in Intake areas. The current number and proportion of Intake-related uses of force remain well below the 2021 peak, when 1,483 Intake uses of force accounted for 18% of all use-of-force incidents, but the current volume remains higher than it should be. During the current Monitoring Period, uses of force occurring in Intake areas were concentrated primarily at OBCC (111), EMTC (92), GRVC (77), and RNDC (74), which together accounted for about 80% of all use-of-force incidents in Intake areas. Further reductions

will require closer facility-level attention to improving operations in Intake, improved supervision, addressing processing delays, and identifying whether people are being moved to Intake unnecessarily after incidents.

- **Intake Data Tracking**: Inter/intra-facility transfers must be tracked pursuant to ¶ 1(c) of the Second Remedial Order (dkt. 398). The Facility Operations Division continues to monitor each facility's Intake continuously, 24 hours per day, seven days per week. The Department also reports that the quality assurance process developed in 2023 remains in effect as described in the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 12–13, which detailed, among other measures, the mandate that Intake staff utilize the Inmate Tracking System ("ITS") to monitor such transfers. The Department reports that it continues to use ITS-generated data to evaluate Intake durations more generally and identify individuals who may be remaining in Intake for extended periods of time.[85] Generally, the issue of individuals languishing in Intake for inter/intra facility transfers does not appear to be occurring at the frequency it did during the chaotic and disorderly conditions observed in 2021.[86] However, the Monitoring Team remains concerned about three persistent issues in the Department's Intake management. First, some individuals continue to remain in Intake longer than necessary. Second, even when individuals are tracked in ITS, the recorded times are not always accurate because staff often delay entering information while responding to other Intake priorities. Third, some categories of movement, including court transfers, are still not tracked in ITS.[87] The Monitoring Team maintains and reiterates its prior recommendations described in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 87-88; the Department must assess the root causes of staff failure to enter individuals into ITS accurately and timely, and develop a practical quality assurance process to ensure Intake use is properly monitored. As of the filing of this report, the Department has not responded to these recommendations. The frequency of use of force in Intake suggests that ongoing and improved oversight is necessary to ensure that these units are managed in a safe manner.

---

[85] The Monitoring Team has not independently confirmed the accuracy of the ITS data.

[86] The conditions that gave rise to the concerns about Intake are described in detail in the Monitor's February 3, 2022, Report (dkt. 504).

[87] *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 12-13.

- **Reduced Reliance on Intake & De-Escalation Units**: Intake continues to be used for post-incident management at a significant volume, even though not all individuals are taken to Intake following an incident (some are returned to their assigned cell, some are immediately rehoused, and some are taken directly to the clinic). Between July and December 2025, the Department reports that 5,520 of 35,508 non-new admission Intake arrivals, or 15.5%, were related to incident management, making it the third most common reason for Intake placement after overload in and overload out.[88] This remains a concern because Intake is generally not an appropriate setting to manage individuals following an incident, particularly given the disorder, delays, and use-of-force risks associated with Intake areas. Previously, the Department had attempted to utilize de-escalation units as a tool to reduce the reliance on Intake and promulgated Directive 5016, "De-escalation Unit," in 2022, and initially opened de-escalation units in each facility as an alternative location to manage individuals following incidents. However, by June 2023, DOC ceased use of de-escalation units in all facilities except EMTC (which still maintains a de-escalation unit).[89] Although Directive 5016 remains in effect, the Department has not issued updated guidance to staff explaining how facilities should manage post-incident de-escalation now that de-escalation units are largely no longer operating. The issue remains unresolved, and the Department must update its policy or provide guidance to clarify whether de-escalation units remain part of its operational practice and, if not, what post-incident management protocols staff should follow to avoid defaulting to Intake.

## Conclusion

The conditions in Intake remain materially improved from the disorder observed in 2021, including an important reduction in the number of use-of-force incidents occurring in Intake. Further, tracking of individuals in Intake has improved since 2021. However, several core issues remain unresolved, including the need to ensure that *all* individuals in Intake are consistently and

---

[88] "Overload in" and "overload out" refer to the transfer of individuals between facility intake areas to manage capacity. "Overload out" identifies individuals sent from the originating facility, while "overload in" identifies individuals received from another facility.

[89] *See*, Monitor's January 13, 2026 Report (dkt. 947) at pgs. 210 and 211.

accurately tracked in ITS, that Intake areas are safely managed, and that facilities reduce unnecessary reliance on Intake following incidents.

The most significant unresolved issue is the lack of clear post-incident de-escalation guidance. De-escalation units are no longer routinely used except at EMTC, yet Directive 5016 remains in effect, and the Department has not issued updated guidance explaining how staff should manage individuals after incidents without defaulting to Intake. The Department must establish clear protocols for safely separating, stabilizing, reassessing, and returning individuals to appropriate placements after incidents.

| COMPLIANCE RATING | **First Remedial Order § A., ¶ 3.** Partial Compliance |
| --- | --- |

| YOUNG ADULTS - PREVENT FIGHT/ASSAULT (CONSENT JUDGMENT § XV., ¶ 1) |
|---|
| *Consent Judgment, § XV., ¶ 1. Prevent Fight/Assault.* Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team does not assess compliance with the Nunez provisions related to 16- and 17-year-olds, who are now classified as Adolescent Offenders by New York State Law (Criminal Procedure Law 1.20(44)), given the December 9, 2025 Court Order (dkt. 933) finding that the Consent Judgment no longer applies to Adolescent Offenders.*

This provision requires the Department to manage units where 18-year-olds are housed in a manner that protects them from an unreasonable risk of harm, by preventing violent conduct and de-escalating confrontations as soon as practicable and reasonably safe to do so.

## Court's 2024 Contempt Order

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Consent Judgment, § XV, ¶ 1. The Court explained the basis for its finding at pgs. 37-40 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order.

## Compliance Rating History

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

130

**Relevant Data and Information**

The Monitoring Team has long been concerned about violence at RNDC, where the majority of 18-year-olds are held (along with those aged 19 to 21).[90] The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **RNDC's Current Facility Population/Composition**: Since the Consent Judgment went into effect, the number of 18-year-olds in custody has declined significantly. In 2016, the Department held approximately 200 18-year-olds, compared to approximately 61 18-year-olds in 2025. This age group typically represents about 1% or 2% of the total population in custody.

- **RNDC's Rates of Use of Force and Violence**: Table 1 of Appendix L identifies the rates of use of force and violence for the entire RNDC facility from January 2022 to December 2025. Increases in use of force, stabbings/slashings and fights were observed during the current Monitoring Period at RNDC, although these increases occurred among units that do not house 18-year-olds.

- **RNDC's Programs Action Plan ("RNDC Action Plan")**: The Department continued to implement the RNDC Action Plan during the 21st Monitoring Period as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 215-217. Table 2 of Appendix L shows that the RNDC Action Plan has led to significant decreases in nearly all violence metrics, compared to rates in young adult housing areas before the RNDC Action Plan was implemented in July 2024.

- **Monitoring Team Recommendations**: The RNDC Action Plan is distinguished from other efforts the Department has made to address the risk of harm to young adults not just because of its positive outcomes, but also because it is an example of a strategy built on good correctional practice (such as consistently assigned staff, reduced idle time, and incentives for positive conduct) paired with the requisite leadership, sustained attention, and tools for assessing the RNDC Action Plan's impact on facility safety. This is a

---

[90] The Monitor's December 22, 2023 Report (dkt. 666) at pg. 87 includes specific citations to various reports from 2022 and 2023 that discuss in detail RNDC's circumstances and the Department's efforts to address them.

131

significant achievement. The Monitoring Team collaborated closely with the Department as it developed and refined the Action Plan's components and throughout its implementation, which has been sustained throughout various agency and facility leadership changes. The Monitoring Team continues to recommend that the Department broaden implementation to all units targeted by the RNDC Action Plan and deepen implementation to include key elements of Direct Supervision (particularly related to incentives), as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 217-218.

**Conclusion**

Achieving substantial compliance with this provision requires that the Department and facility continue to work toward full implementation of the RNDC Action Plan and to ensure the various practices lead to a reduced risk of harm for 18-year-olds in custody. The Department remains in Partial Compliance with this provision.

| COMPLIANCE RATING | **Consent Judgment § XV., ¶ 1. (18-year-olds)** Partial Compliance |
| --- | --- |

| YOUNG ADULTS - DIRECT SUPERVISION (CONSENT JUDGMENT § XV., ¶ 12 & FIRST REMEDIAL ORDER § D., ¶ 3) |
|---|

*Consent Judgment § XV., ¶ 12. Direct Supervision.* The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

*First Remedial Order § D., ¶ 3.* For all housing units at RNDC that may house 18-year-old Incarcerated Individuals, the Department, including RNDC Supervisors, shall take necessary steps to improve the implementation of the Direct Supervision Model with an emphasis on the development of proactive and interactive supervision; appropriate relationship building; early intervention to avoid potential confrontations; de-escalating conflicts; rewarding positive behavior; and the consistent operation of the unit.

*First Remedial Order § D., ¶ 3(i).* The Department, including RNDC Supervisors, shall reinforce the implementation of the Direct Supervision Model with Staff through, among other things, appropriate staff supervision, coaching, counseling, messaging strategies, or roll call training.

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team does not assess compliance with the Nunez provisions related to 16- and 17-year-olds, who are now classified as Adolescent Offenders by New York State Law (Criminal Procedure Law 1.20(44)), given the December 9, 2025 Court Order (dkt. 933) finding that the Consent Judgment no longer applies to Adolescent Offenders.*

This provision requires the Department to implement the Direct Supervision model in all units that house 18-year-olds. To implement Direct Supervision, the Department must emphasize proactive and interactive supervision, appropriate relationship building, early intervention to avoid potential confrontations, de-escalation, rewards for positive behavior and consistent operations on each unit, including the implementation of daily unit schedules. The Department's long-standing inability to implement a Direct Supervision model resulted in the imposition of related provisions in the First Remedial Order (dkt. 350), § D, ¶¶ 3 and 3(i). As part of the additional remedial relief, the Department is required to periodically assess the extent to which these various aspects are being properly implemented, along with adherence to the daily schedule in each housing unit.

## Court's 2024 Contempt Order

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with Consent Judgment, § XV, ¶ 12 and First Remedial Order (dkt. 350), § D, ¶ 3 and 3(i). The Court explained the basis for its finding at pgs. 37-40 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order.

133

**Compliance Rating History**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Key Concepts of Direct Supervision**: The facility has implemented many of the components of Direct Supervision in the units targeted by the RNDC Action Plan as discussed in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 219-225. These strategies include setting a maximum unit size, daily huddles, daily unit schedules, offering programming and incentive programming, and routinely monitoring grievances. The units targeted by the RNDC Action Plan continue to be supervised by an ADW who serves as the Unit Manager and managed by staff who are consistently assigned to the same unit day-to-day (*see* Consent Judgment, § XV, ¶ 17, below). The capacity for each unit continues to be capped at 15, and all units receive enhanced programming which is designated on a daily unit schedule. The facility is still working to implement additional robust programming to incentivize positive behavior and to conduct the required assessments of the extent to which the core components of Direct Supervision have been properly implemented.

**Conclusion**

Progress toward the full implementation of the RNDC Action Plan remains steady. To reach Substantial Compliance, the Department needs to: (1) expand NCU's staffing audits to include the MODs covered by the RNDC Action Plan (NCU currently audits consistent staffing in Buildings 2 and 3); (2) demonstrate the reliable implementation of daily unit schedules per the

134

First Remedial Order (dkt. 350), § D, ¶ 3 (ii), which requires periodic assessments of the extent to which the various aspects of Direct Supervision are being properly implemented, along with adherence to the daily schedule in each housing unit; and (3) expand the availability of group and individual incentives to all units covered by the RNDC Action Plan, and track the frequency of their delivery. Given the overlapping requirements, the state of compliance relative to ¶ 12 of the Consent Judgment also reflects the state of compliance relative to § D ¶ 3 and 3(i) of the Remedial Order.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § XV., ¶ 12. (18-year-olds)** Partial Compliance<br>**First Remedial Order § D., ¶ 3.** Partial Compliance<br>**First Remedial Order § D., ¶ 3(i).** Partial Compliance |

**YOUNG ADULTS - CONSISTENT ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XV., ¶ 17 & FIRST REMEDIAL ORDER § D., ¶ 1)**

*Consent Judgment § XV., ¶ 17. Consistent Assignment of Staff.* The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

*First Remedial Order § D., ¶ 1.* For all housing units at RNDC[91] that may house 18-year-old Incarcerated Individuals, the Department shall enhance the implementation of a staff assignment system under which the same correction officers, Captains, and ADWs are consistently assigned to work at the same housing unit and on the same tour, to the extent feasible given leave schedules and personnel changes.

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team does not assess compliance with the Nunez provisions related to 16- and 17-year-olds, who are now classified as Adolescent Offenders by New York State Law (Criminal Procedure Law 1.20(44)), given the December 9, 2025 Court Order (dkt. 933) finding that the Consent Judgment no longer applies to Adolescent Offenders.*

Consent Judgment, § XV., ¶ 17 requires units where most 18-year-olds are housed to have consistently assigned officers and supervisors day-to-day. In order for the Department to adopt a consistent staff assignment model, staff must reliably report to work as scheduled, and the Department must implement a staff deployment strategy that prioritizes the required consistency across units. Previously, the Department's inability to comply with this provision resulted in additional remedial relief, including a provision regarding staff assignments in the First Remedial Order (dkt. 350), § D, ¶ 1. In addition to requiring the Department to enhance its efforts to consistently assign staff to the same housing unit day-to-day, the First Remedial Order also requires the Department to implement a quality assurance process to assess the extent to which the consistent staffing requirements are met each month.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with Consent Judgment, § XV, ¶ 17 and First Remedial Order (dkt. 350), § D, ¶ 1. The

---

[91] The majority of 18-year-old Incarcerated Individuals are currently housed at RNDC. To the extent that the majority of 18-year-old Incarcerated Individuals are housed at another facility in the future, the provisions in § D shall apply to all housing units in that facility that may house 18-year-old Incarcerated Individuals.

Court explained the basis for its finding at pgs. 37-40 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order.

**Compliance Rating History**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Current Status**: The facility reports that consistent assignment of both officers and Captains is in place in each of the four locations where 18-year-olds can be assigned (Building 2, Building 3, MOD 1 & MOD 2), which continue to be supported by the facility's Security Team and the Unit Manager. Benefits of this staffing strategy remain, as described on pg. 228 of the Monitor's January 13, 2026 Report (dkt. 947).

- **NCU's Consistent Staffing Audits**: Throughout the current Monitoring Period, NCU continued to audit steady staffing in Buildings 2 and 3, demonstrating similar levels of performance as those observed in the 20th Monitoring Period.[92] Table 3 of Appendix L provides the results of these audits. The lower levels of performance observed in December 2025 appeared to be due to the facility's shift to 12-hour tours and a possible discrepancy with the staff assignment list used for the audit, as shown in Table 4 of Appendix L. Table 5 of Appendix L shows that the proportion of posts not worked by the assigned staff for reasons controlled by staff (*e.g.*, mutual, leave, sick, personal

---

[92] The methodology for NCU's audits is described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 229-230.

emergency, et cetera) were similar to the prior Monitoring Period. NCU has not yet audited consistent staffing in the MODs.

**Conclusion**

To achieve Substantial Compliance with this provision, the Department must demonstrate via NCU audits reasonable levels of consistent staffing across all areas targeted by the RNDC Action Plan (Buildings 2 & 3, MODs 1 & 2). The current performance levels are sufficient to maintain Partial Compliance. Given the overlapping requirements, the status of compliance relative to ¶ 17 of the Consent Judgment also reflects the status of compliance relative to § D., ¶ 1 of the First Remedial Order.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § XV., ¶ 17. (18-year-olds)** Partial Compliance<br>**First Remedial Order § D., ¶ 1.** Partial Compliance |

138

---

**SCREENING & PROMOTIONS (CONSENT JUDGMENT § XII., ¶¶ 1-3)**

---

*Consent Judgment § XII., ¶ 1. Promotions.* Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the

        (a) [Use of Force history for the last 5 years]

        (b) [Disciplinary history for the last 5 years]

        (c) [ID Closing memos for incidents in the last 2 years]

        (d) [Results of the review are documented]

*Consent Judgment § XII., ¶ 2.* DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

*Consent Judgment § XII., ¶ 3.* No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

*August 10, 2023 Order § I, ¶ 10. Revise Pre-Promotional Screening Policies and Procedures.* By, October 30, 2023, the Department, in consultation with the Monitor, shall revise its pre-promotional screening policies and procedures to address the issues identified by the Monitor in each of its Court filings in 2023.

---

Strong leadership and supervision are crucial to the Department's efforts to reform the agency. The requirements of Consent Judgment § XII, ¶¶ 1-3 are designed to ensure that staff are appropriately screened for promotion to supervisory ranks. The requirements of the First Remedial Order (dkt. 350), § A, ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3(ii-iii) are designed to increase the number of supervisors working in the facilities and to improve the quality of supervision, and these provisions are discussed separately in the compliance assessment for First Remedial Order (dkt. 350), § A, ¶ 4.

**Compliance Rating History**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with Consent Judgment § XII., ¶¶ 1 and 2, and Substantial Compliance with Consent

Judgment § XII., ¶ 3. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Partial Compliance with Consent Judgment § XII., ¶¶ 1 and 2, and Substantial Compliance with Consent Judgment § XII., ¶ 3. Given that the compliance ratings have not changed, the Monitoring Team will not provide a detailed discussion of these findings per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 10 which requires the Department to revise and implement the pre-promotional screening policy, but a compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Relevant Data and Information**

The Monitoring Team continues to emphasize that the staff the Department chooses to promote sends a message about the leadership's values and the culture it intends to cultivate and foster, and their behavior sets an example for officers. Active, effective supervision is fundamental to the changes in departmental culture and practice that are needed to effectuate the reforms required by the *Nunez* Court Orders. The long-standing supervisory void— in both number and aptitude— is a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to its security operation.

The Monitoring Team's determination that the compliance ratings remain the same as the 20th Monitoring Period is based on the following information:

- **Screening Policy**: The Court's August 10, 2023 Order (dkt. 564) requires the Department to update its policy and procedures for pre-promotional screening process in consultation with and subject to the approval of the Monitor. The Department has still not updated its screening policy, which is necessary. In the meantime, in practice, the Department has

adopted many of the recommendations that the Monitoring Team submitted in March 2023[93] and subsequently consolidated and organized for DOC in July 2025.[94]

- **<u>Overview of Promotions During This Monitoring Period</u>**: A total of 48 staff were promoted during this Monitoring Period. One staff member was promoted to Warden, 23 staff were promoted to Assistant Deputy Warden, and 24 staff were promoted to Captain. Table 12 in Appendix F identifies the number of staff promoted to each rank from 2017 to 2025.

  o *Promotion to Warden*: In November 2025, one individual was appointed to the rank of Warden. This individual was screened prior to their appointment as an Acting Warden, but did not undergo additional documented pre-promotional screening prior to promotion to Warden, which is discussed in more detail below. Although the screening was not conducted, the Monitoring Team confirmed that this individual met the criteria for promotion (*i.e.*, did not have two Class A/B UOF violations within the past five years pursuant to the Consent Judgment, § XII, ¶ 2 and did not have pending UOF-related disciplinary charges pursuant to the Consent Judgment, § XII, ¶ 3). Prior to being promoted, the individual was not formally interviewed by the Promotional Board or Commissioner as required by policy; however, these interviews are not required by the Consent Judgment.

  o *Promotions to Assistant Deputy Warden*: In September 2025, 23 staff members were appointed to the rank of Assistant Deputy Warden ("ADW"). The Monitoring Team received all the screening materials and forms completed for these individuals' promotions. All Divisions conducted the required pre-

---

[93] In March 2023, the Monitoring Team submitted feedback to the Department with recommended revisions to the pre-promotional screening policy as outlined in the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 80-81. In response, the Department reported they would revise the policy before the next round of promotions but failed to do so and promoted additional staff without the recommended enhancements to the policy. *See* the Monitor's July 10, 2023 Report (dkt. 557) at pg. 162; the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 12-15, 47, 64-68, and 195-196; the Monitor's June 27, 2024 Report (dkt. 735) at pg. 3; and the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 12, 56-61, 191, and 224-227.

[94] The Monitoring Team's March 2023 and July 2025 feedback to improve practice include recommendations made for many years prior. Some of these recommendations for improved practice were previously addressed for a short period of time but then the prior practice re-emerged. Other recommendations were never addressed and the concerning practices continued unabated. *See* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 80-81 and the Monitor's November 22, 2024 Report (dkt. 803) at pgs. 162-164.

promotional screening, and all 23 individuals were recommended by all Divisions. All 23 staff met the criteria for promotion (*i.e.*, did not have two Class A/B UOF violations within the past five years nor pending UOF-related disciplinary charges). The Legal Division recommended that four staff selected for promotion to ADW receive counseling prior to their promotions due to disciplinary histories that revealed multiple cases for inefficient performance of duties and poor supervision. The recommended counseling sessions did not occur.

o *Promotions to Captain*: In December 2025, 24 staff members were appointed to the rank of Captain. The Monitoring Team received all the screening materials and forms completed for these individuals' promotions. All Divisions conducted the required pre-promotional screening, and 22 of the 24 staff members were recommended by all Divisions. DOC provided the Monitoring Team with its basis for electing to promote the two staff members who were not recommended. The Monitoring Team also reviewed the screening materials and disciplinary histories for these two staff who were not recommended by at least one Division, and the Department's determination to proceed with these promotions appeared reasonable. Another staff member was promoted who had formal disciplinary charges imposed for four Class A/B UOF violations within the past five years,[95] but the Department determined that exceptional circumstances exist and that promotion was appropriate and submitted a letter to the Monitoring Team with a reasonable basis for their decision to promote this staff member. None of the 24 staff had pending UOF-related disciplinary charges.

- **Assessment of Screening Materials**: The screening requirements of the Consent Judgment were developed to guide the Department's selection of Supervisors with the proper experience and performance history. The promotion process itself is guided by multiple factors and is depicted in Appendix P.

---

[95] It is worth noting that two of these four cases occurred more than 5 years ago, but the discipline was imposed within the last five years.

o *Review of Candidates (¶ 1)*: The Monitoring Team verified that the screening materials for the 47 staff promoted to the ADW and Captain ranks satisfied the requirements of the "Review" as defined by ¶ 1. All 47 staff were screened close in time to their date of promotion. The staff member promoted to Warden did not undergo a pre-promotional screening that satisfied the requirements of the "Review." However, this staff member had undergone pre-promotional screening just prior to being appointed to Acting Warden in September 2024, which satisfied the requirements of this provision.

Even though the Department has not yet formally revised its policy, it incorporated some of the Monitoring Team's recommendations into its pre-promotional screening as described below. As a result, the Department remains in Partial Compliance with this provision. To achieve Substantial Compliance, the Department must revise its policies and procedures, ensure that the policy is followed, and conduct the screening process with integrity.

▪ <u>Document the Basis for Staff Promoted Despite Negative Recommendations from a Division</u>: The Monitoring Team recommended that any candidate who is not recommended for promotion by one or more Divisions must be appropriately scrutinized, and, if the Department decides to promote the candidate, the basis for the decision should be presented to the Monitoring Team. A negative recommendation does not necessarily mean the staff member should be automatically disqualified from promotion but does require additional scrutiny. As noted above, this situation occurred twice during the current Monitoring Period, and the Department's basis for the decision was provided to the Monitoring Team.

▪ <u>Review Personnel Determination Review ("PDR") Records</u>: The Monitoring Team recommended that the Department conduct a holistic review of PDR records during pre-promotional screening. The Department reported that PDR records were evaluated for staff screened for promotion during this Monitoring Period, and the findings were documented.

143

- <u>Consult Both ID Units</u>: The Monitoring Team recommended that the Department should consult with both the ID Special Investigations Unit ("SIU") and the ID UOF Unit and document the recommendations of both units. The Department reported that both ID and SIU were consulted as part of the screening process during this Monitoring Period.

- <u>Conduct a Holistic 2-in-5 Assessment</u>: The Monitoring Team recommended that the Department designate a single person or Division to evaluate PDRs, Command Disciplines ("CDs"), and Memorandum of Complaint ("MOC") charges *together* when doing the 2-in-5 assessment. The Legal Division conducted and documented this holistic 2-in-5 assessment as part of the screening process during this Monitoring Period.

- <u>Comply with Directive 2230 when Conducting Pre-Promotional Screening</u>: The Monitoring Team recommended the Department fully comply with its own pre-promotional screening policies and procedures. As discussed above, during this Monitoring Period, most policy requirements were followed, and a safeguard (recent appointment to Acting Warden, with appropriate screening at the time) was present for the one exception.

o **Disciplinary History (¶ 2)**: Of the 48 staff promoted during this Monitoring Period, one met the 2-in-5 threshold set by this provision. The Department documented the exceptional circumstances that made the promotion appropriate and shared this documentation with the Monitoring Team, thereby satisfying the requirements of this provision. While a holistic 2-in-5 assessment has become the Department's *practice*, it must be incorporated into policy to achieve Substantial Compliance.

o **Pending Disciplinary Matters (¶ 3)**: As discussed above, the Department's screening process for promotion assesses whether the candidates have pending discipline for use-of-force-related misconduct and none of the staff promoted during this Monitoring Period had pending disciplinary charges. Accordingly, the Department is in Substantial Compliance with this provision.

144

**Conclusion**

The Department demonstrated sustained improvement to the pre-promotional screening process during this Monitoring Period. The process appears to have fidelity and has incorporated most of the Monitoring Team's recommendations and the requirements of the *Nunez* Court Orders. However, the Department must update its policies and procedures accordingly, pursuant to the August 10, 2023 Order (dkt. 564) and implement the screening process with fidelity for all candidates.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § XII., ¶ 1.** Partial Compliance<br>**Consent Judgment § XII., ¶ 2.** Partial Compliance<br>**Consent Judgment § XII., ¶ 3.** Substantial Compliance |

| **SUPERVISION OF CAPTAINS (FIRST REMEDIAL ORDER § A., ¶ 4 AND ACTION PLAN § C., ¶ 3 (II-III))** |
|---|
| *First Remedial Order ¶ 4. Supervision of Captains.* The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned and shall be subject to the approval of the Monitor.<br><br>    i.      Within 60 days of the Order Date, RNDC, and at least two other Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.<br><br>    ii.     Within 120 days of the Order Date, at least three additional Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.<br><br>    iii.    By December 31, 2020, all Facilities shall satisfy the requirements of this provision. |
| *Action Plan § C., ¶ 3(ii). Increased Assignment of Captains in the Facility.* Complete a full evaluation of the assignment of all Captains and develop and implement a plan to prioritize assignment of Captains to supervise housing units to increase Captain presence on housing units. |
| *Action Plan § C., ¶ 3(iii). Improved Supervision of Captains.* Substantially increase the number of Assistant Deputy Wardens currently assigned to the facilities or a reasonable alternative to ensure that there is adequate supervision of Captains. |

This provision of the First Remedial Order (dkt. 350), § A., ¶ 4, in conjunction with Action Plan (dkt. 465), § C, ¶ 3 (ii-iii), requires the Department to improve staff supervision by promoting and deploying additional ADWs within the facilities to better supervise captains. The goal of these provisions is to ensure that captains are properly managed, coached, and guided in order to elevate their skill set, so that they in turn better supervise the officers on the housing units. Thus, an assessment of adequate supervision requires an examination of both layers of supervision — ADWs and captains.

The Department's inability to achieve substantial compliance with this provision resulted in additional remedial relief, including two provisions in the Action Plan (dkt. 465) (§ C, ¶ 3 (ii-iii)) requiring an increase in the number of captains and ADWs assigned to the facilities. Action Plan (dkt. 465), § C, ¶ 3 (ii) requires the Department to evaluate the assignments of all Captains and to implement a plan prioritizing captains' assignments to supervise housing units in the facilities. In addition, Action Plan (dkt. 465), § C, ¶ 3 (iii) further requires the Department to

146

increase the number of ADWs assigned to the facilities to ensure captains are adequately supervised.

## Court's 2024 Contempt Order

The Court's 2024 Contempt Order (dkt. 803) found Defendants in contempt for failing to comply with the First Remedial Order (dkt. 350), ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3 (ii-iii). The Court explained the basis for its finding at pgs. 26-31 in section "Failure to Adequately Supervise Staff and Facility Leadership" of the Order.

## Compliance Rating History

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Non-Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Non-Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

## Relevant Data and Information

Improving staff practice not only requires an appropriate number of supervisors but also supervisors who provide quality supervision. Improved practice by line staff requires ongoing, direct intervention by well-trained, competent supervisors—guiding and correcting staff practice in the moment as situations arise. Increasing staff's ability and willingness to utilize proper security practices rests on the supervisors' ability and willingness to confront poor practices and teach new ones. Only with this type of hands-on supervision will the Department be able to confront and break through staff's inability, resistance, and/or unwillingness to take necessary actions.

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

147

- **<u>Organizational Structure and Number of Supervisors</u>**: The Department's organizational structure, which includes only one rank (Captains) between line staff and those who serve as Tour Commanders (ADWs), strains the Department's ability to adequately supervise and develop the skills of both line staff and Captains. This problem is exacerbated by the insufficient number of staff holding these two ranks and the number of staff promoted to these positions has not exceeded the number of staff that have left due to attrition. As of the end of the current Monitoring Period, the number of supervisors remained insufficient to provide the type of *intensive* supervision—throughout the chain of command—that is needed to elevate officers' skills, which echoes the findings of the previous five Monitoring Periods.[96]

  - *ADWs*: The First Remedial Order (dkt. 350), § A, ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3 (iii) both require an increase in the number of ADWs. Appendix F, Table 1 shows the number of ADWs available Department-wide (89 during the current Monitoring Period), and the number assigned to facilities/court commands (57 during the current Monitoring Period, which is 64% of the total ADWs). While the total number of ADWs is higher than it was in 2020 (89 versus 66), the proportion assigned to the facilities is the lowest it has been since that time (64% versus 79%).

  - *Captains*: Appendix F, Table 2 shows the number of Captains available Department-wide (506 during the current Monitoring Period) and the number assigned to facilities/court commands (337 during the current Monitoring Period, which is 67% of the total Captains). Both the total number of Captains and the number assigned to the facilities are at their lowest levels since July 2020 (506 versus 810 Department wide, and 337 versus 558 in the facilities). The proportion assigned to facilities (67%) is largely unchanged.

- **<u>Scheduling</u>**: Both DWs' and ADWs' schedules are distributed relatively evenly across the three tours and on weekdays/weekends (although DWs do not work overnight). However, ADWs and Captains are still not scheduled/assigned in a way that results in

---

[96] *See* the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 15-16, the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 64-68, the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 56-61, the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 120-127, and the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 245-253.

their supervising the same subordinates day-to-day. This lack of continuity impedes the supervisors' ability to serve as effective mentors or to follow through on efforts to resolve staff and incarcerated individuals' concerns.

- **<u>Training for Supervisors</u>**: During the previous Monitoring Period, the Monitoring Team worked closely with the Training Division to finalize several training programs for supervisors (In-Service Captain Leadership Training, Pre-Promotional Assistant Deputy Warden Training, and Pre-Promotional Deputy Warden Training). These trainings are described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 249-250. In this Monitoring Period, 23 ADWs and 25 Captains received this new pre-promotional training. Unfortunately, because there are insufficient numbers of Captains in the facilities and the Training Division has limited availability of instructors, the Department has only been able to provide in-service leadership training for a small number of Captains.[97] During the current Monitoring Period, the Training and Development Division reported that 21 supervisors have participated in the leadership-oriented training development course through John Jay College's Advanced Certificate in Corrections Management ("ACCM") program. The ACCM is a two-year program for uniformed staff at the Captain, ADW, and DW-in-Command levels. The program prepares participants for future senior leadership roles through a four-semester (15-week each) graduate curriculum, culminating in 12 earned graduate-level credits across four courses. Twenty-one supervisors are currently enrolled in the program.

- **<u>Quality of Supervision</u>**: The supervisory ranks remain unprepared to support the weight of the strategies that place them at the center of officers' skill development. Captains often appear to be either unclear about their responsibilities or fail to embrace them, according to reports from facility leadership and staff and as observed during the Monitoring Team's work on site and through assessments of a variety of incidents. This often leads to a superficial execution of duties, where Captains do not appear to routinely conduct substantive tours or, in some instances, fail to conduct tours at all. Their abdication of responsibility leaves officers feeling unsupported and disinclined to fulfill

---

[97] The Monitoring Team shared multiple rounds of feedback with the Department on the in-service leadership training for Captains, most has been incorporated, but the feedback on some matters remains outstanding.

their own duties. Most recently, these dynamics were summarized in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 251-252 and they remain unchanged.[98]

In addition to the Captains' need for intensive guidance, ADWs also need substantive and quality coaching, supervision, and mentoring from their superiors to develop into the type of supervisor that is so sorely needed in this Department. The task of cultivating the ADWs will largely fall to the DWs and Wardens/Assistant Commissioners in each command.

## Conclusion

The Department has taken important steps to improve and refine its training programs for supervisors and actively engaged the Monitoring Team when developing the curricula. However, the quality of supervision remains poor, and the decreasing proportion of ADWs assigned to facilities and the fact that the number of Captains and number assigned to the facilities are at their lowest levels since July 2020 indicates that the Department's struggle to address its supervision deficiencies remains. The lack of quality staff supervision remains a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to basic security practices and operations.[99] The Department remains in Non-Compliance with these provisions.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § A., ¶ 4.** Non-Compliance<br>**Action Plan § C., ¶ 3(ii).** Non-Compliance<br>**Action Plan § C., ¶ 3(iii).** Non-Compliance |

---

[98] *See* also the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 25-28, the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 14-16, the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 64-68, the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 56-61, and the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 120-127.

[99] Furthermore, accountability for inadequate supervision at all levels remains elusive as discussed in more detail under "Accountability for High Level Supervisors," Consent Judgment, § VIII., ¶ 1 and § VIII., ¶ 3 (c).

| IMPROVED ROUTINE TOURS (ACTION PLAN, § A., ¶1(D)) |
|---|

*Action Plan, § A., ¶ 1(d). Improved Routine Tours*. The Department shall conduct routine tours, including, but not limited to, tours of the housing units every 30 minutes. The Department shall immediately institute improved practices to ensure that routine touring is occurring, including the use of the "tour" wand by Correction Officers during each tour conducted. The Office of the Commissioner shall audit the electronic records of tours conducted by uniform staff to ensure compliance with touring requirements.

Routine and adequate touring of housing units is a fundamental component of sound correctional practice. For years, the Monitoring Team has found that officers and captains do not tour the housing units as often as required and that their tours are often not substantive or meaningful (*e.g.*, they do not look into the cell-door windows to verify the safety of the individual). Staff's failure to adequately tour the housing units has contributed to the units' overall state of dysfunction and to the high rates of unnecessary and excessive uses of force and serious acts of violence. The lack of adequate touring has also been identified as a contributing factor in several deaths in custody. As a result of the deficiencies in staff tours, the Action Plan includes requirements to improve routine housing unit tours § A, ¶ 1(d).

## Court's 2024 Contempt Order

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Action Plan § A, ¶ 1(d). The Court explained the basis for its finding on pg. 15 in section the "Deaths in Custody" and on pg. 23 in section "Failure to Correct Failures in Security and Basic Correctional Practice" of the Order.

## Compliance Rating History

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Non-Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Non-Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Background**: Staff must visually inspect the housing units, particularly when incarcerated individuals are confined to their cells, to maintain security, to ensure the welfare of people in custody, to respond to their concerns, and to address any problems that arise. These tours should be conducted at regular intervals throughout each shift, every 30 minutes for officers and three times (at least one hour apart) per 8-hour shift for captains. Since the inception of the Action Plan, even with its specific requirements related to housing unit tours, meaningful change in staff touring has not been observed.

  It is critical for both safety and security reasons that staff conduct tours as required. In the Monitoring Team's experience, this is an area in which active supervision of uniformed staff would support a change in practice, and therefore tours by captains must be closely scrutinized as captains serve as role models for those staff working in the housing units. Officers often report that they do not feel adequately supported by their supervisors. Ensuring that supervisors consistently conduct quality tours of housing units would not only serve as a means of demonstrating improved practice to officers, but also serve as a means of providing necessary supervision and concrete support for their staff.

- **DOC's Assessment of Staff Tours**: DOC has a number of ways through which it can assess whether staff tours occurred, each of which is taken in turn below.

  - *Utilization of Tour Wands by Facility Staff*: In the 21st Monitoring Period, the Watch Tour system and use of the tour wand amongst housing area officers and captains remains the same as described in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 225. The tour wand data simply confirms that the staff member moved throughout the unit and pressed the wand over the sensors, but it does not verify whether the required tour actually occurred or was meaningful. The Department's recordkeeping regarding whether staff have conducted tours or not does not permit the development of aggregated data, in particular because most of the data is maintained in multiple Excel spreadsheets, logbooks, and/or is otherwise not amenable to aggregation.

152

o *Tour Wand Data Analysis*: In the 21st Monitoring Period, the Department's analysis of the tour wand data and use of the tour wand dashboard remained the same as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 225-226. The tour wands can produce electronic information, but that basic data has not yet been maximized to develop a reliable quality assurance program about the actual performance level of staff.[100] The Monitoring Team recommended that the Department improve its ability to assess this data in June 2024, but the Department has not provided any definitive update on its efforts to develop an improved technique to aggregate tour wand data.

o *Quality Assurance of Tours by Department & Facility Leadership*: In the 21st Monitoring Period, the Department's quality assurance initiative to determine whether tours occurred, and the supervisor managing it, remained the same as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 256-257. The Department's quality assurance program is inefficient, burdensome and does not produce results that support the overall goal of ensuring that tours occur as required. The procedures currently used by the quality assurance program, while well-intended, must be reevaluated so that these resources are used in a manner that supports actual change in staff touring practices. The Monitoring Team shared feedback with the Department on this process in June 2024, but the Department has not substantively responded to this feedback, nor has it changed its auditing process.

o *NCU Audits*: Table 20 in Appendix E identifies the number of random security audits NCU conducted between January 2022 and December 2025, and NCU's findings regarding staff's touring practices. In this Monitoring Period, NCU's random audits of housing units found that staff did not conduct meaningful tours

---

[100] An example of the Department's current tour wand dashboard can be found in Exhibits A and B to the Declaration of Captain Gamien Batchelor (dkt. 689-7). The functionality of the dashboard permits leadership to identify close in time whether or not staff walked through a housing unit as they should. Retrospectively, the dashboard also permits a visual inspection of the tours completed on a set of housing units for a particular day/shift (which are represented by a series of dots and Xs), although the dashboard is limited in terms of the lookback window because of the large volume of data that must be processed. The dashboard also includes variables for whether the frequency of tours met the intended "target," the number of tours that were late, and the longest duration between tours.

in 65% of the audits conducted and staff failed to make all required tours in 38% of the audits conducted. Further, staff were found off post for at least some period of time in 62% of the audits. NCU's findings that touring does not occur routinely or as required by policy are consistent with the Monitoring Team's findings via observations of staff practice while on site and during its routine review of use of force incidents, violent incidents, and in-custody deaths.

- **Corrective Action**: The Department takes corrective action in response to staff's failure to conduct tours or conduct adequate tours in a number of different ways. As demonstrated in the data below, the frequency of corrective action does not appear commensurate with the frequency of deficiencies identified by DOC's own audits and reviews.

  o *Corrective Interview Referrals from the Quality Assurance Program*: The quality assurance program conducted by the former Senior Deputy Commissioner's Office, described above, resulted in 820 corrective interview *referrals* for staff who failed to complete all required tours during July-December 2025. It is unknown whether these corrective interviews occurred as the quality assurance audits do not maintain data to confirm whether the recommended corrective interviews took place.

  o *Rapid Review Recommendations*: Table 21 in Appendix E shows the corrective actions that facility leadership recommended, via Rapid Reviews, for staff's potentially deficient touring practices. Less than 30 staff were identified for corrective action. It appears Facility leadership may not be identifying all situations in which there were deficient touring practices as the low number of staff identified for deficient touring practices does not appear consistent with the scope of the problem as identified by the NCU audits and the Monitoring Team's observations and incident reviews.

  o *Formal Discipline*: Between January 2022 and December 2025, the Department has brought 66 cases against 62 staff members for issues related to touring related

154

to uses of force.[101] Of these 66 cases, 47 were resolved with an NPA, 10 were administratively filed, two had deferred prosecutions due to the resignation of the staff member, and seven remained pending at the close of the 21st Monitoring Period.

o *Discipline for Touring Practices Related to In-Custody Deaths*: Table 4 of Appendix C shows the corrective actions taken by the Department in relation to in-custody deaths. From January 2022 to May 2026, a total of 35 staff (two ADWs, 11 captains, and 22 officers) were disciplined due at least in part to deficiencies in their touring practices in cases where an individual died in custody. In this Monitoring Period, the Department found in at least two in-custody deaths that two Captains and one Officer failed to conduct adequate tours and another Officer was off post at the time the individual passed away. It is notable that the sheer number of staff disciplined for failures to tour related to deaths of individuals in custody illustrates just how commonplace touring deficiencies are within the Department and the harm that can and does result when staff fail to conduct meaningful tours.

**Conclusion**

Overall, tours by officers and captains do not appear to be occurring as required and the current levels of supervision and the oversight processes in place (*e.g.*, tour wands and the QA measures) contribute little to the effort to improve staff practice. Given the frequency with which these deficiencies are observed, and the harm that flows from them, the corrective action imposed does not appear effective and also does not appear to sufficiently address the number of violations observed. The level of Department and facility leadership supervision and oversight focused on this issue continues to be insufficient and it must be given more meaningful attention if any progress is to be made with respect to this fundamental safety and security issue.

| COMPLIANCE RATING | Action Plan § A., ¶1(d). Non-Compliance |
|---|---|

---

[101] Some of the cases include additional charges beyond those related to touring. For example, in one case, a staff member may be disciplined for both inadequate touring and a chemical agent violation.

---

**FACILITY USE OF FORCE REVIEWS (FIRST REMEDIAL ORDER § A., ¶ 1)**

*First Remedial Order § A., ¶ 1. Use of Force Reviews.* Each Facility Warden (or designated Deputy Warden) shall promptly review all Use of Force Incidents occurring in the Facility to conduct an initial assessment of the incident and to determine whether any corrective action may be merited ("Use of Force Review"). The Department shall implement appropriate corrective action when the Facility Warden (or designated Deputy Warden) determines that corrective action is merited.

> i. The Department, in consultation with the Monitor, shall implement a process whereby the Use of Force Reviews are timely assessed by the Department's leadership in order to determine whether they are unbiased, reasonable, and adequate.

> ii. If a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline.

---

This provision requires facility leadership to conduct a close-in-time review of all use of force incidents ("Rapid Reviews" or "Use of Force Reviews"). Further, this provision requires the Department to routinely assess Rapid Reviews to identify any completed reviews that may be biased, unreasonable, or inadequate and address them with appropriate corrective action.

**Compliance Rating History**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

The Rapid Review concept is grounded in sound correctional practice and has elevated the quality of staff practice in other jurisdictions. However, catalyzing improved practice requires both Department and facility leadership to possess a strong command of the security protocols and procedures that must be utilized on a daily basis, to develop skills to guide and coach their staff toward sound correctional practice, and to ensure that staff are supervised in a manner that allows them to address these issues in real time.

Rapid Reviews are intended to identify procedural violations, recommend corrective action for staff misconduct, and also identify incidents that could have been avoided had staff made different choices in the moment. Close-in-time use of force reviews are an essential tool for improving staff practice. Both the Department and the Monitoring Team rely on these findings to identify patterns and trends. The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Rapid Review Assessments of UOF Incidents**: The number and findings of the Rapid Reviews can be found in Table 1 of Appendix D.

  o *Overview of Rapid Review Findings*: During this Monitoring Period, 99% of actual use of force incidents were assessed via a Rapid Review, which found that 57% of incidents had some type of violation of Department policy. The Monitoring Team's routine assessments of incidents confirm that a high proportion of use of force incidents do involve violations of Department policy. While not all violations of policy necessarily reflect the use of unnecessary and excessive force, as discussed in other sections of this report, staff practice regarding the use of force remains an area of concern.

  It is important to note that while the Rapid Reviews identify many issues, they do not identify all poor and/or dangerous practices and/or also frequently fail to acknowledge indicators that the incident was avoidable and the use of force was unnecessary.

  o *Avoidable Incidents*: The Rapid Reviews most often fail to identify indicators that incidents were avoidable and explain how operational failures or staff misconduct contributed to incidents that may not have occurred had staff taken different actions. Identification of these incidents and issues is critical as they help to ensure that these practices can be abated and do not occur in the future. In this Monitoring Period, the Rapid Reviews found that 6% of the incidents were avoidable. This finding does not appear to identify all cases that may have been avoidable. The Monitoring Team's review of ID's investigations and independent assessment of use of force incidents suggest that significantly more incidents

157

could have been avoided.[102] Notably, the proportion of incidents identified as avoidable has decreased over time (*e.g.*, 22% of incidents in 2021 were deemed avoidable compared with 5% in 2025). The Monitoring Team's routine assessments of incidents have not identified any material change in practice that would account for such a significant decrease. Following the close of the Monitoring Period, the Department has consulted the Monitoring Team on a revised definition of the avoidable term in order to improve identification of the issue.

o  *Unidentified Operational Failures and Staff Misconduct*: Rapid Reviews do not always identify various types of poor practice and violations, such as unnecessary or excessive use of chemical agents, use of painful escorts, failure to follow anticipated force protocols, and dangerous takedown techniques. As a result, there are missed opportunities to provide much needed coaching and/or immediate corrective action. Deficiencies in the Rapid Reviews thus contribute to the persistence of the security and operational problems plaguing the jails, patterns of excessive and unnecessary uses of force, and the intransigence of the problematic culture.

o  *Minor Violations*: Rapid Reviews often cite violations for issues that do not appear relevant to the use of force or security, such as uniform violations. During the last Monitoring Period, the Monitoring Team recommended that the reviews should focus on the salient and relevant violations that occur given the issues currently facing the Department. While it appears that this recommendation was adopted, the Rapid Reviews continue to cite these non-security/non-force violations frequently.

---

[102] Further exploration of avoidable incidents that were not identified in the Rapid Reviews is available in Table 9 in Appendix B. In this Monitoring Period, the Rapid Reviews determined that 15% of all uses of force involving unmanned posts were avoidable. This finding is dubious given the likelihood that if the post was staffed as it should have been, the need for force would likely have been avoided in more than 15% of those cases. Had staff been present and conducting their duties appropriately, they may have been able to prevent, deter or mitigate the incident that led to the use of force.

- o *Lack of Accountability for Facility Supervisors for Insufficient Rapid Reviews*: Despite the shortcomings identified by the Monitoring Team discussed above, the Department reports that there was no accountability for facility leadership for any incomplete, inaccurate, unreasonable, or biased Rapid Reviews in this Monitoring Period. Facility supervisors' failure to consistently identify ongoing operational and management failures, and the lack of accountability for these supervisors, likely contributes to the fact that such issues persist.

- **Corrective Action Recommendations from Rapid Review Assessments of UOF Incidents**: The number of corrective actions recommended via Rapid Reviews is included in Table 2 in Appendix D. In this Monitoring Period, the following number of corrective actions were recommended: 796 5003 Counseling; 794 Corrective Interviews; 1,703 command disciplines ("CDs"); 162 retraining, 55 MOCs, 21 suspensions, 21 referrals to E.I.S.S., three referrals to C.A.R.E., and one referral for no inmate contact.

  Since January 2021, 5003 counseling, corrective interviews, and CDs have been the most frequently recommended corrective actions via Rapid Reviews. Combined, the referrals for these three types of corrective action made up about 90% of all corrective actions recommended via Rapid Reviews during each of the past ten Monitoring Periods. The numbers and proportions of 5003 Counseling and corrective interviews decreased during this Monitoring Period, but combined, they still made up 44% of all corrective action recommendations via the Rapid Reviews. The number and proportion of CDs recommended via Rapid Reviews has varied, but this Monitoring Period reflects the highest number and proportion of CDs recommended over the past ten Monitoring Periods. This increase in CD recommendations coincided with the effectuation of the revised CD policy and is discussed in more detail in the compliance assessment for Timely, Appropriate, and Meaningful Accountability (Consent Judgment, § VIII, ¶¶ 1 and 3 (c)).

- **Modifications to the Rapid Review Process**: At the end of this Monitoring Period, the Rapid Review process was updated as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 265-267. The Monitoring Team has included a flow chart illustrating the new Rapid Review process in Appendix P. The Department's IT Division created a new electronic Rapid Review form that reflects the same information and

corrective action referrals captured in the legacy Rapid Review template but is more user-friendly and promotes more detailed incident summaries, improved identification of policy violations, better data aggregation, and fewer typos and human errors. The new Rapid Review process went into effect for uses of force occurring on or after December 15, 2025. The Department drafted a policy at the end of the Monitoring Period and the Monitoring Team provided feedback. The policy has not been finalized.

**Conclusion**

The Rapid Reviews provide some insight into Department practice and— when used properly—benefit the larger goal of improving staff practice, however, their full potential has not yet been realized. The Rapid Reviews certainly identify issues that must be addressed, but the ongoing concern is that they do not reliably identify *all* relevant issues that could be identified via a careful video review, for example, and thus are too often incomplete. While the Monitoring Team has long reported on the inadequacies of the Rapid Reviews, facility leaders are generally not held accountable for the ongoing management and operational deficiencies occurring in the jails.

The new Rapid Review process appears to have potential to improve the quality and consistency of the Rapid Review assessments, but the new process must be closely monitored with independence and fidelity to ensure that the Rapid Review quality is elevated above the current levels.

| COMPLIANCE RATING | First Remedial Order § A., ¶ 1. Partial Compliance |
|---|---|

---

**INVESTIGATIONS OF USE OF FORCE INCIDENTS (CONSENT JUDGMENT § VII., ¶ 1, § VII., ¶ 9 (A)) & § VII., ¶ 11)**

*Consent Judgment § VII., ¶ 1. Thorough, Timely, Objective Investigations.* As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

*Consent Judgment § VII., ¶ 9. Timing of Full ID Investigations.* All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

    a.    *Timeliness* [. . .]

        ii.    Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:

            1.    ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

            2.    The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

*Consent Judgment § VII., ¶ 11. Staffing of ID Investigators.* The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

*August 10, 2023 Order § I, ¶ 11. ID Staffing.* By, December 31, 2023, the City shall ensure that the Department's ID Division maintains at least 21 supervisors and 85 investigators to conduct use of force investigations unless and until the Department presents an internal staffing analysis and can demonstrate to the Monitor that fewer staff are necessary to conduct thorough, timely, and objective investigations of all Use of Force Incidents as required by the Nunez Court Orders.

---

This compliance assessment provides an overview of the status of investigations for all use of force ("UOF") incidents through December 31, 2025. This section addresses compliance with three provisions of the Consent Judgment regarding investigations. First, Consent Judgment, § VII., ¶ 1 requires DOC to "conduct thorough, timely, and objective investigations of all use of force incidents to determine whether staff engaged in the excessive or unnecessary use

161

of force or otherwise failed to comply with the New Use of Force Directive." Second, Consent Judgment, § VII., ¶ 9(a) requires the investigation of Full ID Investigations to be completed within 120 days or less. Finally, Consent Judgment § VII., ¶ 11 requires the Department to have adequate staffing levels for the Investigation Division. Compliance with these provisions is taken in turn below.

**Court's 2024 Contempt Order**

The Court's November 26, 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with all three provisions. The Court explained the basis for its finding at pgs. 18-26 in section "Failure to Conduct Adequate Use of Force Investigations and Hold Staff Accountable" of the Order.

**Compliance Rating History**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with Consent Judgment § VII, ¶¶ 1 and 11 and Non-Compliance with Consent Judgment § VII, ¶ 9(a). The compliance ratings for the 21st Monitoring Period remain the same: the Department remains in Partial Compliance with Consent Judgment § VII, ¶¶ 1 and 11 and Non-Compliance with Consent Judgment § VII, ¶ 9(a). Given that the compliance ratings have not changed, the Monitoring Team will not provide a detailed discussion of these findings per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 11 as it relates to ID staffing levels, but a compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Relevant Data and Information**

The Investigations Division ("ID") is instrumental in the Department's efforts to identify excessive, avoidable, and/or unnecessary uses of force ("UOF") as it is tasked with conducting neutral and objective investigations into all UOF incidents. As a part of the investigation process,

ID also identifies staff misconduct and recommends appropriate discipline for staff who use force in a manner that is not permitted by policy. As such, the Monitoring Team has routinely evaluated ID's leadership, staffing, and the timeliness and quality of its work product to assess progress toward compliance with the *Nunez* Court Orders. A description of the issues plaguing ID between 2020 and 2024 are described in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 142-145.

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Investigations Division Leadership**: The leadership of ID has continued the work started in 2024 of returning ID to its previous emphasis on transparency and neutrality and rebuilding a culture focused on the quality of the work product. Given the focus and resulting improvement in investigation quality in 2024, ID leadership began focusing on the efficiency and timeliness of investigations in 2025 by addressing backlogs that had accumulated and creating efficient processes to ensure the timeliness of investigations going forward without negatively impacting the investigation quality.

- **Enhancements to the Investigation Process**: The Department and the Monitoring Team have been exploring additional improvements in the identification and streamlining of investigations for those incidents where the UOF was necessary and no violations occurred, as well as balancing ID's investigatory requirements with a more streamlined investigation report to maximize ID's efficiency without sacrificing quality. The Department's long-standing investigation framework and areas identified for improvement were described in detail in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 273-275. During the 20th and 21st Monitoring Periods, the Department and Monitoring Team collaborated closely to develop a new framework to better align the rigor of the investigations with the characteristics of the UOF incident. The new framework is discussed in Appendix O to this report. The new framework was piloted in November and December 2025 for incidents that occurred at only one facility, RNDC, and an initial review of this work suggests the pilot is achieving the intended goal. A flow chart illustrating the new investigation process is included in Appendix P.

163

- **ID Staffing**: Data on the number of ID supervisors and investigators assigned to ID are presented in Tables 3(a) and 3(b) in Appendix D. As of December 2025, ID had 14 Supervisors and 70 investigators. Accordingly, the ID staffing targets set by the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 11 have not been met and staffing remains insufficient to manage its overall caseload. However, ID has continued to work towards ensuring it has adequate staffing levels, by trying to both recruit and retain staff and making the investigations process as efficient as possible such that staff workloads are more manageable. In this Monitoring Period, the number of staff who departed (n=18) outpaced the number of staff hired (n=11), for a net loss of 3 investigators and 4 supervisors. Data on the number of ID hires and departures is presented in Table 4 in Appendix D. One factor that continues to undercut ID's ability to achieve the staffing requirements is the salary range for investigators, so the Monitoring Team continues to recommend that the City take steps to ensure competitive salaries to better support both the hiring of new staff and the retention of existing staff within ID.

- **Status and Timeliness of Investigations**: Data on the Status of Investigations for all UOF Incidents is presented in Table 5 in Appendix D. While some progress continued in the timeliness of Full ID investigations, significant work remains to both resolve the large backlog of investigations and ensure the timeliness of incoming investigations. One of the underpinnings of addressing and correcting staff misconduct is for the response to misconduct to occur close-in-time to the incident. An efficient process for investigating potential misconduct is therefore essential.

  o *Intake Investigations*: Intake Investigations are required to be completed within 25 business days of the incident's date, although the Monitoring Team has utilized 30 business days as the applicable time frame when determining "timeliness" as it provides a reasonable grace period beyond the deadline. For incidents that occurred in the 21st Monitoring Period, 55% of Intake Investigations were closed or pending within 30 business days or less, 40% were closed or pending within 31-60 business days, and 5% were closed or pending beyond 60 business days.[103] ID reported that some of the delay in completing Intake Investigations in a timely

---

[103] Data as of January 31, 2026.

164

manner occurred towards the end of the Monitoring Period when the investigators conducting these investigations were also being trained on the new investigation process and investigators were adapting to the new approach. ID reports that it anticipates the new investigations process will be more efficient once it is implemented and staff make the necessary transition, but there were some delays as the investigators were in training and working to acclimate to this new process.

- o *Full ID*: The status and timing of all Full ID Investigations for incidents that occurred between January 2024 and December 2025 is demonstrated in Table 6 in Appendix D.[104] Full ID Investigations must be completed within 120 days of the incident's date, but ID has long struggled to meet this deadline. 82% of Full ID Investigations were closed or pending beyond the 120-day deadline. ID reports these investigations have been delayed due to both workload and because of a backlog of MEO-16 interviews.[105] To manage the Full ID workload, the Full ID directors and investigators reported that they are trying to strategically allocate resources and prioritize cases that are approaching their statutes of limitations for staff disciplinary charges and those cases that have the fewest investigative steps left to complete as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 282-283. The Monitoring Team has long recommended that the City and DOC must take concrete steps to increase the number of MEO-16 interviews and address the reported delays due to the unavailability of counsel for the Captains' unit as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 281-282. Despite reported efforts to address the issue, none have been successful. The City and DOC have not made any progress in improving the delays in conducting MEO-16 interviews and these delays continue to contribute to the delay in completing investigations.

---

[104] The period of incident dates of January 2024-December 2025 was selected as it captures *all* pending full ID investigations as of the end of this Monitoring Period. All investigations, including full ID investigations, have been completed for uses of force that occurred prior to January 2024. Given that full ID investigations can take months to complete, it is common that a full ID investigation will be completed in a different Monitoring Period than the Monitoring Period in which it occurred.

[105] MEO-16 interviews are conducted by ID investigators and are intended to gather more information from the staff involved in the incident, as well as the staffs' perspective on whether they engaged in misconduct. If they so choose, staff may be represented by a delegate or counsel, including union counsel, at these MEO-16 interviews.

- **Law Enforcement Referrals**: Detailed data on the number and status of cases that have been referred to outside law enforcement agencies for investigation and potential prosecution are presented in Table 7 in Appendix D. ID continues to promptly make referrals for behavior that appears to be criminal in nature to the Department of Investigation ("DOI"). The majority of cases do not appear to rise to the level of criminal misconduct, although it is important to note that the Monitoring Team continues to observe serious and egregious incidents of force even if they may not rise to the level of criminal charges. Of the 178 UOF cases investigated by outside law enforcement, only 8 have resulted in criminal charges; 14 cases remain pending with law enforcement, some for incidents that occurred in 2024. While the timeliness of law enforcement agency reviews of cases for potential criminal charges has improved over the life of the Consent Judgment, it is still a protracted process that delays internal accountability and discipline within DOC. The Monitoring Team continues to urge that the cases evaluated by law enforcement be prioritized and that cases they will not prosecute be expeditiously returned to DOC for administrative resolution.

- **Use of Force Priority Squad**: The Use of Force Priority Squad ("UPS") is an important management tool to address some of the most serious and complex use of force cases, while it has also been assisting in closing out backlogged Full ID investigations. During this Monitoring Period, 55 new, egregious cases were assigned to UPS, and 34 backlogged Full ID cases were assigned to UPS. UPS closed 38 cases, 30 of which were referred for formal discipline. UPS closed an additional 31 backlogged Full ID cases during the current Monitoring Period, 2 of which were referred for formal discipline and closed with charges. During this Monitoring Period, UPS continued to close out cases from the UPS case backlog,[106] however at the end of the Monitoring Period, UPS still had 100 pending cases (79 new, egregious cases cleared for investigation, 13 backlogged Full ID cases cleared for investigation, and 8 cases on DOI hold). The Monitoring Team continues to recommend that additional resources for UPS are needed as the number of cases assigned to and pending with UPS continues to grow.

---

[106] *See*, Monitor's November 22, 2024 Report (dkt. 802) at pg. 91.

- **Quality of Investigation Findings**: The Monitoring Team's extensive review of thousands of investigations has revealed that while there is variation in the quality of investigations, since 2024, the quality of investigations, generally, has improved as investigators have improved in assessing available evidence, identifying potential violations, and recommending appropriate action or further investigation when necessary. ID's efforts to conduct investigations more efficiently are expected to continue enhancements to the quality of investigations along with additional training efforts and supervision of investigators.

  - *ID's Quality Assurance Program*: ID's audit findings, which remain consistent with the Monitoring Team's findings, reflect that most of the Intake Investigations and Full ID Investigations adequately identify the most concerning violations and result in appropriate outcomes, but there is still room for improvement in the identification and documentation of every violation in an incident. ID's auditing process and general findings remain the same as reported in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 285-287. ID continued its quality assurance program, and the number of case audits and the corresponding findings can be found in Tables 8(a), 8(b), 9(a), and 9(b) in Appendix D.

  - *Monitor's Recommendations to Review and Reevaluate Selected Investigations*: The Monitoring Team submits feedback to the Department recommending additional review for certain investigations where it appears that the objective evidence was not adequately investigated or analyzed. The number of recommendations shared by the Monitoring Team in this Monitoring Period decreased from prior periods, which suggests that there has been some improvement in the quality of ID investigations.

- **Outcome of Investigations**:
  - *Referrals for Full ID Investigations*: The Monitoring Team's review of Intake Investigations in this Monitoring Period[107] suggests that the proportion of cases

---

[107] 6% of intake investigations were referred for Full ID investigations in this Monitoring Period, but there were 536 intake investigations still pending completion at the time the data was developed. As ID investigates these 536 incidents, the number/proportion of and referrals for Full ID investigations is expected to increase.

referred for Full ID Investigations appears reasonable for the same reasons discussed in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 288. Detailed data on the outcome of Intake Investigations, including the number and percentage of Full ID Referrals is presented in Table 10 in Appendix D.

o *Identifying Misconduct and Referrals for Discipline*: As the quality of Intake Investigations has improved, the proportion of cases without any action has decreased (from a peak of 52% in the 15th Monitoring Period down to 31% in the 21st Monitoring Period), and there has been a corresponding increase in corrective action recommendations to address identified violations. While there were some fluctuations in the number of each type of corrective action recommended between this Monitoring Period and the last, the data on each type of corrective action recommended in the 21st Monitoring Period remained similar to prior Monitoring Periods. Detailed data on the outcome and disciplinary referrals of Intake Investigations is presented in Table 10 in Appendix D.

o *Use of Force Incidents with Charges*: Table 12 of Appendix D identifies the number and proportion of use of force incidents from 2016 to 2025 in which at least one staff member was referred for formal disciplinary charges. The proportion of UOF incidents with charges was generally between 6% and 8% from 2016 to 2023. It is premature to draw conclusions about the referrals in 2024 and 2025 given over 1,600 cases remain pending at the time the data was developed.

o *Unnecessary, Excessive, and Avoidable Force*: The data on the number and proportion of incidents that both Intake Investigations and Full ID Investigations determined were "unnecessary," "excessive," and "avoidable" is demonstrated in Table 11 in Appendix D. Based on the data, ID determined that 13% of uses of force that occurred in 2023, 10% of uses of force that occurred in 2024, and 7% of uses of force that occurred in 2025 were excessive and/or unnecessary and/or avoidable. The findings for 2024 and 2025 must be viewed with caution because the numbers remain in flux as a number of cases remain pending, particularly

168

pending Full ID investigations, which often include more egregious incidents and so additional cases will likely be identified that will fall into these categories.

## Conclusion

The Investigation Division has emerged from the state of turmoil that began in 2022 and ended in Spring 2024. The damage caused by mismanagement of ID during that period combined with the progress that needed to be made prior to 2022 will take time to resolve. But it must be emphasized that since Spring 2024, important and significant steps to stabilize ID and make forward movement have been achieved. Key reform-minded leadership remains in place guiding the work of ID. ID investigators, supervisors, and leadership have been working diligently, and the Division is recovering lost ground. The quality of investigations has improved and the regression in the quality of investigations has ceased (although more work remains to ensure consistent quality of investigations). To that end, ID is embarking on new initiatives to further improve the quality and efficiency of investigations. ID is taking appropriate steps towards addressing the investigation backlogs and steps are being taken to ensure that investigations are completed in a timelier manner. While the rate of attrition has decreased from historical highs, there was a net loss of staff in this Monitoring Period and additional staff are still necessary. While significant work remains, ID has achieved Partial Compliance with § VII, ¶¶ 1 and 11.

With regard to the closure of Full ID Investigations, the Division is still attempting to properly manage the backlog but, for the reasons discussed above, remains in Non-Compliance with the requirements to timely complete investigations pursuant to Consent Judgment § VII, ¶ 9(a).

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § VII., ¶ 1.** Partial Compliance<br>**Consent Judgment § VII., ¶ 9(a).** Non-Compliance<br>**Consent Judgment § VII., ¶ 11.** Partial Compliance |

169

| **EARLY WARNING SYSTEM (CONSENT JUDGMENT § X., ¶ 1)** |
|---|

*Consent Judgment § X., ¶ 1. Early Warning System.* Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

    a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

    b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

    c.    On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

This provision of the Consent Judgment requires the Department to have a system to identify and correct staff misconduct at an early stage, which the Department has elected to do through the Early Intervention, Support and Supervision Unit ("E.I.S.S."). Further, § A, ¶ (3)(c) of the Action Plan (dkt. 465) requires the expansion of E.I.S.S. to support staff on disciplinary probation and supervisors during their probationary period. This provision also requires each facility to designate at least one supervisor responsible for working with the E.I.S.S. Unit to support the uniformed staff who are in the E.I.S.S. program and to address any supervision deficiencies that are identified.

**Compliance Assessment Overview**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Nunez Compliance Ratings through the 21st Monitoring Period.

In the 20th Monitoring Period, the Department was in Partial Compliance with Consent Judgment § X, ¶ 1. The compliance rating for the 21st Monitoring Period remains the same, and the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Overarching Purpose of E.I.S.S.**: The overall focus of E.I.S.S.'s work remains unclear and has never fully met its intended purpose of serving as an Early Warning System. E.I.S.S. provides support to some tenured staff who have been identified as requiring additional support (generally because of UOF related misconduct) and separately provides support to probationary support. . For tenured staff, the meetings occur a few times a year and staff review their involvement in certain incidents and purportedly get some feedback. For probationary staff, the meetings are general in nature and provide a forum for staff to speak about their concerns.

- **Staff Actively on E.I.S.S. Monitoring**: E.I.S.S. continued to screen staff referred for concerns with use-of-force-related conduct via Rapid Reviews, Facility Leadership/Department stakeholders, and the Informal Command Discipline Unit ("ICDU"). Table 1 in Appendix K identifies the number of staff actively monitored by E.I.S.S. during each Monitoring Period since 2020. During the 21st Monitoring Period, 134 staff were on E.I.S.S. monitoring, an increase from 111 staff during the 20th Monitoring Period. The increase in the number of staff on monitoring was driven primarily by the addition of 29 entry-level probationary officers from GRVC and RNDC. E.I.S.S. reported that staff were selected from these two facilities because they require the most support given population housed in these facilities and the number of incidents that occur in these facilities. Overall, 55% of actively monitored staff were entry-level probationary staff, while 40% were monitored for use-of-force-related conduct, reflecting E.I.S.S.'s continued focus on newer staff and staff with identified UOF-related needs.
  - *Screening and Placement of Staff on E.I.S.S. Monitoring*: Table 2 of Appendix K identifies the number of staff screened for E.I.S.S. monitoring, the number of staff placed on monitoring, and the number of staff who began their monitoring in 2020 through 2025. During the current Monitoring Period, E.I.S.S. screened 95 staff, including 43 tenured staff and 52 probationary staff, and placed 32 staff on monitoring, including 10 tenured staff and 22 probationary staff. The data reflects

171

E.I.S.S.'s continued shift toward focusing on working with probationary uniformed staff.  E.I.S.S.'s screening practices are outlined in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 294-295 (under the section § X., ¶ 1) and remain unchanged.  The Monitoring Team has ongoing concerns that the screening process is inefficient and does not adequately leverage the Department's available information.

- **Support of Probationary Uniformed Staff**: E.I.S.S. reported that its focus on probationary staff is intended to provide early-career support, improve retention, and create a space for staff to discuss facility conditions, security practices, report writing, use-of-force decision-making, and housing area responsibilities. E.I.S.S. also began expanding this focus to include probationary Captains and staff whose probationary period was extended via a Personnel Determination Review ("PDR"). There is no question that additional support for probationary staff is needed and necessary.  However, the Monitoring Team believes that much of the support being provided by E.I.S.S. is support that should be provided by front-line supervisors on a daily basis and not by a unit outside of the chain of command.  As noted elsewhere in the report, there is a significant supervisory vacuum in the Department.  The Monitoring Team questions whether E.I.S.S resources are being appropriately deployed because the focus on entry-level, probationary staff limits E.I.S.S.'s ability to focus on the core function of the unit, which is to effectively *identify* staff members whose conduct, particularly use-of-force-related conduct, warrants corrective action and work with them to elevate their practice.

- **E.I.S.S. Meetings with Staff**: Once staff are placed on E.I.S.S. monitoring, the unit is expected to meet with them approximately every other month to discuss any subsequent use-of-force incidents, performance-related concerns, and broader issues affecting their ability to meet Department expectations. E.I.S.S. continues to use these meetings to provide guidance on issues such as use-of-force decision-making, report writing, door security, BWC activation, supervision, and managing conflict in housing areas. However, these meetings with staff do not always occur as scheduled. Meeting attendance remained a significant problem during this Monitoring Period, despite multiple efforts to improve scheduling and reinforce attendance. E.I.S.S. meetings were added to the legal schedule, the Deputy Commissioner of Administration reportedly issued a memorandum reminding

facilities that staff are required to attend these meetings, and E.I.S.S. continued to coordinate with facilities regarding staff availability. These steps did not produce meaningful improvement. From July 1 to November 30, 2025, E.I.S.S. scheduled approximately 350 meetings, but staff appeared for only 176 (50%), while 174 (50%) were no-shows. E.I.S.S. reports that missed meetings are often caused by facility-level operational issues, including staffing shortages, lack of relief from post, staff being "stuck," mutuals, FMLA, personal emergencies, or staff simply not appearing. E.I.S.S. has attempted to work around these barriers by adjusting meeting times across tours, including holding meetings as early as 6:00 a.m. and staying later, when necessary, but the current process remains inefficient, and poor attendance by staff undermines the program's impact. The Department must ensure that when E.I.S.S. meetings are scheduled, facilities provide relief and staff attend, because a support-and-monitoring program cannot function effectively if approximately half of its meetings do not occur. The benefit of the E.I.S.S. intervention cannot be realized if the meetings are not reliably and consistently occurring.

   o *Quality of Monitoring Process & Assessing Improved Behavior*: When meetings do occur, it appears the monitoring process is generally informal with staff reviewing recent incidents involving the individuals subject to Monitoring. In one particularly egregious case, it does not appear that E.I.S.S. leadership fully appreciated or understood the gravity of the misconduct of the staff member involved in a particular UOF incident. There do not appear to be any set goals or expectations for staff during the monitoring process except that they attend the meetings. The Monitoring Team has previously shared feedback on how to enhancing the monitoring process and support the overall goal of behavior change and this feedback has not been adopted.

- **Structure and Resources for E.I.S.S**: The overall management of E.I.S.S. could benefit from more active support and supervision from Department leadership and additional resources. The Monitoring Team has long emphasized that E.I.S.S.'s resources must be used more strategically to ensure that even with its limited resources, the program has the greatest impact on staff.

173

o *Reporting Structure for E.I.S.S.*: During this Monitoring Period, E.I.S.S. continued to report to the Senior Deputy Chief of Staff.

o *Staffing Needs for E.I.S.S.*: E.I.S.S. continues to operate with limited staffing while its workload has expanded, particularly as the unit prioritizes working with probationary uniformed staff. The Director position filled in February 2025 has improved capacity by supporting screenings, meetings, administrative preparation, and Warden-level coordination at GRVC and RNDC, but the unit still lacks sufficient personnel. The Department did not approve E.I.S.S.'s proposal to hire three additional Director-level staff with prior correctional experience and instead authorized one Program Manager position. That position remains pending with OMB and has now been pending for more than six months.

o *Staff Referrals to E.I.S.S.*: E.I.S.S. continues to receive referrals from multiple sources, including Rapid Reviews, ICDU, command-level staff, facility leadership, PDRs, and the Commissioner's office, and the unit reported some increase in referrals during this Monitoring Period. However, the Monitoring Team remains concerned that Department and facility leadership still do not understand the purpose of E.I.S.S. as a tool for staff support, coaching, and early intervention. Following prompting by the Monitoring Team, E.I.S.S. reports it has met with operations leadership and plans to continue meeting with Wardens, but more active engagement is needed to ensure facility leaders know when to refer staff, understand what support E.I.S.S. can provide both for individual staff and a broader strategy to improve staff practice. Without prompting from the Monitoring Team, the division would continue to essentially work in isolation failing to actively engage with Department leadership or ensure that materials are provided consistently and reliably (*e.g.* the Monitoring Team had to be directly engaged in ensuring that E.I.S.S. obtained referrals of staff for E.I.S.S. via Rapid Reviews).

## Conclusion

The purpose and goal of E.I.S.S. is important. However, the program's impact remains constrained by persistent operational and management issues and lack of support from DOC

174

leadership. Meeting attendance remains low, the unit lacks clear focus and priorities, the unit's staffing remains insufficient, the Program Manager position remains pending after more than six months, and facility and Department leadership still do not appear to understand or utilize E.I.S.S. as consistently as they should. More fundamentally, the Department has not demonstrated that E.I.S.S. functions as a true early-warning system that uses data, structured interventions, and outcome measures to change staff behavior before misconduct escalates. Nor has the Department demonstrated that it is regularly evaluating the program's effectiveness and implementing necessary enhancements, or that E.I.S.S. is using staff performance data in a sufficiently strategic or systematic way as required by the Consent Judgment.

The Monitoring Team strongly recommends that a wholesale review of the E.I.S.S. program is necessary given the limited impact and utility the system currently has.  Given the many limitations of the program, the Department must consider how it can best deploy its resources to support staff and serve as an adequate risk management tool.  While the Department is currently in Partial Compliance, the overall program is languishing and a re-tooling is necessary.

| COMPLIANCE RATING | Consent Judgment § X., ¶ 1. Partial Compliance |
|---|---|

**TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY (CONSENT JUDGMENT § VIII., ¶ 1 & § VIII., ¶ 3 (C))**

*Consent Judgment, § VIII., ¶ 1. Timely, Appropriate, and Meaningful Accountability.* The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

*Consent Judgment, § VIII., ¶ 3. Use of Force Violations.* In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

. . .

    c.   The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

*August 10, 2023 Order § I, ¶ 13. Revise Command Discipline Policy and Procedures.* By November 30, 2023, the Department, in consultation with the Monitor, shall develop and implement appropriate controls and procedures regarding the adjudication of Command Discipline, including but not limited to the following:

    a.   timely processing of cases so that a minimal number of cases are dismissed due to procedural errors;

    b.   quality assurance measures to ensure that all Command Disciplines impose an appropriate outcome and do not merely default to the lowest level sanction, unless proportional to the severity of the misconduct;

    c.   appropriate mechanisms to ensure cases that require referral for formal discipline via MOCs are completed as required by policy, including but not limited to, when the conduct merits formal discipline or when a staff member has exceeded the number of allowable CDs in a given time period; and

    d.   appropriate tracking of any appeal to the Legal Division and the outcome of the appeal.

The Department's Command Discipline policy and procedures shall be subject to the approval of the Monitor.

The Department is required to impose timely, appropriate, and meaningful accountability for staff's use of force ("UOF") related violations (Consent Judgment § VIII, ¶ 1). As part of this obligation, the Department must expeditiously prosecute cases for formal discipline by the Trials Division (Consent Judgment § VIII, ¶3 (c)) and also ensure it has appropriate controls and procedures related to adjudication of Command Discipline (August 10, 2023 Order § I, ¶ 13).

176

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Consent Judgment § VIII, ¶ 1. The Court explained the basis for its finding at pgs. 18-22 in section "Failure to Conduct Adequate Use of Force Investigations and Hold Staff Accountable" of the Order.

**Compliance Assessment Overview**

The history of compliance ratings for these provisions since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period, the Department was in Partial Compliance with Consent Judgment § VIII, ¶ 1. The compliance rating for the 21st Monitoring Period remains the same. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

The Department's compliance with Consent Judgment § VIII, ¶ 3(c) includes three separate requirements: serving charges, administrative filing, and expeditiously prosecuting disciplinary cases. In the 20th Monitoring Period, the Department was in Substantial Compliance with the requirements related to serving charges and administrative filing, and in Partial Compliance with the requirement to expeditiously prosecute cases. The compliance ratings for the 21st Monitoring Period remain the same. Given that these compliance ratings have not changed, the Monitoring Team will not provide a detailed discussion of these findings per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order § I, ¶ 13 (dkt. 564), which requires the Department to revise and implement an updated Command Discipline policy. A compliance rating is not provided for this provision pursuant to the Court's July 10, 2025 Order (dkt. 879).

**Relevant Data and Information**

Swift, proportional accountability for staff misconduct remains a cornerstone of the *Nunez* reforms. Accountability should address both the misconduct that occurred and reduce the likelihood of recurrence via deterrence, corrective feedback, retraining, counseling, and other

177

skill-building interventions where appropriate. To provide more timely feedback to staff, the Monitoring Team has long supported more immediate accountability measures, including the expanded use of Command Disciplines ("CD"), particularly for less serious violations that can be addressed through timely corrective action. At the same time, accountability must remain proportional and individualized: serious misconduct requires more serious sanctions, while less serious policy violations may be better addressed through progressive discipline or corrective interventions that support improved performance. The Department continues to respond to a large number of policy violations committed by hundreds of staff members each month. The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **General Trends in Accountability for Staff Misconduct**: Table 1 of Appendix E identifies the number and type of accountability outcomes imposed for use-of-force-related misconduct from 2019 through 2025, including support-and-guidance interventions (*i.e.,* Corrective Interviews, 5003 Counseling), CD/suspensions, and formal discipline. The total number of staff held accountable declined 11% (from 1,863 in 2024 to 1,653 in 2025), even as Corrective Interviews and 5003 Counseling increased 45% (from 2,455 to 3,569). Formal discipline also declined slightly from 447 cases in 2024 to 417 cases in 2025. The Department is responding to a large volume of misconduct, but more of the responses are lower-level interventions. To that end, Department leadership reported in 2025 that it intended to focus altering staff practice with increased use of corrective interviews and counseling instead of discipline, which appears consistent with the data presented.

- **Immediate Corrective Action**: Tables 2 and 3 of Appendix E identify the Department's use of immediate corrective action for use-of-force-related misconduct, including Counseling/Corrective Interviews, suspensions, modified duty/no inmate contact, and CDs. The suspension totals differ slightly between the two tables because Table 2 reports suspensions by the date of the underlying incident, while Table 3 reports suspensions by the date the suspension was imposed. In 2025, Counseling and Corrective Interviews accounted for 3,641 actions, or 75% of all immediate corrective action, while suspensions and modified duty/no inmate contact remained rare at 64 total actions, or 1%. Use-of-force-related suspensions also remained low at 57, compared to 62 in 2024 and 136 in

178

2023. The remaining 24% of immediate corrective actions were CDs (reprimand (4%) or days deducted (20%)).

- **Accountability for High Level Supervisors**: Table 4 of Appendix E identifies accountability actions by rank. As the table demonstrates, the Department rarely holds facility leadership accountable for misconduct or systemic failures related to security and use of force practices. From 2023 through 2025, there were no recorded accountability actions imposed on Wardens/Assistant Commissioners, and only four actions across the three-year period on Deputy Wardens. ADWs were held accountable more often, but still relatively infrequently given their operational role, with 78 total actions in 2025, including 47 during the current Monitoring Period. This pattern stands in stark contrast to the volume of accountability imposed on Captains and Officers. Given the frequency of supervisory failures identified in incident reviews, the lack of accountability for senior facility leadership risks reinforcing the perception that accountability is applied to staff at lower ranks, but not through the full chain of command. Wardens/Assistant Commissioners, Deputy Wardens, and Assistant Deputy Wardens are responsible not only for their own conduct but also for whether they identify, correct, and prevent recurring failures by the staff they supervise. When senior and mid-level supervisors are not held accountable for management failures, the Department loses a critical opportunity to improve staff practice, strengthen supervision, and address the systemic conditions that allow the same security and use-of-force problems to recur.

- **Command Discipline**: The Monitoring Team has long supported the Department's expanded use of CDs assuming it is done properly and with fidelity. Beginning in 2024, the Department made significant efforts to centralize the adjudication of Command Disciplines under the new Informal Command Discipline Unit (ICDU).[108] The centralization of CDs under ICDU is "a promising initiative designed to bring consistency and oversight to the CD adjudication process." [109] However, many of the pervasive problems that characterized the facilities' adjudication of CDs in the past appear to have reemerged under ICDU's management including the Department's

---

[108] *See* the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 119-120.

[109] *See* the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 171-172, 227-228.

assignment of limited resources to the unit, large numbers of cases dismissed, closed, or not logged due to due process violations or clerical errors, a tendency to impose lighter sanctions based on questionable mitigating factors, and ongoing efforts to evade the requirements of policy by identifying questionable or irrelevant "issues" to suggest that corrective action should not be imposed when it should be.[110]

The Department's revised CD policy (as required by the August 10, 2023 Order (dkt. 564), § I, ¶ 13) went into effect on July 1, 2025, meaning all CDs issued during this Monitoring Period were subject to the new policy. The specific revisions to the CD policy are discussed in detail in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 227-230. Appendix P contains a flow chart illustrating the CD process as governed by the Department's revised CD policy.

Tables 5(a), and 6(a) of Appendix E show the status and outcome of CDs recommended via Rapid Reviews and recommended via sources other than Rapid Reviews. During this Monitoring Period, the number of CDs with penalties (*i.e.*, CDs resulting in 1-10 days deducted, MOC, reprimand, retraining, or corrective interview) recommended via Rapid Reviews increased over 115% (from 535 CDs in the 20th Monitoring Period to 1,171 CDs in the 21st Monitoring Period). This may be due in part to the fact that the new CD policy expanded the types of violations that are subject to a CD, including violations related to the use of body worn cameras. The Monitoring Team's analysis of the 21st Monitoring Period Rapid Reviews showed that over 60% of the recommended CDs were for violations related to the use of body-worn cameras. In fact, during the 21st Monitoring Period, the number of CDs recommended for body-worn camera violations was higher than the number of CDs recommended in the 20th Monitoring Period for *all types of violations, combined*. There was also a 30% increase in CDs recommended via sources other than Rapid Reviews during the 21st Monitoring Period (from 1,069 during the 20th Monitoring Period to 1,395 during the 21st Monitoring Period). NCU's audits of the CDs recommended via sources other than Rapid Reviews

---

[110] During this Monitoring Period, ICDU and facility leadership reported that they believed CDs could only be utilized to address violations of Rules & Regulations and not violations of Directives and Operations Orders. The CD policy does not state this and generally DOC's *own* practice does not support this interpretation.  Following the close of the Monitoring Period, the Department issued guidance to clarify that the CD policy can be utilized for violations of Rules and Regulations as well as Directives and Operations Orders.

found that this increase was primarily driven by violations that the Health Management Division ("HMD") identified for staff out sick (*e.g.*, found out of residence, log out documentation not submitted, did notify Department of log in/out).[111] Despite the increase in HMD violations, the most common type of violation for CDs recommended via other sources remained AWOL staff (which make up 43% of all CDs recommended via other sources).

Tables 5(b) and 6(b) of Appendix E show the reasons that CDs were dismissed, closed administratively, or were never entered into CMS for those recommended via Rapid Reviews and via sources other than Rapid Reviews. In this Monitoring Period, 25% of CDs were dismissed or were otherwise not processed. While there has been some improvement in the number of cases dismissed as a result of due process violations, the proportion of CDs that continue to be dismissed or otherwise not processed still remains too high, particularly for those cases that were dismissed, closed, or not logged due to due process violations or clerical errors as these cases reflect the failure to properly manage an essential accountability tool.

Finally, if a staff member does not agree with the CD penalty imposed, they may: (1) refuse the CD penalty, which means the CD charges will be converted into a Memorandum of Complaint for formal discipline and will be processed through the Trials Division, or (2) appeal the CD penalty with the Legal Division. The Monitoring Team assessed the appeals resolved by the Legal Division from January to June 2025 and generally found the appeal decisions were reasonable as discussed in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 313.

- **Formal Discipline Process**: Appendix P contains a flow chart of the formal disciplinary process. The formal disciplinary process is generally inefficient, requiring multiple sequential steps before discipline is imposed. This includes completion of the investigation, processing of charges via the Office of Administration, service of charges, sharing of discovery, scheduling matters with OATH, conducting matters before OATH, and obtaining multiple final approvals. **Even when the process works as designed (which it currently does not), it can take well over a year before discipline is**

---

[111] This increase may not reflect a change in staff practice, but an increased pursuit of these violations by the Department.

**imposed**. As discussed in other sections, work is underway to improve the timeliness of ID investigations and to ensure OATH proceedings occur more quickly, but additional efficiencies are needed, in particular those related to processing (*e.g.*, conducting MEO-16 interviews, the review of charges by administration and various other clerical processes). **As a result, the current timeline for processing formal discipline is far too long to meet the goal of timely accountability**.

- **Formal Discipline**: Table 7 of Appendix E identifies the status of formal disciplinary cases by the year the underlying incident occurred, including whether cases have been closed, remain pending with the Trials Division, or are still pending investigation. Total formal disciplinary cases declined from a peak of 1,027 in 2019 to 243 for 2025 incidents, although the figures for 2024 and 2025 are not complete because 312 investigations from 2024 and 1,363 investigations from 2025 were still pending as of December 2025. Based on information available, the data suggests that formal discipline is being used less often, but the final trend remains unclear because investigations into recent incidents have not yet been completed.

- **Backlog of Cases Pending Formal Discipline**: Table 8 of Appendix E identifies the number of use-of-force-related disciplinary cases pending with the Trials Division at the end of each Monitoring Period from 2018 through 2025. At the end of the 21st Monitoring Period, 353 cases were pending, an increase from 272 cases at the end of the 20th Monitoring Period, but still far below the backlog levels seen from 2020 to early 2022, when pending cases exceeded 1,000 and peaked at 1,917. The current pending caseload does not suggest that the prior disciplinary backlog has reemerged.

- **Time from MOC Received to Charges Served**: Table 9 of Appendix E shows the length of time required for the Trials Division to serve charges after receiving the MOC, excluding cases that were administratively filed or where charges were served before the MOC was received. In 2025, 91% of MOCs that were served were completed within 30 days as required by Consent Judgment, § VIII, ¶ 3, and only 1% required more than 60 days. The Department therefore remains in Substantial Compliance with this requirement.

- **Timeliness of Formal Discipline**: Table 10 of Appendix E identifies case processing time for formal discipline cases once the MOC is received by the Trials Division, including closed cases, pending cases, and both groups combined. In 2025, the majority

of cases (n=67%) were closed or within six months of receipt by the Trials Division. Of the 33% closed or pending beyond six months of receipt by the Trials Division, 17 % were closed or pending between six months and a year and 16% were closed or pending *more than one year*, including 5% of cases that were closed/pending more than three years. The Trials Division's ability to process cases has improved since the inception of the Consent Judgment, but too many cases still take too long, which undermines the discipline's value as a timely response to misconduct.

- **Time for Commissioner to Sign Cases from Date of Signature by DC of Trials**: Table 11 of Appendix E identifies how long cases took to move from signature by the Deputy Commissioner of Trials to final signature by the Commissioner. In 2025, 70% of cases were signed by the Commissioner within 30 days. Data for each Monitoring Period suggests that the process improved during the current Monitoring Period compared to the last: more were signed within 14 days (27% versus 13%), and fewer were signed after more than 60 days (2% versus 15%). However, the fact that in 2025, about 80% of the cases signed by the Commissioner required more than 15 days further extends an already protracted disciplinary process. Enhancements to this review process are necessary.

- **Dispositions of Formal Discipline Cases**: Table 12 of Appendix E identifies the disposition of formal discipline cases closed by the Trials Division. In 2025, the Trials Division closed 509 cases (269 in the first half of the year and 240 in the second half). Most were resolved through NPAs (73%), while very few resulted in guilty findings at OATH (1%). Administrative filings remained elevated at 24% of closed cases in 2025, compared to 22% in 2024 and 10% in 2023.

- **Penalties Imposed via NPA**: Tables 13 of Appendix E identifies the penalties imposed in cases resolved through NPAs, including the number of compensatory days lost. In 2025, 83% of NPAs imposed penalties of fewer than 30 days, while 16% imposed penalties of 30 days or more. During the current Monitoring Period, penalties were even more concentrated at the lower end, with 90% of NPAs imposing fewer than 30 days. As shown in Table 14 of Appendix E, the Department also continued to rely on lower-level resolution mechanisms. In 2025, 48% of NPAs included a CD or expungement

183

provision.[112] Overall, the outcomes for the majority of cases are reasonable. In some cases, the outcomes appeared to be questionable, but the presence of potential mitigating factors appeared, in at least some cases, to offset the concerns. A small number of cases appeared to have unreasonable outcomes where it appeared that the use of lower-level sanctions may not have been aligned with the Disciplinary Guidelines.

- **Cases in which Formal Discipline was Not Imposed**: Table 12 of Appendix E identifies formal discipline cases that closed without a disciplinary sanction. During the current Monitoring Period, deferred prosecutions[113] remained low at 3% of closed cases, and administrative filings[114] remained elevated at 23%. The Monitoring Team's review of cases that were administratively filed during this Monitoring Period indicated the majority of these cases were dismissed because of a finding that the charges were unwarranted (*e.g.*, the wrong staff member was identified or the facts did not support the imposition of discipline). The Monitoring Team's review suggested that many of these decisions were reasonable. However, in some of these cases, the Monitoring Team found that dismissal was unreasonable because the available video evidence appeared sufficiently clear to demonstrate that violations meriting corrective actions occurred. In some cases, it appears that deference to the staff member's conduct was afforded where the objective evidence did not appear to support such an approach. These cases were limited in number but reinforce the need for ongoing scrutiny of these cases.

- **Appeals**: Another way that cases are ultimately closed without discipline (or with a penalty that varies from that imposed by the Commissioner) is via an appeal. A disciplinary decision made by the Commissioner is appealable to the Civil Service

---

[112] Although the Monitoring Team has continually encouraged judicious use of NPAs with CD or expungement provisions, the Department continues to consistently rely on them. *See* Monitor's November 22, 2024, Report (dkt. 802)  pgs. 130-131; Monitor's May 22, 2025 Report (dkt. 850) pgs. 176-177; and Monitor's January 13, 2026 Report (dkt. 947) pgs. 318-319.

[113] These are cases in which the staff member chose to leave the Department *with charges pending* and before the case was resolved. Such cases are categorized as "deferred prosecution" because no final determination has been rendered but the facts suggest the case should not be dismissed and the prosecution of these cases will proceed if the staff member returns to the Department.

[114] Administrative filings occur when the Trials Division determines that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a staff member resigns before charges are served). Administrative filing is not only determined by the Department and Trials Division but can also be an outcome as a result of the input from Administrative Law Judges at OATH.

Commission,[115] (which is authorized to make the final disciplinary decision[116]) or as an Article 78 proceeding. Between July and December 2025, the Civil Service Commission issued two decisions (one for use-of-force-related misconduct, and one for excessive absence) and in both cases, the Civil Service Commission affirmed the Department's penalty. There were no Article 78 proceedings pending during the 21st Monitoring Period, therefore no decisions were issued. Finally, in the 21st Monitoring Period, the termination of one staff member was upheld when the appeals in both state and federal court were dismissed.

## Conclusion

The Department's disciplinary process remains relatively unchanged since the last Monitoring Period, as do the compliance ratings. The Department continues to maintain important improvements in certain areas, including a manageable Trials Division caseload, timely service of charges, and generally reasonable case dispositions, but the overall accountability system continues to be undercut by delays from incident date to final disposition, inconsistent use and oversight of facility-level corrective action, and continued concerns about whether misconduct is being identified and addressed consistently.

- For Consent Judgment § VIII, ¶ 1, the Department remains in Partial Compliance. The Department has improved its ability to process formal discipline once cases reach the Trials Division, but significant work remains to ensure that misconduct is reliably identified, corrective action is meaningful and timely, skill-based interventions such as Corrective Interviews and 5003 Counseling are substantive and effective, and

---

[115] Pursuant to Section 813 of the New York City Charter, the Civil Service Commission can decide appeals from permanent civil servants who were subject to disciplinary penalties following proceedings held pursuant to section 75 of the Civil Service Law. According to § 3-01 to 3-04 of Title 60 of the Rules of the City of New York, any civil service employee who receives a determination of guilty and/or a penalty can appeal to the Civil Service Commission within 20 days of the date of notice of the final disciplinary action. After receiving notice of a timely appeal, the Department has 30 days to submit the complete record of the disciplinary proceedings. The Civil Service Commission then reviews the record of the disciplinary proceeding, allows the parties to submit further written arguments, and may schedule a hearing before issuing a final decision. The Civil Service Commission then issues a written decision to affirm, modify, or reverse the determination being appealed. The Civil Service Commission may, at its discretion, direct the reinstatement of the employee or permit transfer to a vacancy in a similar position in another division or department, or direct that the employee's name be placed on a preferred list.

[116] The Civil Service Commission opinion notes "[t]his decision constitutes the final decision of the City of New York."

185

sanctions are consistently imposed and proportionate to the misconduct. Further, renewed and enhanced efforts to improve the centralized processing of CDs are necessary to ensure the outcomes occur with fidelity and results in reasonable and timely outcomes.

- For Consent Judgment § VIII, ¶ 3(c), the Department remains in Substantial Compliance with the requirements related to serving charges and administrative filing, and in Partial Compliance with the requirement to expeditiously prosecute cases. The Department has sustained improvements in the Trials Division's case processing, but further progress is needed to ensure that cases are resolved more quickly after referral and that the broader disciplinary process provides timely accountability from the date of the underlying incident.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § VIII., ¶ 1.** Partial Compliance<br>**Consent Judgment § VIII., ¶ 3(c)**<br>• **Serving Charges**: Substantial Compliance (per the 12th Monitor's Report)<br>• **Administrative Filing**: Substantial Compliance<br>• **Expeditiously Prosecuting Cases**: Partial Compliance |

| **IMMEDIATE CORRECTIVE ACTION & MONITOR RECOMMENDATIONS (FIRST REMEDIAL ORDER § C., ¶ 1 & § C., ¶ 2)** |
|---|
| *First Remedial Order § C., ¶ 1. Immediate Corrective Action*. Following a Use of Force Incident, the Department shall determine whether any involved Staff Member(s) should be subject to immediate corrective action pending the completion of the Use of Force investigation, which may include counseling or re-training, reassignment to a different position with limited or no contact with Incarcerated Individuals, placement on administrative leave with pay, or immediate suspension (collectively, "immediate corrective action"). The Department shall impose immediate corrective action on Staff Members when appropriate and as close in time to the incident as practicable. The Department shall document and track any immediate corrective action taken, the nature of the initial corrective action recommended, the nature of the corrective action imposed, the basis for the corrective action, the date the corrective action is imposed, and the date of the Use of Force Incident resulting in the immediate corrective action. The requirements in this provision are not intended to alter the rights of Staff or the burden of proof in employee disciplinary proceedings under applicable laws and regulations. |
| *First Remedial Order § C., ¶ 2. Responding to Monitor Recommendations*. Upon identification of objective evidence that a Staff Member violated the New Use of Force Directive, the Monitor may recommend that the Department take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. Within ten business days of receiving the Monitor's recommendation, absent extraordinary circumstances that must be documented, the Department shall: (i) impose immediate corrective action (if recommended), and/or (ii) provide the Monitoring Team with an expedited timeline for completing the investigation or otherwise addressing the violation (if recommended), unless the Commissioner (or a designated Assistant Commissioner) reviews the basis for the Monitor's recommendation and determines that adopting the recommendation is not appropriate, and provides a reasonable basis for any such determination in writing to the Monitor. |
| *Action Plan § F., ¶ 2. Expeditious Resolution of Egregious Conduct and/or Multiple Serious Violations*. The City, Department and OATH shall develop, in consultation with the Monitor, a process by which appropriate and meaningful discipline, up to and including termination, for any staff member can be expeditiously imposed in any case involving: (1) conduct that would merit the Department seeking termination pursuant to the Disciplinary Guidelines, or (2) egregious conduct that resulted in the risk of serious harm to an incarcerated individual. The Monitor may refer cases to the Department for resolution in this expedited manner.<br><br> a.  A case identified to be resolved in an expedited manner must be resolved as follows:<br>     i.  *Investigations*: The investigation(s) of the matter must be completed within 30 business days of identification.<br>     ii.  *Referral for Discipline*: The case must be processed for discipline — including completion of the MOC, referred to the Trials Division, charges served on the Respondent, discovery produced to the Respondent, an offer for resolution must be provided to the Respondent, the case filing with OATH, and a pre-trial conference must be scheduled within 20 business days of the closure of the investigation.<br>     iii.  *Adjudication of Discipline*: Any and all disciplinary proceedings, including, but not limited to, convening a pre-trial conference, conducting a trial before OATH, and submission of a Report and Recommendation from the OATH ALJ must be completed within 35 business days of the case being filed with OATH.<br>     iv.  *Imposition of Discipline*: The Commissioner must impose the final disciplinary action within 15 business days of receiving the Report and Recommendation from OATH. |

The First Remedial Order (dkt. 350), § C, ¶¶ 1 and 2, requires the Department to determine whether immediate corrective action should be taken against a staff member pending the completion of an investigation. Further, the Department must respond within 10 business days to any recommendations from the Monitor to take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The Action Plan (dkt. 465), § F, ¶

2, introduced an additional requirement for the Department to expedite egregious cases on specific timelines to ensure those cases are closed as quickly as possible. Given that these three requirements are inextricably linked, they are addressed together herein.

**Compliance Rating History**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with § C, ¶ 1. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

In the 20th Monitoring Period (January-June 2025), compliance was not rated for § C, ¶ 2 because the Monitoring Team did not send any recommendations to take immediate corrective action nor to expedite investigations pursuant to § C, ¶ 2. The Monitoring Team did make two recommendations pursuant to § C, ¶ 2 in the 21st Monitoring Period, however, given its limited use a rating is not provided in this Monitoring Period either.

**Relevant Data and Information**

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Monitor Recommendations for Immediate Corrective Action, etc. (First Remedial Order § C, ¶¶ 1 & 2)**: The use of immediate action is a critical tool for promptly addressing staff misconduct and promoting effective accountability to deter problematic conduct going forward. These actions, taken before the completion of a full use of force investigation, may include counseling or retraining, reassignment to a role with limited or no contact with incarcerated individuals, administrative leave with pay, or immediate suspension. Additionally, Command Disciplines ("CDs") are often imposed closer in time to the incident than formal discipline and are also considered part of this immediate response strategy. The overall disciplinary process is discussed in more detail in the

188

compliance assessment for Consent Judgment, § VIII, ¶ 1 Staff Discipline & Accountability.

- o **Immediate Corrective Action Taken**: The overall number of immediate corrective actions taken is large, with 2,469 actions taken in this Monitoring Period. Data regarding the immediate corrective action imposed for use-of-force ("UOF")-related misconduct is available in Table 2 in Appendix E. In this Monitoring Period, the proportion of corrective actions taken that resulted in CDs for a deduction of one to 10 days increased (29% versus 11% in the last Monitoring Period) with a corresponding decrease in the proportion of corrective actions that were counseling or a corrective interview (64% versus 85%). The quality and efficacy of the immediate corrective actions taken remain questionable given that a high volume of immediate corrective action has been taken each Monitoring Period for some years and it has not resulted in meaningful change in staff practice. A more detailed discussion regarding accountability and discipline is included in this report in the compliance assessment for Consent Judgment, § VIII, ¶ 1 Staff Discipline & Accountability. Active supervision is discussed in more detail in the compliance assessment for First Remedial Order (dkt. 350), § A, ¶ 4 & Action Plan (dkt. 465), § C, ¶ 3 (ii-iii).

- o **Monitor Recommendations for Immediate Corrective Action**: The Monitoring Team is judicious in the recommendations that it makes to the Department regarding immediate action cases and only identifies those cases where immediate action should be considered, *and* the incident is not yet stale for *immediate* action to be taken. The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe. The C2 recommendations shared by the Monitoring Team are only a *subset* of cases in which the Department failed to take immediate corrective action and likely should have.[117] A

---

[117] Recommendations to expedite the completion of investigations pursuant to the First Remedial Order (dkt. 350), § C, ¶ 2, as noted in the Monitor's October 28, 2022 Report (dkt. 472) at pg. 162, were not a fruitful avenue to ensuring those cases were addressed quickly. The Monitoring Team therefore now recommends expedited resolution of cases pursuant to the Action Plan (dkt. 465), § F, ¶ 2 (the "F2" process) for cases that merit expedited completion of investigations or discipline.

detailed discussion of the Monitoring Team's approach to making these recommendations is described in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 183-184.

Between July and December 2025 (the 21st Monitoring Period), the Monitoring Team identified one case for which it recommended the Department take corrective action regarding a UOF incident. The Monitoring Team separately recommended the Department expedite the investigation of one UOF incident pursuant to § C, ¶ 2 of the First Remedial Order (dkt. 350).

- In response to the one case in which the Monitoring Team recommended the Department take immediate corrective action against a staff member, the Department reported that it placed this staff member on modified duty with no contact with people in custody. The investigation was closed and formal MOC charges were filed for the staff member. The formal MOC charges were settled with an NPA for 15 compensatory days and 12 months of probation.

- In response to the one case in which the Monitoring Team did not request immediate action for any specific staff but did request full ID investigations into the incidents be expedited, the Investigation Division promptly reopened the investigation and assigned it to ID's Use of Force Priority Squad. However, the Full ID investigation remains pending, over six months after the Monitoring Team made its recommendation to expedite the case.

- **Expeditious Resolution of Egregious Misconduct (Action Plan § F, ¶ 2)**: The Action Plan (dkt. 465), § F, ¶ 2 ("F2") sets aggressive timelines for the investigation and prosecution of egregious cases. As discussed above, given the limitations on the Monitoring Team's ability to recommend immediate action, the Monitoring Team has continued to focus on recommendations related to F2. The Department's ability to identify these cases continues to improve, though the Monitoring Team continues to make F2 recommendations as well. Detailed information on the number and outcome of F2 cases can be found in Table 15 in Appendix E.

190

In this Monitoring Period, 17 cases involving 17 staff were identified as F2 cases (16 by ID and 1 by the Monitoring Team), and 15 F2 cases involving 15 staff were closed.

- o *Timelines of F2 Cases*: There were 15 F2 cases closed this Monitoring Period. 10 of the 15 cases closed in this Monitoring Period were closed within six months of being identified as an F2 case,[118] which is significantly more expeditious than the standard process for formal disciplinary charges. Of course, improvement of the processing timelines is needed in order to meet the deadlines set out in the F2 provision, but the efficiency of the F2 process compared to the standard process must be noted and acknowledged. ID in particular continues to struggle with completing the investigations for F2 cases pursuant to the required timelines set by the provision, which diminishes the efficacy of this process as a means to impose close-in-time discipline and circumvent the protracted processing times that currently characterize most disciplinary matters in the Department. Given that ID's Use of Force Priority Squad ("UPS") conducts the investigations for F2 cases, ID must continue to ensure that UPS has sufficient investigators in order to expeditiously resolve these F2 cases.[119] The Trials Division continues to consistently expedite the resolution of F2 cases once ID has completed the investigations.

  - As of January 7, 2026, 19 cases are still pending. Eight cases are pending investigation with DOC's ID Division, four of which have been pending investigation with ID for over two months. No cases are pending disciplinary resolution with the Trials Division. The remaining eleven

---

[118] The Investigations Division closed only two of these 15 cases within 30 business days of the incident date. Four of these cases took longer than 30 days to close because they were placed on extended DOI holds. The other nine cases took longer because of delay in ID completing the investigation. The Trials Division closed 14 of these 15 cases within 30 business days of the closure of the investigations.

[119] ID's UPS is discussed in more detail in the compliance assessment for Consent Judgment, § VII, ¶ 1, Use of Force Investigations.

cases are on hold pending stand-down orders from DOI to allow DOI to complete its own investigation into the incident.[120]

o *Resolution of F2 Cases*: Overall, the F2 process has proven to be an effective tool in addressing certain egregious cases more expeditiously than they would otherwise be managed and most cases are resolved with reasonable outcomes. The outcomes of most of the 15 cases closed in the current Monitoring Period appeared reasonable.

## Conclusion

- **First Remedial Order, § C, ¶ 1**. While the Department does impose some corrective action immediately after an incident and has improved its internal ability to identify incidents that merit immediate action, immediate corrective action is not reliably occurring and is not always proportional to the misconduct identified. The Department is therefore in Partial Compliance with this provision.

- **First Remedial Order, § C, ¶ 2**. The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe. The Monitoring Team does continue to identify some instances where certain immediate corrective actions likely could have been taken but were not. Given only two recommendations were made in this Monitoring Period, this provision is not rated.

- **Action Plan, § F, ¶ 2**. This expedited process is important and has resulted in more expeditious resolution of some particularly egregious cases. It is particularly noteworthy that ID has self-identified cases for expedited treatment, and the Trials Division continues to consistently expedite the resolution of F2 cases once the investigations have been completed. Further, the number of cases identified by the Monitoring Team has been limited and has significantly decreased over time, a sign that ID has improved in its identification of these cases. This is notable given these cases reflect some of the most egregious cases that occur in the system. However, ID must ensure that the investigations for F2 cases are appropriately

---

[120] Seven of the eleven cases on DOI hold have been pending longer than two months since they were identified for expeditious resolution. The other four cases were recently identified as F2 cases and recently placed on DOI holds.

prioritized in order to meet the timelines set by the F2 process. A compliance rating is not provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

| COMPLIANCE RATING | **First Remedial Order § C., ¶ 1.** Partial Compliance<br>**First Remedial Order § C., ¶ 2.** Not Rated |
|---|---|

193

> **OATH PROCEEDINGS (FIRST REMEDIAL ORDER § C. 4/THIRD REMEDIAL ORDER, ¶ 2, FIRST REMEDIAL ORDER § C., ¶ 5 & THIRD REMEDIAL ORDER, ¶ 3)**
>
> _Third Remedial Order ¶ 2. Increased Number of OATH Pre-Trial Conferences_. Paragraph C.4 of the First Remedial Order shall be modified to increase the minimum number of pre-trial conferences that OATH must conduct each month for disciplinary cases involving charges related to UOF Violations. Specifically, as of December 15, 2021, Paragraph C.4 shall be revised to read as follows: "All disciplinary cases before OATH involving charges related to UOF Violations shall proceed in an expeditious manner. During each month, Defendants shall hold pre-trial conferences before OATH for at least **150** disciplinary cases involving charges related to UOF Violations, absent extraordinary circumstances that must be documented. If there continues to be delays in conferencing cases despite this calendaring practice, OATH will assign additional resources to hear these cases. The minimum number of case conferences required to be held each month under this Paragraph may be reduced if the Monitor makes a written determination, no earlier than one year after the date of this Order, that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month."[121]
>
> _First Remedial Order § C., ¶ 5. Applicability of Disciplinary Guidelines to OATH Proceedings._ The Disciplinary Guidelines developed pursuant to Section VIII, ¶ 2 of the Consent Judgment shall apply to any OATH proceeding relating to the Department's efforts to impose discipline for UOF Violations.
>
> _Third Remedial Order ¶ 3. New OATH Procedures and Protocols._ Within 45 days of the date of this Order, the City, in consultation with the Monitor, shall develop, adopt, and implement a written plan to allow OATH to more expeditiously prosecute disciplinary cases involving charges related to UOF Violations. The plan shall include the following:
>
> > i.    The steps OATH will take to increase the number ALJs and other staff who will be available to hear Department disciplinary cases, including the number of new ALJs and staff that OATH intends to hire by December 31, 2021.
> >
> > ii.   Improved procedures to ensure that OATH trials are promptly scheduled and completed without unnecessary delays, including scheduling trials within no more than three months of the initial pre-trial conference.
> >
> > iii.  The initiatives and procedures that ALJs will employ to encourage prompt agreed-upon resolutions of disciplinary cases when appropriate.

Addressing the various requirements of the *Nunez* Court Orders related to accountability inherently requires that the Office of Administrative Trials and Hearings ("OATH") practices be considered given their role in DOC's formal disciplinary process. OATH, an administrative law court, adjudicates any contested discipline for tenured staff, pursuant to New York State Civil Service Laws § 75. OATH is a New York City agency, but it is separate and independent from DOC. The Monitoring Team has long reported its concerns related to OATH's practices and the precedents set that impact the Department's ability to impose meaningful and adequate discipline as required by Consent Judgment, § VIII, ¶ 1 and other provisions of the *Nunez* Court Orders.[122]

---

[121] The Action Plan (dkt. 465) requires a compliance assessment with First Remedial Order (dkt. 350), § C, ¶ 4, Timely, Appropriate, and Meaningful Staff Accountability. However, this provision was modified by the Third Remedial Order (dkt. 424), ¶ 2 so a compliance rating with Third Remedial Order, ¶ 2 is provided instead.

[122] The Monitoring Team's concerns regarding issues with the OATH process have been documented for several years. *See* Monitor's April 3, 2017 Report (dkt. 295) at pgs. 179-180 and 184-188; Monitor's October 17, 2018 Report (dkt. 317) at pgs. 126-128; Monitor's April 18, 2019 Report (dkt. 327) at pgs. 151-159 and Appendix C;

As a result, the First Remedial Order, Third Remedial Order, and the Action Plan include specific requirements to enhance OATH's practices, including requirements to increase the number of pre-trial conferences, improve efficiency, and to properly apply the Disciplinary Guidelines.

**Compliance Rating History**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Substantial Compliance with First Remedial Order § C., ¶ 4 & Third Remedial Order ¶ 2 and Partial Compliance with First Remedial Order § C., ¶ 5 & Third Remedial Order ¶ 3. The compliance ratings for the 21st Monitoring Period remain the same: the Department remains in Substantial Compliance with First Remedial Order § C., ¶ 4 & Third Remedial Order ¶ 2 and Partial Compliance with First Remedial Order § C., ¶ 5 & Third Remedial Order ¶ 3. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

- **OATH Proceedings**: When the Department is unable to settle a disciplinary matter directly with a staff member, the Commissioner delegates responsibility to adjudicate the matter to the Office of Administrative Trials and Hearings ("OATH"). In these cases, an Administrative Law Judge ("ALJ") conducts a pre-trial conference in an attempt to facilitate a settlement. If a settlement still cannot be reached, a trial is scheduled before a different ALJ than the one who conducted the pre-trial conference. The trial ALJ assesses the evidence to evaluate whether or not the staff member has violated DOC policy. The

---

Monitor's October 28, 2019 Report (dkt. 332) at pgs. 183-184 and 186-195; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 206-208; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 66-68 and 175-181; Monitor's December 8, 2020 Report (dkt. 365) at pgs. 5-9; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 99-103, 245-250, and 251-257; Monitor's June 3, 2021 Report (dkt. 373) at pgs. 6-16 and Appendix A; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 96-101 and 113-115; Monitor's December 22, 2021 Report (dkt. 435) at pgs. 4-12; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 31-39; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 94-98 and 162-166; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 189-193; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 135, 139-140, and 230; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 59, 71-75, and Appendix C; and the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 109, 124-125, 137-142.

ALJ then issues a written decision (a Report & Recommendation, or "R&R") with a *recommended* outcome, and if the ALJ determines the staff member violated policy, a proposed penalty. The DOC Commissioner has the authority to accept the ALJ's factual findings and recommended penalty or to modify them, as appropriate, in order to resolve the case. The permissible range of penalties is set by law and includes a reprimand, a fine of up to $100, a suspension without pay for up to 60 days, demotion in title, or termination. Accordingly, most of the discipline imposed by DOC (either through settlement or following an OATH trial) is within this same range of penalties. The DOC Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.[123] The Monitoring Team has long raised concerns that in some cases, certain factors emphasized by OATH ALJs appeared to influence outcomes that appeared disproportionately low to the level of misconduct.[124] The Monitoring Team highlighted one such example in the Monitor's January 13, 2026 Report (dkt. 947) at Appendix J. OATH's Role in DOC's Disciplinary Process, OATH's Internal Operating Procedures and Guidelines, Background on *Nunez* Reform Efforts with OATH, and OATH's Procedures and Protocols are described in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 141-148. These descriptions remain an accurate description of the process and are incorporated by reference.

- **<u>Number and Outcomes of Pre-Trial Conferences</u>**: The Monitoring Team has long reported that the majority of cases can and should settle without the need for OATH. When pre-trial conferences are needed, they should occur promptly. Further, pre-trial conference dates need to be readily available because simply scheduling a pre-trial conference sometimes encourages DOC and the staff member to settle the case outside of OATH. Then, if the case is not successfully resolved, the full OATH disciplinary process can occur more quickly because the initial proceeding has already been scheduled. The Monitor's January 13, 2026 Report (dkt. 947) at pgs. 334-335 described the evolution of the Department's efforts to schedule enough pre-trial conferences each week to avoid

---

[123] Appeals to the Civil Service Commission and Article 78 appeals are discussed in more detail in this report in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

[124] *See* the Monitor's April 18, 2019 Report (dkt. 237) at pgs. 151-158, 162-165, and Appendix C.

unreasonable delays in the resolution of cases awaiting pre-trial conference. Beginning in 2024 and continuing through this Monitoring Period, the Monitoring Team approved a temporary reduction in the number of days each week pre-trial conferences are required to be held, as well as the minimum number of pre-trial conferences required to be held each month.

- o *Number of Pre-Trial Conferences*: Table 16 in Appendix E presents the number of use-of-force ("UOF")-related pre-trial conferences that were scheduled in each Monitoring Period since July 2022, and their method of resolution. During this Monitoring Period, the Department scheduled 611 pre-trial conferences, which exceeds the 300 pre-trial conference threshold approved by the Monitor for this six-month period.

- o *Resolution of Pre-Trial Conferences*: In the 21st Monitoring Period, the Department's efficiency in settling UOF-related cases before and after an initial pre-trial conference remained roughly the same as in the 20th Monitoring Period. 133 UOF-related cases settled before the pre-trial conference. Of the 114 UOF cases where a PTC was convened, 40 of the 114 (35%) settled at the pre-trial conference. Only 16 of the 114 (14%) cases required an additional pre-trial conference. 23 of the 114 (20%) of cases were scheduled for trial, but only one case actually proceeded to trial. 23 of the 114 cases were administratively filed, which the Monitoring Team continues to closely scrutinize.

- **Trials at OATH for Use of Force-Related Misconduct**: During this Monitoring Period, there was only one trial conducted for UOF-related misconduct. The number of trials has decreased significantly since 2021 and 2022 when the Department had been focused on closing out a large backlog of cases. Table 17 in Appendix E provides data on the number of trials conducted, the average number of days between a pre-trial conference and the trial, the length of time required to complete the trial, the average number of days for the ALJ to issue an R&R after the trial, and ultimately the length of time between a pre-trial conference and the issuance of the R&R. Historically, the process for scheduling and conducting trials and then issuing an R&R was very inefficient and convoluted, so starting in 2021, OATH set internal deadlines for case processing as enumerated in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 337. The one trial that did occur for

197

UOF-related misconduct in the 21st Monitoring Period met all of OATH's internal deadlines; it occurred within 65 days of the pre-trial conference,[125] only lasted one day, and the R&R was issued within 45 days of the trial date. However, the underlying UOF occurred in June 2023, while the trial occurred in September 2025. While the improvement in the timing of case processing on OATH's end is notable, the length of time between an incident and its resolution in terms of staff accountability remains protracted because investigations are languishing in the Full ID backlog.[126]

- **OATH Reports and Recommendations for Use of Force-Related Misconduct:** Table 18 in Appendix E provides a breakdown of the UOF-related R&Rs issued for trials that occurred between January 2016-December 2025 and the recommended outcomes. The one R&R issued for UOF-related misconduct in the 21st Monitoring Period found the DOC staff member guilty of some charges, but dismissed others, and recommended a 30-day penalty which was imposed by the Commissioner.
  - *Assessment of OATH's Application of Disciplinary Guidelines*: As noted in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 203-204, the proper application of the Disciplinary Guidelines has improved since the Remedial Orders were imposed, although in some cases, questions remained regarding the application of precedent and whether it was consistent with the Disciplinary Guidelines in both pre-trial conferences and the R&Rs. The Monitoring Team is continuing to evaluate cases that merit additional scrutiny as to whether the applicability of the disciplinary guidelines was appropriate. A more fulsome assessment is underway and will be included in a future Monitor's Report.

**Conclusion**

OATH has made some improvements to its practices since the inception of the Consent Judgment, although concerns about OATH remain. Important improvements have been made to ensure that there are adequate numbers of pre-trial conferences and that the processes and

---

[125] During this Monitoring Period, on August 27, 2025, the time to schedule trials was reduced from 65 days to 50 days following the resolution of an Article 78 proceeding brought by Correction Officer Benevolent Association. The one trial that occurred during this Monitoring Period was scheduled for trial before this change went into effect.

[126] The Full ID backlog is discussed in more detail in the compliance assessment for Consent Judgment, § VII., ¶ 9(a).

practices related to Trials and issuance of R&Rs are both more efficient and occur more quickly than they had in the past. Pre-trial conferences are scheduled more quickly, trials are conducted and completed over a more reasonable period of time, and the R&Rs are issued more quickly than they were in the past. However, most, of these reforms, came only after the imposition of various Court Orders and corresponding scrutiny and recommendations from the Monitoring Team.

Further enhancements to the disciplinary process are necessary so that cases can move as expeditiously as possible. This includes the development of additional efficiencies, removal of unnecessary bureaucracy, and the need for a posture that better supports the type of collaboration between OATH and DOC needed to meet the requirements of the *Nunez* Court Orders. The Monitoring Team is continuing to closely scrutinize the various facets of OATH's operation in order to identify whether additional enhancements or modifications to the Department's approach to delegating cases to OATH may be necessary.

- **First Remedial Order § C, ¶ 4 & Third Remedial Order ¶ 2**. OATH has met the requirement to convene the number of pre-trial conferences approved by the Monitor. Accordingly, Substantial Compliance with this provision has been achieved.

- **First Remedial Order § C, ¶ 5**. It appears there has been improvement in the application of the Disciplinary Guidelines to OATH Proceedings since the First Remedial Order was entered, but additional scrutiny by the Monitoring Team is ongoing to determine what additional steps are necessary to achieve Substantial Compliance.

- **Third Remedial Order ¶ 3**. OATH's procedures and protocols for UOF related disciplinary matters are more efficient than when the Remedial Orders were first imposed, but the pre-trial conference and trial process is still not efficient and impedes the ability to support expeditious processing for use of force related misconduct. Further enhancements to the OATH process are needed to support the overall goal of ensuring that proportional discipline is imposed timely.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § C., ¶ 4. & Third Remedial Order ¶ 2.** Substantial Compliance<br>**First Remedial Order § C., ¶ 5.** Partial Compliance<br>**Third Remedial Order ¶ 3.** Partial Compliance |

| **TRIALS DIVISION STAFFING (CONSENT JUDGMENT § VIII., ¶ 4)** |
|---|
| *Consent Judgment § VIII., ¶ 4. Trials Division Staffing.* The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.<br><br>*Action Plan, § F, ¶ 1. (a) Staffing Levels of Trials Division.* The City shall thereafter ensure that the Department's Trials Division maintains at least 25 agency attorneys and 4 directors, unless and until the Department can demonstrate to the Monitor with an internal staffing analysis that fewer agency attorneys and directors are necessary to timely address the disciplinary matters pending with the Trials Division. |

Consent Judgment § VIII., ¶ 4 requires the City and the Department to ensure the Trials Division has sufficient staff to expeditiously prosecute all disciplinary cases. The Department has long struggled to ensure sufficient staff to support the Division's caseload. The Action Plan (dkt. 465), § F, ¶ 1(a), requires the Department to ensure that the Trials Division maintains at least 25 agency attorneys and four Directors.

**Compliance Assessment Overview**

The history of compliance ratings for Consent Judgment § VIII, ¶ 4 since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period." While the Monitoring Team usually provides an update on the Department's efforts to achieve compliance with Action Plan, § F, ¶ 1(a), as it relates to the work of Consent Judgment § VIII, ¶ 4, a compliance rating is never provided pursuant to the Court's July 10, 2025 Order (dkt. 879).

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with Consent Judgment § VIII, ¶ 4. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

The Monitoring Team's determination that the rating remains the same as the 20th Monitoring Period is based on the following available information:

- **Recruitment Efforts**: During the 21st Monitoring Period, the Division reported actively reviewing resumes and interviewing candidates. The Trials Division leadership reports

that the process to hire or promote an individual remains challenging and protracted, taking many months, due to a significant amount of bureaucratic "red tape" at OMB.

- **Staffing Levels**: Appendix E, Table 19 provides an overview of the Trials Division's staffing levels at the end of each Monitoring Period from June 2020 to December 2025.[127] The staffing levels at the end of the 21st Monitoring Period are almost identical to those at the end of the 20th Monitoring Period. While the Trials Division has five Directors, which is one more than the four Directors required by the Action Plan, the Division only has 19 attorneys (one fewer than last Monitoring Period), which remains below the 25 attorneys required by the Action Plan.

As detailed in Appendix E, Table 9, the timeliness of formal discipline through the Trials Division remains relatively steady over the years, with 90-91% of cases closed within 60 days, suggesting that additional efficiencies, such as having additional attorneys and reducing caseload sizes, would expedite prosecution.

## Conclusion

The timeliness of prosecution has improved since the Consent Judgment went into effect, but the Department has not yet achieved Substantial Compliance with the requirement to prosecute cases as expeditiously as possible. The Monitoring Team continues to recommend that the City and the Department remain vigilant in ensuring the Trials Division maintains adequate staffing levels,[128] and continue to work to hire and retain the 25 attorneys as required by the Action Plan (dkt. 465), § F, ¶ 1(a).

| COMPLIANCE RATING | Consent Judgment § VIII., ¶ 4. Partial Compliance |
|---|---|

---

[127] For Trials Division staffing levels from the 6th to the 9th Monitoring Periods, *see* Monitor's November 22, 2024 Report (dkt. 802) at pg. 158.

[128] *See* Monitor's March 16, 2022 Report (dkt. 438) at pg. 62.

| MAXIMIZING DEPLOYMENT OF STAFF - REDUCTION OF UNIFORMED STAFF IN CIVILIAN POSTS (ACTION PLAN § C., ¶ 3(VII)) |
| --- |
| *Action Plan § C., ¶ 3(vii). Maximizing Deployment of Staff – Reduction of Uniformed Staff in Civilian Posts*. The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below: [. . .]<br><br>(vii) Reduce the assignment of uniform staff to civilian posts, including Temporary Duty Assignment, in order to minimize the reliance on uniform staff for tasks that can and should be reasonably completed by civilians. |

The Department is required by Action Plan (dkt. 465), § C, ¶ 3(vii) to reduce the assignment of uniformed staff to civilian posts in order to minimize the reliance on uniformed staff for tasks that can and should be reasonably completed by civilians. This requirement flows from the Monitoring Team's 2022 staffing analysis which found that the use of uniformed staff in positions that could be performed by civilians contributed to the overarching problem of insufficient numbers of uniformed staff being available to work in the jails' housing units.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pgs. 31-34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order.

**Compliance Rating History**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with the portion of this provision that addresses *Management of Internal Staffing Records* and the City was in Non-Compliance with the portion of this provision that addresses *Defendants' Allocation of Resources to Reduce the Assignment of Uniformed Staff to Civilian Posts*.[129] The compliance ratings for the 21st Monitoring Period remain the same. Given that the

---

[129] This provision is divided into two parts because the responsibilities are separate and distinct. The Department is responsible for managing its internal staffing records and the City is responsible for allocating the necessary resources to effectuate the conversion of positions to civilian positions.

compliance ratings have not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

This is one of several key strategies required to maximize the availability of uniformed staff to work directly with people in custody in the jails and is one that requires significant collaboration among various City entities. The Monitoring Team's determination that the compliance rating remains the same as the 20th Monitoring Period is based on the following information:

- **Process to Recruit & Hire Civilians**: As described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 347-350, Defendants must navigate a multitude of bureaucratic hurdles to obtain approval from various City agencies (including OMB and DCAS) to hire civilians and receive new positions (*i.e.*, "new needs") and the Department must also operate within hiring freezes and budget cuts imposed by the City. Even when these obstacles are successfully navigated, civilian positions in the Department are often not competitive with comparable positions in other City agencies. Given the change of administration, the City has not yet responded to the Monitoring Team's inquiries about how the various hiring processes could be streamlined to promote efficiency.

- **Contributing Factors**: Dynamics underpinning the Department's reliance on uniformed staff to fill roles that could reasonably be addressed by civilians include: (1) the Department's historically larger number of uniformed staff versus civilian staff; (2) budget cuts impacting the number of civilian positions; (3) lower turnover among uniformed staff and greater flexibility when deploying uniformed staff; (4) the risk of critical roles going unfilled for a period of time because of the complexity involved in creating positions and attracting qualified civilian candidates. These dynamics remain the same as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 350-352.

- **Staffing Efficiency Committee**: The Staffing Efficiency Committee continues to work to disentangle the various bureaucratic issues and to alter the Department's culture of reliance on uniformed staff to perform duties that could reasonably be accomplished by civilians. The SEC remains focused on prioritizing the Department's uniformed staff for assignments in locations where they are most needed. This includes efforts to: (1) identify

203

the roles suitable for civilians, (2) obtain approval, funding, and an increase in the authorized head count to post these civilian positions for hire, (3) recruit and fill the positions with a civilian, and (4) obtain final approval for hiring and setting the start date. The Committee continues to evaluate various Divisions' use of uniformed staff, identify the universe of positions that have duties appropriate for civilians and those that require uniformed staff, convert unbudgeted civilian posts to budgeted positions, evaluate civilian vacancies to determine whether the positions should be repurposed or allocated elsewhere or whether additional positions need to be added, improve oversight and management of uniformed staff on Temporary Deployment ("TDY"), and manage the civilian hiring process more efficiently so that new needs requests are more credible and defensible.

- **Post Analysis**: A neutral and independent Post Analysis is required pursuant to Action Plan (dkt. 465), § C, ¶ 3(viii). A post analysis will provide critical information on the number and duties of each post in each facility as well as the number of uniformed staff needed to ensure adequate coverage. The Department originally worked with the New York State Commission of Correction ("SCOC") to conduct a post analysis but determined that this approach would not meet the needs for the requirements of the Nunez Court Orders. Following the end of the Monitoring Period, the Department engaged a qualified consultant to undertake the post analysis, and work began in early 2026.

## Conclusion

The complexity of this undertaking and the collaboration required cannot be overstated. The Department, via the Staffing Efficiency Committee, continues to make progress in addressing the problems with its legacy processes and continues to improve its management of civilian positions and hiring. Progress toward compliance requires continued efforts to identify uniformed positions that can be converted to civilian positions. The Department remains in Partial Compliance with the portion of the provision related to its efforts regarding *Managing Internal Staffing Records.* That said, the City's agencies, particularly OMB and DCAS, must provide adequate resources for efficient hiring and funding for both existing and additional civilian positions that are competitive in the marketplace. The City has made no observable progress in this area, which continues to undermine the Department's progress. The City remains

204

in Non-Compliance with the portion of this provision related to *Allocating Resources to Reduce the Assignment of Uniformed Staff to Civilian Posts.*

| | |
|---|---|
| **COMPLIANCE RATING** | **Action Plan § C., ¶ 3(vii).**<br>*Management of Internal Staffing Records.* Partial Compliance<br>*Defendants' allocation of resources to reduce the assignment of uniformed staff to civilian posts.* Non-Compliance |

205

| MAXIMIZING DEPLOYMENT OF STAFF - AWARDED POSTS (ACTION PLAN § C., ¶ 3(v)) |
|---|
| *Action Plan § C., ¶ 3(v). Maximizing Deployment of Staff – Awarded Posts*. The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below:<br><br>(v) Reduce the use of awarded posts so they are primarily utilized for those positions in which a particular skill set is required. A staff member with an awarded non-mandatory post must be re-deployed to a mandatory post if there are staffing shortages. |

This provision requires the Department to reduce the use of awarded posts so that they are primarily utilized for positions for which a particular skill set is required. The purpose of this requirement is to support the Department's efforts to maximize deployment of uniformed staff given the Department's historical *practice* of using awarded posts for positions that were not on housing units or otherwise regularly engaged with incarcerated individuals. It also requires the Department to address its historical *practice* of managing staff on awarded posts in a manner that limited flexibility in re-deploying such staff when they were needed in more critical areas.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pgs. 31-34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order.

**Compliance Rating History**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Partial Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Partial Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

The Department's use of awarded posts has limited the Department's flexibility in deploying staff to places they are needed most as discussed in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 359-370. The Department's use of an "awarded" post is governed by policy, but a number of entrenched *practices* that are not codified in policy impede the Department's overall ability to maximize the deployment of its staff. These include poor management, poor record keeping, limiting reassignments that are permissible by policy but not done in practice, awarding a post for a specific location rather than a population, and awarding posts that have little interaction with the incarcerated population.

- **Department Efforts to Alter Practices Regarding Awarded Posts**: The Department has suspended the practice of awarding posts (with limited exceptions), continues to track existing awarded posts reliably, and has developed safeguards to prevent "unofficial" awarded posts.[130] The Department has acknowledged the Monitoring Team's recommendations to clarify policy requirements regarding awarded posts, but has not yet revised the relevant policies to address the recommendations.

- **Steady Staffing**: The Monitoring Team strongly supports the Department's use of steady staffing (*i.e.*, consistently assigning staff members to the same post day-to-day) without formally awarding the post to the staff member. The Department utilizes steady staffing in this way in certain housing units, such as the Young Adult housing units targeted by the RNDC Action Plan (discussed in more detail in the compliance assessment for § XV. ¶ 17, "Young Adults-Consistent Assignment of Staff," above). During the current Monitoring Period, the Department expanded the use of steady staffing in other jails, assigning over 80 staff to steady incarcerated individual-facing posts, without formally "awarding" the posts to the staff member. However, the Monitoring Team continues to recommend that the Department clarify the procedures relating to the use of steady staffing to ensure consistency and transparency in how the process works and to ensure that the problematic practices related to awarded posts do not become embedded in the

---

[130] In March 2025, COBA submitted a request for arbitration with the Office of Collective Bargaining to address its allegation that the Department's change in practice regarding awarded posts violates the collective bargaining agreement. A hearing on the matter is scheduled for July 2026.

steady staffing convention. The Department has not taken any steps to address this recommendation from the Monitoring Team.

- **<u>Reducing the Number of Staff with Awarded Posts:</u>** The Department regularly inventories its awarded posts to track the location/type (*i.e.*, in a facility, not in a facility; incarcerated individual-facing posts) and the rank of the staff members to whom posts have been awarded.

    o Table 4 in Appendix F shows the inventories conducted from April 2024 to December 2025. These data show a decrease in the number of staff who have been awarded posts over this period (from 844 to 656 staff), mainly attributed to attrition. In 2022, the Department reported approximately 1,650 awarded posts, thus a significant reduction has occurred.

    o Table 5 in Appendix F shows the number of awarded posts in the facilities that are incarcerated individual-facing (*e.g.*, housing units, clinic, law library, corridor, *etc.*).[131] In October 2025, of the approximately 476 awarded posts in the facilities, 385 (81%) were incarcerated individual-facing posts.[132] The proportion of awarded posts located in the facilities has remained about the same (~70%).

    o Table 6 in Appendix F shows additional analysis by the Monitoring Team to determine the number of awarded posts on the housing units. In December 2025, 166 awarded posts on the housing units were identified, which is about 35% of the awarded posts located in the facilities and 43% of the incarcerated individual-facing awarded posts.

- **Evaluating Awarded Posts**: The Department continues to consider how to assess the necessity of each awarded post and the role that awarded posts could play in its effort to promote stability and consistent attendance among the workforce. This process has languished and specific proposals or initiatives toward this end have not been shared with the Monitoring Team.

---

[131] In contrast, non-incarcerated individual facing posts include assignments to patrol, perimeter security, control rooms, gate security, *etc.*

[132] This proportion is approximate given that the snapshots do not quite match up in time (incarcerated individual-facing data is from October 2025, total number of in-facility data is from December 2025).

**Conclusion**

Since 2022, the Department has made significant progress in this area, as the number of staff who were treated as if they had an awarded post, and the number of staff who have actually been awarded a post have both decreased significantly. The Department needs to update its policies and procedures regarding both awarded posts and steady staffing to ensure both practices are managed with fidelity and remain distinct. Once revised policies and procedures have been implemented, the Monitoring Team believes further discussion about potential modifications to the use of awarded posts may be appropriate, in particular regarding the use of awarded posts for staff on housing units. The Department remains in Partial Compliance.

| COMPLIANCE RATING | Action Plan § C, ¶ 3(v). Partial Compliance |
|---|---|

209

| **MAXIMIZING DEPLOYMENT OF STAFF - MAXIMIZE WORK SCHEDULES (ACTION PLAN § C., ¶ 3(VI))** |
|---|
| *Action Plan § C., ¶ 3(vi). Maximizing Deployment of Staff – Maximize Work Schedules*. The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below: (vi) Create and implement alternatives to the work schedule for uniform staff assigned to work in the facilities in order to minimize the use of a 4 by 2 schedule and optimize staff scheduling. |

The Department must maximize staff work schedules as required by Action Plan (dkt. 465), § C, ¶ 3(vi). The purpose of this requirement is for the Department to optimize staff scheduling by implementing alternatives to the work schedule for uniformed staff assigned to work in the facilities to increase the number of days a staff member works. Specifically, the Department is required to minimize the use of the 4x2 schedule in order to increase the number of days that a staff member works during the year.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pgs. 31-34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order.

**Compliance Rating History**

The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "*Nunez* Compliance Ratings through the 21st Monitoring Period."

In the 20th Monitoring Period (January-June 2025), the Department was in Non-Compliance with this provision. The compliance rating for the 21st Monitoring Period remains the same: the Department remains in Non-Compliance. Given that the compliance rating has not changed, the Monitoring Team will not provide a detailed discussion of this finding per the Court's March 18, 2026 Order ¶ 1 (dkt. 967).

**Relevant Data and Information**

This provision requires the Department to reduce its use of the 4x2 work schedule, in favor of the 5x2 (or another) scheduling convention, in order to increase the number of days staff members are available to work each year. Since this provision went into effect via the Action

210

Plan, the Department has made no substantive effort to address the issue and has offered a variety of unclear and at times contradictory reasons for why it claims it cannot do so. *See* Monitor's January 13, 2026 Report (dkt. 947) at pgs. 371-373. During the 20th Monitoring Period (under the previous administration), the Monitoring Team requested a meeting with the Office of Labor Relations to learn more about the reported obstacles. As of the filing of this report, the Department still has not responded to the Monitoring Team's request. The Department has offered no evidence of any progress toward complying with this requirement and remains in Non-Compliance.

| **COMPLIANCE RATING** | **Action Plan § C., ¶ 3(vi).** Non-Compliance |
| --- | --- |

# APPENDIX A:
# COMPREHENSIVE LIST OF PROVISIONS

# Comprehensive List of "Select Group of Provisions" & Provisions Subject to the Court's 2024 Contempt Order

The table below includes a comprehensive list of 40 provisions that are subject to compliance rating pursuant to the Court's July 10, 2025 Order (dkt. 879). The table also identifies whether the provision is either: (1) the Select Group of Provisions subject to compliance assessments (Consent Judgment § XX, ¶ 18) as required by Action Plan § G, ¶ 5(b) **and/or** (2) the provisions that are subject to the Court's 2024 Contempt Order.

The two charts below reference provisions in the Consent Judgment ("CJ"), the First Remedial Order ("FRO"), the Second Remedial Order ("SRO"), the Third Remedial Order ("TRO"), and the Action Plan ("AP"). The first chart presents compliance assessments ratings for the 1st through the 13th Monitoring Periods. The second chart presents compliance assessment ratings for the 14th through the 21st Monitoring Periods.

## Chart One: 1st through 13th Monitoring Periods

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 1st MP | 2nd MP | 3rd MP | 4th MP | 5th MP | 6th MP | 7th MP | 8th MP | 9th MP | 10th MP | 11th MP | 12th MP | 13th MP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility Leadership Responsibilities (FRO, § A., ¶ 2) | Yes | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| New Use of Force Directive (CJ, § IV., ¶ 1) | Yes | Yes | (Develop) Substantial Compliance (Adopt) Partial Compliance (Implement) Partial Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Partial Compliance (Implement) Partial Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Partial Compliance (Implement) Partial Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Partial Compliance (Implement) Partial Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | |
| Independent Staff Reports (CJ, § V., ¶ 2) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | |
| Providing Medical Attention Following Use of Force Incident (CJ, § V., ¶ 22) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | |
| Interim Security Plan (SRO, ¶1(i)(a)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Not Rated | |
| Interim Security Plan (AP, § D, ¶ 2 (a)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Searches (AP, § D, ¶ 2 (d)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Identify/Recover Contraband (AP, § D, ¶ 2 (e)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |

213

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 1st MP | 2nd MP | 3rd MP | 4th MP | 5th MP | 6th MP | 7th MP | 8th MP | 9th MP | 10th MP | 11th MP | 12th MP | 13th MP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Escort Holds (AP, § D, ¶ 2 (f)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Facility Emergency Response Teams (FRO, § A., ¶ 6) | Yes | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| Revised De-escalation Protocol (FRO, § A., ¶ 3) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| Prevent Fight/Assault – 18-year-olds (CJ, § XV., ¶ 1) | Yes | Yes | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | |
| Direct Supervision – 18-year-olds (CJ, § XV., ¶ 12) | Yes | Yes | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | |
| Reinforcement of Direct Supervision – 18-year-olds (FRO, § D, ¶ 3) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| Reinforcement of Direct Supervision – 18-year-olds (FRO, § D, ¶ 3(i)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| Consistent Assignment of Staff – 18-year-olds (CJ, § XV., ¶ 17) | Yes | Yes | Not Yet Rated | Not Yet Rated | Not Yet Rated | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | |
| Consistent Staff Assignment and Leadership (FRO, § D, ¶ 1) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| Promotions - Pre-Promotional Screening (CJ, § XII., ¶ 1) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | |
| Promotions - Restricting Promotions for UOF Disciplinary History (CJ, § XII., ¶ 2) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Non-Compliance | Substantial Compliance | Substantial Compliance | |
| Promotions - Restricting Promotions for Pending UOF Charges (CJ, § XII., ¶ 3) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | |
| Supervision of Captains (FRO, § A., ¶ 4) | Yes | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Non-Compliance | |
| Increased Assignment of Captains in the Facility (AP, § C, ¶ 3 (ii)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Improved Supervision of Captains (AP, § C, ¶ 3 (iii)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Improved Routine Tours (AP, § A, ¶ (d)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Conduct Rapid Reviews (FRO, § A., ¶ 1) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Partial Compliance | |

214

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 1st MP | 2nd MP | 3rd MP | 4th MP | 5th MP | 6th MP | 7th MP | 8th MP | 9th MP | 10th MP | 11th MP | 12th MP | 13th MP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Thorough, Timely, Objective Investigations (CJ, § VII., ¶ 1) | Yes | Yes | Not Yet Rated | Not Yet Rated | Not Yet Rated | Not Yet Rated | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | |
| Timing of Full ID Investigations (CJ, § VII., ¶ 9(a)) | Yes | Yes | Not Yet Rated | Not Yet Rated | Not Yet Rated | Compliance Rating Withheld | Compliance Rating Withheld | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | |
| ID Staffing (CJ, § VII., ¶ 11) | No | Yes | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Compliance Rating Withheld | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | |
| Early Warning System (CJ, § X., ¶ 1) | Yes | No | Not Yet Rated | Partial Compliance | Partial Compliance | Compliance Rating Withheld | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Non-Compliance | |
| Timely, Appropriate and Meaningful Discipline (CJ, § VIII., ¶ 1) | Yes | Yes | Not Yet Rated | Not Yet Rated | Not Yet Rated | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | |
| Prosecution of Formal Disciplinary Charges for UOF Violations (CJ, § VIII., ¶ 3(c)) | Yes | No | Not Yet Rated | Not Yet Rated | Non-Compliance | Compliance Rating Withheld | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Non-Compliance | |
| Immediate Corrective Action (FRO, § C., ¶ 1) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Partial Compliance | |
| Staff Accountability – Monitor Recommendations (FRO, § C., ¶ 2) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Partial Compliance | |
| Expeditious OATH Proceedings (FRO, § C., ¶ 4/TRO ¶ 2) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Partial Compliance | |
| Applicability of Disciplinary Guidelines to OATH Proceedings (FRO, § C., ¶ 5) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Partial Compliance | |
| New OATH Procedures and Protocols (TRO, ¶ 3) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Trials Division Staffing (CJ, § VIII., ¶ 4) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | |
| Maximizing Deployment of Staff - Reduction of Uniformed Staff in Civilian Posts (AP, § C, ¶ 3 (vii)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Maximizing Deployment of Staff - Awarded Posts | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |

215

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 1st MP | 2nd MP | 3rd MP | 4th MP | 5th MP | 6th MP | 7th MP | 8th MP | 9th MP | 10th MP | 11th MP | 12th MP | 13th MP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (AP, § C, ¶ 3 (v)) | | | | | | | | | | | | | | | |
| Maximizing Deployment of Staff - Maximize Work Schedules (AP, § C, ¶ 3 (vi)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |

216

## Chart Two: 14th through 21st Monitoring Periods

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 14th MP | 15th MP | 16th MP | 17th MP | 18th MP | 19th MP | 20th MP | 21st MP |
|---|---|---|---|---|---|---|---|---|---|---|
| Facility Leadership Responsibilities (FRO, § A., ¶ 2) | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| New Use of Force Directive (CJ, § IV., ¶ 1) | Yes | Yes | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance |
| Independent Staff Reports (CJ, § V., ¶ 2) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Providing Medical Attention Following Use of Force Incident (CJ, § V., ¶ 22) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |
| Interim Security Plan (SRO, ¶1(i)(a)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance |
| Interim Security Plan (AP, § D, ¶ 2 (a)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance |
| Searches (AP, § D, ¶ 2 (d)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance |
| Identify/Recover Contraband (AP, § D, ¶ 2 (e)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance |
| Escort Holds (AP, § D, ¶ 2 (f)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance |
| Facility Emergency Response Teams (FRO, § A., ¶ 6) | Yes | Yes | Non-Compliance | Non-Compliance | Development of Protocol: Non-Compliance Review of Responses & Documentation: Partial Compliance Response to Misconduct: Non-Compliance | Development of Protocol: Non-Compliance Review of Responses & Documentation: Partial Compliance Response to Misconduct: Non-Compliance | Development of Protocol: Partial Compliance Review of Responses & Documentation: Partial Compliance Deployment of Teams: Partial Compliance Response to Misconduct: Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Revised De-escalation Protocol (FRO, § A., ¶ 3) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Prevent Fight/Assault – 18-year-olds (CJ, § XV., ¶ 1) | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Direct Supervision – 18-year-olds (CJ, § XV., ¶ 12) | Yes | Yes | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 14th MP | 15th MP | 16th MP | 17th MP | 18th MP | 19th MP | 20th MP | 21st MP |
|---|---|---|---|---|---|---|---|---|---|---|
| Reinforcement of Direct Supervision – 18-year-olds (FRO, § D, ¶ 3) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance |
| Reinforcement of Direct Supervision – 18-year-olds (FRO, § D, ¶ 3(i)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance |
| Consistent Assignment of Staff – 18-year-olds (CJ, § XV., ¶ 17) | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Consistent Staff Assignment and Leadership (FRO, § D, ¶ 1) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance | Partial Compliance |
| Promotions - Pre-Promotional Screening (CJ, § XII., ¶ 1) | Yes | No | Not Rated | Partial Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Promotions - Restricting Promotions for UOF Disciplinary History (CJ, § XII., ¶ 2) | Yes | No | Not Rated | Substantial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Promotions - Restricting Promotions for Pending UOF Charges (CJ, § XII., ¶ 3) | Yes | No | Not Rated | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Supervision of Captains (FRO, § A., ¶ 4) | Yes | Yes | Non-Compliance | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance |
| Increased Assignment of Captains in the Facility (AP, § C, ¶ 3 (ii)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Non-Compliance |
| Improved Supervision of Captains (AP, § C, ¶ 3 (iii)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Non-Compliance |
| Improved Routine Tours (AP, § A, ¶ 1 (d)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance |
| Conduct Rapid Reviews (FRO, § A., ¶ 1) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Thorough, Timely, Objective Investigations (CJ, § VII., ¶ 1) | Yes | Yes | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Timing of Full ID Investigations (CJ, § VII., ¶ 9(a)) | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance |
| ID Staffing (CJ, § VII., ¶ 11) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance | Partial Compliance |
| Early Warning System (CJ, § X., ¶ 1) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Timely, Appropriate and Meaningful Discipline (CJ, § VIII., ¶ 1) | Yes | Yes | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Prosecution of Formal Disciplinary Charges for UOF Violations (CJ, § VIII., ¶ 3(c)) | Yes | No | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per |

218

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 14th MP | 15th MP | 16th MP | 17th MP | 18th MP | 19th MP | 20th MP | 21st MP |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Not rated Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Not rated Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Not rated Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | the 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance |
| Immediate Corrective Action (FRO, § C., ¶ 1) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Staff Accountability – Monitor Recommendations (FRO, § C., ¶ 2) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Not Rated | Not Rated |
| Expeditious OATH Proceedings (FRO, § C., ¶ 4/TRO ¶ 2) | Yes | No | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Applicability of Disciplinary Guidelines to OATH Proceedings (FRO, § C., ¶ 5) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| New OATH Procedures and Protocols (TRO, ¶ 3) | Yes | No | Not Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Trials Division Staffing (CJ, § VIII., ¶ 4) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Maximizing Deployment of Staff - Reduction of Uniformed Staff in Civilian Posts (AP, § C, ¶ 3 (vii)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Management of Internal Staffing Records. Partial Compliance Defendants' allocation of resources to reduce the assignment of uniformed staff to civilian posts. Non-Compliance | Management of Internal Staffing Records. Partial Compliance Defendants' allocation of resources to reduce the assignment of uniformed staff to civilian posts. Non-Compliance |
| Maximizing Deployment of Staff - Awarded Posts (AP, § C, ¶ 3 (v)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance |
| Maximizing Deployment of Staff - Maximize Work Schedules (AP, § C, ¶ 3 (vi)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance |

219

# APPENDIX B:
# USE OF FORCE AND VIOLENCE INDICATORS

## TABLE 1: NUMBER AND RATE OF UOF

The graph below shows the average monthly rate of use of force ("UOF") per 100 people in custody. The table includes data for the last four Monitoring Periods.



| Systewide Use of Force January 2024 to December 2025 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| January-June 2024 | 3497 | 582.8 | 6271 | 9.3 |
| July-December 2024 | 3483 | 580.5 | 6489 | 8.95 |
| January-June 2025 | 3561 | 593.5 | 7123 | 8.34 |
| July-December 2025 | 3614 | 602.3 | 7187 | 8.4 |

## TABLE 2: NUMBER AND PROPORTION OF A, B, AND C USES OF FORCE

The table below shows the number and proportions of uses of force in which at least one serious injury ("A"), less serious injury ("B"), or no injury ("C") occurred.

On the left-hand side of the table (the unshaded side), Column A shows that the raw number of serious injuries (A) increased steadily for several years after the Consent Judgment went into effect. The number of incidents involving serious injuries increased significantly in 2021 and 2022, and since then, the number decreased significantly. In column B, the trajectory of the trend is shaped differently, but the number of incidents involving less serious injuries has been at historical lows for the past two years. In other words, each year, fewer incidents occur in which people are harmed at the hands of staff (from just over 2,000 incidents in 2018, to fewer than 300 incidents in 2024 and 2025).

The shaded cells on the right-hand side of the table show the proportion of As, Bs and Cs each year. As the proportion of As and Bs has decreased over time, the proportion of Cs—uses of force where no one is injured—has increased. In 2018, 37% of UOF incidents involved an injury (Class A and B, combined) compared to only about 2% during the current Monitoring Period. Conversely, in 2018, only about two-thirds of all UOF incidents (63%) did not result in injury, compared to about 98% during the current Monitoring Period. In other words, a much larger proportion of the uses of force occur without inflicting a *physical* injury on those involved. As discussed in other sections of this report, whether or not there was a *physical* injury does not mean that the incident did not cause harm or create a risk of harm.

| Number and Proportion of A, B and C Uses of Force | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Number of UOF Incidents | | | | Proportion of A/B/C | | |
| | A | B | C | Total UOF | A | B | C |
| 2016 | 74 | 1627 | 2950 | 4651 | 1.6% | 35.0% | 63.4% |
| 2017 | 134 | 1743 | 2903 | 4780 | 2.8% | 36.5% | 60.7% |
| 2018 | 136 | 1894 | 3871 | 5901 | 2.3% | 32.1% | 65.6% |
| 2019 | 166 | 1648 | 5355 | 7169 | 2.3% | 23.0% | 74.7% |
| 2020 | 178 | 960 | 5059 | 6197 | 2.9% | 15.5% | 81.6% |
| 2021 | 464 | 1033 | 6697 | 8194 | 5.7% | 12.6% | 81.7% |
| 2022 | 434 | 781 | 5790 | 7005 | 6.2% | 11.1% | 82.7% |
| 2023 | 165 | 380 | 6239 | 6784 | 2.4% | 5.6% | 92.0% |
| 2024 | 52 | 209 | 6719 | 6980 | 0.7% | 3.0% | 96.3% |
| 2025 | 73 | 209 | 6893 | 7175 | 1.0% | 2.9% | 96.1% |
| By Monitoring Period | | | | | | | |
| J-J 24 | 21 | 87 | 3389 | 3497 | 0.6% | 2.5% | 96.9% |
| J-D 24 | 31 | 122 | 3330 | 3483 | 0.9% | 3.5% | 95.6% |
| J-J 25 | 44 | 155 | 3362 | 3625 | 1.2% | 4.3% | 92.7% |
| J-D 25 | 29 | 54 | 3531 | 3614 | 0.8% | 1.5% | 97.7% |

## TABLE 3: NUMBER AND RATE OF STABBINGS AND SLASHINGS

The graph below shows the average monthly rate of stabbings and slashings per 100 people in custody. The table includes data for the past four Monitoring Periods.



| Systemwide Stabbings/Slashings January 2024 to December 2025 | | | | |
|---|---|---|---|---|
| Months | Total # S/S | Average/month | ADP | Rate |
| January-June 2024 | 152 | 25.3 | 6271 | 0.41 |
| July-December 2024 | 146 | 24.3 | 6489 | 0.38 |
| January-June 2025 | 141 | 23.5 | 7123 | 0.33 |
| July-December 2025 | 136 | 22.7 | 7187 | 0.32 |

*\*\*In October 2024, the Department began collecting data on "Attempted Slashings/Stabbings"\*\**

223

## TABLE 4: SERIOUS INJURIES TO INMATES

The graph below shows the number and average monthly rate of serious injuries to inmates ("SITI") per 100 people in custody.[133] Across the six years that this data has been available, the monthly rate has varied +/- 20% at times but overall has been relatively consistent with an average monthly rate of 1.5 per 100 people in custody. During this time, both AMKC and EMTC have contributed disproportionately to the number/rate of serious injuries. These statistics were developed using the *date the incident occurred,* and the data was current as of February 2026.



The chart below shows the Monitoring Team's analysis of injuries reported in CODs that identified the typical causes of serious injuries. Data from 2024-2025 revealed that fights were the most prevalent cause (65% of reported injuries), followed by accidents (27%).[134] Small proportions of serious injuries were caused by self-harm (6%) and uses of force (1%). The Department does not typically include injuries associated with uses of force or stabbings/slashings in its SITI data.[135]

---

[133] There is no consistent process for reviewing, evaluating, and investigating serious injury incidents and it is generally left to be managed by the facilities. In October 2024, the Monitoring Team recommended that the Department evaluate its current investigative procedures for serious injury to inmate incidents, which it has not yet done.

[134] Accidents include incarcerated individual injuries sustained from slipping and falling, engaging in recreational activities such as sports, accidentally slamming a body part in a door (most often fingers), or experiencing a medical emergency (such as falling onto the floor during a seizure).

[135] In a small number of cases, SITI data included serious injuries that were associated with a use of force.



The graph below shows the Monitoring Team's analysis of the time between the incident date and the date the injury severity was ultimately reported via COD. The date the injury is reported via COD is impacted by the time required for CHS to report the data to DOC, and for DOC to enter the information into the COD. The speed with which injury severity is reported following an incident has improved over time, shown by the green bars in the graph. During the current Monitoring Period, in over half of the cases (58%), the injury severity was reported within 2 days, and within 3 to 10 days in another 19% of cases.



225

## TABLE 5: NUMBER AND RATE OF FIGHTS

The graph below shows the average monthly rate of fights per 100 people in custody. The table includes data for the past four Monitoring Periods.



| Systemwide Fights January 2024 to December 2025 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| January-June 2024 | 3491 | 581.8 | 6271 | 9.3 |
| July-December 2024 | 4075 | 679.2 | 6489 | 10.5 |
| January-June 2025 | 4036 | 672.7 | 7123 | 9.4 |
| July-December 2025 | 3801 | 633.5 | 7187 | 8.86 |

## TABLE 6: NUMBER AND RATE OF ASSAULTS ON STAFF WITH UOF

The graph below shows the average monthly rate of assaults on staff (in incidents that involve a UOF) per 100 people in custody. The table includes data for the past four Monitoring Periods.



| Systewide Assaults on Staff with UOF January 2024 to December 2025 | | | | |
|---|---|---|---|---|
| Months | Total # AOS w UOF | Average/month | ADP | Rate |
| January-June 2024 | 323 | 53.8 | 6271 | 0.86 |
| July-December 2024 | 456 | 76.0 | 6489 | 1.17 |
| January-June 2025 | 462 | 77.0 | 7123 | 1.08 |
| July-December 2025 | 474 | 79.0 | 7187 | 1.10 |

227

## TABLE 7: NUMBER AND RATE OF ASSAULTS ON STAFF WITHOUT UOF

The graph below shows the average monthly rate of assaults on staff (in incidents that did not involve a UOF) per 100 people in custody. The table includes data for the past four Monitoring Periods.



*The Department began tracking assaults on staff that did not involve a use of force in 2020. Prior years' data is not available.*

| Systemwide Assaults on Staff without UOF January 2024 to December 2025 | | | | |
|---|---|---|---|---|
| Months | Total # AOS no UOF | Average/month | ADP | Rate |
| January-June 2024 | 202 | 33.7 | 6271 | 0.54 |
| July-December 2024 | 145 | 24.2 | 6489 | 0.37 |
| January-June 2025 | 190 | 31.7 | 7123 | 0.44 |
| July-December 2024 | 230 | 38.3 | 7187 | 0.53 |

228

## TABLE 8: NUMBER AND RATE OF FIRES

The graph below shows the average monthly rate of fires per 100 people in custody. The table includes data for the past four Monitoring Periods.



| Systemwide Fires January 2024 to December 2025 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| January-June 2024 | 219 | 36.5 | 6271 | 0.6 |
| July-December 2024 | 102 | 17.0 | 6489 | 0.3 |
| January-June 2025 | 195 | 32.5 | 7123 | 0.5 |
| July-December 2025 | 169 | 28.2 | 7187 | 0.4 |

229

## TABLE 9: USES OF FORCE INVOLVING INCIDENTS WHEN A STAFF MEMBER IS NOT ON POST

The table below provides the number and proportion of uses of force involving "unmanned posts," as identified by the Department, during each Monitoring Period from 2022 to 2025. These incidents occurred proximal to posts where no staff member was assigned *or* instances where the assigned officer left their post without being relieved (collectively "unmanned posts"). The first column lists the number of uses of force involving unmanned posts. The second and third columns identify the number and proportion of uses of force that involved unmanned posts **and** were deemed avoidable by the Department's Rapid Reviews, specifically due to the absence of staff on post. In other words, the Department determined that these incidents likely could have been avoided if a staff member had been present.[136]

The number of UOF incidents involving unmanned posts may appear to be only a small proportion of the overall number of UOF incidents in this Monitoring Period, however, the Monitoring Team would argue that is not the appropriate context within which such incidents should be viewed. The appropriate context must consider the fact that the staff's absence in each of these cases means that the incidents were potentially avoidable, and had staff been present and performing their duties appropriately, they may have been able to prevent, deter or mitigate the incident that led to the UOF.

| Uses of Force Incidents Involving Unmanned Posts, 2022-2025 | | | |
|---|---|---|---|
| **Monitoring Period** | **# of UOF Incidents involving Unmanned Posts** | **# of UOF Incidents involving Unmanned Posts that DOC Deemed Avoidable** | **% of UOF Incidents involving Unmanned Posts that DOC Deemed Avoidable** |
| **Jan.-Jun. 2022** | 151 | *88* | *58.3%* |
| **Jul.-Dec. 2022** | 159 | *80* | *50.3%* |
| **Jan.-Jun. 2023** | 112 | *57* | *50.9%* |
| **Jul.-Dec. 2023** | 65 | *29* | *44.6%* |
| **Jan.-Jun. 2024** | 89 | *14* | *15.7%* |
| **Jul.-Dec. 2024** | 125 | *9* | *7.2%* |
| **Jan.-Jun. 2025** | 114 | *9* | *7.9%* |
| **Jul.-Dec. 2025** | 92 | *14* | *15.2%* |

---

[136] The data shows that over time, the Department has deemed significantly fewer incidents involving unmanned posts as avoidable. However, the Department has a long history of failing to identify indicators that incidents were avoidable, as discussed in the compliance assessment for First Remedial Order § A, ¶ 1. This pattern continued during the current Monitoring Period, and so this data must be evaluated with caution.

## TABLE 10: NCU SECURITY AUDITS' FINDINGS OF STAFF OFF POST

The table below shows the number of NCU's random security audits conducted between 2022 and 2025, and the proportion that identified staff were off post.

| NCU Security Audits' Findings regarding Staff Off Post *2022-2025* | | |
| --- | --- | --- |
| **Date Audited** | **# of NCU Audits Completed** | **# (%) of Audits that found Staff Off Post** |
| January-June 2022 | 59 | 42 (71%) |
| July-December 2022 | 37 | 32 (86%) |
| January-June 2023 | 19 | 14 (74%) |
| July-December 2023 | 31 | 26 (84%) |
| January-June 2024 | 37 | 28 (76%) |
| July-December 2024 | 34 | 20 (59%) |
| January-June 2025 | 30 | 17 (57%) |
| July-December 2025 | 26 | 16 (62%) |

## TABLE 11: TIMELINESS OF 9 P.M. LOCK-IN

The graph below shows the timeliness of nightly 9 p.m. lock-in across all facilities from October 2023 through December 2025.



## TABLE 12 (A): RESH'S AVERAGE MONTHLY RATES OF KEY VIOLENCE METRICS

The table below presents the average rates of use of force incidents, stabbings/slashings, fights, assaults on staff, and fires in RESH by Monitoring Period since 2023.

| RESH's Average Monthly Rates of Key Violence Metrics | | | | | |
|---|---|---|---|---|---|
| | Use of Force | Stabbings/ Slashings | Fights | Assault on Staff | Fires |
| July-Dec 2023 | 39.2 | 3.8 | 7.2 | 8.4 | 7.8 |
| Jan-June 2024 | 42.8 | 3.2 | 4.9 | 9.3 | 11.9 |
| July-Dec 2024 | 22.1 | 1.3 | 3.8 | 6.8 | 2.9 |
| Jan-June 2025 | 27.6 | 1.5 | 6.8 | 6.9 | 4.5 |
| July-Dec 2025 | 32.4 | 1.2 | 13.1 | 6.4 | 2.4 |
| % change from previous MP | +17% | -20% | +93% | -7% | -47% |
| % change from 2023 | -17% | -68% | +90% | -24% | -69% |

## TABLE 12 (B): RESH LEVEL 1 AND LEVEL 2 COMPARISON

The table below shows the average rates of use of force incidents, stabbings/slashings, fights, assaults on staff, and fires in RESH broken down by Level 1 and Level 2 houses.

| Level 1 vs Level 2 Comparison | | | | | |
|---|---|---|---|---|---|
| | Use of Force | Stabbings/ Slashings | Fights | Assault on Staff | Fires |
| January-June 2025 | | | | | |
| Level 1 | 19.0 | 0.0 | 0.0 | 4.7 | * |
| Level 2 | 24.6 | 4.2 | 16.6 | 5.9 | * |
| July-December 2025 | | | | | |
| Level 1 | 15.1 | 0.0 | 0.0 | 4.7 | * |
| Level 2 | 27.6 | 4.4 | 19.1 | 5.0 | * |
| *The Department does not collect data on fires separated by Level 1 and Level 2.* | | | | | |

## TABLE 13 (A): NUMBER OF SEARCHES

The table below shows the number of searches performed from 2022 to 2025.

| Searches | | | | | | |
|---|---|---|---|---|---|---|
| | **2022** | **2023** | **2024** | **2025** | **Jan.-Jun. 2025** | **Jul.-Dec. 2025** |
| Facility Searches | 195,348 | 135,324 | 117,347 | 99,901 | 53,159 | 46,742 |
| Special Searches[137] | 1,390 | 658 | 278 | 356 | 189 | 167 |
| **Total** | **196,738** | **135,982** | **117,625** | **100,257** | **53,348** | **46,909** |

## TABLE 13 (B): NUMBER OF CONTRABAND RECOVERIES

The table below shows the volume of contraband recovered between 2021 and 2025.

| Contraband Recovery[138] | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan.-Jun. 2025** | **Jul.-Dec. 2025** |
| Drugs | 1,049 | 1,421 | 1,245 | 889 | 826 | 408 | 418 |
| Weapons | 3,144 | 5,507 | 2,061 | 1,602 | 2,195 | 1,215 | 980 |
| Escape-Related Item | 196 | 525 | 292 | 221 | 89 | 27 | 62 |
| Other | 878 | 1,145 | 794 | 558 | 500 | 286 | 214 |

---

[137] This includes searches by the Emergency Services Unit, the Special Search Team, the Canine Unit and/or Tactical Search Operations.

[138] The calculation of the number contraband recoveries varies depending on the type of contraband that is recovered. For example, drug contraband is counted by incident, not the actual number of items seized. If three different types of drugs were recovered in one location, this is counted as a single seizure. In contrast, when weapons are seized, each item recovered is counted separately. If three weapons were seized from a single individual, all three items are counted.

234

## TABLE 14: USE OF FORCE INCIDENTS IN INTAKE AREAS

The Monitoring Team continues to evaluate the frequency with which uses of force occur in the intake areas. The Monitoring Team has previously noted that the chaotic environment in intake areas and longer processing times (which are often mutually reinforcing) can result in a greater frequency of uses of force. Therefore, creating more stable and efficient intake processing and reducing the reliance on intake following uses of force are critical to reduce uses of force in these areas.

The table below shows the number and proportion of use-of-force incidents that occurred in intake areas from 2018 to 2025.

| *Use of Force in Intake Areas (Department-wide)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan-Jun 2025** | **Jul-Dec 2025** |
| **# of UOF in Intakes** | 913 | 1123 | 992 | 1483 | 963 | 767 | 844 | 823 | 383 | 440 |
| **Total UOF** | 5,901 | 7,169 | 6,467 | 8,194 | 7,005 | 6,784 | 6,980 | 7,736 | 3,561 | 3,614 |
| **% of UOF in Intakes** | *15%* | *16%* | *15%* | *18%* | *14%* | *11%* | *12%* | *11%* | *11%* | *12%* |

## TABLE 15: HEAD STRIKE DATA

The following table shows the number of actual and alleged head strikes between January and December 2025.

| Head Strikes January-December 2025, as of May 12, 2026 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Status | Jan-Jun 2025 **Alleged** | | Jul-Jun 2025 **Actual** | | Jul-Dec 2025 **Alleged** | | Jul-Dec 2025 **Actual** | | Total 2025 **Alleged** | | Total 2025 **Actual** | |
| | n=123 | | n=116 | | n=72 | | n=90 | | n=195 | | n=206 | |
| **Total Open** | **65** | **53%** | **62** | **53%** | **36** | **50%** | **58** | **64%** | **101** | **52%** | **120** | **58%** |
| *Open/Pending Investigation* | *65* | *53%* | *43* | *37%* | *36* | *50%* | *28* | *31%* | *101* | *52%* | *71* | *34%* |
| *Open/Will close with HS Charges* | *~* | *~* | *19* | *16%* | *~* | *~* | *30* | *33%* | *~* | *~* | *49* | *24%* |
| **Total Closed** | **58** | **47%** | **54** | **47%** | **36** | **50%** | **32** | **36%** | **94** | **48%** | **86** | **42%** |
| *Closed/No Charges* | *58\** | *44%* | *40* | *35%* | *36\** | *50%* | *23* | *26%* | *94* | *48%* | *63* | *31%* |
| *Closed/HS Charges* | *~* | *~* | *11* | *10%* | *~* | *~* | *9* | *10%* | *~* | *~* | *20* | *10%* |
| *Closed/Other Charges* | *~* | *~* | *3* | *3%* | *~* | *~* | *~* | *~* | *~* | *~* | *3* | *2%* |
| * Two of the alleged HS cases from January-June 2025 and two from July-December 2025 substantiated the HS but did not charge the staff member because the HS was deemed incidental during take-down/being secured. ** Note, an additional 21 Intake Investigations of incidents occurring between July-December 2025 are still pending, so these numbers may change. | | | | | | | | | | | | |

# APPENDIX C:
# IN-CUSTODY DEATHS

The number of people who have died while in custody is tragic and is related, at least in part, to the dangerous conditions and poor security practices in the jails as set forth below.

## TABLE 1: CAUSES OF DEATH

The table below shows the number of people who have died in custody, and the cause of death as determined by the Office of Chief Medical Examiner. In 2025, 15 individuals died in custody or shortly after their release.[139] As of June 17, 2026, four people have died in 2026.

| DOC Causes of Death<br>*2015 to June 17, 2026* | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** | **Total** |
| Accidental | | | | | | | | 1 | | | 1 | | 2 |
| COVID-19 | | | | | | 3 | 2 | | | | | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 5 | 5 | 4 | 2 | | 56 |
| Overdose | | 2 | 1 | | | | 4 | 6 | 2 | 1 | 6 | | 22 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 6 | 2 | | 3 | | 21 |
| Drowned | | | | | | | | 1 | | | | | 1 |
| Pending OCME Confirmation | | | | | | | | | | | 1 | 4 | 5 |
| Undetermined Due to Death Outside of DOC Custody | | | | | | 4 | 2 | | | | 1 | | 7 |
| Undetermined by OCME | | | 1 | | | 1 | | | | | 1 | | 3 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11** | **16** | **19** | **9** | **5** | **15** | **4** | **122** |

---

[139] If an incarcerated individual has a health condition that may merit release, the process for release requires several steps and must be ordered by the Court. The Department does not have the authority to release an individual because of a health condition, although it may certainly identify and recommend individuals that should be considered for potential release. To the extent an individual has a health condition that may merit release, CHS may issue a clinical condition letter, with the patient's consent, which is then provided to the individual's defense counsel. Counsel then may petition the Court to release the individual. Release is not automatic, and an individual determination must be made by the Court. If the Court determines that release is appropriate, the Department is notified via a Court Order that the individual is being released on their own recognizance ("ROR"). However, the Order does not specify a medical reason for the release.

238

## TABLE 2: MORTALITY RATE

The table below shows the Department's mortality rate from January 2010 to June 17, 2026. In 2025, the mortality rate increased 170% from the prior year (2.10 from 0.78) and represented the fourth highest rate in the past decade, surpassed only by the rates from 2020 to 2022. A mortality rate for 2026 cannot be developed because the year is not yet complete.

| Mortality Rate 2010-2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| **Annual ADP** | 13,026 | 12,421 | 12,083 | 11,692 | 10,913 | 9,890 | 9,802 | 9,224 | 8,397 | 7,388 |
| **Number of Deaths** | 17 | 12 | 21 | 24 | 10 | 11 | 15 | 6 | 8 | 3 |
| **Mortality Rate** | 1.31 | 0.97 | 1.74 | 2.05 | 0.92 | 1.11 | 1.53 | 0.65 | 0.95 | 0.41 |

| Mortality Rate 2020-2026 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** |
| **Annual ADP** | 4,543 | 5,574 | 5,639 | 6,054 | 6,380 | 7,155 | 6,748 |
| **Number of Deaths** | 11 | 16 | 19 | 9 | 5 | 15 | 4 |
| **Mortality Rate** | 2.42 | 2.87 | 3.37 | 1.49 | 0.78 | 2.10 | |

**TABLE 3: INVESTIGATIONS OF IN-CUSTODY DEATHS**

The table below shows the status of investigations of in-custody deaths by various agencies: the New York State Commission on Corrections (SCOC), the New York Attorney General's Office of Special Investigation (AG), New York City Office of Chief Medical Examiner (OCME), New York City Board of Corrections (BOC), and DOC's Investigation Division (ID).

| Status of Investigations *2022 to 2026* | | | | | | |
|---|---|---|---|---|---|---|
| Year | Total Deaths | SCOC Completed Investigations | AG Completed Investigations | OCME Completed Investigations | BOC Completed Investigations | ID Completed Investigations |
| **2022** | 19 | 18 | 19 | 19 | 19 | 19 |
| **2023** | 9 | 7 | 9 | 9 | 8[140] | 8 |
| **2024** | 5 | 2 | 4 | 5 | 4[141] | 4 |
| **2025** | 15 | 0 | 7 | 13 | 15 | 4[142] |
| **2026** | 4 | 0 | 0 | 0 | 0 | 0 |

---

[140] One death in 2023 was due to terminal illness and the BOC did not issue a report on this death.

[141] One death in 2024 was due to terminal illness and the BOC did not issue a report on this death.

[142] One death in 2025 was due to terminal illness and ID did not conduct an investigation.

**TABLE 4: CORRECTIVE ACTION TAKEN BY DOC RELATED TO IN-CUSTODY DEATHS, 2022-MAY 21, 2026**[143]

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| **Death of Tarz Youngblood on 2/27/2022** | | |
| CO 36 | NPA – Loss of 17 compensation days | Failed to conduct proper tours and check for signs of life |
| **Death of Dashawn Carter on 5/7/2022** | | |
| CO 1 | Suspended, resigned | Failed to make proper tours and made false entries in the logbook |
| CO 2 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 3 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 4 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Mary Yehuda on 5/18/2022** | | |
| CO 37 | NPA - Loss of 10 compensation days and 12 months limited probation | Off post, failed to conduct frequent tours, and made false entries in the logbook |
| CO 40 | NPA - Loss of 10 compensation days | Off post, failed to conduct frequent tours, and made false entries in the logbook |
| Captain 38 | Suspended - 7 days; and NPA - Loss of 10 compensation days | Failed to conduct proper tours and made false entries in the logbook |
| ADW 39 | Reprimand (Returned to Command) | Failed to produce a COD package |
| **Death of Emanuel Sullivan on 5/28/2022** | | |
| CO 41 | NPA - Loss of 30 days and 12 months limited probation | Failed to conduct proper tours and made false entries in the logbook |
| **Death of Anibal Carrasquillo on 6/20/2022** | | |
| CO 20 | Suspended - 30 days | Failure to conduct proper tour |
| CO 21 | Suspended - 30 days | Failure to conduct proper tour/off post |
| **Death of Elijah Muhammad on 7/11/2022** | | |
| CO 5 | Terminated | Failed to notify supervisor or medical staff |
| **Death of Michael Lopez on 7/15/2022** | | |
| CO 6 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |

---

[143] Given that the investigations into some of these deaths remain open, additional discipline may be forthcoming.

241

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| CO 7 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 8 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Ricardo Cruciani on 8/15/2022** | | |
| Captain 9 | Suspended - 30 days | Failed to conduct tour |
| **Death of Michael Nieves on 8/30/2022** | | |
| CO 10 | Suspended - 30 days | Failed to render aid |
| CO 11 | Suspended - 30 days | Failed to render aid and provide timely report |
| Captain 12 | Suspended - 30 days | Failure to supervise |
| **Death of Erick Tavira on 10/22/2022** | | |
| CO 13 | Suspended - 7 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Gilberto Garcia on 10/31/2022** | | |
| CO 14 | Suspended - 7 days | Failed to conduct tour |
| **Death of Marvin Pines on 2/4/2023** | | |
| CO 15 | Suspended - 6 days | Failed to conduct tours/off post |
| CO 16 | Suspended - 6 days | Failed to conduct tour |
| Captain 17 | Suspended - 15 days | Failed to make proper tours and made false entries in the logbook |
| ADW 18 | Suspended - 30 days | Failed to conduct tours/supervise |
| ADW 19 | Suspended - 6 days | Failed to supervise |
| **Death of Joshua Valles on 5/27/2023** | | |
| Captain 52 | Command Discipline – loss of 9 compensation days and demotion to CO | Failed to produce for medical evaluation within 4 hours of a fight |
| **Death of Felix Taveras on 7/4/2023** | | |
| CO 22 | Suspended - 30 days | Failed to intervene and enforce lock in |
| CO 23 | Suspended - 15 days | Failed to intervene |
| CO 24 | Suspended - 30 days | Failed to conduct tour |
| ADW 25 | Suspended - 15 days | Failed to identify misconduct |
| **Death of Ricky Howell on 7/6/2023** | | |
| Captain 26 | Documented Counseling | Failed to call incident into COD within required time frame |
| **Death of William Johnstone on 7/15/2023** | | |
| Captain 27 | Suspended - 7 days | Failed to conduct proper tour |

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| CO 28 | Suspended - 15 days | Permitting unauthorized person or employee on their post |
| CO 29 | Suspended - 30 days | Failed to conduct proper tour and abandoned post |
| CO 45 | Unknown | Failed to conduct proper tour |
| **Death of Curtis Davis on 7/23/2023** | | |
| CO 30 | Suspended - 30 days | Off post |
| CO 31 | Suspended - 15 days | Failed to secure post |
| ADW 32 | Suspended - 7 days | Failed to conduct proper tour |
| **Death of Manish Kunwar on 10/5/2023** | | |
| Captain 33 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 34 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 35 | Suspended - 30 days | Disobeying a direct order to relieve fellow CO |
| **Death of Ramel Powell on 2/19/2025** | | |
| CO 42 | Terminated | Failed to act and failed to conduct meaningful tours by checking for signs of life |
| **Death of Dashawn Jenkins on 3/31/2025** | | |
| CO 43 | Suspended – 30 days | Conduct unbecoming |
| CO 44 | Suspended – 30 days | Conduct unbecoming |
| **Death of Edwin Quispe on 7/22/2025** | | |
| CO 45 | Suspended – 30 days | Abandoned Post |
| **Death of Ardit Billa on 8/23/2025** | | |
| Captain 46 | Suspended – 28 days | Failed to conduct proper tour |
| CO 47 | Suspended – 30 days | Off post |
| CO 48 | Suspended – 15 days | Unauthorized person on post |
| **Death of Carlos Cruz on 9/3/2025** | | |
| CO 49 | Suspended – 30 days | Failed to conduct proper tours and check for signs of life |
| Captain 50 | Suspended – 15 days | Failed to conduct proper tours and check for signs of life |
| **Death of Aramis Furse on 12/7/2025** | | |
| CO 51 | Suspended – 30 days | Failed to check for signs of life, failed to remain alert, and false logbook entries |
| **Death of Barry Cozart on 3/25/2026** | | |
| Captain 53 | Suspended – 30 days | Failed to conduct meaningful tours |
| CO 54 | Suspended – 30 days | Failed to conduct meaningful tours |
| **Death of Umais Kahn on 5/19/2026** | | |

243

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| CO 55 | Suspended – 10 days | Failed to conduct meaningful tours and left post unauthorized and failed to return. |

# APPENDIX D:
# USE OF FORCE REVIEWS & INVESTIGATIONS

### TABLE 1: OUTCOMES OF RAPID REVIEWS CONDUCTED BY THE FACILITIES

The table below shows the number and outcome of Rapid Reviews conducted by the facilities from January 2018 through December 2025.

| Rapid Review Outcomes, January 2018 to December 2025 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Jan-Jun 2025 | Jul-Dec 2025 |
| Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations | | | | | | | | | | |
| Number of Rapid Reviews | 4,257 (95% of UOF) | 6,899 (97% of UOF) | 6,067 (98% of UOF) | 7,972 (98% of UOF) | 6,889 (98% of UOF) | 6,740 (99% of UOF) | 6,969 (>99% of UOF) | 7,135 (99% of UOF) | 3,562 (100% of UOF) | 3,573 (99% of all UOF) |
| Avoidable | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 1,135 (16%) | 630 (9%) | 322 (5%) | 391 (5%) | 171 (5%) | 220 (6%) |
| UOF or Chemical Agent Policy Violations | ■ | | 345[144] (11%) | 1,233 (16%) | 835 (12%) | 1,161 (17%) | 3,442 (49% of UOF)[145] | 3,990 (56% of UOF) | 1,896 (53% of UOF) | 2,094 (57% of UOF) |
| Procedural Violations | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 3,296 (48%) | 2,545 (38%) | | | | |
| Staff Recommended for Corrective Action | | | | | | | | | | |
| Number of Staff Recommended for Corrective Action[146] | ~ | ~ | 2,040 | 2,970 | 2,417 | 2,756 | 3,149 | 3,633 | 1,666 | 1,967 |

[144] Data for 2020 UOF/Chemical Agent Policy Violations include only July-December.

[145] The Rapid Review template was revised so that staff now enter *all* violations in one place, including UOF Policy violations, Chemical Agent Policy violations, and Procedural Violations. This revision was intended to improve the accuracy of information entered into the Rapid Reviews by streamlining the entry of information and removing staff's need to distinguish between the types of violations at this stage of an incident review. This revised template went into effect in January 2024.

[146] This data captures referrals for corrective action as recommended by the Rapid Reviews shared with the Monitoring Team. The Rapid Review (and therefore this data) does not include information on whether the corrective action referrals were enacted as recommended.

## TABLE 2: CORRECTIVE ACTIONS RECOMMENDED VIA RAPID REVIEWS CONDUCTED BY THE FACILITIES

The table below shows the number of corrective actions recommended[147] via Rapid Reviews conducted by the facilities from January 2021 through December 2025.

| Incident Date | Rapid Review Corrective Action Recommendations | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Jan-Jun 2021 (12th MP) | Jul-Dec 2021 (13th MP) | Jan-Jun 2022 (14th MP) | Jul-Dec 2022 (15th MP) | Jan-Jun 2023 (16th MP) | Jul-Dec 2023 (17th MP) | Jan-Jun 2024 (18th MP) | Jul-Dec 2024 (19th MP) | Jan-Jun 2025 (20th MP) | Jul-Dec 2025 (21st MP) |
| 5003 Counseling | 1277 / 37% | 1327 / 39% | 1064 / 34% | 438 / 17% | 440 / 19% | 592 / 27% | 527 / 19% | 587 / 21% | 1173 / 38% | 796 / 22% |
| Corrective Interview | 572 / 16% | 713 / 21% | 947 / 31% | 582 / 23% | 441 / 19% | 555 / 25% | 628 / 22% | 817 / 30% | 913 / 30% | 794 / 22% |
| Command Discipline (CD) | 1229 / 35% | 1126 / 33% | 907 / 29% | 1216 / 48% | 1007 / 44% | 723 / 33% | 1431 / 50% | 1066 / 39% | 771 / 25% | 1703 / 48% |
| Retraining | 311 / 9% | 123 / 4% | 108 / 3% | 184 / 7% | 221 / 10% | 154 / 7% | 200 / 7% | 207 / 8% | 168 / 5% | 162 / 5% |
| MOC | 33 / 1% | 30 / 1% | 25 / 1% | 74 / 3% | 105 / 5% | 83 / 4% | 31 / 1% | 14 / 1% | 32 / 1% | 55 / 2% |
| Suspension | 41 / 1% | 28 / 1% | 29 / 1% | 30 / 1% | 52 / 2% | 68 / 3% | 16 / 1% | 31 / 1% | 24 / 1% | 21 / 1% |
| Referral to EISS | 17 / <1% | 15 / <1% | 8 / <1% | 1 / <1% | 1 / <1% | 4 / <1% | 4 / <1% | 12 / <1% | 2 / <1% | 21 / 1% |
| Referral to CARE | 2 / <1% | 2 / <1% | 3 / <1% | 4 / <1% | 0 / - | 0 / - | 0 / - | 0 / - | 1 / <1% | 3 / <1% |
| No PIC Contact | 0 / - | 1 / <1% | 0 / - | 0 / - | 0 / - | 1 / <1% | 0 / - | 0 / - | 5 / <1% | 1 / <1% |
| 5003 Counseling + Corrective Interviews + CDs | 3078 / 88% | 3166 / 94% | 2918 / 94% | 2236 / 88% | 1888 / 83% | 1870 / 86% | 2586 / 91% | 2470 / 90% | 2857 / 92% | 3293 / 93% |

---

[147] This data counts the number of corrective action referrals. An individual staff member can be recommended for two or more different types of corrective action for their involvement in a single incident.

| Rapid Review Corrective Action Recommendations | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Incident Date | Jan–Jun 2021 (12th MP) | Jul–Dec 2021 (13th MP) | Jan–Jun 2022 (14th MP) | Jul–Dec 2022 (15th MP) | Jan–Jun 2023 (16th MP) | Jul–Dec 2023 (17th MP) | Jan–Jun 2024 (18th MP) | Jul–Dec 2024 (19th MP) | Jan–Jun 2025 (20th MP) | Jul–Dec 2025 (21st MP) |
| Total # of Actions Recommended[148] | 3482 | 3365 | 3091 | 2529 | 2267 | 2180 | 2837 | 2734 | 3089 | 3556 |

---

[148] *See* the preceding footnote.

## TABLE 3 (A): ID SUPERVISORS ASSIGNED TO UOF CASES

The table below shows the number of supervisors assigned to ID's use of force investigation-level teams at specific times since 2020.

| ID Supervisors Assigned to UOF Cases | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Feb 2020 | Jan 2021 | Jan 2022 | Jan 2023 | Jun 2023 | Dec 2023 | Jun 2024 | Dec 2024 | June 2025 | Dec 2025 |
| Rapid Reviews | | | | | 2 | 2 | 2 | 2 | 3 | 2 |
| Intake Squad | 8 | 10 | 13 | 12 | 8 | 10 | 10 | 11 | 9 | 8 |
| Full ID | 15 | 10 | 7 | 3 | 3 | 5 | 5 | 4 | 4 | 3 |
| UPS | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Total** | **24** | **21** | **21** | **15** | **14** | **18** | **18** | **18** | **17** | **14** |

## TABLE 3 (B): ID INVESTIGATORS ASSIGNED TO UOF CASES

The table below shows the number of investigators assigned to ID's use of force investigation-level teams at specific times since 2020.

| ID Investigators Assigned to UOF Cases | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Feb 2020 | Jan 2021 | Jan 2022 | Jan 2023 | Jun 2023 | Dec 2023 | Jun 2024 | Dec 2024 | June 2025 | Dec 2025 |
| Rapid Reviews | | | | | 8 | 10 | 10 | 10 | 10 | 11 |
| Intake Squad | 32 | 51 | 51 | 51 | 32 | 35 | 31 | 38 | 33 | 32 |
| Full ID | 82 | 58 | 36 | 10 | 12 | 22 | 21 | 23 | 24 | 21 |
| UPS | 4 | 3 | 3 | 4 | 5 | 5 | 4 | 5 | 5 | 6 |
| **Total** | **118** | **112** | **90** | **65** | **57** | **72** | **66** | **76** | **72** | **70** |

## TABLE 4: SUMMARY OF ID HIRES AND DEPARTURES

The table below shows the number of ID hires and departures and the net gains/losses to ID's staffing from 2022 to 2025.

| | Total Investigator | Civilian Investigator | Uniformed Investigator | Total Supervisor | Civilian Supervisor | Uniformed Supervisor | Administrative/ Clerical | Deputy Director | Director | Agency Attorney | Assistant/Associate Commissioner | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Summary of ID Hires & Departures Net Gains & Losses** | | | | | | | | | | | | |
| **January 2022 to December 2022** | | | | | | | | | | | | |
| **Hired 2022** | 28 | 28 | 0 | 3 | 2 | 1 | 0 | 2 | 1 | 0 | 2 | **36** |
| **Departed 2022** | 43 | 32 | 11 | 9 | 7 | 2 | 0 | 3 | 4 | 2 | 0 | **61** |
| **Net Gain/Loss** | **-15** | **-4** | **-11** | **-6** | **-5** | **-1** | **0** | **-1** | **-3** | **-2** | **2** | **-25** |
| **January 2023 to December 2023** | | | | | | | | | | | | |
| **Hired 2023** | 46 | 42 | 4 | 15 | 6 | 9 | 2 | 4 | 0 | 0 | 1 | **68** |
| **Departed 2023** | 60 | 47 | 13 | 22 | 11 | 11 | 2 | 4 | 2 | 0 | 3 | **93** |
| **Net Gain/Loss** | **-14** | **-5** | **-9** | **-7** | **-5** | **-2** | **0** | **0** | **-2** | **0** | **-2** | **-25** |
| **January 2024 to December 2024** | | | | | | | | | | | | |
| **Hired 2024** | 30 | 30 | 0 | 9 | 9 | 0 | 3 | 6 | 2 | 0 | 1 | **51** |
| **Departed 2024** | 20 | 20 | 0 | 6 | 6 | 0 | 2 | 3 | 0 | 0 | 1 | **32** |
| **Net Gain/Loss** | **10** | **10** | **0** | **3** | **3** | **0** | **1** | **3** | **2** | **0** | **0** | **19** |

| | Total Investigator | *Civilian Investigator* | *Uniformed Investigator* | Total Supervisor | *Civilian Supervisor* | *Uniformed Supervisor* | Administrative/ Clerical | Deputy Director | Director | Agency Attorney | Assistant/Associate Commissioner | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Summary of ID Hires & Departures**<br>**Net Gains & Losses** | | | | | | | | | | | | |
| **January to June 2025** | | | | | | | | | | | | |
| **Hired Jan-Jun 2025** | 12 | 12 | 0 | 4 | 4 | 0 | 0 | 2 | 0 | 0 | 0 | 18 |
| **Departed Jan-Jun 2025** | 14 | 13 | 1 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 19 |
| **Net Gain/Loss** | -2 | -1 | -1 | -1 | -1 | 0 | 0 | 2 | 0 | 0 | 0 | -1 |
| **July to December 2025** | | | | | | | | | | | | |
| **Hired Jul-Dec 2025** | 10 | 9 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 11 |
| **Departed Jul-Dec 2025** | 13 | 9 | 4 | 4 | 2 | 2 | 0 | 0 | 1 | 0 | 0 | 18 |
| **Net Gain/Loss** | -3 | 0 | -3 | -4 | -2 | -2 | 0 | 0 | -1 | 0 | 1 | -7 |

251

## TABLE 5: STATUS OF INVESTIGATIONS OF UOF INCIDENTS

The table below shows the status of all investigations of UOF incidents that occurred between January 2020 and December 2025, *as of February 17, 2026.*[149]

| Status of Investigations of UOF Incidents Occurring Between January 2020 and December 2025 *as of February 17, 2026* | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Incident Date | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | | 2025 | | Jan.-Jun. 2025 (20th MP) | | Jul.-Dec. 2025 (21st MP) |
| Total UOF Incidents[150] | 6,399 | | 8,413 | | 7,231 | | 6,958 | | 7,152 | | 7,305 | | 3,629 | | 3,676 |
| Pending Intake Invest. | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 366 | 5% | 1 | <1% | 365 | 10% |
| Pending Full ID Invest. | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 200 | 3% | 304 | 4% | 180 | 5% | 124 | 3% |
| Total Closed Invest. | 6,399 | 100% | 8,413 | 100% | 7,231 | 100% | 6,958 | 100% | 6,952 | 97% | 6,635 | 91% | 3,448 | 95% | 3,187 | 87% |

---

[149] All investigations of incidents that occurred prior to 2020 were closed during previous Monitoring Periods and thus are not included in this table.

[150] Incidents are categorized by the date they occurred or were alleged to have occurred, and therefore these numbers fluctuate very slightly across Monitoring Periods as allegations are sometimes made many months after the incident is alleged to have occurred. The data are updated thereafter.

## TABLE 6: STATUS OF FULL ID INVESTIGATIONS

The table below shows the status of Full ID Investigations for all incidents that occurred between January 2024 and December 2025 (n=1,216), *as of February 17, 2025.*[151]

| Status of Full ID Investigations for incidents that *occurred* between January 2024-December 2025 *As of February 17, 2025* | | | | |
|---|---|---|---|---|
| *Pending* 120 Days or Less | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | Total |
| 49 | 160 | 552 | 455 | 1,216 |
| *4%* | *13%* | *45%* | *37%* | |

---

[151] The date range of January 2024 to December 2025 was utilized because it captures *all* pending Full ID investigations as of the end of this Monitoring Period. All investigations, including Full ID investigations, have been completed for uses of force that occurred prior to January 2024. Given that Full ID investigations can take months to complete, it is common for a Full ID investigation to be completed in a different Monitoring Period than the Monitoring Period in which the incident occurred.

## TABLE 7: LAW ENFORCEMENT REFERRALS

The table below shows the number and status of cases that have been referred to outside law enforcement agencies for investigation and potential prosecution, *as of December 31, 2025*.

| Law Enforcement Referrals *As of December 31, 2025* | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Date of Incident** | **2014 & 2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Total** | |
| **Total** | **9** | **16** | **27** | **22** | **11** | **15** | **7** | **11** | **12** | **26** | **22** | **178** | |
| Criminal Charges Brought / Trial Underway or Complete | 0 | 2 | 0 | 2 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | **8** | **4%** |
| Pending Consideration with Law Enforcement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 9 | **14** | **8%** |
| Returned to ID for Administrative Processing | 9 | 14 | 27 | 20 | 9 | 14 | 6 | 11 | 12 | 21 | 13 | **156** | **88%** |

254

## TABLE 8 (A): RESULTS OF INTAKE INVESTIGATION AUDITS BY DATE OF INITIAL INTAKE INVESTIGATION

The table below shows the results of ID's internal quality assurance audits of closed Intake Investigations *as of February 17, 2026*. These data are categorized by the date the initial Intake Investigation was closed by ID.

| Results of Intake Investigation QA Audits *As of February 17, 2026* | | |
| --- | --- | --- |
| **Date Initial Intake Investigation Closed** | **# of Investigations Audited** | **Audit Identified an Issue with the Initial Investigation[152]** |
| **January-June 2023** | 676 | 180 *(27%)* |
| **July-December 2023** | 632 | 135 *(21%)* |
| **January-June 2024** | 791 | 240 *(30%)* |
| **July-December 2024** | 712 | 172 *(24%)* |
| **January-June 2025** | 621 | 173 *(28%)* |
| **July-December 2025** | 16 | 2 *(13%)* |

---

[152] As a result of the QA audit for these Intake Investigations, ID took additional action for these cases (*e.g.*, updating the investigation's closing report, updating the video preservation, pursuing additional corrective action against the MOS involved in the use of force, counseling the investigator).

**TABLE 8 (B): NUMBER OF INTAKE INVESTIGATION QA AUDITS COMPLETED**

The table below shows the number of ID's internal quality assurance audits of closed Intake Investigations conducted in each Monitoring Period, *as of February 17, 2026*. These data are categorized by the date the QA audit was completed.

| Number of Intake Investigations QA Audits Completed *As of February 17, 2026* | |
|---|---|
| **Date QA Audit Completed** | **# of Investigations Audited** |
| **March-June 2023** | 418 |
| **July-December 2023** | 532 |
| **January-June 2024** | 835 |
| **July-December 2024** | 660 |
| **January-June 2025** | 619 |
| **July-December 2025** | 384 |

**TABLE 9 (A): RESULTS OF FULL ID INVESTIGATION AUDITS BY DATE OF INITIAL FULL ID INVESTIGATION**

The table below shows the results of ID's internal quality assurance audits of closed Full ID Investigations *as of February 17, 2026*. These data are categorized by the date the initial Full ID Investigation was closed by ID.

| Results of Full ID Investigation QA Audits *As of February 17, 2026* | | |
|---|---|---|
| **Date Initial Full ID Investigation Closed** | **# of Investigations Audited** | **Audit Identified an Issue with the Initial Investigation**[153] |
| **January-June 2022** | 2 | 1 *(50%)* |
| **July-December 2022** | 0 | - |
| **January-June 2023** | 21 | 18 *(86%)* |
| **July-December 2023** | 17 | 11 *(65%)* |
| **January-June 2024** | 21 | 9 *(43%)* |
| **July-December 2024** | 13 | 8 *(62%)* |
| **January-June 2025** | 6 | 2 *(33%)* |
| **July-December 2025** | 11 | 7 *(64%)* |

---

[153] As a result of the QA audit for these Full ID Investigations, ID took additional action for these cases (*e.g.*, updating the investigation's closing report, conducting further investigative actions, pursuing additional corrective action against the MOS involved in the use of force, counseling the investigator). The Monitoring Team excluded cases where the audit identified that the only issues with the initial Full ID investigation were grammatical issues.

## TABLE 9 (B): NUMBER OF FULL ID INVESTIGATION QA AUDITS COMPLETED

The table below shows the number of ID's internal quality assurance audits of closed Full ID Investigations completed in each Monitoring Period, *as of February 17, 2026*. These data are categorized by the date the QA audit was completed.

| Number of Full ID Investigation QA Audits Completed *As of February 17, 2026* | |
| --- | --- |
| Date QA Audit Completed | # of Investigations Audited |
| April-June 2023 | 22 |
| July-December 2023 | 16 |
| January-June 2024 | 21 |
| July-December 2024 | 14 |
| January-June 2025[154] | 7 |
| July-December 2025 | 11 |

[154] ID leadership reported that fewer Full ID audits were conducted this Monitoring Period because Full ID leadership was focused on categorizing and addressing the backlog of Full ID investigations as described in the compliance assessment for Consent Judgment § VII., ¶ 1 and § VII., ¶ 9 (a). Additionally, as a part of the broader efforts to improve investigation quality, ID leadership reviewed more Full ID investigations that were near-final but not yet closed so that they could coach the investigators on how to resolve any quality concerns.

## TABLE 10: OUTCOME OF INTAKE INVESTIGATIONS

The table below shows the outcome of Intake Investigations from February 3, 2020 (the inception of Intake Investigations) through December 2025, *as of January 31, 2026*.

| Outcome of Intake Investigations[155] as of January 31, 2026 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date[156]** | *July to Dec. 2020 (11th MP)* | *Jan. to June 2021 (12th MP)* | *July to Dec. 2021 (13th MP)* | *Jan. to June 2022 (14th MP)* | *July to Dec. 2022 (15th MP)* | *Jan. to June 2023 (16th MP)* | *Jul. to Dec. 2023 (17th MP)* | *Jan. to June 2024 (18th MP)* | *Jul. to Dec. 2024 (19th MP)* | *Jan. to June 2025 (20th MP)* | *Jul. to Dec. 2025 (21st MP)* |
| Pending Intake Investigation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 536[157] |
| **Closed Intake Investigations** | **3,278** | **4,476** | **3,946** | **3,349** | **3,883** | **3,317** | **3,642** | **3,590** | **3,562** | **3,629** | **3,140** |
| *No Action[158]* | *1,278 39%* | *1,385 31%* | *971 25%* | *1,259 38%* | *2,002 52%* | *1,571 47%* | *1,156 32%* | *1,023 28%* | *872 24%* | *822 23%* | *979 31%* |
| *MOC* | *11 <1%* | *7 <1%* | *5 <1%* | *13 <1%* | *20 1%* | *42 1%* | *36 1%* | *17 <1%* | *29 1%* | *26 1%* | *58 2%* |
| *PDR* | *2* | *0* | *0* | *1* | *2* | *2* | *2* | *2* | *2* | *8* | *11* |

---

[155] For the purpose of this chart, the results of the Intake Investigations only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC *and* a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart.

[156] The data on the outcomes of intake investigations for incidents that occurred between February 3, 2020 and June 30, 2020 was last included in the Monitor's November 22, 2024 Report (dkt. 802) at pg. 96.

[157] Given the number of pending intake investigations from July-December 2025, it is likely that the number of cases closed with actions, whether it be corrective actions, facility referrals, or referrals to Full ID is expected to increase.

[158] With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the facility via Rapid Review and ID determined that the action recommended in the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better understood as cases in which either no violation was identified, or ID *did not identify additional staff behaviors requiring disciplinary or corrective action beyond what had already been identified and taken by the facilities*.

| | **Outcome of Intake Investigations**[155] *as of January 31, 2026* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date**[156] | *July to Dec. 2020 (11th MP)* | *Jan. to June 2021 (12th MP)* | *July to Dec. 2021 (13th MP)* | *Jan. to June 2022 (14th MP)* | *July to Dec. 2022 (15th MP)* | *Jan. to June 2023 (16th MP)* | *Jul. to Dec. 2023 (17th MP)* | *Jan. to June 2024 (18th MP)* | *Jul. to Dec. 2024 (19th MP)* | *Jan. to June 2025 (20th MP)* | *Jul. to Dec. 2025 (21st MP)* |
| *Corrective Interview* | | | | | | | 2 | 5 | 3 | 0 | 0 |
| *Command Discipline* | | | | | | 100 3% | 109 3% | 255 7% | 187 5% | 159 4% | 281 9% |
| *Re-Training* | 224 7% | 342 8% | 90 2% | 35 1% | 38 1% | 86 3% | 161 4% | 93 3% | 107 3% | 59 2% | 48 2% |
| *Facility Referral* | 1,160 35% | 1,901 43% | 2,181 55% | 1,642 49% | 1,354 35% | 1,146 35% | 1,803 50% | 1,816 51% | 2,007 56% | 2,244 62% | 1,582 50% |
| *Referred for Full ID* | 598 18% | 837 19% | 672 17% | 376 11% | 454 12% | 349 11% | 350 10% | 379 11% | 353 10% | 310 9% | 181 6% |
| *Data Entry Errors*[159] | 5 | 4 | 27 | 23 | 13 | 21 | 23 | 0 | 2 | 1 | 0 |
| **Total Number of Use of Force Incidents** | **3,278** | **4,476** | **3,946** | **3,349** | **3,883** | **3,317** | **3,642** | **3,590** | **3,562** | **3,630** | **3,676** |

---

[159] These investigations had data entry errors in the Intake Squad Tracker. The Monitoring Team was unable to determine the outcome for these cases but is working with the Department to fix these errors.

## TABLE 11: INVESTIGATION FINDINGS

The table below shows the findings of Intake and Full ID Investigations that were closed *as of January 31, 2026*. The investigation findings included assessments of whether the incident was excessive, unnecessary, and/or avoidable.[160]

| | Investigations Findings As January 31, 2026 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Incident Date[161] | *July to Dec. 2020 (11th MP)* | *Jan. to Jun. 2021 (12th MP)* | *July to Dec. 2021 (13th MP)* | *Jan. to Jun. 2022 (14th MP)* | *Jul. to Dec. 2022 (15th MP)* | *Jan. to Jun. 2023 (16th MP)* | *Jul. to Dec. 2023 (17th MP)* | *Jan. to Jun. 2024 (18th MP)* | *Jul. to Dec. 2024 (19th MP)* | *Jan. to Jun. 2025 (20th MP)* | *Jul. to Dec. 2025 (21st MP)* |
| **All Incidents** | **3,278** | **4,476** | **3,946** | **3,349** | **3,883** | **3,317** | **3,642** | **3,590** | **3,562** | **3,630** | **3,676** |
| *Investigations Closed at Intake* | 2,680 | 3,639 | 3,274 | 2,973 | 3,429 | 2,968 | 3,292 | 3,211 | 3,209 | 3,319 | 2,959 |
| *Referred for Full ID* | 598 | 837 | 672 | 376 | 454 | 349 | 350 | 379 | 353 | 310 | 181 |
| *Closed Full ID Investigations* | 598 | 837 | 672 | 376 | 454 | 349 | 350 | 378 | 154 | 130 | 63 |
| *Findings of Investigations Closed at Intake* | | | | | | | | | | | |
| Investigations Closed at Intake | 2,680 | 3,639 | 3,274 | 2,973 | 3,429 | 2,968 | 3,292 | 3,211 | 3,209 | 3,319 | 2,959 |
| *Excessive, and/or Unnecessary, and/or Avoidable* | *454* | *698* | *626* | *523* | *462* | *372* | *394* | *315* | *329* | *236* | *202* |

---

[160] The Department and the Monitoring Team have not finalized an agreed upon definition of these terms. A concrete, objective and shared understanding of what each category is intended to capture is necessary to ensure reliable and consistent findings.

[161] The data on investigation findings for incidents that occurred between February 3, 2020 and June 30, 2020 was last included in the Monitor's November 22, 2024 Report (dkt. 802) at pg. 94.

| Investigations Findings<br>*As January 31, 2026* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date**[161] | *July to Dec. 2020 (11th MP)* | *Jan. to Jun. 2021 (12th MP)* | *July to Dec. 2021 (13th MP)* | *Jan. to Jun. 2022 (14th MP)* | *Jul. to Dec. 2022 (15th MP)* | *Jan. to Jun. 2023 (16th MP)* | *Jul. to Dec. 2023 (17th MP)* | *Jan. to Jun. 2024 (18th MP)* | *Jul. to Dec. 2024 (19th MP)* | *Jan. to Jun. 2025 (20th MP)* | *Jul. to Dec. 2025 (21st MP)* |
| *Chemical Agent Violation* | *150* | *239* | *306* | *286* | *207* | *209* | *273* | *368* | *349* | *374* | *338* |
| ***Findings of Closed Full ID Investigations*** | | | | | | | | | | | |
| Closed Full ID Investigations | 598 | 837 | 672 | 376 | 454 | 349 | 350 | 378 | 154 | 130 | 63 |
| *Excessive, and/or Unnecessary* | *86* | *75* | *51* | *62* | *70* | *76* | *53* | *47* | *20* | *14* | *4* |
| ***Findings of All Closed Investigations*** | | | | | | | | | | | |
| Closed Investigations | 3,278 | 4,476 | 3,946 | 3,349 | 3,883 | 3,317 | 3,642 | 3,589 | 3,363 | 3,449 | 3,022 |
| *Excessive, and/or Unnecessary, and/or Avoidable* | *540 (16%)* | *773 (17%)* | *677 (17%)* | *585 (17%)* | *532 (14%)* | *448 (14%)* | *447 (12%)* | *362 (10%)* | *349 (10%)* | *250 (7%)* | *206 (7%)* |

## TABLE 12: USE OF FORCE INCIDENTS WITH CHARGES

The graph below illustrates the changes in the number and proportion of use of force incidents from January 2016 to December 2025 where at least one staff member was referred for formal discipline charges. These data were calculated *as of December 30, 2025*.[162]



---

[162] The data for 2022 and 2023 incidents includes referrals that were made as part of the lookback initiative in which the original case findings did not identify misconduct, but the subsequent review resulted in a finding that merited the referral for charges. Furthermore, data for investigations in 2024 and 2025 is not final, as 1,638 cases are still pending with ID.

# APPENDIX E:
# DATA RELATED TO RESPONSES TO STAFF MISCONDUCT

## TABLE 1: ACCOUNTABILITY FOR STAFF'S USE OF FORCE RELATED MISCONDUCT

The table below shows the type of accountability imposed for staff's use-of-force-related misconduct. This only includes corrective action that the Department reports was, in fact, *imposed*.

265

| Accountability Imposed for Staff's Use of Force Related Misconduct, 2019 to 2025 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2019**[163] | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan.- Jun. 2025 20th MP** | **Jul.-Dec. 2025 21st MP** |
| **Support and Guidance Provided to Staff** | | | | | | | | | |
| Corrective Interviews and 5003 Counseling | 2,700[164] | 1,378[165] | 3,205 | 2,532 | 1,723 | 2,455 | 3,569 | 1,994 | 1,575 |
| Corrective Interviews (resulting from CDs) | 53 | 32 | 38 | 76 | 79 | 401 | 72 | 61 | 11 |
| **Corrective Action—Command Discipline & Suspension** | | | | | | | | | |
| CD – Reprimand | 156 | 126 | 270 | 319 | 114 | 497 | 192 | 67 | 125 |
| CD resulting in 1-10[166] days deducted | 879 | 673 | 794 | 739 | 798 | 857 | 987 | 262 | 725 |
| Suspension, by date imposed | 48 | 80 | 83 | 66 | 136 | 62 | 57 | 25 | 32 |
| *Total* | *1,083* | *879* | *1,147* | *1,124* | *1,048* | *1,416* | *1,236* | *354* | *882* |
| **Formal Discipline** | | | | | | | | | |
| PDR | 81 | 49 | 2 | 1 | 22 | 22 | 45 | 17 | 28 |
| NPA | 218 | 327 | 460 | 1,808 | 630 | 425 | 372 | 196 | 176 |
| *Total* | *299* | *376* | *462* | *1,809* | *652* | *447* | *417* | *213* | *204* |
| **Total Number of Staff Held Accountable** | | | | | | | | | |
| **Total** | **1,382** | **1,255** | **1,609** | **2,933** | **1,700** | **1,863** | **1,653** | **567** | **1,086** |

---

[163] Counseling that occurred during the 8th Monitoring Period was focused on a more holistic assessment of the staff member's conduct pursuant to specific standards set by Consent Judgment, § X, ¶ 2, Risk Management that was subsequently revised. *See* Monitor's October 28, 2019 Report (dkt. 332) at pgs. 172-173.

[164] The identification of staff for counseling was in transition during the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. *See* Monitor's May 29, 2020 Report (dkt. 341) at pgs. 194-196.

[165] The Department completed the transition to its new process for identifying staff for counseling during this Monitoring Period. *See* Monitor's October 23, 2020 Report (dkt. 360) at pgs. 168-170.

[166] In October 2022, the Department promulgated a revised CD policy which expanded the allowable penalty for a CD from a maximum of 5 days to 10 days.

## TABLE 2: IMMEDIATE CORRECTIVE ACTION

The table below shows the frequency of Immediate Corrective Action imposed for use-of-force-related misconduct from 2020 to 2025, according to the date of the incident.

| Immediate Corrective Action Imposed for UOF Related Misconduct, by Incident Date | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | | 2025 | | Jan.-June 2025 | | July-Dec. 2025 | |
| Counseling and Corrective Interviews[167] | 1,410 | 61% | 3,243 | 74% | 2,608 | 69% | 1,802 | 63% | 2,856 | 66% | 3,641 | 75% | 2,055 | 85% | 1,586 | 64% |
| Suspension | 80 | 3% | 83 | 2% | 75 | 2% | 124 | 4% | 60 | 1% | 57 | 1% | 28 | 1% | 29 | 1% |
| Modified Duty or No Inmate Contact | 5 | <1% | 6 | <1% | 16 | <1% | 14 | <1% | 35 | 1% | 7 | <1% | 3 | <1% | 4 | <1% |
| *Total Suspensions & Modified Duty/No Inmate Contact* | *85* | *4%* | *89* | *2%* | *91* | *2%* | *138* | *5%* | *95* | *2%* | *64* | *1%* | *31* | *1%* | *33* | *1%* |
| CD – Reprimand | 126 | 5% | 270 | 6% | 319 | 8% | 114 | 4% | 497 | 12% | 192 | 4% | 67 | 3% | 125 | 5% |
| CD resulting in 1-10[168] days deducted | 673 | 29% | 794 | 18% | 739 | 20% | 798 | 28% | 857 | 20% | 987 | 20% | 262 | 11% | 725 | 29% |
| **Total[169]** | **2,294** | | **4,396** | | **3,757** | | **2,852** | | **4,305** | | **4,884** | | **2,415** | | **2,469** | |

---

[167] NCU confirmed that the reported Counseling and Corrective Interviews actually occurred.

[168] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the allowable penalty from a maximum of five days to 10 days.

[169] The figures in this table have been updated from prior reports to correct a calculation error identified related to suspensions, modified duty, and no inmate contact cases.

267

## TABLE 3: SUSPENSION

The table below shows the number/percentage of suspensions imposed, and the reasons for the suspensions, *by the date the suspension was imposed* (versus the date of the incident).

| Reason for Staff Suspension, by Date of Suspension, 2020 to 2025 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Reason** | **2020** | | **2021** | | **2022** | | **2023** | | **2024** | | **2025** | | **Jan. to Jun 2025** | | **Jul to Dec. 2025** | |
| Sick Leave | 39 | *11%* | 138 | *22%* | 311 | *45%* | 110 | *19%* | 67 | *22%* | 137 | *30%* | 69 | *33%* | 68 | *28%* |
| Conduct Unbecoming | 92 | *26%* | 128 | *20%* | 100 | *15%* | 160 | *28%* | 119 | *39%* | 97 | *21%* | 58 | *28%* | 39 | *16%* |
| Use of Force | 78 | *22%* | 82 | *13%* | 66 | *10%* | 136 | *23%* | 62 | *20%* | 57 | *13%* | 25 | *12%* | 32 | *13%* |
| AWOL | 0 | *0%* | 165 | *26%* | 99 | *14%* | 22 | *4%* | 0 | *0%* | 68 | *15%* | 27 | *13%* | 41 | *17%* |
| FMLA | | | | | | | | | | | 17 | *4%* | | | 17 | *7%* |
| Arrest | 60 | *17%* | 70 | *11%* | 32 | *5%* | 23 | *4%* | 16 | *3%* | 9 | *2%* | 3 | *1%* | 6 | *2%* |
| Inefficient Performance | 44 | *12%* | 29 | *5%* | 39 | *6%* | 73 | *13%* | 24 | *8%* | 31 | *7%* | 11 | *5%* | 20 | *8%* |
| Electronic Device | 18 | *5%* | 4 | *1%* | 10 | *1%* | 9 | *2%* | 4 | *1%* | 8 | *2%* | 1 | *1%* | 7 | *3%* |
| NPA | 10 | *3%* | 6 | *1%* | 17 | *2%* | 19 | *3%* | 9 | *3%* | 11 | *2%* | 5 | *2%* | 6 | *2%* |
| Other | 6 | *2%* | 4 | *1%* | 11 | *2%* | 22 | *4%* | 2 | *1%* | 11 | *2%* | 5 | *2%* | 6 | *2%* |
| Contraband | 7 | *2%* | 5 | *1%* | 0 | *0%* | 3 | *1%* | 0 | *0%* | 2 | *0%* | 2 | *1%* | 0 | *0%* |
| Erroneous Discharge | 5 | *1%* | 0 | *0%* | 2 | *0%* | 0 | *0%* | 0 | *0%* | 1 | *0%* | 0 | *0%* | 1 | *0%* |
| Abandoned Post | 0 | *0%* | 0 | *0%* | 1 | *0%* | 4 | *1%* | 4 | *1%* | 4 | *1%* | 0 | *0%* | 4 | *2%* |
| **Total** | **359** | | **631** | | **688** | | **581** | | **307** | | **453** | | **206** | | **247** | |

268

## TABLE 4: ACCOUNTABILITY BY RANK

The table below shows the frequency with which Wardens, Deputy Wardens, and Assistant Deputy Wardens, Captains and Officers were held accountable between 2023 and 2025.

| Accountability By Rank 2023 to 2025[170] | | | |
|---|---|---|---|
| | 2023 Total | 2024 Total | 2025 Total |
| **Warden / Assistant Commissioner** | | | |
| Formal Discipline | 0 | 0 | 0 |
| Suspension | 0 | 0 | 0 |
| Command Discipline | 0 | 0 | 0 |
| 5003 Counseling | 0 | 0 | 0 |
| Corrective Interview | 0 | 0 | 0 |
| Total | 0 | 0 | 0 |
| **Deputy Warden** | | | |
| Formal Discipline | 0 | 1 | 0 |
| Suspension | 0 | 0 | 0 |
| Command Discipline | 1 | 0 | 1 |
| 5003 Counseling | 0 | 0 | 0 |
| Corrective Interview | 1 | 0 | 0 |
| Retraining | 0 | 0 | 0 |
| Total | 2 | 1 | 1 |
| **Assistant Deputy Warden** | | | |
| Formal Discipline | 27 | 9 | 4 |
| Suspension | 1 | 1 | 0 |
| Command Discipline | 7 | 19 | 17 |
| 5003 Counseling | 13 | 10 | 33 |
| Corrective Interview | 13 | 19 | 22 |
| Retraining | 4 | 0 | 2 |
| Total | 65 | 58 | 78 |
| **Captains** | | | |
| Formal Discipline | 76 | 62 | 56 |
| Suspension | 7 | 4 | 4 |
| Command Discipline | 74 | 162 | 133 |

---

[170] Command discipline dates reflect the date the command discipline was closed in CMS, excluding dismissed matters, MOCs, and DPVs. Formal discipline dates reflect the date the NPA was closed. Formal discipline actions were de-duplicated where a single staff member received one disciplinary action covering multiple incidents. Corrective interviews, retrainings, suspensions, and 5003 counselings reflect RAPIDS records generated from UOF incidents occurring between October 2022 and December 2025, limited to corrective actions that occurred between 2023 and 2025.

| Accountability By Rank 2023 to 2025[170] | | | |
|---|---|---|---|
| | **2023 Total** | **2024 Total** | **2025 Total** |
| 5003 Counseling | 151 | 158 | 298 |
| Corrective Interview | 144 | 200 | 188 |
| Retraining | 40 | 44 | 43 |
| Total | 492 | 630 | 722 |
| **Officers** | | | |
| Formal Discipline | 413 | 296 | 250 |
| Suspension | 97 | 34 | 35 |
| Command Discipline | 665 | 1,366 | 1,677 |
| 5003 Counseling | 781 | 873 | 1,567 |
| Corrective Interview | 607 | 1,130 | 1,428 |
| Retraining | 245 | 358 | 282 |
| Total | 2808 | 4057 | 5239 |

270

## TABLE 5 (A): COMMAND DISCIPLINES RECOMMENDED BY RAPID REVIEWS

The table below shows the status and outcome of Command Disciplines ("CDs") recommended by Rapid Reviews from 2019 to 2025. Data are current as of December 2025.

| Status/Outcome | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Jan-Jun 2025 | Jul-Dec 2025 |
|---|---|---|---|---|---|---|---|---|---|
| \multicolumn: Status and Outcome of Command Disciplines Recommended by Rapid Reviews, 2019 to 2025 |||||||||||
| Still Pending in CMS | 7 <1% | 15 1% | 65 3% | 64 3% | 97 6% | 31 1% | 121 5% | 14 2% | 107 6% |
| 1-10 Days Deducted | 879 54% | 673 47% | 794 34% | 739 35% | 798 46% | 857 34% | 987 40% | 262 34% | 725 43% |
| MOC | 122 7% | 108 8% | 281 12% | 128 6% | 110 6% | 141 6% | 381 15% | 89 12% | 292 17% |
| Reprimand | 156 10% | 126 9% | 270 11% | 319 15% | 114 7% | 497 20% | 192 8% | 67 9% | 125 7% |
| Retraining | ~ | ~ | ~ | ~ | 11 1% | 125 5% | 73 3% | 55 7% | 18 1% |
| Corrective Interview | 53 3% | 32 2% | 38 2% | 76 4% | 79 5% | 401 16% | 72 3% | 61 8% | 11 1% |
| Dismissed at Hearing or Closed Administratively | 360 22% | 399 28% | 745 32% | 608 29% | 421 24% | 339 14% | 382 15% | 119 15% | 263 15% |
| Never Entered in CMS[171] | 41 3% | 82 6% | 162 7% | 189 9% | 100 6% | 104 4% | 265 11% | 103 13% | 162 10% |
| **Total CDs Recommended** | **1,635** | **1,440** | **2,355** | **2,123** | **1,730** | **2,495** | **2,474** | **771** | **1,703** |

*Note: CDs pending for more than one year are not tracked in the CD reports analyzed for this table and therefore may still appear pending although it is likely that they have since been dismissed.*

[171] CMS is the Department's case management software.

## TABLE 5 (B): REASONS THAT COMMAND DISCIPLINES RECOMMENDED BY RAPID REVIEWS WERE DISMISSED, CLOSED ADMINISTRATIVELY, OR NOT ENTERED INTO CMS

The table below shows the reasons that CDs recommended by Rapid Reviews were dismissed, closed administratively, or were never entered into CMS because of due process violations (DPV) or clerical errors.

| Reasons that Command Disciplines Recommended by Rapid Reviews Were Dismissed, Closed Administratively, or Never Entered into CMS *January 2021-December 2025* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Year of Incident** | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan-Jun 2025** | **Jul-Dec 2025** |
| **Total # of CDs Recommended** | **2,355** | **2,123** | **1,730** | **2,497** | **2,474** | **771** | **1,703** |
| Total # of CDs Dismissed, Closed, or Not Logged for Any Reason | 907 | 797 | 521 | 434 | 647 | 222 | 425 |
| % of All CDs Recommended | 39% | 38% | 30% | 17% | 26% | 29% | 25% |
| CDs Dismissed, Closed, or Not Logged for ***DPV or Clerical Errors***[172] | 673 | 527 | 324 | 221 | 368 | 142 | 226 |
| % of All CDs Dismissed, Closed, or Not Logged for Any Reason | *74%* | *66%* | *62%* | *51%* | *57%* | *64%* | *53%* |
| CDs Dismissed, Closed, or Not Logged for ***Other Reasons***[173] | 234 | 270 | 197 | 213 | 279 | 80 | 199 |
| % of All CDs Dismissed, Closed, or Not Logged for Any Reason | *26%* | *34%* | *38%* | *49%* | *43%* | *36%* | *47%* |

---

[172] A CD may also be dismissed or not entered in CMS for Due Process Violations ("DPV") if the CD is not entered or processed in a timely manner according to policy. A CD can also be dismissed for clerical errors, such as date errors or misidentification of staff.

[173] A CD may be dismissed or not entered in CMS for factual reasons, because a staff member already resigned or left the Department, because ID took over all discipline and corrective action pending further investigation, or other factual reasons.

## TABLE 6 (A): COMMAND DISCIPLINE RECOMMENDED BY OTHER SOURCES

The table below shows the outcome of CDs recommended separately from the Rapid Review process. The Department began tracking these CDs systematically in January 2024. The specific misconduct behind these CDs varies, and includes AWOL staff, staff off-post, Departmental property violations, inadequate supervision, inefficient performance of duties, insubordination, tour wand violations, and use-of-force-related misconduct identified outside of the Rapid Review process.

| Outcome of Command Disciplines Recommended by Other Sources 2024- 2025 | | | | |
|---|---|---|---|---|
| **Outcome** | **Jan-Jun 2024** *18th MP* | **Jul-Dec 2024** *19th MP* | **Jan-Jun 2025** *20th MP* | **Jul-Dec 2025** *21st MP* |
| 1-10 Days Deducted | *238* *27%* | *264* *33%* | *332* *31%* | *615* *44%* |
| MOC | *79* *9%* | *61* *8%* | *188* *18%* | *167* *12%* |
| Reprimand | *87* *10%* | *115* *14%* | *95* *9%* | *104* *7%* |
| Retraining | *3* *0%* | *10* *1%* | *19* *2%* | *30* *2%* |
| Corrective Interview | *59* *7%* | *93* *11%* | *58* *5%* | *94* *7%* |
| Dismissed | *428* *48%* | *268* *33%* | *377* *35%* | *385* *28%* |
| **Total** | **894** | **811** | **1,069** | **1,395** |

273

**TABLE 6 (B): REASONS THAT COMMAND DISCIPLINES RECOMMENDED BY OTHER SOURCES WERE DISMISSED**

The table below shows the reasons that CDs recommended separately from the Rapid Reviews were dismissed because of due process violations (DPV) or clerical errors.

| Reasons that Command Disciplines Recommended by Other Sources Were Dismissed, Closed Administratively, or Never Entered into CMS *January 2021-June 2025* | | | | |
|---|---|---|---|---|
| **Year of Incident** | **2024** | **2025** | **Jan-Jun 2025 20th MP** | **Jan-Jun 2025 21st MP** |
| **Total # of CDs Recommended** | **1,705** | **2,464** | **1,069** | **1,395** |
| Total # of CDs Dismissed | 696 | 762 | 377 | 385 |
| % of All CDs Recommended | 41% | 31% | 35% | 28% |
| CDs Dismissed for DPV or Clerical Errors[174] | 185 | 188 | 90 | 98 |
| % of All CDs Dismissed | *27%* | *25%* | *24%* | *25%* |
| CDs Dismissed for Other Reasons[175] | 511 | 574 | 287 | 287 |
| % of All CDs Dismissed | *73%* | *75%* | *76%* | *75%* |

---

[174] A CD may also be dismissed or not entered in CMS for Due Process Violations ("DPV") if the CD is not entered or processed in a timely manner according to policy. A CD can also be dismissed for clerical errors, such as date errors or misidentification of staff.

[175] A CD may be dismissed or not entered in CMS for factual reasons, because a staff member already resigned or left the Department, because ID took over all discipline and corrective action pending further investigation, or other factual reasons.

274

## TABLE 7: FORMAL DISCIPLINE

The table below shows the status of cases pending with the Trials Division and the number of cases still pending investigation, by the date the incident occurred. Data are current as of December 2025.

| Status of Disciplinary Cases & Number of Pending Investigations, by Date of Incident | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2016** | | **2017** | | **2018** | | **2019** | | **2020** | | **2021** | | **2022** | | **2023** | | **2024** | | **2025** | |
| **Total Cases** | 471 | | 621 | | 784 | | 1027 | | 695 | | 716 | | 668 | | 702 | | 357 | | 243 | |
| Closed Cases | 470 | 100% | 617 | 99% | 780 | 99% | 1020 | 99% | 690 | 99% | 716 | 99% | 662 | 99% | 658 | 94% | 252 | 63% | 61 | 25% |
| Pending Cases with Trials Division | 0 | 0% | 4 | 1% | 4 | 1% | 10 | 1% | 5 | 1% | 0 | 1% | 6 | 1% | 44 | 6% | 105 | 37% | 182 | 75% |
| | | | | | | | | | | | | | | | | | | | |
| **Unique UOF Incidents** | Number of unique UOF incidents not tracked. | | | | 466 | | 606 | | 450 | | 561 | | 415 | | 444 | | 272 | | 218 | |
| | | | | | | | | | | | | | | | | | | | |
| **Pending Investigations** | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 312 | | 1363 | |

## TABLE 8: NUMBER OF CASES PENDING WITH THE TRIALS DIVISION

The table below shows the number of cases pending formal discipline, as of the last day of the month in each Monitoring Period from 2018 to 2025. Data are current as of December 2025.

| Cases Pending Discipline for Use of Force Related Misconduct, 2018 to 2025 | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | June 2018 | Dec. 2018 | June 2019 | Dec. 2019 | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 | June 2022 | Dec. 2022 | Jun. 2023 | Dec. 2023 | June 2024 | Dec. 2024 | June 2025 | Dec. 2025 |
| MP | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th | 20th | 21st |
| **Pending Cases** | 146 | 172 | 407 | 633 | 1,050 | 1,445 | 1,917 | 1,911 | 1,129 | 409 | 435 | 337 | 240 | 270 | 272 | 353 |

## TABLE 9: TIME FROM MOC RECEIVED TO CHARGES SERVED

The table below shows the interval of time between when the MOC was received by the Trials Division to the date charges were served.

| Time from MOC Received by the Trials Division to Date Charges Served | | | | | | |
|---|---|---|---|---|---|---|
| | **2023** | | **2024** | | **2025** | |
| **Total # MOCs Received** | **697** | | **517** | | **568** | |
| # Administratively Filed/No Charges Served | 86 | | 114 | | 81 | |
| # Charges Served before MOC Received | 102 | | 170 | | 208 | |
| **# MOCs Served** | **509** | | **233** | | **279** | |
| 0 to 14 days | 250 | *49%* | 139 | *60%* | 131 | *47%* |
| 15 to 30 days | 206 | *40%* | 70 | *30%* | 122 | *44%* |
| 31 to 60 days | 33 | *6%* | 10 | *4%* | 22 | *8%* |
| More than 60 Days | 20 | *4%* | 14 | *6%* | 4 | *1%* |

277

## TABLE 10: TIMELINESS OF FORMAL DISCIPLINE

The table below shows the timeliness of formal discipline for Closed cases (time between date the MOC received and the date signed by the DC of Trials), cases Pending with Trials (time between the date the MOC was received at the last day of the year), and the timeliness for both Closed and Pending cases, combined.

| Time from Date MOC received in Trials Division to Date Signed by DC of Trials | | | | | | | | | | | Time Cases Pending with Trials as of the last day of the year, and Date the MOC Received | | | | | | | | | | | Timeliness for Closed and Pending Cases | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 2023 | | 2024 | | 2025 | | Jan-June 2025 | | Jul-Dec 2025 | | Year | 2023 | | 2024 | | 2025 | | Jan-June 2025 | | Jul-Dec 2025 | | Year | 2023 | | 2024 | | 2025 | | Jan-June 2025 | | Jul-Dec 2025 | |
| # Cases Closed | 764 | | 595 | | 487 | | 249 | | 238 | | # Cases Pending | 337 | | 270 | | 625 | | 272 | | 353 | | Total | 1101 | | 865 | | 1112 | | 521 | | 591 | |
| 0 to 3 months | 210 | 27% | 232 | 39% | 169 | 35% | 101 | 41% | 68 | 29% | 0 to 3 months | 134 | 40% | 105 | 39% | 202 | 32% | 103 | 38% | 99 | 28% | 0 to 3 months | 344 | 31% | 337 | 39% | 371 | 33% | 204 | 39% | 167 | 28% |
| 3 to 6 months | 227 | 30% | 164 | 28% | 159 | 33% | 78 | 31% | 81 | 34% | 3 to 6 months | 67 | 20% | 36 | 13% | 216 | 35% | 68 | 66% | 148 | 42% | 3 to 6 months | 294 | 27% | 200 | 23% | 375 | 34% | 146 | 28% | 229 | 39% |
| 6 to 12 months | 179 | 23% | 134 | 23% | 85 | 17% | 27 | 11% | 58 | 24% | 6 to 12 months | 77 | 23% | 51 | 19% | 101 | 16% | 43 | 16% | 58 | 16% | 6 to 12 months | 256 | 23% | 185 | 21% | 186 | 17% | 70 | 13% | 116 | 20% |
| 1 to 2 years | 120 | 16% | 49 | 8% | 53 | 11% | 32 | 13% | 21 | 9% | 1 to 2 years | 15 | 4% | 40 | 15% | 56 | 9% | 30 | 11% | 26 | 7% | 1 to 2 years | 135 | 12% | 89 | 10% | 109 | 10% | 62 | 12% | 47 | 8% |
| 2 to 3 years | 17 | 2% | 3 | 1% | 5 | 1% | 1 | 0% | 4 | 2% | 2 to 3 years | 17 | 5% | 3 | 1% | 5 | 1% | 3 | 1% | 2 | 1% | 2 to 3 years | 34 | 3% | 6 | 1% | 10 | 1% | 4 | 1% | 6 | 1% |
| 3+ years | 7 | 1% | 13 | 2% | 16 | 3% | 10 | 4% | 6 | 3% | 3+ years | 27 | 8% | 35 | 13% | 45 | 7% | 25 | 9% | 20 | 6% | 3+ years | 34 | 3% | 48 | 6% | 61 | 5% | 35 | 7% | 26 | 4% |
| Uknown | 4 | 1% | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | Uknown | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | Uknown | 4 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |

## TABLE 11: TIME FOR COMMISSIONER SIGN CASES FROM DATE OF SIGNATURE BY DC OF TRIALS

The table below show the number of days between the date cases were signed by the DC of Trials and the date the case was signed by the Commissioner.

| Days between Signatures by DC of Trials and Commissioner | | | | | | |
|---|---|---|---|---|---|---|
| | Jan-June 2025 | | Jul-Dec 2025 | | 2025 | |
| Total Cases signed by Commissioner | 200 | | 177 | | 377 | |
| 0 to 14 days | 25 | 13% | 48 | 27% | 73 | 19% |
| 15 to 30 days | 108 | 54% | 83 | 47% | 191 | 51% |
| 31 to 60 days | 37 | 19% | 42 | 24% | 79 | 21% |
| More than 60 days | 30 | 15% | 4 | 2% | 34 | 9% |

279

## TABLE 12: DISPOSITION OF FORMAL DISCIPLINE CASES

The table below shows the disposition of formal discipline in cases closed by the Trials Division since 2017.

| Disposition of Formal Discipline Cases, 2017 to 2025 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Jan-Jun 2025 | July-Dec 2025 |
| **# Cases Closed** | **497** | **518** | **267** | **387** | **585** | **2,204** | **759** | **573** | **509** | **269** | **240** |
| NPA | 395 79% | 484 93% | 218 82% | 327 84% | 460 79% | 1,808 82% | 626 82% | 425 74% | 372 73% | 196 73% | 176 73% |
| Guilty at OATH | 4 1% | 3 1% | ~ | 3 1% | 16 3% | 41 2% | 23 3% | 2 0% | 5 1% | 4 1% | 1 1% |
| Administratively Filed | 77 15% | 22 4% | 34 13% | 33 9% | 33 6% | 148 7% | 75 10% | 126 22% | 122 24% | 66 25% | 56 23% |
| Deferred Prosecution | 21 4% | 7 1% | 13 5% | 20 5% | 75 13% | 203 9% | 32 4% | 20 3% | 10 2% | 3 1% | 7 3% |
| Not Guilty at OATH | ~ | 2 0% | 2 1% | 4 1% | 1 0% | 4 0% | 3 0% | ~ | ~ | ~ | ~ |

280

## TABLE 13: PENALTIES IMPOSED VIA NPA FOR USE OF FORCE RELATED MISCONDUCT

The table below shows the penalties imposed for cases closed via NPA each year since 2017.

| Penalties Imposed via NPA for Use of Force Related Misconduct, 2017-2025 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Jan-Jun 2025 | Jul-Dec 2025 |
| # Cases | 395 | 484 | 218 | 327 | 460 | 1,808 | 624 | 425 | 372 | 196 | 176 |
| Refer for CD[176] | 71 18% | 67 14% | 3 1% | 1 0% | ~ | 11 1% | ~ | ~ | ~ | ~ | ~ |
| Reprimand | ~ | ~ | ~ | ~ | 7 1% | 77 4% | 69 11% | 21 5% | ~ | ~ | ~ |
| 1-5 Days | 31 8% | 147 30% | 52 24% | 80 24% | 69 14% | 462 26% | 156 25% | 149 35% | 125 33% | 77 39% | 48 27% |
| 6-9 Days | 14 4% | 19 4% | 6 3% | 14 4% | 29 6% | 163 9% | 88 14% | 84 20% | 64 17% | 26 13% | 38 22% |
| 10-19 Days | 62 16% | 100 21% | 56 26% | 83 25% | 110 24% | 447 25% | 147 24% | 101 24% | 94 25% | 41 21% | 53 30% |
| 20-29 Days | 74 19% | 58 12% | 42 19% | 46 14% | 64 15% | 157 9% | 51 8% | 30 7% | 30 8% | 11 6% | 19 11% |
| 30-39 Days | 42 11% | 42 9% | 21 10% | 32 10% | 43 10% | 170 9% | 51 8% | 18 4% | 13 3% | 7 4% | 6 3% |
| 40-49 Days | 27 7% | 30 6% | 3 1% | 17 5% | 54 11% | 96 5% | 20 3% | 5 1% | 8 2% | 7 4% | 1 1% |
| 50-59 Days | 14 4% | 4 1% | 17 8% | 17 5% | 18 4% | 80 4% | 14 2% | 7 2% | 14 4% | 5 3% | 9 5% |
| 60+ Days | 48 12% | 12 2% | 11 5% | 28 9% | 43 9% | 118 7% | 27 4% | 5 1% | 21 6% | 20 10% | 1 1% |
| Demotion | ~ | ~ | ~ | ~ | ~ | 6 0% | ~ | ~ | | ~ | |
| Retire/Resign | 12 3% | 5 1% | 7 3% | 9 3% | 23 6% | 22 1% | 1 0% | 5 1% | 3 1% | 2 1% | 1 1% |
| Termination (guilty at OATH or PDR) | ~ | 1 | ~ | ~ | 5 | 10 | 12 | 1 | 6 | 5 | 1 |

---

[176] As discussed in the Monitor's April 18, 2019 Report (dkt. 327) at pgs. 42-44, NPAs referred for CDs were previously adjudicated at the facilities after being referred from the Trials Division, a process which was rife with implementation issues. This problem has been corrected and now the Trials Division negotiates a specific number of days (one to five) to be imposed, and those specific days are treated as a CD, rather than an NPA. The main difference is that the case now remains on the staff member's record for one year instead of five years.

281

## TABLE 14: CASES RESOLVED VIA NPA WITH PROVISIONS FOR CD OR EXPUNGEMENT

The table below shows the number and proportion of cases closed via NPA that included provisions for a CD or an Expungement.

| Cases Resolved via NPA with Provisions for Expungement or CD | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Closure Date | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Jan-Jun 2025 | Jul-Dec 2025 |
| # NPAs | 484 | 218 | 327 | 460 | 1,808 | 624 | 425 | 372 | 196 | 176 |
| NPAs with CD Provision | 187 39% | 45 21% | 76 23% | 74 16% | 535 30% | 253 41% | 224 53% | 167 45% | 82 42% | 85 48% |
| NPAs with Expungement | ~ | ~ | 36 11% | 96 21% | 420 23% | 55 9% | 25 6% | 10 3% | 7 4% | 3 2% |
| **Either CD or Expungement** | **187 39%** | **45 21%** | **112 34%** | **170 37%** | **955 53%** | **308 49%** | **249 59%** | **177 48%** | **89 45%** | **88 50%** |

282

## TABLE 15: OUTCOME OF CLOSED ACTION PLAN § F, ¶ 2 CASES

The following table shows the outcomes of cases identified for expeditious resolution, pursuant to the Action Plan (dkt. 465), § F, ¶ 2 ("F2").

| Outcomes of Closed Action Plan § F, ¶ 2 Cases *As of January 7, 2026* | | | | | |
|---|---|---|---|---|---|
| | Jun-Dec 2022 | 2023 | 2024 | 2025 | TOTAL |
| Total # of Cases (by UOF) | 13 | 36 | 22 | 25 | **96** |
| # of Cases from ID (by UOF) | 3 | 30 | 14 | 19 | **66** |
| # of Cases from MT (by UOF) | 10 | 6 | 8 | 6 | **30** |
| **Total Number of Staff with Closed F2 Cases** | **17** | **38** | **24** | **27** | **106** |
| Closed w/ NPA for Resignation/Retirement | 2 *12%* | 0 *0%* | 0 *0%* | 0 *0%* | **2** *2%* |
| Closed w/ NPA for Suspension and/or Compensation Days | 12 *71%* | 35 *92%* | 20 *83%* | 23 *85%* | **90** *85%* |
| Closed via OATH Trial | 0 *0%* | 1 *3%* | 1 *4%* | 2 *7%* | **4** *4%* |
| Trial at OATH, then Closed by Action of the Commissioner | 0 *0%* | 0 *0%* | 0 *0%* | 1 *4%* | **1** *1%* |
| Administratively Filed | 1 *6%* | 1 *3%* | 2 *8%* | 0 *0%* | **4** *4%* |
| MOS Already Resigned/Retired or was Terminated for Other Matters | 2 *12%* | 1 *3%* | 1 *4%* | 0 *0%* | **4** *4%* |
| Charges Withdrawn as Further Investigation Found the MOS was Not Responsible | 0 *0%* | 0 *0%* | 0 *0%* | 1 *4%* | **1** *1%* |

283

## TABLE 16: OATH PRE-TRIAL CONFERENCES

The table below presents the number of *use-of-force-related* pre-trial conferences that were scheduled in each Monitoring Period since July 1, 2020 and the results of those conferences. This data is discussed further in the compliance box for First Remedial Order § C., ¶¶ 4 and 5 (OATH).

| | | | Pre-Trial Conferences Related to UOF Violations | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | | UOF Matters & Staff | |
| # Required | Total # Scheduled | # of UOF PTC Scheduled | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
| July to December 2020 (11th MP) | | | | | | | | | | | | |
| 225[177] | 372 | 303 | 0 | 111 | 10 | 44 | 124 | 12 | 2 | 274 | 198 |
| | | 100% | 0% | 37% | 3% | 15% | 41% | 4% | 1% | | |
| January to June 2021 (12th MP) | | | | | | | | | | | | |
| 300 | 670 | 541 | 0 | 282 | 4 | 85 | 136 | 33 | 1 | 367 | 331 |
| | | 100% | 0% | 52% | 1% | 16% | 25% | 6% | 0% | | |
| July to December 2021 (13th MP) | | | | | | | | | | | | |
| 350 | 575 | 379 | 185 | 87 | 4 | 18 | 58 | 26 | 1 | 284 | 239 |
| | | 100% | 49% | 23% | 1% | 5% | 15% | 7% | 0% | | |

---

[177] The Remedial Order requirement went into effect on August 14, 2020, so it was applicable for only 4.5 months of the Monitoring Period.

| Pre-Trial Conferences Related to UOF Violations | | | | | | | | | | | |
| | | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | UOF Matters & Staff | |
| # Required | Total # Scheduled | # of UOF PTC Scheduled | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
|---|---|---|---|---|---|---|---|---|---|---|---|
| January to June 2022 (14th MP) | | | | | | | | | | | |
| **900** | **1447** | **989** | 612 | 76 | 3 | 174 | 105 | 3 | 16 | **574** | **417** |
| | | 100% | *62%* | *8%* | *0%* | *18%* | *11%* | *0%* | *2%* | | |
| July to December 2022 (15th MP) | | | | | | | | | | | |
| **900** | **1562** | **902** | 621 | 42 | 0 | 153 | 74 | 0 | 12 | **584** | **466** |
| | | 100% | *69%* | *5%* | *0%* | *17%* | *8%* | *0%* | *1%* | | |
| January to June 2023 (16th MP) | | | | | | | | | | | |
| **900** | **1337** | **310** | 203 | 40 | 2 | 29 | 29 | 0 | 7 | **214** | **232** |
| | | 100% | *65%* | *13%* | *1%* | *9%* | *9%* | *0%* | *2%* | | |
| July to December 2023 (17th MP) | | | | | | | | | | | |
| **900** | **1079** | **373** | 264 | 29 | 14 | 32 | 24 | 1 | 9 | **254** | **264** |
| | | 100% | *71%* | *8%* | *4%* | *9%* | *6%* | *0%* | *2%* | | |
| January to June 2024 (18th MP) | | | | | | | | | | | |
| **900** | **942** | **384** | 239 | 38 | 7 | 44 | 21 | 1 | 34 | **228** | **273** |
| | | 100% | *62%* | *10%* | *2%* | *11%* | *5%* | *0%* | *9%* | | |
| July to December 2024 (19th MP) | | | | | | | | | | | |

| Pre-Trial Conferences Related to UOF Violations | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | UOF Matters & Staff | |
| # Required | Total # Scheduled | # of UOF PTC Scheduled | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
| 375[178] | 542 | 207 | 105 | 40 | 0 | 23 | 22 | 0 | 17 | 161 | 113 |
| | | 100% | 51% | 19% | 0% | 11% | 11% | 0% | 8% | | |
| January to June 2025 (20th MP) | | | | | | | | | | | |
| 300[179] | 514 | 236 | 125 | 42 | 0 | 35 | 14 | 0 | 20 | 162 | 175 |
| | | 100% | 53% | 18% | 0% | 15% | 6% | 0% | 8% | | |
| July to December 2025 (21st MP) | | | | | | | | | | | |
| 300[180] | 611 | 247 | 133 | 40 | 2 | 16 | 23 | 10 | 23 | 187 | 178 |
| | | 100% | 54% | 16% | 1% | 6% | 9% | 4% | 9% | | |

[178] The Monitoring Team approved a reduction in the number of required pre-trial conferences in July (100), August (75), September (50), October (50), November (50) and December (50).

[179] The Monitoring Team approved a reduction in the number of required pre-trial conferences in January (50), February (50), March (50), April (50), May (50), and June (50).

[180] The Monitoring Team approved a reduction in the number of required pre-trial conferences in July (50), August (50), September (50), October (50), November (50) and December (50).

## TABLE 17: TRIALS AT OATH FOR USE OF FORCE-RELATED MISCONDUCT

The table below provides data on the number of trials conducted for use-of-force-related misconduct by DOC staff, the average number of days between the pre-trial conference and the trial, the length of time required to complete the trial, the average number of days for the ALJ to issue an R&R after the trial, and ultimately the length of time between a pre-trial conference and the issuance of the R&R.

| Start Date of Trial | Total Number of Trials by First Day the Trial Commenced | Average Days Between Pre-Trial Conference and Trial | Average Duration of Trial in Days | Average Days between Final Trial Date & R&R Issued | Average Days between Pre-Trial Conference and R&R Issued |
|---|---|---|---|---|---|
| 2016 | 1 | N/A | 1 | 38 | N/A |
| 2017 | 8 | 101 | 47 | 81 | 254 |
| 2018 | 2 | 125 | 27 | 28 | 179 |
| 2019 | 3 | 66 | 13 | 84 | 162 |
| 2020 | 4 | 240 | 78 | 239 | 557 |
| 2021 | 26 | 147 | 43 | 131 | 320 |
| 2022 | 15 | 84 | 14 | 45 | 142 |
| 2023 | 6 | 136 | 12 | 44 | 190 |
| 2024 | 6 | 50 | 2 | 62 | 117 |
| 2025 | 2 | 40 | 2 | 33 | 73 |

(Table header: *Trials at OATH for Use of Force-Related Misconduct — January 2016-December 2025*)

## TABLE 18: OATH REPORTS & RECOMMENDATIONS FOR USE OF FORCE-RELATED MISCONDUCT

The chart below provides the recommended outcomes contained in Reports & Recommendations ("R&Rs") issued by OATH Administrative Law Judges ("ALJs") for trials that occurred between January 2016-December 2025 for DOC staffs' use-of-force-related misconduct. In some cases, an R&R may cover multiple staff members, so the table evaluates the ALJ's findings by staff member.

| OATH ALJ's Report & Recommendations by Staff Member *(for use of force trials that occurred between January 2016-December 2025)* | | | | | | |
|---|---|---|---|---|---|---|
| Year R&R was Issued | Total Number of R&Rs Issued & Number of Staff | Guilt *Agreed with DOC's recommendation* | Guilt *Imposed More Than DOC Asked* | Guilt on some, but dismissed some charges *Imposed less than what DOC asked for, but found some guilt* | Acquittal | ALJ Recommended Termination |
| 2016 | 1 R&R covering 1 staff | 0 staff | 0 staff | 1 staff | 0 staff | 0 staff |
| 2017 | 5 R&Rs covering 5 staff | 0 staff | 0 staff | 4 staff | 1 staff | 0 staff |
| 2018 | 5 R&Rs covering 6 staff | 1 staff | 0 staff | 3 staff | 2 staff | 0 staff |
| 2019 | 2 R&Rs covering 5 staff | 0 staff | 0 staff | 0 staff | 5 staff | 0 staff |
| 2020 | 2 R&Rs covering 4 staff | 1 staff | 0 staff | 3 staff | 0 staff | 0 staff |
| 2021 | 17 R&Rs covering 21 staff | 16 staff | 0 staff | 4 staff | 1 staff | 7 staff |
| 2022 | 27 R&Rs covering 30 staff | 15 staff | 1 staff | 11 staff | 3 staff | 12 staff |
| 2023 | 6 R&Rs covering 7 staff | 4 staff | 0 staff | 2 staff | 1 staff | 4 staff |
| 2024 | 6 R&Rs covering 6 staff | 5 staff[181] | 0 staff | 1 staff | 0 staff | 3 staff |
| 2025 | 2 R&Rs covering 2 staff | 1 staff | 0 staff | 1 staff | 0 staff | 1 staff |

---

[181] In two cases for two staff, the ALJ found the staff guilty of all charges, but recommended a lower penalty than what DOC sought at trial.

288

## TABLE 19: TRIALS DIVISION STAFFING

The table below provides an overview of the Trials Division's staffing levels at the end of each Monitoring Period from June 2020 to December 2025.

| Trials Division Staffing | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| As of… | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 | June 2022 | Dec. 2022 | June 2023 | Dec. 2023 | June 2024 | Dec. 2024 | June 2025 | Dec. 2025 |
| **Supervisors & Leadership** | **5** | **5** | **4** | **4** | **5** | **6** | **6** | **7** | **7** | **7** | **8** | **8** |
| - *Deputy Commissioner* | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Associate Commissioner* | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 |
| - *Assistant Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| - *Deputy General Counsel* | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Executive Manager Director* | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 |
| - *Director* | 3 | 3 | 2 | 2 | 2 | 4 | 4 | 5 | 5 | 5 | 6 | 5 |
| **Attorneys** | **17** | **18** | **18** | **17** | **19** | **27** | **20** | **23** | **23** | **20** | **20** | **19** |
| - *Agency Attorney* | 17 | 16 | 15 | 14 | 17 | 21 | 19 | 20 | 20 | 17 | 15 | 15 |
| - *Agency Attorney Intern*[182] | 0 | 2 | 3 | 3 | 0 | 1 | 1 | 3 | 3 | 3 | 5 | 3 |
| - *Law Clerk* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| - *Contract Attorney* | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Attorneys on Loan from Other Agencies* | 0 | 0 | 0 | 0 | 0 | 5 | 0[183] | 0 | 0 | 0 | 0 | 0 |

---

[182] Agency Attorney Interns are individuals who have graduated law school, hold a J.D., and are either scheduled to take the New York Bar Exam or awaiting New York Bar Exam results. Once Interns are admitted to the New York Bar and submit proof of admission, they are promoted to Agency Attorney Level 1.

[183] The MOU for attorneys on loan from other City agencies was terminated on February 1, 2023. Further, the attorneys on loan from DOC Legal were transferred back to Legal by April 14, 2023. *See* Monitor's October 28, 2022 Report (dkt. 472) at pg. 14 regarding a discussion on the attorneys on loan.

| Trials Division Staffing | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| As of… | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 | June 2022 | Dec. 2022 | June 2023 | Dec. 2023 | June 2024 | Dec. 2024 | June 2025 | Dec. 2025 |
| **Administrative and Other Support** | **14** | **13** | **13** | **13** | **10** | **12** | **19** | **17** | **20** | **18** | **19** | **20** |
| - *Administrative Manager* | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 3 | 3 | 3 |
| - *Executive Coordinator* | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Office Manager* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Principal Administrative Associate* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 3 | 3 | 3 |
| - *Legal Coordinator* | 2 | 2 | 2 | 2 | 3 | 5 | 4 | 4 | 5 | 3 | 4 | 4 |
| - *Investigator* | 1 | 1 | 1 | 1 | 0 | 0 | 2 | 2 | 3 | 3 | 3 | 4 |
| - *Clerical Associate* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Program Specialist* | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Intern* | 1 | 1 | 1 | 1 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 |
| - *Front Desk Officer* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Community Coordinator* | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *City Research Scientist* | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Correctional Standard* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 |
| **Total** | **36** | **36** | **35** | **34** | **34** | **45** | **45** | **46** | **49** | **45** | **47** | **47** |

**TABLE 20: NCU SECURITY AUDITS' FINDINGS OF STAFFS' TOURING PRACTICES**

The table below shows the number of random security audits NCU conducted between January 2022 and December 2025, and the proportion identifying that staff failed to make all required tours, failed to conduct meaningful tours, or were off post and therefore could not tour.

| NCU Security Audits' Findings regarding Staffs' Touring Practices January 2022-December 2025 | | | | |
|---|---|---|---|---|
| Date Audited | # of NCU Audits Completed | # of Audits that found Staff Failed to Make All Required Tours | # of Audits that found Staff Failed to Conduct Meaningful Tours | # of Audits that found Staff Off Post (and therefore could not tour) |
| January-June 2022 | 59 | 17 (29%) | 14 (24%) | 42 (71%) |
| July-December 2022 | 37 | 10 (27%) | 7 (19%) | 32 (86%) |
| January-June 2023 | 19 | 7 (37%) | 6 (32%) | 14 (74%) |
| July-December 2023 | 31 | 18 (58%) | 20 (65%) | 26 (84%) |
| January-June 2024 | 37 | 19 (51%) | 19 (51%) | 28 (76%) |
| July-December 2024 | 34 | 10 (29%) | 14 (41%) | 20 (59%) |
| January-June 2025 | 30 | 7 (23%) | 10 (33%) | 17 (57%) |
| July-December 2025 | 26 | 10 (38%) | 17 (65%) | 16 (62%) |

291

## TABLE 21: CORRECTIVE ACTION FOR DEFICIENT TOURING RECOMMENDED VIA RAPID REVIEWS

The following table shows the corrective actions that facility leadership recommended, via Rapid Reviews, for staff's potentially deficient touring practices.

| Corrective Action for Deficient Touring *Recommended* via Rapid Reviews[184] January 2022-December 2025 | | | | |
|---|---|---|---|---|
| Date of UOF Incident | # of Staff Referred for Suspension | # of Staff Referred for Formal Charges | # of Staff Referred for a Command Discipline | # of Staff Referred for a Corrective Interview |
| January-December 2022 | 1 | 0 | 3 | 1 |
| January-December 2023 | 0 | 4 | 17 | 10 |
| January-December 2024 | 0 | 2 | 18 | 6 |
| January-December 2025 | 1 | 0 | 17 | 8 |

[184] This table only shows *recommendations* made for corrective action via the Rapid Reviews and does not indicate whether the corrective action was imposed as recommended.

292

# APPENDIX F:
# STAFFING

## TABLE 1: NUMBER OF ADWS

The table below identifies the number and assignment of ADWs at specific points in time from July 18, 2020, to December 6, 2025.

| Number of ADWs & Assignments in the Department[185] | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # ADW as of… | 7/18/20 | 1/2/21 | 6/26/21 | 1/1/22 | 6/18/22 | 12/31/22 | 6/16/23 | 12/23/23 | 6/22/24 | 12/28/24 | 6/21/25 | 12/6/25 |
| AMKC[186] | 9 | 21 | 13 | 12 | 9 | 12 | 16 | 0 | 1 | 0 | 0 | 0 |
| EMTC[187] | 0 | 0 | 0 | 0 | 0 | 8 | 10 | 11 | 11 | 11 | 8 | 10 |
| GRVC | 6 | 10 | 11 | 9 | 8 | 12 | 11 | 11 | 9 | 9 | 8 | 9 |
| MDC[188] | 6 | 2 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| NIC | 6 | 8 | 8 | 5 | 7 | 8 | 9 | 12 | 11 | 12 | 9 | 10 |
| OBCC[189] | 6 | 8 | 8 | 14 | 7 | 0 | 0 | 11 | 10 | 8 | 6 | 9 |
| RMSC | 5 | 6 | 6 | 5 | 4 | 5 | 6 | 14 | 11 | 8 | 7 | 7 |
| RNDC | 7 | 15 | 15 | 10 | 7 | 12 | 12 | 10 | 10 | 9 | 5 | 9 |
| VCBC[190] | 4 | 6 | 5 | 5 | 4 | 5 | 5 | 0 | 0 | 0 | 0 | 0 |
| Court Commands (BKDC, BXDC, QDC) | 3 | 4 | 3 | 3 | 3 | 3 | 2 | 3 | 3 | 2 | 2 | 2 |
| **Total # of ADWs in Facilities & Court Commands** | **52** | **80** | **70** | **64** | **49** | **66** | **72** | **73** | **67** | **60** | **46** | **57** |
| **Total # of ADWs Available Department-wide** | **66** | **95** | **88** | **80** | **67** | **82** | **89** | **91** | **85** | **87** | **69** | **89** |

[185] The specific post assignments of ADWs within the Facility are not available, so this data simply indicates the number of ADWs assigned to each facility.

[186] AMKC was closed in August 2023.

[187] EMTC was closed and re-opened during these Monitoring Periods. Until late 2022, staff who worked at EMTC were technically assigned to AMKC.

[188] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are actually assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[189] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then re-opened in July 2023.

[190] VCBC was closed in October 2023. Although VCBC no longer housed incarcerated individuals, DOC still assigned staff to the facility to maintain its security given its location off of Rikers Island. The barge was removed in November 2025.

| % of ADWs in Facilities & Court Commands | 79% | 84% | 80% | 80% | 73% | 80% | 81% | 80% | 79% | 69% | 67% | 64% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

## TABLE 2: NUMBER OF CAPTAINS

The table below identifies the number and assignment of Captains at specific points in time from July 18, 2020, to December 6, 2025.

| Number of Captains & Assignments in the Department[191] | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # Captains as of… | 7/18/20 | 1/2/21 | 6/26/21 | 1/1/22 | 6/18/22 | 12/31/22 | 6/16/23 | 12/23/23 | 6/22/24 | 12/28/24 | 6/21/25 | 12/6/25 |
| AMKC[192] | 91 | 111 | 97 | 87 | 81 | 80 | 65 | 13 | 7 | 7 | 5 | 5 |
| EMTC[193] | 0 | 0 | 0 | 0 | 0 | 38 | 37 | 37 | 39 | 43 | 45 | 44 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 | 61 | 43 | 50 | 62 | 59 | 58 |
| MDC[194] | 72 | 39 | 15 | 12 | 11 | 11 | 11 | 12 | 12 | 11 | 11 | 11 |
| NIC | 51 | 45 | 45 | 56 | 45 | 50 | 44 | 58 | 48 | 56 | 55 | 51 |
| OBCC[195] | 85 | 81 | 78 | 77 | 38 | 7 | 7 | 54 | 62 | 62 | 63 | 63 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 | 27 | 55 | 55 | 28 | 33 | 28 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 | 68 | 45 | 52 | 52 | 50 | 53 |
| VCBC[196] | 27 | 25 | 27 | 25 | 23 | 22 | 21 | 3 | 1 | 3 | 3 | 0 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 | 28 | 25 | 29 | 29 | 28 | 26 | 24 |
| **Total # of Captains in Facilities & Court Commands** | **558** | **523** | **499** | **474** | **416** | **427** | **366** | **346** | **354** | **352** | **350** | **337** |
| **Total # of Captains Available Department-wide** | **810** | **765** | **751** | **670** | **607** | **573** | **550** | **539** | **536** | **553** | **533** | **506** |

[191] The specific post assignments of Captains within the Facility are not available, so this data simply indicates the number of Captains assigned to each facility.

[192] AMKC was closed in August 2023.

[193] EMTC was closed and re-opened during these Monitoring Periods. Until late 2022, staff who worked at EMTC were technically assigned to AMKC.

[194] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are actually assigned to the Manhattan Courts (Criminal, Supreme, and Family).

[195] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then re-opened in July 2023.

[196] VCBC was closed in October 2023. Although VCBC no longer housed incarcerated individuals, DOC still assigned staff to the facility to maintain its security given its location off of Rikers Island. The barge was removed in November 2025.

| % of Captains in Facilities & Court Commands | 69% | 68% | 66% | 71% | 69% | 75% | 67% | 64% | 66% | 64% | 66% | 67% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

## TABLE 3: SICK LEAVE, MEDICALLY MONITORED/RESTRICTED, AWOL, PE, AND FMLA

The table below provides data from January 1, 2019, to December 31, 2025 regarding the monthly average staff headcount, the average number/proportion of staff out sick, the average number/proportion of staff on medically monitored/restricted duty level 3, the average number/proportion of staff who were AWOL, the average number/proportion of staff who were on Personal Emergency leave, and the average number/proportion of staff on FMLA leave.[197]

| Average Monthly Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Avg. Head-count | Avg. Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
| 2019 | 10115 | 579 | 5.7% | 475 | 4.7% | | | | | | |
| 2020 | 9302 | 1070 | 11.5% | 464 | 5.0% | | | | | | |
| 2021 | 8454 | 1470 | 17.5% | 699 | 8.3% | 56 | 0.7% | 37 | 0.5% | 60 | 0.7% |
| 2022 | 7181 | 1085 | 15.0% | 586 | 8.1% | 17 | 0.2% | 30 | 0.4% | 51 | 0.7% |
| 2023 | 6479 | 512 | 7.9% | 384 | 5.9% | 12 | 0.2% | 38 | 0.6% | 72 | 1.1% |
| 2024 | 6065 | 385 | 6.4% | 292 | 4.8% | 11 | 0.2% | 43 | 0.7% | 112 | 1.9% |
| 2025 | 5877 | 348 | 5.9% | 237 | 4.0% | 7 | 0.1% | 38 | 0.6% | 141 | 2.4% |

[197] The AWOL, PE, and FMLA data was only available for August 1, 2021-January 26, 2022 and April 2022-December 31, 2025.

## TABLE 4: LOCATION OF AWARDED POSTS

The tables below show how awarded posts were distributed across facilities and ranks at five recent points in time: April 30, 2024, November 13, 2024, March 31, 2025, June 30, 2025, and December 31, 2025.

| Location of Awarded Posts - April 30, 2024 | | | | |
|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **TOTAL** |
| In Facility | 1 *(14%)* | 90 *(77%)* | 484 *(67%)* | **575** *(68%)* |
| Non-Facility | 6 *(86%)* | 27 *(23%)* | 236 *(33%)* | **269** *(32%)* |
| **TOTAL** | **7** | **117** | **720** | **844** |
| Location of Awarded Posts - November 13, 2024 | | | | |
| | **ADW** | **Captain** | **CO** | **Total** |
| In Facility | 1 *(17%)* | 81 *(76%)* | 448 *(67%)* | **530** *(68%)* |
| Non-Facility | 5 *(83%)* | 26 *(24%)* | 218 *(33%)* | **249** *(32%)* |
| **TOTAL** | **6** | **107** | **666** | **779** |
| Location of Awarded Posts - March 31, 2025 | | | | |
| | **ADW** | **Captain** | **CO** | **Total** |
| In Facility | 1 *(17%)* | 79 *(76%)* | 476 *(69%)* | **556** *(70%)* |
| Non-Facility | 5 *(83%)* | 25 *(24%)* | 212 *(31%)* | **242** *(30%)* |
| **TOTAL** | **6** | **104** | **688** | **798** |
| Location of Awarded Posts - June 30, 2025 | | | | |
| | **ADW** | **Captain** | **CO** | **Total** |
| In Facility | 1 *(17%)* | 76 *(78%)* | 451 *(71%)* | **528** *(72%)* |
| Non-Facility | 5 *(83%)* | 21 *(22%)* | 182 *(29%)* | **208** *(28%)* |
| **TOTAL** | **6** | **97** | **633** | **736** |
| Location of Awarded Posts - December 31, 2025 | | | | |
| | **ADW** | **Captain** | **CO** | **Total** |
| In Facility | 1 *(17%)* | 67 *(82%)* | 408 *(72%)* | **476** *(73%)* |
| Non-Facility | 5 *(83%)* | 15 *(18%)* | 160 *(28%)* | **180** *(27%)* |
| **TOTAL** | **6** | **82** | **568** | **656** |

## TABLE 5: INCARCERATED INDIVIDUAL-FACING AWARDED POSTS IN FACILITY

Posts that are awarded "in facility," can be either incarcerated individual-facing posts, which involve direct day-to-day contact with individuals in custody, or non- incarcerated individual-facing posts, which do not. The table below provides additional detail about the number of awarded posts the Department considers to be incarcerated individual-facing. These posts are considered a subset of the "In Facility" posts reflected in Table 4.

| Incarcerated Individual-Facing Posts, by Facility As Identified by the Department | | | | | |
|---|---|---|---|---|---|
|  | ADW | Captain | CO | Total | % of All Awarded Posts |
| April 30, 2024 | 1 | 69 | 360 | 430 | 51% |
| November 13, 2024 | 1 | 61 | 333 | 395 | 51% |
| June 30, 2025 | 1 | 56 | 345 | 402 | 55% |
| October 31, 2025[198] | 1 | 54 | 330 | 385 | 59% |

---

[198] The Department stopped providing this data to the Monitoring Team in October 2025.

## TABLE 6: HOUSING UNIT AWARDED POSTS

The table below reflects further analysis by the Monitoring Team to determine the number of awarded posts that are assigned to a housing unit. These housing unit posts are considered a subset of the "In Facility" posts.

| Housing Unit Posts As Identified by Monitoring Team Analysis | | | | | |
|---|---|---|---|---|---|
| | ADW | Captain | CO | Total | % of All Awarded Posts |
| April 30, 2024 | 1 | 30 | 135 | 166 | 20% |
| November 13, 2024 | 1 | 28 | 126 | 155 | 20% |
| March 31, 2025 | 1 | 26 | 151 | 178 | 22% |
| June 30, 2025 | 1 | 25 | 146 | 172 | 23% |
| December 31, 2025 | 1 | 21 | 144 | 166 | 25% |
| **This table includes posts in which the location on a housing unit was not 100% certain, but is possible, in order to illustrate the maximum possible value.* | | | | | |

## TABLE 7: TRIPLE TOURS

The table below provides the annual total headcount and annual and daily averages of triple tours from January 2021 to December 2025.

| Triple Tour Data[199] 2021 to 2025 | | | |
|---|---|---|---|
| Year | Average Headcount | Total Triple Tours (per year) | Average Triple Tours (per day) |
| 2021 | 8,454 | 3,549 | 10 |
| 2022 | 7,181 | 1,431 | 4 |
| 2023 | 6,479 | 151 | 0 |
| 2024[200] | 6,065 | 601 | 2 |
| 2025 | 5,877 | 524 | 1 |

---

[199] *See* Appendix F, Table 7 in the Monitor's May 22, 2025 Report (dkt. 850) for more detailed data on the monthly totals and averages of triple tours for January 2021-December 2024.

[200] For all data prior to January 2024, the Department calculated triple tours based on the number of staff who worked over 3.75 hours of their third tour. In January 2024, the Department began calculating this data based on the number of staff who worked over 4.28 hours of their third tour. Since some staff only work a short part of a third consecutive shift, using 20.28 hours as a threshold more accurately accounts for those staff who are working significant enough time to be considered a triple tour. In addition, in 2024, the Office of Management Analysis and Planning ("OMAP") conducted a review of triple tour data for quality assurance purposes and to improve efficiencies in its collecting and reporting of this data. Prior to 2024, each facility self-reported its triple tour data based on handwritten Tour Certification reports. Tour Certifications are completed at the beginning of a tour and do not account for how long a staff member remains on that tour. In January 2024, the Department began calculating triple tours based on timesheet and payment data collected from the CityTime payroll application. The Department has reported that this has resulted in more reliable data.

## TABLE 8: OVERTIME SPENDING

The table below shows the Department's monthly overtime costs for uniformed staff since January 2019.

| Month | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|
| **Overtime Data for Uniformed Staff[201]** *2019-April 2026* | | | | | | | | |
| January | $12,860,000 | $9,800,000 | $12,066,000 | $18,847,000 | $22,893,000 | $21,227,000 | $26,192,000 | $25,732,000 |
| February | $12,392,000 | $7,983,000 | $14,037,000 | $18,226,000 | $20,819,000 | $19,936,000 | $22,967,000 | $23,686,000 |
| March | $14,194,000 | $8,426,000 | $15,218,000 | $20,969,000 | $23,855,000 | $21,759,000 | $27,271,000 | $26,268,000 |
| April | $13,941,000 | $13,340,000 | $15,394,000 | $20,783,000 | $22,414,000 | $21,533,000 | $27,108,000 | $27,318,000 |
| May | $14,135,000 | $7,926,000 | $15,850,000 | $21,423,000 | $23,358,000 | $22,450,000 | $27,355,000 | |
| June | $11,894,000 | $5,647,000 | $15,887,000 | $21,721,000 | $22,490,000 | $21,566,000 | $26,920,000 | |
| July | $14,273,000 | $5,817,000 | $18,860,000 | $22,064,000 | $23,758,000 | $24,282,000 | $27,991,000 | |
| August | $14,592,000 | $6,815,000 | $19,719,000 | $22,453,000 | $22,434,000 | $22,125,000 | $27,764,000 | |
| September | $11,714,000 | $6,022,000 | $20,137,000 | $22,006,000 | $18,871,000 | $23,756,000 | $28,304,000 | |
| October | $12,146,000 | $7,168,000 | $21,485,000 | $22,901,000 | $19,712,000 | $26,186,000 | $29,253,000 | |
| November | $11,458,000 | $8,268,000 | $19,514,000 | $22,215,000 | $19,462,000 | $25,506,000 | $26,002,000 | |
| December | $11,439,000 | $11,687,000 | $19,546,000 | $22,276,000 | $20,261,000 | $25,791,000 | $25,966,000 | |
| **Annual Overtime Spending** | **$155,038,000** | **$98,899,000** | **$207,713,000** | **$255,884,000** | **$260,327,000** | **$276,117,000** | **$323,093,000** | **$105,004,000** |
| **Average # of Staff** | **10,115** | **9,302** | **8,454** | **7,181** | **6,479** | **6,065** | **5,877** | **5,853** |

---

[201] Lags in the reporting and payment of overtime may occur. Staff must submit overtime paperwork, and processing lags may result in overtime paid weeks and potentially months after it was worked. On occasion, certain situations (*i.e.*, collective bargaining settlements) may call for substantial retroactive overtime payments. As a result, overtime data is never truly static and is subject to real-time changes. Because these changes are so frequent, they are not reflected in the data produced above.

## TABLE 9: DEPARTMENT'S AVERAGE DAILY POPULATION AND STAFFING LEVELS

The graph below shows the Department's average daily incarcerated population since 2016, and the average uniformed staff levels since 2019.



304

## TABLE 10: TRAINING ACADEMY GRADUATES

The table below shows the number of new recruits that graduated from the Department's Training Academy to become corrections officers each year.

| CO Graduation Data 2013-2025 | |
| --- | --- |
| **Year of Academy Class Graduation** | **Total # of COs who Graduated** |
| 2013 | 342 |
| 2014 | 287 |
| 2015 | 955 |
| 2016 | 2,229 |
| 2017 | 1,144 |
| 2018 | 1,213 |
| 2019 | 381 |
| 2020 | 0 |
| 2021 | 120 |
| 2022 | 108 |
| 2023 | 274 |
| 2024 | 189 |
| 2025 | 270 |

## TABLE 11: ATTRITION

The table below shows the number of staff who terminated their employment with the Department each year from 2020 to 2025, by rank and years of service.

| DOC Attrition Data, 2020-2025 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rank of MOS | Correction Officers | | | | Captains | | | | Senior Ranks (ADW and above) | | | | |
| Years of Service with DOC | Less than 5 Yrs | 5-10 Yrs | 10-20 Yrs | More than 20 Yrs | Less than 5 Yrs | 5-10 Yrs | 10-20 Yrs | More than 20 Yrs | Less than 5 Yrs | 5-10 Yrs | 10-20 Yrs | More than 20 Yrs | Total |
| 2020 | 399 | 51 | 211 | 120 | 0 | 1 | 32 | 22 | 0 | 0 | 3 | 17 | 856 |
| 2021 | 468 | 312 | 270 | 113 | 0 | 2 | 50 | 18 | 0 | 0 | 6 | 18 | 1,257 |
| 2022 | 144 | 455 | 381 | 98 | 0 | 2 | 49 | 18 | 0 | 2 | 5 | 8 | 1,162 |
| 2023 | 119 | 288 | 250 | 34 | 0 | 1 | 40 | 11 | 0 | 0 | 1 | 8 | 752 |
| 2024 | 124 | 135 | 271 | 43 | 0 | 0 | 36 | 8 | 0 | 0 | 6 | 7 | 630 |
| 2025 | 137 | 97 | 259 | 45 | 0 | 0 | 32 | 12 | 0 | 0 | 2 | 3 | 587 |

## TABLE 12: OVERVIEW OF STAFF PROMOTIONS

The table below shows the number of staff promoted to each rank from 2017 to 2025.

| Staff Promoted by Rank | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| Captain | 181 | 97 | 0 | 0 | 0 | 0 | 26 | 50 | 24 |
| Assistant Deputy Warden | 4 | 13 | 3 | 35 | 0 | 26 | 10 | 0 | 23 |
| Deputy Warden | 5 | 3 | 8 | 0 | 1 | 0 | 5 | 0 | 13 |
| Warden | 2 | 5 | 1 | 2 | 4 | 0 | 0 | 3 | 2 |
| Chief | 3 | 2 | 3 | 0 | 4 | 0 | 0 | 2 | 0 |

# APPENDIX G:
# LEADERSHIP APPOINTMENTS

**Leadership Appointments – January 2022 to May 21, 2026**

The table below identifies the leadership positions filled between January 2022 and May 21, 2026, including the date of appointment and the departure date, if applicable.

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Assistant Commissioner | Administration | 5/6/2024 | 1/25/2025 | Promoted to Deputy Commissioner of Administration |
| | | | | |
| Associate Commissioner | Administration | 11/25/2025 | | |
| | | | | |
| Deputy Commissioner | Administration | 9/6/2022 | 5/10/2024 | |
| Deputy Commissioner | Administration | 1/25/2025 | 2/6/2026 | |
| | | | | |
| Assistant Commissioner | AIU | 6/16/2022 | 4/27/2025 | Position Currently Vacant |
| | | | | |
| Executive Director | AIU | 5/11/2025 | | |
| | | | | |
| Agency Chief Contracting Officer (ACCO) | Central Office of Procurement | 9/18/2023 | 10/14/2024 | |
| Agency Chief Contracting Officer (ACCO) | Central Office of Procurement | 11/21/2024 | | |
| | | | | |
| Chief of Department | Chief of Department | 3/11/2026 | | |
| | | | | |
| Assistant Commissioner | CIB | 7/11/2022 | 11/10/2024 | |
| Assistant Commissioner | CIB | 9/30/2025 | | |
| | | | | |
| Assistant Deputy Warden / Executive Officer/Acting Assistant Commissioner | CIB | 11/10/2024 | 9/30/2025 | |
| | | | | |
| Assistant Commissioner | Development and Advancement (ODA) | 6/5/2025 | 4/2/2026 | |
| | | | | |
| Deputy Commissioner / Chief Diversity Officer | Development and Advancement (ODA) | 2/26/2025 | 4/2/2026 | |
| | | | | |
| Assistant Commissioner | Early Intervention, Supervision, & Support | 11/13/2018 | | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| | | | | |
| Acting EEO Officer | Equal Employment Opportunity | 2/10/2025 | 11/12/2025 | Promoted to Assistant Commissioner |
| | | | | |
| Assistant Commissioner/ EEO Officer | Equal Employment Opportunity | 8/2/2021 | 2/9/2025 | |
| Assistant Commissioner | Equal Employment Opportunity | 11/12/2025 | | |
| | | | | |
| Assistant Commissioner | Facilities & Fleet Administration (FMRD) | 9/4/2025 | | |
| Assistant Commissioner | Facilities & Fleet Administration (FMRD) | 1/7/2026 | | |
| | | | | |
| Associate Commissioner | Facilities & Fleet Administration (FMRD) | 9/11/2023 | 11/7/2024 | Promoted to Deputy Commissioner |
| | | | | |
| Deputy Commissioner | Facilities & Fleet Administration (FMRD) | 5/22/2023 | 10/27/2024 | |
| Deputy Commissioner | Facilities & Fleet Administration (FMRD) | 11/7/2024 | | |
| | | | | |
| Director, Energy Mgt Strategy | Facilities & Fleet Administration (FMRD) | 7/17/2023 | 5/4/2025 | Position eliminated |
| | | | | |
| Bureau Chief | Facility Operations and Security | 3/11/2026 | | |
| | | | | |
| Acting Assistant Chief | Facility Operations | 3/11/2026 | | |
| | | | | |
| Assistant Commissioner | Facility Operations, Classification & Population Management | 5/24/2023 | 5/21/2024 | Position eliminated |
| | | | | |
| Associate Commissioner | Facility Operations, Classification & Population Management | 8/22/2022 | 9/18/2025 | Title changed to AC of Security |
| Associate Commissioner | Facility Operations, Classification & Population Management | 6/20/2024 | 9/18/2025 | Title changed to AC of Facility Operations |
| Associate Commissioner | Facility Operations | 9/18/2025 | 3/20/2026 | |
| | | | | |

310

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Administrative Director of Facility Operations | Facility Operations, Classification & Population Management (CMCMU) | 10/28/2024 | 11/24/2025 | Position currently vacant |
| | | | | |
| Deputy Commissioner | Facility Operations, Classification & Population Management (CMCMU) | 7/25/2022 | 2/5/2024 | |
| Deputy Commissioner | Facility Operations, Classification & Population Management (CMCMU) | 10/15/2024 | 5/9/2025 | Position combined with Security Operations |
| | | | | |
| Deputy Warden in Command / Acting Warden (Promoted 3/25/25) | Facility Operations - CJB, Hospital Prison Wards, Transportation, Courts | 9/14/2021 | 3/24/2025 | Promoted to Warden |
| Warden | Facility Operations - CJB, Hospital Prison Wards, Transportation, Courts | 3/25/2025 | 9/18/2025 | Promoted to Acting Assistant Chief |
| Acting Assistant Chief | Facility Operations - CJB, Hospital Prison Wards, Transportation, Courts, GRVC, RNDC, EMTC, RMSC/ESH | 9/18/2025 | 4/2/2026 | Promoted to Assistant Chief |
| Assistant Chief | Facility Operations - CJB, Hospital Prison Wards, Transportation, Courts, GRVC, NIC, WF | 4/2/2026 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - EMTC | 4/24/2023 | 9/18/2025 | Promoted to Acting Warden |
| Acting Warden | Facility Operations - EMTC | 9/18/2025 | 11/25/2025 | Promoted to Warden |
| Warden | Facility Operations - EMTC | 11/25/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - GRVC | 4/24/2023 | 9/9/2024 | |
| Warden (Acting) | Facility Operations - GRVC | 9/9/2024 | 9/18/2025 | Promoted to Acting Warden at RNDC |
| Warden (Acting) | Facility Operations - GRVC | 9/18/2025 | 3/11/2026 | Promoted to Warden |
| Warden | Facility Operations – GRVC | 3/11/2026 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - NIC/WF | 6/20/2023 | 8/11/2024 | |
| Warden (Acting) | Facility Operations - NIC | 9/9/2024 | 9/18/2025 | NIC combined with WF |
| Assistant Commissioner | Facility Operations - WF | 11/13/2023 | 9/18/2025 | Position expanded to include NIC |

311

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Assistant Commissioner | Facility Operations – NIC/WF | 9/18/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - OBCC | 4/24/2023 | 10/7/2023 | |
| Assistant Commissioner (formerly in Security Operations) | Facility Operations - OBCC | 5/6/2024 | 1/8/2025 | |
| Warden (Acting) | Facility Operations - OBCC | 1/8/2025 | 9/18/2025 | |
| Warden | Facility Operations - OBCC | 9/18/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - RMSC | 4/24/2023 | 5/6/2024 | Promoted to Assistant Commissioner of Administration |
| Warden | Facility Operations - RMSC | 10/17/2024 | | |
| | | | | |
| Warden | Facility Operations - RMSC/ESH | 10/17/2024 | 9/18/2025 | Promoted to Warden at OBCC |
| Acting Warden | Facility Operations - RMSC/ESH | 9/18/2025 | | |
| | | | | |
| Warden | Facility Operations - RNDC | 10/17/2024 | 9/18/2025 | |
| Acting Warden | Facility Operations - RNDC | 9/18/2025 | 3/11/2026 | Promoted to Acting Assistant Chief of Facility Operations |
| | | | | |
| Assistant Commissioner | Facility Operations - VCBC | 4/24/2023 | 10/21/2023 | Position eliminated |
| | | | | |
| Assistant Commissioner | Finance | 9/8/2020 | 10/14/2024 | |
| Assistant Commissioner | Finance | 2/18/2025 | 4/9/2026 | Promoted to Deputy Commissioner |
| | | | | |
| Deputy Commissioner | Finance | 9/11/2023 | 4/25/2025 | |
| Deputy Commissioner | Finance | 4/9/2026 | | |
| | | | | |
| Assistant Commissioner | Health Affairs | 11/17/2023 | | |
| | | | | |
| Deputy Commissioner | Health Affairs | 1/30/2023 | 12/19/2025 | Position currently vacant |
| | | | | |
| Assistant Commissioner | Health Management Division | 10/10/2023 | | |

312

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| | | | | |
| Chief Surgeon | Health Management Division | 4/18/2023 | 8/11/2023 | Position eliminated |
| | | | | |
| Medical Director | Health Management Division | 10/16/2025 | | |
| | | | | |
| Assistant Commissioner | Human Resources | 6/16/2022 | 4/9/2023 | |
| Assistant Commissioner | Human Resources | 8/8/2022 | 5/24/2024 | Promoted to Associate Commissioner |
| Assistant Commissioner | Human Resources | 10/1/2023 | 10/31/2025 | |
| Assistant Commissioner | Human Resources | 4/16/2026 | | |
| | | | | |
| Associate Commissioner | Human Resources | 4/7/2022 | 4/1/2023 | |
| Associate Commissioner | Human Resources | 5/24/2024 | 9/12/2025 | Promoted to Deputy Commissioner |
| Associate Commissioner | Human Resources | 10/31/2025 | | |
| | | | | |
| Deputy Commissioner | Human Resources | 10/16/2023 | 8/16/2024 | |
| Deputy Commissioner | Human Resources | 9/12/2025 | 4/28/2026 | |
| | | | | |
| Executive Director | Intergovernmental Affairs | 8/8/2022 | 4/15/2025 | |
| Executive Director | Intergovernmental Affairs | 10/14/2025 | | |
| | | | | |
| Deputy Commissioner | Investigations | 5/9/2022 | 4/1/2023 | |
| Deputy Commissioner | Investigations | 8/3/2023 | | |
| | | | | |
| Assistant Commissioner | Investigations | 12/11/2022 | 3/1/2023 | |
| Assistant Commissioner | Investigations | 8/8/2023 | 3/25/2024 | |
| Assistant Commissioner | Investigations | 10/16/2025 | | |
| | | | | |
| Associate Commissioner | Investigations | 12/15/2021 | 9/5/2023 | |
| Associate Commissioner | Investigations | 11/22/2024 | | |
| | | | | |
| Associate Commissioner | IT | 8/8/2022 | | Acting Deputy Commissioner from 4/10/2023 to 4/9/2024 |
| Associate Commissioner/ | IT | 7/3/2023 | 4/9/2024 | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Deputy CIO IT Division | | | | |
| Associate Commissioner | IT | 11/18/2024 | | |
| | | | | |
| Deputy Commissioner | IT | 9/24/2017 | 6/1/2023 | |
| Deputy Commissioner (Acting) | IT | 4/10/2023 | 4/9/2024 | |
| Deputy Commissioner | IT | 4/9/2024 | | |
| | | | | |
| Deputy Commissioner | Legal | 8/8/2022 | 9/2/2023 | |
| General Counsel (Acting) | Legal | 12/12/2023 | 8/9/2024 | |
| General Counsel | Legal | 8/26/2024 | | |
| | | | | |
| Deputy General Counsel | Legal | 8/14/2023 | 11/5/2023 | |
| Deputy General Counsel (Acting) | Legal | 12/12/2023 | 7/30/2024 | |
| Deputy General Counsel | Legal | 10/21/2024 | | |
| Deputy General Counsel | Legal | 12/23/2025 | | |
| | | | | |
| Assistant Commissioner | Management Analysis & Planning | 1/17/2023 | 9/1/2023 | |
| Assistant Commissioner | Management Analysis & Planning | 8/29/2022 | | |
| | | | | |
| Associate Commissioner | Management Analysis & Planning | 7/3/2022 | 9/19/2025 | During this period also served as Acting Deputy Commissioner – 4/24/2025 to 9/19/2025 |
| | | | | |
| Deputy Commissioner | Management Analysis & Planning | 4/18/2022 | 4/24/2025 | |
| Deputy Commissioner (Acting) | Management Analysis & Planning | 4/24/2025 | 9/19/2025 | |
| Deputy Commissioner | Management Analysis & Planning | 12/10/2025 | | |
| | | | | |
| Assistant Commissioner | Nunez Compliance Unit | 4/17/2023 | | |
| | | | | |
| Assistant Commissioner | Nutritional Services Division | 11/3/2025 | | |
| | | | | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Agency Counsel and Senior Advisor to the Commissioner | Office of the Commissioner | 1/22/2024 | 4/4/2025 | |
| | | | | |
| Chief Of Staff | Office of the Commissioner | 2/14/2022 | 1/12/2024 | |
| Chief Of Staff / Bureau Chief | Office of the Commissioner | 5/24/2024 | 3/11/2026 | Promoted to Chief of Department |
| Chief of Staff | Office of the Commissioner | 3/30/2026 | | |
| | | | | |
| Commissioner | Office of the Commissioner | 1/1/2022 | 12/8/2023 | |
| Commissioner | Office of the Commissioner | 12/8/2023 | 2/13/2026 | |
| Commissioner | Office of the Commissioner | 2/16/2026 | | |
| | | | | |
| Deputy Chief of Staff | Office of the Commissioner | 4/11/2022 | 4/18/2025 | |
| Deputy Chief of Staff | Office of the Commissioner | 8/18/2025 | 3/6/2026 | |
| Deputy Chief of Staff | Office of the Commissioner | 3/13/2026 | | |
| | | | | |
| Senior Deputy Chief of Staff | Office of the Commissioner | 10/21/2024 | | |
| | | | | |
| First Deputy Commissioner | Office of the FDC | 3/5/2021 | 12/8/2023 | Promoted to Commissioner |
| First Deputy Commissioner | Office of the FDC | 2/2/2024 | 2/13/2026 | |
| First Deputy Commissioner | Office of the FDC | 3/3/2026 | | |
| | | | | |
| Senior Deputy Commissioner | Office of the SDC | 10/31/2022 | 2/3/2023 | |
| Senior Deputy Commissioner | Office of the SDC | 10/26/2023 | 5/17/2024 | |
| Senior Deputy Commissioner | Office of the SDC | 11/18/2024 | 3/16/2026 | Transferred to DC of Special Investigations Unit/PREA |
| Senior Deputy Commissioner | Office of the SDC | 3/23/2026 | | |
| | | | | |
| Associate Commissioner | Operations | 11/9/2022 | 1/16/2024 | Position eliminated |
| Assistant Commissioner | Operations Research | 9/12/2022 | 6/16/2023 | Position eliminated |
| | | | | |
| Deputy Warden in Command | Outposted Therapeutic Housing Units | 3/30/2026 | | |
| | | | | |
| Assistant Commissioner | Preparedness and Resilience | 4/11/2022 | 7/6/2025 | |
| Assistant Commissioner | Preparedness and Resilience | 12/3/2025 | | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| | | | | |
| Assistant Commissioner | Program Operations | 3/18/2022 | 6/24/2023 | |
| | | | | |
| Assistant Commissioner | Programs | 1/20/2020 | | |
| Assistant Commissioner | Programs | 11/21/2024 | 2/4/2026 | |
| Assistant Commissioner | Programs | 12/5/2023 | | |
| Assistant Commissioner | Programs | 4/7/2022 | 7/21/2025 | Promoted to Associate Commissioner |
| Assistant Commissioner | Programs | 4/16/2026 | | |
| | | | | |
| Associate Commissioner | Programs | 3/14/2022 | 9/29/2023 | |
| Associate Commissioner | Programs | 11/13/2023 | 11/29/2024 | |
| Associate Commissioner | Programs | 7/21/2025 | | |
| | | | | |
| Deputy Commissioner | Programs | 9/6/2021 | 2/2/2024 | Promoted to First Deputy Commissioner |
| Deputy Commissioner | Programs | 11/29/2024 | | |
| | | | | |
| Assistant Commissioner | Public Information | 1/30/2023 | 7/28/2024 | |
| Assistant Commissioner | Public Information | 11/25/2025 | | |
| Assistant Commissioner | Public Information | 12/10/2025 | | |
| | | | | |
| Deputy Commissioner | Public Information | 7/1/2022 | 4/14/2023 | |
| Deputy Commissioner | Public Information | 5/3/2023 | 6/30/2024 | |
| Deputy Commissioner | Public Information | 11/18/2024 | | |
| | | | | |
| Assistant Commissioner | Research Evaluation and Grants (OMAP) | 11/12/2025 | | |
| | | | | |
| Associate Commissioner | Security | 9/18/2025 | | |
| | | | | |
| Assistant Chief of Security | Security Operations | 5/24/2024 | 3/11/2026 | Promoted to Bureau Chief of Facility Operations and Security |
| | | | | |
| Assistant Commissioner | Security Operations | 4/3/2023 | 5/6/2024 | Moved to AC of OBCC |

316

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Assistant Commissioner | Security Operations | 11/27/2023 | | |
| | | | | |
| Deputy Commissioner | Security Operations | 5/16/2022 | 10/29/2024 | |
| Deputy Commissioner | Security, Classification, Custody Management, and Facility Operations | 10/30/2024 | 2/19/2026 | |
| | | | | |
| Deputy Commissioner | Special Investigations Unit | 3/16/2026 | | |
| | | | | |
| Assistant Commissioner | Special Investigations Unit/PREA | 12/19/2022 | 7/18/2025 | |
| Assistant Commissioner | Special Investigations Unit | 12/23/2025 | | |
| | | | | |
| Deputy Commissioner | Strategic Operations | 4/8/2024 | | |
| | | | | |
| Assistant Commissioner | Strategic Operations - New Initiatives | 11/13/2023 | | |
| | | | | |
| Deputy Commissioner | Training Academy | 12/5/2022 | 1/16/2024 | |
| Deputy Commissioner | Training Academy | 1/17/2024 | 11/26/2024 | Acting Capacity |
| Deputy Commissioner | Training Academy | 11/26/2024 | | |
| | | | | |
| Assistant Commissioner | Training Academy | 9/6/2022 | 9/17/2022 | |
| Assistant Commissioner | Training Academy | 1/30/2023 | | Served as Acting Deputy Commissioner from 1/17/2024 to 11/26/2024 |
| | | | | |
| Assistant Commissioner | Trials | 11/12/2025 | | |
| | | | | |
| Associate Commissioner | Trials | 8/8/2022 | 8/2/2023 | |
| Associate Commissioner | Trials | 11/25/2025 | | |
| | | | | |
| Deputy Commissioner | Trials | 5/31/2022 | | |

317

# APPENDIX H:
# INTAKE

## Update on Processing of New Admissions

The Monitoring Team provides an update about processing people newly admitted to the Department ("New Admissions") because it relates to a number of provisions[202] in the *Nunez* Court Orders related to the Department's use of Intake, and because of the Court's March 13, 2023 Order (dkt. 511) regarding these operations.

New Admissions procedures remain as described in the Monitor's February 3, 2023 Report at pgs. 15 to 18 and Appendix A and the April 3, 2023 Report at pgs. 74 to 75. The New Admissions process is currently governed by Operations Order 22/07 dated December 14, 2007.[203] Overall, since the Monitoring Team began scrutinizing new admissions processing during the 17th Monitoring Period, the Department has been able to process *most* people in custody through Intake within 24 hours, using either custody time or arrival time to calculate their stay in Intake.

---

[202] Three distinct intake provisions are included in the Court's First Remedial Order, Second Remedial Order, and Action Plan in response to concerning reports about poor conditions and excessive lengths of stay in intake units. They are:

- First Remedial Order (dkt. 350): ¶ A(3) (Revised De-Escalation Protocol). This provision requires the Department to implement a de-escalation protocol to minimize the use of intake following use of force incidents.

- Second Remedial Order (dkt. 398): ¶ 1(i)(c). This provision requires the Department to process all incarcerated individuals, including new admissions and inter/intra facility transfers, through intake and place them in an assigned housing unit within 24 hours. The Department must also develop and implement a reliable system to track and record the amount of time an individual is held in intake and document any instance when an individual remains in intake for more than 24 hours.

- Action Plan (dkt. 465): § D, ¶ 2(b) and § E, ¶ (3)(a)-(b). These Action Plan requirements reiterate the intake-related requirements in the First and Second Remedial Orders (described above). They also require the Classification Manager and the Security Operations Manager to collaborate to reduce the reliance on intake and to timely process individuals through intake.

[203] The policy was updated in early 2023 but was rescinded in June 2023 because the Department had not consulted with the Monitoring Team on the changes prior to promulgation. Revisions to the policy have not been prioritized, given the Department's need to focus on other higher priority initiatives.

## TABLE 1 (A): LENGTH OF STAY IN INTAKE FOR MALE NEW ADMISSIONS

As shown in the table below, since the Monitoring Team began scrutinizing Intake processing during the 17th Monitoring Period, most male new admissions are processed through Intake within 24 hours, using either custody time or arrival time to calculate their stay.[204,205]

| Monitoring Period | Per Custody Time | | Per Arrival Time | |
|---|---|---|---|---|
| | # PIC | % | # PIC | % |
| July to December 2023 – 17th Monitoring Period | 8,668 | 94% | 8,848 | 96% |
| January to June 2024 – 18th Monitoring Period | 9,368 | 93% | 9,563 | 95% |
| July to December 2024 – 19th Monitoring Period | 9,046 | 91% | 9,260 | 93% |
| January to June 2025 – 20th Monitoring Period | 9,357 | 90% | 9,606 | 93% |
| July to December 2025 – 21st Monitoring Period | 9,262 | 91% | 9,487 | 93% |

[204] One of two data points can be used as the "start time" when tracking length of stay in intake: (1) "custody time" refers to the time that an individual is transferred from NYPD to NYC DOC Custody, which typically occurs in a court setting; (2) "arrival time" refers to the time that an individual arrives at an intake unit on Rikers Island (typically at EMTC, although a small number of people may be processed through intake at West Facility in response to individual circumstances such as health or security considerations).

[205] As noted in the Monitor's February 3, 2023 Special Report on Intake (dkt. 504), the Monitoring Team assesses the time each person arrives in the intake unit (*i.e.*, "arrival time") compared to the time the individual is transported to their assigned housing unit when calculating whether the 24-hour requirement has been met. Counsel for the Plaintiff Class has advised the Monitoring Team that it believes that the assessment of compliance should be based on the time an individual is taken into custody (*i.e.*, "custody time"). Discussions about the appropriate compliance standard will occur in conjunction with the discussion related to clock stoppages. Given that, this report provides outcomes using both data points for the Court's consideration.

## TABLE 1 (B): LENGTH OF STAY IN INTAKE FOR MALE NEW ADMISSIONS

As shown in the section under the orange bar in the table below, during the current Monitoring Period, 91% (per custody time) and 93% (per arrival time) of male new admissions were processed through Intake within 24 hours. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below. The data beneath the green bar in the table below shows the total length of stay for the small proportion of individuals whose processing did not meet the 24-hour timeline. During this Monitoring Period, most of those individuals who did not meet the 24-hour timeline were housed 9 hours late or less (between 24 and 33 hours after admission; 68% of those housed late using custody time and 78% of those housed late using arrival time).

| Intake Processing Times for New Admissions Arriving at EMTC Intake July to December 2025 | | | | |
|---|---|---|---|---|
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **n=10,179** | **%** | **n=10,179** | **%** |
| Housed/Discharged within 24 hours | 9,262 | 91% | 9,487 | 93% |
| Housed/Discharged beyond 24 hours | 917 | 9% | 692 | 7% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **n=917** | **%** | **n=692** | **%** |
| 24-27 hours ($\leq$ 3 hrs.) | 206 | 22.5% | 204 | 29.5% |
| 27-30 hours (3-6 hrs.) | 228 | 24.9% | 182 | 26.3% |
| 30-33 hours (6-9 hrs.) | 187 | 20.4% | 154 | 22.3% |
| 33-36 hours (9-12 hrs.) | 156 | 17.0% | 81 | 11.7% |
| 36-48 hours (12-24 hrs.) | 104 | 11.3% | 50 | 7.2% |
| More than 48 hours ($\geq$24 hrs.) | 36 | 3.9% | 21 | 3.0% |

## TABLE 2 (A): LENGTH OF STAY IN INTAKE FOR FEMALE NEW ADMISSIONS

Similarly, most female new admissions are processed within 24 hours (using either custody time or arrival time to calculate the length of stay). Since the Monitoring Team began scrutinizing Intake processing in the 17th Monitoring Period, both metrics are reliably above 90%.

| Monitoring Period | Per Custody Time | | Per Arrival Time | |
|---|---|---|---|---|
| | # PIC | % | # PIC | % |
| July to December 2023 – 17th Monitoring Period | 796 | 93% | 818 | 95% |
| January to June 2024 – 18th Monitoring Period | 939 | 93% | 957 | 95% |
| July to December 2024 – 19th Monitoring Period | 973 | 92% | 1,001 | 95% |
| January to June 2025 – 20th Monitoring Period | 1,073 | 93% | 1,118 | 97% |
| July to December 2025 – 21st Monitoring Period | 1,010 | 90% | 1,043 | 93% |

322

## TABLE 2 (B): LENGTH OF STAY IN INTAKE FOR FEMALE NEW ADMISSIONS

Female new admissions are processed through an Intake unit at RMSC and then transferred to a housing unit within RMSC. As shown in the section under the orange bar in the RMSC table below, during the current Monitoring Period, 90% (per custody time) and 93% (per arrival time) of female new admissions were processed through Intake within 24 hours. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below.

The data beneath the green bar in the table below shows the total length of stay for the small proportion of female new admissions whose processing did not meet the 24-hour timeline. During this Monitoring Period, most of those individuals who did not meet the 24-hour timeline were housed 9 hours late or less (between 24 and 33 hours after admission 68% of those housed late using custody time and 65% of those housed late using arrival time).

| Intake Processing Times for New Admissions Arriving at RMSC Intake July to December 2025 | | | | |
|---|---|---|---|---|
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **n=1,123** | **%** | **n=1,123** | **%** |
| Housed/Discharged within 24 hours | 1,010 | 90% | 1,043 | 93% |
| Housed/Discharged beyond 24 hours | 113 | 10% | 80 | 7% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **n=113** | **%** | **n=80** | **%** |
| 24-27 hours (≤ 3 hrs.) | 30 | 26.6% | 28 | 35.0% |
| 27-30 hours (3-6 hrs.) | 31 | 27.4% | 15 | 18.8% |
| 30-33 hours (6-9 hrs.) | 16 | 14.2% | 9 | 11.3% |
| 33-36 hours (9-12 hrs.) | 9 | 8.0% | 6 | 7.5% |
| 36-48 hours (12-24 hrs.) | 20 | 17.7% | 18 | 22.5% |
| More than 48 hours (≥24 hrs.) | 7 | 6.2% | 4 | 5.0% |

323

**Temporarily Suspending New Admission Processing, a.k.a. Clock-Stoppage**

Historically, the Department has identified circumstances in which new admission Intake processing is interrupted and has tolled its accounting of the processing time (*i.e.*, "stopped the clock") until the circumstance is resolved and processing can resume.[206] This includes when:

- An individual is returned to court before the Intake process is completed.

- An individual refuses to participate in Intake processing.

- An individual is transferred to a hospital or Urgi-Care (a clinic in another facility on Rikers Island) before the Intake process is complete.

- An individual makes bail and is released from custody before the Intake process is complete.

Suspending Intake processing appears logical (*e.g.*, processing cannot occur if the person is not physically present) and may also be functional (*e.g.*, Department or CHS staff need to know that an individual will not be presented for a certain procedure).

During the current Monitoring Period, most individuals newly admitted to the Department (85% or 8,675 of 10,179 male new admissions; and 80% or 895 of 1,123 female new admissions) were processed through Intake without the process being suspended for any reason. Further, the fact that the Intake process may have been suspended did not necessarily mean that the individual was not processed within 24 hours. In fact, among the 1,504 male new admissions whose Intake process was suspended for some period, 598 were housed within 24 hours by custody time (40%) and 818 by arrival time (54%). For the 228 female new admissions whose Intake process was suspended for some period, 115 were housed within 24 hours by custody time (50%) and 149 by arrival time (65%). Among those whose Intake process was temporarily suspended and whose processing lasted more than 24 hours, the largest category of suspensions occurred when the individual was required to return to court (74% of male suspensions per custody time; 75% of male suspensions per arrival time; and 64% of female suspensions per custody time; 66% of female suspensions per arrival time).

---

[206] *See* Monitor's February 2023 Report at pgs. 17 and 19-20 and Monitor's April 3, 2023 Report at 79 to 81.

Notably, although the Department tracks all clock stoppages, the data presented in the sections above regarding the 24-hour timeline utilized a continuously running clock, *without deducting any time when processing was suspended.* Accordingly, over 90% of individuals are processed within 24 hours even if the clock is suspended for some period of time. There are legitimate reasons that the processing clock may need to be suspended, especially if the individual is not physically present in the processing facility (*e.g.*, at court).

**NCU's Audits to Verify Data Entry**

The *Nunez* Compliance Unit ("NCU") has continued its audit strategy to corroborate the time entries in the New Admission Dashboard for male new admissions at EMTC using Genetec footage.[207] Prior to the start of the Monitoring Period, the Monitoring Team supported NCU's proposal to decrease the number of audits from two per month to one every two months. Accordingly, during this Monitoring Period, audits occurred in July, September, and November 2025. However, in July, DOC leadership identified an unusual increase in 24-hour violations in a two-day timeframe and asked NCU to perform a *targeted* audit of this timeframe. (Generally, NCU's Intake audits are random.) NCU completed the audit and, as expected, identified multiple inconsistencies between Genetec footage and time entries. Subsequently, changes were made to leadership at EMTC. The results of the July audit are summarized below.

- 3 of 15 people (20%) arrived in Intake and were processed and transferred to a housing unit within the 24-hour timeline (confirmed via Genetec review).

- 6 of 15 arrival time entries (40%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). All nine inaccuracies cited a time *after* the person actually arrived.

- 11 of 15 housing time entries (73%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). All four inaccuracies stated a time *before* the person was actually transferred to a housing unit.

- 15 of 15 people (100%) had "clock stoppages" during the Intake process, all attributed to the individual's refusal to cooperate with Intake procedures. NCU found that 13 of the

---

[207] *See* Monitor's February 3, 2023 Report at pgs. 20 to 22 and Monitor's April 3, 2023 Report at pgs. 78 to 79. NCU does not conduct audits for female new admissions at RMSC.

15 clock stop entries were entered over 12 hours after the supposed refusal, and 13 individuals had duplicate dashboard entries that were inserted two days after the supposed refusal. Additionally, NCU observed only one of the 15 individuals refusing to cooperate. The other 14 refusals were not corroborated by Genetec review.

Findings from the September and November random audits are summarized below.[208]

- 39 of 40 people (98%) arrived in Intake and were processed and transferred to a housing unit within the 24-hour timeline (confirmed via Genetec review).

- 39 of 40 arrival time entries (98%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). The one inaccuracy cited a time *after* the person actually arrived.

- 38 of 38[209] housing time entries (100%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec).

- 4 of 40 people (10%) had "clock stoppages" during the Intake process. Of these four stoppages, three individuals were housed within 24 hours of their arrival time in Intake and three individuals were not.

The NCU's random audits for the current Monitoring Period continue to indicate that time entries are generally accurate and reliable, and time entry errors are not common. More importantly, DOC's proactive identification of an increase in 24-hour violations in July resulted in a targeted audit that identified problematic behavior and resulted in leadership changes.

**<u>New Admission Process and Recent Physical Plant Updates at EMTC</u>**

The staffing at EMTC the intake area remains the same from last Monitoring Period and is staffed each day across all tours with a New Admissions Expeditor, a captain, and an Assistant Deputy Warden, along with approximately seven to nine correction officers assigned to intake operations. EMTC also reported that court production searches continue to be conducted in the

---

[208] NCU confirms the status of all individuals in the intake unit to determine whether they are a new admission or if the individual may already have been in custody and is therefore in intake as an inter/intra facility transfer. The audit is limited to those individuals confirmed as new admissions.

[209] Two individuals were excluded from the Housing Time calculation because they were discharged during their admission process and thus the housing time was not applicable.

gymnasium. However, during this Monitoring Period, EMTC reported two physical plant changes. First, a CellSense machine was installed in the intake area. The CellSense machine is a highly sensitive detector designed specifically to locate concealed cell phones, weapons, and razor blades. Second, in order to further expedite processing, EMTC also reported that a holding pen and three shower stalls were constructed by converting a former closet/storage space, but the facility is still awaiting SCOC approval before the holding pen can be utilized.

# APPENDIX I: UPDATES ON TECHNOLOGY INITIATIVES

Below is a list of IT initiatives that have recently been completed or are in various stages of progress.

**Security & Operations Initiatives**

- **Recidiviz:** The Department is evaluating Recidiviz, a nonprofit technology platform intended to support Programs staff in documenting case manager/PIC interactions and providing continuity across case managers. The Department is also exploring integration with PIC tablets to provide electronic notices and information, including visits, appointments, court and clinic dates, grievance status, and infraction notices. The Department did not receive new needs funding for this initiative and is therefore proceeding with a scaled-down Phase 1, utilizing limited philanthropic funding, to provide PICs with certain basic information that has reportedly been a high priority request from incarcerated individuals. Information to be provided initially will include next court date and location (as available), attorney information (as available), sentence start and end dates for sentenced individuals, and a static list of programs and services available in each facility.

- **Electronic Logbook**: The Electronic Logbook pilot remains ongoing at OBCC (SMU), and the system is also running in all housing areas at BHTU. Some operational issues were identified during the pilot, and IT continues to work with the facility to resolve them. IT is working with Facility Operations and OBCC management to expand the rollout of the system to all A-posts in OBCC, as well as to develop a robust quality assurance process to ensure the consistency and quality of log entries. The Department is considering whether to expand the system to include facility Injury Report Logbooks before broader rollout.

- **Benchmark Analytics:** The Department participated in a demonstration of software that reviews data for the purpose of risk management. This initiative cannot move forward at this time due to funding constraints.

- **PIC Identification Cards**: The Department acquired ID cards, clips, and printers needed to reissue identification cards to people in custody. These cards facilitate identification during service delivery and the movement of individuals. The ID cards were first piloted

329

in RMSC, followed by deployment in RNDC, NIC, WF, GRVC, OBCC, RESH, and EMTC. All PICs in these facilities now have ID cards.

- **Incarcerated Individual Service Delivery Tracker (IISD)**: The Department has developed a mobile and web-based application to document services provided to people in custody, such as laundry & linen exchange, recreation, clinic visits, court, and commissary. The application includes barcode scanning to expedite identification. The Department has provided tablets to the Law Library and has begun using the system to track certain service delivery information, including access to the Law Library. The Department continues to consider expansion to other services.

- **Search & Contraband Tracking System (SSTS)**: The Department is piloting a tablet-based system for documenting ESU, SRT, and SST search operations in real-time, including team planning, contraband findings, and related notifications.  The project has moved slowly due to competing priorities and technical issues affecting facility use. It remains functional for ESU, SRT & SST needs. The Department is working on expanding the system to cover the needs of the K-9 units as well as to support facility searches.

- **PIC Lookup System (Enhancements)**: Enhancements to the PIC Lookup System have been completed, allowing staff to more easily access comprehensive PIC profiles, including incident history, housing movements, program participation, infractions, and separation orders.

- **Incident Reporting System**: The Department is overhauling the incident reporting system to align with State Commission of Correction (SCOC) standards and streamline submissions to the State's eJustice platform. This initiative involved collaboration amongst many stakeholders in various divisions and units. The rollout date has been delayed due to various competing priorities.

- **Program Services Tracking**: A system is in place for the Division of Programs to track program delivery and attendance among PICs. This initiative has been implemented and continues to receive ongoing enhancements as per the needs of the Division of Programs and Community Partnerships.

330

- **Clinic Production Tracking**: The Department collaborated with CHS to develop an electronic system to track clinic call-downs, production, and refusals. The Clinic Production Tracking pilot was launched at NIC in December 2025 and continues to progress in coordination with CHS. The Department is working to add additional data elements and is exploring mobile functionality so escort officers can document refusals and clinic escorts in real time. The Department is also expanding this pilot to GRVC and has started working with GRVC management to train GRVC staff on the use of the system, as well as to pilot the mobile version of the application for use by escort officers. It is discussed in more detail in the Providing Medical Attention Following A Use of Force Incident compliance assessment for Consent Judgment § V., ¶ 22.

- **Infractions Reporting & Tracking System**: The Department continues to develop the Infractions Reporting & Tracking System. Phase 1, which addresses the initial creation and processing of infraction paperwork by the facilities, has been rolled out Department-wide. Phase 2, which addresses the investigation of infractions and service of paperwork to PICs, was demonstrated to the Monitoring Team in April 2026, went live on schedule in May 2026, and is now in use Department-wide. Phase 3, which will address hearings and adjudications, remains under development.

- **Audits & Inspections Management System (AIMS)**: A web and mobile platform is being tested to allow units such as Fire Safety and Environmental Health to schedule and document inspections. This platform went live in October 2025, and the Department reported that this project is complete. The Environmental Health Unit (EHU) identified certain enhancements needed to more effectively document its findings; those enhancements were completed and rolled out in May 2026.

- **Idemia LiveScan:** The Department continues to move forward with Idemia LiveScan, which consists of machines and software for the collection of fingerprints and other biometric data. Hardware has been delivered, and the Department is working to reintroduce the project to new leadership and relevant staff following recent personnel changes.

- **Staff Body Scanning:** Funding was approved by OMB near the end of the Monitoring Period, and the Department is working through procurement for the upgraded staff body scanners. IT intends to order scanners in smaller batches based on operational need, rather than through one large order, to support quicker delivery from the vendor and a more manageable rollout.

## HR, Administration & Training Initiatives

- **TDY Tracker and Transfers**: An electronic tracker records uniform MOS transfers and temporary duty assignments and displays current work locations in the Employee Lookup System. This system has been fully implemented.

- **Electronic Form 22R**: An automated system for generating staff service records by pulling data from multiple sources has been developed. The module is now in pilot; while it has not yet been fully rolled out for Department-wide use, several management-level staff have access to the system and are using it.

- **ArmorerLink Firearms Tracking System**: This web-based platform manages firearm inventory, training, and qualifications and includes a mobile app for real-time documentation at the range. This system has not yet been rolled out. The IT Division is working with the Firearms & Tactics Unit to plan the rollout.

- **Email Accounts for All Staff**: The Department is extending email access to all staff, including COs, to enhance communication and enable digital services. Nearly all staff now have an active email address, but the Department is developing a communication campaign to increase staff engagement with their email accounts.

## Health Management Division (HMD)

- **FMLA Tracking**: HMD staff are now receiving FMLA requests directly from staff. Previously, these calls were made to the facility, unit, or Division for which the staff member worked. The FMLA requests are now being entered into a tracker and the electronic system for scheduling staff. The Department is now working on Phase 2 of this initiative, in which the initial FMLA request will be received by HR, with HR documenting the approval and cadence of block or intermittent FMLA.

**Investigations & Legal**

- **Case Builder**: The Department is introducing a new case management platform to support multiple divisions and improve data quality and efficiency in investigations. The rollout of this platform faced numerous delays, given the complexity, testing, and training conducted by the vendor. Case Builder went live for use by ID, Trials, and ICDU in April 2026, and the Department is now working to roll out the platform to additional divisions.

**Finance & Procurement**

- **Budget Request & Procurement Tracking**: DOC built a digital system for submitting and tracking budget and procurement requests, which was intended to eventually integrate with the City's Passport system. The system ultimately did not meet the needs of the Budget and Procurement divisions and will not be further pursued. IT will work with these divisions to develop requirements for a new system.

**Other Projects**

- **Self-Service Scheduling & Leave Requests**: A platform is being developed to allow staff to view schedules and request leave, OT, and mutuals from personal devices. IT created a proof of concept, but the Department has not yet had time to pilot or further develop the initiative given competing priorities amongst the many Divisions involved.

- **Human Capital Management System (HCM)**: The Department is preparing to implement an enterprise HR system that consolidates employee data and interfaces with city systems like the New York City Automated Personnel System (NYCAPS) and the Payroll Management System (PMS). The Human Capital Management System remains delayed. The Department is working with the vendor to finalize a statement of work as well as with the Office of Management and Budget (OMB), Department of Citywide Administrative Services (DCAS), and the Office of Payroll Administration (OPA, formerly FISA) to complete a review and approval of the funding request.

- **Jail Management System (IIS Replacement)**: The Department formally kicked off the Jail Management System/IIS replacement project with Microsoft in March 2026. This system will manage PIC data and workflows. The kickoff included Department

leadership and senior Microsoft representatives. This remains a significant long-term modernization project intended to replace the Department's aging IIS system.

- **PIC Banking System (IFCOM Replacement)**: The Department is preparing to replace the IFCOM system with a more robust solution for managing PIC finances. The Department has identified a budget for this project and is currently working with the vendor to finalize the legal agreements prior to submitting it for OMB's funding approval.

- **Culinary Digital**: The Department has developed a web-based system to support Nutritional Services with recipe planning, inventory, menu compliance, and dietary tracking. Development of this initiative is complete, and the IT Division is working with the Nutritional Services Division to plan rollout.

## Fully Implemented Initiatives

The following initiatives have been fully implemented and have remained in place and operational, in some cases for an extended period of time:

- **RapiScan Drug Detection System**: The Department has implemented portable drug detection machines capable of swabbing and identifying multiple types of drugs in incoming mail and packages with a high degree of reliability. These machines also support chain of custody by printing time-stamped slips that specify the substance detected. This initiative has been fully implemented and in place for an extended period.

- **Body Worn Cameras**: The Department completed the rollout of Body-Worn Cameras ("BWC") across all major facilities, including the installation of docking stations in each location. In total, more than 4,000 cameras were deployed systemwide. This initiative has been complete for approximately one year.

- **Attendance Tracking**: An electronic system is in place to replace paper sign-in sheets and provide real-time attendance data for uniformed staff. This initiative has been fully implemented and in place for an extended period. Future enhancements will be revisited to determine how to proceed.

334

- **Electronic Health Management System Enhancements**: The existing HMD system was upgraded to support case management, medical fitness determinations, and tracking of MMR status. These enhancements have been fully completed and rolled out.

- **Recruitment Tracking**: A mobile/web application enables recruitment staff to log outreach efforts and track interested candidates for the CO exam. This initiative has been in place for almost two years.

- **Good Guy Letter Tracking**: DOC now tracks requests for Good Guy Letters electronically to support retired officers seeking personal firearm licenses. This initiative has been complete since January 2025.

- **Officer Training Accountability System**: A system is in place to ensure compliance with training requirements by capturing photos during LMS courses for auditing and identity verification. This initiative has been fully implemented and in place for over two years.

- **Vacation Bidding**: A digital system has replaced paper-based vacation scheduling, allowing staff to submit ranked vacation picks which are processed in compliance with operational orders. The Department has made electronic vacation bidding mandatory for this year's vacation pick process. Staff are required to submit vacation picks electronically through the system developed by IT. This initiative is complete.

# APPENDIX J:
# USE OF FORCE REPORTING

## TABLE 1: INDEPENDENT, COMPLETE, AND TIMELY STAFF REPORTS

The table below shows the number and timeliness of staff reports for actual and alleged uses of force from 2018 to 2025.

| | Timeliness of Staff Report | | | | | |
|---|---|---|---|---|---|---|
| | Actual UOF | | | Alleged UOF | | |
| Year | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 24 Hours | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 72 Hours of the Allegation |
| 2018 | 15,172 | 12,709[210] | 83.8% | 139 | 125[211] | 89.9% |
| 2019 | 21,595 | 20,302 | 94.0% | 190 | 134 | 70.5% |
| 2020 | 19,272 | 17,634 | 91.5% | 136 | 94 | 69.1% |
| 2021 | 22,103 | 17,064 | 77.2% | 111 | 45 | 40.5% |
| 2022 | 17,700 | 14,776 | 83.5% | 93 | 42 | 45.2% |
| 2023 | 14,957 | 11,924 | 79.7% | 82 | 40 | 48.8% |
| 2024 | 16,307 | 13,116 | 80.4% | 93 | 48 | 51.6% |
| 2025 | 16,899 | 13,816 | 81.8% | 72 | 33 | 45.8% |
| *Jan to Jun 2025* | *8,306* | *6,766* | *81.5%* | *31* | *13* | *41.9%* |
| *Jul to Dec 2025* | *8,593* | *7,050* | *82.0%* | *41* | *20* | *48.8%* |

[210] NCU began to audit actual UOF reports in February 2018.

[211] NCU began collecting data for UOF allegations in May 2018.

TABLE 2: CLASSIFICATION OF UOF INCIDENTS

The table below identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from 2018 to 2025.

| | 2018 *6th & 7th MP* | 2019 *8th & 9th MP* | 2020 *10th & 11th MP* | 2021 *12th & 13th MP* | 2022 *14th & 15th MP* | 2023 *16th & 17th MP* | 2024 *18th & 19th MP* | 2025 *20th and 21st MP* | *Jan to Jun 2025 20th MP* | *Jul to Dec 2025 21st MP* |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Incidents Reviewed** | 929 | 1,052 | 1,094 | 1,644 | 1,585 | 2,164 | 2,249 | 2,288 | 1,133 | 1,155 |
| **Incidents Classified Within COD Period**[212] | 909 (98%) | 1,023 (97%) | 1,079 (99%) | 1,226 (75%) | 1,238 (78%) | 1,991 (92%) | 2,029 (90%) | 1,759 (77%) | 816 (72%) | 943 (82%) |
| **Incidents Not Classified Within COD Period** | 20 (2%) | 29 (3%) | 15 (1%) | 418 (25%) | 347 (22%) | 173 (8%) | 220 (10%) | 529 (23%) | 317 (28%) | 212 (18%) |

---

[212] The data is maintained in a manner that is most reasonably assessed using a two-week period ("COD Period"). The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less is sufficient to demonstrate compliance.

## TABLE 3: ALLEGED UOF

The graph below shows the number of use of force allegations from 2016 to 2025.



## TABLE 4: H+H STAFF REPORTING

The table below provides an overview of the reports provided by H+H staff from 2018 to 2025.

| H+H Staff Reports Submitted[213] | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2018 (6th & 7th MP)** | **2019 (8th & 9th MP)** | **2020 (10th & 11th MP)** | **2021 (12th & 13th MP)** | **2022 (14th & 15th MP)** | **2023 (16th & 17th MP)** | **2024 (18th & 19th MP)** | **2025 (20h & 21st MP)** | **Jan-Jun 2025 (20th MP)** | **Jul-Dec 2025 (21st MP)** |
| *Total Reports and UOF Incidents* | | | | | | | | | | |
| **# of Reports Submitted** | 53 | 39 | 56 | 97 | 52 | 26 | 78 | 88 | 46 | 42 |
| **# of UOF Incidents Addressed** | 53 | 38 | 46 | 85 | 42 | 27 | 59 | 74 | 41 | 33 |
| *Witness Reports* | | | | | | | | | | |
| **# of Witness Reports Submitted** | 29 | 18 | 45 | 70 | 36 | 18 | 59 | 73 | 35 | 38 |
| **# of Actual/Alleged UOF Incidents Addressed by Submitted Reports** | 31 | 15 | 36 | 64 | 25 | 18 | 45 | 61 | 31 | 30 |
| *Relayed Allegations from Incarcerated Individuals* | | | | | | | | | | |
| **# of Reports Containing Allegations Relayed from PICs** | 24 | 21 | 11 | 27 | 16 | 8 | 19 | 15 | 11 | 4 |
| **# of Actual/Alleged UOF Incidents Addressed by Submitted Reports** | 22 | 23 | 10 | 22[214] | 19[215] | 9 | 15[216] | 14[217] | 11[218] | 3 |

---

[213] *See* the Monitor's November 22, 2024 Report (dkt. 802) at pg. 79 for data on H+H reports submitted in July-December 2017 (the 5th MP).

[214] On one occasion for one use of force incident, we received both a witness report and a relayed allegation report for the same incident.

[215] On two separate occasions for two separate use of force incidents, we received both a witness report and a relayed allegation report for the same incident.

[216] On one occasion for one use of force incident, the Monitoring Team received both a witness report and a relayed allegation report for the same incident.

[217] On one occasion for one use of force incident, the Monitoring Team received both a witness report and a relayed allegation report for the same incident.

[218] On one occasion for one use of force incident, the Monitoring Team received both a witness report and a relayed allegation report for the same incident.

## TABLE 5: DOE WITNESS REPORTING

The table below identifies the number of use of force witness reports submitted by Department of Education ("DOE") staff from July 2024 to December 2025 and the number of use of force incidents the Monitoring Team's review suggests DOE staff may have witnessed.

| Monitoring Period | Number of UOF Witness Reports Submitted by DOE Staff | Number of UOF Incidents the MT's Review Suggests DOE Staff May Have Witnessed |
|---|---|---|
| July-December 2024 | 0 | 4 |
| January-June 2025 | 0 | 7 |
| July-December 2025 | 2 | 6 |

341

## TABLE 6: MEDICAL WAIT TIMES

The table below presents wait times for medical treatment following use of force incidents from 2018 through December 2025.

| | Wait Times for Medical Treatment Following a UOF | | | | |
|---|---|---|---|---|---|
| | # of Medical Encounters Analyzed | % Seen within 2 hours or less | % Seen within 4 hours | % Seen within 6 hours | % Seen 6 hours or more |
| **2018** | 9,345 | 37% | 73% | 89% | 13% |
| **2019** | 11,809 | 43% | 81% | 92% | 9% |
| **2020** | 10,812 | 46% | 82% | 92% | 9% |
| **2021** | 14,745 | 39% | 70% | 81% | 20% |
| **2022** | 12,696 | 51% | 74% | 83% | 19% |
| **2023** | 11,513 | 54% | 81% | 91% | 10% |
| **2024** | 11,014 | 45% | 81% | 91% | 9% |
| **2025** | 12,458 | 37% | 75% | 89% | 11% |
| **Jan-Jun 2025** | 5,849 | 38% | 76% | 88% | 12% |
| **Jul-Dec 2025** | 6,609 | 37% | 75% | 89% | 11% |

# APPENDIX K:
# RISK MANAGEMENT

## TABLE 1: STAFF ACTIVELY ON E.I.S.S. MONITORING

The table below shows the number of individuals on E.I.S.S. Monitoring during each Monitoring Period since 2020.

| Staff Actively Monitored on E.I.S.S. Program | |
|---|---|
| | # of staff |
| January-June 2020, 10th MP | 96 |
| July-December 2020, 11th MP | 106 |
| January-June 2021, 12th MP | 91 |
| July-December 2021, 13th MP | 37 |
| January-June 2022, 14th MP | 80 |
| July-December 2022, 15th MP | 97 |
| January-June 2023, 16th MP | 137 |
| July-December 2023, 17th MP | 135 |
| January-June 2024, 18th MP | 143 |
| July-December 2024, 19th MP | 72 |
| January-June 2025, 20th MP | 111 |
| July-December 2025, 21st MP | 134 |

## TABLE 2: SCREENING AND PLACEMENT OF STAFF FOR E.I.S.S. MONITORING

The table below presents the number of staff screened for E.I.S.S. monitoring, the number placed on E.I.S.S. monitoring, and the status of staff E.I.S.S. monitoring periods from 2020 to 2025.

| Overview of E.I.S.S. Program | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **Jan to Jun 2023 (16th MP)** | **Jul to Dec 2023 (17th MP)** | **Jan to Jun 2024 (18th MP)** | **Jul to Dec 2024 (19th MP)** | **Jan to Jun 2025 (20th MP)** | **Jul to Dec 2025 (21th MP)** |
| *Screening* | | | | | | | | | | |
| Tenured Staff Screened[219] | 218 | 117 | 117 | 96 | 66 | 30 | 59 | 35 | 15 | 43 |
| Probationary Staff Screened | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42 | 43 | 52 |
| Total Staff Screened | 218 | 117 | 117 | 96 | 66 | 30 | 59 | 77 | 58 | 95 |
| Tenured Staff Placed on Monitoring[220] | 75 | 77 | 99 | 89 | 63 | 26 | 41 | 14 | 9 | 10 |
| Probationary Staff Placed on Monitoring | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 41 | 43 | 22 |
| Total Staff Placed on Monitoring | 75 | 77 | 99 | 89 | 63 | 26 | 41 | 55 | 52 | 32 |
| *Monitoring* | | | | | | | | | | |
| Tenured Staff Who Began Monitoring Term | 86 | 46 | 69 | 84 | 61 | 23 | 21 | 17 | 15 | 30 |
| Probationary Staff Who Began Monitoring Term | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 28 | 13 |

[219] The number of staff screened for each Monitoring Period may include some staff who were screened in prior Monitoring Periods and were re-screened in the identified Monitoring Period.

[220] Not all staff selected for monitoring have been enrolled in the program. Certain staff left the Department before monitoring began. Other staff have not yet been placed on monitoring because they are on extended leaves of absence (*e.g.*, sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not initiate a staff's monitoring term if the staff member has subsequently been placed on a no-inmate contact post due to the limited opportunity for mentorship and guidance.

| Overview of E.I.S.S. Program | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **Jan to Jun 2023 (16th MP)** | **Jul to Dec 2023 (17th MP)** | **Jan to Jun 2024 (18th MP)** | **Jul to Dec 2024 (19th MP)** | **Jan to Jun 2025 (20th MP)** | **Jul to Dec 2025 (21th MP)** |
| Total Staff Who Began Monitoring Term | 86 | 46 | 69 | 84 | 61 | 23 | 21 | 34 | 43 | 43 |
| Staff Who Completed Monitoring | 38 | 21 | 25 | 25 | 17 | 8 | 4 | 20 | 9 | 14 |

346

# APPENDIX L: MANAGING INDIVIDUALS UNDER AGE 19

## TABLE 1: RNDC'S RATES OF USE OF FORCE AND VIOLENCE

The table below identifies the rates of use of force and violence for the entire RNDC facility.

| RNDC's Rates of Use of Force and Violence, 2022 to 2025 | | | | |
|---|---|---|---|---|
| | Use of Force | Stabbing/Slashing | Fights | Fires |
| 2022 | 12.5 | 1.2 | 9.9 | 1.6 |
| 2023 | 8.0 | 0.76 | 7.4 | 2.2 |
| 2024 | 6.8 | 0.6 | 8.6 | 0.9 |
| 2025 | 8.5 | 0.56 | 9.3 | 1.5 |
| *Jan-Jun 2025* | *7.1* | *0.5* | *8.8* | *1.5* |
| *Jul-Dec 2025* | *9.9* | *0.65* | *9.7* | *1.4* |

## TABLE 2: RNDC'S PROGRAMS ACTION PLAN ("RNDC ACTION PLAN")

The table below shows the key changes in safety-related indicators in the units covered by the RNDC Action Plan by comparing rates of violence and use of force to those in young adult housing areas before the RNDC Action Plan was implemented.

| RNDC Action Plan's Key Performance Indicator Rates, July 2024 to December 2025 | | | | | |
|---|---|---|---|---|---|
| Incident Type | YA Baseline Rate (CY 2023) | Jul-Dec 2024 | Jan-Jun 2025 | Jul-Dec 2025 | 21st MP % change from YA baseline |
| Use of Force | 3.0 | 2.1 | 2.2 | 1.7 | -43% decrease |
| Stabbing/Slashing | 0.5 | 0.3 | 0.2 | 0.2 | -60% decrease |
| Fights | 2.7 | 3.5 | 3.9 | 2.8 | +4% increase |
| Serious Injuries | 0.4 | 0.3 | 0.4 | 0.1 | -75% decrease |
| Assault on Staff | 1.0 | 0.2 | 0.3 | 0.2 | -80% decrease |

## TABLE 3: NCU'S CONSISTENT STAFFING AUDITS

This table below presents NCU's Steady Staffing Audit Results for Captains and Officers. For the units covered by the RNDC Action Plan, the audit calculates the proportion of posts worked by steadily assigned staff using data from InTime. The table below shows averages for the 19th Monitoring Period ("MP") and 20th MP, and monthly results for the 21st MP, including the building location, (B3 or B2), number of posts, and percentage of posts worked by steadily assigned staff.

| | 19th MP | 20th MP | Jul 2025 | Aug 2025 | Sep 2025 | Oct 2025 | Nov 2025 | Dec 2025 | 21st MP Average |
|---|---|---|---|---|---|---|---|---|---|
| **NCU's Steady Staffing Audit Results—Captains** | | | | | | | | | |
| Location | | | B3 | B2 | B3 | B2 | B3 | B2 | |
| # posts | 73% | 67% | 93 | 84 | 90 | 93 | 84 | 93 | 66% |
| % Steady | | | 74% | 61% | 64% | 39% | 83% | 75% | |
| **NCU's Steady Staffing Audit Results—Officers** | | | | | | | | | |
| | 19th MP | 20th MP | Jul 2025 | Aug 2025 | Sep 2025 | Oct 2025 | Nov 2025 | Dec 2025 | 21st MP Average |
| Location | | | B3 | B2 | B3 | B2 | B3 | B2 | |
| # posts | 72% | 71% | 744 | 756 | 720 | 837 | 587 | 837 | 63% |
| % Steady | | | 71% | 70% | 65% | 63% | 62% | 45% | |

350

## TABLE 4: NCU'S FACILITY-CONTROLLED REASONS THAT ASSIGNED STAFF DID NOT WORK POST

The table below presents NCU's determination of the facility-controlled reasons why assigned captains and officers did not work their steady posts (*i.e.*, Could Not Determine and Assigned Elsewhere). The table presents averages for the 19th and 20th MPs, and monthly results for the 21st MP, including the building location (B3 or B2), number of posts, and the proportion of cases where each reason applied.

| Facility-Controlled Reasons that Assigned Staff Did Not Work Post—Captains | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 19th MP | 20th MP | Jul 25 | Aug 25 | Sep 25 | Oct 25 | Nov 25 | Dec 25 | 21st MP |
| Location | | | B3 | B2 | B3 | B2 | B3 | B2 | |
| # posts | | | 93 | 84 | 90 | 93 | 84 | 93 | |
| Could Not Determine | 12% | 2% | 3% | 16% | 9% | 37% | 4% | 17% | 14% |
| Assigned Elsewhere | 3% | 7% | 1% | 10% | ~ | 3% | 2% | 1% | 3% |
| Facility-Controlled Reasons that Assigned Staff Did Not Work Post—Officers | | | | | | | | | |
| | 19th MP | 20th MP | Jul 25 | Aug 25 | Sep 25 | Oct 25 | Nov 25 | Dec 25 | 21st MP |
| Location | | | B3 | B2 | B3 | B2 | B3 | B2 | |
| # posts | | | 744 | 756 | 720 | 837 | 587 | 837 | |
| Could Not Determine | 14% | 8% | 6% | 11% | 7% | 12% | 14% | 28% | 13% |
| Assigned Elsewhere | 1% | 2% | 2% | 1% | 3% | 8% | 10% | 19% | 7% |

351

## TABLE 5: NCU'S REASONS THAT ASSIGNED STAFF DID NOT WORK POST OUTSIDE OF FACILITY CONTROL

The table below shows the proportion of posts that were not worked by the steady staff for reasons NCU considered to be "outside the facility's control" for the 19th, 20th, and 21st MPs.

| Dynamics Influencing Steady Staffing that NCU Considers Outside Facility Control—Captains | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 19th MP | 20th MP | Jul 25 | Aug 25 | Sep 25 | Oct 25 | Nov 25 | Dec 25 | 21st MP |
| Location | | | B3 | B2 | B3 | B2 | B3 | B2 | |
| # posts | | | 93 | 84 | 90 | 93 | 84 | 93 | |
| Mutual | 3% | 3% | 3% | 2% | 3% | 2% | 4% | ~ | 2% |
| Leave | 1% | 1% | ~ | ~ | 3% | 1% | 4% | 2% | 3% |
| Sick | ~ | 4% | 1% | 1% | 7% | 8% | 1% | ~ | 3% |
| Personal Emergency | 1% | <1% | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| AWOL | <1% | <1% | ~ | ~ | ~ | ~ | 1% | 1% | <1% |
| Time Due | ~ | <1% | 1% | 4% | 1% | ~ | ~ | ~ | 1% |
| 10-hour Exemption | 2% | 4% | ~ | ~ | ~ | 2% | 1% | ~ | 1% |
| Vacation | 3% | 9% | 16% | 6% | 12% | 8% | ~ | 3% | 8% |
| Dynamics Influencing Steady Staffing that NCU Considers Outside Facility Control—Officers | | | | | | | | | |
| | 19th MP | 20th MP | Jul 25 | Aug 25 | Sep 25 | Oct 25 | Nov 25 | Dec 25 | 21st MP |
| Location | | | B3 | B2 | B3 | B2 | B3 | B2 | |
| # posts | | | 744 | 756 | 720 | 837 | 587 | 837 | |
| Mutual | 3% | 2% | 4% | 3% | 3% | 1% | 2% | <1% | 2% |
| Leave | 3% | 6% | 7% | 3% | 6% | 4% | 5% | 1% | 4% |
| Sick | 1% | 3% | 2% | 2% | 1% | 2% | 2% | 4% | 2% |
| Personal Emergency | 1% | 1% | 2% | 1% | 2% | 1% | 2% | 1% | 2% |
| AWOL | 1% | <1% | <1% | <1% | 1% | 1% | <1% | 1% | 1% |
| Time Due | <1% | 1% | ~ | <1% | <1% | <1% | <1% | <1% | <1% |
| 10-hour Exemption | 4% | 4% | 4% | 4% | 4% | 4% | 1% | ~ | 3% |
| Vacation | 1% | 3% | 3% | 4% | 7% | 3% | 2% | 1% | 3% |

352

# APPENDIX M:
# RESH OPERATIONS &
# DATA SUMMARY

Outlined below is a summary of the RESH operations and practices.[221]

## PROCESS FOR PLACEMENT AND REVIEW

- When an incarcerated individual commits a qualifying offense, the facility refers the incarcerated individual to RESH via OSIU. OSIU reviews the Medical Exclusion List, and if the incarcerated individual is not excluded from RESH for medical/mental health reasons, OSIU typically approves Pre-Hearing Detention ("PHD"). If the incarcerated individual is found guilty at the adjudication hearing, the incarcerated individual is referred to RESH and reviewed by the RESH Committee (which includes the DW for Security, a representative from Classification, and RESH's ED of Programming) which makes a recommendation about placement. The Committee almost never recommends that the incarcerated individual not be placed in RESH.

- Incarcerated individuals begin RESH at Level 1. Level 1 and Level 2 are each intended to be 30 days (absent a serious infraction), for a default length of stay of 60 days.

- Every 15 days, a paper review of the individual's behavior/program engagement is conducted by uniformed/programs staff to determine whether the incarcerated individual is meeting expectations. Historically, this was a meeting among various people, but that proved to be too time consuming and interfered with the ability to provide programming/services, so a paper review is now conducted.

- Every 30 days, each incarcerated individual is reviewed by a committee to determine whether they will be promoted to the next Level or to GP (if no serious infractions and satisfactory program engagement), or whether they will be restarted/time added to current level (in response to a serious infraction or refusal to engage in programming). The incarcerated individual is permitted to attend the review.

- Historically, the Monitoring Team has not found issues here—incarcerated individuals have committed a qualifying offense, are reviewed at 15/30 days, and program extensions appear to occur for legitimate reasons.

---

[221] The Monitoring Team has shared feedbacks with the Department on the RESH policies and data dashboard, and these feedbacks remain outstanding.

354

**OPERATIONAL CONSIDERATIONS**

- Typically, each housing area (both Level 1 and Level 2) is staffed with a minimum of 3 officers and 1 Captain.

- Level 1 and Level 2 are housed in separate buildings. There are four Level 1 houses and two Level 2 houses. PHD is housed with Level 1, but on a separate tier so they do not interact with those in the RESH program.

- In both Level 1 and Level 2, out-of-cell time is offered by tier, which reduces the number of people out at any given time. This rotation by tier during the 14 waking hours per day is the foundation of the 7-hours out-of-cell time.

- All movement out-of-cell is escorted, and incarcerated individuals undergo a 3-point search each time they come out of their cells. Staff using poor escort technique and staff complacency during searches are two of the main operational and security challenges, both of which lead to preventable uses of force and the ability for incarcerated individuals to carry weapons to the dayroom. Despite being the Department's most secure and restrictive unit, drug use occurs in the units and drugs are often confiscated (*e.g.*, in March 2026, marijuana and "spice" were recovered).

- In both Levels, incarcerated individuals with known interpersonal conflict (primarily SRG related) are housed in different buildings or on different tiers. Because DOC has historically relied upon this separation strategy to address interpersonal conflict and staff seem to have few skills for mediating interpersonal conflict among those who regularly contact each other, the Monitoring Team has observed that rates of violence have increased significantly when DOC has "gotten the blend wrong" (*i.e.,* housed people together who have pre-existing conflict).

- RESH is nearly always short staffed, and officers work a great deal of overtime. If staffing is critically short, the Warden may decide that all incarcerated individuals must remain in their cells or may continue to offer out-of-cell time but with fewer staff, which significantly delays the delivery of services.

**SUMMARY OF PROGRAMMING OFFERED**

- Each day, recreation is offered for 3 hours per day. In Level 1, incarcerated individuals are in individual rec pens. In Level 2, incarcerated individuals receive congregate recreation. Participation in recreation appears to be related to both time (incarcerated individuals generally do not want to participate in the early morning) and weather.

- Each day, programming is offered for 4 hours per day, delivered by a Program Counselor and/or Associate Correctional Counselor. In Level 1, congregate programming is delivered while incarcerated individuals are secured in restraint desks. Incarcerated individuals are not restrained during programming in Level 2. The Monitoring Team has received mixed reviews on the use of restraint desks. Some incarcerated individuals believe they improve safety and thus incarcerated individuals are more willing to engage in programming. Others say that the restraint desks dissuade them from attending programming. Since RESH's inception, the restraint desks have received additional security features, such as shorter chains for securing legs and panels to prevent incarcerated individuals from reaching to assault one another.

- Programming types include anger management, interactive journaling, Dialectical Behavior Therapy ("DBT") skills, and a variety of social services. While the Program Counselors deliver materials and group interventions aligned with each program type, the intensity and duration is not necessarily according to the program curriculum (*e.g.*, individual DBT skills are taught episodically, but the full 16 sessions are not all provided, nor in the order required for fidelity to the DBT model).

- Incarcerated individuals are only required to attend 4 hours of programming per week in order to promote to the next Level. This requirement may undercut the level of engagement that is possible, given that each person has an opportunity to participate in 20-28 hours of programming per week.

- The Programs Division has excellent data on the number of hours of program engagement per incarcerated individual and hours delivered per Program Counselor.

- Programs staff have observed that incarcerated individuals' boundaries around engaging in violence have shifted over time. Incarcerated individuals used to refrain from violence

when Programs staff were present, but this is no longer true. Reportedly, this has negatively impacted some Programs staffs' willingness to work in RESH.

**UOF AND VIOLENCE DATA**

RESH rates of use of force and various forms of violence since the program opened at RMSC are presented in Appendix B, Table 12 (a).

As shown Appendix B, Table 12 (b), most of the violence occurs in Level 2 houses. During the most recent monitoring period, a major uptick in fights in November 2025 appears to have been related to Level 2 housing decisions which placed people with known interpersonal conflict/SRG issues on the same tier. The Level 2 rate of fights doubled during that month. As noted above, staff typically rely on physical separation to create safety in these situations, and the housing of people with conflicts on the same tier was not accompanied by any additional program interventions to mediate the potential for violence.

# APPENDIX N:
# SUMMARY OF THE SPECIAL INVESTIGATIONS UNIT

Beginning in 2022, the Monitoring Team made several findings that poor management and concerning leadership practices in the Department's Investigation Division had compromised the integrity and quality of ID's work product.[222] These problems seriously undercut the Department's ability to conduct neutral and independent investigations, as required by the *Nunez* Court Orders. In response, in April 2023, then-Commissioner Molina split the Investigation Division's functions in two: the legacy Investigation Division, which would exclusively investigate use of force incidents and a newly formed Special Investigations Unit ("SIU") to investigate all other types of staff misconduct and other non-UOF related matters.

SIU's operation raises significant concerns as outlined below:

- **Unclear Scope of Work and Lack of Policies**: Ostensibly, SIU was created to investigate general staff misconduct and other non-use of force related matters.[223] However, the basis for the creation of SIU was never explicitly articulated and it appears that, in part, the purpose of this division was to evade oversight and scrutiny.[224] SIU has no policies governing its practices.[225] Following the departure of Commissioner Molina, the Monitoring Team was advised by former Commissioner Maginley-Liddie and other DOC leaders that the division of SIU and ID had questionable value (at best) and was most definitely inefficient. Further, they had concerns about SIU's work product. Despite these reports, SIU was not reunified with ID nor were any meaningful steps taken to improve practice.

---

[222] *See* the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 82-84 and the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 142-145.

[223] SIU reports it conducts the following types of investigations: Death Related Investigations, Custody and Escape Related Investigations, Employee Related Investigations, Undue Influence, Contraband Related Investigations, Weapons and Firearm Incidents, Intelligence Driven Investigations, Technology / Security Operations Investigations, and Commissioner Directed Investigations. SIU initially reported that it conducts Serious Injury Investigations, but upon further inquiry, SIU retracted that statement, clarifying that it simply "supports" the Facility level investigations when requested.

[224] Certain DOC leadership have reported that the basis for the separation of investigation divisions was to address issues with the Department of Investigations, an external agency to DOC. It is unclear how the division into two investigation units was necessary to address purported issues with an external agency. Such an explanation appears pre-textual, at best, and is simply illogical.

[225] DOC reported that, in 2023, the then-General Counsel drafted a policy that was ultimately abandoned and never adopted. Further, in response to the Monitoring Team's request for governing policies, SIU produced policies regarding UOF investigations, despite the fact that SIU explicitly does not conduct UOF investigations.

359

- **Poor Management and Supervision**: SIU's investigators receive very limited supervision. The SIU is comprised of a Deputy Commissioner, an Assistant Commissioner, one Supervisor, and 17 investigators. At one time, the unit had two Supervisors, but that too, was insufficient for proper supervisory oversight.

- **Inadequate Leadership**: SIU's leadership remains concerning. To date, the Department has not installed adequate leadership who can neutrally and independently investigate staff misconduct **and** work to *affirmatively* reverse the problematic investigatory practices currently in place. The adequacy of SIU's leadership has been questioned from its inception. Two of SIU's leaders originally appointed by Commissioner Molina were terminated. Subsequently, in 2025, then-Commissioner Maginley-Liddie appointed an Assistant Commissioner of SIU who had no managerial experience, no experience in administrative investigations of staff misconduct, and generally limited investigatory experience. Further, former Commissioner Maginley-Liddie assigned various members of her leadership team to work directly with SIU to improve practice, which resulted in no describable improvement in practice. In early 2026, the current Commissioner transferred the then-Senior Deputy Commissioner, who served as the highest-ranking supervisor of the uniformed staff, to serve as the Deputy Commissioner of SIU to now investigate the staff he previously supervised.

- **Low Quality Investigations**: The Monitoring Team has received credible reports from internal and external stakeholders that the poor quality of SIU's investigations has compromised the Department's ability to prosecute administrative cases of staff misconduct as well as criminal cases for staff misconduct brought by law enforcement agencies.

- **Lack of Training**: SIU investigators have been provided very little training since the division was created in 2023. During the current Monitoring Period, the Trials Division developed and provided an internal remedial training of basic investigatory skills to SIU staff. The training was attended by the former Commissioner and several members of her leadership team. The fact that such a basic training (including reminding investigators to preserve evidence) was required demonstrates the depth of dysfunction and inadequacy of the work being completed. The Monitoring Team received reports that SIU staff essentially rejected the training and expressed frustration that training was even being

360

provided. Staff have reported to the Monitoring Team that there has been no discernible improvement in SIU's investigations since the training was provided.

- **Poor Record Keeping and Management**: SIU is unable to provide basic statistics about the number and type of cases pending with or closed by the unit. The fact that such materials cannot be produced raises significant questions about the oversight and management of the unit. The SIU did provide a variety of *ad hoc* reports which the Monitoring Team used to develop its own data.[226] Record keeping is so poor that SIU could not reliably identify the cases that had been closed nor produce the closed investigations.

- **Low Productivity**: The Monitoring Team's assessment of the data produced by SIU (which may be unreliable because of the poor record keeping discussed above) revealed that SIU closed 442 cases between April 1, 2023 and March 11, 2026. Investigators appear to have a caseload of about 10 cases each and typically close about eight cases *per year* (less than one case per month). This raises significant questions about the efficacy and efficiency of the work being completed by the unit.

The Monitoring Team has strongly recommended recombining SIU and ID *for years*, and that immediate steps need to be taken to address the many deficiencies described above. Restoring lost integrity and productivity will require intensive training and supervision for all SIU staff. Following the end of the Monitoring Period, the Monitoring Team worked with the Remediation Manager and the Commissioner on a new organizational chart for the Department. As a result of this work, beginning on June 1, 2026, SIU will be reintegrated with ID into one investigation unit. This reintegrated Investigation Division will report to a Senior Deputy Commissioner, who was appointed by and will report directly to the Remediation Manager.[227]

---

[226] Concerningly, SIU indicated that such a report could only be produced in PDF format, which limits the ability to analyze the information and suggests that there is limited management and oversight of the Divisions workload. The Monitoring Team independently coordinated with DOC's IT Division to obtain the files in a format that would permit analysis.

[227] *See*, May 5, 2026 Remediation Manager Letter (dkt. 978) at pg. 2 outlining the revisions to the Department's organizational chart, including the Investigation Division.

# APPENDIX O: SUMMARY OF UOF INVESTIGATION PILOT

ID began using the new investigations framework at the end of the 21st Monitoring Period, beginning with a single facility (RNDC).[228] The new framework for conducting investigations is described in detail below:

- **Initial ID Rapid Review Assessment**: The new investigatory process begins with the ID Rapid Review Team.[229] The ID Rapid Review Team reviews all available video, staff reports, facility logs, and any other available evidence within two days of an incident's occurrence. The ID Rapid Review Team alerts ID leadership to any egregious incidents that require immediate attention or action, and classifies all incidents as Category 1, 2, or 3, depending on the necessary level of investigative scrutiny. The ID Rapid Review Team is responsible for making the initial determination of an incident's category, but the determination of the category is not final until after the Intake or Full ID Investigation is closed. Notably, if the ID Rapid Review Team classifies an incident as a Category 2 or 3 but the Intake Investigator finds evidence that the incident meets the criteria for Category 1 or 2 or the incident otherwise requires a greater level of scrutiny, the case is upgraded appropriately.

- **Category 1** cases include those incidents requiring Full ID Investigations per the *Nunez* Court Orders— Consent Judgment § VII, ¶ 8, as revised by the First Remedial Order (dkt. 350), § E and Exhibit A, and they are still subject to a Full ID investigation as required by the *Nunez* Court Orders. Under the old framework, all incidents meeting these criteria essentially had two investigations – first an Intake Investigation and then the Full ID Investigation. Many of the initial investigatory steps from the Intake Investigation were often repeated by Full ID investigators (*e.g.*, reviewing and summarizing video evidence), needlessly consuming investigators' time with duplicative work. This duplication also increased the overall time to close an investigation, as the Full ID investigators could not begin their investigation until the Intake Investigation was complete (which often took up to 30 days, or longer when Intake Investigations were

---

[228] Following the close of the Monitoring Period, the new framework was expanded to GRVC, RMSC, and RESH in January 2026, to OBCC, EMTC, and BHPW in February 2026, and to NIC, WF, and the Court Commands in March 2026. The new framework is now applied to all use of force incidents Department-wide.

[229] The ID Rapid Review Team is entirely separate and independent from the facilities' Rapid Review process. The ID Rapid Review Team conducts its own review of the evidence and makes an independent assessment to determine the appropriate category for the incident.

backlogged). Under the new process, for Category 1 cases, within two business days, the ID Rapid Review Team completes the initial review of evidence, provides a summary of the incident and evidence, and documents the initial findings of their review,[230] and then the case is transferred to the Full ID investigation team. Full ID investigators review the evidence in more detail and with more scrutiny, conduct additional investigative actions (*e.g.*, MEO-16 interviews of staff), and make all final determinations. This new approach prioritizes the expeditious referral of cases for a Full ID investigation, and also focuses on reducing the investigators' duplicative work as much as possible.

- **Category 3** cases include those incidents in which the force used was not anticipated, and was minimal, reasonably necessary, and consistent with Department directives. These incidents involve soft-hand techniques and OC spray, and do not involve tactical weaponry, high-impact force, or result in any staff or incarcerated individual injuries. In addition, all staff and incarcerated individual statements must be consistent with one another and the available evidence. When an incident meets these criteria, the ID Rapid Review Team refers Category 3 cases to the Intake Squad for an Intake Investigation. The evidence for these types of cases is typically more straightforward and as a result, it takes much less time to review and analyze the evidence compared to Categories 1 and 2. Because of the objective evidence in these cases, Category 3 cases rely on written or recorded incarcerated individual statements taken by the facility staff and additional interviews are not conducted by ID because they are not necessary. In addition, given the more straightforward nature of these incidents and their evidence, the closing reports written by the investigators are also much shorter and more streamlined.

- **Category 2** cases include those incidents that do not meet criteria for either Category 1 or 3, as described above. Category 2 includes incidents in which staff use takedown techniques or in which an incarcerated individual makes forceful contact with a floor, wall, or other such immovable object unless there are other Category 1 factors present. Category 2 cases are also referred to the Intake Squad for an Intake Investigation but receive more scrutiny than a Category 3 incident (*e.g.*, the investigator will likely spend

---

[230] ID has reported that while the ID Rapid Review Team is still responsible for creating the initial summary and documentation of evidence for Category 1 cases, the investigators from the Intake Squads sometimes assist in gathering the initial evidence given the limited staffing of the ID Rapid Review Team.

more time reviewing and scrutinizing the video, written reports, and other available evidence to investigate any inconsistencies). The investigatory actions are similar for Categories 2 and 3, but in Category 2, the evidence is either more voluminous and/or requires more time to review and scrutinize. The additional investigatory action of ID interviewing incarcerated individuals is taken in some, but not all, Category 2 cases. Given that more Category 2 cases result in referrals for corrective actions compared to Category 3, investigators also must spend time drafting the necessary paperwork for any corrective action referrals. The investigator's closing reports are more streamlined than in the past but are longer than those of Category 3 cases because the circumstances in these cases require more detailed explanations of the evidence (including any inconsistencies) and the investigator's determinations.

- **Streamlined Investigation Findings**: The new workflow creates improvements to investigation quality and to streamline the closing reports so they are commensurate with the type of case. The previous closing reports had become overly detailed, with lengthy and superfluous word-for-word recitations of staff statements that are otherwise contained in the investigation package, lacking an efficient synthesis and synopsis. Further, closing reports were generally the same regardless of whether the facts of the case merited heightened scrutiny or not. The new streamlined closing reports encourage the investigator to focus on synthesizing all available evidence and explaining how the evidence supports the rationale behind their determination.

- **Case Assignment by Facility**: ID investigators are now assigned to specific teams that investigate incidents at a single facility, whereas previously, they reviewed incidents from various facilities. Focusing on a single facility allows the ID investigator teams, led by Deputy Directors of Investigation ("DDIs"), to gain a better understanding of the unique factors and concerns at their assigned facility and to more clearly see patterns amongst the incidents.

- **Coordination between ID & Facility Leadership**: Under the new framework, the DDI for each facility is required to meet with their facility's leadership on a biweekly basis to discuss the quality of the facility's Rapid Reviews, provide facility leadership with tangible examples of deficiencies or areas of concern, and highlight any patterns that the investigations illuminate. This not only improves the communication and rapport

365

between ID and the facility leadership but also creates an opportunity for ID to provide real-time feedback to the facilities so they can take steps to improve practice.

While it has only been a few months since the new framework initiated, tangible benefits are already visible. ID leadership and supervisors are reporting better workflow management. The initial review by the ID Rapid Review Team frees up the Intake Investigation teams so they can focus on closing out Intake Investigations for Category 2 and 3 incidents more quickly. The categorization process gives supervisors a better sense of each investigator's caseload and thus allows them to allocate cases to investigators in a more informed manner than in the past (*i.e.*, accounting for how long an investigation may take and the level of scrutiny required, compared to the other cases already assigned to an investigator). Further, the improved coordination between ID and Facility leadership is an important first step in shifting the culture to one where uniformed staff see ID not only as a pathway for identifying misconduct and disciplining staff, but also as a well-informed resource that aims to improve safety and security more generally.

# APPENDIX P: DOC PROCESS FLOW CHARTS

**Index of DOC Process Flow Charts**

- DOC Promotions Process

- DOC Investigations Process

- DOC Disciplinary Process

- DOC Rapid Review Process

- DOC Command Discipline Process

## DOC Promotions Process





Flowchart of Disciplinary Process

| Process | Steps |
|---|---|

**Investigations**

Use of Force incident occurs. → ID conducts Preliminary Review of incident. → Facility or ID conducts and completes investigation. → MOC is drafted if charges are substantiated and MOC is reviewed and approved by Commanding Officer or DC of ID

**Office of Administration**

MOC is forwarded to Deputy Commissioner of Administration. → Office of Deputy Commissioner of Administration tracks case and assigns case number. → Signed MOC & 22-R Form is sent to Trials.

**Trials**

Evaluation & Preparation of Case by Trials

Director of Trials reviews case and assigns attorney to case within 2 days of receipt of MOC → Trials Attorney drafts charges & sends to Trials administrator to forward to Respondent's assigned Facility with copy to Bureau Chief of Facilities. → Charges are served by Facility and/or sent by certified mail within 30 days of receipt of MOC

Investigation file is separately forwarded to Trials by ID or Facility. → Discovery materials are served to Respondent's Attorney

Trials Attorney assesses case and confers with Manager to determine next steps

**Prosecution of Cases**

**OATH** proceeding scheduled if no settlement or if the Department is seeking termination.

Trials Administrative Assistant schedules all logistics of OATH including coordination with Respondent's Command.

OATH occurs four days a week and 10-12 cases can be heard each day (including UOF and other matters).

1 of 4 outcomes at OATH:
(1) NPA
(2) Trial
(3) Adjourned if Respondent doesn't appear
(4) Administratively File case

Beginning with the assignment of the case, throughout the prosecution process, Trials evaluates the case and may determine case should be **Administratively Filed** or **Deferred Prosecution**.

**Outcome**

**NPA at OATH**
*Executed by Respondent, Respondent's Attorney & Trials Attorney*

**Trial**
(if no NPA at OATH)
**&**
ALJ renders a
**Report & Recommendation ("R&R")**

Trials Attorney drafts closing report within 2 weeks of receipt of:
• *NPA executed*
• *ALJ Decision Received*
• *Administratively Filed Decision*
• *Deferred Prosecution Decision*

**Closing Case Process**

Trials Deputy Commissioner reviews and approves closing memo. → *If NPA or R&R* Commissioner reviews and either approves or modifies outcome.

*If Administratively Filed or Deferred Prosecution* **Case Closed**

**Case Closed & Returned to Trials AND Discipline Imposed**

Respondent may appeal ALJ decision through Article 78 or Civil Service Commission.





Case 1:11-cv-05845-LTS    Document 684    Filed 06.17.25    Page 376 of 378





# NYC DOC Command Discipline (CD) Process: Legal Division Appeal Review

Case 1:11-cv-05845-LTS   Document 984   Filed 08/27/25   Page 378 of 378

