# THE REMEDIATION ACTION PLAN

July 14, 2026 – June 30, 2027

# REMEDIATION MANAGEMENT TEAM

**Nicholas J. Deml**
*Remediation Manager*

\*        \*        \*

Chloe Aquart, Esq.
*Director of Policy & Implementation*

Isaac Dayno
*Chief of Staff*

Travis Denton
*Senior Expert*

Aryaa Paresh Deshpande
*Data Analyst*

Christopher Fallon
*Senior Expert*

Martha Ferson
*Counsel*

Ana Jimena Gonzalez
*Director of Data & Accountability Systems*

Brandeshawn Harris
*Senior Expert*

Wayne T. Salisbury Jr.
*Senior Director of Investigations, Operations, and Oversight*

Cheyenne Steventon
*Vice President of Operations*

Hernandez D. Stroud
*Senior Legal Advisor*

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

OVERVIEW .......................................................................................................................... 2

THE CURRENT STATE: A SYSTEM IN CRISIS ................................................................ 2

THE FUTURE STATE: A VISION FOR A HEALTHIER AND SAFER SYSTEM ................... 3

ACHIEVING THE VISION: COLLABORATION ...................................................................... 4

    The Remediation Management Team ............................................................................. 4

    The Monitoring Team ...................................................................................................... 4

    New Department of Correction Leadership .................................................................... 5

    Staff .................................................................................................................................. 5

    Stakeholders .................................................................................................................... 5

ACHIEVING THE VISION: PRIORITY AREAS OF FOCUS .................................................. 6

    Improve Core Correctional and Security Functions ....................................................... 6

    Transform Staffing Models and Practices ....................................................................... 8

    Strengthen Individual and Institutional Accountability .................................................. 9

    Modernize Data Systems and Technology ...................................................................... 9

    Promote Effective Organizational Leadership and Governance ...................................... 9

CONCLUSION .................................................................................................................... 11

THE FIRST REMEDIATION ACTION PLAN ..................................................................... 12

ENDNOTES ........................................................................................................................ 29

## INTRODUCTION

The City of New York (the "City") confines individuals awaiting trial in "dismal conditions" that "manifestly violate the Constitution and would shock the conscience of any citizen who knew of them." *Rhem v. Malcolm*, 371 F. Supp. 594, 636 (S.D.N.Y. 1974). United States District Judge Morris E. Lasker wrote these words more than fifty years ago. And yet, despite decades of litigation, reform efforts, and judicial intervention, the statement remains an accurate description of conditions in the New York City jail system today.[i]

The Department of Correction ("DOC") struggles to perform even the most basic correctional functions: staffing posts, securing housing units, and keeping staff and people in its custody safe from violence. Overlapping regulatory structures stifle critical improvements. Leadership cannot ensure staff consistently adhere to fundamental security practices, much less implement broader operational reforms. Funding priorities are misaligned. The jails' physical infrastructure crumbles (in part because the Department cannot access capital funding), yet DOC spent more than $370 million on overtime this past fiscal year.[ii] Rikers Island is, as a result, significantly more violent than comparable jail systems.[iii] And even with a decade of findings and recommendations from the Court-appointed Monitor, DOC still operates without a cohesive strategy to address these systemic failures.

This is the system as I inherited it—and the system the new mayoral administration and Department of Correction leadership inherited, as well. The failures that define these jails developed over many decades and will not be resolved overnight. Yet these conditions can be reversed. Meaningful reform will require sustained commitment, disciplined execution, and close collaboration among my team, DOC, labor representatives, people in custody, advocates, and other stakeholders. By establishing foundational correctional practices, strengthening accountability, and building institutional capacity necessary to sustain reform—including through historic investments in community-based programming—the City can achieve constitutional compliance and ultimately resume full responsibility for its jail system. That is the objective of my office and the path toward a safer, more professional, and more dignified correctional system for all who live and work within it.

I recognize that my appointment represents an extraordinary exercise of the Court's equitable authority. It reflects the Court's determination that so forceful a remedy is necessary to confront the "deeply embedded polycentric problems of the jails." *See* May 13, 2025, Order (Dkt. 846), at 19. Indeed, violence in the City jails is now "demonstrably worse than when the Consent Judgment went into effect in 2015." *See* November 27, 2024, Order (Dkt. 803), at 11. I am acutely aware of the gravity of intervening in the core functions of municipal government. I will therefore exercise the authority entrusted to this office with restraint, transparency, and fidelity to the Court's Orders, working collaboratively wherever possible and invoking the full measure of that authority whenever necessary to achieve constitutional compliance.

OVERVIEW

Nearly two years ago, the Court held the City of New York in civil contempt of eighteen provisions (the "Contempt Provisions") of four Court orders designed to stem violence and use of excessive force in the City's jail system. To address the contempt—and to remedy the violations of the constitutional rights of persons in custody—the Court appointed me as the *Nunez* Remediation Manager. The Court ordered me to produce a series of work plans—Remediation Action Plans—that lay out specific and concrete strategies. Each is to cover a single year and build cumulatively on the one before it. The Remediation Action Plans serve two primary functions: first, to ensure adequate progress from year to year; and second, to "support and facilitate the return of areas of primary *Nunez* Remediation Manager control to Defendants as goals are achieved and sustained over time." *See* May 13, 2025, Order (Dkt. 846), at 36.

The Remediation Action Plan begins on page 12 of this filing. To provide context for the specific action steps it identifies, the following sections set out my initial observations on the Department's current state, my vision for the Department's future, and my strategy for beginning to resolve the City's long-standing corrections crisis.


THE CURRENT STATE: A SYSTEM IN CRISIS

Two incidents my team observed in our first days illustrate the daily dysfunction and routine security lapses in the City jails.

First, on a recent walkthrough of the Rose M. Singer Enhanced Supervision Housing, we entered a housing unit filled with smoke from fires set by individuals in custody. The effect was disorienting: the smoke had a chemical odor, likely due to burning fibers or synthetic marijuana; a fire alarm rebounded off the concrete floor and walls; incarcerated individuals pounded on their cell doors, calling out to us, while others sat shackled to restraint desks. One officer shrugged her shoulders as she surveyed the scene, suggesting this was simply another day on Rikers.

In another incident we reviewed at the George R. Vierno Center, violence erupted in two housing units connected by a shared food pantry. Deviating from proper protocol, a correctional officer unlocked one unit's pantry door without first confirming the door separating the pantry from the second unit was locked. It was not. When the officer in the adjoining unit abandoned his post, leaving it unsupervised for over three minutes, people in custody surged through the pantry into the neighboring unit. A large-scale fight ensued, involving nearly 30 individuals. Unsecured janitorial closets furnished broomsticks and mop buckets that became makeshift weapons. The fight lasted several minutes and ended only after a single officer arrived and deployed a chemical agent. By the next day, both units had returned to typical operation, with no apparent change in practice.

In a functional system, events such as these would precipitate full lockdowns, rapid notification to DOC and political leadership, thorough incident reviews, department-wide changes in correctional practice, and likely discipline for the staff and people in custody involved. Little of this followed the two incidents described above. Troublingly, these incidents are not outliers; they reflect patterns across the City jails. From January to May 2026, persons in custody set 130

fires and engaged in 2,978 fights. [iv]   As the Monitoring Team noted: "The unfortunate and dangerous side effect of the high rates of use of force, violence and entrenched dysfunction in the jails is that they have become normalized." *See* January 13, 2026, Monitoring Team Status Report (Dkt. 947), at 60.

