# Status Report
# by the
# *Nunez* Independent Monitor

**September 30, 2026**

# THE *NUNEZ* MONITORING TEAM

Steve J. Martin
*Monitor*

Elly Davis
*Junior Analyst*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Sarah Geisler
*Junior Analyst*

Dennis O. Gonzalez
*Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Associate*

Emmitt Sparkman
*Subject Matter Expert*

**Table of Contents**


**Introduction ........................................................................................1**

- Prioritizing the Need to Create a Foundation for Reform........................................ 1

**Classification & Housing ...........................................................................6**

- Classification........................................................................................... 6
- Housing ................................................................................................ 8
- Cell and Bed Assignment.......................................................................... 10
- Recommendations ....................................................................................11

**Update on Work Underway Related to LL42 .............................................14**

- Next Steps ............................................................................................. 16

**Status of Collaboration & Consultation ...................................................17**

# INTRODUCTION

In this report, the Monitoring Team ("MT") updates the Court on several issues including concerns about DOC's operations, information related to the Department's overall framework for classifying and housing people in custody according to their risk of violence, updates on the Local Law 42 ("LL42") pilot projects, and the current status of cooperation and collaboration between the Department and the Monitoring Team.

## PRIORITIZING THE NEED TO CREATE A FOUNDATION FOR REFORM

The Monitoring Team has been cautiously optimistic that the Department would make material progress to alleviate the dangerous conditions in the jails so that the Department could work incrementally to advance the *Nunez* reforms and to initiate efforts to address LL42 requirements. The requirements of the *Nunez* Court Orders address constitutional violations and go to the heart of jail operations. They are the *sine qua non* of the foundation necessary to reform the agency. Although the *Nunez* Court Orders address the most basic conditions in the facilities, given the significant number of requirements in play, they must be appropriately synchronized and prioritized. To date, this has yet materialized in the form of significant changes in practice nor improvements to the foundational elements of jail operations.

The Monitoring Team has long reported on the seemingly impenetrable gordian knot and polycentric issues compromising the jails' operations. The Department has remained mired in dysfunction such that the constitutional violations that underpin the *Nunez* Court Orders persist, and in some cases, may have worsened. Outlined below is a brief summary of the current conditions that underlie the MT's findings:

- **Basic Supervision Failures Occurring During In-Custody Deaths**: The three most recent in-custody deaths are a sobering illustration of the impact of the Department's

ongoing failure to operate a system consistent with sound correctional practices. Weaknesses in basic practice, including officers abandoning their posts and failing to verify the welfare of each individual via routine tours of the units, were present in each of these tragic events. These same failures, and others, contribute to dangerous events that occur daily (*e.g.*, large group disturbances, excessive and unnecessary uses of force, and drugs and weapons that are ubiquitous throughout the jails).

- **Ongoing Basic Security Failures**: Security failings remain rampant throughout the jails. Cell doors are left unsecured, staff abandon their posts for long periods of time (which often goes undetected), and searches remain inefficient, unproductive, and ineffective at stemming the flow of dangerous contraband. To the extent that security plans are developed, they are often haphazard and rely on the same strategies that proved to be ineffective in the past. The housing units remain dangerous places for both incarcerated people and staff.

- **Staff Deployment & Supervision Failures**: The Department does not deploy its staff within modern staffing conventions. The Department cannot reliably identify where ***all*** staff are assigned. Further, officers on the units are not adequately or competently supervised. There are insufficient numbers of Supervisors and in most cases, the quality of supervision is so inferior that they cannot be relied upon to guide officers toward better practice.

- **Classification and Management of Housing Units**: The Department maintains a classification tool and generally houses individuals by custody level. However, the operational management of housing units in this Department generally isn't differentiated based on custody level, resulting in inadequate security, structure and supervision for

even the most violence-prone people in the Department's custody. Consequently, the Department's classification scores, which are an essential and valuable tool in a well-managed correctional setting, are virtually meaningless to the task of managing risk and controlling violence in this setting.

