# Status Report by the *Nunez* Independent Monitor

**November 24, 2026**

## THE *NUNEZ* MONITORING TEAM

Steve J. Martin
*Monitor*

Elly Davis
*Junior Analyst*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Sarah Geisler
*Junior Analyst*

Dennis O. Gonzalez
*Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Associate*

Emmitt Sparkman
*Subject Matter Expert*

**Table of Contents**


**Introduction ....................................................................................................1**

- Key Findings from the 22nd Monitoring Period ............................................................ 1
- Ongoing Risk of Harm ............................................................................................... 1
- Important Foundational Steps .................................................................................... 3
- Prioritization ............................................................................................................ 4
- Conclusion and Next Steps ........................................................................................ 5
- Organization of the Report ......................................................................................... 5

**Reform Under the *Nunez* Court Orders ..............................................................8**

- Roles and Responsibilities of Defendants, Remediation Manager Team, and Monitoring Team ........................................................................................................................ 8
- Developing Expertise in the Department's Operation ..................................................... 9
- Update on DOC's Consultation and Collaboration with the Monitoring Team ..............11
- Remediation Action Plan ......................................................................................... 12
- RMT's Organization and Notable Actions Taken ......................................................... 15
- Monitoring Team's Future Reporting on the RAP ........................................................ 17

**Leadership, Supervision, and Maximizing Staff Deployment ...........................18**

- Ongoing Concerns ................................................................................................... 18
- Staffing Analysis Update .......................................................................................... 19
- DOC's Initiatives To Improve Staffing Practices .......................................................... 22
- Conclusion ............................................................................................................. 26

**Assessment of Violence, Use of Force, and Security Practices ..........................29**

- Ongoing Risk of Harm ............................................................................................. 29
- Trends in Use of Force and Violence Metrics, 2016-2025 ............................................. 32
- Department's Findings Regarding Problematic Uses of Force and Security Practices .. 36
- Monitoring Team's Findings Regarding Use of Force and Security Practices ............... 39
- Areas of Improvement in Use of Force ...................................................................... 39
- Pervasive Use of Force and Security Practices ............................................................ 40
- Conclusion ............................................................................................................. 43

**Managing Behavior of People in Custody ............................................................45**

- Classification .......................................................................................................... 45
- Identifying People Who Frequently Engage in Violence ............................................... 46

- Managing People Who Engage in Serious Acts of Violence ........ 48
- RESH Length of Stay ........ 49
- Strip Searches in RESH ........ 51
- Restrictive Housing Pilot Program ........ 55
- DOC and Correctional Health Services Operations ........ 55
- Conclusion and Next Steps ........ 59

**Update On Work Underway Related to LL42 ........ 61**

- Pilot Project Development ........ 61
- MT's Analysis and Findings re: LL42 ........ 62
- Next Steps ........ 64

**Identifying and Addressing Staff Misconduct ........ 67**

- Appointment of Senior Deputy Commissioner For Investigations, Intelligence, and Accountability ........ 67
- Reorganization of Investigations, Intelligence and Accountability Division ........ 69
- Plan for the Next Year ........ 70
- CaseBuilder ........ 71
- Identifying Use of Force-Related Misconduct ........ 72
- Addressing Staff Misconduct ........ 75
- Conclusion and Next Steps ........ 78

**Death of People in Custody ........ 80**

- DOC's Mortality Rate and Objective Evidence of Deaths ........ 80
- Summaries of Deaths in Custody in 2026 ........ 80
- Joint Action Reviews ("JARs") ........ 87
- Incidents of Self-Harm and DOC's Efforts to Address Acts of Self-Harm ........ 88
- Conclusion ........ 90

**Update on the 2023 *Nunez* Court Orders ........ 91**

- June 13, 2023 Order (dkt. 550) ........ 91
- August 10, 2023 Order (dkt. 564) ........ 92
- October 10, 2023 Order (dkt. 582) ........ 95
- December 14, 2023 Order (dkt. 656) ........ 95
- December 20, 2023 Order (dkt. 665) ........ 96

**Compliance Assessments ........ 97**

- Considerations for Compliance Assessments ... 97
- Conclusion ... 100
- Facility Leadership Responsibilities (First Remedial Order § A., ¶ 2) ... 101
- New Use of Force Directive (Consent Judgment § IV., ¶ 1) ... 108
- Independent Staff Reports (Consent Judgment § V., ¶ 2) ... 114
- Providing Medical Attention Following A Use of Force Incident (Consent Judgment § V., ¶ 22) ... 123
- Interim Security Plan (Second Remedial Order ¶ 1(i)(a) and Action Plan § D., ¶ 2(a)) 126
- Searches and Identify/Recover Contraband (Action Plan, § D., ¶ 2(d) and (e) and August 10, 2023 Order, § I., ¶ 2) ... 133
- Escort Procedures (Action Plan § D., ¶ 2(f) and August 10, 2023 Order, § I., ¶ 3) ... 141
- Facility Emergency Response Teams (First Remedial Order § A., ¶ 6) ... 147
- Revised De-escalation Protocol (First Remedial Order § A., ¶ 3) ... 159
- Young Adults - Prevent Fight/Assault (Consent Judgment § XV., ¶ 1) ... 164
- Young Adults - Direct Supervision (Consent Judgment § XV., ¶ 12 & First Remedial Order § D., ¶ 3) ... 168
- Young Adults - Consistent Assignment of Staff (Consent Judgment § XV., ¶ 17 & First Remedial Order § D., ¶ 1) ... 173
- Screening & Promotions (Consent Judgment § XII., ¶¶ 1-3) ... 177
- Supervision of Captains (First Remedial Order § A., ¶ 4 and Action Plan § C., ¶ 3 (II-III)) ... 184
- Improved Routine Tours (Action Plan, § A., ¶1(d)) ... 189
- Facility Use of Force Reviews (First Remedial Order § A., ¶ 1) ... 196
- Investigations Of Use Of Force Incidents (Consent Judgment § VII., ¶ 1, § VII., ¶ 9 (a)) & § VII., ¶ 11) ... 203
- Early Warning System (Consent Judgment § X., ¶ 1) ... 215
- Timely, Appropriate and Meaningful Accountability (Consent Judgment § VIII., ¶ 1 & § VIII., ¶ 3 (c)) ... 221
- Immediate Corrective Action & Monitor Recommendations (First Remedial Order § C., ¶ 1 & § C., ¶ 2) ... 235
- OATH Proceedings (First Remedial Order § C. 4/Third Remedial Order, ¶ 2, First Remedial Order § C., ¶ 5 & Third Remedial Order, ¶ 3) ... 240
- Trials Division Staffing (Consent Judgment § VIII., ¶ 4) ... 247
- Maximizing Deployment of Staff - Reduction of Uniformed Staff in Civilian Posts (Action Plan § C., ¶ 3(vii)) ... 249
- Maximizing Deployment of Staff - Awarded Posts (Action Plan § C., ¶ 3(v)) ... 253
- Maximizing Deployment of Staff - Maximize Work Schedules (Action Plan § C., ¶ 3(vi)) ... 257

**Appendix A: Comprehensive List of Provisions ... 259**

**Appendix B: DOC Acronym Guide....................................................................267**

**Appendix C: Use of Force and Violence Indicators..........................................276**

- Table 1: Number and Rate of Uses of Force ................................................. 277
- Table 2: Number and Proportion of A, B, and C Uses of Force ..................................... 278
- Table 3: Number and Rate of Stabbings and Slashings ................................................ 279
- Table 4: Serious Injuries to Incarcerated Individuals .................................................. 280
- Table 5: Number and Rate of Fights ............................................................................ 282
- Table 6: Number and Rate of Assaults on Staff with Use of Force ................................ 283
- Table 7: Number and Rate of Assaults on Staff without Use of Force ............................ 284
- Table 8: Number and Rate of Fires ................................................................................ 285
- Table 9: Uses of Force Involving Incidents When a Staff Member is Not on Post .......... 286
- Table 10: NCU Security Audits' Findings of Staff Off Post ........................................... 288
- Table 11: Timeliness of 9 p.m. Lock-In ......................................................................... 289
- Table 12(a): RESH's Average Monthly Rates of Key Violence Metrics ......................... 290
- Table 12(b): RESH Level 1 and Level 2 Comparison .................................................... 290
- Table 13(a): Number of Searches ................................................................................. 291
- Table 13(b): Number of Contraband Recoveries ............................................................ 291
- Table 14: Use of Force Incidents in Intake Areas .......................................................... 292
- Table 15: Head Strike Data .......................................................................................... 293

**Appendix D: In-Custody Deaths .......................................................................294**

- Table 1: Causes of Death ............................................................................................. 295
- Table 2: Mortality Rate ................................................................................................. 296
- Table 3: Investigations of In-Custody Deaths ............................................................... 297
- Table 4: Corrective Action Taken by DOC Related to In-Custody Deaths, 2022-November 18, 2026 .................................................................................................................. 298

**Appendix E: Use of Force Reviews and Investigations ....................................303**

- Table 1: Outcomes of Rapid Reviews Conducted by the Facilities ................................ 304
- Table 2: Corrective Actions Recommended via Rapid Reviews Conducted by the Facilities ................................................................................................................... 305
- Table 3(a): ID Supervisors Assigned to Use of Force Cases .......................................... 307

- Table 3(b): ID Investigators Assigned to Use of Force Cases ........................................ 307
- Table 4: Summary of ID Hires and Departures ........................................................... 308
- Table 5: Status of Investigations of Use of Force Incidents ........................................... 310
- Table 6: Status of Intake Investigations ........................................................................311
- Table 7: Status of Full ID Investigations ...................................................................... 312
- Table 8: Law Enforcement Referrals ............................................................................ 313
- Table 9(a): Results of Intake Investigation Audits by Date of Initial Intake Investigation ........................................................................................................................... 314
- Table 9(b): Number of Intake Investigation QA Audits Completed ............................... 315
- Table 10(a): Results of Full ID Investigation Audits by Date of Initial Full ID Investigation ........................................................................................................................... 316
- Table 10(b): Number of Full ID Investigation QA Audits Completed ............................ 317
- Table 11: Outcome of Intake Investigations ................................................................. 318
- Table 12: Investigation Findings.................................................................................... 320
- Table 13: Use of Force Incidents with Charges ............................................................ 322

**Appendix F: Data Related to Responses to Staff Misconduct.........................323**

- Table 1: Accountability for Staff's Use of Force Related Misconduct ............................ 324
- Table 2: Immediate Corrective Action ........................................................................... 326
- Table 3: Suspension ....................................................................................................... 327
- Table 4: Accountability by Rank.................................................................................... 328
- Table 5(a): Command Disciplines Recommended by Rapid Reviews ............................ 330
- Table 5(b): Reasons that Command Disciplines Recommended by Rapid Reviews Were Dismissed, Closed Administratively, or Not Entered into CMS..................................... 331
- Table 6(a): Command Discipline Recommended by Other Sources ............................... 332
- Table 6(b): Reasons that Command Disciplines Recommended by Other Sources Were Dismissed......................................................................................................................... 333
- Table 7: Formal Discipline.............................................................................................. 334
- Table 8: Number of Cases Pending with the Trials Division.......................................... 335
- Table 9: Time from MOC Received to Charges Served ................................................. 336
- Table 10: Timeliness of Formal Discipline..................................................................... 337
- Table 11: Time for Commissioner Sign Cases from Date of Signature by DC of Trials.. 338
- Table 12: Disposition of Formal Discipline Cases ......................................................... 339

- Table 13: Penalties Imposed via NPA for Use of Force Related Misconduct.................. 340
- Table 14: Cases Resolved via NPA with Provisions for CD or Expungement ................ 341
- Table 15: Outcome of Closed Action Plan § F, ¶ 2 Cases............................................... 342
- Table 16: Status of Pending Action Plan § F, ¶ 2 Cases ................................................ 343
- Table 17: OATH Pre-Trial Conferences.......................................................................... 344
- Table 18: Trials at OATH for Use-of-Force-Related Misconduct .................................. 347
- Table 19: OATH Reports & Recommendations for Use-of-Force-Related Misconduct .. 348
- Table 20: Trials Division Staffing.................................................................................... 350
- Table 21: NCU Security Audits' Findings of Staffs' Touring Practices........................... 352
- Table 22: Corrective Action for Deficient Touring Recommended via Rapid Reviews... 353

**Appendix G: Staffing ..........................................................................................354**

- Table 1: Number of ADWs .............................................................................................. 355
- Table 2: Number of Captains ........................................................................................... 357
- Table 3: Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA ............. 359
- Table 4: Location of Awarded Posts ................................................................................ 360
- Table 5: Incarcerated Individual-Facing Awarded Posts in Facility ................................ 361
- Table 6: Housing Unit Awarded Posts ............................................................................. 362
- Table 7: Triple Tours ........................................................................................................ 363
- Table 8: Overtime Spending ............................................................................................ 364
- Table 9: Department's Average Daily Population and Staffing Levels ........................... 365
- Table 10: Training Academy Graduates........................................................................... 366
- Table 11: Attrition ........................................................................................................... 367
- Table 12: Overview of Staff Promotions ......................................................................... 368

**Appendix H: Leadership Appointments ..........................................................369**

**Appendix I: Intake ...............................................................................................380**

- Table 1(a): Length of Stay in Intake for Male New Admissions .................................... 382
- Table 1(b): Length of Stay in Intake for Male New Admissions.................................... 383
- Table 2(a): Length of Stay in Intake for Female New Admissions.................................. 384
- Table 2(b): Length of Stay in Intake for Female New Admissions ................................. 385

**Appendix J: Updates on Technology Initiatives......................................389**

**Appendix K: Use of Force Reporting..................................................398**

- Table 1: Independent, Complete, and Timely Staff Reports ...................................... 399
- Table 2: Classification of Use of Force Incidents ...................................................... 400
- Table 3: Alleged Use of Force ..................................................................................... 401
- Table 4: H+H Staff Reporting ..................................................................................... 402
- Table 5: DOE Witness Reporting ................................................................................ 403
- Table 6: Medical Wait Times ....................................................................................... 404

**Appendix L: Risk Management........................................................405**

- Table 1: Staff Actively on E.I.S.S. Monitoring ........................................................... 406
- Table 2: Screening and Placement of Staff for E.I.S.S. Monitoring ........................... 407

**Appendix M: Managing Individuals Under Age 19..............................409**

- Table 1: RNDC's Rates of Use of Force and Violence ................................................. 410
- Table 2: RNDC's Programs Action Plan ("RNDC Action Plan") ................................. 410
- Table 3: NCU's Consistent Staffing Audits—Captains .................................................411
- Table 4: NCU's Consistent Staffing Audits—Officers ................................................. 412

**Appendix N: DOC Process Flow Charts...............................................413**

# INTRODUCTION

This is the Monitor's 22nd compliance assessment for the period January to June 2026 (either "22nd Monitoring Period" or "current Monitoring Period"), covering the Department's efforts to advance its progress toward compliance with the *Nunez* Court Orders.[1]

## KEY FINDINGS FROM THE 22ND MONITORING PERIOD

As discussed throughout this report, the Department continues to face a set of complex polycentric problems, sustained by long-standing dysfunction. The glacial pace of reform has been frustrating to all stakeholders and is far less than the urgency of the situation demands. The high risk of harm is ongoing and pervasive. However, it must be noted that the Department and the Remediation Manager's Team ("RMT") have made some important forward progress. In order to ensure that the abatement of ongoing harm remains the primary focus, the Monitoring Team ("MT") offers several recommendations for prioritizing certain aspects of the work that lies ahead. Each of these is discussed below.

## ONGOING RISK OF HARM

The constitutional violations that led the Court to impose escalating forms of remedial relief remain pervasive. High levels of dysfunction and the resulting disorder and violence persist in the jails. Consequently, the risk of harm to incarcerated individuals and staff remains unacceptably high. Although this report discusses the period January to June 2026, the conditions described herein also reflect the current state of the jails and concerns raised by the Monitoring Team *for many years*. These concerns include:

[1] *See*, Court's July 10, 2025 Order (dkt. 879).

- **<u>Absence of Sound Security Practices</u>**: Poor security practices continue to create the opportunity for violence to occur. Failed security practices are aggravated by inadequate classification housing practices that often fail to achieve orderly and appropriate housing placements, particularly for those incarcerated persons who pose the highest risk of violence. The combination of poor security practices and ineffective classification/housing practices serves to exacerbate the risk of harm.[2]
- **<u>Use of Force ("UOF") and Violence Remain Unacceptably High</u>**: High rates of use of force persist, along with high rates of multiple forms of violence including stabbings and slashings, fights and assaults on staff. These frequently result in a range of injuries and cause fear and disorder that disrupt the operation of the jails.[3]
- **<u>Lack of Adequate Supervision</u>**: The Department continues to lack sufficient numbers of supervisors and also has a dearth of supervisors with the requisite skills or support to direct and facilitate improved staff practice.[4]
- **<u>Poor Staff Deployment Practices</u>**: Dysfunctional staff deployment practices and dangerous and/or irresponsible behaviors of individual staff members (particularly leaving posts unattended and engaging in various forms of unprofessional conduct) significantly compromise safety in the jails.[5]

---

[2] This is discussed in more detail in the "Assessment of Violence, Use of Force, and Security Practices" section and "Managing Behavior of People in Custody" section along with the compliance assessment for First Remedial Order § A., ¶ 1, "Facility Use of Force Reviews" within this report.

[3] This is discussed in more detail in the "Assessment of Violence, Use of Force, and Security Practices" section of this report.

[4] This is discussed in more detail in the "Leadership, Supervision, and Maximizing Staff Deployment" section and the compliance assessment for First Remedial Order § A., ¶ 2, "Facility Leadership Responsibilities," and First Remedial Order § A., ¶ 4 and Action Plan § C., ¶ 3 (ii-iii), "Supervision of Captains" within this report.

[5] This is discussed in more detail in the "Leadership, Supervision, and Maximizing Staff Deployment" section and compliance assessments for Action Plan § C., ¶ 3(vii), "Reduction of Uniformed Staff in Civilian Posts," Action Plan § C., ¶ 3(v), "Awarded Posts," and Action Plan § C., ¶ 3(vi), "Maximize Work Schedules" within this report.

## IMPORTANT FOUNDATIONAL STEPS

The installation of new Department leaders and the RMT in February 2026 has altered the dynamics within the agency. Important initial steps have been taken to improve the foundation of the Department's operations. These will support the development of the necessary reforms to reduce the risk of harm. Notable steps taken include:

- **Building Foundation, Consultation & Coordination**: Both the new Department leadership and the RMT have invested considerable effort to understand how the Department operates, including its assets and its many challenges. This critical step lays the foundation for their substantive work toward reform. Relatedly, the three core entities involved in the reform (the Department, the RMT, and the Monitoring Team) have established important pathways for coordination and collaboration that have proven effective during the initial planning phase of several foundational initiatives. The Department has addressed issues related to transparency and consultation with the Monitoring Team and has started to actively address the many requirements of the Remediation Action Plan ("RAP").[6]
- **New Leadership & Reorganization of Investigations and Accountability Division**: The Remediation Manager ("RM") has directed a logical reorganization of the Investigations, Intelligence and Accountability Division and installed a well-qualified person to lead it. These changes position the Department to reinvigorate progress toward meaningful staff accountability.[7]

---

[6] This is discussed in more detail in the "Reform Under the *Nunez* Court Orders" section of this report.

[7] This is discussed in more detail in the "Identifying and Addressing Staff Misconduct" section and the compliance assessments for Consent Judgment § VII., ¶ 1, § VII., ¶ 9 (A)) & § VII., ¶ 11, "Investigations of Use of Force Incidents" and Consent Judgment § VIII., ¶ 1 & § VIII., ¶ 3(c), "Timely, Appropriate and Meaningful Accountability" within this report.

- **<u>Addressing Foundation of DOC's Staffing Practices</u>**: The completion of Phase I of the staffing analysis has established a coherent baseline of current staffing practices. The Department has also taken meaningful steps to develop effective strategies to address excess absenteeism, accurately track overtime use, and begin the foundational work needed to ultimately convert positions to civilians.[8]
- **<u>City's Allocation of Resources</u>**: The City has funded a budget to support the reform effort. Significant funds were allocated in response to the Department's multi-faceted plan to deliver an array of meaningful, purposeful rehabilitative programming to people in custody across all of the jails.
- **<u>Development of the RAP</u>**: The RM's first Remediation Action Plan was approved by the Court on July 16, 2026 (dkt. 989).[9]

**PRIORITIZATION**

Given the many issues requiring attention and the impossibility of tackling them simultaneously, the Monitoring Team continues to recommend that the Department prioritize the foundational issues that are an inescapable prerequisite to additional reforms. As discussed in detail in the Monitor's September 30, 2026 Report (dkt. 1006), the Department must address:

- **<u>Governance</u>**: The dearth of operational expertise among agency and facility leaders needed to identify unsafe and unsound security and supervision practices and, just as importantly, *how* to improve them.

---

[8] This is discussed in more detail in the "Leadership, Supervision, and Maximizing Staff Deployment" section and the compliance assessment for Action Plan § C., ¶ 3(vii), "Maximizing Deployment of Staff - Reduction of Uniformed Staff in Civilian Posts" within this report.

[9] The substance of the RAP is discussed in more detail in "Reform Under the *Nunez* Court Orders" section within this report.

- **Security Practices**: Basic security failures that contribute to dangerous conditions in the jails and, too often, serious injury to and death among those in custody. These basic security failures include, among others, unsecured doors, failures to fully adhere to lock-in procedures, staff being off post, lack of direct supervision by captains, and lack of proper management of persons in custody during congregate out of cell time.
- **Staff Deployment**: Poorly conceived, inefficient, and unregulated staff deployment practices and the lack of sufficient numbers of capable supervisors.
- **Classification and Housing Operations**: Classification and housing assignment protocols that do not provide security, supervision, and structure commensurate with different risk levels.

The importance of properly prioritizing and sequencing the transformation of the many practices that must be remediated cannot be overstated.

### Conclusion and Next Steps

Throughout subsequent Monitoring Periods, the Monitoring Team will continue to urge the Department and RMT to focus on these priorities and the implementation of the RAP, offering any guidance or technical assistance necessary. The Monitoring Team plans to issue an interim update on the Department's progress to date by March 30, 2027, along with the next comprehensive report that covers the July-December 2026 Monitoring Period, to be filed with the Court on May 26, 2027.

### Organization of the Report

This report has three distinct sections:

**Section I: Narrative Updates on Various DOC Operations and Practices**: A summary discussion about the current state of the jails and key aspects of the Department's functioning are discussed, including:

- Reform Under the *Nunez* Court Orders
- Leadership, Supervision, and Maximizing Staff Deployment
- Assessment of the Violence, Use of Force, and Security Practices
- Managing Behavior of People in Custody
- Update on Work Underway Related to LL42
- Identifying and Addressing Staff Misconduct
- Death of People in Custody
- Update on the 2023 *Nunez* Court Orders

**Section II: Compliance Assessment with Select Provisions of the *Nunez* Court Orders**: This section includes a discussion about the Monitoring Team's approach to assessing compliance. This is followed by a detailed compliance assessment for 40 provisions from the *Nunez* Court Orders.

**Section III: Data and Information Appendices**: Relevant data and other corresponding information is included in the following appendices:

- **Appendix A**: Comprehensive List of Provisions
- **Appendix B**: DOC Acronym Guide
- **Appendix C**: Use of Force and Violence Indicators
- **Appendix D**: In-Custody Deaths
- **Appendix E**: Use of Force Reviews and Investigations
- **Appendix F**: Data Related to Responses to Staff Misconduct

- **Appendix G**: Staffing
- **Appendix H**: Leadership Appointments
- **Appendix I**: Intake
- **Appendix J**: Updates on Technology Initiatives
- **Appendix K**: Use of Force Reporting
- **Appendix L**: Risk Management
- **Appendix M**: Managing Individuals Under Age 19
- **Appendix N**: DOC Process Flow Charts

# REFORM UNDER THE *NUNEZ* COURT ORDERS

The purpose of the *Nunez* Court Orders is to provide a "constitutionally sufficient level of safety for those who live and work on Rikers Island."[10] The reform effort has been underway for over 11 years and has reaffirmed the original findings that the jail system is rife with polycentric issues that oftentimes feel intractable.[11] This section reviews the overarching roles and responsibilities among the Department/City, Remediation Manager, and Monitoring Team; describes the framework for the RM's work to advance progress toward compliance with the *Nunez* Court Orders; highlights actions taken by the RM since his appointment; and summarizes the substance of the Monitoring Team's feedback and recommendations to the RM.

## ROLES AND RESPONSIBILITIES OF DEFENDANTS, REMEDIATION MANAGER TEAM, AND MONITORING TEAM

The roles and responsibilities of the actors related to the *Nunez* reform effort are intended to be distinct, but complementary.

- **The Department and the City** ("Defendants") are obligated under the *Nunez* Court Orders to materially and substantially improve the conditions in the jails and to implement a wide range of system reforms. This includes developing and refining policies and procedures and implementing practices consistently to reduce the risk of harm in the jails.[12]
- **The Remediation Manager** is an agent of the Court and has the authority to exercise all powers vested by law in the Commissioner to the extent necessary to achieve compliance with the Contempt Provisions. To that end, the RM may direct the Department to take

[10] *See* Court's November 27, 2024 Order (dkt. 803) at pg. 54.

[11] *See*, also, Background on *Nunez* matter in Monitor's January 13, 2026 Report (dkt. 947) at pgs. 1-3.

[12] *See* Consent Judgment §III, ¶ 17.

specific action to remedy unconstitutional conditions in the jails. While this role requires obvious collaboration with the Department, the purpose of the Remediation Manager is to fundamentally *alter* the current operations of the Department and, in so doing, move the Department forward to achieve compliance with the *Nunez* Court Orders.

- **The Monitor** is also an agent of the Court. The Monitor's role is distinct from that of the RM.[13] The Monitor's role is one of oversight and to provide the Court and the Parties a neutral and independent assessment of the efforts to comply with the *Nunez* Court Orders.[14] The Monitoring Team also serves as a resource for the Department and the Remediation Manager Team, providing technical assistance to support and advance the reform effort. To that end, the Department and RMT are also required to consult the Monitoring Team as part of their work to advance the reform effort.[15] In addition, for certain specific requirements, the Monitor is required to approve key policies or practices to ensure the prescribed practices are sound and meet the requirements of the Court Orders.[16]

### DEVELOPING EXPERTISE IN THE DEPARTMENT'S OPERATION

The greatest influx of new leadership and oversight into the Department's operations since monitoring of the *Nunez* Court Orders began in 2015 occurred in 2026 with the appointment of both a new Commissioner and the RM and their respective teams.

[13] *See*, Court's February 18, 2026 Order (dkt. 961), § VI, ¶¶ A and C. Further, the Consent Judgment specifically states, "[t]he Monitor will not, and is not intended to, replace or assume the duties of the Commissioner, any of [their] staff, or any other City officials." Consent Judgment §XX, ¶ 4.

[14] The Consent Judgment requires the Monitor to describe "the efforts the Department has taken to implement the requirements of this Agreement and [evaluate] the extent to which the Department has complied with each substantive provision of this Agreement (the "Monitor Report")." *See* Consent Judgment, § XX, ¶ 16. Further,

[15] *See*, for example, June 13, 2023 Order (dkt. 550), § I, ¶ 5 and Court's February 18, 2026 Order (dkt. 961), § V, ¶ F.

[16] *See*, for example, Court's November 27, 2024 Order (dkt. 803) at pg. 40 and Court's February 18, 2026 Order (dkt. 961), § V, ¶ G.

Unquestionably, the learning curve is particularly steep in this case, which the Court aptly noted "is inherent in addressing the deeply embedded polycentric problems of the [New York City] jails."[17] Discovering and understanding the nuances of an agency this complex is a daunting task particularly with regard to the agency's operations and current conditions, as well as the context upon which the current system was created. Throughout 2026, the Monitoring Team has engaged and shared its experience and knowledge about this case with the RMT and DOC leadership team so that each entity can develop internal expertise in the Department's operation, assets, obstacles and struggles. The Monitoring Team, for example, has:

- helped Department leaders and the RMT to identify where to find the information they need;
- explained how a multitude of Department policies and practices interface with the *Nunez* Court Orders;
- provided the historical context behind many of the strategies the Department and RMT have developed to address discrete practices;
- consulted and advised the Department and RMT on a myriad of initiatives related to the reform effort; and
- provided a summary of the over 140 outstanding MT recommendations and feedback.

These initial educational and contextual steps have been crucial to the Department's and RMT's efforts to advance the reform effort, as discussed below.

The RMT and MT have also worked closely to ensure alignment of priorities and areas of focus. The RMT and MT communicate daily on matters of mutual concern, and the RMT has demonstrated a commitment to working collaboratively with the Monitoring Team. The

[17] *See*, Court's November 27, 2024 Order (dkt. 803) at pg. 57.

Monitoring Team and RMT have also worked together to develop efficiencies and streamline their respective work.

**UPDATE ON DOC'S CONSULTATION AND COLLABORATION WITH THE MONITORING TEAM**

In September 2026, the Monitoring Team raised significant concerns about DOC's consultation and collaboration on the reform effort. Following the issuance of the Monitor's September 3, 2026 Report (dkt. 997) and the Court's September 10, 2026 Order (dkt. 998), the Monitoring Team observed an important shift in the City's and DOC's adherence to the requirements of transparency, candor, and consultation. These improvements are discussed in the Monitor's September 30, 2026 Report (dkt. 1006) at pgs. 17-20.[18]

In addition, the Department has since shifted important aspects of its organization to better engage and empower critical actors[19] in the agency to coordinate the *Nunez* reform effort and, importantly, to engage directly and collaboratively with the MT and the RMT. The Department also recently created a new position, an Assistant Commissioner of Operations,[20] who will focus on managing the work of the Remediation Action Plan and coordinating efforts both internally and with the RMT and MT. In addition, the DOC leadership team has become better organized and aligned, and the Commissioner now convenes bi-weekly cabinet meetings with his highest-ranking staff. Given these various organizational changes and improved dynamics, the RMT, in consultation with the MT, determined that filling the Associate Commissioner of *Nunez* position (originally recommended to improve internal and external

---

[18] This section of the report also summarizes the steps taken by the Remediation Manager and the Department in response to the Court's Order and the Remediation Manager's Order.

[19] This includes but is not limited to the Senior Deputy Commissioner for Administrative Operations and his Senior Advisor, the Senior Deputy Commissioner for Investigations, Intelligence and Accountability, the Senior Advisor to the First Deputy Commissioner, the Deputy Commissioner of Legal Matters/General Counsel, the *Nunez* Manager, and the Assistant Commissioner of the *Nunez* Compliance Unit.

[20] The position has been posted and expected to be filled before the end of the year.

coordination) should be put on hold. This will enable the relevant parties to evaluate the impact of the new initiatives and then determine whether the position remains necessary. Additional information on the Department's routine management of the reform effort can be found in the "Managing the *Nunez* Reform Effort" subsection within the "Update on the 2023 *Nunez* Court Orders" section of this report.

**REMEDIATION ACTION PLAN**

The Court's appointment of the RM also set out a requirement for the RM to develop a Remediation Action Plan, a roadmap to address the contempt of 18 provisions in the *Nunez* Court Orders, all of which address foundational operational practices that go to the heart of underlying violations of the constitutional rights of persons in custody. The RAP will be a series of plans, each covering a single year, "building successively on each other to enable the DOC to achieve Substantial Compliance with all Contempt Provisions within seven years, if not sooner."[21] The dual purposes of the RAP are to ensure adequate progress toward improved conditions of confinement and to build the Department's internal capacity to eventually reassume control of each area.

- **Priorities & Focus of First Year RAP**

Following the end of the current Monitoring Period, on July 16, 2026, the Court approved the Remediation Manager's First RAP (dkt. 989). The First RAP laid out the RM's vision for a set of initiatives that, in combination, are designed to "build the Department's capacity to consistently perform the fundamental correctional functions necessary to operate safe, constitutional, and professionally managed detention facilities" (pg. 3). The first set of initiatives

[21] *See*, Court's December 18, 2025 Order (dkt. 938) at pg. 2.

focuses on safety and building the necessary foundation for subsequent reform. The five priority areas of the first RAP include:

- *Priority Area I: Improving core correctional and security functions*: The RAP focuses on two key categories of correctional practice: security practices and programming. The first priority regarding security is addressing unsecured doors, both through physical plant improvements and enhanced staff practice. Programming objectives are to promote behavioral stability by reducing idle time and supporting rehabilitation. The RAP emphasizes the potential synergy of security and programming elements to improve safety in the jails.
- *Priority Area II: Transforming staffing models and practices*: The RAP envisions a four-part approach to improved staffing practices, spanning multiple years. First is to map and validate DOC's current posts and deployment practices. The second phase is to create an improved staffing model that ensures "the right staff are in the right posts" (pg. 8). The third step is to develop an optimal staffing system that integrates new conventions to address long-standing problems regarding efficiency, coverage and substantial overtime costs. Finally, the staffing model will then be developed for the Borough Based Jails.
- *Priority Area III: Strengthening individual and institutional accountability*: The RAP aims to reorganize and strengthen accountability systems for addressing misconduct by both staff and incarcerated individuals. Reforms in both areas are intended to achieve the goal of "timely, transparent, objective, and trusted" systems for accountability.[22]

[22] *See*, First Remediation Action Plan (dkt. 988) at pg. 9.

- *Priority Area IV: Modernizing data systems and technology*: To create data systems that support reform and effective operational oversight, the RAP first requires an analysis of gaps in data collection and data systems, and then in turn, the development of a strategic plan to address each gap.
- *Priority Area V: Promoting effective organizational leadership and governance*: The RAP recognizes that reform requires "stable and effective executive leadership, as well as skilled and committed management at all levels of the Department."[23] A key initiative is to strengthen the quality of engagement between executive and facility leadership, so that operational deficiencies can be addressed with timely resolutions and accountability. To drive alignment and accountability across facilities, the RAP also includes initiatives to ensure directives, policies and priorities are "clearly conveyed and consistently understood" by staff throughout the Department.[24] (pg. 10).

- **Monitoring Team's Feedback and Recommendations Regarding the RAP**

The RMT has consulted and collaborated with the MT on both the development of the RAP and the work conducted pursuant to the RAP. The Monitoring Team has offered several recommendations designed to strengthen the planning, development and approach of strategies initiated under the RAP. Some of these pertained to the framework for developing and implementing the RAP; ensuring that timelines are achievable; identifying the relevant Monitoring Team findings to support setting priorities and identify areas in need of support; and coordinating feedback to the Department with the RMT to ensure consistent, unified messaging.

---

[23] *See*, First Remediation Action Plan (dkt. 988) at pgs. 9-10.

[24] *See*, First Remediation Action Plan (dkt. 988) at pg. 10.

The Monitoring Team also offered broader substantive feedback to fortify the plans for reform in key areas. For example, reinforcing our recommendation for embedded subject matter expertise in day-to-day DOC operations and ensuring those experts' involvement in the development and implementation of plans, ensuring that historical problems that may have impacted the plans for reform in certain areas are identified, ensuring that implementation plans sufficiently address obstacles that have impeded implementation in the past, and identifying relevant outstanding MT recommendations and feedback that should be considered when building each plan. The RMT has embraced the MT's input and has engaged in thoughtful, collaborative discussions with the Monitoring Team when considering revisions to the RAP.

**RMT's Organization and Notable Actions Taken**

Since his appointment, the RM has built a team; worked on developing the necessary internal expertise regarding the Department's operation, assets and challenges; and developed and begun implementing the RAP. Several notable affirmative actions have occurred during the first nine months of his tenure.

- **Established the Remediation Manager Team**: The RMT established an office on Rikers Island. The team includes a Senior Advisor, Chief of Staff, a Vice President of Operations, Counsel, a Senior Legal Advisor, four career correctional experts who each have experience in jail and prison systems outside of New York City, three Senior Experts, a Senior Director, a Director of Policy and Implementation, and a Director of Data & Accountability Systems. The RM has also contracted with a consultant on restrictive housing and a consultant on executive leadership.
- **Appointed Key Leaders, Direct Reporting to RM & Re-Organization of Critical DOC Divisions**: The RM collaborated with DOC, and consulted the MT, to reconfigure

the Department's organizational chart, identifying key leaders with demonstrated credibility and skills to establish who is in charge of and who will set the direction and priorities in each area of the RAP. Notably, the RM appointed a Senior Deputy Commissioner of Investigations, Intelligence and Accountability ("SDC") (who also reports to the RM). The RM's appointment of the SDC also included an important restructuring of investigation and accountability divisions in the Department.

- **Increased DOC's Resources**: The RM worked with the City and DOC to successfully allocate significant resources to the Department's reform effort under the Remediation Action Plan. The City's most recent November Budget Plan has invested approximately $367 million dollars of expense funding in DOC for the implementation of the Remediation Action Plan over the City's fiscal years 2027 through 2031 (July 1, 2027 to June 30, 2031). Notably, this includes an annual investment of $50 million towards improvement of programming for PICs and an overall increased civilian head-count of 403 positions.
- **Centralized Project Management, Implementation Plans and Tracking of the RAP**: The RMT has developed a project management tool that creates visibility across the entire RAP and provides the ability to measure progress (or lack thereof) in a consistent manner. The RMT has also convened a RAP Oversight & Steering Committee (including the DOC and MT) to set priorities, track deadlines, address any obstacles to implementation, and ensure accountability. These components are essential for keeping the RAP on track and managing the significant amount of work.
- **Guiding and Prioritizing Key Foundational Areas**: The RMT has directed and guided key work to reform the investigation, accountability, and staffing work in this agency

(discussed throughout this report). The RMT has also been directly engaging with security and programming staff to lead a pilot to improve Restrictive Housing, Classification, and Security initiatives.

For its part, the Department has demonstrated a concerted focus on pursuing the goals and actions specified in the RAP. Various DOC leaders are now responsible for taking the lead on the RAP's requirements and developing implementation plans to produce the practice changes envisioned. Many of the plans are high-quality and identify sound strategies to resolve long-standing problems. The plans' success obviously depends on the quality of their implementation which has not yet begun, but to date, DOC has been focused on delivering the required written products and meeting the RAP's ambitious timelines.

**MONITORING TEAM'S FUTURE REPORTING ON THE RAP**

Given that the RAP was approved and issued following the end of the Monitoring Period, progress toward its requirements is not specifically addressed in this report. As required by the Court's December 18, 2025 Order (dkt. 938), § VI, ¶ B, going forward, each semi-annual Monitor's Report will include:

- a description of the efforts that the Department and the *Nunez* Remediation Manager have taken to implement the requirements of the Remediation Action Plan that was operative during that Reporting Period;
- a description of the extent to which the Department and the *Nunez* Remediation Manager have met the Benchmarks of the then-operative Remediation Action Plan and complied with each of the Contempt Provisions; and
- address the overall extent to which the work under the then-operative Remediation Action Plan is advancing compliance with the Contempt Provisions.

# LEADERSHIP, SUPERVISION, AND MAXIMIZING STAFF DEPLOYMENT

The Department's ability to reform current operations and provide a safe and humane environment for incarcerated individuals requires strong leadership, adequate supervision of staff, and appropriate staff deployment. Agency and facility leaders must have core competencies in sound correctional practice in order to adequately guide staff to meet their expectations.[25] They must also be provided with quality tools to manage their staff and to ensure sufficient staff are available to provide proper coverage to support day-to-day operations. The Monitoring Team has longstanding concerns about these issues. During this Monitoring Period, however, the Department made important initial progress toward the goal of untangling and rebuilding many of the dysfunctional staff deployment practices.

## ONGOING CONCERNS

The Monitoring Team remains concerned about the Department's struggles to effectively manage its large number of uniformed staff and deploy them effectively. Poor practices leave the jails without sufficient staff available to support day-to-day operations, prevent and address violence, and ensure consistent service delivery[26]. Concerns include:

- Dysfunctional and inefficient staffing practices[27]
- Allocating and managing the large number of uniformed staff[28]
- High rates of staff absenteeism[29]

---

[25] For a full list of Department leadership appointments see Appendix H.

[26] *See*, Appendix G, Tables 7 and 9-11 for detailed staffing data through the current Monitoring Period.

[27] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pg. 23.

[28] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pgs. 23-24.

[29] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pg. 24.

- Unmanned posts and staff off post[30]
- Excessive use of overtime[31]
- Unregulated facility-added posts[32]

Successful advancement of the reform effort will require direct supervision and guidance of staff managing the housing units. The Monitoring Team continues to have concerns about skill deficits among leaders and supervisors in the Department and facilities, and their lack of success in motivating staff to embrace and execute necessary changes in practice. These deficiencies have collectively impeded the reform effort and left the dysfunctional culture thwarting reform firmly in place. Problems include:

- Limited expertise, competency, and knowledge of sound correctional practice.[33]
- Erosion of the strategy to infuse the Department with outside expertise.[34]
- Insufficient number and limited skill set of supervisory staff in the facilities.[35]

Disentangling these issues is clearly complicated and will require dedicated focus on multiple issues, often simultaneously. The Department has initiated some of that foundational work in concrete ways as outlined below.

**STAFFING ANALYSIS UPDATE**

The Department engaged a qualified consultant to undertake a staffing analysis as required by the Action Plan (dkt. 465) § C, ¶3 (viii). The goal of this analysis is to provide

---

[30] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pgs. 24-26.

[31] Appendix G, Table 8 shows the Department's monthly overtime costs for uniformed staff since January 2019. These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pgs. 26-27.

[32] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pg. 27.

[33] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pgs. 19-20.

[34] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pgs. 20-21.

[35] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pg. 22.

critical information on the number of posts required to safely operate the jails, the duties of each post, strategies for optimizing staff schedules, the number of uniformed staff needed to provide adequate coverage, and how the Department can improve its overall management of uniformed staff deployment. Multiple changes in practice will be required to ensure the Department assigns uniformed staff to key functions and deploys them efficiently to address operational needs. The consultant began work in early 2026. In August 2026, the consultant began to report directly to the Remediation Manager. The consultant works closely with a senior expert from the Remediation Management Team who also has significant experience and expertise in this area. Throughout the process of conducting the staffing analysis, both the staffing consultant and senior expert from the RMT proactively and routinely consulted with the Monitoring Team and thoughtfully considered and incorporated the Monitoring Team's feedback along the way.

The RM has set out a four-phase approach to addressing the Department's staffing practices that will be completed in conjunction with the staffing consultant's work. The four phases are: (1) mapping and verifying current post and deployment practices; (2) developing an improved staffing model using current resources to better align staff with operational needs; (3) designing an optimal Department-wide staffing system; and (4) adapting the model for use within the Borough Based Jails.

Phase 1 of the project is complete. The staffing consultant and RMT's senior expert worked closely with the Department staff at all levels to untangle existing staffing conventions within DOC's *current practice*. Given the widespread inconsistency, dysfunction, and poor record management in the Department's staffing practices, establishing a baseline required extensive reconciliation to determine how many staff the current, inefficient model actually needs to operate. This has required detailed and exacting work by the staffing consultant and

RMT's senior expert who have demonstrated a keen ability to ascertain the specific contours of DOC's practices. The complexity and importance of the work completed in this phase cannot be overstated. The work completed under Phase 1 provides the Department with this information in a reliable manner for the first time since the Consent Judgment went into effect over 10 years ago.

The work completed in Phase 1 confirmed several known problems, including the lack of a central repository of information regarding uniformed posts and staff assignments, uncoordinated practices for reassigning staff to different facilities/posts, and a relief factor that has not been updated in at least 15 years. Most importantly, the work in Phase 1 identified the number and location of ***all*** uniformed posts the Department currently runs and developed an updated relief factor. The work in this phase provides a critical foundation for subsequent phases and provides a baseline against which progress can be measured. Critically, the work in phase 1 provided DOC with a baseline of current staff assignments that, until now, DOC simply did not maintain in a centralized or organized manner.

This work in Phase 1 resulted in a number of important recommendations for the second phase of work, including developing a single authoritative record of approved uniformed posts and staffing levels and a formal process for modifying it; adopting the industry standard method for calculating the relief factor and updating it regularly; actively managing various statuses that affect workforce availability (*e.g.*, TDY, MMR, extended leave, etc.); analyzing the practice of facility-added posts and evaluating whether they should be maintained, discontinued, or converted to regular posts; and evaluating the options for a revised scheduling model (other than the 4x2 schedule) to maximize efficiency and staff availability.

Phase 2 of the analysis will focus on the practices that can optimize the current uniformed staffing schedule and identify opportunities to better align staffing practices with operational needs. The objective is to further inform the development of a more efficient staffing model, which is the goal of Phase 3.

**DOC'S INITIATIVES TO IMPROVE STAFFING PRACTICES**

The staffing analysis work complements the work being directed by the SDC of Administrative Operations, who has made important progress in tracking and managing various staffing conventions embedded in current practice. Together with the staffing consultant and the RMT's senior expert, the Department appears positioned to make tangible progress toward staffing efficiencies that can support the broader effort to protect incarcerated individuals from harm.

- **Staffing Efficiency Committee**: The Staffing Efficiency Committee ("SEC") has continued to meet to disentangle the various bureaucratic and interrelated issues around the Department's staffing. The new Senior Deputy Commissioner for Administrative Operations, who was appointed in March 2026, took over leadership of the SEC. The SDC streamlined the individuals engaged in the SEC to improve efficiency and promote closer collaboration. While the SEC continued to work on many of the projects initiated under the previous administration, they started to execute them expeditiously and with greater tangible impact than in the past.
- **Reduction of Staff on Temporary Duty Assignment**: While intended to be temporary, many uniformed staff had been serving on Temporary Duty status ("TDY") for extended periods of time, some for years. While the Department has previously reported that it was

evaluating the list of TDY staff,[36] the SEC, under the leadership of the SDC, completed this evaluation.[37] As a result, throughout the summer of 2026, the number of staff on TDY was reduced from approximately 260 staff to fewer than 100 staff. Going forward, the SDC's office will routinely conduct this assessment for all staff on the TDY list to ensure that the TDY usage remains low and is only used to address temporary needs or to temporarily evaluate the suitability of uniformed staff when first assigned to roles requiring specialized experience or skills.

- **Reduction of Civilian Vacancies**: One of the first priorities of the new SDC was to reconcile the number of civilian vacancies to ensure alignment between DOC's records and the City's Office of Management and Budget ("OMB"). The SDC's office implemented a temporary hiring freeze for civilian staff while they updated the Tables of Organization for each civilian Division and reallocated the number of vacancies to align with the number assigned by OMB. When the hiring freeze was lifted, the SDC's office encouraged a hiring blitz to fill the vacancies as soon as possible, and if a vacancy was not filled within a certain window of time, it was reallocated to another Division. The goal was to fill as many of the Department's vacancies as quickly as possible to address OMB's concern that the Department was not sufficiently filling the vacant budget lines already allocated to them. The Department will approach OMB in the upcoming budget cycle to request new vacant civilian lines. The SDC's office also shared a memorandum

[36] *See* Monitor's January 13, 2026 Report (dkt. 947) at pgs. 354-355.

[37] The SDC's Office assessed whether each TDY post was conducting a necessary task and whether the uniformed staff member serving TDY for that post had the appropriate skills, experience, or qualifications for the role, and if so, converted the post into a permanent position, and if not, returned the staff member back to a standard post.

within the Department outlining best practices for hiring, promoting, and transferring civilian staff to ensure that the Department's practices align with OMB's requests.

- **Reduction of Facility-Added Posts**: Facility-added posts are intended to be daily temporary posts added by the facility to address specific and urgent operational needs of the facility,[38] however, much like TDY discussed above, many facility-added posts had remained in use for extended periods of time and some with questionable justification. The SDC created the Staff Efficiency Unit, an administrative audit unit, tasked with assessing and reducing the number of facility-added posts. Between January and September 2026, the Department reduced the number of facility-added posts by 15% (there were 6,610 facility-added posts in January 2026 and 5,606 facility-added posts in September 2026). These Staff Efficiency Unit staff go to the facilities and commands to evaluate what duties the facility-added posts cover and whether the posts were: (1) tied to true, incident-driven reasons, (2) not necessary, or (3) appropriate for permanent, budgeted posts. Facility and command leadership submit requests to the Office of Administration for permanent posts, but these forms have gone unanswered for an extended period, so the Staff Efficiency Unit also reviewed and approved these requests in line with their assessment of the facility or command. Significant progress has been made on the overall assessment, but it is still underway. Once completed, the Staff Efficiency Unit will do routine reassessments of the facility-added posts to monitor the issue going forward.

[38] This practice is not governed by policy. A draft policy was developed under the previous administration in the 21st Monitoring Period and the Monitoring Team provided feedback. The status of this policy is unknown given the administration change.

- **<u>Updated Overtime Caps for Uniformed Staff</u>**: The Department calculated new overtime "caps," or limits on the amount of overtime that uniformed staff could work in a month.[39] While the Department has previously used overtime caps, most staff frequently went over the caps which rendered them effectively meaningless. The new caps were deliberately set higher than the previous caps to address the practical reality of a greater need for overtime, while ensuring it is allocated more fairly across all staff. The new caps were put into use in the summer of 2026, and shortly thereafter, a number of staff started to exceed the caps and restrictions were imposed. In the past, staff used to continue to exceed restrictions with few or no ramifications, so the SDC's office intends to more closely monitor the hours worked by staff on overtime restrictions. This initiative is still underway, and the SDC's office is continuing to evaluate whether it is an effective strategy to reduce the most pervasive overtime usage.
- **<u>FMLA Task Force</u>**: Facility leadership has long reported to the Monitoring Team that FMLA leave has a significant impact on their ability to adequately staff the posts in the facilities. On average, 165 staff used FMLA leave each day during this Monitoring Period, nearly 3% of the Department's daily uniformed headcount.[40] The SDC's office reported that the high rate of FMLA usage has a significant impact on the ability to equitably distribute overtime, as it reduces the pool of people available for overtime shifts. The SDC's office created an FMLA Task Force that has taken a number of concrete steps to ensure that those staff invoking FMLA leave are, in fact, entitled to that leave. These initiatives include updating documentation forms that allow DOC to better

---

[39] When a staff member exceeds their overtime cap, they can be placed on "restriction," which means they are limited to an even lower number of overtime hours in the following month(s).

[40] This number and proportion have been steadily increasing since 2022. *See* Appendix G, Table 3.

evaluate applications for FMLA leave, implementing IT solutions that permit real-time access to staff's FMLA leave status and/or available FMLA leave so the staff member's FMLA record can be reviewed contemporaneously at the time it is requested,[41] and holding staff accountable for claiming FMLA leave, when, in fact, they do not have approved FMLA leave. Additionally, the SDC's office coordinated an information session provided by the Department of Labor to DOC's HR, HMD, and Legal staff regarding the appropriate framework for accepting and rejecting FMLA requests and to clarify any legal ambiguities around the FMLA process. While these initiatives are still in their early stages, the Department has taken many concrete steps to improve the Department's management of FMLA and reduce the possibility of misuse of FMLA status.[42]

## CONCLUSION

While significant work remains to address the deep-seated issues underpinning the Department's staff management, there is cause for optimism that tangible progress on foundational issues has been made this year. In terms of next steps, the Monitoring Team recommends the following:

- **Dedicated and Ongoing Resources**: Disentangling the various ineffective staffing conventions in this Department will take significant resources to identify and address the obstacles and barriers to correcting them and to finance this critical foundational remedial work. First, the City must allocate appropriate funding resources to DOC. Further, the

[41] DOC did not previously have the capacity to verify whether a staff member had approved FMLA leave and/or the amount of FMLA leave available at the time it was requested and that verification process often occurred days, if not weeks, after the staff member had already invoked FMLA leave.

[42] This is similar to how the Department approached staff's misuse of sick leave in the years following the COVID-19 pandemic, which proved to be generally effective.

process for hiring/onboarding additional staff and to entering contracts for additional resources must streamlined such that resources can be utilized in an efficient manner.

- **<u>Staffing Assessment</u>**
  - *RMT's Phase 2 of the Staffing Analysis*: The RMT, with the staffing consultant, is initiating Phase 2 of the staffing work to build on the work developed during Phase 1 and to address the corresponding recommendations. The RMT and staffing consultant will work with DOC collaboratively on these issues and provide technical assistance and support as needed to advance this work.
  - *Simplify and Secure Overtime Controls*: Given the volume at which overtime is used, more secure and straightforward practices are needed for managing and operating overtime.
  - *Preparation for Optimizing Staff Work Schedules*: A key component of the RMT's staffing work will be to devise a more efficient work schedule to address the requirements of Action Plan § C., ¶ 3(vi). The City must begin planning for how these changes can be made in terms of any legal barriers, collective bargaining requirements and resources needed to make those changes.
  - *Preparation for Reducing Uniformed Staff in Civilian Posts*: A key component of the RMT's staffing work will be to identify opportunities where positions or job duties can be transferred from uniformed staff to civilian staff to address the requirements of Action Plan § C., ¶ 3(vii). The Department has begun identifying these opportunities, but significant work is needed to truly maximize the number of uniformed staff working directly with incarcerated individuals.

- **<u>Leadership and Supervision</u>**
  - *Expand Supervisory Organizational Structure*: Expand the organizational structure for Supervisors to include three ranks of supervisors instead of two.
  - *Improve Quality of DOC's Leadership and Supervision*: Concrete and specific action must be taken to elevate the quality of supervision throughout the Department.
  - *Increase Number of Supervisors*: The overall number of supervisors must be increased to ensure they have a workable span of control (*i.e.*, number of officers supervised).

# ASSESSMENT OF VIOLENCE, USE OF FORCE, AND SECURITY PRACTICES

The Department's use of force and security practices are deeply interconnected, and deficiency in one area inevitably impacts the other. Together, poor security practices and excessive and unnecessary uses of force are the center of the ongoing risk of harm. Poor security practices create disorder and conditions where violence becomes more likely and often contribute to uses of force that may have been avoided if proper security measures were taken. These practice errors remain common in the jails, as do uses of force that are either unnecessary or excessive.

This section discusses data related to the use of force and violence in the jails, the Department's assessment of its security practices, and a summary of the Monitoring Team's findings in this area.[43]

## ONGOING RISK OF HARM

The jails continue to present a significant risk of harm to those incarcerated and those who work there. This is evident in the Department's aggregate violence and use of force data and a review of underlying incidents.

- **One Week of Incidents within DOC**

An illustration of the ongoing risk of harm is provided by the incidents and allegations reported to DOC during the eight-day period of October 1–8, 2026. They include:

  - 148 Reported Uses of Force
  - 6 Stabbings and Slashings (including 2 attempted stabbing/slashings)

[43] The Monitor's January 13, 2026 Report (dkt. 947) at pgs. 28-29, 40-43, 45-51, and Appendix L provides a compendium of the security problems that are pervasive throughout the incidents that occur in the jails, and the excessive and unnecessary use of force that too often ensues. The problems identified in that report and those in the 21st Monitoring Period remain unchanged.

- 7 Fires
- 42 Incidents of Self-Injurious Behavior
- 35 Assaults on Staff, including 30 involving uniformed staff and 5 involving civilian or medical personnel
- 16 Serious-Injury Reports Involving Fights or Reported Assaults
- 7 Incidents Involving Narcan Administration
- 38 Discoveries of Contraband
- 28 Emergency Lock-Ins

- **Two Weeks of Use of Force Incidents at DOC**

Below is an illustrative example of the 263 use of force incidents reported in a two-week period from the August 28 through September 10, 2026.

- *103 uses of force during escorts*
  - On September 8, 2026, at RNDC, a restrained individual resisting an escort was taken to the floor and struck a radiator, resulting in a Class A injury requiring sutures, staples, or glue.
- *93 incarcerated individual fights*
  - On September 6, 2026, at OBCC, two individuals were fighting when one struck the other in the face with a closed fisted punch, causing him to fall backward and strike the back of his head on the floor. The individual sustained a 3.5-centimeter scalp laceration.
- *39 use of force incidents involving individuals housed in Mental Observation.*
  - On September 2, 2026, at GRVC, during lock-in in a Mental Observation housing area, an individual repeatedly punched an officer in the upper torso

and face. Chemical agent was deployed twice before the individual was restrained. The officer sustained a head injury and a black eye.

- *23 search-related use of force incidents, including 12 during strip searches.*
  - On September 4, 2026, at EMTC, an individual alleged that after he refused a search and was rear-cuffed, a captain slapped him in the face several times and directed officers to take him down, after which he was allegedly kicked and punched in the legs.
- *20 use of force incidents involving self-injurious behavior*
  - On August 29, 2026, at OBCC, an individual tied a sheet around his neck and affixed it to a holding-pen gate. Staff warned that chemical agent would be used and then deployed OC toward his face.
  - On September 9, 2026, at OBCC, another individual tied a shirt around his neck and affixed it to a holding pen. Staff again warned that chemical agent would be used and deployed OC before entering the pen and restraining him.
  - These incidents are especially troubling because the Department's Chemical Agent Directive expressly prohibits chemical-agent use when an individual is attempting to hang themselves with a ligature around the neck attached to another object.
- *19 incidents involving five or more incarcerated individuals*
  - On September 4, 2026, at RNDC, six individuals were involved in a fight. One individual sustained a hematoma to the forehead, a laceration to the eyelid, and a laceration to the forearm.
- *7 stabbing/slashing incidents*

- On August 28, 2026, at OBCC, several individuals entered another individual's cell at approximately 11:30 p.m. and assaulted him with punches, kicks, and stabbing motions. The individual sustained a fractured jaw. The incident occurred more than two hours after lock-in.

**TRENDS IN USE OF FORCE AND VIOLENCE METRICS, 2016-2025**

The Monitoring Team continues to evaluate trends in key metrics related to the use of force and various types of violence occurring in the jails. Detailed data are provided in Appendix C, "Use of Force and Violence Indicators." These data show few differences in outcomes for the current Monitoring Period and the previous Monitoring Period. Longer-term trends are useful for assessing the trajectory of the reform effort, as shown in the graphs below.

These graphs illustrate the persistently high rates of most metrics related to violence and disorder in the jails. Notably, the use of force rate and the rates of fights and stabbings/slashings remain at concerningly high levels. Modest improvements are taking shape in other areas, but overall, these data portray a dangerous jail system with a persistently elevated risk of harm.







Number and Rate of Serious Injuries to Incarcerated Individuals
1400
1200
1000
800
600
400
200
0
2
1.5
1
0.5
0
2020
2021
2022
2023
2024
2025
J-J 2026


Number and Rate of Fights
10000
7500
5000
2500
0
12
10
8
6
4
2
0
2016
2017
2018
2019
2020
2021
2022
2023
2024
2025
J-J 2026


Number and Rate of Assaults on Staff with UOF
1200
1000
800
600
400
200
0
2
1.5
1
0.5
0
2016
2017
2018
2019
2020
2021
2022
2023
2024
2025
J-J 2026


Number and Rate of Assaults on Staff without UOF
1600
1400
1200
1000
800
600
400
200
0
2.5
2
1.5
1
0.5
0
2020
2021
2022
2023
2024
2025
J-J 2026


Number and Rate of Fires
1800
1600
1400
1200
1000
800
600
400
200
0
2.5
2
1.5
1
0.5
0
2016
2017
2018
2019
2020
2021
2022
2023
2024
2025
J-J 2026

The Monitoring Team compares current data to previous time periods for different purposes. Most importantly, the Court has explained that the *Nunez* "Court orders [are] designed to remedy consistently unconstitutional levels of violence and disorder in the jails."[44] To that end, the Court's November 26, 2024 Contempt Order (dkt. 803) expressly finds that current data must be compared to the state of affairs in 2016.[45] The Monitoring Team also makes comparisons to other points in time, including 2018 (first full year of implementation of the new Use of Force Directive) and 2021 (the apex of the Department's staffing crisis), because these comparisons help to explain the context for *why* certain changes may have occurred.

- **Comparisons to 2016, When the Consent Judgment Went into Effect**:

| **Comparison: 2016 Rates versus January-June 2026 Rates** | |
|---|---|
| **Current is Same/Better than 2016** | **Current is Worse than 2016** |
| ▪ 13% reduction in UOF A with injury (1.6% versus 1.4%)<br>▪ 88% reduction in UOF with A or B injury (36.6% versus 4.3%) | ▪ 113% increase in Use of Force (3.96 versus 8.45)<br>▪ 157% increase in Stabbings/Slashings (0.14 versus 0.36)<br>▪ 72% increase in Fights (5.11 versus 8.79)<br>▪ 71% increase in Assault on Staff with UOF (0.72 versus 1.23)<br>▪ Rate of Fires was 0.0 versus 0.39 |

- **Comparisons to 2018, When the New Use of Force Definition Went into Effect**:

| **Comparison: 2018 Rates versus January-June 2026 Rates** | |
|---|---|
| **Current is Same/Better than 2018** | **Current is Worse than 2018** |
| ▪ 39% reduction in UOF A with injury (2.3% versus 1.4%)<br>▪ 88% reduction in UOF with A or B injury (34.4% versus 4.3%) | ▪ 43% increase in Use of Force (5.9 versus 8.45)<br>▪ 300% increase in Stabbings/Slashings (0.09 to 0.36)<br>▪ 42% increase in Fights (6.2 versus 8.79)<br>▪ 27% increase in Assault on Staff with UOF (0.97 versus 1.23)<br>▪ Rate of Fires was nearly zero (0.02) versus 0.39 |

[44] *See*, Court's November 26, 2024 Order (dkt. 803) at pg. 50.

[45] *See*, for example, the Court's November 26, 2024 Order (dkt. 803) at pgs. 50 and 52.

- **<u>Comparisons to 2021, When the Department's Staffing Crisis Hit an Apex</u>**:

| **Comparison: 2021 Rates versus January-June 2026 Rates** | |
|---|---|
| **Current is Same/Better than 2021** | **Current is Worse than 2021** |
| ▪ 31% decrease in UOF (12.23 versus 8.45)<br>▪ 75% reduction in UOF A with injury (5.7% versus 1.4%)<br>▪ 77% reduction in UOF with A or B injury (18.3% versus 4.3%)<br>▪ 43% reduction in Stabbings and Slashings (0.63 versus 0.36)<br>▪ 37% reduction in Serious Injuries to Individuals (1.9 versus 1.19)<br>▪ 5% reduction in Fights (9.28 versus 8.79)<br>▪ 26% reduction in Assault on Staff with UOF (1.67 versus 1.23)<br>▪ 76% reduction in Assault on Staff without UOF (2.26 versus 0.55)<br>▪ 84% reduction in Fires (2.36 versus 0.39) | |

Since the 2021 staffing crisis when violence and use of force reached exceptionally high levels, the Department has significantly reduced the number of uses of force that result in injury. While this is an important improvement, it does not address the constitutional violations underlying the *Nunez* Court Orders. The rates of use of force and every other violence metric remain substantially higher than when the Consent Judgment took effect. Improvements to a few metrics from a historical high point do not make the jails "safe." Incarcerated individuals continue to face a substantial risk of harm, and staff continue to work in dangerous conditions.

The high rates of violence and use of force are intertwined with the Department's failure to consistently implement basic security practices. This is discussed in detail below. The related issues of identifying and managing individuals in custody who are prone to violence and the Department's efforts to identify strategies to deal with this population are discussed elsewhere in this report.

### DEPARTMENT'S FINDINGS REGARDING PROBLEMATIC USES OF FORCE AND SECURITY PRACTICES

The Department generates an abundance of information about staff's failure to consistently implement basic security practices. These include:

- ***Nunez* Compliance Unit Audit Findings**: For several years, NCU has produced security audits that utilize a rigorous methodology and offer valuable insight into the way in which housing units in each jail are managed. During the current Monitoring Period, NCU conducted 36 security audits. The findings for this Monitoring Period identify similar problems and practice deficiencies as those reported during the past five years of NCU's audits, beginning in 2021. These include:
    - Staff frequently abandon housing area posts.
    - Unsecured cell doors during times when staff were actively supervising the tier.
    - Multiple incarcerated individuals inside one cell.
    - Incomplete housing unit tours, improper use of tour wands, and poorly executed safety/welfare checks when incarcerated individuals were locked in their cells.
    - Incomplete and/or inaccurate logbook entries.
    - Open and unaddressed contraband use.
    - Failure to enforce lock-in.
    - Cursory Supervisor tours (although those completed by ADWs tended to be more robust).
    - Absence of meaningful presence of Wardens, DWs and Tour Commanders on the housing units.
- **Reports from Facility Leadership**: The Monitoring Team's routine communications with facility Wardens/Assistant Commissioners and Deputy Wardens indicate that many

of these individuals are aware of these performance issues among their staff. While these facility leaders do, in some instances, make efforts to provide coaching and guidance, often utilizing video footage, the effectiveness of these efforts has not yet been determined. The pervasiveness of poor security practices and their connection to unnecessary uses of force contributes to the ongoing risks of harm to those in custody and Department staff.

- **Findings of Staff Off Post**: There continue to be ongoing situations where individuals in custody are left unsupervised either because (1) the Department does not have a staff person assigned to the housing unit because an insufficient number of staff reported to work or (2) when staff leave their assigned post without being properly relieved.[46] These situations continue to occur too often. During the current Monitoring Period, over 78% of NCU's random security audits[47] found that staff were off post for some period of time, suggesting this issue is quite pervasive. This is alarming given that this practice should never occur. As shown in Table 4 in Appendix D, three staff were suspended for being off post or leaving a post unauthorized in relation to three separate in-custody deaths this year, underscoring the harm that can and does result when staff leave their posts without proper relief. As shown in Table 9 in Appendix C, at least 148 uses of force occurred

---

[46] Leaving a housing unit without an officer on the B post, however briefly, should never occur. Staff must be present at all times to maintain the safety and security of individuals in the housing unit and abate issues that arise, such as medical emergencies or interpersonal conflicts. Pursuant to the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 6, staff are not permitted leave their assigned post without a Supervisor's permission and staff assigned to housing unit posts are not permitted to leave their post until they have been properly relieved (absent an exigent circumstance).

[47] *See*, Table 10 in Appendix C

during this Monitoring Period when a staff member was not on post, either because staff were not assigned to the post or the officer left their post without appropriate relief.[48]

- **Immediate Corrective Action for Staff Misconduct**: The Department took 3,066 immediate corrective actions for use-of-force-related misconduct during the current Monitoring Period (*see* Appendix F, Table 2). The extent to which the volume and severity of these actions are commensurate with the underlying use-of-force-related misconduct identified during the period is discussed in more detail in the compliance assessment for First Remedial Order § C., ¶ 1 & § C., ¶ 2.
- **Rapid Review Findings**: During the current Monitoring Period, Rapid Reviews recommended 5,160 corrective actions for 2,201 staff members' use-of-force-related misconduct (*see* Appendix E, Tables 1 and 2). More information about the quality of Rapid Reviews can be found in the compliance assessment for First Remedial Order § A., ¶ 1. This has also increased the number of immediate corrective actions taken, as noted above.
- **Command Disciplines Referred by Other Sources**: In addition to those referred via Rapid Reviews, 1,023 staff were referred via other sources for Command Disciplines (*see* Appendix F, Table 6(a)). Of these, 668 (65%) resulted in substantial penalties or referrals for formal disciplinary charges.
- **Actions Taken by the Investigations Division**: During the current Monitoring Period, ID took some type of corrective action or referred a case for a Full ID investigation for

[48] While the number of incidents may appear to be small given the overall number of uses of force incidents during this Monitoring Period, this is not the appropriate context to view such incidents. The proper context to consider is that the staff's absence means that all such incidents were potentially avoidable. Had staff been present and conducting their duties appropriately, they may have been able to prevent, deter or mitigate the incident that led to the use of force.

1,182 uses of force, which is 34% of all incidents that occurred (*see* Appendix E, Table 11).[49] ID also determined that at least 291 incidents involved excessive force, unnecessary force, or force that may have been avoidable.

Although multiple structures within the Department generate this information and leadership has had access to it for many years, the Department has not fully used this readily available information to develop a comprehensive plan to improve poor staff practice identified through these reviews and investigations.

**MONITORING TEAM'S FINDINGS REGARDING USE OF FORCE AND SECURITY PRACTICES**

**AREAS OF IMPROVEMENT IN USE OF FORCE**

Although a wide variety of problematic practices related to security and the use of force continue to negatively impact the Department, it has made progress in certain areas that has been sustained for a year or more. This includes:

- a clear definition of "use of force" that includes a broad range of physical and chemical interventions,
- ensuring that most use of force incidents are reported,
- using tactical equipment with significantly less frequency (*e.g.*, batons, tasers, OC grenades, and stun shields),
- utilizing low-grade physical interventions in the majority of incidents,
- activating Emergency Response Teams far less often, and
- inflicting fewer injuries on incarcerated individuals and staff during use of force events.[50]

---

[49] This does not include cases in which the facilities identified the same staff misconduct as ID and took disciplinary or corrective action in response.

[50] *See* Monitor's November 22, 2024 Report (dkt. 802) at pg. 16; Monitor's May 22, 2025 Report (dkt. 850) at pgs. 15-22; and Monitor's January 13, 2026 Report (dkt. 947) at pgs. 43-45.

These advancements, if sustained, can be important building blocks for additional progress toward reform, as described throughout the remainder of this section.

**PERVASIVE USE OF FORCE AND SECURITY PRACTICES**

The Monitoring Team has long reported its findings regarding these pervasive problems in basic security practices and their relationship to use of force events. The record in this case is replete with descriptions of these issues and illustrative case examples.[51] The problems the Monitoring Team has identified in its 2025 and earlier 2026 reports have persisted throughout the current Monitoring Period:

- Precipitating staff conduct (*e.g.*, hyper-confrontational, argumentative behavior, unprofessional conduct such as threats, profanity and racial epithets).
- Failure to attempt de-escalation prior to resorting to the use of force.
- Poor security practices, such as failures to secure doors, to limit congregation in cells and vestibules, to utilize security hardware, to supervise and control the environment, and to utilize reasonable search and escort procedures.
- Excessive and unauthorized uses of chemical agents, particularly when immediate intervention is not required to address the extant risk of harm.
- Staff failures to intervene, even in situations involving an obvious risk of harm.
- Staff continue to lose control during movement, conduct escorts without adequate coordination, use improper or painful holds, and fail to properly manage restrained individuals.
- Use of dangerous or prohibited takedown techniques.

[51] *See,* for example, Monitor's January 13, 2026 Report (dkt. 947) at pgs. 46-51 and Appendix L.

- Failures to comply with Anticipated Staff Use of Force protocols.
- Failures to reduce interpersonal violence through effective supervision and meaningful intervention.
- Frequent uses of force during searches and staff failures to activate their body-worn cameras as required by policy, particularly in designated search areas that do not have camera coverage due to privacy concerns. Use of head strikes in circumstances not permitted by policy.
- Discounting the risk inherent in any use of force by limiting the perception of harm to only incidents that result in injury.

The Department's use of force practices cannot be viewed in isolation. They are intrinsically intertwined with its security practices. This is why the conditions that lead to the use of force are equally critical to any evaluation of an incident. The Monitoring Team's reviews repeatedly identify unsecured doors, staff off post or inattentive, poor control of movement, deficient escorts, failures to keep individuals separated, inadequate de-escalation, and weak supervision that either create the circumstances for an incident or allow it to escalate.

The Department must consistently evaluate why there was a need for force, whether staff practice contributed to the escalation, what could reasonably have been done differently, and whether the same underlying problems are contributing to other incidents as well. The Department too often identifies and addresses these issues on a case-by-case basis through counseling, retraining, or command disciplines, without assessing or addressing the broader pattern. As a result, the Department repeatedly identifies the same deficiencies without showing that it uses the information to change day-to-day staff practice more globally.

One of the most pervasive issues underlying the Department's use of force practices relates to the lack of professionalism and staff hostility. The Monitoring Team's review of incidents routinely identifies officers, captains, and other supervisors using profanity, derogatory or demeaning language, racial slurs, and confrontational language toward incarcerated individuals. These incidents are routine and occur across facilities. A few illustrative examples are included below:

- **February 24, 2026 – OBCC**: After deploying chemical agent to stop a fight, an officer was captured on BWC stating, "spray them nig**s. Y'all, fight you get sprayed." The force itself was found justified, but the officer received a command discipline for the racially charged and unprofessional comments.
- **March 24, 2026 – QNCTS**: During a restraint, an officer grabbed an individual by the front of the neck and pushed him against a wall while repeatedly using profanity. BWC captured staff saying, "nig**, nig**, let's handcuff this mother f**ker," while the restraint was occurring. The officer was subsequently given a 10-day suspension, and ID referred the matter for a Full ID investigation.
- **April 6, 2026 – EMTC**: Multiple officers were captured on BWC making confrontational and degrading comments during the same incident. One officer stated, "your mother is a bit**," another told an individual who was threatening to fight staff, "so do it," and another stated, "you fight in here mother F**cker."
- **July 5, 2026 – West Facility**: An officer escalated an encounter with an individual in custody who was seated on the telephone. The officer grabbed him by the neck and repeatedly pulled his hair during the ensuing struggle and escort. After the individual was restrained, the officer continued pulling the individual in custody by the hair, kneed him

in the head, struck him multiple times in the head/face with an MK-9 chemical-agent canister, and later deployed chemical agent while the individual was seated and restrained. Throughout the incident, the officer used egregious, retaliatory, and racially charged language, including "f**k you ni**a," "f**king punch me in my face you bit** ass ni**a," "shut up pu**y," and "it's lit now, I like that energy." Another officer repeatedly told him to "chill," and the captain ultimately had to order the officer to step away, although the officer continued antagonizing the individual afterward. The officer was subsequently given a 30-day suspension. In September 2026, facing formal charges, this officer ultimately resigned.

Profanity, insults, threats, and confrontational exchanges undermine de-escalation, provoke resistance, and contribute to incidents that ultimately require force. The Department and its staff have a duty to engage in a professional manner. Meaningful improvement will require clear expectations, active intervention, appropriate accountability, and sustained assessment of whether the conduct is actually decreasing.

**CONCLUSION**

Overall, given the ongoing patterns and practices cited herein, the fact that the Department appears to have curtailed some of the most egregious and excessive uses of force does not alleviate the Monitoring Team's continued concerns about the failure to properly implement the Use of Force Directive, reform staff practice and substantially reduce the risk of harm faced by incarcerated individuals and staff. The fact that many incidents end with force that appears facially necessary or low-level does not, in and of itself, show meaningful compliance because the assessment of compliance is not limited to the narrow question of whether staff avoided the worst possible tactic at the final moment of confrontation. The purpose of the reform

is to improve the Department's *overall* management of force: preventing violence when possible, protecting incarcerated individuals from harm from each other and from staff abuses, requiring de-escalation where feasible, ensuring planned responses when force is anticipated, prohibiting provocative or retaliatory conduct, and requiring accurate reporting and accountability. When staff repeatedly fail in those antecedent and surrounding duties, their subsequent use of low-level force does not reflect a system that has properly embraced the duty to protect incarcerated individuals from harm. Instead, the patterns and practices described above reflect a system that is generating avoidable force events and then responding to them. For that reason, the reduction of the most extreme forms of violence at the hands of staff, while important, is better understood as a baseline expectation than as proof of compliance with the *Nunez* Court Orders. To conclude otherwise would risk treating the absence of the worst misconduct as evidence that reform has been achieved, when the record instead shows a persistent and pervasive failure to satisfy the core obligation to substantially reduce the risk of harm to those in custody.

## Managing Behavior of People in Custody

An important aspect of facility safety is the framework for managing the behavior of incarcerated individuals—both how positive behavior is incentivized and how negative behavior is addressed. During the current Monitoring Period, the Department, Remediation Manager Team and Monitoring Team focused on DOC's management of incarcerated individuals who are engaging in violence. This included better understanding the Department's framework for utilizing custody classification to better respond to those at higher risk of violent misconduct, identifying people who frequently engage in lower-level violence, and housing strategies for those who commit serious violence.[52] Each of these tools for enhancing facility safety are discussed below.

### Classification

An overhaul of the housing decisions that flow from custody classification is needed to ensure that the levels of structure, security and supervision are appropriately differentiated so that maximum custody individuals are housed in units with tighter controls and more limited movement in order to reduce their potential to commit violent infractions. As discussed in detail in the Monitor's September 30, 2026 Status Report (dkt. 1006) at pgs. 6-13, the Department's custody classification instruments were determined to be valid by Dr. James Austin in early 2026, although several aspects need to be strengthened to ensure an individual's risk is assessed accurately (*e.g.*, ensuring infractions are issued and processed timely, ensuring program participation data is migrated into the platform for scoring the re-classification instrument, using

[52] The First Remediation Action Plan, Action Step 3 requires the Department to develop and evaluate a pilot housing program for individuals following serious acts of violence as well as develop data-driven short-term strategies for managing persistently violent persons in custody. The First Remediation Action Plan, Action Step 4 requires recruitment for a new senior leadership role to oversee the classification of persons in custody and develop a plan regarding the Department's classification practices, deficiencies, and priorities.

discretionary overrides when warranted, and only permitting staff with certain job titles to change an individual's custody level).

The Monitoring Team issued specific recommendations in the Monitor's September 30, 2026 Status Report at pgs. 11-12 to enhance the classification process. The recommendations are intended to align with the Remediation Action Plan, Action Step 4. The Department has appointed an interim leader for the Classification Division and has posted the position to attract a qualified professional with deep expertise and experience with correctional classification systems.

**IDENTIFYING PEOPLE WHO FREQUENTLY ENGAGE IN VIOLENCE**

As discussed in the "Assessment of Violence, Use of Force, and Security Practices" section of this report, the Department's rate of fights has been at record levels for several years (*see* Appendix C, Table 5) and fights remain a primary reason that force is used in the jails.[53] Since the inception of the Consent Judgment, the Monitoring Team has encouraged the Department to shore up its infraction process and to develop proportional consequences for all levels of violence. For many years, the Department has operated units to respond to those found guilty of the most serious violent infractions (*i.e.*, restricted housing) but has never had an effective or durable strategy for addressing mid-level violence (*e.g.*, fights and assaults).[54] As

[53] *See* Monitor's January 13, 2026 Report (dkt. 947) pgs. 40-43.

[54] For a time, the Department operated two units to address mid-level misconduct among young adults aged 18 to 21. The Transitional Restorative Unit ("TRU") and Second Chance Housing Unit ("SCHU") were operational from 2017 to 2019 (SCHU) and 2017 to 2021 (TRU). While the programs usefully expanded the continuum of disciplinary options, they were plagued by violence and had other operational concerns. *See* Monitor's April 3, 2017 Report (dkt. 295) pgs. 218-221 and 225-233; Monitor's October 10, 2017 Report (dkt. 305) pgs. 232-234 and 240-246; Monitor's April 18, 2018 Report (dkt. 311) pgs. 172-176; Monitor's October 17, 2018 Report (dkt. 317) pgs. 187-192; Monitor's April 18, 2019 Report (dkt. 327) pgs. 229-236; Monitor's October 28, 2019 Report (dkt. 332) pgs. 276-283; Monitor's May 29, 2020 Report (dkt. 341) pgs. 310-317; Monitor's October 23, 2020 Report (dkt. 360) pgs. 270-275; Monitor's May 11, 2021 Report (dkt. 368) pgs. 311-317; Monitor's December 6, 2021 Report (dkt. 431) pgs. 132-133.

discussed in the Monitor's June 17, 2026 Report (dkt. 984) at pg. 44, the Department developed and deployed an electronic infraction system, which is now operational[55]. However, the Department has not yet equipped the facilities with meaningful options for responding to mid-level violent misconduct.

Currently, individuals who engage in violent misconduct in the jails may be charged with an infraction, but unless the violent conduct is extremely serious and qualifies for placement in RESH (*e.g.*, stabbing or slashing, assaults that cause a serious injury, among others), the Department has few options for sanctioning the behavior. Depending on whether staff write an infraction (some choose not to because they believe the consequences to be inadequate, and thus not worth the paperwork), only some of the incarcerated individuals who engage in fights are held accountable. The only sanction currently available is a commissary restriction, and Department and facility leadership report this sanction has little practical impact and is of very limited utility in deterring the behavior. A more proportional and effective response is urgently needed. The first step toward strengthening the available consequences is developing tools to identify the target population.

Throughout the Monitoring Period, the Monitoring Team worked with Office of Management Analysis and Planning ("OMAP") and the Remediation Manager Team to develop an analytical tool that easily identifies the incarcerated individuals who are contributing to the Department's high rates of violent infractions. OMAP utilized a variety of parameters to explore how to best define this subpopulation, focusing on ways to identify those who commit multiple violent infractions within a proximal window of time. Ultimately, the parameters of "two violent infractions in a 30-day period" (*i.e.,* "2 in 30") produced a target population of a manageable size

[55] The Department reports it is in the final phase of development to make the appeals process electronic.

such that these individuals could be promptly transferred to housing unit with enhanced security features, greater supervision and/or structure to better manage the risk of harm.

The Monitoring Team is currently working with the Remediation Manager Team and the Department to develop the protocol for housing transfers and appropriate management strategies for those who meet the "2 in 30" threshold. Once operational, this will add an important tool to the Department's array of strategies to manage individuals who engage in mid-level violent misconduct across the jails. This initiative is addressed in Priority Area 1, Action Step 3.3 of the Remediation Action Plan.

**MANAGING PEOPLE WHO ENGAGE IN SERIOUS ACTS OF VIOLENCE**

The Monitor's 21st Report discussed the various options for responding to people who engage in serious violence (*e.g.*, Enhanced Supervision Housing at RMSC ("RESH"), the Special Management Unit ("SMU"), and Behavioral Health Units ("CAPS" and "PACE") (dkt. 984) at pgs. 45-49.[56] During the current Monitoring Period, the Monitoring Team continued to focus on conditions in RESH.[57]

By policy, Level 1 provides for seven hours out-of-cell time each day, comprised of three hours of recreation in individual recreation pens and four hours of programming in restraint desks. In Level 2, policy requires each individual to be offered seven hours out-of-cell each day, comprised of three hours of congregate recreation and four hours of programming in congregate space. The Monitoring Team's routine conversations with RESH leadership, and observations of unit operations, continue to reveal significant difficulty maintaining the minimum staffing levels

---

[56] The Department also utilized the protocol for Involuntary Protective Custody, often for people housed at NIC, about which the Monitoring Team frequently voiced concerns. NIC was closed in early 2026.

[57] RESH's program design and operation were discussed in detail in the Monitor's January 13, 2016 Report (dkt. 947) at pgs. 57-63.

prescribed by policy (four floor officers per unit), which compromises lock-out time and service delivery in both Level 1 and Level 2. Further, the Department's inability to adequately stymie the presence of contraband (weapons and drugs) continues to jeopardize safety and uses of force are prevalent during routine movement in the unit and during searches. The level of interpersonal violence in Level 2 is also particularly concerning, and the increasing number of individuals on suicide precautions/enhanced supervision. Problems related to searches that are not aligned with policy are discussed in more detail below.

Appendix C, Table 12 (a) shows the reductions in most metrics (except for fights) since the unit first opened at RMSC in July 2023. Appendix C, Table 12 (b) shows the significantly higher rates of interpersonal violence in Level 2 housing (which does not utilize restraint desks). For the past three Monitoring Periods, few if any fights occurred in Level 1 housing and the rate of fights in Level 2 housing remained exponentially higher. For the current Monitoring Period, the rate of fights in Level 1 housing was 0.5, compared to 13.2 in Level 2 housing. The reason for this pervasive violence appears to be multifactorial. Among them, individuals in RESH have high levels of pre-existing conflict with others, Level 2 has fewer security controls than Level 1, and the Department lacks an effective strategy for behavior change for this subpopulation. The units' difficulty maintaining minimum staffing levels and longstanding inability to operate with appropriate security protocols and diminished supervision practices are also likely contributors.

**RESH Length of Stay**

The Monitoring Team conducted an inquiry into the length of stay among people who exited the RESH program during the current Monitoring Period to better understand how the program is utilized. Aggregate data are presented in the table below.

| RESH Length of Stay, January-May 2026 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **LOS 1-15 days** | **LOS 16-30 days** | **LOS 31-50 days** | **LOS 51-60 days** | **LOS 61-70 days** | **LOS 71-80 days** | **LOS 81-90 days** | **LOS 91+ days** | **Total Discharged** |
| Number of PIC | 126 | 35 | 35 | 155 | 91 | 30 | 18 | 12 | 502 |
| % of Total PIC Discharged | 25% | 7% | 7% | 31% | 18% | 6% | 4% | 2% | 100% |

Of the 502 people discharged from RESH between January and May 2026:

- **About half (49%) spent between 51 and 70 days in the program**. This is plus/minus 10 days from the program's default length of stay of 60 days.
- **One-quarter (25%) spent 15 days or less in the program**. Based on information gathered from members of the RESH Committee:
    - Some were discharged from DOC custody because their case was dropped, they made bail or were transferred to NY DOCCS.
    - Others were discharged from Pre-Hearing Detention because the referring facility did not complete infraction paperwork in a timely manner; subsequent review by the Operation Security Investigation Unit ("OSIU") determined the individual was not the perpetrator of the qualifying offense (*e.g.*, the person had a peripheral rather than direct role), or the individuals were subsequently determined to be excluded from RESH for medical/mental health reasons.
    - Some were found "not guilty" by the Adjudication Captain hearing the infraction.

  Each of these warrant further inquiry to identify and address potential weaknesses surrounding the infraction and/or RESH referral protocols. The Monitoring Team is engaging various Department leaders to explore the issues.
- **A small number of people (2%, n=12) spent more than 90 days in RESH**. The Department provided detailed information regarding each person's length of stay.

Overall, the Monitoring Team found that the length of stay was not unreasonably protracted, given that the additional time was directly connected to serious violent conduct while in RESH (*e.g.*, stabbing/slashing, possessing weapons, involvement in uses of force, etc.). Some of the incarcerated individuals with long lengths of stay voiced safety concerns about transferring to Level 2, believing that the absence of restraint desks put them at risk of attack by others in the program. Several indicated that their violent infractions were committed in order to stay in Level 1 where they felt safer. Some individuals' time in RESH was extended following some, but not all, violent infractions. Further, the lengths of the extensions were often not as long as that permitted by policy, rarely restarting the clock and requiring an additional 60 days in the program.

These findings provide the foundation for a variety of recommendations related to strengthening the Department's approach to managing those who commit serious violence, particularly how to establish safe living conditions in restrictive housing units that target those with a demonstrated willingness to engage in the most serious forms of violence while in custody. The Monitoring Team has shared its findings regarding safety in the RESH program with the workgroup currently developing the restrictive housing pilot program so that operational and program approaches can be informed by, and improved upon, the dynamics in the Department's current form of restrictive housing.

### Strip Searches in RESH

Concerns have been raised that strip searches may be occurring in RESH with greater frequency than permitted by the Department's search policy and may also involve visual body cavity searches in situations when they are not permitted by policy. In particular, it appears that strip searches (and possibly visual body cavity searches) are routinely occurring in RESH (both

levels 1 and 2) when individuals are leaving/returning to their cells to go to/from the dayroom and restraint chairs. Allegations have also been made that staff utilize or threaten to utilize strip searches to intimidate, harass and/or demean incarcerated individuals. The Investigation, Intelligence and Accountability Division has initiated an investigation into the use of strip searches in RESH. This investigation is ongoing.

- **DOC's Search Policy and RESH Policy**

Searches should be used only in the circumstances permitted by policy, which provides a continuum of invasiveness based on potential access to weapons and the presence of reasonable suspicion. Various types of searches may be conducted, including pat searches, searches with a handheld metal detector, searches using a walk-through magnetometer, searches of one's belongings using a line scan, "BOSS" (Body Orifice Scanning System) chairs to detect metallic contraband that is concealed in a body cavity or orifice, strip searches without a visual body cavity search, and strip searches with a visual body cavity search. DOC policies prescribe the circumstances in which each of these types of searches may be used.

As searches become more invasive, heightened standards govern the circumstances when they can be used. Strip searches are the most invasive of the options and are both staff intensive and operationally burdensome. Even when conducted only in the limited circumstances permitted by policy, staff must make every effort to afford the individual dignity and respect. In RESH, strip searches during routine movement between cells and the dayroom or restraint chairs can also lead to uses of force, some of which are unnecessary. These encounters can undermine rapport between incarcerated individuals and officers.

Given the required level of security in restricted housing, enhanced search procedures are warranted in certain circumstances, but as noted above, there are policy-governed limits. The

limited circumstances in which a strip search without/with a visual body cavity search may be used are outlined in the Department's Search Policy and presented below:

- Strip searches *without* a visual body cavity search[58] must be conducted when incarcerated individuals leave or return to the RESH unit. Strip searches without a visual body cavity *may* also be conducted prior to the search of an incarcerated individual's living quarters to ensure that the incarcerated individual is not concealing contraband on his/her person.
- Strip searches *with* a visual body cavity search[59] are only permitted to occur under two circumstances: (1) new admissions to a facility (under certain criteria), and (2) when reasonable suspicion exists.

The Monitoring Team recently learned about a security memo that was issued in July 2023 and remained in distribution within the facility. This memo directed staff to conduct strip searches without a visual body cavity search every time an individual was moved in/out of their cell to go to/from the dayroom and restraint chair. This direction is in direct contravention of the Department's Search policy. In other words, the Security Memo directed staff to conduct strip searches in a manner that is not permitted by the Department's Searches Directive. The

[58] A strip search without a visual body cavity search means a visual inspection of the armpits, oral cavity, ears, nose, navel, and hair while the incarcerated individual is undressed. This search shall not involve visual inspection of an incarcerated individual's anal or genital cavity, nor require the incarcerated individual to spread his/her buttocks, nor lift his/her genitals or breasts. This inspection may involve directing the incarcerated individual to perform a deep knee bend in order to expel any contraband that may be secreted in the anal or genital cavity. This procedure may also include conducting a search of the incarcerated individual's wearing apparel after clothing has been removed, including the ripping, tearing, and/or cutting of the clothing.

[59] A strip search with a visual body cavity search is intended to include all procedures for a strip search without a visual body cavity and also includes a thorough visual inspection of an incarcerated individual's genital and anal cavities while the incarcerated individual is standing with his/her legs spread and body bent forward at the waist. This may also involve requiring an incarcerated individual to lift the breast or genitals, as appropriate. This search shall not include any probing or touching of the genital or anal cavities. If contraband is not found and suspicion still exists, Department policy provides additional guidance relating to the isolation of incarcerated individuals and/or medical referral.

Department reported that various DOC leaders were not aware this memo had been issued. Although required by the *Nunez* Court Orders, the Department did not consult or otherwise advise the Monitoring Team about this security memo—the Monitoring Team only learned about the existence of the memo in October 2026.

- **<u>DOC's Strip Search Practices at RESH & Next Steps</u>**

Initial observations, discussions with staff and incarcerated individuals, and a review of the allegations suggest that at a minimum, strip searches have been used when individuals are moving to/from their cells to go to/from the dayroom and restraint chairs.

Given the concerns attendant to potential excessive and unnecessary strip searches, the Remediation Manager Team and the Monitoring Team issued a joint recommendation to the DOC that:

- The Chief of Department must immediately provide written guidance to RESH staff that:
  - Rescinds the July 2023 Security Memo;
  - Issues specific guidance to cease the practice of conducting strip searches when individuals are leaving/returning from their cells to go to/from the dayroom and restraint chairs;
  - Issues guidance on the use of strip searches and visual body cavity searches that aligns with Department policy.
- DOC leadership must provide additional guidance to RESH staff on appropriate search procedures in the RESH Program.

The Department has reported it will adopt the joint recommendations of the RMT and MT. First, the Department intends to issue a Teletype, following consultation with the RMT and

MT, that informs staff of the required practices and prohibitions. The Department will also need to support proper implementation with subsequent reminders of the expected practices and limits, ongoing monitoring and accountability if staff practice does not conform to expectations and prohibitions.

**RESTRICTIVE HOUSING PILOT PROGRAM**

To address the level of violence and other operational challenges in RESH (*e.g.*, low staffing levels, presence of weapons and drugs), as part of the Remediation Action Plan, the Department is working with the Remediation Manager Team and the Monitoring Team to develop a new model of restrictive housing which it plans to pilot in 2027. Goals of the pilot program include increasing the level of safety in restrictive housing and implementing a program model focused on behavior change among those in the program. To do so, the pilot program intends to emphasize specialized staff training in the program model, deploying appropriate security measures to reduce violence and the presence of dangerous contraband, and *actually meeting* the required staffing levels, something which is rarely accomplished in the RESH program. Subject matter experts from the Remediation Manager Team are working in close coordination with key Department staff, including the Deputy Commissioner of Programs, and the Assistant Chief of Facility Operations and a skilled captain who currently works with the RESH program. The Monitoring Team fully supports the direction of the pilot, particularly the workgroup's core value that behavior change cannot occur absent safe living conditions in restrictive housing.

**DOC AND CORRECTIONAL HEALTH SERVICES OPERATIONS**

The National Commission on Correctional Health Care ("NCCHC") has explained that "the delivery of health care in a correctional facility is a joint effort of custody and health staffs

and is best achieved through trust and cooperation."[60] A safe jail operation inherently depends on close coordination between custody staff and those providing medical care because it directly relates to both the care for people in custody[61] and the daily management of the jails.[62]

Collaborating across disciplines is always challenging, and even more so in this Department given the unique organizational structure and division of labor between the Department and Correctional Health Services ("CHS"). In particular, the agencies operate with separate leadership and reporting lines. While there are certainly examples where the two agencies have engaged productively and efficiently, for the most part, the agencies' relationship is often counterproductive and has a direct negative impact on daily operations and facility safety. There appears to be a fundamental lack of trust between DOC and CHS staff, marked by guarded and constrained information sharing. While concerns about sharing personal health information are legitimate, privacy concerns are often cited in situations when such protections should not apply (*e.g.*, staffing, schedules, aggregate data). The inability to work together effectively and efficiently exchange information significantly compromises the ability of the agencies to cooperatively meet individuals' needs. Examples of these issues include:

- **Failure to communicate effectively about staffing/operational matters**: The agencies do not reliably communicate about potential staffing challenges or schedules for service and program delivery.

---

[60] *See*, National Commission on Correctional Health Care. (2018). *Standards for health services in jails* (Standard J-A-03: Medical autonomy).

[61] A non-exhaustive list includes medical assessments of new admissions, routine clinic operations, assessing potential risk of self-harm, providing mental health care, addressing people who are frequently involved in violence, and assessing the unfortunate circumstances in which an individual may die in custody.

[62] A non-exhaustive list includes allocating sufficient staff to provide enhanced observation for individuals at acute risk of self-harm/suicide, providing programming on housing units, placing individuals in housing units specifically designed for those with medical conditions, producing individuals to clinic appointments or hospitals, and de-escalating individuals or managing anticipated uses of force with individuals with medical/mental health conditions.

- **<u>Inefficient and inconsistent data tracking</u>**: Data systems are maintained by each agency, without a central repository or tracking mechanism for basic information. Furthermore, the flow of information is not systematic, standardized or uniform. Even jointly developed tracking systems omit essential data points, limiting the ability to measure important outcomes. For example, the jointly developed clinic production tracking system does not record whether an individual was seen by CHS.
- **<u>Suicide prevention protocols that are not aligned with professional standards</u>**: The Monitoring Team's initial assessment of current suicide protocols and the collaboration needed to support them suggest that DOC's protocols are not aligned with professional standards or sound correctional practice. Further, it appears the necessary collaboration between DOC and CHS staff regarding risk assessment, placement on preventative measures, observation levels and subsequent modifications is not occurring in a manner that supports safe jail operations.
- **<u>Poor coordination about individuals requiring more support</u>**: Collaboration and information sharing about individuals who engage in serious/frequent acts of violence or otherwise present management challenges is limited. This precludes the necessary engagement by DOC and CHS to devise the most appropriate and safe strategy for managing these individuals and ensuring they obtain the care needed.

The Monitoring Team has recommended that the City must bring DOC and CHS together to develop an efficient and productive collaboration that promotes safety and enhances service delivery. The Monitoring Team recommended the following initiatives be prioritized:

- **<u>Paradigm Shift to Build a Shared Mission and Culture of Trust</u>.** A paradigm shift toward effective collaboration is essential. Improved communication, information

sharing, and problem-solving must address the culture of distrust and lack of cross-disciplinary training. Furthermore, the City must act on the findings of the Data Gaps analysis the Department developed to address Remediation Action Plan Step 11.1 and its obligations to improve information-sharing under Step 11.3.

- **Enhancing Self-Harm Prevention Protocols**. Recurring assessments, ongoing clinical support, and close supervision of individuals at risk of self-harm make suicide precautions among the most labor-intensive operations in a correctional setting. The Monitoring Team recommends that: (1) current policy and practice should be evaluated against NCCHC standards and guidance from nationally recognized experts to ensure alignment; and (2) DOC and CHS staff must work together to improve the process for risk assessment, placement of individuals on preventative measures, appropriate observation levels and subsequent modifications to those precautions.
- **Addressing Individuals Who Present Management Challenges**. A collaborative approach between DOC and CHS (across all ranks) is needed to address individuals who present significant management challenges often stemming from an inability to regulate their emotions, manage interpersonal conflict, tolerate frustration and control impulses. This will require improvements to the level, candor and frequency with which information is shared and the development of individualized behavior support strategies that are jointly developed by CHS and DOC.

Agency leaders must model effective interagency and cross-disciplinary collaboration and also give staff the permission, skills and boundaries to practice it. The Monitoring Team strongly encourages the City, DOC and CHS leadership to design and implement an initiative that promotes meaningful collaboration among staff at all levels.

## Conclusion and Next Steps

The Department has significant work to do to develop an effective continuum of strategies for managing the behavior of incarcerated individuals. This includes:

- **Housing Strategies Based on Classification**: Ensuring the Classification unit has both the expertise and authority to manage the process of assessing individuals' risk of institutional misconduct, along with ensuring people are assigned to housing units that operate commensurate with the assessed custody level (*e.g.*, more staffing, supervision and structure in housing units for maximum custody people).
- **Consequences for Mid-Level Misconduct**: Developing a robust array of consequences for mid-level misconduct to address the Department's high rates of less serious violence (fights) and the ensuing uses of force.
- **Enhanced Restrictive Housing Program**: Developing a restrictive housing program model that provide safe living conditions such that the overarching goal of durable behavior change among those who commit serious violence can be realized.
- **Additional Housing Options**: The Department continues to have a critical need to develop additional program/housing options that address the risks and needs of those who engage in serious violence but are excluded from RESH due to mental health or physical conditions that contraindicate placement.[63]

[63] *See* Monitor's November 8, 2023 Report (dkt. 595) pg. 21; Monitor's November 30, 2023 Letter to the Court (dkt. 616) pg. 9; Monitor's April 18, 2024 Report (dkt. 706) pgs. 49-50; Monitor's November 22, 2024 Report (dkt. 802) pg. 35; Monitor's January 31, 2025 Report (dkt. 814) pgs. 24, 27; Monitor's January 13, 2026 Report (dkt. 947) at pgs. 70-71; and Declaration of James Austin dated March 19, 2024 (dkt. 689-9) at ¶ 28.

If well-designed and properly implemented, together, these strategies can provide a pathway forward that would reduce the use of force and enhance safety for both those in custody and staff.

## UPDATE ON WORK UNDERWAY RELATED TO LL42

The Department, RMT and MT continue to consider issues related to LL42. As the Monitoring Team has long emphasized, these efforts must be responsibly balanced against the larger effort to cure the constitutional violations at the heart of *Nunez*.[64] Any work to implement LL42 must be integrated into the inescapable realities of competing responsibilities and other priorities within the Department's operation.

### PILOT PROJECT DEVELOPMENT

The approach and goals of the pilot projects remain as described in the Monitor's April 23, 2026 Report at pgs. 13 to 15. Below are some interim updates:

- **Due Process Pilot Project**: The Department has closely coordinated with the MT on how to approach developing and managing the due process pilot project. To align with the recent reorganization of the Investigations, Intelligence and Accountability Division ("IIA"), the pilot project will be managed by the SDC of IIA, in consultation with the General Counsel of the Department and the DOC Legal team. To permit the Department to finalize IIA's reorganization and to coordinate and balance this work with competing priorities under the RAP and *Nunez* Court Orders, the work to advance the due process pilot will require additional time. The MT will work with the Department and RMT to devise a reasonable timeline.
- **Restrictive Housing Pilot Project**: As described in the Monitor's September 30, 2026 Report (dkt. 1006), the RMT has taken the lead in organizing this effort. For the past two

[64] *See* Monitor's November 22, 2024 Report (dkt. 802) at pgs. 36-39; Monitor's January 31, 2025 Report (dkt. 814); Monitor's July 16, 2025 Report (dkt. 883); January 13, 2026 Report (dkt. 947) at pgs. 71-75; January 14, 2026 Report (dkt. 949); Monitor's April 23, 2026 Report (dkt. 975); Monitor's June 17, 2026 Report (dkt. 984) at pgs. 50-53; and Monitor's September 30, 2026 Report (dkt. 1006) at pgs. 14-16.

months, key personnel from the RMT, Department, and MT have met weekly to conceptualize the project and to properly sequence the effort to ensure that the group's work is productive and efficient. To date, the group has focused on identifying an appropriate location for the pilot and outlining the various physical plant modifications that will be needed; determining the target population and flow of individuals into and through the pilot program; developing daily unit schedules that provide for the necessary mandated services and rehabilitative programming; identifying the rehabilitative programming curriculum and training needs; and considering the necessary security protocols (*e.g.*, search practices, movement, restraints, etc.).

**MT'S ANALYSIS AND FINDINGS RE: LL42**

Beginning in 2024, the MT has conducted significant analysis of LL42. The MT has provided guidance to the Department, met with the LL42 Parties and reviewed substantive materials they submitted, engaged extensively with the RMT, and provided the Court with at least five reports addressing LL42. Outlined below is a summary of the work completed and the findings made by the MT regarding the "Conflicting Provisions" of LL42[65]:

- **Relevant Provisions of the *Nunez* Court Orders**: The MT identified the relevant *Nunez* provisions that overlap and possibly conflict with LL42.[66] This analysis also outlined the relevant provisions that require the Monitor's approval and/or implicate the Monitor's duty to direct Department operations to ensure the relevant practices are aligned with the

[65] *See*, October 21, 2025 Second Amended Temporary Restraining Order (dkt. 923) at ¶ 4.

[66] *See* Monitor's April 23, 2026 Report (dkt, 975) at Appendix A as well as pgs. 1-2, 8-10. *See also*, Monitor's January 31, 2025 Report (dkt. 814) at pg. 5; Monitor's July 16, 2025 Report (dkt. 883) at pgs. 13-15; Monitor's January 14, 2026 Report (dkt. 949) at pgs. 4, 6-7, 8-9.

*Nunez* Court Orders. Upon the RM's appointment by the Court, this analysis also included the relevant provisions related to the work of the RM.

- **<u>Background and Input Sought on LL42</u>**: The MT provided a detailed explanation of the procedural background on LL42.[67] The MT also evaluated alternative program models[68] along with national and international standards for restrictive housing and solitary confinement.[69] The MT also collaborated with and sought input from the *Nunez* Parties and the Limited City Intervenors multiple times since the law went into effect.[70]
- **<u>Deviations from Generally Accepted Practice</u>**: The MT described the generally accepted practice in key areas of operations and how the LL42 provisions deviate from them, particularly regarding the law's provisions related to Out of Cell Time, Restrictive Housing, Restraints, De-Escalation, and Emergency Lock-In.[71] Further, the MT raised concerns regarding the elimination of managerial discretion in key areas, given that the absence of discretion would increase the risk of harm.[72]
- **<u>Concerns Regarding Impact on DOC Operations</u>**: The MT explained concerns about the impact of the Conflicting Provisions on DOC's operations in several key areas.[73]

---

[67] *See* Monitor's January 31, 2025 Report (dkt. 814) at pgs. 2-4, 58-60; and Monitor's January 14, 2026 Report (dkt. 949) at pgs. 1-4.

[68] *See* Monitor's January 31, 2025 Report (dkt. 814) at pgs. 22 to 28.

[69] *See* Monitor's January 31, 2025 Report (dkt. 814) at pgs. 15-28 and 35-36. *See also* Monitor's January 31, 2025 Report (dkt. 814) at Appendix C to Monitor's January 12, 2024 Letter for a detailed chart containing definitions of solitary confinement from various reputable sources.

[70] *See* Monitor's January 31, 2025 Report (dkt. 814) at pgs. 9-10; Monitor's July 16, 2025 Report (dkt. 883) at pg. 13; Monitor's January 14, 2026 Report (dkt. 949) at pgs. 4-5, 9; Monitor's April 23, 2026 Report (dkt. 975) at pgs. 9-11; Monitor's June 17, 2026 Report (dkt. 984) at pg. 50, 52-53; and Monitor's September 30, 2026 Report (dkt. 1006) at pg. 14.

[71] *See* Monitor's January 31, 2025 Report (dkt. 814) at pgs. 15-28, 39-40, 41-43, 49-50, 54-55; Monitor's April 23, 2026 Report (dkt. 975) at pgs. 10-11.

[72] *See* Monitor's January 31, 2025 Report (dkt. 814) at pgs. 7-9; Monitor's January 14, 2026 Report (dkt. 949) at pg. 1.

[73] *See* Monitor's January 31, 2025 Report (dkt. 814) at pgs. 29-40, 43-48, 50-53, 55-57.

- **Coordination by RMT & MT**: The MT and RMT have worked collaboratively and in coordination to evaluate LL42, described in the Next Steps section below.
- **Current Conditions that Substantially Impact the Department's Ability to Implement Certain LL42 Requirements**: The prospect of implementing LL42's requirements cannot be divorced from the current conditions in the jails. Serious deficiencies in multiple areas severely compromise the Department's ability to safely implement new practices. These include:
    - The ongoing high risk of harm in the jails, [74]
    - The limited expertise of staff at all levels in sound correctional practices,[75]
    - Ongoing staffing issues and insufficient and ineffective supervision of staff,
    - Poor management and high levels of violence in the existing restrictive housing program, which have stricter limits on individual's out of cell activity than contemplated by LL42.[76]
- The need to build the necessary predicates to improve operations and ultimately build the reform effort, including the development of pilot projects for restrictive housing.[77]

### NEXT STEPS

The Monitor and RM jointly believe that addressing the unconstitutional conditions in the jails must be DOC's top priority because they directly relate to the safety of all incarcerated

---

[74] *See* Monitor's January 31, 2025 Report (dkt. 814) at pgs. 5-6, 13-15; Monitor's April 23, 2026 Report (dkt, 975) at pgs. 4

[75] *See* Monitor's January 31, 2025 Report (dkt. 814) at pgs. 6-7; Monitor's January 14, 2026 Report (dkt. 949) at pg. 5; Monitor's April 23, 2026 Report (dkt, 975) at pgs. 4-5

[76] *See*, for example, the "Managing Behavior of People in Custody" section of this Report.

[77] *See* Monitor's January 14, 2026 Report (dkt. 949) at pgs. 5-6; Monitor's April 23, 2026 Report (dkt. 975) at pgs. 9, 13-15; Monitor's June 17, 2026 Report (dkt. 984) at pgs. 50-51,52-53; and Monitor's September 30, 2026 Report (dkt. 1006) at pgs. 14-16.

individuals, including but not limited to those in restrictive housing settings.[78] They are the foundation of the reform effort. The Conflicting Provisions cannot be implemented in any form without the operational foundation required by the *Nunez* Court Orders. The unconstitutional conditions that brought about the *Nunez* Consent Judgment simply cannot be safely addressed if the Department must simultaneously attempt to implement requirements for which it does not have a sufficient foundation to support.

DOC remains in a state of crisis, which demands that all stakeholders prioritize basic operational and security matters to better equip the Department to address the constitutional violations related to the risk of harm. The dangerous and unconstitutional conditions in the jails are disturbing. As outlined in the introduction of this report, the Department must prioritize an appropriate governance structure, reliable staff deployment, utilizing security practices consistent with sound correctional practice, and employing classification and housing operations that adequately address risk. The *Nunez* Court Orders and the RAP emphasize these priority areas of focus.

Work on the issues discussed above will continue in earnest, but it will be appropriately balanced with the critical need to focus on foundational matters underlying the ongoing dangerous conditions in the jails that present immediate risks of harm to incarcerated individuals and staff. Given the findings of both the MT and RMT, it is premature for the Monitor to approve,[79] or propose modification to, any new practices flowing from LL42. The Department

---

[78] *See* Monitor's January 14, 2026 Report (dkt. 949) at pgs. 7, 53, 56-57, 59, Monitor's April 23, 2026 Report (dkt. 975) at pgs. 2, 5-7, 11-12; Monitor's June 17, 2026 Report (dkt. 984) at pgs. 51-52; and Monitor's September 30, 2026 Report (dkt. 1006) at pgs. 15-16.

[79] Standard for Monitor approval is "With respect to provisions of this Agreement that require the Monitor's approval, the Monitor's approval shall not be unreasonably withheld. Mere disagreement as to how best to achieve compliance with the terms of the Agreement is not enough to withhold approval; such approval may only be withheld when the Monitor reasonably believes that the Department's proposal is not consistent with the terms of the Agreement or the purpose of the relevant provision(s) and the requirements set forth in such provision(s). The

does not have the necessary foundation to implement the Conflicting Provisions safely and any attempts to do so at this juncture would only distract from the critical work of developing the foundation needed to support further reform.

In terms of next steps, work will continue on the pilot projects as well as the priority areas of focus. The MT will issue a report on March 30, 2027 with updates on these critical issues, which will also be addressed in the Monitor's Report on the 23rd Monitoring Period, scheduled to be filed on May 26, 2027.

Monitor shall indicate in writing whether the Monitor approves the Department's proposal within 30 days of receiving the Department's proposal."

## IDENTIFYING AND ADDRESSING STAFF MISCONDUCT

Timely detection of staff misconduct and prompt, adequate responses to identified misconduct are essential to enable the Department to reduce the unnecessary and excessive use of force. In this section, the Monitoring Team provides an overview of the Department's progress toward improving investigations and the overall disciplinary process. This requires the Department to accurately and consistently: (1) identify misconduct when it occurs; (2) recommend proportional and effective responses to that misconduct; and (3) ensure the responses are imposed in a timely manner.

These accountability functions are discussed together because a holistic assessment is needed to determine the effectiveness of the accountability system. The discussion is informed by the Monitoring Team's qualitative assessments of hundreds of Rapid Reviews and investigations and relevant data about the various corrective actions imposed. The assessment does not assume that there is a "correct" number of cases in which a certain type of corrective action should or could have been taken but instead recognizes that accountability comes in many forms and varies in both quality and impact. With progressive discipline, corrective action may, for good reason, look different in its application across staff members.

Below, the Monitoring Team summarizes the main issues that impact the Department's efforts to identify and address staff misconduct and certain areas where incremental progress is evident.

### APPOINTMENT OF SENIOR DEPUTY COMMISSIONER FOR INVESTIGATIONS, INTELLIGENCE, AND ACCOUNTABILITY

In June 2026, the Remediation Manager appointed a Senior Deputy Commissioner for Investigations, Intelligence, and Accountability who reports directly to the Remediation Manager and oversees the Investigation Division ("ID," focused on use-of-force investigations), the

former Special Investigation Unit ("SIU," now integrated into ID),[80] the Correction Intelligence Bureau ("CIB"), the Trials and Litigation Unit ("Trials"), the Adjudication Unit, and the Informal Charges and Discipline Unit ("ICDU").

The current Senior Deputy Commissioner is a licensed attorney and has extensive experience in conducting and managing investigations, managing the accountability process, and with the *Nunez* reform effort. The SDC previously worked at DOC, serving as Deputy General Counsel and Deputy Commissioner of the Intelligence, Investigation, & Trials Divisions, as well as the Disciplinary Manager appointed in *Nunez*. As the Monitoring Team has previously reported, the current SDC is a strong, independent and highly competent leader with the qualities and expertise needed to fill this role and possesses a strong mastery of the core areas underpinning the *Nunez* reform effort and the creative thinking skills necessary to advance it.[81]

---

[80] For more information on the Special Investigation Unit, *see* Monitor's June 17, 2026 Report (dkt. 984) at Appendix N.

[81] *See*, for example, Monitor's December 22, 2021 Report (dkt. 435) at pg. 8.

## REORGANIZATION OF INVESTIGATIONS, INTELLIGENCE AND ACCOUNTABILITY DIVISION

The RM directed an important re-organization of the Investigation, Intelligence, and Accountability Division as demonstrated below:

**Re-Organization of Investigation, Intelligence & Accountability Unit**




The reorganization of the Investigations, Intelligence, and Accountability Division includes the following notable changes:

- **Integrated Investigation Process**: The reorganization integrates the investigative work of ID (which investigates use-of-force-related misconduct), SIU (which investigates non-use-of-force-related misconduct), and CIB (which gathers intelligence and conducts criminal investigations).
- **Integrated Accountability Process**: The reorganization brings all of the functions related to accountability in one Division, but with separate and distinct units, including the Adjudication Unit (which adjudicates infractions against people in custody), the Trials Division (which imposes formal discipline against staff), and ICDU (which imposes Command Disciplines ("CDs") against staff).
- **Early Intervention Support System ("E.I.S.S.")**: E.I.S.S. now reports under this vertical, which creates a natural partnership and collaboration between the function and

goal of this unit and the overarching work of the Division to identify and prevent misconduct.

- **Training and Data Management**: The newly constituted Division includes dedicated leadership and staff for training and managing data related to all Division functions.

### Plan for the Next Year

The reorganization includes plans for additional staffing resources, both uniformed and civilian, to support the work of the new Division. Necessary next-steps, which are underway, include posting positions for hire, recruiting and interviewing candidates, and hiring additional staff at all levels.

The SDC has also set out priority areas of focus concurrent with the first Remediation Action Plan 10.1. This work, some of which will likely extend beyond the first year of work, includes:

- Implementing appropriate internal coordination among the individual units as part of the overarching restructuring of the Investigations, Intelligence and Accountability Division.
- Improving coordination with the external agencies responsible for criminal review and/or prosecution of DOC cases.
- Developing a process for criminal referrals of cases from DOC to relevant prosecutors in which DOI may decline to refer the case for prosecution.
- Enhancing the quality and timing of ID's investigations of use of force incidents.
- Evaluating the CD policy and *Nunez* Disciplinary Guidelines to ensure that the documents are internally consistent and support the Department's obligation to impose appropriate and meaningful discipline. As part of this evaluation, recommendations for

potential revisions of the CD Directive or *Nunez* Disciplinary Guidelines may be developed.

- Exploring the development of a Department-wide disciplinary matrix.
- Evaluating potential alternatives to expedite adjudication of disciplinary matters, including, but not limited to, initiatives to resolve cases outside of the OATH process.
- Developing a process to permit DOC to conduct administrative disciplinary proceedings, as appropriate, during the pendency of criminal proceedings.
- Enhancing the practices, staffing and leadership of the Correction Intelligence Bureau.
- Developing a set of relevant data points to track compliance with the *Nunez* requirements that can be routinely shared and reviewed by key stakeholders.

**CASEBUILDER**

During this Monitoring Period, the Department introduced a new case management platform, CaseBuilder, to support multiple Divisions and improve data quality and efficiency in investigations.[82] CaseBuilder went live in April 2026 and is now in use by ID, Trials, and ICDU.[83] Staff from these Divisions were trained prior to implementation. CaseBuilder is now the primary software for entering investigation materials and drafting investigation reports, as well as disciplinary materials and draft disciplinary paperwork. CaseBuilder is also used to manage and track the investigation and disciplinary processes.

---

[82] Given the scope of the initiative, the planning, development, and eventual rollout of this platform took many years. Department stakeholders and CaseBuilder staff repeatedly engaged the Monitoring Team throughout the development and planning. The rollout of this platform faced numerous delays, given the complexity, testing, and training conducted by the vendor. *See* the Monitor's May 22, 2025 Report at Appendix I, pg. 316, the Monitor's January 13, 2026 Report at Appendix I, pg. 467, and the Monitor's June 17, 2026 Report at Appendix I, pg. 333.

[83] IT is working to develop and rollout the platform to additional Divisions, as described in Appendix I of this report.

This large-scale transition affected multiple Divisions responsible for various *Nunez* initiatives. The transition required significant time, attention, and resources to train staff and ensure mastery of the new software. The transition resulted in delays to the work of certain Divisions, such as ID,[84] as staff acclimated to the new processes. However, by summer 2026, the Department reported that most staff had adjusted to the new platform and that workflow efficiency was improving.

During the transition, technological issues and staff adjustment challenges resulted in modifications and some delays in the production of information that the Department routinely produces internally and for the Monitoring Team. IT has worked with the various Divisions and CaseBuilder staff to address technological issues as they arise. Many of the issues have been resolved, but a few technological issues persist, and new issues continue to arise. The Department reports it will continue to improve the system as users identify additional issues and needs.

**Identifying Use of Force-Related Misconduct**

The Department conducted thousands of incident reviews and investigations during this Monitoring Period. Facility leadership completed Rapid Reviews for 3,406 use of force incidents, and ID completed intake investigations for 3,384 use of force incidents and Full ID investigations for 342 use of force incidents.

The Department has a reasonable foundation for identifying misconduct through a combination of Rapid Reviews conducted by facility leadership a few days after an incident

[84] This is discussed in the compliance assessment for Consent Judgment § VII, ¶ 1, § VII, ¶ 9(a)) & § VII, ¶ 11, Investigations of Use of Force Incidents.

occurs[85], *ad hoc* reviews of use of force incidents by Department leadership, investigations conducted by ID via an initial Intake Investigation conducted within 30 days of the incidents and Full ID Investigations for those cases that merit additional scrutiny and investigation. During this Monitoring Period, a few of these procedures were modified and/or improved.

- **Rapid Reviews**: The revised Rapid Review process was rolled out Department-wide at the end of the last Monitoring Period. When assessing an incident, the revised process requires facility leadership to evaluate additional information and provide additional detail in their summaries.[86]
- **ID Investigations**: Investigation quality continues to improve. The backlog of investigations continues, but reasonable efforts are underway to eliminate it. During this Monitoring Period, ID completed the full roll-out of the streamlined process for case intake and now categorizes cases based on incident severity and the required level of investigative scrutiny, as illustrated in Appendix N and discussed in detail in the Monitor's June 17, 2026 Report (dkt. 984) at Appendix O. The Monitoring Team's assessment of the new process so far is that it supports a more efficient allocation of staff resources so that greater scrutiny can be applied to those cases where needed and efficiently manages cases that can be addressed more quickly. The Monitoring Team has found that investigation quality continues to improve, and investigation reports are more succinct and easier to follow. However, further improvements to both the quality and

---

[85] Rapid Reviews are also referred to as "Use of Force Reviews" by the Department, but the moniker Rapid Reviews will continue to be used in this report.

[86] The new process is illustrated in Appendix N and discussed in detail in the "Facility Use of Force Reviews" compliance assessment for First Remedial Order § A., ¶ 1. The Monitoring Team cautions that the new process must be closely monitored to ensure that the expanded reviews actually improve the quality of the assessments and do not delay the initiation of corrective actions.

timing of investigations remain necessary. This is discussed in more detail in the "Investigations of Use of Force Incidents" compliance assessment for Consent Judgment § VII., ¶ 1, § VII., ¶ 9 (A)) & § VII., ¶ 11.

- **Use of Force Review Committee**: Between March and June 2026, the Department established a Use of Force Review Committee consisting of leadership from the Investigations Division, uniformed leadership from the Office of Security and Facility Operations (*e.g.*, the Chief of Department or Assistant Chief), the Strategic Operations Division, Office of Management Analysis and Planning, the Training and Development Division, the Trials Division, the *Nunez* Compliance Unit, the Legal Division (including the *Nunez* Manager), and the Policies and Procedures Unit. The purpose of the Committee is to identify, increase awareness of, and address operational and management issues through routine collaboration among these key Department stakeholders. The Committee discusses select use of force incidents that illustrate a variety of issues (*e.g.,* ongoing patterns/trends, concerning policy violations, potential policy revisions, training needs, concerns identified by the Monitoring Team). For example, the group revised the definition of "avoidable uses of force";[87] modified the timeframes to complete Rapid Reviews to ensure appropriate oversight; revised the submission timeframe for CDs to address an inadvertent loophole in the policy; and worked to improve coordination among ID, Trials, and the facilities when issuing formal charges for misconduct,

[87] As discussed in the compliance assessment for First Remedial Order § A, ¶ 1, "Facility Use of Force Reviews," this definition was developed in consultation with the Monitoring Team and is expected to be implemented in the next Monitoring Period. The agreed-upon definition states, "A Use of Force that likely could have been prevented but for one or more of the Contributing Factors." The Contributing Factors are categorized into five groups – supervision, security, conflict resolution alternatives and de-escalation techniques for anticipated uses of force, professionalism, and escort procedure. Each of these five groups list a number of specific contributing factors, as well as an "other" option to capture unique factors not otherwise enumerated.

addressing body worn camera and minor procedural violations for probationary staff, preserving sufficient video evidence for all incidents resulting in disciplinary action for staff, and improving coordination among the facilities and ID when reclassifying use of force injury levels that investigations determined were incorrect. The Committee also discussed, but did not resolve, issues related to improving the quality of Corrective Interviews and addressing Monitoring Team feedback on ID's categorization process of use of force incidents.

The Use of Force Committee appeared to be a promising initiative, but following the end of the Monitoring Period, the Committee stopped meeting.[88] The Monitoring Team encourages the Department to resume these meetings or another similar forum to work through the various interdivisional operational issues that need to be addressed in order to advance the *Nunez* reforms.

**ADDRESSING STAFF MISCONDUCT**

The Department responds to a significant volume of staff misconduct in a variety of ways, including suspensions, modifying staff assignments, re-training, counseling/corrective interviews, CDs (which can range from corrective interviews/verbal reprimands, re-training, to the relinquishment of days), and formal discipline (which may include the relinquishment of time off, demotion, or termination). This is discussed in more detail in the compliance assessments for "Timely, Appropriate and Meaningful Accountability" compliance assessment for Consent Judgment § VIII., ¶ 1 & § VIII., ¶ 3 (c); the "Immediate Corrective Action & Monitor Recommendations" compliance assessment for First Remedial Order § C., ¶ 1 & § C., ¶ 2; and

[88] The Use of Force Committee stopped meeting amidst the Department's overall change in organizational structure. It appears the meetings ended because there was no designated leader of the meetings to ensure they continued to occur.

the "OATH Proceedings" compliance assessment for First Remedial Order § C. ¶ ¶ 4 and 5 and Third Remedial Order, ¶¶ 2 and 3.

Taken together, the Department imposes a significant amount of discipline each year in response to the substantial volume of staff misconduct that continues to occur. The table below details the type and frequency of discipline imposed for use-of-force- related misconduct during the 22nd Monitoring Period.

| **Form of Discipline** | **Jan.-Jun. 2026** |
|---|---|
| Corrective Interviews and 5003 Counseling | 2,518 |
| Corrective Interviews (resulting from CDs) | 25 |
| CD – Reprimand | 63 |
| CD resulting in 1-10 days deducted | 409 |
| Suspension | 39 |
| Modified Duty or No Contact w/ Incarcerated Individuals | 12 |
| Personnel Determination Review | 43 |
| Negotiated Plea Agreement | 223 |
| **Total** | **3,332** |

Corrective action taken in response to misconduct can reasonably take different forms, based on aggravating and mitigating factors. However, the Department's responses to misconduct remain both protracted and inconsistent.

DOC certainly identifies many policy violations, but as noted above, it does not identify all such violations and often focuses on the least egregious issues. While DOC does respond with corrective action, problems in the Department's overall response to misconduct remain:

- Ineffective, inconsistent, unreliable, and protracted processes.[89]

[89] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pg. 58.

- Efforts to guide staff practice via corrective interviews and counseling sessions are ineffective.[90]
- Supervisors are not held accountable for their failures to properly supervise their subordinates or for their direct involvement in use-of-force-related misconduct.[91]
- The CD Process has not been implemented with fidelity.[92]
- Formal Discipline has improved in certain ways but constitutes a small proportion of accountability.[93]

DOC leadership and staff continue to express concern that staff are being "over-disciplined," but, as noted above, the available data does not support such a contention. There is no evidence that corrective action has been taken when it should *not* have been. This description by DOC leadership that the current accountability process reflects "over discipline" is not only inaccurate but also seriously undermines and dilutes the efficacy of the work underway. The Monitoring Team continues to strongly recommend that the Department while making the necessary efforts to enhance the investigative and disciplinary processes to ensure consistency and reliability of discipline, also address these staff perceptions directly in order to gain staff buy-in. The Department should use objective, factual information to explain the basis of any discipline being imposed including why it is necessary and how it is intended to improve staff practice, reinforce standards, and support safer practices.

The reorganization and integration of the various components of the staff disciplinary system, coupled with the caliber of current Division leadership, hold promise for addressing

[90] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pgs. 57-58.

[91] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pg. 58.

[92] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pg. 59.

[93] These concerns were described in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pg. 59.

these issues. However, such promise will only be realized through sustained attention to addressing the underlying dynamics contributing to each long-standing problem.

## CONCLUSION AND NEXT STEPS

The Department has continued its incremental progress toward timely accountability and discipline for staff misconduct. Misconduct is identified somewhat more reliably, and the timeliness and quality of use of force investigations are being systematically improved under the current leadership of the Division. The Department implemented its new investigatory process, which should reduce backlogs and shorten investigation timeframes so that discipline can be imposed more quickly. These initiatives are critical and address longstanding recommendations from the Monitoring Team. The SDC's appointment in conjunction with her leadership team and reorganization of the investigation/accountability systems should create a solid foundation for accelerated progress, but significant work remains.

The Department must still improve its efforts to reliably identify all misconduct and accountability must become both consistent and reliable, particularly for Supervisors, which heretofore have not been adequately held accountable. CDs must be better managed to avoid dismissals due to error, and the overall process to impose formal discipline must become more timely. The Monitoring Team also continues to recommend that DOC must improve the quality of staff counseling sessions. The Department must also directly address staff misperceptions about the accountability system and take appropriate steps to counter this inaccurate and undermining narrative.

Concerningly, while the number of corrective actions imposed have increased in number, these actions have not served to improve staff practice, raising serious questions about the efficacy and substance of the disciplinary process as it currently operates. The Department has

not yet brought *all* the components of accountability— reliable and consistent identification of misconduct, proportional and effective responses, and timely imposition of those responses— to a level sufficient to create a robust accountability framework, and the misperception, apparently being embraced by the Department and staff, that staff are being “overly disciplined” continues to further undermine the disciplinary process.

## DEATH OF PEOPLE IN CUSTODY

A key indicator for assessing trends in facility safety is deaths in custody. The critical question is whether adequate security and operational practices were in place to prevent the death.[94] The Monitoring Team's assessment of the objective evidence surrounding deaths in custody (or shortly after release) in 2025 and 2026 continues to reveal that longstanding security and operational lapses identified in DOC practices appear to contribute to almost all deaths in custody.[95]

### DOC'S MORTALITY RATE AND OBJECTIVE EVIDENCE OF DEATHS

The number of in-custody deaths and their causes, between January 2015 and October 15, 2026, are presented in Appendix D, Table 1. The mortality rates have fluctuated throughout the past 15 years (ranging between ~0.5 and ~2.0) but reached an all-time high in 2022 (3.37). Additional information regarding in-custody deaths can also be found in Appendix D, including: Causes of Death (Table 1), Mortality Rates (Table 2), Investigations of In-Custody Deaths (Table 3), and Corrective Actions Taken by DOC related to In-Custody Deaths from 2022 to 2026 (Table 4).

### SUMMARIES OF DEATHS IN CUSTODY IN 2026[96]

Below is a brief summary[97] of each death occurring in-custody or shortly after release from January 2026 to the date of this report:

---

[94] The Department and other external agencies, including the NYS Attorney General, State Commission of Correction, the Department of Investigation, and NYC Board of Correction investigate each death in custody.

[95] A detailed description of these issues is included in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 79-84.

[96] The Board of Correction released a report on 2026 deaths in custody on September 25,2026. *See* https://www.nyc.gov/site/boc/reports/board-of-correction-reports.page

[97] All deaths are currently under investigation by external agencies and/or the Department of Correction. The causes of death for some individuals remain pending with the Office of the Chief Medical Examiner of the City of New York.

- **Barry Cozart.** On March 25, 2026, Mr. Cozart was found unresponsive in his cell in a housing area at GRVC during morning mail distribution. Staff initiated CPR and a medical emergency response, but Mr. Cozart was later pronounced deceased. The Monitoring Team's review of housing area video during the 24 hours preceding the incident showed that the unit operated with little to no effective supervision, with incarcerated individuals moving freely throughout the housing area and opening cell doors, including during overnight lock-in hours. The video also showed repeated superficial tours by staff and supervisors throughout the night where they did not address any of these behaviors. Mr. Cozart was last observed entering his cell shortly before overnight lock-in (approximately 9:00 p.m.) and was not discovered until approximately 11:00 a.m. the following day. Body-worn camera footage showed staff finding Mr. Cozart unresponsive on his bed with blood visible on the bedding and blood coming from his mouth during resuscitation efforts. The area supervisor and B post officer were both suspended for 30 days for inefficient performance of duties and perfunctory tours. The Office of the Chief Medical Examiner of the City of New York ("OCME") determined the official cause of death to be acute intoxication by the combined effects of methadone and gabapentin. Investigation into the incident is ongoing.
- **John Price.** On March 29, 2026, Mr. Price died at Elmhurst Hospital after experiencing a medical emergency while housed at EMTC. According to the Department, Mr. Price had recently been transferred from NIC to EMTC as part of a housing area consolidation. Two days prior to his death, he reportedly complained of chest pain and shortness of breath and was transported from EMTC via EMS to the hospital, where he subsequently passed away. The Department reported that Mr. Price had an extensive medical history.

Mr. Price was 49 years old and had been in custody since December 18, 2024. OCME determined the official cause of death to be influenza B pneumonia with superimposed methicillin-resistant staphylococcus infection. The Department did not take any immediate corrective action with any staff involved in the incident, but the investigation is still pending.

- **Rajpattie Ramkellawan.** On May 18, 2026, Ms. Ramkellawan experienced a medical emergency in a housing area at RMSC after reportedly appearing altered and unwell during the period before the incident. The Board of Correction reported that video from the evening from the night before on May 17 showed Ms. Ramkellawan crushing and snorting a substance she received from another individual. Video appeared to show another incarcerated person sharing unknown substances with others in the unit. The sharing of these substances appeared to go unnoticed. The Board also found that the officer posted on the unit left the post several times and did not consistently conduct the required tours in a meaningful manner. Statements from incarcerated individuals indicate that Ms. Ramkellawan had been taking or seeking pills, may have taken methadone and/or other medication, was throwing up, and was "not right" that evening. On the morning of May 18, body-worn camera footage captures staff and incarcerated individuals attempting to wake Ms. Ramkellawan at approximately 10:00 a.m. The video showed she appeared unresponsive and discolored, and individuals reported that she was foaming at the mouth. Staff deployed Narcan, called a medical emergency, and began chest compressions before medical staff arrived and took over treatment. The video showed medical staff then removing her from the housing area on a gurney. OCME found the official cause of death to be undetermined but listed possible intoxication of an

unknown type. The Department did not take any immediate corrective action with any staff involved in the incident, but the investigation is still pending.

- **Umais Khan.** On May 19, 2026, Mr. Khan was found unresponsive in his bed in a dorm area at EMTC after other incarcerated individuals attempted to wake him. Body-worn camera footage shows staff responding at approximately 10:55 a.m. Incarcerated individuals stated that Mr. Khan had a pulse, and Narcan was administered. Staff then began chest compressions. Medical staff arrived about five minutes later and began treatment, which continued for approximately twenty minutes. According to the reports, several incarcerated individuals reported that Mr. Khan had been feeling sick the night before and was taking medication for a medical condition. The Department reported that the officer involved was suspended because his tours were not meaningful and because he temporarily left his post without authorization early in the morning to bring another incarcerated individual to court. OCME determined the official cause of death to be an undetermined "sudden death during sleep." Investigation into the incident is ongoing.
- **Julian Pagan.** On July 24, 2026, Mr. Pagan, age 29, died at Lincoln Hospital after being found unresponsive in a holding pen at the Bronx Hall of Justice, where he had entered DOC custody directly from court earlier that day. Video showed that Mr. Pagan fell from a bench at approximately 4:55 p.m. and remained on the floor without moving until an officer attempted to rouse him at approximately 5:26 p.m. Staff entered the holding pen approximately three minutes later, administered two doses of Narcan, began chest compressions, and applied an AED before EMS arrived and assumed treatment. Mr. Pagan was transported to Lincoln Hospital and pronounced deceased at 6:37 p.m. The Department's initial review identified discrepancies in tours and logbook entries, as well

as a failure to activate a body-worn camera. The official cause of death remains pending with the OCME. The Department did not take any immediate corrective action with any staff involved in the incident, but the investigation is still pending.

- **Christopher Rodriguez.** On August 19, 2026, Mr. Rodriguez was found unresponsive in his bed in the Outposted Therapeutic Housing Unit at Bellevue Hospital after another incarcerated individual alerted staff at approximately 8:18 a.m. Medical staff initiated resuscitation efforts, but Mr. Rodriguez was pronounced deceased at approximately 8:39 a.m. A review of housing area video showed the open use of unknown substances by several incarcerated individuals the preceding evening, including Mr. Rodriguez repeatedly using his identification card to arrange powder on his tablet and snorting it, as well as drinking unidentified liquids shared by others. He laid down in his bed at approximately 8:00 p.m. and was not discovered until the following morning, when he was found unresponsive. According to the Department's initial investigation, the Medical Examiner preliminarily estimated that he had died approximately seven hours before discovery. The Department's review identified failures to conduct meaningful tours and inaccurate logbook entries. Six officers received 30-day suspensions, a captain received a 24-day suspension for inefficient performance of duties, and an Assistant Deputy Warden was suspended for false reporting. The substances Mr. Rodriguez ingested remain under investigation, and the official cause of death remains pending with the OCME. Investigation into the incident is ongoing.
- **Clarence Woodward.** On August 25, 2026, Mr. Woodward was found unresponsive in his cell at RNDC, slumped on the floor with his head resting on the toilet. A review of housing area video revealed multiple unsecured cell doors, incarcerated individuals freely

entering and exiting one another's cells, and the B-post officer spending prolonged periods in the A station rather than supervising the housing area. The officer's initial tours were sporadic and superficial, and then ceased completely at approximately 2:30 a.m. At approximately 4:45 a.m., an incarcerated individual distributing breakfast alerted the officer to Mr. Woodward's cell. The officer looked inside but returned to the A station and did not open the cell until approximately 5:00 a.m. Staff did not begin administering Narcan and chest compressions until an Assistant Deputy Warden arrived approximately 10 minutes later. Medical staff subsequently arrived and Mr. Woodward was pronounced deceased at approximately 5:40 a.m. Body-worn camera captured significant stiffness in his body and medical personnel stating that he appeared to have been deceased for several hours. A responding Urgi-Care physician reported that facility staff delayed his arrival by providing directions to the housing unit rather than an escort. The B-post officer received a 30-day suspension for failure to tour and inefficient performance of duties. Numerous pills were recovered from Mr. Woodward's cell, but their source and role in his death remain under investigation. OCME determined the official cause of death to be acute synthetic cannabinoid intoxication. Investigation into the incident is ongoing.

- **Luis Albert Lopez Castillo**. On September 16, 2026, Mr. Lopez Castillo, 20, was found hanging from the bars of a holding pen at Queens Courts at approximately 6:38 p.m., with an institutional shirt tied around his neck. He was wearing enhanced restraints, including waist chains, leg restraints and a mitt on his left hand, while his right hand was free. The Department's preliminary investigation found that the assigned officer left the post without ensuring he was properly relieved and was absent for at least two hours

before Mr. Lopez Castillo was discovered. Camera coverage of the holding area was limited. A review of body-worn camera footage showed that the officer who discovered Mr. Lopez Castillo did not immediately cut him down but instead called for a captain. Upon the captain's arrival, staff cut Mr. Lopez Castillo down, removed his restraints, began chest compressions and applied an AED. Medical personnel subsequently responded, and Mr. Lopez Castillo was transported to Jamaica Hospital, where he was pronounced deceased at approximately 7:54 p.m. The assigned officer received a 30-day suspension for being off post, and investigators are continuing to examine supervisors' actions and whether additional discipline is warranted. OCME determined the official cause of death to be hanging. Investigation into the incident is ongoing.

- **Cesar Medero Curet**. On November 10, 2026, Mr. Medero Curet was found unresponsive in his bed in an RNDC dorm when staff went to wake him in the morning for his shift as a pantry worker. DOC and medical staff initiated resuscitation efforts, but Mr. Rodriguez was pronounced deceased at approximately 6:03 a.m. DOC reported that an initial review of housing area video footage showed several incarcerated individuals, including Mr. Medero Curet, exchanging and ingesting unknown substances throughout the preceding afternoon and evening, as well as hiding and retrieving unknown items repeatedly in the pantry. Mr. Medero Curet laid down in his bed at approximately 9:00 p.m. Multiple staff and incarcerated individuals reported that they heard Mr. Medero Curet snoring unusually and loudly throughout the night, but that the snoring stopped hours before Mr. Medero Curet was identified as unresponsive. The Department's initial review of the incident identified failures by staff to conduct meaningful tours and potential inaccurate logbook entries. The assigned housing unit officer was suspended for

30 days, and the meal relief officer was suspended for 15 days. Investigation into the incident is ongoing, and the official cause of death remains pending with the OCME.

**Joint Action Reviews ("JARs")**

In 2016, Correctional Health Services established and began to regularly convene the Joint Assessment and Review committee with the Department of Correction. The JAR meetings are generally expected to occur two, seven, and 30 business days following a death, and relevant delegates from the Department, CHS leadership, and the Law Department attend. The initial review focuses on sharing immediately available information and identifying necessary immediate remedial measures, while subsequent reviews focus on sharing additional findings, whether additional remedial measures are necessary, and assessing the status of corrective actions, to the extent they have been taken. Dr. Tim Belavich, a qualified expert in the prevention of and response to self-harm in correctional settings, provided recommendations to enhance the process as described in the Monitor's April 3, 2023, Report at pgs. 69–70. Some have been adopted while some remain outstanding.

The JAR meetings provide an important opportunity to assess both the circumstances of an individual's death as well as broader deficiencies in security, operational, and health care practices. Recent meetings have identified concerns regarding medical screening for individuals entering custody directly from court, supervision and post coverage, camera availability, and the quality of emergency medical responses. These discussions illustrate the value of a multidisciplinary review that considers how the agencies work together and where gaps may exist. However, the process's effectiveness depends on consistent participation by both agencies, timely access to relevant information, and sustained follow-through on identified corrective

actions. Identifying concerns and discussing potential remedies are necessary steps, but the process must also ensure those concerns lead to concrete changes in practice.

In fall 2026, the Department and CHS worked together to enhance the JAR process. In particular, DOC and CHS reported that they wanted to streamline information exchange and make discussions more meaningful. To that end, they also revised the timing of JARs to balance the need for timely meetings and ensure relevant information is available before those discussions. Further, they developed a more streamlined process to track information discussed during the JARs and any potential remedial measures. The Monitoring Team's initial review of meetings utilizing the new process suggests that the information exchange has become more meaningful.

**INCIDENTS OF SELF-HARM AND DOC'S EFFORTS TO ADDRESS ACTS OF SELF-HARM**

The Monitoring Team has long raised concerns about staff response to self-harm incidents. The Monitoring Team's extensive review of incidents has identified patterns where staff utilize harmful interventions (*e.g.*, OC spray) or intentionally ignore or fail to intervene in suicide attempts or events where individuals attempt to harm themselves (*e.g.*, head banging).[98] Three illustrative examples of such incidents were provided in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 527-538. These problematic practices continue.

. In late 2023, the Monitoring Team provided the Department with feedback on recurring deficiencies in staff responses to self-harm, including failures to intervene promptly, failures to maintain continuous observation during and after an attempt, failures to remove materials that

[98] The fact that such patterns exist does not mean that staff always act inappropriately. For example, DOC provided the Monitoring Team with an example from this Monitoring Period in which it reported that the Department awarded a staff member a medal for their quick response to an individual's act of self-harm which protected the individual from further harm.

could permit further self-harm, and failure to adequately coordinate with clinical staff.[99] Nearly three years later, the Department has not addressed these concerns

In 2024 and 2025, the Monitoring Team also provided feedback on the use of chemical agents during self-harm incidents the Department's broader overreliance on chemical agents, including in situations where staff could safely use de-escalation or other interventions. In response, the Department revised its Chemical Agents Directive in 2025 to prohibit the use of OC spray when a person is attempting to hang themselves with a ligature around the neck attached to another object. However, the Monitoring Team continues to identify incidents in which staff use OC spray in these circumstances. Staff overreliance on chemical agents also remains a recurring concern, particularly when staff use OC spray as a first response to self-harm and delay rendering aid.DOC reports that the Suicide Prevention Task Force, an interdisciplinary group comprised of CHS and DOC staff, holds meetings bi-monthly. The Self-Inflicted Harm Subcommittee meets on an *ad hoc* basis at the request of CHS Mental Health to review incidents involving self-injurious behavior.[100] The Department reports that it attempts to provide annual suicide prevention training to DOC uniformed staff, and enhancements to joint DOC-CHS training are ongoing.

Dr. Belavich provided a list of recommendations regarding self-harming behavior in his 2024 report[101] pursuant to the August 10, 2023 Court Order (dkt. 564), § I, ¶ 14. The Department reports it intends to address the report's recommendations. The information provided by the Department to date is insufficient to determine the status of implementation and what, if

---

[99] *See,* Monitor's June 17, 2026 Report (dkt. 984) at pgs. 66-68.

[100] DOC reported that the Self-Inflicted Harm Subcommittee met at a near-weekly tempo in prior years, but now only meets on an *ad hoc* basis.

[101] A copy of his final report was filed with the Court on March 19, 2024 as Exhibit A to the Saunders Declaration (dkt. 689-12).

anything, has actually been implemented. The Monitoring Team has requested follow-up information, but it has not been provided. The Monitoring Team continues to strongly encourage the Department and CHS to renew their focus on implementing Dr. Belavich's recommendations, including clear ownership of responsibilities, identifying specific deliverables and deadlines, centralized tracking of corrective actions, and verification that the substance of each recommendation has been implemented.

While the Department has taken some steps to improve its practices in abating and addressing self-harm, significant work remains.

**CONCLUSION**

The deaths of people in DOC custody are tragic and continue to expose the serious consequences that occur when basic security, supervision, and correctional health practices break down. Several of these tragic events involved suspected self-harm, apparent use of drug-related contraband, and significant security failures, including deficient tours, staff being off post, uncontrolled movement, and delayed emergency response.

Preventing deaths in custody requires improvements in the Department's core security operations and health care. This includes meaningful supervision, effective contraband control, reliable tours, and continuous post coverage. Further, enhanced collaboration between DOC and CHS is essential to support the care of incarcerated individuals, to improve prompt identification of people in distress, and improve emergency response times. The Department must also ensure that deficient practices identified through its reviews of in-custody deaths and self-harm incidents result in concrete corrective action that is tracked, implemented, and sustained.

## UPDATE ON THE 2023 *NUNEZ* COURT ORDERS

This section provides an update on the Department's work related to five of the Court Orders entered in 2023.[102] Collectively, these Orders were intended to catalyze improvement in the Department's management of the various requirements, its work with the Monitor, and its efforts to address fundamental security, reporting, and management practices to bring about immediate relief from the ongoing risk of harm faced by incarcerated individuals and staff.

### JUNE 13, 2023 ORDER (DKT. 550)

- **Transparency, Consultation, and Collaboration**

Following repeated issues with lack of transparency and candor, the Court entered an Order on June 13, 2023 regarding the City's and Department's obligation to work transparently and diligently and collaborate in good faith with the Monitor and his team, including providing relevant information as requested and notifying the Monitor of serious incidents in the jails, including deaths in custody. This is critical to the reform effort. More information about the Department's consultation and collaboration with the Monitoring Team can be found in the "Reform Under the *Nunez* Court Orders" section of this report.

- **Managing the *Nunez* Reform Effort**

Despite the issues raised regarding transparency and candor, the Monitoring Team acknowledges and appreciates that the Department engages with the Monitoring Team routinely and provides a significant volume of information in response to the Monitoring Team's requests. Further, the Department has promptly notified the Monitoring Team of all deaths in custody.

[102] These five orders are the June 13, 2023 Order (dkt. 550), August 10, 2023 Order (dkt. 564), October 10, 2023 Order (dkt. 582), December 14, 2023 Order (dkt. 656), and December 20, 2023 Order (dkt. 665).

The *Nunez* Manager remains in place, but her team and others (including the *Nunez* Compliance Unit, Strategic Initiatives, and the Legal Division) still do not appear to have sufficient resources to facilitate the Department's and Monitoring Team's work to advance the reform. As discussed throughout this report, an array of Court-ordered requirements, including policy development and practice changes, continue to languish, sometimes for years, and a significant number of the Monitoring Team's requests for information remain outstanding for extended periods of time, including information that the Department reportedly maintains during its ordinary course of business and thus should be straightforward to produce. The Department's ongoing failure to keep pace with the flow of information needed to both advance practice changes and support the Monitoring Team's duty to keep the Court apprised of the Department's progress suggests that current staffing levels in critical divisions are inadequate and additional resources are needed. These resource needs are further heightened given the appointment of the Remediation Manager, whose team also relies on the *Nunez* Manager as part of their work.[103]

**AUGUST 10, 2023 ORDER (DKT. 564)**

The Court entered an Order on August 10, 2023 to address several critical items needed to reduce the imminent risk of harm. The Order required the Department to prioritize these actions as other remedial relief was being contemplated. These steps were intended to be immediate, *interim measures* to ensure a proper focus and pace for initiatives that have direct bearing on the imminent risk of harm.

- **Use of Force, Security and Violence Indicators (§ I, ¶ 1)**: An update on the current status of these meetings and the corresponding data dashboard is provided in the

[103] The First Remediation Action Plan, Action Step 16 requires DOC to produce ongoing assessments of any additional resources, including personnel, needed to comply with the *Nunez* Court Orders and Remediation Action Plan, and also directing the City and DOC to procure those additional resources upon approval by the Remediation Manager.

compliance assessment of the First Remedial Order, § A, ¶ 2, Facility Leadership Responsibilities in this report.

- **Revised Search Procedures (§ I, ¶ 2)**: This is addressed in the compliance assessment for Action Plan § D, ¶ 2(d) & (e), Searches and Identify/Recover Contraband.
- **Revised Escort Procedures (§ I, ¶ 3)**: This is addressed in the compliance assessment for Action Plan § D, ¶ 2(f), Escort Procedures.
- **Lock-in and Lock-out Procedures (§ I, ¶ 4)**: Table 11 of Appendix C demonstrates evening lock-in is now better managed than it was in late 2023, with nearly all lock-ins being completed within one hour of the designated time.[104] However, incidents among incarcerated individuals continue to occur after lock-in is supposedly complete, suggesting that cells are not actually secured or people are not remaining on their dorm beds as required during lock-in. While it is an improvement that lock-in is occurring, the purpose of lock-in is to promote safety and security by ensuring that incarcerated individuals remain locked in their cells or on their dorm beds overnight such that these incidents do not occur. Unfortunately, that still is not occurring as it should be.
- **Control Station Security (§ I, ¶ 5)**: The Department is required to revise and implement a protocol to ensure the Control Station Door is properly secured pursuant to the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 5. Despite the Monitoring Team recommendations, the Department has not issued any policy or plan to improve staff practices beyond the issuance of a teletype in October 2023 reminding staff of their

[104] In late 2023, the Department began to focus on properly implementing the evening lock-in (9:00 p.m.) and consulted with the Monitoring Team on its plans as required by the Court's August 10, 2023 Order § I, ¶ 4. The Department elected to focus first on the 9:00 p.m. lock-in before addressing compliance with the 3:00 p.m. lock-in. On October 31, 2023, the Department issued a teletype articulating the requisite procedures and required each facility to devise a lock-in plan.

obligation to secure the control station doors. Accordingly, there are no new updates beyond those provided in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 180-181.

- **Staff Off Post (§ I, ¶ 6)**: This is addressed in the section "Department's Findings Regarding Problematic Uses of Force and Security Practices" of this report.
- **Special Teams Training (§ I, ¶ 7)**: This is addressed in the compliance assessment for First Remedial Order § A., ¶ 6, Facility Emergency Response Teams.
- **Special Teams Command Level Orders (§ I, ¶ 8)**: This is addressed in the compliance assessment for First Remedial Order § A., ¶ 6, Facility Emergency Response Teams.
- **Screening and Assignment of Staff to Special Teams (§ I, ¶ 9)**: This is addressed in the compliance assessment for First Remedial Order § A., ¶ 6, Facility Emergency Response Teams.
- **Revised Pre-Promotional Screening Policies and Procedures (§ I, ¶ 10)**: This is addressed in the compliance assessment for Consent Judgment, § XII, ¶ 1-3 (Screening & Promotions).
- **ID Staffing (§ I, ¶ 11)**: ID staffing levels are addressed in the compliance assessment for Consent Judgment, § VII, ¶¶ 1, 9(a) & 11, Investigations of Use of Force Incidents.
- **Additional Reporting by the City and Department Regarding Intake (§ I, ¶ 12)**: The City and Department filed two reports regarding intake,[105] satisfying this provision. The Monitoring Team also provides an update on intake and the status of processing new admissions in the compliance assessment of First Remedial Order, § A, ¶ 3, Revised De-Escalation Protocol, and Appendix I of this report.

---

[105] *See*, City's September 15, 2023 Submission (dkt. 571) and City's November 15, 2025 Submission (dkt. 598).

- **<u>Command Discipline Directive (§ I, ¶ 13)</u>**: The Department's revised CD policy, as discussed in detail in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 227-230, went into effect on July 1, 2025. Updates on CDs that have been filed since the new policy went into effect are provided in the compliance assessment of Consent Judgment § VIII., ¶ 1 & § VIII., ¶ 3(c), Timely, Appropriate, and Meaningful Accountability.
- **<u>External Assessment (§ I, ¶ 14)</u>**: This is addressed in the "Death of People in Custody" section of this report.

**OCTOBER 10, 2023 ORDER (DKT. 582)**

On October 10, 2023, the Court issued an Order directing Defendants to engage with the Monitoring Team on immediate initiatives to address the risk of harm and issues regarding incident reporting, as identified in the Monitor's October 5, 2023 Report (dkt. 581). The Order also reminded Defendants of their obligations to collaborate with the Monitor and to comply with the *Nunez* Court Orders.

- **<u>Immediate Security Plan</u>**: This is addressed in the compliance assessment for the Second Remedial Order, ¶1(i)(a) and Action Plan, § D, ¶ 2(a), Security Plan.
- **<u>Immediate Reporting Initiatives</u>**: This is addressed in the compliance assessment for Consent Judgment § V, ¶ 2, Independent Staff Reports.

**DECEMBER 14, 2023 ORDER (DKT. 656)**

On December 14, 2023, the Court issued an Order regarding changes the Defendants must make to incident reporting practices in light of the findings in the Monitor's October 4, 2023 Report (dkt. 581) and the Monitor's November 8, 2023 Report (dkt. 595). This is addressed in the compliance assessment for Consent Judgment § V, ¶ 2, Independent Staff Reports.

**DECEMBER 20, 2023 ORDER (DKT. 665)**

On December 20, 2023, the Court found the Department in contempt of Action Plan § D, ¶ 3 and § E, ¶ 4 (dkt. 465) and § I, ¶ 5 of the June 13, 2023 Order (dkt. 550). On February 27, 2024 (dkt. 680), the Court found that the Department purged its contempt because it complied with the three enumerated requirements set out by the Court as described in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 124.

# Compliance Assessments

This section of the report discusses the Monitoring Team's process for assessing the Department's compliance with the court-ordered reforms and the basis for such findings. The discussion provides context for the Monitoring Team's work and methodology.

## Considerations for Compliance Assessments

- **Provisions Subject to a Compliance Rating**: Since 2022, the number of provisions subject to compliance ratings have been limited to a selected group of priority issues.[106] The Monitoring Team currently assesses compliance with only 40 of the hundreds of provisions contained in the *Nunez* Court Orders.[107] In this report, the 40 unique provisions are discussed in 25 individual "sections." Several provisions are interrelated and thus are addressed together. Updates on relevant portions of the 2023 *Nunez* Court Orders[108] are also discussed within the 25 individual "sections." Compliance ratings are not applied to the 2023 *Nunez* Court Order provisions pursuant to the Court's March 18, 2026 Order (dkt. 967).

[106] Over four years ago, the Monitoring Team recommended that, in order to stimulate reform, the Department focus on and prioritize a select group of provisions. *See*, Monitor's December 6, 2021 Report (dkt. 431) at pgs. 10-12. Accordingly, the Action Plan limited the number of provisions subject to compliance ratings so that the Department could concentrate its efforts on the foundational requirements for advancing reform.

[107] These 40 provisions included two subsets. The first includes the 25 provisions that were prioritized for compliance assessments beginning in the 14th Monitoring Period under the Action Plan. *See*, Action Plan § G, ¶ 5. These 25 provisions were selected because they prioritize four key areas for improvement to properly undergird the reform effort: (1) security practices and procedures that are deeply flawed, inconsistent with best practice and, in some cases, illogical, (2) inadequate supervision of line staff and facility leadership who do not possess the requisite expertise and ability to lead, (3) staffing practices and procedures that have resulted in ineffective deployment across the agency, and (4) limited and/or extremely delayed accountability for staff misconduct. For the second subset, beginning in the 20th Monitoring Period, an additional 15 provisions with which the Department was found in contempt were added to the list of provisions that require a compliance assessment. *See* March 18, 2026 Order (dkt. 967).

[108] The 2023 Orders include the June 13, 2023 Order (dkt. 550), August 10, 2023 Order (dkt. 564), October 10, 2023 Order (dkt. 582), December 14, 2023 Order (dkt. 656), and December 20, 2023 Order (dkt. 665).

- *History of Compliance Ratings*: A list of the 40 provisions for which the Monitoring Team provides compliance ratings is provided in Appendix A, "Comprehensive List of Provisions." This chart includes the history of compliance ratings for each of these 40 provisions since the inception of the Consent Judgment.

- **Monitoring Team's Methodology for Assessing Compliance**: The Monitoring Team's comprehensive methodology for assessing compliance and considering the current state of affairs remains unchanged and is described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 97-105 (covered in the sections "Monitoring Team's Methodology for Assessing Compliance," "Considerations for Quantitative Metrics," "Considerations for Assessing Compliance," and "External Factors that Impact Department Operations"). The compliance standards that the Monitoring Team must utilize are defined by Consent Judgment § XX, ¶ 18:
  - "Substantial Compliance" shall mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision.
  - "Partial Compliance" shall mean that the Department has achieved compliance on some components of the relevant provision of this Agreement, but significant work remains.
  - "Non-compliance" shall mean that the Department has not met most or all of the components of the relevant provision of this Agreement.

- **DOC's Production of Information**: In order for the Monitoring Team to render its determinations and independently verify the Department's representations about its

progress, the Monitoring Team must assess a wide array of information from many sources. DOC continues to struggle to respond to requests for information in a timely manner and a significant number of requests for information and responses to feedback remain unanswered and outstanding. A significant number have been pending *for years*. These delays inherently impact the Monitoring Team's work and, most importantly, on DOC's ability to advance the reform effort. The Monitoring Team has long reported that advancing the reform effort under the *Nunez* Court Orders requires significant time, effort, and resources and that DOC has insufficient resources to support and address the requirements of the *Nunez* Court Orders. This issue is described in more detail in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 106-108.

- **Communication with DOC Staff**: The Monitoring Team routinely communicates with DOC staff of all ranks and in various divisions across the agency through both routine calls and *ad hoc* discussions. These communications inform the Monitoring Team's work, provide necessary context, and create visibility into the Department's operations. Open lines of communication are critical to the Monitoring Team's ability to assess compliance with the Court's requirements. This is why the Monitoring Team has raised concerns with the Court in instances where it has learned its access to information may have been limited inappropriately.[109]
- **Coordination with Remediation Manager Team**: The Monitoring Team's work now also involves coordination with the Remediation Manager Team. The Monitoring Team routinely communicates, consults, and meets with the RM and RMT. The collaboration

[109] *See, for example*, the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 108-114; Monitor's June 17, 2026 Report (dkt. 984) at pg. 81; and Monitor's September 3, 2026 Report (dkt. 997).

and consultation between the MT and RMT is discussed in more detail in the "Reform Under the *Nunez* Court Orders" section of this Report.

**CONCLUSION**

The Monitoring Team's neutral, independent, and nuanced assessment of compliance is a critical component of the reform effort. The Monitoring Team continues to dutifully examine changes in metrics and patterns in staff behavior using a multifaceted methodology to develop insight into the factors that may be catalyzing or undercutting progress. This insight is embedded in the Monitoring Team's technical assistance so that the Department may advance toward the overarching requirement to materially improve the jails' safety and operations relative to the conditions that existed when the Consent Judgment went into effect.

| **FACILITY LEADERSHIP RESPONSIBILITIES (FIRST REMEDIAL ORDER § A., ¶ 2)** |
| --- |
| *<u>First Remedial Order § A., ¶ 2. Facility Leadership Responsibilities</u>*. Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.<br><br>*<u>August 10, 2023 Order § I, ¶ 1 UOF, Security and Violence Indicators.</u>* By, September 30, 2023, the Department, in consultation with the Monitor, shall develop a set of data and metrics for use of force, security and violence indicators that will be routinely evaluated by Department leadership to identify trends and patterns regarding unnecessary and excessive force and violence in order to identify the root cause of these issues and develop strategies to address them. Upon request by the Monitor, the Department shall provide data regarding use of force, security, and violence indicators and permit observation of meetings in which such information is evaluated by Department leadership. |

This provision was imposed by the Court in the First Remedial Order (dkt. 350), § A, ¶ 2. The goal of this provision is to ensure that the leadership of each facility is consistently and reliably identifying pervasive operational deficiencies, poor security practices, and trends related to problematic uses of force and that they address these patterns so that supervisors and staff alike receive the guidance and advice necessary to improve practices. Facility leadership is required to routinely analyze available data regarding uses of force, including the daily Rapid Reviews, to determine whether any operational changes or corrective action plans are needed to reduce the use of excessive or unnecessary force, the frequency of use of force incidents, serious injuries or other harm to incarcerated individuals or staff resulting from use of force incidents.

**<u>Court's 2024 Contempt Order</u>**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pgs. 34-37 in section "Failure to Adequately Supervise Staff and Facility Leadership" of the Order.

**<u>Compliance Rating</u>**

During the current Monitoring Period, the Department was in Partial Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order § I, ¶ 1 (dkt. 564), as it relates to facility leadership's requirement to routinely analyze available data. A compliance rating is not provided for this provision pursuant to the Court's March 18, 2026 Order (dkt. 967).

**Relevant Data and Information**

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **Facility Leadership's Communication with Monitoring Team**: Facility leadership's communication with the Monitoring Team remains consistent with the prior Monitoring Period. The Monitoring Team continues to hold monthly meetings with facility leadership to discuss incident and violence trends, significant incidents, high-needs individuals, staffing, delivery of mandated services, facility initiatives, and emerging challenges. Facility leaders continue to be candid and generally appear to act in good faith to address the issues affecting their commands. Facility leaders appear most effective at addressing discrete operational issues within their control, such as recreation, visits, mail, and other service-delivery problems that can often be resolved through improved scheduling, staffing, or logistical coordination. The response to violence and other recurring security problems remains more limited. Leadership can generally identify the immediate or most apparent factors associated with incidents, including SRG conflict, interpersonal disputes, individuals with significant mental health needs, and individuals who repeatedly engage in disruptive behavior. However, these explanations too often become the end of the analysis rather than the starting point for identifying an appropriate intervention. Leadership does not consistently examine when, where, and why these incidents occur, whether particular staff practices or environmental conditions contribute to them, or what changes could reduce the likelihood of a reoccurrence. Responses often rely on moving problematic individuals between housing areas or facilities or otherwise managing the immediate issue without developing a more sustained response to the underlying problems. Facility leaders should more routinely consider individualized behavior-management strategies, greater coordination with CHS, stronger communication and relationship-building with incarcerated individuals, and proactive supervision intended to prevent predictable incidents. This is particularly important because some levels of violence and disorder appear to be normalized within the facilities. Conditions associated with a

difficult population may explain why certain problems are challenging, but they do not eliminate the need to determine what can be done differently to reduce their frequency and severity. The most persistent weakness remains basic security practice. Despite thousands of counseling sessions, Corrective Interviews, contemporaneous video reviews, and other efforts intended to improve staff performance, there has not been sufficient improvement in basic security practices. Facility leaders have an important responsibility to identify and correct these deficiencies within their commands. At the same time, the persistence of the same problems across facilities demonstrates that individual Wardens/Assistant Commissioners cannot address this issue in isolation. A coordinated Department-wide effort is necessary to strengthen basic security skills, establish clearer expectations, provide facility leadership with effective tools to address recurring deficiencies, and ensure that improvements are sustained. The First Remediation Action Plan, Action Step 14 requires the Department to develop and implement a new approach to coaching Facility Leadership focused on building leadership and problem-solving capabilities.

- **ACT Dashboard**: The ACT Dashboard[110] remains live and continues to serve as a central hub for facility data and analytics. In this Monitoring Period, the Department placed a link to the ACT dashboard and other facility management tools, on the home page of the Department's intranet for easy access. The extent of the facility leaderships' use of the ACT Dashboard remains unclear and the Department should continue to work with facility leadership to ensure they are routinely utilizing this information as part of their management of the facility. The Dashboard brings together contemporary data on incidents, use of force, location, time of day, individuals involved, and other operational measures in a single platform, providing facility leadership with greater visibility into what is occurring within their commands. At present, the Dashboard is primarily a repository and visualization tool. Its value could be further strengthened if it highlighted emerging trends, unusual changes, recurring problem locations, or other patterns that may warrant closer review. Enhancing the Dashboard to identify potential issues could make it a more effective management tool and

[110] The ACT Dashboard integrates data from multiple systems into a single, interactive, and visually intuitive platform. It allows facility leadership to track key metrics—such as the use of force, slashing and stabbings, serious injuries, Narcan deployments, and fires by location, individuals involved, and time of day. The goal of this system is to help leadership to identify trends and make informed operational decisions to reduce violence and prevent incidents. *See* Monitor's November 22, 2024 Report (dkt. 802) at pgs. 47-48.

better support informed, proactive decision-making at the facility level. The Department reports it is working on updating the ACT Dashboard.

- **ACT Meetings**: The Department held four ACT meetings this Monitoring Period (in January, February, March, and May). The meetings brought executive and facility leadership together to review facility performance data and discuss clinic production, sanitation, infractions, use of force, slashings and stabbings, supervision, and other operational concerns. The use of facility scorecards and incident case studies, including Genetec video, provides a potentially useful structure for identifying poor performance and illustrating the security and supervision failures that contribute to violence and avoidable uses of force. However, the ACT meetings still do not consistently function as an effective problem-solving and management forum. Discussions frequently identify familiar problems like poor supervision, unsecured doors, inadequate clinic movement, staffing constraints, weak enforcement of basic rules, or recurring violence, but do not sufficiently examine why the problem persists or identify a specific change in practice that should follow. Too often, facility explanations remain at the level of staffing shortages, population challenges, individual staff failures, or statements that staff were counseled, video was reviewed, or expectations were reinforced. These may be appropriate responses to individual incidents, but they do not by themselves address recurring operational failures. At times, the discussion of accountability has also focused too heavily on whether individual staff should be disciplined rather than whether supervision, staffing practices, facility routines, or other operational conditions need to change. There were some encouraging developments during the latter part of the Monitoring Period. Executive leadership increasingly emphasized the need to move beyond simply reporting metrics and instead understand the causes of poor performance, and discussions more directly addressed active supervision, meaningful tours, door security, coordination with CHS, and other basic correctional practices. Some facilities also described specific adjustments, such as daily huddles, increased audits, and closer supervisory involvement. However, these discussions have not yet developed into a consistent process in which significant problems result in defined corrective actions, responsible parties, expected timeframes, and subsequent review of whether the intervention actually improved operations. In June 2026, the Monitoring Team shared Feedback on considerations for enhancements to the ACT meetings. In this feedback the Monitoring Team

noted the same concerns often recur from meeting to meeting without sufficient follow-through. The ACT meetings consume substantial executive and facility leadership time and could serve as an important mechanism for improving practice. To do so, the Department must use them less as a forum for reporting performance and more as a management process that requires facilities to diagnose persistent problems, identify practical corrective strategies, assign responsibility for implementation, and then determine whether those strategies produced the intended result. In June 2026, the Department paused the monthly ACT meetings in order to revamp the process. It has retained consultants from the City University of New York and is consulting the RMT on improvements to the meetings.

- **Weekly Operational Leadership Meetings**: The Department reports that operational leadership meetings continue to occur between executive staff and facility leaders, including Deputy Commissioners, Associate Commissioners, Assistant Commissioners, Directors, Wardens, and, at times, other facility staff. The Department describes these meetings as a forum to communicate Department updates, discuss operational issues and ongoing initiatives, and promote coordination across commands and divisions. Minutes were shared for three meetings that occurred in this Monitoring Period in which DOC reported that a broad range of issues were discussed, including cell-door security, meaningful tours, inoperable cameras, staffing and posts, unit management, conditions of confinement, training, intelligence sharing, and facility maintenance. These topics are relevant to the problems identified throughout this Report and suggest that the meetings can serve as a useful forum for communicating expectations and coordinating Department activity. Unfortunately, little change in Department practice has been observed.

- **Revolving Leadership**: Facility leadership continues to change frequently, and Wardens are often reassigned from one facility to another with little or no transition period. When these changes occur, there is no formal process for the outgoing and incoming Wardens to review the facility's issues, population and staffing, ongoing initiatives, known security concerns, or areas requiring attention. As a result, incoming Wardens must often learn the facility while simultaneously managing it. This creates a significant learning curve, disrupts continuity, and makes it more difficult to sustain corrective strategies that may already be underway. The broader management structure for Wardens also remains unclear. Wardens vary significantly

in experience, management style, and strengths, as would be expected in any large organization. A strong correctional management structure should account for these differences through a clear chain of supervision that provides routine direction, evaluates performance, identifies weaknesses, supports improvement, and intervenes when facility performance stagnates. Under the Department's current organizational structure, Wardens report through Assistant Chiefs to the Bureau Chief of Facility Operations and Security and ultimately to the Chief of Department. However, it remains unclear how this chain of command functions as a management system in practice. The Monitoring Team is not aware of a consistent framework establishing how often facility leaders are evaluated, what measures are used to assess their performance, how senior leaders help Wardens address persistent problems, or what steps are taken when a facility repeatedly fails to meet basic operational expectations. Too often, Wardens appear to be left to manage these challenges largely on their own. The Department would benefit from a more deliberate system for managing facility leadership, including structured transitions when Wardens are reassigned, routine performance reviews tied to outcomes, regular feedback and coaching, and clear expectations for corrective action when performance does not improve. A stable and effective chain of command should not simply establish who reports to whom; it should ensure that facility leaders are supported, challenged, and held accountable for improving their commands. The First Remediation Action Plan, Action Step 14 requires the Department to develop and implement a new approach to coaching facility leadership focused on building leadership and problem-solving capabilities.

- **Executive Leadership Tours of Facilities**: Executive Leadership Tours were discontinued in February upon the departure of the prior Commissioner.

**Conclusion**

Facility leaders have access to substantial data and multiple forums to discuss performance with executive leadership. However, these tools and meetings have not yet developed into a consistent management system that identifies root causes, produces specific corrective strategies, and measures whether those strategies improve practice. Frequent leadership changes, limited transition planning, and an unclear structure for supporting and holding Wardens accountable further weaken continuity and follow-through. The Department

must strengthen the management of facility leadership so that data, oversight, and executive engagement translate into sustained improvements in day-to-day jail operations.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § A., ¶ 2.** Partial Compliance |

| **NEW USE OF FORCE DIRECTIVE (CONSENT JUDGMENT § IV., ¶ 1)** |
|---|
| *Consent Judgment § IV., ¶ 1. New Use of Force Directive.* Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor. |

This provision of the Consent Judgment requires the Department to develop, adopt, and implement a comprehensive Use of Force Policy with particular emphasis on permissible and impermissible uses of force.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with Consent Judgment § IV, ¶ 1. The Court explained the basis for this finding at pgs. 16-18 in section "Failure to Implement the Use of Force Directive" of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Substantial Compliance with the develop, adopt, and Monitoring Team approval components, and in Non-Compliance with the implementation component, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

The Monitoring Team's findings for this Monitoring Period are based on the following available information.

The Monitoring Team uses both quantitative and qualitative information to assess the risk of harm in the jails, the Department's implementation of the Use of Force Directive, and the reliability of its security practices. Numerical data must be understood in context. There is no national standard establishing a "safe" use of force rate, an acceptable number of unnecessary or excessive uses of force, or a precise rate at which staff must be held accountable. Accordingly, the Monitoring Team's assessment considers multiple sources of information, including thousands of use of force incidents, discussions with Department leadership and staff, relevant data trends, the Department's own findings, and comparisons to correctional practice in other jail systems.

The Monitoring Team also recognizes that force is necessary at times and that not all uses of force are alike. Some incidents involve minimal physical contact or low-level control techniques, while others involve aggressive tactics that create a substantial risk of injury. Likewise, some force is used to safely resolve a dangerous situation, while other force is avoidable, excessive, retaliatory, or punitive. The compliance assessment, therefore, considers not only the technique used but also whether the incident could have been prevented, whether staff attempted de-escalation, whether anticipated force procedures were followed, whether the force was executed properly, and whether the incident was accurately reported and reviewed.

- **Use of Force Directive and Related Policies**: The Department maintains a Use of Force Policy ("UOF Policy") and several related standalone policies addressing force-related requirements under the *Nunez* Consent Judgment. The Department previously achieved Substantial Compliance with developing and adopting the UOF Policy, which went into effect on September 27, 2017, followed by the New Disciplinary Guidelines on October 27, 2017. The UOF Policy did not create a new legal standard or abandon the core principles of the prior policy; rather, it clarified and expanded guidance to staff and supervisors on how to respond to threats to safety and security with the overarching goal of changing staff practice and reducing the risk of harm associated with force.
- **Standalone Use of Force Policies**: In addition to the UOF Policy, the Department must consult with and obtain Monitoring Team approval for several standalone policies governing force-related tools and practices, including restraints, spit masks, hands-on techniques, chemical agents, electronic immobilizing devices, kinetic energy devices, batons, lethal force, and canines. The Emergency Services Unit ("ESU") also maintains several Command Level Orders, including orders governing specialized chemical agent tools such as Sabre Phantom Fog Aerosol Grenades. Several of these policies and orders require revision,[111] including those related to restraints, searches, and Emergency Response Teams, and although the Department has long reported that revisions are underway, no revised policies were provided to the Monitoring Team during this Monitoring Period.

[111] The need for revision has been extensively documented in prior Monitor's Reports, most recently in the Monitor's June 16, 2026 Report (dkt. 984) at pgs. 87-88.

- **<u>Training on UOF Policy</u>**: The Department has continued to deliver the Use of Force Refresher and Practical Application of Force/Defensive Tactics Refresher trainings, which are offered together as a two-day course.[112] As of the end of the Monitoring Period, only 25% of staff are current with the Use of Force Refresher and only 13% are current with the Defensive Tactics Refresher.[113] The Department reports that instructor shortages, staffing constraints, class-size limits required for safety, and the annual nature of the training requirement continue to significantly limit its ability to train staff at the necessary scale.
- **<u>Implementation of Use of Force Directive</u>**: The Monitoring Team provides the current status of the Department's problematic use of force and corresponding security failures in the "Assessment of Violence, Use of Force, and Security Practices" section of this report, as well as in prior reports.[114] The findings in that section, including the persistent pattern of unnecessary and excessive force and the security failures that contribute to avoidable uses of force are incorporated into the Monitoring Team's compliance assessment of the implementation of Use of Force Directive. Throughout the current Monitoring Period, the force employed by Department staff often did not comply with the Department's Use of Force Directive or the requirements of the Consent Judgment.
    - *Persistent Problematic Practices*: The Monitoring Team's review of incidents from this Monitoring Period revealed a continuing pattern and practice of unnecessary and excessive uses of force. In particular, force is still used too frequently,[115] head strikes in circumstances outside of those permitted by policy

[112] The Monitoring Team has shared feedback on the Use of Force Refresher training for supervisors in April 2024 which remains outstanding. The Monitoring Team also shared feedback on the Defensive Tactics training for new recruits in March 2023, which also remains outstanding.

[113] Both trainings are required to be provided annually. This data reflects the number of staff that are current with the annual training requirement.

[114] *See* Martin Declaration (dkt. 397) Exhibit E "Citations to Monitoring Team Findings re: Security Failures" and Monitor's December 6, 2021 Report (dkt. 431) at pgs. 17-23; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 7-30; Monitor's April 27, 2022 Report (dkt. 452) at pgs. 2-3; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 13-17; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-77; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68; Monitor's October 10, 2024 Report (dkt. 581) at pgs. 4-19; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 2-3 and 6-28; Monitor's December 12, 2023 Report (dkt. 666) at pgs. 6-22; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 29-38; Monitor's November 22, 2024 Report (dkt. 802) at pgs. 11-18; Monitor's June 17, 2026 Report (dkt. 984) at pgs. 30-39.

[115] *See*, for example, Consent Judgment, § IV, ¶ 3(a) and UOF Directive § II (A) and (B).

are still used too often;[116] excessive or unauthorized use of chemical agent/OC spray is ongoing;[117] problematic and/or painful escorts continue;[118] unsafe takedown techniques occur too frequently;[119] use of force during searches occurs in situations in which it does not appear necessary; precipitating staff conduct creates situations in which force is then needed;[120] conversely, staff sometimes fail to act when they should;[121] staff fail to intervene in self-harm attempts;[122] and finally, staff's failure to adhere to basic security practices creates situations in which force is needed but could have been avoided. The frequency and severity of these problems are one of the core reasons that the Department continues to be in Non-Compliance with the requirement to properly implement the Use of Force Directive.

- *Department's Use of High-Impact Force & Head Strikes*: In addition to the problems listed above, the Department's use of high-impact force, particularly head strikes, is a continuing concern because the tactic inherently involves such a high risk of harm that it should be used infrequently and only under very specific circumstances. To be certain, head strikes are permissible when a staff member or another person is in imminent danger of serious physical injury or death, and Department-authorized types and instruments of force are unavailable, impractical, or ineffective. The dynamics of the problematic use of head strikes were described at length in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 138-143. Staff continue to use high-impact force and head strikes in situations that are not permitted by policy and when lesser means could have effectively resolved the situation. In 2025, the use of head strikes were confirmed

[116] *See*, for example, Consent Judgment, § IV, ¶¶ 3(b), (g)(v) and UOF Directive § II (G) and § V(A)(8).

[117] *See*, for example, Consent Judgment, § IV, ¶ 3(d) and UOF Directive § II (C) and §VI (B)(1)(g).

[118] *See*, for example, Consent Judgment, § IV, ¶ 3(c)(vii) and UOF Directive § II V(B)(1)(d).

[119] *See*, for example, Consent Judgment, § IV, ¶ 3(b), (g)(v) and UOF Directive § II (C) and (G) and §VI (1)(f)(ix).

[120] *See*, for example, Consent Judgment, § IV, ¶ 3(k) and (m) and UOF Directive § II (B) and (C).

[121] *See*, for example, Consent Judgment, § IV, ¶ 3(m) and UOF Directive § II (I).

[122] *See*, for example, Consent Judgment, § IV, ¶ 3(m) and UOF Directive § II (I).

in 205 incidents and alleged in another 193 incidents.[123] During the current Monitoring Period, the use of head strikes were confirmed in 103 incidents and alleged in another 111 incidents.[124] Table 15 of Appendix C displays the Department's head strike data from January 2025 to June 2026. Even as some head strikes may ultimately be deemed justified, the frequency of actual head strikes, allegations of unreported head strikes, the Monitoring Team's observations about the circumstances in which staff use head strikes, and cases resulting in or expected to result in charges for the improper use of head strikes indicate that the Department has not yet ensured that high-impact force is used only rarely and strictly within policy guidelines.

The Department has not yet developed a systemic approach to evaluating head strikes or identifying strategies to reduce their use, though the Monitoring Team continues to recommend that it do so. In the meantime, the Monitoring Team has initiated an assessment of these cases to support a more systematic review by the Department going forward. This work will be included in subsequent reports.

**Conclusion**

As described in the Monitor's May 22, 2025 Report (dkt. 850), the Department has demonstrated progress towards implementing the Use of Force Directive *since the initiation of the Consent Judgment* and is now showing movement toward achieving Partial Compliance. Other sections of this report describe the Department's work during this Monitoring Period regarding operations, security, investigations, and accountability.

Substantially reducing unnecessary and excessive force will require more than avoiding the most egregious forms of misconduct. The Department must ensure that staff avoid uses of force where possible, use de-escalation and planned responses when feasible, apply force safely and proportionally when necessary, report uses of force accurately, and are held accountable when they violate policy. Persistent concerns, including the improper use of head strikes, unsafe

[123] The investigation of 137 incidents remains under investigation. At least 31 investigations of incidents resulted in charges for violations related to the use of head strikes.

[124] The investigation of 159 incidents remains under investigation. At least 5 investigations of incidents resulted in charges for violations related to the use of head strikes.

takedowns, excessive or unauthorized chemical agent use, painful escort holds, force during searches, and staff conduct that precipitates or escalates incidents, remain unresolved. During this Monitoring Period, current practices remain essentially the same as in previous Monitoring Periods, and the Department did not report any specific, concerted steps to meaningfully change these practices. Therefore, the Department remains in Non-Compliance with the implementation of the Use of Force Directive.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § IV., ¶ 1. (Develop)** Substantial Compliance<br>**Consent Judgment § IV., ¶ 1. (Adopt)** Substantial Compliance<br>**Consent Judgment § IV., ¶ 1. (Implement)** Non-Compliance<br>**Consent Judgment § IV., ¶ 1. (Monitor Approval)** Substantial Compliance |

| **Independent Staff Reports (Consent Judgment § V., ¶ 2)** |
|---|
| <u>*Consent Judgment § V., ¶ 2. Independent Staff Reports.*</u> Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.<br><br><u>*October 10, 2023 Order. Immediate Reporting Initiatives*</u>. The Department, in consultation with the Monitor, shall immediately develop and implement, by October 25, 2023, protocols to address the deficiencies in the Department's internal reporting structures and notifications to the Monitor as described in the "Incident Reporting" Section of the [October 5, 2023] Status Report. (See Status Report at 10-12.)<br><br><u>*December 14, 2023 Order § 1. Department's Incident Reporting Practices*</u>. The Department shall develop and implement a comprehensive and streamlined policy and procedures for all incidents and events that must be reported (New COD Policy). The policy and procedures shall be subject to the approval of the Monitor. Accordingly, by the dates set forth below, the Department, in consultation with the Monitor, shall:<br>a. By December 15, 2023: Provide the Monitoring Team will the full list of Department policies that must be reviewed for potential consolidation into the new COD policy.<br>b. By December 22, 2023: Review, revise, and implement updated definitions of Stabbing and Slashing to ensure that the definitions are clear and concise and will result in the collection and reporting of reliable and accurate data. The definitions for Stabbing and Slashing shall be subject to the approval of the Monitor.<br>c. By February 2, 2024: Review, revise, and implement updated definitions for the various incident categories maintained by the Department, including all security indicators related to violence, including but not limited to use of force, use of force (allegation), assault/attack on staff, inmate-on-inmate fight/assault, inmate-on-inmate sexual assault, and staff sexual misconduct, to ensure that the definitions are clear and concise and will result in the collection and reporting of reliable and accurate data. The definitions of the various incident categories shall be subject to the approval of the Monitor.<br>d. By May 31, 2024: The Department shall implement the New COD Policy. |

The Department is required to accurately and timely report when force is used as part of its overall goal to manage use of force effectively pursuant to Consent Judgment § V, ¶ 2. The assessment below covers five critical areas related to reporting force: (1) notifying Supervisors that a use of force occurred, (2) submission of complete, independent, and timely reports, (3) the classification of use of force incidents, (4) allegations of use of force, and (5) reporting of use of force by non-DOC staff who either witness the incident and/or relay reports from incarcerated individuals.

## <u>Compliance Rating</u>

During the current Monitoring Period, the Department was in Partial Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

## <u>Relevant Data and Information</u>

The Department's Use of Force Directive requires Department staff to independently prepare a staff report or Use of Force Witness Report if they employ, witness, or are alleged to

have employed or witnessed force. For reported uses of force, these reports must be submitted within 24 hours; for alleged uses of force, the deadline is extended to 72 hours because the staff members involved must first be identified and notified that a report is required. The *Nunez* Court Orders also require non-DOC staff working in the facilities to report uses of force.

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **<u>Notifying Supervisor of Uses of Force</u>**: Appendix K, Table 1 shows the number and timeliness of staff reports for reported and alleged uses of force from 2018 to April 2026.[125] From January to April 2026, 2,258 use of force incidents were reported by supervisors to the Central Operations Desk ("COD"), and over 4,500 use of force or use of force witness reports were submitted for incidents occurring during this same time period. To assess whether staff are timely and reliably notifying a supervisor of a use of force, the Monitoring Team considers both the overall number of reports as well as whether there is evidence that staff are not reporting force as required. This includes consideration of use of force allegations as well as reports from outside stakeholders (*e.g.*, New York City Health + Hospitals ("H+H") and Legal Aid Society ("LAS")) about potentially unreported uses of force. As discussed in more detail below, the number of allegations of use of force remains low and only a small fraction are substantiated. Further, 54 of the 57 reports of uses of force from H+H and LAS were already under investigation by ID before those reports were submitted to DOC.[126] Overall, the volume of reported cases, combined with the fact that unreported uses of force appear to be infrequent, suggests that notification to a supervisor of a use of force is occurring as required.

---

[125] Due to the transition to CaseBuilder during the 22nd Monitoring Period, no audits on the timeliness of staff reporting could be performed for the months of May and June 2026. Audits are expected to resume in the 23rd Monitoring Period.

[126] In this Monitoring Period, 37 out of the 38 reports from H+H staff alleging use of force were already under investigation by ID before H+H's reports were submitted. Further, 17 of the 19 use of force allegations submitted by LAS in this Monitoring Period had already been reported before receipt of the allegation via LAS. While the number of use of force allegations submitted by LAS decreased in 2025 (14 reports in 2025), it appears the number of use of force allegations submitted by LAS this Monitoring Period is similar to past years (27 reports in 2024 and 46 reports in 2023).

- **<u>Timely, Independent, and Complete Staff Reports</u>**: During the Monitoring Period, most of the over 4,500 use of force and use of force witness reports were submitted on time, 90% of reports for reported uses of force were submitted within the 24-hour deadline, and 72% of reports for alleged uses of force were submitted within the 72-hour deadline.[127] This represents a notable improvement in timely report submissions for both reported and alleged uses of force over the 21st Monitoring Period, when 82% of reports for reported uses of force were submitted within the 24-hour deadline, and 49% of reports for alleged uses of force were submitted within the 72-hour deadline.

  The Monitoring Team's review of reports revealed a general tendency toward independent preparation by the staff. However, the substance and quality of reports remain inconsistent, which has long been reported and is consistent with prior findings highlighted in the Monitor's May 29, 2020 Report (dkt. 341) at pgs. 89-91. The Monitoring Team continues to routinely identify reports that are incomplete, vague, or at times inconsistent with the evidence. The Department itself continues to identify issues with staff reporting practices. However, the proportion of intake investigations closed during this Monitoring Period that identified report-writing issues (9%) has been decreasing steadily since 2024. Further examination of the issue is necessary to determine whether this may indicate a change in reporting practices. The Monitoring Team intends to conduct a closer assessment of the quality and veracity of reports in an upcoming Monitoring Period.

- **<u>Classification of Use of Force Incidents</u>**: The Department is required to immediately classify all use of force incidents as Class A, B, C, or P[128] when an incident is reported to the COD. Appendix K, Table 2 identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from 2018 to 2026. The sample review has demonstrated the Department's ongoing improvement its ability to classify the majority of incidents in a timely manner, with 98% of incidents classified within 2 weeks between January 2026 and June 2026, compared to 82% in July to December 2025. This reflects

[127] Due to the transition to CaseBuilder during the 22nd Monitoring Period, audits on the timeliness of staff reporting could be performed for the months of May and June 2026. Audits are expected to resume in the 23rd Monitoring Period

[128] Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of the report to COD to receive an injury classification of Class A, B, or C.

an improvement from a decline in 2025 when only 72% of incidents were classified within the reviewed time period. Facility Operations leadership attributes the improved timeliness of incident classification to stronger oversight by the Division Chiefs, who monitor classification status and send daily follow-up emails to facilities to ensure incidents are properly classified.

- **Alleged Use of Force**: The Monitoring Team evaluates both reported instances of force by staff and substantiated *allegations* of uses of force – instances when staff purportedly used force on an incarcerated individual and did not report it. As demonstrated in Appendix K, Table 3, the number of use of force allegations has steadily declined from 471 use of force allegations in 2016 to 131 use of force allegations in 2025. From January to June 2026, there have been 83 use of force allegations. At this rate, the number of allegations made in 2026 may outpace those made in 2025, but it is small compared to the total number of uses of force reported by staff (n=3,494); only a fraction of these allegations were substantiated,[129] and instances of excessive or unnecessary unreported uses of force remained rare.

  The Monitoring Team recently assessed all closed investigations of all allegations of uses of force that were reported in 2024 and 2025.[130] Most types of force alleged were relatively low impact techniques, ranging from tight restraints to chemical agent uses to gentle pushes to create distance, or appeared to be accidental, such as individual's fingers or feet getting stuck in closing doors and cuffing ports. About 10% of the nearly 300 incidents reviewed were partially or fully substantiated. Most of these cases involved minimal use of force, none of these incidents involved serious injuries to incarcerated individuals, and ID determined that the force used in the majority of these incidents was unavoidable, necessary or accidental, proportional, and in line with the Use of Force

[129] The Monitoring Team relied on ID's determinations as to whether an allegation was substantiated or not. An allegation was considered substantiated by ID when the investigation and supporting evidence concluded that an unreported use of force did in fact occur. An allegation was considered unsubstantiated by ID when the investigation and supporting evidence conclusively determined that a use of force did not occur (*e.g.*, clear video refutes all possible force) or could not conclusively determine whether a use of force occurred (*e.g.*, video is not available of the location where the incident occurred, such as the bathroom, but the available evidence, such as injury reports, did not appear to confirm the allegation).

[130] As of the end of July 2026, 18 investigations remained pending for allegations of uses of force that occurred in 2025. All investigations for allegations of use of force in 2024 have been completed.

Directive. There was one case in which ID determined the force used, which included the use of a chokehold, was unnecessary, excessive, and in violation of the Use of Force Directive, and was not reported as it should have been.[131] Approximately 22% of the alleged incidents contained allegations of head strikes, however none were substantiated and all but one were appropriately referred for Full ID investigations. Nearly 100 staff were recommended for corrective action, most for failure to recognize that force was used and therefore failure to report the force, or to complete or upload appropriate documentation. The Monitoring Team found that the vast majority of investigations appeared to be thorough and the corrective action recommendations generally appeared appropriate. Overall, these findings suggest that most uses of force are being reported as required. However, this assessment confirmed that continued vigilance is necessary to ensure that all uses of force are reported as required.

- **Non-DOC Staff Reporting**: Consent Judgment § V, ¶¶ 10-13 requires non-DOC staff members who witness a use of force incident to report the incident in writing directly to a supervisor, and medical staff are also required to report to a supervisor when they have reason to suspect that an incarcerated individual has sustained injuries due to a use of force, but the injury was not reported as such to the medical staff.
    - *DOE Staff Reporting:* Appendix K, Table 5 details the incidents in which it appears Department of Education ("DOE") staff may have witnessed a use of force,[132] and the reports submitted by DOE staff from July 2024 to June 2026. Reports submitted by DOE staff remain low despite efforts in the last Monitoring Period to improve this process. In this Monitoring Period, the Monitoring Team's review suggested there were six incidents that DOE staff may have witnessed, yet only one staff witness report was submitted. Following the close of the Monitoring Period, the Monitoring Team shared feedback with DOE in an effort to enhance this process and ensure reports are submitted when required. Updates on DOE's response to this feedback will be included in the next Monitor's Report.

[131] The officer received formal charges that were closed with an NPA for 12 compensatory days.

[132] DOE staff are required to submit witness reports pursuant to Consent Judgment § V, ¶ 10 and the December 4, 2019 Order (dkt. 334) clarifying the requirement for DOE staff to submit witness reports.

- *H+H Reporting*: Appendix K, Table 4 provides an overview of the reporting provided by H+H staff from January 2018 to June 2026. H+H (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for staff reporting. Since June 2023, there has been notable and sustained progress in H+H staff reporting following feedback from the Monitoring Team.[133] H+H staff submitted a total of 38 reports in this Monitoring Period; 33 reports were H+H witness reports of use of force incidents, and 5 reports relayed use of force allegations from an incarcerated individual.

  During this Monitoring Period, the Monitoring Team identified and shared[134] an additional 18 incidents with H+H, most of which occurred in the 21st Monitoring Period, in which it appears that H+H staff may have witnessed a use of force, but a report was not submitted. H+H determined that at least 51 staff members should have submitted use of force reports for 17 of the use of force incidents.[135] Following the close of the 22nd Monitoring Period, the Monitoring Team identified and shared an additional 20 incidents, all of which occurred in the 22nd Monitoring Period, in which it appears that H+H staff may have witnessed a use of force, but a report was not submitted. H+H determined that at least 52 staff members should have submitted use of force reports for 19 of the use of force incidents.[136] In response, depending on the case, H+H reported that the staff who failed to report were referred for documented verbal warnings or formal counseling.

---

[133] *See* Monitor's November 22, 2024 Report (dkt. 802) at pgs. 79-80.

[134] The Monitoring Team continues to monitor incidents that may be witnessed by H+H staff and share feedback with H+H to ensure that reporting occurs when it should as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 155-156. The number of incidents potentially witnessed but unreported by H+H staff that the Monitoring Team submitted to H+H increased during the 21st and 22nd Monitoring Periods because the Monitoring Team improved its process for identifying these incidents, not because of any observable change in H+H staff reporting practices. With respect to use of force incidents occurring in the clinics, between January and June 2026, 205 use of force incidents occurred in clinic areas and only 32 of those incidents (16%) had corresponding reports submitted by H+H staff. It is worth noting that just because an incident occurred in a clinic area does not mean H+H staff witnessed the incident. However, the number of incidents that occurred in a clinic versus the number of reports received suggests it is possible that additional incidents were observed but not reported.

[135] Due to the available camera angles, H+H was unable to identify the staff that may have witnessed the eighteenth use of force incident.

[136] H+H chose to take no action for the twentieth use of force incident as it occurred rapidly while CHS staff were changing tours, so it was unclear if any staff witnessed the incident.

The improvement observed in H+H reporting is notable, but the Monitoring Team's findings suggest that more work is needed to ensure that staff are reporting reliably. The reports submitted by H+H staff are crucial to the investigation of use of force incidents, so continued, sustained focus on ensuring that H+H staff report as required is critical.

- **Overarching Work Regarding Department's Reporting**: On October 10, 2023 and December 14, 2023, the Court issued two Orders (dkt. 582 and dkt. 656, respectively) requiring changes to the Department's incident reporting practices in light of findings in the Monitor's October 4, 2023 Report (dkt. 581) and November 8, 2023 Report (dkt. 595). A brief update on the specific requirements of the December 14, 2024 Order is included below given its impact on the Department's overall reporting practices.
  - *List of Reporting Policies (§ 1, ¶ a)*: The Department has continued to assess its policies to determine what may need to be updated. This list has continued to expand. Currently, the Department has determined that approximately 127 directives, Operations Orders, and teletypes must be analyzed (and potentially updated) as part of the incident-reporting overhaul.
  - *Stabbing and Slashing Definition (§ 1, ¶ b)*: The Department continues to utilize the definition of "stabbing/slashing" that was developed in consultation with the Monitoring Team and issued on October 15, 2024. The Department trained ADWs on the revised definition and issued a teletype containing the approved definition. The Monitoring Team's ongoing review of stabbing and slashing incidents suggests that the Department is reporting incidents as required by this definition.
  - *Definitions of Incident Categories (§ 1, ¶ c)*: In December 2025, the Department completed a draft of Reportable Incident Definitions, Reportable Incident Attributes, and a COD Notification Index. The Monitoring Team reviewed these materials and provided feedback in January 2026. The Department also continued to refine reporting timeframes, notification requirements, and responsibility for the entry of particular incident information. Given the changes in leadership, this process has moved slowly in order to ensure that the work is aligned with the various other initiatives underway.

- *Comprehensive COD Policy (§ 1, ¶ d)*: The Department continues to pursue a significant redesign of its incident-reporting process. The proposed model would centralize incident reporting within a new version of the Incident Reporting System ("IRS 2.0"), largely replace existing incident definitions with SCOC definitions, redefine the respective responsibilities of COD and facility staff, and replace the existing 24-hour report with an enhanced preliminary and final incident report. Under the proposed model, COD will enter verified preliminary information for immediate notification, while Tour Commanders and facility staff will have up to 72 hours to complete a final incident report that will become the authoritative incident record after facility leadership review.

After the close of the Monitoring Period, the Department provided an updated briefing on the efforts to revise the COD process and the ways in which it has evolved into a broader restructuring. The Department now proposes centralizing all incident reporting in IRS 2.0, integrating the system with CaseBuilder and SCOC's eJustice system, streamlining COD's responsibilities, and creating a more structured facility-level review process. The Department has also identified new staffing needs, including assigning dedicated civilians to the facilities and a Department-wide Incident Reporting Executive responsible for reporting standards, quality assurance, training, and process improvement. The Department's current implementation plan anticipates policy development, system testing and integration, staffing, and training before an anticipated rollout at the end of 2027. While the Department continues to work on the overhaul of the reporting process, substantial work remains before the revised reporting process is implemented and its effectiveness can be assessed.

**Conclusion**

The Department continues to submit thousands of staff reports and, in this Monitoring Period, showed improvement in both timeliness and the classification of use of force incidents. Allegations of unreported force remain relatively low, and the available information indicates that unreported uses of force are infrequent. However, the quality and accuracy of staff reports require further assessment to determine whether recent indications of improvement reflect sustained changes in practice.

The Department is undertaking a significant redesign of its incident-reporting system that could substantially affect the reporting practices this provision addresses. The proposed model

has the potential to improve the accuracy, consistency, timeliness, and utility of incident reporting by creating a more centralized and modern reporting process. However, substantial work remains to finalize the policy, staffing, technology, training, and supervisory structure necessary to ensure that the new process is implemented effectively and can be sustained over time.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § V., ¶ 2.** Partial Compliance |

| **PROVIDING MEDICAL ATTENTION FOLLOWING A USE OF FORCE INCIDENT (CONSENT JUDGMENT § V., ¶ 22)** |
| --- |
| *Consent Judgment § V., ¶ 22. Providing Medical Attention Following Use of Force Incident.* All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any. |

Given the potential for injury, incarcerated individuals involved in uses of force and fights should receive prompt medical attention. There is no generally accepted standard for the specific period of time when medical treatment must be provided after an incident, which is why the provision simply requires medical treatment to be provided "as soon as practicable" after the incident. However, as a management tool, time markers are useful. Accordingly, the Department's Directive 4516R-B "Injury to Inmate Reports" requires individuals to be afforded medical attention as soon as practicable, but no more than four hours following a use of force incident or fight amongst incarcerated individuals. The Department's policy also sets forth guidelines for affording expedited medical treatment. Incarcerated individuals who appear to have specific conditions or complain of having such conditions (*e.g.,* loss of consciousness, seizures, *etc*.) must be produced directly to a clinic (and not taken to an intake location) following a use of force or fight. The timelines set by this policy are within the generally accepted practice, and thus the Monitoring Team measures compliance using the Department's four-hour standard.

**Compliance Rating**

During the current Monitoring Period, the Department was in Substantial Compliance with this provision, which is an improvement from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **Medical Wait Times**: Appendix K, Table 6 details wait times for medical treatment following Use of Force incidents from 2018 through June 2026. This provision is well-

suited to the use of setting quantitative metrics to assess compliance (*i.e.*, the proportion of cases that receive medical attention following a use of force within four hours, which is the standard set by Department policy), and the Monitoring Team determined that 80% is an appropriate standard for Substantial Compliance.[137] In the 22nd Monitoring Period, 84% of use-of-force-related medical encounters occurred within four hours, which is an improvement from the last MP (which was 75%) and exceeds the 80% standard for Substantial Compliance and represents one of the highest performance levels since the Monitoring Team began reporting on this provision in the 3rd Monitoring Period. This improvement appears attributable to the Department improving medical wait times at EMTC and OBCC.[138] During this Monitoring Period, the performance levels at both facilities improved (at EMTC from 66% in the 21st Monitoring Period to 71% in the 22nd Monitoring Period; and at OBCC from 68% in the 21st Monitoring Period to 76% in the 22nd Monitoring Period).

- **Electronic Clinic Production Dashboard**: The Clinic Production Dashboard[139] launched on December 18, 2025 at NIC. In this Monitoring Period, the Department revised the training to clarify supervisory oversight, documentation expectations, and requirements for verifying clinic production to support compliance with DOC directives, BOC Minimum Standards, and *Nunez*-related requirements. These revisions strengthened the training. Expansion of the Clinic Production Dashboard to other facilities is underway. Staff at GRVC were trained in May 2026 and all other facilities began training

[137] The Monitoring Team's review of the historical record of compliance ratings indicated that most of the compliance ratings to date have been congruent with an 80% threshold for Substantial Compliance, although two exceptions were identified. In the 7th Monitoring Period, Substantial Compliance was assessed with a 74% performance level and in the 8th Monitoring Period, Substantial Compliance was assessed with a 78% performance level). Despite the small number of exceptions, the Monitoring Team believes that 80% is an appropriate threshold for Substantial Compliance going forward.

[138] As detailed in the Monitor's June 17, 2026 Report (dkt. 984) at pg. 99, the lower performance levels during the 20th and 21st Monitoring Periods was mainly attributable to delays in medical wait times at EMTC and OBCC.

[139] The Department collaborated with the Strategic Operations Division, Training and Development, Information Technology Division, and Health Affairs to create an Electronic Clinic Production Dashboard. The Dashboard is intended to support compliance with BOC minimum standards requiring DOC to produce incarcerated individuals to clinic for sick call and other medical appointments. The system allows DOC to electronically record sick call requests, document whether individuals were produced, and track the outcome of the clinic visit, including whether the person was seen by CHS.

in June 2026. The Department's IT Division and Strategic Operations Division continue to oversee the expansion of the new dashboard.

**Conclusion**

The Department's concerted focus on improving operations, especially at EMTC and OBCC, resulted in the ability to provide medical care more quickly. Given that the systemwide average for providing medical attention within 4 hours of the incidents is 84%, the Department is now in Substantial Compliance with this provision. Further, the Department's efforts to track this information in a centralized and electronic manner appear to also support these improvements. The Department must maintain and continue to improve performance levels at all facilities to remain in Substantial Compliance.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § V., ¶ 22.** Substantial Compliance |

| **INTERIM SECURITY PLAN (SECOND REMEDIAL ORDER ¶ 1(I)(A) AND ACTION PLAN § D., ¶ 2(A))** |
|---|
| *Second Remedial Order ¶ 1(i)(a). Interim Security Plan*. Develop, in consultation with the Monitor, and implement an interim Security Plan that describes, in detail, how various security breaches will be addressed by October 11, 2021. This plan shall address, among other things, the following issues: unsecured doors, abandonment of a post, key control, post orders, escorted movement with restraints when required, control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing officer keys and OC spray.<br><br>*Action Plan § D., ¶ 2(a). Interim Security Plan*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: (a) the interim Security Plan required by ¶ 1(i)(a) of the Second Remedial Order.<br><br>*October 10, 2023 Order. Immediate Security Plan*. The Department's Executive Leadership, including the Senior Deputy Commissioner, the Security Manager, the Classification Manager, and the Staffing Manager, shall convene a meeting with the Monitor, no later than October 18, 2023, to devise a plan that can be implemented immediately to ameliorate the unacceptable levels of harm in the New York City jails. |

The Department is required to develop a comprehensive Security Plan pursuant to the Second Remedial Order (dkt. 398), ¶ 1(i)(a) and the Action Plan (dkt. 465), § D, ¶ 2(a). The Department has struggled to develop a comprehensive and effective Security Plan.[140] Previous iterations of security plans have failed to adequately address standard, basic security protocols that are necessary to reduce unnecessary, inappropriate, and/or excessive uses of force and other forms of institutional violence as required by the *Nunez* Court Orders.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with the requirements to develop the Security Plan in the Second Remedial Order (dkt. 398), ¶ 1(i)(a) and the Action Plan (dkt. 465), § D, ¶ 2(a). The Court explained the basis for these findings at pgs. 22-26 in the section "Failure to Correct Failures in Security and Basic Correctional Practice" of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Non-Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance

[140] *See*, Monitor's October 14, 2021 Report (dkt. 403) at pg. 5; November 17, 2021 Report (dkt. 420) at pgs. 2-3; Monitor's December 1, 2021 Report (dkt. 429) at pg. 7; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 15-20; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 21-22, and 44-46; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-81; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 37-39; Monitor's June 8, 2023 Report (dkt. 541) at pgs. 35-36; July 10, 2023 Report (dkt. 557) at pgs. 31-33; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 3, 17-23, 44, and 56; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 20-29, 32, 164, and 166; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 14-18, and 185-186.

ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's October 10, 2023 Order (dkt. 582), as it also requires the Department to develop an immediate security plan. A compliance rating is not provided for this provision pursuant to the Court's March 18, 2026 Order (dkt. 967).

**Relevant Data and Information**

The Monitoring Team has established a lengthy, detailed record of the deficiencies in basic security practices and the negative impact they have on facility operations and safety. The Monitoring Team's reporting is consistent with the security audits conducted by the Department's *Nunez* Compliance Unit. The patterns and practices discussed in the Monitor's prior reports remain an accurate description of the jails' dysfunction today. [141]

The Monitoring Team's findings for this Monitoring Period are based on the following available information.

The security and operational deficiencies which continue to permeate the Department's operations include failures to secure doors, remain on post, conduct meaningful tours, maintain control of housing areas, address visible misconduct, conduct safe and effective searches and escorts, use de-escalation, activate body-worn cameras, and ensure supervisors actively direct and correct staff practice. These failures remain central to the Department's unsafe conditions because they increase the risks of violence, use of unnecessary and/or excessive force, contraband circulation, self-harm, and other preventable harm.

The Department has attempted to address some of these issues through discrete initiatives, but the same basic security failures continue to recur across facilities and incidents.

- **DOC's Efforts to Develop a Security Plan**: The Department has struggled to develop and sustain an effective Security Plan to address the significant and pervasive security

[141] *See* Martin Declaration (dkt. 397) Exhibit E "Citations to Monitoring Team Findings re: Security Failures" and Monitor's December 6, 2021 Report (dkt. 431) at pgs. 17-23; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 7-30; Monitor's April 27, 2022 Report (dkt. 452) at pgs. 2-3; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 13-17; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 56-77; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 36-63; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 12-68; Monitor's October 10, 2024 Report (dkt. 581) at pgs. 4-19; Monitor's November 8, 2023 Report (dkt. 595) at pgs. 2-3 and 6-28; Monitor's December 12, 2023 Report (dkt. 666) at pgs. 6-22; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 22-29; Monitor's November 22, 2024 Report (dkt. 802) at pgs. 11-18; Monitor's May 22, 2025 Report (dkt. 849) at pgs. 66-71; and Monitor's January 13, 2026 Report (dkt. 947) at pgs. 43-51 and 162-174.

deficiencies. The Department has long acknowledged that basic security and operational practices involving door security, post coverage, routine tours, searches, escorts, movement, supervision, and control of housing areas require improvement. The persistent challenge has been developing and executing concrete strategies that actually *change* these practices. The Department has made efforts to develop security plans, none of which have been successful to date.

- *2021 Security Plan:*[142] In fall 2021, following the issuance of the Second Remedial Order, the Department developed a Security Plan to address fundamental security failures across the jails. The plan focused on securing doors, keeping staff on post, controlling keys and movement, and updating and reinforcing post orders and other basic correctional practices. While the plan itself was reasonable, the Department failed to effectively manage the initiative and it was ultimately abandoned.
- *2022 Commissioner's Violence Reduction Plan:*[143] The Department launched the Commissioner's Violence Reduction Plan at RNDC in early 2022 and expanded it to GRVC that summer. The plan included assignment of extra staff to the housing units, increased tactical searches, and blending of individuals affiliated with security risk groups. At RNDC, the effective facility leadership and implementation of the plan initially contributed to improved conditions in late 2022 and early 2023, but those gains reversed as the population increased and implementation of the plan faltered. At GRVC, the plan was not faithfully implemented. By April 2024, the Monitoring Team reported that the plan at both facilities had effectively been abandoned.

---

[142] The 2021 Security Plan is discussed in the Monitor's December 1, 2021 Letter to the Court (dkt. 429) at pg. 3, Monitor's December 6, 2021 Report (dkt. 431) at pg. 15; Monitor's October 28, 2022 Report (dkt. 472) at pg. 77; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 26-27

[143] The Commissioner's Violence Reduction Plan is described in detail in the Monitor's October 28, 2022 Report (dkt. 472) at pgs. 65-70; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 53-58; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 87-89; and Monitor's April 18, 2024 Report (dkt. 706) at pgs. 26-27.

- *June 2024 Security Plan*:[144] The Department submitted another safety plan in June 2024, but it did not adequately address longstanding deficiencies in staff practice, lacked sufficient data-driven strategies, and did not establish a clear path to improve day-to-day security operations.
- *Door Security Pilot:*[145] In August 2024, following the Monitoring Team's recommendation to focus on discrete, fundamental security practices, the Department launched a Door Security Pilot in one housing unit each at OBCC, GRVC, and RNDC. The pilot sought to ensure cell doors remained secured through scheduled opportunities for incarcerated individuals to enter or exit their cells, enforcement of lock-in procedures, consistent staffing, and increased supervision. Although initial audit results demonstrated some improvement in overnight lock-in compliance, progress plateaued despite revised post orders, leadership meetings, and increased oversight. Officers continued to fail to secure doors, supervisors did not provide effective oversight and coaching, and progressive discipline was not consistently identified or imposed. By mid-2025, the Department reported its intention to abandon the pilot and pursue a different initiative. While the pilot did not result in improved practice, it provided valuable insight into the cultural resistance, leadership shortcomings, and inconsistent supervision that continue to undermine basic correctional practices.
- *August 2025 Safety Plan*:[146] The Safety Plan provided few strategies to address and change staff security practice and appeared to focus more on minimizing the issues facing the agency.
- *2025 Honors Dorm Initiative*: [147] GRVC has one dedicated Honors Unit and one dedicated unit focused on Back-to-Basics. The Honors Unit at GRVC uses an

[144] The Department first shared an updated Security Plan on May 23, 2024, but shortly after its submission the Department reported the plan was being revised. Consequently, the Monitoring Team did not provide feedback on the May 23, 2024 Security Plan.

[145] The Door Security Pilot is also described in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 15-16; Monitor's May 22, 2025 Report (dkt. 850) at pgs. 69-70; Monitor's January 13, 2026 Report (dkt. 947) at pgs. 34-35 and 167-168; Monitor's June 17, 2026 (dkt. 984) at pgs. 104-105.

[146] DOC developed this Safety Plan with its Consultant to the Commissioner, Mr. Gary Raney.

[147] The Honors Unit is described in more detail in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 55-56, and this description remains true for this Monitoring Period.

incentive-based model intended to incentivize positive behavior by the incarcerated population. The Back-to-Basics Unit focuses more directly on fundamental correctional practices, including securing doors, conducting counts, enforcing rules, conducting appropriate pat frisks, and providing staff with real-time coaching, supported by video review and scorecards. While the units are not operating at optimal levels, the available scorecards demonstrate stronger adherence to basic practices than is generally observed in other general-population housing areas, and safety outcomes in both units remain encouraging. For example, NCU's audits generally found that staff secured cell doors, limited unauthorized access to cells, and enforced institutional lock-ins. The Monitoring Team site visits also confirmed these areas appear to be in better physical condition and, overall, have a more positive environment. The Department has expressed interest in expanding aspects of this model but has not yet done so. These units provide some evidence that concentrated supervision, clear expectations, positive incentives, and sustained attention can improve operations within a defined area. The challenge is whether the Department can successfully translate those practices beyond isolated units with hand-picked incarcerated individuals and into routine operations across the jail system.

- *22nd Monitoring Period Initiatives*: The Department pursued several tangible security priorities during this Monitoring Period.
  - **GRVC**: In response to feedback from the Monitoring Team, uniformed Department Leadership focused on basic security practices such as securing cell doors, strengthening supervision in problematic housing areas, assigning additional officers where incidents were concentrated, expanding active video monitoring, improving point-to-point radio availability, and developing a unit-management concept.
  - **Door Control**: Leadership also created signage and staff messaging to reinforce door security, reported using incentives and infractions to improve compliance with closed doors, and made facility-specific

adjustments such as placing additional officers at OBCC and cross-gate controls at RNDC.[148]

During this Monitoring Period, the Department did not develop a new written Security Plan that addressed the requirements of the Second Remedial Order and Action Plan. New Department leadership identified several security concerns requiring attention, but these efforts did not coalesce into the comprehensive, sustainable plan. Thus, the requirement to develop and implement a Security Plan continues to remain outstanding.

DOC's areas of focus are reasonable but fail to translate into sustainable initiatives that change staff practice. For example, while Department leadership has repeatedly emphasized door security and basic correctional practices, the initiatives often focus on transmitting information via teletypes/roll call briefings, making staffing adjustments, or attempting other limited-scope interventions without first establishing a concrete plan for ensuring that the requirements are implemented, staff are provided adequate guidance and supervision to implement the directives, and staff and supervisors are held accountable if they fail to meet their responsibilities. The problem has been and remains that the Department, due to its inability or unwillingness to develop a comprehensive and well-thought-out Security Plan, has lacked a consistent and disciplined process to develop, implement, improve, and measure the relevant security practices.

**Conclusion**

Poor security practices remain deeply entrenched across the Department. Staff continue to struggle with basic and foundational correctional responsibilities, including securing doors, maintaining posts, conducting meaningful tours, controlling movement safely and efficiently, and properly managing searches and escorts. These failures contribute directly to violence, disorder, unnecessary uses of force, and an increased risk of harm to both staff and incarcerated individuals. Despite years of plans, pilots, and discrete initiatives, the Department has not been able to implement, much less sustain, a Security Plan that has produced viable and consequential changes in day-to-day staff practice.

[148] In at least some locations in the jails, the physical doors in the Facilities must be replaced so that they can operate as designed. The First Remediation Action Plan, Action Step 2 requires the Department to identify and replace defective doors and the City to provide necessary funding. This is a critical step, but it must be emphasized that staff's practice of failing to lock operable doors remains a widespread and frequently-identified problem.

The appointment of the Remediation Manager and the Department's new leadership provide another opportunity to address these longstanding deficiencies in a more deliberate and disciplined manner. The work relating to the Remediation Action Plan will take time and be difficult, but it cannot be deferred. Improving basic security practice is foundational to reducing violence and the use of unnecessary and/or excessive force, and the Department must now approach this work with the urgency, sustained leadership attention, staff engagement, and rigorous follow-through necessary to produce lasting change.

| | |
|---|---|
| **COMPLIANCE RATING** | **Second Remedial Order ¶ 1(i)(a).** Non-Compliance<br>**Action Plan § D., ¶ 2(a).** Non-Compliance |

| **SEARCHES AND IDENTIFY/RECOVER CONTRABAND (ACTION PLAN, § D., ¶ 2(D) AND (E) AND AUGUST 10, 2023 ORDER, § I., ¶ 2)** |
|---|
| *Action Plan, § D, ¶ 2(d). Searches*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: : [. . . ]<br><br>(d) improved procedures on how searches are conducted, including addressing the Monitor's feedback that was provided in 2021.<br><br>*Action Plan, § D, ¶ 2(e). Identify/Recover Contraband*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: [. . . ]<br><br>(e) enhanced efforts to identify and recover weapons and other contraband.<br><br>*August 10, 2023 Order § I, ¶ 2. Revise Search Procedures*. By October 30, 2023, the Department, in consultation with the Monitor, shall reconstitute its search procedures and practices to ensure searches are conducted in an efficient, timely, safe manner and to reduce the possibility of a use of force. The new search procedures shall be subject to the approval of the Monitor. |

Searches are among the most frequent settings for uses of force, and in many cases, the need for force during searches could have been avoided had better practices and procedures been utilized. Additionally, improved search procedures are particularly critical in the Department's ongoing efforts to intercept and reduce the prevalence of dangerous contraband that is directly impacting the Department's operations and has also been connected to several in-custody deaths. Accordingly, improved search procedures are required by the Action Plan (dkt. 465), § D, ¶ 2 (d) and the August 10, 2023 Order (dkt. 564), § I, ¶ 2 and the Department is required to enhance efforts to identify and recover weapons and other contraband by the Action Plan (dkt. 465), § D, ¶ 2 (e).[149]

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with requirements related to searches and contraband recovery in Action Plan § D, ¶¶ 2 (d) and (e). The Court explained the basis for these finding at pgs. 22-26 in the "Failure to Correct Failures in Security and Basic Correctional Practice" section of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in non-compliance with Action Plan, § D, ¶ 2(d) (Searches), which is a downgrade from the prior Monitoring Period. The

[149] Contraband generally includes, but is not limited to, weapons, cell phones, illegal drugs, alcohol, cigarettes/tobacco, currency, and prescription drugs (*i.e.*, suboxone, prescription pain killers, anxiety medication, etc.).

Department remains in Partial Compliance with Action Plan, § D, ¶ 2(e) (Contraband). The history of compliance ratings for these provisions since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order § I, ¶ 2 (dkt. 564), as it relates to searches and contraband recovery. A compliance rating is not provided for this provision pursuant to the Court's March 18, 2026 Order (dkt. 967).

**Relevant Data and Information**

Searches of facility spaces, visitors, staff, and incarcerated individuals are a basic and necessary component of maintaining safe and secure jails. Searches must be conducted consistently and with fidelity to proper procedures in order to maximize the discovery of contraband and deter its presence. Searches must also limit disruption to operations in general and be conducted in a manner that minimizes the need to use force.

The Monitoring Team's findings for this Monitoring Period are based on the following available information.

- **Background**: The Department conducts thousands of searches each year. Searches are conducted for a variety of reasons: following incidents, based on intelligence, at random, or as part of operations conducted by facility staff or Special Teams. Currently, there is no clear framework for how these efforts fit together, what risks they are intended to address, or how the results are used to inform operations or future searches. The Department has consistently struggled to control contraband, which generally enters the facilities through four primary methods: visitors, jail staff, the mail, and repurposed materials from the physical plant. The Department's ability to improve its overall search practices is therefore directly tied to its ability to detect, deter and recover contraband.

  Violence remains commonplace in the jails, and stabbings and slashings using contraband weapons remain too frequent. Further, acute intoxication or overdose have resulted in 20 deaths confirmed by the Office of the Chief Medical Examiner since 2019. These deaths involved fentanyl, heroin, methadone, synthetic cannabinoids and other substances or combinations of drugs. Two recent deaths in custody showed apparent contraband use during the evening before the individuals were found unresponsive,

further demonstrating that contraband remains readily accessible for use within housing areas.

- **Number of Searches & Data**: During the current monitoring period, the Department conducted 50,763 searches (50,529 facility searches and 234 Special Team Searches). While the number of searches conducted is informative, it is not a measure of whether searches are effective in detecting and recovering contraband. DOC's data related to searches is limited, and the Monitoring Team has long recommended that the Department determine what information facility and Department leadership need to evaluate search practices and develop consistent requirements for collecting and reviewing that information. Examples of potential data points include the locations and types of searches conducted, the reasons for those searches, the types and quantities of contraband recovered and where it was found, and whether searches involved uses of force. Other useful information may include whether searches prompted by intelligence recovered the anticipated contraband, whether the same locations or individuals are repeatedly associated with recoveries, and when areas where serious incidents occur were last searched. This type of data should help the Department identify recurring contraband problems, determine where additional or different search efforts are needed, and assess whether changes in search practices are actually improving detection and recovery of contraband. Table 13(a) of Appendix C provides the number of facility and special searches conducted from 2022 to June 2026.
- **Contraband Recoveries and Interdiction**: From January to June 2026, the Department recovered 912 weapons, 359 drug-related items, 55 escape-related items, and 229 other contraband items. Table 13(b) of Appendix C shows the amount of contraband recovered from 2021 through June 2026. The Monitoring Team does not compare these recoveries with prior Monitoring Periods because changes in the number of recoveries may reflect many factors, including the quality of the searches conducted, number and type of searches conducted, how searches are targeted, and changes in reporting practices. The Department must analyze these factors in order to understand what the recovery data says about the effectiveness of search practices.
- **Searches and the Use of Force**: The Department does not specifically track *use of force incidents that occur during searches*. However, the Monitoring Team's review of

incidents from this Monitoring Period identified that of the 3,411 total uses of force, approximately 329 (10%) occurred during searches. The Monitoring Team's observations regarding these incidents are discussed in more detail below.

- **Monitoring Team's Observations of DOC's Search Procedures and Practices**: The dangerous conditions in the jails are exacerbated by the Department's failure to establish an overarching strategy for managing and evaluating searches, and by searches being executed in a haphazard and chaotic manner that is both inefficient and results in potential confrontations between staff and incarcerated people. These concerns are outlined in more detail below:
    - *Presence of Contraband*: The Monitoring Team's routine review of incidents and jail operations indicates a high prevalence of contraband in the facilities. For example, in August 2026, one facility reported recovering six vacuum-sealed bags containing approximately 150 grams of marijuana in a single housing area. In December 2025, 12 hobby blades and five scalpels were recovered from a single incarcerated individual in restrictive housing.
    - *Overarching Search Strategy*: Sound jail operations demand a comprehensive search program that executes searches in a coordinated and procedurally appropriate manner. The Department does not employ such an overarching strategy when determining when or how to conduct searches either system-wide or for a particular area. Decision-making about searches continues to occur in an *ad hoc* manner and is not governed by a consistent framework that adequately addresses when searches should occur, how they should be targeted, who should participate in the search, and how searches should be supervised and conducted. Further, the Department does not systematically assess the outcome of searches including consideration of intelligence, contraband recoveries, incident trends, and other available information to identify where contraband is coming from, where it is concentrated, and how resources for searches can be deployed most effectively.

- *Searches Practices*: The Monitoring Team has had longstanding concerns regarding how searches are conducted.[150] The manner in which many searches are conducted is disruptive and, often appears to be poorly planned and supervised, and thus unnecessarily escalates encounters with incarcerated individuals and results in avoidable uses of force. The Monitoring Team's review of incidents continues to identify the same problems that have been reported for years, including:
  - inadequate tactical planning and staff briefings,
  - perfunctory searches,
  - failures to anticipate resistance,
  - unnecessary uses of chemical agents in response to verbal refusal or passive resistance,
  - Supervisors who are present but do not meaningfully direct staff,
  - unsecured doors and poor span of control,
  - failures to activate body-worn cameras,
  - aggressive efforts to recover suspected contraband,
  - unprofessional staff conduct that increases tension, and
  - excessive and invasive strip searches at RESH (discussed in more detail in the "Strip Searches in RESH" subsection of the "Managing Behavior of People in Custody" section of this report).
- *Monitoring Team Recommendations*: For more than five years, the Monitoring Team has repeatedly provided feedback and recommendations to improve the Department's search policies and practices. This includes recommendations on tighter spans of control, improved coordination with medical staff, improved procedures for searches of dormitory, celled, and common areas, and use of

[150] *See*, for example, Monitor's April 3, 2017 Report (dkt. 295) at pgs. 13-14 and 128; Monitor's October 17, 2018 Report (dkt. 317) at pg. 42; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 16, 29, and 75; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 24, 43-44, 48 and 124; Monitor's December 6, 2021 Report (dkt. 431) at pg. 26; Monitor's March 16, 2022 Report (dkt. 438) at pgs. 22 and 71-72; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 71-72, 81, and 117; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 54 and 138; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 42-43; December 22, 2023 Monitor's Report, (dkt. 666) at pgs. 17-22; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 69-75, 159; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 65-66 and 177-178; Monitor's May 22, 2025 Report (dkt. 849) at pgs. 71-79; Monitor's May 22, 2025 Report (dkt. 849) at pgs. 71-79; and Monitor's January 13, 2026 Report (dkt. 947) at pgs. 174-188.

"Anticipated Use of Force" procedures when an individual refuses a search, better management of movement and property during searches, post-search review and data analysis, improved communication with incarcerated individuals, supervisory involvement when an individual refuses to comply, and additional search training.

- **DOC's Efforts to Improve Search Practices**: The status of the Department's work is outlined below:
  - The Department reported probationary officers received training on identifying paper-based contraband.
  - In April 2025, the Department proposed a six-phase process to revise the Department's search procedures (including revisions to the relevant search policies - Directive 4508R-E and 11 related Operations Orders) as required by the August 10, 2023 Order § I, ¶ 2. The proposal contemplated that the work would begin with stakeholder review of existing search-training materials, followed by revisions of the relevant Directives and Operations Orders, development of updated training and reference materials, and phased implementation across the facilities. The Department also identified, collected, and collated all relevant requirements and regulations regarding these practices (including recommendations from the Monitoring Team). The overall goal was to create a more coherent, standardized search system with clearer requirements for planning, coordination, documentation, training, and accountability. The plan provides a reasonable pathway towards advancing compliance with this provision. However, the Department has not taken any steps to implement the plan, nor has the Department otherwise taken any meaningful steps to address the Monitoring Team's recommendations to improve its search procedures.
  - The operational initiatives led by the then-Deputy Commissioner initiated during the 20th Monitoring Period (*e.g.,* more strategic deployment of tactical searches, increased scrutiny of the frequency, methods, documentation, and results of facility searches, and video training on proper cell search and pat-frisk

techniques[151]), as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 180-182, no longer appear to be in place.

- **Contraband Interdiction**: During this Monitoring Period, the Department continued several contraband-related initiatives described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 183-187. These include use of body scanners for incarcerated individuals and at facility entrances for staff, the centralized Mail Screening Distribution Unit, CEIA cell-phone detectors, the use of a tablet-based system for documenting ESU, Strategic Response Team ("SRT"), and Special Search Team ("SST") search operations, enhanced scrutiny of visitors[152] and physical plant improvements such as replacing Lexan with security glass and installing additional fencing. Upgrades to the body scanners for staff are underway, a new machine was installed at the Bellevue Outpost Unit, and the Department is seeking an additional new machine for the WF staff entrance.[153] While these initiatives address potential avenues for contraband entry, given the volume of contraband in the jails additional tools and efforts are clearly needed.

**Conclusion**

Searches are a basic and necessary security practice in any correctional system. The Department has taken some steps to improve its ability to detect and intercept contraband, including improving technology, centralizing mail screening, and reducing reliance on Special Teams for routine searches. However, the Department has not made sufficient progress on the core requirements governing how searches are planned, conducted, supervised, and reviewed. Although a plan to revise the search-related policies was developed, it has essentially been abandoned and no alternative plans or improved procedures have been developed. Accordingly, the Department is in Non-Compliance with the requirements to implement improved security

[151] At the end of the 20th Monitoring Period, the Department developed training videos on proper search procedures and pat frisk techniques and showed these videos to at least some staff at roll call. The Monitoring Team recommended that during the video presentations, additional guidance be provided on body-worn cameras, communication with incarcerated individuals, and the care and respectful management of personal items such as family photos and letters, but the Department never responded to these recommendations. In addition, the training videos were not shown to staff during the current Monitoring Period.

[152] During this Monitoring Period, DOC reported that CIB coordinated 63 arrests of visitors.

[153] X-ray machines, walk-through metal detectors, and body scanners at the facilities' front entrances remain in use for staff as described in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 183. The status of the updates to the staff body scanners can be found in the "Staff Body Scanning" section of Appendix J of this report.

practices and procedures on how searches are conducted, including addressing the Monitor's feedback that was provided in 2021, enhancing efforts to identify and recover weapons and other contraband, and ensuring searches are conducted in an efficient, timely, safe manner that reduces the possibility of a use of force.

The Department's continued efforts to detect and intercept contraband support a continued rating of Partial Compliance with the requirements related to contraband recovery. These initiatives reflect ongoing efforts to address potential avenues of contraband entry, but the Department must do more to assess their effectiveness and use the results to improve its practices.

Significant work remains to establish sound search procedures, improve supervision and de-escalation during searches, use intelligence and recovery data to better target search activity, and identify and close the pathways through which dangerous contraband enters and circulates within the jails. Given the substantial risk of harm associated with weapons and drugs in the facilities, greater urgency and focus in this area is necessary.

| | |
|---|---|
| **COMPLIANCE RATING** | **Action Plan, § D, ¶ 2(d).** Non-Compliance<br>**Action Plan, § D, ¶ 2(e).** Partial Compliance |

| **ESCORT PROCEDURES (ACTION PLAN § D., ¶ 2(F) AND AUGUST 10, 2023 ORDER, § I., ¶ 3)** |
| --- |
| *Action Plan § D., ¶ 2(f). Escort Holds*. The Department shall implement improved security practices and procedures, including, but not limited to, the following items outlined below: (f) improved escort techniques to eliminate the unnecessary use of painful escort holds. <br><br> *August 10, 2023 Order § I., ¶ 3. Revise Escort Procedures*. By, October 30, 2023, the Department, in consultation with the Monitor, shall revise its escort procedures and practices to eliminate the use of painful escort holds. The new escort procedures shall be subject to the approval of the Monitor. |

Painful escorts and poor escorting practices have contributed to unnecessary uses of force for years. For this reason, the Action Plan (dkt. 465), § D, ¶ 2(f) requires the Department to have improved escort techniques to eliminate the unnecessary use of painful escort holds and improve escort practices and procedures. Given the Department's lack of progress on this issue, the Court ordered on August 10, 2023 (dkt. 564), § I, ¶ 3 that the Department must revise its escort procedures and practices to eliminate the use of painful escort holds and improve escort holds generally. The new escort procedures are also subject to the approval of the Monitor.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Action Plan § D, ¶ 2(f). The Court explained the basis for its finding at pgs. 22-24 in the section "Failure to Correct Failures in Security and Basic Correctional Practice" of the 2024 Contempt Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Non-Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

Below, the Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 3 which requires the Department to revise its escort procedures, but a compliance rating is not provided for this provision pursuant to the Court's March 18, 2026 Order (dkt. 967).

**Relevant Data and Information**

The Monitoring Team has long been concerned about how often routine escorts result in uses of force. Escorts are a basic security practice that supports the safe movement of an

individual from one location to another and, in most cases, should not require force. When force is used during an escort, it often suggests that some aspects of the escort procedure have not worked as designed, whether because of improper escort technique, lack of control, poor communication, poor supervision, or failure to de-escalate.

The Monitoring Team remains concerned about the frequency with which problems occur during escorts. Routine discussions with Department leadership and Wardens reflect persistent reports of problems with escort practices, and ongoing efforts to provide guidance to staff on proper procedures, which have not yet resulted in improved practice. Outlined below is a summary of the issues observed. The Monitoring Team's findings for this Monitoring Period are based on the following available information.

- **<u>Escorts & Use of Force</u>**: While not all incidents involving escorts are catalyzed by poor escort practices or inappropriate and/or painful escort techniques, the number of use of force incidents involving escorts is notably higher than what the Monitoring Team has observed in other correctional systems. Outlined below are various data points identified during different reports/reviews of use of force incidents:
    - "Resistance during escort" was the primary reason force was used in 433 (13%) of the 3,411 use of force incidents that occurred during this Monitoring Period, as reported by the Department.
    - Facility leadership (via the Rapid Review) identified escort-related issues in 322 (9%) of the 3,411 use of force incidents[154] that occurred during this Monitoring Period. These issues included improper technique, poor situational awareness, security violations, supervision failures, or escorting individuals without proper attire.
    - During its routine reviews, the Monitoring Team determined that force occurred during the movement or escort of an individual in 1,337 (39%) of the 3,411 use of force incidents that occurred during this Monitoring Period.

[154] This number does not appear to identify the full universe of violations, as the Monitoring Team's observation of practice suggests the problems are far more prevalent. Further, as discussed in other sections of this report, the Monitoring Team has found that facility leaders' Rapid Reviews do not reliably identify *all* violations.

- **<u>Contributing Dynamics to Escorts & Use of Force</u>**: The Monitoring Team's review of use of force incidents continues to identify significant problems with how escorts are planned, supervised, and conducted. In particular, the following patterns have been identified:
    - Staff routinely fail to maintain appropriate physical control, including conducting one-handed escorts, failing to use required restraints or enhanced restraints, losing control of individuals during movement, and moving restrained individuals through areas where other individuals remain unsecured.
    - Escorts are also frequently conducted without adequate control of the surrounding environment, including unsecured doors and gates, intersecting movements, crowded corridors, and insufficient separation of individuals involved in prior conflicts.
    - Staff continue to use improper and unnecessarily painful escort techniques (*e.g.*, bent wrist hold and upward arm bend), sometimes after the individual is restrained or otherwise compliant.
    - Staff who were directly involved in the use of force before the subsequent escort are not regularly replaced by an uninvolved staff member, which unnecessarily prolongs contact between staff and incarcerated individuals following a confrontation.
    - Supervisors frequently fail to provide clear direction, correct improper escort holds, ensure appropriate restraints are used, control the escort route, or otherwise intervene when foreseeable security risks are present.

  These problems are consistent with those discussed in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 190-194, and no improvement was observed during the current Monitoring Period.

  The frequency and variety of these deficiencies demonstrate that the Department still has not established a reliable escort practice grounded in basic security, appropriate restraint, de-escalation, and active supervision. Escorts too often become another source of disorder or unnecessary force rather than a controlled means of safely moving people through the facilities.

- **Revised or Alternative Escort Techniques**: The August 10, 2023 Order required the Department to revise its escort procedures and practices to eliminate painful escort holds, subject to Monitoring Team approval. To date, the Department has not identified or otherwise proposed any solutions or alternatives regarding the Monitoring Team's feedback on the Department's current escort techniques. In September 2023, the Monitoring Team made recommendations to improve staff practice, including recommending an alternative escort technique. In May 2024, the Department formally rejected this recommendation, citing potential safety concerns, but did not offer an alternative approach or next steps and essentially asserted the *status quo* would remain. There have been no further updates and no movement by the Department.
- **Restraint Chairs**: DOC currently utilizes restraint chairs (*e.g.,* PowerTraxx and SureGuard Safety Chair) designed to restrain an individual during transport. Restraint chairs are specialized physical immobilization devices utilized and designed to secure a violent, combative or self-harming individual in an upright, seated position using multi-point straps across the waist, shoulders, wrists, and ankles to prevent self-injury or injury to staff. Restraint chairs can be a useful tool in jail operations. That potential benefit, however, depends on clear limits and appropriate safeguards. Without device-specific procedures and training, there is a risk that the restraint chair will be used improperly, unnecessarily, or without adequate medical and supervisory oversight. While the Department may have a legitimate need for restraint chairs, their use does not address the underlying deficiencies in the Department's escort practices regarding how staff plan, supervise, control, de-escalate, and conduct routine escorts.[155] The Monitoring Team nonetheless addresses restraint chairs in this section because the Department introduced the SureGuard Safety chairs, at least in part, as a purported means of addressing escort situations and the requirements of this provision.
    - *DOC's Use of SureGuard Restraint Chair & Monitor Recommendations*: The Department obtained five SureGuard Safety Chairs in October 2025 in response to a recommendation from one of DOC's former Consultants[156] that the

[155] *See*, for example, Monitor's June 17, 2026 Report (dkt. 984) at pgs. 112 to 115 and the Court's November 26, 2024 Order (dkt. 803) at pgs. 22-24.

[156] *See*, Monitor's January 20, 2026 Report (dkt. 947), footnote 10 at pg.9 and pgs. 9-17

Department should consider a restraint chair to generally address the Monitoring Team's concerns regarding escort practices and for situations in which an individual remains combative after being handcuffed. In this Monitoring Period, DOC reported that ESU showed facility staff how to operate the restraint chairs during an initial rollout and that the restraint chairs were available for use in the facilities. Contrary to the Department's prior position, DOC reported that it was not going to issue a separate policy for the restraint chair and the restraint chair would be governed by policies and procedures related to the gurney.[157] This is a misguided characterization of the proper use of a restraint chair. Further, the Monitor was not consulted, nor was approval obtained, as required by § IV, ¶ 3(p) of the Consent Judgment, regarding any policies and procedures governing the use of the restraint chairs. Accordingly, at the end of the Monitoring Period, after learning that the SureGuard Restraint Chair was in use, the Monitoring Team strongly recommended that the Department immediately suspend using restraint chairs until adequate policies and procedures are in place and approved by the Monitor. The Monitoring Team provided specific recommendations and feedback for consideration in development of the policy. The Monitoring Team also recommended that DOC provide clarification to staff regarding the use of the Jetweel Chair (a transportation chair) to ensure its use is limited to its intended purpose.[158] The Department reported it intended to adopt the Monitoring Team's recommendations. In July 2026, Department leadership directed all facilities to remove restraint chairs and the Jetweel from service and place them in facility

[157] At the end of 2025, the DOC reported to the Monitoring Team that the Sure Guard Safety Chair would be distributed after a policy has been drafted and staff had been trained. *See* Monitor's 20th Report (dkt. 947) at pg. 172. It is unclear how or why DOC subsequently determined that a separate policy regarding the use of the Restraint Chair was no longer necessary and that instead it would be sufficient to rely on the Department's policy regarding the use of gurneys.

[158] At the time the Monitoring Team issued these recommendations, it had just reviewed a recent use of force incident involving the Jetweel chair which suggested that there is an additional and separate misunderstanding about the use of transportation chairs more generally. It is the Monitoring Team's understanding that the Department does not maintain a policy on the use of the Jetweel chair, but has a Security Memorandum in place, providing some basic guidance on its use. The use of force incident reviewed involving the Jetweel appears to be an example in which the Jetweel may be used in a manner that is not consistent with its intended purpose and potentially in ways that are more akin to a restraint chair. The Monitoring Team recommended that immediate and improved policy guidance be developed on the use of the Jetweel (or similar transportation devices) to ensure that their use is limited to the purpose of the particular equipment and to address any potential confusion among staff.

storehouses pending the development of appropriate policy and training. DOC also reported that it is developing appropriate policy and training materials in line with the Monitoring Team's feedback.

**Conclusion**

Despite the Monitoring Team's longstanding and repeated feedback, the Department has not demonstrated any improvement to its escort practices. The frequency of escort-related force warrants a fundamental reexamination of how the Department plans and performs this basic correctional function. The Monitoring Team's review of incidents and the Department's Rapid Reviews identify frequent and recurring problems during the escort process. The persistence and breadth of these issues indicate that the problem is not limited to a single technique or isolated training deficiency, but rather that the Department has not established or institutionalized a reliable escort practice grounded in basic security, appropriate control, de-escalation, and active supervision.

The Department's introduction of restraint chairs does not resolve this concern. Although a properly governed restraint chair may be appropriate in limited circumstances, the rollout itself occurred without clear policy and device-specific training, and the equipment cannot address the underlying failures that cause routine escorts to escalate into uses of force. Significant work remains to address these root causes and change longstanding practices through a sustained, comprehensive effort to improve policy, training, supervision and accountability. The Department therefore remains in Non-Compliance.

| | |
|---|---|
| **COMPLIANCE RATING** | **Action Plan § D., ¶ 2(f).** Non-Compliance |

| **FACILITY EMERGENCY RESPONSE TEAMS (FIRST REMEDIAL ORDER § A., ¶ 6)** |
| --- |
| *First Remedial Order § A., ¶ 6. Facility Emergency Response Teams.* Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (*i.e.*, probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented. <br><br> *August 10, 2023 Order § I., ¶ 7. Special Teams Training*. By, August 31, 2023, the Department, in consultation with the Monitor, shall develop a training program and provide such training to Special Teams[159]. The training program shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of the training program shall include, among other things, procedures and protocols for use of force, conducting searches, and responding to alarms and emergency situations in a manner that ensures the safety of incarcerated individuals and staff. The content of the training programs shall be subject to the approval of the Monitor. <br><br> *August 10, 2023 Order § I., ¶ 8. Revise Special Teams Command Level Orders*. By, November 30, 2023, the Department, in consultation with the Monitor, shall review and revise as necessary all of Special Teams command level orders related to the use of force. The new Special Teams command level orders related to the use of force shall be subject to the approval of the Monitor. <br><br> *August 10, 2023 Order § I, ¶ 9. Screening and Assignment of Staff to Special Teams*. By, October 30, 2023, the Department, in consultation with the Monitor, shall revise and implement its screening and assignment process for the initial assignment to Special Teams and routine reassessment of Special Teams staff to ensure the staff assigned to Special Teams are appropriately fit for duty. The Department's screening policy and reassessment procedures shall be subject to the approval of the Monitor. |

The overall goal of these provisions is to minimize unnecessary or avoidable uses of force by Emergency Response Teams. A series of Court Orders have been entered to address the Department's use of Emergency Response Teams. The First Remedial Order (dkt. 350), § A, ¶ 6 was imposed by the Court to address concerns that facility operations often over-relied on Emergency Response Teams and that the Emergency Response Teams needlessly exacerbated situations, were often overstaffed, and routinely responded to incidents with a show of force that was disproportionate to what triggered the incident. Given the ongoing concerns, in 2022, the Court reiterated these obligations in Action Plan, § D, ¶ 2(c) and also required the Department to address the Monitoring Team's feedback from 2021. The Court's August 10, 2023 Order (dkt. 564) was entered to address the ongoing concerns about Emergency Response Teams by

[159] Special Teams is defined as the Emergency Services Unit and any functional equivalent unit, including, but not limited to the Strategic Response Team and the Special Search Team.

requiring training for Special Teams (§ I, ¶ 7), revisions to Command Level Orders for Special Teams (§ I, ¶ 8) and Screening and Assignment of Staff to Special Teams (§ I, ¶ 9).

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with First Remedial Order (dkt. 350), § A, ¶ 6. The Court explained the basis for its finding at pgs. 34-37 in the "Failure to Curb the Emergency Response Teams' Excesses" section of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

Given the requirements of the August 10, 2023 Order (dkt. 564) are related to the other provisions regarding Emergency Response Teams, the Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order § I, ¶¶ 7-9 (dkt. 564), as it relates to the First Remedial Order § A, ¶ 6. Compliance ratings are not provided for these provisions pursuant to the Court's March 18, 2026 Order (dkt. 967).

**Relevant Data and Information**

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **Emergency Response Teams**: Emergency Response Teams can serve an important role in a correctional system and, in some circumstances, may be necessary to safely terminate serious incidents or disturbances. However, specialized response teams must be carefully structured and managed. Policy must clearly define each team's purpose, distinguish the roles and responsibilities of the different teams, establish requirements for staff selection and training, and specify criteria for deployment. Leadership must provide meaningful oversight to ensure these requirements are followed, and responses are measured, effective, and consistent with sound correctional practice. There are two types of Emergency Response Teams utilized by the Department: (1) Facility Response Teams

or Probe Teams, which are teams of facility-based staff, and (2) Special Teams,[160] which include the Emergency Services Unit, a specialized team of staff specifically dedicated and trained to respond to emergencies across the Department; the Strategic Response Team and the Special Search Team, which function similarly to ESU and are deployed to facilities as part of operational security efforts. ESU, SRT, and SST often perform similar or overlapping functions, including conducting searches within the facilities. More information about Special Teams and searches can be found in the compliance assessment for Action Plan, § D., ¶ 2(d) and (e) and August 10, 2023 Order, § I., ¶ 2, Searches and Identify/Recover Contraband. SRT and SST are not governed by any policies and procedures. Department leadership have reported inconsistent (and sometimes conflicting) understandings of the respective roles and responsibilities of ESU, SRT, and SST. These broader structural concerns are compounded by continuing deficiencies in the practices governing both Special Teams and Probe Teams, as discussed below.

- **Emergency Response Teams Practices**: The Monitoring Team has long-standing concerns about the practices of both Probe Teams and Special Teams[161] which generally center around the issues below.
  - *Recurring Issues*: The Emergency Response Teams often provide a delayed response, and when teams arrive, they frequently include more staff than necessary, many of whom have not been screened for suitability to serve on the team. The Emergency Response Teams are generally not well supervised, resulting in chaotic and disorganized responses. Further, in many cases, the team's supervisor engages directly in the use of force and fails to properly supervise and direct staff to guide or correct their behavior. The conduct of team members is often hyper-confrontational, and teams often fail to adequately secure the scene. De-escalation tactics and anticipated use of force protocols are often not utilized

[160] Special Teams are defined, pursuant to the August 10, 2023 Order (dkt. 564), ¶ 7 as the Emergency Services Unit and any functionally equivalent unit, including, but not limited to the Strategic Response Team and the Special Search Team. The Special Teams are generally utilized in the facilities in the same manner as a Probe Team.

[161] *See* Monitor's May 11, 2021 Report (dkt. 368) at pgs. 38-50 and 116-120; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 49-51; Monitor's June 3, 2021 Report (dkt. 373) at pgs. 3-4; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 137-143; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 34-42; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 17-22; and Monitor's April 18, 2024 report (dkt. 706) at pgs. 69-75.

when they should be. The deployment of Emergency Response Teams often disrupts operations throughout the jail and has a cascading effect beyond where the disturbance first occurred. Together, these problems often result in unnecessary force, elevated risk of harm, disorder, and general disruption in facility operations.

- *Use of Tactical Equipment*: ESU is authorized to utilize a variety of tactical equipment under certain circumstances. Historically, the Monitoring Team has been concerned about whether policy guidance regarding the use of such equipment is sufficient and whether its deployment is appropriate and necessary. ESU has significantly curtailed its use of tactical equipment over the last few years. Outlined below is a non-exhaustive list of authorized tactical equipment and the status of its use.
  - **Batons**: The use of batons by Probe Teams and Special Teams was commonplace in the early years of this case. The Monitoring Team raised concerns about frequent misuse of batons by Emergency Response Teams and recommended the Department evaluate the batons utilized by Probe Teams and Special Teams,[162] which staff could carry them, and the governing policy. ESU's equipment now includes the 24-inch Monadnock Expandable Baton, an expandable metal baton. Since May 2025, use of batons is now rare.[163]
  - **Pepperball System**: ESU maintained the Pepperball system as a specialized chemical-agent tool. In 2021, the Monitoring Team found that the Command Level Order lacked sufficient guidance on when the Pepperball can be used as part of the use of force continuum and which circumstances warrant its use. Recommended revisions went unaddressed for almost two years.[164] As of March 2024, the Department had not

[162] *See* Monitor's April 18, 2019 Report (dkt. 327) at pgs. 54–55.

[163] *See* Monitor's May 22, 2025 Report (dkt. 850) at pgs. 20–21; and Monitor's June 17, 2026 Report (dkt. 984) at pg. 37.

[164] *See* Monitor's December 6, 2021 Report (dkt. 431) at pg. 55.

updated the policy but ceased use of the Pepperball system and directed that the equipment be stored indefinitely.[165]

- **Chemical Agents Grenades**: ESU's equipment also includes Sabre Phantom Fog Aerosol Grenades. The Monitoring Team identified a number of instances in which the use of the grenades occurred during routine incidents that did not appear to warrant the use of this emergency response tool (*e.g.*, used on passively resistant individuals when no exigent circumstances were present). In 2021, the Monitoring Team raised concerns that the Department's policies lacked sufficient guidance on when and how to use the grenades and recommended revising the policy.[166] Since May 2025, there have been no reported uses of the grenades.[167] The Department has not addressed the Monitoring Team's recommendations, and policy revisions remain outstanding.
- **Tasers**: From 2021 to January 2023, ESU utilized tasers. The Monitoring Team worked with ESU to develop an approved policy. The use of tasers was closely scrutinized given the level of potential harm. The Monitoring Team raised concerns that, in some cases, tasers appeared to be used without exhausting available de-escalation tactics and/or without sufficient resistance to justify their display and use. There has been no report of the use of tasers since January 2023.[168]
- **Stun Shields/Electronic Immobilization Shields**: The Department maintains electronic immobilization shields, which are governed by a standalone policy.[169] The Monitoring Team identified concerns about staff using shields to strike or push individuals when such force was

[165] *See* Monitor's April 18, 2024 Report (dkt. 706) at pg. 162 & fn. 119; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 182–183 & fn. 164.

[166] *See* Monitor's December 6, 2021 Report (dkt. 431) at pg. 55; Monitor's November 22, 2024 Report (dkt. 802) at pgs. 182–183; and Monitor's June 17, 2026 Report (dkt. 984) at pgs. 87–88.

[167] *See* Monitor's May 11, 2021 Report (dkt. 368) at pgs. 123–124; Monitor's May 22, 2025 Report (dkt. 850) at pgs. 20–21; and Monitor's June 17, 2026 Report (dkt. 984) at pg. 119.

[168] *See* Monitor's October 28, 2022 Report (dkt. 472) at pgs. 118 and 120; Monitor's April 3, 2023 Report (dkt. 517) at pg. 142 & fn. 124 and Monitor's May 22, 2025 Report (dkt. 850) at pgs. 20–21.

[169] *See* Monitor's October 17, 2018 Report (dkt. 317) at pg. 42.

unnecessary, including individuals who were passive or posed no threat. Using shields in this manner risked strikes to the head and other injuries, escalating force rather than safely containing the situation. Since May 2025, the use of stun shields has been rare.[170]

- **<u>Policies and Procedures of Emergency Response Teams</u>**:
  - *Probe Teams*: The Department maintains an Incident Command Policy which ostensibly governs Probe Team responses. The policy has many deficiencies, and the Department does not faithfully adhere to it. The Monitoring Team recommended revisions to the policy in 2021 that have not yet been addressed. The Department still has not established clear criteria for when a Probe Team should be activated, who makes the decision to deploy the team, or what the Tour Commander's responsibilities are in managing the response. Further, the Department has not established clear criteria for who may serve on Probe Teams nor a reliable screening process, nor has it prescribed how many staff should respond nor sufficiently defined their roles.
  - *Special Teams*: There are no policies or procedures governing the Department's overarching use of Special Teams (ESU, SRT or SST).
    - **Screening/Assignment to Special Teams**: The Department maintains a policy for screening and assignment to Special Teams, but it has many deficiencies and does not address the requirements of the *Nunez* Court Orders.[171] In September 2023, the Department shared proposed revisions to the Special Teams screening and assignment policy. The Monitoring Team provided feedback to the draft policy in October 2023. The Department has not shared a revised policy in response to the Monitoring Team's 2023 recommendations. In fall 2025, the Monitoring Team recommended the Department adopt temporary interim measures until the policy had been revised. The Department has not yet provided a revised

[170] *See* Monitor's May 22, 2025 Report (dkt. 850) at pg. 15; Monitor's January 13, 2026 Report (dkt. 947) at pg. 45; and Monitor's June 17, 2026 Report (dkt. 984) at pg. 37.

[171] DOC policy requires screening for both the Support and Permanent Teams of ESU and the August 10, 2023 Order (dkt. 564) requires screening for all Special Teams.

draft of the policy, and while some stopgap procedures appear to be in place, the screening process is not systematic or planned and, in some cases, has not occurred at all.

- **ESU Policies & Procedures***:* The Department reports that ESU has nine Command Level Orders ("CLOs")[172] and that the other Special Teams (including SST and SRT) do not have any. No meaningful steps have been taken to revise these policies, and the Monitoring Team's feedback on policies regarding the use of Aerosol Grenades, Pepperball spray, and Ballistic and Lethal Weapon Teams remain outstanding.

- **Selection and Assignment to Special Teams**: Screening staff prior to assignment to Special Teams or Probe Teams is a basic requirement for ensuring that Emergency Response Teams are appropriately staffed and managed.
  - *Screening and Assignment to Probe Teams*: The facilities do not have selected staff assigned to the Probe Team and do not screen the staff who serve on a team *ad hoc*.
  - *Assignment to Special Teams*: The Department's assignment of staff to Special Teams remains complicated and confusing, and there is no *centralized* tracking of staff assigned to the Special Teams.[173] There are at least six different rosters of staff assigned to ESU, SRT, and SST.[174] On a daily basis, staff on the rosters of Special Teams are "called-out" of their assigned facility to serve on ESU, SRT, or SST. Facility leadership at all facilities report that these daily call-outs contribute to the destabilization of staff assignments within the facilities.

---

[172] The nine CLOs are: Extractions on Rikers Island; Protective Security Detail; Hospital Runs; ESU Response to the Situational Use of a Firearm or Threat of Same; Hurricane Evacuation; Orange Alert Response on Rikers Island; Red Alert Response on Rikers Island; High Security Escort Operation Guideline and Procedure; and Ballistic and Lethal Weapon Teams. These CLOs are required to be updated and subject to Monitor approval pursuant to the Court's August 10, 2023 Order § I, ¶ 8.

[173] The staffing consultant and Remediation Manager Team's senior expert are actively assessing the staffing and duties of the Emergency Response Teams and consulting with the Monitoring Team as a part of this assessment.

[174] The ESU and SRT Teams are comprised of both Permanent Teams (staff who are officially assigned to ESU or SRT) and Support Teams that are technically assigned to a facility command and report to that command unless ESU or SRT need additional staff, at which point they will be redeployed to ESU or SRT instead. The Monitoring Team has found that a large number of staff on the Support Team are routinely called to participate in ESU or SRT activities and are ostensibly part of the team full-time. The Department reports it does not technically assign staff to the SST; staff are assigned to the facilities but are "on-call" for assignment to the SST as needed, including those who are part of SST's "Permanent" Team.

- As of the end of the Monitoring Period, the Department reported that approximately 247 staff were assigned to Special Teams (approximately 114 to ESU, 70 to SRT, and 63 to SST). Notably, the Monitoring Team has ongoing concerns about management of the roster. While the staff on the roster list remained generally static compared with the prior Monitoring Period when the rosters changed month-to-month, it does not appear that the rosters are maintained in a format that is fully reliable.[175]

- *Screening of Staff Assigned to Special Teams (August 10, 2023 Order § I, ¶ 9)*: The Department does not have a reliable process for selecting and screening staff assigned to Special Teams, and selection remains insular. For the last few years, rather than broadly advertising openings, the Department has relied on assignment of former or previously trained members of Special Teams to fill vacancies. The Department does screen some staff for ESU and SRT but does not do so consistently for all staff before they are assigned to those teams.
  - During this Monitoring Period, 7 staff were added to ESU and 21 to SRT. The number of staff added to SST is unknown as the Department has not reliably produced SST rosters to the Monitoring Team.[176] Of the 28 staff added to ESU/SRT during this Monitoring Period, 17 (61%) were screened and the screening materials did not raise any questions regarding the individual's fitness for the position. An additional 4 (14%) staff were screened, and their screening materials raised questions and concerns about their fitness for appointment, but they were placed on the unit.[177] Seven (25%) of the 28 staff added to ESU/SRT were not screened prior to their appointment. Finally, the required ongoing screening of staff who remain assigned to Special Teams

[175] The Department has long reported to the Monitoring Team that it does not maintain a roster of staff assigned to the SST, but the Department's staffing consultant was able to obtain rosters of staff assigned to SST's Permanent and Support Teams and provided them to the Monitoring Team. This data is based on the SST Rosters from the DOC's staffing consultant. Further, for some months in this Monitoring Period, the DOC produced different versions of its ESU Rosters for the same month. It is unclear how or why there may be different versions of the roster for the same months it purportedly captures.

[176] *See* previous two footnotes.

[177] The screening materials revealed negative recommendations from some Divisions and/or concerning disciplinary histories related to force.

essentially does not occur. The Department's failure to consistently screen staff undermines the purpose of such screening and increases the risk of inappropriate assignments of personnel to these teams.

- **Reduced Deployment of Emergency Response Teams**: Emergency Response Teams have historically been overused and often arrived after incidents already ended.
  - *Deployment of Emergency Response Teams*: In this Monitoring Period, Emergency Response Teams were involved in 385 (11%) (67 for Special Teams and 318 for Probe Teams) of the Department's 3,411 use of force incidents. This is a decrease from 2024, when 15% of uses of force involved an Emergency Response Team. Moreover, ESU was involved in 12 use of force incidents during this Monitoring Period. The ongoing reduction in Emergency Response Team deployments and involvement in use of force incidents is encouraging.
- **De-escalation**: The Department has taken important steps to reduce the impact of Emergency Response Teams, including developing Special Teams training, reducing deployment of teams, discontinuing the use of certain problematic equipment, and utilizing the Rapid Review process to evaluate use of force incidents involving Special Teams. However, these efforts have not resulted in sufficient culture change in Emergency Response Teams to ensure that their conduct is appropriate and their practices are consistent with policy.
  - *Practices*: The Department has not taken specific and concrete steps that are necessary to alter the practices of Emergency Response Teams. This remains a concern, as discussed in the introduction to the compliance assessment of this provision.
  - *Training*: As required by the Court's August 10, 2023 Order § I, ¶ 7, the Department created Special Teams training[178] in February 2024 and began delivering it in April 2024. In this Monitoring Period, the Department reports that only seven staff received Special Teams training, which seems unreasonable given the number of individuals added to the Special Team rosters.[179] Moreover, ESU has not conducted the periodic

---

[178] The Special Team training was developed in close collaboration with the Monitoring Team and Training Division, and addressed de-escalation, proportional use of force, restraints, and prohibited tactics.

[179] Shortly after the rollout of the training, the Department reported that ESU would self-manage the cadence and delivery of the training for special teams.

refresher training initially envisioned for existing staff to build skills or address problematic practices. Further, Probe Team members do not receive comparable specialized training even though they perform similar emergency response functions within the facilities. The Department's current approach will not meaningfully improve practice given that training is not routinely delivered, properly managed, or tailored to the staff responding to emergencies.

- *Reduced or Discontinued Use of Tactical Equipment:* Tactical equipment can serve a legitimate purpose when its use is necessary, proportionate, and consistent with policy. As discussed above, the Monitoring Team has previously raised concerns about the *use* of certain tactical equipment by Emergency Response Teams when it appeared to be inappropriate or unnecessary. Special Teams have essentially ceased using certain tactical equipment (*e.g.*, Tasers, OC grenades, and the Pepperball system).[180] This has reduced concerns about misuse, although clear policy guidance and appropriate oversight remain necessary for any equipment that continues to be authorized for use.
- *Evaluation of Special Team Practices*: The First Remedial Order, § A, ¶ 6 also requires Department leadership to regularly review Emergency Response Team deployments for compliance with policy, document the findings, and address violations through instruction, counseling, or pursuit of appropriate discipline. Although the Department has a Rapid Review process in place, these reviews do not consistently identify whether Special Team deployments were unnecessary, avoidable, or poorly managed. Between January and June 2026, the Department completed Rapid Reviews for 67 use of force incidents involving Special Teams. Seventeen policy violations were identified. Nearly half involved Body-Worn Camera violations, and one involved the use of unauthorized gloves. Other violations involved the use of chemical agents and staff conduct. However, Rapid Reviews did not consistently address the broader concerns about the use of potentially improper force identified through the Monitoring Team's review of incidents, including

[180] Regarding Tasers, *see* Monitor's April 3, 2023 Report (dkt. 517) at pg. 142 and 125; regarding Tasers and OC grenades, *see* Monitor's May 22, 2025 Report (dkt. 850) at pgs. 20–21 and Monitor's June 17, 2026 Report (dkt. 984) at pg. 119; regarding the Pepperball system, *see* Monitor's April 18, 2024 Report (dkt. 706) at pg. 162 & fn. 119.

allegations of head strikes and prohibited holds. These findings suggest that the Department's review process does not yet identify and address underlying concerns about how these teams operate. The Department's oversight of Probe Teams continues to require closer supervision, a more consistent structure and application for deployment and incident reviews, and the establishment of clearer expectations regarding the need for containment, de-escalation, proper escort practices, and incident termination.

**Conclusion**

The Department deploys Emergency Response Teams less often, and the use of certain tactical equipment has been curtailed, especially by the Special Teams. However, significant work remains regarding both the composition and practices of these teams. There has been some marginal improvement, but problematic practices persist, including inadequate planning, overly aggressive conduct, and ineffective supervision. Too often, the staff on Emergency Response Teams approach the incident with an expectation that force will be used, without adequately considering whether the situation can be safely resolved without using force. The Department has not yet codified policies and procedures to provide appropriate clarity about who and how people are assigned to these teams or the number of individuals who should be assigned to these teams. Further, policies and procedures regarding the practices of the teams have not yet been revised. Given the significant work that remains, the Department is in Partial Compliance.

In order to move towards achieving Substantial Compliance with this requirement, the Department must take the following steps:

- *Probe Teams*: Evaluate and revise the process for assigning staff and deploying Probe Teams. This includes establishing clear criteria for selecting and screening staff, prescribing the number of staff and their respective roles, defining when teams should be deployed, and determining the Tour Commander's responsibilities in making and overseeing those decisions. The revised procedures must encourage the resolution of incidents by housing area staff and supervisors whenever possible, greater use of Level A responses[181] when appropriate, and the avoidance of unnecessary Probe

[181] Level A is a lower-level response by staff in the immediate area, without special equipment. Level A responses are intended for most routine disruptions, including medical emergencies, refusal to follow orders, fights without weapons, smoking, contraband recovery, and uses of force that staff believe they can control.

Team deployments. The Department must also improve on-scene supervision and provide staff with clear guidance and appropriate training on de-escalation, anticipated use of force protocols, escort practices, and incident debriefing. Department leadership must regularly review deployments at each facility, document findings, and address violations through appropriate instruction, counseling, or pursuit of discipline.

- *Special Teams*: The roles, responsibilities, and operations of the ESU, SRT, and SST must be streamlined. The Department must establish policies and procedures regarding: (1) the operation and management of Special Teams, (2) screening and selection of members of Special Teams, and (3) policies and procedures regarding the operations of Special Teams and the equipment used by such teams. These efforts must be accompanied by changes in practice, including improving planning and supervision, using de-escalation and anticipated use of force procedures consistently, conducting orderly searches, utilizing safe escort and restraint practices, and eliminating unprofessional, aggressive and confrontational conduct. The Department must also ensure that all staff assigned to Special Teams routinely receive approved initial and refresher training. Training programs must provide staff with the skills needed to serve on a Special Team and also address the recurring deficiencies identified in Special Team responses. Finally, leadership must routinely assess staff practices, identify where improvements may be needed, and take the actions necessary to ensure that those improvements occur.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § A., ¶ 6.** Partial Compliance |

| **REVISED DE-ESCALATION PROTOCOL (FIRST REMEDIAL ORDER § A., ¶ 3)** |
|---|
| *First Remedial Order § A., ¶ 3. Revised De-Escalation Protocol.* Within 90 days of the date this Order is approved and entered by the Court ("Order Date"), the Department shall, in consultation with the Monitor, develop, adopt, and implement a revised de-escalation protocol to be followed after Use of Force Incidents. The revised de-escalation protocol shall be designed to minimize the use of Intake areas to hold Incarcerated Individuals following a Use of Force Incident given the high frequency of Use of Force Incidents in these areas during prior Reporting Periods. The revised de-escalation protocol shall address: (i) when and where Incarcerated Individuals are to be transported after a Use of Force Incident; (ii) the need to regularly observe Incarcerated Individuals who are awaiting medical treatment or confined in cells after a Use of Force Incident, and (iii) limitations on how long Incarcerated Individuals may be held in cells after a Use of Force Incident. The revised de-escalation protocol shall be subject to the approval of the Monitor. |

The discussion below provides a compliance assessment of the Department's efforts to reduce its reliance on Intake units in general operations pursuant to the requirements of the First Remedial Order (dkt. 350), § A, ¶ 3. This assessment also includes references to the Action Plan (dkt. 465), § E, ¶ 3 (a) (which adopts ¶ 1 (c) of the Second Remedial Order (dkt. 398) regarding tracking of inter-/intra-facility transfers), and Action Plan (dkt. 465), § E, ¶ 3 (b) (which requires the new leadership to address these requirements) given these orders' interplay with the First Remedial Order (dkt. 350), § A, ¶ 3. Together, these provisions require the Department to identify the various processes that are negatively impacting orderly operations in Intakes and address them through the development and implementation of new procedures.

The Monitoring Team also provides an update on the Department's efforts to process new admissions as required by the Second Remedial Order (dkt. 398), ¶ 1(i)(c), and the Action Plan (dkt. 465), § D, ¶ 2(b), and § E, ¶ 3(a)-(b), as these provisions relate to the work of the First Remedial Order, § A, ¶ 3. This update is included in Appendix I of this Report.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

Reducing reliance on Intake for de-escalation serves an important harm-reduction function. These provisions require the Department to establish a reliable process for de-escalating individuals involved in violence and/or use of force incidents so that any continuing risk of harm to themselves or others is safely abated. When an individual is agitated or has

engaged in conduct that harmed another person, the Department must be able to separate the individual from potential victims, stabilize the situation, and determine whether the individual can be safely returned to the housing area or requires another appropriate placement. That determination must account for the risk of pain, injury, or further violence, and should not be limited only to the risk of serious injury.

The Monitoring Team's findings for this Monitoring Period are based on the following:

- **Background**: Historically, the Department has transported incarcerated individuals to Intake following incidents of violence or force as a default method of separation and de-escalation. This practice creates additional disorder, burdens Intake operations, and subverts the intended function of Intake units, which is to process new admissions and inter-/intra-facility transfers. Accordingly, the Monitoring Team has focused on reducing the use of Intake for de-escalation and ensuring the Department develops routine, facility-based procedures to de-escalate individuals and manage post-incident separation outside of Intake. To assess the Department's compliance with these requirements, the Monitoring Team reviews uses of force in Intake, available data regarding the amount of time individuals remain in Intake areas, the Department's ability to manage individuals outside of Intake, observations from site visits, and incident-specific reviews of use of force events.

- **Use of Force Incidents in Intake Areas**: Table 14 of Appendix C identifies the number and proportion of use of force incidents that occurred in Intake areas from 2018 through June 2026. In this Monitoring Period, 394 (12%) of the Department's 3,411 total use of force incidents occurred in Intake areas. The current number and proportion of Intake-related uses of force remain well below the 2021 peak, when 1,483 Intake uses of force accounted for 18% of all use of force incidents, but the current volume remains higher than it should be. During the current Monitoring Period, uses of force occurring in Intake areas were concentrated primarily at OBCC (121), GRVC (90), EMTC (59), and RNDC (55), which together accounted for about 82% of all use of force incidents in Intake areas. Further reductions will require sustained facility-level attention to processing delays, supervision, staff practice, and whether people are being moved to Intake unnecessarily after incidents.

- *OBCC*: OBCC attributed its high volume of Intake-related force to the large number of people moving through the unit, delays in moving individuals to housing, and resistance to searches, housing assignments, movement, and property or clothing restrictions. Facility leadership also acknowledged that staff practices may contribute to these incidents, including resorting to force too quickly or failing to use effective de-escalation. In response, OBCC reported counseling staff, making E.I.S.S. referrals, reviewing video with Intake personnel, and considering changes to staff assignments. These efforts are reasonable, but the continued concentration of use of force incidents in OBCC's Intake indicates that the Department must assess whether these interventions are effectively addressing the conditions contributing to these incidents and are being consistently implemented.

- **Intake Data Tracking**: Generally, individuals do not appear to languish in Intake with the frequency observed during the chaotic conditions in 2021. The Facility Operations Monitoring Unit remains active, although it was recently moved from the Associate Commissioner of Facility Operations to report to Custody Management Centralized Movement Unit ("CMCMU"). Four officers provide 24-hour coverage and continue to monitor individuals held in facility Intake areas who are not new admissions. The basic monitoring process has not significantly changed. Staff continue to review four-hour Intake reports submitted by facilities, the ITS tracking dashboard, and Genetec video to identify individuals who appear to have remained in Intake for extended periods or are not properly accounted for. Staff then follow up directly with facilities if they identify any issues. CMCMU reports that it works to resolve difficult placements and, in some cases, conducts searches, provides transport, and moves individuals out of Intake when facilities need assistance. However, the current monitoring process remains highly manual and resource-intensive and still has gaps that limit its efficiency and reliability. First, Intake staff must manually enter movement information into ITS, which is difficult given their competing priorities. This often means that even when staff track individuals in ITS, the recorded times are not always accurate because they delay entering information while responding to other Intake priorities. Further, ITS still does not track some categories of movement, including court transfers. Additionally, the intake

monitoring unit process is highly manual and remains focused on resolving individual problems in real time rather than analyzing Intake performance over time. The Department does not routinely track how many individuals experience prolonged stays, the most common reasons for delay, which facilities or tours experience recurring problems, or whether Intake length of stay is improving. Department leadership acknowledged that the underlying tracking process could be improved. The progress made is important, but a more streamlined approach to tracking and monitoring this process would benefit overall operations.

- **Reduced Reliance on Intake & De-Escalation Units**: Intake continues to be used for post-incident management at a significant volume, even though not all individuals are taken to Intake following an incident (some are returned to their assigned cell, some are immediately rehoused, and some are taken directly to the clinic). Between January and June 2026, the Department reports that 4,555 of 33,516 non-new admission Intake arrivals, or 13.6%, were placed in Intake in response to incident management, making it the third most common reason for Intake placement after overload in and overload out.[182] This remains a concern because Intake is generally not an appropriate setting to manage individuals following an incident, particularly given the disorder, delays, and use of force risks associated with Intake areas. Previously, the Department attempted to use de-escalation units to reduce reliance on Intake and promulgated Directive 5016, "De-escalation Unit," in 2022, initially opening de-escalation units in each facility as an alternative location to manage individuals following incidents. However, by June 2023, DOC ceased use of de-escalation units in all facilities except EMTC (which still maintains a de-escalation unit).[183] Although Directive 5016 remains in effect, the Department has not issued updated guidance to staff explaining how facilities should manage post-incident de-escalation now that de-escalation units are largely no longer operating. The issue remains unresolved, and the Department must update its policy or provide guidance to clarify whether de-escalation units remain part of its operational

[182] "Overload in" and "overload out" refer to the transfer of individuals between facility intake areas to manage capacity. "Overload out" identifies individuals sent from the originating facility, while "overload in" identifies individuals received from another facility.

[183] *See*, Monitor's January 13, 2026 Report (dkt. 947) at pgs. 210 and 211.

practice and, if not, what post-incident management protocols staff should follow to avoid defaulting to Intake.

**Conclusion**

The conditions in Intake have improved from the disorder observed in 2021, and the Department now appears to place greater emphasis on monitoring Intake areas and preventing prolonged stays. However, Intake continues to account for a meaningful share of use of force incidents and therefore requires continued scrutiny. The Intake monitoring process itself also remains largely unchanged and a highly labor-intensive manual process. The Department should assess whether it can be modernized and made more efficient while preserving the oversight that has helped prevent the most serious historical problems.[184]

More importantly, the Department still has not established a clear process for post-incident management. Directive 5016 remains in effect, but the de-escalation model contemplated by that Directive is no longer routinely used outside EMTC, and practice has evolved without corresponding guidance. The Department should establish clear expectations for how individuals are to be separated, stabilized, reassessed, and returned to appropriate housing after incidents so that Intake is not used by default in the absence of a defined alternative. Conditions are better than they were at the height of the Intake crisis, but further work is necessary to ensure that those improvements are sustained and supported by sound, current operating practices.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § A., ¶ 3.** Partial Compliance |

[184] As noted in Appendix J, the Department is working on a Jail Management System project, which includes work to automate data collection and entry at intake so staff can use a fully digitized intake process. However, this is a two-year project, and progress is expected to be incremental, with the full replacement not anticipated until 2028.

| **YOUNG ADULTS - PREVENT FIGHT/ASSAULT (CONSENT JUDGMENT § XV., ¶ 1)** [185] |
| --- |
| *Consent Judgment, § XV., ¶ 1. Prevent Fight/Assault.* Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |

This provision requires the Department to manage units where 18-year-olds are housed in a manner that protects them from an unreasonable risk of harm, by preventing violent conduct and de-escalating confrontations as soon as practicable and reasonably safe to do so.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Consent Judgment, § XV, ¶ 1. The Court explained the basis for its finding at pgs. 37-40 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Facts and Information**

The Monitoring Team has long been concerned about violence at RNDC, where the majority of 18-year-olds are held (along with those aged 19 to 21).[186] The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **RNDC's Current Facility Population/Composition**: Since the Consent Judgment went into effect, the number of 18-year-olds in custody has declined significantly. In 2016, the Department held approximately 200 18-year-olds; in July 2026, only 58 18-year-olds

[185] The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team does not assess compliance with the *Nunez* provisions related to 16- and 17-year-olds, who are now classified as Adolescent Offenders by New York State Law (Criminal Procedure Law 1.20 (44)) given the December 9, 2025 Court Order (dkt. 933) finding that the Consent Judgment no longer applies to Adolescent Offenders.

[186] The Monitor's December 22, 2023 Report (dkt. 666) at pg. 87 includes specific citations to various reports from 2022 and 2023 that discuss in detail RNDC's circumstances and the Department's efforts to address them.

were in the Department's custody. This age group typically represents about 1% or 2% of the total population in custody.

- **<u>RNDC's Programs Action Plan ("RNDC Action Plan") and Housing for 18-year-olds</u>**: The RNDC Action Plan remains in effect and was described in detail in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 215-217. The Department continued to implement the RNDC Action Plan during the 22nd Monitoring Period including core strategies of housing 18-year-olds with other Young Adults (aged 19-21) in certain units capped at 15 incarcerated individuals. These units also have steadily assigned staff, enhanced programming, and focus on the core tenets of Direct Supervision. The Monitoring Team reviewed the housing location of all 18-year-old individuals on the last day of the Monitoring Period to assess the extent to which they were housed in units covered by the RNDC Action Plan, and not in other general population units. Of the 58 18-year-olds in custody, 39 individuals (67%) were housed in a unit covered by the RNDC Action Plan (*i.e.*, Building 1, Building 2, MOD 1 and 2) and 18 (31%) were in a permissible alternative (*e.g.*, EMTC New Admissions (n=5), RESH (n=4), RMSC (n=2), or RNDC's PAWS program (n=3), Protective Custody (n=2) and Mental Observation (n=2) units). As noted below, the RNDC Action Plan units where 18-year-olds are housed have significantly lower rates of violence than the facility at large.
- **<u>Rates of Use of Force and Violence</u>**: Table 1 of Appendix M identifies the rates of use of force and violence for the *entire* RNDC facility from January 2022 to June 2026. Increases in use of force, stabbings/slashings and fights were observed during the current Monitoring Period at RNDC, although these increases occurred among units that do not house 18-year-olds. Comparing the rates of key metrics between the facility at large (Table 1) and the RNDC Action Plan's units (Table 2) reveals stark differences: (1) the use of force rate for RNDC at large was 9.0, compared to 1.7 in the RNDC Action Plan's units; (2) the rate of stabbing/slashing was 1.0 for RNDC at large, compared to 0.3 in the RNDC Action Plan's units; and (3) the rate of fights was 10.1 for RNDC at large, compared to 3.0 in the RNDC Action Plan's units.

  Furthermore, Table 2 of Appendix M shows that RNDC Action Plan units have experienced sustained improvements across most violence metrics compared with the 2023 baseline of young adult housing. The Use of Force rate is 43% lower than the

baseline, the rate of stabbing/slashing is 40% lower, the rate of serious injuries is 25% lower, and the rate of assaults on staff is 70% lower, although the rate of fights continues to be slightly above the baseline (3.0 versus 2.7). These improvements are meaningful, but they do not fully establish that 18-year-olds no longer face an unreasonable risk of harm.

Historically, reducing fights among young adults has been a persistent challenge. Young adults have less impulse control and more limited ability to regulate their emotions, heightened sensitivity to perceived disrespect or status challenges, and as a result peer conflicts may escalate more quickly or persist via SRG dynamics. These characteristics underscore the importance of consistent Direct Supervision and developmentally appropriate efforts to de-escalate peer conflict, steady staff assignments, meaningful programming, and sound correctional practices. Furthermore, a more rigorous approach to delivering incentives (both short and longer term) and applying meaningful consequences is needed to reduce the frequency of fights.

- **Security Practices in RNDC Action Plan Units**: Although violence and use of force are less prevalent in the RNDC Action Plan units, NCU security audits have demonstrated that these units suffer from the same poor security practices observed systemwide. NCU audited security practices in one of the RNDC Action Plan units during the current Monitoring Period. Lock-ins were properly enforced and captains made tours on schedule, but the audit found staff to be off post (particularly on the midnight tour), and multiple individuals congregating in cells/pantry that had not been properly secured. These echoed findings from NCU's security audits of RNDC Action Plan units conducted during 2025. This is a significant vulnerability for the success of the RNDC Action Plan.

**Recommendations and Conclusion**

The RNDC Action Plan is distinguished from other efforts the Department has made to address the risk of harm to young adults not just because of its positive outcomes, but also because it is an example of a strategy built on good correctional practice (such as consistently assigned staff, reduced idle time, and incentives for positive conduct) paired with the requisite leadership, sustained attention, and tools for assessing the RNDC Action Plan's impact on facility safety. This is a significant achievement. The Monitoring Team collaborated closely with the Department as it developed and refined the Action Plan's components and throughout its

implementation, which has been sustained throughout various agency and facility leadership changes.

The Department remains in Partial Compliance with this provision. To further advance toward Substantial Compliance, particularly given the regression in the level of steady staffing, the Monitoring Team recommends that the Department shore up its steady staff assignment list for both officers and captains (as discussed in § XV., ¶ 17), ensure that all officers and captains assigned to RNDC Action Plan units have completed required training (as discussed in § XV., ¶ 12), develop a framework for eligibility criteria and track the delivery of individual and group incentives (as discussed in § XV., ¶ 12), continue to refine and implement targeted strategies to reduce fights in RNDC Action Plan units and assess adherence to core tenets of Direct Supervision and sustain adequate performance levels (as discussed in § XV., ¶ 12).

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § XV., ¶ 1. (18-year-olds)** Partial Compliance |

| **YOUNG ADULTS - DIRECT SUPERVISION (CONSENT JUDGMENT § XV., ¶ 12 & FIRST REMEDIAL ORDER § D., ¶ 3)** [187] |
|---|
| *Consent Judgment § XV., ¶ 12. Direct Supervision.* The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.<br>*First Remedial Order § D., ¶ 3.* For all housing units at RNDC that may house 18-year-old Incarcerated Individuals, the Department, including RNDC Supervisors, shall take necessary steps to improve the implementation of the Direct Supervision Model with an emphasis on the development of proactive and interactive supervision; appropriate relationship building; early intervention to avoid potential confrontations; de-escalating conflicts; rewarding positive behavior; and the consistent operation of the unit.<br>*First Remedial Order § D., ¶ 3(i).* The Department, including RNDC Supervisors, shall reinforce the implementation of the Direct Supervision Model with Staff through, among other things, appropriate staff supervision, coaching, counseling, messaging strategies, or roll call training. |

This provision requires the Department to implement the Direct Supervision model in all units that house 18-year-olds. To implement Direct Supervision, the Department must emphasize proactive and interactive supervision, appropriate relationship building, early intervention to avoid potential confrontations, de-escalation, rewards for positive behavior and consistent operations on each unit, including the implementation of daily unit schedules. The Department's long-standing inability to implement a Direct Supervision model resulted in the imposition of related provisions in the First Remedial Order (dkt. 350), § D, ¶¶ 3 and 3(i). The First Remedial Order § D, ¶3(ii) requires the Department to periodically assess the extent to which these various aspects are being properly implemented, along with adherence to the daily schedule in each housing unit.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with Consent Judgment, § XV, ¶ 12 and First Remedial Order (dkt. 350), § D, ¶ 3 and 3(i). The Court explained the basis for its finding at pgs. 37-40 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order.

[187] The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team does not assess compliance with the *Nunez* provisions related to 16- and 17-year-olds, who are now classified as Adolescent Offenders by New York State Law (Criminal Procedure Law 1.20 (44)) given the December 9, 2025 Court Order (dkt. 933) finding that the Consent Judgment no longer applies to Adolescent Offenders.

**<u>Compliance Rating</u>**

During the current Monitoring Period, the Department was in Partial Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**<u>Relevant Facts and Information</u>**

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **<u>Foundation for Direct Supervision</u>**: Since early 2024, the Department has continued to pursue the implementation of the RNDC Action Plan. During the current Monitoring Period, the Department continued to focus on building a stable foundation upon which the elements of Direct Supervision can rest. This foundation includes several elements—consistent staffing, smaller unit populations, and enhanced programming/reduced idle time. With the exception of consistent staffing (discussed in § XV, ¶ 17, below), the Department continues to reliably implement these elements. Security Team members are currently assigned to RNDC Action Plan housing units and are credited by facility leadership as a key asset for problem-solving and reducing interpersonal conflict. DOC Programs Division staff and community-based providers are assigned to each unit, delivering rehabilitative programming five days per week. The RNDC Action Plan limits the number of people who can be housed on a unit to 15, and this population cap has been maintained consistently. However, the staffing strategy requires a Unit Manager, Supervisors and staff to be consistently assigned to the same unit day-to-day. Early in the current Monitoring Period, due to the low number of ADW's assigned to RNDC, the Unit Manager was sometimes assigned elsewhere in the facility (*e.g.*, as the Tour Commander) and NCU's audits revealed that the level of steady staffing decreased compared to prior Monitoring Periods (*see* Consent Judgment, § XV, ¶ 17, below). The focus on steady staffing needs to be reinvigorated, supported by the many actions the Department is taking to create efficiencies in staff deployment discussed elsewhere in this report.
- **<u>Staff Training</u>**: Officers and captains assigned to the RNDC Action Plan units are required to complete two trainings "Procedural and Restorative Justice" and "Working with Emerging Adults in Correctional Custody." When new staff are assigned to RNDC

Action Plan units, the Department must ensure they receive the required training. At the end of the current Monitoring Period, RNDC Action Plan's lead estimated that between 20 and 30 staff needed to complete the required trainings.

- **Early Intervention and De-Escalation**: The overarching goal of this provision of the Consent Judgment is to increase safety by reducing interpersonal conflict. Under the Direct Supervision model, consistently assigned staff who are engaged with incarcerated individuals are better positioned to detect rising tensions and to intervene verbally to diffuse interpersonal conflicts before they erupt into violence. The RNDC Action Plan lead often remarks on the de-escalation skills of both unit staff and Security Team members, a report that is borne out by the low rates of violence on the RNDC Action Plan units discussed in Consent Judgment, § XV, ¶ 1, above.
- **Daily Unit Schedules**: Each RNDC Action Plan unit has a daily schedule that shows the days/times the units are scheduled for programming, recreation, barbershop, laundry, law library, religious services, and the PEACE Center, among others. The Department reports that the schedules are posted in each unit but has not yet assessed whether they are followed dependably (as required by the First Remedial Order § D, ¶ 3 (ii)). The Monitoring Team continues to encourage the RNDC Action Plan's leadership team to devise a strategy for this assessment.
- **Programming**: Incorporated in each unit's daily schedule is an array of programming that targets rehabilitative needs and reduces idle time. The Department's Programs Division continues to richly resource the 16 housing areas designated in the Action Plan (12 units in Buildings 2 & 3 and four units in Mod 1 & Mod 2),[188] relying both on Programs staff (*e.g.*, Program Counselors, Social Service providers) and community-based partner organizations. These investments significantly reduce idle time for the individuals housed in each area addressed by the RNDC Action Plan. During the current Monitoring Period, the Department expected to renew an MOU with the community-based provider for Building 3, but the vendor did not reapply. The Department was able to maintain the 2-3 hours of programming 5 days per week by issuing purchase orders and via Program Counselors' willingness to work overtime to ensure all units received

[188] During the early part of the Monitoring Period, one of the units in Building 3 was utilized as swing space while other units underwent physical plant upkeep and renovation.

services. The Programs Division closely monitors program offerings and engagement each month. In the early part of the Monitoring Period, lockdowns interfered with programming more often than in the past, but these cancellations decreased following operational changes to how/when lockdowns may be used. Units designated as "School Houses" (where all youth *commit* to attending school; school is offered to all RNDC Action Plan units) have the highest rates of engagement in programming. In other units, on average, about 40-45% of the individuals on each housing unit participate in a given program.

- **Incentive Program**: Since the RNDC Action Plan was implemented in early 2024, the facility has endeavored to develop regularly reoccurring opportunities for individuals to participate in on-unit events (*e.g.*, "Late Nights," movie nights, sporting event watch parties, etc.) and special off-unit events (*e.g.*, holiday events, Family Engagement Days, pizza parties, extra visits to the PEACE Center or extra sessions of recreation) to motivate prosocial behavior and discourage violence. Most of the rewards were provided in response to a unit remaining incident-free for a certain period of time, although sometimes unit sanitation was also considered. The RNDC Action Plan team reported regularly holding these events (*e.g.*, a Family Day in June, multiple Watch Parties for the 2026 World Cup and NBA Finals) and reported that several units were motivated and successfully earned these rewards. Interestingly, in contrast to several years ago when many staff were not proponents of any type of "reward" being issued to incarcerated individuals, the RNDC Action Plan lead has observed that several staff assigned to RNDC Action Plan units have begun to advocate for their units to receive access to incentive programs. This is a positive indicator of the type of culture change that the RNDC Action Plan was intended to bring about.

  In April 2026, the RNDC Action Plan team issued a Memorandum to all RNDC staff that described the Family Day events, formalized the eligibility criteria and provided the protocol for incarcerated individuals to submit requests for specific people to attend. The RNDC Action Plan team has yet to produce a specific framework for the eligibility criteria/decision making process for the other types of incentives and does not routinely produce data regarding the delivery of the incentive programs. The Monitoring Team

continues to offer support and guidance for the development of simple, practical strategies in this area.

**Conclusion**

Progress toward the full implementation of the RNDC Action Plan remains steady, although the Department must be vigilant to ensure that initial gains in certain areas are maintained while also working to fully implement other elements of the RNDC Action Plan. To reach Substantial Compliance with this provision, the Department needs to: (1) fill the gaps in the steady officer and captain assignments to RNDC Action Plan housing units, as discussed in § XV, ¶ 17. This is supported by the Department's larger work related to staffing under phase 2 of that plan; (2) provide the required Young Adult trainings to officers and captains who are newly assigned to the RNDC Action Plan Units; (3) demonstrate the reliable implementation of daily unit schedules per the First Remedial Order (dkt. 350), § D, ¶ 3 (ii), which requires periodic assessments of the extent to which the various aspects of Direct Supervision are being properly implemented, along with adherence to the daily schedule in each housing unit; and (4) develop and implement a framework for eligibility to on- and off-unit incentives, and track data regarding their delivery.

Given the overlapping requirements, the state of compliance relative to ¶ 12 of the Consent Judgment also reflects the state of compliance relative to § D ¶ 3 and 3(i) of the Remedial Order.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § XV., ¶ 12. (18-year-olds)** Partial Compliance<br>**First Remedial Order § D., ¶ 3.** Partial Compliance<br>**First Remedial Order § D., ¶ 3(i).** Partial Compliance |

| **YOUNG ADULTS - CONSISTENT ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XV., ¶ 17 & FIRST REMEDIAL ORDER § D., ¶ 1) 189** |
| --- |
| *Consent Judgment § XV., ¶ 17. Consistent Assignment of Staff.* The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.<br><br>*First Remedial Order § D., ¶ 1*. For all housing units at RNDC[190] that may house 18-year-old Incarcerated Individuals, the Department shall enhance the implementation of a staff assignment system under which the same correction officers, Captains, and ADWs are consistently assigned to work at the same housing unit and on the same tour, to the extent feasible given leave schedules and personnel changes. |

Consent Judgment, § XV., ¶ 17 requires housing units where most 18-year-olds are housed to have consistently assigned officers and supervisors day-to-day. In order for the Department to adopt a consistent staff assignment model, staff must reliably report to work as scheduled, and the Department must implement a staff deployment strategy that prioritizes the required consistency across units. Previously, the Department's inability to comply with this provision resulted in additional remedial relief, including a provision regarding staff assignments in the First Remedial Order (dkt. 350), § D, ¶ 1. A subpart of this provision requires the Department to implement a quality assurance process to assess the extent to which the consistent staffing requirements are met each month.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 810) found the Defendants in contempt for failing to comply with Consent Judgment, § XV, ¶ 17 and First Remedial Order (dkt. 350), § D, ¶ 1. The Court explained the basis for its finding at pgs. 37-40 in the section "Failure to Ensure the Safety of Young People in Custody" of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance

[189] The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team does not assess compliance with the *Nunez* provisions related to 16- and 17-year-olds, who are now classified as Adolescent Offenders by New York State Law (Criminal Procedure Law 1.20 (44)) given the December 9, 2025 Court Order (dkt. 933) finding that the Consent Judgment no longer applies to Adolescent Offenders.

[190] The majority of 18-year-old Incarcerated Individuals are currently housed at RNDC. To the extent that the majority of 18-year-old Incarcerated Individuals are housed at another facility in the future, the provisions in § D shall apply to all housing units in that facility that may house 18-year-old Incarcerated Individuals.

ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Facts and Information**

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **Context and Background**: Given that the overall goal of the RNDC Action Plan is to reduce conflict and violence, structuring the units' staffing to permit the development of appropriate familiarity, cooperation and trust with incarcerated individuals is essential for the type of problem solving that must occur. Consistently assigning staff to the targeted units day-to-day is the core strategy that other components of the RNDC Action Plan rest upon. As discussed in § XV ¶12 "Direct Supervision," above, facility leaders have noted several ways in which the steady assignments to the RNDC Action Plan's units have positively impacted facility safety and culture.

  The Monitoring Team's approach to assessing compliance recognizes that staff members do not work 7 days per week. The monitoring strategy focuses on the extent to which the facility has assigned staff to cover each post on all tours (4-day and 2-day), has appropriate backup staff to fill in when the assigned staff are not on the schedule or are unavailable, and avoids deploying assigned staff to other units whenever possible. More global, reasonable efforts to control excessive absenteeism are also considered.

- **Staff Assignments**: During the past year, the RNDC Action Plan's staff assignments needed to be reconstituted multiple times in response to various system-level factors (*e.g.*, shifting to 12-hour tours, shifting back to 8-hour tours, staff transfers due to the closure of NIC/opening of OTHU/Bellevue). These changes disrupted many of the previous staff assignments and left more posts without an assigned staff member than has been observed in the past.

  More specifically, a review of the staff assignment matrix for RNDC Action Plan units where an 18-year-old may be housed revealed that, as of June 2026, about one-

quarter of the total posts did not have an officer assigned.[191] Among captains, just over half of the total posts did not have a captain assigned.[192] An ADW continues to serve as the Unit Manager for most of the units covered by the Action Plan (another ADW covers one of the Mods). During the current Monitoring Period, the facility's leadership reported that the Unit Manager was sometimes pulled from this assignment to serve as the facility's Tour Commander role when coverage was needed. The Department reports that facility leadership is actively trying to fill the gaps in the staff assignment matrix, focusing on staff who embody the necessary commitment to rapport building and problem solving, and who consistently report to work.

- **NCU's Consistent Staffing Audits**: The aforementioned challenges regarding steady staff assignments are reflected in the results of NCU's Consistent Staffing Audits.[193] Appendix M, Tables 3 and 4 compile the results of the monthly audits conducted for the current Monitoring Period. Table 3 shows that the portion of posts worked by the assigned captain decreased during the current monitoring period, from about 73% during the 19th Monitoring Period to 59% in the current Monitoring Period. Further, Table 3 shows that the proportion of posts audited where NCU "Could Not Determine or No Steady Assigned" substantially increased to 31% during the current Monitoring Period. Table 4 shows that these same patterns were present for officers, with only 60% of posts worked by the assigned staff and 20% of posts where NCU "Could Not Determine or No Steady Assigned."

  On a positive note, Tables 3 and 4 also show that assigned staff were deployed elsewhere in the facility relatively infrequently (7% for captains and 5% for officers). Staff-controlled dynamics (*e.g.,* mutuals, various leave statuses, vacations) that interfere with steady staffing are relatively low (about 3% for captains and 15% for officers). These proportions have remained stable over time.

---

[191] This was calculated by reviewing each post in each unit, for both 4-day and 2-day staff, for all three tours. In June 2026, the 168 total posts, 75% were assigned to a specific staff member and 25% did not have a specific staff member assigned.

[192] This was calculated by reviewing each Building/MOD, for both 4-day and 2-day staff, for all three tours. In September the Department reported that of the 24 total posts, 46% were assigned to a specific captain and 54% did not have a specific captain assigned.

[193] The methodology for NCU's audits is described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 229-230.

Although time-consuming to perform, NCU's steady staffing audits enhance the Department's ability to improve practice because they identify the *source* of changes in performance level (*e.g.,* that steady staff are not assigned versus, for example, high rates of absenteeism among the assigned staff or staff being deployed elsewhere). In addition, during the current Monitoring Period, NCU expanded the scope of its audits to include all of the housing units covered by the RNDC Action Plan. During the current Monitoring Period, NCU's audits focused on the MODs in four of the six audits conducted and focused on Buildings 2 & 3 in the other two audits. NCU now reliably addresses the quality assurance component of the relevant provision of the Remedial Order (§ D, ¶ 1(i)).

**Conclusion**

To achieve Substantial Compliance with this provision, the Department must demonstrate reasonable levels of consistent staffing across all areas targeted by the RNDC Action Plan (Buildings 2 & 3, MODs 1 & 2). In concert with Department-wide phase 2 staffing initiatives, the Department must shore up the staff assignment matrix to increase the proportion of posts with an assigned officer and captain. This will undoubtedly improve the results of NCU's audits, which now cover all of the units included in the RNDC Action Plan. Although audits for the current monitoring period show a decline in performance related to steady staffing, current performance levels are sufficient to maintain Partial Compliance. Given the overlapping requirements, the status of compliance relative to ¶ 17 of the Consent Judgment also reflects the status of compliance relative to § D., ¶ 1 of the First Remedial Order.

| | |
|---|---|
| COMPLIANCE RATING | **Consent Judgment § XV., ¶ 17. (18-year-olds)** Partial Compliance<br>**First Remedial Order § D., ¶ 1.** Partial Compliance |

| Screening & Promotions (Consent Judgment § XII., ¶¶ 1-3) |
| --- |
| *Consent Judgment § XII., ¶ 1. Promotions.* Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the<br>(a) [Use of Force history for the last 5 years]<br>(b) [Disciplinary history for the last 5 years]<br>(c) [ID Closing memos for incidents in the last 2 years]<br>(d) [Results of the review are documented]<br>*Consent Judgment § XII., ¶ 2.* DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.<br>*Consent Judgment § XII., ¶ 3.* No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.<br>*August 10, 2023 Order § I, ¶ 10. Revise Pre-Promotional Screening Policies and Procedures*. By, October 30, 2023, the Department, in consultation with the Monitor, shall revise its pre-promotional screening policies and procedures to address the issues identified by the Monitor in each of its Court filings in 2023. |

Strong leadership and supervision are crucial to the Department's efforts to reform the agency. The requirements of Consent Judgment § XII, ¶¶ 1-3 are designed to ensure that staff are appropriately screened for promotion to supervisory ranks. The requirements of the First Remedial Order (dkt. 350), § A, ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3(ii-iii) are designed to increase the number of supervisors working in the facilities and to improve the quality of supervision, and these provisions are discussed separately in the compliance assessment for First Remedial Order (dkt. 350), § A, ¶ 4.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with Consent Judgment § XII., ¶¶ 1 and 2, and Substantial Compliance with Consent Judgment § XII., ¶ 3, which are unchanged from the prior Monitoring Period. The history of compliance ratings for these provisions since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

Below, the Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 10 which requires the Department to revise and implement the pre-promotional screening policy, but a compliance rating is not provided for this provision pursuant to the Court's March 18, 2026 Order (dkt. 967).

**Relevant Data and Information**

The Monitoring Team continues to emphasize that the staff the Department chooses to promote sends a message about the leadership's values and the culture it intends to cultivate and foster, and the behavior of these staff sets an example for other officers. Active, effective supervision is fundamental to the changes in departmental culture and practice that are needed to effectuate the reforms required by the *Nunez* Court Orders. The long-standing supervisory void— in both number and aptitude— continues to be a strong contributing factor in the Department's inability to alter staff practice and to make meaningful changes to its security operation.

The Monitoring Team's findings for this Monitoring Period are based on the following information:

- **Screening Policy**: The Court's August 10, 2023 Order (dkt. 564) requires the Department to update the policy and procedures for its pre-promotional screening process, in consultation with and subject to the approval of the Monitor. The Department has still not updated its screening policy. However, in practice, the Department has adopted many of the Monitoring Team's recommendations[194] shared in March 2023 and July 2025.[195] This has improved the Department's screening *practices* over the past several Monitoring

[194] The Monitoring Team's recommendations are enumerated in more detail in the Monitor's June 17, 2026 Report (dkt. 984) at pgs. 143-144. These recommendations include (1) documenting the basis for staff promoted despite negative recommendations from a Division, (2) reviewing Personnel Determination Review ("PDR") records, (3) consulting both ID and SIU, (4) conducting a holistic 2-in-5 assessment and (5) complying with Directive 2230 when conducting pre-promotional screening.

[195] In March 2023, the Monitoring Team submitted feedback to the Department with recommended revisions to the pre-promotional screening policy. *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 80-81. In response, the Department reported they would revise the policy before the next round of promotions but then failed to do so and promoted additional staff without revising the policy. Since then, additional staff have been promoted. The Monitoring Team's feedback has intermittently been adopted in *practice* during this time. *See* Monitor's July 10, 2023 Report (dkt. 557) at pg. 162; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 80-81; Monitor's April 18, 2024 Report (dkt. 706) at pgs. 12-15, 47, 64-68, and 195-196; Monitor's June 27, 2024 Report (dkt. 735) at pg. 3; and Monitor's November 22, 2024 Report (dkt. 802) at pgs. 12, 56-61, 191, and 224-227. In July 2025, the Monitoring Team consolidated and organized all of the Monitoring Team's outstanding feedback and recommendations for the Department (see the previous footnote) given the number of staff who continued to be promoted despite the fact that the policy had not been updated.

Periods.[196] However, even with some improvement in *practice*, the screening for some staff during this Monitoring Period did not follow all steps required by the current policy[197] nor the updated practices adopted pursuant to the Monitoring Team's recommendations.

- **Overview of Promotions During This Monitoring Period**: Table 12 in Appendix G identifies the number of staff promoted to each rank from January 2017 to June 2026. A total of 10 staff were promoted during this Monitoring Period. Three staff members were promoted to Chief,[198] two staff members were promoted to Warden,[199] two staff were promoted to Deputy Warden in Command,[200] two staff were promoted to Executive Officer, and one staff was promoted to Captain.
- **Assessment of Screening Materials**: The screening requirements of the Consent Judgment were developed to guide the Department's selection of Supervisors with the proper experience and performance history. The promotion process itself is guided by multiple factors and is depicted in Appendix N.
    - *Review of Candidates (¶ 1)*: The Monitoring Team verified that the screening materials for nine of the ten staff promoted during this Monitoring Period satisfied the requirements of the "Review" as defined by ¶ 1. Even though the Department has not yet formally revised its policy, it incorporated some of the Monitoring

[196] *See* Monitor's November 22, 2024 Report (dkt. 803) at pgs. 162-164; the Monitor's May 22, 2026 Report (dkt. 850) at pgs. 115-118; the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 239 and 241-242; and the Monitor's June 17, 2-26 Report (dkt. 984) at pgs. 1401-141 and 143-144.

[197] The last time the Department failed to follow its own pre-promotional screening policy was in 2023. *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 78-86.

[198] Two of the three Chiefs promoted during the 22nd Monitoring Period already held the rank of Chief but were promoted to higher-ranking Chief roles – the Bureau Chief was elevated to Chief of Department, and an Assistant Chief was elevated to the Bureau Chief of Facility Operations and Security. In April 2026, the Acting Assistant Chief was promoted to Assistant Chief of Facility Operations and Security. All three staff were screened by all required Divisions prior to promotion.

[199] In March 2026, two staff members were promoted to the rank of Warden. Both individuals had been serving as Acting Wardens, and one immediately went on to serve as Acting Assistant Chief of Facility Operations and Security but retained the official title of Warden. Both staff were screened by all required Divisions prior to promotion.

[200] In March 2026, two staff members were promoted to the rank of Deputy Warden in Command ("DWIC"). One of the individuals appointed to DWIC was also appointed as the Deputy Chief of Staff. Both individuals were screened prior to their promotion, but for one of the two staff, the Department could not locate all of the screening forms required.

Team's recommendations into its pre-promotional screening process for the nine staff who were screened.

The available screening materials did not identify any reason that the nine staff being considered would be precluded from promotion pursuant to the Consent Judgment (*i.e.*, did not have two Class A/B use of force violations within the past five years pursuant to the Consent Judgment, § XII, ¶ 2 and did not have pending use-of-force-related disciplinary charges pursuant to the Consent Judgment, § XII, ¶ 3) and all Divisions that completed screening materials recommended these staff for promotion. However, in the cases enumerated below, the screening materials raised concerns about the level of internal scrutiny applied to the individuals' disciplinary histories and whether each individual's fitness to serve as a supervisor was considered. Even if a promotion does not explicitly violate the Consent Judgment provisions, the people the Department chooses to promote still send a message about the leadership's values and the culture it intends to cultivate and foster, and the supervisors' behavior sets an example for officers.

- **Reinstatement of Captain**: In May 2026, one staff member was promoted to the rank of captain via reinstatement, thereby reversing the prior Commissioner's decision to demote this staff member.[201] This staff member was not re-screened prior to reinstatement. The paperwork, stated rationale, and materials related to the decision to reverse the demotion raise questions about both the process and judgment utilized to make this determination.

[201] This staff member was demoted by the prior Commissioner for violation of disciplinary probation for leave violations. The staff member was placed on probation in 2023 as part of resolution of a formal disciplinary case regarding violations of the Department's leave policy. Subsequently, the staff member was out sick for over 200 days within less than 10 months of 2025 and had consistently used various leave statuses in 2023-2025. In response, in 2025, the Trials Division recommended the staff member be terminated for violating the terms of her probation. The Department reported to the Monitoring Team that there was significant advocacy by the captains' union to reduce the penalty. The former Commissioner ultimately decided to demote the staff member in January 2026 rather than terminate the staff member. Upon the administration change, the captains' union reinvigorated advocacy to alter the resolution of the case. In May 2026, the Commissioner issued an Action of the Commissioner, reversing the demotion and reinstating the staff member to captain, which effectively dismissed all charges for the leave violations.

- **Promotions to Executive Officer**: In June 2026, two staff members were promoted to the rank of Executive Officer. Both individuals were screened prior to their promotion, but the Department could not locate all of the screening forms required for either staff member. All Divisions that completed screening materials recommended the staff members for promotion. However, one staff member had eight substantiated formal disciplinary charges, many of which revealed a failure to follow through on a supervisor's duties and responsibilities, and the other staff member was found guilty of involvement in a concerning hostage drill described in the Monitor's August 7, 2023 Report (dkt. 561) at pgs. 14-15 and 33-34.[202] While these disciplinary cases do not explicitly preclude promotion and were identified and documented in their screening materials, they do raise concerns about these two individuals' fitness for promotion and whether appropriate scrutiny is being applied to staff members' disciplinary records prior to promotion.[203]

Even though the Department has not yet formally revised its policy to memorialize the Monitoring Team's recommendations, it incorporated some of the suggested elements into its pre-promotional screening process for the nine staff who were screened. As a result, the Department remains in Partial Compliance with this provision. To achieve Substantial Compliance, the Department must revise its policies and procedures and address the Monitoring Team's recommendations in so doing, ensure that the policy is followed, and conduct the screening process with integrity and an appropriate level of scrutiny.

- *Disciplinary History (¶ 2)*: The Department's screening process for promotion assesses whether the candidates met the 2-in-5 threshold set by this provision. However, one individual was not screened prior to their promotion, so this assessment was not conducted for that individual. None of the staff promoted

[202] The staff member, who was aware a drill was being conducted, used chemical agents towards an incarcerated individual who was carrying out the staff member's orders to stage the drill, and made misleading statements about the incident in the MEO-16 interview regarding the incident.

[203] The Department reported that these disciplinary cases were considered during the screening process, but did not present a legal basis to deny promotion and that decisions not to promote are used judiciously.

during this Monitoring Period met the 2-in-5 threshold, including the staff member who was not screened. While a holistic 2-in-5 assessment has become the Department's *practice*, it must be incorporated into policy to achieve Substantial Compliance. Accordingly, the Department is in Partial Compliance with this provision.

- *Pending Disciplinary Matters (¶ 3)*: The Department's screening process for promotion assesses whether the candidates have pending discipline for use-of-force-related misconduct, and this process is properly incorporated into the current policy. One individual was not screened prior to their promotion, so this assessment was not conducted for that individual. However, none of the staff promoted during this Monitoring Period had pending disciplinary charges, including the staff member who was not screened. Given that the policy and practice do incorporate this assessment, the Department is in Substantial Compliance with this provision. The Monitoring Team reiterates that all candidates must consistently undergo appropriate screening prior to promotions to ensure this assessment is conducted.

**Conclusion**

While the Department's pre-promotional screening process has generally improved since 2023, the Monitoring Team's recommended revisions of the screening policy remain outstanding, and application of the screening process remains inconsistent and incomplete. The need for a comprehensive policy is reinforced by the fact that DOC's internal controls in managing the process in *practice* were insufficient to ensure the process complied both with DOC's current policy and the Monitoring Team's recommendations. In some cases, not all screening materials were available, and in others, the available screening materials raised questions about the individual's fitness for promotion. In one case, a staff member was promoted (*i.e.*, reinstated) without re-screening. While the screening policy must be updated, the Monitoring Team reiterates that in the meantime, the Department must follow its *current* pre-promotional screening policy when conducting its promotional assessment (*e.g.*, conduct required interviews of candidates).

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § XII., ¶ 1.** Partial Compliance<br>**Consent Judgment § XII., ¶ 2.** Partial Compliance |

| | |
|---|---|
| | **Consent Judgment § XII., ¶ 3.** Substantial Compliance |

| **SUPERVISION OF CAPTAINS (FIRST REMEDIAL ORDER § A., ¶ 4 AND ACTION PLAN § C., ¶ 3 (II-III))** |
|---|
| *First Remedial Order ¶ 4. Supervision of Captains.* The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned and shall be subject to the approval of the Monitor.<br>i. Within 60 days of the Order Date, RNDC, and at least two other Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.<br>ii. Within 120 days of the Order Date, at least three additional Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.<br>iii. By December 31, 2020, all Facilities shall satisfy the requirements of this provision. |
| *Action Plan § C., ¶ 3(ii). Increased Assignment of Captains in the Facility.* Complete a full evaluation of the assignment of all Captains and develop and implement a plan to prioritize assignment of Captains to supervise housing units to increase Captain presence on housing units. |
| *Action Plan § C., ¶ 3(iii). Improved Supervision of Captains.* Substantially increase the number of Assistant Deputy Wardens currently assigned to the facilities or a reasonable alternative to ensure that there is adequate supervision of Captains. |

This provision of the First Remedial Order (dkt. 350), § A., ¶ 4, in conjunction with Action Plan (dkt. 465), § C, ¶ 3 (ii-iii), requires the Department to improve staff supervision by promoting and deploying additional ADWs within the facilities to better supervise captains. The goal of these provisions is to ensure that captains are properly managed, coached, and guided in order to elevate their skill set, so that they in turn better supervise the officers on the housing units. Thus, an assessment of adequate supervision requires an examination of both layers of supervision — ADWs and captains.

The Department's inability to achieve substantial compliance with this provision resulted in additional remedial relief, including two provisions in the Action Plan (dkt. 465) (§ C, ¶ 3 (ii-iii)) requiring an increase in the number of captains and Assistant Deputy Wardens ("ADWs") assigned to the facilities. Action Plan (dkt. 465), § C, ¶ 3 (ii) requires the Department to evaluate the assignments of all captains and to implement a plan prioritizing captains' assignments to supervise housing units in the facilities. In addition, Action Plan (dkt. 465), § C, ¶ 3 (iii) further

requires the Department to increase the number of ADWs assigned to the facilities to ensure captains are adequately supervised.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found Defendants in contempt for failing to comply with the First Remedial Order (dkt. 350), ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3 (ii-iii). The Court explained the basis for its finding at pgs. 26-31 in section "Failure to Adequately Supervise Staff and Facility Leadership" of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Non-Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

Improving staff practice not only requires an appropriate number of supervisors but also supervisors who provide quality supervision. Improved practice by line staff requires ongoing, direct intervention by well-trained, competent supervisors—guiding and correcting staff practice in the moment as situations arise. Increasing staffs' ability and willingness to utilize proper security practices rests on the supervisors' ability and willingness to confront poor practices and teach new ones. Only with this type of hands-on supervision will the Department be able to confront and break through staffs' inability, resistance, and/or unwillingness to take necessary actions.

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **Organizational Structure and Number of Supervisors**: The Department's organizational structure, which includes only one rank (captains) between line staff and those who serve as Tour Commanders (ADWs), strains the Department's ability to adequately supervise and develop the skills of both line staff and captains. This problem is exacerbated by the insufficient number of staff holding these two ranks and the number of staff promoted to these positions has not offset the number of staff lost through

attrition. As of the end of the current Monitoring Period, the number of supervisors remained insufficient to provide the type of *intensive* supervision—throughout the chain of command—that is needed to elevate officers' skills, which echoes the findings of the previous six Monitoring Periods.[204]

- *ADWs*: The First Remedial Order (dkt. 350), § A, ¶ 4 and Action Plan (dkt. 465), § C, ¶ 3 (iii) both require an increase in the number of ADWs. Appendix G, Table 1 shows the number of ADWs available Department-wide. In this Monitoring Period, 88 ADWs were available and 69 (78%) were assigned to facilities/court commands. While both the total number of ADWs Department-wide and the number assigned to facilities/court commands is higher than it was in 2020 when the First Remedial Order went into effect (88 versus 66 Department-wide, and 69 versus 52 in the facilities/court commands), the proportion assigned to facilities/court commands (78%) is largely unchanged.
- *Captains*: Appendix G, Table 2 shows the number of captains available Department-wide. In this Monitoring Period, 477 captains were available and 353 (74%) were assigned to facilities/court commands. Both the total number of captains Department-wide and the number assigned to facilities/court commands are at their lowest levels since July 2020 (477 versus 810 Department-wide, and 353 versus 565 in the facilities/court commands). The proportion assigned to facilities/court commands (74%) is largely unchanged.

- **Scheduling**: Both Deputy Wardens' ("DWs") and ADWs' schedules are distributed relatively evenly across the three tours and on weekdays/weekends (although DWs do not work overnight). However, ADWs and captains are still not scheduled/assigned in a manner that results in their supervising the same subordinates day-to-day. This lack of continuity impedes the supervisors' ability to serve as effective mentors or to follow through on efforts to resolve staffs' and incarcerated individuals' concerns.
- **Training for Supervisors**: During this Monitoring Period, the Training Division shared drafts of revised initial and refresher Use of Force and Chemical Agents training for

[204] *See* Monitor's December 22, 2023 Report (dkt. 666) at pgs. 15-16, the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 64-68, the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 56-61, the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 120-127, the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 245-253, and the Monitor's June 17, 2026 Report (dkt. 984) at pgs. 146-150.

Supervisors. The materials included useful instruction for supervisory leadership and included actual Department incidents to examine how supervisory failures contribute to unnecessary force and harm. The Monitoring Team shared several feedback documents that recommended strengthening the practical application of these lessons, so supervisors are better prepared to prevent escalation, direct staff during incidents, ensure that affected individuals receive prompt medical attention, and identify and address staff misconduct.

  - *Pre-Promotional Training*: The Department did not deliver any supervisory pre-promotional training during this Monitoring Period. After the close of the Monitoring Period, the Department initiated additional pre-promotional training for captains, ADWs, and DWs. candidates is now underway.

- **Quality of Supervision**: The supervisory ranks remain unprepared to support the weight of the strategies that place them at the center of officers' skill development. Captains often appear to be either unclear about their responsibilities or fail to embrace them, according to reports from facility leadership and staff and as observed during the Monitoring Team's work on site and through assessments of a variety of incidents. This often leads to a superficial execution of duties, where captains do not appear to routinely conduct substantive tours or, in some instances, fail to conduct tours at all. Their abdication of responsibility leaves officers feeling unsupported and disinclined to fulfill their own duties. Most recently, these dynamics were summarized in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 251-252 and they remain unchanged.[205]

  In addition to the captains' need for intensive guidance, ADWs also need substantive and quality coaching, supervision, and mentoring from their superiors to develop into the type of supervisor that is so sorely needed in this Department. The task of cultivating the ADWs falls to the DWs and Wardens/Assistant Commissioners in each command. To date, there is no evidence that there has been effective guidance to ADWs, DWs, or Wardens/Assistant Commissioners on how to effectively supervise the rank they are supposed to supervise (*e.g.*, there has been no effective guidance provided to ADWs

---

[205] *See* also the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 25-28, the Monitor's December 22, 2023 Report (dkt. 666) at pgs. 14-16, the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 64-68, the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 56-61, and the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 120-127.

on how to appropriately supervise captains and hold them accountable for the performance of staff under their command).

**Conclusion**

The overall number of supervisors remains inadequate, and the quality of supervision remains poor. At the end of this Monitoring Period, the Monitoring Team directly reiterated its longstanding feedback[206] that the Department must increase the number[207] and quality of supervisors. The Monitoring Team also reiterated its recommendation for consideration of an additional supervisory rank. The lack of quality staff supervision remains a leading contributor to the Department's inability to alter staff practice and to make meaningful changes to basic security practices and operations.[208] The Department remains in Non-Compliance with these provisions.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § A., ¶ 4.** Non-Compliance<br>**Action Plan § C., ¶ 3(ii).** Non-Compliance<br>**Action Plan § C., ¶ 3(iii).** Non-Compliance |

206 These feedback and recommendations have been included in the Monitor's reports for years.

207 Phase Two of the staffing analysis intends to identify opportunities for improving staff efficiency and maximize staff deployment, including supervision within the facilities. *See* the First Remediation Action Plan, Action Step 8.

208 Furthermore, accountability for inadequate supervision at all levels remains elusive as discussed in more detail under "Accountability for High Level Supervisors," Consent Judgment, § VIII., ¶ 1 and § VIII., ¶ 3 (c).

| **IMPROVED ROUTINE TOURS (ACTION PLAN, § A., ¶1(D))** |
| --- |
| *Action Plan, § A., ¶ 1(d). Improved Routine Tours*. The Department shall conduct routine tours, including, but not limited to, tours of the housing units every 30 minutes. The Department shall immediately institute improved practices to ensure that routine touring is occurring, including the use of the "tour" wand by Correction Officers during each tour conducted. The Office of the Commissioner shall audit the electronic records of tours conducted by uniform staff to ensure compliance with touring requirements. |

Routine and adequate touring of housing units is a fundamental component of sound correctional practice. For years, the Department's own audits, consistent with the Monitoring Team's findings, have demonstrated that officers and captains do not tour the housing units as often as required and that their tours are often not substantive or meaningful (*e.g.*, they do not look into the cell-door windows to verify the safety of the individual). Staffs' failure to adequately tour the housing units has contributed to the overall state of dysfunction and to the high rates of unnecessary and excessive uses of force and serious acts of violence. The lack of adequate touring has also been identified as a contributing factor in several deaths in custody. As a result of the deficiencies in staff tours, the Action Plan includes requirements to improve routine housing unit tours § A, ¶ 1(d).

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Action Plan § A, ¶ 1(d). The Court explained the basis for its finding on pg. 15 in section the "Deaths in Custody" and on pg. 23 in section "Failure to Correct Failures in Security and Basic Correctional Practice" of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Non-Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **Background**: Staff must visually inspect the housing units, particularly when incarcerated individuals are confined to their cells, to maintain security, to ensure the

welfare of incarcerated individuals, to respond to their concerns, and to address any problems that arise. These tours should be conducted at regular intervals throughout each shift, every 30 minutes for officers and three times (at least one hour apart) per 8-hour shift for captains. Since the inception of the Action Plan, even with its specific requirements related to housing unit tours, meaningful change in staff touring has not been observed.

It is critical for both safety and security reasons that staff conduct tours as required. In the Monitoring Team's experience, this is an area in which active supervision of uniformed staff would support a change in practice, and therefore tours by captains must be closely scrutinized as captains serve as role models for those staff working in the housing units. Officers often report that they do not feel adequately supported by their supervisors. Ensuring that supervisors consistently conduct quality tours of housing units would not only serve as a means of demonstrating improved practice to officers but also as a means of providing necessary supervision and concrete support for their staff.

- **DOC's Assessment of Staff Tours**: DOC has a number of ways through which it can assess whether staff tours occurred, each of which is taken in turn below.
    - *Utilization of Tour Wands by Facility Staff*: The Watch Tour system and use of the tour wand amongst housing area officers and captains remains the same as described in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 255. To the extent that there is tour wand data, it simply confirms that the staff member moved throughout the unit and pressed the wand over the sensors, but it does not verify whether the required tour actually occurred or was meaningful. The Department's recordkeeping regarding whether staff have conducted tours or not does not permit the development of aggregated data, in particular because most of the data is maintained in multiple Excel spreadsheets, logbooks, and/or is otherwise not amenable to aggregation.
    - *Tour Wand Data Analysis*: In this Monitoring Period, the Department's analysis of the tour wand data and use of the tour wand dashboard remained the same as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 255-256. The tour wands can produce electronic information, but that basic data has not yet been maximized to develop a reliable quality assurance program about the actual

performance level of staff.[209] The Monitoring Team recommended that the Department improve its ability to assess this data in June 2024, but the Department has not provided any substantive update on its efforts to develop an improved technique to aggregate tour wand data.

- *Quality Assurance of Tours by Department & Facility Leadership*: For most of the 22nd Monitoring Period, the Department's quality assurance initiative to determine whether tours occurred, and the supervisor managing it, remained the same as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 256-257. However, in mid-May 2026 after Department-wide organizational restructuring, the daily tour wand auditing process was transitioned from the former Senior Deputy Commissioner's Office[210] to uniformed staff in each of the facilities with some oversight by the Offices of the Assistant Chiefs of Facility Operations.[211] The Department reported at the time the audit work was transitioned, facility leadership and the Assistant Chiefs were provided an overview of the audit process from the Offices of Security and the Chief of Department. The facilities' process for conducting the audits of each day's tours is the same as was done by the former SDC's office as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 256-257. The Monitoring Team has long reported that this

[209] An example of the Department's current tour wand dashboard can be found in Exhibits A and B to the Declaration of Captain Gamien Batchelor (dkt. 689-7). The functionality of the dashboard permits leadership to identify close in time whether or not staff walked through a housing unit as they should. Retrospectively, the dashboard also permits a visual inspection of the tours completed on a set of housing units for a particular day/shift (which are represented by a series of dots and Xs), although the dashboard is limited in terms of the lookback window because of the large volume of data that must be processed. The dashboard also includes variables for whether the frequency of tours met the intended "target," the number of tours that were late, and the longest duration between tours.

[210] Upon appointment of the current Commissioner in February 2026, the Senior Deputy Commissioner was reassigned, and a Chief of Department was appointed in place of the Senior Deputy Commissioner.

[211] Since the tour wand auditing began in fall 2023, the management of this process has changed multiple times across at least three different offices (the Office of Commissioner, the Office of the Deputy Commissioner of Facility Operations, and Office of the Senior Deputy Commissioner) as described in the Monitor's November 8, 2023 Report (dkt. 595) at pgs. 75-76 and the Monitor's April 18, 2024 Report (dkt. 706) at pg. 25, fn. 4. The process was managed by the Office of the Senior Deputy Commissioner ("SDC") from March 2024-May 2026, however the leadership of the team under the SDC's office changed three times between March 2024-March 2025 as described in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 256, fn. 275. From March 2025-May 2026, the same captain within the SDC's office managed the quality assurance initiative to determine whether tours occurred. The transition of this initiative to the facilities with some oversight by the offices of the Assistant Chiefs of Facility Operations Divisions in May 2026 is now the fourth office to manage the tour wand auditing process since the initiative began in Fall 2023.

process is inefficient, burdensome, and does not produce any noticeable change in staff practice or results that support the overall goal of ensuring that tours occur as required. Facility staff have also reported to the Monitoring Team that the process is "tedious" and "time-consuming" and requires the daily allocation of uniformed staff within the facilities to conduct the audits and diverts uniformed staff from other responsibilities with direct engagement with incarcerated individuals.

In addition to the daily audits conducted by the facilities, on a monthly basis, the Offices of the Assistant Chiefs of Facility Operations Divisions are reviewing the daily audits conducted by the facilities and validating the work done for randomly selected units and tours to ensure the facilities are accurately identifying and reporting touring violations through the daily audits. The Offices of the Assistant Chiefs of Facility Operations Divisions also verify whether the facility generated all the corrective action as recommended. While this is a well-intended effort to ensure the facilities are accurately conducting their audits and appropriately identifying and disciplining violations amongst their own staff, this only added an additional layer of auditing to an already inefficient and burdensome process that has not resulted in discernable changes to staff practice. The Monitoring Team reiterates that the current quality assurance process must be reevaluated so that resources can be used efficiently and issues can be identified and addressed in a manner that supports actual change in staff touring practices. The Monitoring Team shared feedback with the Department on this process in June 2024 and the Department has not substantively responded, nor has it changed its auditing process.

- *Nunez Compliance Unit ("NCU") Audits*: Table 21 in Appendix F identifies the number of random security audits NCU conducted between January 2022 and June 2026, and NCU's findings regarding staff touring practices. In this Monitoring Period, NCU's audits of housing units found that staff did not conduct meaningful tours in 42% of the audits conducted and staff failed to make all required tours in 22% of the audits conducted. Further, staff were found off post for at least some period of time in 78% of the audits. NCU's findings that touring does not occur routinely or as required by policy are consistent with the

Monitoring Team's findings via observations of staff practice while on site and during its routine review of use of force incidents, violent incidents, and in-custody deaths.

- **Corrective Action**: The Department takes corrective action in response to staff failures to conduct tours or conduct adequate tours in a number of different ways. The Department does identify staff failures to tour in at least some cases, but as demonstrated in the data below, the frequency of corrective action does not appear commensurate with the frequency of deficiencies identified by DOC's own audits and reviews.
  - *Corrective Interview Referrals from the Quality Assurance Program*: The quality assurance program conducted by the SDC's office, then by the facilities, as described above, resulted in 1,976 corrective interview *referrals* for staff who failed to complete all required tours during January-June 2026. This is significantly more corrective interviews than were recommended via the quality assurance program in the 20th Monitoring Period (n=1,461) and 21st Monitoring Period (n=820). Generally, it is unknown whether all these corrective interviews actually occurred as the quality assurance audits do not maintain data to confirm whether the recommended corrective interviews took place.[212] The Monitoring Team reiterates its broader recommendation about the efficacy of corrective interviews – the purpose and goal of these corrective interviews is to actually change practice as discussed in the compliance assessments for First Remedial Order § A, ¶ 1, Facility Use of Force Reviews and First Remedial Order § C, ¶ 1, Immediate Corrective Action.
  - *Rapid Review Recommendations*: Table 22 in Appendix F shows the corrective actions that facility leadership recommended, via Rapid Reviews, for potentially deficient staff touring practices. About 40 staff were identified for corrective action, most of which was for corrective interviews or 5003 counseling.[213] It

[212] The former SDC's office did not confirm whether the corrective interviews occurred when the process was managed by that office. Currently, the Offices of the Assistant Chiefs of Facility Operations and Security review some of the facilities' audits to ensure the corrective actions were generated as recommended. The reviews conducted by the Offices of the Assistant Chiefs found that the facilities did generate and conduct most corrective interviews.

[213] The Monitoring Team has reported corrective interviews or 5003 counseling are procedural and perfunctory and have not resulted in any observable change in practice as described in more detail for the compliance assessments of

appears that the facilities are improving in their ability to identify this issue while reviewing use of force incidents as described in the compliance assessment for First Remedial Order § A, ¶ 1, Facility Use of Force Reviews. However, it still appears facility leadership may not be identifying all situations in which there were deficient touring practices as the low number of staff identified for deficient touring practices does not appear consistent with the scope of the problem as identified by the NCU audits and the Monitoring Team's observations and incident reviews.

- *Formal Discipline*: Between January 2022 and June 2026, the Department has brought 70 cases against 66 staff members for issues related to touring related to uses of force.[214] Of these 70 cases, 50 were resolved with an NPA, 10 were administratively filed, two had deferred prosecutions due to the resignation of the staff member, and eight remained pending at the close of the 22nd Monitoring Period.
- *Discipline for Touring Practices Related to In-Custody Deaths*: Table 4 of Appendix D shows the corrective actions taken by the Department in relation to in-custody deaths. From January 2022 to September 2026, a total of 43 staff (two ADWs, 12 captains, and 29 officers) were disciplined at least in part due to deficiencies in their touring practices in cases where an individual died in custody. In this Monitoring Period, the Department found in at least two in-custody deaths that one captain and two officers failed to conduct adequate tours and one of the officers left their post unauthorized. It is notable that the sheer number of staff disciplined for failures to tour related to deaths of individuals in custody illustrates just how commonplace touring deficiencies are within the Department and the harm that can and does result when staff fail to conduct meaningful tours.

**Conclusion**

First Remedial Order § A, ¶ 1, Facility Use of Force Reviews, and First Remedial Order § C, ¶ 1 & § C, ¶ 2, Immediate Corrective Action & Monitor Recommendations.

[214] Some of the cases include additional charges beyond those related to touring. For example, in one case, a staff member may be disciplined for both inadequate touring and a chemical agent violation.

Overall, tours by officers and captains do not appear to be occurring as required and the current levels of supervision and the oversight processes in place (*e.g.*, tour wands and the quality assurance measures) contribute little to the effort to improve staff practice. Given the frequency with which these deficiencies are observed, and the harm that flows from them, the corrective action imposed does not appear effective and also does not appear to sufficiently address the number of violations observed. The level of Department and facility leadership supervision and oversight focused on this issue continues to be insufficient and it must be given more meaningful attention if any progress is to be made with respect to this fundamental safety and security issue.[215]

| | |
|---|---|
| **COMPLIANCE RATING** | **Action Plan § A., ¶1(d).** Non-Compliance |

[215] The First Remediation Action Plan, Action Step 1 requires the Department to develop a proposed order of priority for developing and implementing practice-change plans (including Routine Tours) to address lapses in core security practices.

| **FACILITY USE OF FORCE REVIEWS (FIRST REMEDIAL ORDER § A., ¶ 1)** |
|---|
| *First Remedial Order § A., ¶ 1. Use of Force Reviews*. Each Facility Warden (or designated Deputy Warden) shall promptly review all Use of Force Incidents occurring in the Facility to conduct an initial assessment of the incident and to determine whether any corrective action may be merited ("Use of Force Review"). The Department shall implement appropriate corrective action when the Facility Warden (or designated Deputy Warden) determines that corrective action is merited.<br>i. The Department, in consultation with the Monitor, shall implement a process whereby the Use of Force Reviews are timely assessed by the Department's leadership in order to determine whether they are unbiased, reasonable, and adequate.<br>ii. If a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. |

This provision requires facility leadership to conduct a close-in-time review of all use of force incidents ("Rapid Reviews" or "Use of Force Reviews"). Further, this provision requires the Department to routinely assess Rapid Reviews to identify any completed reviews that may be biased, unreasonable, or inadequate and address them with appropriate corrective action.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

The Rapid Review concept is grounded in sound correctional practice and has elevated the quality of staff practice in other jurisdictions. However, catalyzing improved practice requires both Department and facility leadership to possess a strong command of the security protocols and procedures that must be utilized on a daily basis, to develop skills to guide and coach their staff toward sound correctional practice, and to ensure that staff are supervised in a manner that allows them to address these issues in real time.

Rapid Reviews are intended to identify procedural violations, recommend corrective action for staff misconduct, and also identify incidents that could have been avoided had staff made different choices in the moment. Close-in-time use of force reviews are an essential tool for improving staff practice. Both the Department and the Monitoring Team rely on these findings to identify patterns and trends.

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **Rapid Review Process**: At the end of the last Monitoring Period, the Rapid Review process was updated as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 265-267 and illustrated in Appendix N. All Rapid Reviews conducted during this Monitoring Period were subject to the new Rapid Review process, with a few changes: (1) the *Nunez* Compliance Unit established a process to identify recommended but uninitiated corrective actions, and (2) a two-week deadline was imposed for the Office of Security and Facility Operations to review and finalize the Rapid Reviews.[216] As discussed below, the additional time and materials reviewed by supervisors before finalization of a Rapid Review has improved the identification of policy violations, but deficiencies in the Rapid Reviews continue to contribute to the persistence of the security and operational problems plaguing the jails, patterns of excessive and unnecessary uses of force, and the intransigence of the problematic culture. The policy drafted in the last Monitoring Period to codify the Rapid Review process still has not been finalized.[217]
- **Rapid Review Assessments of Use of Force Incidents**: The number and findings of the Rapid Reviews can be found in Table 1 of Appendix E.
    - *Overview of Rapid Review Findings*: During this Monitoring Period, over 99% of reported use of force incidents were assessed via a Rapid Review, which found that 10% of incidents were avoidable and 75% of incidents had some type of violation of Department policy. The fact that 75% of incidents identified some type of violation illustrates the extent of poor operational practices and policy violations throughout the facilities on a daily basis. It is important to note that while the Rapid Reviews identify many issues, they often do not identify/acknowledge all poor and/or dangerous practices, fail to

[216] This change was imposed to address the fact that Rapid Reviews were frequently being updated and revised to include more complete information or more appropriate corrective action recommendations, often weeks later following a review by the Assistant Chiefs' office. The ongoing revisions of Rapid Reviews appeared both unnecessary and undermined the purpose of the Rapid Review process to conduct close-in-time reviews of use of force incidents.

[217] The Monitoring Team provided feedback on the policy and it remains outstanding.

identify/acknowledge indicators that the incident was avoidable, and fail to identify/acknowledge when the use of force was unnecessary.

- *Avoidable Incidents*: Identification of incidents that were avoidable is critical as they help to ensure that poor practices can be abated and do not occur in the future. In this Monitoring Period, the Rapid Reviews found that 10% of the incidents were avoidable. The Monitoring Team has long reported that Rapid Reviews most often fail to identify indicators that incidents were avoidable and explain how operational failures or staff misconduct contributed to incidents that may not have occurred had staff taken different actions. It therefore is notable that the proportion of incidents identified as avoidable has increased in this Monitoring Period (10% in this Monitoring Period compared with 6% in the last Monitoring Period[218]). This appears to reflect an improvement in identifying cases that may be avoidable versus a change in staff practice or an actual increase in the number of avoidable incidents. While this improvement is notable, the Investigation Division's investigations of use of force incidents and the Monitoring Team's review of incidents suggest that additional incidents could have been avoided but were not properly identified as such in the Rapid Reviews.[219] At the end of the Monitoring Period, the Department finalized a revised definition of the avoidable term in order to improve identification of the issue.[220] This definition was developed in consultation with the Monitoring Team and is expected to be implemented in the next Monitoring Period.
- *Incidents with Policy Violations:* In this Monitoring Period, 75% of incidents identified some type of violation of Department policy. The Department's finding

[218] *See* Monitor's June 17, 2026 Report (dkt. 984) at Appendix D, Table 1.

[219] Further exploration of avoidable incidents that were not identified in the Rapid Reviews is available in Table 9 in Appendix C. In this Monitoring Period, the Rapid Reviews determined that 13.5% of all uses of force involving unmanned posts were avoidable. This finding is dubious given the likelihood that if the post was staffed as it should have been, the need for force would likely have been avoided in more than 13.5% of those cases. Had staff been present and conducting their duties appropriately, they may have been able to prevent, deter or mitigate the incident that led to the use of force.

[220] The agreed-upon definition states, "A Use of Force that likely could have been prevented but for one or more of the Contributing Factors." The Contributing Factors are categorized into five groups – supervision, security, conflict resolution alternatives and de-escalation techniques for anticipated uses of force, professionalism, and escort procedure. Each of these five groups list a number of specific contributing factors, as well as an "other" option to capture unique factors not otherwise enumerated.

is consistent with the Monitoring Team's routine assessments of incidents that violations are common and widespread. The proportion of incidents with some type of policy violation grew significantly this Monitoring Period (75% in this Monitoring Period compared with 57% in the last Monitoring Perion). This increase does not appear to reflect a change in staff practice nor an actual increase in the number of violations, but it instead appears to reflect improvement in the Rapid Reviews' ability to identify such violations. However, the Monitoring Team's review of the Investigation Division's investigations and independent assessment of use of force incidents continues to suggest that the Rapid Reviews do not consistently and comprehensively identify various types of poor practice and violations, such as unnecessary or excessive use of chemical agents, use of painful escorts, failure to follow anticipated force protocols, and failure to supervise. As a result, there are missed opportunities to provide much needed coaching and/or to take immediate corrective action. The violations that are identified in the Rapid Reviews continue to run the gamut from minor violations to more concerning violations. The most common types of violations identified were body-worn camera or handheld camera violations with hundreds of these violations identified each month, though violations for situational awareness, unprofessional language or conduct, and unsecured doors and/or equipment were also frequently identified. Rapid Reviews continue to cite violations for issues that do not appear relevant to the use of force or security, such as uniform violations. Over 500 uniform violations were identified in the Rapid Reviews for the 22nd Monitoring Period. The Monitoring Team previously recommended that the Rapid Reviews focus on the salient and relevant security and force violations that occur given the issues currently facing the Department versus minor violations such as uniform violations. While there has been some reduction in this, the Monitoring Team strongly recommends that the primary focus of the Rapid Reviews remains on security and force violations.[221]

---

[221] The Department reports that it does not intend to adopt this recommendation because Department Leadership reports that it does not want Facility leadership to be selective when choosing which violations to identify and address when conducting Rapid Reviews. Department uniformed leadership report that all standards, however minor, must be upheld in order to maintain a culture where all violations will consistently be identified and

- *Lack of Accountability for Facility Supervisors for Insufficient Rapid Reviews*: The Monitoring Team has long reported that facility leadership are rarely held accountable for incomplete, inaccurate, unreasonable, or biased Rapid Reviews or the failure to consistently identify ongoing operational and management failures, which likely contributes to the fact that such issues persist.[222] The Department reports that there was some accountability for facility leadership for incomplete or inaccurate Rapid Reviews in this Monitoring Period. Two facility leaders received 5003 Counseling for failure to identify all staff actions in a Rapid Review, one facility leader received 5003 counseling for failure to identify that an incident was avoidable in the Rapid Review, and three facility leaders were given corrective interviews for failure to generate corrective actions recommended for staff in the Rapid Reviews. Overall, the Monitoring Team recommends that the Department provide ongoing support to facility leadership to improve the quality of Rapid Reviews.

- **<u>Corrective Action Recommendations from Rapid Review Assessments of Use of Force Incidents</u>**: The number of corrective actions recommended via Rapid Reviews is included in Table 2 in Appendix E. In this Monitoring Period, the following number of corrective actions were recommended: 1,395 5003 Counseling; 1,728 corrective interviews; 1,503 command disciplines; 289 retraining, 137 Memorandums of Complaint ("MOCs"), 40 suspensions, 45 referrals to E.I.S.S., 11 referrals to the Correction Assistance Response for Employees Unit ("C.A.R.E."), and 7 referrals for no contact with incarcerated individuals. All types of corrective action referrals, except for CD referrals, increased during this Monitoring Period. The increase in corrective action referrals appears to reflect improved identification of policy violations as discussed above.

---

corrected. Additionally, Department uniformed leadership have expressed that if people in custody are expected to dress and act a certain way, then this standard must also be upheld with staff.

[222] Between the 16th and 21st Monitoring Periods, the Department reported that only one facility leader was held accountable for completing incomplete, inaccurate, unreasonable, or biased Rapid Reviews. *See* Monitor's April 18, 2024 Report (dkt. 706) at pg. 56, the Monitor's November 22, 2024 Report (dkt. 802) at pg. 44, the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 263-264, and the Monitor's June 17, 2026 Report (dkt. 984) at pg. 159.

The numbers and proportions of 5003 Counseling and corrective interviews increased the most during this Monitoring Period, and combined, they made up 61% of all corrective action recommendations via Rapid Reviews. The Monitoring Team receives repeated reports from line staff, supervisors and DOC leadership that corrective interviews and 5003 Counseling sessions are procedural and perfunctory at best, and in spite of thousands of corrective interviews and counseling sessions that occur each year, there has been no demonstrable change or improvement in staff practice. As a result, the Monitoring Team shared feedback with the Department recommending that they critically evaluate the approach, content, and delivery of corrective interviews and 5003 Counseling to ensure these actions are substantive, instructional, and constructive and achieve their intended purpose of improving staff practice.

Despite the overall increase in corrective action referrals, there was a decrease in both the number and proportion of CD referrals between this Monitoring Period and last (n=1,703, 48% in this Monitoring Period compared to n=1,508, 29% in the last Monitoring Period), however the number of CDs recommended in this Monitoring Period still exceeds the number of CDs recommended in all but the last Monitoring Period. The number of recommended CDs is further decreased by the fact that some of the recommended CDs are not processed. The Monitoring Team continues to find that a significant number of CDs recommended via Rapid Reviews are not actually entered by facility staff into the Case Management System as described in more detail in the compliance assessment for Consent Judgment § VIII, ¶ 1 & § VIII. ¶ 3(c)), Timely, Appropriate and Meaningful Accountability, so the Monitoring Team recommends that the offices of the Assistant Chiefs of Facility Operations and Security more closely scrutinize the facilities' generation of corrective actions as recommended in the Rapid Reviews.

**Conclusion**

The Rapid Reviews provide important insight into Department practice and— when used properly—benefit the larger goal of improving staff practice. The fact that the Rapid Reviews identified 75% of incidents that occurred during this Monitoring Period involved policy violations reflects the persistence of poor operational and security practices throughout the facilities. While there have been improvements observed in the Rapid Reviews during the current

Monitoring Period such as the increased number of violations identified, their full potential has not yet been realized. The Rapid Reviews certainly identify issues that must be addressed, but the ongoing concern is that they do not reliably identify *all* relevant issues that could be identified via a careful video review, for example, and thus are too often incomplete. In addition, the identification of these violations and the resulting recommendations for corrective action do not appear to be changing staff practice. While the Monitoring Team has long reported on the inadequacies of the Rapid Reviews, facility leaders are generally not held accountable for the ongoing management and operational deficiencies occurring in the jails.

The new Rapid Review process has shown initial signs of potential to improve the quality and consistency of the Rapid Review assessments. However, the new process must be closely monitored with independence and fidelity to ensure that the quality of the Rapid Reviews continues to be elevated and results in tangible impacts on staff practice. The new Rapid Review process must also be formalized into policy, along with the revised avoidable use of force definition.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § A., ¶ 1.** Partial Compliance |

| **INVESTIGATIONS OF USE OF FORCE INCIDENTS (CONSENT JUDGMENT § VII., ¶ 1, § VII., ¶ 9 (A)) & § VII., ¶ 11)** |
|---|
| *Consent Judgment § VII., ¶ 1. Thorough, Timely, Objective Investigations.* As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.<br><br>*Consent Judgment § VII., ¶ 9. Timing of Full ID Investigations.* All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:<br>a. *Timeliness* [. . .]<br>ii. Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:<br>1. ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than 120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.<br>2. The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.<br><br>*Consent Judgment § VII., ¶ 11. Staffing of ID Investigators.* The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.<br><br>*August 10, 2023 Order § I, ¶ 11. ID Staffing*. By, December 31, 2023, the City shall ensure that the Department's ID Division maintains at least 21 supervisors and 85 investigators to conduct use of force investigations unless and until the Department presents an internal staffing analysis and can demonstrate to the Monitor that fewer staff are necessary to conduct thorough, timely, and objective investigations of all Use of Force Incidents as required by the Nunez Court Orders. |

This compliance assessment provides an overview of the status of investigations for all use of force incidents through June 30, 2026. This section addresses compliance with three provisions of the Consent Judgment regarding investigations. First, Consent Judgment, § VII., ¶ 1 requires DOC to "conduct thorough, timely, and objective investigations of all use of force incidents to determine whether staff engaged in the excessive or unnecessary use of force or otherwise failed to comply with the New Use of Force Directive." Second, Consent Judgment, § VII., ¶ 9(a) requires Full ID Investigations to be completed within 120 days or less. Finally, Consent Judgment § VII., ¶ 11 requires the Department to have adequate staffing levels for the

Investigation Division. The Department's progress toward compliance with these provisions is discussed in turn below.

**Court's 2024 Contempt Order**

The Court's November 26, 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with all three provisions. The Court explained the basis for its finding at pgs. 18-26 in section "Failure to Conduct Adequate Use of Force Investigations and Hold Staff Accountable" of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with Consent Judgment § VII, ¶¶ 1 and 11 and in Non-Compliance with Consent Judgment § VII, ¶ 9(a), which are unchanged from the prior Monitoring Period. The history of compliance ratings for these provisions since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 11 as it relates to the Investigation Division's staffing levels, but a compliance rating is not provided for this provision pursuant to the Court's March 18, 2026 Order (dkt. 967).

**Relevant Data and Information**

The Investigations Division is instrumental in the Department's efforts to identify excessive, avoidable, and/or unnecessary uses of force as it is tasked with conducting neutral and objective investigations into all use of force incidents. As a part of the investigation process, ID also identifies staff misconduct and recommends appropriate discipline for staff who use force in a manner that is not permitted by policy. As such, the Monitoring Team has routinely evaluated ID's leadership, staffing, and the timeliness and quality of its work product to assess progress toward compliance with the *Nunez* Court Orders. A description of the issues plaguing ID between 2020 and 2024 are described in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 142-145. As discussed below, the impact of the mismanagement of ID was extensive, and ID still struggles in several areas.

The Monitoring Team's findings for this Monitoring Period are based on the following information.

- **Investigations Division Leadership**: The leadership of ID has continued the important work started in 2024 of returning ID to its previous emphasis on transparency and neutrality and rebuilding a culture focused on the quality of the work product.[223] Importantly, in June 2026, the Remediation Manager appointed a Senior Deputy Commissioner for Investigations, Intelligence, and Accountability who reports directly to the Remediation Manager and oversees the Investigation Division (that focuses on use of force investigations), the Special Investigation Unit,[224] the Correction Intelligence Bureau, the Trials and Litigation Unit, the Adjudication Unit, and the Informal Charges and Discipline Unit. The current Senior Deputy Commissioner has extensive experience in conducting and managing investigations, managing the accountability process, and with the *Nunez* reform effort. The SDC previously worked at DOC, serving as Deputy General Counsel and Deputy Commissioner of the Intelligence, Investigation, & Trials Divisions. As the Monitoring Team has previously reported, the current SDC is a strong leader, who is highly competent, possesses the qualities and expertise needed to fill this role including strong competency in the core areas underpinning the *Nunez* reform effort, and has the creative thinking necessary to advance the reform effort. *See*, for example, Monitor's December 22, 2021 Report (dkt. 435) at pg. 8.
- **Restructuring of the ID Division**: The Remediation Manager directed that the Department's Divisions related to investigations, intelligence, and staff discipline be managed under a single leader, as noted above. Following the close of the Monitoring Period, in October 2026, the Remediation Manager approved and directed the restructuring of these units.
- **Enhancements to the Investigation Process**: ID's leadership has continued to focus on developing efficiencies for the investigation process.[225] As part of this work, ID now investigates all of use of force incidents under a new framework which categorizes incidents into one of three categories that correlate to the level of investigative scrutiny

[223] *See*, Monitor's May 22, 2025 Report (dkt. 850) at pgs. 144-145.

[224] For more information on the Special Investigation Unit, *see* Monitor's June 17, 2026 Report (dkt. 984) at Appendix N.

[225] The Department's long-standing investigation framework and areas identified for improvement were described in detail in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 273-275.

required.[226] The roll-out of the new framework began at the end of 2025 and was fully implemented across all facilities by March 2026.[227] Per the Monitoring Team's initial review, this work is promising and suggests that this approach could support more efficient and higher quality investigations. The changes to the investigations process are discussed in more detail in the "Status and Timeliness of Investigations" section below.

- **ID Staffing**: As suggested by protracted investigations and ongoing case backlogs, ID staffing remains insufficient to manage its overall caseload. Further, the staffing levels of 21 supervisors and 85 investigators set by the Court's August 10, 2023 Order (dkt. 564), § I, ¶ 11 have not been met. As of June 2026, ID had 14 Supervisors and 67 investigators. Data on the number of supervisors and investigators assigned to ID are presented in Tables 3(a) and 3(b) in Appendix E. In this Monitoring Period, the number of staff who departed (n=16) outpaced the number of staff hired (n=6), for a net loss of nine investigators and one supervisor. Additional data on the number of ID hires and departures is presented in Table 4 in Appendix E. ID reports it has continued to work towards ensuring it has adequate staffing levels, by both trying to recruit and retain staff and making the investigations process as efficient as possible so that staff workloads are more manageable. One factor that continues to undercut ID's ability to achieve the required staffing levels is the low salary range for investigators, and the Monitoring Team continues to recommend that the City take steps to ensure competitive salaries to better support both the hiring of new staff and the retention of existing staff within ID. Given the long-standing challenges with retaining and recruiting civilian investigators, at the end of this Monitoring Period, ID opened applications for CO and captain investigators. ID received a significant number of applications, and is thoroughly screening, vetting, and interviewing those who applied to determine whether they would be appropriate for assignment to ID.
- **Status and Timeliness of Investigations**: While some progress has been made in the timeliness of Full ID investigations, significant work remains to both resolve the large

[226] The new framework was discussed in detail and illustrated in the Monitor's June 17, 2026 Report (dkt. 984) at Appendices O and P.

[227] The new framework was piloted at the end of the last Monitoring Period for incidents that occurred at only one facility, RNDC, but was expanded to GRVC, RMSC, and RESH in January 2026, to OBCC, EMTC, and BHPW in February 2026, and to NIC, WF, and the Court Commands in March 2026.

backlog of investigations and to ensure the timeliness of incoming investigations. One of the underpinnings of adequately addressing and correcting staff misconduct is for the response to misconduct to occur close-in-time to the incident. An efficient process for investigating potential misconduct is therefore essential. Data on the Status of Investigations for all Use of Force Incidents is presented in Table 5 in Appendix E and discussed more below.

- *Intake Investigations*: For incidents that occurred in the 22nd Monitoring Period, 52% of Intake Investigations were closed or pending within 30 business days[228] or less; 41% were closed or pending within 31-60 business days; and 7% were closed or pending beyond 60 business days. The status and timing of Intake Investigations for all use of force incidents that occurred during this Monitoring Period is demonstrated in Table 6 in Appendix E. ID reported that much of the delay in completing Intake Investigations in a timely manner occurred after the rollout of the Department's new case management platform, CaseBuilder.[229] Most of the delays were due to unanticipated technical issues and staff's adjustment to learning the new software, which led to a backlog of Intake Investigations. ID leadership proactively identified this backlog and took immediate steps to reduce it. Originally, the initial investigation for Category 1/Full ID cases were conducted by the ID Rapid Review Team, but now intake investigators complete initial investigations for Category 1/Full ID cases, and the ID Rapid Review Team assists with Intake Investigations for Category 2 and 3 cases. In addition, one of two levels of supervisory review was removed from Category 3 cases (Deputy Director of Investigations review) so that supervisor resources could be redeployed to other areas that needed additional supervisory support.[230] And finally, staff from the Intake Investigation Quality Assurance teams were reassigned to assist with the closure of Intake Investigations. This backlog was

[228] Intake Investigations are required to be completed within 25 business days of the incident's date, although the Monitoring Team has utilized 30 business days as the applicable time frame when determining "timeliness" as it provides a reasonable grace period beyond the deadline.

[229] For more information about CaseBuilder, *see* the "Identifying and Addressing Staff Misconduct" section of this report.

[230] Category 3 cases still undergo one level of supervisory review by an Intake Supervisor.

significantly reduced following the close of the Monitoring Period. ID leadership reported that technical solutions had also been put in place to address problems with CaseBuilder and staff had adjusted to using the new software.

- *Full ID*: Full ID Investigations must be completed within 120 days of the incident's date, but ID has long struggled to meet this deadline. During the current Monitoring Period, 61% of Full ID Investigations (n=456) were closed or pending beyond the 120-day deadline. Although this proportion remains excessive, it is an improvement from the last Monitoring Period in which 83% of Full ID Investigations were closed or pending beyond the 120-day deadline. The status and timing of all Full ID Investigations for incidents that occurred between January 2025 and June 2026 is provided in Table 7 in Appendix E.[231] To better manage the Full ID workload, the Full ID directors and investigators reported that they continue to strategically allocate resources and prioritize cases that are approaching their statutes of limitations for staff disciplinary charges as well as those cases that have the fewest investigative steps left to complete as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 282-283. Delays in conducting MEO-16 interviews continue to contribute to delays in completing investigations. The Monitoring Team has long recommended that the City and DOC take concrete steps to increase the number of MEO-16 interviews and address the reported delays due to the unavailability of counsel for the captains' union as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 281-282. No meaningful progress has been made on this issue despite the Monitoring Team's ongoing recommendations and scrutiny.

- **Law Enforcement Referrals**: ID continues to promptly make referrals for behavior that may be criminal in nature to the Department of Investigation ("DOI"). Detailed data on the number and status of cases that have been referred to outside law enforcement agencies for investigation and potential prosecution are presented in Table 8 in Appendix

[231] The period of incident dates of January 2025-June 2026 was selected as it captures *all* pending full ID investigations as of the end of this Monitoring Period. All investigations, including full ID investigations, have been completed for uses of force that occurred prior to January 2025. Given that full ID investigations can take months to complete, it is common that a full ID investigation will be completed in a different Monitoring Period than the Monitoring Period in which it occurred.

E. The referral process is necessary even though the majority of cases referred do not result in criminal charges. Of the 182 use of force cases investigated by outside law enforcement since 2015, only 8 have resulted in criminal charges and 17 cases remain pending with law enforcement, some for incidents that occurred in 2024. While the timeliness of law enforcement agency reviews of cases for potential criminal charges has improved over the life of the Consent Judgment, it is still a protracted process that delays internal accountability and discipline within DOC. The Monitoring Team continues to urge that the cases evaluated by law enforcement be prioritized so that cases that will not be prosecuted can be expeditiously returned to DOC for administrative resolution. Further, the Monitoring Team has recommended that the Department explore the possibility of administratively processing certain cases still pending law enforcement review to the extent possible. Following the close of the Monitoring Period, the newly appointed SDC initiated efforts to address this recommendation that appear promising.

- **Use of Force Priority Squad**: The Use of Force Priority Squad ("UPS") is an important management tool to address some of the most serious and complex use of force cases, including those identified for expedited closure pursuant to Action Plan, § F ¶ 2 as discussed in further detail in the compliance assessment for First Remedial Order § C, ¶ 1 & § C, ¶ 2, Immediate Corrective Action & Monitor Recommendations. UPS has also been assisting in closing out backlogged Full ID investigations. During this Monitoring Period, UPS was assigned fewer cases given the size of its case backlog but closed a comparable number of cases: 35 newer complex cases and 7 backlogged Full ID cases were assigned to UPS, and 28 newer complex cases and 13 backlogged Full ID cases were closed. Of the 41 cases closed by UPS in this Monitoring Period, 27 (66%) were referred for formal discipline. However, the UPS backlog remains significant. At the end of the Monitoring Period, UPS had 99 total pending cases – 85 newer complex cases cleared for investigation, 5 backlogged Full ID cases cleared for investigation, and 9 cases on DOI hold. The Monitoring Team recommends this unit is given additional resources to ensure prompt case closures given its necessary role in supporting the Department's obligation to timely and meaningfully hold staff accountable for serious misconduct.

- **<u>Quality of Investigation Findings</u>**: The Monitoring Team continues to routinely review hundreds of investigations each Monitoring Period. While the quality of investigations varies, since 2024, the overall quality has improved. Investigators have become more skilled at assessing available evidence, identifying potential violations, and recommending appropriate action or further investigation when necessary. ID's efforts to conduct investigations more efficiently are also expected to continue to improve the quality of investigations.
  - *ID's Categorization Process*:[232] During this Monitoring Period, the Monitoring Team closely scrutinized a random sample of Category 2 and 3 cases to determine whether the cases were appropriately categorized and whether the investigators' determinations appeared reasonable. The majority of cases appeared to be appropriately categorized according to ID's policy, and the investigators' determinations of whether an incident was avoidable/necessary/excessive appeared reasonable. It also appeared that investigators made appropriate referrals for Category 2 cases to be upgraded to Category 1/Full ID investigations when warranted. Overall, this review suggested the pilot process is achieving the intended goal of more efficient investigations and improving the quality of investigations.
    - Through this review the Monitoring Team identified a number of cases (about 14% of those reviewed) that suggested ID should consider whether the factors that define Category 2 and Category 3 incidents need to be clarified. Investigators do appear to properly identify the factors but may not always apply or utilize the information appropriately. Additional guidance is needed to ensure that incidents involving self-harm or stabbings/slashings are placed in Category 2, that verbal allegations heard via BWC should be considered when evaluating whether there are inconsistent statements, and that "forceful contact" with the floor/ground is appropriately defined in policy.

[232] The new framework was discussed in detail and illustrated in the Monitor's June 17, 2026 Report (dkt. 984) at Appendices O and P.

- *ID's Quality Assurance Program*: ID's Quality Assurance audit findings, which remain consistent with the Monitoring Team's findings, reflect that most of the Intake Investigations and Full ID Investigations adequately identify the most concerning violations and result in appropriate outcomes, but there is still room for improvement in the identification and documentation of every violation that may have occurred. ID's auditing process and general findings remain the same as reported in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 285-287, however fewer Intake Investigation audits were conducted during this Monitoring Period because as noted above, the staff assigned to conduct these audits were reassigned to assist in closing the backlog of Intake Investigations that resulted from the CaseBuilder rollout. Prior to the CaseBuilder rollout, ID continued its quality assurance program, and the number of case audits and the corresponding findings can be found in Tables 9(a), 9(b), 10(a), and 10(b) in Appendix E.
- *Monitor's Recommendations to Review and Reevaluate Selected Investigations*: The Monitoring Team submits feedback to the Department recommending additional review for certain investigations where it appears that the objective evidence was not adequately investigated or analyzed. The Monitoring Team continues to identify cases in which it appears the quality of the Intake Investigation or Full ID Investigation was questionable. While not a large number, the continued presence of these cases suggests the need for ongoing efforts to enhance the quality of investigations. In this Monitoring Period, ID leadership reported that the quality of some Full ID investigations was impacted by the length of time between the incident date and when the investigation was conducted. This underscores the importance of timely Full ID investigations and the improvements needed in this area.

- **<u>Outcome of Investigations</u>**:
  - *Referrals for Full ID Investigations*: 9% of Intake Investigations for incidents that occurred during this Monitoring Period were referred for Full ID

investigations.[233] The Monitoring Team's review of Intake Investigations in this Monitoring Period suggests that the proportion of cases referred for Full ID Investigations appears reasonable for the same reasons discussed in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 288. Detailed data on the outcome of Intake Investigations, including the number and percentage of Full ID Referrals is presented in Table 11 in Appendix E.

- *Identifying Misconduct and Referrals for Discipline*: In this Monitoring Period, 40% of Intake Investigations closed thus far were closed with either corrective action, facility referrals, or Full ID referrals.[234] This is a decrease from the last Monitoring Period, in which 68% of Intake Investigations closed thus far were closed with either corrective action, facility referrals, or Full ID referrals. ID leadership reported that the decrease in the proportion of cases with recommended corrective action is because ID is now relying on the improvement in the facilities' identification of misconduct and resulting corrective action recommendations in the Rapid Reviews, but caution with this approach is necessary,[235] which is discussed in the compliance assessment for First Remedial Order § A, ¶ 1, Facility Use of Force Reviews. As noted above, the Monitoring Team's review of thousands of Intake Investigations has not revealed any significant concerns or patterns of investigators failing to identify staff misconduct or failing to recommend appropriate corrective actions. Detailed data

[233] There were 537 intake investigations still pending completion at the time the data was developed. As ID investigates these 537 incidents, the number of referrals for either corrective action, facility referrals, or Full ID referrals is expected to increase.

[234] With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the facility via Rapid Review and ID determined that the action recommended in the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better understood as cases in which either no violation was identified, or ID *did not identify additional staff behaviors requiring disciplinary or corrective action beyond what had already been identified and taken by the facilities*.

[235] While the improved identification of misconduct in Rapid Reviews is notable, the Monitoring Team cautions that ongoing vigilance is necessary regarding the steps taken to actually implement the recommendations from the Rapid Reviews. Notably, corrective interviews and 5003 counseling do not appear to be occurring with fidelity and CDs are not reliably adjudicated as described in the compliance assessment of First Remedial Order § C, ¶¶ 1 and 2, Immediate Corrective Action & Monitor Recommendations and the compliance assessment for Consent Judgment, § VIII, ¶ 1 Staff Discipline & Accountability.

on the outcome and disciplinary referrals of Intake Investigations is presented in Table 11 in Appendix E.

- *Use of Force Cases Resulting in Charges*: The proportion of use of force cases resulting in charges, which are most often recommended via Full ID investigations, has generally remained the same, between 6% and 7% from 2016 to 2024. It is premature to draw conclusions about the referrals in 2025 and 2026 given that over 900 cases remained pending at the time the data was developed. Table 13 of Appendix E identifies the number and proportion of use of force incidents from January 2016 to June 2026 in which at least one staff member was referred for formal disciplinary charges.
- *Unnecessary, Excessive, and Avoidable Force*: Based on the data for closed investigations, ID determined that 13% of uses of force that occurred in 2023, 10% of uses of force that occurred in 2024, 7% of uses of force that occurred in 2025, and 11% of uses of force that occurred in January-June 2026 were excessive and/or unnecessary and/or avoidable. The findings for 2025 and 2026 are preliminary because a large number of cases remain pending. Many of these cases are Full ID investigations, which typically include more egregious incidents, and additional cases of unnecessary, excessive and avoidable force will likely be identified as more Full ID investigations are closed. The data on the number and proportion of incidents that both Intake Investigations and Full ID Investigations determined were "unnecessary," "excessive," and "avoidable" is demonstrated in Table 12 in Appendix E.

**Conclusion**

There is no question that the mismanagement of the Investigations Division in 2022 did significant damage to the Department's ability to make progress toward compliance with these provisions. Challenges remain evident four years later – staffing levels remain insufficient, only half of Intake Investigations and less than half of Full ID investigations close within required timelines, and both Full ID and the UPS squad have significant backlogs of cases. That said, there is reason for optimism that the Division has turned a corner and is on track to resume progress toward compliance.

The re-appointment of key reform-minded leadership is a critical step forward. ID investigators, supervisors, and leadership have been working diligently, and the Division is recovering lost ground. The quality of investigations has improved although more work remains to ensure that quality remains consistent. To that end, ID has embarked on new initiatives to further improve the quality and efficiency of investigations. ID is taking appropriate steps towards addressing the investigation backlogs and steps are being taken to ensure that investigations are completed in a more timely manner. The Department and ID must still work to ensure it has adequate staffing as its rate of attrition has started to increase again. While significant work remains, ID has maintained Partial Compliance with § VII, ¶¶ 1 and 11.

With regard to the closure of Full ID Investigations, the Division has made some progress and is still attempting to properly manage the backlog but, for the reasons discussed above, remains in Non-Compliance with the requirement to timely complete investigations pursuant to Consent Judgment § VII, ¶ 9(a).

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § VII., ¶ 1.** Partial Compliance<br>**Consent Judgment § VII., ¶ 9(a).** Non-Compliance<br>**Consent Judgment § VII., ¶ 11.** Partial Compliance |

| **EARLY WARNING SYSTEM (CONSENT JUDGMENT § X., ¶ 1)** |
| --- |
| *Consent Judgment § X., ¶ 1. Early Warning System.* Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.<br>a. The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.<br>b. ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.<br>c. On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements. |

This provision of the Consent Judgment requires the Department to have a system to identify and correct staff misconduct at an early stage, which the Department has elected to do through the Early Intervention, Support and Supervision Unit. Further, § A, ¶ (3)(c) of the Action Plan (dkt. 465) requires the expansion of E.I.S.S. to support staff on disciplinary probation and supervisors during their probationary period. This provision also requires each facility to designate at least one supervisor responsible for working with the E.I.S.S. Unit to support the uniformed staff who are in the E.I.S.S. program and to address any supervision deficiencies that are identified.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **Overarching Purpose of E.I.S.S.**: The overall focus of E.I.S.S.'s work remains unclear and has never fully met its intended purpose of serving as an Early Warning System.

E.I.S.S. provides support to some tenured staff who have been identified as requiring additional support (generally because of use-of-force-related misconduct) and separately provides support to probationary staff and newly promoted captains. For tenured staff, the meetings occur a few times a year, and staff review their involvement in certain incidents and purportedly get some feedback. For probationary staff, the meetings are general in nature and provide a forum for staff to speak about their concerns.

- **Staff Actively on E.I.S.S. Monitoring**: E.I.S.S. continued to screen staff referred for concerns with use-of-force-related misconduct via Rapid Reviews, Facility Leadership/Department stakeholders, and the Informal Charges and Discipline Unit. Table 1 in Appendix L identifies the number of staff actively monitored by E.I.S.S. during each Monitoring Period since 2020. During the 22nd Monitoring Period, 168 staff were on E.I.S.S. monitoring; 46% were entry-level probationary staff; 40% were on monitoring for use-of-force-related misconduct; and 14% were on monitoring for other reasons (*e.g.*, medical incompetence or probation following a promotion).
    - *Screening and Placement of Staff on E.I.S.S. Monitoring*: Table 2 of Appendix L identifies the number of staff screened for E.I.S.S. monitoring, the number of staff placed on monitoring, and the number of staff who began their monitoring in 2020 through June 2026. The Monitoring Team has previously reported its concerns that the screening process is inefficient and does not adequately leverage the Department's available information. The Department has not taken any steps to improve the screening process. During the current Monitoring Period, E.I.S.S. screened 67 staff for monitoring, including 41 tenured staff and 26 probationary staff. Ultimately, 9 staff were placed on monitoring (3 tenured staff and 6 probationary staff). An additional 53 staff were awaiting placement on monitoring, pending completion of their placement meetings, which were scheduled to occur after the close of the Monitoring Period. E.I.S.S.'s screening practices are outlined in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 294-295 (under the section § X., ¶ 1) and remain unchanged.
- **Support of Probationary Uniformed Staff**: E.I.S.S. continued to devote substantial attention to probationary officers and newly promoted captains during this Monitoring Period. E.I.S.S. hosts meetings with probationary officers and captains to provide them

with an opportunity to discuss facility conditions, report writing, security practices, use of force decision-making, interpersonal communication, and other challenges associated with working in the jails. E.I.S.S. also reports it supports probationary captains in the adjustment from line officer to supervisor. E.I.S.S. reports that staff generally value these meetings and, in some instances, contact the unit outside of scheduled meetings for additional guidance. This type of support is clearly needed. However, much of the guidance E.I.S.S. provides, like coaching on basic security practice, report writing, supervision, communication, and managing incidents, should also be routinely provided by front-line supervisors within the facilities. E.I.S.S.'s experience with probationary staff therefore continues to highlight the broader staff-development issues discussed elsewhere in this Report.

- **Referrals and Current E.I.S.S. Resources:**
  - *Staff Referrals to E.I.S.S.*: E.I.S.S. continues to receive referrals from multiple sources, including Rapid Reviews, ICDU, command-level staff, facility leadership, Personnel Determination Reviews ("PDRs"), and the Commissioner's office, and the unit reported an increase in referrals from facilities during this Monitoring Period. However, the Monitoring Team remains concerned that Department and facility leadership still do not understand or leverage E.I.S.S. as a tool for staff support, coaching, and early intervention.
  - *Staffing of E.I.S.S.*: E.I.S.S. continues to operate with limited staffing while its workload has expanded, particularly as the unit prioritizes working with probationary uniformed staff and newly promoted captains. The Director position filled in February 2025 has improved capacity by supporting screenings, meetings, administrative preparation, and Warden-level coordination at GRVC and RNDC, but the unit still lacks sufficient personnel. The Department did not approve the proposal by E.I.S.S. to hire three additional Director-level staff with prior correctional experience and instead authorized one Program Manager position. That position remained pending with the City's Office of Management and Budget for over six months and so the candidate then under consideration ultimately declined the offer for another position.

- **E.I.S.S. Meetings with Staff**: Once staff are placed on E.I.S.S. monitoring, the unit generally attempts to meet with them every other month to review subsequent incidents, performance concerns, and other issues affecting their practice. Attendance for these meetings remained uneven during this Monitoring Period. Despite various scheduling initiatives, staff continue to miss meetings (75% of staff attended meetings in March, while 61% attended meetings in May). E.I.S.S. reports that missed meetings often stem from facility-level operational issues, including staffing shortages, lack of relief from post, mutuals, FMLA, personal emergencies, or staff simply not appearing. E.I.S.S. has attempted to work around these barriers by adjusting meeting times across tours, including holding meetings as early as 6:00 a.m. and staying later, when necessary, but the current process remains inefficient, and poor attendance by staff undermines the program's impact.
    - *Quality of Monitoring Process & Assessing Improved Behavior*: When meetings do occur, it appears the monitoring process is generally informal, with staff reviewing recent incidents involving the individuals subject to Monitoring. It is unclear whether the level of support provided by E.I.S.S. is sufficient. In this Monitoring Period, the Monitoring Team reviewed the meeting records of an individual who was on E.I.S.S. support for use-of-force-related misconduct. The notes regarding the individual's involvement in a recent use of force incident suggested that E.I.S.S. leadership did not fully appreciate or understand the gravity of the misconduct of the staff member involved in a particular use of force incident. In fact, it appeared to minimize particularly egregious misconduct that resulted in the staff member's suspension. Further, the monitoring process does not include any goals or expectations for the staff member's involvement in the program except that staff attends the meetings. Further, the unit does not maintain any data or metrics to evaluate staff performance and the unit's work. The Monitoring Team's feedback on enhancing the monitoring process and supporting the overall goal of behavior change has gone unaddressed.
- **Structure and Future of E.I.S.S.**
    - *Reporting Structure for E.I.S.S.*: E.I.S.S.'s reporting line changed during this Monitoring Period, and it now reports to the Training and Development Division.

- *Re-evaluation of E.I.S.S.:* Upon the recommendation of the Monitoring Team, the Department began to more actively consider the purpose, organizational placement, and day-to-day work of E.I.S.S. Although specific changes have not yet been determined, the discussions appear focused on bringing the unit closer to its intended function under the Consent Judgment: identifying staff who demonstrate concerning conduct closer in time to the underlying incident and determining what immediate intervention, enhanced supervision, coaching, training, reassignment, or other support may reduce the identified risk for future incidents. This is an encouraging step. As discussed throughout this section, E.I.S.S.'s existing structure, staffing, and practices have not been sufficiently aligned with its intended role as an early-warning and risk-management system. Taking a broader look at where the unit should sit within the Department, what information it should routinely receive, which staff it should prioritize, and what actions should follow is therefore necessary. Shortly after the end of the Monitoring Period, the Monitoring Team shared feedback recommending that the Department use E.I.S.S. more deliberately as a risk-management tool and consider aligning it more closely with the Department’s investigative and accountability functions. This could provide E.I.S.S. with more timely information regarding staff involved in significant or concerning incidents and better position the unit to assess assignments, enhanced supervision, coaching, training, or other interventions and ensure that appropriate action actually occurs.

**<u>Conclusion</u>**

E.I.S.S. could be an essential and useful risk-management tool, but the program has been allowed to stagnate for years and has not developed into the effective early-warning and risk-management system contemplated by the Consent Judgment. The Department has not provided the staffing and resources originally envisioned for the program and therefore must reconsider how E.I.S.S. can best perform its core function with the resources that are realistically available.

The Monitoring Team supports the Department’s current effort to reevaluate E.I.S.S.’s organizational placement and day-to-day operation. A structural and organizational redesign could allow the unit to identify concerning staff conduct closer in time to underlying incidents and support more immediate action through reassignment, enhanced supervision, coaching,

training, or other intervention. While closer alignment with the Department's investigative and intelligence functions may help provide more timely information necessary to perform that work, organizational realignment alone will not solve the problems. The Department must redesign the program around the purpose established by the Consent Judgment and ensure that its staffing, information flow, interventions, management, and follow-through are all directed toward identifying and reducing risk.

A more focused, efficient, and effective program is both possible and necessary. Achieving it will require thoughtful reconsideration, coordination across Department functions, and a willingness to change practices that have not produced meaningful results. The experience of the past several years demonstrates that the current approach is not working.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § X., ¶ 1.** Partial Compliance |

| **TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY (CONSENT JUDGMENT § VIII., ¶ 1 & § VIII., ¶ 3 (C))** |
|---|
| *Consent Judgment, § VIII., ¶ 1. Timely, Appropriate, and Meaningful Accountability.* The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations"). |
| *Consent Judgment, § VIII., ¶ 3. Use of Force Violations.* In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:<br>. . .<br>c. The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances. |
| *August 10, 2023 Order § I, ¶ 13. Revise Command Discipline Policy and Procedures*. By November 30, 2023, the Department, in consultation with the Monitor, shall develop and implement appropriate controls and procedures regarding the adjudication of Command Discipline, including but not limited to the following:<br>a. timely processing of cases so that a minimal number of cases are dismissed due to procedural errors;<br>b. quality assurance measures to ensure that all Command Disciplines impose an appropriate outcome and do not merely default to the lowest level sanction, unless proportional to the severity of the misconduct;<br>c. appropriate mechanisms to ensure cases that require referral for formal discipline via MOCs are completed as required by policy, including but not limited to, when the conduct merits formal discipline or when a staff member has exceeded the number of allowable CDs in a given time period; and<br>d. appropriate tracking of any appeal to the Legal Division and the outcome of the appeal.<br>The Department's Command Discipline policy and procedures shall be subject to the approval of the Monitor. |

The Department is required to impose timely, appropriate, and meaningful accountability for staff's use-of-force-related violations (Consent Judgment § VIII, ¶ 1). As part of this obligation, the Department must expeditiously prosecute cases for formal discipline by the Trials Division (Consent Judgment § VIII, ¶3 (c)) and also ensure it has appropriate controls and procedures related to adjudication of Command Discipline (August 10, 2023 Order § I, ¶ 13).

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with Consent Judgment § VIII, ¶ 1. The Court explained the basis for its finding at pgs. 18-22 in section "Failure to Conduct Adequate Use of Force Investigations and Hold Staff Accountable" of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with Consent Judgment § VIII, ¶ 1, which is unchanged from the prior Monitoring Period. The Department's compliance with Consent Judgment § VIII, ¶ 3(c) includes three separate requirements: serving charges, administrative filing, and expeditiously prosecuting disciplinary cases. During this Monitoring Period, the Department was in Substantial Compliance with the requirements related to serving charges and in Substantial Compliance with the requirements related to administrative filing, and in Partial Compliance with the requirement to expeditiously prosecute cases, which are unchanged from the prior Monitoring Period. The history of compliance ratings for these provisions since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

The Monitoring Team also provides an update on the Department's efforts to achieve compliance with the Court's August 10, 2023 Order § I, ¶ 13 (dkt. 564), which requires the Department to revise and implement an updated Command Discipline policy. A compliance rating is not provided for this provision pursuant to the Court's March 18, 2026 Order (dkt. 967).

**Relevant Data and Information**

Swift, proportional accountability for staff misconduct remains a cornerstone of the *Nunez* reforms. Accountability should both address the misconduct that occurred and reduce the likelihood of recurrence via deterrence, corrective feedback, retraining, counseling, and other skill-building interventions where appropriate. To provide more timely feedback to staff, the Monitoring Team has long supported more immediate accountability measures, including the expanded use of Command Disciplines, particularly for less serious violations that can be addressed through timely corrective action. At the same time, accountability must remain proportional and individualized: serious misconduct requires more serious sanctions, while less serious policy violations may be better addressed through progressive discipline or corrective interventions that support improved performance.

The Monitoring Team's findings during this Monitoring Period are based on the following available information.

- **Monitoring Team's Assessment of Timely, Appropriate, and Meaningful Accountability**: In order to assess the Department's timely, appropriate, and meaningful accountability of staff, the Monitoring Team evaluates all avenues in which the staff may

be held accountable by the Department. This includes evaluation of suspensions/modified duty, Command Disciplines, and Counseling/Corrective Interviews as well as the formal disciplinary process. As part of this analysis the reason the action was taken, aggravating/mitigating factors of the particular case, the total number of actions taken, and the staff member's rank are also considered. This multi-faceted review provides a holistic view of the Department's efforts to comply with these provisions.

- **Restructuring of Investigations, Intelligence, and Accountability Functions**: In June 2026, the Remediation Manager directed the Department to establish a new division to centralize investigative and disciplinary functions concerning both incarcerated individuals and staff. The division will incorporate the Investigation Division, Special Investigations Unit, Correction Intelligence Bureau, E.I.S.S., Adjudications, Trials & Litigation, and Informal Charges and Discipline Unit. A new Senior Deputy Commissioner, selected by and reporting directly to the Remediation Manager manages the division. The current SDC is a strong leader, who is highly competent, possesses the qualities and expertise needed to fill this role including strong competency in the core areas underpinning the *Nunez* reform effort, and has the creative thinking necessary to advance the reform effort.[236] Final decision-making authority on disciplinary adjudications will rest jointly with the Remediation Manager and the Commissioner.
- **General Trends in Accountability for Staff Misconduct**: As discussed throughout this report, the Department's overarching approach to accountability has not materially altered staff behavior. In this Monitoring Period (January to June 2026), the Department imposed 2,543 Corrective Interviews and 5003 Counseling sessions, 513 Command Disciplines or suspensions, and 266 formal discipline outcomes. The data continues to reflect the Department's emphasis on using support and guidance as the primary response to staff misconduct. The volume of these interventions is significant, but their effectiveness ultimately depends on whether they are timely, appropriately targeted, and result in sustained changes to staff practice. Table 1 of Appendix F identifies the type of accountability imposed for use-of-force-related misconduct from 2019 through June

[236] *See*, for example, Monitor's December 22, 2021 Report (dkt. 435) at pg. 8.

2026, including support-and-guidance interventions (*i.e.*, Corrective Interviews and 5003 Counseling), Command Disciplines and suspensions, and formal discipline.

- **Immediate Corrective Action**: In this Monitoring Period, 5003 Counseling and Corrective Interviews accounted for 2,543 actions, or 83% of all immediate corrective action, while suspensions and modified duty/no contact with incarcerated individuals remained rare at 51 actions, or 2%. The Department's use of suspensions increased significantly, with 41 use-of-force-related suspensions during the first six months of 2026, compared to 57 suspensions in all of 2025. The remaining 15% of immediate corrective actions were CDs (either reprimand (2%) or days deducted (13%)). The Department's use of immediate corrective actions is discussed in more detail in the compliance assessment for First Remedial Order § C, ¶ 1. Tables 2 and 3 of Appendix F identify the Department's use of immediate corrective action for use-of-force-related misconduct, including Counseling/Corrective Interviews, suspensions, modified duty/no contact with incarcerated individuals, and CDs.
- **Accountability for High Level Supervisors**: The data shows that the Department's approach regarding accountability for misconduct is concentrated overwhelmingly among officers. The Department has not taken any documented corrective action involving Wardens or Assistant Commissioners managing the Facilities from 2023 through the end of the current Monitoring Period. During this Monitoring Period, the Department imposed three corrective actions on Deputy Wardens and 72 corrective actions on Assistant Deputy Wardens (60 of which were counseling/corrective interviews), nearing the same total for all of 2025 (78 corrective actions). The Department took 549 corrective actions with captains and 3,335 accountability actions against officers. Table 4 of Appendix F identifies accountability actions by rank. The absence of accountability for supervisors is stark. Given how often incident reviews identify failures of supervision, planning, and management, the accountability must extend through the chain of command and not rest primarily with line staff and first-line supervisors. Wardens/Assistant Commissioners, Deputy Wardens, and Assistant Deputy Wardens are responsible not only for their own conduct, but also for identifying and correcting issues within their commands. Without meaningful accountability for management and supervisory failures, the Department loses an important mechanism for reinforcing

leadership's responsibility to address the conditions that perpetuate ongoing security and use of force problems.

- **<u>Command Discipline</u>**:
  - *CD Policy*: The Monitoring Team has long supported the Department's expanded use of CDs assuming it is done properly and with fidelity. The revised CD policy (as required by the August 10, 2023 Order (dkt. 564), § I, ¶ 13) has been in effect since July 1, 2025.[237] A flow chart illustrating the CD process as governed by the Department's CD policy can be found in Appendix N.
  - *Concerning Management of CD Process*: The Department continues to struggle to effectively and reliably manage the CD process. The centralized management of CDs under the Informal Charges and Discipline Unit (ICDU), which began in 2024,[238] has not achieved the desired results. Many of the pervasive problems that characterized the facilities' adjudication of CDs have not been resolved by ICDU's management. An unreasonable number of cases continue to be dismissed, closed, or not logged due to due process violations or clerical errors. The adjudication process continues to demonstrate a tendency to impose lighter sanctions based on questionable mitigating factors, and there appears to be an ongoing effort to evade the policy requirements by identifying questionable or irrelevant "issues" to suggest, erroneously, that corrective action should not be imposed.[239]
  - *CD Referrals*: In this Monitoring Period, a total of 2,531 CDs were referred either via the Rapid Reviews of use of force incidents (n=1,508) or via other processes (n=1,023). This reflects an 18% reduction in the number of CDs referred compared to the last Monitoring Period in which 3,098 CDs were referred (1,703

[237] The specific revisions made to this CD policy are discussed in detail in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 227-230.

[238] *See* Monitor's November 22, 2024 Report (dkt. 802) at pg. 119.

[239] During the last Monitoring Period, ICDU and facility leadership reported that they believed CDs could only be utilized to address violations of Rules & Regulations and not violations of Directives and Operations Orders. The CD policy does not state this and generally DOC's *own* practice does not support this interpretation. At the beginning of this Monitoring Period, the Department issued guidance to clarify that the CD policy can be utilized for violations of Rules and Regulations as well as Directives and Operations Orders.

via Rapid Reviews and 1,395 via other sources). Table 5(a) of Appendix F shows the status and outcome of CDs recommended via Rapid Reviews. Table 6(a) of Appendix F shows the number and outcome of CDs recommended via sources other than Rapid Reviews.

- *CD Penalties*: Only 52% of 2,531 CDs (n=1,319) that were recommended resulted in corrective action being imposed. Of those 1,319 CDs that resulted in corrective action, 1,124 (44% of *all* 2,531 CDs recommended) resulted in a penalty of 1 to 10 days or a Memorandum of Complaint and 195 (8% of *all* 2,531 CDs recommended) resulted in a verbal reprimand, retraining or a corrective interview.
- *CD Dismissals*: At least 953 (38%)[240] of the 2,531 CDs recommended in this Monitoring Period were dismissed or otherwise not entered in the system (n=607 for CDs via Rapid Reviews and n=346 for CDs via other sources). Both the number and proportion are higher than the previous Monitoring Period (n=838; 27%), which appears to be driven by cases never being entered into the case management system. The practical impact of these problems is that staff are never notified of the violation, a penalty is not imposed, and the opportunity to improve staff practice is lost. Table 5(b) of Appendix F shows the number, proportion, and reason that CDs were dismissed, closed administratively, or were never entered into the case management system for those recommended via Rapid Reviews. Table 6(b) of Appendix F shows the number, proportion, and reason that CDs were dismissed, closed administratively, or were never entered into the case management system for those recommended via other sources.
- *Appeal or Staff Rejection of CD*: If a staff member does not agree with the CD penalty imposed, they may: (1) refuse the CD penalty, which means the CD charges will be converted into a MOC for formal discipline and will be processed through the Trials Division, or (2) appeal the CD penalty with the Legal Division. The Monitoring Team assessed the appeals resolved by the Legal Division from

[240] The number of dismissals may increase given there are at least 200 CDs still pending adjudication.

January to June 2025 and generally found the appeal decisions were reasonable, as discussed in the Monitor's January 13, 2026 Report (dkt. 947) at pg. 313.

- **Formal Discipline Process**: The formal disciplinary process is generally inefficient, requiring multiple sequential steps before discipline is imposed. This includes completing the investigation, processing charges via the Office of Administrative Trials and Hearings ("OATH"), serving charges, sharing discovery, scheduling matters with OATH, conducting matters before OATH, and obtaining multiple final approvals. **Even when the process works as designed (which it currently does not), it can take well over a year before discipline is imposed**. As discussed in other sections of this report, work is underway to improve the timeliness of ID investigations and to ensure OATH proceedings occur more quickly, but additional efficiencies are needed, in particular those related to case processing (*e.g.*, conducting MEO-16 interviews, the review of charges by administration and various other clerical processes). **As a result, the current timeline for processing formal discipline is far too long to meet the goal of timely accountability**[241].
- **Imposition of Formal Discipline**: As of June 2026, 113 cases were brought for formal discipline for incidents that occurred during the current Monitoring Period. However, 874 investigations remained pending, making it too early to assess the volume of formal discipline arising from this Monitoring Period. Of the 113 cases already referred for formal discipline, only 16 (14%) had been closed, while 97 (86%) remained pending with the Trials Division. Table 7 of Appendix F identifies the status of formal disciplinary cases by the year the underlying incident occurred, including whether cases have been closed, remain pending with the Trials Division, or are still pending investigation.
- **Backlog of Cases Pending Formal Discipline**: At the end of the current Monitoring Period, a total of 447 cases were pending with Trials (nearly one hundred more than at the end of the last Monitoring Period (n= 353)). Nearly all of the increase is due to the large number of cases awaiting final approvals, which increased to 144 from 47 in the previous Monitoring Period. Most of these cases were awaiting the Commissioner's approval and appeared to have accumulated near the end of the Monitoring Period

[241] For a flow chart of the disciplinary process, *see* Appendix N.

(almost all are now closed). The pending caseload has increased for two consecutive Monitoring Periods so ongoing vigilance in case processing is important. That said, the number of cases pending remains far below its peak of 1,917 in June 2021. Table 8 of Appendix F identifies the number of use-of-force-related disciplinary cases pending with the Trials Division at the end of each Monitoring Period from 2018 through June 2026.

- **Time from MOC Received to Charges Served**: During the current Monitoring Period, 85% of MOCs that were received by the Trials Division were served within 30 days. Although the Department continues to serve most charges within the 30-day timeframe required by Consent Judgment § VIII, ¶ 3, performance declined from 91% during the previous Monitoring Period and should be monitored to identify any systemic problems. Table 9 of Appendix F shows the length of time required for the Trials Division to serve charges after receiving the MOC, excluding cases that were administratively filed or where charges were served before the MOC was received.
- **Timeliness of Formal Discipline**: Once the MOC has been received, the time that cases are pending or closed within the Trials Division is relatively unchanged from the previous Monitoring Period (70% versus 67% of closed/pending cases were resolved/pending for six months or less). In other words, nearly one-third of cases extend beyond six months. Furthermore, the number of cases more than one year old remains concerning because these delays diminish the value of discipline as a timely and meaningful response to misconduct. Table 10 of Appendix F identifies case processing time for formal discipline once the MOC is received by the Trials Division, including closed cases, pending cases, and both groups combined.
- **Time for Commissioner to Sign Cases from Date of Signature by DC of Trials**: During the current Monitoring Period, 58% of cases were signed by the Commissioner within 30 days of submission. This reflects a general decline in the case processing speed at the Commissioner level. The Department attributes delays that occurred earlier in the Monitoring Period partly to the transition between Commissioners. As noted above, cases submitted for signature near the end of the Monitoring Period contributed to the accumulation of cases awaiting finalization. Given that these cases have already proceeded through investigation, charging, and review by the Trials Division, extended delays awaiting final approval unnecessarily prolong an already lengthy disciplinary

process and diminish the value of discipline as a timely response to misconduct. Table 11 of Appendix F identifies the time between signature by the Deputy Commissioner of Trials and final signature by the Commissioner.

- **Dispositions of Formal Discipline Cases**: During the current Monitoring Period, the Trials Division closed 362 cases, with 233 (64%) resolved via a Negotiated Plea Agreement ("NPA") and 121 (33%) dismissed via Administrative Filing.[242] Both outcomes are discussed in more detail below. Table 12 of Appendix F identifies the disposition of formal discipline cases closed by the Trials Division.
  - *Penalties Imposed via NPA*: During the current Monitoring Period, penalties via NPA remained concentrated at the lower end: 213 of 233 NPAs (91%) resulted in a penalty of 30 days or less, including 110 cases (47%) resulting in one to five days. Only 12 cases (5%) resulted in penalties of 30 days or more. Table 13 of Appendix F identifies the penalties imposed in cases resolved through NPAs, including the number of compensatory days lost. Of the 233 NPAs closed during the Monitoring Period, 66% contained either a CD provision (63%) or expungement provision (3%), compared to 48% in 2025.[243] Those cases with a CD or expungement provision are only intended to stay on the staff member's record for a year. Table 14 of Appendix F shows the number and proportion of cases closed via NPA that included provisions for a CD or an Expungement. The Trials Division use of CDs and Expungement was originally supported by the Monitoring Team as part of the effort to efficiently process the backlog of disciplinary cases. However, as the Department's backlog has dissipated, the Monitoring Team has encouraged the Trials Division to curtail its use of these type of sanctions given they are not proportional to the misconduct resolved by the Trials Division.

[242] Administrative filings occur when the Trials Division determines that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a staff member resigns before charges are served). Administrative filing is not only determined by the Department and Trials Division but can also be an outcome as a result of the input from Administrative Law Judges at OATH.

[243] Although the Monitoring Team has continually encouraged judicious use of NPAs with CD or expungement provisions, the Department continues to consistently rely on them. *See* Monitor's November 22, 2024, Report (dkt. 802) pgs. 130-131; Monitor's May 22, 2025 Report (dkt. 850) pgs. 176-177; and Monitor's January 13, 2026 Report (dkt. 947) pgs. 318-319.

Generally, although the NPA outcomes are within a range of reasonable penalties, it must be noted that there is a clear tendency to impose the lesser penalty within the range and/or to mitigate the impact of the disciplinary action by treating the outcome as a CD versus formal discipline. In addition, a small number of cases continue to raise concerns due to the fact that the sanction imposed did not adequately reflect the seriousness of the misconduct or the sanction was not aligned with the Disciplinary Guidelines.

- *Cases in which Formal Discipline was Not Imposed*: During the current Monitoring Period, 121 of the 362 cases closed by Trials (33%) were Administratively Filed, or dismissed, while another 2% were resolved through deferred prosecution. Table 12 of Appendix F identifies formal discipline cases that were closed without a disciplinary sanction. The proportion of cases Administratively Filed has increased substantially since 2024, prior to that fewer than 10% of cases were dismissed each year between 2016 and 2023. The Monitoring Team has closely scrutinized cases that have been dismissed and generally found the determination to administratively file the cases was reasonable.[244]

  Given the ongoing increase in the number of cases being administratively filed, the Monitoring Team reviewed the closing memos for over 170 cases that were administratively filed during the 21st and 22nd Monitoring Periods (July 2025 to June 2026) to assess whether the dismissals appear reasonable and to better understand why the number of cases being dismissed has continued to increase.

  Overall, the Monitoring Team found the majority of the determinations by the Trials Division to dismiss the group of cases reviewed was reasonable. Dismissals occur, for instance, in some cases because the Trials Division determined that the objective evidence did not support the charges (this included cases in which the ALJ opined during the pre-trial conferences that the case should be dismissed), while other

[244] *See* Monitor's May 22, 2025 Report (dkt. 850) at pg. 178; Monitor's January 13, 2026 Report (dkt. 947) at pgs. 318-319; and Monitor's June 17, 2026 Report (dkt. 984) at pg. 184.

dismissals occurred due to procedural errors (*e.g.* the wrong staff member being charged, inaccurate information regarding body worn camera activation or secured doors, and charges against staff who were not responsible for the conduct at issue). In most instances, procedural error cases arose from referrals from Facilities (though a few came from ID). While the Trials Division's determinations to dismiss the cases were reasonable, it is critical for the Department to address the underlying reasons that the cases are dismissed, especially the procedural errors which can generally be avoided.

While most decisions were reasonable, the Monitoring Team's review identified an increase in the number of cases where the determination by the Trials Division to dismiss the case was questionable. For instance, in some cases, it appears additional work by the Trials Division may have resulted in the ability to support the charges (*e.g.*, diligently pursuing missing information, appropriately reconciling conflicting findings between the facility and ID). However, in other cases, the determination to dismiss was not as clear-cut, so the decision to dismiss was not unreasonable, though the case could potentially have been sustained.

Finally, in a small number of cases, the determinations by the Trials Division to dismiss the group of cases reviewed was found to be unreasonable. In those cases, the decision to dismiss did not appear consistent with the objective evidence available and the Department's policy obligations.

The Monitoring Team discussed the increase in cases administratively filed with the new Trials Division leadership. The SDC and her team independently identified the same concerns as the Monitoring Team. The SDC and her team reported that they have been working with the attorneys on the unit to address these concerns. This includes working with the attorneys to improve their analysis, evaluation and documentation in dismissing cases, improvements in assessing

evidence, and further working on cases requiring additional coordination with facilities or ID. Leadership also acknowledged the need to improve its internal tracking process to ensure requests for additional information from the individual/entity referring the case are completed. It is notable that the Trials Division both identified and implemented initiatives to address these concerns in advance of the Monitoring Team's feedback on these issues.

- *Actions of the Commissioner*: One action of the Commissioner occurred in this Monitoring Period.[245] The Commissioner dismissed the case of a uniformed staff member who was demoted and reinstated the individual to their former rank of captain. Based on the available objective evidence, the determination to reverse this disciplinary action was questionable. The Monitoring Team discussed this case in more detail in the compliance assessment for Consent Judgment § XII., ¶¶ 1-3, Screening & Promotions.

- **Appeals**: A disciplinary decision made by the Commissioner is appealable to the Civil Service Commission[246] (which is authorized to make the final disciplinary decision[247]) or as an Article 78 proceeding. Between January and June 2026, the Civil Service Commission issued one decision affirming the Department's penalty of termination. There were no Article 78 proceedings pending during the 22nd Monitoring Period.

---

[245] The final decision of all formal disciplinary charges rests with the Commissioner. This includes NPAs and PDRs, but also penalties for those cases that go to OATH trial as the OATH ALJ only provides a *recommended* penalty and the Commissioner has the authority to accept or modify it accordingly. Actions of the Commissioner are when the Commissioner's final determination deviates from the proposed outcome for the NPA, PDR, or OATH Report & Recommendation.

[246] Pursuant to Section 813 of the New York City Charter, the Civil Service Commission can decide appeals from permanent civil servants who were subject to disciplinary penalties following proceedings held pursuant to section 75 of the Civil Service Law. According to § 3-01 to 3-04 of Title 60 of the Rules of the City of New York, any civil service employee who receives a determination of guilty and/or a penalty can appeal to the Civil Service Commission within 20 days of the date of notice of the final disciplinary action. After receiving notice of a timely appeal, the Department has 30 days to submit the complete record of the disciplinary proceedings. The Civil Service Commission then reviews the record of the disciplinary proceeding, allows the parties to submit further written arguments, and may schedule a hearing before issuing a final decision. The Civil Service Commission then issues a written decision to affirm, modify, or reverse the determination being appealed. The Civil Service Commission may, at its discretion, direct the reinstatement of the employee or permit transfer to a vacancy in a similar position in another division or department, or direct that the employee's name be placed on a preferred list.

[247] The Civil Service Commission opinion notes "[t]his decision constitutes the final decision of the City of New York."

**Conclusion**

The Department has made notable improvements to its disciplinary process since the inception of the Consent Judgment. However, despite these improvements significant work remains to ensure timely and meaningful accountability in the system. First, as noted in other sections of this report, not all policy violations are reliably identified, and for those that are identified, the focus tends to be on the lower-level misconduct. Second, the Department continues to focus on addressing accountability for line staff, while supervisors are rarely held accountable. Third, when corrective actions are recommended, the effectiveness of the process is undercut by the significant number of cases that are dismissed, particularly given that many of the dismissals are attributable to process failures. Finally, the impact of the accountability that is imposed, when accountability is imposed, continues to be undermined by the fact that the Department relies on corrective interviews and counseling, yet there is no evidence that these measures are being used with fidelity or altering practice in any meaningful way. Further, that accountability is too often imposed after a protracted process, with delays across the various phases, and tends to lean heavily toward more lenient, seemingly ineffectual disciplinary measures. Significant work remains to ensure that misconduct is consistently identified, cases are resolved promptly, and accountability is meaningful and extends throughout the chain of command.

- For Consent Judgment § VIII, ¶ 1, the Department remains in Partial Compliance. Since the Consent Judgment went into effect, the Department has improved its ability to process formal discipline once cases reach the Trials Division, but significant weaknesses remain in whether misconduct is consistently identified, addressed promptly, and met with an appropriate and proportionate response. Corrective Interviews and 5003 Counseling continue to account for the large majority of immediate corrective action, yet the Department has not demonstrated that these interventions consistently improve staff practice. Administrative filings have increased, delays remain at multiple stages of the formal disciplinary process, and accountability continues to be placed primarily on officers and captains and is not being applied throughout the chain of command. The Department must also strengthen the processing and oversight of Command Disciplines so that cases

are handled consistently, timely, and with outcomes proportionate to the underlying misconduct.

- For Consent Judgment § VIII, ¶ 3(c), the Department remains in Substantial Compliance with the requirements related to serving charges and in Substantial Compliance with administrative filing, and in Partial Compliance with the requirement to expeditiously prosecute cases. The Department has made improvements in the Trials Division's case processing, but further progress is needed to ensure that cases are resolved more quickly after referral and that the broader disciplinary process provides timely accountability from the date of the underlying incident. Although the proportion of cases administratively filed has increased, the Monitoring Team's review of these cases over the last two Monitoring Periods found that the Trials Division's decision to dismiss was reasonable in most cases. In many instances, the basis for dismissal was a deficiency in the underlying referral, and many of the procedural errors identified in the review originated in MOCs prepared by the Facilities, and a smaller number originated in referrals from ID. These findings support a continued rating of Substantial Compliance with respect to administrative filing. However, the number of case dismissals must decrease to preserve and focus resources. The Department must work to eliminate the procedural errors resulting in case dismissals, particularly with respect to referrals from the Facilities. Further, the Trials Division must also work with its attorneys to ensure that rigorous case reviews occur to ensure that cases are not improperly dismissed based on inaccurate, incomplete, or otherwise deficient assessments of applicable policy requirements. The high volume of cases proceeding through the disciplinary process only to be dismissed reflects a substantial waste of resources and, in at least some cases, a lost opportunity for accountability.

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § VIII., ¶ 1.** Partial Compliance<br>**Consent Judgment § VIII., ¶ 3(c)**<br>• **Serving Charges**: Substantial Compliance<br>• **Administrative Filing**: Substantial Compliance<br>• **Expeditiously Prosecuting Cases**: Partial Compliance |

| **IMMEDIATE CORRECTIVE ACTION & MONITOR RECOMMENDATIONS (FIRST REMEDIAL ORDER § C., ¶ 1 & § C., ¶ 2)** |
|---|
| *First Remedial Order § C., ¶ 1. Immediate Corrective Action*. Following a Use of Force Incident, the Department shall determine whether any involved Staff Member(s) should be subject to immediate corrective action pending the completion of the Use of Force investigation, which may include counseling or re-training, reassignment to a different position with limited or no contact with Incarcerated Individuals, placement on administrative leave with pay, or immediate suspension (collectively, "immediate corrective action"). The Department shall impose immediate corrective action on Staff Members when appropriate and as close in time to the incident as practicable. The Department shall document and track any immediate corrective action taken, the nature of the initial corrective action recommended, the nature of the corrective action imposed, the basis for the corrective action, the date the corrective action is imposed, and the date of the Use of Force Incident resulting in the immediate corrective action. The requirements in this provision are not intended to alter the rights of Staff or the burden of proof in employee disciplinary proceedings under applicable laws and regulations. |
| *First Remedial Order § C., ¶ 2. Responding to Monitor Recommendations*. Upon identification of objective evidence that a Staff Member violated the New Use of Force Directive, the Monitor may recommend that the Department take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. Within ten business days of receiving the Monitor's recommendation, absent extraordinary circumstances that must be documented, the Department shall: (i) impose immediate corrective action (if recommended), and/or (ii) provide the Monitoring Team with an expedited timeline for completing the investigation or otherwise addressing the violation (if recommended), unless the Commissioner (or a designated Assistant Commissioner) reviews the basis for the Monitor's recommendation and determines that adopting the recommendation is not appropriate, and provides a reasonable basis for any such determination in writing to the Monitor. |
| *Action Plan § F., ¶ 2. Expeditious Resolution of Egregious Conduct and/or Multiple Serious Violations*. The City, Department and OATH shall develop, in consultation with the Monitor, a process by which appropriate and meaningful discipline, up to and including termination, for any staff member can be expeditiously imposed in any case involving: (1) conduct that would merit the Department seeking termination pursuant to the Disciplinary Guidelines, or (2) egregious conduct that resulted in the risk of serious harm to an incarcerated individual. The Monitor may refer cases to the Department for resolution in this expedited manner.<br>a. A case identified to be resolved in an expedited manner must be resolved as follows:<br>i. *Investigations*: The investigation(s) of the matter must be completed within 30 business days of identification.<br>ii. *Referral for Discipline*: The case must be processed for discipline — including completion of the MOC, referred to the Trials Division, charges served on the Respondent, discovery produced to the Respondent, an offer for resolution must be provided to the Respondent, the case filing with OATH, and a pre-trial conference must be scheduled within 20 business days of the closure of the investigation.<br>iii. *Adjudication of Discipline*: Any and all disciplinary proceedings, including, but not limited to, convening a pre-trial conference, conducting a trial before OATH, and submission of a Report and Recommendation from the OATH ALJ must be completed within 35 business days of the case being filed with OATH.<br>iv. *Imposition of Discipline*: The Commissioner must impose the final disciplinary action within 15 business days of receiving the Report and Recommendation from OATH. |

The First Remedial Order (dkt. 350), § C, ¶¶ 1 and 2, requires the Department to determine whether immediate corrective action should be taken against a staff member pending the completion of an investigation. Further, the Department must respond within 10 business days to any recommendations from the Monitor to take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The Action Plan (dkt. 465), § F, ¶ 2, introduced an additional requirement for the Department to expedite egregious cases on

specific timelines to ensure those cases are closed as quickly as possible. Given that these three requirements are inextricably linked, they are addressed together herein.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with § C, ¶ 1, which is unchanged from the prior Monitoring Period. The Monitoring Team only made one recommendation pursuant to § C, ¶ 2 so, given its limited use, a rating is not provided in this Monitoring Period. The history of compliance ratings for these provisions since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **Immediate Corrective Action Taken (First Remedial Order § C, ¶ 1)**: The use of immediate action is a critical tool for promptly addressing staff misconduct and promoting effective accountability to deter problematic conduct going forward. These actions, taken before the completion of a full use of force investigation, may include counseling or retraining, reassignment to a role with limited or no contact with incarcerated individuals, administrative leave with pay, or immediate suspension. Additionally, Command Disciplines are often imposed closer in time to the incident than formal discipline and are also considered part of this immediate response strategy. The overall disciplinary process is discussed in more detail in the compliance assessment for Consent Judgment, § VIII, ¶ 1 Staff Discipline & Accountability.

  Data regarding the immediate corrective action imposed for use-of-force-related misconduct is available in Table 2 in Appendix F. During this Monitoring Period, 3,066 immediate corrective actions were taken. This is a significant increase in the number of corrective actions from prior Monitoring Periods.[248] The increase in the number of corrective actions appears to be a reflection of the fact that the Department's Rapid Review process is more consistently *identifying* potential violations during incident reviews versus an increase in actual violations *occurring* as discussed in more detail in the compliance assessment for First Remedial Order, § A., ¶ 1, Facility Use of Force

[248] *See* Monitor's June 17, 2026 Report (dkt. 984) at Appendix E, Table 2.

Reviews. The overall increase in immediate corrective actions is driven by an increased use of counseling and corrective action (from n=1,589, 63% in the 21st Monitoring Period to n=2,543, 83% in the 22nd Monitoring Period). In fact, the number and proportion of Command Disciplines decreased during this Monitoring Period (from n=885, 35% in the 21st Monitoring Period to n=479, 15% in the 22nd Monitoring Period). Meanwhile, the number and proportion of suspensions and placements on modified duty/no contact with incarcerated individuals remained relatively low compared to other forms of immediate corrective action, but their use did increase significantly in this Monitoring Period (from n=33, 1% in the 21st Monitoring Period to n=51, 2% in the 22nd Monitoring Period).

The quality and efficacy of the counseling and corrective interviews remain questionable. The Monitoring Team receives repeated reports from line staff, supervisors and Department leadership that corrective interviews and 5003 Counseling sessions are procedural and perfunctory at best. This appears consistent with the fact that thousands of these sessions have been held over the years with little to no observable change in practice. The Monitoring Team shared feedback with the Department recommending that it critically evaluate the approach, content, and delivery of corrective interviews and 5003 Counseling to ensure they are substantive, instructional, and constructive so they can achieve their intended purpose of improving staff practice. A more detailed discussion regarding accountability and discipline is included in this report in the compliance assessment for Consent Judgment, § VIII, ¶ 1 Staff Discipline & Accountability.

- **Monitor Recommendations for Immediate Corrective Action (First Remedial Order § C, ¶ 2)**: The Monitoring Team is judicious in the recommendations that it makes to the Department regarding immediate action cases and only identifies those cases where the facts clearly suggest that immediate action should be considered *and* that *immediate* action can, in fact, still be taken. The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe given that the Monitoring Team's access to information is not contemporaneous and often lags. Accordingly, the C2 recommendations shared by the Monitoring Team are only a *subset* of cases in which the Department failed to take immediate corrective action and likely

should have.[249] A detailed discussion of the Monitoring Team's approach to making these recommendations is described in the Monitor's May 22, 2025 Report (dkt. 850) at pgs. 183-184.

Between January and June 2026 (the 22nd Monitoring Period), the Monitoring Team identified one use of force case for which it recommended the Department take corrective action. The Department reported that it placed the involved staff member on modified duty with no contact with incarcerated individuals.[250] The Monitoring Team also recommended that the investigation and formal discipline be expedited pursuant to the Action Plan (dkt. 465), § F, ¶ 2.[251]

- **Expeditious Resolution of Egregious Misconduct (Action Plan § F, ¶ 2)**: The Action Plan (dkt. 465), § F, ¶ 2 ("F2") sets expedited timelines for the investigation and prosecution of egregious cases. As discussed above, given the limitations on the Monitoring Team's ability to recommend immediate action, the Monitoring Team has continued to focus on recommendations related to F2. The Department's ability to identify these cases continues to improve, though the Monitoring Team continues to make F2 recommendations as well. In this Monitoring Period, 15 cases involving 15 staff were identified as F2 cases (12 by ID and 3 by the Monitoring Team).
    - *Resolution of F2 Cases*: Detailed information on the number and outcome of F2 cases can be found in Table 15 in Appendix F. In this Monitoring Period, eight F2 cases involving nine staff were closed. Overall, the F2 process has proven to be an effective tool in addressing certain egregious cases more expeditiously than they would otherwise be managed and most cases are resolved with reasonable outcomes. The outcomes of the eight cases closed in the current Monitoring Period appeared reasonable.

[249] Recommendations to expedite the completion of investigations pursuant to the First Remedial Order (dkt. 350), § C, ¶ 2, as noted in the Monitor's October 28, 2022 Report (dkt. 472) at pg. 162, were not a fruitful avenue to ensuring those cases were addressed quickly. The Monitoring Team therefore now recommends expedited resolution of cases pursuant to the Action Plan (dkt. 465), § F, ¶ 2 (the "F2" process) for cases that merit expedited completion of investigations or discipline.

[250] This staff member was on extended leave at the time the Monitoring Team identified the case, so he was placed on modified duty upon his return to service.

[251] The investigation and formal disciplinary charges were still pending at the end of the Monitoring Period because the staff member was on leave and unavailable to be interviewed.

- *Timeliness of F2 Cases*: Of the eight F2 cases closed this Monitoring Period, five were closed within six months of being identified as an F2 case,[252] which is significantly more expeditious than the standard process for formal disciplinary charges. Nonetheless, improvement of the processing timelines is needed in order to meet the deadlines set out in the F2 provision, but the efficiency of the F2 process compared to the standard process must be noted and acknowledged. The Investigations Division in particular continues to struggle with completing the investigations for F2 cases pursuant to the required timelines set by the provision, which diminishes the efficacy of this process as a means to impose close-in-time discipline and circumvent the protracted processing times that currently characterize most disciplinary matters in the Department. Given that ID's Use of Force Priority Squad conducts the investigations for F2 cases, ID must continue to ensure that UPS has sufficient investigators in order to expeditiously resolve these F2 cases.[253] The Trials Division continues to consistently expedite the resolution of F2 cases once ID has completed the investigations.
  - **Pending F2 Cases**: Detailed information on the status of pending F2 cases can be found in Table 16 in Appendix F. As of June 30, 2026, 25 cases are still pending; and 14 cases are pending investigation by ID, half of which have been pending investigation beyond the 30-business day deadline set by the provision. One case is pending final approval by the Commissioner and has been pending beyond the 15-business day deadline set by this provision. The remaining 10 cases are on hold pending stand-down orders from NYC Department of Investigation to allow DOI to complete its own investigation into the incident.[254]

---

[252] The Investigations Division ("ID") closed only one of these eight cases within 30 business days of identification. Three of these cases took longer than 30 days to close because they were placed on extended NYC Department of Investigation ("DOI") holds. The other four cases took longer because of delay in ID completing the investigation. The Trials Division closed seven of these eight cases within 30 business days of the closure of the investigations. The Trials Division took longer than 30 days in one case because the pre-trial conferences were repeatedly delayed due to health issues with the MOS.

[253] ID's UPS is discussed in more detail in the compliance assessment for Consent Judgment, § VII, ¶ 1, Use of Force Investigations.

[254] All 10 cases on DOI hold have been pending longer than one month since they were identified for expeditious resolution.

**Conclusion**

- **First Remedial Order, § C, ¶ 1**: While the Department does impose some corrective action immediately after an incident and has improved its internal ability to identify incidents that merit immediate action, immediate corrective action is not reliably occurring and is not always proportional to the misconduct identified. The Department is therefore in Partial Compliance with this provision.
- **First Remedial Order, § C, ¶ 2**: The Monitoring Team's overall goal is to mitigate lost opportunities for immediate action, but this approach is not failsafe. The Monitoring Team does continue to identify some instances where certain immediate corrective actions likely could have been taken but were not. Given only one recommendation was made in this Monitoring Period, this provision is not rated.
- **Action Plan, § F, ¶ 2**: This expedited process is important and has resulted in accelerated resolution of some particularly egregious cases. It is particularly noteworthy that ID has self-identified cases for expedited treatment, and the Trials Division continues to consistently advance the resolution of F2 cases once the investigations have been completed. Further, the number of cases identified by the Monitoring Team has been limited and has significantly decreased over time, a sign that ID has improved in its identification of these cases. This is notable given these cases reflect some of the most egregious cases that occur in the system. However, ID must ensure that the investigations of F2 cases are appropriately prioritized in order to meet the established timelines. A compliance rating is not provided for this provision pursuant to the Court's March 18, 2026 Order (dkt. 967).

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § C., ¶ 1.** Partial Compliance<br>**First Remedial Order § C., ¶ 2.** Not Rated |

| **OATH PROCEEDINGS (FIRST REMEDIAL ORDER § C. 4/THIRD REMEDIAL ORDER, ¶ 2, FIRST REMEDIAL ORDER § C., ¶ 5 & THIRD REMEDIAL ORDER, ¶ 3)** |
|---|
| *Third Remedial Order ¶ 2. Increased Number of OATH Pre-Trial Conferences*. Paragraph C.4 of the First Remedial Order shall be modified to increase the minimum number of pre-trial conferences that OATH must conduct each month for disciplinary cases involving charges related to UOF Violations. Specifically, as of December 15, 2021, Paragraph C.4 shall be revised to read as follows: "All disciplinary cases before OATH involving charges related to UOF Violations shall proceed in an expeditious manner. During each month, Defendants shall hold pre-trial conferences before OATH for at least |

**150** disciplinary cases involving charges related to UOF Violations, absent extraordinary circumstances that must be documented. If there continues to be delays in conferencing cases despite this calendaring practice, OATH will assign additional resources to hear these cases. The minimum number of case conferences required to be held each month under this Paragraph may be reduced if the Monitor makes a written determination, no earlier than one year after the date of this Order, that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month."[255]

*First Remedial Order § C., ¶ 5. Applicability of Disciplinary Guidelines to OATH Proceedings.* The Disciplinary Guidelines developed pursuant to Section VIII, ¶ 2 of the Consent Judgment shall apply to any OATH proceeding relating to the Department's efforts to impose discipline for UOF Violations.

*Third Remedial Order ¶ 3. New OATH Procedures and Protocols.* Within 45 days of the date of this Order, the City, in consultation with the Monitor, shall develop, adopt, and implement a written plan to allow OATH to more expeditiously prosecute disciplinary cases involving charges related to UOF Violations. The plan shall include the following:

i. The steps OATH will take to increase the number ALJs and other staff who will be available to hear Department disciplinary cases, including the number of new ALJs and staff that OATH intends to hire by December 31, 2021.

ii. Improved procedures to ensure that OATH trials are promptly scheduled and completed without unnecessary delays, including scheduling trials within no more than three months of the initial pre-trial conference.

iii. The initiatives and procedures that ALJs will employ to encourage prompt agreed-upon resolutions of disciplinary cases when appropriate.

Addressing the various requirements of the *Nunez* Court Orders related to accountability inherently requires that the practices of the Office of Administrative Trials and Hearings be considered given OATH's role in DOC's formal disciplinary process. OATH, an administrative law court, adjudicates any contested discipline for tenured staff, pursuant to New York State Civil Service Laws § 75. OATH is a New York City agency, but it is separate and independent from DOC. The Monitoring Team has long reported its concerns related to OATH's practices and the precedents set that impact the Department's ability to impose meaningful and adequate discipline as required by Consent Judgment, § VIII, ¶ 1 and other provisions of the *Nunez* Court Orders.[256] As a result, the First Remedial Order, Third Remedial Order, and the Action Plan

[255] The Action Plan (dkt. 465) requires a compliance assessment with First Remedial Order (dkt. 350), § C, ¶ 4, Timely, Appropriate, and Meaningful Staff Accountability. However, this provision was modified by the Third Remedial Order (dkt. 424), ¶ 2 so a compliance rating with Third Remedial Order, ¶ 2 is provided instead.

[256] The Monitoring Team's concerns regarding issues with the OATH process have been documented for several years. *See* Monitor's April 3, 2017 Report (dkt. 295) at pgs. 179-180 and 184-188; Monitor's October 17, 2018 Report (dkt. 317) at pgs. 126-128; Monitor's April 18, 2019 Report (dkt. 327) at pgs. 151-159 and Appendix C; Monitor's October 28, 2019 Report (dkt. 332) at pgs. 183-184 and 186-195; Monitor's May 29, 2020 Report (dkt. 341) at pgs. 206-208; Monitor's October 23, 2020 Report (dkt. 360) at pgs. 66-68 and 175-181; Monitor's December 8, 2020 Report (dkt. 365) at pgs. 5-9; Monitor's May 11, 2021 Report (dkt. 368) at pgs. 99-103, 245-250, and 251-257; Monitor's June 3, 2021 Report (dkt. 373) at pgs. 6-16 and Appendix A; Monitor's December 6, 2021 Report (dkt. 431) at pgs. 96-101 and 113-115; Monitor's December 22, 2021 Report (dkt. 435) at pgs. 4-12; Monitor's June 30, 2022 Report (dkt. 467) at pgs. 31-39; Monitor's October 28, 2022 Report (dkt. 472) at pgs. 94-98 and 162-166; Monitor's April 3, 2023 Report (dkt. 517) at pgs. 189-193; Monitor's July 10, 2023 Report (dkt. 557) at pgs. 135,

include specific requirements to enhance OATH's practices, including requirements to increase the number of pre-trial conferences, improve efficiency, and to properly apply the Disciplinary Guidelines.

**Compliance Rating**

During the current Monitoring Period, the Department was in Substantial Compliance with First Remedial Order § C., ¶ 4 & Third Remedial Order ¶ 2 and Partial Compliance with First Remedial Order § C., ¶ 5 & Third Remedial Order ¶ 3, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **OATH Proceedings**: When the Department is unable to settle a disciplinary matter directly with a staff member, the Commissioner delegates responsibility to adjudicate the matter to the OATH. In these cases, an Administrative Law Judge ("ALJ") conducts a pre-trial conference in an attempt to facilitate a settlement. If a settlement still cannot be reached, a trial is scheduled before a different ALJ than the one who conducted the pre-trial conference. The trial ALJ assesses the evidence to evaluate whether or not the staff member has violated DOC policy. The ALJ then issues a written decision (a Report & Recommendation, or "R&R") with a *recommended* outcome, and if the ALJ determines the staff member violated policy, a proposed penalty. The DOC Commissioner has the authority to accept the ALJ's factual findings and recommended penalty or to modify them, as appropriate, in order to resolve the case. The permissible range of penalties is set by law and includes a reprimand, a fine of up to $100, a suspension without pay for up to 60 days, demotion in title, or termination. Accordingly, most of the discipline imposed by DOC (either through settlement or following an OATH trial) is within this same range of penalties. The DOC Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78

139-140, and 230; Monitor's December 22, 2023 Report (dkt. 666) at pgs. 59, 71-75, and Appendix C; and the Monitor's April 18, 2024 Report (dkt. 706) at pgs. 109, 124-125, 137-142.

proceeding.[257] The Monitoring Team has long raised concerns that in some cases, certain factors emphasized by OATH's ALJs appeared to influence outcomes that appeared disproportionately low given the level of misconduct.[258] "OATH's Role in DOC's Disciplinary Process", "OATH's Internal Operating Procedures and Guidelines", "Background on *Nunez* Reform Efforts with OATH", and "OATH's Procedures and Protocols" are described in the Monitor's November 22, 2024 Report (dkt. 802) at pgs. 141-148. These descriptions remain an accurate description of the process and are incorporated by reference.

- **<u>Number and Outcomes of Pre-Trial Conferences</u>**: The Monitoring Team has long reported that the majority of cases can and should settle without the need for OATH. When pre-trial conferences are needed, they should occur promptly. Further, pre-trial conference dates need to be readily available because simply scheduling a pre-trial conference sometimes encourages the Department and the staff member to settle the case outside of OATH. Then, if the case is not successfully resolved, the full OATH disciplinary process can occur more quickly because the initial proceeding has already been scheduled. The evolution of the Department's efforts to schedule enough pre-trial conferences each week to avoid unreasonable delays in the resolution of cases awaiting pre-trial conference is described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 334-335. In March of this Monitoring Period, the Department and OATH returned to the standard schedule to conduct OATH conferences four days a week with a minimum of 150 pre-trial conferences a month.
    - *Number of Pre-Trial Conferences*: Table 17 in Appendix F presents the number of use-of-force-related pre-trial conferences that were scheduled in each Monitoring Period since July 2022, and their method of resolution. During this Monitoring Period, the Department scheduled 913 pre-trial conferences, which exceeds the 750 pre-trial conference threshold approved by the Monitor for this six-month period.

---

[257] Appeals to the Civil Service Commission and Article 78 appeals are discussed in more detail in this report in the compliance assessment for Consent Judgment, § VIII, Staff Discipline & Accountability.

[258] The Monitoring Team highlighted one such example in the Monitor's January 13, 2026 Report (dkt. 947) at Appendix J. *See also,* the Monitor's April 18, 2019 Report (dkt. 237) at pgs. 151-158, 162-165, and Appendix C.

- *Resolution of Pre-Trial Conferences*: In the 22nd Monitoring Period, the Department's efficiency in settling use-of-force-related cases before and after an initial pre-trial conference improved slightly over the 21st Monitoring Period (61% (n=273) of cases settled before the pre-trial conference). Of the 171 use of force cases where a pre-trial conference was convened, 55 of 171 (32%) cases were settled at the pre-trial conference; 43 (25%) cases required an additional pre-trial conference; 13 (8%) cases were scheduled for trial, but only 1 case actually proceeded to trial; and 58 (34%) cases were administratively filed, which the Monitoring Team continues to closely scrutinize.

- **Trials at OATH for Use-of-Force-Related Misconduct**: During this Monitoring Period, there was only one trial conducted for a use-of-force-related misconduct. Table 18 in Appendix F provides data on the number of trials conducted, the average number of days between a pre-trial conference and the trial, the length of time required to complete the trial, the average number of days for the ALJ to issue an R&R after the trial, and ultimately the length of time between a pre-trial conference and the issuance of the R&R. Historically, the process for scheduling and conducting trials and then issuing an R&R was very inefficient and convoluted, so starting in 2021, OATH set internal deadlines for case processing.[259] The one trial that did occur for use-of-force-related misconduct in the 22nd Monitoring Period met all of OATH's internal deadlines; it occurred within 50 days of the pre-trial conference, only lasted one day, and the R&R was issued within 35 days of the trial date. This case was identified for expeditious resolution pursuant to Action Plan (dkt. 465), § F, ¶ 2, so this case also met the deadline set by this provision which requires OATH to complete all disciplinary proceedings from when the case is filed with OATH through the submission of the R&R within 35 business days.
- **OATH Reports and Recommendations for Use-of-Force-Related Misconduct:** Table 19 in Appendix F provides a breakdown of the use-of-force-related R&Rs issued for trials that occurred between January 2016 and June 2026 and the recommended outcomes. The one R&R issued for use-of-force-related misconduct in the 22nd Monitoring Period found

[259] *See* Monitor's January 13, 2026 Report (dkt. 947) at pg. 337 and the Monitor's June 17, 2026 Report (dkt. 984) at pgs. 197-198, fn. 125.

the DOC staff member guilty of the charges and recommended a penalty of termination which was imposed by the Commissioner.

- *Assessment of OATH's Application of Disciplinary Guidelines*: As noted in the Monitor's April 3, 2023 Report (dkt. 517) at pgs. 203-204, the proper application of the Disciplinary Guidelines has improved since the Remedial Orders were imposed, although in some cases, questions remained regarding the application of precedent and whether it was consistent with the Disciplinary Guidelines in both pre-trial conferences and the R&Rs. The Monitoring Team is continuing to evaluate cases that merit additional scrutiny as to whether the applicability of the Disciplinary Guidelines was appropriate. A more fulsome assessment is underway and will be included in a future Monitor's Report.

Following the end of the Monitoring Period, the newly appointed leadership of OATH met with the Monitoring Team to discuss the status of compliance and how OATH can work to further advance the reform effort. The Monitoring Team was encouraged by the approach taken by the new leadership team and will report on forthcoming initiatives in the next report.

**Conclusion**

OATH has made important improvements to ensure that there are adequate numbers of pre-trial conferences and that the processes and practices related to Trials and the issuance of R&Rs are both more efficient and more expeditious than in the past. Pre-trial conferences are scheduled more quickly, trials are conducted and completed within a more reasonable timeframe, and R&Rs are issued more quickly than they were in the past.

Further enhancements to the disciplinary process are necessary so that cases can move as expeditiously as possible. This includes the development of additional efficiencies, removal of unnecessary bureaucracy, adherence to the Disciplinary Guidelines, and necessary collaboration between OATH and the Department to meet the requirements of the *Nunez* Court Orders. The Monitoring Team is continuing to closely examine the various facets of OATH's operation to identify whether additional enhancements or modifications to the Department's process of delegating cases to OATH may be necessary.

- **First Remedial Order § C, ¶ 4 & Third Remedial Order ¶ 2**. OATH has met the requirement to convene the number of pre-trial conferences approved by the Monitor. Accordingly, Substantial Compliance with this provision has been maintained.

- **First Remedial Order § C, ¶ 5**. It appears there has been improvement in the application of the Disciplinary Guidelines to OATH Proceedings since the First Remedial Order was entered, but additional analysis by the Monitoring Team is ongoing to determine what additional steps are necessary to achieve Substantial Compliance.
- **Third Remedial Order ¶ 3**. OATH's procedures and protocols for use-of-force-related disciplinary matters are more efficient than when the Remedial Orders were first imposed, but the pre-trial conference and trial process is still not efficient and impedes the expeditious processing for use-of-force-related misconduct. Further enhancements to the OATH process are needed to support the overall goal of ensuring that proportional discipline is imposed timely.

| | |
|---|---|
| **COMPLIANCE RATING** | **First Remedial Order § C., ¶ 4. & Third Remedial Order ¶ 2.** Substantial Compliance<br>**First Remedial Order § C., ¶ 5.** Partial Compliance<br>**Third Remedial Order ¶ 3.** Partial Compliance |

| **TRIALS DIVISION STAFFING (CONSENT JUDGMENT § VIII., ¶ 4)** |
|---|
| *Consent Judgment § VIII., ¶ 4. Trials Division Staffing.* The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.<br>*Action Plan, § F, ¶ 1. (a) Staffing Levels of Trials Division.* The City shall thereafter ensure that the Department's Trials Division maintains at least 25 agency attorneys and 4 directors, unless and until the Department can demonstrate to the Monitor with an internal staffing analysis that fewer agency attorneys and directors are necessary to timely address the disciplinary matters pending with the Trials Division. |

Consent Judgment § VIII., ¶ 4 requires the City and the Department to ensure the Trials Division has sufficient staff to expeditiously prosecute all disciplinary cases. The Department has long struggled to ensure sufficient staff to support the Division's caseload. The Action Plan (dkt. 465), § F, ¶ 1(a), requires the Department to ensure that the Trials Division maintains at least 25 agency attorneys and four Directors.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

The Monitoring Team's findings for this Monitoring Period are based on the following available information:

- **Staffing Levels and Recruitment**: Appendix F, Table 20 provides an overview of the Trials Division's staffing levels from June 2020 to October 1, 2026.[260] The staffing levels at the end of the 22nd Monitoring Period were almost identical to those at the end of the 21st Monitoring Period. While the Trials Division has the four Directors required by the Action Plan, the Division only has 18 attorneys (one fewer than last Monitoring Period), which remains below the 25 attorneys required by the Action Plan.

  During the 22nd Monitoring Period, under the direction of the Remediation Manager and the new Commissioner, the Department began a significant reorganization effort. Through this reorganization, the Trials Division was placed within a larger division

[260] For Trials Division staffing levels from the 6th to the 9th Monitoring Periods, *see* Monitor's November 22, 2024 Report (dkt. 802) at pg. 158.

overseen by the new Senior Deputy Commissioner of Investigations, Intelligence & Accountability. The SDC subsequently spearheaded a reconciliation and reorganization of the Trials Division to bring its staffing levels into compliance with the Action Plan. The Department reports that this reconciliation has immediately identified four open attorney positions, two of which are actively being filled and are in the interview stage of the hiring process. The other two will become available when the reorganization is complete.

As detailed in Appendix F, Tables 8-10, the Trials Division's ability to expeditiously process cases has improved since the early years of the Consent Judgment, and the most recent data reflect some additional improvement. However, performance levels in several key areas declined during this Monitoring Period, confirming that the staffing levels mandated by the Action Plan remain a necessary goal to ensure cases are prosecuted as expeditiously as possible.

**Conclusion**

The timeliness of prosecutions has improved since the Consent Judgment went into effect, but the Department has not yet achieved Substantial Compliance with the requirement to prosecute cases as expeditiously as possible. The Monitoring Team continues to recommend that the City and the Department remain vigilant in ensuring the Trials Division maintains adequate staffing levels,[261] and continue to work to hire and retain the 25 attorneys as required by the Action Plan (dkt. 465), § F, ¶ 1(a).

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § VIII., ¶ 4.** Partial Compliance |

[261] *See* Monitor's March 16, 2022 Report (dkt. 438) at pg. 62.

| **MAXIMIZING DEPLOYMENT OF STAFF - REDUCTION OF UNIFORMED STAFF IN CIVILIAN POSTS (ACTION PLAN § C., ¶ 3(VII))** |
| --- |
| *Action Plan § C., ¶ 3(vii). Maximizing Deployment of Staff – Reduction of Uniformed Staff in Civilian Posts*. The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below: [. . .]<br>(vii) Reduce the assignment of uniform staff to civilian posts, including Temporary Duty Assignment, in order to minimize the reliance on uniform staff for tasks that can and should be reasonably completed by civilians. |

The Department is required by Action Plan (dkt. 465), § C, ¶ 3(vii) to reduce the assignment of uniformed staff to civilian posts in order to minimize the reliance on uniformed staff for tasks that reasonably can and should be completed by civilians. This requirement flows from the Monitoring Team's 2022 staffing analysis which found that the use of uniformed staff in positions that could be performed by civilians contributed to the overarching problem of insufficient numbers of uniformed staff being available to work in the jails' housing units.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pgs. 31-34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order.

**Compliance Rating**

During this Monitoring Period, the Department was in Partial Compliance with the portion of this provision that addresses *Management of Internal Staffing Records* and the City was in Non-Compliance with the portion of this provision that addresses *Defendants' Allocation of Resources to Reduce the Assignment of Uniformed Staff to Civilian Posts*.[262] Both are unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

[262] This provision is divided into two parts because the responsibilities are separate and distinct. The Department is responsible for managing its internal staffing records and the City is responsible for allocating the necessary resources to effectuate the conversion of positions to civilian positions.

This is one of several key strategies required to maximize the availability of uniformed staff to work directly with incarcerated individuals in the jails and is one that requires significant collaboration among various City entities.

The Monitoring Team's findings for this Monitoring Period are based on the following available information.

- **DOC Leadership Changes**: During this Monitoring Period, there were a number of key leadership changes that impacted the Department's work in this area. In February 2026, the Deputy Commissioner of Administration was terminated, and an Acting Deputy Commissioner of Administration was appointed. Following the appointment of the new Commissioner, a Senior Deputy Commissioner for Administrative Operations was appointed in March 2026. This individual previously worked in the Department and has extensive experience with New York City government. The reporting lines for many of the divisions engaged in this work were also changed so that a number of key divisions (*e.g.,* Administration and Finance) now report to the SDC for Administrative Operations. The SDC has already demonstrated that his experience with City government will effectively support moving these initiatives forward in a constructive manner. Despite the leadership and reporting line changes, the Department's efforts to untangle staffing management issues continued. The overarching strategy and approach remained the same (which, as previously reported, is a reasonable approach), but some of the work has intensified demonstrating continued progress toward the requirements of these provisions.
- **Process to Recruit & Hire Civilians**: As described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 347-350, Defendants must navigate a multitude of bureaucratic hurdles to obtain approval from various City agencies (including the Mayor's Office of Management and Budget and the NYC Department of Citywide Administrative Services) to hire civilians and receive new positions (*i.e.*, "new needs"). The Department must also operate within hiring freezes and budget cuts imposed by the City. Even when these obstacles are successfully navigated, civilian positions in the Department are often not competitive with comparable positions in other City agencies. The Monitoring Team renewed its feedback upon the appointment of a new administration. Following the close

of the Monitoring Period, the City advised it was working to respond to the Monitoring Team's feedback.

- **<u>Contributing Factors to Reliance on Uniformed Staff</u>**: Dynamics underpinning the Department's reliance on uniformed staff to fill roles that could reasonably be addressed by civilians include: (1) the Department's historically larger number of uniformed staff versus civilian staff; (2) budget cuts impacting the number of civilian positions; (3) lower turnover among uniformed staff and greater flexibility when deploying uniformed staff; (4) the risk of critical roles going unfilled for a period of time because of the complexity involved in creating positions and attracting qualified civilian candidates. These dynamics remain the same as described in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 350-352.
- **<u>Staffing Efficiency Committee</u>**: The Staffing Efficiency Committee has continued to meet to disentangle the various bureaucratic and interrelated issues around the Department's staffing. The new Senior Deputy Commissioner for Administrative Operations, who was appointed in March 2026, took over leadership of the SEC. The SDC streamlined the individuals engaged in the SEC to improve efficiency and promote closer collaboration. While the SEC continued to work on many of the projects initiated under the previous administration, they started to execute them expeditiously and with greater tangible impact than in the past. This work is discussed in more detail in the "DOC's Initiatives To Improve Staffing Practices" subsection of the "Leadership, Supervision, and Maximizing Staff Deployment" section of this Report. The findings in that section are incorporated by reference into the Monitoring Team's assessment of compliance.
- **<u>Post Analysis</u>**: The Department engaged a qualified consultant to undertake the post analysis,[263] and work began in early 2026. Subsequently, upon the appointment of the Remediation Manager, the staffing consultant began to report directly with the RM and worked closely with one of the senior experts on the Remediation Manager's Team.

[263] A neutral and independent Post Analysis is required pursuant to Action Plan (dkt. 465), § C, ¶ 3(viii). A post analysis will provide critical information on the number and duties of each post in each facility as well as the number of uniformed staff needed to ensure adequate coverage. The Department originally worked with the New York State Commission of Correction ("SCOC") to conduct a post analysis but determined that this approach would not meet the Department's needs to meet the requirements of the *Nunez* Court Orders.

**Conclusion**

The complexity of this undertaking and the collaboration required cannot be overstated. The Department, via the SDC and SEC, continues to make progress in addressing the problems with its legacy processes and continues to improve its management of civilian positions and hiring. Progress toward compliance requires continued efforts to identify uniformed positions that can be converted to civilian positions. The Department remains in Partial Compliance with the portion of the provision related to its efforts regarding *Managing Internal Staffing Records.* That said, the City's agencies, particularly OMB and DCAS, must provide adequate resources for efficient hiring and funding for both existing and additional civilian positions that are competitive in the marketplace. The City has made no observable progress in this area, which continues to undercut the Department's progress. The City remains in Non-Compliance with the portion of this provision related to *Allocating Resources to Reduce the Assignment of Uniformed Staff to Civilian Posts.*

| | |
|---|---|
| **COMPLIANCE RATING** | **Action Plan § C., ¶ 3(vii).**<br>*Management of Internal Staffing Records*. Partial Compliance<br>*Defendants' allocation of resources to reduce the assignment of uniformed staff to civilian posts.* Non-Compliance |

| Maximizing Deployment of Staff - Awarded Posts (Action Plan § C., ¶ 3(v)) |
| --- |
| *Action Plan § C., ¶ 3(v). Maximizing Deployment of Staff – Awarded Posts*. The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below:<br>(v) Reduce the use of awarded posts so they are primarily utilized for those positions in which a particular skill set is required. A staff member with an awarded non-mandatory post must be re-deployed to a mandatory post if there are staffing shortages. |

The Department has historically used awarded posts for positions that were not on housing units or otherwise regularly engaged with incarcerated individuals and managed staff on awarded posts in a manner that limited flexibility in re-deploying such staff when they were needed in more critical areas. This provision requires the Department to reduce the use of awarded posts so that such assignments are primarily utilized for positions for which a particular skill set is required and to support the Department's efforts to maximize deployment of uniformed staff.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pgs. 31-34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Partial Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Data and Information**

Historically, the Department's use of awarded posts has limited its flexibility in deploying staff to posts where they are needed, as detailed in the Monitor's January 13, 2026 Report (dkt. 947) at pgs. 359-370. The Department's use of an "awarded" post is governed by policy, but a number of entrenched *practices* that are not codified in policy impede the Department's overall ability to maximize the deployment of its staff. These practices include poor management, poor recordkeeping, limiting reassignments of staff to other posts, awarding a

post for a specific location rather than a population, and awarding posts that have little interaction with the incarcerated population.

The Monitoring Team's findings during this Monitoring Period are based on the following available information.

- **<u>Suspension of Awarded Posts & Policy Revisions</u>**: The practice of awarding posts (with limited exceptions) has been suspended since early 2025. The Department reports it is working to revise the policy on awarded posts and has engaged the unions on potential revisions given the pending arbitration (see below). The Department intends to provide a draft policy for the Monitoring Team's review once complete.
- **<u>Steady Staffing</u>**: Regular post assignments can provide benefits to the Department's operations (*e.g.*, rapport development, task mastery, predictability and reduced stress). Toward that end, the Department has been working towards utilizing "steady staffing" wherein staff members are consistently assigned to the same post day-to-day without being formally awarded the post. The Department utilizes this staffing convention in certain housing units, such as the Young Adult housing units targeted by the RNDC Action Plan (discussed in more detail in the compliance assessment for § XV. ¶ 17, "Young Adults-Consistent Assignment of Staff," above). During the last Monitoring Period, the Department expanded the use of steady staffing in other jails, assigning over 80 staff to steady incarcerated individual-facing posts, without formally "awarding" the posts to the staff member. As of October 2026, 50 of these staff remain in their steady posts and over 30 staff were removed from their steady posts, primarily due to staff transfers to new assignments as well as departures from the Department. The Monitoring Team supports this practice but continues to recommend that the Department clarify the procedures relating to the use of steady staffing to ensure consistency and transparency in how the process works and to ensure that the problematic practices related to awarded posts do not become embedded in the steady staffing convention. The Department has not taken any steps to address this recommendation from the Monitoring Team.
- **<u>Pending Arbitration</u>**: In early 2025, COBA submitted a request for arbitration to the Office of Collective Bargaining to address its allegation that the Department's January 2025 change in practice regarding awarded posts violates the Collective Bargaining

Agreement. The Department has reported it is working with COBA to reach resolution on the matter. A hearing is scheduled for early 2027.

- **Reducing the Number of Staff with Awarded Posts:** The Department reports it continues to evaluate the list of staff with awarded posts. The Department regularly inventories its awarded posts to track the location/type (*i.e.*, in a facility, not in a facility; incarcerated individual-facing posts) and the rank of the staff members to whom posts have been awarded. Following the close of the Monitoring Period, the Department reported that the list of awarded posts may include posts that are no longer in service so additional revisions to the awarded post inventory are likely necessary. The Senior Deputy Commissioner has prioritized this issue and is both validating existing data on the number of awarded posts and taking action to reduce the number of staff with awarded posts as appropriate.
  - During the current Monitoring Period, the number of staff with awarded posts decreased 16%, from 656 in December 2025 to 550 in June 2026. No new awarded posts were added during the Monitoring Period. The decrease in the number of awarded posts continues to mainly be a result of attrition. The Department has also started to remove posts from the list that are no longer being operated. In 2022, the Department reported approximately 1,650 awarded posts, thus a significant reduction has occurred. Table 4 in Appendix G shows the inventories conducted since April 2024.
  - Table 4 in Appendix G also shows that over time, the proportion of awarded posts located in the facilities has remained about the same (~70%).
  - The Monitoring Team estimates that in June 2026 about 21% of all awarded posts were located on a housing unit (115 of 550). Although this proportion is largely unchanged over time, during the current Monitoring Period, the *number* of awarded posts located in a housing unit decreased 31%, from 166 in December 2025 to 115 in June 2026, this is mainly attributed to the fact that NIC closed and so the awarded posts to that facility were eliminated. Tables 5 and 6 in Appendix G show additional analysis by the Monitoring Team to determine the number of awarded posts which involve direct day-to-day contact with individuals in custody and/or are located on the housing units.

## Conclusion

Since 2022, the Department has made important progress in this area. The number of staff who were treated as if they had an awarded post but, in fact, did not, and the number of staff who have actually been awarded a post have both decreased significantly. The Department needs to update its policies and procedures regarding both awarded posts and steady staffing to ensure both practices are managed with fidelity and remain distinct. Once revised policies and procedures have been implemented, the Monitoring Team believes further discussion about potential modifications to the use of awarded posts may be appropriate, in particular regarding the use of awarded posts for staff on housing units. The Department remains in Partial Compliance.

| | |
|---|---|
| **COMPLIANCE RATING** | **Action Plan § C, ¶ 3(v).** Partial Compliance |

| **MAXIMIZING DEPLOYMENT OF STAFF - MAXIMIZE WORK SCHEDULES (ACTION PLAN § C., ¶ 3(VI))** |
|---|
| *Action Plan § C., ¶ 3(vi). Maximizing Deployment of Staff – Maximize Work Schedules*. The Department shall maximize deployment of uniform staff within the facilities by implementing modified staffing practices, including, but not limited to the items outlined below: (vi) Create and implement alternatives to the work schedule for uniform staff assigned to work in the facilities in order to minimize the use of a 4 by 2 schedule and optimize staff scheduling. |

The Department must maximize staff work schedules as required by Action Plan (dkt. 465), § C, ¶ 3(vi). The purpose of this requirement is for the Department to optimize staff scheduling by implementing alternatives to the work schedule for uniformed staff assigned to work in the facilities in order to increase the number of days a staff member works. Specifically, the Department is required to minimize the use of the 4x2 schedule in order to increase the number of days that a staff member works during the year.

**Court's 2024 Contempt Order**

The Court's 2024 Contempt Order (dkt. 803) found the Defendants in contempt for failing to comply with this provision. The Court explained the basis for its finding at pgs. 31-34 in section "Failure to Effectively Deploy Uniform Staff to Adequately Supervise Incarcerated Individuals" of the Order.

**Compliance Rating**

During the current Monitoring Period, the Department was in Non-Compliance with this provision, which is unchanged from the prior Monitoring Period. The history of compliance ratings for this provision since the inception of the Consent Judgment is provided in Appendix A, "Comprehensive List of Provisions."

**Relevant Facts and Information**

The Monitoring Team's findings for this Monitoring Period are based on the following available information.

This provision requires the Department to reduce its use of the 4x2 work schedule in favor of a more efficient schedule that would increase the number of days staff members are available to work each year. Since this provision went into effect via the Action Plan, the Department has made no substantive progress toward compliance and has offered a variety of unclear and at times contradictory reasons as justification for why it cannot do so. *See* Monitor's January 13, 2026 Report (dkt. 947) at pgs. 371-373.

Some extremely preliminary work toward this requirement has been initiated. First, the Office of Labor Relations ("OLR") met with the Department, Monitoring Team, and Remediation Manager Team at the end of the Monitoring Period to provide information about the process the City would need to utilize to alter the schedule for uniformed staff, as well as the related contractual obligations that would be involved. Following this meeting, the Monitoring Team requested additional information in order to better understand the issues. Additional updates will be provided in the next Monitor's Report. Second, the Department's Staffing Consultant has initiated a four-phase assessment of the Department's staffing practices under the direction of the Remediation Manager. This work is expected to identify appropriate scheduling conventions for the workforce.

During the current Monitoring Period, the Department and the Staffing Consultant initiated some long-awaited initial steps to examine and analyze the relevant issues. Although useful and informative, these actions have not yet resulted in meaningful progress toward altering staff schedules to increase the number of days staff members are available to work each year. The Department remains in Non-Compliance.

| | |
|---|---|
| **COMPLIANCE RATING** | **Action Plan § C., ¶ 3(vi).** Non-Compliance |

# APPENDIX A:
# COMPREHENSIVE LIST OF PROVISIONS

**<u>Comprehensive List of "Select Group of Provisions" & Provisions Subject to the Court's 2024 Contempt Order</u>**

The table below includes a comprehensive list of 40 provisions that are subject to compliance rating pursuant to the Court's March 18, 2026 Report (dkt. 967). The table also identifies whether the provision is either: (1) the Select Group of Provisions subject to compliance assessments (Consent Judgment § XX, ¶ 18) as required by Action Plan § G, ¶ 5(b) **and/or** (2) the provisions that are subject to the Court's 2024 Contempt Order.

The two charts below reference provisions in the Consent Judgment ("CJ"), the First Remedial Order ("FRO"), the Second Remedial Order ("SRO"), the Third Remedial Order ("TRO"), and the Action Plan ("AP"). The first chart presents compliance assessments ratings for the 1st through the 13th Monitoring Periods. The second chart presents compliance assessment ratings for the 14th through the 22nd Monitoring Periods.

**Chart One: 1st through 13th Monitoring Periods**

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 1st MP | 2nd MP | 3rd MP | 4th MP | 5th MP | 6th MP | 7th MP | 8th MP | 9th MP | 10th MP | 11th MP | 12th MP | 13th MP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility Leadership Responsibilities (FRO, § A., ¶ 2) | Yes | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| New Use of Force Directive (CJ, § IV., ¶ 1) | Yes | Yes | (Develop) Substantial Compliance (Adopt) Partial Compliance (Implement) Partial Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Partial Compliance (Implement) Partial Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Partial Compliance (Implement) Partial Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Partial Compliance (Implement) Partial Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | |
| Independent Staff Reports (CJ, § V., ¶ 2) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | |
| Providing Medical Attention Following Use of Force Incident (CJ, § V., ¶ 22) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | |
| Interim Security Plan (SRO, ¶1(i)(a)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Not Rated | |
| Interim Security Plan (AP, § D, ¶ 2 (a)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Searches (AP, § D, ¶ 2 (d)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Identify/Recover Contraband (AP, § D, ¶ 2 (e)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 1st MP | 2nd MP | 3rd MP | 4th MP | 5th MP | 6th MP | 7th MP | 8th MP | 9th MP | 10th MP | 11th MP | 12th MP | 13th MP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Escort Holds (AP, § D, ¶ 2 (f)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Facility Emergency Response Teams (FRO, § A., ¶ 6) | Yes | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| Revised De-escalation Protocol (FRO, § A., ¶ 3) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| Prevent Fight/Assault – 18-year-olds (CJ, § XV., ¶ 1) | Yes | Yes | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | |
| Direct Supervision – 18-year-olds (CJ, § XV., ¶ 12) | Yes | Yes | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | |
| Reinforcement of Direct Supervision – 18-year-olds (FRO, § D, ¶ 3) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| Reinforcement of Direct Supervision – 18-year-olds (FRO, § D, ¶ 3(i)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| Consistent Assignment of Staff – 18-year-olds (CJ, § XV., ¶ 17) | Yes | Yes | Not Yet Rated | Not Yet Rated | Not Yet Rated | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | |
| Consistent Staff Assignment and Leadership (FRO, § D, ¶ 1) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Non-Compliance | Non-Compliance | |
| Promotions - Pre-Promotional Screening (CJ, § XII., ¶ 1) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | |
| Promotions - Restricting Promotions for UOF Disciplinary History (CJ, § XII., ¶ 2) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Non-Compliance | Substantial Compliance | Substantial Compliance | |
| Promotions - Restricting Promotions for Pending UOF Charges (CJ, § XII., ¶ 3) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | |
| Supervision of Captains (FRO, § A., ¶ 4) | Yes | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Non-Compliance | |
| Increased Assignment of Captains in the Facility (AP, § C, ¶ 3 (ii)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Improved Supervision of Captains (AP, § C, ¶ 3 (iii)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Improved Routine Tours (AP, § A, ¶1 (d)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Conduct Rapid Reviews (FRO, § A., ¶ 1) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Partial Compliance | |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 1st MP | 2nd MP | 3rd MP | 4th MP | 5th MP | 6th MP | 7th MP | 8th MP | 9th MP | 10th MP | 11th MP | 12th MP | 13th MP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Thorough, Timely, Objective Investigations (CJ, § VII., ¶ 1) | Yes | Yes | Not Yet Rated | Not Yet Rated | Not Yet Rated | Not Yet Rated | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | |
| Timing of Full ID Investigations (CJ, § VII., ¶ 9(a)) | Yes | Yes | Not Yet Rated | Not Yet Rated | Not Yet Rated | Compliance Rating Withheld | Compliance Rating Withheld | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | |
| ID Staffing (CJ, § VII., ¶ 11) | No | Yes | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Compliance Rating Withheld | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | |
| Early Warning System (CJ, § X., ¶ 1) | Yes | No | Not Yet Rated | Partial Compliance | Partial Compliance | Compliance Rating Withheld | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Non-Compliance | |
| Timely, Appropriate and Meaningful Discipline (CJ, § VIII., ¶ 1) | Yes | Yes | Not Yet Rated | Not Yet Rated | Not Yet Rated | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | |
| Prosecution of Formal Disciplinary Charges for UOF Violations (CJ, § VIII., ¶ 3(c)) | Yes | No | Not Yet Rated | Not Yet Rated | Non-Compliance | Compliance Rating Withheld | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | Serving Charges: Substantial Compliance Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Non-Compliance | |
| Immediate Corrective Action (FRO, § C., ¶ 1) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Partial Compliance | |
| Staff Accountability – Monitor Recommendations (FRO, § C., ¶ 2) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Partial Compliance | |
| Expeditious OATH Proceedings (FRO, § C., ¶ 4/TRO ¶ 2) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Partial Compliance | |
| Applicability of Disciplinary Guidelines to OATH Proceedings (FRO, § C., ¶ 5) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Partial Compliance | Partial Compliance | |
| New OATH Procedures and Protocols (TRO, ¶ 3) | Yes | No | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Trials Division Staffing (CJ, § VIII., ¶ 4) | Yes | No | Not Yet Rated | Not Yet Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | |
| Maximizing Deployment of Staff - Reduction of Uniformed Staff in Civilian Posts (AP, § C, ¶ 3 (vii)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |
| Maximizing Deployment of Staff - Awarded Posts | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 1st MP | 2nd MP | 3rd MP | 4th MP | 5th MP | 6th MP | 7th MP | 8th MP | 9th MP | 10th MP | 11th MP | 12th MP | 13th MP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (AP, § C, ¶ 3 (v)) | | | | | | | | | | | | | | | |
| Maximizing Deployment of Staff - Maximize Work Schedules (AP, § C, ¶ 3 (vi)) | No | Yes | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | Order Not Yet In Effect | |

## Chart Two: 14th through 22nd Monitoring Periods

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 14th MP | 15th MP | 16th MP | 17th MP | 18th MP | 19th MP | 20th MP | 21st MP | 22nd MP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility Leadership Responsibilities (FRO, § A., ¶ 2) | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| New Use of Force Directive (CJ, § IV., ¶ 1) | Yes | Yes | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance | (Develop) Substantial Compliance (Adopt) Substantial Compliance (Implement) Non-Compliance (Monitor Approval) Substantial Compliance |
| Independent Staff Reports (CJ, § V., ¶ 2) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Providing Medical Attention Following Use of Force Incident (CJ, § V., ¶ 22) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance |
| Interim Security Plan (SRO, ¶1(i)(a)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Non-Compliance |
| Interim Security Plan (AP, § D, ¶ 2 (a)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Non-Compliance |
| Searches (AP, § D, ¶ 2 (d)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance | Non-Compliance |
| Identify/Recover Contraband (AP, § D, ¶ 2 (e)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance | Partial Compliance |
| Escort Holds (AP, § D, ¶ 2 (f)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Non-Compliance |
| Facility Emergency Response Teams (FRO, § A., ¶ 6) | Yes | Yes | Non-Compliance | Non-Compliance | Development of Protocol: Non-Compliance Review of Responses & Documentation: Partial Compliance Response to Misconduct: Non-Compliance | Development of Protocol: Non-Compliance Review of Responses & Documentation: Partial Compliance Response to Misconduct: Non-Compliance | Development of Protocol: Partial Compliance Review of Responses & Documentation: Partial Compliance Deployment of Teams: Partial Compliance Response to Misconduct: Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Revised De-escalation Protocol (FRO, § A., ¶ 3) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Prevent Fight/Assault – 18-year-olds (CJ, § XV., ¶ 1) | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Direct Supervision – 18-year-olds (CJ, § XV., ¶ 12) | Yes | Yes | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 14th MP | 15th MP | 16th MP | 17th MP | 18th MP | 19th MP | 20th MP | 21st MP | 22nd MP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Reinforcement of Direct Supervision – 18-year-olds (FRO, § D, ¶ 3) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance | Partial Compliance |
| Reinforcement of Direct Supervision – 18-year-olds (FRO, § D, ¶ 3(i)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance | Partial Compliance |
| Consistent Assignment of Staff – 18-year-olds (CJ, § XV., ¶ 17) | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Consistent Staff Assignment and Leadership (FRO, § D, ¶ 1) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Promotions - Pre-Promotional Screening (CJ, § XII., ¶ 1) | Yes | No | Not Rated | Partial Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Promotions - Restricting Promotions for UOF Disciplinary History (CJ, § XII., ¶ 2) | Yes | No | Not Rated | Substantial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Promotions - Restricting Promotions for Pending UOF Charges (CJ, § XII., ¶ 3) | Yes | No | Not Rated | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Supervision of Captains (FRO, § A., ¶ 4) | Yes | Yes | Non-Compliance | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance |
| Increased Assignment of Captains in the Facility (AP, § C, ¶ 3 (ii)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance |
| Improved Supervision of Captains (AP, § C, ¶ 3 (iii)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance |
| Improved Routine Tours (AP, § A, ¶1 (d)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Non-Compliance |
| Conduct Rapid Reviews (FRO, § A., ¶ 1) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Thorough, Timely, Objective Investigations (CJ, § VII., ¶ 1) | Yes | Yes | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Timing of Full ID Investigations (CJ, § VII., ¶ 9(a)) | Yes | Yes | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Non-Compliance |
| ID Staffing (CJ, § VII., ¶ 11) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Early Warning System (CJ, § X., ¶ 1) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Timely, Appropriate and Meaningful Discipline (CJ, § VIII., ¶ 1) | Yes | Yes | Partial Compliance | Partial Compliance | Non-Compliance | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Prosecution of Formal Disciplinary Charges for UOF Violations (CJ, § VIII., ¶ 3(c)) | Yes | No | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per the | Serving Charges: Substantial Compliance (per | Serving Charges: Substantial Compliance (per |

| Short Description of Provision | Select Group of Provisions as defined by Action Plan § G, ¶ 5(b) | Provision Subject to 2024 Contempt Order | 14th MP | 15th MP | 16th MP | 17th MP | 18th MP | 19th MP | 20th MP | 21st MP | 22nd MP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Not rated Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Not rated Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Not rated Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | the 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance | the 12th Monitor's Report) Administrative Filing: Substantial Compliance Expeditiously Prosecuting Cases: Partial Compliance |
| Immediate Corrective Action (FRO, § C., ¶ 1) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Staff Accountability – Monitor Recommendations (FRO, § C., ¶ 2) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Not Rated | Not Rated | Not Rated |
| Expeditious OATH Proceedings (FRO, § C., ¶ 4/TRO ¶ 2) | Yes | No | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Applicability of Disciplinary Guidelines to OATH Proceedings (FRO, § C., ¶ 5) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| New OATH Procedures and Protocols (TRO, ¶ 3) | Yes | No | Not Rated | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Trials Division Staffing (CJ, § VIII., ¶ 4) | Yes | No | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Maximizing Deployment of Staff - Reduction of Uniformed Staff in Civilian Posts (AP, § C, ¶ 3 (vii)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Management of Internal Staffing Records. Partial Compliance Defendants' allocation of resources to reduce the assignment of uniformed staff to civilian posts. Non-Compliance | Management of Internal Staffing Records. Partial Compliance Defendants' allocation of resources to reduce the assignment of uniformed staff to civilian posts. Non-Compliance | Management of Internal Staffing Records. Partial Compliance Defendants' allocation of resources to reduce the assignment of uniformed staff to civilian posts. Non-Compliance |
| Maximizing Deployment of Staff - Awarded Posts (AP, § C, ¶ 3 (v)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Partial Compliance | Partial Compliance | Partial Compliance |
| Maximizing Deployment of Staff - Maximize Work Schedules (AP, § C, ¶ 3 (vi)) | No | Yes | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Not Rated | Non-Compliance | Non-Compliance | Non-Compliance |

# APPENDIX B:
# DOC ACRONYM GUIDE

| Acronym or Term | Definition |
|---|---|
| 911 Knife | Duty knife with a high carbon, stainless steel locking blade approximately 2 1/2" long |
| ACCO | Agency Chief Contracting Officer |
| ACT Meeting | Assess Collaborate Transform Meeting |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Applicant Investigation Unit |
| ALJ | Administrative Law Judge |
| AMKC | Anna M. Kross Center (closed facility) |
| AOS | Assault on Staff |
| AS | Administrative Segregation |
| Assistant Chief | Position that oversees a DOC Division (group of facilities/units) |
| Assistant Commissioner ("AC") of Operations | Position that serves as Warden in some facilities, **not limited** to uniformed staff |
| ATPO | At the Time and Place of Occurrence |
| AWOL | Absent without Leave |
| Bang In | Call in sick |
| BC | Borough Court; alternatively, Burean Chief |
| Beds at Standard | Number of beds in a facility |
| BHPW | Bellevue Hospital Prison Ward |
| BHTU/OTXB | Bellevue Hospital Therapeutic Unit/ Outposted Therapeutic Housing Unit at Bellevue |
| BKCT | Brooklyn Courts |
| BKDC | Brooklyn Detention Complex (now closed) |
| BOC | Board of Correction |
| Brad - H | City's agreement to provide incarcerated individuals (confined in its jails for at least 24 hours and who received treatment for mental illness during that time) with a discharge plan for accessing ongoing services upon release |
| BUP | Bed Utilization Plan |
| BWC | Body-worn Camera |
| BWVC | Benjamin Ward Visit Center |
| BXCT/BXDC | Bronx Courts |
| B&C | Book & Case Number |
| CAPS | Clinical Alternative to Punitive Segregation |
| C.A.R.E. | Correction Assistance Response for Employees Unit |
| CASC | Compliance and Safety Center |
| CCA | Correction Captains' Association (Union) |
| CD | Command Discipline |
| CDU | Contagious Disease Unit |

| Acronym or Term | Definition |
|---|---|
| Census | Department-wide and facility-specific census count report produced daily, reflecting the total number of detainees in DOC custody. Also referred to as the "5am Census" |
| CHESS | Coordinated Housing and Event Scheduling System |
| CHS | Correctional Health Services |
| CIB | Correction Intelligence Bureau |
| CID | Correction Industries Division |
| CityTime | New York City's computerized time and attendance tracking application |
| Civilian | Non-uniformed staff |
| CJB | Criminal Justice Bureau |
| Classification | Numerical score given to all detainees during intake that represents their potential for violence in order to determine their housing |
| CLO | Command Level Order |
| CLU | Complex Litigation Unit |
| CMC | Centrally Monitored Case |
| CMCMU | Custody Management Centralized Movement Unit |
| CMS | Case Management System |
| CMU | Central Movement Unit |
| CO | Correction Officer |
| COBA | Correction Officers' Benevolent Association (union) |
| COD | Central Operations Division |
| CPSU | Central Punitive Segregation Unit |
| CUES | Center for Urban Community Service |
| CUNY | City University of New York |
| CV | Civil Cases |
| DA | District Attorney |
| Dayroom | Location within a housing area where the incarcerated individuals have recreation time |
| DCAS | Department of Citywide Administrative Services |
| DCJS | NYS Division of Criminal Justice Services |
| DDC | Department of Design and Construction |
| Directives | Instructions issued by the chief of a department |
| DMR | Daily Media Report |
| DOA | Date of Appointment |
| DOC or Department | New York City Department of Correction |
| DOCCS | New York State Department of Correction and Community Supervision |

| Acronym or Term | Definition |
|---|---|
| DOHMH | New York City Department of Health and Mental Hygiene |
| DOI | New York City Department of Investigation |
| DPV | Due Process Violation |
| DW | Deputy Warden |
| DWIC | Deputy Warden in Command |
| EAM | Enterprise Asset Management |
| EHPW | Elmhurst Hospital Prison Ward |
| E.I.S.S. | Early Intervention, Support and Supervision Unit |
| Emergency Response Teams | There are at least four types of Emergency Response Teams: (1) Probe Teams, which consist of facility-based staff ("Facility Emergency Response Teams"); (2) the Emergency Services Unit ("ESU") which is a separate and dedicated unit outside of the facility; (3) the Strategic Response Team ("SRT") which is another separate and dedicated unit outside of the facility; and (4) the Special Search Team ("SST"), a separate and dedicated unit associated with the Special Operations Division that conducts searches |
| EMP | Emergency Mobilization Plan |
| EMTC | Eric M. Taylor Center |
| ERS | Enhanced Restraint Status |
| ESH | Enhanced Supervision Housing |
| ESH1 | Enhanced Supervision Level 1 |
| ESH2 | Enhanced Supervision Level 2 |
| ESO | Enhanced Supervision Officer for incarcerated individuals on suicide watch |
| ESS | Employee Self-Service |
| ESU | Emergency Services Unit |
| EWS | Employee Web System |
| FMRD | Facility Maintenance Repair Division |
| Fortune Society | Agency that DOC partners with under the purview of DOC's Programs Division |
| FSU | Fire Safety Unit |
| Full ID Investigations | More extensive use of force investigations conducted by the Investigations Division |
| GATE | Groups for Addictions Treatment Enhancement |

| Acronym or Term | Definition |
|---|---|
| Gate 1 | Main gate to enter the island |
| GMDC | George Motchan Detention Center |
| GO-SO | Getting Out Staying Out |
| GP | General Population |
| GPE | General Population Escort |
| GRVC | George R. Vierno Center |
| HHC/H+H | New York City Health + Hospitals (Corp) |
| HMD | Health Management Division |
| HOJC | Horizon Juvenile Center |
| Hot Bus | DOC transport bus in which the driver reports disruptive/violent incarcerated individual behavior |
| HPW | Hospital Prison Ward |
| HQ | DOC Headquarters |
| HUB | Housing Unit Balancer |
| ICE Unit | US Immigration and Customs Enforcement |
| ICR | Intended Contraband Recipient |
| ICDU | Informal Charges and Discipline Unit |
| ID | Investigation Division |
| IF | Infirmary |
| IIS | Inmate Information System |
| ILS | Inmate Lookup System |
| In-Service training | Training provided to current DOC staff |
| Intake Investigation | Initial investigation provided for all use of force incidents, which is a more streamlined version of the predecessor "Preliminary Review" |
| Intake Squad | Dedicated unit within ID to conduct intake investigations of all use of force incidents |
| inTime | The hardware and software staff use to scan-in when starting and ending tours |
| IRS | Incident Reporting System |
| JARs | Joint Assessment and Reviews |
| JATC | James A. Thomas Center |
| LBE | Logbook Entry |
| LL42 | Local Law 42 |
| Lock-in | Time during which incarcerated individuals are locked in their cells (*i.e.*, at night, during count time, and in emergency situations) |
| Lock-out | Time during which incarcerated individuals are not locked in their cells and are free to move around the housing area. Regulated by the BOC |
| LOS | Length of Stay |
| LMS | Learning Management System—Advanced training tracking platform |

| Acronym or Term | Definition |
|---|---|
| MDC | Manhattan Court Division (formerly the Manhattan Detention Center) |
| MEO-16 | Interviews of staff conducted pursuant to Mayors Executive Order 16 |
| MH | Mental Health |
| MIL | Military Program |
| MMR | Medically Monitored/Restricted Duty Status in which staff may not have direct contact with incarcerated individuals |
| MNCT | Manhattan Courts |
| MO | Mental Observation |
| MOC | Memorandum of Complaint |
| MOS | Member of Service (uniformed or non-uniformed) |
| MP | Monitoring Period |
| MS | Maximum Security |
| MT | Monitoring Team |
| NA | New Admissions |
| NAMCU Unit | New Admission Monitoring and Control Unit |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised use of force policy, effective September 27, 2017 |
| NIC | North Infirmary Command (closed facility) |
| Non-Compliance | Term defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment |
| NPA | Negotiated Plea Agreement |
| NU | Nursery |
| NYSID | New York State ID Number |
| OATH | New York City Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Center |
| OC Spray | Chemical Agent |
| MK-4 | A handheld pepper spray canister carried by individual staff for responding to incidents involving one or a small number of people |
| MK-9 | A larger-capacity pepper spray canister, typically carried by supervisors or emergency response staff, designed for larger or prolonged incidents requiring greater spray volume |
| OMAP | Office of Management Analysis and Planning |
| OMB | New York City Mayor's Office of Management and Budget |

| Acronym or Term | Definition |
|---|---|
| Orange Alert | Alert issued when a facility's incarcerated individual count does not match (called an 'off count'). Once this occurs, movement stops in all facilities as well as access on/off Rikers. If the count remains off, the Orange Alert is upgraded to a Red Alert |
| OSIU | Operations Security Intelligence Unit |
| Outpost | Situation in which an incarcerated individual requires care outside of DOC facilities requiring a correction officer's presence |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| Partial Compliance | Term defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains |
| PACE | Program for Accelerated Clinical Effectiveness |
| PC | Protective Custody |
| PC/48 | Protective Custody (temporary intake housing during review) |
| PDR | Personnel Determination Review—formal disciplinary process for probationary staff members |
| PHD | Pre-Hearing Detention |
| PIC | Person in Custody |
| PMA | Performance Management Application |
| PMO | Project Management Office |
| PPF | Personal Protective Firearm |
| PPU | Policy & Procedure Unit |
| PREA | Prison Rape Elimination Act |
| Pre-Service or Recruit training | Mandatory training provided by the Training Academy to new recruits |
| PRGM | Programs Housing Unit |
| PSEG | Punitive Segregation |
| QDC/QNCT | Queens Courts Division (formerly Queens Detention Complex (now closed)) |
| RAP | Remediation Action Plan |
| Rapid Review | Facility leadership's documented close-in-time review conducted for all use of force incidents |
| Red Alert | Alert issued when an incarcerated individual is confirmed missing or a security breach is confirmed |

| Acronym or Term | Definition |
|---|---|
| Red ID | Status given to an incarcerated individual who has been caught with contraband and/or is considered a contraband recipient |
| RESH | Enhanced Supervision Housing at the Rose M. Singer Center (which currently houses both individuals in restrictive housing and general population) |
| RHU | Restrictive Housing Unit |
| RICC | Rikers Island Central Cashier |
| RM | Remediation Manager |
| RMAS | Risk Management Accountability Systems |
| RMSC | Rose M. Singer Center |
| RMT | Remediation Manager Team |
| RNDC | Robert N. Davoren Complex |
| Roll Call | Meeting at the start of each tour in which attendance is taken for the uniformed staff coming on duty, and in which they review issues and receive instructions |
| RR | Receiving Room |
| SCHL | School |
| SCOC | New York State Commission of Correction |
| SCM | Safe Crisis Management |
| SCU | Special Considerations Unit |
| SDNY | Southern District of New York |
| SEN | Sentenced Housing |
| SH | Sentenced Help |
| Service Desk | Computerized request system and tracking application |
| SIU | Special Investigations Unit |
| S.M.A.R.T Unit | Scheduling Management and Redeployment Team |
| SMI | Severe Mental Illness |
| SMU | Special Management Unit |
| SOD | Security Operations Division |
| SRG | Security Risk Group (gang affiliation) |
| SRT | Strategic Response Team |
| SSD | Support Services Division - Maintenance Services |
| SSH | Separation Status Housing |
| SST | Special Search Team |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| STEP | Supportive Transitional Engagement Program |

| Acronym or Term | Definition |
|---|---|
| Substantial Compliance | Term defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision |
| TC | Tour Commander |
| TD | Transportation Division |
| TDY | Temporary Duty |
| TEAMS | Total Efficiency Accountability Management System |
| TRU | Transitional Restorative Unit |
| Trials Division | Department's Trials & Litigation Division |
| TSO | Tactical Search Operation |
| TTS | Training Tracking Software system |
| TTY | Teletypes Department |
| UOF | Use of Force |
| UOF - A | UOF incident classification - A. Serious injury to staff, incarcerated individual(s), or any other person, *i.e.*, fractured bones, chipped teeth, or other injuries requiring more than over-the-counter treatment |
| UOF - B | UOF incident classification - B. Non-serious injury to staff or incarcerated individual(s) that can be treated over-the counter |
| UOF - C | UOF Incident classification - C. No injuries to staff, incarcerated individual(s), or any other person |
| UOF - P | A temporary UOF classification while the appropriate UOF class ('A', 'B', or 'C') is determined |
| UPS | Use of Force Priority Squad within the Investigations Division |
| VCBC | Vernon C. Bain Center (closed facility) |
| VFO | Violent Felony Offenses |
| VMU | Video Monitoring Unit |
| VRU | Video Review Unit |
| VTC | Video Teleconferencing Unit |
| WF | West Facility |
| YA | Young Adult/Emergent adults aged 18-21 |

# APPENDIX C: USE OF FORCE AND VIOLENCE INDICATORS

## TABLE 1: NUMBER AND RATE OF USES OF FORCE

The graph below shows the average monthly rate of use of force per 100 incarcerated individuals. The table includes data for the last four Monitoring Periods.




| Systemwide Use of Force<br>July 2024 to June 2026 | | | | |
|---|---|---|---|---|
| Months | Total # UOF | Average/month | ADP | Rate |
| July-December 2024 | 3483 | 580.5 | 6489 | 8.95 |
| January-June 2025 | 3561 | 593.5 | 7123 | 8.34 |
| July-December 2025 | 3614 | 602.3 | 7187 | 8.38 |
| January-June 2026 | 3411 | 568.5 | 6727 | 8.45 |

## TABLE 2: NUMBER AND PROPORTION OF A, B, AND C USES OF FORCE

The table below shows the number and proportions of uses of force in which at least one serious injury ("A"), less serious injury ("B"), or no injury ("C") occurred.

On the unshaded side of the table, Column A shows that the raw number of serious injuries (A) increased steadily for several years after the Consent Judgment went into effect. The number of incidents involving serious injuries increased significantly in 2021 and 2022, and since then, the number decreased significantly. In column B, the trajectory of the trend is shaped differently, but the number of incidents involving less serious injuries has been at historical lows for the past two years. In other words, each year, fewer incidents occur in which people are harmed at the hands of staff (from just over 2,000 incidents in 2018, to fewer than 300 incidents in 2024 and 2025). These trends were unchanged for the current Monitoring Period.

The shaded cells on the right side of the table show the proportion of As, Bs and Cs each year. As the proportion of As and Bs has decreased over time, the proportion of Cs—uses of force where no one is injured—has increased. In 2018, 37% of use of force incidents involved an injury (Class A and B, combined) compared to only about 4% during the current Monitoring Period. Conversely, in 2018, only about two-thirds of all use of force incidents (63%) did not result in injury, compared to about 96% during the current Monitoring Period. In other words, a much larger proportion of the uses of force occur without inflicting a *physical* injury on those involved. As discussed in other sections of this report, whether or not there was a *physical* injury does not mean that the incident did not cause harm or create a risk of harm.

| Number and Proportion of A, B and C Uses of Force | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Number of UOF Incidents | | | | Proportion of A/B/C | | |
| | A | B | C | Total UOF | A | B | C |
| 2016 | 74 | 1627 | 2950 | 4651 | 1.6% | 35.0% | 63.4% |
| 2017 | 134 | 1743 | 2903 | 4780 | 2.8% | 36.5% | 60.7% |
| 2018 | 136 | 1894 | 3871 | 5901 | 2.3% | 32.1% | 65.6% |
| 2019 | 166 | 1648 | 5355 | 7169 | 2.3% | 23.0% | 74.7% |
| 2020 | 178 | 960 | 5059 | 6197 | 2.9% | 15.5% | 81.6% |
| 2021 | 464 | 1033 | 6697 | 8194 | 5.7% | 12.6% | 81.7% |
| 2022 | 434 | 781 | 5790 | 7005 | 6.2% | 11.1% | 82.7% |
| 2023 | 165 | 380 | 6239 | 6784 | 2.4% | 5.6% | 92.0% |
| 2024 | 52 | 209 | 6719 | 6980 | 0.7% | 3.0% | 96.3% |
| 2025 | 73 | 209 | 6893 | 7175 | 1.0% | 2.9% | 96.1% |
| Jan.-Jun. 2026 | 48 | 98 | 3265 | 3411 | 1.4% | 2.9% | 95.7% |

## TABLE 3: NUMBER AND RATE OF STABBINGS AND SLASHINGS

The graph below shows the average monthly rate of actual stabbings and slashings per 100 people in custody (*i.e.,* incidents where the perpetrator made contact with the victim). After declining from an apex in 2022, the rate has been relatively stable for the past two years.




The Department began collecting data on *attempted* stabbings/slashings in late 2024. This is essential data to include in a review of violence in the jails as it creates a more fulsome picture of the risk of harm, focused on the perpetrators' intent rather than whether contact was made or an injury occurred. The table and graph combine data on attempted and actual stabbings and slashings for the past three Monitoring Periods.




| Systemwide Actual and Attempted Stabbings/Slashings<br>January 2025 to June 2026 | | | | | | |
|---|---|---|---|---|---|---|
| Months | Attempted | Actual | Total # S/S | Average/month | ADP | Rate |
| January-June 2025 | 45 | 141 | 186 | 31.0 | 7123 | 0.44 |
| July-December 2025 | 62 | 136 | 198 | 33.0 | 7187 | 0.46 |
| January-June 2026 | 61 | 147 | 208 | 34.7 | 6727 | 0.52 |

## TABLE 4: SERIOUS INJURIES TO INCARCERATED INDIVIDUALS

The graph below shows the number and average monthly rate of serious injuries to incarcerated individuals ("SITI") per 100 incarcerated individuals.[264] Across the six years that this data has been available, the monthly rate has varied +/- 20% at times but overall has been relatively consistent with an average monthly rate of 1.5 per 100 incarcerated individuals. During the current Monitoring Period, EMTC, GRVC and OBCC had the highest rate of SITI among the facilities.




The chart below shows the Monitoring Team's analysis of injuries reported in CODs that identified the typical causes of serious injuries. Data from 2024- June 2026 revealed that fights were the most prevalent cause (65% of reported injuries), followed by accidents (27%).[265] Small proportions of serious injuries were caused by self-harm (6%) and uses of force (1%)[266]. Injuries associated with uses of force or stabbings/slashings are generally not in SITI data because they are reported as either a use of force or a stabbing/slashing.

[264] There is no consistent process for reviewing, evaluating, and investigating serious injury incidents and it is generally left to be managed by the facilities. In October 2024, the Monitoring Team recommended that the Department evaluate its current investigative procedures for serious injury to incarcerated individual incidents, which it has not yet done.

[265] Accidents include incarcerated individual injuries sustained from slipping and falling, engaging in recreational activities such as sports, accidentally slamming a body part in a door (most often fingers), or experiencing a medical emergency (such as falling onto the floor during a seizure).

[266] These cases were also reported as use of force incidents so it was technically reported twice.




The graph below shows the Monitoring Team's analysis of the time between the incident date and the date the injury severity was ultimately reported via COD. The date the injury is reported via COD is impacted by the time required for CHS to report the data to DOC, and for DOC to enter the information into the COD. The speed with which injury severity is reported following an incident has improved over time, shown by the green bars in the graph. During the current Monitoring Period, in over half of the cases (57%), the injury severity was reported within 2 days, and within 3 to 10 days in another 25% of cases.



## TABLE 5: NUMBER AND RATE OF FIGHTS

The graph below shows the average monthly rate of fights per 100 incarcerated individuals. The table includes data for the past four Monitoring Periods.




| Systemwide Fights<br>July 2024 to June 2026 | | | | |
|---|---|---|---|---|
| Months | Total # Fights | Average/month | ADP | Rate |
| July-December 2024 | 4075 | 679.2 | 6489 | 10.5 |
| January-June 2025 | 4036 | 672.7 | 7123 | 9.4 |
| July-December 2025 | 3801 | 633.5 | 7187 | 8.86 |
| January-June 2026 | 3548 | 591.3 | 6727 | 8.79 |

## TABLE 6: NUMBER AND RATE OF ASSAULTS ON STAFF WITH USE OF FORCE

The graph below shows the average monthly rate of assaults on staff (in incidents that involve a use of force) per 100 incarcerated individuals. The table includes data for the past four Monitoring Periods.




| Systemwide Assaults on Staff with UOF<br>July 2024 to June 2026 | | | | |
|---|---|---|---|---|
| Months | Total # AOS w UOF | Average/month | ADP | Rate |
| July-December 2024 | 456 | 76.0 | 6489 | 1.17 |
| January-June 2025 | 462 | 77.0 | 7123 | 1.08 |
| July-December 2025 | 474 | 79.0 | 7187 | 1.10 |
| January-June 2026 | 497 | 82.8 | 6727 | 1.23 |

## TABLE 7: NUMBER AND RATE OF ASSAULTS ON STAFF WITHOUT USE OF FORCE

The graph below shows the average monthly rate of assaults on staff (in incidents that did not involve a use of force) per 100 incarcerated individuals. The table includes data for the past four Monitoring Periods.




**The Department began tracking assaults on staff that did not involve a use of force in 2020. Prior years' data is not available.*

| Systemwide Assaults on Staff without UOF<br>July 2024 to June 2026 | | | | |
|---|---|---|---|---|
| Months | Total # AOS no UOF | Average/month | ADP | Rate |
| July-December 2024 | 145 | 24.2 | 6489 | 0.37 |
| January-June 2025 | 190 | 31.7 | 7123 | 0.44 |
| July-December 2025 | 230 | 38.3 | 7187 | 0.53 |
| January-June 2026 | 220 | 36.7 | 6727 | 0.55 |

## TABLE 8: NUMBER AND RATE OF FIRES

The graph below shows the average monthly rate of fires per 100 incarcerated individuals. The table includes data for the past four Monitoring Periods.




| Systemwide Fires<br>July 2024 to June 2026 | | | | |
|---|---|---|---|---|
| Months | Total # Fires | Average/month | ADP | Rate |
| July-December 2024 | 102 | 17.0 | 6489 | 0.3 |
| January-June 2025 | 195 | 32.5 | 7123 | 0.5 |
| July-December 2025 | 169 | 28.2 | 7187 | 0.4 |
| January-June 2026 | 158 | 26.3 | 6727 | 0.4 |

## TABLE 9: USES OF FORCE INVOLVING INCIDENTS WHEN A STAFF MEMBER IS NOT ON POST

The table below provides the number and proportion of uses of force involving "unmanned posts," as identified by the Department, during each Monitoring Period from 2022 to June 2026. These incidents occurred proximal to posts where no staff member was assigned *or* instances where the assigned officer left their post without being relieved (collectively "unmanned posts"). The first column lists the number of uses of force involving unmanned posts. The second and third columns identify the number and proportion of uses of force that involved unmanned posts **and** were deemed avoidable by the Department's Rapid Reviews, specifically due to the absence of staff on post. In other words, the Department determined that these incidents likely could have been avoided if a staff member had been present.[267]

The number of use of force incidents involving unmanned posts may appear to be only a small proportion of the overall number of use of force incidents in this Monitoring Period, however, the Monitoring Team would argue that is not the appropriate context within which such incidents should be viewed. The appropriate context must consider the fact that the staff's absence in each of these cases means that the incidents were potentially avoidable, and had staff been present and performing their duties appropriately, they may have been able to prevent, deter or mitigate the incident that led to the use of force.

| Uses of Force Incidents Involving Unmanned Posts, 2022-June 2026 | | | |
|---|---|---|---|
| **Monitoring Period** | **# of UOF Incidents involving Unmanned Posts** | **# of UOF Incidents involving Unmanned Posts that DOC Deemed Avoidable** | **% of UOF Incidents involving Unmanned Posts that DOC Deemed Avoidable** |
| **Jan.-Jun. 2022** | 151 | *88* | *58.3%* |
| **Jul.-Dec. 2022** | 159 | *80* | *50.3%* |
| **Jan.-Jun. 2023** | 112 | *57* | *50.9%* |
| **Jul.-Dec. 2023** | 65 | *29* | *44.6%* |
| **Jan.-Jun. 2024** | 89 | *14* | *15.7%* |
| **Jul.-Dec. 2024** | 125 | *9* | *7.2%* |
| **Jan.-Jun. 2025** | 114 | *9* | *7.9%* |
| **Jul.-Dec. 2025** | 92 | *14* | *15.2%* |

[267] The data shows that over time, the Department has deemed significantly fewer incidents involving unmanned posts as avoidable. However, the Department has a long history of failing to identify indicators that incidents were avoidable, as discussed in the compliance assessment for First Remedial Order § A, ¶ 1. This pattern continued during the current Monitoring Period, and so this data must be evaluated with caution.

| Uses of Force Incidents Involving Unmanned Posts, 2022-June 2026 | | | |
|---|---|---|---|
| **Monitoring Period** | **# of UOF Incidents involving Unmanned Posts** | **# of UOF Incidents involving Unmanned Posts that DOC Deemed Avoidable** | **% of UOF Incidents involving Unmanned Posts that DOC Deemed Avoidable** |
| **Jan.-Jun. 2026** | 148 | *20* | *13.5%* |

## TABLE 10: NCU SECURITY AUDITS' FINDINGS OF STAFF OFF POST

The table below shows the number of NCU's random security audits conducted between January 2022 and June 2026,[268] and the proportion that identified staff were off post.

| **NCU Security Audits' Findings regarding Staff Off Post** ***January 2022-June 2026*** | | |
|---|---|---|
| **Date Audited** | **# of NCU Audits Completed** | **# (%) of Audits that found Staff Off Post** |
| January-June 2022 | 59 | 42 (71%) |
| July-December 2022 | 37 | 32 (86%) |
| January-June 2023 | 19 | 14 (74%) |
| July-December 2023 | 31 | 26 (84%) |
| January-June 2024 | 37 | 28 (76%) |
| July-December 2024 | 34 | 20 (59%) |
| January-June 2025 | 30 | 17 (57%) |
| July-December 2025 | 26 | 16 (62%) |
| January-June 2026 | 36 | 28 (78%) |

[268] Beginning in July 2025, NCU initiated targeted audits of the Back to Basics and Honors Units at GRVC for randomly selected days and times. These targeted audits are conducted along with the security audits of randomly selected units in other facilities. Data includes the results from both sets of audits.

## TABLE 11: TIMELINESS OF 9 P.M. LOCK-IN

The graph below shows the timeliness of nightly 9 p.m. lock-in across all facilities from October 2023 through June 2026.[269]




[269] In June 2026, the Department facilitated "late nights" in which incarcerated individuals were permitted to be locked out of their cells later than 9 p.m. so that they could watch the 2026 NBA Finals games. This is accounted for in the "Excused Late Nights" line on the graph above.

## TABLE 12(A): RESH'S AVERAGE MONTHLY RATES OF KEY VIOLENCE METRICS

The table below presents the average rates of use of force incidents, stabbings/slashings, fights, assaults on staff, and fires in RESH by Monitoring Period since 2023.

| RESH's Average Monthly Rates of Key Violence Metrics | | | | | |
|---|---|---|---|---|---|
| | **Use of Force** | **Stabbings/ Slashings** | **Fights** | **Assault on Staff** | **Fires** |
| **July-Dec 2023** | 39.2 | 3.8 | 7.2 | 8.4 | 7.8 |
| **Jan-June 2024** | 42.8 | 3.2 | 4.9 | 9.3 | 11.9 |
| **July-Dec 2024** | 22.1 | 1.3 | 3.8 | 6.8 | 2.9 |
| **Jan-June 2025** | 27.6 | 1.5 | 6.8 | 6.9 | 4.5 |
| **July-Dec 2025** | 32.4 | 1.2 | 13.1 | 6.4 | 2.4 |
| **Jan-June 2026** | 30.1 | 0.9 | 18.9 | 5.3 | 2.7 |
| **% change from previous MP** | -7% | -25% | +44% | -17% | +13% |
| **% change from 2023** | -23% | -76% | +163% | -37% | -65% |

## TABLE 12(B): RESH LEVEL 1 AND LEVEL 2 COMPARISON

The table below shows the average rates of use of force incidents, stabbings/slashings, fights, assaults on staff in RESH, broken down by Level 1 and Level 2 houses. The Department does not separate data on fires by Level 1 and Level 2.

| Level 1 vs Level 2 Comparison | | | | | |
|---|---|---|---|---|---|
| | Use of Force | Stabbings/ Slashings | Fights | Assault on Staff | Fires |
| **January-June 2025** | | | | | |
| Level 1 | 19.0 | 0.0 | 0.0 | 4.7 | * |
| Level 2 | 24.6 | 4.2 | 16.6 | 5.9 | * |
| **July-December 2025** | | | | | |
| Level 1 | 15.1 | 0.0 | 0.0 | 4.7 | * |
| Level 2 | 27.6 | 4.4 | 19.1 | 5.0 | * |
| **January-June 2026** | | | | | |
| Level 1 | 14.8 | 0.0 | 0.5 | 4.5 | * |
| Level 2 | 17.0 | 2.2 | 13.2 | 1.8 | * |

## TABLE 13(A): NUMBER OF SEARCHES

The table below shows the number of searches performed from 2022 to June 2026.

| Searches | | | | | |
|---|---|---|---|---|---|
| | **2022** | **2023** | **2024** | **2025** | **Jan.-Jun. 2026** |
| Facility Searches | 195,348 | 135,324 | 117,347 | 99,901 | 50,529 |
| Special Searches[270] | 1,390 | 658 | 278 | 356 | 234 |
| **Total** | **196,738** | **135,982** | **117,625** | **100,257** | **50,763** |

## TABLE 13(B): NUMBER OF CONTRABAND RECOVERIES

The table below shows the volume of contraband recovered between 2021 and June 2026.

| Contraband Recovery[271] | | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan.-Jun. 2026** |
| Drugs | 1,049 | 1,421 | 1,245 | 889 | 826 | 359 |
| Weapons | 3,144 | 5,507 | 2,061 | 1,602 | 2,195 | 912 |
| Escape-Related Item | 196 | 525 | 292 | 221 | 89 | 55 |
| Other | 878 | 1,145 | 794 | 558 | 500 | 229 |
| **Total** | **5,276** | **8,598** | **4,392** | **3,270** | **3,610** | **1,555** |

[270] This includes searches by the Emergency Services Unit, the Special Search Team, the Canine Unit and/or Tactical Search Operations.

[271] The calculation of the number contraband recoveries varies depending on the type of contraband that is recovered. For example, drug contraband is counted by incident, not the actual number of items seized. If three different types of drugs were recovered in one location, this is counted as a single seizure. In contrast, when weapons are seized, each item recovered is counted separately. If three weapons were seized from a single individual, all three items are counted.

## TABLE 14: USE OF FORCE INCIDENTS IN INTAKE AREAS

The Monitoring Team continues to evaluate the frequency with which uses of force occur in the intake areas. The Monitoring Team has previously noted that the chaotic environment in intake areas and longer processing times (which are often mutually reinforcing) can result in a greater frequency of uses of force. Therefore, creating more stable and efficient intake processing and reducing the reliance on intake following uses of force are critical to reduce uses of force in these areas.

The table below shows the number and proportion of use of force incidents that occurred in intake areas from 2018 to 2025.

| ***Use of Force in Intake Areas (Department-wide)*** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan-Jun 2026** |
| **# of UOF in Intakes** | 913 | 1123 | 992 | 1483 | 963 | 767 | 844 | 823 | 396 |
| **Total UOF** | 5,901 | 7,169 | 6,467 | 8,194 | 7,005 | 6,784 | 6,980 | 7,736 | 3,411 |
| **% of UOF in Intakes** | *15%* | *16%* | *15%* | *18%* | *14%* | *11%* | *12%* | *11%* | *12%* |

## TABLE 15: HEAD STRIKE DATA

The following table shows the number and investigation status of actual and alleged head strike incidents that occurred in 2025 and between January and June 2026.

| Head Strike Cases: Department Outcomes, 2025 and Jan-Jun 2026 (as of Sept. 1, 2026) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total 2025 Alleged | | Total 2025 Actual | | Jan-Jun 2026 Alleged | | Jan-Jun 2026 Actual | | Total 2025 + Jan-Jun 2026 Alleged | | Total 2025 + Jan-Jun 2026 Actual | |
| Open / Pending Investigation | 53 | 27% | 84 | 41% | 87 | 78% | 72 | 70% | 140 | 46% | 156 | 51% |
| Closed | 140 | 73% | 121 | 59% | 24 | 22% | 31 | 30% | 164 | 54% | 152 | 49% |
| **Total** | **n=193** | | **n=205** | | **n=111** | | **n=103** | | **n=304** | | **n=308** | |
| **Charges for Head Strike Violations** | | | | | | | | | | | | |
| Head Strike Related Charges | ~ | ~ | 31 | 26% | ~ | ~ | 5 | 16% | ~ | ~ | 36 | 24% |

* Four alleged cases were substantiated but not charged because the contact was deemed incidental during a takedown or while the person was being secured (two January-June 2025; two July-December 2025). Incidental and non-incidental cases are not separately reported.
** Twenty-one July-December 2025 Intake Investigations remain pending; 2025 figures may change. Head strike charge percentages are calculated as a share of closed actual cases (n=121 in 2025; n=31 in January-June 2026; n=152 in total).

# APPENDIX D:
# IN-CUSTODY DEATHS

The number of people who have died while in custody is tragic and is related, at least in part, to the dangerous conditions and poor security practices in the jails as set forth below.

## TABLE 1: CAUSES OF DEATH

The table below shows the number of people who have died in custody, and the cause of death as determined by the Office of Chief Medical Examiner. As of November 18, 2026, nine people have died in 2026.[272]

| **DOC Causes of Death**<br>*2015 to November 18, 2026* | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** | **Total** |
| Accidental | | | | | | | | 1 | | | 1 | | 2 |
| COVID-19 | | | | | | 3 | 2 | | | | | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 5 | 5 | 4 | 3 | 1 | 58 |
| Overdose | | 2 | 1 | | | | 4 | 6 | 2 | 1 | 6 | 2 | 24 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 6 | 2 | | 3 | 1 | 22 |
| Drowned | | | | | | | | 1 | | | | | 1 |
| Pending OCME Confirmation | | | | | | | | | | | | 3 | 3 |
| Undetermined Due to Death Outside of DOC Custody | | | | | | 4 | 2 | | | | 1 | | 7 |
| Undetermined by OCME | | | 1 | | | 1 | | | | | 1 | 2 | 5 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11** | **16** | **19** | **9** | **5** | **15** | **9** | **127** |

[272] If an incarcerated individual has a health condition that may merit release, the process for release requires several steps and must be ordered by the Court. The Department does not have the authority to release an individual because of a health condition, although it may certainly identify and recommend individuals that should be considered for potential release. To the extent an individual has a health condition that may merit release, CHS may issue a clinical condition letter, with the patient's consent, which is then provided to the individual's defense counsel. Counsel then may petition the Court to release the individual. Release is not automatic, and an individual determination must be made by the Court. If the Court determines that release is appropriate, the Department is notified via a Court Order that the individual is being released on their own recognizance ("ROR"). However, the Order does not specify a medical reason for the release.

## TABLE 2: MORTALITY RATE

The table below shows the Department's mortality rate from January 2010 to November 18, 2026. In 2025, the mortality rate increased 170% from the prior year (2.10 from 0.78) and represented the fourth highest rate in the past decade, surpassed only by the rates from 2020 to 2022. A mortality rate for 2026 cannot be developed because the year is not yet complete.

| Mortality Rate 2010-2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| **Annual ADP** | 13,026 | 12,421 | 12,083 | 11,692 | 10,913 | 9,890 | 9,802 | 9,224 | 8,397 | 7,388 |
| **Number of Deaths** | 17 | 12 | 21 | 24 | 10 | 11 | 15 | 6 | 8 | 3 |
| **Mortality Rate** | 1.31 | 0.97 | 1.74 | 2.05 | 0.92 | 1.11 | 1.53 | 0.65 | 0.95 | 0.41 |

| Mortality Rate 2020-2026 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** |
| **Annual ADP** | 4,543 | 5,574 | 5,639 | 6,054 | 6,380 | 7,155 | 6,661 |
| **Number of Deaths** | 11 | 16 | 19 | 9 | 5 | 15 | 9 |
| **Mortality Rate** | 2.42 | 2.87 | 3.37 | 1.49 | 0.78 | 2.10 | |

## TABLE 3: INVESTIGATIONS OF IN-CUSTODY DEATHS

The table below shows the status of investigations of in-custody deaths by various agencies: the New York State Commission on Corrections (SCOC), the New York Attorney General's Office of Special Investigation (AG), New York City Office of Chief Medical Examiner (OCME), New York City Board of Corrections (BOC), and DOC's Investigation Division (ID).

| **Status of Investigations** *2022 to November 18, 2026* | | | | | | |
|---|---|---|---|---|---|---|
| **Year** | **Total Deaths** | **SCOC Completed Investigations** | **AG Completed Investigations** | **OCME Completed Investigations** | **BOC Completed Investigations** | **ID Completed Investigations** [273] |
| **2022** | 19 | 18 | 19 | 19 | 19 | 19 |
| **2023** | 9 | 7 | 9 | 9 | 8 [274] | 9 |
| **2024** | 5 | 2 | 5 | 5 | 4 [275] | 4 |
| **2025** | 15 | 0 | 11 | 15 | 15 | 7 [276] |
| **2026** | 9 | 0 | 0 | 6 | 4 | 0 |

[273] Status of ID Investigations available only through August 19, 2026.

[274] One death in 2023 was due to terminal illness and the BOC did not issue a report on this death.

[275] One death in 2024 was due to terminal illness and the BOC did not issue a report on this death.

[276] One death in 2025 was due to terminal illness and ID did not conduct an investigation.

## TABLE 4: CORRECTIVE ACTION TAKEN BY DOC RELATED TO IN-CUSTODY DEATHS, 2022-NOVEMBER 18, 2026[277]

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| **Death of Tarz Youngblood on 2/27/2022** | | |
| CO 36 | NPA – Loss of 17 compensation days | Failed to conduct proper tours and check for signs of life |
| **Death of Dashawn Carter on 5/7/2022** | | |
| CO 1 | Suspended, resigned | Failed to make proper tours and made false entries in the logbook |
| CO 2 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 3 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 4 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Mary Yehuda on 5/18/2022** | | |
| CO 37 | NPA - Loss of 10 compensation days and 12 months limited probation | Off post, failed to conduct frequent tours, and made false entries in the logbook |
| CO 40 | NPA - Loss of 10 compensation days | Off post, failed to conduct frequent tours, and made false entries in the logbook |
| Captain 38 | Suspended - 7 days; and NPA - Loss of 10 compensation days | Failed to conduct proper tours and made false entries in the logbook |
| ADW 39 | Reprimand (Returned to Command) | Failed to produce a COD package |
| **Death of Emanuel Sullivan on 5/28/2022** | | |
| CO 41 | NPA - Loss of 30 days and 12 months limited probation | Failed to conduct proper tours and made false entries in the logbook |
| **Death of Anibal Carrasquillo on 6/20/2022** | | |

[277] Given that the investigations into some of these deaths remain open, additional discipline may be forthcoming.

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| CO 20 | Suspended - 30 days | Failure to conduct proper tour |
| CO 21 | Suspended - 30 days | Failure to conduct proper tour/off post |
| **Death of Elijah Muhammad on 7/11/2022** | | |
| CO 5 | Terminated | Failed to notify supervisor or medical staff |
| **Death of Michael Lopez on 7/15/2022** | | |
| CO 6 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| CO 7 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| Captain 8 | Suspended - 30 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Ricardo Cruciani on 8/15/2022** | | |
| Captain 9 | Suspended - 30 days | Failed to conduct tour |
| **Death of Michael Nieves on 8/30/2022** | | |
| CO 10 | Suspended - 30 days | Failed to render aid |
| CO 11 | Suspended - 30 days | Failed to render aid and provide timely report |
| Captain 12 | Suspended - 30 days | Failure to supervise |
| **Death of Erick Tavira on 10/22/2022** | | |
| CO 13 | Suspended - 7 days | Failed to make proper tours and made false entries in the logbook |
| **Death of Gilberto Garcia on 10/31/2022** | | |
| CO 14 | Suspended - 7 days | Failed to conduct tour |
| **Death of Marvin Pines on 2/4/2023** | | |
| CO 15 | Suspended - 6 days | Failed to conduct tours/off post |
| CO 16 | Suspended - 6 days | Failed to conduct tour |
| Captain 17 | Suspended - 15 days | Failed to make proper tours and made false entries in the logbook |
| ADW 18 | Suspended - 30 days | Failed to conduct tours/supervise |
| ADW 19 | Suspended - 6 days | Failed to supervise |
| **Death of Joshua Valles on 5/27/2023** | | |
| Captain 52 | Command Discipline – loss of | Failed to produce for medical evaluation within 4 hours of a fight |

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| | 9 compensation days and demotion to CO | |
| **Death of Felix Taveras on 7/4/2023** | | |
| CO 22 | Suspended - 30 days | Failed to intervene and enforce lock in |
| CO 23 | Suspended - 15 days | Failed to intervene |
| CO 24 | Suspended - 30 days | Failed to conduct tour |
| ADW 25 | Suspended - 15 days | Failed to identify misconduct |
| **Death of Ricky Howell on 7/6/2023** | | |
| Captain 26 | Documented Counseling | Failed to call incident into COD within required time frame |
| **Death of William Johnstone on 7/15/2023** | | |
| Captain 27 | Suspended - 7 days | Failed to conduct proper tour |
| CO 28 | Suspended - 15 days | Permitting unauthorized person or employee on their post |
| CO 29 | Suspended - 30 days | Failed to conduct proper tour and abandoned post |
| CO 45 | Unknown | Failed to conduct proper tour |
| **Death of Curtis Davis on 7/23/2023** | | |
| CO 30 | Suspended - 30 days | Off post |
| CO 31 | Suspended - 15 days | Failed to secure post |
| ADW 32 | Suspended - 7 days | Failed to conduct proper tour |
| **Death of Manish Kunwar on 10/5/2023** | | |
| Captain 33 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 34 | Suspended - 30 days | Failed to conduct meaningful tours |
| CO 35 | Suspended - 30 days | Disobeying a direct order to relieve fellow CO |
| **Death of Ramel Powell on 2/19/2025** | | |
| CO 42 | Terminated | Failed to act and failed to conduct meaningful tours by checking for signs of life |
| **Death of Dashawn Jenkins on 3/31/2025** | | |
| CO 43 | Suspended – 30 days | Conduct unbecoming |
| CO 44 | Suspended – 30 days | Conduct unbecoming |
| **Death of Edwin Quispe on 7/22/2025** | | |
| CO 45 | Suspended – 30 days | Abandoned Post |

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| **Death of Ardit Billa on 8/23/2025** | | |
| Captain 46 | Suspended – 28 days | Failed to conduct proper tour |
| CO 47 | Suspended – 30 days | Off post |
| CO 48 | Suspended – 15 days | Unauthorized person on post |
| **Death of Carlos Cruz on 9/3/2025** | | |
| CO 49 | Suspended – 30 days | Failed to conduct proper tours and check for signs of life |
| Captain 50 | Suspended – 15 days | Failed to conduct proper tours and check for signs of life |
| **Death of Aramis Furse on 12/7/2025** | | |
| CO 51 | Suspended – 30 days | Failed to check for signs of life, failed to remain alert, and false logbook entries |
| **Death of Barry Cozart on 3/25/2026** | | |
| Captain 53 | Suspended – 30 days | Failed to conduct meaningful tours |
| CO 54 | Suspended – 30 days | Failed to conduct meaningful tours |
| **Death of Umais Kahn on 5/19/2026** | | |
| CO 55 | Suspended – 10 days | Failed to conduct meaningful tours and left post unauthorized and failed to return. |
| **Death of Christopher Rodriguez on 8/19/2026** | | |
| ADW 63 | Suspended – 7 days | False report |
| Captain 56 | Suspended – 24 days | Inefficient performance: failed to conduct meaningful tours; inaccurate logbook entries |
| CO 57 | Suspended – 30 days | Inefficient performance: failed to conduct meaningful tours; inaccurate logbook entries |
| CO 58 | Suspended – 30 days | Inefficient performance: failed to conduct meaningful tours; inaccurate logbook entries |
| CO 59 | Suspended – 30 days | Inefficient performance: failed to conduct meaningful tours; inaccurate logbook entries |
| CO 60 | Suspended – 30 days | Inefficient performance: failed to conduct meaningful tours; inaccurate logbook entries |
| CO 61 | Suspended – 30 days | Inefficient performance: failed to conduct meaningful tours; inaccurate logbook entries |
| CO 62 | Suspended – 30 days | Inefficient performance: failed to conduct meaningful tours; inaccurate logbook entries |
| **Death of Clarence Woodward on 8/25/2026** | | |

| Staff Member | Penalty | Reason for Suspension |
|---|---|---|
| CO 64 | Suspended – 30 days | Off post, failed to conduct meaningful tours, and failed to render assistance |
| **Death of Luis Lopez Castillo on 9/16/2026** | | |
| CO 65 | Suspended – 30 days | Off post |
| **Death of Cesar Medero Curet on 11/10/2026** | | |
| CO 66 | Suspended – 30 days | Failed to conduct meaningful tours; potentially inaccurate logbook entries |
| CO 67 | Suspended – 15 days | Failed to conduct meaningful tours; potentially inaccurate logbook entries |

# APPENDIX E: USE OF FORCE REVIEWS AND INVESTIGATIONS

## TABLE 1: OUTCOMES OF RAPID REVIEWS CONDUCTED BY THE FACILITIES

The table below shows the number and outcome of Rapid Reviews conducted by the facilities from January 2018 through June 2026.

| Rapid Review Outcomes, January 2018 to June 2026 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan-Jun 2026** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of UOF) | 6,899 (97% of UOF) | 6,067 (98% of UOF) | 7,972 (98% of UOF) | 6,889 (98% of UOF) | 6,740 (99% of UOF) | 6,969 (>99% of UOF) | 7,135 (99% of UOF) | 3,406 (>99% of UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 1,135 (16%) | 630 (9%) | 322 (5%) | 391 (5%) | 346 (10%) |
| **UOF or Chemical Agent Policy Violations** | | | 345[278] (11%) | 1,233 (16%) | 835 (12%) | 1,161 (17%) | 3,442 (49%)[279] | 3,990 (56%) | 2,544 (75%) |
| **Procedural Violations** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 3,296 (48%) | 2,545 (38%) | | | |
| **Staff Recommended for Corrective Action** | | | | | | | | | |
| **Number of Staff Recommended for Corrective Action**[280] | ~ | ~ | 2,040 | 2,970 | 2,417 | 2,756 | 3,149 | 3,633 | 2,201 |

[278] Data for 2020 UOF/Chemical Agent Policy Violations include only July-December.

[279] The Rapid Review template was revised so that staff now enter *all* violations in one place, including UOF Policy violations, Chemical Agent Policy violations, and Procedural Violations. This revision was intended to improve the accuracy of information entered into the Rapid Reviews by streamlining the entry of information and removing staff's need to distinguish between the types of violations at this stage of an incident review. This revised template went into effect in January 2024.

[280] This data captures referrals for corrective action as recommended by the Rapid Reviews shared with the Monitoring Team. The Rapid Review (and therefore this data) does not include information on whether the corrective action referrals were enacted as recommended.

## TABLE 2: CORRECTIVE ACTIONS RECOMMENDED VIA RAPID REVIEWS CONDUCTED BY THE FACILITIES

The table below shows the number of corrective actions recommended[281] via Rapid Reviews conducted by the facilities from January 2021 through June 2026.

| Rapid Review Corrective Action Recommendations | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **Jan-Jun 2021 (12th MP)** | **Jul-Dec 2021 (13th MP)** | **Jan-Jun 2022 (14th MP)** | **Jul-Dec 2022 (15th MP)** | **Jan-Jun 2023 (16th MP)** | **Jul-Dec 2023 (17th MP)** | **Jan-Jun 2024 (18th MP)** | **Jul-Dec 2024 (19th MP)** | **Jan-Jun 2025 (20th MP)** | **Jul-Dec 2025 (21st MP)** | **Jan-Jun 2026 (22nd MP)** |
| **5003 Counseling** | 1277 *37%* | 1327 *39%* | 1064 *34%* | 438 *17%* | 440 *19%* | 592 *27%* | 527 *19%* | 587 *21%* | 1173 *38%* | 796 *22%* | 1395 *27%* |
| **Corrective Interview** | 572 *16%* | 713 *21%* | 947 *31%* | 582 *23%* | 441 *19%* | 555 *25%* | 628 *22%* | 817 *30%* | 913 *30%* | 794 *22%* | 1728 *33%* |
| **Command Discipline (CD)** | 1229 *35%* | 1126 *33%* | 907 *29%* | 1216 *48%* | 1007 *44%* | 723 *33%* | 1431 *50%* | 1066 *39%* | 771 *25%* | 1703 *48%* | 1508 *29%* |
| **Retraining** | 311 *9%* | 123 *4%* | 108 *3%* | 184 *7%* | 221 *10%* | 154 *7%* | 200 *7%* | 207 *8%* | 168 *5%* | 162 *5%* | 289 *6%* |
| **MOC** | 33 *1%* | 30 *1%* | 25 *1%* | 74 *3%* | 105 *5%* | 83 *4%* | 31 *1%* | 14 *1%* | 32 *1%* | 55 *2%* | 137 *3%* |
| **Suspension** | 41 *1%* | 28 *1%* | 29 *1%* | 30 *1%* | 52 *2%* | 68 *3%* | 16 *1%* | 31 *1%* | 24 *1%* | 21 *1%* | 40 *1%* |
| **Referral to E.I.S.S.** | 17 *<1%* | 15 *<1%* | 8 *<1%* | 1 *<1%* | 1 *<1%* | 4 *<1%* | 4 *<1%* | 12 *<1%* | 2 *<1%* | 21 *1%* | 45 *1%* |
| **Referral to C.A.R.E.** | 2 *<1%* | 2 *<1%* | 3 *<1%* | 4 *<1%* | 0 - | 0 - | 0 - | 0 - | 1 *<1%* | 3 *<1%* | 11 *<1%* |
| **No Contact with Incarcerated Individuals** | 0 - | 1 *<1%* | 0 - | 0 - | 0 - | 1 *<1%* | 0 - | 0 - | 5 *<1%* | 1 *<1%* | 7 *<1%* |
| **5003 Counseling + Corrective Interviews + CDs** | 3078 *88%* | 3166 *94%* | 2918 *94%* | 2236 *88%* | 1888 *83%* | 1870 *86%* | 2586 *91%* | 2470 *90%* | 2857 *92%* | 3293 *93%* | 4631 *90%* |

[281] This data counts the number of corrective action referrals. An individual staff member can be recommended for two or more different types of corrective action for their involvement in a single incident.

| Rapid Review Corrective Action Recommendations | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **Jan-Jun 2021 (12th MP)** | **Jul-Dec 2021 (13th MP)** | **Jan-Jun 2022 (14th MP)** | **Jul-Dec 2022 (15th MP)** | **Jan-Jun 2023 (16th MP)** | **Jul-Dec 2023 (17th MP)** | **Jan-Jun 2024 (18th MP)** | **Jul-Dec 2024 (19th MP)** | **Jan-Jun 2025 (20th MP)** | **Jul-Dec 2025 (21st MP)** | **Jan-Jun 2026 (22nd MP)** |
| **Total # of Actions Recommended**[282] | **3482** | **3365** | **3091** | **2529** | **2267** | **2180** | **2837** | **2734** | **3089** | **3556** | **5160** |

[282] *See* the preceding footnote.

## TABLE 3(A): ID SUPERVISORS ASSIGNED TO USE OF FORCE CASES

The table below shows the number of supervisors assigned to ID's use of force investigation-level teams at specific times since 2020.

| ID Supervisors Assigned to Use of Force Cases | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Feb 2020** | **Jan 2021** | **Jan 2022** | **Jan 2023** | **Jun 2023** | **Dec 2023** | **Jun 2024** | **Dec 2024** | **Jun 2025** | **Dec 2025** | **Jun 2026** |
| Rapid Reviews | [redacted] | | | | 2 | 2 | 2 | 2 | 3 | 2 | 1 |
| Intake Squad | 8 | 10 | 13 | 12 | 8 | 10 | 10 | 11 | 9 | 8 | 9 |
| Full ID | 15 | 10 | 7 | 3 | 3 | 5 | 5 | 4 | 4 | 3 | 3 |
| UPS | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Total** | **24** | **21** | **21** | **15** | **14** | **18** | **18** | **18** | **17** | **14** | **14** |

## TABLE 3(B): ID INVESTIGATORS ASSIGNED TO USE OF FORCE CASES

The table below shows the number of investigators assigned to ID's use of force investigation-level teams at specific times since 2020.

| ID Investigators Assigned to Use of Force Cases | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Feb 2020** | **Jan 2021** | **Jan 2022** | **Jan 2023** | **Jun 2023** | **Dec 2023** | **Jun 2024** | **Dec 2024** | **June 2025** | **Dec 2025** | **Jun 2026** |
| Rapid Reviews | [redacted] | | | | 8 | 10 | 10 | 10 | 10 | 11 | 5 |
| Intake Squad | 32 | 51 | 51 | 51 | 32 | 35 | 31 | 38 | 33 | 32 | 36 |
| Full ID | 82 | 58 | 36 | 10 | 12 | 22 | 21 | 23 | 24 | 21 | 19 |
| UPS | 4 | 3 | 3 | 4 | 5 | 5 | 4 | 5 | 5 | 6 | 7 |
| **Total** | **118** | **112** | **90** | **65** | **57** | **72** | **66** | **76** | **72** | **70** | **67** |

## TABLE 4: SUMMARY OF ID HIRES AND DEPARTURES

The table below shows the number of ID hires and departures and the net gains/losses to ID's staffing from 2022 to June 2026.

| Summary of ID Hires & Departures<br>Net Gains & Losses | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Total Investigator** | *Civilian Investigator* | *Uniformed Investigator* | **Total Supervisor** | *Civilian Supervisor* | *Uniformed Supervisor* | Administrative/ Clerical | Deputy Director | Director | Agency Attorney | Assistant/Associate Commissioner | **Total** |
| **January 2022 to December 2022** | | | | | | | | | | | | |
| **Hired 2022** | 28 | 28 | 0 | 3 | 2 | 1 | 0 | 2 | 1 | 0 | 2 | **36** |
| **Departed 2022** | 43 | 32 | 11 | 9 | 7 | 2 | 0 | 3 | 4 | 2 | 0 | **61** |
| **Net Gain/Loss** | **-15** | **-4** | **-11** | **-6** | **-5** | **-1** | **0** | **-1** | **-3** | **-2** | **2** | **-25** |
| **January 2023 to December 2023** | | | | | | | | | | | | |
| **Hired 2023** | **46** | **42** | **4** | **15** | **6** | **9** | **2** | **4** | **0** | **0** | **1** | **68** |
| **Departed 2023** | **60** | **47** | **13** | **22** | **11** | **11** | **2** | **4** | **2** | **0** | **3** | **93** |
| **Net Gain/Loss** | **-14** | **-5** | **-9** | **-7** | **-5** | **-2** | **0** | **0** | **-2** | **0** | **-2** | **-25** |
| **January 2024 to December 2024** | | | | | | | | | | | | |
| **Hired 2024** | **30** | **30** | **0** | **9** | **9** | **0** | **3** | **6** | **2** | **0** | **1** | **51** |
| **Departed 2024** | **20** | 20 | 0 | **6** | 6 | 0 | 2 | 3 | 0 | 0 | 1 | **32** |
| **Net Gain/Loss** | **10** | **10** | **0** | **3** | **3** | **0** | **1** | **3** | **2** | **0** | **0** | **19** |

| Summary of ID Hires & Departures<br>Net Gains & Losses | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Total Investigator** | *Civilian Investigator* | *Uniformed Investigator* | **Total Supervisor** | *Civilian Supervisor* | *Uniformed Supervisor* | Administrative/ Clerical | Deputy Director | Director | Agency Attorney | Assistant/Associate Commissioner | **Total** |
| **January to June 2025** | | | | | | | | | | | | |
| **Hired Jan-Jun 2025** | **12** | **12** | **0** | **4** | **4** | **0** | **0** | **2** | **0** | **0** | **0** | **18** |
| **Departed Jan-Jun 2025** | **14** | 13 | 1 | **5** | 5 | 0 | 0 | 0 | 0 | 0 | 0 | **19** |
| **Net Gain/Loss** | **-2** | **-1** | **-1** | **-1** | **-1** | **0** | **0** | **2** | **0** | **0** | **0** | **-1** |
| **July to December 2025** | | | | | | | | | | | | |
| **Hired Jul-Dec 2025** | **10** | **9** | **1** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **1** | **11** |
| **Departed Jul-Dec 2025** | **13** | 9 | 4 | **4** | 2 | 2 | 0 | 0 | 1 | 0 | 0 | **18** |
| **Net Gain/Loss** | **-3** | **0** | **-3** | **-4** | **-2** | **-2** | **0** | **0** | **-1** | **0** | **1** | **-7** |
| **January to June 2026** | | | | | | | | | | | | |
| **Hired Jan-Jun 2026** | **6** | **6** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **6** |
| **Departed Jan-Jun 2026** | **15** | 12 | 3 | **1** | 1 | 0 | 0 | 0 | 0 | 0 | 0 | **16** |
| **Net Gain/Loss** | **-9** | **-6** | **-3** | **-1** | **-1** | **0** | **0** | **0** | **0** | **0** | **0** | **-10** |

## TABLE 5: STATUS OF INVESTIGATIONS OF USE OF FORCE INCIDENTS

The table below shows the status of all investigations of UOF incidents that occurred between January 2020 and June 2026, *as of August 15, 2026.*[283]

| Status of Investigations of Use of Force Incidents Occurring Between January 2020 and June 2026 *as of August 15, 2026* | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **2020** | | **2021** | | **2022** | | **2023** | | **2024** | | **2025** | | **Jan.-Jun. 2026 (22nd MP)** | |
| **Total Use of Force Incidents**[284] | **6,399** | | **8,413** | | **7,231** | | **6,958** | | **7,152** | | **7,305** | | **3,494** | |
| **Pending Intake Invest.** | 0 | **0%** | 0 | **0%** | 0 | **0%** | 0 | **0%** | 0 | **0%** | 27 | **<1%** | 333 | **10%** |
| **Pending Full ID Invest.** | 0 | **0%** | 0 | 0% | 0 | **0%** | 0 | **0%** | 0 | **0%** | 205 | **3%** | 196 | **6%** |
| **Total Closed Invest.** | 6,399 | **100%** | 8,413 | **100%** | 7,231 | **100%** | 6,958 | **100%** | 7,152 | **100%** | 7,073 | **97%** | 2,965 | **85%** |

[283] All investigations of incidents that occurred prior to 2020 were closed during previous Monitoring Periods and thus are not included in this table.

[284] Incidents are categorized by the date they occurred or were alleged to have occurred, and therefore these numbers fluctuate very slightly across Monitoring Periods as allegations are sometimes made many months after the incident is alleged to have occurred. The data are updated thereafter.

## TABLE 6: STATUS OF INTAKE INVESTIGATIONS

The table below shows the status of Intake Investigations for all incidents that occurred in the 22nd Monitoring Period (n=3,494), *as of August 15, 2026*.

| **Status of Intake Investigations<br>for incidents that *occurred* between January 2026-June 2026<br>*As of August 15, 2026*** | | | | |
|---|---|---|---|---|
| **ID Category** | **30 Business Days or Less**[285] | **31-60 Business Days** | **Beyond 60 Business Days** | **Total** |
| **All Uses of Force *(Closed & Pending)*** | **1,828**<br>***52%*** | **1,436**<br>***41%*** | **230**<br>***7%*** | **3,494** |
| *Pending* Intake Investigations | 0<br>*0%* | 242<br>*73%* | 91<br>*27%* | 333 |
| *All Closed* Intake Investigations | 1,828<br>*58%* | 1,194<br>*38%* | 139<br>*4%* | 3,161 |

[285] Intake Investigations are required to be completed within 25 business days of the incident's date, although the Monitoring Team has utilized 30 business days as the applicable time frame when determining "timeliness" as it provides a reasonable grace period beyond the deadline.

## TABLE 7: STATUS OF FULL ID INVESTIGATIONS

The table below shows the status of Full ID Investigations for all incidents that occurred between January 2025 and June 2026 (n=744), *as of August 15, 2026.*[286]

| **Status of Full ID Investigations for incidents that *occurred* between January 2025-June 2026 *As of August 15, 2026*** | | | | |
|---|---|---|---|---|
| ***Pending* 120 Days or Less** | ***Closed* within 120 Days** | ***Closed* Beyond 120 Days** | ***Pending* Beyond 120 Days** | **Total** |
| 96<br>*13%* | 192<br>*26%* | 151<br>*20%* | 305<br>*41%* | 744 |

[286] The date range of January 2025 to June 2026 was utilized because it captures *all* pending Full ID investigations as of the end of this Monitoring Period. All investigations, including Full ID investigations, have been completed for uses of force that occurred prior to January 2025. Given that Full ID investigations can take months to complete, it is common for a Full ID investigation to be completed in a different Monitoring Period than the Monitoring Period in which the incident occurred.

## TABLE 8: LAW ENFORCEMENT REFERRALS

The table below shows the number and status of cases that have been referred to outside law enforcement agencies for investigation and potential prosecution, *as of June 30, 2026*.

| **Law Enforcement Referrals** *As of June 30, 2026* | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Date of Incident** | **2014 & 2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** | **Total** | |
| **Total** | **9** | **16** | **27** | **22** | **11** | **15** | **7** | **11** | **12** | **29** | **23** | **12** | **182** | |
| Criminal Charges Brought/Trial Underway or Complete | 0 | 2 | 0 | 2 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | **8** | **4%** |
| Pending Consideration with Law Enforcement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 6 | 6 | **17** | **9%** |
| Returned to ID for Administrative Processing | 9 | 14 | 27 | 20 | 9 | 14 | 6 | 11 | 12 | 24 | 17 | 6 | **169** | **93%** |

## TABLE 9(A): RESULTS OF INTAKE INVESTIGATION AUDITS BY DATE OF INITIAL INTAKE INVESTIGATION

The table below shows the results of ID's internal quality assurance audits of closed Intake Investigations *as of August 15, 2026*. These data are categorized by the date the initial Intake Investigation was closed by ID.

| **Results of Intake Investigation QA Audits** *As of August 15, 2026* | | |
|---|---|---|
| **Date Initial Intake Investigation Closed** | **# of Investigations Audited** | **Audit Identified an Issue with the Initial Investigation**[287] |
| **January-June 2023** | 676 | 180 *(27%)* |
| **July-December 2023** | 632 | 135 *(21%)* |
| **January-June 2024** | 791 | 240 *(30%)* |
| **July-December 2024** | 712 | 172 *(24%)* |
| **January-June 2025** | 717 | 211 *(29%)* |
| **July-December 2025** | 171 | 62 *(36%)* |

[287] As a result of the QA audit for these Intake Investigations, ID took additional action for these cases (*e.g.*, updating the investigation's closing report, updating the video preservation, pursuing additional corrective action against the MOS involved in the use of force, counseling the investigator).

## TABLE 9(B): NUMBER OF INTAKE INVESTIGATION QA AUDITS COMPLETED

The table below shows the number of ID's internal quality assurance audits of closed Intake Investigations conducted in each Monitoring Period, *as of August 15, 2026*. These data are categorized by the date the QA audit was completed.

| **Number of Intake Investigations QA Audits Completed** *As of August 15, 2026* | |
|---|---|
| **Date QA Audit Completed** | **# of Investigations Audited** |
| **March-June 2023** | 419 |
| **July-December 2023** | 532 |
| **January-June 2024** | 835 |
| **July-December 2024** | 660 |
| **January-June 2025** | 621 |
| **July-December 2025** | 553 |
| **January-June 2026**[288] | 79 |

[288] ID leadership reported that fewer Intake Investigation audits were conducted during this Monitoring Period because the staff that typically conduct the audits were temporarily reallocated to assist with resolving a backlog of intake investigations that had accumulated when the Department rolled out a new case management software.

## TABLE 10(A): RESULTS OF FULL ID INVESTIGATION AUDITS BY DATE OF INITIAL FULL ID INVESTIGATION

The table below shows the results of ID's internal quality assurance audits of closed Full ID Investigations *as of August 15, 2026*. These data are categorized by the date the initial Full ID Investigation was closed by ID.

| Results of Full ID Investigation QA Audits *As of August 15, 2026* | | |
|---|---|---|
| **Date Initial Full ID Investigation Closed** | **# of Investigations Audited** | **Audit Identified an Issue with the Initial Investigation**[289] |
| **January-June 2022** | 2 | 1 *(50%)* |
| **July-December 2022** | 0 | - |
| **January-June 2023** | 21 | 18 *(86%)* |
| **July-December 2023** | 17 | 11 *(65%)* |
| **January-June 2024** | 21 | 9 *(43%)* |
| **July-December 2024** | 13 | 8 *(62%)* |
| **January-June 2025** | 6 | 2 *(33%)* |
| **July-December 2025** | 13 | 8 *(62%)* |
| **January-June 2026** | 9 | 6 *(67%)* |

[289] As a result of the QA audit for these Full ID Investigations, ID took additional action for these cases (*e.g.*, updating the investigation's closing report, conducting further investigative actions, pursuing additional corrective action against the MOS involved in the use of force, counseling the investigator). The Monitoring Team excluded cases where the audit identified that the only issues with the initial Full ID investigation were grammatical issues.

## TABLE 10(B): NUMBER OF FULL ID INVESTIGATION QA AUDITS COMPLETED

The table below shows the number of ID's internal quality assurance audits of closed Full ID Investigations completed in each Monitoring Period, *as of August 15, 2026*. These data are categorized by the date the QA audit was completed.

| **Number of Full ID Investigation QA Audits Completed** *As of August 15, 2026* | |
|---|---|
| **Date QA Audit Completed** | **# of Investigations Audited** |
| **April-June 2023** | 22 |
| **July-December 2023** | 16 |
| **January-June 2024** | 21 |
| **July-December 2024** | 14 |
| **January-June 2025**[290] | 7 |
| **July-December 2025** | 11 |
| **January-June 2026** | 11 |

[290] ID leadership reported that fewer Full ID audits were conducted this Monitoring Period because Full ID leadership was focused on categorizing and addressing the backlog of Full ID investigations as described in the compliance assessment for Consent Judgment § VII., ¶ 1 and § VII., ¶ 9 (a). Additionally, as a part of the broader efforts to improve investigation quality, ID leadership reviewed more Full ID investigations that were near-final but not yet closed so that they could coach the investigators on how to resolve any quality concerns.

## TABLE 11: OUTCOME OF INTAKE INVESTIGATIONS

The table below shows the outcome of Intake Investigations from February 3, 2020 (the inception of Intake Investigations) through June 2026, *as of July 31, 2026*.

| **Outcome of Intake Investigations**[291] *as of July 31, 2026* | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date**[292] | ***July to Dec. 2020* (11th MP)** | ***Jan. to June 2021* (12th MP)** | ***July to Dec. 2021* (13th MP)** | ***Jan. to June 2022* (14th MP)** | ***July to Dec. 2022* (15th MP)** | ***Jan. to June 2023* (16th MP)** | ***Jul. to Dec. 2023* (17th MP)** | ***Jan. to June 2024* (18th MP)** | ***Jul. to Dec. 2024* (19th MP)** | ***Jan. to June 2025* (20th MP)** | ***Jul. to Dec. 2025* (21st MP)** | ***Jan. to June 2026* (22nd MP)** |
| Pending Intake Investigation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 22 | 537 |
| **Closed Intake Investigations** | **3,278** | **4,476** | **3,946** | **3,349** | **3,883** | **3,317** | **3,642** | **3,590** | **3,562** | **3,624** | **3,654** | **2,957** |
| *No Action*[293] | *1,278 39%* | *1,385 31%* | *971 25%* | *1,259 38%* | *2,002 52%* | *1,571 47%* | *1,156 32%* | *1,023 28%* | *872 24%* | *822 23%* | *1,183 32%* | *1,775 60%* |
| *MOC* | *11 <1%* | *7 <1%* | *5 <1%* | *13 <1%* | *20 1%* | *42 1%* | *36 1%* | *17 <1%* | *29 1%* | *31 1%* | *76 2%* | *35 1%* |
| *PDR* | *2 >1%* | *0 0%* | *0 0%* | *1 >1%* | *2 >1%* | *2 >1%* | *2 >1%* | *2 >1%* | *2 >1%* | *8 >1%* | *13 >1%* | *0 0%* |
| *Corrective Interview* | [redacted] | | | | | | *2 >1%* | *5 >1%* | *3 >1%* | *0 0%* | *1 >1%* | *30 1%* |

[291] For the purpose of this chart, the results of the Intake Investigations only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC *and* a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart.

[292] The data on the outcomes of intake investigations for incidents that occurred between February 3, 2020 and June 30, 2020 was last included in the Monitor's November 22, 2024 Report (dkt. 802) at pg. 96.

[293] With respect to cases closed with no action, in some, the violation identified by ID had already been identified by the facility via Rapid Review and ID determined that the action recommended in the Rapid Review was sufficient to address the violation. Therefore, "no action" cases are better understood as cases in which either no violation was identified, or ID *did not identify additional staff behaviors requiring disciplinary or corrective action beyond what had already been identified and taken by the facilities*.

| **Outcome of Intake Investigations**[291] *as of July 31, 2026* | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date**[292] | ***July to Dec. 2020* (11th MP)** | ***Jan. to June 2021* (12th MP)** | ***July to Dec. 2021* (13th MP)** | ***Jan. to June 2022* (14th MP)** | ***July to Dec. 2022* (15th MP)** | ***Jan. to June 2023* (16th MP)** | ***Jul. to Dec. 2023* (17th MP)** | ***Jan. to June 2024* (18th MP)** | ***Jul. to Dec. 2024* (19th MP)** | ***Jan. to June 2025* (20th MP)** | ***Jul. to Dec. 2025* (21st MP)** | ***Jan. to June 2026* (22nd MP)** |
| *Command Discipline* | [redacted] | | | | | *100 3%* | *109 3%* | *255 7%* | *187 5%* | *159 4%* | *300 8%* | *119 4%* |
| *Re-Training* | *224 7%* | *342 8%* | *90 2%* | *35 1%* | *38 1%* | *86 3%* | *161 4%* | *93 3%* | *107 3%* | *60 2%* | *63 2%* | *60 2%* |
| *Facility Referral* | *1,160 35%* | *1,901 43%* | *2,181 55%* | *1,642 49%* | *1,354 35%* | *1,146 35%* | *1,803 50%* | *1,816 51%* | *2,007 56%* | *2,246 62%* | *1,833 50%* | *679 23%* |
| *Referred for Full ID* | *598 18%* | *837 19%* | *672 17%* | *376 11%* | *454 12%* | *349 11%* | *350 10%* | *379 11%* | *353 10%* | *297 8%* | *185 5%* | *259 9%* |
| *Data Entry Errors*[294] | *5* | *4* | *27* | *23* | *13* | *21* | *23* | *0* | *2* | *0* | *0* | *0* |
| **Total Number of Use of Force Incidents** | **3,278** | **4,476** | **3,946** | **3,349** | **3,883** | **3,317** | **3,642** | **3,590** | **3,562** | **3,629** | **3,676** | **3.494** |

[294] These investigations had data entry errors in the Intake Squad Tracker. The Monitoring Team was unable to determine the outcome for these cases but is working with the Department to fix these errors.

## TABLE 12: INVESTIGATION FINDINGS

The table below shows the findings of Intake and Full ID Investigations that were closed *as of July 31, 2026*. The investigation findings included assessments of whether the incident was excessive, unnecessary, and/or avoidable.[295]

| **Investigations Findings** *As July 31, 2026* | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date**[296] | ***July to Dec. 2020*** **(11th MP)** | ***Jan. to Jun. 2021*** **(12th MP)** | ***July to Dec. 2021*** **(13th MP)** | ***Jan. to Jun. 2022*** **(14th MP)** | ***Jul. to Dec. 2022*** **(15th MP)** | ***Jan. to Jun. 2023*** **(16th MP)** | ***Jul. to Dec. 2023*** **(17th MP)** | ***Jan. to Jun. 2024*** **(18th MP)** | ***Jul. to Dec. 2024*** **(19th MP)** | ***Jan. to Jun. 2025*** **(20th MP)** | ***Jul. to Dec. 2025*** **(21st MP)** | ***Jan. to Jun. 2026*** **(22nd MP)** |
| ***Findings of Investigations Closed at Intake*** | | | | | | | | | | | | |
| Investigations Closed at Intake | 2,680 | 3,639 | 3,274 | 2,973 | 3,429 | 2,968 | 3,292 | 3,211 | 3,209 | 3,326 | 3,469 | 2,698 |
| *Excessive, and/or Unnecessary, and/or Avoidable* | *454* | *698* | *626* | *523* | *462* | *372* | *394* | *315* | *329* | *202* | *239* | *287* |
| *Chemical Agent Violation* | *150* | *239* | *306* | *286* | *207* | *209* | *273* | *368* | *349* | *377* | *402* | *369* |
| ***Findings of Closed Full ID Investigations*** | | | | | | | | | | | | |
| Closed Full ID Investigations | 598 | 837 | 672 | 376 | 454 | 349 | 350 | 379 | 353 | 192 | 85 | 58 |
| *Excessive, and/or Unnecessary* | *86* | *75* | *51* | *62* | *70* | *76* | *53* | *47* | *46* | *16* | *13* | *4* |

[295] The Department and the Monitoring Team have not finalized an agreed upon definition of these terms. A concrete, objective and shared understanding of what each category is intended to capture is necessary to ensure reliable and consistent findings.

[296] The data on investigation findings for incidents that occurred between February 3, 2020 and June 30, 2020 was last included in the Monitor's November 22, 2024 Report (dkt. 802) at pg. 94.

| **Investigations Findings** *As July 31, 2026* | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date[296]** | ***July to Dec. 2020*** **(11th MP)** | ***Jan. to Jun. 2021*** **(12th MP)** | ***July to Dec. 2021*** **(13th MP)** | ***Jan. to Jun. 2022*** **(14th MP)** | ***Jul. to Dec. 2022*** **(15th MP)** | ***Jan. to Jun. 2023*** **(16th MP)** | ***Jul. to Dec. 2023*** **(17th MP)** | ***Jan. to Jun. 2024*** **(18th MP)** | ***Jul. to Dec. 2024*** **(19th MP)** | ***Jan. to Jun. 2025*** **(20th MP)** | ***Jul. to Dec. 2025*** **(21st MP)** | ***Jan. to Jun. 2026*** **(22nd MP)** |
| ***Findings of All Closed Investigations*** | | | | | | | | | | | | |
| **Closed Investigations** | **3,278** | **4,476** | **3,946** | **3,349** | **3,883** | **3,317** | **3,642** | **3,590** | **3,562** | **3,518** | **3,554** | **2,756** |
| ***Excessive, and/or Unnecessary, and/or Avoidable*** | ***540 (16%)*** | ***773 (17%)*** | ***677 (17%)*** | ***585 (17%)*** | ***532 (14%)*** | ***448 (14%)*** | ***447 (12%)*** | ***362 (10%)*** | ***375 (11%)*** | ***218 (6%)*** | ***252 (7%)*** | ***291 (11%)*** |

## TABLE 13: USE OF FORCE INCIDENTS WITH CHARGES

The graph below illustrates the changes in the number and proportion of use of force incidents from January 2016 to December 2025 where at least one staff member was referred for formal discipline charges. These data were calculated *as of June 30, 2026.*[297]




[297] The data for 2022 and 2023 incidents includes referrals that were made as part of the lookback initiative in which the original case findings did not identify misconduct, but the subsequent review resulted in a finding that merited the referral for charges. Furthermore, data for investigations in 2024 and 2025 is not final, as 1,638 cases are still pending with ID.

# APPENDIX F: DATA RELATED TO RESPONSES TO STAFF MISCONDUCT

## TABLE 1: ACCOUNTABILITY FOR STAFF'S USE OF FORCE RELATED MISCONDUCT

The table below shows the type of accountability imposed for staff's use-of-force-related misconduct. This only includes corrective action that the Department reports was, in fact, *imposed*.

| Accountability Imposed for Staff's Use of Force Related Misconduct, 2019 to June 2026 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2019**[298] | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan.- Jun. 2026 22nd MP** |
| **Support and Guidance Provided to Staff** | | | | | | | | |
| Corrective Interviews and 5003 Counseling | 2,700[299] | 1,378[300] | 3,205 | 2,532 | 1,723 | 2,455 | 3,569 | 2,518 |
| Corrective Interviews (resulting from CDs) | 53 | 32 | 38 | 76 | 79 | 401 | 75 | 25 |
| **Corrective Action—Command Discipline & Suspension** | | | | | | | | |
| CD – Reprimand | 156 | 126 | 270 | 319 | 114 | 497 | 202 | 63 |
| CD resulting in 1-10[301] days deducted | 879 | 673 | 794 | 739 | 798 | 857 | 1,017 | 409 |
| Suspension, by date imposed | 48 | 80 | 83 | 66 | 136 | 62 | 57 | 41 |
| *Total* | *1,083* | *879* | *1,147* | *1,124* | *1,048* | *1,416* | *1,276* | *513* |
| **Formal Discipline** | | | | | | | | |
| PDR | 81 | 49 | 2 | 1 | 22 | 22 | 45 | 43 |
| NPA | 218 | 327 | 460 | 1,808 | 630 | 425 | 372 | 223 |
| *Total* | *299* | *376* | *462* | *1,809* | *652* | *447* | *417* | *266* |
| **Total Number of Disciplinary Actions** | | | | | | | | |
| **Total Except for CIs and Counseling** | **1,382** | **1,255** | **1,609** | **2,933** | **1,700** | **1,863** | **1,693** | **779** |

[298] Counseling that occurred during the 8th Monitoring Period was focused on a more holistic assessment of the staff member's conduct pursuant to specific standards set by Consent Judgment, § X, ¶ 2, Risk Management that was subsequently revised. *See* Monitor's October 28, 2019 Report (dkt. 332) at pgs. 172-173.

[299] The identification of staff for counseling was in transition during the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. *See* Monitor's May 29, 2020 Report (dkt. 341) at pgs. 194-196.

[300] The Department completed the transition to its new process for identifying staff for counseling during this Monitoring Period. *See* Monitor's October 23, 2020 Report (dkt. 360) at pgs. 168-170.

[301] In October 2022, the Department promulgated a revised CD policy which expanded the allowable penalty for a CD from a maximum of 5 days to 10 days.

## TABLE 2: IMMEDIATE CORRECTIVE ACTION

The table below shows the frequency of Immediate Corrective Action imposed for use-of-force-related misconduct from 2020 to June 2026, according to the date of the incident.

| Immediate Corrective Action Imposed for Use-of-Force-Related Misconduct, by Incident Date | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Type** | **2020** | | **2021** | | **2022** | | **2023** | | **2024** | | **2025** | | **Jan.-Jun. 2026** | |
| Counseling and Corrective Interviews[302] | 1,410 | 61% | 3,243 | 74% | 2,608 | 69% | 1,802 | 63% | 2,856 | 66% | 3,644 | 74% | 2,543 | 83% |
| Suspension[303] | 80 | 3% | 83 | 2% | 75 | 2% | 124 | 4% | 60 | 1% | 57 | 1% | 39 | 1% |
| Modified Duty or No Contact w/ Incarcerated Individuals | 5 | <1% | 6 | <1% | 16 | <1% | 14 | <1% | 35 | 1% | 7 | <1% | 12 | <1% |
| *Total Suspensions & Modified Duty/No Contact w/ Incarcerated Individuals* | *85* | *4%* | *89* | *2%* | *91* | *2%* | *138* | *5%* | *95* | *2%* | *64* | *1%* | *51* | *2%* |
| CD – Reprimand | 126 | 5% | 270 | 6% | 319 | 8% | 114 | 4% | 497 | 12% | 202 | 4% | 63 | 2% |
| CD resulting in 1-10[304] days deducted | 673 | 29% | 794 | 18% | 739 | 20% | 798 | 28% | 857 | 20% | 1,017 | 20% | 409 | 13% |
| **Total[305]** | **2,294** | | **4,396** | | **3,757** | | **2,852** | | **4,305** | | **4,927** | | **3,066** | |

[302] NCU confirmed that the reported Counseling and Corrective Interviews actually occurred.

[303] The suspension totals differ slightly between this table and the following table because Table 2 reports suspensions by the date of the underlying incident, while Table 3 reports suspensions by the date the suspension was imposed.

[304] In October 2022, the Department promulgated a revised Command Discipline policy which expanded the allowable penalty from a maximum of five days to 10 days.

[305] The figures in this table have been updated from prior reports to correct a calculation error identified related to suspensions, modified duty, and no contact with incarcerated individual cases.

## TABLE 3: SUSPENSION

The table below shows the number/percentage of suspensions imposed, and the reasons for the suspensions, *by the date the suspension was imposed* (versus the date of the incident).[306]

**Reason for Staff Suspension, by Date of Suspension, 2020 to June 2026**

| **Reason** | **2020** | | **2021** | | **2022** | | **2023** | | **2024** | | **2025** | | **Jan. to June 2026** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sick Leave | 39 | *11%* | 138 | *22%* | 311 | *45%* | 110 | *19%* | 67 | *22%* | 137 | *30%* | 54 | *25%* |
| Conduct Unbecoming | 92 | *26%* | 128 | *20%* | 100 | *15%* | 160 | *28%* | 119 | *39%* | 97 | *21%* | 13 | *6%* |
| Use of Force | 78 | *22%* | 82 | *13%* | 66 | *10%* | 136 | *23%* | 62 | *20%* | 57 | *13%* | 41 | *19%* |
| AWOL | 0 | *0%* | 165 | *26%* | 99 | *14%* | 22 | *4%* | 0 | *0%* | 68 | *15%* | 42 | *20%* |
| FMLA | [redacted] | | | | | | | | | | 17 | *4%* | 0 | *0%* |
| Arrest | 60 | *17%* | 70 | *11%* | 32 | *5%* | 23 | *4%* | 16 | *3%* | 9 | *2%* | 27 | *13%* |
| Inefficient Performance | 44 | *12%* | 29 | *5%* | 39 | *6%* | 73 | *13%* | 24 | *8%* | 31 | *7%* | 9 | *4%* |
| Electronic Device | 18 | *5%* | 4 | *1%* | 10 | *1%* | 9 | *2%* | 4 | *1%* | 8 | *2%* | 3 | *1%* |
| NPA | 10 | *3%* | 6 | *1%* | 17 | *2%* | 19 | *3%* | 9 | *3%* | 11 | *2%* | 1 | *<0%* |
| Other | 6 | *2%* | 4 | *1%* | 11 | *2%* | 22 | *4%* | 2 | *1%* | 11 | *2%* | 17 | *8%* |
| Contraband | 7 | *2%* | 5 | *1%* | 0 | *0%* | 3 | *1%* | 0 | *0%* | 2 | *0%* | 2 | *1%* |
| Erroneous Discharge | 5 | *1%* | 0 | *0%* | 2 | *0%* | 0 | *0%* | 0 | *0%* | 1 | *0%* | 3 | *1%* |
| Abandoned Post | 0 | *0%* | 0 | *0%* | 1 | *0%* | 4 | *1%* | 4 | *1%* | 4 | *1%* | 2 | *1%* |
| **Total** | **359** | | **631** | | **688** | | **581** | | **307** | | **453** | | **214** | |

[306] The suspension totals differ slightly between this table and the previous table because Table 2 reports suspensions by the date of the underlying incident, while Table 3 reports suspensions by the date the suspension was imposed.

## TABLE 4: ACCOUNTABILITY BY RANK

The table below shows the frequency with which Wardens, Deputy Wardens, and Assistant Deputy Wardens, Captains and Officers were held accountable between 2023 and June 2026.

| Accountability By Rank 2023 to 2026[307] | | | | |
|---|---|---|---|---|
| | 2023 Total | 2024 Total | 2025 Total | Jan. to June 2026 |
| **Warden / Assistant Commissioner** | | | | |
| Formal Discipline | 0 | 0 | 0 | 0 |
| Suspension | 0 | 0 | 0 | 0 |
| Command Discipline | 0 | 0 | 0 | 0 |
| 5003 Counseling | 0 | 0 | 0 | 0 |
| Corrective Interview | 0 | 0 | 0 | 0 |
| Total | 0 | 0 | 0 | 0 |
| **Deputy Warden** | | | | |
| Formal Discipline | 0 | 1 | 0 | 0 |
| Suspension | 0 | 0 | 0 | 0 |
| Command Discipline | 1 | 0 | 1 | 1 |
| 5003 Counseling | 0 | 0 | 0 | 2 |
| Corrective Interview | 1 | 0 | 0 | 0 |
| Retraining | 0 | 0 | 0 | 0 |
| Total | 2 | 1 | 1 | 3 |
| **Assistant Deputy Warden** | | | | |
| Formal Discipline | 27 | 9 | 4 | 1 |
| Suspension | 1 | 1 | 0 | 0 |
| Command Discipline | 7 | 19 | 17 | 9 |
| 5003 Counseling | 13 | 10 | 33 | 25 |
| Corrective Interview | 13 | 19 | 22 | 35 |
| Retraining | 4 | 0 | 2 | 2 |
| Total | 65 | 58 | 78 | 72 |
| **Captains** | | | | |
| Formal Discipline | 76 | 62 | 56 | 22 |
| Suspension | 7 | 4 | 4 | 2 |
| Command Discipline | 74 | 162 | 133 | 121 |

[307] Command discipline dates reflect the date the command discipline was closed in CMS, excluding dismissed matters, MOCs, and DPVs. Formal discipline dates reflect the date the NPA was closed. Formal discipline actions were de-duplicated where a single staff member received one disciplinary action covering multiple incidents. Corrective interviews, retrainings, suspensions, and 5003 counselings reflect RAPIDS records generated from use of force incidents occurring between October 2022 and December 2025, limited to corrective actions that occurred between 2023 and 2025.

| Accountability By Rank 2023 to 2026[307] | | | | |
|---|---|---|---|---|
| | **2023 Total** | **2024 Total** | **2025 Total** | **Jan. to June 2026** |
| 5003 Counseling | 151 | 158 | 298 | 185 |
| Corrective Interview | 144 | 200 | 188 | 203 |
| Retraining | 40 | 44 | 43 | 16 |
| Total | 492 | 630 | 722 | 549 |
| **Officers** | | | | |
| Formal Discipline | 413 | 296 | 251 | 160 |
| Suspension | 97 | 34 | 35 | 38 |
| Command Discipline | 665 | 1,366 | 1,677 | 1,025 |
| 5003 Counseling | 781 | 873 | 1,567 | 841 |
| Corrective Interview | 607 | 1,130 | 1,428 | 1,098 |
| Retraining | 245 | 358 | 282 | 173 |
| Total | 2808 | 4057 | 5240 | 3,335 |

## TABLE 5(A): COMMAND DISCIPLINES RECOMMENDED BY RAPID REVIEWS

The table below shows the status and outcome of Command Disciplines recommended by Rapid Reviews. Data are current as of September 2026.

| **Status and Outcome of Command Disciplines Recommended by Rapid Reviews, January 2019-June 2026** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Status/Outcome** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan.-Jun. 2026** |
| Still Pending in Case Management System | 7<br><1% | 15<br>1% | 65<br>3% | 64<br>3% | 97<br>6% | 31<br>1% | 42<br>2% | 212<br>14% |
| Pending Appeal[308] | [redacted] | | | | | | 1<br><1% | 38<br>3% |
| 1-10 Days Deducted | 879<br>54% | 673<br>47% | 794<br>34% | 739<br>35% | 798<br>46% | 857<br>34% | 1017<br>41% | 409<br>27% |
| MOC | 122<br>7% | 108<br>8% | 281<br>12% | 128<br>6% | 110<br>6% | 141<br>6% | 389<br>16% | 127<br>8% |
| Reprimand | 156<br>10% | 126<br>9% | 270<br>11% | 319<br>15% | 114<br>7% | 497<br>20% | 202<br>8% | 63<br>4% |
| Retraining | ~ | ~ | ~ | ~ | 11<br>1% | 125<br>5% | 70<br>3% | 27<br>2% |
| Corrective Interview | 53<br>3% | 32<br>2% | 38<br>2% | 76<br>4% | 79<br>5% | 401<br>16% | 75<br>3% | 25<br>2% |
| Dismissed at Hearing or Closed Administratively | 360<br>22% | 399<br>28% | 745<br>32% | 608<br>29% | 421<br>24% | 339<br>14% | 329<br>13% | 239<br>16% |
| Never Entered in Case Management System | 41<br>3% | 82<br>6% | 162<br>7% | 189<br>9% | 100<br>6% | 104<br>4% | 347<br>14% | 368<br>24% |
| **Total CDs Recommended** | **1,635** | **1,440** | **2,355** | **2,123** | **1,730** | **2,495** | **2,472** | **1,508** |
| *Note: CDs pending for more than one year are not tracked in the CD reports analyzed for this table and therefore may still appear pending although it is likely that they have since been dismissed.* | | | | | | | | |

[308] In the 22nd Monitoring Period, the Department rolled out new case management software for command disciplines, which allow them to begin tracking command disciplines that were pending appeal starting in the 21st Monitoring Period.

## TABLE 5(B): REASONS THAT COMMAND DISCIPLINES RECOMMENDED BY RAPID REVIEWS WERE DISMISSED, CLOSED ADMINISTRATIVELY, OR NOT ENTERED INTO CMS

The table below shows the reasons that CDs recommended by Rapid Reviews were dismissed, closed administratively, or were never entered into CMS because of due process violations (DPV) or clerical errors.

**Reasons that Command Disciplines Recommended by Rapid Reviews Were Dismissed, Closed Administratively, or Never Entered into CMS**
***January 2021-June 2026***

| Year of Incident | 2021 | 2022 | 2023 | 2024 | 2025 | Jan.-Jun. 2026 |
|---|---|---|---|---|---|---|
| **Total # of CDs Recommended** | **2,355** | **2,123** | **1,730** | **2,497** | **2,472** | **1,508** |
| **Total # of CDs Dismissed, Closed, or Not Logged for Any Reason** | **907** | **797** | **521** | **434** | **675** | 607 |
| **% of All CDs Recommended** | ***39%*** | ***38%*** | ***30%*** | ***17%*** | ***27%*** | *40%* |
| CDs Dismissed, Closed, or Not Logged for ***DPV or Clerical Errors***[309] | 673 | 527 | 324 | 221 | 382 | 308 |
| % of All CDs Dismissed, Closed, or Not Logged for Any Reason | *74%* | *66%* | *62%* | *51%* | *57%* | *51%* |
| CDs Dismissed, Closed, or Not Logged for ***Other Reasons***[310] | 234 | 270 | 197 | 213 | 293 | 299 |
| % of All CDs Dismissed, Closed, or Not Logged for Any Reason | *26%* | *34%* | *38%* | *49%* | *43%* | *49%* |

[309] A CD may also be dismissed or not entered in CMS for Due Process Violations ("DPV") if the CD is not entered or processed in a timely manner according to policy. A CD can also be dismissed for clerical errors, such as date errors or misidentification of staff.

[310] A CD may be dismissed or not entered in CMS for factual reasons, because a staff member already resigned or left the Department, because ID took over all discipline and corrective action pending further investigation, or other factual reasons.

## TABLE 6(A): COMMAND DISCIPLINE RECOMMENDED BY OTHER SOURCES

The table below shows the outcome of CDs recommended separately from the Rapid Review process. The Department began tracking these CDs systematically in January 2024. The specific misconduct behind these CDs varies, and includes AWOL staff, staff off-post, Departmental property violations, inadequate supervision, inefficient performance of duties, insubordination, tour wand violations, and use-of-force-related misconduct identified outside of the Rapid Review process.

| Outcome of Command Disciplines Recommended by Other Sources *January 2024- June 2026* | | | | | |
|---|---|---|---|---|---|
| **Outcome** | **Jan-Jun 2024** *18th MP* | **Jul-Dec 2024** *19th MP* | **Jan-Jun 2025** *20th MP* | **Jul-Dec 2025** *21st MP* | **Jan.-June 2026** *22nd MP* |
| 1-10 Days Deducted | 238 *27%* | 264 *33%* | 332 *31%* | 615 *44%* | 483 *47%* |
| MOC | 79 *9%* | 61 *8%* | 188 *18%* | 167 *12%* | 105 *10%* |
| Reprimand | 87 *10%* | 115 *14%* | 95 *9%* | 104 *7%* | 45 *4%* |
| Retraining | 3 *<1%* | 10 *1%* | 19 *2%* | 30 *2%* | 4 *<1%* |
| Corrective Interview | 59 *7%* | 93 *11%* | 58 *5%* | 94 *7%* | 31 *3%* |
| Dismissed | 428 *48%* | 268 *33%* | 377 *35%* | 385 *28%* | 346 *34%* |
| No Further Action[311] | [redacted] | | | | 9 *1%* |
| **Total** | **894** | **811** | **1,069** | **1,395** | **1,023** |

[311] The Department's case management software, CaseBuilder, rolled out in the 22nd Monitoring Period, introduced a new CD closure status of "closed without corrective action." The Department reports it uses this category to document guilty findings when no formal corrective action was implemented, such as if an MOS has left the Department after the CD was filed, if the CD had been combined with another CD, if the facility had already given the MOS a Corrective Interview for the violation, or if the CD was a duplicate of another CD. The Department reports it is working internally to clarify the use of this category.

## TABLE 6(B): REASONS THAT COMMAND DISCIPLINES RECOMMENDED BY OTHER SOURCES WERE DISMISSED

The table below shows the reasons that CDs recommended separately from the Rapid Reviews were dismissed because of due process violations (DPV) or clerical errors.

| **Reasons that Command Disciplines Recommended by Other Sources Were Dismissed, Closed Administratively, or Never Entered into CMS** *January 2021-June 2026* | | | |
|---|---|---|---|
| **Year of Incident** | **2024** | **2025** | **Jan.-June 2026 22nd MP** |
| **Total # of CDs Recommended** | **1,705** | **2,464** | **1,023** |
| **Total # of CDs Dismissed** | **696** | **762** | **346** |
| **% of All CDs Recommended** | ***41%*** | ***31%*** | ***34%*** |
| CDs Dismissed for DPV or Clerical Errors[312] | 185 | 188 | 47 |
| % of All CDs Dismissed | *27%* | *25%* | *14%* |
| CDs Dismissed for Other Reasons[313] | 511 | 574 | 299 |
| % of All CDs Dismissed | *73%* | *75%* | *86%* |

[312] A CD may also be dismissed or not entered in CMS for Due Process Violations ("DPV") if the CD is not entered or processed in a timely manner according to policy. A CD can also be dismissed for clerical errors, such as date errors or misidentification of staff.

[313] A CD may be dismissed or not entered in CMS for factual reasons, because a staff member already resigned or left the Department, because ID took over all discipline and corrective action pending further investigation, or other factual reasons.

## TABLE 7: FORMAL DISCIPLINE

The table below shows the status of cases pending with the Trials Division and the number of cases still pending investigation, by the date the incident occurred. Data are current as of June 2026.

**Status of Disciplinary Cases & Number of Pending Investigations, by Date of Incident**

| | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | | 2025 | | Jan. to June 2026 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Cases** | 471 | | 621 | | 784 | | 1027 | | 695 | | 716 | | 668 | | 703 | | 439 | | 503 | | 113 | |
| Closed Cases | 470 | 100% | 618 | 99% | 780 | 99% | 1021 | 99% | 690 | 99% | 716 | 99% | 667 | 99% | 692 | 98% | 352 | 80% | 270 | 54% | 16 | 14% |
| Pending Cases with Trials Division | 0 | 0% | 3 | 1% | 4 | 1% | 6 | 1% | 5 | 1% | 0 | 1% | 1 | 1% | 11 | 2% | 87 | 20% | 233 | 46% | 97 | 86% |
| | | | | | | | | | | | | | | | | | | | | | | |
| **Unique Use of Force Incidents** | Number of unique use of force incidents not tracked. | | | | 466 | | 606 | | 450 | | 561 | | 415 | | 444 | | 321 | | 440 | | 99 | |
| | | | | | | | | | | | | | | | | | | | | | | |
| **Pending Investigations** | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 2 | | 874 | |

## TABLE 8: NUMBER OF CASES PENDING WITH THE TRIALS DIVISION

The table below shows the number of cases pending formal discipline, as of the last day of the month in each Monitoring Period from 2018 to 2026. Data are current as of June 2026.

| Cases Pending Discipline for Use of Force Related Misconduct, 2018 to 2026 | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **June 2018** | **Dec. 2018** | **June 2019** | **Dec. 2019** | **June 2020** | **Dec. 2020** | **June 2021** | **Dec. 2021** | **June 2022** | **Dec. 2022** | **Jun. 2023** | **Dec. 2023** | **June 2024** | **Dec. 2024** | **June 2025** | **Dec. 2025** | **June 2026** |
| MP | 6th | 7th | 8th | 9th | 10th | 11th | 12th | 13th | 14th | 15th | 16th | 17th | 18th | 19th | 20th | 21st | 22nd |
| **Pending Cases** | 146 | 172 | 407 | 633 | 1,050 | 1,445 | 1,917 | 1,911 | 1,129 | 409 | 435 | 337 | 240 | 270 | 272 | 353 | 447 |

## TABLE 9: TIME FROM MOC RECEIVED TO CHARGES SERVED

The table below shows the interval of time between when the MOC was received by the Trials Division to the date charges were served.

**Time from MOC Received by the Trials Division to Date Charges Served**

| | **2023** | | **2024** | | **2025** | | **Jan. to June 2026** | |
|---|---|---|---|---|---|---|---|---|
| **Total # MOCs Received** | **697** | | **517** | | **620** | | **403** | |
| # Administratively Filed/No Charges Served | 86 | | 114 | | 134 | | 63 | |
| # Charges Served before MOC Received | 102 | | 170 | | 162 | | 106 | |
| **# MOCs Served** | **509** | | **233** | | **324** | | **234** | |
| 0 to 14 days | 250 | *49%* | 139 | *60%* | 146 | *45%* | *108* | *46%* |
| 15 to 30 days | 206 | *40%* | 70 | *30%* | 148 | *46%* | *91* | *39%* |
| 31 to 60 days | 33 | *6%* | 10 | *4%* | 24 | *7%* | *24* | *10%* |
| More than 60 Days | 20 | *4%* | 14 | *6%* | 6 | *2%* | *11* | *5%* |

## TABLE 10: TIMELINESS OF FORMAL DISCIPLINE

The table below shows the timeliness of formal discipline for Closed cases (time between date the MOC received and the date signed by the DC of Trials), cases Pending with Trials (time between the date the MOC was received at the last day of the year), and the timeliness for both Closed and Pending cases, combined.

| Time from Date MOC received in Trials Division to Date Signed by DC of Trials | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Year** | **2023** | | **2024** | | **2025** | | **Jan.–June 2026** | |
| ***# Cases Closed*** | ***764*** | | ***595*** | | ***512*** | | ***429*** | |
| **0 to 3 months** | 210 | *27%* | 232 | *39%* | 172 | *34%* | 130 | *30%* |
| **3 to 6 months** | 227 | *30%* | 164 | *28%* | 175 | *34%* | 171 | *40%* |
| **6 to 12 months** | 179 | *23%* | 134 | *23%* | 90 | *18%* | 99 | *23%* |
| **1 to 2 years** | 120 | *16%* | 49 | *8%* | 54 | *11%* | 24 | *6%* |
| **2 to 3 years** | 17 | *2%* | 3 | *1%* | 4 | *1%* | 3 | *1%* |
| **3+ years** | 7 | *1%* | 13 | *2%* | 17 | *3%* | 1 | *0%* |
| **Unknown** | 4 | *1%* | ~ | ~ | ~ | ~ | 1 | *0%* |

| Time Cases Pending with Trials as of the last day of the Monitoring Period, and Date the MOC Received | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Year** | **2023** | | **2024** | | **2025** | | **Jan.–June 2026** | |
| ***# Cases Pending*** | ***337*** | | ***270*** | | ***625*** | | ***447*** | |
| **0 to 3 months** | 134 | *40%* | 105 | *39%* | 202 | *32%* | 147 | *33%* |
| **3 to 6 months** | 67 | *20%* | 36 | *13%* | 216 | *35%* | 161 | *36%* |
| **6 to 12 months** | 77 | *23%* | 51 | *19%* | 101 | *16%* | 95 | *21%* |
| **1 to 2 years** | 15 | *4%* | 40 | *15%* | 56 | *9%* | 21 | *5%* |
| **2 to 3 years** | 17 | *5%* | 3 | *1%* | 5 | *1%* | 3 | *1%* |
| **3+ years** | 27 | *8%* | 35 | *13%* | 45 | *7%* | 20 | *4%* |
| **Unknown** | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |

| Timeliness for Closed and Pending Cases | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Year** | **2023** | | **2024** | | **2025** | | **Jan.–June 2026** | |
| ***Total*** | ***1101*** | | ***865*** | | ***1137*** | | ***876*** | |
| **0 to 3 months** | 344 | *31%* | 337 | *39%* | 374 | *33%* | 277 | *32%* |
| **3 to 6 months** | 294 | *27%* | 200 | *23%* | 391 | *34%* | 332 | *38%* |
| **6 to 12 months** | 256 | *23%* | 185 | *21%* | 191 | *17%* | 194 | *22%* |
| **1 to 2 years** | 135 | *12%* | 89 | *10%* | 110 | *10%* | 45 | *5%* |
| **2 to 3 years** | 34 | *3%* | 6 | *1%* | 9 | *1%* | 6 | *1%* |
| **3+ years** | 34 | *3%* | 48 | *6%* | 62 | *5%* | 21 | *2%* |
| **Unknown** | 4 | *0%* | ~ | ~ | ~ | ~ | 1 | *0%* |

## TABLE 11: TIME FOR COMMISSIONER SIGN CASES FROM DATE OF SIGNATURE BY DC OF TRIALS

The table below show the number of days between the date cases were signed by the DC of Trials and the date the case was signed by the Commissioner.

| Days between Signatures by DC of Trials and Commissioner | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Jan-June 2025** | | **Jul-Dec 2025** | | **2025** | | **Jan. to June 2026** | |
| Total Cases signed by Commissioner | *200* | | *177* | | *377* | | *234* | |
| 0 to 14 days | 25 | *13%* | 48 | *27%* | 73 | *19%* | 59 | *25%* |
| 15 to 30 days | 108 | *54%* | 83 | *47%* | 191 | *51%* | 78 | *33%* |
| 31 to 60 days | 37 | *19%* | 42 | *24%* | 79 | *21%* | 68 | *29%* |
| More than 60 days | 30 | *15%* | 4 | *2%* | 34 | *9%* | 29 | *12%* |

## TABLE 12: DISPOSITION OF FORMAL DISCIPLINE CASES

The table below shows the disposition of formal discipline in cases closed by the Trials Division since 2017.

| Disposition of Formal Discipline Cases, 2017 to 2026 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan.-June 2026** |
| **# Cases Closed** | **497** | **518** | **267** | **387** | **585** | **2,204** | **759** | **573** | **510** | **362** |
| NPA | 395<br>79% | 484<br>93% | 218<br>82% | 327<br>84% | 460<br>79% | 1,808<br>82% | 626<br>82% | 425<br>74% | 372<br>73% | 233<br>64% |
| Guilty at OATH | 4<br>1% | 3<br>1% | ~ | 3<br>1% | 16<br>3% | 41<br>2% | 23<br>3% | 2<br>0% | 5<br>1% | 0<br>0% |
| Administratively Filed | 77<br>15% | 22<br>4% | 34<br>13% | 33<br>9% | 33<br>6% | 148<br>7% | 75<br>10% | 126<br>22% | 123<br>24% | 121<br>33% |
| Deferred Prosecution | 21<br>4% | 7<br>1% | 13<br>5% | 20<br>5% | 75<br>13% | 203<br>9% | 32<br>4% | 20<br>3% | 10<br>2% | 8<br>2% |
| Not Guilty at OATH | ~ | 2<br>0% | 2<br>1% | 4<br>1% | 1<br>0% | 4<br>0% | 3<br>0% | ~ | ~ | ~ |

## TABLE 13: PENALTIES IMPOSED VIA NPA FOR USE OF FORCE RELATED MISCONDUCT

The table below shows the penalties imposed for cases closed via NPA each year since 2017.

| Penalties Imposed via NPA for Use of Force Related Misconduct, 2017-2026 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan.-June 2026** |
| **# Cases** | **395** | **484** | **218** | **327** | **460** | **1,808** | **624** | **425** | **374** | **233** |
| Refer for CD[314] | 71<br>18% | 67<br>14% | 3<br>1% | 1<br>0% | ~ | 11<br>1% | ~ | ~ | ~ | ~ |
| Reprimand | ~ | ~ | ~ | ~ | 7<br>1% | 77<br>4% | 69<br>11% | 21<br>5% | ~ | 1<br><1% |
| 1-5 Days | 31<br>8% | 147<br>30% | 52<br>24% | 80<br>24% | 69<br>14% | 462<br>26% | 156<br>25% | 149<br>35% | 125<br>34% | 110<br>47% |
| 6-9 Days | 14<br>4% | 19<br>4% | 6<br>3% | 14<br>4% | 29<br>6% | 163<br>9% | 88<br>14% | 84<br>20% | 64<br>17% | 46<br>20% |
| 10-19 Days | 62<br>16% | 100<br>21% | 56<br>26% | 83<br>25% | 110<br>24% | 447<br>25% | 147<br>24% | 101<br>24% | 96<br>26% | 45<br>19% |
| 20-29 Days | 74<br>19% | 58<br>12% | 42<br>19% | 46<br>14% | 64<br>15% | 157<br>9% | 51<br>8% | 30<br>7% | 30<br>8% | 12<br>5% |
| 30-39 Days | 42<br>11% | 42<br>9% | 21<br>10% | 32<br>10% | 43<br>10% | 170<br>9% | 51<br>8% | 18<br>4% | 13<br>3% | 7<br>3% |
| 40-49 Days | 27<br>7% | 30<br>6% | 3<br>1% | 17<br>5% | 54<br>11% | 96<br>5% | 20<br>3% | 5<br>1% | 8<br>2% | 4<br>2% |
| 50-59 Days | 14<br>4% | 4<br>1% | 17<br>8% | 17<br>5% | 18<br>4% | 80<br>4% | 14<br>2% | 7<br>2% | 14<br>4% | 0<br>0% |
| 60+ Days | 48<br>12% | 12<br>2% | 11<br>5% | 28<br>9% | 43<br>9% | 118<br>7% | 27<br>4% | 5<br>1% | 21<br>6% | 1<br><1% |
| Demotion | ~ | ~ | ~ | ~ | ~ | 6<br>0% | ~ | ~ | | |
| Retire/Resign | 12<br>3% | 5<br>1% | 7<br>3% | 9<br>3% | 23<br>6% | 22<br>1% | 1<br>0% | 5<br>1% | 3<br>1% | 7<br>3% |
| Termination (guilty at OATH or PDR) | ~ | 1 | ~ | ~ | 5 | 10 | 12 | 1 | 6 | ~ |

[314] As discussed in the Monitor's April 18, 2019 Report (dkt. 327) at pgs. 42-44, NPAs referred for CDs were previously adjudicated at the facilities after being referred from the Trials Division, a process which was rife with implementation issues. This problem has been corrected and now the Trials Division negotiates a specific number of days (one to five) to be imposed, and those specific days are treated as a CD, rather than an NPA. The main difference is that the case now remains on the staff member's record for one year instead of five years.

## TABLE 14: CASES RESOLVED VIA NPA WITH PROVISIONS FOR CD OR EXPUNGEMENT

The table below shows the number and proportion of cases closed via NPA that included provisions for a CD or an Expungement.

| Cases Resolved via NPA with Provisions for Expungement or CD | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Closure Date** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Jan.-June 2026** |
| **# NPAs** | **484** | **218** | **327** | **460** | **1,808** | **624** | **425** | **372** | **233** |
| NPAs with CD Provision | 187<br>39% | 45<br>21% | 76<br>23% | 74<br>16% | 535<br>30% | 253<br>41% | 224<br>53% | 167<br>45% | 147<br>63% |
| NPAs with Expungement | ~ | ~ | 36<br>11% | 96<br>21% | 420<br>23% | 55<br>9% | 25<br>6% | 10<br>3% | 7<br>3% |
| **Either CD or Expungement** | **187<br>39%** | **45<br>21%** | **112<br>34%** | **170<br>37%** | **955<br>53%** | **308<br>49%** | **249<br>59%** | **177<br>48%** | **154<br>71%** |

## TABLE 15: OUTCOME OF CLOSED ACTION PLAN § F, ¶ 2 CASES

The following table shows the outcomes of cases identified for expeditious resolution, pursuant to the Action Plan (dkt. 465), § F, ¶ 2.

| **Outcomes of Closed Action Plan § F, ¶ 2 Cases**<br>***As of June 30, 2026*** | | | | | | |
|---|---|---|---|---|---|---|
| **Date Case Closed** | **Jun-Dec 2022** | **2023** | **2024** | **2025** | **2026** | **TOTAL** |
| Total # of Cases (by UOF) | 13 | 36 | 22 | 25 | 8 | **104** |
| # of Cases referred by ID (by UOF) | 3 | 30 | 14 | 19 | 8 | **74** |
| # of Cases referred by Monitoring Team (by UOF) | 10 | 6 | 8 | 6 | 0 | **30** |
| **Total Number of Staff with Closed F2 Cases** | **17** | **38** | **24** | **27** | **9** | **115** |
| Closed w/ NPA for Resignation/Retirement | 2<br>*12%* | 0<br>*0%* | 0<br>*0%* | 0<br>*0%* | 0<br>*0%* | **2**<br>***2%*** |
| Closed w/ NPA for Suspension and/or Compensation Days | 12<br>*71%* | 35<br>*92%* | 20<br>*83%* | 23<br>*85%* | 9<br>*100 %* | **99**<br>***86%*** |
| Closed via OATH Trial | 0<br>*0%* | 1<br>*3%* | 1<br>*4%* | 2<br>*7%* | 0<br>*0%* | **4**<br>***3%*** |
| Trial at OATH, then Closed by Action of the Commissioner | 0<br>*0%* | 0<br>*0%* | 0<br>*0%* | 1<br>*4%* | 0<br>*0%* | **1**<br>***1%*** |
| Administratively Filed | 1<br>*6%* | 1<br>*3%* | 2<br>*8%* | 0<br>*0%* | 0<br>*0%* | **4**<br>***3%*** |
| MOS Already Resigned/Retired or was Terminated for Other Matters | 2<br>*12%* | 1<br>*3%* | 1<br>*4%* | 0<br>*0%* | 0<br>*0%* | **4**<br>***3%*** |
| Charges Withdrawn as Further Investigation Found the MOS was Not Responsible | 0<br>*0%* | 0<br>*0%* | 0<br>*0%* | 1<br>*4%* | 0<br>*0%* | **1**<br>***1%*** |

## TABLE 16: STATUS OF PENDING ACTION PLAN § F, ¶ 2 CASES

The following table shows the status of pending cases, by staff member, identified for expeditious resolution, pursuant to the Action Plan (dkt. 465), § F, ¶ 2.

| **Status of Pending Action Plan § F, ¶ 2 Cases**<br>***As of June 30, 2026*** | | | | |
|---|---|---|---|---|
| | **Before Deadline Set by Action Plan** | **Around Deadline Set by Action Plan** | **Past Deadline Set by Action Plan** | **Total # of Cases** |
| **Pending with DOC ID** | **≤30 business days** | **31-40 business days** | **≥40 business days** | **Total Pending with ID** |
| | 6 | 1 | 7 | **14** |
| **Pending Commissioner's Imposition of OATH Penalty** | **≤15 business days** | **15-25 business days** | **≥25 business days** | **Total Pending Final Approval** |
| | 0 | 0 | 1 | **1** |
| **Pending with DOI** | **≤1 month** | **1-3 months** | **≥3 months** | **Total Pending with DOI** |
| | 0 | 2 | 8 | **10** |

## TABLE 17: OATH PRE-TRIAL CONFERENCES

The table below presents the number of *use-of-force-related* pre-trial conferences that were scheduled in each Monitoring Period since July 1, 2020 and the results of those conferences. This data is discussed further in the compliance box for First Remedial Order § C., ¶¶ 4 and 5 (OATH).

| Pre-Trial Conferences Related to Use of Force Violations | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | UOF Matters & Staff | |
| # Required | Total # Scheduled | # of UOF PTC Scheduled | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
| **July to December 2020 (11th MP)** | | | | | | | | | | | |
| **225**[315] | **372** | **303** | *0* | *111* | *10* | *44* | *124* | *12* | *2* | **274** | **198** |
| | | 100% | *0%* | *37%* | *3%* | *15%* | *41%* | *4%* | *1%* | | |
| **January to June 2021 (12th MP)** | | | | | | | | | | | |
| **300** | **670** | **541** | *0* | *282* | *4* | *85* | *136* | *33* | *1* | **367** | **331** |
| | | 100% | *0%* | *52%* | *1%* | *16%* | *25%* | *6%* | *0%* | | |
| **July to December 2021 (13th MP)** | | | | | | | | | | | |
| **350** | **575** | **379** | 185 | 87 | 4 | 18 | 58 | 26 | 1 | **284** | **239** |
| | | 100% | *49%* | *23%* | *1%* | *5%* | *15%* | *7%* | *0%* | | |
| **January to June 2022 (14th MP)** | | | | | | | | | | | |
| **900** | **1447** | **989** | 612 | 76 | 3 | 174 | 105 | 3 | 16 | **574** | **417** |
| | | 100% | *62%* | *8%* | *0%* | *18%* | *11%* | *0%* | *2%* | | |

315 The Remedial Order requirement went into effect on August 14, 2020, so it was applicable for only 4.5 months of the Monitoring Period.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **July to December 2022 (15th MP)** | | | | | | | | | | | |
| **900** | **1562** | **902** | 621 | 42 | 0 | 153 | 74 | 0 | 12 | **584** | **466** |
| | | 100% | *69%* | *5%* | *0%* | *17%* | *8%* | *0%* | *1%* | | |
| **January to June 2023 (16th MP)** | | | | | | | | | | | |
| **900** | **1337** | **310** | 203 | 40 | 2 | 29 | 29 | 0 | 7 | **214** | **232** |
| | | 100% | *65%* | *13%* | *1%* | *9%* | *9%* | *0%* | *2%* | | |
| **July to December 2023 (17th MP)** | | | | | | | | | | | |
| **900** | **1079** | **373** | 264 | 29 | 14 | 32 | 24 | 1 | 9 | **254** | **264** |
| | | 100% | *71%* | *8%* | *4%* | *9%* | *6%* | *0%* | *2%* | | |
| **January to June 2024 (18th MP)** | | | | | | | | | | | |
| **900** | **942** | **384** | 239 | 38 | 7 | 44 | 21 | 1 | 34 | **228** | **273** |
| | | 100% | *62%* | *10%* | *2%* | *11%* | *5%* | *0%* | *9%* | | |
| **July to December 2024 (19th MP)** | | | | | | | | | | | |
| **375**[316] | **542** | **207** | 105 | 40 | 0 | 23 | 22 | 0 | 17 | **161** | **113** |
| | | 100% | *51%* | *19%* | *0%* | *11%* | *11%* | *0%* | *8%* | | |
| **January to June 2025 (20th MP)** | | | | | | | | | | | |
| **300**[317] | **514** | **236** | 125 | 42 | 0 | 35 | 14 | 0 | 20 | **162** | **175** |
| | | 100% | *53%* | *18%* | *0%* | *15%* | *6%* | *0%* | *8%* | | |
| **July to December 2025 (21st MP)** | | | | | | | | | | | |
| **300**[318] | **611** | **247** | 133 | 40 | 2 | 16 | 23 | 10 | 23 | **187** | **178** |
| | | 100% | *54%* | *16%* | *1%* | *6%* | *9%* | *4%* | *9%* | | |

[316] The Monitoring Team approved a reduction in the number of required pre-trial conferences in July (100), August (75), September (50), October (50), November (50) and December (50).

[317] The Monitoring Team approved a reduction in the number of required pre-trial conferences in January (50), February (50), March (50), April (50), May (50), and June (50).

[318] The Monitoring Team approved a reduction in the number of required pre-trial conferences in July (50), August (50), September (50), October (50), November (50) and December (50).

| January to June 2026 (22nd MP) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **750**[319] | **913** | **444** | 273 | 55 | 1 | 43 | 13 | 1 | 58 | **343** | **278** |
| | | 100% | *61%* | *12%* | *0%* | *10%* | *3%* | *0%* | *13%* | | |

[319] The Monitoring Team approved a reduction in the number of required pre-trial conferences in January (75) and February (75).

## TABLE 18: TRIALS AT OATH FOR USE-OF-FORCE-RELATED MISCONDUCT

The table below provides data on the number of trials conducted for use-of-force-related misconduct by DOC staff, the average number of days between the pre-trial conference and the trial, the length of time required to complete the trial, the average number of days for the ALJ to issue an R&R after the trial, and ultimately the length of time between a pre-trial conference and the issuance of the R&R.

| **Trials at OATH for Use-of-Force-Related Misconduct** *January 2016-June 2026* | | | | | |
|---|---|---|---|---|---|
| **Start Date of Trial** | **Total Number of Trials by First Day the Trial Commenced** | **Average Days Between Pre-Trial Conference and Trial** | **Average Duration of Trial in Days** | **Average Days between Final Trial Date & R&R Issued** | **Average Days between Pre-Trial Conference and R&R Issued** |
| 2016 | 1 | N/A | 1 | 38 | N/A |
| 2017 | 8 | 101 | 47 | 81 | 254 |
| 2018 | 2 | 125 | 27 | 28 | 179 |
| 2019 | 3 | 66 | 13 | 84 | 162 |
| 2020 | 4 | 240 | 78 | 239 | 557 |
| 2021 | 26 | 147 | 43 | 131 | 320 |
| 2022 | 15 | 84 | 14 | 45 | 142 |
| 2023 | 6 | 136 | 12 | 44 | 190 |
| 2024 | 6 | 50 | 2 | 62 | 117 |
| 2025 | 2 | 40 | 2 | 33 | 73 |
| Jan.-June 2026 | 1 | 16 | 1 | 32 | 48 |

## TABLE 19: OATH REPORTS & RECOMMENDATIONS FOR USE-OF-FORCE-RELATED MISCONDUCT

The chart below provides the recommended outcomes contained in Reports & Recommendations ("R&Rs") issued by OATH Administrative Law Judges for trials that occurred between January 2016-June 2026 for DOC staffs' use-of-force-related misconduct. In some cases, an R&R may cover multiple staff members, so the table evaluates the ALJ's findings by staff member.

| **OATH ALJ's Report & Recommendations by Staff Member** *(for use of force trials that occurred between January 2016-June 2026)* | | | | | | |
|---|---|---|---|---|---|---|
| **Year R&R was Issued** | **Total Number of R&Rs Issued & Number of Staff** | **Guilt** ***Agreed with DOC's recommendation*** | **Guilt** ***Imposed More Than DOC Asked*** | **Guilt on some, but dismissed some charges** ***Imposed less than what DOC asked for, but found some guilt*** | **Acquittal** | **ALJ Recommended Termination** |
| **2016** | 1 R&R covering 1 staff | 0 staff | 0 staff | 1 staff | 0 staff | 0 staff |
| **2017** | 5 R&Rs covering 5 staff | 0 staff | 0 staff | 4 staff | 1 staff | 0 staff |
| **2018** | 5 R&Rs covering 6 staff | 1 staff | 0 staff | 3 staff | 2 staff | 0 staff |
| **2019** | 2 R&Rs covering 5 staff | 0 staff | 0 staff | 0 staff | 5 staff | 0 staff |
| **2020** | 2 R&Rs covering 4 staff | 1 staff | 0 staff | 3 staff | 0 staff | 0 staff |
| **2021** | 17 R&Rs covering 21 staff | 16 staff | 0 staff | 4 staff | 1 staff | 7 staff |
| **2022** | 27 R&Rs covering 30 staff | 15 staff | 1 staff | 11 staff | 3 staff | 12 staff |
| **2023** | 6 R&Rs covering 7 staff | 4 staff | 0 staff | 2 staff | 1 staff | 4 staff |
| **2024** | 6 R&Rs covering 6 staff | 5 staff[320] | 0 staff | 1 staff | 0 staff | 3 staff |
| **2025** | 2 R&Rs covering 2 staff | 1 staff | 0 staff | 1 staff | 0 staff | 1 staff |

[320] In two cases for two staff, the ALJ found the staff guilty of all charges, but recommended a lower penalty than what DOC sought at trial.

| **OATH ALJ's Report & Recommendations by Staff Member** *(for use of force trials that occurred between January 2016-June 2026)* | | | | | | |
|---|---|---|---|---|---|---|
| **Year R&R was Issued** | **Total Number of R&Rs Issued & Number of Staff** | **Guilt** *Agreed with DOC's recommendation* | **Guilt** *Imposed More Than DOC Asked* | **Guilt on some, but dismissed some charges** *Imposed less than what DOC asked for, but found some guilt* | **Acquittal** | **ALJ Recommended Termination** |
| **Jan.-June 2026** | 1 R&Rs covering 1 staff | 1 staff | 0 staff | 0 staff | 0 staff | 1 staff |

## TABLE 20: TRIALS DIVISION STAFFING

The table below provides an overview of the Trials Division's staffing levels at the end of each Monitoring Period from June 2020 to 2026.

| Trials Division Staffing[321] | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| As of… | **June 2020** | **Dec. 2020** | **June 2021** | **Dec. 2021** | **June 2022** | **Dec. 2022** | **June 2023** | **Dec. 2023** | **June 2024** | **Dec. 2024** | **June 2025** | **Dec. 2025** | **Oct 1, 2026** |
| **Supervisors & Leadership** | **5** | **5** | **4** | **4** | **5** | **6** | **6** | **7** | **7** | **7** | **8** | **8** | **6** |
| - *Deputy Commissioner* | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| - *Associate Commissioner* | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 |
| - *Assistant Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| - *Deputy General Counsel** | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | ~ |
| - *Executive Manager Director** | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | ~ |
| - *Director* | 3 | 3 | 2 | 2 | 2 | 4 | 4 | 5 | 5 | 5 | 6 | 5 | 4 |
| **Attorneys** | **17** | **18** | **18** | **17** | **19** | **27** | **20** | **23** | **23** | **20** | **20** | **19** | **18** |
| - *Agency Attorney* | 17 | 16 | 15 | 14 | 17 | 21 | 19 | 20 | 20 | 17 | 15 | 15 | 15 |
| - *Agency Attorney Intern*[322] | 0 | 2 | 3 | 3 | 0 | 1 | 1 | 3 | 3 | 3 | 5 | 3 | 3 |
| - *Law Clerk** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | ~ |
| - *Contract Attorney** | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | ~ |

[321] In 2026, a staffing reconciliation identified that many position titles included on this chart were no longer active positions within the Trials Division. These positions are included here to provide historical context but are noted with an asterisk beside the position title.

[322] Agency Attorney Interns are individuals who have graduated law school, hold a J.D., and are either scheduled to take the New York Bar Exam or awaiting New York Bar Exam results. Once Interns are admitted to the New York Bar and submit proof of admission, they are promoted to Agency Attorney Level 1.

| Trials Division Staffing[321] | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| As of… | **June 2020** | **Dec. 2020** | **June 2021** | **Dec. 2021** | **June 2022** | **Dec. 2022** | **June 2023** | **Dec. 2023** | **June 2024** | **Dec. 2024** | **June 2025** | **Dec. 2025** | **Oct 1, 2026** |
| - *Attorneys on Loan from Other Agencies** | 0 | 0 | 0 | 0 | 0 | 5 | 0[323] | 0 | 0 | 0 | 0 | 0 | ~ |
| **Administrative and Other Support** | **14** | **13** | **13** | **13** | **10** | **12** | **19** | **17** | **20** | **18** | **19** | **20** | **20** |
| - *Administrative Manager* | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | 3 | 3 | 3 | 3 |
| - *Executive Coordinator* | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| - *Office Manager* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Principal Administrative Associate* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 3 | 3 | 3 | 3 |
| - *Legal Coordinator* | 2 | 2 | 2 | 2 | 3 | 5 | 4 | 4 | 5 | 3 | 4 | 4 | 4 |
| - *Investigator* | 1 | 1 | 1 | 1 | 0 | 0 | 2 | 2 | 3 | 3 | 3 | 4 | 4 |
| - *Clerical Associate* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Program Specialist** | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | ~ |
| - *Intern** | 1 | 1 | 1 | 1 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | ~ |
| - *Front Desk Officer* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Community Coordinator* | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *City Research Scientist* | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Correctional Standard* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 |
| **Total** | **36** | **36** | **35** | **34** | **34** | **45** | **45** | **46** | **49** | **45** | **47** | **47** | **44** |

[323] The MOU for attorneys on loan from other City agencies was terminated on February 1, 2023. Further, the attorneys on loan from DOC Legal were transferred back to Legal by April 14, 2023. *See* Monitor's October 28, 2022 Report (dkt. 472) at pg. 14 regarding a discussion on the attorneys on loan.

## TABLE 21: NCU SECURITY AUDITS' FINDINGS OF STAFFS' TOURING PRACTICES

The table below shows the number of random security audits NCU conducted between January 2022 and June 2026,[324] and the proportion identifying that staff failed to make all required tours or failed to conduct meaningful tours.

| **NCU Security Audits' Findings regarding Staffs' Touring Practices** ***January 2022-June 2026*** | | | |
|---|---|---|---|
| **Date Audited** | **# of NCU Audits Completed** | **# of Audits that found Staff Failed to Make All Required Tours** | **# of Audits that found Staff Failed to Conduct Meaningful Tours** |
| January-June 2022 | 59 | 17 (29%) | 14 (24%) |
| July-December 2022 | 37 | 10 (27%) | 7 (19%) |
| January-June 2023 | 19 | 7 (37%) | 6 (32%) |
| July-December 2023 | 31 | 18 (58%) | 20 (65%) |
| January-June 2024 | 37 | 19 (51%) | 19 (51%) |
| July-December 2024 | 34 | 10 (29%) | 14 (41%) |
| January-June 2025 | 30 | 7 (23%) | 10 (33%) |
| July-December 2025 | 26 | 10 (38%) | 17 (65%) |
| January-June 2026 | 36 | 8 (22%) | 15 (42%) |

[324] Beginning in July-December 2025, NCU began targeted audits of randomly selected days and times for the Back to Basics and Honors Units at GRVC, while continuing a limited number of audits of randomly selected units in other facilities. Therefore, the data below for July 2025 onwards includes both the audits of randomly selected units and the targeted audits of the Back to Basics and Honors Units at GRVC.

## TABLE 22: CORRECTIVE ACTION FOR DEFICIENT TOURING RECOMMENDED VIA RAPID REVIEWS

The following table shows the corrective actions that facility leadership recommended, via Rapid Reviews, for staff's potentially deficient touring practices.

| Corrective Action for Deficient Touring *Recommended* via Rapid Reviews[325] January 2022-June 2026 | | | | |
|---|---|---|---|---|
| **Date of Use of Force Incident** | **# of Staff Referred for Suspension** | **# of Staff Referred for Formal Charges** | **# of Staff Referred for a Command Discipline** | **# of Staff Referred for a Corrective Interview or 5003 Counseling** |
| January-December 2022 | 1 | 0 | 3 | 1 |
| January-December 2023 | 0 | 4 | 17 | 10 |
| January-December 2024 | 0 | 2 | 18 | 6 |
| January-December 2025 | 1 | 0 | 17 | 8 |
| January-June 2026 | 1 | 4 | 14 | 23 |

325 This table only shows *recommendations* made for corrective action via the Rapid Reviews and does not indicate whether the corrective action was imposed as recommended.

# APPENDIX G:
# STAFFING

## TABLE 1: NUMBER OF ADWS

The table below identifies the number and assignment of ADWs at specific points in time from July 18, 2020, to June 20, 2026.

| Number of ADWs & Assignments in the Department[326] | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **# ADW as of…** | **7/18/20** | **1/2/21** | **6/26/21** | **1/1/22** | **6/18/22** | **12/31/22** | **6/17/23** | **12/23/23** | **6/22/24** | **12/28/24** | **6/21/25** | **12/6/25** | **6/20/26** |
| AMKC[327] | 9 | 21 | 13 | 12 | 9 | 12 | 16 | 0 | 1 | 0 | 0 | 0 | 0 |
| EMTC[328] | 0 | 0 | 0 | 0 | 0 | 8 | 10 | 11 | 11 | 11 | 8 | 10 | 8 |
| GRVC | 6 | 10 | 11 | 9 | 8 | 12 | 11 | 11 | 9 | 9 | 8 | 9 | 7 |
| NIC/WF | 6 | 8 | 8 | 5 | 7 | 8 | 9 | 12 | 11 | 12 | 9 | 10 | 10 |
| OBCC[329] | 6 | 8 | 8 | 14 | 7 | 0 | 0 | 11 | 10 | 8 | 6 | 9 | 12 |
| RESH[330] | | | | | | | | | | 5 | 5 | 9 | 9 |
| RMSC | 5 | 6 | 6 | 5 | 4 | 5 | 6 | 14 | 11 | 8 | 7 | 7 | 5 |
| RNDC | 7 | 15 | 15 | 10 | 7 | 12 | 12 | 10 | 10 | 9 | 5 | 9 | 9 |
| VCBC[331] | 4 | 6 | 5 | 5 | 4 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | |
| Court Commands[332] (BKDC, BXDC, MDC, QDC) | 9 | 6 | 4 | 4 | 3 | 4 | 3 | 4 | 4 | 3 | 3 | 3 | 4 |

326 The specific post assignments of ADWs within the facility are not available, so this data simply indicates the number of ADWs assigned to each facility.

327 AMKC was closed in August 2023.

328 EMTC was closed and re-opened during these Monitoring Periods. Until late 2022, staff who worked at EMTC were technically assigned to AMKC.

329 OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then re-opened in July 2023.

330 RESH opened in June 2023, however the staff that worked in RESH were technically assigned to RMSC until December 2024.

331 VCBC was closed in October 2023. Although VCBC no longer housed incarcerated individuals, DOC still assigned staff to the facility to maintain its security given its location off of Rikers Island. The barge was removed in November 2025.

332 Prior to the 22nd Monitoring Period, data for MDC was included separately. It is now being combined with data for the other court commands. MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are actually assigned to the Manhattan Courts (Criminal, Supreme, and Family).

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hospitals[333] (BHPW, BHTU, EHPW) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| **Total # of ADWs in Facilities & Court Commands** | **52** | **80** | **70** | **64** | **49** | **66** | **72** | **73** | **67** | **65** | **51** | **66** | **69** |
| **Total # of ADWs Available Department-wide** | **66** | **95** | **88** | **80** | **67** | **82** | **89** | **91** | **85** | **87** | **69** | **89** | **88** |
| **% of ADWs in Facilities & Court Commands** | **79%** | **84%** | **80%** | **80%** | **73%** | **80%** | **81%** | **80%** | **79%** | **75%** | **74%** | **74%** | **78%** |

333 Prior to this report, the hospitals were inadvertently excluded from this data.

## TABLE 2: NUMBER OF CAPTAINS

The table below identifies the number and assignment of captains at specific points in time from July 18, 2020, to June 20, 2026.

| Number of Captains & Assignments in the Department[334] | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **# Captains as of…** | **7/18/20** | **1/2/21** | **6/26/21** | **1/1/22** | **6/18/22** | **12/31/22** | **6/17/23** | **12/23/23** | **6/22/24** | **12/28/24** | **6/21/25** | **12/6/25** | **6/20/26** |
| AMKC[335] | 91 | 111 | 97 | 87 | 81 | 80 | 65 | 13 | 7 | 7 | 5 | 5 | 3 |
| EMTC[336] | 0 | 0 | 0 | 0 | 0 | 38 | 37 | 37 | 39 | 43 | 45 | 44 | 41 |
| GRVC | 75 | 72 | 86 | 86 | 81 | 90 | 61 | 43 | 50 | 62 | 59 | 58 | 56 |
| NIC/WF | 51 | 45 | 45 | 56 | 45 | 50 | 44 | 58 | 48 | 56 | 55 | 51 | 31 |
| OBCC[337] | 85 | 81 | 78 | 77 | 38 | 7 | 7 | 54 | 62 | 62 | 63 | 63 | 63 |
| RESH[338] | [redacted] | | | | | | | | | 27 | 31 | 23 | 28 |
| RMSC | 51 | 50 | 49 | 36 | 34 | 31 | 27 | 55 | 55 | 28 | 33 | 28 | 21 |
| RNDC | 58 | 56 | 60 | 63 | 70 | 70 | 68 | 45 | 52 | 52 | 50 | 53 | 45 |
| VCBC[339] | 27 | 25 | 27 | 25 | 23 | 22 | 21 | 3 | 1 | 3 | 3 | 0 | [redacted] |
| Court Commands[340] (BKDC, BXDC, MDC, QDC) | 111 | 76 | 50 | 44 | 44 | 39 | 36 | 41 | 41 | 39 | 37 | 35 | 33 |

[334] The specific post assignments of captains within the facility are not available, so this data simply indicates the number of captains assigned to each facility.

[335] AMKC was closed in August 2023.

[336] EMTC was closed and re-opened during these Monitoring Periods. Until late 2022, staff who worked at EMTC were technically assigned to AMKC.

[337] OBCC was closed by July 2022. Staff were then reassigned to other commands. OBCC was then re-opened in July 2023.

[338] RESH opened in June 2023, however the staff that worked in RESH were technically assigned to RMSC until December 2024.

[339] VCBC was closed in October 2023. Although VCBC no longer housed incarcerated individuals, DOC still assigned staff to the facility to maintain its security given its location off of Rikers Island. The barge was removed in November 2025.

[340] Prior to the 22nd Monitoring Period, data for MDC was included separately. It is now being combined with data for the other court commands. MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021. The staff currently assigned to MDC are actually assigned to the Manhattan Courts (Criminal, Supreme, and Family).

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hospitals[341] (BHPW, BHTU, EHPW) | 16 | 17 | 18 | 14 | 12 | 10 | 12 | 13 | 15 | 13 | 12 | 15 | 32 |
| **Total # of Captains in Facilities & Court Commands** | **565** | **533** | **510** | **488** | **428** | **437** | **378** | **362** | **370** | **392** | **393** | **375** | **353** |
| **Total # of Captains Available Department-wide** | **810** | **765** | **751** | **670** | **607** | **573** | **550** | **539** | **536** | **553** | **533** | **506** | **477** |
| **% of Captains in Facilities & Court Commands** | **70%** | **70%** | **68%** | **73%** | **71%** | **76%** | **69%** | **67%** | **69%** | **71%** | **74%** | **74%** | **74%** |

[341] Prior to this report, the hospitals were inadvertently excluded from this data.

## TABLE 3: SICK LEAVE, MEDICALLY MONITORED/RESTRICTED, AWOL, PE, AND FMLA

The table below provides data from January 1, 2019, to June 30, 2026, regarding the monthly average staff headcount, the average number/proportion of staff out sick, the average number/proportion of staff on medically monitored/restricted duty level 3, the average number/proportion of staff who were AWOL, the average number/proportion of staff who were on Personal Emergency leave, and the average number/proportion of staff on FMLA leave.[342]

**Average Monthly Sick Leave, Medically Monitored/Restricted, AWOL, PE, and FMLA**

| Year | Avg. Head-count | Avg. Daily Sick | Avg. Daily % Sick | Avg. Daily MMR3 | Avg. Daily % MMR3 | Avg. Daily AWOL | Avg. Daily % AWOL | Avg. Daily PE | Avg. Daily % PE | Avg. Daily FMLA | Avg. Daily % FMLA |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **2019** | **10115** | 579 | 5.7% | 475 | 4.7% | | | | | | |
| **2020** | **9302** | 1070 | 11.5% | 464 | 5.0% | | | | | | |
| **2021** | **8454** | 1470 | 17.5% | 699 | 8.3% | 56 | 0.7% | 37 | 0.5% | 60 | 0.7% |
| **2022** | **7181** | 1085 | 15.0% | 586 | 8.1% | 17 | 0.2% | 30 | 0.4% | 51 | 0.7% |
| **2023** | **6479** | 512 | 7.9% | 384 | 5.9% | 12 | 0.2% | 38 | 0.6% | 72 | 1.1% |
| **2024** | **6065** | 385 | 6.4% | 292 | 4.8% | 11 | 0.2% | 43 | 0.7% | 112 | 1.9% |
| **2025** | **5877** | 348 | 5.9% | 237 | 4.0% | 7 | 0.1% | 38 | 0.6% | 141 | 2.4% |
| **Jan-Jun 2026** | **5768** | 340 | 5.9% | 172 | 3.0% | 6 | 0.1% | 34 | 0.6% | 165 | 2.9% |

[342] The AWOL, PE, and FMLA data was only available for August 1, 2021-January 26, 2022 and April 2022-June 30, 2026.

## TABLE 4: LOCATION OF AWARDED POSTS

The chart and tables below show how awarded posts were distributed across facilities and ranks at five recent points in time: April 30, 2024, March 31, 2025, June 30, 2025, December 31, 2025, and June 30, 2026.



## TABLE 5: INCARCERATED INDIVIDUAL-FACING AWARDED POSTS IN FACILITY

Posts that are awarded "in facility," can be either incarcerated individual-facing posts, which involve direct day-to-day contact with individuals in custody, or non- incarcerated individual-facing posts, which do not. The table below provides additional detail about the number of awarded posts the Department considers to be incarcerated individual-facing. These posts are considered a subset of the "In Facility" posts reflected in Table 4.

| Incarcerated Individual-Facing Posts, by Facility As Identified by the Department | | | | | |
|---|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** | **% of All Awarded Posts** |
| April 30, 2024 | 1 | 69 | 360 | 430 | 51% |
| November 13, 2024 | 1 | 61 | 333 | 395 | 51% |
| June 30, 2025 | 1 | 56 | 345 | 402 | 55% |
| October 31, 2025[343] | 1 | 54 | 330 | 385 | 59% |

[343] The Department stopped providing this data to the Monitoring Team in October 2025.

## TABLE 6: HOUSING UNIT AWARDED POSTS

The table below reflects further analysis by the Monitoring Team to determine the number of awarded posts that are assigned to a housing unit. These housing unit posts are considered a subset of the "In Facility" posts.

| **Housing Unit Posts<br>As Identified by Monitoring Team Analysis** | | | | | |
|---|---|---|---|---|---|
| | **ADW** | **Captain** | **CO** | **Total** | **% of All Awarded Posts** |
| April 30, 2024 | 1 | 30 | 135 | 166 | 20% |
| November 13, 2024 | 1 | 28 | 126 | 155 | 20% |
| March 31, 2025 | 1 | 26 | 151 | 178 | 22% |
| June 30, 2025 | 1 | 25 | 146 | 172 | 23% |
| December 31, 2025 | 1 | 21 | 144 | 166 | 25% |
| June 30, 2026 | 1 | 17 | 97 | 115 | 21% |
| ***This table includes posts in which the location on a housing unit was not 100% certain, but is possible, in order to illustrate the maximum possible value.* | | | | | |

## TABLE 7: TRIPLE TOURS

The table below provides the annual total headcount and annual and daily averages of triple tours from January 2021 to June 2026.

| Triple Tour Data[344]<br>2021 to June 2026 | | | |
|---|---|---|---|
| Year | Average Headcount | Total Triple Tours (per year) | Average Triple Tours (per day) |
| 2021 | 8,454 | 3,549 | 10 |
| 2022 | 7,181 | 1,431 | 4 |
| 2023 | 6,479 | 151 | 0 |
| 2024[345] | 6,065 | 601 | 2 |
| 2025 | 5,877 | 524 | 1 |
| Jan-Jun 2026 | 5,768 | 241 | 1 |

[344] *See* Appendix F, Table 7 in the Monitor's May 22, 2025 Report (dkt. 850) for more detailed data on the monthly totals and averages of triple tours for January 2021-December 2024.

[345] For all data prior to January 2024, the Department calculated triple tours based on the number of staff who worked over 3.75 hours of their third tour. In January 2024, the Department began calculating this data based on the number of staff who worked over 4.28 hours of their third tour. Since some staff only work a short part of a third consecutive shift, using 20.28 hours as a threshold more accurately accounts for those staff who are working significant enough time to be considered a triple tour. In addition, in 2024, the Office of Management Analysis and Planning ("OMAP") conducted a review of triple tour data for quality assurance purposes and to improve efficiencies in its collecting and reporting of this data. Prior to 2024, each facility self-reported its triple tour data based on handwritten Tour Certification reports. Tour Certifications are completed at the beginning of a tour and do not account for how long a staff member remains on that tour. In January 2024, the Department began calculating triple tours based on timesheet and payment data collected from the CityTime payroll application. The Department has reported that this has resulted in more reliable data.

## TABLE 8: OVERTIME SPENDING

The table below shows the Department's monthly overtime costs for uniformed staff since January 2019.

| Overtime Data for Uniformed Staff[346] *2019-August 2026* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Month** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** |
| **January** | $12,860,000 | $9,800,000 | $12,066,000 | $18,847,000 | $22,893,000 | $21,227,000 | $26,192,000 | $25,732,000 |
| **February** | $12,392,000 | $7,983,000 | $14,037,000 | $18,226,000 | $20,819,000 | $19,936,000 | $22,967,000 | $23,686,000 |
| **March** | $14,194,000 | $8,426,000 | $15,218,000 | $20,969,000 | $23,855,000 | $21,759,000 | $27,271,000 | $26,268,000 |
| **April** | $13,941,000 | $13,340,000 | $15,394,000 | $20,783,000 | $22,414,000 | $21,533,000 | $27,108,000 | $27,318,000 |
| **May** | $14,135,000 | $7,926,000 | $15,850,000 | $21,423,000 | $23,358,000 | $22,450,000 | $27,355,000 | $27,267,000 |
| **June** | $11,894,000 | $5,647,000 | $15,887,000 | $21,721,000 | $22,490,000 | $21,566,000 | $26,920,000 | $26,763,000 |
| **July** | $14,273,000 | $5,817,000 | $18,860,000 | $22,064,000 | $23,758,000 | $24,282,000 | $27,991,000 | $27,383,000 |
| **August** | $14,592,000 | $6,815,000 | $19,719,000 | $22,453,000 | $22,434,000 | $22,125,000 | $27,764,000 | $27,206,000 |
| **September** | $11,714,000 | $6,022,000 | $20,137,000 | $22,006,000 | $18,871,000 | $23,756,000 | $28,304,000 | |
| **October** | $12,146,000 | $7,168,000 | $21,485,000 | $22,901,000 | $19,712,000 | $26,186,000 | $29,253,000 | |
| **November** | $11,458,000 | $8,268,000 | $19,514,000 | $22,215,000 | $19,462,000 | $25,506,000 | $26,002,000 | |
| **December** | $11,439,000 | $11,687,000 | $19,546,000 | $22,276,000 | $20,261,000 | $25,791,000 | $25,966,000 | |
| **Annual Overtime Spending** | **$155,038,000** | **$98,899,000** | **$207,713,000** | **$255,884,000** | **$260,327,000** | **$276,117,000** | **$323,093,000** | **$213,623,000** |
| **Average # of Staff** | **10,115** | **9,302** | **8,454** | **7,181** | **6,479** | **6,065** | **5,877** | **5,768** |

[346] Lags in the reporting and payment of overtime may occur. Staff must submit overtime paperwork, and processing lags may result in overtime paid weeks and potentially months after it was worked. On occasion, certain situations (*i.e.*, collective bargaining settlements) may call for substantial retroactive overtime payments. As a result, overtime data is never truly static and is subject to real-time changes. Because these changes are so frequent, they are not reflected in the data produced above.

## TABLE 9: DEPARTMENT'S AVERAGE DAILY POPULATION AND STAFFING LEVELS

The graph below shows the Department's average daily incarcerated population since 2016, and the average uniformed staff levels since 2019.



## TABLE 10: TRAINING ACADEMY GRADUATES

The table below shows the number of new recruits that graduated from the Department's Training Academy to become corrections officers each year.

| **CO Graduation Data**<br>*January 2013- June 2026* | |
|---|---|
| **Year of Academy Class Graduation** | **Total # of COs who Graduated** |
| 2013 | 342 |
| 2014 | 287 |
| 2015 | 955 |
| 2016 | 2,229 |
| 2017 | 1,144 |
| 2018 | 1,213 |
| 2019 | 381 |
| 2020 | 0 |
| 2021 | 120 |
| 2022 | 108 |
| 2023 | 274 |
| 2024 | 189 |
| 2025 | 270 |
| January-June 2026 | 261 |

## TABLE 11: ATTRITION

The table below shows the number of staff who terminated their employment with the Department each year from January 2020 to June 2026, by rank and years of service.

| DOC Attrition Data, 2020-2025 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Rank of MOS** | **Correction Officers** | | | | **Captains** | | | | **Senior Ranks (ADW and above)** | | | | **Total** |
| **Years of Service with DOC** | **Less than 5 Yrs** | **5-10 Yrs** | **10-20 Yrs** | **More than 20 Yrs** | **Less than 5 Yrs** | **5-10 Yrs** | **10-20 Yrs** | **More than 20 Yrs** | **Less than 5 Yrs** | **5-10 Yrs** | **10-20 Yrs** | **More than 20 Yrs** | |
| **2020** | 399 | 51 | 211 | 120 | 0 | 1 | 32 | 22 | 0 | 0 | 3 | 17 | **856** |
| **2021** | 468 | 312 | 270 | 113 | 0 | 2 | 50 | 18 | 0 | 0 | 6 | 18 | **1,257** |
| **2022** | 144 | 455 | 381 | 98 | 0 | 2 | 49 | 18 | 0 | 2 | 5 | 8 | **1,162** |
| **2023** | 119 | 288 | 250 | 34 | 0 | 1 | 40 | 11 | 0 | 0 | 1 | 8 | **752** |
| **2024** | 124 | 135 | 271 | 43 | 0 | 0 | 36 | 8 | 0 | 0 | 6 | 7 | **630** |
| **2025** | 137 | 97 | 259 | 45 | 0 | 0 | 32 | 12 | 0 | 0 | 2 | 3 | **587** |
| **Jan.-Jun. 2026** | 74 | 29 | 124 | 43 | 0 | 0 | 17 | 8 | 0 | 0 | 2 | 0 | **297** |

## TABLE 12: OVERVIEW OF STAFF PROMOTIONS

The table below shows the number of staff promoted to each rank from January 2017 to June 2026.

| Staff Promoted by Rank | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Jan-Jun 2026 |
| Captain | 181 | 97 | 0 | 0 | 0 | 0 | 26 | 50 | 24 | 1 |
| Assistant Deputy Warden | 4 | 13 | 3 | 35 | 0 | 26 | 10 | 0 | 23 | 0 |
| Deputy Warden | 5 | 3 | 8 | 0 | 1 | 0 | 5 | 0 | 13 | 0 |
| Deputy Warden in Command | [redacted] | | | | | | | | | 2[347] |
| Executive Officer | | | | | | | | | | 2[348] |
| Warden | 2 | 5 | 1 | 2 | 4 | 0 | 0 | 3 | 2 | 2[349] |
| Chief | 3 | 2 | 3 | 0 | 4 | 0 | 0 | 2 | 0 | 3[350] |

[347] Beginning in 2026, the Monitoring Team began separately tracking appointments to Deputy Warden in Command as it appeared that the Department began using this rank instead of the "Acting Warden" titles that were used in the years prior. One of the individuals appointed to Deputy Warden in Command during the 22nd Monitoring Period was appointed as Deputy Chief of Staff.

[348] Beginning in 2026, the Monitoring Team began separately tracking appointments to Executive Officer as it appeared that the Department began using this rank instead of the "Acting Warden" titles that were used in the years prior.

[349] One of the individuals appointed to Warden during the 22nd Monitoring Period was appointed as Acting Assistant Chief.

[350] Two of the three chiefs promoted during the 22nd Monitoring Period already held the rank of chief but were promoted from one chief role to a higher chief role.

# APPENDIX H:
# LEADERSHIP APPOINTMENTS

**Leadership Appointments – January 2022 to August 10, 2026**

The table below identifies the leadership positions filled between January 2022 and August 10, 2026, including the date of appointment and the departure date, if applicable.

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Assistant Commissioner | Administration | 5/6/2024 | 1/25/2025 | Promoted to Deputy Commissioner of Administration |
| | | | | |
| Associate Commissioner | Administration | 11/25/2025 | 7/24/2026 | Transferred to Associate Commissioner of Human Resources |
| | | | | |
| Deputy Commissioner | Administration | 9/6/2022 | 5/10/2024 | |
| Deputy Commissioner | Administration | 1/25/2025 | 2/6/2026 | |
| Deputy Commissioner | Administration | 8/2/2026 | | |
| | | | | |
| Agency Chief Contracting Officer (ACCO) | Central Office of Procurement | 9/18/2023 | 10/14/2024 | |
| Agency Chief Contracting Officer (ACCO) | Central Office of Procurement | 11/21/2024 | | |
| | | | | |
| Chief of Department | Chief of Department | 3/11/2026 | | |
| | | | | |
| Associate Commissioner | Chief of Department | 5/17/2026 | | |
| | | | | |
| Assistant Commissioner | CIB | 7/11/2022 | 11/10/2024 | |
| Assistant Commissioner | CIB | 9/30/2025 | | |
| | | | | |
| Assistant Deputy Warden / Executive Officer/Acting Assistant Commissioner | CIB | 11/10/2024 | 9/30/2025 | |
| | | | | |
| Assistant Commissioner | Development and Advancement (ODA) | 6/5/2025 | 4/2/2026 | |
| | | | | |
| Deputy Commissioner / Chief Diversity Officer | Development and Advancement (ODA) | 2/26/2025 | 4/2/2026 | |
| | | | | |
| Assistant Commissioner | Early Intervention, Supervision, & Support | 11/13/2018 | | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| | | | | |
| Acting EEO Officer | Equal Employment Opportunity | 2/10/2025 | 11/12/2025 | Promoted to Assistant Commissioner |
| | | | | |
| Assistant Commissioner/ EEO Officer | Equal Employment Opportunity | 8/2/2021 | 2/9/2025 | |
| Assistant Commissioner | Equal Employment Opportunity | 11/12/2025 | | |
| | | | | |
| Assistant Commissioner | Facilities & Fleet Administration (FMRD) | 9/4/2025 | | |
| Assistant Commissioner | Facilities & Fleet Administration (FMRD) | 1/7/2026 | | |
| | | | | |
| Associate Commissioner | Facilities & Fleet Administration (FMRD) | 9/11/2023 | 11/7/2024 | Promoted to Deputy Commissioner |
| | | | | |
| Deputy Commissioner | Facilities & Fleet Administration (FMRD) | 5/22/2023 | 10/27/2024 | |
| Deputy Commissioner | Facilities & Fleet Administration (FMRD) | 11/7/2024 | | |
| | | | | |
| Director, Energy Mgt Strategy | Facilities & Fleet Administration (FMRD) | 7/17/2023 | 5/4/2025 | Position eliminated |
| | | | | |
| Bureau Chief | Facility Operations and Security | 3/11/2026 | | |
| | | | | |
| Acting Assistant Chief | Facility Operations | 3/11/2026 | | |
| | | | | |
| Assistant Commissioner | Facility Operations, Classification & Population Management | 5/24/2023 | 5/21/2024 | Position eliminated |
| | | | | |
| Associate Commissioner | Facility Operations, Classification & Population Management | 8/22/2022 | 9/18/2025 | Title changed to AC of Security |
| Associate Commissioner | Facility Operations, Classification & Population Management | 6/20/2024 | 9/18/2025 | Title changed to AC of Facility Operations |
| Associate Commissioner | Facility Operations | 9/18/2025 | 3/20/2026 | |
| | | | | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Administrative Director of Facility Operations | Facility Operations, Classification & Population Management (CMCMU) | 10/28/2024 | 11/24/2025 | Position currently vacant |
| | | | | |
| Deputy Commissioner | Facility Operations, Classification & Population Management (CMCMU) | 7/25/2022 | 2/5/2024 | |
| Deputy Commissioner | Facility Operations, Classification & Population Management (CMCMU) | 10/15/2024 | 5/9/2025 | Position eliminated |
| | | | | |
| Deputy Warden in Command / Acting Warden (Promoted 3/25/25) | Facility Operations - CJB, Hospital Prison Wards, Transportation, Courts | 9/14/2021 | 3/24/2025 | Promoted to Warden |
| Warden | Facility Operations - CJB, Hospital Prison Wards, Transportation, Courts | 3/25/2025 | 9/18/2025 | Promoted to Acting Assistant Chief |
| Acting Assistant Chief | Facility Operations - CJB, Hospital Prison Wards, Transportation, Courts, GRVC, RNDC, EMTC, RMSC/ESH | 9/18/2025 | 4/2/2026 | Promoted to Assistant Chief |
| Assistant Chief | Facility Operations - CJB, Hospital Prison Wards, Transportation, Courts, GRVC, NIC, WF | 4/2/2026 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - EMTC | 4/24/2023 | 9/18/2025 | Promoted to Acting Warden |
| Acting Warden | Facility Operations - EMTC | 9/18/2025 | 11/25/2025 | Promoted to Warden |
| Warden | Facility Operations - EMTC | 11/25/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - GRVC | 4/24/2023 | 9/9/2024 | |
| Warden (Acting) | Facility Operations - GRVC | 9/9/2024 | 9/18/2025 | Promoted to Acting Warden at RNDC |
| Warden (Acting) | Facility Operations - GRVC | 9/18/2025 | 3/11/2026 | Promoted to Warden |
| Warden | Facility Operations – GRVC | 3/11/2026 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - NIC/WF | 6/20/2023 | 8/11/2024 | |
| Warden (Acting) | Facility Operations - NIC | 9/9/2024 | 9/18/2025 | NIC combined with WF |
| Assistant Commissioner | Facility Operations - WF | 11/13/2023 | 9/18/2025 | Position expanded to include NIC |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Assistant Commissioner | Facility Operations – NIC/WF | 9/18/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - OBCC | 4/24/2023 | 10/7/2023 | |
| Assistant Commissioner (formerly in Security Operations) | Facility Operations - OBCC | 5/6/2024 | 1/8/2025 | |
| Warden (Acting) | Facility Operations - OBCC | 1/8/2025 | 9/18/2025 | |
| Warden | Facility Operations - OBCC | 9/18/2025 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - RMSC | 4/24/2023 | 5/6/2024 | Promoted to Assistant Commissioner of Administration |
| Warden | Facility Operations - RMSC | 10/17/2024 | 7/15/2026 | Position expanded to include ESH |
| | | | | |
| Warden | Facility Operations - RESH | 10/17/2024 | 9/18/2025 | Promoted to Warden at OBCC |
| Acting Warden | Facility Operations - RESH | 9/18/2025 | 7/15/2026 | Promoted to Warden at RNDC |
| Warden | Facility Operations – RMSC/ESH | 7/15/2026 | | Position expanded to include RMSC |
| | | | | |
| Warden | Facility Operations - RNDC | 10/17/2024 | 9/18/2025 | |
| Acting Warden | Facility Operations - RNDC | 9/18/2025 | 3/11/2026 | Promoted to Acting Assistant Chief of Facility Operations |
| Warden | Facility Operations – RNDC | 7/15/2026 | | |
| | | | | |
| Assistant Commissioner | Facility Operations - VCBC | 4/24/2023 | 10/21/2023 | Position eliminated |
| | | | | |
| Assistant Commissioner | Finance | 9/8/2020 | 10/14/2024 | |
| Assistant Commissioner | Finance | 2/18/2025 | 4/9/2026 | Promoted to Deputy Commissioner |
| Assistant Commissioner | Finance | 8/10/2026 | | |
| | | | | |
| Deputy Commissioner | Finance | 9/11/2023 | 4/25/2025 | |
| Deputy Commissioner | Finance | 4/9/2026 | | |
| | | | | |
| Assistant Commissioner | Health Affairs | 11/17/2023 | | |
| | | | | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Deputy Commissioner | Health Affairs | 1/30/2023 | 12/19/2025 | |
| Deputy Commissioner | Health Affairs | 4/16/2026 | | |
| | | | | |
| Assistant Commissioner | Health Management Division | 10/10/2023 | | |
| | | | | |
| Chief Surgeon | Health Management Division | 4/18/2023 | 8/11/2023 | Position eliminated |
| | | | | |
| Medical Director | Health Management Division | 10/16/2025 | | |
| | | | | |
| Assistant Commissioner | Human Resources | 6/16/2022 | 4/9/2023 | |
| Assistant Commissioner | Human Resources (AIU) | 6/16/2022 | 4/27/2025 | |
| Assistant Commissioner | Human Resources | 8/8/2022 | 5/24/2024 | Promoted to Associate Commissioner |
| Assistant Commissioner | Human Resources | 10/1/2023 | 10/31/2025 | Promoted to Associate Commissioner |
| Assistant Commissioner | Human Resources | 4/16/2026 | | |
| Assistant Commissioner | Human Resources | 7/10/2026 | | |
| | | | | |
| Associate Commissioner | Human Resources | 4/7/2022 | 4/1/2023 | |
| Associate Commissioner | Human Resources | 5/24/2024 | 9/12/2025 | Promoted to Deputy Commissioner |
| Associate Commissioner | Human Resources | 10/31/2025 | | |
| Associate Commissioner | Human Resources | 7/27/2026 | | |
| | | | | |
| Deputy Commissioner | Human Resources | 10/16/2023 | 8/16/2024 | |
| Deputy Commissioner | Human Resources | 9/12/2025 | | |
| | | | | |
| Executive Director | Intergovernmental Affairs | 8/8/2022 | 4/15/2025 | |
| Executive Director | Intergovernmental Affairs | 10/14/2025 | 4/28/2026 | |
| | | | | |
| Senior Deputy Commissioner | Investigations, Intelligence, Accountability | 6/1/2026 | | |
| | | | | |
| Deputy Commissioner | Investigations | 5/9/2022 | 4/1/2023 | |
| Deputy Commissioner | Investigations | 8/3/2023 | | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| | | | | |
| Assistant Commissioner | Investigations | 12/11/2022 | 3/1/2023 | |
| Assistant Commissioner | Investigations | 8/8/2023 | 3/25/2024 | |
| Assistant Commissioner | Investigations | 10/16/2025 | | |
| | | | | |
| Associate Commissioner | Investigations | 12/15/2021 | 9/5/2023 | |
| Associate Commissioner | Investigations | 11/22/2024 | | |
| | | | | |
| Associate Commissioner | IT | 8/8/2022 | | Acting Deputy Commissioner from 4/10/2023 to 4/9/2024 |
| Associate Commissioner/ Deputy CIO IT Division | IT | 7/3/2023 | 4/9/2024 | Promoted to Deputy Commissioner |
| Associate Commissioner | IT | 11/18/2024 | | |
| | | | | |
| Deputy Commissioner | IT | 9/24/2017 | 6/1/2023 | |
| Deputy Commissioner (Acting) | IT | 4/10/2023 | 4/9/2024 | |
| Deputy Commissioner | IT | 4/9/2024 | | |
| | | | | |
| Deputy Commissioner | Legal | 8/8/2022 | 9/2/2023 | |
| General Counsel (Acting) | Legal | 12/12/2023 | 8/9/2024 | |
| General Counsel | Legal | 8/26/2024 | | |
| | | | | |
| Deputy General Counsel | Legal | 8/14/2023 | 11/5/2023 | |
| Deputy General Counsel (Acting) | Legal | 12/12/2023 | 7/30/2024 | |
| Deputy General Counsel | Legal | 10/21/2024 | | |
| Deputy General Counsel | Legal | 12/23/2025 | | |
| | | | | |
| Assistant Commissioner | Management Analysis & Planning | 1/17/2023 | 9/1/2023 | |
| Assistant Commissioner | Management Analysis & Planning | 8/29/2022 | | |
| Assistant Commissioner | Management Analysis & Planning | 11/27/2023 | | |
| | | | | |
| Associate Commissioner | Management Analysis & Planning | 7/3/2022 | 9/19/2025 | During this period also served as Acting Deputy |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| | | | | Commissioner – 4/24/2025 to 9/19/2025 |
| | | | | |
| Deputy Commissioner | Management Analysis & Planning | 4/18/2022 | 4/24/2025 | |
| Deputy Commissioner (Acting) | Management Analysis & Planning | 4/24/2025 | 9/19/2025 | |
| Deputy Commissioner | Management Analysis & Planning | 12/10/2025 | | |
| | | | | |
| Assistant Commissioner | *Nunez* Compliance Unit | 4/17/2023 | | |
| | | | | |
| Assistant Commissioner | Nutritional Services Division | 11/3/2025 | | |
| | | | | |
| Agency Counsel and Senior Advisor to the Commissioner | Office of the Commissioner | 1/22/2024 | 4/4/2025 | |
| | | | | |
| Chief Of Staff | Office of the Commissioner | 2/14/2022 | 1/12/2024 | |
| Chief Of Staff / Bureau Chief | Office of the Commissioner | 5/24/2024 | 3/11/2026 | Promoted to Chief of Department |
| Chief of Staff | Office of the Commissioner | 3/30/2026 | | |
| | | | | |
| Commissioner | Office of the Commissioner | 1/1/2022 | 12/8/2023 | |
| Commissioner | Office of the Commissioner | 12/8/2023 | 2/13/2026 | |
| Commissioner | Office of the Commissioner | 2/16/2026 | | |
| | | | | |
| Deputy Chief of Staff | Office of the Commissioner | 4/11/2022 | 4/18/2025 | |
| Deputy Chief of Staff | Office of the Commissioner | 8/18/2025 | 3/6/2026 | |
| Deputy Chief of Staff | Office of the Commissioner | 3/13/2026 | | |
| | | | | |
| Senior Advisor | Office of the Commissioner | 4/23/2026 | | |
| | | | | |
| Senior Deputy Chief of Staff | Office of the Commissioner | 10/21/2024 | 3/9/2026 | Transferred to Executive Agency Council, PREA |
| | | | | |
| First Deputy Commissioner | Office of the FDC | 3/5/2021 | 12/8/2023 | Promoted to Commissioner |
| First Deputy Commissioner | Office of the FDC | 2/2/2024 | 2/13/2026 | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| First Deputy Commissioner | Office of the FDC | 3/3/2026 | | |
| | | | | |
| Senior Deputy Commissioner | Office of the SDC | 10/31/2022 | 2/3/2023 | |
| Senior Deputy Commissioner | Office of the SDC | 10/26/2023 | 5/17/2024 | |
| Senior Deputy Commissioner | Office of the SDC | 11/18/2024 | 3/16/2026 | Transferred to DC of Special Investigations Unit/PREA |
| Senior Deputy Commissioner | Office of the SDC | 3/23/2026 | | |
| | | | | |
| Associate Commissioner | Operations | 11/9/2022 | 1/16/2024 | Position eliminated |
| Assistant Commissioner | Operations Research | 9/12/2022 | 6/16/2023 | Position eliminated |
| | | | | |
| Deputy Warden in Command | Outposted Therapeutic Housing Units | 3/30/2026 | | |
| | | | | |
| Deputy Commissioner | Policy and Strategy | 7/14/2026 | | |
| | | | | |
| Assistant Commissioner | Preparedness and Resilience | 4/11/2022 | 7/6/2025 | |
| Assistant Commissioner | Preparedness and Resilience | 12/3/2025 | | |
| | | | | |
| Assistant Commissioner | Program Operations | 3/18/2022 | 6/24/2023 | |
| | | | | |
| Assistant Commissioner | Programs | 1/20/2020 | | |
| Assistant Commissioner | Programs | 11/21/2024 | 2/4/2026 | |
| Assistant Commissioner | Programs | 12/5/2023 | | |
| Assistant Commissioner | Programs | 4/7/2022 | 7/21/2025 | Promoted to Associate Commissioner |
| Assistant Commissioner | Programs | 4/16/2026 | | |
| Assistant Commissioner | Programs | 7/10/2026 | | |
| | | | | |
| Associate Commissioner | Programs | 3/14/2022 | 9/29/2023 | |
| Associate Commissioner | Programs | 11/13/2023 | 11/29/2024 | |
| Associate Commissioner | Programs | 7/21/2025 | | |
| | | | | |
| Deputy Commissioner | Programs | 9/6/2021 | 2/2/2024 | Promoted to First Deputy Commissioner |
| Deputy Commissioner | Programs | 11/29/2024 | | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| | | | | |
| Assistant Commissioner | Public Information | 1/30/2023 | 7/28/2024 | |
| Assistant Commissioner | Public Information | 11/25/2025 | | |
| Assistant Commissioner | Public Information | 12/10/2025 | 5/11/2026 | |
| | | | | |
| Deputy Commissioner | Public Information | 7/1/2022 | 4/14/2023 | |
| Deputy Commissioner | Public Information | 5/3/2023 | 6/30/2024 | |
| Deputy Commissioner | Public Information | 11/18/2024 | | |
| | | | | |
| Assistant Commissioner | Research Evaluation and Grants (OMAP) | 11/12/2025 | | |
| | | | | |
| Associate Commissioner | Security | 9/18/2025 | 6/22/2026 | |
| | | | | |
| Assistant Chief of Security | Security Operations | 5/24/2024 | 3/11/2026 | Promoted to Bureau Chief of Facility Operations and Security |
| | | | | |
| Assistant Commissioner | Security Operations | 4/3/2023 | 5/6/2024 | Moved to AC of OBCC |
| | | | | |
| Deputy Commissioner | Security Operations | 5/16/2022 | 10/29/2024 | |
| Deputy Commissioner | Security, Classification, Custody Management, and Facility Operations | 10/30/2024 | 2/19/2026 | |
| | | | | |
| Deputy Commissioner | Special Investigations Unit | 3/16/2026 | | |
| | | | | |
| Assistant Commissioner | Special Investigations Unit/PREA | 12/19/2022 | 7/18/2025 | |
| Assistant Commissioner | Special Investigations Unit | 12/23/2025 | | |
| | | | | |
| Executive Agency Counsel | PREA | 3/9/2026 | | Previously Senior Deputy Chief of Staff |
| | | | | |
| Deputy Commissioner | Strategic Operations | 4/8/2024 | 4/16/2026 | |
| | | | | |
| Assistant Commissioner | Strategic Initiatives | 11/13/2023 | | |
| | | | | |

| TITLE | DIVISION/BUREAU | APPOINTMENT DATE | END DATE | NOTES |
|---|---|---|---|---|
| Deputy Commissioner | Training Academy | 12/5/2022 | 1/16/2024 | |
| Deputy Commissioner | Training Academy | 1/17/2024 | 11/26/2024 | Acting Capacity |
| Deputy Commissioner | Training Academy | 11/26/2024 | | |
| | | | | |
| Assistant Commissioner | Training Academy | 9/6/2022 | 9/17/2022 | |
| Assistant Commissioner | Training Academy | 1/30/2023 | 7/18/2026 | Served as Acting Deputy Commissioner from 1/17/2024 to 11/26/2024 |
| | | | | |
| Assistant Commissioner | Trials | 11/12/2025 | | |
| | | | | |
| Associate Commissioner | Trials | 8/8/2022 | 8/2/2023 | Promoted to DC of Investigations |
| Associate Commissioner | Trials | 11/25/2025 | | |
| | | | | |
| Deputy Commissioner | Trials | 5/31/2022 | 7/22/2026 | |

# APPENDIX I:
# INTAKE

## Update on Processing of New Admissions

The Monitoring Team provides an update about processing people newly admitted to the Department ("New Admissions") because it relates to a number of provisions[351] in the *Nunez* Court Orders related to the Department's use of Intake, and because of the Court's March 13, 2023 Order (dkt. 511) regarding these operations.

New Admissions procedures remain as described in the Monitor's February 3, 2023 Report at pgs. 15-18 and Appendix A and the Monitor's April 3, 2023 Report at pgs. 74-75. The New Admissions process is currently governed by Operations Order 22/07 dated December 14, 2007.[352] Overall, since the Monitoring Team began scrutinizing new admissions processing during the 17th Monitoring Period, the Department has been able to process *most* incarcerated individuals through Intake within 24 hours, using either custody time or arrival time to calculate their stay in Intake.

---

[351] Three distinct intake provisions are included in the Court's First Remedial Order, Second Remedial Order, and Action Plan in response to concerning reports about poor conditions and excessive lengths of stay in intake units. They are:

- First Remedial Order (dkt. 350): ¶ A(3) (Revised De-Escalation Protocol). This provision requires the Department to implement a de-escalation protocol to minimize the use of intake following use of force incidents.
- Second Remedial Order (dkt. 398): ¶ 1(i)(c). This provision requires the Department to process all incarcerated individuals, including new admissions and inter/intra facility transfers, through intake and place them in an assigned housing unit within 24 hours. The Department must also develop and implement a reliable system to track and record the amount of time an individual is held in intake and document any instance when an individual remains in intake for more than 24 hours.
- Action Plan (dkt. 465): § D, ¶ 2(b) and § E, ¶ (3)(a)-(b). These Action Plan requirements reiterate the intake-related requirements in the First and Second Remedial Orders (described above). They also require the Classification Manager and the Security Operations Manager to collaborate to reduce the reliance on intake and to timely process individuals through intake.

[352] The policy was updated in early 2023 but was rescinded in June 2023 because the Department had not consulted with the Monitoring Team on the changes prior to promulgation. Revisions to the policy have not been prioritized, given the Department's need to focus on other higher priority initiatives.

## TABLE 1(A): LENGTH OF STAY IN INTAKE FOR MALE NEW ADMISSIONS

As shown in the table below, since the 17th Monitoring Period, most male new admissions are processed through Intake within 24 hours, using either custody time or arrival time to calculate their stay.[353]

| Monitoring Period | Per Custody Time | | Per Arrival Time | |
|---|---|---|---|---|
| | # PIC | % | # PIC | % |
| July to December 2023 – 17th Monitoring Period | 8,668 | 94% | 8,848 | 96% |
| January to June 2024 – 18th Monitoring Period | 9,368 | 93% | 9,563 | 95% |
| July to December 2024 – 19th Monitoring Period | 9,046 | 91% | 9,260 | 93% |
| January to June 2025 – 20th Monitoring Period | 9,357 | 90% | 9,606 | 93% |
| July to December 2025 – 21st Monitoring Period | 9,262 | 91% | 9,487 | 93% |
| January to June 2026 – 22nd Monitoring Period | 8,888 | 91% | 9,093 | 93% |

353 One of two data points can be used as the "start time" when tracking length of stay in intake: (1) "custody time" refers to the time that an individual is transferred from NYPD to NYC DOC Custody, which typically occurs in a court setting; (2) "arrival time" refers to the time that an individual arrives at an intake unit on Rikers Island (typically at EMTC, although a small number of people may be processed through intake at West Facility in response to individual circumstances such as health or security considerations).

As noted in the Monitor's February 3, 2023 Special Report on Intake (dkt. 504), the Monitoring Team assesses the time each person arrives in the intake unit (*i.e.*, "arrival time") compared to the time the individual is transported to their assigned housing unit when calculating whether the 24-hour requirement has been met. Counsel for the Plaintiff Class has advised the Monitoring Team that it believes that the assessment of compliance should be based on the time an individual is taken into custody (*i.e.*, "custody time"). Discussions about the appropriate compliance standard will occur in conjunction with the discussion related to clock stoppages. Given that, this report provides outcomes using both data points for the Court's consideration.

## TABLE 1(B): LENGTH OF STAY IN INTAKE FOR MALE NEW ADMISSIONS

As shown in the section under the orange bar in the table below, during the current Monitoring Period, 91% (per custody time) and 93% (per arrival time) of male new admissions were processed through Intake within 24 hours. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below.

The data beneath the green bar in the table below shows the total length of stay for the small proportion of individuals whose processing did not meet the 24-hour timeline. During this Monitoring Period, most of those individuals who did not meet the 24-hour timeline were housed 9 hours late or less (between 24 and 33 hours after admission; 65% of those housed late using custody time and 77% of those housed late using arrival time).

| **Intake Processing Times for New Admissions Arriving at EMTC Intake January to June 2026** | | | | |
|---|---|---|---|---|
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **n=9,778** | **%** | **n=9,778** | **%** |
| Housed/Discharged within 24 hours | 8,888 | 91% | 9,093 | 93% |
| Housed/Discharged beyond 24 hours | 890 | 9% | 685 | 7% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **n=890** | **%** | **n=685** | **%** |
| 24-27 hours (≤ 3 hrs.) | 194 | 21.8% | 204 | 29.8% |
| 27-30 hours (3-6 hrs.) | 213 | 24.0% | 186 | 27.2% |
| 30-33 hours (6-9 hrs.) | 174 | 19.6% | 140 | 20.4% |
| 33-36 hours (9-12 hrs.) | 152 | 17.0% | 87 | 12.7% |
| 36-48 hours (12-24 hrs.) | 101 | 11.3% | 39 | 5.7% |
| More than 48 hours (≥24 hrs.) | 56 | 6.3% | 29 | 4.2% |

## TABLE 2(A): LENGTH OF STAY IN INTAKE FOR FEMALE NEW ADMISSIONS

Similarly, most female new admissions are processed within 24 hours (using either custody time or arrival time to calculate the length of stay). Since the 17th Monitoring Period, both metrics have consistently been above 90%.

| Monitoring Period | Per Custody Time | | Per Arrival Time | |
|---|---|---|---|---|
| | # PIC | % | # PIC | % |
| July to December 2023 – 17th Monitoring Period | 796 | 93% | 818 | 95% |
| January to June 2024 – 18th Monitoring Period | 939 | 93% | 957 | 95% |
| July to December 2024 – 19th Monitoring Period | 973 | 92% | 1,001 | 95% |
| January to June 2025 – 20th Monitoring Period | 1,073 | 93% | 1,118 | 97% |
| July to December 2025 – 21st Monitoring Period | 1,010 | 90% | 1,043 | 93% |
| January to June 2026 – 22nd Monitoring Period | 947 | 92% | 973 | 94% |

## TABLE 2(B): LENGTH OF STAY IN INTAKE FOR FEMALE NEW ADMISSIONS

Female new admissions are processed through an Intake unit at RMSC and then transferred to a housing unit within RMSC. As shown in the section under the orange bar in the RMSC table below, during the current Monitoring Period, 92% (per custody time) and 94% (per arrival time) of female new admissions were processed through Intake within 24 hours. These calculations were made using a continuously running clock, *without deducting time for clock stoppages*, which are described in more detail below.

The data beneath the green bar in the table below shows the total length of stay for the small proportion of female new admissions whose processing did not meet the 24-hour timeline. During this Monitoring Period, most of those individuals who did not meet the 24-hour timeline were housed 9 hours late or less (between 24 and 33 hours after admission; 79% of those housed late using custody time and 78% of those housed late using arrival time).

| **Intake Processing Times for New Admissions Arriving at RMSC Intake<br>January to June 2026** | | | | |
|---|---|---|---|---|
| **Outcome** | **Per Custody Time** | | **Per Arrival Time** | |
| | **n=1,032** | **%** | **n=1,032** | **%** |
| Housed/Discharged within 24 hours | 947 | 92% | 973 | 94% |
| Housed/Discharged beyond 24 hours | 85 | 8% | 59 | 6% |
| **Length of Stay ("LOS") Beyond 24 Hours** | | | | |
| **LOS (# hrs. overdue)** | **n=85** | **%** | **n=59** | **%** |
| 24-27 hours (≤ 3 hrs.) | 30 | 35.3% | 24 | 40.7% |
| 27-30 hours (3-6 hrs.) | 17 | 20.0% | 15 | 25.4% |
| 30-33 hours (6-9 hrs.) | 20 | 23.5% | 7 | 11.9% |
| 33-36 hours (9-12 hrs.) | 6 | 7.1% | 4 | 6.8% |
| 36-48 hours (12-24 hrs.) | 8 | 9.4% | 5 | 8.4% |
| More than 48 hours (≥24 hrs.) | 4 | 4.7% | 4 | 6.8% |

**Temporarily Suspending New Admission Processing, a.k.a. Clock-Stoppage**

Historically, the Department has identified circumstances in which new admission Intake processing is interrupted and has tolled its accounting of the processing time (*i.e.*, "stopped the clock") until the circumstance is resolved and processing can resume.[354] This includes when:

- An individual is returned to court before the Intake process is completed.
- An individual refuses to participate in Intake processing.
- An individual is transferred to a hospital or Urgi-Care (a clinic in another facility on Rikers Island) before the Intake process is complete.
- An individual makes bail and is released from custody before the Intake process is complete.

Suspending Intake processing appears logical (*e.g.*, processing cannot occur if the person is not physically present) and may also be functional (*e.g.*, Department or CHS staff need to know that an individual will not be presented for a certain procedure).

During the current Monitoring Period, most individuals newly admitted to the Department (85% or 8,285 of 9,778 male new admissions; and 82% or 851 of 1,032 female new admissions) were processed through Intake without the process being suspended for any reason. Further, the fact that the Intake process may have been suspended did not necessarily mean that the individual was not processed within 24 hours. In fact, among the 1,493 male new admissions whose Intake process was suspended for some period, 642 were housed within 24 hours by custody time (43%) and 830 by arrival time (56%). For the 181 female new admissions whose Intake process was suspended for some period, 98 were housed within 24 hours by custody time (54%) and 120 by arrival time (66%). Among those whose Intake process was temporarily suspended and whose processing lasted more than 24 hours, the largest category of suspensions occurred when the individual was required to return to court (75% of male suspensions per custody time; 82% of male suspensions per arrival time; and 60% of female suspensions per custody time; 62% of female suspensions per arrival time).

Notably, although the Department tracks all clock stoppages, the data presented in the sections above regarding the 24-hour timeline utilized a continuously running clock, *without*

[354] *See* Monitor's February 3, 2023 Report at pgs. 17 and 19-20; and Monitor's April 3, 2023 Report at pgs. 79-81.

*deducting any time when processing was suspended.* Accordingly, over 90% of individuals are consistently processed within 24 hours even if the clock is suspended for some period of time.

**NCU's Audits to Verify Data Entry**

The *Nunez* Compliance Unit has continued its audit strategy to corroborate the time entries in the New Admission Dashboard for male new admissions at EMTC using Genetec footage.[355] NCU's conducts audits once every two months. Accordingly, during this Monitoring Period, audits occurred in January, March, and May 2026. The results of these audits are summarized below.[356]

- 60 of 60 people (100%) arrived in Intake and were processed and transferred to a housing unit within the 24-hour timeline (confirmed via Genetec review).
- 60 of 60 arrival time entries (100%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec).
- 53 of 55[357] housing time entries (100%) were generally accurate (*i.e.*, within 20 minutes of the time shown on Genetec). Of the two inaccuracies, one cited a time *before* the person actually arrived, and one cited a time *after* the person actually arrived.
- 2 of 60 people (3%) had "clock stoppages" during the Intake process. Both of these individuals were housed within 24 hours of their arrival time in Intake.

The NCU's random audits for the current Monitoring Period continue to indicate that time entries are generally accurate and reliable, and time entry errors are not common.

**New Admission Process and Recent Physical Plant Updates at EMTC**

The staffing and operations of EMTC's Intake/New Admissions area remain consistent with the prior Monitoring Period. Facility leadership reports that it continues to staff the area across all tours with a New Admissions Expeditor, a captain, an Assistant Deputy Warden, and correction officers assigned to intake operations. The Expeditor continues to maintain the

[355] *See* Monitor's February 3, 2023 Report at pgs. 20-22 and Monitor's April 3, 2023 Report at pgs. 78-79. NCU does not conduct audits for female new admissions at RMSC.

[356] NCU confirms the status of all individuals in the intake unit to determine whether they are a new admission or if the individual may already have been in custody and is therefore in intake as an inter/intra facility transfer. The audit is limited to those individuals confirmed as new admissions.

[357] Five individuals were excluded from the Housing Time calculation because they were discharged during their admission process and thus the housing time was not applicable.

dashboard each tour. In May 2026, the facility added an officer on an additional day tour to assist with searches and escorts of court returns so that other Intake staff can remain in place and continue processing new admissions. An additional staff member may be added for further efficiency.

There have been some additional physical plant changes in this Monitoring Period. Facility leadership reported that a new holding pen was constructed in Intake near the clinic and body scanner, but it remains unavailable pending SCOC approval. The facility also reported modifying the mental health evaluation area by removing a wall to create additional cubicle space, adding mirrors to improve visibility of movement, and repositioning security cameras so they no longer capture the medical evaluation areas.

# APPENDIX J: UPDATES ON TECHNOLOGY INITIATIVES

Below is a list of IT initiatives that have recently been completed or are in various stages of progress.

**Security & Operations Initiatives**

- **Recidiviz**: The Department reports it continues to evaluate Recidiviz, a nonprofit technology platform intended to support Programs staff in documenting case manager/ incarcerated individual interactions and providing continuity across case managers. The Department previously reported that it did not receive new-needs funding for this initiative and would therefore proceed with a scaled-down Phase 1, using limited philanthropic funding, to provide certain basic information that incarcerated individuals had identified as a high priority. The Department reports it has developed a Phase 0, which provides incarcerated individuals with access to the NYPL Connections Guide in digital, searchable form on their tablets, while Recidiviz continues user interface research into what information would be most relevant to incarcerated individuals for a soon-to-follow Phase 1.

- **Electronic Logbook**: The Electronic Logbook pilot remains active at OBCC. The system is also running in all housing areas at the Bellevue Hospital Therapeutic Unit. IT continues to work with Facility Operations to roll out the Electronic Logbook across the system. The electronic logbooks were successfully rolled out in all "A" posts in OBCC. Officers in GRVC are currently being trained to use the system along with the Clinic Production Tracking System.

- **Incarcerated Individual Service Delivery Tracker (IISD)**: The Department reports it has developed a mobile and web-based application to document services provided to incarcerated individuals, such as laundry & linen exchange, recreation, clinic visits, court, and commissary. The application includes barcode scanning to expedite identification. The Department reports it has provided tablets to the Law Library and uses the system to track certain service-delivery information, including access to the Law Library. The Department reports it continues to consider expansion to other services.

- **Search & Contraband Tracking System (SSTS)**: The Department reports it is piloting a tablet-based system for documenting ESU, SRT, and SST search operations in real time, including team planning, contraband findings, and related notifications. The

Department reports the project has moved slowly due to competing priorities and technical issues affecting facility use, but it remains functional for ESU, SRT, and SST needs. The Department reports it continues to work on expanding the system to cover the K-9 units, and has identified a need to extend it to additional areas, including facility searches, the Facilities unit, and the Mail Trailer. This initiative is also discussed in the Searches and Identify/Recover contraband compliance assessment for Action Plan, § D., ¶ 2(d) and (e) and August 10, 2023 Order, § I., ¶ 2.

- **Incident Reporting System**: The Department reports it is overhauling the incident reporting system to align with State Commission of Correction (SCOC) standards and streamline submissions to the State's eJustice platform. This project remains pending. This initiative is also discussed in the Use of Force Reporting compliance assessment for Consent Judgment § V., ¶ 2.
- **911 Cellular:** This initiative provides a cellular panic-button capability for civilian staff. The Department reports that deployment is underway at RNDC, the first facility to receive the devices.
- **Program Services Tracking**: A system is in place for the Division of Programs to track program delivery and attendance among incarcerated individuals. The Division of Programs and Community Partnerships reports this initiative has been implemented and continues to receive ongoing enhancements as per the needs of the division.
- **Clinic Production Tracking**: The Department reports that it collaborated with CHS to develop an electronic system to track clinic call-downs, production, and refusals. The pilot launched at NIC in December 2025 and continues to progress in coordination with CHS. The Department expects GRVC to be the next facility to implement the electronic clinic-tracking system, and training for GRVC officers is underway. Department hopes to complete a Department-wide rollout in 2027. . IT reports it is also working to add data elements and mobile functionality so escort officers can document refusals and clinic escorts in real time. This initiative is discussed in more detail in the Providing Medical Attention Following A Use of Force Incident compliance assessment for Consent Judgment § V., ¶ 22.

- **Audits & Inspections Management System (AIMS)**: The Department reports it is testing a web and mobile platform to allow units such as Fire Safety and Environmental Health to schedule and document inspections. According to the Department, this platform went live in October 2025. The Environmental Health Unit (EHU) identified certain enhancements needed to more effectively document its findings; those enhancements were completed and rolled out in May 2026. IT reports it continues to collect feedback from EHU and to make additional enhancements as requested. In addition, the Office of Policy Compliance (OPC) and the Internal Audit Unit (IAU) have expressed renewed interest in using the system, which was already built to accommodate their requirements. IT will engage those units in the coming months to determine their readiness and, if necessary, provide retraining.

- **Idemia LiveScan**: The Department reports that it continues to move forward with Idemia LiveScan, which consists of machines and software for the collection of fingerprints and other biometric data. The necessary equipment was delivered and is currently in the process of being installed by the vendor.

- **Staff Body Scanning**: The Department reports the Certificate to Proceed (funding) request was approved by the City, and the Department has begun initiating procurement of the upgraded staff body scanners. IT intends to order scanners in smaller batches based on operational need, rather than through one large order, to support quicker vendor delivery and a more manageable rollout. One new machine was installed at OTXB when that facility was brought online. IT reported it has worked with the vendor through several cycles of refinement to ensure the machine met the Department's requirements, and setup is now complete. IT reports it is working with the Security Operations Division (SOD) to train staff and place that machine in use. In parallel, purchase orders have been issued for upgrades to machines at other facilities, and IT will work with the vendor in the coming months to complete that work. This initiative is also discussed in the Searches and Identify/Recover contraband compliance assessment for Action Plan, § D., ¶ 2(d) and (e) and August 10, 2023 Order, § I., ¶ 2.

## HR, Administration & Training Initiatives

- **ArmorerLink Firearms Tracking System**: This web-based platform manages firearm inventory, training, and qualifications and includes a mobile app for real-time documentation at the range. IT reports that it has fully built out the system and is working with the Academy to start rollout of the system in the upcoming weeks.
- **Email Accounts for All Staff**: The Department reports it is extending email access to all staff, including COs, to enhance communication and enable digital services. Nearly all staff now have an active email address, but the Department is developing a communication campaign to increase staff engagement with their email accounts.

## Health Management Division (HMD)

- **FMLA Tracking**: The Department reports HMD staff continue to receive FMLA requests directly from staff and enter those requests into a tracker and the electronic staff-scheduling system. IT reported it is nearing completion of Phase 2, which will digitally document FMLA approvals. Once rolled out, it will also allow HR staff to pull data showing how much FMLA each member of service is using, because approvals will be documented electronically. IT expects to demonstrate the system to stakeholders in fall 2026, after which it will work to roll it out.

## Investigations & Legal

- **CaseBuilder**: The Department reports it has introduced this case-management platform to support multiple divisions and improve data quality and efficiency in investigations. Following delays related to the platform's complexity, testing, and vendor-led training, the Department reported CaseBuilder went live for ID, Trials, and ICDU in April 2026. The platform is now in use, and as expected with a transition of this scale, users have encountered initial issues that IT continues to address in coordination with business stakeholders and the vendor. IT and the vendor are also working on data migration for additional business units, specifically EEO and CIB, while the Legal module is in the process of being built. The Department reports it will continue improving the system as users identify additional needs.

**<u>Other Projects</u>**

- **Self-Service Scheduling & Leave Requests**: A platform is being developed to allow staff to view schedules and request leave, OT, and mutuals from personal devices. IT reports it created a proof of concept, but the Department has not yet had time to pilot or further develop the initiative given competing priorities amongst the many Divisions involved.
- **Human Capital Management System (HCM)**: The Department reports it is preparing to implement an enterprise HR system that consolidates employee data and interfaces with city systems like the New York City Automated Personnel System (NYCAPS) and the Payroll Management System (PMS). The Human Capital Management System remains delayed. The Department reports it is working with the vendor to finalize a statement of work as well as with the Office of Management and Budget (OMB), Department of Citywide Administrative Services (DCAS), and the Office of Payroll Administration (OPA, formerly FISA) to complete a review and approval of the funding request.
- **Jail Management System (IIS Replacement)**: The Department reports it formally kicked off the Jail Management System/IIS replacement project with Microsoft in March 2026. The initiative remains on track and is intended to replace the Department's aging IIS system by managing incarcerated individual data and operational workflows. The Department reports it is working to automate data collection and entry at intake so staff can use a fully digitized intake process. However, this is a two-year project, and progress is expected to be incremental, with the full replacement not anticipated until 2028.
- **PIC Banking System (IFCOM Replacement)**: The Department reports it is preparing to replace the IFCOM system with a more robust solution for managing incarcerated individual finances. The Department notes it has identified a budget for this project and is currently working with the vendor to finalize the legal agreements prior to submitting it for OMB's funding approval.
- **Culinary Digital**: The Department reports it developed a web-based system to support Nutritional Services with recipe planning, inventory, menu compliance, and dietary tracking. Development is complete, and a go-live is currently being considered.

**Completed Initiatives**

The Department reports the following initiatives have been implemented and remain in place and operational, in some cases for an extended period of time:

- **Infractions Reporting & Tracking System**: The Department reports all three phases of the Infractions Reporting & Tracking System are now complete. Phase 1 addresses the initial creation and processing of infraction paperwork by the facilities, and Phase 2 addresses investigation of infractions and service of paperwork to incarcerated individuals. Phase 3, which covers hearings and dispositions, was completed and went live across all facilities on July 6, 2026. As a result, the entire infraction process is now automated. IT reports it is currently working to close the loop so that infractions documented in this system are automatically updated in IIS, a change expected to take effect during the first week of September.
- **PIC Lookup System (Enhancements)**: The Department reports that enhancements to the PIC Lookup System have been completed, allowing staff to more easily access comprehensive incarcerated individual profiles, including incident history, housing movements, program participation, infractions, and separation orders.
- **RapiScan Drug Detection System**: The Department reports it has implemented portable drug detection machines capable of swabbing and identifying multiple types of drugs in incoming mail and packages with a high degree of reliability. These machines also support chain of custody by printing time-stamped slips that specify the substance detected.
- **Body Worn Cameras**: The Department completed the rollout of Body-Worn Cameras ("BWC") across all major facilities, including the installation of docking stations in each location. In total, more than 4,000 cameras were deployed systemwide. The current cameras are scheduled for a full refresh/replacement cycle in December 2027.
- **PIC Identification Cards**: The Department reports it acquired ID cards, clips, and printers needed to reissue identification cards to incarcerated individuals. These cards facilitate identification during service delivery and the movement of individuals. The ID cards were first piloted in RMSC, followed by deployment in RNDC, NIC, WF, GRVC,

OBCC, RESH, and EMTC. All incarcerated individuals in these facilities now have ID cards.

- **Attendance Tracking**: The Department reports an electronic system is in place to replace paper sign-in sheets and provide real-time attendance data for uniformed staff. This initiative has been fully implemented and in place for an extended period. Future enhancements will be revisited to determine how to proceed.
- **Electronic Health Management System Enhancements**: The Department reports that existing HMD system was upgraded to support case management, medical fitness determinations, and tracking of MMR status. These enhancements have been fully completed and rolled out.
- **Recruitment Tracking**: The Department reports it has developed a mobile/web application that enables recruitment staff to log outreach efforts and track interested candidates for the CO exam. This initiative has been in place for almost two years.
- **Good Guy Letter Tracking**: The Department reports it now tracks requests for Good Guy Letters electronically to support retired officers seeking personal firearm licenses.
- **Officer Training Accountability System**: The Department reports a system is in place to ensure compliance with training requirements by capturing photos during LMS courses for auditing and identity verification. This initiative has been fully implemented and in place for over two years.
- **Vacation Bidding**: The Department reports it developed a digital system that has replaced paper-based vacation scheduling, allowing staff to submit ranked vacation picks which are processed in compliance with operational orders. The Department reports it has made electronic vacation bidding mandatory for this year's vacation pick process. Staff are required to submit vacation picks electronically through the system developed by IT. This initiative is complete.
- **TDY Tracker and Transfers**: The Department reports that it developed an electronic tracker that records uniformed MOS transfers and temporary duty assignments and displays current work locations in the Employee Lookup System. This system has been fully implemented.

- **Electronic Form 22R**: The Department reports an automated system for generating staff service records by pulling data from multiple sources has been developed. The module is now in pilot; while it has not yet been fully rolled out for Department-wide use, several management-level staff have access to the system and are using it.

# APPENDIX K:
# USE OF FORCE REPORTING

## TABLE 1: INDEPENDENT, COMPLETE, AND TIMELY STAFF REPORTS

The table below shows the number and timeliness of staff reports for reported and alleged uses of force from 2018 to April 2026.

| Timeliness of Staff Report | | | | | | |
|---|---|---|---|---|---|---|
| | Reported Uses of Force | | | Alleged Uses of Force | | |
| Year | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 24 Hours | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 72 Hours of the Allegation |
| 2018 | 15,172 | 12,709[358] | 83.8% | 139 | 125[359] | 89.9% |
| 2019 | 21,595 | 20,302 | 94.0% | 190 | 134 | 70.5% |
| 2020 | 19,272 | 17,634 | 91.5% | 136 | 94 | 69.1% |
| 2021 | 22,103 | 17,064 | 77.2% | 111 | 45 | 40.5% |
| 2022 | 17,700 | 14,776 | 83.5% | 93 | 42 | 45.2% |
| 2023 | 14,957 | 11,924 | 79.7% | 82 | 40 | 48.8% |
| 2024 | 16,307 | 13,116 | 80.4% | 93 | 48 | 51.6% |
| 2025 | 16,899 | 13,816 | 81.8% | 72 | 33 | 45.8% |
| Jan to Apr 2026[360] | 5,080 | 4,572 | 90% | 32 | 23 | 71.9% |

[358] NCU began to audit reports for *reported* uses of force in February 2018.

[359] NCU began collecting data for use of force *allegations* in May 2018.

[360] Due to the transition to CaseBuilder during the 22nd Monitoring Period, no audits on the timeliness of staff reporting could be performed for the months of May and June 2026. Audits are expected to resume in the 23rd Monitoring Period.

## TABLE 2: CLASSIFICATION OF USE OF FORCE INCIDENTS

The table below identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from 2018 to June 2026.

| | **2018** *6th & 7th MP* | **2019** *8th & 9th MP* | **2020** *10th & 11th MP* | **2021** *12th & 13th MP* | **2022** *14th & 15th MP* | **2023** *16th & 17th MP* | **2024** *18th & 19th MP* | **2025** *20th & 21st MP* | ***Jan to Jun 2026 22nd MP*** |
|---|---|---|---|---|---|---|---|---|---|
| **Total Incidents Reviewed** | 929 | 1,052 | 1,094 | 1,644 | 1,585 | 2,164 | 2,249 | 2,288 | 1,042 |
| **Incidents Classified Within COD Period**[361] | 909 (98%) | 1,023 (97%) | 1,079 (99%) | 1,226 (75%) | 1,238 (78%) | 1,991 (92%) | 2,029 (90%) | 1,759 (77%) | 1,023 (98%) |
| **Incidents Not Classified Within COD Period** | 20 (2%) | 29 (3%) | 15 (1%) | 418 (25%) | 347 (22%) | 173 (8%) | 220 (10%) | 529 (23%) | 19 (2%) |

361 The data is maintained in a manner that is most reasonably assessed using a two-week period ("COD Period"). The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less is sufficient to demonstrate compliance.

## TABLE 3: ALLEGED USE OF FORCE

The graph below shows the number of use of force allegations from 2016 to June 2026.



## TABLE 4: H+H STAFF REPORTING

The table below provides an overview of the reports provided by H+H staff from January 2018 to June 2026.

| H+H Staff Reports Submitted[362] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 (6th & 7th MP) | 2019 (8th & 9th MP) | 2020 (10th & 11th MP) | 2021 (12th & 13th MP) | 2022 (14th & 15th MP) | 2023 (16th & 17th MP) | 2024 (18th & 19th MP) | 2025 (20th & 21st MP) | Jan-Jun 2026 (22nd MP) |
| ***Total Reports and UOF Incidents*** | | | | | | | | | |
| **# of Reports Submitted** | 53 | 39 | 56 | 97 | 52 | 26 | 78 | 88 | 38 |
| **# of UOF Incidents Addressed** | 53 | 38 | 46 | 85 | 42 | 27 | 59 | 74 | 32 |
| ***Witness Reports*** | | | | | | | | | |
| **# of Witness Reports Submitted** | 29 | 18 | 45 | 70 | 36 | 18 | 59 | 73 | 33 |
| **# of Actual/Alleged UOF Incidents Addressed by Submitted Reports** | 31 | 15 | 36 | 64 | 25 | 18 | 45 | 61 | 28 |
| ***Relayed Allegations from Incarcerated Individuals*** | | | | | | | | | |
| **# of Reports Containing Allegations Relayed from PICs** | 24 | 21 | 11 | 27 | 16 | 8 | 19 | 15 | 5 |
| **# of Actual/Alleged UOF Incidents Addressed by Submitted Reports** | 22 | 23 | 10 | 22[363] | 19[364] | 9 | 15[365] | 14[366] | 4 |

[362] *See* Monitor's November 22, 2024 Report (dkt. 802) at pg. 79 for data on H+H reports submitted in July-December 2017 (the 5th MP).

[363] On one occasion for one use of force incident, we received both a witness report and a relayed allegation report for the same incident.

[364] On two separate occasions for two separate use of force incidents, we received both a witness report and a relayed allegation report for the same incident.

[365] On one occasion for one use of force incident, the Monitoring Team received both a witness report and a relayed allegation report for the same incident.

[366] On one occasion for one use of force incident, the Monitoring Team received both a witness report and a relayed allegation report for the same incident.

## TABLE 5: DOE WITNESS REPORTING

The table below identifies the number of use of force witness reports submitted by Department of Education staff from July 2024 to June 2026 and the number of use of force incidents the Monitoring Team's review suggests DOE staff may have witnessed.

| Monitoring Period | Number of UOF Witness Reports Submitted by DOE Staff | Number of UOF Incidents the Monitoring Team's Review Suggests DOE Staff May Have Witnessed |
|---|---|---|
| July-December 2024 | 0 | 4 |
| January-June 2025 | 0 | 7 |
| July-December 2025 | 2 | 6 |
| January-June 2026 | 1 [367] | 6 |

[367] DOE staff submitted one *additional* report for a use of force that was reported to them by an incarcerated individual but which they did not themselves witness. This incident is not included in the table.

## TABLE 6: MEDICAL WAIT TIMES

The table below presents wait times for medical treatment following use of force incidents from 2018 through June 2026.

| Wait Times for Medical Treatment Following a Use of Force | | | | | |
|---|---|---|---|---|---|
| | # of Medical Encounters Analyzed | % Seen within 2 hours or less | % Seen within 4 hours | % Seen within 6 hours | % Seen 6 hours or more |
| **2018** | 9,345 | 37% | 73% | 89% | 13% |
| **2019** | 11,809 | 43% | 81% | 92% | 9% |
| **2020** | 10,812 | 46% | 82% | 92% | 9% |
| **2021** | 14,745 | 39% | 70% | 81% | 20% |
| **2022** | 12,696 | 51% | 74% | 83% | 19% |
| **2023** | 11,513 | 54% | 81% | 91% | 10% |
| **2024** | 11,014 | 45% | 81% | 91% | 9% |
| **2025** | 12,458 | 37% | 75% | 89% | 11% |
| **Jan-Jun 2026** | 5,804 | 45% | 84% | 93% | 7% |

# APPENDIX L:
# RISK MANAGEMENT

## TABLE 1: STAFF ACTIVELY ON E.I.S.S. MONITORING

The table below shows the number of individuals on E.I.S.S. Monitoring during each Monitoring Period since 2020.

| Staff Actively Monitored on E.I.S.S. Program | | | | |
|---|---|---|---|---|
| **Monitoring Period** | **Date Covered** | **Tenured Staff** | **Probationary Staff** | **Total # of staff** |
| 10th MP | January-June 2020 | [redacted] | [redacted] | 96 |
| 11th MP | July-December 2020 | [redacted] | [redacted] | 106 |
| 12th MP | January-June 2021 | [redacted] | [redacted] | 91 |
| 13th MP | July-December 2021 | [redacted] | [redacted] | 37 |
| 14th MP | January-June 2022 | [redacted] | [redacted] | 80 |
| 15th MP | July-December 2022 | [redacted] | [redacted] | 97 |
| 16th MP | January-June 2023 | [redacted] | [redacted] | 137 |
| 17th MP | July-December 2023 | [redacted] | [redacted] | 135 |
| 18th MP | January-June 2024 | [redacted] | [redacted] | 143 |
| 19th MP | July-December 2024 | [redacted] | [redacted] | 72 |
| 20th MP | January-June 2025 | [redacted] | [redacted] | 111 |
| 21st MP | July-December 2025 | [redacted] | [redacted] | 134 |
| 22nd MP | January-June 2026 | 91 | 77 | 168 |

## TABLE 2: SCREENING AND PLACEMENT OF STAFF FOR E.I.S.S. MONITORING

The table below presents the number of staff screened for E.I.S.S. monitoring, the number placed on E.I.S.S. monitoring, and the status of staff E.I.S.S. monitoring periods from 2020 to June 2026. The table distinguishes, screening, placement and Monitoring, between tenured staff ("Ten.") and probationary staff ("Prob".)

| Period | Screening[368] | | | Placement[369] | | | Began Monitoring Term | | | Completed E.I.S.S. Program |
|---|---|---|---|---|---|---|---|---|---|---|
| | Ten. | Prob. | Total | Ten. | Prob. | Total | Ten. | Prob. | Total | |
| **2020** *full year* | 218 | 0 | **218** | 75 | 0 | **75** | 86 | 0 | **86** | **38** |
| **2021** *full year* | 117 | 0 | **117** | 77 | 0 | **77** | 46 | 0 | **46** | **21** |
| **2022** *full year* | 117 | 0 | **117** | 99 | 0 | **99** | 69 | 0 | **69** | **25** |
| **16th MP** *January to June 2023* | 66 | 0 | **66** | 63 | 0 | **63** | 61 | 0 | **61** | **17** |
| **17th MP** *July to December 2023* | 30 | 0 | **30** | 26 | 0 | **26** | 23 | 0 | **23** | **8** |
| **18th MP** *January to June 2024* | 59 | 0 | **59** | 41 | 0 | **41** | 21 | 0 | **21** | **4** |
| **19th MP** *July to December 2024* | 35 | 42 | **77** | 14 | 41 | **55** | 17 | 17 | **34** | **20** |
| **20th MP** *January to June 2025* | 15 | 43 | **58** | 9 | 43 | **52** | 15 | 28 | **43** | **9** |
| **21st MP** | 43 | 52 | **95** | 10 | 22 | **32** | 30 | 13 | **43** | **14** |

[368] The number of staff screened in a given period may include some staff who were screened in a prior period and were re-screened in the identified period.

[369] Not all staff selected for monitoring have been enrolled in the program. Certain staff left the Department before monitoring began. Others have not yet been placed on monitoring because they are on extended leaves of absence (*e.g.*, sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not initiate a staff member's monitoring term if the staff member has subsequently been placed on a post with no contact with incarcerated individuals, due to the limited opportunity for mentorship and guidance.

| **Period** | **Screening**[368] | | | **Placement**[369] | | | **Began Monitoring Term** | | | **Completed E.I.S.S. Program** |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Ten.** | **Prob.** | **Total** | **Ten.** | **Prob.** | **Total** | **Ten.** | **Prob.** | **Total** | |
| *July to December 2025* | | | | | | | | | | |
| **22nd MP** *January to June 2026* | 41 | 26 | **67** | 3 | 6 | **9** | 43 | 16 | **59** | **17** |

# Appendix M: Managing Individuals Under Age 19

## TABLE 1: RNDC'S RATES OF USE OF FORCE AND VIOLENCE

The table below identifies the rates of use of force and violence for the entire RNDC facility.

| RNDC's Rates of Use of Force and Violence, 2022 to June 2026 | | | | |
|---|---|---|---|---|
| | Use of Force | Stabbing/Slashing | Fights | Fires |
| 2022 | 12.5 | 1.2 | 9.9 | 1.6 |
| 2023 | 8.0 | 0.8 | 7.4 | 2.2 |
| 2024 | 6.8 | 0.6 | 8.6 | 0.9 |
| 2025 | 8.5 | 0.6 | 9.3 | 1.5 |
| Jan-Jun 2026 | 9.0 | 1.0 | 10.1 | 1.2 |

## TABLE 2: RNDC'S PROGRAMS ACTION PLAN ("RNDC ACTION PLAN")

The table below shows the key changes in safety-related indicators in the units covered by the RNDC Action Plan by comparing rates of violence and use of force to those in young adult housing areas before the RNDC Action Plan was implemented.

| RNDC Action Plan's Key Performance Indicator Rates, July 2024 to December 2025 | | | | | | |
|---|---|---|---|---|---|---|
| Incident Type | YA Baseline Rate (CY 2023) | Jul-Dec 2024 | Jan-Jun 2025 | Jul-Dec 2025 | Jan-Jun 2026 | 22nd MP % change from YA baseline |
| Use of Force | 3.0 | 2.1 | 2.2 | 1.7 | 1.7 | -43% decrease |
| Stabbing/Slashing | 0.5 | 0.3 | 0.2 | 0.2 | 0.3 | -40% decrease |
| Fights | 2.7 | 3.5 | 3.9 | 2.8 | 3.0 | +11% increase |
| Serious Injuries | 0.4 | 0.3 | 0.4 | 0.1 | 0.3 | -25% decrease |
| Assault on Staff | 1.0 | 0.2 | 0.3 | 0.2 | 0.3 | -70% decrease |

## TABLE 3: NCU'S CONSISTENT STAFFING AUDITS—CAPTAINS

The table below presents NCU's Steady Staffing audit results for captains. For the units covered by the RNDC Action Plan, the audit calculates the proportion of posts worked by steadily assigned staff using data from InTime. The table shows the proportion of posts worked by the assigned captain, and for those that were not, the reasons why this occurred.

| Results of NCU's Steady Staffing Audits—Captains | | | | |
|---|---|---|---|---|
| | 19th MP | 20th MP | 21st MP | 22nd MP |
| **Assigned Captain Worked the Post** | | | | |
| Assigned Captain Worked the Post | 73% | 67% | 66% | 59% |
| **Facility-Controlled Reasons that Assigned Captain Did Not Work Post** | | | | |
| Could Not Determine or No Steady Assigned | 12% | 2% | 14% | 31% |
| Assigned Elsewhere | 3% | 7% | 3% | 7% |
| **Staff-Controlled Reasons that Assigned Captain Did Not Work Post** | | | | |
| Mutual | 3% | 3% | 2% | 1% |
| Leave | 1% | 1% | 3% | <1% |
| Sick | ~ | 4% | 3% | 1% |
| Personal Emergency | 1% | <1% | ~ | <1% |
| AWOL | <1% | <1% | ~ | <1% |
| Time Due | ~ | <1% | 1% | <1% |
| 10-Hour Exemption | 2% | 4% | 1% | <1% |
| Vacation | 3% | 9% | 8% | 1% |

## TABLE 4: NCU'S CONSISTENT STAFFING AUDITS—OFFICERS

The table below presents NCU's Steady Staffing audit results for officers. For the units covered by the RNDC Action Plan, the audit calculates the proportion of posts worked by steadily assigned staff using data from InTime. The table shows the proportion of posts worked by the assigned officer, and for those that were not, the reasons why this occurred.

| Results of NCU's Steady Staffing Audits—Officers | | | | |
|---|---|---|---|---|
| | 19th MP | 20th MP | 21st MP | 22nd MP |
| **Assigned Officer Worked the Post** | | | | |
| Assigned Officer Worked the Post | 72% | 71% | 63% | 60% |
| **Facility-Controlled Reasons that Assigned Officer Did Not Work Post** | | | | |
| Could Not Determine or No Steady Assigned | 14% | 8% | 13% | 20% |
| Assigned Elsewhere | 1% | 2% | 7% | 5% |
| **Staff-Controlled Reasons that Assigned Officer Did Not Work Post** | | | | |
| Mutual | 3% | 2% | 2% | 1% |
| Leave | 3% | 6% | 4% | 7% |
| Sick | 1% | 3% | 2% | 2% |
| Personal Emergency | 1% | 1% | 2% | <1% |
| AWOL | 1% | <1% | 1% | <1% |
| Time Due | <1% | 1% | <1% | <1% |
| 10-Hour Exemption | 4% | 4% | 3% | <1% |
| Vacation | 1% | 3% | 3% | 3% |

# APPENDIX N: DOC PROCESS FLOW CHARTS

**Index of DOC Process Flow Charts**


- DOC Promotions Process
- DOC Rapid Review Process
- DOC Investigations Process
- DOC Command Discipline Process
- DOC Formal Disciplinary Process

# DOC Promotions Process



# NYC DOC Rapid Review Process



# NYC DOC Investigation Flow Chart



# NYC DOC Command Discipline (CD) Process: Violation to CD Hearing



# NYC DOC Command Discipline (CD) Process: CD Hearing Results

**CD Hearing**

↓

Hearing Officer renders a decision
*Within 3 business days after hearing*

↓

- If the Hearing Officer feels the charge is not substantiated, the CD is rejected and no formal record of the charge remains
- If the Hearing Officer feels the charges are substantiated, the Hearing Officer informs MOS of recommended penalty
- If Hearing Officer determines that a formal disciplinary charge is more appropriate, the CD is rejected and the Hearing Officer drafts a Memorandum of Complaint

If substantiated ↓

**Does MOS accept penalty?**

**Yes** → Penalty applied, HR informed, and matter is closed

**No** → MOS may appeal to ICDU CD Supervisor for review, and no penalty is applied until resolution
→ ICDU CD Supervisor reviews incident and renders decision
*Within 10 days of receiving appeal*

**VIOLATION SCHEDULES & PENALTIES**

| | | |
|---|---|---|
| **SCH A** | *Including, but not limited to:* Improper uniform; failure to wear BWC; failure to scan in/out | **Written reprimand / 1 vacation/comp day / retraining** |
| **SCH B** | *Including, but not limited to:* Unauthorized/unsafe vehicle use; failure to report unusual incidents; lateness (under 3 hrs); tobacco use | **Written reprimand / 2–4 vacation/comp days / retraining** |
| **SCH C** | *Including, but not limited to:* AWOL 1 tour; unauthorized property use; improper cuffing; unprofessional acts; inefficiency in duties | **3–5 vacation/comp days** |
| **SCH D** | *Including, but not limited to:* Loss of shield/ID; failure to remain vigilant; count failures; failure to wear or activate BWC during incident | **4–7 vacation/comp days** |
| **SCH E** | *Including, but not limited to:* Sleeping on duty; staff off-post (no incident); low-level UOF procedural violations; disobeying lawful supervisor orders | **6–10 vacation/comp days** |

# NYC DOC Command Discipline (CD) Process: ICDU CD Supervisor Appeal Review



# NYC DOC Command Discipline (CD) Process: Legal Division Appeal Review




**QUARTERLY OVERSIGHT**

A Legal Division attorney at rank of Deputy General Counsel or above shall conduct a quarterly assessment of the appeals process to ensure it is functioning as designed.

**RECORD EXPUNGEMENT**

CD charges are expunged from the member's institutional personnel folder after ONE calendar year from the violation date, provided the member has not been penalized in any subsequent CD proceeding or departmental disciplinary trial.

# Flowchart of Formal Disciplinary Process for Uniformed Staff




Process
Prosecution of Cases
Outcome
Closing Case Process
OATH proceeding scheduled if no settlement or if the Department is seeking termination.
Trials Administrative Assistant schedules all logistics of OATH including coordination with Respondent's Command.
OATH occurs four days a week and 10-12 cases can be heard each day (including UOF and other matters).
1 of 4 outcomes at OATH:
(1) NPA
(2) Trial
(3) Adjourned if Respondent doesn't appear
(4) Administratively File case
Beginning with the assignment of the case, throughout the prosecution process, Trials evaluates the case and may determine case should be
Administratively Filed
or
Deferred Prosecution.
Beginning with the assignment of the case, throughout the prosecution process, settlement may occur outside OATH.
NPA at OATH
Executed by Respondent, Respondent's Attorney & Trials Attorney
Trial
(if no NPA at OATH)
&
ALJ renders a
Report & Recommendation
("R&R")
Administrative Filing
or
Deferred Prosecution
OATH Timelines
OATH Trial must be scheduled within 50 days of OATH PTC date
OATH Trials must be completed within 3 weeks
OATH R&R must be issued within 45 days of the final trial date
Trials Attorney drafts closing report within 2 weeks of receipt of:
• NPA executed
• ALJ Decision Received
• Administratively Filed Decision
• Deferred Prosecution Decision
Trials Deputy Commissioner reviews and approves closing memo.
If NPA or R&R
Commissioner reviews and either approves or modifies outcome.
If Administratively Filed or Deferred Prosecution
Case Closed
Case Closed & Returned to Trials
AND
Discipline Imposed
Respondent may appeal ALJ decision through Article 78 or Civil Service Commission.