Running the City jails is among the most complex operational responsibilities in municipal government, and reforming them will be no less demanding.  The Department operates within an unusually dense network of governmental and oversight institutions, including the Mayor's Office, the City Council, the Board of Correction, the New York State Commission of Correction, the courts, Correctional Health Services, labor organizations, the Court-appointed Monitoring Team—and now the Remediation Manager.  Each holds legitimate authority over some aspect of jail operations, yet none bears responsibility for the entire system.  Operational decisions are therefore frequently shaped by an overlay of competing legal obligations, regulatory requirements, ad hoc demands, and institutional priorities.  The environment is chaotic.

But recognizing these complex dynamics does not diminish DOC's responsibility for present conditions.  Years of inconsistent leadership, eroded correctional practice, and weak accountability left the Department unable to reliably perform many of its core functions.  Yet lasting reform demands more than correcting isolated deficiencies.  It requires building the Department's capacity to manage its vast daily operations in a manner that is consistent with its strategic priorities and organizational values.  That objective shapes the priorities and benchmarks in this first Remediation Action Plan.


## THE FUTURE STATE: A VISION FOR A HEALTHIER AND SAFER SYSTEM

The benchmarks that follow comprise the primary goals to be achieved in the first year of this remediation effort.  Before turning to those actions, it is important to define the end state they are meant to establish.  The priorities in this Remediation Action Plan are not isolated initiatives.  Together, they are designed to build the Department's capacity to consistently perform the fundamental correctional functions necessary to operate safe, constitutional, and professionally managed detention facilities—and thereby to comply with this Court's orders.  The success of this foundational effort should be measured not by the number of reforms implemented, but by whether the Department ultimately develops the institutional capacity to sustain those reforms long after Court oversight ends.

The City now faces a rare convergence of circumstances.  New DOC leadership, my appointment, and the planned transition to modern borough-based facilities together present an opportunity to fundamentally reshape the New York City jail system.  But that opportunity will be realized only through disciplined reform.  New facilities alone will not cure the longstanding deficiencies identified by this Court.  Lasting improvement depends on restoring sound correctional practice, strengthening leadership and accountability, and building organizational systems capable of sustaining safe and effective operations over time.

A successfully remediated Department will look markedly different from the system that exists today.  Fundamental correctional practices will be carried out consistently and professionally.  Housing units will be secure.  Staff will be appropriately deployed, supported,

supervised, and held accountable. Policies governing safety and use of force will be applied uniformly, and leaders will have timely, reliable information to identify operational problems before they become systemic failures. Investigations will be thorough, objective, and prompt. Individuals in custody will be confined in conditions that satisfy constitutional requirements and promote safety, stability, and rehabilitation. And Department staff will work in facilities that are orderly, professionally managed, and substantially safer than they are today.

The objective of this remediation effort is to cure the specific, longstanding constitutional violations identified by the Court. But it is also to build a Department capable of sustaining lawful operations without judicial intervention. Whether the City ultimately runs its jail system on Rikers Island or in the planned borough-based facilities, the operational foundations must be the same: disciplined correctional practice, effective leadership, meaningful accountability, and a professional staff. Achieving this will return full responsibility for the City's jail system to local government, supported by reforms durable enough to outlast this litigation.

## ACHIEVING THE VISION: COLLABORATION

I will not—and cannot—carry out this work alone. The success of this remediation effort depends on sustained collaboration with Department leadership and staff, the Monitoring Team, labor unions, advocates, and all other stakeholders with relevant experience and responsibility. Sustainable solutions will emerge only through shared engagement and implementation.

**The Remediation Management Team**

Since my appointment, I began to build a team and lay the operational foundation needed to carry out our mandate. I assembled a small team—an administrative and operations professional, a chief of staff, counsel, legal advisor, data analyst, project manager, and four career correctional experts, each with decades of experience in jail and prison systems outside New York City. And to understand the jails' challenges up close, we worked with DOC to establish our primary physical office on Rikers Island, allowing our team to regularly inspect the jails.

**The Monitoring Team**

For the past decade, the Monitoring Team has served as the Court's eyes and ears, assessing DOC's compliance with the *Nunez* orders. This long tenure gives the Monitoring Team a deep and sophisticated understanding of DOC, and they have generously drawn on the expertise of their long tenure to help orient my team and better understand the full sweep of DOC's challenges. This support remains critical to our success. Building on this well-founded partnership, we anticipate continued collaboration with the Monitoring Team to augment the efficiency, pace, and quality of the remedial work. Helpfully, the Monitoring Team has long documented recommendations for reform. I appreciate their thoughtful and thorough guidance. We have and will continue to use their recommendations as the basis for much of our work.

**New Department of Correction Leadership**

On January 31, 2026, the New York City Mayor's Office appointed a new DOC Commissioner, Stanley Richards, the first formerly incarcerated person to lead DOC in the City's history. Despite the problems facing the jails, I am encouraged that the current City administration and its appointed DOC leadership expressly support remediation and genuinely appear eager for reform. Acknowledging openly and publicly that the City jails are out of step with accepted practice and basic operational norms is a prerequisite to reform. To date, the Department's leadership is actively engaged in our reform efforts.[v] I remain optimistic about the partnership and progress we can make together.

At the same time, engagement alone is insufficient. More than a decade has passed without meaningful improvement in safety and constitutional compliance within the jail system. The Court's orders are clear, and the mandate of this office is to achieve compliance as expeditiously as possible. That responsibility does not pause for transitions in leadership or periods of institutional adjustment.

In carrying out this mandate, the Remediation Management Team recognizes its work will require difficult decisions, structural change, and sustained effort from DOC staff. These actions may be challenging for Department leadership as new structures and expectations are established. Nevertheless, the objective is not confrontation but progress toward durable reform.

Within the Department, this work requires a shift in institutional culture toward transparency, professionalism, and safety. A system shaped by fear—whether among staff or incarcerated individuals—undermines accountability, suppresses reporting of problems, and reinforces reactive rather than corrective practices. The goal of this remediation effort is to support a culture in which staff are empowered to perform their duties effectively and operational problems are identified early and addressed directly.

**Staff**

Staff are the backbone of any functional correctional system and the primary agents of change. They are public servants, integral to jail operations and safety, and they will be responsible for carrying out these reforms every day. In every high-performing correctional system—and indeed every high-performing enterprise—leadership treats staff as the organization's greatest asset and invests in them deliberately. That investment has not occurred here. Although violations of the rights of people in custody gave rise to this litigation, staff also operate in environments characterized by violence, trauma, and significant operational strain.[vi] A safe and functional correctional system must account for the safety and dignity of both populations. And in my conversations with staff, they expressed to me their own desire for true reform at Rikers. I look forward to working with them to achieve this shared goal and adjusting the Department's approach to promoting staff success.

**Stakeholders**

Since my appointment, my team sought out the perspectives of people who spent time living and working in the City jails as well as their representatives: former and current incarcerated

individuals, former and current DOC staff, counsel for Plaintiffs and Defendants, and local and federal prosecutors.