- **Department Leadership and Management**: The Department's leadership is clearly weighed down by the sheer magnitude of all they must do is struggling to find a clear direction forward, much less one based on sound correctional practice. This is exacerbated by the leadership team's limited operational experience and expertise in actual day-to-day correctional management and practice. There are limited numbers of leaders with the necessary security and correctional expertise to know *what* needs to be done, and just as importantly, *how* to get it done. This obviously inhibits the Department's capacity and ability to manage the complex series of initiatives that must be developed and implemented.

Unfortunately, the consequence of these failures is that the constitutional violations that led the Court to impose escalating forms of remedial relief remain present and the violence in the system remains persistent. These conditions will continue unabated if the core issues underlying these problems are not addressed first. The constitutional violations underpinning this case simply cannot be resolved given the current trajectory, where the Department is being pulled in many directions and is attempting to develop and implement a variety of initiatives without first establishing the proper and necessary foundations in basic correctional practice. To that end, the Department must narrow its immediate focus to four foundational issues upon which additional reforms can then be built:

- **Governance**: Consistent with the first RAP Action Plan Step 14 (dkt. 988), the Department must promote and develop effective organizational leadership and governance by strengthening stable, capable executive and facility leadership and improving management and communication throughout the Department. In particular, the Department must prioritize strengthening engagement between executive and facility leadership, particularly to identify and address operational deficiencies, develop facility leaders' problem-solving skills, and ensure timely corrective action.

- **Staff Deployment**: The first phase of the staffing analysis conducted by the DOC's staffing consultant and RMT and is nearly complete. The findings are critical as they define what currently exists, which, until now, was unknown, even to the Department. This is only the first phase of this work. It is important that this evaluative work has been done, but there is a substantial amount of work that will have to be completed to bring staffing practices up to par. The RMT will be guiding the next phases of this work to ultimately prescribe the many new conventions that are needed to modernize deployment practices so that the jails are staffed appropriately nor does it address implementation of those conventions. To that end, the Department must, at a minimum, gain a command and understanding of all potential post assignments, have accurate and immediate knowledge about where its staff are assigned at any given time, and make appropriate adjustments so that staff deployment practices become efficient and provide for the appropriate management and supervision of people in custody.

- **Security Practices**: Housing units must be properly managed using basic and sound correctional practices to ensure that doors are secured, staff remain on post, and people in custody are appropriately supervised. Supervision of staff must also be significantly

improved and strengthened. The necessary security plans will not achieve their goals unless and until the staff are reliably remaining on the units and capable of implementing basic and sound correctional practices and the supervisors are actively, consistently and appropriately monitoring staff.

- **Classification and Housing Operations**: The Department must design, differentiate and implement an appropriate classification and operational framework for the management of housing units based on custody level. The current approach, which essentially manages almost all units in the exact same way, does not incorporate basic and sound correctional practices, and consequently has not been effective in preventing violence. The Department must reformulate its classification and housing strategy.

The vast amount of work to be done, both under the *Nunez* Court Orders and beyond, creates pressure to attempt to address as many issues as possible, simultaneously. Such an approach will inevitably fail if the foundational issues have not been addressed. Curing the core deficiencies in jail operations and the foundational dynamics that perpetuate them requires that the Department focus first and foremost on discrete foundational issues. The amelioration of the dangerous and unconstitutional conditions in the jails will not be materially improved until the Department has fully implemented an appropriate foundation of sound correctional practice.

Ultimately, without a strong foundation of proper staff deployment and safe jail operations, the Department will not be able to achieve the reforms required by the *Nunez* Court Orders nor will it be able to address the variety of other requirements imposed by oversight bodies and local law. The past 10 years of stalled reforms and ongoing constitutional violations clearly demonstrates this sobering and unfortunate reality.