We also met with all three labor unions representing uniformed Department staff: the Assistant Deputy Wardens/Deputy Wardens Association, the Correction Captains' Association, and the Correction Officers' Benevolent Association. We recognize the essential role each of these groups plays in representing DOC staff and advocating for workplace safety. The Remediation Management Team welcomes continued engagement with labor partners in pursuit of that shared objective.

The Remediation Management Team also attended City Council hearings and meetings of the Board of Correction, met with City officials, and had discussions with the Office of the Public Advocate. While members of my team and I, as Court agents, cannot engage in any political activity or policymaking, we remain open to hearing from policymakers and the public, particularly to advance sustainable reform to the jail system.

I appreciate the candor and engagement these individuals and organizations have shown. We intend to maintain this level of contact and connection throughout our work, recognizing that input from those directly affected by conditions within the jail systems is critical to building sustainable reforms.

## ACHIEVING THE VISION: PRIORITY AREAS OF FOCUS

Achieving Substantial Compliance with the Contempt Provisions will take years of steady, coordinated effort. Although the Contempt Provisions address broad and interlocking deficiencies, the Court instructed my office to prioritize "the safety-related areas." *See* February 18, 2026, Order (Dkt. 961), at 11. The first Remediation Action Plan, therefore, begins with safety, organizing its action steps around five foundational areas that are necessary predicates to achieving Substantial Compliance with the Contempt Provisions: (I) improving core correctional and security functions; (II) transforming staffing models and practices; (III) strengthening individual and institutional accountability; (IV) modernizing data systems and technology; and (V) promoting effective organizational leadership and governance. Later Remediation Action Plans will build on these priority areas.

**Improve Core Correctional and Security Functions**

Core correctional and security practices form the backbone of a safe and well-run jail environment. When properly implemented, these practices limit rates of violence, including stabbings and slashings, assaults, and self-harm; the circulation of dangerous contraband, such as weapons and illegal drugs; and excessive, unnecessary uses of force. Conversely, when such practices are not properly implemented, unsafe and unstable conditions flourish. Two key categories of core correctional practices deserve the greatest attention: security practices and programming, which are addressed below.

As thoroughly documented by the Monitoring Team, multiple lapses in core security practices afflict the City jails. They include: "failures to secure doors, remain on post, conduct

meaningful tours, maintain control of housing areas, address visible misconduct, conduct safe and effective searches and escorts, use de-escalation, activate body-worn cameras, and ensure supervisors actively direct and correct staff practice." *See* June 17, 2026, Monitoring Team Status Report (Dkt. 984), at 104. A major contributing factor is the absence of a cohesive Security Plan that "prioritizes the most urgent deficiencies, establishes clear expectations for staff and supervisors, uses data to identify and measure progress, and is capable of being sustained through changes in facility and executive leadership." *Id*. at 104–05. The Court previously directed DOC to develop a comprehensive Security Plan. As the Monitor reported, however, DOC has "struggled" to complete that task. *Id*. at 103.

To advance this requirement, I will direct and guide DOC to build and operationalize a cohesive Security Plan beginning in the first reporting period. Given the scale of the project, DOC's historical challenges completing it, and the pressing need to begin implementing corrective actions as swiftly as possible, we will do this work in phases, starting with the highest-priority issues. In addition, because the problem of unsecured doors is attributable not only to staff failures but also to defective doors, I will collaborate with the City and DOC on a plan for replacing defective doors. Simultaneously, my team and DOC will launch a restrictive-housing pilot program. The pilot will complement ongoing development of the Security Plan, providing us with direct insight into factors contributing to security lapses and an opportunity to test potential solutions. Ultimately, we will work with DOC to scale effective interventions across the Department, though this effort is unlikely to be realized in the first Remediation Action Plan period.

In addition to security, programming is a second core pillar of effective correctional practice. Modern correctional systems recognize that the scope, quality, and consistency of programming are central to both safe facility operations and meaningful rehabilitation and behavior change. Structured programming reduces unproductive idle time, which is a known driver of conflict and violence in custodial environments. More broadly, well-designed programming allows correctional systems to make productive use of the period of incarceration by addressing behavioral risks and individual needs in a structured and supervised setting.

Programming also plays an important role in supporting behavioral stability within facilities. Regular, structured activities reduce unstructured movement and idle congregation, strengthen facility routines, and improve overall institutional order. Over time, consistent engagement in programming can support more stable decision-making and improved interpersonal functioning, which in turn contributes to safer housing unit conditions for both staff and incarcerated individuals.

Finally, programming is a key component of successful reentry.[vii] It supports the development of practical skills—such as communication, conflict resolution, and daily functioning—that are necessary for stability following release. Effective programming is not limited to reducing future justice system involvement; it is also intended to support individuals in returning to their communities with greater capacity to participate in work, family life, and civic engagement. In this way, programming contributes to safety both inside and outside the facility.

7

Community-based service providers play a central role in delivering high-quality programming within correctional settings.[viii] These providers bring subject-matter expertise in areas such as substance use treatment, behavioral health, education, workforce development, and the arts. Critically, these organizations often deliver services using peer coaches: individuals with lived experience in the carceral system who are now thriving in the community. Such providers expand the Department's capacity to deliver programming beyond what can be provided directly by DOC, serving as key partners in program design and implementation. In addition, their presence within facilities strengthens continuity between facility-based programming and community-based services, helping to bridge the transition between custody and reentry.

While programming is currently offered on Rikers Island, the Remediation Management Team observed broad agreement among stakeholders that existing programming is insufficient in both scale and diversity to meet the needs of the incarcerated population. Addressing this gap, which widened under previous City leadership, will require a significant expansion of programming capacity. In the first Remediation Action Plan period, I will work with the City and DOC to determine the appropriate funding (estimated here at $50 million) to be allocated in the annual DOC budget for community-based programming. The Remediation Management Team will support DOC in engaging existing and new providers to design and implement this expansion, with the goal of significantly increasing both the volume and variety of programming available to people in custody.

**Transform Staffing Models and Practices**

Staffing is, according to the Court, "*the* essential element to reform." *See* November 26, 2024, Order (Dkt. 803), at 31 (emphasis in original). Multiple problems contribute to the staffing dilemma. DOC's staffing models and practices "are not being deployed effectively."[ix] *See* Dkt. 846, at 30. DOC's "mismanagement of staff is inextricably linked to high rates of force and violence in the jails." *See* November 26, 2024, Order (Dkt. 803), at 31. Recognizing the nexus between staffing and the ongoing constitutional violations relating to violence, the Court granted my office broad authority to improve, maximize, and optimize staffing. *See* February 18, 2026, Order (Dkt. 961), at 17–21.

The Monitor's latest status report highlights DOC's ongoing challenges with maximizing the deployment of uniform staff. It also recognizes that completing DOC's post analysis "will provide critical information on the number and duties of each post in each facility as well as the number of uniform staff needed to ensure adequate coverage." *See* Dkt. 984, at 206. In the first reporting period, I will oversee DOC's efforts to analyze and improve staffing using a four-part approach: first, my team will map and validate DOC's current post and deployment practices; second, we will create an improved staffing model given current resources, ensuring the right staff are in the right posts; third, we will design an optimal DOC staffing system; and finally we will adjust it for each facility in the new borough-based jail system. This work will take time, but I am confident the system can achieve immediate improvements to relieve pressure on staff, better align with accepted best practices, and reduce substantial overtime costs.