## CLASSIFICATION & HOUSING

The safe and orderly operation of any correctional facility depends on assigning incarcerated individuals to housing units that match their demonstrated level of risk. A valid, objective classification system provides the foundation for these decisions by identifying individuals who present a greater risk of violence and other institutional misconduct and distinguishing them from those who can be safely managed in less restrictive settings. It is essential to recognize that classification alone (*i.e.*, completing the initial or reclassification form, determining risk level, and assigning a custody level) does nothing to actually *mitigate* the person's risk—it merely applies a label. The process of classification is an effective tool for managing the jail population only when custody levels consistently drive housing assignments and when housing unit types are meaningfully *differentiated* according to security level. Higher-level custody housing units should provide greater structure, supervision, staffing and physical security than lower custody housing. Without these operational differences, classification becomes an administrative exercise rather than a tool for managing risk and promoting safety.

### CLASSIFICATION

Classification tools used for this purpose are typically comprised of objective risk factors (*e.g.*, criminal history, age, prior institutional misconduct, etc.) with a known statistical relationship to institutional misconduct. Upon intake, the tool is completed for each person by tallying the points associated with each risk factor to derive a total score. This score translates to a custody level (e.g., Minimum, Medium or Maximum) that corresponds to the person's risk. In January 2026, Dr. James Austin validated the Department's initial classification and reclassification instruments, finding that they both accurately classify individuals according to their risk.

People's circumstances and behaviors often change while they are in custody, which is why it is important to reassess their risk/custody level periodically. In contrast to the static risk factors found on initial classification instruments (*e.g.*, aspects of one's criminal history that are unchangeable), reclassification instruments typically include dynamic risk factors related to an individual's current behavior. The Department's reclassification instrument includes risk factors regarding the number/severity of infractions and the level of program engagement in the past 60 days. Points are deducted from the total score of those who are infraction-free and who participate in programming, which may translate to a lower custody level. Additional points are added to the total score of those who engage in serious misconduct, which may translate to a higher custody level.

In addition, an individual's need for medical care, mental health care, or protective custody (among others) should be identified at intake, which may supersede the individual's custody level when making a housing assignment. The Department's Classification Policy #4100R-D, III.C "Special Population Housing" provides for such placements.

Equally important to utilizing a valid classification instrument and reassessing individuals' risk level periodically is the proper use of overrides. An override may be used to supersede the scored custody level when an individual's circumstances suggest that a different custody level is more appropriate.[1] Overrides must be closely regulated to avoid their biased or inappropriate application. The Department's Classification policy identifies several mandatory

[1] For example, upon Reclassification, an individual with a serious committing offense (Murder, 7 points) and previous conviction (Burglary, 7 points) will likely accrue sufficient points to score as Maximum custody (14 points), even though they may have been in custody for a significant period of time without any behavioral issues. In this case, an override to a lower custody level (e.g., Medium) would be appropriate. Conversely, an individual may have a less serious committing offense (Grand Larceny 2, 3 points) and no criminal history and would score as Minimum custody. If that individual commits an act of violence, the score will increase upon reclassification (1 point for the infraction, and 7 points for the severity) but perhaps only to Medium custody (11 points). In such cases, an override to Maximum custody would be appropriate.

override circumstances where an individual may not be assigned to Minimum custody (*e.g.*, if they are charged with homicide, kidnapping, felony sex offense or if they are a Security Risk Group member). Policy also identifies various discretionary override criteria for assigning an individual to a higher custody level than indicated by the score (*e.g.*, known management problem, escape threat, serious violence threat, high bail/remand, etc.) or to a lower custody level than indicated by the score (*e.g.*, prior good institutional conduct, isolated prior misconduct, current offense not as serious as scored, etc.). To apply an override, a classification supervisor in the rank of Captain or above must approve the recommendation. However, Dr. Austin's 2026 validation study of the Department's classification process found "virtually no use of overrides, when there should be a 5 to 15% application of the discretionary override system."