**Strengthen Individual and Institutional Accountability**

DOC's anemic systems for addressing misconduct contribute to the repeated and systemic policy violations fueling dangerous conditions in the City jails. Early in my tenure, I learned that DOC's investigative and disciplinary units were disconnected and dispersed across the Department, weakening DOC's ability to hold staff, and the Department itself, accountable for misconduct. In May 2026, I began to resolve the structural and organizational deficiencies by reintegrating the investigative units into a single centralized division under a new Senior Deputy Commissioner who reports directly to my team.

The Monitor's most recent status report identifies inadequate staffing within the newly consolidated division as a principal obstacle to the timely investigation of misconduct and the fair administration of discipline. *See* June 17, 2026, Monitoring Team Status Report (Dkt. 984), at 166. In response, I will direct the Department to develop and implement a comprehensive staffing plan for the Investigations, Intelligence, and Accountability Division. We will also conduct a thorough review of existing investigative and disciplinary processes and redesign them, where necessary, to reflect national best practices and eliminate unnecessary delay, inconsistency, and inefficiency. Our objective is clear: establish accountability systems that are timely, transparent, objective, and trusted—systems that hold employees to consistent standards, reinforce professional conduct, and strengthen public confidence in the Department's ability to police itself. Those same principles must govern accountability for the incarcerated population, ensuring misconduct is addressed promptly, disciplinary decisions are fair and consistent, and expectations are applied uniformly throughout the jail system.

**Modernize Data Systems and Technology**

Modern data systems and technology are essential to monitor organizational operations and risks, assess compliance with policy and law, identify areas for enhancement, track the progress and effectiveness of reform efforts, and support effective operational oversight. The Court tasked me with ensuring facility leadership regularly reviews data on uses of force to identify "operational changes or corrective action plans that should be implemented . . . to reduce the use of excessive or unnecessary force," and the Monitoring Team identified gaps in DOC's data collection and technology systems, which impede efforts to assess compliance with requirements of other Contempt Provisions, including the requirement that staff conduct routine tours. *See* August 14, 2020, First Remedial Order (Dkt. 350), at 3.

In this period, my team will direct and guide DOC to identify gaps in their data collection and data systems and, in turn, develop a strategic plan to prioritize and provide timelines for addressing those gaps. Internally, we will design and launch a remediation compliance tool to ensure real-time transparent tracking of our activities and those of DOC. This effort will help us measure success, identify gaps and barriers, and achieve the Remediation Action Plan's goals.

**Promote Effective Organizational Leadership and Governance**

Sustainable, transformative reform requires stable and effective executive leadership, as well as skilled and committed management at all levels of the Department. It also requires institutional imagination—the ability to reorient long-standing systems toward safer and more

humane outcomes.  Over the past decade, repeated turnover in DOC leadership undermined steady progress, contributing to cycles of reform initiatives that were launched and later abandoned.[x]  At times, leadership decisions actively impeded reform efforts.  Despite this history, I am encouraged by the current direction of DOC leadership and their stated commitment to working toward compliance.

The Monitoring Team's most recent report underscores that some facility leadership teams require additional support to develop stronger operational problem-solving capacity.  In this period, I will address this need by directing DOC to strengthen the structure and frequency of engagement between executive leadership and facility leadership, particularly around operational deficiencies and the timely implementation of corrective actions.

Effective leadership also depends on the ability to communicate clearly and consistently across the organization—an operational baseline that DOC has not yet fully achieved.  I will direct DOC to implement a system that enables reliable communication with all staff, ensuring directives, policy changes, and operational priorities are clearly conveyed and consistently understood throughout the Department.  This will be a foundational tool for driving alignment and accountability across facilities.

Beyond structural improvements, this work also requires close attention to institutional values.  In May 2026, Commissioner Richards and I traveled to Germany to observe correctional facilities that are widely regarded as among the most humane and professionally operated in the world.  While German correctional systems are not directly transferable to New York, they reflect a fundamentally different orientation—one that places human dignity at the center of incarceration.  Article 1 of Germany's Basic Law states that "Human dignity shall be inviolable."  In practice, this principle shapes a system in which conditions of confinement are designed, to the extent possible, to approximate life in the community, with a strong emphasis on rehabilitation and reintegration.  Correctional staff operate within a framework that prioritizes safety, professionalism, and a rehabilitative mission.

By contrast, in the United States, correctional systems are organized primarily around custody, control, and order.[xi]  While those functions are necessary, they are not sufficient to produce safe, stable, or constitutional jail environments.  Nor are they explicitly grounded in a shared commitment to human dignity or the reciprocal obligation of safety for those who live and work in custody settings.

The City and DOC can draw on international best practices to define a clearer and more explicit set of governing values.[xii]  One step in that direction is the development of a framework of values for people who live and work in City jails.  Grounded in human dignity, safety, and professional responsibility, this framework will be developed in consultation with stakeholders and made publicly available upon completion.  It will not replace governing law or existing court orders, but it will provide an explicit institutional baseline that clarifies expectations, strengthens accountability, and helps guide daily practice across the system.

CONCLUSION

For more than a decade, this Court, the Monitoring Team, the parties, advocates, and successive City administrations devoted immense effort to reforming the New York City jail system. Yet violence remains pervasive, basic correctional practices remain unreliable, and unconstitutional conditions persist. The system has reached the point where incrementalism is itself a form of failure. The political structures that failed to lead the City into compliance during this crisis will not lead it out of contempt.

That is why this Court granted my office broad powers to exercise "oversight, direction, and management of all aspects of the DOC necessary" to spur transformative change in the City jails. *See* May 13, 2025, Order (Dkt. 846), at 18, 36–37. This authority extends beyond the traditional powers of the Commissioner or the City's political officials. Where necessary, it permits me to seek relief from "any legal or contractual requirements that impede [me] from carrying out [my] duties" in striving to achieve constitutional compliance. *See* May 13, 2025, Order (Dkt. 846), at 41. I do not hold this responsibility lightly. But I will use my full authority to bring immediate and lasting change to the City jails.

This Remediation Action Plan begins a new chapter. It is grounded in the power of this Court, guided by measurable objectives, and determined to make real change. This is why this effort not only maps the path to compliance but provides the direction and guidance to finally arrive at sustainable reform. The Plan's timelines are aggressive because the moment demands it. Meeting them will require the Department's immediate and focused attention. And if these timelines are not met, our intervention will deepen.

Every person who enters these facilities—to await trial, to serve a sentence, to report for duty, to provide medical care, to visit a loved one, to participate in a community-based program, or to deliver an essential service—should expect to leave safely. With new borough-based facilities on the horizon, we have a rare opportunity to heal this institution before its failures are carried into the next generation of City jails.

Accordingly, I respectfully request the Court approve this First Remediation Action Plan so that this work may proceed without delay.

Respectfully submitted,

**Nicholas J. Deml**
*Remediation Manager*

11

# THE FIRST REMEDIATION ACTION PLAN

## Year 1

*July 14, 2026 – June 30, 2027*

## YEAR 1

This is the first *Nunez* Remediation Action Plan ("RAP").  It sets forth the priorities, directives, and measures of compliance that the Remediation Manager ("RM") established to guide reform of the New York City jail system from July 14, 2026, through June 30, 2027.