**HOUSING**

Once an individual's custody level is established, they should be assigned to a housing unit with corresponding security and operational protocols. Generally, fewer controls are required to safely house people at lower custody levels, while greater controls are needed to ensure safety among those at higher custody levels. Housing units should differ in ways that directly correspond to the risk presented by the individuals housed in them. Key aspects include:

- **Physical Security:** Maximum custody units may utilize individual cells, secure recreation spaces and various controlled access points. In contrast, minimum custody units may utilize dormitory housing with fewer physical barriers or controlled access points.

- **Movement:** Minimum custody individuals may move throughout a housing unit and facility spaces for meals, programs, or religious services with less stringent staff

supervision. Maximum custody individuals may have specific cell lock-out periods and may require closely escorted movement or restraints during transport to facility spaces.

- **Staffing and Supervision:** Staffing levels should be higher in units that house higher custody individuals to ensure safety and access to programs and services, and security rounds may be more frequent than in lower custody units. Furthermore, minimum custody dormitories with fewer posts (*e.g.*, a shared, roving B-officer) and unescorted movement to facility spaces make more staff available to maximum custody/high acuity units, where they are most needed.

- **Access to Programming and Services:** Individuals in lower custody housing may access services and spaces outside of the housing unit (*e.g.*, dining hall, place of worship, program spaces) while services for higher custody individuals may be delivered on the housing units to minimize movement to congregate areas.

- **Association with Other Incarcerated Individuals:** Higher custody housing typically limits interaction with individuals housed in other units (*e.g.*, at recreation) and minimizes opportunities for unsupervised interactions in order to reduce violence and intimidation. Lower custody housing units may permit individuals to attend congregate services (*e.g.*, recreation, religious services) with other individuals from other housing units.

Few if any of these distinctions are evident among the Department's housing units. Apart from celled versus dormitory-style housing, the units designated for minimum, medium and maximum custody individuals operate in substantially the same manner. They have the same staffing levels, movement procedures, and service delivery protocols. Their operational similarity reduces the effectiveness of the classification system as a tool for managing violence.

While it may be appropriate at times to house Medium custody individuals with Minimum or Maximum custody individuals, it is never appropriate to house Minimum and Maximum custody individuals together. The Department identifies individuals who are "mishoused" on a daily basis, including instances where Minimum and Maximum custody individuals are housed together, but the Monitoring Team has observed no sense of urgency in rectifying the mis-housing situations. Furthermore, many individuals have "Keep Separate" orders that prohibit housing them with certain individuals. The Monitoring Team has observed a lack of adherence to these orders in some facilities. This increases unnecessary risk to both staff and incarcerated individuals.

**CELL AND BED ASSIGNMENT**

Although not dictated by the classification process, individuals' cell/bed assignments within a housing unit are an essential, adjacent consideration. When informed and well controlled, cell/bed assignment protocols can minimize violence, intimidation and the influence of Security Risk Groups ("SRG"). Sound practice would require designated staff to be authorized to make cell/bed assignments (for example, Custody Management Centralized Movement Unit "CMCMU" staff). Housing unit officers should not be permitted to change cell/bed assignments according to individuals' preferences, which may shield the officers from intimidation by those wishing to manipulate the location of their cell/bed. The Department's unregulated cell/bed assignment practices have resulted in concentrations of SRG affiliated individuals in specific areas of housing units, which increases the likelihood of intimidation, coordinated violence and other types of disorder.

## Recommendations

Below, the Monitoring Team outlines a series of recommendations for the Department to consider in order to utilize its classification and housing system to improve the Department's operations and corresponding safety in the jails. The Monitoring Team also makes recommendations regarding the Department's leadership for managing classification, differentiating the features and management of housing units based on individuals' custody level, reducing the frequency of mis-housing, and centralizing control of the cell/bed assignment process, all of which severely undercut the effectiveness of the classification system as a tool for managing violence and disorder.

The Remediation Action Plan includes this recommendation as part of Priority Area I, Action Step 4.