Starting with practices, protocols, and systems most closely related to institutional safety and most urgently in need of reform, the RAP organizes the first year of work around five Priority Areas: (I) improving core correctional and security functions; (II) transforming staffing models and practices; (III) strengthening individual and institutional accountability; (IV) modernizing data systems and technology; and (V) promoting effective organizational leadership and governance. These five Priority Areas are not an exhaustive catalog of the multi-year remedial action necessary to achieve Substantial Compliance with the Contempt Provisions.  Instead, they are foundational and necessary predicates on which durable and sustainable reform depends.  The RM cannot empower DOC to achieve, much less sustain, substantial compliance with the Contempt Provisions unless and until DOC first establishes the basic operational competencies these Priority Areas represent.  Accordingly, this first RAP does not implicate all the Contempt Provisions; successive RAPs will do so as they build on this initial framework.

Each Priority Area sets a goal describing normative conditions and model practices that reflect a healthy and functional system.  These goals set the vision for each Priority Area, and many will not be achieved in the first year of the Plan.  However, each Priority Area also prescribes specific and concrete Action Steps, which, carried out effectively over time, will cumulatively move DOC toward Substantial Compliance with the Contempt Provisions.  In short: the goals of the Priority Areas identify the destination while the Action Steps mark the route.

The Action Steps are also measurable.  Substantial remediation of the City jails will be a yearslong effort, not a single event, and progress will be incremental.  The RAP sets measures of remediation for each Action Step within twelve months and notes where some measures extend beyond one year.  These measures allow the RM to track progress toward each Priority Area's goal, identify shortfalls early, and correct course as needed.  The RAP also identifies areas of work that necessarily extend beyond the first year; future RAPs will take them up.

The RAP's initial approach to DOC is generally twofold: to direct and to guide.  The RM will direct DOC by setting a vision, establishing the requirements and standards, prescribing and approving the Department's plans, and holding DOC to account for meeting its obligations.  But the RM will also guide DOC, deliberately identifying and supporting growth opportunities within the DOC enterprise to build the institution's capacity to carry the work itself and establish the basis for long-term self-management by DOC, thereby resolving the need for an RM.

*The dates set forth below are working deadlines set by the RM.  The RM may make reasonable adjustments to deadlines for good cause.  Where an order of priority or implementation plan governs sequencing, the corresponding dates shall be fixed upon the RM's approval of that order or plan.  To the extent DOC becomes aware of any impediment that risks inability to meet a deadline, DOC must promptly notify the RM.*

*Where the RM directs the Department to submit proposals for approval, the Department must communicate and collaborate with the RM during proposal development to ensure the final proposal will meet the RM's expectations.  The Department's responsibilities to notify, report to, and obtain the approval of the RM are not limited to those explicitly enumerated in this RAP.*

# PRIORITY AREA I

## Improve Core Correctional and Security Functions

*Goal: DOC reliably and routinely performs nationally accepted core correctional and security functions, including securing doors; staffing posts; controlling keys and OC spray; conducting tours and searches on schedule; using restraints and escorted movement in accordance with protocol; and promptly and effectively responding to emergencies.  DOC effectively limits contraband and controls unauthorized movement.  When rare security failures occur, DOC quickly contains them, conducts thorough and timely reviews, and implements corrective action as necessary to prevent recurrences. DOC provides diverse and impactful programming through partnerships with community-based service providers to reduce idle time, foster behavioral change, and support rehabilitation and successful return to the community.  DOC's housing options for individuals engaged in serious acts of violence promote safety, follow national best practice, and encourage engagement in meaningful programming.*

**Action Step 1: Develop and Begin Executing the Security Plan**

1.1    The RM shall direct DOC to submit for the RM's approval a proposed order of priority for addressing lapses in core correctional and security practices.  DOC shall devise the order of priority so that it is aligned to the Contempt Provisions, DOC's prior work, and the Monitoring Team's recommendations.  DOC's proposed order shall encompass, at a minimum: unsecured doors; abandonment of post; officer key control; post orders; routine tours; searches; facility emergency response teams; escorted movement with restraints where required; control of undue congregation of detainees around secure ingress/egress doors; management of vestibules; and the securing of officer keys and OC spray.

1.2    By **October 1, 2026**, DOC shall submit its proposed priority order, together with a proposed timeline, to the RM for review and final approval.

1.3    Beginning with the highest-priority item and proceeding in order, the RM shall direct and guide DOC to develop, for the RM's approval, a written practice-change plan for each item that specifies: (a) the leadership official accountable for the item; (b) performance expectations disaggregated by rank; (c) required revisions to policy and to pre-service and in-service training, including revisions for training for first-line supervisors; (d) the metrics and data sources by which DOC will measure changes in staff practice; (e) the supervisory, reinforcement, and accountability mechanisms that will sustain the change, and (f) the communication plan to announce the change.

1.4    DOC shall execute each approved practice-change plan in priority order and shall report progress to the RM on a monthly basis against the metrics established under 1.3.

1.5    The RM shall convene periodic reviews with DOC leadership to identify and remove barriers to progress and to determine when DOC shall commence the next priority item.

Execution of the items enumerated in 1.1 is expected to extend into subsequent Remediation Action Plans and reporting periods.

### *Action Step 1 Measures of Remediation*

- **Within one year:**
  - o DOC will obtain RM's approval for the proposed priority order and associated timeline.
  - o In accordance with the timeline, DOC will obtain RM approval of and begin operationalizing the practice-change plan(s) and providing monthly progress reports on operationalized practice-change plans.
  - o RM and DOC will conduct periodic reviews.
  - o Drafting of practice-change plans for the full set of enumerated items will be completed.
- **Beyond one year:**
  - o Execution of practice-change plans for the full set of enumerated items will continue into subsequent RAPs and reporting periods.

### Action Step 2: Validate and Replace Defective Doors

**2.1**   No later than **September 1, 2026**, DOC shall validate and document, by facility and housing area, the number and location of defective doors.

**2.2**   No later than **October 1, 2026**, DOC shall submit for the RM's approval a procurement and replacement schedule that specifies milestone dates, sequencing by risk, and funding requirements, coordinating with the City on appropriations and procurement as needed.

**2.3**   The City and DOC shall obtain necessary funding and execute the approved schedule and shall report replacement progress, including any barriers or delays to progress, against milestones to the RM on a monthly basis.

**2.4**   The City and DOC shall promptly notify the RM of any issue or event that risks preventing DOC from procuring and replacing the doors on schedule.

### *Action Step 2 Measures of Remediation*

- **Within one year:**
  - o DOC will complete and submit to the RM a validated inventory of defective doors.
  - o DOC will obtain RM's approval of procurement and replacement schedule.
  - o The City and DOC will obtain necessary funding and procure and replace doors on schedule.

16

- o DOC will regularly report on progress to the RM.
- **Beyond one year:**
  - o Full door replacement will likely extend beyond one year.