- **Dedicated Leadership with Necessary Expertise:** To guide this work, the Monitoring Team strongly recommended[2] that the Department recruit for a Deputy Commissioner of Classification and ensure this individual has direct and significant expertise in classification. The Department has adopted this recommendation and is actively recruiting for this position.

- **Classification Instrument and Process:** In early 2026, the Department's initial and reclassification tools were validated by Dr. James Austin, meaning that they accurately categorize people according to their risk of misconduct. While the Department's initial and reclassification tools are valid, additional work is necessary to increase the accuracy

[2] *See*, Monitor's June 17, 2026 Report (dkt. 984) at pg. 15.

of the information used to score them and to ensure that individuals' custody levels are modified only when appropriate. This includes:

- Ensuring that infractions are issued and processed in a timely manner such that individuals' involvement in misconduct can be accurately accounted for during reclassification,
- Ensuring that information about individuals' program participation is migrated from the Programs Division's database into the Department's information system to increase the accuracy of reclassification scores,
- Expanding the use of discretionary overrides, and
- Limiting non-classification staff's ability to change an individual's custody level in the Department's information system.

- **Housing Unit Operations.** The Department needs to reconfigure the framework for ensuring that housing unit operations are commensurate with the assessed risk level indicated by individuals' classification level. This should occur by:
  - Increasing the number of units/beds of a single custody level and decreasing the number of units that house Minimum/Medium individuals together in order to maximize the ability to find staffing and resource efficiencies,
  - Differentiating the security features of housing units across custody levels to enhance safety, and also to motivate individuals to refrain from misconduct in order to avoid being reclassified to a higher custody level with the greater controls that would accompany a housing reassignment, and

- Controlling and managing the cell assignments within a housing unit via the CMCMU, rather than permitting housing unit officers to make cell assignments independently.[3]

[3] CMCMU staff are responsible for making housing unit assignments, but do not currently assign individuals to specific cells within the housing units.

## UPDATE ON WORK UNDERWAY RELATED TO LL42

The Department has continued its work to advance certain issues related to LL42. However, as the Monitoring Team has continued to emphasize, these efforts must be responsibly balanced against the larger effort to cure the constitutional violations at the heart of *Nunez*. Any work to implement LL42 must be integrated into the inescapable realities of competing responsibilities and other priorities within the Department's operation. Outlined below is a summary of the work that has occurred during the 8-week period since the Monitoring Team's last update to the Court on June 17, 2026.

- **Engagement of the Monitoring Team, Department, Remediation Manager Team and Other Stakeholders**: Leadership from DOC and the Law Department, the Remediation Manager Team ("RMT") and the Monitoring Team ("MT") regularly engage on matters related to LL42 in order to develop a pathway forward.

- **Pilot Project Development**: The approach and goals of the pilot projects remain as described in the Monitor's April 23, 2026 Report at pgs. 13 to 15. Below are some interim updates:

    - Due Process Pilot Project: The Department has been closely coordinating with the MT on how to approach the development and management of the due process pilot project. The Department, in consultation with the MT, has been considering potential policy revisions, operational needs for implementing the pilot, and appropriate leadership and management of the initiative. The Department determined that the pilot should be managed by the SDC of Investigations, Intelligence and Accountability because the Adjudication Unit now reports to her. The MT believes this is a logical approach to managing this initiative. The

Investigations, Intelligence and Accountability Division is currently in the middle of a reorganization as required by RAP Action Item 9.1. As a result, work to advance the pilot will require additional time to ensure its appropriate integration into the new structure with suitable leadership and management.

- Restrictive Housing Pilot Project: The RMT has taken the lead in organizing this effort, by first identifying personnel from the RMT, Department, and MT who can meaningfully contribute to conceptualizing the project and then sequencing the effort to ensure that the group's work is productive and efficient. To date, the group's efforts have focused identifying an appropriate location for the pilot and outlining the various physical plant modifications that will be needed; determining the target population and flow of individuals into and through the pilot program; developing daily unit schedules that provide for the necessary mandated services and rehabilitative programming; evaluating options for rehabilitative programming curricula and supporting activities; and considering the necessary security protocols (*e.g.*, search practices, movement, restraints, etc.).