**Action Step 3: Evaluate Existing Placement Options and Develop New Placement Options for Individuals Following Serious Acts of Violence**

**3.1** The RM shall direct and guide DOC to create and submit for approval an implementation plan for a pilot housing program for individuals following serious acts of violence, which covers, among other things: the process for staff selection, inclusion criteria for the population, a staffing plan, staff training, a schedule for the unit(s), and programming for the population in the unit(s). Goals of the pilot shall include improved security practices (e.g., routine tours and well-conducted searches), behavior change, and increased engagement in meaningful programming.

**3.2** Once launched, the RM shall direct and guide DOC to assess pilot housing program progress and shall determine whether and how to extend the model to additional units and populations. This work shall be planned in consultation with the Monitor and developed in accordance with Action Plan Section E, Paragraph 4.

**3.3** The RM shall direct and guide DOC to develop data-driven short-term strategies for managing the population of persistently violent persons in custody ("PVPs") with the goal of reducing the rate at which PVPs commit violent infractions, including a schedule for operationalizing these strategies.

*Action Step 3 Measures of Remediation*

- **Within one year:**
  - o DOC will obtain the RM's approval of implementation plan.
  - o DOC will execute the implementation plan in a timely fashion.
  - o The pilot will be launched.
  - o DOC will assess pilot progress to inform decisions regarding potential expansion.
  - o DOC will complete data analysis concerning PVPs to inform potential housing and programming strategies.
  - o DOC will begin operationalizing strategies for managing the PVP population.
- **Beyond one year:**
  - o Implementation of any approved pilot expansion and strategies for managing PVPs may extend beyond one year.

17

**Action Step 4: Establish Classification Leadership**

**4.1**   No later than **September 1, 2026**, DOC shall submit for the RM's approval a position description and rank for an appropriately senior leadership role to oversee the strategic classification of persons in custody consistent with the requirements of Action Plan Section E, Paragraph 1.

**4.2**   Upon approval, DOC shall commence recruitment of a qualified official to the approved role.

**4.3**   Within 60 days of the start date of the appointed official in the new role, the official shall present to the RM a concrete and specific plan of action regarding DOC's classification practices, deficiencies, and priorities.

**4.4**   The appointed official will continue refining the plan of action, as needed, and begin operationalizing the plan.

*Action Step 4 Measures of Remediation*

- **Within one year:**
  - DOC will obtain RM approval of a classification leadership role.
  - DOC will fill the classification leadership role with a qualified official.
  - The classification official will present a concrete and specific plan of action to the RM.
  - The classification official will begin operationalizing the plan.
- **Beyond one year:**
  - Execution of the plan of action will likely continue beyond one year.

**Action Step 5: Establish a Rapid Executive Reporting Procedure for Serious Security Incidents**

**5.1**   The RM shall direct DOC to submit for the RM's approval, no later than **October 15, 2026**, a rapid executive reporting procedure that requires preparation of a standardized executive summary within a fixed period—presumptively 24 hours—of serious security incidents or breaches, pursuant to a definition to be proposed by DOC; and that designates the ranks responsible for preparing, reviewing, and escalating the report.

**5.2**   The procedure shall prescribe the content of the executive summary, which shall include, at a minimum: a concise factual account of the incident, including identification of the individuals involved; the immediate actions taken; a preliminary assessment of contributing causes (including any staffing breakdowns that contributed to the incident); the follow-up procedures initiated; and any best practices or corrective measures identified for dissemination.

18

**5.3**    The procedure shall establish the escalation path by which the executive summary is conveyed upward to executive leadership, the RM and the Monitor, within the prescribed timeframe.

**5.4**    No later than **December 1, 2026,** DOC shall implement the approved procedure and shall take steps to enhance the timeliness, quality, and completeness of executive summaries as needed.

*Action Step 5 Measures of Remediation*

- **Within one year:**
  - o DOC will propose definition of serious security incidents or breaches that will be subject to the rapid reporting procedure.
  - o Rapid-reporting procedure will be approved and implemented.
  - o DOC will track timeliness, quality, and completion of executive summaries.

**Action Step 6: Allocate Annual Funding for Programming to Increase Engagement, Promote Rehabilitation, and Reduce Violence in the City Jails**

**6.1**    The City and DOC shall conduct an assessment to determine the appropriate amount of dedicated annual funding (approximated here as $50 million) for community-based programming to increase engagement, promote rehabilitation, and reduce violence across the City jails.

**6.2**    DOC shall present to the RM for approval, by October 15, 2026, a plan to administer the funding for community-based programming.  The plan shall address, among other things: potential activities; the types of service providers; selection criteria and a vetting process for providers; and security and operational considerations, including financial oversight.

*Action Step 6 Measure of Remediation*

- **Within one year:**
  - o The City will approve or provide, and DOC will have obtained, an estimated $50 million in annual funding for community-based programming.
  - o DOC has begun to bring new and additional programming into the jails.

# PRIORITY AREA II

## Transforming Staffing Models and Practices

*Goal: DOC has completed a sophisticated, independent staffing analysis so that staff can be efficiently deployed to meet operational needs.  In accordance with that analysis, DOC reliably fills posts and provides appropriate levels of supervision.  DOC minimizes absenteeism, overtime, and security failures resulting from staffing breakdowns.*

**Action Step 7: Validate and Assess Staffing**

**7.1**    The RM will assume oversight of the independent staffing analysis being conducted by a consultant previously engaged by DOC.  The analysis shall validate the Department's staffing data, including posts, schedules, deployment, and supervision.

**7.2**    No later than **October 1, 2026**, the RM and consultant shall deliver a completed staffing assessment, supported by validated data, that identifies deficiencies in posts, scheduling, deployment (including distribution of uniform staff across security and civilian roles), and supervision (including the number of supervisors in the facilities).

**7.3**    The RM shall direct and guide DOC to develop a plan to operationalize the recommendations of the independent staffing analysis.

*Action Step 7 Measures of Remediation*

- **Within one year:**
    - Validation of staffing data (posts, schedules, deployment, supervision).
    - Completed staffing assessment, supported by validated data, and accepted by the RM.
    - DOC shall provide a plan approved by the RM to operationalize the staffing analysis recommendations.

- **Beyond one year:**
    - The work to operationalize the plan shall likely extend beyond one year.

**Action Step 8: Develop and Execute Staffing Plan**

**8.1**    Following completion of Action Step 7, the RM shall direct and guide DOC to develop for the RM's approval a staffing plan that defines, prioritizes, and assigns timelines to the tasks necessary to maximize staff deployment, including supervision, scheduling, and assignment.  DOC shall update or modify the plan as directed by the RM.

20

**8.2**    Upon the RM's approval, DOC shall execute the plan and shall report task completion against timeline to the RM on a monthly basis.

*Action Step 8 Measures of Remediation*

- **Within one year:**
    - Staffing plan approved by RM.
    - DOC is executing the staffing plan consistent with the timelines established in the plan.
    - DOC is reporting progress to the RM.
- **Beyond one year:**
    - Full execution of staffing plan is expected to extend beyond one year. Additionally, development and execution of a model staffing structure that maximizes human resources will occur after the first year.