- **Efforts of the Monitor/Remediation Manager to Collaborate on Operational Impact on "Conflicted" LL42 Provisions**: The MT and RMT have worked diligently to both evaluate and coordinate their respective positions on the LL42 provisions that have been stayed by the Court. In addition to the complex and time-consuming nature of the work, the efforts of the RMT and MT on this project must also be balanced with the immediate security and critical operational matters that the MT and RMT must prioritize to support

the Department's larger reform effort. A more detailed update on the work of the MT and RMT will be provided in the Monitor's next report.

**NEXT STEPS**

The Department remains in a state of perpetual crisis, which demands that all stakeholders prioritize basic operational and security matters to better equip the Department to address the constitutional violations related to the risk of harm. Work on the issues discussed above will continue in earnest, but it will be appropriately balanced with the critical need to focus on foundational matters underlying the ongoing dangerous conditions in the jails that present immediate risks of harm to incarcerated individuals and staff. An update on the pilot projects' statuses will be included in the Monitor's 22nd Report, due in November 2026.

## STATUS OF COLLABORATION & CONSULTATION

The Monitoring Team submitted a report to the Court on September 3, 2026 (dkt. 997) outlining a series of concerns regarding failures by the Department vis-à-vis transparency and consultation with the Monitoring Team and Remediation Manager Team. As directed by the Court's September 10, 2026 Order (dkt. 998), outlined below is a summary of the steps taken by the RMT and the DOC, improvements observed to date, and the work that remains to be done:

- **RM Orders**: The RM responded to the Chief of Staff's September 1, 2026 communication[4] by emailing the DOC leaders who had received it. In that email, the RM rescinded the Commissioner's instructions and clarified the Department's obligations in working with the RMT and MT.
- The RM also issued an order to DOC directing:
  - The Commissioner to issue a written communication, approved by the RMT and MT, to Department leadership and staff regarding their obligations under the *Nunez* Court Orders to collaborate and communicate openly and candidly with the RMT and MT. Communications to staff with similar guidance should then be shared routinely.
  - The Department to revise the line of reporting for the *Nunez* Manager and the Assistant Commissioner ("AC") of the *Nunez* Compliance Unit so they no longer report to the First Deputy Commissioner and instead report to the General Counsel ("GC").

[4] On September 1, 2026, the Commissioner's Chief of Staff sent an email to the Commissioner's key executives with instructions regarding communications to the MT and RMT among others. *See,* the Monitor's September 3, 2026 Report (dkt. 997) at pgs. 2-3 and Appendix B.

  - The Remediation Manager to select the individual for the position of Associate Commissioner of *Nunez* Compliance in consultation with the Monitor. The Remediation Manager will also determine the appropriate reporting line for this position once the selection has been made.
  - That Department Leadership are not to interfere with or inhibit the activities of the *Nunez* Manager, the AC of the *Nunez* Compliance Unit ("NCU"), the General Counsel, or any other staff or leadership charged with managing the *Nunez* compliance effort.
  - That no employee shall be deterred from, retaliated against, or punished or penalized for collaborating or providing information to the RMT or MT.

- **Altered Reporting Lines of *Nunez* Manager and Assistant Commissioner of NCU**: On September 18, 2026, the Department officially moved the *Nunez* Manager and AC of NCU to now report to the GC.
- **Communication to Staff**: On September 24, 2026, the Commissioner issued a Teletype approved by the RM and the Monitor that clearly outlined DOC staff's and leadership's obligations under the *Nunez* Court Orders. The Law Department, GC, and *Nunez* Manager have also initiated discussions in targeted meetings with staff and leadership to directly engage, discuss obligations, and answer questions to ensure that the issues identified are mitigated and improved.
- **Improved Engagement**: City and DOC leadership have expressed genuine interest to the MT in improving their work with the MT and RMT. For example, the MT has observed some improvement in notifications to the MT relating to work DOC has underway. These notifications are an important first step, but, as the MT has advised DOC, notification is