# PRIORITY AREA III

## Strengthen Individual and Institutional Accountability

*Goal: Misconduct and serious incidents are investigated promptly, objectively, and competently by an adequately staffed investigative function; findings reliably lead to proportionate, timely discipline; and staff and persons in custody experience a credible, consistent system of accountability. Functionally, accountability is swift and even-handed, deterring misconduct and reinforcing lawful, professional practice.*

**Action Step 9: Improve Investigations Staffing, Structure, and Training**

9.1    The RM shall direct DOC to submit, by **September 1, 2026**, for the RM's approval, a proposal for a redesigned Investigations, Intelligence, and Accountability Division (the "Division") that is responsible for members-of-service related investigations, person-in-custody ("PIC")-related investigations, intelligence functions, and a special investigations unit for use in investigating discrete issues at the direction of the RM.

9.2    By **October 1, 2026**, DOC shall submit for the RM's approval a plan through June 30, 2027 to improve initial staffing levels of the Division, including target staffing levels and a hiring and assignment timeline.

9.3    By **October 1, 2026**, DOC shall prepare a proposal of resources (e.g., budget, equipment, technology) required by the Division.  On receipt of the proposal, the RM shall direct the City to take all necessary steps to provide DOC with the Division resources.

9.4    By **February 1, 2027**, DOC shall prepare a proposed training plan detailing all facets of investigative and intelligence training, including any needs for remedial training for existing investigators.

9.5    DOC shall enact each approved plan or proposal, coordinating with the City as needed.

*Action Step 9 Measures of Remediation*

- **Within one year:**
  - DOC will obtain RM approval of redesigned Division, initial investigations staffing plan, resources proposal, and training plan.
  - DOC will execute the above plans and proposals.
  - The City shall provide DOC with the necessary resources to implement the Division staffing plan.

22

- **Beyond one year:**
  - DOC will continue updating its staffing, resources, and training plans and will work to achieve long-term sustainable staffing levels for its investigations teams.

**Action Step 10: Develop the Investigations, Intelligence, and Accountability Division Strategic Plan**

**10.1**  The RM shall direct and guide DOC to submit a proposal no later than **September 1, 2026** that outlines how the new Division will be restructured to operate in a streamlined and efficient manner.  The proposal shall include short- and long-term action items designed to produce reliable, objective, high-quality, transparent, and expeditious investigations and outcomes, and improvements to the Department's accountability framework, accounting for the Monitor's recommendations.  The list shall specifically address (a) potential revisions to the employee disciplinary framework and (b) practices for referring to prosecutors cases involving apparently criminal conduct by staff or persons in custody.  Each action item shall identify an accountable owner and a target completion date.

*Action Step 10 Measures of Remediation*

- **Within one year:**
  - DOC will obtain RM approval of the Division's strategic plan.
  - DOC will operationalize the plan in accordance with the plan's target completion dates.
- **Beyond one year:**
  - Long-term action items are expected to extend beyond one year.
  - Periodic review of the Division's Strategic Plan, with modifications submitted to the RM for approval as needed.

# PRIORITY AREA IV

## Modernizing Data Systems and Technology

*Goal: DOC's data systems reliably capture accurate, timely, and complete operational, health, and mental health information; that information flows to the decision-makers who need it—including for classification, housing, incident prevention and response; and leadership has trustworthy business-intelligence tools to manage their enterprise, monitor conditions, act proactively, target problems, and measure whether reforms are working. Functionally, the institution manages its operations using reliable data rather than anecdote, and information gaps no longer impair safe operations.*

**Action Step 11: Develop the Technology Strategic Plan**

**11.1**    The RM shall direct and guide DOC to produce, no later than **October 1, 2026**, for the RM's approval, a report identifying and documenting gaps in its data management systems, accounting for the Monitor's recommendations.

**11.2**    The RM shall direct and guide DOC to submit, no later than **April 1, 2027**, for the RM's approval, an integrated technology strategic plan that prioritizes and sequences the actions necessary to remediate the identified gaps and to modernize DOC's data systems in support of the Priority Areas and Action Steps as outlined in the Remediation Action Plan.

**11.3**    As part of this process, the City and DOC shall report to the RM on any gaps in data available to DOC regarding health and mental health data that impede DOC operational functions (including the proper classification and housing of PICs, and placement in specialized housing).  The City and DOC shall specify the necessary steps that must be taken to ensure DOC has the information to safely operate the jails, consistent with sound and standard correctional practice.  The RM shall direct the City to ensure that Correctional Health Service ("CHS") provides DOC with all information the RM or Monitoring Team determine is necessary for safe operations of the jails.

*Action Step 11 Measures of Remediation*

- **Within one year:**
  - DOC will identify data gaps and communicate them to the RM.
  - DOC and the City will identify any gaps in information-sharing with CHS and any proposed actions needed to ensure DOC has all necessary information.
  - DOC will obtain RM's approval of an integrated technology strategic plan.
  - DOC will execute the integrated technology strategic plan in a timely fashion.

24

- **Beyond one year:**
  - o Modernization of DOC's data systems is expected to extend beyond one year.

**Action Step 12: Develop a Business Intelligence Tool**

**12.1** The RM shall direct and guide DOC to produce, by **October 1, 2026**, for the RM's approval, a proposed business intelligence tool (e.g., dashboard, daily executive briefing document) providing regular insight into the status of key Department functions and performance indicators to inform executive oversight and decision-making.  The proposal shall specify the data inputs, indicators, and refresh cadence, along with a timeline for development and rollout.

**12.2** Upon the RM's approval, DOC shall develop and deploy the approved tool for use by executive and facility leadership in accordance with the approved timeline.

*Action Step 12 Measures of Remediation*

- **Within one year:**
  - o DOC will obtain RM approval of proposed business intelligence tool.
  - o DOC will deploy tool in accordance with the timeline, refining the tool as necessary beyond October 1, 2026.

**Action Step 13: Develop a Remediation Compliance Tool**

**13.1** By **October 15, 2026**, the RM will design and launch a remediation compliance tool to ensure real-time tracking of the activities of the City, DOC, RM, and the Monitoring Team to assess the status of initiatives and work, and identify gaps and barriers to addressing the goals of this Remediation Action Plan.

*Action Step 13 Measures of Remediation*

- **Within one year:**
  - o RM will launch the remediation compliance tool.

# PRIORITY AREA V

## Promoting Effective Organizational Leadership and Governance

*Goal: DOC leadership actively manages operations using reliable information, engages in structured problem solving and corrective action, is equipped to imagine, design, and lead sustainable reform, and models a dignity-based culture oriented toward safety and rehabilitation. Functionally, DOC leadership drives sustained, accountable operation of the facilities— anticipating and correcting problems—rather than reacting to crises. Leadership effectively and proactively communicates with staff at all levels and across all locations within the organization.*

**Action Step 14: Develop New Support for Facility Leaders**

**14.1**    The RM shall direct and guide DOC to propose, no later than **January 1, 2027**, for the RM's approval, a new approach to coaching Facility Leadership in maintaining safety and implementing sustainable reforms. The proposal shall include cadence, participants, data to be reviewed, and decisions and corrective actions to be tracked and shall focus on building leadership and problem-solving capabilities.

**14.2**    DOC shall implement the approved new engagement and shall maintain a log of corrective actions and their resolution.

*Action Step 14 Measures of Remediation*

- **Within one year:**
    - o DOC will obtain the RM's approval of the restructuring of engagement between Executive and Facility Leadership.
    - o DOC will implement the restructured engagement.