only the first step in ensuring that consultation occurs.[5] Further, it appears that DOC leadership are now more actively engaging the GC, *Nunez* Manager and AC of NCU in DOC's internal work so that these individuals can provide more contemporaneous feedback and input to ensure the Department is appropriately addressing its obligations under the *Nunez* Court Orders in its day-to-day work. Finally, DOC leadership has sought clarification from the MT and RMT on how best to engage and coordinate with everyone. Improved engagement has already been observed.

- **MT and RMT Coordination with DOC on Logistics**: The MT and RMT are actively collaborating with DOC leadership to ensure that there is clarity and understanding regarding the logistics of required notification and consultation is occurring. The RMT is also convening a leadership summit with the top leaders from the DOC, Law Department, RMT and MT to meet and discuss these issues in a candid forum and address outstanding issues and concerns.
- **Ongoing Concerns**: While the work done to date is notable and important, it has not fully eliminated the issues identified by the Monitoring Team. The Monitoring Team has identified issues regarding failures of transparency,[6] lack of consultation when required,[7]

[5] As described in the *Nunez* Court Orders, consultation necessarily requires an opportunity for the MT (and/or RMT) to consider the proposed work and provide feedback, and for the Department to meaningfully consider and incorporate that feedback into the work.

[6] On September 8, 2026, the Department shared a letter from the Commissioner to the Monitoring Team, and Defendants requested the Monitoring Team share it with the Court. The Monitoring Team promptly recommended that any such communications to the Court must be made by counsel for the represented party on the docket consistent with the individual rules of the Chief Judge Laura T. Swain. The Monitoring Team subsequently learned the letter had been submitted *ex parte* to Judge Swain at the request of the Law Department. On September 11, 2026, the MT advised the Law Department of its concerns regarding the manner in which it attempted to convey an *ex parte* communication to the Court and its disregard of the MT's recommendation to file the communication on the docket. The Monitoring Team recommended the Law Department immediately advise counsel for the Plaintiff Class and the Southern District of New York of the matter, which it did. The Law Department subsequently filed its letter with the Court on September 14, 2026 (dkt. 1001).

[7] Since the September 3, 2026 Monitor's Letter to the Court, the Monitoring Team has identified at least two separate occasions in which the Department should have consulted the MT before rendering a determination but did

and an instance in which information should have been provided to the MT but was not.[8] In each of these cases, the MT immediately notified City and DOC leadership of the problems to ensure they were corrected.

The MT acknowledges and appreciates the improvement that has been made over the last few weeks. However, the fact that ongoing concerns persist in certain key areas underscores the need for vigilance in ensuring that the City and DOC faithfully adhere to the obligations of the *Nunez* Court Orders. In the cases identified, it appears that enhanced engagement of the *Nunez* Manager or AC of the NCU might have mitigated, if not eliminated, the issue. This reinforces the need for active and consistent involvement of the *Nunez* Manager, the AC of the NCU and other relevant designees throughout the Department's operations. It appears that the Department is actively working to ensure this occurs.

---

not do so. The MT subsequently provided feedback to DOC in both cases. In the first case, DOC considered unilaterally appointing an individual to a key leadership position without conducting a complete recruitment effort. In response to the MT's feedback, the DOC is now in the process of recruiting for the position. In the second case, the DOC directed changes to security practices without consulting the MT. The DOC subsequently provided a briefing to the MT on the security initiatives it intended to implement. The MT provided feedback to DOC for consideration during the briefing.

[8] The DOC failed to produce all relevant information related to a request by the MT in response to specific, direct, and repeated requests for such information and instead claimed certain documents did not exist. The MT subsequently learned that the documents did, in fact, exist and obtained copies of those documents. DOC reported it will update its process for addressing certain MT requests to ensure all relevant information is provided in a timely manner.