**Action Step 15: Adopt a Dignity-Based Values Statement**

**15.1**    The RM shall direct and guide DOC to draft, by **April 1, 2027**, for the RM's approval, a Departmental values statement emphasizing the dignity of all persons in custody and DOC staff as well as a proposed process for periodically assessing the consistency of organizational practices with the values statement.

**15.2**    Following the RM's approval, DOC shall formally adopt the finalized values statement and, using a communication plan, distribute the statement to staff and persons in custody.

*Action Step 15 Measures of Remediation*

- **Within one year:**
  - o DOC will obtain the RM's approval of, adopt, and disseminate the values statement to staff and persons in custody.

- **Beyond one year:**
  - o DOC will continue conducting periodic assessments of the consistency of organizational practices with the values statement.

**Action Step 16: Assess Compliance-Focused Resource Use**

16.1    The RM shall direct DOC to produce for approval, within 30 days of the approval of this RAP and every three months thereafter, an assessment of (a) what, if any, additional resources (including personnel) are necessary and appropriate for DOC to timely complete the tasks required of DOC under this Remediation Action Plan and *Nunez* Court orders and (b) how those resources can be expeditiously obtained.

16.2    Upon approval by the RM of each resource need assessment, the RM shall direct the City and DOC to procure the additional required resources.

*Action Step 16 Measures of Remediation*

- **Within one year:**
  - o DOC will timely submit each resource assessment to the RM.
  - o DOC will obtain the RM's approval of the resource assessments.
  - o To the extent the RM approves additional resources, the City will approve or provide, and DOC will obtain, the resources.

- **Beyond one year:**
  - o DOC will continue conducting periodic resource assessments.

**Action Step 17: Enhance Staff Communication**

17.1    The RM shall direct and guide DOC to submit by **August 31, 2026,** for the RM's approval, a new means of effectively communicating with all staff across all posts within the organization.  The proposal shall aim to address the deficiencies of communicating via teletypes and roll calls.

17.2    The RM shall direct and guide DOC to operationalize the approved new communication strategies no later than **October 30, 2026.**

*Action Step 17 Measures of Remediation*

- **Within one year:**
  - o  DOC will roll out a new method for effectively communicating with all staff across all posts within the organization

## Endnotes

[i] *See* November 27, 2024, Order (Dkt. 803), at 11 (finding "the unsafe and dangerous conditions in the jails" have persisted notwithstanding nearly a decade of Court-ordered reform); *see also* May 13, 2025, Order (Dkt. 846), at 3–5 (recounting the history of DOC's noncompliance warranting the RM's appointment); Homer Venters, *Life and Death in Rikers Island* (2019) (documenting, from the perspective of the jail system's former chief medical officer, systemic harms produced by conditions plaguing the City jails); *see generally* Margo Schlanger, *Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*, 81 N.Y.U. L. Rev. 550 (2006) (documenting the decades-long lifecycle of correctional court orders nationwide).

[ii] Internal DOC data reflect overtime expenditures of more than $370 million for Fiscal Year 2026 (July 1, 2025– June 30, 2026).

[iii] *See, e.g.*, July 10, 2023, Monitor Special Report (Dkt. 557), at 12–13 (finding that the use-of-force rate and rates of violence are "far higher than in any jurisdiction with which the Monitoring Team is familiar"); *id*. at 17–18 (DOC staff used head strikes nearly 400 times in 2022, compared to 52 in the larger Los Angeles County jail system).

[iv] These figures reflect internal incident data maintained by DOC for the period January 1 through May 31, 2026.

[v] As one example, new DOC leadership worked closely with my team to restructure the Department's organizational chart.  While I was not required to amend the chart until the Court approved the Remediation Action Plan, new DOC leadership, the Monitoring Team, and I agreed: clarifying who oversees each part of the organization was critical to collectively charting a new course for the jails.  As a result, in May 2026, I reversed the prior mayoral administration's decision to fracture the Department's investigative, intelligence, and accountability functions—a decision that created operational silos and weakened accountability among PICs and staff alike.  Now these functions, covering both staff and PICs, sit in a single division under a Senior Deputy Commissioner ("SDC").  I selected the SDC, who reports directly to my team; the Commissioner and I together make final determinations on staff discipline.  In consultation with the Monitoring Team, I also urged DOC to move its Administration unit, which handles officer scheduling, out of the officer chain of command and under the SDC of Administration.  And the Chief of Department, the top uniformed officer, now reports to both the Commissioner and me.  I view each of these changes as vital to robust individual and institutional accountability in service of reform.

[vi] *See, e.g.*, Erika Harrell et al., U.S. Dep't of Just., Bureau of Just. Stat., NCJ 250748, *Indicators of Workplace Violence, 2019* (2022), https://bjs.ojp.gov/content/pub/pdf/iwv19.pdf (reporting an average annual rate of 149.1 nonfatal violent victimizations per 1,000 workers in corrections occupations during 2015–2019—the highest rate among all occupations measured—compared with 8.0 per 1,000 for workers overall).

[vii] *See, e.g.*, Jeremy Travis, *But They All Come Back: Facing the Challenges of Prisoner Reentry* (2005) (arguing that because nearly all incarcerated people eventually return to their communities, correctional policy should be organized around preparing them for that return); Bruce Western, *Homeward: Life in the Year After Prison* (2018) (documenting, through a longitudinal study of people in their first year after release, the material hardship, unstable housing, and untreated health needs that often follow unprepared reentry).

[viii] *See, e.g.*, The Fortune Society, https://fortunesociety.org (providing reentry programming in the City jails since 1967 through staff and leadership substantially comprising formerly incarcerated people); Osborne Association, https://www.osborneny.org (providing family, education, and reentry programming inside New York City and State correctional systems).

[ix] DOC staff perform a wide range of functions—security posts, intake, escort, transportation, court production, hospital coverage, visit operations, and administrative assignments—each of which bears on the number and type of posts the Department must fill on a day-to-day basis.

[x] Over the last 20 years, DOC has had seven commissioners—an average tenure of about 3.3 years, excluding the current commissioner.  Since 2021 alone, the Department has had four commissioners.

[xi] *See generally* Judith Resnik, *Impermissible Punishments: How Prison Became a Problem for Democracy* (2025) (chronicling the American corrections profession's construction of imprisonment around custody and control as its organizing premises); Sharon Dolovich, *Exclusion and Control in the Carceral State*, 16 Berkeley J. Crim. L. 259 (2011) (arguing that American incarceration is organized around the imperatives of excluding and controlling those it confines, rather than around their eventual successful return to society).

[xii] *See* Ruth Delaney et al., Vera Inst. of Just., *Reimagining Prison* (2018), https://www.vera.org/publications/reimagining-prison-print-report (drawing on the German model to propose human dignity as the governing principle of American correctional policy and practice); Ram Subramanian et al., Brennan Ctr. for Just., *Prison Reform in the United States* (2026), https://www.brennancenter.org/our-work/research-reports/prison-reform-united-states (documenting dignity-centered correctional reforms underway in Maine,

Michigan, North Dakota, Pennsylvania, and South Carolina, including a Pennsylvania housing unit modeled on Scandinavian practice that recorded almost no violent episodes in 2024 even as violence rose 22 percent across the state's other facilities).